IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

PATRICK NATHANIEL REED,

    PLAINTIFF,

v.

BRANDEL EUGENE CHAMBLEE;
TGC, LLC d/b/a Golf Channel;
DAMON HACK; BENJAMIN SHANE
BACON; EAMON LYNCH;
GANNETT SATELLITE
INFORMATION NETWORK, LLC
d/b/a Golfweek; GANNETT CO., INC.;
CONDE NAST INTERNATIONAL,
INC. d/b/a The New Yorker; and ZACH
HELFAND,

    DEFENDANTS.

_____/

CASE NO.  3:22-cv-01059-TJC-PDB

**DEFENDANTS GANNETT SATELLITE INFORMATION
NETWORK, LLC'S AND GANNETT CO., INC.'S MOTION
TO DISMISS AMENDED COMPLAINT AND FOR FEES
WITH SUPPORTING MEMORANDUM OF LAW**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Gannett

Satellite Information Network, LLC, d/b/a *Golfweek* ("Golfweek"), and Gannett Co.,

Inc. ("Gannett")[1] (collectively, the "Gannett Defendants") move to dismiss all counts

---

[1] Gannet Co., Inc., as the parent company of Golfweek (*see* Am. Compl. ¶ 10), is not a proper defendant here. It is "well settled" that parent corporations and their subsidiaries are separate and distinct legal entities and parent legal liability for the acts of its subsidiary cannot automatically be imposed by virtue of that relationship alone. *See Heidbrink v. ThinkDirect Marketing Grp., Inc.*, No. 8:14–cv–1232–T–30AEP, 2014 WL 3585698, at *3 (M.D. Fla. July 21, 2014) (citing *Reynolds Amer., Inc. v. Gero*, 56 So. 3d 117, 120 (Fla. 3d DCA 2011) (citations omitted)).  For this added reason, the case must be dismissed as to Gannett.

of the Amended Complaint against them. The bloated 101-page complaint purports to state claims for defamation, defamation per se, defamation by implication, and tortious interference. In every instance, Plaintiff Patrick Nathaniel Reed ("Reed" or "Plaintiff") fails to properly plead a claim as a matter of law. Further, the Gannett Defendants are entitled to an award of the attorney's fees and costs for this motion, pursuant to Section 768.295 of the Florida Statutes. Specific grounds for this motion are included in the Memorandum of Law. Most fundamentally, the publications at issue never mention Plaintiff. Moreover, they are rife with protected hyperbole, including Star Wars references and coined terms like "sportswashing."

## MEMORANDUM OF LAW

### Introduction

A long time ago in a galaxy far, far away. . . . a public figure could bring a defamation suit without proving the challenged statements were false statements of fact published with actual malice. This is the fictional galaxy where Reed's Amended Complaint exists. This second complaint comes after the Court *sua sponte* dismissed the initial complaint without prejudice for being a shotgun pleading that is "neither short nor plain," in contravention of the Federal Rules of Civil Procedure. *See* Order, ECF No. 27. Neither short nor plain, the Amended Complaint has grown in length and become more convoluted.[2] Reed rests his baseless claims on statements made in

---

[2] To pre-empt a second shotgun pleading from being filed, the Court's November 18, 2022 dismissal Order instructed Reed "to incorporate into each count only the factual allegations that are relevant to

two columns published in *Golfweek* magazine (collectively, the "Columns") – columns that *never once mention Reed*. Rather, they address matters of undeniable public interest: the ongoing galactic battle between two golf empires, the PGA Tour and its new competitor, LIV Golf ("LIV"), and the widespread public criticism of LIV for its financial ties to Saudi Arabia. The Columns essentially call LIV the "evil empire's . . . Death Star," criticize large payments that "sportswash Saudi atrocities," criticize using the sport of golf as a reputational "life raft" for the Saudi regime, and generally describe moving to LIV as "opting to cut and run for Saudi money" with "reputational consequences for the entire sport." Am. Compl. ¶¶ 101, 103; Ex. A; Ex. B. In the real world, the First Amendment protects such debate. To sue for defamation, the subject publication must be of or concerning the plaintiff. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 288, (1964); *Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 805 (Fla. 1st DCA 1997). Additionally, it must be provably false. The First Amendment certainly does not sanction liability for the rhetorical hyperbole and figurative epithets employed here. *See Greenbelt Co-op Pub. Ass'n v. Bresler*, 398 U.S. 6, 13-14 (1970). And public figures must plead and prove actual malice: knowledge of falsity or reckless disregard for the truth. *See Gertz v. Welch, Inc.*, 418 U.S. 323, 351-52 (1974); *Sullivan*, 376 U.S. at 279-80.  Plaintiff does not – and cannot. *See Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018): *Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016).

---

the respective causes of action." ECF 27 at 2. The Amended Complaint not only fails to do this, but now fails to incorporate *any* factual allegations into any count.

The tortious interference counts are barred by Florida's single action rule because they are based on the same facts that give rise to the defamation claims. *See*, *e.g.*, *Tymar Distrib. LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275, 1286-88. They, too, fail as a matter of law.

Further, as the 11th Circuit has cautioned, courts must carefully examine First Amendment activity because "there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." *Michel*, 816 F.3d at 702. Florida similarly seeks to protect speech from meritless litigation through its "anti-SLAPP" statute, § 768.295, Fla. Stat. Plaintiff's groundless litigation must be put to an end. Accordingly, the Gannett Defendants request that the Court dismiss the claims against them, with prejudice, and award fees.[3]

## BACKGROUND

Reed acknowledges his public figure status in describing himself as a "professional golfer" of "exceptional world-class golfing achievements." Am. Compl. ¶¶ 14, 15.  Despite his accomplishments, however, Reed has long been plagued with accusations of cheating. *See* Am. Compl. ¶¶ 76, 78-79, 86-88. In June 2022, Reed claims to have been "constructively terminated" as a member of the PGA Tour, *id.* at ¶ 15, which "is mainly engaged in the business of promoting professional golf tournaments throughout North America." *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 235

---

[3] State substantive law applies in this diversity action. *See Davis v. McKenzie*, No. 16-62499-CIV-COHN/SELTZER, 2017 WL 8809359, at *11 (S.D. Fla. Nov. 3, 2017); *adopted in full by Davis v. McKenzie,* No. 16-62499-CIV-COHN/SELTZER, 2018 WL 1813897 (S.D. Fla. Jan. 19, 2018).

F. Supp. 2d 1269, 1272 (M.D. Fla. 2002). He subsequently joined the PGA Tour's new competitor, LIV, which held its inaugural tournament the same month. Am. Compl. ¶¶ 15, 32. Reed is among "*many* professional golfers" who have jumped to LIV. *Id.* at ¶¶ 36-37.

As Reed admits, LIV "is a professional golf tour operating company which is financially backed by the Public Investment Fund of Saudi Arabia," *id.* at ¶ 28, "a sovereign wealth fund of the Kingdom of Saudi Arabia," *Sakab Saudi Holding Co. v. Aljabri*, No. 21-10529-NMG, 2021 WL 8999588, at *1 (D. Mass. Oct. 26, 2021). This, of course, means that LIV – for better or worse – has undeniably close, public ties to the Saudi regime, which has for decades been admonished for basic human rights deprivations. *See*, *e.g., Saudi Arabia v. Nelson*, 507 U.S. 349, 361 (1993) (describing the "Saudi Government's wrongful arrest, imprisonment, and torture of" an individual as a "monstrous" "abuse of power."); *CDM Smith Inc. v. Atasi*, 594 F. Supp. 3d 246, 256-57 (D. Mass. 2022) (noting a  U.S. Department of State report on the Kingdom found that its "law and practice discriminate against women, noncitizens, nonpracticing Sunni, Shia, and persons of other religions."); *Alayan v. Permanent Mission of Saudi Arabia to the U.N.*, No. 18-CV-10068, 2021 WL 1964078, at *2 (S.D.N.Y. May 17, 2021) (opining that plaintiff's concerns about a trial in Saudi Arabia due to "human rights scandals, the detention of women's rights activists, and the murder of a Saudi Journalist" were not trivial.) It is no surprise, then, that LIV's ties to the Saudi government have been widely condemned.

The first allegedly defamatory column, entitled "*PGA Tour's war with LIV Golf enters 'Return of the Jedi' phase*" (the "First Column"), was published on August 24, 2022. Am. Compl. ¶ 99 n. 11. A true and correct copy of the First Column is attached as **Exhibit A**.[4] This column examines the pitched battle between the PGA Tour and LIV, the "evil empire's (or kingdom's) Death Star." *See* Ex. A.

Ignoring the First Column's actual content, Plaintiff contends defamatory statements in that column include:

> 1) accusing LIV, and its golfers, prominently including Mr. Reed, as being the "**evil empire's . . . Death Star**," (2) accusing Mr. Reed and other LIV golfers of "**opt[ing] to cut and run for Saudi money**," and (3) publishing that Mr. Reed and other LIV golfers had endured "**reputational harm that comes with taking guaranteed cash to sportswash Saudi atrocities**."

Am. Compl. ¶ 101 (emphasis in original). Incredibly, however, the First Column never even mentions Reed. Here are actual quotes from the First Column (with the relevant portions in bold):

> (1) As [PGA] Tour commissioner Jay Monahan fought to ring-fence and then rally his troops in an effort to destroy the **evil empire's** (or kingdom's) **Death Star**, the price of player loyalty grew exponentially.
>
> (2) Some **opted to cut and run for Saudi money**, others to stay and fight—as much against the structure and complacency of their own Tour as against LIV.

---

[4] Although the Court's review of a motion to dismiss is generally limited to the "four corners" of the pleading, a court can consider documents integral to the complaint's allegations without the motion being converted into a summary judgment motion. *See Horsley v. Feldt*, 304 F.3d 1125, 1134-35 (11th Cir. 2002) (court could consider news article forming basis of defamation claim without converting the same to motion for summary judgment); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) ("[A] document need not be physically attached to a pleading to be incorporated by reference into it…."); *Brooks v. Blue Cross & Blue Shield of Fla.*, 116 F.3d 1364, 1369 (11th Cir. 1997) ("where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of motion to dismiss). Bottom line: The Court can consider the Columns.

> (3) In the case of Cameron Smith, much depends on whether the choice has already been made. Rumors suggest the world No. 2 will soon decamp to LIV. Today's announcement makes his reported price—$100 million—seem a poor return given what a player of his caliber could earn on the PGA Tour in the coming years, and without the **reputational harm that comes with taking guaranteed cash to sportswash Saudi atrocities**.

Ex. A (emphasis added).

The second allegedly defamatory publication, entitled "*LIV Golf's problems aren't limited to Greg Norman's Incompetence. Replacing him won't solve them.*" (the "Second Column"), was published on November 10, 2022. Am. Compl. ¶ 102. A true and correct copy of the Second Column is attached as **Exhibit B**. This column criticizes LIV's ties to the Saudi regime, while examining the possible effects of the ouster of LIV's CEO, Greg Norman. *See* Ex. B.

Reed specifically claims that the words in bold defame him:

> (1) "Team golf is a tough sell, but moreso [sic] when the product is lousy and **the association with a merciless regime too toxic for commercial sponsors**", and (2) "Whatever divisions need to be bridged in golf, whatever personal relationships must be healed, **doing so cannot involve offering the sport wholesale as a life raft for sportswashing ambitions in Riyadh. No amount of investment by the Saudi Arabian regime can be rendered respectable or accepted without dire reputational consequences for the entire sport. Golf cannot choose to host a cancer and expect to remain healthy.**"

Am. Compl. ¶ 103 (emphasis in original). Yet again, Reed is never mentioned or even referenced in the Second Column.

**The Counts**

**Counts XVI-XVIII** against Golfweek and virtually identical **Counts IX-XI** against Gannett (labeled "defamation," "defamation by implication," and "defamation per se") broadly charge that the Columns somehow defame Reed individually. *See id.* at ¶¶ 267-290, 296-319.

**Counts XXVII** (Golfweek) and **XXVIII** (Gannett) are claims for tortious interference premised again on the Columns. *Id.* at ¶¶390-401. They similarly claim the Gannett Defendants damaged Reed's business relationships by "spreading lies . . . in order to destroy his reputation." *Id.* at ¶¶ 338, 343.

Each baseless count must be dismissed as a matter of law.

## LEGAL ARGUMENT

On a motion to dismiss a complaint for failure to state a claim, a court "must accept the allegations of the complaint as true and must construe the facts alleged in the light most favorable to the plaintiff." *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994). "However, conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003) (citation omitted). Plaintiffs cannot simply regurgitate labels, conclusions, and "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The touchstone is that "to survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

As the 11th Circuit has noted, testing a complaint against the plausibility standard is critical in public figure defamation suits, like this one:

> [T]here is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation. Indeed, the actual malice standard was designed to allow publishers the "breathing space" needed to ensure robust reporting on public figures and events. *Sullivan*, 376 U.S. at 271-72 . . . . Forcing publishers to defend inappropriate suits through expensive discovery proceedings in all cases would constrict that breathing space in exactly the manner the actual malice standard was intended to prevent. The costs and efforts required to defend a lawsuit through that stage of litigation could chill free speech nearly as effectively as the absence of the actual malice standard altogether.

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).

The *Michel* warnings ring true here. Plaintiff will undoubtedly seek substantial discovery in the futile hope of unearthing proof of the wild allegations he and his counsel have concocted out of nothing more than the Gannett Defendants' publication of newsworthy commentary about a controversy surrounding professional golf. *Michel* makes clear that this Court plays a critical gatekeeper role in preventing that type of assault on the press and its free speech rights. As demonstrated below, Plaintiff's ridiculously speculative pleading fails to state any claim and should be dismissed now.

## I.   THE FAILED DEFAMATION CLAIMS

"Under Florida law, to state a defamation claim, the plaintiffs must allege: (1) a false and defamatory statement of and concerning the plaintiff; (2) an unprivileged publication to a third party; (3) fault on the part of the publisher; and (4) damages."

*Sanchez Sifonte v. Fonseca*, No. 21-CV-20543-O'SULLIVAN, 2021 WL 5086297, at *3 (S.D. Fla. Nov. 1, 2021); *see also Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)).  To allege fault, "[a] public figure plaintiff must establish 'actual malice.'" *Mile Marker, Inc. v. Petersen Pub., LLC*, 811 So. 2d 841, 845 (Fla. 4th DCA 2002). As discussed below, the Amended Complaint is fatally flawed.[5]

### A. Plaintiff Can Never Plausibly Plead 'Of and Concerning' Element

Most fundamentally, defamatory statements must be "of and concerning" the plaintiff.  *See Molenda v. Hoechst Celanese Corp.*, 60 F. Supp. 2d 1294, 1303 (S.D. Fla. 1999), *aff'd*, 212 F.3d 600 (11th Cir. 2000) (table); *see also, e.g.*, *Baker v. McDonald's Corp.*, 686 F. Supp. 1474, 1484 (S.D. Fla. 1987), aff'd, 865 F.2d 1272 (11th Cir. 1988) (table); *Mile Marker, Inc.*, 811 So. 2d at 845; *Thomas*, 699 So. 2d 800. This requirement is of constitutional magnitude.  *See Sullivan*, 376 U.S. at 288.  Consequently, a plaintiff is "required to show specific reference" to himself in an allegedly defamatory statement. *Rosenblatt v. Baer*, 383 U.S. 75, 83 (1966).  To meet this burden, a plaintiff must demonstrate that a reader would understand the passages in question actually refer to him.  *See, e.g.*, *Beres v. Daily Journal Corp.*, No. 0:22-cv-60123-WPD, 2022 WL 805733, at *4 (S.D. Fla. Mar. 8, 2022).

---

[5] Reed purports to allege separate claims for defamation, defamation per se, and defamation by implication. With respect to defamation by implication, Plaintiff does not allege how any of the statements were actually true but convey a false and defamatory implication, dooming this theory. *See Jews for Jesus*, 997 So. 2d at 1106 (defamation by implication is based on true statements used to imply a defamatory meaning). Even had he alleged a proper implication claim, "all of the protections of defamation law that are afforded to the media" apply. *See id.* at 1108 & n.13.

Here, Reed is never mentioned – or even alluded to – anywhere in the Columns. Instead, the First Column describes the extent to which the PGA Tour and its commissioner will go to keep players from defecting to LIV. *See* Ex. A (noting "the [PGA Tour's] price of player loyalty grew exponentially. The final bill . . . isn't cheap,'" and that "top players receive a lot more reward: significantly increased purses, often fewer guys to beat for the money, [and] enormous bonus programs," among other things). The Column characterizes the Tour's actions as "an effort to destroy the evil empire's (or kingdom's) Death Star," (i.e., LIV) and dissuade players from jumping ship to the "Saudi-funded" association. *See id.* Several PGA Tour and LIV golfers are mentioned in the Column, but Reed is not.

The Second Column similarly covers the widespread criticism of LIV's significant ties to the Saudi government and further notes LIV's "strategic shortcomings and managerial ineptitude." *See* Ex. B. The column posits that a change in LIV's executive leadership will not fix the problems and pushes against a hypothetical outcry for the PGA Tour to come to LIV's aid "for the good of the game." *Id.* No LIV players, much less Reed, are mentioned in the Second Column.

Yet, Reed proclaims "where the Defendants are making false and misleading statements regarding LIV and its players, it is reasonably understood by an objective viewer/listener that the Defendants are making these statements of and concerning Mr. Reed." Am. Compl. ¶ 39. Essentially, Plaintiff takes personal offense at any mention of the golf profession, LIV, or anyone associated with LIV, from the Saudi regime to LIV's CEO. Defamation law obviously does not countenance an individual

attacking speech that is not about them. *See Thomas*, 699 So. 2d at 805. For this reason alone, any claim premised on the Columns is fatally flawed.

Apparently, Plaintiff is grasping for a group libel theory. Even if the Columns were reasonably about a group, alleged defamation "concerning a group . . . is subject to liability [as] to an individual member of it if, but only if, (a) the group or class is so small that the matter can reasonably be understood to refer to the member, or (b) the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member." *Id.* at 804 (quoting Restatement (Second) of Torts § 564A (Am. Law. Inst. 1977)). Neither circumstance exists here.

Reed himself recognizes he is merely one of the "*many* top professional golfers" who "have decided to join LIV." Am. Compl. ¶ 42 (emphasis added). In fact, there are currently over 65 professional LIV golfers.[6] Reed cannot plausibly claim that all statements about LIV or even LIV players are of and concerning him, individually. *See Thomas*, 699 So. 2d at 805 (affirming dismissal of defamation case because the statements focused on commercial net fishing generally, so they were not of and concerning any individual fishermen). Even statements about LIV players as a group could not be of and concerning any one player because the LIV group is too large.

Defamation "[p]laintiffs face a difficult task when the statements concern groups; when a group is large, that is, composed of twenty-five or more members, courts consistently hold that plaintiffs cannot show the statements were 'of and

---

[6] *See LIV Roster* available at https://www.livgolf.com/players-directory.

concerning' them." *Id.*; *see also Chinese Americans Civil Rights Coal. v. Trump*, No. 21-cv-4548 (JGK), 2022 WL 1443387, at *5 (S.D.N.Y. May 6, 2022) ("[W]hen a reference is made to a large group of people, no individual within that group can fairly say that the statement is about him, nor can the 'group' as a whole state a claim for defamation." (internal quotations omitted)).

From the face of the Columns, they can never be read in context to be about Reed. Moreover, the sheer number of LIV players precludes any argument that discussions of LIV or its players, generally, refer to any one player. The Columns, taken as a whole, refute the allegation that any mention of LIV in the Columns is a reasonable reference to Reed. *See Thomas*, 699 So. 2d at 804-05.

This failure is fatal to Reed's defamation claims, rendering any amendment to his complaint futile. *See id.* at 806.   As such, Plaintiff's defamation claims should be dismissed with prejudice as a matter of law on this ground alone.

### B.  Rhetorical Hyperbole and Figurative Speech Are Not Actionable as a Matter of Law[7]

Rhetorical hyperbole and opinions – statements that cannot be proven true or

---

[7] Plaintiff has also failed to plead facts supporting damages. Under Florida law, there is no longer a cause of action for "libel *per se*" with presumed damages against a media defendant; rather, "a plaintiff suing a media defendant must nevertheless plead and prove actual injury." *Edelstein v. WFTV, Inc.*, 798 So. 2d 797, 798 (Fla. 4th DCA 2001); *see Blake v. Giustibelli*, 182 So. 3d 881, 884-85 (Fla. 4th DCA 2016) ("[I]n libel cases involving media defendants, fault and proof of damages must always be established."). Plaintiff has alleged a count of "Defamation Per Se" against each of the Gannett Defendants, but provides nothing more than legal conclusions that the publications "caused irreparable harm" to Reed. *See* Am. Compl. ¶¶ 283, 308. Indeed, Reed makes only sweeping general allegations that all the Defendants' collective defamatory statements led him to lose "sponsorship deals and . . . business opportunities." *Id.* at 17; *see also id.* at ¶ 18. However, he has pleaded no *facts* plausibly suggesting his reputation has suffered or he has incurred any financial loss *due to the statements in the Gannett Defendants' Columns.*

false – are not actionable, period. Whether a statement is provably false is a question of law for the Court. *See Turner*, 879 F.3d at 1262-63. "A false statement of fact is the *sine qua non* for recovery in a defamation action." *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983); *see Turner*, 879 F.3d at 1262-63 ("True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment.") "[S]tatements that cannot reasonably be interpreted as stating actual facts about an individual are protected." *Milkovich v. Lorain Journal, Co.*, 497 U.S. 1, 2 (1990). Moreover, columns are appropriate, protected places to discuss opinions and employ figurative language. *See Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 583 (D.D.C. 2000) ("The reasonable reader who peruses [a] column on the editorial or Op–Ed page is fully aware that the statements found there are not "hard" news . . . Readers expect that columnists will make strong statements, sometimes phrased in a polemical manner . . .") (quoting *Ollman v. Evans*, 750 F.2d 970, 986 (D.D.C. 1984)). The Columns are rife with hyperbole and opinions.

 1. <u>Star Wars References</u>

 The Death Star is, well, a fictional space weapon. Emperor Palpatine's "evil empire" exists only in Star Wars mythology. Reasonable readers would certainly understand that drawing on Star Wars imagery hardly presents provable statements of facts. *See*, *e.g.*, *Underwager v. Channel 9 Australia,* 69 F.3d 361, 367 (9th Cir. 1995) (statement that plaintiff was "intrinsically evil" was not "not capable of verification" and thus not actionable); *Boley v. Atlantic Monthly Grp.*, 950 F. Supp. 2d 249, 259-60

(D.D.C. 2013) (granting motion to dismiss defamation claim because, among other things, the statements that public official was "evil" were rhetorical hyperbole, "not a verifiable statement of fact"); *Considering Homeschooling v. Morningstar Educ. Network*, No. SACV 06-00615-CJC(ANx), 2008 WL 11413459, at *3 (C.D. Cal. Aug. 6, 2008) (statements about plaintiff being "evil," among other "clearly 'lusty and imaginative expressions of contempt,'" were not "statements that are capable of being proven true or false . . . and thus are not actionable"). As Master Yoda might say, actionable these Star Wars references are not.

   2.  "Sportswash"

   The observation that joining LIV may cause "reputational harm that comes with taking guaranteed cash to sportswash Saudi atrocities" and references to LIV's "sportswashing ambitions in Riyadh . . ."[8] suffer the same fate. "Sportswash" is a coined term, which, in context, suggests that LIV is a Saudi government attempt to distract the world from Saudi atrocities. In essence, the sentiment is that, by enticing renowned professional athletes into a lucrative professional sports association, the world can watch golf and willfully ignore any bad things happening behind the scenes in Saudi Arabia. It is not surprising that someone holding this view would also opine that those associated with LIV might endure reputational harm because of the

---

[8] The allegedly defamatory statement continues, "No amount of investment by the Saudi Arabian regime can be rendered respectable or accepted without dire reputational consequences for the entire sport. Golf cannot choose to host a cancer and expect to remain healthy." No reasonable person would believe this statement represents actual facts about LIV – much less Plaintiff – including that LIV is literally cancerous and makes people physically ill.

14

inextricable association between the organization and the Saudi regime. Such opinions and coined terms are not actionable. *See Hoang v. Tran*, 60 Cal. App. 5th 513, 533-34 (2021) (A billionaire investor's defamation claim based on assertion he had been tarnished by the "sickening culture" of Communist China and Vietnam failed because the statement fell "within the category of protected rhetorical hyperbole. . . . Appellant was expressing his opinion that, by doing business in Communist China and Vietnam for more than 20 years, respondent had imbibed the amoral, materialistic values of the 'sickening culture' of these countries.")

Likewise, "sportswashing" clearly suggests a means of glossing over Saudi wrongdoings. And anyone, of course, is free to speculate on behavior causing reputational damage. These words are protected as a matter of law.

3. <u>"Merciless regime too toxic for commercial sponsors."</u>

For similar reasons, the sentence in the Second Column that "Team golf is a tough sell, but moreso when the product is lousy and **the association with a merciless regime too toxic for commercial sponsors**" (Am. Compl. ¶ 103), is not actionable either. Discourse and expressions of pure opinions surrounding the unethical and "toxic" nature of the Saudi Arabian regime simply cannot form the basis of a defamation claim. *See, e.g.*, *Sequin LLC v. Renk*, No. 20-62WES, 2021 WL 124250, at *6, *13 (D.R.I. Jan. 13, 2021), *adopted in full by Sequin, LLC v. Renk*, No. 20-062 WES, 2021 WL 391519 (D.R.I. Feb. 4, 2021) (email communication that plaintiff's "hostile atmosphere has become so toxic" and suggesting family members had engaged in toxic litigation recognized to be nonactionable hyperbole and opinion); *Stein v. City of*

*Philadelphia*, No. 13–4644, 2013 WL 6408384, at *9 (E.D. Pa. Dec. 5, 2013) (commentary about neighborhood "finally get[ting] relief from this toxic, unlicensed dance club" "sound[s] in opinion" and is not actionable); *Point Ruston, LLC v. Pacific Northwest Reg'l Council of the United Broth. Of Carpenters & Joiners of Am.*, No. C09–5232BHS, 2010 WL 3732984 (comment about "toxic deal" with plaintiff is "hyperbolic, incapable of proof, and [is] simply an opinion").

In fact, the Constitution protects criticism of government without fear of liability. Government agencies cannot sue for libel. *See Sullivan*, 376 U.S. at 291-92. For decades, this truth has been clear. *Id.* Reed cannot do what the First Amendment bars the Saudi government from doing directly.

### C. Truth is Not Actionable as a Matter of Law

1. "Cut and Run" is not actionable as a matter of law.

Plaintiff concedes that some of the statements complained of are true, which renders them not actionable as a matter of law.[9] *See Nix v. ESPN, Inc.*, 772 Fed. Appx. 807, 814 (11th Cir. 2019). For instance, the second of the three statements from the First Column identified in the Complaint allegedly accuses Reed and other LIV golfers of "opt[ing] to cut and run for Saudi money." Am. Compl. ¶ 101. But the Amended Complaint confirms that this statement, even if it were about Reed, is true.  Reed

---

[9] Falsity, like all other elements of a cause of action, is subject to the *Iqbal/Twombly* standard. *See, e.g.*, *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1270 (M.D. Ala. 2019). Failure to plead falsity plausibly is itself a basis for dismissal. *See Turner*, 879 F.3d at 1267. Here, other than merely concluding the speech is "false," there are no allegations as to which portions are false, no allegations of *how* they are false, and no allegations of *fact* that give rise to an inference of falsity. Such pleading is the very definition of "conclusory." Plaintiff has not plausibly alleged falsity.

admits that he joined LIV – a "company which is financially backed by" the Saudi regime. *Id.* at ¶ 28; *see also Sakab Saudi Holding Co.*, 2021 WL 8999588, at *1 (describing the Public Investment Fund of Saudi Arabia as "a sovereign wealth fund of the Kingdom of Saudi Arabia."). He also admits having done so "[f]or a litany of reasons," including "*financial benefit*." *Id.* at ¶ 42. Consequently, even an assertion that Reed "opted to cut and run for Saudi money" would be true. *See, e.g.*, *Smith v. DeTar Hosp. LLC*, No. V-10-83, 2012 WL 2871673, at *3, *19 (S.D. Tex. July 11, 2012) (finding that plaintiff's claims that defendants had published defamatory statements about her having abandoned or quit her job, including a comment that she "decided to cut and run," were not actionable because plaintiff "did in fact quit or abandon her job").

### D. Reed Cannot Plausibly Allege Actual Malice

Still another independent ground for dismissal is Plaintiff's complete failure to allege facts plausibly suggesting that any of the Gannett Defendants acted with actual malice. That failure infects each claim.

The First Amendment guarantees "a defendant may not be held liable for defaming a public figure about a matter of public concern unless he is shown to have 'acted with actual malice.'" *Berisha v. Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020). Actual malice means that:

> defendants published a defamatory statement either with actual knowledge of its falsity or with a high degree of awareness of its probable falsity. It is a subjective test, which asks whether the publisher in *fact* entertained serious doubts as to the truth of his publication. Even an extreme departure from

> professional [publishing] standards does not necessarily rise to the level of actual malice.

*Id.* at 1312; *see Turner*, 879 F.3d at 1273; *Michel*, 816 F.3d at 702-03.

There is no serious dispute that Reed is a public figure who must plead actual malice. He describes himself as a "professional golfer" of "exceptional world-class golfing achievements," who is one of LIV's "most prominent athletes." Am. Compl. ¶¶ 14, 15, 20. His position as a sports professional, alone, makes him a public figure. *See Curtis Publishing v. Butts*, 388 U.S. 130, 155 (1967). "This conclusion is consistent with a long line of cases, beginning with the Supreme Court's opinion in *Butts*, which have found professional and collegiate athletes . . . to be public figures." *Barry v. Time, Inc.*, 584 F. Supp. 1110, 1119 (N.D. Cal. 1984) (collecting cases). The common thread in these decisions is that "one's voluntary decision to pursue a career in sports, whether as an athlete or a coach, invites attention and comment regarding his job performance and thus constitutes an assumption of the risk of negative publicity." *Id.* (internal quotations omitted); *see also Turner*, 879 F.3d at 1272. A professional golfer of Reed's admitted caliber is a public figure.

Reed has not – and cannot – plead the high standard of actual malice. Purely conclusory allegations of "recklessness" and the like, which amount to "threadbare recitals of the elements of a cause of action," must be disregarded. *Michel*, 816 F.3d at 703-04; *see Turner*, 879 F.3d at 1273 (affirming dismissal with prejudice of complaint alleging defendants "knowingly and recklessly" ignored truth where "the complaint does not set forth facts demonstrating that the Defendants acted in these ways.").

When a public figure "fails to allege facts sufficient to give rise to a reasonable inference that the defendants published the [allegedly defamatory statements] with actual malice," the complaint must be dismissed. *See Michel*, 816 F.3d at 706 (affirming dismissal with prejudice for failure to plead actual malice); *Turner*, 879 F.3d at 1274 (same).

For instance, in *Turner v. Wells*, the Eleventh Circuit affirmed dismissal with prejudice of a professional football coach's defamation claims because, *inter alia*, he had failed to properly allege actual malice. *Id.* Former Miami Dolphins coach James Turner was deemed a public figure because of his job. *Id.* at 1271. Despite having "allege[d] malice," the court found that "most of his allegations are set forth in a conclusory manner." *Id.* at 1273. Notwithstanding the coach's claims "that defendants were aware of certain information that would have portrayed him in a better light, but purposefully decided to omit it," the court explained the allegations fell short of actual malice:

> Ultimately, many of Coach Turner's allegations center on the Defendants' failure to properly analyze certain information. But these allegations also fail to allege malice, because they do not give rise to a reasonable inference that the Defendants knowingly or with reckless disregard published a false statement of fact. If anything, these allegations attack the <u>reliability</u> of the Defendants' <u>opinions</u>, and we have explained above why these types of claims fall outside the scope of a defamation suit.

*Id.* at 1274 (emphasis in original).

Reed similarly offers sweeping conclusory allegations that do not support a reasonable inference that the Gannett Defendants acted with actual malice. He imagines ill will: "Defendants . . . have engaged in repetitive media attacks

on Mr. Reed, having done so years and years ago," concluding that "Defendants have made prior and subsequent defamatory statements, evidencing their actual malice." Am. Compl. ¶ 46. This ill will allegation falls exceedingly short of plausibly pleading actual malice. *See Klayman v. City Pages*, No. 5:13–cv–143–Oc–22PRL, 2015 WL 1546173, at *13-14 (M.D. Fla. Apr. 3, 2015) (educating Reed's counsel on the differences between actual malice and "ill will"). Further, given that the statements are protected opinion or are simply true, the Gannett Defendants, like the *Turner* defendants, could not have published them with actual malice, as a matter of law.

## II.    THE FAILED TORTIOUS INTERFERENCE CLAIMS

Plaintiff's twin claims for tortious interference are barred under Florida's single action rule. That rule provides that "a single publication gives rise to a single cause of action." *Samara v. Juice Plus+ Co., LLC*, No. 6:20-cv-520-Orl-31EJK, 2020 WL 13389215, at *5 (M.D. Fla. Sept. 9, 2020) (quoting *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. 4th DCA 2002)). The rule "prohibits defamation claims from being re-cast as additional, separate torts," if all the claims arise from the same publication. *Kinsman v. Winston*, No: 6:15-cv-696-Orl-22GJK, 2015 WL 12839267, at *5 (M.D. Fla. Sept. 15, 2015). As the Florida Supreme Court has explained, a plaintiff is not permitted to make an end-run around a valid defense to defamation by "renaming the cause of action and pleading the same facts" as those alleged in support of a defamation claim. *Fridovich v. Fridovich*, 598 So. 2d 65, 69 (Fla.

1992); *see also Orlando Sports Stadium, Inc. v. Sentinel Star Co.*, 316 So. 2d 607, 609 (Fla. 4th DCA 1975) (a plaintiff cannot skirt the strict requirements of defamation "by the simple expedient of redescribing the libel action to fit a different category of intentional wrong"). Rather than being guided by the label a plaintiff puts on his claims, Florida courts "look for the reality, and the essence of the action and not its mere name." *Orlando Sports Stadium, Inc.*, 316 So. 2d at 609 (quotations omitted).

Federal courts have also acknowledged that extraneous tort claims rooted in challenged statements are barred regardless of whether the defamation claim fails. *Tobinick v. Novella*, No. 9:14-CV-80781-ROSENBERG/BRAN, 2015 WL 328236, at *11 n.17 (S.D. Fla. Jan. 23, 2015) (citing *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1256 (S.D. Fla. 2014) (in case brought by Reed's counsel, court dismissed tortious interference and intentional infliction of emotional distress claims "based on analogous underlying facts. . . intended to compensate for the same alleged harm" as his defamation claims)); *see also Fridovich*, 598 So. 2d at 70 ("In short, regardless of privilege, a plaintiff cannot transform a defamation action into a claim for intentional infliction of emotional distress simply by characterizing the allegedly defamatory statements as 'outrageous'"). In fact, the single action rule bars such claims even when no defamation claim has been asserted, if the wrong stems from allegedly defamatory statements. *Gilliard v. New York Times Co.*, No. GC-01-59, 2001 WL 1147256 (Fla. Cir. Ct. May 22, 2001) (interference, conspiracy, negligence, and extortion claims barred even though no defamation claim was alleged because the wrong complained of was based on the publication of allegedly defamatory statements), *aff'd*, 826 So. 2d 296

(Fla. 2d DCA 2002). If the claim is premised upon allegedly false and defamatory speech, it cannot masquerade as another tort. *Orlando Sports Stadium*, 316 So. 2d at 609.

Here, Plaintiff's tortious interference claims are grounded in the same publications underlying the six failed defamation counts. *See* Am. Compl. ¶¶ 338, 343 (alleging that Plaintiff's tortious interference claims against the Gannett Defendants are based on their alleged "spreading [of] lies of and concerning Mr. Reed in order to destroy his reputation"). Because the counts for tortious interference are nothing more than re-labeled defamation counts, they violate the single cause of action rule and must be dismissed. *See Klayman,* 22 F. Supp. 3d at 1256.

## III.    VIOLATION OF FLORIDA'S ANTI-SLAPP STATUTE

Florida's anti-SLAPP[10] statute provides a substantive right to recover fees from plaintiffs "fil[ing] . . . any lawsuit . . . against another person or entity without merit and primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue . . . as protected by the First Amendment to the United States Constitution and s. 4, Art. I of the State Constitution." § 768.295(3) and (4), Fla. Stat.; *see, e.g., Corsi v. Newsmax Media, Inc.*, 519 Supp. 3d 1110, 1128 (S.D. Fla. 2021) (awarding media defendants attorney's fees and costs under Florida's anti-SLAPP statute); *Vibe Ener v. Duckenfield*, No. 20-cv-22886, 2020 WL 6373419 (S.D. Fla. Sep. 28, 2020) (applying Florida's anti-SLAPP fee provision);

---

[10] SLAPP stands for **S**trategic **L**awsuits **A**gainst **P**ublic **P**articipation. § 768.295.

*Anderson v. Best Buy Stores L.P.*, No. 5:20-cv-41-Oc-30, 2020 WL 5122781 (M.D. Fla. July 28, 2020) (same), *adopted in full by Anderson v. Coupons in the News*, No. 5:20-cv-41-Oc-30, 2020 WL 5106676 (M.D. Fla. Aug. 31, 2020); *Bongino v. Daily Beast Co.*, LLC, 477 F. Supp. 3d 1310, 1322–24 (S.D. Fla. 2020) (same, noting Florida's statute does not conflict with Federal Rules of Civil Procedure). Plaintiff's suit here falls squarely within the statute's prohibition and entitles the Gannett Defendants to a fee award.

First, this case was filed "primarily" – indeed, exclusively – as a result of the Gannett Defendants' protected speech and seeks to silence speech with a flatly unconstitutional prior restraint.[11] *See* Am. Compl., Wherefore Clauses ¶ (a) (seeking damages "as well as injunctive relief"). Second, the statute defines "free speech in connection with public issues" to include any "statement that is protected under applicable law and . . . is made in or in connection with a . . . news report, or other similar work." § 768.295(2)(a), Fla. Stat. As amply demonstrated, the Columns are protected speech in a magazine containing golf news and not actionable as a matter of law. Finally, the instant suit was filed "without merit" because, for the reasons stated above, the Amended Complaint collapses under the weight of its legal deficiencies, despite two tries and over a hundred pages of allegations.

Indeed, counsel's *modus operandi* appears to be the filing of SLAPP suits, as evidenced by the volume of his cases that have been dismissed pursuant to various

---

[11] *See, e.g.*, *Baskin v. Royal Goode Prods., LLC*, No. 8:21-cv-2558-VMC-TGW, 2021 WL 6125612, at *6 (M.D. Fla. Nov. 19, 2021) (finding injunctive relief was unconstitutional prior restraint where "plaintiffs have not shown that the extraordinary remedy . . . is warranted").

jurisdictions' anti-SLAPP statutes. *See, e.g.*, *Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29 (D.D.C. 2012), *aff'd*, 736 F.3d 528 (D.C. Cir. 2013); *Forras v. Rauf*, 39 F. Supp. 3d 45 (D.D.C. 2014), *aff'd on other grounds*, 812 F.3d 1102 (D.C. Cir. 2016); *Loomer v. New York Magazine*, No. 50-2019-CA-015123 (Fla. 15th Cir. Ct.) (multiple orders granting various defendants' anti-SLAPP motions).

Because Reed's suit violates yet another anti-SLAPP statute, the Gannett Defendants request leave to move for an award of their attorney's fees, together with the proof of the amounts incurred, at an appropriate time in accordance with Local Rule 7.01.

## CONCLUSION

Florida law recognizes that cases involving First Amendment rights are particularly suited for early-stage disposition. *See Stewart v. Sun Sentinel Co.*, 695 So. 2d 360, 363 (Fla. 4th DCA 1997) ("pretrial dispositions are 'especially appropriate' because of the chilling effect these cases have on freedom of speech") (quoting *Karp v. Miami Herald Publ'g Co.*, 359 So. 2d 580, 581 (Fla. 3d DCA 1978)). Dismissals are often granted in favor of publishers in cases like this one where the publications involve matters of opinion and are not of and concerning the plaintiff. *See, e.g.*, *Parekh v. CBS Corp.*, 820 F. Fed. Appx. 827, 834-35 (11th Cir. 2020) (affirming dismissal of defamation claim based on expressions of opinion); *Beres*, 2022 WL 805733, at *3-4 (defamation claim could not be cured because publication was not of and concerning plaintiff, defamatory, or false); *R.W. v. Charter Schs. USA, Inc.*, No. 18-14405-CIV-

MARRA, 2019 WL 13216131, at *9 (S.D. Fla. May 23, 2019) (dismissed because publication not of and concerning plaintiff); *see also Berenato v. Tankel*, No. 3:10–cv–979–J–32MCR, 2012 WL 473933, at *1-2 (M.D. Fla. Feb. 14, 2012) (dismissing slander claim because statements not defamatory).

In sum, the Amended Complaint fails to state a claim against the Gannett Defendants as a matter of law and should be dismissed with prejudice under Fed. R. Civ. P. 12(b)(6). The Defendants' anti-SLAPP request should also be granted.

## LOCAL RULE 3.01(g) CERTIFICATION

The undersigned certifies that she has conferred with opposing counsel, Larry Klayman, via email, and Plaintiff opposes this Motion.

Dated: January 13, 2023.        Respectfully submitted,

                                THOMAS & LoCICERO PL


                                */s/  Carol Jean LoCicero*
                                Carol Jean LoCicero
                                  Florida Bar No. 603030
                                Linda R. Norbut
                                  Florida Bar No. 1011401
                                601 South Boulevard
                                Tampa, FL  33606
                                Telephone: (813) 984-3060
                                Facsimile:  (813) 984-3070
                                clocicero@tlolawfirm.com
                                lnorbut@tlolawfirm.com
                                tgilley@tlolawfirm.com

                                *Attorneys for the Gannett Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the **13th day of January, 2023**, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system.  I also certify that the foregoing document is being served this date on all counsel of record via transmission of Notices of Electronic Filing generated by the CM/ECF system.

*/s/  Carol Jean LoCicero*
Attorney for the Gannett Defendants
