**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

|  |  |
|---|---|
| PATRICK NATHANIEL REED, | } |
|  | } |
| Plaintiff | } |
|  | } |
| v. | } **Case Number: 3-22-CV-01059-TJC-PDB** |
|  | } |
| BRANDEL EUGENE CHAMBLEE, et al | } |
|  | } |
| Defendants. | } |
|  | } |
|  | } |
|  | } |
|  | } |
|  | } |

**PLAINTIFF PATRICK NATHANIEL REED'S MOTION TO STRIKE USB DRIVES**
**AND OTHER EXHIBITS AND FOR SANCTIONS**

Plaintiff Patrick Reed ("Mr. Reed" or "Plaintiff") hereby moves this honorable Court to strike the exhibits, which consist of a USB Hard Drive and other documents sent to chambers ex parte, as set forth in his "Motion to Return to Defendants' Counsel USB Drive and Documents Submitted by Defendant's Counsel to Court Ex Parte Concerning Defendants' Motion to Dismiss and Other Appropriate Relief" as they are not to be considered with regard to Defendants' Motion to Dismiss Amended Complaint ("MTD")

In Defendants' MTD at page 1, Mr. Minch Minchin, states without equivocation, that:

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Section 768.295, Florida Statutes, Defendants Brandel Chamblee, Damon Hack, Benjamin Bacon, Eamon Lynch, and TGC, LLC d/b/a The Golf Channel (collectively, "Defendants") ask the Court to dismiss with prejudice Plaintiff Patrick Reed's Amended Complaint.

And in footnote 1 of Defendants' MTD Mr. Minchin states clearly that his MTD pursuant to Federal Rule of Civil Procedure 12 (b) (6) ("FRCP") is not to be converted into a summary judgment motion by virtue of his submission of the USB Drive and other exhibits. He writes:

> This motion references several documents – attached to the Minchin Declaration, which is filed contemporaneously herewith – that may be considered by the Court without converting the motion into a motion for summary judgment. Defendants MTD at page 2, footnote 1.

Thus, before this honorable Court is Defendants' MTD pursuant to FRCP 12(b)(6)  and Defendants have conceded that material is not to be considered which is not referenced and linked in the Amended Complaint. This would therefore apply to the unauthenticated USB Hard Drive and other exhibits, which were improperly sent ex parte to chambers, as there is no summary judgment motion pending and at issue.

And, importantly, Mr. Minchin's alleged excuse that he filed exhibits electronically and thus Mr. Reed and his counsel did not need to be provided with a copy of the USB Hard Drive, is non-sensical and wholly improper. Under these circumstances,  it can only be concluded that what was sent to chambers secretly was never intended to ever be seen and inspected by Mr. Reed and his counsel. To this day, about six (6) weeks later, it still has not been provided to Mr. Reed and his counsel!  One can only conclude under these extreme circumstances that Mr. Minchin does not want Mr. Reed and his counsel intended to hide what was sent to chambers ex parte.

As ruled by the Honorable Raag Singhal in *Dershowitz v. Cable News Network, Inc.*, 541 F. Supp 3d 1354 (S.D. Fla. 202) ("Dershowitz"), which case is on all fours with this case, submissions such as Mr. Minchin's USB Hard Drive and other exhibits are not to be considered in ruling upon the pending MTD of the Defendants and must be stricken. Indeed, as Mr. Minchin conceded in his Opposition to Motion to Return to Defendants' Counsel USB Drive and

Documents Submitted by Defendant's Counsel to Court Ex Parte Concerning Defendants' Motion to Dismiss and Other Appropriate Relief,  the references to the alleged defamatory statements contained in the counts of the Amended Complaint, coupled with the links to the actual publications which are also set forth in this Amended Complaint, are all this honorable Court needs to consider in disposing of Defendants MTD.

This is consistent with Judge Singhal ruling in the Dershowitz case, where he finds:

> The Court must first address those items that it considered in resolving this Motion. CNN included numerous exhibits with its Motion to Dismiss and argues the Court may properly consider all of them when deciding the Motion. The Court disagrees. At the 12(b)(6) stage, the court may (only) consider the allegations in the complaint as well as documents incorporated into the complaint by reference…" *Id*. at 5. *See Dershowitz* attached as <u>Exhibit 1</u>.

For these reasons, Plaintiff Mr. Reed moves to strike the USB Hard Drive and other documents submitted ex parte to chambers in support of Defendants' MTD as they are not only unauthenticated, but also unnecessary and inappropriate for this honorable Court to consider in disposing  of Defendants' MTD. Further, Plaintiff Reed, as previously briefed, has reason to believe that the contents of the USB Drive, never provided to Plaintiff Reed's counsel – outrageously  about  six (6) week and counting after they were sent ex parte to chambers – have been altered, are incomplete or doctored.

Attached and incorporated herein is an expert opinion by Michael Primeau, <u>Exhibit 2</u>, that Defendants have in the past likely altered and doctored video at issue in this case and, notwithstanding the other highly irrelevant and prejudicial exhibits that were sent ex parte to chambers, without providing a copy to Mr. Reed and his counsel, are more than suspect not just based on these unprofessional actions by Mr. Minchin, Defendants lead counsel, but also the past practice of his clients.

For all of these reasons, as well as textbook black letter law, as set forth by Judge Singhal of the U.S. District Court for the Southern District of Florida, a federal sister court to this court in Florida , the USB Hard Drive and exhibits sent to chambers must not be considered, but instead stricken from the record. This is particularly important to avoid prejudice to Mr. Reed as there has been no discovery as to their content and authenticity.

In addition, Mr. Minchin and his clients should now be sanctioned for this unprofessional and highly prejudicial conduct and Defendants MTD summarily denied even on this basis alone, notwithstanding Defendants' non-meritorious, intentionally confusing,  and frivolous  argument as detailed in Plaintiff Patrick Nathaniel Reed's Opposition to Defendants Brandel Chamblee, Damon Hack, Benjamin Bacon, Eamon Lynch, and TGC, LLC's Motion to Dismiss Amended Complaint.

Dated: February 17, 2023

Respectfully submitted,

By: */s/ Larry Klayman*　　　　　　　
Larry Klayman, Esq.
Florida Bar No.: 246220
Klayman Law Group P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Tel: 561-558-5536
leklayman@gmail.com

*Counsel for Patrick Nathaniel Reed*

**CERTIFICATE OF SERVICE**

I, Larry Klayman, hereby certify that on this day, February 17, 2023 I electronically filed the foregoing with the Clerk of Court using the Court's ECF procedures. I also certify that the foregoing document is being served this day on all counsel of record through the Court's eservice procedures.

*/s/ Larry Klayman*

EXHIBIT 1

CASE NO. 20-61872-CIV-SINGHAL
United States District Court, S.D. Florida.

# Dershowitz v. Cable News Network, Inc.

541 F. Supp. 3d 1354 (S.D. Fla. 2021)
Decided May 24, 2021

CASE NO. 20-61872-CIV-SINGHAL

2021-05-24

Alan DERSHOWITZ, Plaintiff, v. CABLE NEWS NETWORK, INC., Defendant.

Brian Mitchell Rodier, Rodier & Rodier, Hallandale, FL, for Plaintiff. George S. LeMieux, Eric Corey Edison, Gunster, Yoakley and Stewart, P.A., Fort Lauderdale, FL, Amanda Levine, Pro Hac Vice, Katherine M. Bolger, Pro Hac Vice, Davis Wright Tremaine LLP, New York, NY, for Defendant.

RAAG SINGHAL, UNITED STATES DISTRICT JUDGE

1358*1358

Brian Mitchell Rodier, Rodier & Rodier, Hallandale, FL, for Plaintiff.

George S. LeMieux, Eric Corey Edison, Gunster, Yoakley and Stewart, P.A., Fort Lauderdale, FL, Amanda Levine, Pro Hac Vice, Katherine M. Bolger, Pro Hac Vice, Davis Wright Tremaine LLP, New York, NY, for Defendant.

# ORDER

RAAG SINGHAL, UNITED STATES DISTRICT JUDGE

**THIS CAUSE** is before the Court upon Defendant Cable News Network's Motion to Dismiss (DE [17]). The parties have fully briefed the Motion to Dismiss and the Court heard argument of counsel. For the reasons set forth below, the Motion to Dismiss is denied.

## I. <u>INTRODUCTION</u>

Plaintiff Alan Dershowitz ("Dershowitz") has filed a Complaint (DE [1]) against Cable News Network, Inc. ("CNN") seeking damages for defamation. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

In January 2020, Dershowitz represented the President of the United States in an impeachment trial before the United States Senate. (*Id.* ¶ 6). This dispute concerns CNN's coverage of an argument Dershowitz made to the Senate about whether a president can be impeached and removed from office if he takes any action that is 1359 motivated by a desire to be reelected. *1359 According to the Complaint, Dershowitz gave the following answer to a question by Senator Ted Cruz:



The only thing that would make a quid pro quo unlawful is if the quo were somehow illegal. Now we talk about motive. There are three possible motives that a political figure could have. One, a motive in the public interest and the Israel argument would be in the public interest. The second is in his own political interest and the third, which hasn't been mentioned, would be his own financial interest, his own pure financial interest, just putting money in the bank. I want to focus on the second one just for one moment. Every public official that I know believes that his election is in the public interest and, mostly you are right, your election is in the public interest, and if a president does something which he believes will help him get elected in the public interest, that cannot be the kind of quid pro quo that results in impeachment. (*Id.* ¶ 7).[1]

> [1] The Complaint sets forth only an excerpt of Dershowitz' response. CNN has submitted the Congressional Record (DE [17-1] with the full transcript of Dershowitz' argument found at S650 and asks the Court to take judicial notice of the entirety of Dershowitz' comments.

Following the day's impeachment proceedings, CNN aired a clip of this argument that featured only the last sentence and omitted Dershowitz' words that a quid pro quo would be unlawful if the quo were somehow illegal.[2] (*Id.* , ¶ 8). Dershowitz alleges that several CNN commentators responded to the truncated clip and "exploded into a one-sided and false narrative that Professor Dershowitz believes and argued that as long as the President believes his reelection is in the public interest, that he could do anything at all – including illegal acts – and be immune from impeachment." (*Id.* ). Dershowitz alleges CNN commentators made the following defamatory statements[3] (DE [1], ¶ 13):

> [2] The Complaint acknowledges that CNN aired the entire statement several times earlier in the day on shows hosted by CNN employees Wolf Blitzer and Jake Tapper. (DE [1] ¶ 9).

> [3] In his Memorandum in Opposition (DE [21]), Dershowitz identified the underlined portions of these statements as those he alleges are defamatory.

Having worked on about a dozen campaigns, there is always the sense that, boy, if we win, it's better for the country. But that doesn't give you license to commit crimes or to do things that are unethical. So, it was absurd. What I thought when I was watching it was this is un-American. This is what you hear from Stalin. This is what you hear from Mussolini, what you hear from authoritarians, from Hitler, from all the authoritarian people who rationalized, in some cases genocide, based on what was in the public interest." -- Joe Lockhart @ 7:11 p.m., January 29, 2020.

The president's defense team [Dershowitz] seems to be redefining the powers of the president, redefining them towards infinity." ... [truncated clip played] ... "If you look at what he says there it blows your mind. He says if a president is running for re-election because he thinks getting elected will help America, he can do anything, anything. And that redefines the presidency and America." -- John Berman @ 6:17 a.m., January 30, 2020.

I did not go to Harvard Law, but I did go to the University of Texas School of Law, where I studied criminal law and constitutional law, but never dreamed a legendary legal mind would set them both ablaze on the Senate floor. The Dershowitz Doctrine would make presidents immune from

1360*1360



<u>every criminal act, so long as they could plausibly claim they did it to boost their re-election effort. Campaign finance laws: out the window. Bribery statutes: gone. Extortion: no more.</u> This is Donald Trump's fondest figurative dream: to be able to shoot someone on Fifth Avenue and get away with it." -- Paul Begala on CNN.com, January 29, 2020 @ 9:11 p.m.

This narrative, claims Dershowitz, damaged his reputation as a legal scholar and subjected him to ridicule on news outlets, talk shows, and social media. (*Id.* ¶¶ 12, 13).

Dershowitz alleges that CNN knew or had serious doubts that its commentators' statements were false at the time they were made but nonetheless made and/or published the statements with an intent to indulge ill will, hostility, and an intent to harm. (*Id.* ¶ 20). Dershowitz asserts that CNN's airing of only a portion of his answer was done to falsely paint him "as a constitutional scholar and intellectual who had lost his mind" and that "[w]ith that branding, [his] sound and meritorious arguments would then be drowned under a sea of repeated lies." (*Id.* ¶ 8). The result of omitting the words "[t]he only thing that would make a quid pro quo unlawful is if the quo were somehow illegal," says Dershowitz, is that CNN could "fool" its viewers into thinking "that the respected Alan Dershowitz believed that the President of the United States could commit <u>illegal</u> acts as long as he thought it would help his reelection and that his reelection was in the public interest, even though it was the opposite of what he said." (*Id.* ). Dershowitz alleges he has suffered and continues to suffer damage, including but not limited to damage to his reputation, embarrassment, pain, humiliation, and mental anguish and has sustained past and future loss of earnings. (*Id.* ¶ 19). He seeks $50 million in compensatory damages and $250 million in punitive damages from CNN.

CNN moves to dismiss the Complaint for failure to state a claim upon which relief can be granted. (DE [17]). Fed. R. Civ. P. 12(b)(6). First, CNN contends its broadcasts are protected by the fair report privilege, which shields the press from liability for reporting information on official government proceedings. Second, CNN argues that the statements made by its commentators were non-actionable opinions based upon Dershowitz' public testimony. Finally, CNN asserts that Dershowitz has not and cannot plead that CNN acted with the actual malice required for a public figure to sustain a defamation claim. CNN asks the Court to dismiss Dershowitz' Complaint with prejudice.

II. <u>LEGAL STANDARDS</u>

A. Motion to Dismiss

To survive a motion to dismiss, "factual allegations must be enough to raise a right to relief above the speculative level" and must be sufficient "to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly* , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal* , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.* , 578 F.3d 1252, 1261 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Authority* , 566 U.S. 449, 132 S.Ct. 1702, 182 L.Ed.2d 720 (2012).

In considering a Rule 12(b)(6) motion to dismiss, the court's review is generally "limited to the four corners of 1361 the complaint." *1361 *Wilchombe v. TeeVee Toons, Inc.* , 555 F.3d 949, 959 (11th Cir. 2009) (quoting *St. George v. Pinellas Cty.* , 285 F.3d 1334, 1337 (11th Cir. 2002) ). The court must review the complaint in the light most favorable to the plaintiff, and it must generally accept the plaintiff's well-pleaded facts as true. *See Hishon v. King & Spalding* , 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). But "[c]onclusory allegations,

unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Jackson v. BellSouth Telecommunications* , 372 F.3d 1250, 1262 (11th Cir. 2004) (citation omitted); *see also Iqbal* , 129 S. Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").

B. Defamation

The parties agree that Florida law applies to this dispute. In Florida, a defamation claim has "five elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews For Jesus, Inc. v. Rapp* , 997 So. 2d 1098, 1106 (Fla. 2008).

CNN argues that its broadcasts concerning Dershowitz' statements are protected from liability by the fair report privilege. The fair report privilege is a qualified privilege given to news media "to accurately report on the information they receive from government officials." *Woodard v. Sunbeam Television Corp.* , 616 So. 2d 501, 502 (Fla. 3d DCA 1993). "If the report of a public official proceeding is accurate or a fair abridgment, an action cannot be constitutionally maintained, either for defamation or for invasion of the right of privacy." *Id.* (quoting Restatement (Second) of Torts § 611, cmt. b (1977)). "The privilege extends to the publication of the contents of official documents, as long as the account is reasonably accurate and fair." *Rasmussen v. Collier County Publ. Co.* , 946 So. 2d 567, 571 (Fla. 2nd DCA 2006).

Next, CNN argues that its commentators offered opinions and, therefore, it cannot be liable for defamation. In Florida, a claim of defamation requires a false statement of fact. *Id.* Statements of pure opinion are not actionable. *Zambrano v. Devanesan* , 484 So. 2d 603, 606 (Fla. 4th DCA 1986). "The distinction between fact and opinion is not always easy to perceive." *Id.* "Thus, the law recognizes that some comments may be pure expressions of opinion whereas others may be mixed expressions of opinion." *Id.*

A mixed opinion is one "based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication." *LRX, Inc. v. Horizon Assocs. Joint Venture ex rel. Horizon-ANF, Inc.* , 842 So. 2d 881, 885 (Fla. 4th DCA 2003). "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications." *Milkovich v. Lorain Journal Co.* , 497 U.S. 1, 18-19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

Whether a challenged statement is one of fact or opinion is a question of law to be decided by the court. *Turner v. Wells* , 879 F.3d 1254, 1262 (11th Cir. 2018). "In assessing whether an allegedly libelous statement is 1362 opinion, the court must construe the statement in its totality, examining not merely a particular phrase *1362 or sentence, but all of the words used in the publication." *Rasmussen* , 946 So. 2d at 571 (citing *Hay v. Indep. Newspapers, Inc.* , 450 So. 2d 293, 295 (Fla. 2d DCA 1984) ).

Finally, CNN challenges the sufficiency of Dershowitz' pleading of actual malice. *See New York Times Co. v. Sullivan* , 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (public figure must prove actual malice to succeed in defamation case). Actual malice "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." *Masson v. New Yorker Mag., Inc.* , 501 U.S. 496, 500, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). Rather, actual malice refers to "publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity." *Id.* at 511, 111 S.Ct. 2419. To avoid dismissal of a defamation claim, a

Dershowitz v. Cable News Network, Inc.    541 F. Supp. 3d 1354 (S.D. Fla. 2021)

public figure must plead facts sufficient to give rise to a plausible inference of actual malice. *Michel v. NY Post Holdings, Inc.* , 816 F.3d 686, 702 (11th Cir. 2016). The pleading standards of *Iqbal* and *Twombly* apply to a public figure's allegations of actual malice. *Id.*

III. <u>ANALYSIS</u>

The Court must first address those items that it considered in resolving this Motion. CNN included numerous exhibits with its Motion to Dismiss and argues the Court may properly consider all of them when deciding the Motion. The Court disagrees. At the 12(b)(6) stage, the court may consider the allegations in the complaint as well as documents incorporated into the complaint by reference and matters of which it may take judicial notice. *Lozman v. City of Riviera Beach* , 713 F.3d 1066, 1075 n.9 (11th Cir. 2013) (citations omitted). These items are incorporated by reference in the Complaint and are properly considered at the motion to dismiss stage:

- CNN footage of the impeachment trial aired on January 29, 2020 (DE [17-6], ex. A);

- Transcript and footage of the January 29, 2020, episode of the program Erin Burnett Outfront (DE [17-6], ex. B);

- Transcript and footage of the January 20, 2020, episode of the program New Day (DE [17-6], ex. C); and

- Paul Begala article "Presenting the Ludicrous 'Dershowitz Doctrine' " published January 29, 2020 on cnn.com (DE [17-6], ex. D)

In addition, the Court may take judicial notice of Congressional Record of January 29, 2020 (DE [17-1]). *See Coastal Wellness Centers, Inc. v. Progressive American Ins. Co.* , 309 F. Supp. 3d 1216, n.4 (S.D. Fla. 2018) ("The Court may take judicial notice of government publications and website materials."). The remaining items[4] – transcripts of shows broadcast by other media outlets, transcripts of interviews given by Dershowitz on January 30 and 31, 2020, and a copy of Dershowitz' book *Defending the Constitution* – fall outside the pleadings. "The clear rule in this Circuit is that consideration of material falling outside the pleadings converts a motion to dismiss into one for summary judgment. And in doing so, the judge must give notice to the parties and allow them 10 days in which to supplement the record." *Michel* , 816 F.3d at 701. The Court declines to 1363 make that conversion and, therefore, has only considered those items referenced in the Complaint.*1363  A. <u>Fair Report Privilege</u>

4  These items are attached to CNN's Motion to Dismiss (DE [17]) at DE [17-2]; [17-3]; [17-4]; [17-5]; [17-6], ex. E; and [17-6], ex. D.

CNN argues that its airing of verbatim statements that Dershowitz made on the floor of the United States Senate is unquestionably protected by the fair report privilege. *See Woodard* , 616 So. 2d at 502 ("The news media has been given a qualified privilege to accurately report on the information they receive from government officials."). "The fair report privilege is news media's qualified privilege 'to report accurately on information received from government officials.' " *Folta v. New York Times Co.* , 2019 WL 1486776, at *2 (N.D. Fla. 2019) (quoting *Rasmussen* , 946 So. 2d at 570-71 ). Clearly, a public broadcast concerning the impeachment trial of the President of the United States triggers the fair report privilege.

Dershowitz v. Cable News Network, Inc.    541 F. Supp. 3d 1354 (S.D. Fla. 2021)

The next issue is whether the fair report privilege applies to CNN's broadcasts. The fair report privilege applies "[i]f the report of a public official proceeding is an accurate or a fair abridgment." *Folta* , 2019 WL 1486776, at *2 (quoting *Woodard* , 616 So. 2d at 502 ). CNN argues that it played a verbatim clip of Dershowitz' actual words spoken during a high-level government proceeding and, therefore, the fair report privilege applies. *See Jamason v. Palm Beach Newspapers, Inc.* , 450 So. 2d 1130, 1132 (Fla. 4th DCA 1984) ("accurate report of judicial proceeding" entitled to fair report privilege). Dershowitz does not dispute that the privilege would probably apply if CNN had merely played the truncated clip without further comment. But that is not Dershowitz' claim. The one-count Complaint alleges that the truncated clip was part of "a deliberate scheme to defraud" CNN's audience (DE [1], ¶ 11) that enabled Lockhart, Berman, and Begala to present Dershowitz's comments in a defamatory manner. Thus, for purposes of applying the fair report privilege the Court must consider the broadcasts and the clip as a whole and not as separate claims. And the question is whether CNN's broadcasts presented an accurate or fair abridgment of Dershowitz' comments to the Senate. To answer this, we must look to the source documents. *Folta* , 2019 WL 1486776, at *4 ("Determining whether a report is fair and accurate requires a close comparison of the report and the documents and information from which it is drawn."); *Stewart v. Sun Sentinel Co.* , 695 So. 2d 360, 362 (Fla. 4th DCA 1997) (comparing defamatory information with official documents for "material differences" that would defeat the fair report privilege).

During the impeachment trial, Senator Ted Cruz submitted a question for Dershowitz to answer: "As a matter of law, does it matter if there was a quid pro quo? Is it true that quid pro quos are often used in foreign policy?" *Congressional Record* , 166:19 (Jan. 29, 2020), p. S650. (DE [17-1], p. 7). Dershowitz answered at length and gave several hypotheticals of quid pro quo that he considered would be lawful. At several points in his response, Dershowitz stated that a quid pro quo that is unlawful would be one based on an illegal motive. These points are highlighted below:

> I offered you a hypothetical the other day: What if a Democratic President were to be elected and Congress were to authorize much money to either Israel or the Palestinians and the Democratic President were to say to Israel "No; I am going to withhold this money unless you stop all settlement growth" or to the Palestinians "I will withhold the money Congress authorized to you unless you stop paying terrorists, and the President said "Quid pro quo. If you don't do it, you don't get the money. If you do it, you get the money"? There is no one in this Chamber who would regard that as in any way unlawful. *The only thing that would make a quid pro quo unlawful is that if the quo were in some way illegal.*

1364*1364

Dershowitz v. Cable News Network, Inc.     541 F. Supp. 3d 1354 (S.D. Fla. 2021)

Now, we talked about motive. There are three possible motives that a political figure can have: One, a motive in the public interest, and the Israel argument would be in the public interest; the second is in his own political interest; and the third, which hasn't been mentioned, *would be in his own financial interest, just putting money in the bank.* I just want to focus on the second one for just one moment.

Every public official whom I know believes that his election is in the public interest. Mostly, you are right. Your election is in the public interest. If a President does something which he believes will help him get elected – in the public interest – that cannot be the kind of quid pro quo that results in impeachment....

Everybody has mixed motives, and for there to be a constitutional impeachment based upon mixed motives would permit almost any President to be impeached.

How many Presidents have made foreign policy decisions after checking with their political advisers and their pollsters? If you are just acting in the national interest, why do you need pollsters? Why do you need political advisers? Just do what is best for the country. But if you want to balance what is in the public interest with what is in your party's electoral interest and in your own electoral interest, it is impossible to discern how much weight is given to one or the other.

Now, we may argue that it is not in the national interest for a particular President to get reelected or for a particular Senator or Member of Congress – and maybe we are right; it is not in the national interest for everybody who is running to be elected – but for it to be impeachable, you would have to discern that he or she made a decision solely on the basis of, as the House managers put it, corrupt motives, and *it cannot be a corrupt motive if you have a mixed motive that partially involves the national interest, partially involves electoral, and does not involve personal pecuniary interest.*

The House managers do not allege that this decision, this quid pro quo, as they call it – and the question is based on the hypothesis that there was a quid pro quo. I am not attacking the facts. *They never allege that it was based on pure financial reasons. It would be a much harder case.*

If a hypothetical President of the United States said to a hypothetical leader of a foreign country: Unless you build a hotel with my name on it and unless you give me a million-dollar kickback, I will withhold the funds. *That is an easy case. That is purely corrupt and in the purely private interest.*

But a complex middle case is: I want to be elected. I think I am the greatest President there ever was, and if I am not elected the national interest will suffer greatly. That cannot be.

*Congressional Record* 166:19 (Jan. 29, 2020) pp. S650-51 (emphasis added). (DE [17-1], pp. 7-8).[5]

[5] CNN argues that the paragraph breaks in the Congressional Record signify that Dershowitz is "manipulat[ing] his Senate arguments by merging together *three* separate paragraphs from the Congressional Record to make it appear as one thought." (DE [24], p. 5). The Court must consider the entirety of Dershowitz' remarks, and the editorial judgment of the Government Printing Office staff is not binding on this Court.

To compare Dershowitz' answer with the comments made by CNN's commentators, those comments are set forth again, below:

Having worked on about a dozen campaigns, there is always the sense that, boy, if we win, it's better for the country.

1365*1365

But that doesn't give you license to commit crimes or to do things that are unethical. So, it was absurd. What I thought when I was watching it was this is un-American. This is what you hear from Stalin. This is what you hear from Mussolini, what you hear from authoritarians, from Hitler, from all the authoritarian people who rationalized, in some cases genocide, based what was in the public interest." -- Joe Lockhart @ 7:11 p.m., January 29, 2020.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The president's defense team [Dershowitz] seems to be redefining the powers of the president, redefining them towards infinity." ... [truncated clip played] ... "If you look at what he says there it blows your mind. He says if a president is running for re-election because he thinks getting elected will help America, he can do anything, anything, And that redefines the presidency and America." -- John Berman @ 6:17 a.m., January 30, 2020.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I did not go to Harvard Law, but I did go to the University of Texas School of Law, where I studied criminal law and constitutional law, but never dreamed a legendary legal mind would set them both ablaze on the Senate floor. The Dershowitz Doctrine would make presidents immune from every criminal act, so long as they could plausibly claim they did it to boost their re-election effort. Campaign finance laws: out the window. Bribery statutes: gone. Extortion: no more. This is Donald Trump's fondest figurative dream: to be able to shoot someone on Fifth Avenue and get away with it." -- Paul Begala on CNN.com, January 29, 2020 @ 9:11 p.m.

Dershowitz alleges he never said a president could commit illegal acts if he thought it would help his reelection and his reelection was in the public interest. (DE [1], ¶ 8). And he alleges that CNN, through its employee commentators, distorted the meaning of what he said to the Senate in the coverage on CNN.com and the two broadcasts. (DE [1], ¶ 10, 11). Dershowitz contends that by omitting the phrase, "the only thing that would make a quid pro quo unlawful is if the quo were somehow illegal," CNN presented Dershowitz' comments in a misleading context, which enabled the commentators to (falsely) assert that Dershowitz believed a president could extract a quid pro quo for any reason, including an illegal reason, if he believed it would help his re-election. Dershowitz alleges that if the entire clip had been played, no panel guest would have been able to credibly make that statement. (DE [1], ¶ 9). Thus, Dershowitz argues, CNN presented an official proceeding in a misleading manner and the fair report privilege does not apply.

The Court agrees. CNN presented an abridgment of Dershowitz' answer to Senator Cruz' question. The abridgment is not accurate, to the extent that it omitted a crucial qualification: that an illegal motive for a quid pro quo would be corrupt. As a result, the commentators' statements – that Dershowitz believes a President can do anything, even commit crimes if it would help his re-election – are not based upon a fair and accurate summary of Dershowitz' statement to the Senate.

CNN argues that editors and publishers have great discretion to determine what information to publish. This is correct. But the qualified fair report privilege "merely means that the report of [official] proceedings must be correct." *Jamason* , 450 So. 2d at 1132 (quoting *Walsh v. Miami Herald Publishing Co.* , 80 So. 2d 669, 671 1366(Fla. 1955) ).*1366 CNN argues that Dershowitz' response to Senator Cruz' statement was ambiguous and that CNN was reasonable in its belief that Dershowitz argued "that presidents cannot be impeached for actions taken to win an election if the President believes his own interest would be in the public interest, regardless of the legality of those actions." (DE [17], p. 14). That is an argument that CNN may present to a jury. But because the broadcasts did not present a fair and accurate abridgment of Dershowitz' remarks, CNN cannot avail itself of the fair report privilege.

Finally, CNN argues that the media has no obligation to present additional information that would present a subject in a better light. This too is correct. *See Folta* , 2019 WL 1486776, at *5 (media has "the right to focus and color their report to capture and hold the readers' attention" provided the report is "substantially accurate"). Thus, in *Larreal v. Telemundo of Florida, LLC* , 489 F. Supp. 3d 1309 (S.D. Fla. 2020), the fair report privilege applied to a report that the plaintiff was arrested during a raid conducted as part of a long-term undercover narcotics investigation. The Telemundo report was one about the undercover raid and arrests. *Id.* The plaintiff sued Telemundo for defamation and alleged it omitted information that would have clarified that he was arrested on a traffic-related warrant. The court stated that "regardless of the charges against the other individuals, the fact that Larreal was arrested on a bench warrant alone does not rebut or undermine Telemundo's accurate reporting about the operation's arrests or change the gist of the story." *Id.* at *1322.

By contrast, the CNN broadcast segments set forth in Dershowitz' Complaint were focused specifically on Dershowitz' comments to the Senate and, as presented on air, changed the gist of what Dershowitz said. For the fair report privilege to apply a defendant must have "presented a fair and accurate report of the source documents." *Folta* , 2019 WL 1486776, at *6. The CNN broadcasts do not meet that standard.

B. <u>Fact v. Opinion</u>

CNN's next ground for dismissal is that the allegedly defamatory statements were non-actionable opinion. CNN argues that the statements at issue were made during commentary shows about the impeachment proceedings and were "rhetorical hyperbole" protected by the First Amendment. *See Horsley v. Rivera* , 292 F.3d 695, 701 (11th Cir. 2002) (holding non-literal, figurative language not defamatory). Thus, CNN argues that statements referring to Dershowitz' arguments as "un-American," that he was "redefining the powers of the President," that his position "blows your mind," and that his argument "is what you hear from Stalin ... what you hear from Mussolini, what you hear from authoritarians" are hyperbole for which there can be no liability.

Dershowitz agrees with CNN on the hyperbolic nature of the commentary and that no liability would attach to those kinds of statements. But he argues that the commentaries also contained untrue, defamatory factual comments – that Dershowitz said a President could do anything without liability (even commit crimes) if he thought it would help his reelection and was in the national public interest – that were contradicted by the full context of Dershowitz' answer to Senator Cruz' question. The Court concludes that the commentators' statements set forth in the Complaint were not pure opinion but instead were mixed expressions of opinion that could reasonably be construed as defamatory. *See Barnes v. Horan* , 841 So. 2d 472, 477 (Fla. 3rd DCA 2002) 1367(the court must determine whether an expression of opinion can also contain a defamatory *1367 meaning due to assertion of undisclosed acts).

A mixed expression of opinion is not constitutionally protected. *Madsen v. Buie* , 454 So. 2d 727, 729 (Fla. 1st DCA 1984). "[A] statement that although ostensibly in the form of an opinion 'implies the allegation of undisclosed defamatory facts as the basis for the opinion' *is* actionable." *Eastern Air Lines, Inc. v. Gellert* , 438 So. 2d 923, 927 (Fla. 3rd DCA 1983) *disapproved on other grounds* , *Ter Keurst v. Miami Elevator Co.* , 486 So. 2d 547 (Fla. 1986) (quoting Restatement (Second) of Torts § 566 (1977) ) (emphasis in original). Further, "where the speaker or writer neglects to provide the audience with an adequate factual foundation prior to engaging in the offending discourse, liability may arise." *Zambrano* , 484 So. 2d at 607. The Complaint alleges that CNN's broadcasts lacked the "adequate factual foundation" that would have prevented the commentators from mischaracterizing Dershowitz' argument. The Court concludes that the Complaint plausibly alleges that the comments made on CNN and CNN.com were defamatory statements of mixed opinion.

CNN argues that because the impeachment trial was widely covered by it and other media outlets, the underlying facts were "known to the audience" and, therefore, a finding of pure opinion may still be made. *Id.* at 606-07 ; *Rasmussen* , 946 So. 2d at 571. The court must consider numerous factors in determining whether a comment or editorial is based upon publicly disclosed facts. *Rasmussen* , 946 So.2d at 571. These include construing "the statement in its totality," considering "the context in which the statement was published," and accounting for "all of the circumstances surrounding the publication, including the medium by which it was disseminated and the audience to which it was published." *Id.* Although some of these factors are alleged in the Complaint or are available to the Court at the motion to dismiss stage, other factors relating to the context of the broadcasts and its audience are not before the Court. This requires a more fully developed record. At this stage, the Court concludes that Dershowitz' Complaint meets the plausibility standard for alleging a false statement of fact.

C. <u>Actual Malice</u>

CNN next moves to dismiss the Complaint for failure to plausibly allege the "actual malice" standard of fault applicable to public figures as required by *New York Times Co.* , 376 U.S. 254, 84 S.Ct. 710. The plausibility standard of *Iqbal* and *Twombly* applies to the actual malice standard in defamation proceedings. *See Michel* , 816 F.3d at 702. A public figure must, therefore, plead "facts giving rise to a reasonable inference that the defendant[ ] published the story knowing that it was false or with reckless disregard for whether it was false or not." *Id.* at 703. There must be some showing that the defendant intended "to avoid the truth." *Id.*

CNN argues that Dershowitz pleads only conclusory statements of actual malice and fails to "home to" the person(s) responsible for the alleged defamation. *New York Times Co.* , 376 U.S. at 287, 84 S.Ct. 710 (The state of mind required for actual malice must be "brought home" to the persons having responsibility for publishing the offending material). CNN also argues that it aired live Dershowitz' complete argument earlier in the day and, therefore, it is impossible for Dershowitz to plead actual malice with connection to the later showing of the 1368 truncated clip.[6] *1368 Finally, CNN argues that Dershowitz' statement to the Senate was so ambiguous that any misinterpretation by CNN cannot be attributed to actual malice.

[6] The Court will not (at this time) entertain CNN's arguments concerning Dershowitz' subsequent appearances on shows with Wolf Blitzer and Chris Cuomo as those matters are outside the four corners of the Complaint.

In deciding a motion to dismiss, the court must accept as true the plaintiff's well-pleaded facts and construe them in the light most favorable to the plaintiff. *Crawford's Auto Center, Inc. v. State Farm Mut. Auto. Ins. Co.* , 945 F.3d 1150 (11th Cir. 2019). Dershowitz alleges that, after the live broadcast, "CNN then went to work by assembling panels for programming throughout the day in which the hosts shared" only the truncated clip. (DE [1], ¶ 8). He alleges that CNN intentionally omitted the statement that a quid pro quo would be unlawful if the

quo were illegal in order to "fool its viewers" into believing that Dershowitz actually said that a President could commit illegal acts so long as he thought it would help his reelection and that his reelection was in the public interest. (*Id.* ). This was done, he alleges, "to falsely paint Professor Dershowitz as a constitutional scholar and intellectual who had lost his mind." (*Id.* ). He alleges that CNN knew for certain that he had prefaced his remarks with the qualifier that a quid pro quo could not include an illegal act because it aired the entire statement earlier in the day, but that CNN knowingly omitted that portion when it played the truncated clip "time and again." (*Id.* , ¶¶ 9, 10). He alleges that the truncated clip was created "intentionally and deliberately with knowledge and malice to facilitate its ability to falsely claim that plaintiff said the opposite of what he actually said." (*Id.* , ¶ 18). And, finally, Dershowitz alleges that commentators made their statements with knowledge or reckless disregard that they were false. (*Id.* , ¶ 17).

These allegations, for purposes of surviving the Motion to Dismiss, plausibly plead a factual basis from which "actual malice" can be inferred. The Complaint alleges that CNN knew its reports were false, it explains the reasons CNN and its employees knew the reports were false, it explains the nature of the alleged falsehoods, and it alleges who made the false statements.

To the extent that the Complaint does not identify with specificity the persons (other than the commentators) within the CNN organization who were responsible for the broadcast decisions, that is a matter for discovery. The Court does not accept CNN's argument that a public figure defamation plaintiff must identify and plead (before discovery) each responsible decision maker within a news organization. The claims in *New York Times Co.* , 376 U.S. 254, 84 S.Ct. 710, went to a jury trial but the plaintiff ultimately failed to establish that the persons responsible for publication of the offending advertisement acted with actual malice. *Id.* at 287, 84 S.Ct. 710. In a case involving a large news organization where the responsible decision makers may not be otherwise known, a plaintiff must be permitted to plead the facts that would plausibly establish actual malice without identifying a specific person. It is then the plaintiff's burden to conduct the discovery necessary to identify and, to be successful, present record evidence that those individuals acted with actual malice. *See, id.* ("[T]he evidence against the Times supports at most a finding of negligence ... and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice.")

CNN cites the district court's dismissal in *Mejia v. Telemundo Mid-Atl., LLC* , 440 F. Supp. 3d 495, 497 (D. Md. 2020), for support of its argument that Dershowitz was required to plead that a specific individual acted with actual malice. But *Mejia* is inapposite. That case involved a private figure whose punitive damages claim required *1369 allegations that the defamer acted with actual malice. *Id.* at 499. The case was dismissed because the plaintiff failed to allege any facts that would establish the requisite fault (negligence). *Id.* at 501-502. The court's reference to actual malice, that the complaint contained "no factual allegations referring to the state of mind of the individual in charge of Defendant's banners," referred to the punitive damages claim.[7] *Id.* at 499, 502. *Mejia* has no bearing on the present case.

> [7] In a later decision, the *Mejia* court granted leave to file a third amended complaint where the proposed pleading raised additional factual allegations sufficient to raise a plausible claim that the defendant acted negligently in allowing the false banner to be broadcast. The third amended complaint did not specify a particular individual. *Mejia v. Telemundo Mid-Atlantic LLC* , 2021 WL 594215, at *3 (D. Md. Feb. 16, 2021).

Next, the fact that CNN played Dershowitz' entire statement earlier in the day does not preclude Dershowitz from alleging that later broadcasts of the truncated clip (and the related commentary) were done with actual malice. Viewers who watched the earlier broadcasts may well have been able to put the truncated clip and the commentators' statements into context. But for those viewers who did not see the earlier broadcasts,

Dershowitz' Complaint about the later broadcasts at least reaches the required level of plausibility to sustain his defamation claim. The earlier broadcasts and their effect on the issue of actual malice may be an issue for a jury to consider, but they have no bearing on the sufficiency of the pleadings.

Finally, CNN argues that Dershowitz' answer to the Senator Cruz' question was so "extravagantly ambiguous" that Dershowitz cannot establish that CNN acted with actual malice in airing the clip or discussing his arguments. Citing *Time, Inc. v. Pape* , 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), CNN contends that its commentators' analysis of Dershowitz' argument, even if incorrect, cannot create an issue of actual malice.

In *Pape* , the newsmagazine Time published an article about a report issued by the federal Civil Rights Commission. The report detailed numerous incidents of police brutality, including an incident in Chicago that gave rise to a federal lawsuit. But the Time article did not specify that the facts about the Chicago incident were taken from a civil complaint, rather than from an independent finding of the Commission. A police officer named in the report sued Time for defamation, and the issue was whether omission of the word "allegedly" from the Time account was enough to establish actual malice. The trial court entered a directed verdict in favor of the defendant, but the court of appeals reversed. The author of the Time article testified at trial that the context of the report indicated to him that the Commission believed that the incident occurred as described. After reviewing the totality of the underlying report *and the testimony of the Time writer* , the Supreme Court concluded that "[t]o permit the malice issue to go to the jury because of the omission of a word like 'alleged,' despite the context of that word in the Commission Report and the external evidence of the Report's overall meaning, would be to impose a much stricter standard of liability on errors of interpretation or judgment than on error of fact." *Id.* at 290, 91 S.Ct. 633.

In the present case, the Court has before it only the allegations of the Complaint, which must be taken as true, and the substance of the broadcasts. Dershowitz has adequately pleaded actual malice to survive the Motion to Dismiss. Whether the evidence adduced will ultimately satisfy Dershowitz' burden of proving actual malice by 1370 clear and convincing evidence *1370 remains to be seen. But he has alleged enough to go forward.

## IV. POLITICAL MALEVOLENCE

In a footnote, CNN argues that Dershowitz' "claims of disinterested political malevolence are insufficient" to establish actual malice. The Court agrees and, further, concludes that these allegations should be stricken as immaterial and impertinent. Fed. R. Civ. P. 12(f). In paragraph 14 of the Complaint, Dershowitz alleges:

> Professor Dershowitz was one of the most revered and celebrated legal minds of the past half century. His reputation relating to his expertise in criminal and constitutional matters was one that lawyers would only dream about attaining in their lifetimes. However, Professor Dershowitz appears to have made one mistake. He chose to defend the President of the United States and defend the U.S. Constitution at a moment in time where CNN has decided that doing so is not permitted. For this, CNN set out to punish him and destroy his credibility and reputation, and unfortunately, succeeded.

The Supreme Court has stated that "[a defendant's] motive in publishing a story ... cannot provide a sufficient basis for finding actual malice." *Harte-Hanks Communications., Inc. v. Connaughton* , 491 U.S. 657, 665, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Indeed, a defamation claim cannot rest on the argument that "erroneous communications were motivated by differences in political opinions. Doing so would run afoul of the Supreme Court's landmark ruling in *New York Times Co. v. Sullivan* . *See* 376 U.S. at 271–72, 84 S.Ct. 710 (noting that errors are inevitable when there is free debate and that they too must be protected to give breathing room to those exercising their freedom of expression)." *Arpaio v. Robillard* , 459 F. Supp. 3d 62, 66 (D.D.C. 2020).

Paragraph 14 of Dershowitz' Complaint alleges that CNN was motivated by political animus. As Judge Lamberth noted in *Arpaio* , "Allegations of 'leftist enmity' cannot trump the guarantees of the First Amendment." *Id.* "Striking a pleading or a portion thereof is a drastic remedy to be resorted to only when required for the purposes of justice." *Sanchez v. Selective Ins. Co. of the Southeast* , 2019 WL 79282, at *2 (S.D. Fla. Jan. 2, 2019) (quotation omitted). Nevertheless, the allegations in paragraph 14 are immaterial to the claim and are an impertinent salvo that do not belong in this case. Rule 12(f)(1), Fed. R. Civ. P., gives the Court the power to strike such matters "on its own." *Sanchez* , at *3 (*sua sponte* striking plaintiff's request for interest). The Court will exercise that power and strike paragraph 14 from the Complaint.

## V. CONCLUSION

For the reasons set forth above, the Court finds that Dershowitz has plausibly alleged facts sufficient to withstand CNN's Motion to Dismiss. The Court is in no way ruling on the merits of the case but concludes merely that Dershowitz has satisfied the pleading requirements of Rule 8(a)(2), Federal Rules of Civil Procedure. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss (DE [17]) is **DENIED** . It is further **ORDERED** that paragraph 14 of Plaintiff's Complaint is **STRICKEN** pursuant to Fed. R. Civ. P. 12(f)(1).

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 24th day of May 2021.

 casetext

EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

|  |  |
|---|---|
| PATRICK NATHANIEL REED, | } |
| | } |
| Plaintiff | } |
| | } |
| v. | } |
| | } Case Number: 3-22-CV-01059-TJC-PDB |
| BRANDEL CHAMBLEE, TGC, LLC, | } |
| DAMON HACK, BENJAMIN BACON, | } |
| EAMON LYNCH, GOLFWEEK, & | } |
| GANNETT CO., INC., | } |
| | } |
| Defendants. | } |
| | } |
| | } |
| | } |
| | } |
| | } |

---

## <u>AFFIDAVIT OF MICHAEL PRIMEAU</u>

STATE OF MICHIGAN          )

COUNTY OF OAKLAND      )

  BEFORE ME, the undersigned authority, personally appeared MICHAEL PRIMEAU, who having been duly sworn, deposes and says:

  1. I, MICHAEL PRIMEAU, an American citizen of legal age, partner at Primeau Forensics, LTD, address located at 1703 Star Batt Drive, Rochester Hills, Michigan, USA. Primeau Forensics is a firm comprised of experts and technicians specializing in analyzing audio, video, and image recordings.

1

2. I have been practicing the analysis of digital media as a consulting and testifying expert for ten years.

3. I have expert witness testimony experience in the United States at the State and Federal levels.

4. Throughout my career, I have been retained as an expert for Law Enforcement agencies in forensic investigative capacities throughout the United States. Some of these departments include The Department of Justice, Department of Defense, Department of Internal Affairs, Cedar Rapids Police in I.A., Attorney Generals' offices of New York, Michigan, and several others.

5. I am a current video committee member with SWGDE (The Scientific Working Group on Digital Evidence), regularly contributing to best practices in forensic video analysis.

6. I am a current member of the IAI (International Associate for Identification), AES (Audio Engineering Society), and LEVA (The Law Enforcement and Emergency Services Video Association).

7. I am certified as a Forensic Video Technician through LEVA (The Law Enforcement and Emergency Services Video Association).

8. My forensic practices for audio investigation include digital audio authentication, clarification, and comparison. As a video forensic expert, my practices include video authentication, clarification, analysis, and recovery. As an image forensic expert, my practices include image clarification, image authentication, and image comparison.

9. I, Michael Primeau, understand that my duty as an expert witness is to assist the court by providing impartial, objective, unbiased, and independent opinions uninfluenced by the party who retained me or called me a witness.

10. Throughout every video authentication investigation, I apply peer-reviewed methodology and training I have received in multiple forensic video analysis tools.

11. Please see Exhibit A, my curriculum vitae, which outlines my qualifications.

12. Please see Exhibit B, my courtroom testimony, which outlines my experience giving deposition and courtroom testimony.

13. On August 19, 2020, Ms. Justine Reed contacted Primeau Forensics to examine two (2) video files and again on February 15, 2023, to examine four (4) additional video files. Ms. Reed requested I perform a forensic video authentication investigation to determine the authenticity of six (6) videos and to provide opinions. For this case, I was retained as an expert in forensic video analysis by Klayman Law Group, P.A.

14. The videos provided to me by Ms. Reed are as follows:

  a. "USGOLF_12-06-2019_14.32.17.mp4" includes the events where Mr. Reed participated in the subject Hero World challenge tournament where the events were broadcast. The events are related to the shot played by Mr. Reed on hole number 11. The broadcast includes an audio commentary with the video events.

  b. "USGOLF_12-06-2019_14.56.46.mp4" includes the events where Mr. Reed participated in the subject Hero World Challenge Tournament, where the events were broadcasted and recapped. The commentary analyzes a slow-motion re-broadcast of the shot played from hole number 11 referenced in a. above. This is the first mention of any precarious positioning that Patrick may have been in.

  c. "USGOLF_01-29-2023_07.06.05.mp4" includes the events where Mr. Reed participated in the Dubai Desert Classic subject. The events depict a shot played

3

by Patrick where his ball ended up in a palm tree in Dubai. This video demonstrated the original, unaltered broadcast that 40,000 people watched online.

d. "USGOLF_01-29-2023_19.17.53.mp4" includes the events where the Golf Central live broadcast breaks down Mr. Reed's original shot from the events in point c. above. The breakdown uses demonstrative highlighting, slow motion evaluation, video enlargement, and frame-by-frame breakdown over a live broadcast. Statements were generated as to the travel route and balls landing position through subjective analyses. This video includes the defendant Brandel Chamblee.

e. "USGOLF_01-29-2023_19.25.03. over 250,000 viewership.mp4" includes the events that reference a substantial increase in viewership from 39,000 plus to over 250,000 viewership in a matter of minutes. This is, in part, a pattern of practice concerning Mr. Reed.

f. "USGOLF_01-29-2023_19.27.53.mp4" includes events referenced in point d above, where Brandel Chamblee made continued evaluations and statements.

g. The videos set forth and analyzed are referenced in the Amended Complaint document in the above-styled case, Paragraphs 121 through 126.

15. The definition of image authentication as defined by SWGDE Best Practices for Image Authentication Version: 1.0 (July 11, 2018) is as follows; The application of image science and domain expertise to discern if a questioned image or video is an accurate representation of the original data by some defined criteria, and/or the determination of the source of the image.

4

16. I applied preliminary forensic video analysis testing to two recordings Ms. Reed provided me in 2020 titled "USGOLF_12-06-2019_14.32.17.mp4" and "USGOLF_12-06-2019_14.56.46.mp4" as well as a report. The findings from that investigation are as follows:

   a. Observations from the Data Acquisition

      i. The first set of videos was downloaded from a source titled TVEyes.

      ii. Throughout my investigation, I noted no information about the handling of the digital video evidence noted in the objective section of this report. This information includes but is not limited to the circumstances in which the recordings were created, maintained, copied, and delivered to my office for investigation purposes. Therefore, I cannot authenticate the chain of custody and provide confirmation or forensic certainty that the digital video recordings provided in the objective section of this report are original copies and, therefore an authentic representation of the events as they naturally occurred.

   b. Observations from the Frame-by-Frame Analyses

      i. Based on my review of both digital video recordings, there are events that occurred in the digital video recording titled "USGOLF_12-06-2019_14.32.17.mp4" (live broadcast) that were not included in the digital video recording titled "USGOLF_12-06-2019_14.56.46.mp4" (replay). Throughout the analysis of the recording, I noted that the video events depicted were the actions from Mr. Reed's 2nd Golf swing to which the

5

ball landed and ultimately stopped. Throughout the course of these events, I noted that they appear to have been recorded before the events in the recording titled "USGOLF_12-06-2019_14.56.46.mp4". This is based on the audio narration that describes the video event in slow motion or considered a "replay" in the game of Golf. Therefore, the events in the digital video recording titled "USGOLF_12-06-2019_14.32.17.mp4" occurred before the events in the recording titled "USGOLF_12-06-2019_14.56.46.mp4".

ii. In conclusion, this video content may be necessary to determine the authenticity of the events that occurred throughout Mr. Reed's Golf performance that day. I understand that the video recordings are portions of a more extensive broadcast that the Golf Channel captured. Therefore, I believe there may be additional video recorded content in the form of any of the following available for review; digital video tape, completed broadcast at full length, original digital video files, individual camera digital video stems. However, an authentic chain of custody would also be necessary. In other words, the recordings would need to have been preserved in an original or original copy format.

iii. Throughout the frame-by-frame analysis, I also noted visual compression artifacts on the recording titled "USGOLF_12-06-2019_14.56.46.mp4". The visual compression artifact I noted is included in the category of macroblock compression. Compression artifacts can either introduce or remove pixel information initially recorded at the initial encoding time. A

visual compression artifact such as block-level compression can change the authenticity of the events as they occurred initially because the pixel information has been reduced (compressed). I noted two areas of the digital image in frame 879.

    iv.  The referenced visual artifacts in video frame 879 raised concerns about the accuracy of the digital integrity verification testing I could perform. Therefore I concluded the testing would be inconclusive on a non-original recording because the recordings had been reencoded or compressed using lossy compression.

c.  Opinions

    i.  Based on the theories of admissibility as well as the relevancy to the images depicted in the digital video recordings titled "USGOLF_12-06-2019_14.32.17.mp4" and "USGOLF_12-06-2019_14.56.46.mp4", it is my opinion that the recordings are missing relevant images that are important to the investigation of the events that transpired during Mr. Reed's game of Golf that day.

    ii.  I believe the digital video recordings titled "USGOLF_12-06-2019_14.32.17.mp4" and "USGOLF_12-06-2019_14.56.46.mp4" are not an accurate or authentic representation of the events because additional video content was recorded and not broadcasted to the public. Therefore, they do not meet the admissibility requirements under the silent witness theory as they have not been authenticated.

7

      iii.  I believe that The Golf Channel may have additional video content in their possession that was initially recorded in the live broadcast relevant to the investigation of Mr. Reed's playing that day. To provide additional information, these additional recordings would require a full authentication investigation.

17. When conducting forensic examinations to determine authenticity, the methodology to authenticate/identify a video's source may differ from the methodology to authenticate whether or not the video content has been altered. Commonly asked questions that drive authentication examinations include but are not limited to the following:

    a.  How did a file come to be in its present state?

    b.  What type, brand, or model of camera-generated the file?

    c.  Is the file a camera-original file?

    d.  Has the file been reencoded?

    e.  Has the content of a file been altered/modified beyond what it is purported to be?

18. After careful examination of the digital information within the files titled "USGOLF_12-06-2019_14.32.17.mp4", "USGOLF_12-06-2019_14.56.46.mp4", "USGOLF_01-29-2023_19.25.03. over 250,000 viewership.mp4", "USGOLF_01-29-2023_19.27.53.mp4", "USGOLF_01-29-2023_19.17.53.mp4", "USGOLF_01-29-2023_07.06.05.mp4", I noted several observations:

    a.  The metadata contained insufficient camera-original or device information to authenticate the videos. In other words, the video files do not accurately represent the original footage as they have been edited, reformatted/converted, and broadcasted.

8

b.  The digital information necessary about the original equipment that created the videos has been stripped. Thus, the equipment or camera source that initially recorded the files cannot be identified.

c.  A "Lavf58.51.10" signature within the metadata indicates that the files have been reencoded using the Lavf (Libavformat) writing library. This writing library is commonly used in dozens, if not hundreds, of video applications.

d.  Slow-motion videos were recorded at a higher frame rate than the evidence provided. Thus, accurate frame timing reports cannot be extracted from the files we received to determine authenticity.

19. After a critical review of the audio and video streams of the files titled "USGOLF_12-06-2019_14.32.17.mp4", "USGOLF_12-06-2019_14.56.46.mp4", "USGOLF_01-29-2023_19.25.03. over 250,000 viewership.mp4", "USGOLF_01-29-2023_19.27.53.mp4", "USGOLF_01-29-2023_19.17.53.mp4", "USGOLF_01-29-2023_07.06.05.mp4",

I noted that the subject events contained multiple sources of video commonly described as broadcasts. These events can either be arranged using a non-linear editing application or switched between through a device or software in a live format. All individual sources of video and audio streams would need to be analyzed independently to verify the accuracy of the subject events that initially occurred. These individual streams were subsequently captured within individual containers. Video files are commonly produced in two containers: Open File Format and Proprietary. Each container will include pertinent information that an analyst relies upon to determine authenticity. Thus, the representation of the events may have been changed and cannot be authenticated at this time.

9

20. After a critical review of the encoding structure of the files titled "USGOLF_12-06-2019_14.32.17.mp4", "USGOLF_12-06-2019_14.56.46.mp4", "USGOLF_01-29-2023_19.25.03. over 250,000 viewership.mp4", "USGOLF_01-29-2023_19.27.53.mp4", "USGOLF_01-29-2023_19.17.53.mp4", "USGOLF_01-29-2023_07.06.05.mp4", I noted that the provenance had changed the format. This is primarily based on my experience as a video editor for several years. Due to the alteration in proprietary timing, quality, format, container, and encoding information, content authentication cannot be applied to determine changes to the recorded audio and video streams/streams.

21. Based on the materials provided, I believe that the authenticity of all video recordings (i.e., witness) submitted cannot be verified due to the lack of information about the provenance of individual audio and video sources. The additional methodology cannot be applied accurately to make determinations about manipulation.

22. Based on the materials provided, it is my opinion that the accuracy and reliability of the events within the video recordings (i.e., witness) submitted have been limited due to the spatial resolution, temporal/spatial compression artifacts, and frame rate.

23. I recommend completing a complete evaluation of all equipment, storage devices, video containers, and sessions/projects used in preparation and production of video evidence to provide further information. Furthermore, I consider a site inspection necessary.

24. Based on the materials provided, I believe the evidence files submitted were altered. This is based on widely-accepted terms within the scientific community.

25. I reserve the right to amend my conclusions and opinions as additional materials are provided in conjunction with future oral testimony.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Affiant's Name: <u>MICHAEL PRIMEAU</u>

Dated: <u>2/17/23</u>

     Sworn and subscribed before me, by means of [  ] physical presence or [  ] online notarization, on this ____ day of February 2023 by <u>MICHAEL PRIMEAU</u>, who is personally known to me and/or produced to me an identification card or other document, and who took an oath.

NOTARY PUBLIC

Name: <u>Frederick Sellers</u>

Commission No. : _____

My Commission Expires: <u>April 12, 2029</u>

11