**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

|                                   |     |                                   |
|-----------------------------------|-----|-----------------------------------|
| PATRICK NATHANIEL REED,           | }   |                                   |
|                                   | }   |                                   |
| Plaintiff                         | }   |                                   |
|                                   | }   | **Case Number: 3-22-CV-01059-TJC-PDB** |
| v.                                | }   |                                   |
|                                   | }   | **ORAL ARGUMENT REQUESTED**       |
| BRANDEL EUGENE CHAMBLEE,          | }   |                                   |
| et al                             | }   |                                   |
|                                   | }   |                                   |
| Defendants.                       | }   |                                   |

---

### PLAINTIFF PATRICK NATHANIEL REED'S OPPOSITION TO DEFENDANTS BRANDEL CHAMBLEE, DAMON HACK, BENJAMIN BACON, EAMON LYNCH AND TGC, LLC'S MOTION TO DISMISS AMENDED COMPLAINT

Plaintiff Patrick Nathaniel Reed ("Mr. Reed") hereby submits his opposition to Defendants Brandel Chamblee ("Defendant Chamblee"), Damon Hack ("Defendant Hack"), Benjamin Bacon ("Defendant Bacon"), Eamon Lynch ("Defendant Lynch") and TGC, LLC d/b/a The Golf Channel's ("Defendant Golf Channel") Motion to Dismiss Amended Complaint. ("Defendants' Motion"). The Amended Complaint goes far beyond complying with the mere notice and plausibility pleading requirements under Federal Rules of Civil Procedure 8(a) and 12(b)(6) ("FRCP"), and the landmark Supreme Court case of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Thus, Defendants' frivolous Motion must be denied.

As importantly, Defendants Motion is little more than a not too veiled attempt to deceptively end run the law of defamation by falsely hiding upon contrived claims of First Amendment protection. The First Amendment categorically does not shield those who defame even a public figure from being held to the letter of the law. *See* Manual Socias, *Showing Constitutional Malice in Media Defamation*, Fla. Bar. J. Exhibit 1. Here, counsel for Defendants distorts the well pled facts and the law to further the on-going campaign to destroy Mr. Reed, his

family and colleagues as the poster boy of LIV Golf, a new entrant into professional golf, by mischaracterizing the allegations of the Amended Complaint, which goes to pains to adhere to this honorable Court's instructions. *See* Notice at ECF No. 29. In so doing, Defendants' counsel refuses to address the specific allegations of defamation, falsely lumping them all together as mere opinion, and then, to top it all off, unethically attempting to communicate ex parte with this honorable Court by sending to chambers a USB Hard Drive, which for the last six weeks and counting was and still has not been served on Mr. Reed's counsel! At this point, only God knows what is contained in this secret USB Hard Drive, along with irrelevant other so-called exhibits to try to prejudice Mr. Reed. These extraneous materials are prohibited given that their Motion to Dismiss is made pursuant to FRCP (12)(6). Apparently, Defendants' counsel, who advertises on his firm's website that he worked for this honorable Court to obviously lure clients as a young associate, such as his clients here, feels that he can do as he pleases without consequences.

## INTRODUCTION AND STATEMENT OF RELEVANT FACTS

Contrary to the wholly non-meritorious Motion of Defendants – which fails to address with any specificity the alleged defamatory statements -- Mr. Reed's Amended Complaint is meticulously detailed and fact specific, and clearly sets forth not only false and defamatory statements made by the Defendants of and concerning Mr. Reed with actual malice. The Amended Complaint also explains  the motivation for  the Defendants to have engaged in this pattern and practice of making these defamatory statements, mostly as a result of Mr. Reed having joined the LIV Golf Tour, which as a new entry into the world of professional golf, they have set out to destroy. This is of particular importance, as it is textbook black-letter law that constitutional and actual malice can be discerned by circumstantial facts which show the intent of the speaker, among the other many badges of actual malice. Exhibit 1. It is clear that

Defendants are incorrectly counting on this honorable Court glossing over the extremely detailed Amended Complaint and not taking the time to read the defamatory publications at issue. This arrogance is also shown in counsel for Defendants not being honest in Defendants' Motion, which as just one example is shown on page 10, where Defendants seem to accuse Mr. Reed of moving to Florida for the purpose of this litigation. This is completely untrue, as Mr. Reed has resided in this district in Florida well before this suit was contemplated. And then there are Defendants' counsel's games with the submission ex parte of the unauthenticated secreted USB Hard Drive and wholly irrelevant and prejudicial so-called exhibits. Motion at ECF No. 41.

## I.      FACTS PERTAINING TO THE DEFENDANTS' MALICIOUS INTENT

Mr. Reed, a world class professional golf player, decided in June of 2022 to sign with LIV Golf ("LIV"), an upstart professional golf league, after being constructively terminated as a member of the PGA Tour, as a result of threats and actions by its Commissioner Jay Monahan ("Monahan") and the PGA Tour. Am. Comp. ¶ 15. Mr. Reed was one of the original golfers who signed with LIV and remains one of LIV's top star's and prominent golfers. Am. Comp. ¶ 14. As such, when the defamatory statements at issue were made, Mr. Reed's name was prominently and inextricably linked to LIV as in effect its poster boy, along with other top golfers such as Dustin Johnson, Phil Mickelson, Brooks Koepka and Bryson DeChambeau. Indeed, in articles publishing and republishing the defamatory statements regarding Mr. Reed and other golfers joining LIV, Mr. Reed's photo, wearing his LIV Golf logo on his hat and his collar, is often prominently displayed, thereby leaving no doubt who the statements were "of and concerning." *See Reed v. Ryan et al*, 3:22-cv-1181, Amended Complaint ¶ 117.

The PGA Tour and its European joint venture partner, the DP World Tour, have seen many of their top golfers, including Mr. Reed, sign with LIV, and therefore they clearly came to

view LIV as what they called an "existential threat" to their longstanding monopolistic stranglehold on professional golf. Am. Comp. ¶ 20. Thus, the PGA Tour and DP World Tour began a concerted scheme to defame, smear, and harm the players who joined LIV—and especially Mr. Reed, one of its most prominent athletes—in order to try to maintain their monopolistic their stranglehold on professional golf, and therefore continue to substantially profit, to the tune of an estimated $1.522 billion in revenue for the PGA Tour alone in 2021. Am. Comp. ¶ 20. Indeed, it has even recently been revealed in LIV's lawsuit against the PGA Tour for illegal, anticompetitive actions that the PGA Tour itself has orchestrated a campaign to defame LIV and its players over LIV being financed by the Saudi PIF, branding them even as accepters of blood money, terrorist collaborators and murderers. The PGA Tour hired Clout Public Affairs to not only assist in orchestrating these attacks, but also to bury the PGA Tour's involvement from the public. This is disclosed in LIV's motion to compel Clout to comply with its subpoena, which details how these entities paid some rogue 9/11 families to whip up hatred against Mr. Reed and other LIV golfers. *LIV Golf Inc. v. Clout Public Affairs, LLC,* 1:22-mc-00126, (N.D. CA.) Dkt. 1-1. Am. Comp. ¶ 25. This even resulted in a bomb threat during the last LIV tournament in 2022, at Trump National Doral, in Miami, Florida, where Mr. Reed and his associates had to take cover during the final round. Am. Comp. ¶ 132.

The Defendants here are either employed by or work closely and directly with Defendant Golf Channel. Am. Comp. ¶ 24. Not coincidentally, Defendant Golf Channel is firmly ensconced as the PGA Tour's and the DP World Tour's chosen and  media partner to publish and push the PGA Tour and DP World Tour's agenda, which in this case involves the smearing, defaming, and harming of anyone associated with LIV, and in particular Mr. Reed. Am. Comp. ¶ 22. This was admitted by Monahan in a recent appearance on none other than Golf Channel, where he

referred to the "partnership" between the PGA Tour and Golf Channel, stating that he was "really proud of the partnership that we [the PGA Tour and the Golf Channel] share." Am. Comp. ¶ 23. Thus, as set forth in the Amended Complaint, the task of fomenting, orchestrating, and manufacturing outrage and even violence to damage Mr. Reed, LIV players and LIV was delegated to Defendants to serve as the PGA Tour's mouthpieces, which explains why there has been such a clearly orchestrated attack by the Defendants. Am. Comp. ¶ 26. In return for serving as the mouthpieces for the PGA Tour and DP World Tour, Defendants get preferred access to PGA Tour players and officials and  continue the other benefits that come with being "partners" with the PGA Tour and DP World Tour. In sum, the interests of the Defendants align perfectly with the interests of the PGA Tour and the DP World Tour, and thus, it serves the Defendants greatly to push the PGA Tour's defamatory agenda against Mr. Reed and other LIV players.[1]

## II.    THE DEFENDANTS' DEFAMATORY STATEMENTS

As set forth below and in the Amended Complaint, each and every one of the Defendants have made numerous false, malicious, and defamatory statements of and concerning Mr. Reed and LIV. It does not matter that some of the defamatory statements at issue herein do not specifically name Mr. Reed, as it is well-established that defamation will arise from persons not specifically named in the statements at issue so long as understood by the listener or reader that it is of and concerning the person being defamed. "It is not essential that the person defamed be named in the publication if, by intrinsic reference, the allusion is apparent, or if the publication contains matters of description or reference to facts and circumstances from which others may understand that he is the person referred to, or if he is pointed out by extraneous circumstances

---

[1] Louis Radnofsky, *Justice Department Is Investigating PGA Tour Over Potential Antitrust Violations in LIV Golf Battle*, WSJ, Jun. 11, 2022, available at: https://www.wsj.com/articles/pga-tour-antitrust-liv-department-of-justice-investigation-11657557177

so that persons knowing him can and do understand that he is the person referred to; and it is sufficient if those who know the plaintiff can make out that he is the person meant." *Harwood v. Bush*, 223 So. 2d 359, 362 (Fla. Dist. Ct. App. 1969).[2]

### a.   Defendant Chamblee's Published Defamatory Statements

Defendant Chamblee has engaged in a continuous pattern and practice of obsessively if not pathologically fixating on Mr. Reed as the prime target for his defamatory attacks. Indeed, Defendant Chamblee is one of the prime media surrogates who have manufactured the narrative that Mr. Reed is a perpetual "cheater" in order to bring attention to this own name and bring in click and views and thus more profit. Am. Comp. ¶ 120. This has been done with no regard for the severe damage to Mr. Reed's reputation that has already been done. Thus, when Mr. Reed left the PGA Tour to join LIV in June of 2022, Defendant Chamblee, one of Defendant Golf Channel's chief golf analysts, wasted absolutely no time doubling down on his defamatory attacks to destroy Mr. Reed,  LIV players and LIV in service of his benefactors at the PGA Tour and DP World Tour. While these attacks were not new, they reached intolerable heights after Mr. Reed joined LIV, forcing Mr. Reed to bring suit, as he had never done in the past.

On or about June 14, 2022, Defendant Chamblee appeared on a podcast with Horace "Froggy" Langley and on or about June 10, 2022, Defendant Chamblee appeared on Sky Sports News where he published the following numerous malicious and defamatory statements of and concerning Mr. Reed and LIV. Am. Comp. ¶ 57, 70:

> **So if they're aligning themselves with a tyrannical, murderous leader**… look if you if you look at who MBS is… centralizing power, committing all these atrocities, you look at what he's doing to the citizens of his… of his country ask yourself I mean would you have played for Stalin would you have played for Hitler would you have played for Mao would you play for Pol Pot," [Froggy] "would you have played for Putin?"

---

[2] *See also Depp . v . Heard* Civil Action No. 2019-02911 (Va. 2022)  (Amber Heard found liable by a jury for defamation even though he publication did not even mention Johnny Depp

[Chamblee in agreement] "would you have played for Putin… which… and this who this guy is. He settles disputes with bonesaws."

I think there's a reason for that…**they're destroying the professional game** they were they been put in the Hall of Fame because of their accomplishments and because of their legacy well **they've tainted their legacy in an irreparable way** so I think both of them should be kicked out of the Hall of Fame I really do…

Mr. Reed is "**over there purely playing for blood money**."

[t]his is one of the saddest days in the history of golf. Watching these players come together for money and show to the world…**they are showing us that they are the greediest, most self-serving, self-interesting, willfully blind players in the world of golf today**.

[s]o when I hear these players say that they are 'growing the game'… it makes me want to puke. **They're destroying the game. And they are destroying their reputations.**

Defendant Chamblee also made the following false, malicious, and defamatory statements of and concerning Mr. Reed on Twitter. Am. Comp. ¶¶ 89 – 98.

August 10, 2022: **Golf won today. Murderers lost**.

June 26, 2022: …either way, whether the money is against or in addition to guarantees **its still blood money and you're still complicit in sportswashing.**

September 2, 2022: **[t]hese thugs are directed by the people who fund LIV golf**…but LIV will pretend this video and so many others depicting human rights atrocities don't exist, but will happily post video of a golf event in Boston meant **to sportswash these atrocities**.

September 13, 2022: [b]y defectors **I mean those who have turned their backs on the meritocracy of professional golf. I mean those who have sold their independence to a murderous dictator and those who have sued their fellow professionals so they can benefit from the tours they are trying to ruin**.

August 28, 2022: No. Wrong. But when they murdered, butchered and dismembered a dissenting journalists [sic] they began to care. **Those same people behind that murder run this tour**.

August 28, 2022: [t]he IOC decides where the Olympics go…and there is a big difference between doing business in a country and **directly for a murderous regime as LIV golfers are**.

<u>August 30, 2022</u>: I can understand [Mohammed bin Salman Al Saud's] regime wanting to become more than a petro[l] country & corporate interest to serve that part of the world. **I can't understand an individual working for him**.

<u>September 2, 2022</u>: **LIV golf is about hiding [the Saudi Arabia regime's] human atrocities**.

<u>August 28, 2022</u>: [t]he criticism of LIV defectors is not that they are doing it for the **money, that is easily understood, what is not so easily understood is why they would directly work for a regime that has such a reprehensible record on human rights**.

<u>September 15, 2022</u>**: [t]he sportwashing paid to turn a blind eye to atrocities, the blight of LIV**.

  **b.  Defendant Chamblee's Published Defamatory Statements on Defendant Golf Channel**

   Defendant Chamblee also made further false, malicious, and defamatory statements of and concerning Mr. Reed. during appearances on Defendant Golf Channel's broadcasts or while writing for Defendant Golf Channel's website. Specifically, Defendant Chamblee published:

[n]ow he has continued his subterfuge by saying the PGA Tour could end any threat, **presumably from the Saudi blood money funding a proposed Super Golf League**, by just handing back the media rights to the players

Mr. Reed's money is "**coming from the wrong place**" and that its "**good [PGA Tour] versus evil [Mr. Reed and LIV] …evil usually fails. So, it will fail.**"

**I either messaged or talked to 15 to 20 current and past tour players, some of them Hall of Fame members, over the past 24 hours and not a single player is in defense of what Patrick Reed did.**

**violated that [unwritten] code in so many ways that even the rules officials themselves were sort of stammering as to how to address it.**

**In the same way that there is a distinction between law and morality, there is a mark distinction, in this case, between what he was legally allowed to do and what he ethically appeared to be doing.**

**Ask yourself this: if everybody in the field were to conduct themselves around a golf ball in this manner, would it be good for the game of golf? It would not be. It would call into question every single movement or drop that every single player would be making. It would cause an uproar on the PGA Tour.**

**They would not like to see a tour funded by a government with such a discriminatory practice by that government. This would be at least in my view akin to allowing – at the time it was called the South African tour under apartheid – tournaments played there to accumulate world ranking points**.

**Mr. Reed was "bought" by LIV**

    c.    **Defendants Hack and Bacon's Published Statements on Defendant Golf Channel**

On or about January 31, 2021, Defendants Hack and Bacon appeared on a broadcast by Golf Channel where they maliciously defamed Mr. Reed by accusing him of cheating and exacerbating that defamation by publishing that Mr. Reed has a "history" of cheating:

> **I'm just not comfortable with Patrick's behavior around the ball**. You know, I always thought that the golf ball -- you treat it like the Hope Diamond. You treat it like a Fabergé egg, especially when it comes to an unclear situation. **So right here we're seeing Patrick kind of hovering over where he says the ball was embedded and it's just hard to know what he's doing.** Like where is the official at this point? You know, we're supposed to take him at his word, but there's -- **there just seems to be smoke**.

> **To me, this looks bad for Patrick Reed, a guy that has history of doing these things**.

> **So now we have to lean on the fact that Patrick Reed does have a history. I go back to 2019 in the Bahamas, the Par 5, 11th hole where he, you know, has the brushing away of the sand; and then later says, "Well, it's my word against their word." And he says that "When I get in the sand" -- he says, "I'm afraid of getting close to the cup hole." That's his direct quote. "I'm afraid." "Every time I get in the bunker, I'm scared to even get my club close to it." He's close to it, Shane Bacon. He's not just close to it. He's sweeping it away. When you tell me that high-level players can tell me the difference between two clubs that weigh a .01 ounce difference. He's not feeling that? So we already have this situation. And we have the smoking mirrors about his time in Georgia where he was kicked off of the team and had to transfer to Augusta State. So he does have a history and now we have another situation.**

    d.    **Defendant Lynch's Published Statements**

Lastly, Defendant Lynch, who also is employed by Defendant Golf Channel, made further malicious and defamatory statements of and concerning Mr. Reed. Specifically, Defendant Lynch published two articles on August 24, 2022 and November 10, 2022:

accusing LIV, and its golfers, prominently including Mr. Reed, as being the "**evil empire's…Death Star**,"

accusing Mr. Reed and other LIV golfers of "**opt[ing] to cut and run for Saudi money**,"

admitting that Mr. Reed and other LIV golfers had endured "**reputational harm that comes with taking guaranteed cash to sportswash Saudi atrocities**."

Team golf is a tough sell, but moreso when the product is lousy and **the association with a merciless regime too toxic for commercial sponsors.**

Whatever divisions need to be bridged in golf, whatever personal relationships must be healed, **doing so cannot involve offering the sport wholesale as a life raft for sportswashing ambitions in Riyadh. No amount of investment by the Saudi Arabian regime can be rendered respectable or accepted without dire reputational consequences for the entire sport. Golf cannot choose to host a cancer and expect to remain healthy.**

## LEGAL STANDARD

A motion to dismiss is designed to test the legal sufficiency of a complaint and not to determine any factual issues. *Dorleus v. Bank of New York*, No. 14-80124-CIV, 2014 WL 1621941, at *2 (S.D. Fla. Apr. 23, 2014). All allegations of the complaint must be taken as true and all reasonable inferences drawn therefrom must be construed in favor the non-moving party. *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC,* 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009).  A complaint "does not require detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (U.S. 2009) (internal quotations omitted). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. (internal quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual  content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

Finally, when considering a FRCP 12(b)(6) motion, trial courts are  limited to the four corners of the complaint and may only consider documents incorporated in the complaint—i.e.,

either documents attached to the complaint or documents which do not allege acts extrinsic to the pleadings. *Dershowitz v. Cable News Network, Inc*. 541 F. Supp. 3d 1354, 1360-61 (S.D. Fla. 2021). "In considering a Rule 12(b)(6) motion to dismiss, the court's review is generally "limited to the four corners of the complaint." This is conceded in Defendants' Motion as well, as in its footnote 1, they make it clear that it should not be construed as one for summary judgment.

## LEGAL ARGUMENT

### I.     MR. REED HAS MORE THAN SUFFICIENTLY ALLEGED DEFAMATION

The elements of defamation are "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Peerenboom v. Perlmutter*, 2017 Fla. Cir. LEXIS 14957, *24. To determine whether a statement is defamatory, it must be considered in context of the publication. *Smith v. Cuban Am. Nat'l Found*., 731 So.2d 702, 705 (Fla. 3d DCA 1999). "A publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983). A jury issue is present whenever a phrase is "ambiguous and reasonably susceptible of a defamatory meaning." *Perry v. Cosgrove*, 464 So. 2d 664 (Fla. Dist. Ct. App.1985). A complaint cannot be dismissed if there is any possibility that the common mind could construe the publication as defamatory. *Abrams v. Gen. Ins. Co.*, 460 So. 2d 572 (Fla. Dist. Ct. App. 1984).

Furthermore, the Florida courts have found that a defendant may not escape liability for his defamatory conduct simply by attempting to couch his defamatory statement as an "opinion."

However, a statement that although ostensibly in the form of an opinion "implies the allegation of undisclosed defamatory facts as the basis for the opinion," Restatement (Second) of Torts § 566 (1977), *is* actionable….Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff

or his conduct that have not been stated in the article or assumed to exist by the parties to the communication. *Barnes v. Horan*, 841 So. 2d 472, 476-77 (Fla. Dist. Ct. App. 2002).

"Mixed opinion is based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication. Rather, the communicator implies that a concealed or undisclosed set of defamatory facts would confirm his opinion." *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. Dist. Ct. App. 1984).

Of particular recent importance is the *Dershowitz* case, attached hereto as Exhibit 2, which tracks this instant case to a "tee." Importantly, in *Dershowitz*, Plaintiff Alan Dershowitz prevailed on a motion to dismiss brought by Defendant CNN in an action for defamation. *Id.* at 1370. CNN – similar to the submission of Defendants' USB Drive and other extraneous documents here - also tried to improperly include items outside of the Complaint in a FRCP 12(b)(6) motion, which the Honorable Raag Singhal ("Judge Singhal") correctly rejected. *Dershowitz* also involved mixed questions of fact and opinion, which Judge Singhal correctly found to be actionable defamation: "A mixed expression of opinion is not constitutionally protected…. The Court concludes that the Complaint plausibly alleges that the comments made on CNN and CNN.com were defamatory statements of mixed opinion." *Id.* at 1367. Thus, Mr. Reed respectfully requests that the Court thoroughly review the attached opinion of Judge Singhal in the *Dershowitz* case from a sister Florida federal court, as it bears directly here.

### a.   Defendants' Defamatory Statements Related to the Farmers Insurance Open Are Not Time Barred

Defendants falsely contend that the defamatory statements in the Amended Complaint that pertain to Mr. Reed's participation in the 2021 Farmers Insurance Open are time barred under Texas' statute of limitations. While conceding that Florida has a two-year statute of limitations for defamation, Defendants disingenuously strain to argue that the Court should apply

Texas' one-year statute of limitations for defamation under Fla. Stat. § 95.10, which states "[w]hen the cause of action arose in another state or territory of the United States, or in a foreign country, and its laws forbid the maintenance of the action because of lapse of time, no action shall be maintained in this state."   The Florida Supreme Court has applied the "significant relationship" test to determine whether the Court should "borrow" the statute of limitations from another jurisdiction, and the factors that are to be considered are: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.." *Celotex Corp. v. Meehan*, 523 So. 2d 141, 144 (Fla. 1988). As set forth below, all of these factors mandate a finding that Florida bears a much higher "significant relationship" than Texas to Mr. Reed's causes of action.

### i.    The Parties' Relationship is Centered in Florida

Mr. Reed is a professional golfer, who at the time that the defamatory statements concerning the 2021 Farmers Insurance Open were published by the Defendants, was signed with the PGA Tour. Defendants are members of the golf media who made their living exclusively by talking and writing about PGA Tour golfers, as LIV was not yet in existence at the time. These Defendants were all employed by Defendant Golf Channel, the admitted "partner" of the PGA Tour, Am. Comp. ¶ 23, and Defendant Golf Channel displays in a chyron that it is the "Home of the PGA Tour" on its broadcasts. This means that  the Defendants are the media "arm" of the PGA Tour. Thus, only common link between Mr. Reed and the Defendants at the time was their affiliation with the PGA Tour. The PGA Tour is headquartered in Ponte Vedra, Florida, in this judicial district. Am. Comp. ¶ 48. Accordingly, the relationship between Mr. Reed and the Defendants is exclusively centered in Florida.

### ii.        Mr. Reed' Injury Occurred in Florida

The defamatory statements published by the Defendants concerning the Farmers Insurance Open all boil down to a principal defamatory smear – that Mr. Reed "cheated." It is therefore indisputable that statements of this nature strongly damage Mr. Reed' reputation as a professional golfer. Professional golf is a different animal than other team professional sports, where players are centered in one home city, and represent that city. For instance, defamatory statements that accuse Lebron James of cheating would involve an injury in Los Angeles, California since he plays for the Lakers. Professional golfers, on the other hand, play tournaments all over the country and over the world. There is no "home base" where a primary injury can be felt. Thus, the only place that makes sense for an injury of this type to occur is in Ponte Vedra, Florida, where the PGA Tour is headquartered, Am. Comp. ¶ 48, and the golf capitol of the United States and probably the world. Am. Comp. ¶ 47.  Mr. Reed's  community is the Middle District of Florida, as he has long resided in Kissimmee, Florida.

### iii.        The Defamatory Conduct Did Not Occur in Texas

Defendants argue incredulously that the defamatory conduct did not occur in Florida but make no argument as to how the defamatory conduct occurred in Texas – where they allege has a "substantial relationship" to Mr. Reed's claims. In fact, all of these statements were made and transmitted by the Defendants from Golf Channel's headquarters in Connecticut.[3] Connecticut also has a two-year statute of limitations for defamation.  Connecticut General Statutes § 52-597. Thus, even in the unlikely event that this  Court views this factor as determinative and borrows Connecticut's statute of limitations, the defamation would still not be time-barred.

---

[3] The Defendants' argument that "Publication 4" originated in Scotland is completely false. Defendant Chamblee's defamatory statements made on Defendant Golf Channel, in Connecticut, were simply republished by Bunkered, a Scottish website which reaches into this district and Florida.

### iv.        The Parties Are Located in Multiple States, But Primarily in Florida

Mr. Reed owns a house in Florida, Am. Comp. ¶ 3, and resides there, and Ponte Vedra, Florida is the headquarters of the PGA Tour. Florida is the golf capitol of the United States and probably world. Am. Comp. ¶ 47, 48. Importantly, this factor weighs "the domicil[e], residence, nationality, place of incorporation and place of business of the parties." While Mr. Reed is not a citizen of Florida, he is definitely a resident of Florida, as he spends much of his time at his Florida home in this district, where he also plays professional golf. Similarly, the Defendants, while citizens of different states, have a primary  "place of business" in Florida. Again, they are all members of the golf media, and the PGA Tour is headquartered in Florida.[4]

### b.        The LIV Publications Are  "Of and Concerning" Mr. Reed

The Defendants, as is their strategy throughout, attempt  in a jumbled mess to tactically lump all of the defamatory statements together without any specificity, deceptively  hoping that the Court will simply overlook the specifically pled defamatory statements. For instance, the Amended Complaint sets forth that on September 13, 2022, Defendant Chamblee tweeted:

> [b]y defectors I mean those who have turned their backs on the meritocracy of professional golf**. I mean those who have sold their independence to a murderous dictator and those who have sued their fellow professionals so they can benefit from the tours they are trying to ruin**. Am. Comp. ¶ 92.

There is absolutely no ambiguity as to who Chamblee is talking about here, as he directly references "those who have sued their fellow professionals…." This is an unmistakable reference to the fact that Defendant Chamblee had been sued by Mr. Reed, which was widely publicized.

The Amended Complaint also clearly sets forth that, "[i]t is clear that where the Defendants are making false and misleading statements regarding LIV and its players, it is

---

[4] A plaintiff's choice of forum is entitled to deference, and there is a presumption in favor of a plaintiff's choice of forum, particularly where the plaintiffs are citizens of the United States *Wilson v. Island Seas Invs., Ltd.*, 590 F.3d 1264, 1269 (11th Cir. 2009).

reasonably understood by an objective viewer/listener that the Defendants are making these statements of and concerning Mr. Reed, as well as other golfers signed to LIV." Am. Comp. ¶ 39. This aligns with the fundamental principle set forth in *Harwood,* 223 So. 2d at 362, that a person need not be expressly named to maintain a cause of action for defamation, where it can be reasonably understood by others that the publication refers to him:

> It is not essential that the person defamed be named in the publication if, by intrinsic reference, the allusion is apparent, or if the publication contains matters of description or reference to facts and circumstances from which others may understand that he is the person referred to, or if he is pointed out by extraneous circumstances so that persons knowing him can and do understand that he is the person referred to; and it is sufficient if those who know the plaintiff can make out that he is the person meant. *Id.*

Here, Mr. Reed is among the most prominent of  professional golfers who have joined LIV. Mr. Reed sits in a unique position because he is a member of a group where everyone is a public figure. Indeed, most golf fans can probably recite the names of most golfers signed to LIV, and definitely those in the top echelon like Mr. Reed, and they at least know off the top of their heads whether a specific golfer is a member of LIV or the PGA Tour. Thus, where a publication refers to LIV's golfers, most people will know Mr. Reed is one of the primary LIV golfers being referred to. This is particularly true because Mr. Reed "has become, not by choice but due to media-driven narrative to increase clicks and profit, a "lightning rod" and therefore a frequent target of the Defendants and others in the media in order to defame, disparage and harm LIV's other golfers and LIV as a whole." Am. Comp. ¶ 40.

The Defendants assert that the group libel doctrine must be considered, and under this doctrine, the defamatory statements are still "of and concerning" Mr. Reed. Indeed, Restat 2d of Torts, § 564A, states, "[e]ven when the group or class defamed is a large one, there may be circumstances that are known to the readers or hearers and which give the words such a personal application to the individual that he may be defamed as effectively as if he alone were named."

Again, Mr. Reed sits in a unique circumstance because he one of the most prominent members of a group of LIV players, where a golf fan will instantly correlate Mr. Reed's name with LIV, particularly given that he has become "not by choice but due to media-driven narrative, a "lightning rod" and therefore a frequent target of the Defendants and others…in order to defame, disparage and harm LIV's other golfers and LIV as a whole." Am. Comp. ¶ 40. Indeed, Defendant Chamblee himself makes this admission during his broadcast on Sky Sports, Am. Comp. ¶ 70, where he states that when he looks over the list of the 48 players who participated in the LIV Gold Invitational Series, "there are (only) fourteen names that you might…recognize." This severely reduces the size of the "group" pursuant to the group libel doctrine.

*Fawcett Publ'ns, Inc. v. Morris*, 377 P.2d 42 (1962) is particularly instructive. In *Fawcett*, the Oklahoma Supreme Court found that a member of the University of Oklahoma's 1956 football team could bring a claim for libel where a publication had accused "Oklahoma players" of being on amphetamines during games. *Id*. at 47. Specifically, the article stated, "[s]peaking of football teams, during the 1956 season, while Oklahoma was increasing its sensational victory streak, several physicians observed Oklahoma players being sprayed in the nostrils with an atomizer. And during a televised game, a close-up showed Oklahoma spray jobs to the nation." *Id*. The Oklahoma Supreme Court found that the plaintiff could bring a claim for libel based on this article. In doing so, it correctly reasoned:

> …we are convinced that the article is clearly defamatory on its face and does expose the entire O. U. team to public hatred and contempt and tends to deprive the team and its membership of public confidence. The reader was unequivocally informed that the members of the team illegally used amphetamine; the article explained that amphetamine could be administered with a nasal spray and that for 95 cents one could purchase 'enough to hop up an entire football team'. The use of the phrase 'hop up' negates any implication that the amphetamine was legally administered under the direction of a physician for medical purposes. The reference to the 1956 O. U. football team is so well tied into, or interwoven, into the article that the full weight and import of the article falls upon the O. U. team. *Id*. at 48.

The facts here are nearly identical. Whereas the OU football team was at issue in *Fawcett*, here it is the members of LIV golf, which itself can be viewed as a "team," as it pertains to being pitted against the PGA Tour. And, Mr. Reed's case is even more compelling given the fact that the group that he belongs to, LIV, is now, with all of the adverse defamatory publicity on Golf Channel and other fake news media, even more well-known than the OU football team, so it follows to reason that even more people will associate Mr. Reed with LIV. *See also Ball v. Taylor,* 416 F.3d 915 (8th Cir. 2005)(finding group libel applicable to a group of fifty-eight plaintiffs).  Thus,  any defamatory statements that pertain to LIV golfers will subject Me. Reed to "public hatred and contempt and tends to deprive…its members of public confidence," *id*., and is therefore actionable defamation as it pertains to Mr. Reed.

c.      **Each of the Defamatory Statements At Issue Are Actionable Defamatory Statements of Fact Made With Actual Malice**

The Defendants attempt to argue that each and every one of the defamatory statements at issue are non-actionable statements of "opinion," but this is completely false. Tellingly, the Defendants do not address **any** of the defamatory statements in the Amended Complaint with specificity, and instead make jumbled generalized arguments, obviously intended to confuse, likely in the hope that the Court does not actually read the defamatory statements at issue. This goes against the directive of the Court to Mr. Reed in its order directing him to file an Amended Complaint with specificity, which is exactly what Mr. Reed has done, but which the Defendants ignore for their own improper strategic reasons, thus flouting the Court's edict.

Florida law recognizes defamation, defamation *per se* and defamation by implication. Importantly, defamation by implication arises, not only from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection

between them, or (2) creates a defamatory implication by **<u>omitting facts</u>**, such that he may be held responsible for the defamatory implication. *Readon v. WPLG, LLC*, 46 Fla. L. Weekly 836 (Dist. Ct. App. 2021) (emphasis added). Each and every one of the statements set forth below are defamatory generally, defamatory *per se* because they damage Mr. Reed's trade and profession as a professional golfer, and at a minimum, defamatory by implication.

### i.      Defamatory Statements Regarding Mr. Reed Signing With LIV

At issue herein are several defamatory statements published by the Defendants in retaliation for Mr. Reed choosing to sign with LIV. For the convenience of the Court, Mr. Reed will put these statements into the following subcategories: (1) defamatory statements that make the false factual allegation that Mr. Reed works directly for the Saudi government, Am. Comp. ¶¶ 58, 92, 93, 94, 95, 97, 101; (2) defamatory statements that make the false allegation that Mr. Reed and LIV are complicit in and being paid to hide and/or bury human rights atrocities, or "sportswashing"; Am. Comp. ¶¶ 63, 65, 90, 91, 96, 98, 101, 103, 108 and (3) other defamatory statements regarding Mr. Reed's decision to sign with LIV. Am. Comp. ¶¶ 61, 68, 71, 74, 110.

Before even reaching these statements, it is clear that the defamatory statement published by Defendant Chamblee on Twitter on or about August 10, 2022 falls into its own vile category. On August 10, 2022, Defendant Chamblee tweeted, "**Golf won today. Murderers lost**." Am. Comp. ¶ 89. This defamatory statement is of particular importance because of the context in which it was made, which the Court must consider. This tweet was made in reference to an order from the U.S. District Court for the Northern District of California in *Mickelson v. PGA Tour, Inc. et al*, 5:22-cv-04486) denying the plaintiffs', who are LIV players, motion for preliminary injunctive relief. ECF No. 63. <u>Crucially</u>, LIV was not a party to this lawsuit, as the Plaintiffs were several professional golfers who had signed to LIV. Thus, the only possible plausible

19

interpretation of this tweet is that Defendant Chamblee published that LIV golfers, including Mr. Reed, are **murderers**. This is patently defamatory *per se*.

1.    **Statements in Category One Are Defamatory, Defamatory *Per Se* and Defamatory By Implication**

There is no legitimate possible dispute that the first category of statements are not defamatory statements of hard, provable fact. This category includes statements including but not limited to: (1) Mr. Reed has chosen to "**directly work for a regime that has such a reprehensible record on human rights**," Am. Comp. ¶ 97, (2) "**I can't understand an individual working for [Mohammed bin Salman Al Saud]** ("MBS")," Am. Comp. ¶ 95, (3) "there is a big difference between doing business in a country and **directly for a murderous regime as LIV golfers are**," Am. Comp. ¶ 94, and (4) that Mr. Reed has "**aligned**" himself with "**a tyrannical murderous leader**," which equates to Mr. Reed playing golf for **Hitler**[5]**, Mao, Pol Pot or Putin**, Am. Comp. ¶ 58, and (5) accusing Mr. Reed and other LIV golfers of "**opt[ing] to cut and run for Saudi money**." Am. Comp. ¶ 101.

An individual's employer is an objectively verifiable fact. Are Mr. Reed's paychecks signed by LIV or are they signed by MBS and the Saudi Arabian government? They are signed by LIV, a golf tour. Mr. Reed is a professional golfer who plays for LIV. He has not chosen to and does not work directly for MBS or the Saudi Arabian government. This is a cold, hard verifiable fact. Defendants Chamblee and Golf Channel did not stop at merely asserting that Mr. Reed's employer, LIV, is associated with a "murderous regime" – which in and of itself would

---

[5] In the same vein, these statements of comparison to murderous dictators is the same as in *Dershowitz*, 541 F. Supp. 3d at 1359, where one of the defamatory statements at issue that was published was :" What I thought when I was watching it was this is un-American. This is what you hear from Stalin. This is what you hear from Mussolini, what you hear from authoritarians, from Hitler, from all the authoritarian people who rationalized, in some cases genocide, based on what was in the public interest."

be defamatory. They took it even further to say that LIV golfers, including Mr. Reed, work **directly for** a "murderous regime." There is no credible debate here. All of the defamatory statements in this subcategory are clearly false statements <u>of fact</u>, and the Defendants do not argue otherwise. They simply gloss over this entire category of defamatory statements, apparently hoping that they somehow just get overlooked or "lost in the shuffle."

### 2. Statements in Category 2 Are Defamatory, Defamatory *Per Se* and Defamatory By Implication

These statements are equally clearly defamatory statements of fact of and concerning Mr. Reed, since they accuse Mr. Reed and other LIV Golfers of willfully and intentionally participating in hiding and/or burying human rights atrocities by the Saudi Arabian regime, and/or "sportswashing" when in actuality, they are simply professional golfers who have absolutely nothing to do with any human rights atrocities. These defamatory statements were published by the Defendants in order to try to destroy the public image of Mr. Reed and other LIV golfers by associating their names with human rights atrocities to create the entirely false and defamatory implication that Mr. Reed and other LIV golfers are complicit in hiding and/or burying human rights atrocities by the Saudi Arabian regime, when in actuality, they have nothing to do with any such alleged activities. This is part and parcel to the Defendants' role as the PGA Tour's chosen media mouthpieces to try to influence public opinion against LIV players in order to try to destroy LIV as a competitor to the PGA Tour. It is this sinister and simple - destroy the players, who are the engine that drives LIV - and you destroy LIV as a competitor.

Published statements in this category include, but are not limited to: (1) **"LIV golf is about hiding [the Saudi Arabian regime's] human atrocities"** Am. Comp. ¶ 96, (2) **"its still blood money and you're still complicit in sportswashing,"** Am. Comp. ¶ 90, (3) "[t]**hese thugs are directed by the people who fund LIV golf**…but LIV will pretend this video and so

many others depicting human rights atrocities don't exist, but will happily post video of a golf event in Boston meant **to sportswash these atrocities**," Am. Comp. ¶ 91, and (4) Mr. Reed and other LIV golfers had endured "**reputational harm that comes with taking guaranteed cash to sportswash Saudi atrocitie**s." Am. Comp. ¶ 101.

There is no plausible argument that these statements are "opinion," as the Defendants try to disingenuously assert. This is because these statements all stand for the same proposition – that Mr. Reed and LIV golfers are active and willing participants in a scheme to hide and/or bury Saudi human rights atrocities and sportswashing on behalf of the Saudi government. As just one example, this is clearly demonstrated in Defendant Lynch's published statement accusing Mr. Reed of "**taking guaranteed cash to sportswash Saudi atrocities**." Am. Comp. ¶ 101. This statement alleges the existence of a *quid pro quo* agreement between Mr. Reed and the Saudi regime, and thus is purely a question of fact. Either Mr. Reed has agreed to participate in this type of scheme, or he has not. Of course, in actuality, Mr. Reed has not made any such agreement. He simply play professional golf for LIV. Nothing more.

### 3.  Statements in Category 3 Are Defamatory, Defamatory *Per Se* and Defamatory By Implication

Lastly, the Defendants made numerous other false, malicious, and defamatory statements of and concerning Mr. Reed that are actionable, at a minimum, as defamation by implication, or as statements of mixed opinion. *Barnes*,   841 So. 2d at 476-77. As set forth above, the defamatory nature of a publication must be taken as a whole,   *Byrd*, 433 So. 2d at 595, and a publication must be considered in its totality. These statements all work together to create the entirely false implication that Mr. Reed is evil, a villain, and money hungry simply because he made a personal decision to sign with LIV.

Statements in this category include but are not limited to: (1) "**they are showing us that they are the greediest, most self-serving, self-interesting, willfully blind players in the world of golf today**" Am. Comp. ¶ 71, (2) "**They're destroying the game. And they are destroying their reputations**" Am. Comp. ¶ 74, and (3) "**Golf cannot choose to host a cancer and expect to remain healthy**" Am. Comp. ¶ 103.

These highly defamatory statements create the entirely false implication that Mr. Reed has completely destroyed his reputation and legacy as a professional golfer simply because he chose to sign with another league. In actuality, professional athletes do this all the time for a myriad of reasons, whether it be for money, increased opportunity, increased exposure, or family reasons - since as in this case Mr. Reed, because LIV entails far few tournaments than the PGA Tour with even greater compensation - he can spend more time at home with his wife and children. This is the reality of professional sports, which the Defendants conveniently ignore and omit in order to create the entirely false and misleading implication that Mr. Reed is an evil villain, that is a cancer, who is greedy and who deserves to have his entire reputation and legacy burned to the ground. These statements are incredibly damaging to Mr. Reed, not only as a professional golfer, but as a person with a family and friends that must repeatedly endure the severe damage caused by these defamatory attacks.

### ii.     Defamatory Statements Regarding the Farmers Insurance Open

In addition to the statements set forth above concerning Mr. Reed's decision to leave the PGA Tour for LIV, the Defendants also published numerous false, malicious, and defamatory statements that accuse Mr. Reed of intentionally cheating at the 2021 Farmers Insurance Open. Am. Comp. ¶¶ 78, 79, 80, 81, 84, 86, 87.  Statements in this category include but are not limited to: (1) "**I [Defendant Chamblee] either messaged or talked to 15 to 20 current and past tour**

**players, some of them Hall of Fame members, over the past 24 hours and not a single player is in defense of what Patrick Reed did**" Am. Comp. ¶ 78 and (2) "**So right here we're seeing Patrick kind of hovering over where he says the ball was embedded and it's just hard to know what he's doing.** Like where is the official at this point? You know, we're supposed to take him at his word, but there's -- **there just seems to be smoke**" Am. Comp. ¶ 84. Defendant Chamblee's defamatory publication, Am. Comp. ¶ 78, is an example of textbook actionable defamation under *Hay*, as he "implies that a concealed or undisclosed set of defamatory facts would confirm his opinion." *Id*. at 295. Who are these alleged 15-20  players that Defendant Chamblee allegedly spoke to that thought Mr. Reed was cheating? Defendant Chamblee conveniently omits this material information in order to defame Mr. Reed. The facts are identical to *Saadi v. Maroun*, 2008 U.S. Dist. LEXIS 116658 (M.D. Fla. Sep. 9, 2008), which was decided in this same Court. In. *Saadi*, the Court found actionable statements of "mixed opinion," where the speaker claimed that the information was the result of "thorough investigation." *Id*. at 8. Defendant Chamblee does the same here, and as such, has made actionable defamatory statements of and concerning Mr. Reed.

Furthermore, Defendant Chamblee published that Mr. Reed "**violated that [unwritten] code in so many ways that even the rules officials themselves were sort of stammering as to how to address it**." Am. Comp. ¶ 79. This defamatory statement is especially problematic because it omits a key fact – the rules official on the scene actually had no problem "addressing" the situation. He cleared Mr. Reed to take a free drop, and Mr. Reed was absolved of any wrongdoing by PGA officials. Am. Comp. ¶ 78. This undisputable fact renders each and every one of the defamatory statements in this regard accusing Mr. Reed of cheating completely false and made with actual malice. If the rules official on the scene, and the PGA officials all cleared

Mr. Reed of any wrongdoing contemporaneously, how can the Defendants in good faith come out after the fact and accuse Mr. Reed of having cheated? This is clearly, at a minimum, a false statement of fact of and concerning Mr. Reed, made with reckless disregard for the truth.

Then, Defendants Bacon and Hack take the defamation even further and publish that Mr. Reed "**has a history of [cheating]**" Am. Comp. ¶ 86, 87, and that "…**we have  the smoking mirrors about his time in Georgia where he was kicked off of the team and had to transfer to Augusta State. So he does have a history and now we have another situation**." Am. Comp. ¶ 87.  This is absolutely false, malicious, and defamatory. Mr. Reed has never been found to have cheated. To say that he has a "history" of "doing these things"—which would clearly be interpreted as an accusation of cheating by any objective listener—is  false, malicious, and defamatory. This statement is especially harmful because it falsely accuses Mr. Reed of being a habitual cheater. Defendant Bacon failed to reveal and omitted material exculpatory information that Mr. Reed has never once been found to have cheated. Mr. Reed has never been disqualified from an event  on any professional tour for cheating. Am. Comp. ¶ 86. Even worse, Defendant Hack creates the entirely false implication that Mr. Reed was kicked off the Georgia golf team for cheating, which is completely false. Am. Comp. ¶ 87.

Lastly, the Defendants' attempt to couch these statements as "opinion," is not just outrageous but also  laughable. Whether an individual cheated is a question of fact, and Merriam-Webster defines "cheating" as "to violate rules dishonestly." This is the entire point of rules officials, or referees and umpires in other sports. If Mr. Reed had cheated, he would have been punished and penalized by PGA Tour officials, and not cleared of any wrongdoing.

### iii.        Mr. Reed Has More Than Sufficiently Pled Actual Malice

Actual malice is shown when the Plaintiff pleads "facts giving rise to a reasonable inference that the defendant published the story knowing that it was false or with reckless

disregard for whether it was false or not." *Dershowitz v. Cable News Network, Inc*. 541 F. Supp. 3d 1354, 1367  (S.D. Fla. 2021) (internal quotation omitted). "[M]ost authorities suggest that a failure to retract, in conjunction with other circumstances, may be used to establish the requisite level of [constitutional] malice." John C. Martin, Comment, The Role of Retraction in Defamation Suits, 1993 U. Chi. Legal F. 293, 295 (1993). Furthermore, Exhibit 1 lays out twenty-four (24) "badges" or indicators of actual malice in medial publications, many of which apply here. Indeed, a "refusal to publish a retraction upon learning of errors in a story" is one such "badge."  Importantly, with each allegation of defamation in the Amended Complaint, Mr. Reed explains each applicable badge and shows specifically why and how they were published with actual malice. Moreover, here there is no disputing the fact that the Defendants have received notice of the defamatory statements in question, Am. Comp. ¶ 133, and have failed to retract these statements, strongly evidencing yet another badge of actual malice.

Furthermore, awareness of facts prior to the defamatory statements being made which strongly suggested innocence of plaintiff from the published accusations shows actual malice. *Cape Publ'ns v. Adams*, 336 So. 2d 1197 (Fla. 4th DCA 1976). This is certainly the case here.

Lastly, whether in the context of the facts of this case the statements were published with actual malice is a question for the jury. *Southern Air Transport, Inc. v. Post-Newsweek Stations, Florida, Inc.*, 568 So.2d 927, 929 (Fla. App. 3 Dist. 1990). For instance, where statements are capable of multiple meanings, statements must be presented to the trier of fact, notwithstanding the fact here that the defamatory statements at issue here are not vague and clearly defamatory. *Wolfson v. Kirk*, 273 So. 2d 774 (Fla. Dist. Ct. App. 1973).

With regard to the statements alleging that Mr. Reed cheated at the 2021 Farmers Insurance Open, there is no plausible argument that Mr. Reed did not plead the requisite malice –

that the Defendants acted with knowledge of falsity or reckless disregard for the truth. This is because Defendants were, at all material times, aware that the PGA Tour and rules officials had contemporaneously cleared Mr. Reed of any wrongdoing. Am. Comp. ¶ 78. Thus, for the Defendants to go on air, after the fact, and accuse Mr. Reed of cheating is clear knowledge of falsity, or at a bare minimum a reckless disregard for the truth. *Adams*, 336 So. 2d 1197.

Then, with regard to the published statements that Mr. Reed has a "history of cheating," the Defendants also clearly acted with actual malice. This is because the undisputable fact of the matter is that Mr. Reed has never once been found to have cheated and Mr. Reed has never been disqualified from an event  on any professional tour for cheating. Am. Comp. ¶ 86. As golf media professionals, it is clear that the Defendants knew of this fact, yet still published the bold-faced lie that Mr. Reed has a "habit of cheating." The same applies for implication that Mr. Reed had been kicked off the University of Georgia team for cheating, there have been written statements aired and published **on Golf Channel's networks** from Mr. Reed's Head Coaches at the University of Georgia and Augusta State University in which both state that they were unaware of any evidence or accusations of cheating by Mr. Reed. Again, as shown in *Adams*, 336 So. 2d 1197, the Defendants had knowledge that Mr. Reed did not have a history of cheating and was not kicked off the Georgia golf team due to cheating prior to making their defamatory statements, so they acted clearly with actual malice. Am. Comp. ¶ 87.

Similarly, with regard to the published defamatory statements regarding Mr. Reed's decision to sign with LIV, the Defendants clearly acted with, at a minimum, a reckless disregard for the truth in publishing that Mr. Reed and other LIV golfers work directly for MBS and the Saudi regime. *See* Am. Comp. ¶ 94. It is widely known that Mr. Reed and other LIV golfers play for LIV and are simply paid to play golf by LIV. The same applies to the published allegations

that Mr. Reed and LIV golfers are being paid to hide and/or bury Saudi human rights atrocities. There is simply nothing to back up this false accusation. Mr. Reed has no connection to the Saudi government. He simply plays golf for LIV. The Defendants, therefore, knowingly just made this storyline up, and therefore acted with, at a minimum, a reckless disregard for the truth.

This is notwithstanding that many the "badges" of constitutional malice set forth by Mr. Socias, <u>Exhibit 1</u>, are patently obvious in the Defendants' publications. These include, but are not limited to: (1) failure to conduct a thorough investigation before publishing serious and damaging allegations that are not "hot news," (2) failure to report exculpatory facts, (3) omitting pertinent information to create a false impression, (4) a reporter's knowledge of facts conflicting with the report, (5) repetitive media attacks on the plaintiff, (6) failure to contact key witnesses, (7) a reporter's ill will toward the plaintiff, (8) a reporter's departure from professional standards, (9) refusal to publish a retraction upon learning of errors in a story, and (10) prior and subsequent defamatory statements. <u>Exhibit 1</u>.

## II.     THE SINGLE ACTION RULE DOES NOT APPLY

The Defendants disingenuously argue that the "single-action" rule must be applied to Mr. Reed's counts for tortious interference because they are "premised on the same actions giving rise to his defamation claims." Defendants' Motion at 27. This is not true. Nowhere in the Amended Complaint does Mr. Reed plead that his tortious interference claims are premised on the e same defamatory statements published by the Defendants at issue in the defamation counts. The fact of the matter is that Mr. Reed's counts for tortious interference do not directly reference the defamatory publications set forth in the Amended Complaint, and instead premised on the Defendants "spreading lies of and concerning Mr. Reed in order to destroy his reputation, and to induce sponsors to break their contractual relationships with Mr. Reed." *See generally* Am.

Comp. ¶ 333. There is nothing in the Amended Complaint limiting these "lies" to the defamatory publications set forth the Amended Complaint, and at the motion to dismiss stage, before any discovery, Mr. Reed has pled all he needs to for his tortious interference counts under *Iqbal*.

## III.    FLORIDA'S ANTI SLAPP STATUTE DOES NOT APPLY TO THIS CASE

It is crucial to note, first and foremost, that this case is being brought before a federal court sitting in diversity, and as such, the Florida Anti-SLAPP statute cannot be applied. The Chief Judge of the U.S. Court of Appeals for the Eleventh Circuit, the Honorable William Pryor recently expressed "serious doubt" as to whether Florida's Anti-SLAPP statute applied:

> The thing I'm most interested, at least – I can only speak for myself - is the attorney's fees issue, and I have serious doubts about whether the anti-SLAPP statute applies in federal court. And it seems to me that if it doesn't, then a suit filed in violation of it can't give rise to an attorney's fee award." *Corsi v. Newsmax Media Inc et al*, 21-10480 (Oral Argument of May 19, 2022).

Other federal courts have made this finding as well. The U.S. Court of Appeals for the District of Columbia Circuit has made this precedential ruling  in *Abbas v. Foreign Policy Group*, 783 F.3d 1328, 1337 (D.C. Cir. 2015) ("In sum, Federal Rules 12 and 56 answer the same question as the D.C. Anti-SLAPP Act, and those Federal Rules are valid under the Rules Enabling Act. A federal court exercising diversity jurisdiction therefore must apply Federal Rules 12 and 56 instead of the D.C. Anti- SLAPP Act's special motion to dismiss provision."). Importantly, the same legal conclusion has been reached by the U.S. Court of Appeals for the Eleventh Circuit when applying Georgia's Anti-SLAPP statute. *Carbone v. CNN, Inc.*, 910 F.3d 1345 (11th Cir. 2018), as well as the Texas Anti-SLAPP statute in *Van Dyke v. Retzlaff*, 781 F. App'x 368 (5th Cir. 2019). And, in the *Dershowitz* case, brought in the Southern District of Florida under diversity jurisdiction, there was also importantly no Anti-SLAPP at issue, which bears directly on this instant case. Importantly, no federal appellate court has ever found Anti-

SLAPP to apply in a diversity case. Thus, the Court should deny the Defendants' motion under Florida's Anti-SLAPP statue on the basis that it is a federal court sitting in diversity. However, even in the extremely unlikely event that the Court finds Florida's Anti-SLAPP statute applicable to federal courts sitting in diversity, Defendants have still fallen woefully short.

### a. Florida's Anti-SLAPP Statute Does Not Protect Defamatory Speech

The express purpose of Florida's Anti-SLAPP statute, which does not apply in diversity cases in federal court like this one, is "to protect the right in Florida to exercise the rights of free speech in connection with public issues . . . as protected by the First Amendment…." Fla. Stat. § 768.295(1). However, no such statute in the country protects against defamatory speech. The statutes only apply to a limited number of legal actions that are based on, or relate to, or are in response to a party's exercise of certain rights protected by the U.S. Constitution, including the right of free speech. The right of free speech does not protect defamatory statements. *Beauharnais v. Illinois*, 343 U.S. 250, 266 (1952). As in *Heffernan v. Bilzerian*, 20STCV25549 (Los Angeles Sup. Ct.), attorneys fees and costs must be awarded to Mr. Reed for having to defend against Defendants frivolous and in bad faith Anti-SLAPP motion.

### <u>CONCLUSION</u>

In sum, the Defendants' Motion to Dismiss Amended Complaint must be denied in its entirety. Mr. Reed, his colleagues and hardly least his family, have been severely damaged by the malicious defamatory campaign of the Defendants, as the partners and surrogates of the monopolistic PGA Tour and the DP World Tour. This honorable Court provides the only legitimate vehicle for Mr. Reed and his family to be made whole for the huge damage that has been inflicted upon them, and thus must, on the merits, allow this case to proceed to discovery and eventually trial by a jury. Finally, Mr. Reed respectfully requests oral argument.

Dated: February 17, 2023

Respectfully submitted,

By: */s/ Larry Klayman*         
Larry Klayman, Esq.
Florida Bar No.: 246220
Klayman Law Group P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Tel: 561-558-5536
leklayman@gmail.com

*Counsel for Patrick Nathaniel Reed*

## CERTIFICATE OF SERVICE

I, Larry Klayman, hereby certify that on this day, February 17, 2023 I electronically filed the foregoing with the Clerk of Court using the Court's ECF procedures. I also certify that the foregoing document is being served this day on all counsel of record through the Court's eservice procedures.

*/s/ Larry Klayman*         

# EXHIBIT 1

# SHOWING CONSTITUTIONAL MALICE IN MEDIA DEFAMATION

📅 **Vol. 92, No. 8   September/October 2018   Pg 38**   👤 **Manual Socias**

📁 **Featured Article**



Illustration by Barbara Kelley

There is a myth that it is virtually impossible for a public figure to successfully sue the media for defamation. This myth is based on a perceived insurmountability of the requirement imposed on public figures to prove "actual" or "constitutional" malice by clear and convincing evidence when suing for defamation. In reality, the courts have provided an almost step-by-step guide for finding and proving constitutional malice. The guide is the badges of malice. The phrase "badges of malice" is adapted from the badges of fraud used in tax evasion and fraudulent conveyance cases to categorize types of circumstantial evidence that may support an inference of a subjective intent to defraud.

No doubt showing constitutional malice is an obstacle. Public figures must show constitutional malice to maintain their claim. The requirement of proving constitutional malice is not limited to public figures. Plaintiffs that are not public figures still must show constitutional malice to recover punitive damages.

Constitutional malice, also called actual malice, is the publishing of a defamatory statement either knowing it is false or with reckless disregard for its truth or falsity.[1] Requiring a showing of constitutional malice for a public figure to sue for defamation, or to impose greater than actual damages ( *i.e.* , presumed and punitive damages) on the media, is intended to prevent a chilling effect on news reporting and protect First Amendment rights.[2] The concept of "knowledge of falsity" is familiar to all attorneys in multiple contexts. Recklessness as to falsity, however, has evolved definitions and inferences unique to defamation law.

### Twenty-Four Badges of Constitutional Malice: A Guide

The Supreme Court articulated the parameters of "reckless disregard" in *St. Amant v. Thompson* , 390 U.S. 727, 731 (1965): "Reckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. There must be evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."

Accordingly, *St . Amant* reasoned that recklessness may be inferred when "there are obvious reasons" to doubt the veracity of the defamatory statement.[3]

In *Mason v. New Yorker Magazine* , 501 U.S. 496 (1991), the Supreme Court summarized that, for proof of constitutional malice, "mere negligence does not suffice," and that the plaintiff must demonstrate that the author "in fact entertained serious doubts as to the truth of his publication...or acted with a high degree of awareness of probable falsity."[4]

Knowledge of falsity or reckless disregard for falsity is a subjective mental state of the person responsible for publishing the defamatory statement. Consequently, absent an admission by the media, showing constitutional malice is based on circumstantial evidence. The courts have recognized certain fact patterns of circumstantial evidence as probative of constitutional malice. These "badges of malice," some alone and some in combination with others, have been held sufficient to support a jury inference of constitutional malice. There are 24 badges of malice.[5]

· failure to conduct a thorough investigation before publishing serious and damaging allegations that are not "hot news";

· failure to give the plaintiff a fair opportunity to reply to defamatory allegations;

· failure to report exculpatory facts;

· omitting pertinent information to create a false impression;

· destruction, loss, or unavailability of a reporter's notes or research;

· the reporter's knowledge of a quoted source's animosity toward the plaintiff;

· the alteration of quotes to maximize a story's impact;

· a reporter's knowledge of facts conflicting with the report;

· emphasizing unimportant events to support a defamatory statement;

· continued reliance on a source that had proven unreliable in other respects;

· a preconceived determination to disparage a plaintiff or a preconceived slant or view;

· repetitive media attacks on the plaintiff;

· failure to contact key witnesses;

· a reporter's ill will toward the plaintiff;

· competitive pressure for "hot news" story;

· discrepancies, inconsistencies, and equivocation in the testimony of media witnesses;

· a reporter's departure from professional standards;

· failure to supervise the reporter's preparation of the story;

· refusal to publish a retraction upon learning of errors in a story;

· the use of deception to obtain a defamatory story;

· a reporter's lack of credibility;

· prior and subsequent defamatory statements;

· that an investigative agency with the same information as a reporter declined to prosecute or take any action against the plaintiff; and

· making threats in connection with a story.

These badges of malice are a guide and nothing more. The possible scope of evidence that may support an inference of malice is unlimited. The badges are useful because they summarize actual events that tend to repeat themselves in media defamation cases. Evidence of the badges in discovery will support a strong and well-precedented argument for constitutional malice. For each badge developed in discovery, the media will have an explanation. Developing multiple badges of malice can expose the media's serial excuses as pretextual and increase the chances of successfully arguing constitutional malice.

## Malice Typically Is Evaluated from the Accumulation of Circumstantial Evidence

The badges of malice are consistent with the extremely broad scope of evidence that the Supreme Court held must be discoverable by plaintiffs to prove malice. In *Herbert v. Lando* , 441 U.S. 153 (1979), the Supreme Court observed that the First Amendment protections given to the media were balanced by the corollary that the fact finder could consider an extremely broad scope of evidence in determining malice. "[A]ny competent evidence either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown…" to show malice.[6] The specific items of relevant evidence favorably itemized in *Herbert* include 1) all information known to the defamer showing the falsity of defamatory statements; 2) the defamer's thought process and reasons for crediting or discrediting information; 3) the defamer's thought processes and reasons for incorporating only certain information into a press statement; 4) threats made by the defendant; 5) prior defamations by the defendant; 6) subsequent defamations made by the defendant; 7) subsequent statements made by the defendant; and 8) circumstances indicating rivalry, ill will, or hostility.[7]

In *Harte-Hanks Communications, Inc. v. Connaughton* , 491 U.S. 657 (1989), the Supreme Court emphasized that a jury may infer malice from a series of factors none of which alone would have been sufficient. In that case, a newspaper published witness' allegations that a judicial candidate had been bribed. The candidate sued for defamation, and the newspaper argued that it had no knowledge that the bribery allegations were false. The jury found malice, and the newspaper appealed.

*Harte-Hanks* emphasized numerous factors in evaluating the entire record. The newspaper was involved in heated competition with another local paper and was under pressure to "scoop it" on local news ( *i.e* ., profit motive for the defamation). After hearing the obviously damaging bribery allegations, the newspaper conducted an investigation, but it failed to contact key witnesses.

Numerous taped witness interviews were available to the newspaper, but the editorial director did not listen to them. There were discrepancies in the testimony of the newspaper's witnesses. Though no single factor was dispositive, *Harte-Hanks* stressed that the jury may have found that "failure to conduct a complete investigation involved a deliberate effort to avoid the truth."[8]

In *Curtis Publishing Co. v. Butts* , 388 U.S. 130 (1967), a football coach sued a magazine for publishing an article accusing him of fixing games. The evidence showed that this was not "hot news," that the charges were serious, that the editors recognized "the need for a thorough investigation," that the reporter's superiors did not look at the reporter's notes prior to the publication, that a key witness was not interviewed, and that "no attempt was made to screen the films of the game."[9] The Supreme Court held that a jury may infer from this that the magazine "had been anxious to publish an expose and had, thus, wantonly and recklessly seized on a questionable affidavit."[10]

*Hunt v. Liberty Lobby* , 720 F.2d 631 (11th Cir. 1983), affirmed a jury finding of malice in a Florida defamation case. *Hunt* ruled that two factors present in that case independently supported the jury's determination. First, "when an article is not in the category of 'hot news,' that is, information that must be printed immediately or it will lose its newsworthy value, 'actual malice may be inferred when the investigation for a story...was grossly inadequate in the circumstances.'"[11] Second, "an inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him, even when the defendant testifies that he believed that the statement was not defamatory and was consistent with the facts within his knowledge."[12]

A defendant's "inconsistent" and "equivocating" testimony supported a finding of malice in *Texas Disposal Systems Landfill, Inc. v. Waste Management Holdings, Inc.* , 219 S.W.3d 563 (Tex. App. 2007). The court cited a combination of

circumstantial evidence from which the jury may have inferred malice. These factors included 1) omitting pertinent information that would have prevented a "false impression" from the information included in the defamatory communication; 2) a failure to attempt verification of the defamatory information; and 3) "inconsistent" and "equivocating" testimony from the defendant.[13]

The frequency and duration of the media's attack on a plaintiff also may help establish malice. In *Bentley v. Bunton* , 94 S.W.3d 561 (Tex. 2002), the court affirmed a jury finding of malice. *Bentley* cited factors that included the fact that the talk show host had "relentlessly" repeated allegations against a particular judge for months while ignoring people that had knowledge of the allegations.[14]

Emphasizing unimportant events to support serious defamatory statements will also support a finding of malice. In *Bolling v. Baker* , 671 S.W. 2d 559 (Tex. App. 1984), a physician accused a nurse of dishonesty. When the nurse sued for defamation, the physician testified that one reason he doubted the nurse's honesty was an incident in which some lab slips "had been changed."[15] *Bolling* concluded that the physician's "obsession with such an insignificant event warrants the inference that he was using the incident to get even with [the nurse]."[16] Accordingly, the court concluded that there was sufficient evidence to support the jury's finding that the statements were made with knowledge of their falsity or with reckless disregard for the truth. Emphasizing unimportant events also fits within the more general badge of a reporter knowing that the facts do not support a defamatory story.

Finally, the context of a defamatory statement and the media's use of deception to obtain images for a defamatory story may support a jury inference of malice. In *Braun v. Flynt* , 726 F.2d 245 (5th Cir. 1984), a novelty entertainer who performed an act with a swimming pig at a family-oriented amusement park sued a sexually oriented men's magazine for defamation for publishing her

photo in its "Chic Thrills" section. The magazine obtained authority to use the photograph by misrepresenting the nature of the magazine. *Braun* affirmed a jury finding of malice, holding that the jury may infer malice from the magazine's use of deception to obtain the photograph and then inserting the photograph of what the editors knew was a family tourist attraction "in the context of" a lewd magazine.[17]

The media cannot avoid an inference of malice when it publishes a defamatory headline by showing that it published the full truth in the text of the story. In *Kaelin v. Globe Communications Corp.*, 162 F.3d 1036 (9th Cir. 1998), Kato Kaelin sued a newspaper for publishing a headline stating, "COPS THINK KATO DID IT!" after O.J. Simpson was acquitted of murder. The newspaper argued that there was no malice because the body of the story made clear that the "IT" referred to perjury and not the murders. The trial court entered summary judgment for the newspaper. The appellate court reversed *Kaelin*, holding that a jury may infer that the newspaper intended to convey a false impression from the scandalous headlines for the pecuniary motive of selling more newspapers. The truthful disclosure in the body of the article did not guarantee the newspaper immunity from defamatory headlines. "The editors' statements of their subjective intention," *Kaelin* stressed, "are matters of credibility for a jury."[18]

## Some Badges Alone May Establish Malice

There are instances in which courts have approved an inference of malice from a single item of circumstantial evidence. This occurs in two scenarios. One is when there is evidence of the reporter's lack of credibility regarding the story. This evidence includes the mysterious disappearance of the reporter's research notes, the alteration of quotes for defamatory impact, and the reporter's possession of materials showing that the defamatory story was false. The second scenario focuses on the reporter's conduct after the defamatory publication. When the media refuses to retract a defamatory statement after learning of its falsity, courts have allowed an inference that the defamation was published with

malice. Though neither scenario guarantees a finding of constitutional malice, both scenarios may support such a finding if the evidence is material to the defamation.

The destruction or unavailability of a reporter's notes and research supported a finding of malice in *Murphy v. Boston Herald, Inc.* , 449 Mass. 42 (Mass. 2007). There, a newspaper reporter, relying on the statement of a district attorney with animosity toward a judge, published an article accusing the judge of belittling a juvenile rape victim. *Murphy* found that a number of factors combined to furnish clear and convincing evidence of malice.[19] *Murphy* stressed 1) the reporter's knowledge that his source had animosity toward the judge; 2) the reporter's failure to verify the accuracy of the statements attributable to the judge with others who were present; and 3) the reporter's incredible claim that he discarded his notebook where he wrote the information told to him by the district attorney.[20] *Murphy* stressed that the strongest evidence of malice was the mysterious unavailability of the notebook: "The jury were entitled to draw the negative inference that [the reporter] discarded his notebook in a deliberate effort to conceal what he knew were inaccuracies in his reporting. This inference, in turn, *provides a strong basis for a finding of actual malice.*"[21]

Consistent with *Murphy* , numerous courts have held that the destruction or unavailability of a reporter's notes or research may support a jury verdict of malice.[22]

A reporter's alteration of quotes to maximize the impact of the story also supports a verdict of malice. In *Masson v. New Yorker Magazine, Inc* ., 501 U.S. 496 (1991) , the Supreme Court held that a reporter's alteration of quoted words may equate with knowledge of falsity when the alteration results in a material change of the meaning conveyed by the quoted statement.[23] That a reporter in *Masson* might have misunderstood his or her sources is insufficient to overturn a jury's evaluation of the circumstances.[24]

The court in *Southern Air Transport, Inc. v. Post Newsweek Stations Florida, Inc* ., 568 So. 2d 927 (Fla. 3d DCA 1990), upheld a finding of malice when the media aired an uncorroborated claim by an individual of questionable credibility that the plaintiff was a drug trafficker. The court held publishing this serious and uncorroborated allegation without giving the plaintiff a fair opportunity to reply supported the inference of malice. The court also noted that the defamatory broadcast made the informant appear credible and failed to report information that would negatively impact his credibility.[25]

A reporter's possession of documents conflicting with his report supported a finding of malice in *Mitchell v. Griffin Television, LLC*, 60 P.3d 1058 (Okl. App. 2002). There, a veterinarian sued a TV station for falsely reporting that a lawsuit accused him of medicating a champion race horse to hide injuries so the horse could be sold. The TV station claimed there was no showing of malice because the complaint filed in federal court alleged the veterinarian had medicated the horse prior to the sale. That complaint accused the trainer of trying to mask the horse's unsoundness but made no such accusation as to the veterinarian. Since the TV station had a copy of the complaint, *Mitchell* held that the jury properly found that the false report was made with "reckless disregard."[26]

In *Herbert* , the court held that a defamer's post-publication conduct may be relevant to establishing malice at the time of publication.[27] The key post-publication conduct developed in the caselaw is the media's refusal to retract a defamatory statement after learning that it is false. *Restatement Second of Torts* 580A (1977), Comment D, concludes that a defamer's refusal to retract a defamatory statement after learning it is false "might be relevant in showing recklessness at the time the statement was published." In *Mahnke v. Northwest Publications, Inc.* , 160 N.W. 2d 1 (Minn. 1968), the Minnesota Supreme Court held that a jury may properly consider a defendant's failure to retract defamatory statements as evidence of recklessness. "We think that the failure to retract the

defamatory statements," *Mahnke* stressed, "underscored defendant's reckless attitude as to the consequences of what had been published and that the jury was entitled to take that fact into consideration."[28]

### Use of the Badges in Discovery

The focus of discovery on constitutional malice is obtaining evidence that the reporter either knew the truth refuting the defamation or the truth was so readily available that failure to inquire amounts to a deliberate avoidance of truth. The badges suggest where to look for this evidence. The first step is obtaining all investigative research materials, notes, drafts of articles, edits, article or script changes, outtakes communications, tweets, web postings (including both the defamatory article and any guest comments or posts), Facebook posts, and other social media materials concerning the defamatory story. The reporter's familiarity with the subject matter of the story, as well as the identities of his or her sources also warrant discovery. The goal of this phase of discovery is to learn everything the reporter said, wrote, knew, or had access to concerning the defamatory story.

A next step is to identify every item of information known or available to the reporter that is inconsistent with the defamatory sting of the story. This aspect of discovery then focuses on tracing how and why the reporter made editorial decisions to omit, downplay, or not pursue what was inconsistent with the defamation. This should be done at deposition, but it is helpful to initially obtain copies of all drafts or outtakes of the defamatory publication to see what was deleted.

The reporter should be deposed on every step of the investigation conducted on the story. Particular emphasis is on the reasons for a reporter's decision not to pursue research areas that would have exposed the defamatory story as false. The credibility issue surrounding a reporter's explanation of this process is often

the lynchpin that decides constitutional malice. Inconsistencies between the reporter's research and the defamatory string of the story may rise to a level where this alone allows an inference of malice.

The next aspect of discovery deals with external influences on the defamatory story. External influences discussed in the caselaw include 1) animosity toward the subject of the defamation; 2) competitive pressure to scoop other media outlets; 3) a pattern of defamatory coverage; and 4) an editorial slant. Also, failure to retract after learning of a defamatory falsity, though not an influence on the story, is an external factor that may support an inference of malice. Accordingly, discovery into the editorial decision not to retract should be as thorough as discovery into the decision to initially publish the defamation. In cases in which the media issues an inadequate retraction, the retraction can often be pled as an additional defamatory publication requiring discovery in its own right.

Discovery into animosity toward the subject of the defamation can be far ranging or a quick dead end. In cases in which a news outlet had an established relationship with the plaintiff, there is often a falling out predating the defamatory publication — and evidence of animosity. The entire history of the relationship, including all statements made by news outlet representatives about the plaintiff, are in play.

Competitive pressure for attention-grabbing stories is always present but must be shown in the record. There are often emails or other communications discussing a news outlet's market position (circulation or viewers). Media executives normally must acknowledge that their company's source of income (advertising), and often their income depends on their circulation or number of viewers. Editors sometimes direct reporters to pursue certain stories, either orally or in writing, to maximize viewers during ratings periods.

Television stations typically feature their most inflammatory stories during national ratings periods knowns as "sweeps." During this time, there can be increased pressure on reporters to generate high-profile stories or to exaggerate

to the point of defaming. Sweeps periods occur four times each year and are usually acknowledged in internal communications. It is important in the industry because the viewership established during sweeps determines advertising revenue. Questioning the reporter regarding his or her basis for publishing multiple defamatory statements will often yield testimony helpful to establish a credibility dispute.

A pattern of defamatory statements about the plaintiff can be key to showing malice. Identifying every defamatory statement about the plaintiff made by a news outlet is the first step. This includes defamatory statements that were made before and after the defamatory publication. In some cases, the sheer number of false statements made may support an inference of malice. In others, credibility issues are raised by a reporter's attempts to explain this pattern.

### Defending Summary Judgment

The first test of a plaintiff's evidence of constitutional malice is usually the media's motion for summary judgement. It is here that a plaintiff first feels the weight of being required to prove malice by clear and convincing evidence. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the Supreme Court held that, in ruling on a media motion for summary judgment or a directed verdict on constitutional malice, a court must evaluate the evidence of malice to determine whether a jury reasonably could infer malice under this heavier evidentiary burden. Media defendants, quoting isolated language from *Anderson* and similar cases, exaggerate that a plaintiff's burden is virtually insurmountable.

In reality, *Anderson* also stresses that courts should be cautious in granting summary judgment on constitutional malice:

> [I]t is clear enough from our recent cases that at the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.[29]

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.[30]

*Anderson* has been inconsistently applied. Some courts invoke *Anderson* as a license to act as jury in weighing the evidence. Others look at whether there are factual issues that may be presented to a jury. This was predicted by the dissent in *Anderson* .[31]

The dissenting justices argued that *Anderson* gave conflicting instructions to trial courts. Specifically, courts were simultaneously instructed to weigh the evidence under the "prism" of the clear and convincing standard and cautioned against weighing the evidence when ruling on a motion for summary judgment or directed verdict. The dissents predicated that *Anderson* would prove devoid of practical application.[32]

In *Hutchinson v. Proxmire*, 443 U.S. 111, n.9 (1979), the U.S. Supreme Court noted in a libel case "the proof of actual malice calls a defendant's state of mind into question [ *citations omitted* ] and does not readily lend itself to summary disposition."[33]

Summary judgment in a Florida defamation case arising from "investigative television news" was addressed in *Southern Air Transport* . There, the plaintiff sued a TV station for broadcasting an investigative story accusing the plaintiff of drug trafficking while engaged in covert arms shipments to the Nicaraguan Contras. The trial court granted summary judgment for the TV station on the issue of malice. The district court reversed, holding that these factors precluded

summary judgment: 1) A source's information had proven unreliable in other respects; 2) "the defendants *did not give plaintiff a fair opportunity to reply* to this drug trafficking accusation..."[34]; and 3) the government declined to prosecute anyone based on the source's information.[35] The court noted that other evidence in the record supported contrary inferences but stressed that weighting them was for the jury.[36]

Media defendants always assert that they believed the truth of the defamation. Constitutional malice pivots on creating a triable issue concerning credibility. The badges of malice help create this issue, but the courts have stressed that it is in the jury's purview to evaluate the credibility of media witnesses and reject their claim that they believed the defamation was true.

In *Harrison v. Williams* , 430 So. 2d 585 (Fla. 4th DCA 1983), a father sent defamatory communications to officials accusing a police officer of beating up his son. The police officer brought a defamation action, and the father's defense was that "he made a good faith mistake about the identity" of the police officer. The trial evidence showed that the son "informed his father" that it was the plaintiff who had attacked him. The assistant state attorney, however, had told the father that the attacker was another officer who looked like the plaintiff. The fact finder resolved the credibility issue in favor of the plaintiff and found that the father had made his accusations with malice. On appeal, the court affirmed, finding substantial competent evidence to support the inference of malice.[37]

*Dibella v. Hopkins* , 403 F.3d 102 (2d Cir. 2005), affirmed a jury's finding of malice and held that it was within the jury's purview to discredit the defamer's account of his mental state in making a defamatory statement.[38] Evidence that creates an issue concerning the reporter's credibility requires a jury determination.

The thrust of the focus on the credibility of the media witnesses is that anything normally impacting a witness' credibility is in play. In particular situations, these factors may be unique. For instance, a witness' hesitations, tone, and demeanor

are properly considered by a jury deciding whether to believe the witness. In the context of a motion for directed verdict, the matter must be put on the record because the transcript will not reflect them. In defending a summary judgment, an argument that the record prevents an issue on the media witnesses' credibility can be supported by videotaped deposition testimony.[39]

## Conclusion

The caselaw developed over the last half century shows that proving constitutional malice is feasible. It takes the discipline of developing every item of circumstantial evidence that may furnish a motive to defame or shows that the reporter knew or should have known the truth. The "should have known" standard applies to negligence, but negligence is a step toward recklessness. The 24 badges of constitutional malice reflect combinations of evidence that can defeat the media's First Amendment defense.

[1] *Gertz v. Welch* , 94 S. Ct. 2997 (1974).

[2] *Id.*

[3] *St. Amant*, 390 U.S. at 732, fn. 3 (citations omitted).

[4] *Mason*, 501 U.S. 496 at 510 (citations omitted).

[5]The badges are summarized here and the cases utilizing the various badges are discussed below.

[6] *Herbert*, 441 U.S. at 177, fn. 12 (citations omitted).

[7] *Id.* Courts typically reject various journalist privileges which normally protect journalists' sources from discovery on the ground that the media waives the privilege when it asserts its First Amendment defenses.

[8] *Harte-Hanks Communications*, 491 U.S. at 685. *See also Celle v. Filipino Reporter Enterprises, Inc* ., 209 F.3d 163 (2d Cir. 2000) (malice finding affirmed based on evidence of reporter's ill will, reporter's conflicting testimony, and reliance on questionable source without conducting investigation).

[9] *Curtis Publishing Co*., 388 U.S. at 157.

[10] *Id.* at fn.20. *See also Healey v. New England Newspapers, Inc* ., 555 A.2d 321 (R.I. 1989) (newspaper report of angry relative blaming doctor for death creates jury issue of malice where newspaper failed to report known facts tending to exculpate the doctor); *Buratt v. Capital City Press* , 459 So. 2d 1268 (La. 1 Cir. 1984) (reckless disregard for truth shown when reporter omits reporting available information because it refuted defamatory point reporter trying to make).

[11] *Hunt*, 720 F.2d at 643.

[12] *Id*. at 645 (citations omitted).

[13] *Texas Disposal Systems Landfill*, 219 S.W.3d at 578-579.

[14] *Bentley,* 94 S.W.3d at 584-585, 600. *See also Kentucky Kingdom Amusement Co. v. Belo Kentucky, Inc.* , 179 S.W.3d 785 (Ky. 2005) (affirming jury finding of malice based on television station's failure to correct inaccuracies in prior reports, continuing commitment to running the same false story line, failure to significantly investigate, and because the general make up and presentation of the story exhibited hostility).

[15] *Bolling,* 671 S.W.2d at 563.

[16] *Id*. at 565.

[17] *Braun*, 726 F. 2d at 257.

[18] *Kaelin,* 162 F. 3d at 1042.

[19] *Murphy* , 449 Mass. at 58.

[20] *Id*. at 58-61.

[21] *Id*. at 61 (emphasis added).

[22] *See Moore v. Vislosky* , 240 F. App'x 457, 469 (3d Cir. 2007) (defamer's claim that she "lost" documentary evidence that supported her defamatory statements was implausible and supports jury finding that she acted with reckless disregard for truth); *Torgerson v. Journal/Sentinel, Inc.* , 563 N.W. 2d 472, 483 (Wis. 1997) (destruction of reporter's notes is sufficient evidence to support a jury verdict of actual malice); *Chang v. Michiana Telecasting Corp.* , 900 F.2d 1085, 1090 (7th Cir. 1990) ("destruction could imply that the notes would have revealed the reporter did not believe what he wrote or said") (citations omitted).

[23] *Masson,* 501 U.S. at 516.

[24] *Id* . at 520-521.

[25] *Southern Air Transport* , 568 So. 2d at 928.

[26] *Mitchell*, 60 P.3d at 1063.

[27] *Herbert,* 441 U.S. at 170-171.

[28] *Mahnke,* 160 N.W.2d at 344. *See also Zerangue v. TSP Newspapers, Inc.* , 814 F.2d 1066 (5th Cir. 1987) (refusal to retract an exposed error supports a finding of malice just as a readiness to retract tends to negate malice); *Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.* , 708 F.2d 944 (5th Cir. 1983) (refusal to retract supports jury finding that defamatory article published with reckless disregard of the truth).

[29] *Anderson*, 477 U.S. at 249.

[30] *Id*. at 255 (citations omitted).

[31] *Id.* at 265-268.

[32] *Id* . at 267-269.

[33] *See also Shiavone Const. Co. v. Time, Inc.* , 847 F.2d 1069 (3d Cir. 1988) (reversing summary judgment in media defamation case where media had internal inconsistencies in its research and information contradicting libelous assertions but nevertheless published libelous statements).

[34] *Southern Air Transport* , 568 So. 2d at 928 (emphasis added).

[35] *Id.*

[36] *Id.* at 929.

[37] *Harrison*, 430 So. 2d at 586. *See also Durso v. Lyle Stuart, Inc* ., 337 N.E. 2d. 443, 447 (Ill. App. 1975) (citations omitted) (jury may find malice and disregard defendant's claim that defamatory statement in investigative publication was caused by unintentional "error" where evidence creates issue of author's credibility because (citations omitted) it showed "muckraking intent, the absence of hot news, and an inadequate investigation...").

[38] *See also Newton v. NBC, Inc* ., 930 F.2d 662, 671 (9th Cir. 1990) (malice may be based on jury's negative assessment of reporter's credibility at trial).

[39] The normal rule is that the court should leave credibility issues for the jury. To the extent that the court weighs evidence to see if a credibility issue satisfies the "clear and convincing" standard, witness demeanor should be in play. The dissent in *Anderson* pointed out that applying the "clear and convincing" standard at the summary judgment stage and telling the courts not to weigh evidence was inherently contradictory. The dissent predicted that *Anderson* would be inapplicable in practice.



**MANUEL SOCIAS** *is a solo practitioner who has represented clients in business litigation for 35 years. He also handles and consults on defamation cases.*

EXHIBIT 2

CASE NO. 20-61872-CIV-SINGHAL
United States District Court, S.D. Florida.

# Dershowitz v. Cable News Network, Inc.

541 F. Supp. 3d 1354 (S.D. Fla. 2021)
Decided May 24, 2021

CASE NO. 20-61872-CIV-SINGHAL

2021-05-24

Alan DERSHOWITZ, Plaintiff, v. CABLE NEWS NETWORK, INC., Defendant.

Brian Mitchell Rodier, Rodier & Rodier, Hallandale, FL, for Plaintiff. George S. LeMieux, Eric Corey Edison, Gunster, Yoakley and Stewart, P.A., Fort Lauderdale, FL, Amanda Levine, Pro Hac Vice, Katherine M. Bolger, Pro Hac Vice, Davis Wright Tremaine LLP, New York, NY, for Defendant.

---

RAAG SINGHAL, UNITED STATES DISTRICT JUDGE

1358*1358

Brian Mitchell Rodier, Rodier & Rodier, Hallandale, FL, for Plaintiff.

George S. LeMieux, Eric Corey Edison, Gunster, Yoakley and Stewart, P.A., Fort Lauderdale, FL, Amanda Levine, Pro Hac Vice, Katherine M. Bolger, Pro Hac Vice, Davis Wright Tremaine LLP, New York, NY, for Defendant.

# ORDER

RAAG SINGHAL, UNITED STATES DISTRICT JUDGE

**THIS CAUSE** is before the Court upon Defendant Cable News Network's Motion to Dismiss (DE [17]). The parties have fully briefed the Motion to Dismiss and the Court heard argument of counsel. For the reasons set forth below, the Motion to Dismiss is denied.

I. <u>INTRODUCTION</u>

Plaintiff Alan Dershowitz ("Dershowitz") has filed a Complaint (DE [1]) against Cable News Network, Inc. ("CNN") seeking damages for defamation. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

In January 2020, Dershowitz represented the President of the United States in an impeachment trial before the United States Senate. (*Id.* ¶ 6). This dispute concerns CNN's coverage of an argument Dershowitz made to the Senate about whether a president can be impeached and removed from office if he takes any action that is 1359 motivated by a desire to be reelected. *1359  According to the Complaint, Dershowitz gave the following answer to a question by Senator Ted Cruz:



The only thing that would make a quid pro quo unlawful is if the quo were somehow illegal. Now we talk about motive. There are three possible motives that a political figure could have. One, a motive in the public interest and the Israel argument would be in the public interest. The second is in his own political interest and the third, which hasn't been mentioned, would be his own financial interest, his own pure financial interest, just putting money in the bank. I want to focus on the second one just for one moment. Every public official that I know believes that his election is in the public interest and, mostly you are right, your election is in the public interest, and if a president does something which he believes will help him get elected in the public interest, that cannot be the kind of quid pro quo that results in impeachment. (*Id.* ¶ 7).[1]

[1] The Complaint sets forth only an excerpt of Dershowitz' response. CNN has submitted the Congressional Record (DE [17-1] with the full transcript of Dershowitz' argument found at S650 and asks the Court to take judicial notice of the entirety of Dershowitz' comments.

Following the day's impeachment proceedings, CNN aired a clip of this argument that featured only the last sentence and omitted Dershowitz' words that a quid pro quo would be unlawful if the quo were somehow illegal.[2] (*Id.* , ¶ 8). Dershowitz alleges that several CNN commentators responded to the truncated clip and "exploded into a one-sided and false narrative that Professor Dershowitz believes and argued that as long as the President believes his reelection is in the public interest, that he could do anything at all – including illegal acts – and be immune from impeachment." (*Id.* ). Dershowitz alleges CNN commentators made the following defamatory statements[3] (DE [1], ¶ 13):

[2] The Complaint acknowledges that CNN aired the entire statement several times earlier in the day on shows hosted by CNN employees Wolf Blitzer and Jake Tapper. (DE [1] ¶ 9).

[3] In his Memorandum in Opposition (DE [21]), Dershowitz identified the underlined portions of these statements as those he alleges are defamatory.

Having worked on about a dozen campaigns, there is always the sense that, boy, if we win, it's better for the country. But that doesn't give you license to commit crimes or to do things that are unethical. So, it was absurd. What I thought when I was watching it was this is un-American. This is what you hear from Stalin. This is what you hear from Mussolini, what you hear from authoritarians, from Hitler, from all the authoritarian people who rationalized, in some cases genocide, based on what was in the public interest." -- Joe Lockhart @ 7:11 p.m., January 29, 2020.

The president's defense team [Dershowitz] seems to be redefining the powers of the president, redefining them towards infinity." ... [truncated clip played] ... "If you look at what he says there it blows your mind. He says if a president is running for re-election because he thinks getting elected will help America, he can do anything, anything. And that redefines the presidency and America." -- John Berman @ 6:17 a.m., January 30, 2020.

I did not go to Harvard Law, but I did go to the University of Texas School of Law, where I studied criminal law and constitutional law, but never dreamed a legendary legal mind would set them both ablaze on the Senate floor. The Dershowitz Doctrine would make presidents immune from

1360*1360

every criminal act, so long as they could plausibly claim they did it to boost their re-election effort.
Campaign finance laws: out the window. Bribery statutes: gone. Extortion: no more. This is Donald
Trump's fondest figurative dream: to be able to shoot someone on Fifth Avenue and get away with it." --
Paul Begala on CNN.com, January 29, 2020 @ 9:11 p.m.

This narrative, claims Dershowitz, damaged his reputation as a legal scholar and subjected him to ridicule on
news outlets, talk shows, and social media. (*Id.* ¶¶ 12, 13).

Dershowitz alleges that CNN knew or had serious doubts that its commentators' statements were false at the
time they were made but nonetheless made and/or published the statements with an intent to indulge ill will,
hostility, and an intent to harm. (*Id.* ¶ 20). Dershowitz asserts that CNN's airing of only a portion of his answer
was done to falsely paint him "as a constitutional scholar and intellectual who had lost his mind" and that "
[w]ith that branding, [his] sound and meritorious arguments would then be drowned under a sea of repeated
lies." (*Id.* ¶ 8). The result of omitting the words "[t]he only thing that would make a quid pro quo unlawful is if
the quo were somehow illegal," says Dershowitz, is that CNN could "fool" its viewers into thinking "that the
respected Alan Dershowitz believed that the President of the United States could commit <u>illegal</u> acts as long as
he thought it would help his reelection and that his reelection was in the public interest, even though it was the
opposite of what he said." (*Id.* ). Dershowitz alleges he has suffered and continues to suffer damage, including
but not limited to damage to his reputation, embarrassment, pain, humiliation, and mental anguish and has
sustained past and future loss of earnings. (*Id.* ¶ 19). He seeks $50 million in compensatory damages and $250
million in punitive damages from CNN.

CNN moves to dismiss the Complaint for failure to state a claim upon which relief can be granted. (DE [17]).
Fed. R. Civ. P. 12(b)(6). First, CNN contends its broadcasts are protected by the fair report privilege, which
shields the press from liability for reporting information on official government proceedings. Second, CNN
argues that the statements made by its commentators were non-actionable opinions based upon Dershowitz'
public testimony. Finally, CNN asserts that Dershowitz has not and cannot plead that CNN acted with the
actual malice required for a public figure to sustain a defamation claim. CNN asks the Court to dismiss
Dershowitz' Complaint with prejudice.

II. <u>LEGAL STANDARDS</u>

A. Motion to Dismiss

To survive a motion to dismiss, "factual allegations must be enough to raise a right to relief above the
speculative level" and must be sufficient "to state a claim for relief that is plausible on its face." *Bell Atl. Corp.
v. Twombly* , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when
the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is
liable for the misconduct alleged." *Ashcroft v. Iqbal* , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868
(2009). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss."
*Sinaltrainal v. Coca-Cola Co.* , 578 F.3d 1252, 1261 (11th Cir. 2009), *abrogated on other grounds by Mohamad
v. Palestinian Authority* , 566 U.S. 449, 132 S.Ct. 1702, 182 L.Ed.2d 720 (2012).

In considering a Rule 12(b)(6) motion to dismiss, the court's review is generally "limited to the four corners of
1361 the complaint." *1361 *Wilcombe v. TeeVee Toons, Inc.* , 555 F.3d 949, 959 (11th Cir. 2009) (quoting *St. George
v. Pinellas Cty.* , 285 F.3d 1334, 1337 (11th Cir. 2002) ). The court must review the complaint in the light most
favorable to the plaintiff, and it must generally accept the plaintiff's well-pleaded facts as true. *See Hishon v.
King & Spalding* , 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). But "[c]onclusory allegations,

unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Jackson v. BellSouth Telecommunications* , 372 F.3d 1250, 1262 (11th Cir. 2004) (citation omitted); *see also Iqbal* , 129 S. Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").

B. Defamation

The parties agree that Florida law applies to this dispute. In Florida, a defamation claim has "five elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews For Jesus, Inc. v. Rapp* , 997 So. 2d 1098, 1106 (Fla. 2008).

CNN argues that its broadcasts concerning Dershowitz' statements are protected from liability by the fair report privilege. The fair report privilege is a qualified privilege given to news media "to accurately report on the information they receive from government officials." *Woodard v. Sunbeam Television Corp.* , 616 So. 2d 501, 502 (Fla. 3d DCA 1993). "If the report of a public official proceeding is accurate or a fair abridgment, an action cannot be constitutionally maintained, either for defamation or for invasion of the right of privacy." *Id.* (quoting Restatement (Second) of Torts § 611, cmt. b (1977)). "The privilege extends to the publication of the contents of official documents, as long as the account is reasonably accurate and fair." *Rasmussen v. Collier County Publ. Co.* , 946 So. 2d 567, 571 (Fla. 2nd DCA 2006).

Next, CNN argues that its commentators offered opinions and, therefore, it cannot be liable for defamation. In Florida, a claim of defamation requires a false statement of fact. *Id.* Statements of pure opinion are not actionable. *Zambrano v. Devanesan* , 484 So. 2d 603, 606 (Fla. 4th DCA 1986). "The distinction between fact and opinion is not always easy to perceive." *Id.* "Thus, the law recognizes that some comments may be pure expressions of opinion whereas others may be mixed expressions of opinion." *Id.*

A mixed opinion is one "based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication." *LRX, Inc. v. Horizon Assocs. Joint Venture ex rel. Horizon-ANF, Inc.* , 842 So. 2d 881, 885 (Fla. 4th DCA 2003). "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications." *Milkovich v. Lorain Journal Co.* , 497 U.S. 1, 18-19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

Whether a challenged statement is one of fact or opinion is a question of law to be decided by the court. *Turner v. Wells* , 879 F.3d 1254, 1262 (11th Cir. 2018). "In assessing whether an allegedly libelous statement is 1362 opinion, the court must construe the statement in its totality, examining not merely a particular phrase *1362 or sentence, but all of the words used in the publication." *Rasmussen* , 946 So. 2d at 571 (citing *Hay v. Indep. Newspapers, Inc.* , 450 So. 2d 293, 295 (Fla. 2d DCA 1984) ).

Finally, CNN challenges the sufficiency of Dershowitz' pleading of actual malice. *See New York Times Co. v. Sullivan* , 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (public figure must prove actual malice to succeed in defamation case). Actual malice "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." *Masson v. New Yorker Mag., Inc.* , 501 U.S. 496, 500, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). Rather, actual malice refers to "publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity." *Id.* at 511, 111 S.Ct. 2419. To avoid dismissal of a defamation claim, a

public figure must plead facts sufficient to give rise to a plausible inference of actual malice. *Michel v. NY Post Holdings, Inc.* , 816 F.3d 686, 702 (11th Cir. 2016). The pleading standards of *Iqbal* and *Twombly* apply to a public figure's allegations of actual malice. *Id.*

## III. <u>ANALYSIS</u>

The Court must first address those items that it considered in resolving this Motion. CNN included numerous exhibits with its Motion to Dismiss and argues the Court may properly consider all of them when deciding the Motion. The Court disagrees. At the 12(b)(6) stage, the court may consider the allegations in the complaint as well as documents incorporated into the complaint by reference and matters of which it may take judicial notice. *Lozman v. City of Riviera Beach* , 713 F.3d 1066, 1075 n.9 (11th Cir. 2013) (citations omitted). These items are incorporated by reference in the Complaint and are properly considered at the motion to dismiss stage:

- • CNN footage of the impeachment trial aired on January 29, 2020 (DE [17-6], ex. A);

- • Transcript and footage of the January 29, 2020, episode of the program Erin Burnett Outfront (DE [17-6], ex. B);

- • Transcript and footage of the January 20, 2020, episode of the program New Day (DE [17-6], ex. C); and

- • Paul Begala article "Presenting the Ludicrous 'Dershowitz Doctrine' " published January 29, 2020 on cnn.com (DE [17-6], ex. D)

In addition, the court may take judicial notice of Congressional Record of January 29, 2020 (DE [17-1]). *See Coastal Wellness Centers, Inc. v. Progressive American Ins. Co.* , 309 F. Supp. 3d 1216, n.4 (S.D. Fla. 2018) ("The Court may take judicial notice of government publications and website materials."). The remaining items[4] – transcripts of shows broadcast by other media outlets, transcripts of interviews given by Dershowitz on January 30 and 31, 2020, and a copy of Dershowitz' book *Defending the Constitution* – fall outside the pleadings. "The clear rule in this Circuit is that consideration of material falling outside the pleadings converts a motion to dismiss into one for summary judgment. And in doing so, the judge must give notice to the parties and allow them 10 days in which to supplement the record." *Michel* , 816 F.3d at 701. The Court declines to make that conversion and, therefore, has only considered those items referenced in the Complaint.*1363  A. <u>Fair Report Privilege</u>

<sub>1363</sub>

4   These items are attached to CNN's Motion to Dismiss (DE [17]) at DE [17-2]; [17-3]; [17-4]; [17-5]; [17-6], ex. E; and [17-6], ex. D.

CNN argues that its airing of verbatim statements that Dershowitz made on the floor of the United States Senate is unquestionably protected by the fair report privilege. *See Woodard* , 616 So. 2d at 502 ("The news media has been given a qualified privilege to accurately report on the information they receive from government officials."). "The fair report privilege is news media's qualified privilege 'to report accurately on information received from government officials.' " *Folta v. New York Times Co.* , 2019 WL 1486776, at *2 (N.D. Fla. 2019) (quoting *Rasmussen* , 946 So. 2d at 570-71 ). Clearly, a public broadcast concerning the impeachment trial of the President of the United States triggers the fair report privilege.

The next issue is whether the fair report privilege applies to CNN's broadcasts. The fair report privilege applies "[i]f the report of a public official proceeding is an accurate or a fair abridgment." *Folta* , 2019 WL 1486776, at *2 (quoting *Woodard* , 616 So. 2d at 502 ). CNN argues that it played a verbatim clip of Dershowitz' actual words spoken during a high-level government proceeding and, therefore, the fair report privilege applies. *See Jamason v. Palm Beach Newspapers, Inc.* , 450 So. 2d 1130, 1132 (Fla. 4th DCA 1984) ("accurate report of judicial proceeding" entitled to fair report privilege). Dershowitz does not dispute that the privilege would probably apply if CNN had merely played the truncated clip without further comment. But that is not Dershowitz' claim. The one-count Complaint alleges that the truncated clip was part of "a deliberate scheme to defraud" CNN's audience (DE [1], ¶ 11) that enabled Lockhart, Berman, and Begala to present Dershowitz's comments in a defamatory manner. Thus, for purposes of applying the fair report privilege the Court must consider the broadcasts and the clip as a whole and not as separate claims. And the question is whether CNN's broadcasts presented an accurate or fair abridgment of Dershowitz' comments to the Senate. To answer this, we must look to the source documents. *Folta* , 2019 WL 1486776, at *4 ("Determining whether a report is fair and accurate requires a close comparison of the report and the documents and information from which it is drawn."); *Stewart v. Sun Sentinel Co.* , 695 So. 2d 360, 362 (Fla. 4th DCA 1997) (comparing defamatory information with official documents for "material differences" that would defeat the fair report privilege).

During the impeachment trial, Senator Ted Cruz submitted a question for Dershowitz to answer: "As a matter of law, does it matter if there was a quid pro quo? Is it true that quid pro quos are often used in foreign policy?" *Congressional Record* , 166:19 (Jan. 29, 2020), p. S650. (DE [17-1], p. 7). Dershowitz answered at length and gave several hypotheticals of quid pro quo that he considered would be lawful. At several points in his response, Dershowitz stated that a quid pro quo that is unlawful would be one based on an illegal motive. These points are highlighted below:

> I offered you a hypothetical the other day: What if a Democratic President were to be elected and Congress were to authorize much money to either Israel or the Palestinians and the Democratic President were to say to Israel "No; I am going to withhold this money unless you stop all settlement growth" or to the Palestinians "I will withhold the money Congress authorized to you unless you stop paying terrorists, and the President said "Quid pro quo. If you don't do it, you don't get the money. If you do it, you get the money"? There is no one in this Chamber who would regard that as in any way unlawful. *The only thing that would make a quid pro quo unlawful is that if the quo were in some way illegal.*

1364*1364

Now, we talked about motive. There are three possible motives that a political figure can have: One, a motive in the public interest, and the Israel argument would be in the public interest; the second is in his own political interest; and the third, which hasn't been mentioned, *would be in his own financial interest, just putting money in the bank.* I just want to focus on the second one for just one moment.

Every public official whom I know believes that his election is in the public interest. Mostly, you are right. Your election is in the public interest. If a President does something which he believes will help him get elected – in the public interest – that cannot be the kind of quid pro quo that results in impeachment....

Everybody has mixed motives, and for there to be a constitutional impeachment based upon mixed motives would permit almost any President to be impeached.

How many Presidents have made foreign policy decisions after checking with their political advisers and their pollsters? If you are just acting in the national interest, why do you need pollsters? Why do you need political advisers? Just do what is best for the country. But if you want to balance what is in the public interest with what is in your party's electoral interest and in your own electoral interest, it is impossible to discern how much weight is given to one or the other.

Now, we may argue that it is not in the national interest for a particular President to get reelected or for a particular Senator or Member of Congress – and maybe we are right; it is not in the national interest for everybody who is running to be elected – but for it to be impeachable, you would have to discern that he or she made a decision solely on the basis of, as the House managers put it, corrupt motives, and *it cannot be a corrupt motive if you have a mixed motive that partially involves the national interest, partially involves electoral, and does not involve personal pecuniary interest.*

The House managers do not allege that this decision, this quid pro quo, as they call it – and the question is based on the hypothesis that there was a quid pro quo. I am not attacking the facts. *They never allege that it was based on pure financial reasons. It would be a much harder case.*

If a hypothetical President of the United States said to a hypothetical leader of a foreign country: Unless you build a hotel with my name on it and unless you give me a million-dollar kickback, I will withhold the funds. *That is an easy case. That is purely corrupt and in the purely private interest.*

But a complex middle case is: I want to be elected. I think I am the greatest President there ever was, and if I am not elected the national interest will suffer greatly. That cannot be.

*Congressional Record* 166:19 (Jan. 29, 2020) pp. S650-51 (emphasis added). (DE [17-1], pp. 7-8).[5]

[5] CNN argues that the paragraph breaks in the Congressional Record signify that Dershowitz is "manipulat[ing] his Senate arguments by merging together *three* separate paragraphs from the Congressional Record to make it appear as one thought." (DE [24], p. 5). The Court must consider the entirety of Dershowitz' remarks, and the editorial judgment of the Government Printing Office staff is not binding on this Court.

To compare Dershowitz' answer with the comments made by CNN's commentators, those comments are set forth again, below:

Having worked on about a dozen campaigns, there is always the sense that, boy, if we win, it's better for the country.

1365*1365

But that doesn't give you license to commit crimes or to do things that are unethical. So, it was absurd. What I thought when I was watching it was this is un-American. This is what you hear from Stalin. This is what you hear from Mussolini, what you hear from authoritarians, from Hitler, from all the authoritarian people who rationalized, in some cases genocide, based what was in the public interest." -- Joe Lockhart @ 7:11 p.m., January 29, 2020.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The president's defense team [Dershowitz] seems to be redefining the powers of the president, redefining them towards infinity." ... [truncated clip played] ... "If you look at what he says there it blows your mind. He says if a president is running for re-election because he thinks getting elected will help America, he can do anything, anything. And that redefines the presidency and America." -- John Berman @ 6:17 a.m., January 30, 2020.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I did not go to Harvard Law, but I did go to the University of Texas School of Law, where I studied criminal law and constitutional law, but never dreamed a legendary legal mind would set them both ablaze on the Senate floor. The Dershowitz Doctrine would make presidents immune from every criminal act, so long as they could plausibly claim they did it to boost their re-election effort. Campaign finance laws: out the window. Bribery statutes: gone. Extortion: no more. This is Donald Trump's fondest figurative dream: to be able to shoot someone on Fifth Avenue and get away with it." -- Paul Begala on CNN.com, January 29, 2020 @ 9:11 p.m.

Dershowitz alleges he never said a president could commit illegal acts if he thought it would help his reelection and his reelection was in the public interest. (DE [1], ¶ 8). And he alleges that CNN, through its employee commentators, distorted the meaning of what he said to the Senate in the coverage on CNN.com and the two broadcasts. (DE [1], ¶ 10, 11). Dershowitz contends that by omitting the phrase, "the only thing that would make a quid pro quo unlawful is if the quo were somehow illegal," CNN presented Dershowitz' comments in a misleading context, which enabled the commentators to (falsely) assert that Dershowitz believed a president could extract a quid pro quo for any reason, including an illegal reason, if he believed it would help his re-election. Dershowitz alleges that if the entire clip had been played, no panel guest would have been able to credibly make that statement. (DE [1], ¶ 9). Thus, Dershowitz argues, CNN presented an official proceeding in a misleading manner and the fair report privilege does not apply.

The Court agrees. CNN presented an abridgment of Dershowitz' answer to Senator Cruz' question. The abridgment is not accurate, to the extent that it omitted a crucial qualification: that an illegal motive for a quid pro quo would be corrupt. As a result, the commentators' statements – that Dershowitz believes a President can do anything, even commit crimes if it would help his re-election – are not based upon a fair and accurate summary of Dershowitz' statement to the Senate.

CNN argues that editors and publishers have great discretion to determine what information to publish. This is correct. But the qualified fair report privilege "merely means that the report of [official] proceedings must be correct." *Jamason* , 450 So. 2d at 1132 (quoting *Walsh v. Miami Herald Publishing Co.* , 80 So. 2d 669, 671 1366 (Fla. 1955) ).*1366 CNN argues that Dershowitz' response to Senator Cruz' statement was ambiguous and that CNN was reasonable in its belief that Dershowitz argued "that presidents cannot be impeached for actions taken to win an election if the President believes his own victory would be in the public interest, regardless of the legality of those actions." (DE [17], p. 14). That is an argument that CNN may present to a jury. But because the broadcasts did not present a fair and accurate abridgment of Dershowitz' remarks, CNN cannot avail itself of the fair report privilege.

Finally, CNN argues that the media has no obligation to present additional information that would present a subject in a better light. This too is correct. *See Folta* , 2019 WL 1486776, at *5 (media has "the right to focus and color their report to capture and hold the readers' attention" provided the report is "substantially accurate"). Thus, in *Larreal v. Telemundo of Florida, LLC* , 489 F. Supp. 3d 1309 (S.D. Fla. 2020), the fair report privilege applied to a report that the plaintiff was arrested during a raid conducted as part of a long-term undercover narcotics investigation. The Telemundo report was one about the undercover raid and arrests. *Id.* The plaintiff sued Telemundo for defamation and alleged it omitted information that would have clarified that he was arrested on a traffic-related warrant. The court stated that "regardless of the charges against the other individuals, the fact that Larreal was arrested on a bench warrant alone does not rebut or undermine Telemundo's accurate reporting about the operation's arrests or change the gist of the story." *Id.* at *1322.

By contrast, the CNN broadcast segments set forth in Dershowitz' Complaint were focused specifically on Dershowitz' comments to the Senate and, as presented on air, changed the gist of what Dershowitz said. For the fair report privilege to apply a defendant must have "presented a fair and accurate report of the source documents." *Folta* , 2019 WL 1486776, at *6. The CNN broadcasts do not meet that standard.

B. <u>Fact v. Opinion</u>

CNN's next ground for dismissal is that the allegedly defamatory statements were non-actionable opinion. CNN argues that the statements at issue were made during commentary shows about the impeachment proceedings and were "rhetorical hyperbole" protected by the First Amendment. *See Horsley v. Rivera* , 292 F.3d 695, 701 (11th Cir. 2002) (holding non-literal, figurative language not defamatory). Thus, CNN argues that statements referring to Dershowitz' arguments as "un-American," that he was "redefining the powers of the President," that his position "blows your mind," and that his argument "is what you hear from Stalin ... what you hear from Mussolini, what you hear from authoritarians" are hyperbole for which there can be no liability.

Dershowitz agrees with CNN on the hyperbolic nature of the commentary and that no liability would attach to those kinds of statements. But he argues that the commentaries also contained untrue, defamatory factual comments – that Dershowitz said a President could do anything without liability (even commit crimes) if he thought it would help his reelection and was in the national public interest – that were contradicted by the full context of Dershowitz' answer to Senator Cruz' question. The Court concludes that the commentators' statements set forth in the Complaint were not pure opinion but instead were mixed expressions of opinion that could reasonably be construed as defamatory. *See Barnes v. Horan* , 841 So. 2d 472, 477 (Fla. 3rd DCA 2002) 1367 (the court must determine whether an expression of opinion can also contain a defamatory *1367 meaning due to assertion of undisclosed acts).

A mixed expression of opinion is not constitutionally protected. *Madsen v. Buie* , 454 So. 2d 727, 729 (Fla. 1st DCA 1984). "[A] statement that although ostensibly in the form of an opinion 'implies the allegation of undisclosed defamatory facts as the basis for the opinion' *is* actionable." *Eastern Air Lines, Inc. v. Gellert* , 438 So. 2d 923, 927 (Fla. 3rd DCA 1983) *disapproved on other grounds* , *Ter Keurst v. Miami Elevator Co.* , 486 So. 2d 547 (Fla. 1986) (quoting Restatement (Second) of Torts § 566 (1977) ) (emphasis in original). Further, "where the speaker or writer neglects to provide the audience with an adequate factual foundation prior to engaging in the offending discourse, liability may arise." *Zambrano* , 484 So. 2d at 607. The Complaint alleges that CNN's broadcasts lacked the "adequate factual foundation" that would have prevented the commentators from mischaracterizing Dershowitz' argument. The Court concludes that the Complaint plausibly alleges that the comments made on CNN and CNN.com were defamatory statements of mixed opinion.

CNN argues that because the impeachment trial was widely covered by it and other media outlets, the underlying facts were "known to the audience" and, therefore, a finding of pure opinion may still be made. *Id.* at 606-07 ; *Rasmussen* , 946 So. 2d at 571. The court must consider numerous factors in determining whether a comment or editorial is based upon publicly disclosed facts. *Rasmussen* , 946 So.2d at 571. These include construing "the statement in its totality," considering "the context in which the statement was published," and accounting for "all of the circumstances surrounding the publication, including the medium by which it was disseminated and the audience to which it was published." *Id.* Although some of these factors are alleged in the Complaint or are available to the Court at the motion to dismiss stage, other factors relating to the context of the broadcasts and its audience are not before the Court. This requires a more fully developed record. At this stage, the Court concludes that Dershowitz' Complaint meets the plausibility standard for alleging a false statement of fact.

C. <u>Actual Malice</u>

CNN next moves to dismiss the Complaint for failure to plausibly allege the "actual malice" standard of fault applicable to public figures as required by *New York Times Co.* , 376 U.S. 254, 84 S.Ct. 710. The plausibility standard of *Iqbal* and *Twombly* applies to the actual malice standard in defamation proceedings. *See Michel* , 816 F.3d at 702. A public figure must, therefore, plead "facts giving rise to a reasonable inference that the defendant[ ] published the story knowing that it was false or with reckless disregard for whether it was false or not." *Id.* at 703. There must be some showing that the defendant intended "to avoid the truth." *Id.*

CNN argues that Dershowitz pleads only conclusory statements of actual malice and fails to "home to" the person(s) responsible for the alleged defamation. *New York Times Co.* , 376 U.S. at 287, 84 S.Ct. 710 (The state of mind required for actual malice must be "brought home" to the persons having responsibility for publishing the offending material). CNN also argues that it aired live Dershowitz' complete argument earlier in the day and, therefore, it is impossible for Dershowitz to plead actual malice with connection to the later showing of the 1368 truncated clip.[6] *1368 Finally, CNN argues that Dershowitz' statement to the Senate was so ambiguous that any misinterpretation by CNN cannot be attributed to actual malice.

> [6]  The Court will not (at this time) entertain CNN's arguments concerning Dershowitz' subsequent appearances on shows with Wolf Blitzer and Chris Cuomo as those matters are outside the four corners of the Complaint.

In deciding a motion to dismiss, the court must accept as true the plaintiff's well-pleaded facts and construe them in the light most favorable to the plaintiff. *Crawford's Auto Center, Inc. v. State Farm Mut. Auto. Ins. Co.* , 945 F.3d 1150 (11th Cir. 2019). Dershowitz alleges that, after the live broadcast, "CNN then went to work by assembling panels for programming throughout the day in which the hosts shared" only the truncated clip. (DE [1], ¶ 8). He alleges that CNN intentionally omitted the statement that a quid pro quo would be unlawful if the

quo were illegal in order to "fool its viewers" into believing that Dershowitz actually said that a President could commit illegal acts so long as he thought it would help his reelection and that his reelection was in the public interest. (*Id.* ). This was done, he alleges, "to falsely paint Professor Dershowitz as a constitutional scholar and intellectual who had lost his mind." (*Id.* ). He alleges that CNN knew for certain that he had prefaced his remarks with the qualifier that a quid pro quo could not include an illegal act because it aired the entire statement earlier in the day, but that CNN knowingly omitted that portion when it played the truncated clip "time and again." (*Id.* , ¶¶ 9, 10). He alleges that the truncated clip was created "intentionally and deliberately with knowledge and malice to facilitate its ability to falsely claim that plaintiff said the opposite of what he actually said." (*Id.* , ¶ 18). And, finally, Dershowitz alleges that commentators made their statements with knowledge or reckless disregard that they were false. (*Id.* , ¶ 17).

These allegations, for purposes of surviving the Motion to Dismiss, plausibly plead a factual basis from which "actual malice" can be inferred. The Complaint alleges that CNN knew its reports were false, it explains the reasons CNN and its employees knew the reports were false, it explains the nature of the alleged falsehoods, and it alleges who made the false statements.

To the extent that the Complaint does not identify with specificity the persons (other than the commentators) within the CNN organization who were responsible for the broadcast decisions, that is a matter for discovery. The Court does not accept CNN's argument that a public figure defamation plaintiff must identify and plead (before discovery) each responsible decision maker within a news organization. The claims in *New York Times Co.* , 376 U.S. 254, 84 S.Ct. 710, went to a jury trial but the plaintiff ultimately failed to establish that the persons responsible for publication of the offending advertisement acted with actual malice. *Id.* at 287, 84 S.Ct. 710. In a case involving a large news organization where the responsible decision makers may not be otherwise known, a plaintiff must be permitted to plead the facts that would plausibly establish actual malice without identifying a specific person. It is then the plaintiff's burden to conduct the discovery necessary to identify and, to be successful, present record evidence that those individuals acted with actual malice. *See, id.* ("[T]he evidence against the Times supports at most a finding of negligence ... and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice.")

CNN cites the district court's dismissal in *Mejia v. Telemundo Mid-Atl., LLC* , 440 F. Supp. 3d 495, 497 (D. Md. 2020), for support of its argument that Dershowitz was required to plead that a specific individual acted with actual malice. But *Mejia* is inapposite. That case involved a private figure whose punitive damages claim required *1369 allegations that the defamer acted with actual malice. *Id.* at 499. The case was dismissed because the plaintiff failed to allege any facts that would establish the requisite fault (negligence). *Id.* at 501-502. The court's reference to actual malice, that the complaint contained "no factual allegations referring to the state of mind of the individual in charge of Defendant's banners," referred to the punitive damages claim.[7] *Id.* at 499, 502. *Mejia* has no bearing on the present case.

[7] In a later decision, the *Mejia* court granted leave to file a third amended complaint where the proposed pleading raised additional factual allegations sufficient to raise a plausible claim that the defendant acted negligently in allowing the false banner to be broadcast. The third amended complaint did not specify a particular individual. *Mejia v. Telemundo Mid-Atlantic LLC* , 2021 WL 594215, at *3 (D. Md. Feb. 16, 2021).

Next, the fact that CNN played Dershowitz' entire statement earlier in the day does not preclude Dershowitz from alleging that later broadcasts of the truncated clip (and the related commentary) were done with actual malice. Viewers who watched the earlier broadcasts may well have been able to put the truncated clip and the commentators' statements into context. But for those viewers who did not see the earlier broadcasts,

Dershowitz' Complaint about the later broadcasts at least reaches the required level of plausibility to sustain his defamation claim. The earlier broadcasts and their effect on the issue of actual malice may be an issue for a jury to consider, but they have no bearing on the sufficiency of the pleadings.

Finally, CNN argues that Dershowitz' answer to the Senator Cruz' question was so "extravagantly ambiguous" that Dershowitz cannot establish that CNN acted with actual malice in airing the clip or discussing his arguments. Citing *Time, Inc. v. Pape* , 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), CNN contends that its commentators' analysis of Dershowitz' argument, even if incorrect, cannot create an issue of actual malice.

In *Pape* , the newsmagazine Time published an article about a report issued by the federal Civil Rights Commission. The report detailed numerous incidents of police brutality, including an incident in Chicago that gave rise to a federal lawsuit. But the Time article did not specify that the facts about the Chicago incident were taken from a civil complaint, rather than from an independent finding of the Commission. A police officer named in the report sued Time for defamation, and the issue was whether omission of the word "allegedly" from the Time account was enough to establish actual malice. The trial court entered a directed verdict in favor of the defendant, but the court of appeals reversed. The author of the Time article testified at trial that the context of the report indicated to him that the Commission believed that the incident occurred as described. After reviewing the totality of the underlying report *and the testimony of the Time writer* , the Supreme Court concluded that "[t]o permit the malice issue to go to the jury because of the omission of a word like 'alleged,' despite the context of that word in the Commission Report and the external evidence of the Report's overall meaning, would be to impose a much stricter standard of liability on errors of interpretation or judgment than on error of fact." *Id.* at 290, 91 S.Ct. 633.

In the present case, the Court has before it only the allegations of the Complaint, which must be taken as true, and the substance of the broadcasts. Dershowitz has adequately pleaded actual malice to survive the Motion to Dismiss. Whether the evidence adduced will ultimately satisfy Dershowitz' burden of proving actual malice by clear and convincing evidence *1370 remains to be seen. But he has alleged enough to go forward.

## IV. POLITICAL MALEVOLENCE

In a footnote, CNN argues that Dershowitz' "claims of disinterested political malevolence are insufficient" to establish actual malice. The Court agrees and, further, concludes that these allegations should be stricken as immaterial and impertinent. Fed. R. Civ. P. 12(f). In paragraph 14 of the Complaint, Dershowitz alleges:

> Professor Dershowitz was one of the most revered and celebrated legal minds of the past half century. His reputation relating to his expertise in criminal and constitutional matters was one that lawyers would only dream about attaining in their lifetimes. However, Professor Dershowitz appears to have made one mistake. He chose to defend the President of the United States and defend the U.S. Constitution at a moment in time where CNN has decided that doing so is not permitted. For this, CNN set out to punish him and destroy his credibility and reputation, and unfortunately, succeeded.

The Supreme Court has stated that "[a defendant's] motive in publishing a story ... cannot provide a sufficient basis for finding actual malice." *Harte-Hanks Communications., Inc. v. Connaughton* , 491 U.S. 657, 665, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Indeed, a defamation claim cannot rest on the argument that "erroneous communications were motivated by differences in political opinions. Doing so would run afoul of the Supreme Court's landmark ruling in *New York Times Co. v. Sullivan* . *See* 376 U.S. at 271–72, 84 S.Ct. 710 (noting that errors are inevitable when there is free debate and that they too must be protected to give breathing room to those exercising their freedom of expression)." *Arpaio v. Robillard* , 459 F. Supp. 3d 62, 66 (D.D.C. 2020).

Paragraph 14 of Dershowitz' Complaint alleges that CNN was motivated by political animus. As Judge Lamberth noted in *Arpaio* , "Allegations of 'leftist enmity' cannot trump the guarantees of the First Amendment." *Id.* "Striking a pleading or a portion thereof is a drastic remedy to be resorted to only when required for the purposes of justice." *Sanchez v. Selective Ins. Co. of the Southeast* , 2019 WL 79282, at *2 (S.D. Fla. Jan. 2, 2019) (quotation omitted). Nevertheless, the allegations in paragraph 14 are immaterial to the claim and are an impertinent salvo that do not belong in this case. Rule 12(f)(1), Fed. R. Civ. P., gives the Court the power to strike such matters "on its own." *Sanchez* , at *3 (*sua sponte* striking plaintiff's request for interest). The Court will exercise that power and strike paragraph 14 from the Complaint.

V. CONCLUSION

For the reasons set forth above, the Court finds that Dershowitz has plausibly alleged facts sufficient to withstand CNN's Motion to Dismiss. The Court is in no way ruling on the merits of the case but concludes merely that Dershowitz has satisfied the pleading requirements of Rule 8(a)(2), Federal Rules of Civil Procedure. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss (DE [17]) is **DENIED** . It is further **ORDERED** that paragraph 14 of Plaintiff's Complaint is **STRICKEN** pursuant to Fed. R. Civ. P. 12(f)(1).

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 24th day of May 2021.

 casetext