**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| PATRICK NATHANIEL REED, | } | |
| | } | |
| Plaintiff | } | |
| | } | **Case Number: 3-22-CV-01059-TJC-PDB** |
| v. | } | |
| | } | **ORAL ARGUMENT REQUESTED** |
| BRANDEL EUGENE CHAMBLEE, et al | } | |
| | } | |
| Defendants. | } | |

**PLAINTIFF PATRICK NATHANIEL REED'S OPPOSITION TO DEFENDANT CONDE NAST INTERNATION, INC. D/B/A THE NEW YORKER'S MOTION TO DISMISS AMENDED COMPLAINT AND FOR ATTORNEYS' FEES AND COSTS**

Plaintiff Patrick Nathaniel Reed ("Mr. Reed") hereby submits his opposition to Defendant Conde Nast International, Inc. d/b/a The New Yorker's ("New Yorker") Motion to Dismiss Amended Complaint. ("Defendant's Motion")[1].

## INTRODUCTION AND STATEMENT OF RELEVANT FACTS

There is only one question present before the Court – whether the allegations in the Amended Complaint have satisfied the very minimal plausibility pleading standard set forth by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The answer is clearly and unequivocally, **yes**. Mr. Reed's Amended Complaint is meticulously detailed and fact specific, and clearly sets forth not only false and defamatory statements made by the Defendants of and concerning Mr. Reed with actual malice. The Amended Complaint also explains the motivation for the Defendants to have engaged in this pattern and practice of making these defamatory statements, mostly as a result of Mr. Reed having joined the LIV Golf Tour, which as a new entry into the world of professional golf, they set out to harm and stop in its nascent tracks by using Plaintiff Reed as a vehicle.

This is underscored by the fact that the PGA Tour has recently conceded that the defamatory narrative that they created and delegated to its media partners – Defendants in this case including New Yorker – to propagate was false and wholly tactical, as the PGA Tour announced a merger with LIV on June 6, 2023.[2] This conclusively shows that the PGA Tour's concerted media campaign to try to brand LIV and its players, including Mr. Reed, as terrorist

---

[1] Defendant New Yorker makes the assertion that Conde Nast International, Inc is now a defunct corporate entity. The veracity of this assertion must be determined through discovery, and it is true, Mr. Reed respectfully requests leave to amend in this limited manner. For now, Plaintiff's naming of Conde Naste must stand.

[2] Lillian Rizzo, PGA Tour agrees to merge with Saudi-backed rival LIV Golf, June 6, 2023, CNBC, available at: https://www.cnbc.com/2023/06/06/pga-tour-agrees-to-merge-with-saudi-backed-rival-liv-golf.html

sympathizers, being complicit in murder and sportswashing, and playing for "blood money" (among other false, malicious, and defamatory statements set forth in the Amended Complaint) was not based in fact, but was simply part of a then anticompetitive campaign to try to destroy LIV and its players, such as Plaintiff Reed,  in its infancy. There is no other explanation. If the PGA Tour and its media partners were genuinely concerned about being complicit in alleged human rights atrocities, there is no way that the PGA Tour would have now merged and aligned itself with LIV and its Saudi Public Investment Fund. In sum, in the end, it was all just a media-driven defamatory "smear job" on LIV and its golfers to at the time further commercial and media interests, readership, click and thus profits.

Furthermore, in a case before a sister federal court in the U.S. District Court for the Southern District of Florida, the Honorable Raag Singhal ("Judge Singhal"), presiding over a case on all fours with this one, shot down CNN's attempt to dismiss a defamation suit filed by public figure Harvard Professor Alan Dershowitz based on similar claims that his allegations were not plausible:

> To survive a motion to dismiss, factual allegations must (only) be enough to raise a right to relief above the speculative level" and must be sufficient to state a claim for relief that is plausible on its face….. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. (internal quotations omitted). Exhibit 2.

In another defamation case, *see generally U.S. Dominion, Inc. v. Guiliani, et al*, 1:21-cv-00213 (CJN)(D.D.C.) August 11, 2021 Mem. Op., the Honorable Carl Nichols of the U.S. District Court for the District of Columbia allowed a similar high profile defamation complaint to proceed based on the plaintiff having pled all that was needed to be pled at the motion to dismiss stage of this very high-profile case. This is the correct interpretation and application of the relevant pleading standard. Judge Nichols thus found that "[w]hen evaluating a motion to

dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Dominion*, ECF No. 36 at 13.

These cases both stand for the universally accepted and well-settled principle as found by the Supreme Court that at the Fed. R. Civ. P 12(b)(6) motion to dismiss stage, the only question is whether what needed to be pled in the operative Complaint was pled and <u>nothing else</u>. And furthermore, the standard for dismissal at this stage is high. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007):

> Rule 12(b)(6) does not countenance … dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer* v. *Rhodes*, 416 U. S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"). *Id*. at 556.

*Twombly*'s well-reasoned and clearly settled opinion makes particular since given that the well-settled right to have one's claims heard by the jury is the bedrock of our entire legal system:

> I consider trial by jury as the only anchor ever yet imagined by man, by which government can be held to the principles of its constitution. - Thomas Jefferson, 1788.

> Representative government and trial by jury are the heart and lungs of liberty. Without them we have no other fortification against being ridden like horses, fleeced like sheep, worked like cattle and fed and clothed like swine and hounds. - John Adams, 1774.

This is especially true in defamation cases, as found by not only Florida's courts, but also courts all over the country:

> It is peculiarly the province of the jury to weigh and determine what effect is to be given to all such mitigating circumstances. The *quo animo* with which the words are spoken, or the written article published, should, in a case where no special damage is alleged and proven, regulate the amount of damages; but whatever is calculated to show that the defendant acted in good faith, and with reasonable belief of the truth of the charge, and with good motives, should be permitted to go to the jury, who will give it the effect it should have. *Jones, Varnum & Co. v. Townsend's Adm'x*, 21 Fla 431, 446-47 (Fla. 1885).

Therefore, a reasonable jury could conclude the statement was false. *See Southard v. Forbes, Inc.*, 588 F.2d 140, 143 (5th Cir. 1979) ("If the publication has no necessarily defamatory meaning, but can be understood in more than one way, one of which is defamatory, then it is for the jury to decide if . . . the publication in fact had that defamatory meaning."); *see also Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 705 (Fla. 3d Dist. Ct. App. 199) ("If the statement is capable of more than one meaning, however, the trier of fact should determine whether the language used was actually understood in its defamatory sense."). *Johnston v. Borders*, 36 F.4th 1254 (11th Cir. 2022).

For the foregoing reasons, the Defendants' Motion must also fail, as pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"), Mr. Reed's Amended Complaint more than set forth allegations of defamation and tortious interference that more than satisfy the minimal plausibility standard of *Twombly* at this early pleading stage before discovery gets underway.

## I.  FACTS PERTAINING TO THE DEFENDANTS' MALICIOUS INTENT

Mr. Reed, a world class professional golf player, decided in June of 2022 to sign with LIV Golf ("LIV"), an upstart professional golf league, after being constructively terminated as a member of the PGA Tour as a result of threats and actions by the PGA Tour and its Commissioner Jay Monahan ("Monahan"). Am. Comp. ¶ 15. Mr. Reed was one of the original golfers who signed with LIV and remains one of its top stars and prominent golfers domestically and worldwide. Am. Comp. ¶ 14. As such, when the defamatory statements at issue were made, Mr. Reed's name was prominently linked to LIV, along with others such as Dustin Johnson, Phil Mickelson, Brooks Koepka and Bryson DeChambeau.

The PGA Tour and its European joint venture partner, DP World Tour, have seen many of their top golfers, including Mr. Reed, sign with LIV, and therefore came to view LIV as a strong threat to their monopolistic stranglehold on professional golf. Am. Comp. ¶ 20. Thus, they began a concerted scheme to defame, smear, and harm anyone associated with LIV—and in particular Mr. Reed, one of its most prominent athletes—in order to try to maintain their

monopolistic stranglehold, and therefore continue to substantially profit, to the tune of an estimated $1.522 billion in revenue for the PGA Tour in 2021. Am. Comp. ¶ 20. In this regard, the  PGA Tour hired Clout Public Affairs to not only assist in orchestrating these defamatory attacks, but also to bury the PGA Tour's involvement from public knowledge. This is disclosed in LIV's motion to compel Clout to comply with its subpoena, which details how these entities paid some rogue 9/11 families to whip up hatred against Mr. Reed and other LIV golfers.  *LIV Golf Inc. v. Clout Public Affairs, LLC,* 1:22-mc-00126, (N.D. CA.) Dkt. 1-1. Am. Comp. ¶ 25.

As set forth in the Amended Complaint, the task of fomenting, orchestrating, and manufacturing outrage and even provoking violence[3] against LIV and Mr. Reed was given to the PGA Tour and DP World Tour's chosen media "partners," including Defendant New Yorker, to serve as the PGA Tour's fake news hit mouthpieces, which explains why there has been such an orchestrated attack by all of the Defendants as alleged herein on Mr. Reed and LIV. Am. Comp. ¶ 26. In return for serving as the hit mouthpieces for the PGA Tour and DP World Tour, Defendant New Yorker got to continue to enjoy  preferred status with access to PGA Tour players that comes with being "partners," and the lucrative financial and other benefits that come with this preferred status. In sum, the interests of Defendant New Yorker aligned perfectly with the interests of the PGA Tour and the DP World Tour prior to the new merger, and thus, it used Defendant New Yorker, along with the other Defendants,  to push the defamatory agenda against Mr. Reed and other LIV players.

## II.   DEFENDANT NEW YORKER'S DEFAMATION

---

[3] This even resulted in a bomb threat during the last LIV tournament in 2022, at Trump National Doral, in Miami, Florida, where Mr. Reed, his caddie, coach, wife and even the undersigned counsel had to take cover during the final round. Am. Comp. ¶ 132.

On or about October 17, 2022, Defendant Zach Helfand ("Helfand") published on Defendant New Yorker's website an article titled "*Will the Saudis and Donald Trump Save Golf – Or Wreck It?*" (the "Helfand Article"). Am. Comp. ¶ 116. The Helfand Article publishes the following clearly defamatory statement of and concerning Mr. Reed: "**LIV needs a public investment fund to sportswash its association with Patrick Reed**." Am. Comp. ¶ 117. This statement is severely damaging to Mr. Reed's reputation and also further evidences the incredible harm done by Defendant's campaign to destroy Mr. Reed by falsely portraying him and LIV as "in bed" with Mohammad Bin Salman and the Saudi Public Investment Fund, as other publications, including Defendant New Yorker here, are constantly using it as fuel to continue to destroy Mr. Reed's reputation and financial well-being for him, his colleagues, and his family. Am. Comp. ¶ 119. This statement effectively accuses Mr. Reed of being complicit in alleged human rights atrocities perpetrated by the Saudi regime -- which such as the murder of Jamal Khashoggi – have never been proven to be true in any event. Indeed, when was the last time the Central Intelligence Agency has been proven right about anything, for example Saddam Hussein having weapons of mass destruction, which lie resulted in the failed war in Iraq and hundreds of thousands of dead and wounded. Furthermore, this statement is doubly defamatory because it falsely publishes and makes the accusation that Mr. Reed's reputation is so bad that even the Saudi PIF and LIV want nothing to do with him. Of course, this is objectively false, as Mr. Reed was sought after by LIV and did, in fact, sign with LIV.

There is nothing more damaging to an individual's reputation than the published actionable statement of this nature, namely that "**LIV needs a public investment fund to sportswash its association with Patrick Reed**."

## **LEGAL STANDARD**

A motion to dismiss is designed to test the legal sufficiency of a complaint and not to determine any factual issues. *Dorleus v. Bank of New York*, No. 14-80124-CIV, 2014 WL 1621941, at *2 (S.D. Fla. Apr. 23, 2014). All allegations of the complaint must be taken as true and all reasonable inferences drawn therefrom must be construed in favor the non-moving party. *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). A motion to dismiss a complaint is not a motion for summary judgment in which the court may rely on facts adduced in other proofs. *Urquilla–Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1053 n. 12 (11th Cir.2015). Instead, a motion to dismiss tests the legal sufficiency of the complaint. *Dorleus*, No. 14-80124-CIV, 2014 WL 1621941, at *2 (S.D. Fla. Apr. 23, 2014).

A complaint "does not require detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (U.S. 2009) (internal quotations omitted). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotations omitted). All that is required at this stage is the pleading of "enough facts to state a claim to relief that is plausible on its face." "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Finally, when considering an FRCP 12(b)(6) motion, trial courts are limited to the four corners of the complaint and may only consider documents incorporated in the complaint—i.e., either documents attached to the complaint or documents which do not allege acts extrinsic to the pleadings. *Dershowitz v. Cable News Network, Inc.* 541 F. Supp. 3d 1354, 1360  (S.D. Fla. 2021). A court may consider only the complaint itself and any documents referred to in the complaint which are central to the claims. *Id.* "A court's review on a motion to dismiss is

'limited to the four corners of the complaint." *Coastal Wellness Ctrs., Inc. v. Progressive Am. Ins. Co.,* 309 F. Supp. 3d 1216, 1219 (S.D. Fla. 2018)

## LEGAL ARGUMENT

**I.   MR. REED HAS MORE THAN SUFFICIENTLY ALLEGED DEFAMATION**

Under Florida law, the elements of defamation are "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Peerenboom v. Perlmutter*, 2017 Fla. Cir. LEXIS 14957, *24. To determine whether a statement is defamatory, it must be considered **in the context of the publication**. *Smith v. Cuban Am. Nat'l Found.*, 731 So.2d 702, 705 (Fla. 3d DCA 1999). "A publication must be considered **in its totality**. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983) (emphasis added).

It is well settled that at the motion to dismiss stage, the pleading threshold is not high for defamation counts. A jury issue is present whenever a communication is "ambiguous and reasonably susceptible of a defamatory meaning." *Perry v. Cosgrove*, 464 So. 2d 664, 666 (Fla. Dist. Ct. App. 1985). Florida courts have also found that a defendant may not escape liability for his defamatory conduct simply by attempting to couch his defamatory statement as an "opinion."

> However, a statement that although ostensibly in the form of an opinion "implies the allegation of undisclosed defamatory facts as the basis for the opinion," Restatement (Second) of Torts § 566 (1977), *is* actionable…. Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the article or assumed to exist by the parties to the communication."

*Barnes v. Horan*, 841 So. 2d 472, 476-77 (Fla. Dist. Ct. App. 2002). "Mixed opinion is based upon facts regarding a person or his conduct that are neither stated in the publication nor

assumed to exist by a party exposed to the communication.  Rather, the communicator implies that a concealed or undisclosed set of defamatory facts would confirm his opinion." *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. Dist. Ct. App. 1984).

### a.   The Helfand Article Contains False Statements of Fact Of And Concerning Mr. Reed

Defendant New Yorker first unconvincingly argues that the Helfand Article constitutes "non-actionable" opinion and hyperbole. Of course, as set forth above, a Defendant may not escape liability for defamatory conduct simply by couching a defamatory statement as "opinion." *Barnes*, 841 So. 2d. at 476-66. Furthermore, statements of "mixed opinion" and fact are actionable as defamation. *Hay*, 450 So. 2d at 295. And lastly, where a statement is ambiguous, it must go to the jury and cannot be disposed of on a motion to dismiss. *Johnston v. Borders*, 36 F.4th 1254 (11ᵗʰ Cir. 2022). When viewed under this controlling authority, it is clear that Defendant New Yorker's argument that the Helfand Article constitutes "non-actionable" opinion and hyperbole must be rejected. Defendant New Yorker's defamatory publication must be taken in its entire context, and this is particularly true where its co-Defendants have already maliciously defamed Mr. Reed by publishing that (1) Mr. Reed has chosen to "**directly work for a regime that has such a reprehensible record on human rights**," Am. Comp. ¶ 97, (2) "**I can't understand an individual working for [Mohammed bin Salman Al Saud]** ("MBS")," Am. Comp. ¶ 95, (3) "there is a big difference between doing business in a country and **directly for a murderous regime as LIV golfers are**," Am. Comp. ¶ 94, and (4) that Mr. Reed has "**aligned**" himself with "**a tyrannical murderous leader**," which equates to Mr. Reed playing golf for **Hitler**[4]**, Mao, Pol Pot or Putin**, Am. Comp. ¶ 58, and (5) accusing Mr. Reed and other

---

[4] In the same vein, these statements of comparison to murderous dictators is the same as in *Dershowitz*, 541 F. Supp. 3d at 1359, where one of the defamatory statements at issue that was

LIV golfers of "**opt[ing] to cut and run for Saudi money**." Am. Comp. ¶ 101; (6) **"LIV golf is about hiding [the Saudi Arabian regime's] human atrocities**" Am. Comp. ¶ 96, (7) "**its still blood money and you're still complicit in sportswashing**," Am. Comp. ¶ 90, (8) "**[t]hese thugs are directed by the people who fund LIV golf**…but LIV will pretend this video and so many others depicting human rights atrocities don't exist, but will happily post video of a golf event in Boston meant **to sportswash these atrocities**," Am. Comp. ¶ 91, and (9) Mr. Reed and other LIV golfers had endured "**reputational harm that comes with taking guaranteed cash to sportswash Saudi atrocitie**s." Am. Comp. ¶ 101

Thus, by publishing now publishing that "**LIV needs a public investment fund to sportswash its association with Patrick Reed**," Am. Comp. ¶ 117, Defendant New Yorker is simply furthering and thus compounding the incredibly harmful defamation already perpetrated by its co-conspirators. Where the fabricated allegations that Mr. Reed is "working directly" for the Saudi regime and is willfully assisting the Saudi regime with a "sportswashing" effort already in the public's mind as a result of New Yorker's co-Defendants' defamatory conduct, the New Yorker's statements can only be read as furthering allegations that Mr. Reed is complicit in "sportswashing" and endorses alleged human rights violations and the murder of Jamal Khashoggi.

Of course, accusing Mr. Reed of sportswashing is making a false statement **of fact** of and concerning him. This is because accusing Mr. Reed of "sportswashing" is akin to accusing Mr. Reed of willfully and intentionally participating in hiding and/or burying human rights atrocities by the Saudi Arabian regime. Whether Mr. Reed has done this (again, he clearly has not) is a

---

published was :" What I thought when I was watching it was this is un-American. This is what you hear from Stalin. This is what you hear from Mussolini, what you hear from authoritarians, from Hitler, from all the authoritarian people who rationalized, in some cases genocide, based on what was in the public interest."

question of objectively verifiable fact. Either Mr. Reed has agreed to participate in this type of scheme, or he has not. Of course, in actuality, Mr. Reed has not made any such agreement. He simply play professional golf for himself, his colleagues, his family and of course LIV. Nothing more. And, this is doubly defamatory because it falsely publishes and makes the accusation that Mr. Reed's reputation is so bad that even the allegedly heinous Saudi PIF and LIV want nothing to do with him. Of course, this is objectively false, as Mr. Reed was sought after by LIV and did sign with LIV.

These defamatory statements were published by Defendant New Yorker, a leftist publication,  in order to try to destroy the public image of Mr. Reed and other LIV golfers by associating their names with human rights atrocities to create the entirely false and defamatory implication that Mr. Reed and other LIV golfers are complicit in hiding and/or burying alleged human rights atrocities by the Saudi Arabian regime, when in actuality, they have nothing to do with any such alleged activities. This is part and parcel to the Defendant New Yorker's role as part of the PGA Tour's past chosen media mouthpieces to try to negatively influence public opinion against LIV players in order to try to destroy LIV as a competitor to the PGA Tour. It is this sinister and simple -destroy the players such as Mr. Reed, who are the engine that drives LIV - and you destroy LIV as a competitor.

**b.      Mr. Reed Has More Than Sufficiently Pled Actual Malice**

Actual malice is shown when the Plaintiff pleads "facts giving rise to a reasonable inference that the defendant published the story knowing that it was false or with reckless disregard for whether it was false or not." *Dershowitz v. Cable News Network, Inc.* 541 F. Supp. 3d 1354, 1367  (S.D. Fla. 2021) (internal quotation omitted). "[M]ost authorities suggest that a failure to retract, in conjunction with other circumstances, may be used to establish the requisite

level of [constitutional] malice." John C. Martin, Comment, The Role of Retraction in Defamation Suits, 1993 U. Chi. Legal F. 293, 295 (1993). This is further shown in a practice guide published in The Florida Bar Journal by Manual Socias titled "*Showing Constitutional Malice in Media Defamation.*[5]" This article lays out twenty-four (24) "badges" or indicators of actual malice in media publications, many of which apply here. Indeed, a "refusal to publish a retraction upon learning of errors in a story" is one such "badge." <u>Exhibit 1</u>. There is no disputing the fact that the Defendants have received notice of the defamatory statements in question, Am. Comp. ¶ 133, and have failed to retract these statements, evidencing actual malice.

Awareness of facts prior to the defamatory statements being made which strongly suggested innocence of plaintiff from the published accusations shows actual malice. *Cape Publ'ns v. Adams*, 336 So. 2d 1197 (Fla. 4th DCA 1976). As set forth by the Supreme Court in *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 692 (1989), the "purposeful avoidance of truth" can show actual malice. This is certainly the case here.

Lastly, whether in the context of the facts of this case the statements were published with actual malice is a question for the jury. *Southern Air Transport, Inc. v. Post-Newsweek Stations, Florida, Inc.*, 568 So.2d 927, 929 (Fla. App. 3 Dist. 1990). For instance, where statements are capable of multiple meanings, statements must be presented to the trier of fact, notwithstanding the fact here that the defamatory statements at issue here are not vague and instead clearly defamatory. *Wolfson v. Kirk*, 273 So. 2d 774 (Fla. Dist. Ct. App. 1973).

The relevant inquiry is whether New Yorker's publication that Mr. Reed is complicit in "sportswashing" was made with actual malice. It is more than clear that it was, because there is

---

[5] https://www.floridabar.org/the-florida-bar-journal/showing-constitutional-malice-in-media-defamation/#:~:text=Constitutional%20malice%2C%20also%20called%20actual,for%20its%20truth%20or%20falsity.

simply nothing to there to back up this accusation. Defendant New Yorker clearly acted with, at a minimum, a reckless disregard for the truth in publishing that Mr. Reed and LIV golfers are being paid to hide and/or bury Saudi human rights atrocities, a.k.a. "sportswashing." There is simply nothing to back up this false accusation. Mr. Reed plays golf for LIV. This cannot be disputed. Mr. Reed has no connection to the Saudi government. This too, cannot be disputed.

As set forth in the Amended Complaint, extremely clearly, the only "link," if one can even call it that, between LIV and the Saudi regime is that it is financed by the Public Investment Fund of Saudi Arabia ("PIF"). Am. Comp. ¶ 28. However, as set forth in the Amended Complaint, the PIF finances numerous corporations domestically and worldwide, and now even the PGA Tour itself post proposed merger, including but not limited to: Disney, Uber, Boeing, Facebook, Citigroup, Bank of America, Capcom, Nexon, Electronic Arts, Take-Two Interactive, Activision Blizzard, Berkshire Hathaway, and Newcastle United F.C. in the EPL. Am. Comp. ¶ 30, 31.  So then, would it be fair to say that after the  merger of PGA Tour and LIV, their players are collectively engaging in sportswashing, or Newcastle F.C.'s players are  guilty of sportswashing? Or that Warren Buffet, Mark Zuckerberg, or even Mickey Mouse are being paid to hide and/or bury Saudi human rights atrocities? Of course not[6]. Such propositions would be rightfully held out for extreme humiliation and ridicule.

---

[6] Actual malice is further shown through the fact that the Defendants have remained totally silent on PGA Tour's partnership with China in 2018. The current Chinese regime has committed - and is currently committing - mass genocide on Muslim Uyghurs, to the point where the United States has formally dubbed China's actions as "genocide," and the United Nations has publicly stated that they could resort to crimes against humanity. Am. Comp. ¶ 42. Where are the accusations of sportswashing from the Defendants there? Defendants like the New Yorker that are so concerned with the morality of golf surely would have spoken up, right?  Defendants' coordinate effort to try to destroy LIV and its golfers through fabricated storylines is patently evident.

The Court, therefore, respectfully, needs to ask itself why there has been no extremely coordinated effort to accuse the above major corporations and its employees of "sportswashing" or being complicit in hiding human rights atrocities if simply being financed by the PIF was adequate grounds to do so? Under this lens, the actual malice of Defendant New Yorker and its co-Defendants becomes instantly clear. This is nothing more than a completely fabricated, made up story line as part of a coordinated effort to destroy LIV and its golfers, including Mr. Reed. Thus, at a bare minimum, Defendant New Yorker acted with a reckless disregard for the truth, and therefore acted with the requisite actual malice.

Apparently knowing that they have no defense against the clear actual malice set forth above, Defendant New Yorker dwells instead on the anonymous "source" that was quoted in the Helfand Article, which is not dispositive to any finding of actual malice. Regardless of whether the anonymous "source" was fabricated or not (and it likely was given the obscurity of this tweet creating a pretext for defamation) this is a purely factual question for discovery that is inappropriate at this stage of litigation[7], and nothing can change the fact that Defendant New Yorker's publication that Mr. Reed was engaged in and is responsible "sportswashing" and thus human rights abuses was made with a minimum of a reckless disregard for the truth.

Furthermore, Defendant New Yorker's attempt to assert that Mr. Reed's allegations of actual malice are based only on his allegations of conspiracy amongst all of the Defendants must be similarly rejected, as this is clearly not the basis for Mr. Reed's assertions of actual malice. As set forth above, actual malice is shown through the fact that Defendant New Yorker had no basis to accuse Mr. Reed of "sportswashing."

---

[7] Indeed, linking to some anonymous Twitter account is far from "verification" as a publication as credible as Defendant New Yorker surely is aware.

Lastly, the Amended Complaint does also set forth instances of common law, "ill will" malice exhibited by New Yorker, but actual malice is not premised entirely on this. This "ill will" malice is included and pled because it is one of the "badges" of constitutional malice, Exhibit 1, which taken together can form a showing of actual, constitutional malice.

### c.   Mr. Reed Has More Than Sufficiently Pled Damages Caused Directly and Proximately Caused by New Yorker

Defendant New Yorker also makes the bizarre argument that Mr. Reed has not specifically pled actual injury as a result of its malicious defamatory statement. In support thereof, Defendant New Yorker cites *Edelstein v. WFTV, Inc.*, 798 So. 2d 797, 798 (Fla. 4th DCA 2001) (per curiam), which is a Florida Appellate Court case and not binding on this Court. In any event, Mr. Reed has more than pled actual injury as a result of the malicious, false, and defamatory statements made by Defendant New Yorker:

> These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally. Am. Comp. ¶ 350.

> These calculated, malicious, false and/or reckless attacks have had a direct effect on Mr. Reed's and his family's livelihood because he has suffered major damages through the loss of multiple multi-million dollar sponsorship deals that were not or have not been renewed including, but not limited to Titleist, Nike, Ultimate Software, cbdMD, Callaway, Tax Slayer, Perry Ellis, NetJets, and ETS as well as numerous promising prospective sponsorship and business opportunities that did not come to fruition as a direct and proximate result including, but not limited to companies such as Quicken Loans, Draft Kings, Travelers, DOW, ARAMCO, CISCO, Porsche, Wells-Fargo, ROUSH, Zurich, Perry Ellis, Waste Management, Citi Bank, Houston Tourism, Taylormade, Bettinardi, and SRIXON. The damages do not just stop there. Top Coaches in the "world have denied to coach or work with him periodically throughout his career as a top-player in the world for fear of backlash they would receive from the Tour or the media, including, but not limited to Butch Harmon, and Sean Foley, two very prominent coaches in the golf world who took on lesser players at the time asked or thereafter. Am. Comp. ¶ 17.

This is more than sufficient at the motion to dismiss stage, where again, the Court must take the allegations of Mr. Reed's Amended Complaint as true. *AXA.*, 608 F. Supp. 2d at 1353.

Defendant New Yorker's argument to the contrary essentially boils down to one completely unavailing point – that Mr. Reed already had a "poor reputation" before it maliciously defamed him. Just on its face, it is clear that this argument makes no sense. A person's reputation exists on a spectrum. It is not simply "good" or "bad." Even if, for the sake of argument, Mr. Reed's reputation was "bad" – not from his doing but the fake news golf media -- before Defendant New Yorker maliciously defamed him, Defendant New Yorker's defamation still makes his reputation even worse.  See *Liberty Lobby v. Anderson*, 241 U.S. App. D.C. 246, 746 F.2d 1563 (1984) (writing for the majority, the Hon. Antonin Scalia ruled that there is no such thing as being defamation proof).  And, even further shredding any semblance of credibility that Defendant New Yorker's argument may have had is the fact that any damage that has already been done to Mr. Reed's reputation has been a result of Defendant New Yorker's co-Defendants' ongoing, continuous, and unabated pattern and practice of maliciously defaming Mr. Reed. It is also further alleged that Defendant New Yorker itself has acted in concert with its co-Defendants to maliciously defame Mr. Reed. Am. Comp. ¶ 345. It would be patently unjust and contrary to the administration of justice for Defendant New Yorker to benefit from the Defendant New Yorker's and its co-Defendants' ongoing, continuous, and unabated pattern and practice of maliciously defaming Mr. Reed. As such, Defendant New Yorker's argument that it could not have caused damage to Mr. Reed because Mr. Reed's reputation was already damaged by its co-Defendants is completely unavailing and must be rejected.

### d.      Mr. Reed Has More Than Sufficiently Pled Defamation By Implication

Florida law recognizes clearly recognizes a cause of action for defamation by implication. This arises, not only from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2)

creates a defamatory implication by **<u>omitting facts</u>**, such that he may be held responsible for the defamatory implication. *Readon v. WPLG, LLC*, 46 Fla. L. Weekly 836 (Dist. Ct. App. 2021) (emphasis added). Here, New Yorker clearly intentionally creates accuses Mr. Reed is complicit in "sportswashing" so obvious that even the allegedly evil Saudis would have nothing to do with him, which carries the extremely harmful implication that he has personally participated in the alleged human rights atrocities of the Saudi regime, including but not limited to the murder of Jamal Khashoggi. There was no other reason for New Yorker to use the term "sportswash" in its totally defamatory statement other than to accuse Mr. Reed of sportswashing and all of the extremely harmful connotations that come along with such an accusation.

> e.     **Mr. Reed Has More Than Sufficiently Pled Defamation Per Se**

A publication is *per se* defamatory if it (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession." *Blake v. Ann-Marie Giustibelli, P.A.*, 182 So. 3d 881, 884 (Fla. Dist. Ct. App. 2016).

It is abundantly clear that falsely accusing Mr. Reed of being complicit in "sportswashing" is incredibly damaging to his trade and profession as a professional golfer. Not only does it severely harm his ability to obtain and retain sponsors – the lifeblood of any professional golfer – it completely discredits Mr. Reed's lifetime of dogged work spent perfecting his craft in order to reach the highest pinnacles of professional golf. By falsely accusing Mr. Reed of being complicit in "sportswashing," Defendant New Yorker has branded Mr. Reed as not a professional golfer and competitor, but instead as someone whose sole purpose is to serve nefarious Saudi interests. This is as damaging as it gets to Mr. Reed's professional

reputation, as the reason that each and every golfer plays is to try to leave a lasting legacy as a force to be remembered among the ranks of some of the best to ever play the game.

## II.     MR. REED HAS PLED VIABLE CAUSES OF ACTION FOR TORTIOUS INTERFERENCE

With regard to Mr. Reed's claim for tortious interference, Defendant New Yorker disingenuously argue that the "single-action" rule must be applied to Mr. Reed's count for tortious interference. This is not true. Nowhere in the Amended Complaint does Mr. Reed plead that his tortious interference claims are premised on the exact same defamatory statements published by the Defendants that are at issue in the defamation counts. The fact of the matter is that Mr. Reed's counts for tortious interference do not directly reference the defamatory publications set forth in the Amended Complaint, and instead premised on the Defendants "spreading lies of and concerning Mr. Reed in order to destroy his reputation, and to induce sponsors to break their contractual relationships with Mr. Reed." *See generally* Am. Comp. ¶ 251. There is nothing in the Amended Complaint limiting these "lies" to the defamatory publications set forth the Amended Complaint. And Mr. Reed has more than pled damages:

> As a result of...intentional and unjustified interference, Mr. Reed experienced the loss of multiple multi-million dollar sponsorship deals that were not or have not been renewed including, but not limited to Titleist, Nike, Ultimate Software, cbdMD, Callaway, Tax Slayer, Perry Ellis, NetJets, and ETS as well as numerous promising prospective sponsorship and business opportunities that did not come to fruition as a direct and proximate result including, but not limited to companies such as Quicken Loans, Draft Kings, Travelers, DOW, ARAMCO, CISCO, Porsche, Wells-Fargo, ROUSH, Zurich, Perry Ellis, Waste Management, Citi Bank, Houston Tourism, Taylormade, Bettinardi, and SRIXON. Am. Comp. ¶ 299.

## III.    FLORIDA'S ANTI-SLAPP STATUTE DOES NOT APPLY

Defendant New Yorker, in extremely cursory fashion, tries to argue in vain if not frivolously that Florida's Anti-SLAPP statute should be applied. However, it is crucial to note, first and foremost, that this case is being brought before a federal court sitting in diversity, and as

such, the Florida Anti-SLAPP statute cannot be applied. The Chief Judge of the U.S. Court of Appeals for the Eleventh Circuit, the appellate court which sits over this honorable Court, the Honorable William Pryor recently expressed "serious doubt" as to whether Florida's Anti-SLAPP statute applied:

> The thing I'm most interested, at least – I can only speak for myself - is the attorney's fees issue, and I have serious doubts about whether the anti-SLAPP statute applies in federal court. And it seems to me that if it doesn't, then a suit filed in violation of it can't give rise to an attorney's fee award." *Corsi v. Newsmax Media Inc et al*, 21-10480 (Oral Argument of May 19, 2022).  Exhibit 3.

Other federal courts have made this finding as well. The U.S. Court of Appeals for the District of Columbia Circuit has made this precedential ruling in *Abbas v. Foreign Policy Group*, 783 F.3d 1328, 1337 (D.C. Cir. 2015) ("In sum, Federal Rules 12 and 56 answer the same question as the D.C. Anti-SLAPP Act, and those Federal Rules are valid under the Rules Enabling Act. A federal court exercising diversity jurisdiction therefore must apply Federal Rules 12 and 56 instead of the D.C. Anti- SLAPP Act's special motion to dismiss provision."). Importantly, the same legal conclusion has been reached by the U.S. Court of Appeals for the Eleventh Circuit when applying Georgia's Anti-SLAPP statute. *See also Carbone v. CNN, Inc.*, 910 F.3d 1345 (11th Cir. 2018); *Van Dyke v. Retzlaff*, 781 F. App'x 368 (5th Cir. 2019). Thus, the Court should deny Defendants' motion under Florida's Anti-SLAPP statue on the basis that it is a federal court sitting in diversity.

### a.  Florida's Anti-SLAPP Statute Does Not Protect Defamatory Speech

The purpose of Florida's Anti-SLAPP statute, which does not apply in diversity cases in federal court like this one, is "to protect the right in Florida to exercise the rights of free speech in connection with public issues . . . as protected by the First Amendment…." Fla. Stat. § 768.295(1). However, no such statute in the country protects against defamatory speech. The

statutes only apply to a limited number of legal actions that are based on, or relate to, or are in response to a party's exercise of certain rights protected by the U.S. Constitution, including the right of free speech. The right of free speech does not protect defamatory statements. *Beauharnais v. Illinois*, 343 U.S. 250, 266 (1952). As in *Heffernan v. Bilzerian*, 20STCV25549 (Los Angeles Sup. Ct.), attorneys fees and costs must be awarded to Mr. Reed for having to defend against Defendants' frivolous and in bad faith Anti-SLAPP motion.

## **CONCLUSION**

Based on the foregoing, Defendant's Motion must be denied in its entirety. Mr. Reed, his colleagues, and hardly least his family, have been severely damaged by the defamatory campaign of the Defendant New Yorker, who is predictably driven by the thirst for readership, clicks, views, attention, and therefore substantial profit. In the course of this unquenchable thirst, Defendant New Yorker has shown that it does not care about facts, accuracy, or any type of professional journalistic standard as they have clearly discovered that media-created narratives of fabricated scandals are the easiest way to drive sales, clicks, viewership, and profit. In furtherance of this quest for clicks, viewership and profit, Defendant New Yorker had effectively became the partner and surrogate of the monopolistic PGA Tour and its European joint venture partner the DP World Tour – that is before the merger was recently reached with LIV and the Saudi Public Investment Fund -- seeking to destroy Mr. Reed and fellow LIV players like Mr. Reed, the latter being the engine of LIV Golf. These overwhelmingly dominant if not monopolistic professional golf tours had hypocritically and now admittedly used the captive and corrupted golf fake news media to accomplish this illegal objective, all the while maliciously and severely using Mr. Reed as the vehicle to severely damage Mr. Reed, his family and his colleagues.  This defamation must be addressed before a jury of Mr. Reed's peers.

Dated: June 8, 2023

Respectfully submitted,

By: */s/ Larry Klayman*
Larry Klayman, Esq.
Florida Bar No.: 246220
Klayman Law Group P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Tel: 561-558-5536
leklayman@gmail.com

*Counsel for Patrick Nathaniel Reed*

## CERTIFICATE OF SERVICE

I, Larry Klayman, hereby certify that on this day, June 8, 2023 I electronically filed the foregoing with the Clerk of Court using the Court's ECF procedures. I also certify that the foregoing document is being served this day on all counsel of record through the Court's eservice procedures.

*/s/ Larry Klayman*

# EXHIBIT 1

# SHOWING CONSTITUTIONAL MALICE IN MEDIA DEFAMATION

📅 **Vol. 92, No. 8   September/October 2018   Pg 38**   👤 **Manual Socias**

📁 **Featured Article**



Illustration by Barbara Kelley

There is a myth that it is virtually impossible for a public figure to successfully sue the media for defamation. This myth is based on a perceived insurmountability of the requirement imposed on public figures to prove "actual" or "constitutional" malice by clear and convincing evidence when suing for defamation. In reality, the courts have provided an almost step-by-step guide for finding and proving constitutional malice. The guide is the badges of malice. The phrase "badges of malice" is adapted from the badges of fraud used in tax evasion and fraudulent conveyance cases to categorize types of circumstantial evidence that may support an inference of a subjective intent to defraud.

No doubt showing constitutional malice is an obstacle. Public figures must show constitutional malice to maintain their claim. The requirement of proving constitutional malice is not limited to public figures. Plaintiffs that are not public figures still must show constitutional malice to recover punitive damages.

Constitutional malice, also called actual malice, is the publishing of a defamatory statement either knowing it is false or with reckless disregard for its truth or falsity.[1] Requiring a showing of constitutional malice for a public figure to sue for defamation, or to impose greater than actual damages ( *i.e.* , presumed and punitive damages) on the media, is intended to prevent a chilling effect on news reporting and protect First Amendment rights.[2] The concept of "knowledge of falsity" is familiar to all attorneys in multiple contexts. Recklessness as to falsity, however, has evolved definitions and inferences unique to defamation law.

**Twenty-Four Badges of Constitutional Malice: A Guide**

The Supreme Court articulated the parameters of "reckless disregard" in *St. Amant v. Thompson* , 390 U.S. 727, 731 (1965): "Reckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. There must be evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."

Accordingly, *St . Amant* reasoned that recklessness may be inferred when "there are obvious reasons" to doubt the veracity of the defamatory statement.[3]

In *Mason v. New Yorker Magazine* , 501 U.S. 496 (1991), the Supreme Court summarized that, for proof of constitutional malice, "mere negligence does not suffice," and that the plaintiff must demonstrate that the author "in fact entertained serious doubts as to the truth of his publication...or acted with a high degree of awareness of probable falsity."[4]

Knowledge of falsity or reckless disregard for falsity is a subjective mental state of the person responsible for publishing the defamatory statement. Consequently, absent an admission by the media, showing constitutional malice is based on circumstantial evidence. The courts have recognized certain fact patterns of circumstantial evidence as probative of constitutional malice. These "badges of malice," some alone and some in combination with others, have been held sufficient to support a jury inference of constitutional malice. There are 24 badges of malice.[5]

· failure to conduct a thorough investigation before publishing serious and damaging allegations that are not "hot news";

· failure to give the plaintiff a fair opportunity to reply to defamatory allegations;

· failure to report exculpatory facts;

· omitting pertinent information to create a false impression;

· destruction, loss, or unavailability of a reporter's notes or research;

· the reporter's knowledge of a quoted source's animosity toward the plaintiff;

· the alteration of quotes to maximize a story's impact;

· a reporter's knowledge of facts conflicting with the report;

· emphasizing unimportant events to support a defamatory statement;

· continued reliance on a source that had proven unreliable in other respects;

· a preconceived determination to disparage a plaintiff or a preconceived slant or view;

· repetitive media attacks on the plaintiff;

· failure to contact key witnesses;

· a reporter's ill will toward the plaintiff;

· competitive pressure for "hot news" story;

· discrepancies, inconsistencies, and equivocation in the testimony of media witnesses;

· a reporter's departure from professional standards;

· failure to supervise the reporter's preparation of the story;

· refusal to publish a retraction upon learning of errors in a story;

· the use of deception to obtain a defamatory story;

· a reporter's lack of credibility;

· prior and subsequent defamatory statements;

· that an investigative agency with the same information as a reporter declined to prosecute or take any action against the plaintiff; and

· making threats in connection with a story.

These badges of malice are a guide and nothing more. The possible scope of evidence that may support an inference of malice is unlimited. The badges are useful because they summarize actual events that tend to repeat themselves in media defamation cases. Evidence of the badges in discovery will support a strong and well-precedented argument for constitutional malice. For each badge developed in discovery, the media will have an explanation. Developing multiple badges of malice can expose the media's serial excuses as pretextual and increase the chances of successfully arguing constitutional malice.

## Malice Typically Is Evaluated from the Accumulation of Circumstantial Evidence

The badges of malice are consistent with the extremely broad scope of evidence that the Supreme Court held must be discoverable by plaintiffs to prove malice. In *Herbert v. Lando* , 441 U.S. 153 (1979), the Supreme Court observed that the First Amendment protections given to the media were balanced by the corollary that the fact finder could consider an extremely broad scope of evidence in determining malice. "[A]ny competent evidence either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown..." to show malice.[6] The specific items of relevant evidence favorably itemized in *Herbert* include 1) all information known to the defamer showing the falsity of defamatory statements; 2) the defamer's thought process and reasons for crediting or discrediting information; 3) the defamer's thought processes and reasons for incorporating only certain information into a press statement; 4) threats made by the defendant; 5) prior defamations by the defendant; 6) subsequent defamations made by the defendant; 7) subsequent statements made by the defendant; and 8) circumstances indicating rivalry, ill will, or hostility.[7]

In *Harte-Hanks Communications, Inc. v. Connaughton* , 491 U.S. 657 (1989), the Supreme Court emphasized that a jury may infer malice from a series of factors none of which alone would have been sufficient. In that case, a newspaper published witness' allegations that a judicial candidate had been bribed. The candidate sued for defamation, and the newspaper argued that it had no knowledge that the bribery allegations were false. The jury found malice, and the newspaper appealed.

*Harte-Hanks* emphasized numerous factors in evaluating the entire record. The newspaper was involved in heated competition with another local paper and was under pressure to "scoop it" on local news ( *i.e* ., profit motive for the defamation). After hearing the obviously damaging bribery allegations, the newspaper conducted an investigation, but it failed to contact key witnesses.

Numerous taped witness interviews were available to the newspaper, but the editorial director did not listen to them. There were discrepancies in the testimony of the newspaper's witnesses. Though no single factor was dispositive, *Harte-Hanks* stressed that the jury may have found that "failure to conduct a complete investigation involved a deliberate effort to avoid the truth."[8]

In *Curtis Publishing Co. v. Butts* , 388 U.S. 130 (1967), a football coach sued a magazine for publishing an article accusing him of fixing games. The evidence showed that this was not "hot news," that the charges were serious, that the editors recognized "the need for a thorough investigation," that the reporter's superiors did not look at the reporter's notes prior to the publication, that a key witness was not interviewed, and that "no attempt was made to screen the films of the game."[9] The Supreme Court held that a jury may infer from this that the magazine "had been anxious to publish an expose and had, thus, wantonly and recklessly seized on a questionable affidavit."[10]

*Hunt v. Liberty Lobby* , 720 F.2d 631 (11th Cir. 1983), affirmed a jury finding of malice in a Florida defamation case. *Hunt* ruled that two factors present in that case independently supported the jury's determination. First, "when an article is not in the category of 'hot news,' that is, information that must be printed immediately or it will lose its newsworthy value, 'actual malice may be inferred when the investigation for a story...was grossly inadequate in the circumstances.'"[11] Second, "an inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him, even when the defendant testifies that he believed that the statement was not defamatory and was consistent with the facts within his knowledge."[12]

A defendant's "inconsistent" and "equivocating" testimony supported a finding of malice in *Texas Disposal Systems Landfill, Inc. v. Waste Management Holdings, Inc.* , 219 S.W.3d 563 (Tex. App. 2007). The court cited a combination of

circumstantial evidence from which the jury may have inferred malice. These factors included 1) omitting pertinent information that would have prevented a "false impression" from the information included in the defamatory communication; 2) a failure to attempt verification of the defamatory information; and 3) "inconsistent" and "equivocating" testimony from the defendant.[13]

The frequency and duration of the media's attack on a plaintiff also may help establish malice. In *Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002), the court affirmed a jury finding of malice. *Bentley* cited factors that included the fact that the talk show host had "relentlessly" repeated allegations against a particular judge for months while ignoring people that had knowledge of the allegations.[14]

Emphasizing unimportant events to support serious defamatory statements will also support a finding of malice. In *Bolling v. Baker*, 671 S.W. 2d 559 (Tex. App. 1984), a physician accused a nurse of dishonesty. When the nurse sued for defamation, the physician testified that one reason he doubted the nurse's honesty was an incident in which some lab slips "had been changed."[15] *Bolling* concluded that the physician's "obsession with such an insignificant event warrants the inference that he was using the incident to get even with [the nurse]."[16] Accordingly, the court concluded that there was sufficient evidence to support the jury's finding that the statements were made with knowledge of their falsity or with reckless disregard for the truth. Emphasizing unimportant events also fits within the more general badge of a reporter knowing that the facts do not support a defamatory story.

Finally, the context of a defamatory statement and the media's use of deception to obtain images for a defamatory story may support a jury inference of malice. In *Braun v. Flynt*, 726 F.2d 245 (5th Cir. 1984), a novelty entertainer who performed an act with a swimming pig at a family-oriented amusement park sued a sexually oriented men's magazine for defamation for publishing her

photo in its "Chic Thrills" section. The magazine obtained authority to use the photograph by misrepresenting the nature of the magazine. *Braun* affirmed a jury finding of malice, holding that the jury may infer malice from the magazine's use of deception to obtain the photograph and then inserting the photograph of what the editors knew was a family tourist attraction "in the context of" a lewd magazine.[17]

The media cannot avoid an inference of malice when it publishes a defamatory headline by showing that it published the full truth in the text of the story. In *Kaelin v. Globe Communications Corp.* , 162 F.3d 1036 (9th Cir. 1998), Kato Kaelin sued a newspaper for publishing a headline stating, "COPS THINK KATO DID IT!" after O.J. Simpson was acquitted of murder. The newspaper argued that there was no malice because the body of the story made clear that the "IT" referred to perjury and not the murders. The trial court entered summary judgment for the newspaper. The appellate court reversed *Kaelin* , holding that a jury may infer that the newspaper intended to convey a false impression from the scandalous headlines for the pecuniary motive of selling more newspapers. The truthful disclosure in the body of the article did not guarantee the newspaper immunity from defamatory headlines. "The editors' statements of their subjective intention," *Kaelin* stressed, "are matters of credibility for a jury."[18]

## Some Badges Alone May Establish Malice

There are instances in which courts have approved an inference of malice from a single item of circumstantial evidence. This occurs in two scenarios. One is when there is evidence of the reporter's lack of credibility regarding the story. This evidence includes the mysterious disappearance of the reporter's research notes, the alteration of quotes for defamatory impact, and the reporter's possession of materials showing that the defamatory story was false. The second scenario focuses on the reporter's conduct after the defamatory publication. When the media refuses to retract a defamatory statement after learning of its falsity, courts have allowed an inference that the defamation was published with

malice. Though neither scenario guarantees a finding of constitutional malice, both scenarios may support such a finding if the evidence is material to the defamation.

The destruction or unavailability of a reporter's notes and research supported a finding of malice in *Murphy v. Boston Herald, Inc.* , 449 Mass. 42 (Mass. 2007). There, a newspaper reporter, relying on the statement of a district attorney with animosity toward a judge, published an article accusing the judge of belittling a juvenile rape victim. *Murphy* found that a number of factors combined to furnish clear and convincing evidence of malice.[19] *Murphy* stressed 1) the reporter's knowledge that his source had animosity toward the judge; 2) the reporter's failure to verify the accuracy of the statements attributable to the judge with others who were present; and 3) the reporter's incredible claim that he discarded his notebook where he wrote the information told to him by the district attorney.[20] *Murphy* stressed that the strongest evidence of malice was the mysterious unavailability of the notebook: "The jury were entitled to draw the negative inference that [the reporter] discarded his notebook in a deliberate effort to conceal what he knew were inaccuracies in his reporting. This inference, in turn, *provides a strong basis for a finding of actual malice.*"[21]

Consistent with *Murphy* , numerous courts have held that the destruction or unavailability of a reporter's notes or research may support a jury verdict of malice.[22]

A reporter's alteration of quotes to maximize the impact of the story also supports a verdict of malice. In *Masson v. New Yorker Magazine, Inc* ., 501 U.S. 496 (1991) , the Supreme Court held that a reporter's alteration of quoted words may equate with knowledge of falsity when the alteration results in a material change of the meaning conveyed by the quoted statement.[23] That a reporter in *Masson* might have misunderstood his or her sources is insufficient to overturn a jury's evaluation of the circumstances.[24]

The court in *Southern Air Transport, Inc. v. Post Newsweek Stations Florida, Inc* ., 568 So. 2d 927 (Fla. 3d DCA 1990), upheld a finding of malice when the media aired an uncorroborated claim by an individual of questionable credibility that the plaintiff was a drug trafficker. The court held publishing this serious and uncorroborated allegation without giving the plaintiff a fair opportunity to reply supported the inference of malice. The court also noted that the defamatory broadcast made the informant appear credible and failed to report information that would negatively impact his credibility.[25]

A reporter's possession of documents conflicting with his report supported a finding of malice in *Mitchell v. Griffin Television, LLC*, 60 P.3d 1058 (Okl. App. 2002). There, a veterinarian sued a TV station for falsely reporting that a lawsuit accused him of medicating a champion race horse to hide injuries so the horse could be sold. The TV station claimed there was no showing of malice because the complaint filed in federal court alleged the veterinarian had medicated the horse prior to the sale. That complaint accused the trainer of trying to mask the horse's unsoundness but made no such accusation as to the veterinarian. Since the TV station had a copy of the complaint, *Mitchell* held that the jury properly found that the false report was made with "reckless disregard."[26]

In *Herbert* , the court held that a defamer's post-publication conduct may be relevant to establishing malice at the time of publication.[27] The key post-publication conduct developed in the caselaw is the media's refusal to retract a defamatory statement after learning that it is false. *Restatement Second of Torts* 580A (1977), Comment D, concludes that a defamer's refusal to retract a defamatory statement after learning it is false "might be relevant in showing recklessness at the time the statement was published." In *Mahnke v. Northwest Publications, Inc.* , 160 N.W. 2d 1 (Minn. 1968), the Minnesota Supreme Court held that a jury may properly consider a defendant's failure to retract defamatory statements as evidence of recklessness. "We think that the failure to retract the

defamatory statements," *Mahnke* stressed, "underscored defendant's reckless attitude as to the consequences of what had been published and that the jury was entitled to take that fact into consideration."[28]

## Use of the Badges in Discovery

The focus of discovery on constitutional malice is obtaining evidence that the reporter either knew the truth refuting the defamation or the truth was so readily available that failure to inquire amounts to a deliberate avoidance of truth. The badges suggest where to look for this evidence. The first step is obtaining all investigative research materials, notes, drafts of articles, edits, article or script changes, outtakes communications, tweets, web postings (including both the defamatory article and any guest comments or posts), Facebook posts, and other social media materials concerning the defamatory story. The reporter's familiarity with the subject matter of the story, as well as the identities of his or her sources also warrant discovery. The goal of this phase of discovery is to learn everything the reporter said, wrote, knew, or had access to concerning the defamatory story.

A next step is to identify every item of information known or available to the reporter that is inconsistent with the defamatory sting of the story. This aspect of discovery then focuses on tracing how and why the reporter made editorial decisions to omit, downplay, or not pursue what was inconsistent with the defamation. This should be done at deposition, but it is helpful to initially obtain copies of all drafts or outtakes of the defamatory publication to see what was deleted.

The reporter should be deposed on every step of the investigation conducted on the story. Particular emphasis is on the reasons for a reporter's decision not to pursue research areas that would have exposed the defamatory story as false. The credibility issue surrounding a reporter's explanation of this process is often

the lynchpin that decides constitutional malice. Inconsistencies between the reporter's research and the defamatory string of the story may rise to a level where this alone allows an inference of malice.

The next aspect of discovery deals with external influences on the defamatory story. External influences discussed in the caselaw include 1) animosity toward the subject of the defamation; 2) competitive pressure to scoop other media outlets; 3) a pattern of defamatory coverage; and 4) an editorial slant. Also, failure to retract after learning of a defamatory falsity, though not an influence on the story, is an external factor that may support an inference of malice. Accordingly, discovery into the editorial decision not to retract should be as thorough as discovery into the decision to initially publish the defamation. In cases in which the media issues an inadequate retraction, the retraction can often be pled as an additional defamatory publication requiring discovery in its own right.

Discovery into animosity toward the subject of the defamation can be far ranging or a quick dead end. In cases in which a news outlet had an established relationship with the plaintiff, there is often a falling out predating the defamatory publication — and evidence of animosity. The entire history of the relationship, including all statements made by news outlet representatives about the plaintiff, are in play.

Competitive pressure for attention-grabbing stories is always present but must be shown in the record. There are often emails or other communications discussing a news outlet's market position (circulation or viewers). Media executives normally must acknowledge that their company's source of income (advertising), and often their income depends on their circulation or number of viewers. Editors sometimes direct reporters to pursue certain stories, either orally or in writing, to maximize viewers during ratings periods.

Television stations typically feature their most inflammatory stories during national ratings periods knowns as "sweeps." During this time, there can be increased pressure on reporters to generate high-profile stories or to exaggerate

to the point of defaming. Sweeps periods occur four times each year and are usually acknowledged in internal communications. It is important in the industry because the viewership established during sweeps determines advertising revenue. Questioning the reporter regarding his or her basis for publishing multiple defamatory statements will often yield testimony helpful to establish a credibility dispute.

A pattern of defamatory statements about the plaintiff can be key to showing malice. Identifying every defamatory statement about the plaintiff made by a news outlet is the first step. This includes defamatory statements that were made before and after the defamatory publication. In some cases, the sheer number of false statements made may support an inference of malice. In others, credibility issues are raised by a reporter's attempts to explain this pattern.

### Defending Summary Judgment

The first test of a plaintiff's evidence of constitutional malice is usually the media's motion for summary judgement. It is here that a plaintiff first feels the weight of being required to prove malice by clear and convincing evidence. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the Supreme Court held that, in ruling on a media motion for summary judgment or a directed verdict on constitutional malice, a court must evaluate the evidence of malice to determine whether a jury reasonably could infer malice under this heavier evidentiary burden. Media defendants, quoting isolated language from *Anderson* and similar cases, exaggerate that a plaintiff's burden is virtually insurmountable.

In reality, *Anderson* also stresses that courts should be cautious in granting summary judgment on constitutional malice:

> [I]t is clear enough from our recent cases that at the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.[29]

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.[30]

*Anderson* has been inconsistently applied. Some courts invoke *Anderson* as a license to act as jury in weighing the evidence. Others look at whether there are factual issues that may be presented to a jury. This was predicted by the dissent in *Anderson* .[31]

The dissenting justices argued that *Anderson* gave conflicting instructions to trial courts. Specifically, courts were simultaneously instructed to weigh the evidence under the "prism" of the clear and convincing standard and cautioned against weighing the evidence when ruling on a motion for summary judgment or directed verdict. The dissents predicated that *Anderson* would prove devoid of practical application.[32]

In *Hutchinson v. Proxmire*, 443 U.S. 111, n.9 (1979), the U.S. Supreme Court noted in a libel case "the proof of actual malice calls a defendant's state of mind into question [ *citations omitted* ] and does not readily lend itself to summary disposition."[33]

Summary judgment in a Florida defamation case arising from "investigative television news" was addressed in *Southern Air Transport* . There, the plaintiff sued a TV station for broadcasting an investigative story accusing the plaintiff of drug trafficking while engaged in covert arms shipments to the Nicaraguan Contras. The trial court granted summary judgment for the TV station on the issue of malice. The district court reversed, holding that these factors precluded

summary judgment: 1) A source's information had proven unreliable in other respects; 2) "the defendants *did not give plaintiff a fair opportunity to reply* to this drug trafficking accusation..."[34]; and 3) the government declined to prosecute anyone based on the source's information.[35] The court noted that other evidence in the record supported contrary inferences but stressed that weighting them was for the jury.[36]

Media defendants always assert that they believed the truth of the defamation. Constitutional malice pivots on creating a triable issue concerning credibility. The badges of malice help create this issue, but the courts have stressed that it is in the jury's purview to evaluate the credibility of media witnesses and reject their claim that they believed the defamation was true.

In *Harrison v. Williams* , 430 So. 2d 585 (Fla. 4th DCA 1983), a father sent defamatory communications to officials accusing a police officer of beating up his son. The police officer brought a defamation action, and the father's defense was that "he made a good faith mistake about the identity" of the police officer. The trial evidence showed that the son "informed his father" that it was the plaintiff who had attacked him. The assistant state attorney, however, had told the father that the attacker was another officer who looked like the plaintiff. The fact finder resolved the credibility issue in favor of the plaintiff and found that the father had made his accusations with malice. On appeal, the court affirmed, finding substantial competent evidence to support the inference of malice.[37]

*Dibella v. Hopkins* , 403 F.3d 102 (2d Cir. 2005), affirmed a jury's finding of malice and held that it was within the jury's purview to discredit the defamer's account of his mental state in making a defamatory statement.[38] Evidence that creates an issue concerning the reporter's credibility requires a jury determination.

The thrust of the focus on the credibility of the media witnesses is that anything normally impacting a witness' credibility is in play. In particular situations, these factors may be unique. For instance, a witness' hesitations, tone, and demeanor

are properly considered by a jury deciding whether to believe the witness. In the context of a motion for directed verdict, the matter must be put on the record because the transcript will not reflect them. In defending a summary judgment, an argument that the record prevents an issue on the media witnesses' credibility can be supported by videotaped deposition testimony.[39]

## Conclusion

The caselaw developed over the last half century shows that proving constitutional malice is feasible. It takes the discipline of developing every item of circumstantial evidence that may furnish a motive to defame or shows that the reporter knew or should have known the truth. The "should have known" standard applies to negligence, but negligence is a step toward recklessness. The 24 badges of constitutional malice reflect combinations of evidence that can defeat the media's First Amendment defense.

[1] *Gertz v. Welch* , 94 S. Ct. 2997 (1974).

[2] *Id.*

[3] *St. Amant*, 390 U.S. at 732, fn. 3 (citations omitted).

[4] *Mason*, 501 U.S. 496 at 510 (citations omitted).

[5]The badges are summarized here and the cases utilizing the various badges are discussed below.

[6] *Herbert*, 441 U.S. at 177, fn. 12 (citations omitted).

[7] *Id.* Courts typically reject various journalist privileges which normally protect journalists' sources from discovery on the ground that the media waives the privilege when it asserts its First Amendment defenses.

[8] *Harte-Hanks Communications*, 491 U.S. at 685. *See also Celle v. Filipino Reporter Enterprises, Inc* ., 209 F.3d 163 (2d Cir. 2000) (malice finding affirmed based on evidence of reporter's ill will, reporter's conflicting testimony, and reliance on questionable source without conducting investigation).

[9] *Curtis Publishing Co.*, 388 U.S. at 157.

[10] *Id.* at fn.20. *See also Healey v. New England Newspapers, Inc* ., 555 A.2d 321 (R.I. 1989) (newspaper report of angry relative blaming doctor for death creates jury issue of malice where newspaper failed to report known facts tending to exculpate the doctor); *Buratt v. Capital City Press* , 459 So. 2d 1268 (La. 1 Cir. 1984) (reckless disregard for truth shown when reporter omits reporting available information because it refuted defamatory point reporter trying to make).

[11] *Hunt*, 720 F.2d at 643.

[12] *Id.* at 645 (citations omitted).

[13] *Texas Disposal Systems Landfill*, 219 S.W.3d at 578-579.

[14] *Bentley,* 94 S.W.3d at 584-585, 600. *See also Kentucky Kingdom Amusement Co. v. Belo Kentucky, Inc.* , 179 S.W.3d 785 (Ky. 2005) (affirming jury finding of malice based on television station's failure to correct inaccuracies in prior reports, continuing commitment to running the same false story line, failure to significantly investigate, and because the general make up and presentation of the story exhibited hostility).

[15] *Bolling,* 671 S.W.2d at 563.

[16] *Id.* at 565.

[17] *Braun*, 726 F. 2d at 257.

[18] *Kaelin,* 162 F. 3d at 1042.

[19] *Murphy* , 449 Mass. at 58.

[20] *Id*. at 58-61.

[21] *Id.* at 61 (emphasis added).

[22] *See Moore v. Vislosky* , 240 F. App'x 457, 469 (3d Cir. 2007) (defamer's claim that she "lost" documentary evidence that supported her defamatory statements was implausible and supports jury finding that she acted with reckless disregard for truth); *Torgerson v. Journal/Sentinel, Inc.* , 563 N.W. 2d 472, 483 (Wis. 1997) (destruction of reporter's notes is sufficient evidence to support a jury verdict of actual malice); *Chang v. Michiana Telecasting Corp.* , 900 F.2d 1085, 1090 (7th Cir. 1990) ("destruction could imply that the notes would have revealed the reporter did not believe what he wrote or said") (citations omitted).

[23] *Masson,* 501 U.S. at 516.

[24] *Id* . at 520-521.

[25] *Southern Air Transport* , 568 So. 2d at 928.

[26] *Mitchell*, 60 P.3d at 1063.

[27] *Herbert,* 441 U.S. at 170-171.

[28] *Mahnke,* 160 N.W.2d at 344. *See also Zerangue v. TSP Newspapers, Inc.* , 814 F.2d 1066 (5th Cir. 1987) (refusal to retract an exposed error supports a finding of malice just as a readiness to retract tends to negate malice); *Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.* , 708 F.2d 944 (5th Cir. 1983) (refusal to retract supports jury finding that defamatory article published with reckless disregard of the truth).

[29] *Anderson*, 477 U.S. at 249.

[30] *Id.* at 255 (citations omitted).

[31] *Id.* at 265-268.

[32] *Id* . at 267-269.

[33] *See also Shiavone Const. Co. v. Time, Inc.* , 847 F.2d 1069 (3d Cir. 1988) (reversing summary judgment in media defamation case where media had internal inconsistencies in its research and information contradicting libelous assertions but nevertheless published libelous statements).

[34] *Southern Air Transport* , 568 So. 2d at 928 (emphasis added).

[35] *Id.*

[36] *Id.* at 929.

[37] *Harrison*, 430 So. 2d at 586. *See also Durso v. Lyle Stuart, Inc* ., 337 N.E. 2d. 443, 447 (Ill. App. 1975) (citations omitted) (jury may find malice and disregard defendant's claim that defamatory statement in investigative publication was caused by unintentional "error" where evidence creates issue of author's credibility because (citations omitted) it showed "muckraking intent, the absence of hot news, and an inadequate investigation...").

[38] *See also Newton v. NBC, Inc* ., 930 F.2d 662, 671 (9th Cir. 1990) (malice may be based on jury's negative assessment of reporter's credibility at trial).

[39] The normal rule is that the court should leave credibility issues for the jury. To the extent that the court weighs evidence to see if a credibility issue satisfies the "clear and convincing" standard, witness demeanor should be in play. The dissent in *Anderson* pointed out that applying the "clear and convincing" standard at the summary judgment stage and telling the courts not to weigh evidence was inherently contradictory. The dissent predicted that *Anderson* would be inapplicable in practice.

 **MANUEL SOCIAS** *is a solo practitioner who has represented clients in business litigation for 35 years. He also handles and consults on defamation cases.*

# EXHIBIT 2

CASE NO. 20-61872-CIV-SINGHAL
United States District Court, S.D. Florida.

# Dershowitz v. Cable News Network, Inc.

541 F. Supp. 3d 1354 (S.D. Fla. 2021)
Decided May 24, 2021

CASE NO. 20-61872-CIV-SINGHAL

2021-05-24

Alan DERSHOWITZ, Plaintiff, v. CABLE NEWS NETWORK, INC., Defendant.

Brian Mitchell Rodier, Rodier & Rodier, Hallandale, FL, for Plaintiff. George S. LeMieux, Eric Corey Edison, Gunster, Yoakley and Stewart, P.A., Fort Lauderdale, FL, Amanda Levine, Pro Hac Vice, Katherine M. Bolger, Pro Hac Vice, Davis Wright Tremaine LLP, New York, NY, for Defendant.

RAAG SINGHAL, UNITED STATES DISTRICT JUDGE

1358*1358

Brian Mitchell Rodier, Rodier & Rodier, Hallandale, FL, for Plaintiff.

George S. LeMieux, Eric Corey Edison, Gunster, Yoakley and Stewart, P.A., Fort Lauderdale, FL, Amanda Levine, Pro Hac Vice, Katherine M. Bolger, Pro Hac Vice, Davis Wright Tremaine LLP, New York, NY, for Defendant.

## ORDER

RAAG SINGHAL, UNITED STATES DISTRICT JUDGE

**THIS CAUSE** is before the Court upon Defendant Cable News Network's Motion to Dismiss (DE [17]). The parties have fully briefed the Motion to Dismiss and the Court heard argument of counsel. For the reasons set forth below, the Motion to Dismiss is denied.

I. <u>INTRODUCTION</u>

Plaintiff Alan Dershowitz ("Dershowitz") has filed a Complaint (DE [1]) against Cable News Network, Inc. ("CNN") seeking damages for defamation. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

In January 2020, Dershowitz represented the President of the United States in an impeachment trial before the United States Senate. (*Id.* ¶ 6). This dispute concerns CNN's coverage of an argument Dershowitz made to the Senate about whether a president can be impeached and removed from office if he takes any action that is 1359 motivated by a desire to be reelected. *1359 According to the Complaint, Dershowitz gave the following answer to a question by Senator Ted Cruz:



The only thing that would make a quid pro quo unlawful is if the quo were somehow illegal. Now we talk about motive. There are three possible motives that a political figure could have. One, a motive in the public interest and the Israel argument would be in the public interest. The second is in his own political interest and the third, which hasn't been mentioned, would be his own financial interest, his own pure financial interest, just putting money in the bank. I want to focus on the second one just for one moment. Every public official that I know believes that his election is in the public interest and, mostly you are right, your election is in the public interest, and if a president does something which he believes will help him get elected in the public interest, that cannot be the kind of quid pro quo that results in impeachment. (*Id.* ¶ 7).[1]

> [1]  The Complaint sets forth only an excerpt of Dershowitz' response. CNN has submitted the Congressional Record (DE [17-1] with the full transcript of Dershowitz' argument found at S650 and asks the Court to take judicial notice of the entirety of Dershowitz' comments.

Following the day's impeachment proceedings, CNN aired a clip of this argument that featured only the last sentence and omitted Dershowitz' words that a quid pro quo would be unlawful if the quo were somehow illegal.[2] (*Id.* , ¶ 8). Dershowitz alleges that several CNN commentators responded to the truncated clip and "exploded into a one-sided and false narrative that Professor Dershowitz believes and argued that as long as the President believes his reelection is in the public interest, that he could do anything at all – <u>including illegal acts</u> – and be immune from impeachment." (*Id.* ). Dershowitz alleges CNN commentators made the following defamatory statements[3] (DE [1], ¶ 13):

> [2]  The Complaint acknowledges that CNN aired the entire statement several times earlier in the day on shows hosted by CNN employees Wolf Blitzer and Jake Tapper. (DE [1] ¶ 9).

> [3]  In his Memorandum in Opposition (DE [21]), Dershowitz identified the underlined portions of these statements as those he alleges are defamatory.

Having worked on about a dozen campaigns, there is always the sense that, boy, if we win, it's better for the country. <u>But that doesn't give you license to commit crimes</u> or to do things that are unethical. So, it was absurd. What I thought when I was watching it was this is un-American. This is what you hear from Stalin. This is what you hear from Mussolini, what you hear from authoritarians, from Hitler, from all the authoritarian people who rationalized, in some cases genocide, based on what was in the public interest." -- Joe Lockhart @ 7:11 p.m., January 29, 2020.

The president's defense team [Dershowitz] seems to be redefining the powers of the president, redefining them towards infinity." ... [truncated clip played] ... "If you look at what he says there it blows your mind. <u>He says if a president is running for re-election because he thinks getting elected will help America, he can do anything, anything.</u> And that redefines the presidency and America." -- John Berman @ 6:17 a.m., January 30, 2020.

I did not go to Harvard Law, but I did go to the University of Texas School of Law, where I studied criminal law and constitutional law, but never dreamed a legendary legal mind would set them both ablaze on the Senate floor. <u>The Dershowitz Doctrine would make presidents immune from</u>

1360*1360



every criminal act, so long as they could plausibly claim they did it to boost their re-election effort.
Campaign finance laws: out the window. Bribery statutes: gone. Extortion: no more. This is Donald
Trump's fondest figurative dream: to be able to shoot someone on Fifth Avenue and get away with it." --
Paul Begala on CNN.com, January 29, 2020 @ 9:11 p.m.

This narrative, claims Dershowitz, damaged his reputation as a legal scholar and subjected him to ridicule on
news outlets, talk shows, and social media. (*Id.* ¶¶ 12, 13).

Dershowitz alleges that CNN knew or had serious doubts that its commentators' statements were false at the
time they were made but nonetheless made and/or published the statements with an intent to indulge ill will,
hostility, and an intent to harm. (*Id.* ¶ 20). Dershowitz asserts that CNN's airing of only a portion of his answer
was done to falsely paint him "as a constitutional scholar and intellectual who had lost his mind" and that "
[w]ith that branding, [his] sound and meritorious arguments would then be drowned under a sea of repeated
lies." (*Id.* ¶ 8). The result of omitting the words "[t]he only thing that would make a quid pro quo unlawful is if
the quo were somehow illegal," says Dershowitz, is that CNN could "fool" its viewers into thinking "that the
respected Alan Dershowitz believed that the President of the United States could commit <u>illegal</u> acts as long as
he thought it would help his reelection and that his reelection was in the public interest, even though it was the
opposite of what he said." (*Id.* ). Dershowitz alleges he has suffered and continues to suffer damage, including
but not limited to damage to his reputation, embarrassment, pain, humiliation, and mental anguish and has
sustained past and future loss of earnings. (*Id.* ¶ 19). He seeks $50 million in compensatory damages and $250
million in punitive damages from CNN.

CNN moves to dismiss the Complaint for failure to state a claim upon which relief can be granted. (DE [17]).
Fed. R. Civ. P. 12(b)(6). First, CNN contends its broadcasts are protected by the fair report privilege, which
shields the press from liability for reporting information on official government proceedings. Second, CNN
argues that the statements made by its commentators were non-actionable opinions based upon Dershowitz'
public testimony. Finally, CNN asserts that Dershowitz has not and cannot plead that CNN acted with the
actual malice required for a public figure to sustain a defamation claim. CNN asks the Court to dismiss
Dershowitz' Complaint with prejudice.

II. <u>LEGAL STANDARDS</u>

A. Motion to Dismiss

To survive a motion to dismiss, "factual allegations must be enough to raise a right to relief above the
speculative level" and must be sufficient "to state a claim for relief that is plausible on its face." *Bell Atl. Corp.
v. Twombly* , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when
the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is
liable for the misconduct alleged." *Ashcroft v. Iqbal* , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868
(2009). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss."
*Sinaltrainal v. Coca-Cola Co.* , 578 F.3d 1252, 1261 (11th Cir. 2009), *abrogated on other grounds by Mohamad
v. Palestinian Authority* , 566 U.S. 449, 132 S.Ct. 1702, 182 L.Ed.2d 720 (2012).

In considering a Rule 12(b)(6) motion to dismiss, the court's review is generally "limited to the four corners of
1361 the complaint." *1361 *Wilchombe v. TeeVee Toons, Inc.* , 555 F.3d 949, 959 (11th Cir. 2009) (quoting *St. George
v. Pinellas Cty.* , 285 F.3d 1334, 1337 (11th Cir. 2002) ). The court must review the complaint in the light most
favorable to the plaintiff, and it must generally accept the plaintiff's well-pleaded facts as true. *See Hishon v.
King & Spalding* , 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). But "[c]onclusory allegations,

unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Jackson v. BellSouth Telecommunications* , 372 F.3d 1250, 1262 (11th Cir. 2004) (citation omitted); *see also Iqbal* , 129 S. Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").

B. Defamation

The parties agree that Florida law applies to this dispute. In Florida, a defamation claim has "five elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews For Jesus, Inc. v. Rapp* , 997 So. 2d 1098, 1106 (Fla. 2008).

CNN argues that its broadcasts concerning Dershowitz' statements are protected from liability by the fair report privilege. The fair report privilege is a qualified privilege given to news media "to accurately report on the information they receive from government officials." *Woodard v. Sunbeam Television Corp.* , 616 So. 2d 501, 502 (Fla. 3d DCA 1993). "If the report of a public official proceeding is accurate or a fair abridgment, an action cannot be constitutionally maintained, either for defamation or for invasion of the right of privacy." *Id.* (quoting Restatement (Second) of Torts § 611, cmt. b (1977)). "The privilege extends to the publication of the contents of official documents, as long as the account is reasonably accurate and fair." *Rasmussen v. Collier County Publ. Co.* , 946 So. 2d 567, 571 (Fla. 2nd DCA 2006).

Next, CNN argues that its commentators offered opinions and, therefore, it cannot be liable for defamation. In Florida, a claim of defamation requires a false statement of fact. *Id.* Statements of pure opinion are not actionable. *Zambrano v. Devanesan* , 484 So. 2d 603, 606 (Fla. 4th DCA 1986). "The distinction between fact and opinion is not always easy to perceive." *Id.* "Thus, the law recognizes that some comments may be pure expressions of opinion whereas others may be mixed expressions of opinion." *Id.*

A mixed opinion is one "based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication." *LRX, Inc. v. Horizon Assocs. Joint Venture ex rel. Horizon-ANF, Inc.* , 842 So. 2d 881, 885 (Fla. 4th DCA 2003). "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications." *Milkovich v. Lorain Journal Co.* , 497 U.S. 1, 18-19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

Whether a challenged statement is one of fact or opinion is a question of law to be decided by the court. *Turner v. Wells* , 879 F.3d 1254, 1262 (11th Cir. 2018). "In assessing whether an allegedly libelous statement is 1362 opinion, the court must construe the statement in its totality, examining not merely a particular phrase *1362 or sentence, but all of the words used in the publication." *Rasmussen* , 946 So. 2d at 571 (citing *Hay v. Indep. Newspapers, Inc.* , 450 So. 2d 293, 295 (Fla. 2d DCA 1984) ).

Finally, CNN challenges the sufficiency of Dershowitz' pleading of actual malice. *See New York Times Co. v. Sullivan* , 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (public figure must prove actual malice to succeed in defamation case). Actual malice "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." *Masson v. New Yorker Mag., Inc.* , 501 U.S. 496, 500, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). Rather, actual malice refers to "publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity." *Id.* at 511, 111 S.Ct. 2419. To avoid dismissal of a defamation claim, a

public figure must plead facts sufficient to give rise to a plausible inference of actual malice. *Michel v. NY Post Holdings, Inc.* , 816 F.3d 686, 702 (11th Cir. 2016). The pleading standards of *Iqbal* and *Twombly* apply to a public figure's allegations of actual malice. *Id.*

III. <u>ANALYSIS</u>

The Court must first address those items that it considered in resolving this Motion. CNN included numerous exhibits with its Motion to Dismiss and argues the Court may properly consider all of them when deciding the Motion. The Court disagrees. At the 12(b)(6) stage, the court may consider the allegations in the complaint as well as documents incorporated into the complaint by reference and matters of which it may take judicial notice. *Lozman v. City of Riviera Beach* , 713 F.3d 1066, 1075 n.9 (11th Cir. 2013) (citations omitted). These items are incorporated by reference in the Complaint and are properly considered at the motion to dismiss stage:

• CNN footage of the impeachment trial aired on January 29, 2020 (DE [17-6], ex. A);

• Transcript and footage of the January 29, 2020, episode of the program Erin Burnett Outfront (DE [17-6], ex. B);

• Transcript and footage of the January 20, 2020, episode of the program New Day (DE [17-6], ex. C); and

• Paul Begala article "Presenting the Ludicrous 'Dershowitz Doctrine' " published January 29, 2020 on cnn.com (DE [17-6], ex. D)

In addition, the Court may take judicial notice of Congressional Record of January 29, 2020 (DE [17-1]). *See Coastal Wellness Centers, Inc. v. Progressive American Ins. Co.* , 309 F. Supp. 3d 1216, n.4 (S.D. Fla. 2018) ("The Court may take judicial notice of government publications and website materials."). The remaining items[4] – transcripts of shows broadcast by other media outlets, transcripts of interviews given by Dershowitz on January 30 and 31, 2020, and a copy of Dershowitz' book *Defending the Constitution* – fall outside the pleadings. "The clear rule in this Circuit is that consideration of material falling outside the pleadings converts a motion to dismiss into one for summary judgment. And in doing so, the judge must give notice to the parties and allow them 10 days in which to supplement the record." *Michel* , 816 F.3d at 701. The Court declines to 1363 make that conversion and, therefore, has only considered those items referenced in the Complaint.*1363  A. <u>Fair Report Privilege</u>

4  These items are attached to CNN's Motion to Dismiss (DE [17]) at DE [17-2]; [17-3]; [17-4]; [17-5]; [17-6], ex. E; and [17-6], ex. D.

CNN argues that its airing of verbatim statements that Dershowitz made on the floor of the United States Senate is unquestionably protected by the fair report privilege. *See Woodard* , 616 So. 2d at 502 ("The news media has been given a qualified privilege to accurately report on the information they receive from government officials."). "The fair report privilege is news media's qualified privilege 'to report accurately on information received from government officials.' " *Folta v. New York Times Co.* , 2019 WL 1486776, at *2 (N.D. Fla. 2019) (quoting *Rasmussen* , 946 So. 2d at 570-71 ). Clearly, a public broadcast concerning the impeachment trial of the President of the United States triggers the fair report privilege.

The next issue is whether the fair report privilege applies to CNN's broadcasts. The fair report privilege applies "[i]f the report of a public official proceeding is an accurate or a fair abridgment." *Folta* , 2019 WL 1486776, at *2 (quoting *Woodard* , 616 So. 2d at 502 ). CNN argues that it played a verbatim clip of Dershowitz' actual words spoken during a high-level government proceeding and, therefore, the fair report privilege applies. *See Jamason v. Palm Beach Newspapers, Inc.* , 450 So. 2d 1130, 1132 (Fla. 4th DCA 1984) ("accurate report of judicial proceeding" entitled to fair report privilege). Dershowitz does not dispute that the privilege would probably apply if CNN had merely played the truncated clip without further comment. But that is not Dershowitz' claim. The one-count Complaint alleges that the truncated clip was part of "a deliberate scheme to defraud" CNN's audience (DE [1], ¶ 11) that enabled Lockhart, Berman, and Begala to present Dershowitz's comments in a defamatory manner. Thus, for purposes of applying the fair report privilege the Court must consider the broadcasts and the clip as a whole and not as separate claims. And the question is whether CNN's broadcasts presented an accurate or fair abridgment of Dershowitz' comments to the Senate. To answer this, we must look to the source documents. *Folta* , 2019 WL 1486776, at *4 ("Determining whether a report is fair and accurate requires a close comparison of the report and the documents and information from which it is drawn."); *Stewart v. Sun Sentinel Co.* , 695 So. 2d 360, 362 (Fla. 4th DCA 1997) (comparing defamatory information with official documents for "material differences" that would defeat the fair report privilege).

During the impeachment trial, Senator Ted Cruz submitted a question for Dershowitz to answer: "As a matter of law, does it matter if there was a quid pro quo? Is it true that quid pro quos are often used in foreign policy?" *Congressional Record* , 166:19 (Jan. 29, 2020), p. S650. (DE [17-1], p. 7). Dershowitz answered at length and gave several hypotheticals of quid pro quo that he considered would be lawful. At several points in his response, Dershowitz stated that a quid pro quo that is unlawful would be one based on an illegal motive. These points are highlighted below:

> I offered you a hypothetical the other day: What if a Democratic President were to be elected and Congress were to authorize much money to either Israel or the Palestinians and the Democratic President were to say to Israel "No; I am going to withhold this money unless you stop all settlement growth" or to the Palestinians "I will withhold the money Congress authorized to you unless you stop paying terrorists, and the President said "Quid pro quo. If you don't do it, you don't get the money. If you do it, you get the money"? There is no one in this Chamber who would regard that as in any way unlawful. *The only thing that would make a quid pro quo unlawful is that if the quo were in some way illegal.*

1364*1364

Now, we talked about motive. There are three possible motives that a political figure can have: One, a motive in the public interest, and the Israel argument would be in the public interest; the second is in his own political interest; and the third, which hasn't been mentioned, *would be in his own financial interest, just putting money in the bank.* I just want to focus on the second one for just one moment.

Every public official whom I know believes that his election is in the public interest. Mostly, you are right. Your election is in the public interest. If a President does something which he believes will help him get elected – in the public interest – that cannot be the kind of quid pro quo that results in impeachment....

Everybody has mixed motives, and for there to be a constitutional impeachment based upon mixed motives would permit almost any President to be impeached.

How many Presidents have made foreign policy decisions after checking with their political advisers and their pollsters? If you are just acting in the national interest, why do you need pollsters? Why do you need political advisers? Just do what is best for the country. But if you want to balance what is in the public interest with what is in your party's electoral interest and in your own electoral interest, it is impossible to discern how much weight is given to one or the other.

Now, we may argue that it is not in the national interest for a particular President to get reelected or for a particular Senator or Member of Congress – and maybe we are right; it is not in the national interest for everybody who is running to be elected – but for it to be impeachable, you would have to discern that he or she made a decision solely on the basis of, as the House managers put it, corrupt motives, and *it cannot be a corrupt motive if you have a mixed motive that partially involves the national interest, partially involves electoral, and does not involve personal pecuniary interest.*

The House managers do not allege that this decision, this quid pro quo, as they call it – and the question is based on the hypothesis that there was a quid pro quo. I am not attacking the facts. *They never allege that it was based on pure financial reasons. It would be a much harder case.*

If a hypothetical President of the United States said to a hypothetical leader of a foreign country: Unless you build a hotel with my name on it and unless you give me a million-dollar kickback, I will withhold the funds. *That is an easy case. That is purely corrupt and in the purely private interest.*

But a complex middle case is: I want to be elected. I think I am the greatest President there ever was, and if I am not elected the national interest will suffer greatly. That cannot be.

*Congressional Record* 166:19 (Jan. 29, 2020) pp. S650-51 (emphasis added). (DE [17-1], pp. 7-8).[5]

[5] CNN argues that the paragraph breaks in the Congressional Record signify that Dershowitz is "manipulat[ing] his Senate arguments by merging together *three* separate paragraphs from the Congressional Record to make it appear as one thought." (DE [24], p. 5). The Court must consider the entirety of Dershowitz' remarks, and the editorial judgment of the Government Printing Office staff is not binding on this Court.

To compare Dershowitz' answer with the comments made by CNN's commentators, those comments are set forth again, below:

casetext

Having worked on about a dozen campaigns, there is always the sense that, boy, if we win, it's better for the country.

1365*1365

But that doesn't give you license to commit crimes or to do things that are unethical. So, it was absurd. What I thought when I was watching it was this is un-American. This is what you hear from Stalin. This is what you hear from Mussolini, what you hear from authoritarians, from Hitler, from all the authoritarian people who rationalized, in some cases genocide, based what was in the public interest." -- Joe Lockhart @ 7:11 p.m., January 29, 2020.

**************************************************

The president's defense team [Dershowitz] seems to be redefining the powers of the president, redefining them towards infinity." ... [truncated clip played] ... "If you look at what he says there it blows your mind. He says if a president is running for re-election because he thinks getting elected will help America, he can do anything, anything. And that redefines the presidency and America." -- John Berman @ 6:17 a.m., January 30, 2020.

****************************************************

I did not go to Harvard Law, but I did go to the University of Texas School of Law, where I studied criminal law and constitutional law, but never dreamed a legendary legal mind would set them both ablaze on the Senate floor. The Dershowitz Doctrine would make presidents immune from every criminal act, so long as they could plausibly claim they did it to boost their re-election effort. Campaign finance laws: out the window. Bribery statutes: gone. Extortion: no more. This is Donald Trump's fondest figurative dream: to be able to shoot someone on Fifth Avenue and get away with it." -- Paul Begala on CNN.com, January 29, 2020 @ 9:11 p.m.

Dershowitz alleges he never said a president could commit illegal acts if he thought it would help his reelection and his reelection was in the public interest. (DE [1], ¶ 8). And he alleges that CNN, through its employee commentators, distorted the meaning of what he said to the Senate in the coverage on CNN.com and the two broadcasts. (DE [1], ¶ 10, 11). Dershowitz contends that by omitting the phrase, "the only thing that would make a quid pro quo unlawful is if the quo were somehow illegal," CNN presented Dershowitz' comments in a misleading context, which enabled the commentators to (falsely) assert that Dershowitz believed a president could extract a quid pro quo for any reason, including an illegal reason, if he believed it would help his re-election. Dershowitz alleges that if the entire clip had been played, no panel guest would have been able to credibly make that statement. (DE [1], ¶ 9). Thus, Dershowitz argues, CNN presented an official proceeding in a misleading manner and the fair report privilege does not apply.

The Court agrees. CNN presented an abridgment of Dershowitz' answer to Senator Cruz' question. The abridgment is not accurate, to the extent that it omitted a crucial qualification: that an illegal motive for a quid pro quo would be corrupt. As a result, the commentators' statements – that Dershowitz believes a President can do anything, even commit crimes if it would help his re-election – are not based upon a fair and accurate summary of Dershowitz' statement to the Senate.

CNN argues that editors and publishers have great discretion to determine what information to publish. This is correct. But the qualified fair report privilege "merely means that the report of [official] proceedings must be correct." *Jamason* , 450 So. 2d at 1132 (quoting *Walsh v. Miami Herald Publishing Co.* , 80 So. 2d 669, 671

1366(Fla. 1955) ).*1366  CNN argues that Dershowitz' response to Senator Cruz' statement was ambiguous and that CNN was reasonable in its belief that Dershowitz argued "that presidents cannot be impeached for actions taken to win an election if the President believes his own victory would be in the public interest, regardless of the legality of those actions." (DE [17], p. 14). That is an argument that CNN may present to a jury. But because the broadcasts did not present a fair and accurate abridgment of Dershowitz' remarks, CNN cannot avail itself of the fair report privilege.

Finally, CNN argues that the media has no obligation to present additional information that would present a subject in a better light. This too is correct. *See Folta* , 2019 WL 1486776, at *5 (media has "the right to focus and color their report to capture and hold the readers' attention" provided the report is "substantially accurate"). Thus, in *Larreal v. Telemundo of Florida, LLC* , 489 F. Supp. 3d 1309 (S.D. Fla. 2020), the fair report privilege applied to a report that the plaintiff was arrested during a raid conducted as part of a long-term undercover narcotics investigation. The Telemundo report was one about the undercover raid and arrests. *Id.* The plaintiff sued Telemundo for defamation and alleged it omitted information that would have clarified that he was arrested on a traffic-related warrant. The court stated that "regardless of the charges against the other individuals, the fact that Larreal was arrested on a bench warrant alone does not rebut or undermine Telemundo's accurate reporting about the operation's arrests or change the gist of the story." *Id.* at *1322.

By contrast, the CNN broadcast segments set forth in Dershowitz' Complaint were focused specifically on Dershowitz' comments to the Senate and, as presented on air, changed the gist of what Dershowitz said. For the fair report privilege to apply a defendant must have "presented a fair and accurate report of the source documents." *Folta* , 2019 WL 1486776, at *6. The CNN broadcasts do not meet that standard.

B. Fact v. Opinion

CNN's next ground for dismissal is that the allegedly defamatory statements were non-actionable opinion. CNN argues that the statements at issue were made during commentary shows about the impeachment proceedings and were "rhetorical hyperbole" protected by the First Amendment. *See Horsley v. Rivera* , 292 F.3d 695, 701 (11th Cir. 2002) (holding non-literal, figurative language not defamatory). Thus, CNN argues that statements referring to Dershowitz' arguments as "un-American," that he was "redefining the powers of the President," that his position "blows your mind," and that his argument "is what you hear from Stalin ... what you hear from Mussolini, what you hear from authoritarians" are hyperbole for which there can be no liability.

Dershowitz agrees with CNN on the hyperbolic nature of the commentary and that no liability would attach to those kinds of statements. But he argues that the commentaries also contained untrue, defamatory factual comments – that Dershowitz said a President could do anything without liability (even commit crimes) if he thought it would help his reelection and was in the national public interest – that were contradicted by the full context of Dershowitz' answer to Senator Cruz' question. The Court concludes that the commentators' statements set forth in the Complaint were not pure opinion but instead were mixed expressions of opinion that could reasonably be construed as defamatory. *See Barnes v. Horan* , 841 So. 2d 472, 477 (Fla. 3rd DCA 2002)

1367(the court must determine whether an expression of opinion can also contain a defamatory *1367  meaning due to assertion of undisclosed acts).

A mixed expression of opinion is not constitutionally protected. *Madsen v. Buie* , 454 So. 2d 727, 729 (Fla. 1st DCA 1984). "[A] statement that although ostensibly in the form of an opinion 'implies the allegation of undisclosed defamatory facts as the basis for the opinion' *is* actionable." *Eastern Air Lines, Inc. v. Gellert* , 438 So. 2d 923, 927 (Fla. 3rd DCA 1983) *disapproved on other grounds* , *Ter Keurst v. Miami Elevator Co.* , 486 So. 2d 547 (Fla. 1986) (quoting Restatement (Second) of Torts § 566 (1977) ) (emphasis in original). Further, "where the speaker or writer neglects to provide the audience with an adequate factual foundation prior to engaging in the offending discourse, liability may arise." *Zambrano* , 484 So. 2d at 607. The Complaint alleges that CNN's broadcasts lacked the "adequate factual foundation" that would have prevented the commentators from mischaracterizing Dershowitz' argument. The Court concludes that the Complaint plausibly alleges that the comments made on CNN and CNN.com were defamatory statements of mixed opinion.

CNN argues that because the impeachment trial was widely covered by it and other media outlets, the underlying facts were "known to the audience" and, therefore, a finding of pure opinion may still be made. *Id.* at 606-07 ; *Rasmussen* , 946 So. 2d at 571. The court must consider numerous factors in determining whether a comment or editorial is based upon publicly disclosed facts. *Rasmussen* , 946 So.2d at 571. These include construing "the statement in its totality," considering "the context in which the statement was published," and accounting for "all of the circumstances surrounding the publication, including the medium by which it was disseminated and the audience to which it was published." *Id.* Although some of these factors are alleged in the Complaint or are available to the Court at the motion to dismiss stage, other factors relating to the context of the broadcasts and its audience are not before the Court. This requires a more fully developed record. At this stage, the Court concludes that Dershowitz' Complaint meets the plausibility standard for alleging a false statement of fact.

C. <u>Actual Malice</u>

CNN next moves to dismiss the Complaint for failure to plausibly allege the "actual malice" standard of fault applicable to public figures as required by *New York Times Co.* , 376 U.S. 254, 84 S.Ct. 710. The plausibility standard of *Iqbal* and *Twombly* applies to the actual malice standard in defamation proceedings. *See Michel* , 816 F.3d at 702. A public figure must, therefore, plead "facts giving rise to a reasonable inference that the defendant[ ] published the story knowing that it was false or with reckless disregard for whether it was false or not." *Id.* at 703. There must be some showing that the defendant intended "to avoid the truth." *Id.*

CNN argues that Dershowitz pleads only conclusory statements of actual malice and fails to "home to" the person(s) responsible for the alleged defamation. *New York Times Co.* , 376 U.S. at 287, 84 S.Ct. 710 (The state of mind required for actual malice must be "brought home" to the persons having responsibility for publishing the offending material). CNN also argues that it aired live Dershowitz' complete argument earlier in the day and, therefore, it is impossible for Dershowitz to plead actual malice with connection to the later showing of the ¹³⁶⁸ truncated clip.[6] *1368 Finally, CNN argues that Dershowitz' statement to the Senate was so ambiguous that any misinterpretation by CNN cannot be attributed to actual malice.

> [6] The Court will not (at this time) entertain CNN's arguments concerning Dershowitz' subsequent appearances on shows with Wolf Blitzer and Chris Cuomo as those matters are outside the four corners of the Complaint.

In deciding a motion to dismiss, the court must accept as true the plaintiff's well-pleaded facts and construe them in the light most favorable to the plaintiff. *Crawford's Auto Center, Inc. v. State Farm Mut. Auto. Ins. Co.* , 945 F.3d 1150 (11th Cir. 2019). Dershowitz alleges that, after the live broadcast, "CNN then went to work by assembling panels for programming throughout the day in which the hosts shared" only the truncated clip. (DE [1], ¶ 8). He alleges that CNN intentionally omitted the statement that a quid pro quo would be unlawful if the

quo were illegal in order to "fool its viewers" into believing that Dershowitz actually said that a President could commit illegal acts so long as he thought it would help his reelection and that his reelection was in the public interest. (*Id.* ). This was done, he alleges, "to falsely paint Professor Dershowitz as a constitutional scholar and intellectual who had lost his mind." (*Id.* ). He alleges that CNN knew for certain that he had prefaced his remarks with the qualifier that a quid pro quo could not include an illegal act because it aired the entire statement earlier in the day, but that CNN knowingly omitted that portion when it played the truncated clip "time and again." (*Id.* , ¶¶ 9, 10). He alleges that the truncated clip was created "intentionally and deliberately with knowledge and malice to facilitate its ability to falsely claim that plaintiff said the opposite of what he actually said." (*Id.* , ¶ 18). And, finally, Dershowitz alleges that commentators made their statements with knowledge or reckless disregard that they were false. (*Id.* , ¶ 17).

These allegations, for purposes of surviving the Motion to Dismiss, plausibly plead a factual basis from which "actual malice" can be inferred. The Complaint alleges that CNN knew its reports were false, it explains the reasons CNN and its employees knew the reports were false, it explains the nature of the alleged falsehoods, and it alleges who made the false statements.

To the extent that the Complaint does not identify with specificity the persons (other than the commentators) within the CNN organization who were responsible for the broadcast decisions, that is a matter for discovery. The Court does not accept CNN's argument that a public figure defamation plaintiff must identify and plead (before discovery) each responsible decision maker within a news organization. The claims in *New York Times Co.* , 376 U.S. 254, 84 S.Ct. 710, went to a jury trial but the plaintiff ultimately failed to establish that the persons responsible for publication of the offending advertisement acted with actual malice. *Id.* at 287, 84 S.Ct. 710. In a case involving a large news organization where the responsible decision makers may not be otherwise known, a plaintiff must be permitted to plead the facts that would plausibly establish actual malice without identifying a specific person. It is then the plaintiff's burden to conduct the discovery necessary to identify and, to be successful, present record evidence that those individuals acted with actual malice. *See, id.* ("[T]he evidence against the Times supports at most a finding of negligence ... and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice.")

CNN cites the district court's dismissal in *Mejia v. Telemundo Mid-Atl., LLC* , 440 F. Supp. 3d 495, 497 (D. Md. 2020), for support of its argument that Dershowitz was required to plead that a specific individual acted with actual malice. But *Mejia* is inapposite. That case involved a private figure whose punitive damages claim

<span>1369</span> required *1369 allegations that the defamer acted with actual malice. *Id.* at 499. The case was dismissed because the plaintiff failed to allege any facts that would establish the requisite fault (negligence). *Id.* at 501-502. The court's reference to actual malice, that the complaint contained "no factual allegations referring to the state of mind of the individual in charge of Defendant's banners," referred to the punitive damages claim.[7] *Id.* at 499, 502. *Mejia* has no bearing on the present case.

[7] In a later decision, the *Mejia* court granted leave to file a third amended complaint where the proposed pleading raised additional factual allegations sufficient to raise a plausible claim that the defendant acted negligently in allowing the false banner to be broadcast. The third amended complaint did not specify a particular individual. *Mejia v. Telemundo Mid-Atlantic LLC* , 2021 WL 594215, at *3 (D. Md. Feb. 16, 2021).

Next, the fact that CNN played Dershowitz' entire statement earlier in the day does not preclude Dershowitz from alleging that later broadcasts of the truncated clip (and the related commentary) were done with actual malice. Viewers who watched the earlier broadcasts may well have been able to put the truncated clip and the commentators' statements into context. But for those viewers who did not see the earlier broadcasts,

Dershowitz' Complaint about the later broadcasts at least reaches the required level of plausibility to sustain his defamation claim. The earlier broadcasts and their effect on the issue of actual malice may be an issue for a jury to consider, but they have no bearing on the sufficiency of the pleadings.

Finally, CNN argues that Dershowitz' answer to the Senator Cruz' question was so "extravagantly ambiguous" that Dershowitz cannot establish that CNN acted with actual malice in airing the clip or discussing his arguments. Citing *Time, Inc. v. Pape* , 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), CNN contends that its commentators' analysis of Dershowitz' argument, even if incorrect, cannot create an issue of actual malice.

In *Pape* , the newsmagazine Time published an article about a report issued by the federal Civil Rights Commission. The report detailed numerous incidents of police brutality, including an incident in Chicago that gave rise to a federal lawsuit. But the Time article did not specify that the facts about the Chicago incident were taken from a civil complaint, rather than from an independent finding of the Commission. A police officer named in the report sued Time for defamation, and the issue was whether omission of the word "allegedly" from the Time account was enough to establish actual malice. The trial court entered a directed verdict in favor of the defendant, but the court of appeals reversed. The author of the Time article testified at trial that the context of the report indicated to him that the Commission believed that the incident occurred as described. After reviewing the totality of the underlying report *and the testimony of the Time writer* , the Supreme Court concluded that "[t]o permit the malice issue to go to the jury because of the omission of a word like 'alleged,' despite the context of that word in the Commission Report and the external evidence of the Report's overall meaning, would be to impose a much stricter standard of liability on errors of interpretation or judgment than on error of fact." *Id.* at 290, 91 S.Ct. 633.

In the present case, the Court has before it only the allegations of the Complaint, which must be taken as true, and the substance of the broadcasts. Dershowitz has adequately pleaded actual malice to survive the Motion to Dismiss. Whether the evidence adduced will ultimately satisfy Dershowitz' burden of proving actual malice by 1370 clear and convincing evidence *1370 remains to be seen. But he has alleged enough to go forward.

IV. POLITICAL MALEVOLENCE

In a footnote, CNN argues that Dershowitz' "claims of disinterested political malevolence are insufficient" to establish actual malice. The Court agrees and, further, concludes that these allegations should be stricken as immaterial and impertinent. Fed. R. Civ. P. 12(f). In paragraph 14 of the Complaint, Dershowitz alleges:

> Professor Dershowitz was one of the most revered and celebrated legal minds of the past half century. His reputation relating to his expertise in criminal and constitutional matters was one that lawyers would only dream about attaining in their lifetimes. However, Professor Dershowitz appears to have made one mistake. He chose to defend the President of the United States and defend the U.S. Constitution at a moment in time where CNN has decided that doing so is not permitted. For this, CNN set out to punish him and destroy his credibility and reputation, and unfortunately, succeeded.

The Supreme Court has stated that "[a defendant's] motive in publishing a story ... cannot provide a sufficient basis for finding actual malice." *Harte-Hanks Communications., Inc. v. Connaughton* , 491 U.S. 657, 665, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Indeed, a defamation claim cannot rest on the argument that "erroneous communications were motivated by differences in political opinions. Doing so would run afoul of the Supreme Court's landmark ruling in *New York Times Co. v. Sullivan* . *See* 376 U.S. at 271–72, 84 S.Ct. 710 (noting that errors are inevitable when there is free debate and that they too must be protected to give breathing room to those exercising their freedom of expression)." *Arpaio v. Robillard* , 459 F. Supp. 3d 62, 66 (D.D.C. 2020).

Dershowitz v. Cable News Network, Inc.     541 F. Supp. 3d 1354 (S.D. Fla. 2021)

Paragraph 14 of Dershowitz' Complaint alleges that CNN was motivated by political animus. As Judge Lamberth noted in *Arpaio* , "Allegations of 'leftist enmity' cannot trump the guarantees of the First Amendment." *Id.* "Striking a pleading or a portion thereof is a drastic remedy to be resorted to only when required for the purposes of justice." *Sanchez v. Selective Ins. Co. of the Southeast* , 2019 WL 79282, at \*2 (S.D. Fla. Jan. 2, 2019) (quotation omitted). Nevertheless, the allegations in paragraph 14 are immaterial to the claim and are an impertinent salvo that do not belong in this case. Rule 12(f)(1), Fed. R. Civ. P., gives the Court the power to strike such matters "on its own." *Sanchez* , at \*3 (*sua sponte* striking plaintiff's request for interest). The Court will exercise that power and strike paragraph 14 from the Complaint.

<u>V. CONCLUSION</u>

For the reasons set forth above, the Court finds that Dershowitz has plausibly alleged facts sufficient to withstand CNN's Motion to Dismiss. The Court is in no way ruling on the merits of the case but concludes merely that Dershowitz has satisfied the pleading requirements of Rule 8(a)(2), Federal Rules of Civil Procedure. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss (DE [17]) is **DENIED** . It is further **ORDERED** that paragraph 14 of Plaintiff's Complaint is **STRICKEN** pursuant to Fed. R. Civ. P. 12(f)(1).

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 24th day of May 2021.

 casetext

EXHIBIT 3

Page 1

UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT
CASE NO.:  21-10480

JEROME CORSI,

   Appellant,

v.

NEWSMAX MEDIA, INC., et al.,

   Appellees.

_____/

TRANSCRIPTION OF AUDIO RECORDING
OF ORAL ARGUMENT

(Pages 1 to 41)

DATE:   Thursday, May 19, 2022

LOCATION:  12th Floor Courtroom
James Lawrence King Federal Justice
99 Northeast Fourth Street
Miami, Florida  33132

Reported By:  Gail Hmielewski
Court Stenographer

---

Page 2

```
 1    APPEARANCES:
 2
 3    Appeared for the Appellant:
 4    MELISSA L. ISAAK, ESQUIRE
      ISAAK LAW FIRM
 5    P.O. Box 4894
      Montgomery, Alabama  36103
 6    334-262-8200 Phone
      334-819-4072 Fax
 7    isaaklaw@gmail.com
 8
 9    Appeared for Appellees:
10    MARK A. LERNER, ESQUIRE
      DUANE MORRIS, LLP
11    230 Park Avenue, Suite 1130
      New York, New York  10169
12    212-404-8714 Phone
      212-818-9606 Fax
13    malerner@duanemorris.com
14       - and -
15    JULIAN ANTONY JACKSON-FANNIN, ESQUIRE
      DUANE MORRIS, LLP
16    201 South Biscayne Boulevard, Suite 3400
      Miami, Florida  33131
17    305-960-2253 Phone
      305-402-0544 Fax
18    jjfannin@duanemorris.com
19
20
21
22
23
24
25
```

---

Page 3

```
 1           INDEX OF PROCEEDINGS
 2
 3                         PAGE
 4
     PROCEEDINGS                4
 5
     CERTIFICATE OF REPORTER          41
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1           PROCEEDINGS
 2       THE COURT:  Oh, Corsi vs. Newsmax Media.  Oh,
 3    boy.
 4       Good morning, Ms. Isaak.
 5       MS. ISAAK:  Good morning, Judge.
 6       THE COURT:  You can begin.
 7       MS. ISAAK:  May it please the Court.  My name
 8    is Melissa Isaak and I represent Jerome Corsi in
 9    this matter.
10       And we're arguing two main points here today,
11    Your Honors, is that the case was properly
12    dismissed via a 12(b)(6) motion by the District
13    Court; and also the fee provision, the fee
14    distribution, rather, ruling by the District Court
15    was improper because the Florida's anti-SLAPP
16    statute does not apply in federal court; and also,
17    which we don't - we say it does not, but, if it
18    did, the statute was not complied with by the lower
19    court.
20       THE COURT:  It seems to me the actual malice
21    requirement is a tough one for you here.
22       MS. ISAAK:  He is a public figure and I think
23    the actual malice standard is a hurdle for any
24    public figure in a defamation action, however --
25       THE COURT:  Yeah, and I just - it just doesn't
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida  954-755-6401

Page 5

1  seem to me that you've alleged enough to plausibly
2  allege actual malice.
3      I mean, you know, the fact that the Newsmax
4  defendants and Fairbanks knew Corsi doesn't know -
5  doesn't mean they know his character for
6  truthfulness was beyond reproach or anything like
7  that.  The fact that Newsmax has sold Corsi's books
8  doesn't imply that they entertained serious doubts
9  about the allegation that he plagiarized a
10  reporting.
11      You know, just - I look at these allegations,
12  I'm looking for where the actual malice is alleged
13  and I'm not seeing it.
14      MS. ISAAK:  I understand, sir.  The
15  defendants, they called Mr. Corsi's allegations a
16  conspiracy theory, but Mr. Corsi would offer that
17  those who know Roger Stone would know that that is
18  not a conspiracy theory.
19      We allege the complaint was properly pled
20  under Rule 8, and also there was an affidavit
21  submitted by Mr. Corsi where he specifies that
22  these people know him, the defendants know him and
23  they know that the allegations made were untrue;
24  and not only are they untrue, they're provably
25  false.

Page 6

1      Mr. Corsi is not a liar.  Mr. Corsi --
2      THE COURT:  Just the fact that they know him
3  means that they know that what he says was untrue?
4      MS. ISAAK:  The fact that they intimately know
5  Mr. Corsi, that they have worked with Mr. Corsi.  I
6  understand that Newsmax sold his books, however,
7  Mr. Corsi did allege and he pled that these are,
8  these things are provably false.
9      And they called him - a liar, a
10  plagiarist, having committed fraud - these are all
11  things that can destroy and discredit him in his
12  trade and profession, which would be defamation
13  per se.
14      THE COURT:  Yeah, but I thought -- I mean,
15  maybe I'm wrong about this, I thought that this was
16  on a program where it was a sort of point
17  counterpoint and so there was an opportunity to
18  respond to these allegations real time provided by
19  the station.
20      MS. ISAAK:  Well, Your Honors, Mr. Klayman,
21  Mr. Corsi's attorney, was invited on Newsmax
22  America Talks Live.  Well, he was more lured into
23  the program.  Now, counsel for defendants say that
24  this was a debate.  Mr. Klayman did not know that
25  he was entering into a debate.  In fact, the issues

Page 7

1  that Mr. Klayman thought were to be discussed were
2  the public issues related to the Mueller
3  investigation and the results involving Roger
4  Stone's alleged crimes of perjury, witness
5  tampering, and obstruction of justice.  Mr. Klayman
6  was not even made aware that Ms. Fairbanks was
7  going to be on the show until directly before the
8  show went live.
9      So I understand the way it was presented, that
10  this was a debate where they had an opportunity to
11  respond, but Mr. Klayman was not given notice that
12  this was going to be the issue of the show.
13      THE COURT:  Yeah, I mean, I understand.  I
14  mean, that means sounds like a legitimate gripe
15  against Newsmax if you just want to like write them
16  a letter or something.  I guess my point is it just
17  seems - it seems hard to tag Newsmax with the
18  statements of, I guess it's --
19      MALE VOICE:  Fairbanks.
20      THE COURT:  -- Fairbanks, given that Newsmax's
21  role was to host these people and give them an
22  opportunity to respond.
23      MS. ISAAK:  Yes, sir, and Mr. Corsi, again, we
24  do believe that he's properly pled under Rule 8,
25  and also, if they were allowed to proceed to

Page 8

1  discovery, Mr. Corsi believes that he would have
2  been able to prove the allegations that he did make
3  in his complaint.
4      Again, this is not -- Mr. Corsi is intimately
5  familiar with Roger Stone, and the fact that
6  Mr. Stone worked in concert with others, as joint
7  tortfeasors to defame Dr. Corsi, was something that
8  he believes that he could prove had the case
9  advanced to the discovery phase.
10      THE COURT:  I'll tell you, the thing that I
11  was more interested in here was attorney's fee
12  issue, because I have doubts about whether the
13  anti-SLAPP statute applies.
14      MS. ISAAK:  Yes, sir.  We contend the
15  anti-SLAPP statute does not apply, well, for two
16  reasons.  First, in this case, as it applied the
17  Florida statute, which of course is just a garden
18  variety fee-shifting statute, however, the Florida
19  statute states with specificity that for fees to be
20  assessed, a hearing must be scheduled.  It says
21  shall - it doesn't say may, it says shall.
22      THE COURT:  Well, there has to be a violation
23  of the statute, the Florida statute, and here's the
24  concern I have.  If the statute doesn't apply in
25  federal court, then --

2 (Pages 5 to 8)

Page 9

1    MS. ISAAK: We don't think the statute
2    applies.
3    THE COURT: -- then there can't be an
4    attorney's fee based on it, can there?
5    MS. ISAAK: No. No, sir, you're absolutely
6    correct.
7    THE COURT: Based on its violation.
8    MS. ISAAK: Yes, sir, it's a violation. I
9    think that --
10   THE COURT: No, I'm saying there can't be an
11   attorney's fee award based on its violation if it
12   doesn't apply in federal court.
13   MS. ISAAK: That's correct. That's correct,
14   yes.
15   THE COURT: And so in order to figure out
16   whether it applies, I mean, we would compare the
17   language of Rule 11, right --
18   MS. ISAAK: Correct.
19   THE COURT: -- with the language, the fee
20   language in the anti-SLAPP statute, which basically
21   says that fees would be awarded, reasonable fees
22   would be awarded if, "A", the suit is without merit
23   and, "B", it's primarily filed because someone
24   exercised the First Amendment right, right?
25   MS. ISAAK: Yes, that's correct. That's

Page 10

1    correct.
2    THE COURT: Well, if we're looking under - so
3    if we're looking under Rule 11, then, so the
4    question is whether that captures everything that's
5    in there, and I guess the question then is, under
6    Rule 11, it would have to be without merit and/or
7    filed for an improper reason, right.
8    MS. ISAAK: Yes, ma'am. Yes, ma'am.
9    THE COURT: Okay. So the question to me,
10   anyway, is, if it's primarily filed because
11   somebody has exercised a First Amendment right,
12   does that mean it's filed for an improper reason?
13   MS. ISAAK: Yes, ma'am, it would, and that
14   would directly fall under Rule 11. The anti-SLAPP
15   statutes covers means to dispose of cases, whether
16   it be through a 12(b)(6), through summary judgment.
17   It also covers how to recoup attorney's fees --
18   I'm sorry. The rules allow, under Rule 11, where
19   you could recoup attorney's fees, so they're
20   saying, they're calling it "merless" - meritless,
21   rather --
22   THE COURT: They really aren't the same thing,
23   though, are they? So Rule 11, in saying that
24   there's an improper purpose, is not the same thing
25   as filing a meritless lawsuit about someone's free

Page 11

1    speech exercise.
2    MS. ISAAK: But the Florida anti-SLAPP statute
3    says that the suit was filed for the purpose of
4    silencing free speech or infringing on a First
5    Amendment right, so therefore it would be an
6    improper purpose under Rule 11.
7    THE COURT: Well, I don't know, I just -- I
8    guess the problem with the Rule 11 argument, in my
9    mind, is that we've said over and over and over
10   again, and it's just common sense with the law,
11   that if states want to have fee-shifting statutes,
12   then they can have fee-shifting statutes for the
13   causes of action that state law creates and those
14   fee-shifting statutes would apply in federal court.
15   So why isn't the way to see this as just a
16   fee-shifting statute that, if you file a meritless
17   defamation lawsuit, then you have to pay the other
18   side's fees?
19   MS. ISAAK: Because it's more of a procedural
20   rule. So the Florida fee-shifting statute gives a
21   procedure to recoup on attorney's fees. The
22   Florida federal - I'm sorry, the federal rules
23   already have that. Rule 11 already allows for
24   that.
25   THE COURT: Okay. So, I mean, we've said in

Page 12

1    like seven different cases that statutes for the
2    recovery of attorney's fees apply in federal court
3    as just a general matter, so, I mean, what would
4    make this conflict with Rule 11 specifically if
5    just a normal state fee-shifting statute doesn't
6    conflict?
7    MS. ISAAK: Well, I think if we look at most
8    of the states' anti-SLAPP statutes, they deal with
9    shifting burdens, they deal with heightened
10   pleading requirements. Florida's being just a
11   garden variety anti-SLAPP statute really is just a
12   mirror image of the Rule 11.
13   THE COURT: Isn't the answer that this
14   attorney's fee provision is tied to a pleading
15   standard as opposed to, well, if you win a claim
16   for - under the deceptive trade practices act,
17   you're entitled to attorney's fees, the prevailing
18   party's entitled to attorney's fees?
19   MS. ISAAK: Yes, we would offer that Rule 11
20   always applies to pleading standards. I think if a
21   pleading is considered --
22   THE COURT: I'm not even sure you understand
23   my --
24   THE COURT: Let me ask a question to follow
25   up --

3 (Pages 9 to 12)

Page 13

1      MS. ISAAK:  Okay.
2      THE COURT:  -- on Judge Pryor's question.  So
3  he said, you know, isn't - doesn't this statute
4  impose a pleading standard, and he's talking about
5  the part of the statute that says, you know,
6  merits, right?
7      The question is, does that part of the statute
8  impose a pleading standard or is it just if you
9  lose, then you pay the fees?  Is there a pleading
10  standard associated with that phrase?
11      MS. ISAAK:  The heightened standard I think
12  that's imposed in the Florida Statute goes along
13  with the -- There's an evidentiary burden that has
14  to be set.
15      THE COURT:  Okay.  When you say the heightened
16  standard, where are you getting the idea that the
17  Florida Anti-SLAPP Statute imposes a heightened
18  standard?
19      MS. ISAAK:  Because the Florida Anti-SLAPP
20  Statute says that, prior to any fees being
21  assessed, or prior to a case being dismissed under
22  the Florida Anti-SLAPP Statute, that it must be set
23  for a hearing.  If it has to be set for a hearing,
24  the parties are required to produce - to submit
25  evidence on their respective positions.  Now --

Page 14

1      THE COURT:  There's a conflict in what the -
2  the Florida courts even say this - in how the
3  statute works, right?
4      MS. ISAAK:  Yes.
5      THE COURT:  On the one hand, at least one DCA
6  has said it does create a heightened pleading
7  standard, right?
8      MS. ISAAK:  Correct.
9      THE COURT:  The other says it doesn't.
10      MS. ISAAK:  That's correct.
11      THE COURT:  If it does, it seems to me, then
12  it conflicts with the federal rules and it doesn't
13  apply.
14      MS. ISAAK:  Yes, sir.
15      THE COURT:  And if it doesn't create a
16  heightened pleading standard, then it seems to me
17  it's procedural and it also doesn't apply.
18      MS. ISAAK:  Well, yes, sir --
19      THE COURT:  But either way, it seems to me the
20  statute just doesn't apply in federal court.
21      MS. ISAAK:  Yes, sir, that's what we
22  submitted, it does not apply.  Between, we have
23  Rule 8 --
24      THE COURT:  May I ask a follow-up question on
25  that?  I'm not sure I understand that.  So if it

Page 15

1  is - if it doesn't impose a heightened pleading
2  standard, why isn't it just a fee-shifting statute?
3      MS. ISAAK:  Well, there is case law that says
4  it's just a fee-shifting standard.  It says that.
5      THE COURT:  Okay.  Well, if it's just a
6  fee-shifting statute as part of the tort of
7  defamation in Florida law, why isn't that something
8  that applies in federal court?
9      MS. ISAAK:  Because we're dealing I think
10  specifically with anti-SLAPP as it pertains to this
11  issue, so I --
12      THE COURT:  Okay.
13      THE COURT:  Well, I mean, here's the thing.
14  This is the text of the statute - the court shall
15  award the prevailing party reasonable attorney's
16  fees and costs incurred in connection with a claim
17  that an action was filed in violation of this
18  section --
19      MS. ISAAK:  Yes, sir.
20      THE COURT:  -- right?
21      MS. ISAAK:  Yes, sir.
22      THE COURT:  And the section says - sets out,
23  basically, a procedural requirement, right --
24      MS. ISAAK:  Yes, sir.
25      THE COURT:  -- and says you can't file it if

Page 16

1  the suit's without merit and if it was filed
2  because someone exercised their free speech rights.
3      MS. ISAAK:  That's correct, so the court would
4  have to make a finding that that's specifically why
5  that was --
6      THE COURT:  Filed.
7      MS. ISAAK:  -- filed, right, which conflicts
8  with Rule 8.  The Rule 8 pleading requirements
9  don't have that level of a standard.  And also, for
10  the Rule 11, Rule 11 covers all of these things
11  already.
12      THE COURT:  Okay, I think we understand your
13  argument.
14      THE COURT:  Can you just address the issue of
15  certification?  I know we sent you some questions
16  to address, one is whether we should certify this
17  question to the Florida Supreme Court.  We've
18  already talked about the split in the intermediate
19  appellate courts.  I just want to get your position
20  on that.
21      MS. ISAAK:  It's a quick no.  I don't think
22  that it needs to be certified to the Florida
23  Supreme Court, because the federal rules are clear
24  that there are other avenues for recovery and there
25  are other avenues for dismissal of cases.

4  (Pages 13 to 16)

1      So I think, based upon the federal case law,
2   and based upon the procedure that's in place for
3   the federal court, I don't think this is
4   necessarily an issue for the state court to decide.
5   This -- Go ahead.
6      THE COURT:  Okay.  Mr. Lerner.
7      MR. LERNER:  Thank you, Your Honors.  May it
8   please the Court, my name is Mark Lerner and I'm
9   here with my colleague, Julian Jackson-Fannin, and
10  we represent the appellees, Newsmax Media, Inc.,
11  Christopher Ruddy, John Bachman, and John Cardillo.
12     This case is a public figure's groundless
13  attempt to punish a media outlet for engaging in
14  classic First Amendment protected activity because
15  he didn't like what a guest, and only the guest,
16  said about him on a live television broadcast.
17     As it did in Michel v. NYP Holdings, and
18  numerous other cases, this Court should recognize
19  the powerful interest in ensuring that speech is
20  not burdened by the defense of groundless
21  litigation and affirm the decision of the District
22  Court in its entirety.
23     The facts here, which I think you're familiar
24  and discussed a little bit before --
25     THE COURT:  We know the facts --

1      MR. LERNER:  Okay.
2      THE COURT:  -- and if you want to address
3   whether the complaint plausibly alleges actual
4   malice, you certainly can.  I don't think it does.
5      The thing I'm most interested, at least - I
6   can only speak for myself - is the attorney's fees
7   issue, and I have serious doubts about whether the
8   anti-SLAPP statute applies in federal court.  And
9   it seems to me that if it doesn't, then a suit
10  filed in violation of it can't give rise to an
11  attorney's fee award.
12     MR. LERNER:  I'm certainly happy to address
13  the actual malice issue, although we agree,
14  obviously, with Your Honor and with some of the
15  skepticism addressed by the panel.  So if there
16  aren't questions on the actual malice, I am happy
17  to move on to the questions that seem to be of more
18  interest in terms of the application of anti-SLAPP
19  in this case.
20     THE COURT:  Let me ask you, before you get
21  into the legal merits of the anti-SLAPP, do you
22  really want attorney's fees in this case?  Do you
23  want this case to continue with additional
24  litigation?  I mean, is that, I mean --
25     MR. LERNER:  Well, certainly, as I said

1   before, Newsmax is hoping and the individual
2   defendants who didn't utter any of the allegedly
3   defamatory statements don't want to be burdened by
4   ongoing litigation.  On the other hand, they do
5   believe it makes sense to take advantage and send
6   the message that this kind of lawsuit chills the
7   speech that they should be protected from.
8      THE COURT:  Okay.
9      MR. LERNER:  So, yeah, I mean, it makes sense
10  here that there is this fee-shifting that the
11  Florida legislature has determined is important in
12  this kind of case and that they --
13     THE COURT:  So the question, I guess --  The
14  reason I ask that sort of practical question is
15  that one of our options here would be to certify
16  this question to the Florida Supreme Court, which
17  would, if we were to do that, would continue the
18  litigation, right?  I mean, you would just - it
19  would just be another court, come back to us, we'd
20  rule again, go back to the District Court, all to
21  collect some kind of attorney's fees ward against
22  Mr. Corsi.  Do you want to do that?
23     MR. LERNER:  Well, there is a principal at
24  stake here and we agree, frankly, what little we do
25  agree with with Ms. Isaak in terms of her position

1   that this doesn't need to be --
2      THE COURT:  That it doesn't need to be
3   certified.
4      MR. LERNER:  Right, it doesn't need to be
5   certified, exactly.  So there should be no
6   continuation of litigation on that front, because
7   all that was applied here, frankly, was
8   Rule 12(b)(6).
9      THE COURT:  We appreciate your confidence in
10  the 11th Circuit.  Thank you.
11     MR. LERNER:  Well, whether it's my confidence
12  in the 11th Circuit or a query as to whether or not
13  there really is a material issue of law that needs
14  to be addressed in order for the 11th Circuit to
15  rule on this issue, in this particular
16  circumstance, the case doesn't turn on the answer
17  to a material state law question because Florida
18  law doesn't directly impose, nor did the defendants
19  seek, a higher pleading standard here.
20     The court only ever cited application of
21  Rule 12(b)(6) and the federal pleading standards
22  under Iqbal and Twombly.  There was no burden
23  shifting undertaken, there was no heightened
24  standard applied, nor is, actually, one called for
25  in the language of the statute.

5 (Pages 17 to 20)

Page 21

1    The language of the statute simply prohibits a
2  lawsuit brought without merit and it provides for a
3  person or entity may move the court for an order
4  dismissing the action or granting final judgment in
5  favor of that person.  The person or entity may
6  file a motion for summary judgment together with
7  supplemental affidavit.
8    I mean, this just repeats that, okay, the
9  procedure that's available to you under the federal
10  rules is available to you here.  You can file a
11  motion to dismiss, you can file a motion for
12  summary judgment.  It doesn't stay discovery like
13  some of the other cases do, anti-SLAPP laws do, it
14  doesn't impose --
15    THE COURT:  But then you would agree that
16  there's a split in authority among the DCAs about
17  what it does and what it doesn't do, wouldn't you?
18    MR. LERNER:  It's not a hundred percent clear
19  to me, honestly, Your Honor, in terms of what it
20  does or doesn't do as far as a heightened pleading
21  standard under the federal rules, right?
22    There's a question in terms of burden shifting
23  and how you determine whether or not the case at
24  issue falls under anti-SLAPP because there is a
25  statement of the case being related to an

Page 22

1  abridgement of First Amendment rights.  And in
2  Gundel, there was a question of going outside the
3  pleadings in order to determine whether or not
4  there was a First Amendment issue.
5    As far as the determination of whether the
6  case has merit, I don't think that there's really
7  any indication that Lam and Gundel are clearly in
8  opposition.  That question ultimately wasn't
9  answered and again here certainly there was no
10  heightened pleading standard applied.  It was a
11  simple 12(b)(6) plausibility standard that was
12  applied.
13    And as Your Honor pointed out, Judge Pryor
14  said, it doesn't rise to that level.  There's just
15  no plausibility on the notion that a claim of
16  actual --
17    THE COURT:  I agree, I agree that if,
18  obviously, if there's no actual malice under the
19  regular pleading standards, that's it, but for
20  purposes of our decision on the attorney's fees
21  issue, I mean, there is a split in authority as to
22  whether there's a heightened pleading standard, is
23  there not?
24    MR. LERNER:  Again, I think the question of
25  the heightened pleading standard goes to the burden

Page 23

1  as far as establishing that the case falls under
2  anti-SLAPP.  That's the most you could say as far
3  as where Gundel and Lam might be in opposition.
4  So, but, again, it's clear on its face here there
5  wasn't any dispute in this case.  There was no
6  heightened pleading standard, there was no --
7    THE COURT:  But if it doesn't fall under
8  anti-SLAPP you wouldn't be entitled to your fees
9  even in -- I mean, right?
10    MR. LERNER:  Yes, if it didn't fall under
11  anti-SLAPP, but, again, this is clear on its face
12  that the allegations of the complaint stated that
13  the basis for the defamation claim was a broadcast
14  from a media outlet that hosted a live public
15  forum.
16    There was nowhere else you had to look, there
17  was no heightened pleading, there was no
18  burden-shifting to say, well, plaintiffs met this
19  burden initially, now let's go to, sorry,
20  defendants met this burden initially, now let's go
21  to plaintiff to determine if they can establish
22  that in fact it doesn't fall under anti-SLAPP,
23  because I think the dispute in-between Gundel and
24  Lam in terms of is there that shifting, does the
25  plaintiff have to come forward now with evidence to

Page 24

1  show that it doesn't fall under anti-SLAPP.
2    None of that is an issue here.  It is clear on
3  the face of the pleadings that this falls under
4  anti-SLAPP because it relates to the exercise of
5  First Amendment activity.  And because it falls
6  under anti-SLAPP, it is, as Judge Brasher said, a
7  garden variety, and then, frankly, Ms. Isaak said,
8  a garden variety fee-shifting.
9    And the court's ruling I think in Showen v.
10  Presti (phonetic) really should be controlling.
11  There the 11th Circuit held that Rule 11 addresses
12  punitive sanctions, not fee-shifting, and it
13  answers a different question from what Georgia
14  statute was there.  And the Georgia statute at
15  issue provided for compensatory damages for
16  frivolous suits, including attorney's fees, which
17  is much closer to Rule 11, right.  There's a
18  frivolousness question built into the Georgia law
19  and this court still applied that Georgia law,
20  saying that a state's law attorney's fee provision
21  are unequivocally substantive and then there's no
22  question that they should apply.
23    And this has been supported by the Supreme
24  Court numerous times as well, it says that Rule 11
25  sanctions are not fee-shifting provisions.

6 (Pages 21 to 24)

Page 25

1 Sanctions under Rule 11 aren't tied to the outcome
2 of litigation. The relevant inquiry is whether a
3 particular filing was well-founded, so the rule
4 only calls for an appropriate sanction and
5 attorney's fees aren't even mandated.
6     In Business Guides, the Supreme Court said
7 that the main objective of Rule 11 is not to reward
8 parties who are victimized by litigation, it's to
9 deter baseless filings and curb abuses and it
10 imposes an objective standard on those who sign
11 papers. Rule 11 authorizes sanctions to prevent
12 repeated abuses, which may or may not be monetary
13 sanctions.
14     Florida, in contrast, enacted a policy to
15 prevent anti-SLAPP suits that would, among other
16 things, chill free speech, whether or not they're
17 frivolous. Meritless doesn't necessarily equal
18 frivolous. Under Florida 768.295 --
19     THE COURT: But there's something, right,
20 there's something -- So I guess what you're
21 saying, because I asked your friend on the other
22 side this question, is you have to have without
23 merit and primarily because the party exercised its
24 First Amendment rights, right?
25     MR. LERNER: Yes.

Page 26

1     THE COURT: And so your friend on the other
2 side says the part that says primarily - it was
3 filed primarily because the party exercised its
4 First Amendment rights is necessarily the
5 equivalent of saying that it was filed for an
6 improper purpose. And so your position I guess has
7 to be it's not, is that right?
8     MR. LERNER: That's right. I mean, you know,
9 there may be some incidental overlap, as the courts
10 have talked about, that where a rule is procedural
11 if it affects a substantive right and here, you
12 know, it's that substantive right that the Florida
13 courts have said you can be free from a suit of
14 defamation that impinges free speech rights and
15 that should result in fee-shifting if it's without
16 merit.
17     THE COURT: I guess, you know, know, a lot of, I
18 think even your Rule 11 argument goes to the
19 definition of the phrase without merit, right? I
20 mean, you read without merit to say you lose the
21 lawsuit, that's a lawsuit without merit. It seems
22 like maybe you could also read it to be something a
23 little bit different to impose some kind of
24 heightened standard.
25     I guess, how do we answer -- It seems like we

Page 27

1 have to answer that question before we get to the
2 Rule 11 issue, right? We have to decide what the
3 standard is before we can decide whether this
4 conflicts with Rule 11?
5     MR. LERNER: Well, again, I mean, you know, in
6 order to determine whether the fee-shifting
7 applies, right, as Your Honors have pointed out,
8 you do have to determine whether anti-SLAPP
9 applies, and for it to apply it has to be an action
10 that was primarily filed because a person or entity
11 exercised the constitutional right of free speech,
12 but that doesn't implicate a heightened pleading
13 standard under the federal rules or Iqbal/Twombly.
14     THE COURT: Your argument is that it also
15 isn't about whether it's an improper purpose, it's
16 just really an inquiry into was this a lawsuit
17 about someone speaking?
18     MR. LERNER: Correct, right, that the focus of
19 Rule 11 in terms of curbing abuses in the court and
20 protecting the integrity of the court and making
21 sure that pleadings that are filed are signed
22 knowing that there are, you know, a factual and
23 legal basis that aren't frivolous is protecting the
24 integrity of the system, whereas the Florida
25 Statute, as Your Honor pointed out, is simply a

Page 28

1 question of is this what this case is about.
2     THE COURT: But it's got to be more than just
3 the fact that the case involves First Amendment
4 issues, right? Because it says it was filed
5 primarily because of that. I mean, so there has to
6 be - it has to mean something more, otherwise it
7 would just say and the case involved the exercise
8 of First Amendment rights, right?
9     MR. LERNER: Well, primarily, I mean, there's
10 a standard of, you know, is the primary basis for
11 this the exercise of First Amendment rights.
12     THE COURT: When I read that, I wondered
13 whether that meant you might have joinder of a lot
14 of claims.
15     MR. LERNER: Exactly, and it's --
16     THE COURT: And you might have some weird like
17 consumer fraud or, you know, allegation or
18 something like that, but the thrust of the suit was
19 about someone just as a "but for" kind of matter
20 was about them exercising speech rights.
21     MR. LERNER: That's exactly right.
22     THE COURT: I mean, that could certainly be
23 the case. You know, that's certainly one
24 reasonable way of looking at it, but could it also
25 reasonably be the case that it means something

7 (Pages 25 to 28)

Page 29

1    else; that, you know, that it was filed sort of in
2    retaliation, which is what your friend on the other
3    side says, which is kind of different, right?
4    Because then, then, if that's the meaning of it,
5    then it's assuming an improper purpose, right?
6        MR. LERNER: I mean, again, it depends on your
7    notion of what an improper purpose is, which gets
8    you to the question of Rule 11.
9        THE COURT: I mean, you can't -- I think it
10   would be an improper purpose to file a suit without
11   merit because you're trying to get back at someone
12   for saying things you don't like. Why would that
13   not be an improper purpose?
14       MR. LERNER: It may be an improper purpose
15   but, again, not necessarily under the rubric of
16   Rule 11, which I think is aimed at a different kind
17   of relief. And, again, Rule 11 is kind of - the
18   sanctions that it provides for are prospective
19   sanctions. They're not retrospective
20   compensatory --
21       THE COURT: Even so, I mean, obviously, it's
22   just, talking off the top of my head, it seems to
23   me like a court that finds that there is a
24   meritless suit that's been filed and it's been
25   filed solely because the person is trying to get

Page 30

1    back at someone and inflict costs on someone for
2    exercising their First Amendment rights in a way
3    that they didn't like, that that would be an
4    improper purpose. I mean, I can't imagine - it's
5    hard for me to imagine that a court would find that
6    that was a proper purpose. Do you disagree?
7        MR. LERNER: Yeah, I understand your position,
8    Your Honor, that it may be an improper purpose, but
9    that doesn't necessarily mean that the fee-shifting
10   under anti-SLAPP, and if this is a garden variety
11   fee-shifting, as Judge Brasher is suggesting, that
12   this court regularly recognizes, then it still
13   applies in federal court. I mean, it is a garden
14   variety fee-shifting, because, unlike Rule 11,
15   again, which is prospective --
16       THE COURT: I'm sorry, but that's kind of a
17   different issue, right? I mean, you're, I mean,
18   maybe you're saying it's not a different issue,
19   you're saying it doesn't even matter. Let's assume
20   it was for an improper purpose, it still doesn't
21   cross over completely with Rule 11, because in
22   Rule 11 we're trying to deter this kind of bad
23   conduct, whereas with this anti-SLAPP statute,
24   although I think that's also trying to deter this
25   kind of bad conduct, we're trying to compensate

Page 31

1    someone for having to have to deal with this,
2    although I think under Rule 11 you'd find that,
3    even though it's to deter the conduct, that
4    oftentimes the punishments that will be imposed
5    would be imposed in such a way that you're
6    essentially making whole the party that had the
7    improper purpose inflicted upon them.
8        MR. LERNER: I seem out of time, but I'm happy
9    to --
10       THE COURT: You may continue to speak, and
11   I've got a question for you.
12       MR. LERNER: I hear everything and acknowledge
13   all of that, but I think that there's still
14   daylight there; that, yes, it may be for an
15   improper purpose, and it's possible that Rule 11
16   award in certain circumstances may have the effect
17   incidentally of compensating somebody, but that
18   still doesn't mean that it's, you know, the central
19   question is the same and the compensation for
20   having been burdened with this kind of suit, even,
21   you know, a suit for an improper purpose, is a
22   different question. The compensation question
23   is --
24       THE COURT: Let me ask you this.
25       MR. LERNER: -- different than a deterrence

Page 32

1    question.
2        THE COURT: Let me ask you, is there anything
3    in the text of this statute that requires a court
4    to determine the purpose or motive behind why a
5    lawsuit was filed?
6        MR. LERNER: Well, only if Your Honors read --
7        THE COURT: Well, let's just read the words
8    and -- I mean, is there anything in the words that
9    says that a court has to determine the purpose
10   behind a lawsuit to apply the anti-SLAPP?
11       MR. LERNER: The word purpose is not in there,
12   right. The question is whether it was filed
13   against another person or entity without merit and
14   primarily because such person has exercised the
15   constitutional right of free speech.
16       THE COURT: Yeah, and it's really whether that
17   is - that primarily "because of" language is just
18   "but for" kind of stuff, right, or whether it's
19   imposing some kind of retaliatory standard, right?
20   And it's just -- The question I was going to ask
21   you about that is are you aware of any Florida case
22   law that addresses that question?
23       MR. LERNER: I am not, Your Honor.
24       THE COURT: Okay. Is that another reason why
25   we ought to certify it?

8 (Pages 29 to 32)

Page 33

1     MR. LERNER: I don't think so, Your Honor.
2  I appreciate your time this morning,
3  Your Honors.
4     THE COURT: How much money are you trying to
5  get in attorney's fees?
6     MR. LERNER: Well, that's the subject of a
7  separate appeal, actually, already.
8     THE COURT: Okay.
9     MR. LERNER: I mean, right now there is a
10  judgment for $50,000.
11     THE COURT: Fifty thousand dollars?
12     MR. LERNER: I mean, approximately. It's a
13  little bit less than that.
14     THE COURT: Are you sure you want to go to the
15  Florida Supreme Court, come back here, maybe go
16  back to the District Court, do all that just to try
17  to get $50,000?
18     MR. LERNER: Well, again, no, we don't want to
19  go to the Supreme Court to do all that because
20  we're hoping Your Honors will affirm the decision
21  in its entirety as we've requested today.
22     THE COURT: All right.
23     MR. LERNER: We thank you for your time.
24     THE COURT: Ms. Isaak, you've got five
25  minutes.

Page 34

1     MS. ISAAK: Yes, sir. In the Carbone case, I
2  think the court properly referenced the Abbas case,
3  and in the Carbone case the court said that Federal
4  Rules of Civil Procedure 12 and 56 answer the same
5  question about the circumstance under which a court
6  must dismiss a case before trial.
7     The Abbas case talks about an order granting a
8  special motion to dismiss under the anti-SLAPP act.
9  The court may grant attorney's fees and costs to
10  the prevailing party. The act does not purport to
11  make attorney's fees available to parties who
12  obtained dismissal by other means, such as Federal
13  Rule 12(b)(6), such as what we have in this case.
14  Therefore we conclude that the case should be
15  dismissed under 12(b)(6), attorney's fees under the
16  anti-SLAPP statute are not available to the
17  defendants in this case. It's our position that
18  anti-SLAPP does not apply, period - does not apply.
19     And as far as the argument, Your Honors, that
20  the statute says that it was filed primarily
21  because of someone exercising the First Amendment
22  rights, this case was filed because Jerome Corsi
23  was in fact injured by statements that he could
24  prove to be false. This case was not filed, nor
25  was there a finding that this case was filed,

Page 35

1  primarily for the purpose of infringing on
2  someone's First Amendment rights.
3     THE COURT: Now, don't say purpose; it's
4  because of, right?
5     MS. ISAAK: Because of, yes.
6     THE COURT: Because of someone's exercise of
7  First Amendment rights --
8     MS. ISAAK: Yes.
9     THE COURT: -- right?
10     MS. ISAAK: Yes.
11     THE COURT: I mean, you filed it because of
12  the exercise of First Amendment rights, right?
13     MS. ISAAK: Filed it because he was damaged by
14  a provable - provably false, because the
15  statements --
16     THE COURT: Well, you filed it because of
17  speech, someone's speech on a news show on TV.
18     THE COURT: I mean, defamation is speech.
19     MS. ISAAK: Defamation is speech, but
20  defamatory statements are not protected speech and
21  that is why this was filed. There was nothing --
22     THE COURT: If you find that the claim of
23  defamation is without merit, then you're left with
24  it being speech and it is protected, right?
25     MS. ISAAK: Well, I understand that, sir, but

Page 36

1  if this - we believe if this case was allowed to go
2  to the discovery phase, perhaps we would have had a
3  different result.
4     THE COURT: I understand that.
5     MS. ISAAK: But I don't think that there can
6  be --
7     THE COURT: Let's assume for just the sake of
8  the argument you're going to lose on whether there
9  was a plausible allegation of actual malice.
10     MS. ISAAK: Okay.
11     THE COURT: Okay?
12     MS. ISAAK: Okay.
13     THE COURT: Then where are we?
14     MS. ISAAK: Well, if we lose that there was a
15  plausible allegation of actual malice, then I guess
16  we're stuck with the 12(b)(6) dismissal. However,
17  the attorney's fees provision in the District Court
18  was awarded pursuant to the Florida anti-SLAPP
19  statute, does not apply in this case, it does not
20  apply in federal court, and that is our position
21  there.
22     I think the federal courts have been clear,
23  even though there's been a split in the circuit,
24  there's - that it does not, it does not apply in
25  federal court. And we go to the case, the Georgia

9  (Pages 33 to 36)

Page 37

```
 1   case, the Carbone case, Georgia's anti-SLAPP
 2   statute --
 3        THE COURT:  I mean, none of these cases, not
 4   Carbone, none of them have to do with an award of
 5   attorney's fees.
 6        MS. ISAAK:  I understand that, but it has to
 7   do with the applicability of the anti-SLAPP --
 8        THE COURT:  We apply state laws that provide
 9   for an award of attorney's fees for claims that
10   arise under state law --
11        MS. ISAAK:  Yes, sir.
12        THE COURT:  -- or fail under state law all the
13   time, right?
14        MS. ISAAK:  Yes, sir.
15        THE COURT:  So why wasn't the District Court
16   to award --  Why was the District Court wrong to
17   award the fees here?
18        MS. ISAAK:  Because they awarded the fees
19   pursuant to the anti-SLAPP statute, the Florida
20   anti-SLAPP statute, and that's why this is wrong.
21        Not only --  Of course, we contend that the
22   anti-SLAPP statute has no place in federal court,
23   it should not be applied in federal court, but,
24   even if it was, they did not follow their own
25   statute, which says it required a hearing.  So
```

Page 38

```
 1   there is a higher evidentiary burden for the
 2   Florida SLAPP statute that is not - that does not
 3   apply in federal court.
 4        THE COURT:  And where do you get the idea --
 5   I mean, where in the text of the statute does the
 6   idea that there's a higher evidentiary burden come
 7   from?
 8        MS. ISAAK:  Because upon the filing of a
 9   dismissal under the Florida anti-SLAPP statute, and
10   before the assessment of attorney's fees, a hearing
11   must be scheduled.  It says "shall".  That is not
12   something that is optional, so --
13        THE COURT:  Yeah, but, I mean, but wouldn't
14   you have to have a hearing to assess the attorney's
15   fees?  I mean, couldn't you apply 12(b)(6) for a
16   motion for summary judgment, Rule 56, whatever, to
17   the issue of merit?
18        Of course you have to have a hearing to assess
19   attorney's fees.  I mean, you can't, you know, just
20   magic come out of the air, you have to determine
21   what the attorney's fees are, that kind of stuff.
22   Why does that impose --  The idea of having a
23   hearing, why does that say that there's a
24   heightened evidentiary standard on the issue of
25   whether there's merit or not?
```

Page 39

```
 1        MS. ISAAK:  I guess because the statute --
 2   The statute, there has to be a showing that there
 3   is a violation of the anti-SLAPP statute, that this
 4   was filed primarily for - because someone exercised
 5   free speech.
 6        And I understand what you're saying, Judge, I
 7   do.  I think there's a difference here that there
 8   has to be a showing of that, but also --
 9        THE COURT:  It seems to me it's just
10   uncontested that this is a speech case.
11        MS. ISAAK:  Well, I would say it's --
12        THE COURT:  I mean, the suit's about
13   someone --
14        MS. ISAAK:  A defamation?
15        THE COURT:  -- speaking, right?  It's a
16   defamation suit, that's all it's about, and if it's
17   without merit, if the claim of defamation is
18   without merit, it was filed primarily because
19   someone exercised their right to speak.
20        MS. ISAAK:  I understand what you're saying,
21   Judge, and Dr. Corsi was in fact damaged by
22   provably false statements and it's his position
23   that they are defamatory and at the very least he
24   should have been allowed to go to the discovery
25   phase and I don't even think there was an
```

Page 40

```
 1   opportunity to amend pleadings.
 2        THE COURT:  Okay.  I think we understand your
 3   case, MS. ISAAK.  And you've gone over, but you've
 4   been answering questions from us, so we're going to
 5   move to our last case.
 6        MS. ISAAK:  Okay.
 7        THE COURT:  Thank you.
 8        (The audio concluded.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

10 (Pages 37 to 40)

Page 41

```
 1              C E R T I F I C A T E
 2
 3
 4     STATE OF FLORIDA
 5     COUNTY OF MIAMI-DADE
 6
 7        I, Gail Hmielewski, Court Stenographer, do hereby
 8     certify that the foregoing transcript, Pages 1 to and
 9     including 40, is a true and correct transcript of an
10     audio recording that was provided to me of court
11     proceedings.
12
13        The audio recording was provided to me by Larry E.
14     Klayman, Esquire, and transcribed to the best of my
15     ability.
16
17        Dated this 2nd day of June, 2022.
18
19
20
21     _____
22     Gail Hmielewski, Court Stenographer
23
24
25
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

**A**

Abbas 34:2,7
ability 41:15
able 8:2
abridgement 22:1
absolutely 9:5
abuses 25:9,12 27:19
acknowledge 31:12
act 12:16 34:8 34:10
action 4:24 11:13 15:17 21:4 27:9
activity 17:14 24:5
actual 4:20,23 5:2,12 18:3,13 18:16 22:16,18 36:9,15
additional 18:23
address 16:14 16:16 18:2,12
addressed 18:15 20:14
addresses 24:11 32:22
advanced 8:9
advantage 19:5
affidavit 5:20 21:7
affirm 17:21 33:20
agree 18:13 19:24,25 21:15 22:17,17
ahead 17:5
aimed 29:16
air 38:20
al 1:7
Alabama 2:5
allegation 5:9 28:17 36:9,15
allegations 5:11

5:15,23 6:18 8:2 23:12
allege 5:2,19 6:7
alleged 5:1,12 7:4
allegedly 19:2
alleges 18:3
allow 10:18
allowed 7:25 36:1 39:24
allows 11:23
amend 40:1
Amendment 9:24 10:11 11:5 17:14 22:1,4 24:5 25:24 26:4 28:3,8,11 30:2 34:21 35:2,7 35:12
America 6:22
and/or 10:6
answer 12:13 20:16 26:25 27:1 34:4
answered 22:9
answering 40:4
answers 24:13
anti-SLAPP 4:15 8:13,15 9:20 10:14 11:2 12:8,11 13:17,19,22 15:10 18:8,18 18:21 21:13,24 23:2,8,11,22 24:1,4,6 25:15 27:8 30:10,23 32:10 34:8,16 34:18 36:18 37:1,7,19,20 37:22 38:9 39:3
ANTONY 2:15
anyway 10:10
appeal 33:7
APPEALS 1:1

**APPEARAN...**

2:1
Appeared 2:3,9
Appellant 1:5 2:3
appellate 16:19
appellees 1:8 2:9 17:10
applicability 37:7
application 18:18 20:20
applied 8:16 20:7,24 22:10 22:12 24:19 37:23
applies 8:13 9:2 9:16 12:20 15:8 18:8 27:7 27:9 30:13
apply 4:16 8:15 8:24 9:12 11:14 12:2 14:13,17,20,22 24:22 27:9 32:10 34:18,18 36:19,20,24 37:8 38:3,15
appreciate 20:9 33:2
appropriate 25:4
approximately 33:12
arguing 4:10
argument 1:13 11:8 16:13 26:18 27:14 34:19 36:8
asked 25:21
assess 38:14,18
assessed 8:20 13:21
assessment 38:10
associated 13:10
assume 30:19

36:7
assuming 29:5
attempt 17:13
attorney 6:21
attorney's 8:11 9:4,11 10:17 10:19 11:21 12:2,14,17,18 15:15 18:6,11 18:22 19:21 22:20 24:16,20 25:5 33:5 34:9 34:11,15 36:17 37:5,9 38:10 38:14,19,21
audio 1:12 40:8 41:10,13
authority 21:16 22:21
authorizes 25:11
available 21:9 21:10 34:11,16
Avenue 2:11
avenues 16:24 16:25
award 9:11 15:15 18:11 31:16 37:4,9 37:16,17
awarded 9:21,22 36:18 37:18
aware 7:6 32:21

**B**

B 9:23
Bachman 17:11
back 19:19,20 29:11 30:1 33:15,16
bad 30:22,25
based 9:4,7,11 17:1,2
baseless 25:9
basically 9:20 15:23
basis 23:13 27:23 28:10

believe 7:24 19:5 36:1
believes 8:1,8
best 41:14
beyond 5:6
Biscayne 2:16
bit 17:24 26:23 33:13
books 5:7 6:6
Boulevard 2:16
Box 2:5
boy 4:3
Brasher 24:6 30:11
broadcast 17:16 23:13
brought 21:2
built 24:18
burden 13:13 20:22 21:22 22:25 23:19,20 38:1,6
burden-shifting 23:18
burdened 17:20 19:3 31:20
burdens 12:9
Business 25:6

**C**

C 41:1,1
called 5:15 6:9 20:24
calling 10:20
calls 25:4
captures 10:4
Carbone 34:1,3 37:1,4
Cardillo 17:11
case 1:2 4:11 8:8 8:16 13:21 15:3 17:1,1 18:19,22,23 19:12 20:16 21:23,25 22:6 23:1,5 28:1,3,7 28:23,25 32:21

34:1,2,3,6,7,13
34:14,17,22,24
34:25 36:1,19
36:25 37:1,1
39:10 40:3,5
**cases** 10:15 12:1
16:25 17:18
21:13 37:3
**causes** 11:13
**central** 31:18
**certain** 31:16
**certainly** 18:4
18:12,25 22:9
28:22,23
**CERTIFICATE**
3:5
**certification**
16:15
**certified** 16:22
20:3,5
**certify** 16:16
19:15 32:25
41:8
**character** 5:5
**chill** 25:16
**chills** 19:6
**Christopher**
17:11
**circuit** 1:1 20:10
20:12,14 24:11
36:23
**circumstance**
20:16 34:5
**circumstances**
31:16
**cited** 20:20
**Civil** 34:4
**claim** 12:15
15:16 22:15
23:13 35:22
39:17
**claims** 28:14
37:9
**classic** 17:14
**clear** 16:23
21:18 23:4,11
24:2 36:22

**clearly** 22:7
**closer** 24:17
**colleague** 17:9
**collect** 19:21
**come** 19:19
23:25 33:15
38:6,20
**committed** 6:10
**common** 11:10
**compare** 9:16
**compensate**
30:25
**compensating**
31:17
**compensation**
31:19,22
**compensatory**
24:15 29:20
**complaint** 5:19
8:3 18:3 23:12
**completely**
30:21
**complied** 4:18
**concern** 8:24
**concert** 8:6
**conclude** 34:14
**concluded** 40:8
**conduct** 30:23
30:25 31:3
**confidence** 20:9
20:11
**conflict** 12:4,6
14:1
**conflicts** 14:12
16:7 27:4
**connection**
15:16
**considered**
12:21
**conspiracy** 5:16
5:18
**constitutional**
27:11 32:15
**consumer** 28:17
**contend** 8:14
37:21
**continuation**

20:6
**continue** 18:23
19:17 31:10
**contrast** 25:14
**controlling**
24:10
**correct** 9:6,13
9:13,18,25
10:1 14:8,10
16:3 27:18
41:9
**Corsi** 1:4 4:2,8
5:4,16,21 6:1,1
6:5,5,7 7:23
8:1,4,7 19:22
34:22 39:21
**Corsi's** 5:7,15
6:21
**costs** 15:16 30:1
34:9
**counsel** 6:23
**counterpoint**
6:17
**COUNTY** 41:5
**course** 8:17
37:21 38:18
**court** 1:1,24 4:2
4:6,7,13,14,16
4:19,20,25 6:2
6:14 7:13,20
8:10,22,25 9:3
9:7,10,12,15
9:19 10:2,9,22
11:7,14,25
12:2,13,22,24
13:2,15 14:1,5
14:9,11,15,19
14:20,24 15:5
15:8,12,13,14
15:20,22,25
16:3,6,12,14
16:17,23 17:3
17:4,6,8,18,22
17:25 18:2,8
18:20 19:8,13
19:16,19,20
20:2,9,20 21:3

21:15 22:17
23:7 24:19,24
25:6,19 26:1
26:17 27:14,19
27:20 28:2,12
28:16,22 29:9
29:21,23 30:5
30:12,13,16
31:10,24 32:2
32:3,7,9,16,24
33:4,8,11,14
33:15,16,19,22
33:24 34:2,3,5
34:9 35:3,6,9
35:11,16,18,22
36:4,7,11,13
36:17,20,25
37:3,8,12,15
37:15,16,22,23
38:3,4,13 39:9
39:12,15 40:2
40:7 41:7,10
41:22
**court's** 24:9
**Courtroom** 1:17
**courts** 14:2
16:19 26:9,13
36:22
**covers** 10:15,17
16:10
**create** 14:6,15
**creates** 11:13
**crimes** 7:4
**cross** 30:21
**curb** 25:9
**curbing** 27:19

———————
**D**
———————
**damaged** 35:13
39:21
**damages** 24:15
**DATE** 1:16
**Dated** 41:17
**day** 41:17
**daylight** 31:14
**DCA** 14:5
**DCAs** 21:16

**deal** 12:8,9 31:1
**dealing** 15:9
**debate** 6:24,25
7:10
**deceptive** 12:16
**decide** 17:4 27:2
27:3
**decision** 17:21
22:20 33:20
**defamation** 4:24
6:12 11:17
15:7 23:13
26:14 35:18,19
35:23 39:14,16
39:17
**defamatory** 19:3
35:20 39:23
**defame** 8:7
**defendants** 5:4
5:15,22 6:23
19:2 20:18
23:20 34:17
**defense** 17:20
**definition** 26:19
**depends** 29:6
**destroy** 6:11
**deter** 25:9 30:22
30:24 31:3
**determination**
22:5
**determine** 21:23
22:3 23:21
27:6,8 32:4,9
38:20
**determined**
19:11
**deterrence**
31:25
**difference** 39:7
**different** 12:1
24:13 26:23
29:3,16 30:17
30:18 31:22,25
36:3
**directly** 7:7
10:14 20:18
**disagree** 30:6

**discovery** 8:1,9
21:12 36:2
39:24
**discredit** 6:11
**discussed** 7:1
17:24
**dismiss** 21:11
34:6,8
**dismissal** 16:25
34:12 36:16
38:9
**dismissed** 4:12
13:21 34:15
**dismissing** 21:4
**dispose** 10:15
**dispute** 23:5,23
**distribution**
4:14
**District** 4:12,14
17:21 19:20
33:16 36:17
37:15,16
**dollars** 33:11
**doubts** 5:8 8:12
18:7
**Dr** 8:7 39:21
**DUANE** 2:10,15

**E**

**E** 41:1,1,13
**effect** 31:16
**either** 14:19
**ELEVENTH**
1:1
**enacted** 25:14
**engaging** 17:13
**ensuring** 17:19
**entering** 6:25
**entertained** 5:8
**entirety** 17:22
33:21
**entitled** 12:17
12:18 23:8
**entity** 21:3,5
27:10 32:13
**equal** 25:17
**equivalent** 26:5

**Esquire** 2:4,10
2:15 41:14
**essentially** 31:6
**establish** 23:21
**establishing**
23:1
**et** 1:7
**evidence** 13:25
23:25
**evidentiary**
13:13 38:1,6
38:24
**exactly** 20:5
28:15,21
**exercise** 11:1
24:4 28:7,11
35:6,12
**exercised** 9:24
10:11 16:2
25:23 26:3
27:11 32:14
39:4,19
**exercising** 28:20
30:2 34:21

**F**

**F** 41:1
**face** 23:4,11
24:3
**fact** 5:3,7 6:2,4
6:25 8:5 23:22
28:3 34:23
39:21
**facts** 17:23,25
**factual** 27:22
**fail** 37:12
**Fairbanks** 5:4
7:6,19,20
**fall** 10:14 23:7
23:10,22 24:1
**falls** 21:24 23:1
24:3,5
**false** 5:25 6:8
34:24 35:14
39:22
**familiar** 8:5
17:23

**far** 21:20 22:5
23:1,2 34:19
**favor** 21:5
**Fax** 2:6,12,17
**federal** 1:18
4:16 8:25 9:12
11:14,22,22
12:2 14:12,20
15:8 16:23
17:1,3 18:8
20:21 21:9,21
27:13 30:13
34:3,12 36:20
36:22,25 37:22
37:23 38:3
**fee** 4:13,13 8:11
9:4,11,19
12:14 18:11
24:20
**fee-shifting** 8:18
11:11,12,14,16
11:20 12:5
15:2,4,6 19:10
24:8,12,25
26:15 27:6
30:9,11,14
**fees** 8:19 9:21,21
10:17,19 11:18
11:21 12:2,17
12:18 13:9,20
15:16 18:6,22
19:21 22:20
23:8 24:16
25:5 33:5 34:9
34:11,15 36:17
37:5,9,17,18
38:10,15,19,21
**Fifty** 33:11
**figure** 4:22,24
9:15
**figure's** 17:12
**file** 11:16 15:25
21:6,10,11
29:10
**filed** 9:23 10:7
10:10,12 11:3
15:17 16:1,6,7

18:10 26:3,5
27:10,21 28:4
29:1,24,25
32:5,12 34:20
34:22,24,25
35:11,13,16,21
39:4,18
**filing** 10:25 25:3
38:8
**filings** 25:9
**final** 21:4
**find** 30:5 31:2
35:22
**finding** 16:4
34:25
**finds** 29:23
**FIRM** 2:4
**First** 8:16 9:24
10:11 11:4
17:14 22:1,4
24:5 25:24
26:4 28:3,8,11
30:2 34:21
35:2,7,12
**five** 33:24
**Floor** 1:17
**Florida** 1:19
2:16 8:17,18
8:23 11:2,20
11:22 13:12,17
13:19,22 14:2
15:7 16:17,22
19:11,16 20:17
25:14,18 26:12
27:24 32:21
33:15 36:18
37:19 38:2,9
41:4
**Florida's** 4:15
12:10
**focus** 27:18
**follow** 12:24
37:24
**follow-up** 14:24
**foregoing** 41:8
**forum** 23:15
**forward** 23:25

**Fourth** 1:18
**frankly** 19:24
20:7 24:7
**fraud** 6:10 28:17
**free** 10:25 11:4
16:2 25:16
26:13,14 27:11
32:15 39:5
**friend** 25:21
26:1 29:2
**frivolous** 24:16
25:17,18 27:23
**frivolousness**
24:18
**front** 20:6

**G**

**Gail** 1:24 41:7
41:22
**garden** 8:17
12:11 24:7,8
30:10,13
**general** 12:3
**Georgia** 24:13
24:14,18,19
36:25
**Georgia's** 37:1
**getting** 13:16
**give** 7:21 18:10
**given** 7:11,20
**gives** 11:20
**go** 17:5 19:20
23:19,20 33:14
33:15,19 36:1
36:25 39:24
**goes** 13:12 22:25
26:18
**going** 7:7,12
22:2 32:20
36:8 40:4
**Good** 4:4,5
**grant** 34:9
**granting** 21:4
34:7
**gripe** 7:14
**groundless**
17:12,20

**guess** 7:16,18
  10:5 11:8
  19:13 25:20
  26:6,17,25
  36:15 39:1
**guest** 17:15,15
**Guides** 25:6
**Gundel** 22:2,7
  23:3,23

**H**

**hand** 14:5 19:4
**happy** 18:12,16
  31:8
**hard** 7:17 30:5
**head** 29:22
**hear** 31:12
**hearing** 8:20
  13:23,23 37:25
  38:10,14,18,23
**heightened** 12:9
  13:11,15,17
  14:6,16 15:1
  20:23 21:20
  22:10,22,25
  23:6,17 26:24
  27:12 38:24
**held** 24:11
**higher** 20:19
  38:1,6
**Hmielewski** 1:24
  41:7,22
**Holdings** 17:17
**honestly** 21:19
**Honor** 18:14
  21:19 22:13
  27:25 30:8
  32:23 33:1
**Honors** 4:11
  6:20 17:7 27:7
  32:6 33:3,20
  34:19
**hoping** 19:1
  33:20
**host** 7:21
**hosted** 23:14
**hundred** 21:18

**hurdle** 4:23

**I**

**idea** 13:16 38:4
  38:6,22
**image** 12:12
**imagine** 30:4,5
**impinges** 26:14
**implicate** 27:12
**imply** 5:8
**important** 19:11
**impose** 13:4,8
  15:1 20:18
  21:14 26:23
  38:22
**imposed** 13:12
  31:4,5
**imposes** 13:17
  25:10
**imposing** 32:19
**improper** 4:15
  10:7,12,24
  11:6 26:6
  27:15 29:5,7
  29:10,13,14
  30:4,8,20 31:7
  31:15,21
**in-between**
  23:23
**incidental** 26:9
**incidentally**
  31:17
**including** 24:16
  41:9
**incurred** 15:16
**INDEX** 3:1
**indication** 22:7
**individual** 19:1
**inflict** 30:1
**inflicted** 31:7
**infringing** 11:4
  35:1
**initially** 23:19
  23:20
**injured** 34:23
**inquiry** 25:2
  27:16

**integrity** 27:20
  27:24
**interest** 17:19
  18:18
**interested** 8:11
  18:5
**intermediate**
  16:18
**intimately** 6:4
  8:4
**investigation** 7:3
**invited** 6:21
**involved** 28:7
**involves** 28:3
**involving** 7:3
**Iqbal** 20:22
**Iqbal/Twombly**
  27:13
**Isaak** 2:4,4 4:4,5
  4:7,8,22 5:14
  6:4,20 7:23
  8:14 9:1,5,8,13
  9:18,25 10:8
  10:13 11:2,19
  12:7,19 13:1
  13:11,19 14:4
  14:8,10,14,18
  14:21 15:3,9
  15:19,21,24
  16:3,7,21
  19:25 24:7
  33:24 34:1
  35:5,8,10,13
  35:19,25 36:5
  36:10,12,14
  37:6,11,14,18
  38:8 39:1,11
  39:14,20 40:3
  40:6
**isaaklaw@gm...**
  2:7
**issue** 7:12 8:12
  15:11 16:14
  17:4 18:7,13
  20:13,15 21:24
  22:4,21 24:2
  24:15 27:2

  30:17,18 38:17
  38:24
**issues** 6:25 7:2
  28:4

**J**

**Jackson-Fannin**
  2:15 17:9
**James** 1:18
**Jerome** 1:4 4:8
  34:22
**jjfannin@dua...**
  2:18
**John** 17:11,11
**joinder** 28:13
**joint** 8:6
**Judge** 4:5 13:2
  22:13 24:6
  30:11 39:6,21
**judgment** 10:16
  21:4,6,12
  33:10 38:16
**Julian** 2:15 17:9
**June** 41:17
**justice** 1:18 7:5

**K**

**kind** 19:6,12,21
  26:23 28:19
  29:3,16,17
  30:16,22,25
  31:20 32:18,19
  38:21
**King** 1:18
**Klayman** 6:20
  6:24 7:1,5,11
  41:14
**knew** 5:4
**know** 5:3,4,5,11
  5:17,17,22,22
  5:23 6:2,3,4,24
  11:7 13:3,5
  16:15 17:25
  26:8,12,17
  27:5,22 28:10
  28:17,23 29:1
  31:18,21 38:19

**knowing** 27:22

**L**

**L** 2:4
**Lam** 22:7 23:3
  23:24
**language** 9:17
  9:19,20 20:25
  21:1 32:17
**Larry** 41:13
**law** 2:4 11:10,13
  15:3,7 17:1
  20:13,17,18
  24:18,19,20
  32:22 37:10,12
**Lawrence** 1:18
**laws** 21:13 37:8
**lawsuit** 10:25
  11:17 19:6
  21:2 26:21,21
  27:16 32:5,10
**left** 35:23
**legal** 18:21
  27:23
**legislature** 19:11
**legitimate** 7:14
**Lerner** 2:10
  17:6,7,8 18:1
  18:12,25 19:9
  19:23 20:4,11
  21:18 22:24
  23:10 25:25
  26:8 27:5,18
  28:9,15,21
  29:6,14 30:7
  31:8,12,25
  32:6,11,23
  33:1,6,9,12,18
  33:23
**let's** 23:19,20
  30:19 32:7
  36:7
**letter** 7:16
**level** 16:9 22:14
**liar** 6:1,9
**litigation** 17:21
  18:24 19:4,18

20:6 25:2,8
**little** 17:24 19:24
  26:23 33:13
**live** 6:22 7:8
  17:16 23:14
**LLP** 2:10,15
**LOCATION**
  1:17
**look** 5:11 12:7
  23:16
**looking** 5:12
  10:2,3 28:24
**lose** 13:9 26:20
  36:8,14
**lot** 26:17 28:13
**lower** 4:18
**lured** 6:22

**M**
**ma'am** 10:8,8,13
**magic** 38:20
**main** 4:10 25:7
**making** 27:20
  31:6
**MALE** 7:19
**malerner@du...**
  2:13
**malice** 4:20,23
  5:2,12 18:4,13
  18:16 22:18
  36:9,15
**mandated** 25:5
**Mark** 2:10 17:8
**material** 20:13
  20:17
**matter** 4:9 12:3
  28:19 30:19
**mean** 5:3,5 6:14
  7:13,14 9:16
  10:12 11:25
  12:3 15:13
  18:24,24 19:9
  19:18 21:8
  22:21 23:9
  26:8,20 27:5
  28:5,6,9,22
  29:6,9,21 30:4

30:9,13,17,17
  31:18 32:8
  33:9,12 35:11
  35:18 37:3
  38:5,13,15,19
  39:12
**meaning** 29:4
**means** 6:3 7:14
  10:15 28:25
  34:12
**meant** 28:13
**media** 1:7 4:2
  17:10,13 23:14
**Melissa** 2:4 4:8
**meriless** 10:20
**merit** 9:22 10:6
  16:1 21:2 22:6
  25:23 26:16,19
  26:20,21 29:11
  32:13 35:23
  38:17,25 39:17
  39:18
**meritless** 10:20
  10:25 11:16
  25:17 29:24
**merits** 13:6
  18:21
**message** 19:6
**met** 23:18,20
**Miami** 1:19 2:16
**MIAMI-DADE**
  41:5
**Michel** 17:17
**mind** 11:9
**minutes** 33:25
**mirror** 12:12
**monetary** 25:12
**money** 33:4
**Montgomery**
  2:5
**morning** 4:4,5
  33:2
**MORRIS** 2:10
  2:15
**motion** 4:12
  21:6,11,11
  34:8 38:16

**motive** 32:4
**move** 18:17 21:3
  40:5
**Mueller** 7:2

**N**
**name** 4:7 17:8
**necessarily** 17:4
  25:17 26:4
  29:15 30:9
**need** 20:1,2,4
**needs** 16:22
  20:13
**New** 2:11,11
**news** 35:17
**Newsmax** 1:7
  4:2 5:3,7 6:6
  6:21 7:15,17
  17:10 19:1
**Newsmax's** 7:20
**normal** 12:5
**Northeast** 1:18
**notice** 7:11
**notion** 22:15
  29:7
**numerous** 17:18
  24:24
**NYP** 17:17

**O**
**objective** 25:7
  25:10
**obstruction** 7:5
**obtained** 34:12
**obviously** 18:14
  22:18 29:21
**offer** 5:16 12:19
**oftentimes** 31:4
**Oh** 4:2,2
**okay** 10:9 11:25
  13:1,15 15:5
  15:12 16:12
  17:6 18:1 19:8
  21:8 32:24
  33:8 36:10,11
  36:12 40:2,6
**ongoing** 19:4

**opportunity**
  6:17 7:10,22
  40:1
**opposed** 12:15
**opposition** 22:8
  23:3
**optional** 38:12
**options** 19:15
**ORAL** 1:13
**order** 9:15 20:14
  21:3 22:3 27:6
  34:7
**ought** 32:25
**outcome** 25:1
**outlet** 17:13
  23:14
**outside** 22:2
**overlap** 26:9

**P**
**P.O** 2:5
**PAGE** 3:3
**Pages** 1:15 41:8
**panel** 18:15
**papers** 25:11
**Park** 2:11
**part** 13:5,7 15:6
  26:2
**particular** 20:15
  25:3
**parties** 13:24
  25:8 34:11
**party** 15:15
  25:23 26:3
  31:6 34:10
**party's** 12:18
**pay** 11:17 13:9
**people** 5:22 7:21
**percent** 21:18
**period** 34:18
**perjury** 7:4
**person** 21:3,5,5
  27:10 29:25
  32:13,14
**pertains** 15:10
**phase** 8:9 36:2
  39:25

**Phone** 2:6,12,17
**phonetic** 24:10
**phrase** 13:10
  26:19
**place** 17:2 37:22
**plagiarist** 6:10
**plagiarized** 5:9
**plaintiff** 23:21
  23:25
**plaintiffs** 23:18
**plausibility**
  22:11,15
**plausible** 36:9
  36:15
**plausibly** 5:1
  18:3
**pleading** 12:10
  12:14,20,21
  13:4,8,9 14:6
  14:16 15:1
  16:8 20:19,21
  21:20 22:10,19
  22:22,25 23:6
  23:17 27:12
**pleadings** 22:3
  24:3 27:21
  40:1
**please** 4:7 17:8
**pled** 5:19 6:7
  7:24
**point** 6:16 7:16
**pointed** 22:13
  27:7,25
**points** 4:10
**policy** 25:14
**position** 16:19
  19:25 26:6
  30:7 34:17
  36:20 39:22
**positions** 13:25
**possible** 31:15
**powerful** 17:19
**practical** 19:14
**practices** 12:16
**presented** 7:9
**Presti** 24:10
**prevailing** 12:17

15:15 34:10
**prevent** 25:11
  25:15
**primarily** 9:23
  10:10 25:23
  26:2,3 27:10
  28:5,9 32:14
  32:17 34:20
  35:1 39:4,18
**primary** 28:10
**principal** 19:23
**prior** 13:20,21
**problem** 11:8
**procedural**
  11:19 14:17
  15:23 26:10
**procedure** 11:21
  17:2 21:9 34:4
**proceed** 7:25
**proceedings** 3:1
  3:4 4:1 41:11
**produce** 13:24
**profession** 6:12
**program** 6:16
  6:23
**prohibits** 21:1
**proper** 30:6
**properly** 4:11
  5:19 7:24 34:2
**prospective**
  29:18 30:15
**protected** 17:14
  19:7 35:20,24
**protecting** 27:20
  27:23
**provable** 35:14
**provably** 5:24
  6:8 35:14
  39:22
**prove** 8:2,8
  34:24
**provide** 37:8
**provided** 6:18
  24:15 41:10,13
**provides** 21:2
  29:18
**provision** 4:13

12:14 24:20
  36:17
**provisions** 24:25
**Pryor** 22:13
**Pryor's** 13:2
**public** 4:22,24
  7:2 17:12
  23:14
**punish** 17:13
**punishments**
  31:4
**punitive** 24:12
**purport** 34:10
**purpose** 10:24
  11:3,6 26:6
  27:15 29:5,7
  29:10,13,14
  30:4,6,8,20
  31:7,15,21
  32:4,9,11 35:1
  35:3
**purposes** 22:20
**pursuant** 36:18
  37:19

---
**Q**

**query** 20:12
**question** 10:4,5
  10:9 12:24
  13:2,7 14:24
  16:17 19:13,14
  19:16 20:17
  21:22 22:2,8
  22:24 24:13,18
  24:22 25:22
  27:1 28:1 29:8
  31:11,19,22,22
  32:1,12,20,22
  34:5
**questions** 16:15
  18:16,17 40:4
**quick** 16:21

---
**R**

**R** 41:1
**read** 26:20,22
  28:12 32:6,7

**real** 6:18
**really** 10:22
  12:11 18:22
  20:13 22:6
  24:10 27:16
  32:16
**reason** 10:7,12
  19:14 32:24
**reasonable** 9:21
  15:15 28:24
**reasonably**
  28:25
**reasons** 8:16
**recognize** 17:18
**recognizes** 30:12
**recording** 1:12
  41:10,13
**recoup** 10:17,19
  11:21
**recovery** 12:2
  16:24
**referenced** 34:2
**regular** 22:19
**regularly** 30:12
**related** 7:2
  21:25
**relates** 24:4
**relevant** 25:2
**relief** 29:17
**repeated** 25:12
**repeats** 21:8
**Reported** 1:24
**REPORTER**
  3:5
**reporting** 5:10
**represent** 4:8
  17:10
**reproach** 5:6
**requested** 33:21
**required** 13:24
  37:25
**requirement**
  4:21 15:23
**requirements**
  12:10 16:8
**requires** 32:3
**respective** 13:25

**respond** 6:18
  7:11,22
**result** 26:15 36:3
**results** 7:3
**retaliation** 29:2
**retaliatory**
  32:19
**retrospective**
  29:19
**reward** 25:7
**right** 9:17,24,24
  10:7,11 11:5
  13:6 14:3,7
  15:20,23 16:7
  19:18 20:4
  21:21 23:9
  24:17 25:19,24
  26:7,8,11,12
  26:19 27:2,7
  27:11,18 28:4
  28:8,21 29:3,5
  30:17 32:12,15
  32:18,19 33:9
  33:22 35:4,9
  35:12,24 37:13
  39:15,19
**rights** 16:2 22:1
  25:24 26:4,14
  28:8,11,20
  30:2 34:22
  35:2,7,12
**rise** 18:10 22:14
**Roger** 5:17 7:3
  8:5
**role** 7:21
**rubric** 29:15
**Ruddy** 17:11
**rule** 5:20 7:24
  9:17 10:3,6,14
  10:18,23 11:6
  11:8,20,23
  12:4,12,19
  14:23 16:8,8
  16:10,10 19:20
  20:8,15,21
  24:11,17,24
  25:1,3,7,11

26:10,18 27:2
  27:4,19 29:8
  29:16,17 30:14
  30:21,22 31:2
  31:15 34:13
  38:16
**rules** 10:18
  11:22 14:12
  16:23 21:10,21
  27:13 34:4
**ruling** 4:14 24:9

---
**S**

**sake** 36:7
**sanction** 25:4
**sanctions** 24:12
  24:25 25:1,11
  25:13 29:18,19
**saying** 9:10
  10:20,23 24:20
  25:21 26:5
  29:12 30:18,19
  39:6,20
**says** 6:3 8:20,21
  9:21 11:3 13:5
  13:20 14:9
  15:3,4,22,25
  24:24 26:2,2
  28:4 29:3 32:9
  34:20 37:25
  38:11
**scheduled** 8:20
  38:11
**se** 6:13
**section** 15:18,22
**see** 11:15
**seeing** 5:13
**seek** 20:19
**send** 19:5
**sense** 11:10 19:5
  19:9
**sent** 16:15
**separate** 33:7
**serious** 5:8 18:7
**set** 13:14,22,23
**sets** 15:22
**seven** 12:1

**shifting** 12:9
  20:23 21:22
  23:24
**show** 7:7,8,12
  24:1 35:17
**Showen** 24:9
**showing** 39:2,8
**side** 25:22 26:2
  29:3
**side's** 11:18
**sign** 25:10
**signed** 27:21
**silencing** 11:4
**simple** 22:11
**simply** 21:1
  27:25
**sir** 5:14 7:23
  8:14 9:5,8
  14:14,18,21
  15:19,21,24
  34:1 35:25
  37:11,14
**skepticism** 18:15
**SLAPP** 38:2
**sold** 5:7 6:6
**solely** 29:25
**somebody** 10:11
  31:17
**someone's** 10:25
  35:2,6,17
**sorry** 10:18
  11:22 23:19
  30:16
**sort** 6:16 19:14
  29:1
**sounds** 7:14
**South** 2:16
**speak** 18:6 31:10
  39:19
**speaking** 27:17
  39:15
**special** 34:8
**specifically** 12:4
  15:10 16:4
**specificity** 8:19
**specifies** 5:21
**speech** 11:1,4

16:2 17:19
  19:7 25:16
  26:14 27:11
  28:20 32:15
  35:17,17,18,19
  35:20,24 39:5
  39:10
**split** 16:18 21:16
  22:21 36:23
**stake** 19:24
**standard** 4:23
  12:15 13:4,8
  13:10,11,16,18
  14:7,16 15:2,4
  16:9 20:19,24
  21:21 22:10,11
  22:22,25 23:6
  25:10 26:24
  27:3,13 28:10
  32:19 38:24
**standards** 12:20
  20:21 22:19
**state** 11:13 12:5
  17:4 20:17
  37:8,10,12
  41:4
**state's** 24:20
**stated** 23:12
**statement** 21:25
**statements** 7:18
  19:3 34:23
  35:15,20 39:22
**states** 1:1 8:19
  11:11
**states'** 12:8
**station** 6:19
**statute** 4:16,18
  8:13,15,17,18
  8:19,23,23,24
  9:1,20 11:2,16
  11:20 12:5,11
  13:3,5,7,12,17
  13:20,22 14:3
  14:20 15:2,6
  15:14 18:8
  20:25 21:1
  24:14,14 27:25

30:23 32:3
  34:16,20 36:19
  37:2,19,20,22
  37:25 38:2,5,9
  39:1,2,3
**statutes** 10:15
  11:11,12,14
  12:1,8
**stay** 21:12
**Stenographer**
  1:24 41:7,22
**Stone** 5:17 8:5,6
**Stone's** 7:4
**Street** 1:18
**stuck** 36:16
**stuff** 32:18 38:21
**subject** 33:6
**submit** 13:24
**submitted** 5:21
  14:22
**substantive**
  24:21 26:11,12
**suggesting** 30:11
**suit** 9:22 11:3
  18:9 26:13
  28:18 29:10,24
  31:20,21 39:16
**suit's** 16:1 39:12
**Suite** 2:11,16
**suits** 24:16
  25:15
**summary** 10:16
  21:6,12 38:16
**supplemental**
  21:7
**supported** 24:23
**Supreme** 16:17
  16:23 19:16
  24:23 25:6
  33:15,19
**sure** 12:22 14:25
  27:21 33:14
**system** 27:24

**T**

**T** 41:1,1
**tag** 7:17

**take** 19:5
**talked** 16:18
  26:10
**talking** 13:4
  29:22
**talks** 6:22 34:7
**tampering** 7:5
**television** 17:16
**tell** 8:10
**terms** 18:18
  19:25 21:19,22
  23:24 27:19
**text** 15:14 32:3
  38:5
**thank** 17:7
  20:10 33:23
  40:7
**theory** 5:16,18
**thing** 8:10 10:22
  10:24 15:13
  18:5
**things** 6:8,11
  16:10 25:16
  29:12
**think** 4:22 9:1,9
  12:7,20 13:11
  15:9 16:12,21
  17:1,3,23 18:4
  22:6,24 23:23
  24:9 26:18
  29:9,16 30:24
  31:2,13 33:1
  34:2 36:5,22
  39:7,25 40:2
**thought** 6:14,15
  7:1
**thousand** 33:11
**thrust** 28:18
**Thursday** 1:16
**tied** 12:14 25:1
**time** 6:18 31:8
  33:2,23 37:13
**times** 24:24
**today** 4:10 33:21
**top** 29:22
**tort** 15:6
**tortfeasors** 8:7

**tough** 4:21
**trade** 6:12 12:16
**transcribed**
  41:14
**transcript** 41:8
  41:9
**TRANSCRIP...**
  1:12
**trial** 34:6
**true** 41:9
**truthfulness** 5:6
**try** 33:16
**trying** 29:11,25
  30:22,24,25
  33:4
**turn** 20:16
**TV** 35:17
**two** 4:10 8:15
**Twombly** 20:22

**U**

**ultimately** 22:8
**uncontested**
  39:10
**understand** 5:14
  6:6 7:9,13
  12:22 14:25
  16:12 30:7
  35:25 36:4
  37:6 39:6,20
  40:2
**undertaken**
  20:23
**unequivocally**
  24:21
**UNITED** 1:1
**untrue** 5:23,24
  6:3
**utter** 19:2

**V**

**v** 1:6 17:17 24:9
**variety** 8:18
  12:11 24:7,8
  30:10,14
**victimized** 25:8
**violation** 8:22

| | | |
|---|---|---|
| 9:7,8,11 15:17 18:10 39:3 | **Z** | **334-262-8200** 2:6 |
| **VOICE** 7:19 | **0** | **334-819-4072** 2:6 |
| **vs** 4:2 | | **3400** 2:16 |
| **W** | **1** | **36103** 2:5 |
| **want** 7:15 11:11 16:19 18:2,22 18:23 19:3,22 33:14,18 | **1** 1:15 41:8 **10169** 2:11 **11** 9:17 10:3,6 10:14,18,23 11:6,8,23 12:4 | **4** **4** 3:4 **40** 41:9 |
| **ward** 19:21 **wasn't** 22:8 23:5 37:15 | 12:12,19 16:10 16:10 24:11,17 24:24 25:1,7 | **41** 1:15 3:5 **4894** 2:5 |
| **way** 7:9 11:15 14:19 28:24 30:2 31:5 | 25:11 26:18 27:2,4,19 29:8 29:16,17 30:14 | **5** **50,000** 33:10,17 **56** 34:4 38:16 |
| **we're** 4:10 10:2 10:3 15:9 30:22,25 33:20 36:16 40:4 | 30:21,22 31:2 31:15 **1130** 2:11 **11th** 20:10,12,14 24:11 | **6** **7** |
| **we've** 11:9,25 16:17 33:21 | **12** 34:4 **12(b)(6)** 4:12 | **768.295** 25:18 |
| **weird** 28:16 **well-founded** 25:3 | 10:16 20:8,21 22:11 34:13,15 36:16 38:15 | **8** **8** 5:20 7:24 14:23 16:8,8 |
| **went** 7:8 **win** 12:15 **witness** 7:4 | **12th** 1:17 **19** 1:16 | **9** **99** 1:18 |
| **wondered** 28:12 **word** 32:11 **words** 32:7,8 **worked** 6:5 8:6 **works** 14:3 | **2** **201** 2:16 **2022** 1:16 41:17 **21-10480** 1:2 **212-404-8714** 2:12 | |
| **wouldn't** 21:17 23:8 38:13 **write** 7:15 **wrong** 6:15 37:16,20 | **212-818-9606** 2:12 **230** 2:11 **2nd** 41:17 | |
| **X** | **3** | |
| **Y** **yeah** 4:25 6:14 7:13 19:9 30:7 32:16 38:13 **York** 2:11,11 | **305-402-0544** 2:17 **305-960-2253** 2:17 **33131** 2:16 **33132** 1:19 | |