**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA**

PATRICK NATHANIEL REED,

          Plaintiff,

v.

SHANE RYAN, *et al*

      Defendants.

**Case No: 3:22-cv-01181-TJC-PDB**

PATRICK NATHANIEL REED,

          Plaintiff

      v.

BRANDEL EUGENE CHAMBLEE, et al

      Defendants.

**Case Number: 3-22-CV-01059-TJC-PDB**

---

**SWORN AFFIDAVIT OF LARRY KLAYMAN CONCERNING CASE AND OTHER
AUTHORITY IN ABOVE STYLED LAWSUITS**

    I, Larry Klayman, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

    1.    I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

    2.    I am counsel to Plaintiff Patrick Reed ("Mr. Reed") in the above styled cases

    3.    Attached hereto are true and correct copies of cases cited in Mr. Reed's responses in opposition to the Defendants' motions to dismiss, as well as a few other cases that are directly on point to the issues herein.

4.      Attached hereto is a true and correct copy of a portion of the transcript of the oral argument in *Corsi v. Newsmax Media Inc et al*, 21-10480 where the Chief Judge, the Honorable William Pryor expressed "serious doubt" as to whether Florida's Anti-SLAPP statute could be applied in federal court.

I hereby certify that the foregoing facts are true and correct to the best of my personal information and belief.

Sworn to under penalty of perjury this July 25, 2023

    */s/ Larry Klayman* _____
Larry Klayman, Esq.

<u>**INDEX OF CASES**</u>

**Cases Pertaining to Federal Rules of Civil Procedure Pleading Standard**

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (U.S. 2009)
*AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1330 (S.D. Fla. 2009)
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)
*Buja v. Capital*, 2016 U.S. Dist. LEXIS 201575
*Coastal Wellness Ctrs., Inc. v. Progressive Am. Ins. Co.*, 309 F. Supp. 3d 1216 (S.D. Fla. 2018)
*Dershowitz v. Cable News Network, Inc.* 541 F. Supp. 3d 1354 (S.D. Fla. 2021)
*Dorleus v. Bank of New York*, 2014 U.S. Dist. LEXIS 58360
*Folta v. New York Times Company et al.* 2017 U.S. Dist. LEXIS 234146
*Perlman v. Vox Media, Inc*, 2015 Del. Ch. LEXIS 248
*Urquilla–Diaz v. Kaplan Univ.*, 780 F.3d 1039 (11th Cir.2015)

**Cases Pertaining to Defamation Pleading Standard**

*Abrams v. Gen. Ins. Co.*, 460 So. 2d 572 (Fla. Dist. Ct. App. 1984).
*Axelrod v. Califano*, 357 So. 2d 1048 (Fla. Dist. Ct. App. 1978)
*Ball v. Taylor*, 416 F.3d 915 (8th Cir. 2005)
*Barnes v. Horan*, 841 So. 2d 472 (Fla. Dist. Ct. App. 2002)
*Beauharnais v. Illinois*, 343 U.S. 250 (1952)
*Blake v. Ann-Marie Giustibelli, P.A.*, 182 So. 3d 881 (Fla. Dist. Ct. App. 2016).
*Brown v. Fawcett Publ'ns, Inc.*, 196 So. 2d 465 (Fla. Dist. Ct. App. 1967)
*Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983)
*Cape Publ'ns v. Adams*, 336 So. 2d 1197 (Fla. 4th DCA 1976)
*Depp. v. Heard* Civil Action No. 2019-02911 (Va. 2022)
*Dietrich v. Hauser*, 257 N.Y.S.2d 716 (Sup. Ct. 1965)
*Edelstein v. WFTV, Inc.*, 798 So. 2d 797 (Fla. 4th DCA 2001)
*Fawcett Publ'ns, Inc. v. Morris*, 377 P.2d 42 (1962)
*Harte- Hanks Communications v. Connaughton*, 491 U.S. 657, 692 (1989)
*Harwood v. Bush*, 223 So. 2d 359, 362 (Fla. Dist. Ct. App. 1969)
*Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293 (Fla. Dist. Ct. App. 1984).
*Henderson v. Todd Rhyne, Inc.*, 2019 U.S. Dist. LEXIS 224784 (M.D. Fla. Dec. 13, 2019)
*Hood v. Connors*, 419 So. 2d 742 (Fla. Dist. Ct. App. 1982)
*Isaac v. Twitter, Inc.*, 557 F. Supp. 3d 1251 (S.D. Fla. 2021).
*Johnston v. Borders*, 36 F.4th 1254 (11th Cir. 2022)
*Jones, Varnum & Co. v. Townsend's Adm'x*, 21 Fla 431 (Fla. 1885)
*Joopanenko v. Gavagan*, 67 So. 2d 434 (Fla. 1953)
*Lawnwood Med. Ctr. Inc. v. Sadow*, 43 So. 3d 710  (Fla. Dist. Ct. App. 2010)
*Liberty Lobby v. Anderson*, 241 U.S. App. D.C. 246, 746 F.2d 1563 (1984)
*Marron v. Moros,*2023 U.S. Dist. LEXIS 11240 (S.D. Fla. Jan. 20, 2023)
*Metropolis Co. v. Croasdell*, 145 Fla. 455 (1941)
*Miami Herald Pub. Co. v. Ane*, 423 So. 2d 376 (Fla. Dist. Ct. App. 3rd Dist. 1983).
*Miller v. Sawant*, 2023 U.S. Dist. LEXIS 40015 (W.D. Wash. Mar. 9, 2023)

*Newton v. National Broadcasting Co.*, 930 F.2d 662 (9th Cir. 1990)

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710 (1964)

*Nix v. ESPN, Inc.,* 2018 WL 8802885

*Peerenboom v. Perlmutter*, 2017 Fla. Cir. LEXIS 14957

*Perry v. Cosgrove*, 464 So. 2d 664 (Fla. Dist. Ct. App. 1985)

*Readon v. WPLG, LLC*, 46 Fla. L. Weekly 836

*Saadi v. Maroun*, 2008 U.S. Dist. LEXIS 116658 (M.D. Fla. Sep. 9, 2008)

*Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702 (Fla. 3d Dist. Ct. App. 1999)

*Southard v. Forbes, Inc.*, 588 F.2d 140 (5th Cir. 1979)

*Southern Air Transport, Inc. v. Post-Newsweek Stations, Florida, Inc.*, 568 So.2d 927 (Fla. App. 3 Dist. 1990)

*White v. Fraternal Order of Police*, 909 F.2d 512  (D.C. Cir. 1990)

*Wolfson v. Kirk*, 273 So. 2d 774 (Fla. Dist. Ct. App. 1973).

*Yang Zhang v. Ga. Telesis, LLC,* , 2018 U.S. Dist. LEXIS 249262

*Zervos v. Trump*, Case No. 150522/2017 (Sup. Ct. NY)

*Masson v. New Yorker Magazine*, 501 U.S. 496 (1991)

*St. Amant v. Thompson*, 390 U.S. 727, 88 S. Ct. 1323 (1968)

**Cases Pertaining to Anti-SLAPP Statute**

*Abbas v. Foreign Policy Group*, 783 F.3d 1328 (D.C. Cir. 2015)

*Carbone v. CNN, Inc.*, 910 F.3d 1345 (11th Cir. 2018)

*Heffernan v. Bilzerian*, 20STCV25549 (Los Angeles Sup. Ct.)

*Van Dyke v. Retzlaff*, 781 F. App'x 368 (5th Cir. 2019)

**Cases Pertaining to Choice of Law**

*Celotex Corp. v. Meehan*, 523 So. 2d 141 (Fla. 1988)

**Transcript of *Corsi v. Newsmax Media Inc et al*, 21-10480 where the Chief Judge, the Honorable William Pryor expressed "serious doubt" as to whether Florida's Anti-SLAPP statute could be applied in federal court**

# CASES PERTAINING TO PLEADING STANDARD UNDER FEDERAL RULES OF CIVIL PROCEDURE 8(A) AND12(B)(6)

Ashcroft v. Iqbal, 556 U.S. 662, 678 (U.S. 200

Search: Everything

Client: -None-

Folders     History     Help     More

Document:                     Ashcroft v. Iqbal, 556 U.S. 662                     Actions

Go to     Page     Page #     Search Document

## Ashcroft v. Iqbal, 556 U.S. 662

**Copy Citation**

Supreme Court of the United States

December 10, 2008, Argued; May 18, 2009, Decided

No. 07-1015

**Reporter**

**556 U.S. 662** * | [129 S. Ct. 1937 **](#) | [173 L. Ed. 2d 868 ***](#) | [2009 U.S. LEXIS 3472 ****](#) | 77 U.S.L.W. 4387 | 2009-2 Trade Cas. (CCH) P76,785 | 73 Fed. R. Serv. 3d (Callaghan) 837 | 21 Fla. L. Weekly Fed. S 853

JOHN D. ASHCROFT, FORMER ATTORNEY GENERAL, et al., Petitioners v. JAVAID IQBAL et al.

**Subsequent History:** On remand at, Remanded by [Iqbal v. Ashcroft, 574 F.3d 820, 2009 U.S. App. LEXIS 16571 (2d Cir., July 28, 2009)](#)

**Prior History:** [****1] ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT.
[Iqbal v. Hasty, 490 F.3d 143, 2007 U.S. App. LEXIS 13911 (2d Cir. N.Y., 2007)](#)

**Disposition:** [490 F.3d 143](#), reversed and remanded.

## Core Terms

allegations, supervisory, subordinate, discriminatory, qualified immunity, petitioners', detainees, pleadings, motion to dismiss, discovery, court of appeals, factual allegations, national origin, religion, confinement, condoned, district court, conclusory, arrested, high interest, conspiracy, terrorist, attacks, conditions, complaint alleges, designated, detention, suspected, deliberate indifference, restrictive conditions

### Case Summary

**Procedural Posture**
Respondent detainee, who was designated a person "of high interest" to the September 11 investigation, filed a Bivens action against numerous federal officials including petitioner former Attorney General of the United States and the Director of the Federal Bureau of Investigation. The U.S. Court of Appeals for the Second Circuit upheld a denial of petitioners' motion to dismiss based on qualified immunity. Certiorari was granted.

**Overview**
The detainee pled guilty to criminal charges, served a term of imprisonment, and was removed to his native Pakistan. The complaint did not challenge the detainee's arrest or his confinement in a general prison population. Rather, it concentrated on his treatment while confined to an administrative maximum special housing unit. The complaint contended that petitioners designated him a person of high interest on account of his race, religion, or national origin, in contravention of the [U.S. Const. amends. I](#) and [V](#). Evaluating the sufficiency of the complaint was not a "fact-based" question of law, so the denial of the motion to dismiss was a final decision under the collateral-order doctrine over which the Court of Appeals had jurisdiction. To state a claim based on a violation of a clearly established right, the detainee had to have pled sufficient factual matter to show that petitioners adopted and implemented the detention policies not for a neutral, investigative reason, but for the purpose of discriminating on account of race, religion, or national origin. The complaint had not nudged the claims of invidious discrimination across the line from conceivable to plausible.

**Outcome**
The judgment of the Second Circuit was reversed, and the case was remanded for further proceedings. 5-4 Decision; 1 Dissent.

▼  LexisNexis® Headnotes

Civil Procedure > ... > Jurisdiction ▾ > Subject Matter Jurisdiction ▾ > General Overview ▾

**HN1**⬇ **Jurisdiction, Subject Matter Jurisdiction**

Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (199)*    1   ➕ 2

Civil Procedure > Appeals ▾ > Appellate Jurisdiction ▾ > Collateral Order Doctrine ▾

**HN2**⬇ **Appellate Jurisdiction, Collateral Order Doctrine**

With exceptions, Congress has vested the courts of appeals with jurisdiction of appeals from all final decisions of the district courts of the United States. 28 U.S.C.S. § 1291. Though the statute's finality requirement ensures that interlocutory appeals--appeals before the end of district court proceedings--are the exception, not the rule, it does not prevent review of all prejudgment orders. Under the collateral-order doctrine a limited set of district-court orders are reviewable though short of final judgment. The orders within this narrow category are immediately appealable because they finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (36)*   ➕ 3

Civil Procedure > Appeals ▾ > Appellate Jurisdiction ▾ > Final Judgment Rule ▾
Civil Rights Law > Protection of Rights ▾ > Immunity From Liability ▾ > Federal Officials ▾

**HN3**⬇ **Appellate Jurisdiction, Final Judgment Rule**

A district court decision denying a Government officer's claim of qualified immunity can fall within the narrow class of appealable orders despite the absence of a final judgment. This is so because qualified immunity--which shields Government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights--is both a defense to liability and a limited entitlement not to stand trial or face the other burdens of litigation. Provided it turns on an issue of law, a district-court order denying qualified immunity conclusively determines that the defendant must bear the burdens of discovery, is conceptually distinct from the merits of the plaintiff's claim, and would prove effectively unreviewable on appeal from a final judgment. As a general matter, the collateral-order doctrine may have expanded beyond the limits dictated by its internal logic and the strict application of the criteria set out in Cohen. But the applicability of the doctrine in the context of qualified-immunity claims is well established; and a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a final decision within the meaning of 28 U.S.C.S. § 1291. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (371)*    4   ➕ 28

Civil Rights Law > Protection of Rights ▾ > Immunity From Liability ▾ > Federal Officials ▾

**HN4**⬇ **Immunity From Liability, Federal Officials**

Whether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (28)*   ➕ 2

Civil Procedure > Appeals ▾ > Appellate Jurisdiction ▾ > Collateral Order Doctrine ▾

**HN5**⬇ **Appellate Jurisdiction, Collateral Order Doctrine**

The collateral orders that are final turn on abstract, rather than fact-based, issues of law. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (8)*   ➕ 2

Civil Rights Law > Protection of Rights ▾ > Implied Causes of Action ▾

**HN6**⬇ **Protection of Rights, Implied Causes of Action**

In Bivens--proceeding on the theory that a right suggests a remedy--the U.S. Supreme Court recognizes for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights. Because implied causes of action are disfavored, the Court has been reluctant to extend Bivens liability to any new context or new category of defendants. 🔍 More like this Headnote

003

*Shepardize® - Narrow by this Headnote (553)*    1    33

---

Civil Rights Law > Protection of Rights ⌄ > Implied Causes of Action ⌄
View more legal topics

**HN7⬇ Protection of Rights, Implied Causes of Action**
In the limited settings where Bivens does apply, the implied cause of action is the federal analog to suits brought against state officials under 42 U.S.C.S. § 1983. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior. It is undisputed that supervisory Bivens liability cannot be established solely on a theory of respondeat superior. A federal official's liability will only result from his own neglect in not properly superintending the discharge of his subordinates' duties. A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties. Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (14900)*   ⚠ 7   ⊕ 1665

---

Civil Rights Law > Protection of Rights ⌄ > Implied Causes of Action ⌄

**HN8⬇ Protection of Rights, Implied Causes of Action**
The factors necessary to establish a Bivens violation will vary with the constitutional provision at issue. Where the claim is invidious discrimination in contravention of the First and Fifth Amendments, the plaintiff must plead and prove that the defendant acted with discriminatory purpose. Under extant precedent purposeful discrimination requires more than intent as volition or intent as awareness of consequences. It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (451)*    5    76

---

Civil Rights Law > Protection of Rights ⌄ > Implied Causes of Action ⌄
View more legal topics

**HN9⬇ Protection of Rights, Implied Causes of Action**
Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose Bivens liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2671)*   ⚠ 2   ⊕ 349

---

Civil Procedure > ... > Defenses, Demurrers & Objections ⌄ > Motions to Dismiss ⌄ > Failure to State Claim ⌄
View more legal topics

**HN10⬇ Motions to Dismiss, Failure to State Claim**
Under Fed. R. Civ. P. 8(a)(2), a pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief. The pleading standard Rule 8 announces ==does not require detailed factual allegations==, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (244416)*    59    20777

---

Civil Procedure > ... > Defenses, Demurrers & Objections ⌄ > Motions to Dismiss ⌄ > Failure to State Claim ⌄
View more legal topics

**HN11⬇ Motions to Dismiss, Failure to State Claim**
The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Although for the purposes of a motion to dismiss courts must take all of the factual allegations in the complaint as true, they are not bound to accept as true a legal conclusion couched as a factual allegation. Fed. R. Civ. P. 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (114426)*    10    7670

Civil Procedure  >  ...  >  Defenses, Demurrers & Objections ▾  >  Motions to Dismiss ▾  >  Failure to State Claim ▾
View more legal topics

**HN12**⬇  **Motions to Dismiss, Failure to State Claim**

Only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not shown--that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (102771)*   ⚠ 11   ➕ 7043

Civil Procedure  >  ...  >  Defenses, Demurrers & Objections ▾  >  Motions to Dismiss ▾  >  Failure to State Claim ▾

**HN13**⬇  **Motions to Dismiss, Failure to State Claim**

A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (45922)*   ⚠ 1   ➕ 5367

Civil Procedure  >  ...  >  Pleadings ▾  >  Complaints ▾  >  📄 Requirements for Complaint ▾

**HN14**⬇  **Complaints, Requirements for Complaint**

Fed. R. Civ. P. 8 governs the pleading standard in all civil actions and proceedings in the United States district courts. Fed. R. Civ. P. 1. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (258)*   ➕ 19

Civil Procedure  >  ...  >  Defenses, Demurrers & Objections ▾  >  Motions to Dismiss ▾  >  Failure to State Claim ▾
View more legal topics

**HN15**⬇  **Motions to Dismiss, Failure to State Claim**

Fed. R. Civ. P. 9(b) requires particularity when pleading fraud or mistake, while allowing malice, intent, knowledge, and other conditions of a person's mind to be alleged generally. But "generally" is a relative term. In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid--though still operative--strictures of Fed. R. Civ. P. 8. And Rule 8 does not empower a plaintiff to plead the bare elements of his cause of action, affix the label "general allegation," and expect his complaint to survive a motion to dismiss. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (12574)*   ⚠ 3   ➕ 927

---

▼ Lawyers' Edition Display

**Decision**

[***868]  Federal Court of Appeals held to have subject-matter jurisdiction to affirm Federal District Court's order denying federal officials' motion to dismiss former detainee's complaint on basis of qualified immunity; complaint held to have failed to state claim for purposeful and unlawful discrimination.

**Summary**

**Procedural posture:** Respondent detainee, who was designated a person "of high interest" to the September 11 investigation, filed a Bivens action against numerous federal officials including petitioner former Attorney General of the United States and the Director of the Federal Bureau of Investigation. The U.S. Court of Appeals for the Second Circuit upheld a denial of petitioners' motion to dismiss based on qualified immunity. Certiorari was granted.

**Overview:** The detainee pled guilty to criminal charges, served a term of imprisonment, and was removed to his native Pakistan. The complaint did not challenge the detainee's arrest or his confinement in a general prison population. Rather, it concentrated on his treatment while confined to an administrative maximum special housing unit. The complaint contended that petitioners designated him a person of high interest on account of his race, religion, or national origin, in contravention of the U.S. Const. amends. I and V. Evaluating the sufficiency of the complaint was not a "fact-based" question of law, so the denial of the motion to dismiss was a final decision under the collateral-order doctrine over which the Court of Appeals had jurisdiction. To state a claim based on a violation of a clearly established

right, the detainee had to have pled sufficient factual matter to show that petitioners adopted and implemented the detention policies not for a neutral, investigative reason, but for the purpose of discriminating on account of race, religion, or national [***869] origin. The complaint had not nudged the claims of invidious discrimination across the line from conceivable to plausible.

**Outcome:** The judgment of the Second Circuit was reversed, and the case was remanded for further proceedings. 5-4 Decision; 1 Dissent.

## Headnotes

COURTS §245 COURTS §247 > JURISDICTION -- WAIVER  > Headnote:

***LEdHN[1]*** [1]

Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt. (Kennedy ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Thomas ▾, and Alito ▾, JJ.)

APPEAL §23.5 APPEAL §31 > JURISDICTION -- FINALITY -- INTERLOCUTORY MATTERS -- COLLATERAL ORDERS  > Headnote:

***LEdHN[2]*** [2]

With exceptions, Congress has vested the courts of appeals with jurisdiction of appeals from all final decisions of the district courts of the United States. 28 U.S.C.S. § 1291. Though the statute's finality requirement ensures that interlocutory appeals--appeals before the end of district court proceedings--are the exception, not the rule, it does not prevent review of all prejudgment orders. Under the collateral-order doctrine a limited set of district-court orders are reviewable though short of final judgment. The orders within this narrow category are immediately appealable because they finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated. (Kennedy ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Thomas ▾, and Alito ▾, JJ.)

[***870] APPEAL §23 APPEAL §23.5 APPEAL §38PUBLIC OFFICERS §56 > JURISDICTION -- FINALITY -- COLLATERAL ORDER -- DISMISSAL -- QUALIFIED IMMUNITY  > Headnote:

***LEdHN[3]*** [3]

A district court decision denying a Government officer's claim of qualified immunity can fall within the narrow class of appealable orders despite the absence of a final judgment. This is so because qualified immunity--which shields Government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights--is both a defense to liability and a limited entitlement not to stand trial or face the other burdens of litigation. Provided it turns on an issue of law, a district-court order denying qualified immunity conclusively determines that the defendant must bear the burdens of discovery, is conceptually distinct from the merits of the plaintiff's claim, and would prove effectively unreviewable on appeal from a final judgment. As a general matter, the collateral-order doctrine may have expanded beyond the limits dictated by its internal logic and the strict application of the criteria set out in Cohen. But the applicability of the doctrine in the context of qualified-immunity claims is well established; and a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a final decision within the meaning of 28 U.S.C.S. § 1291. ( Kennedy ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Thomas ▾, and Alito ▾, JJ.)

PLEADING §130 > ALLEGING VIOLATION OF LAW  > Headnote:

***LEdHN[4]*** [4]

Whether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded. (Kennedy ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Thomas ▾, and Alito ▾, JJ.)

APPEAL §23.5 > FINALITY -- COLLATERAL ORDERS  > Headnote:

***LEdHN[5]*** [5]

The collateral orders that are final turn on abstract, rather than fact-based, issues of law. (Kennedy ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Thomas ▾, and Alito ▾, JJ.)

ACTIONS §2 > CONSTITUTIONAL RIGHT -- BIVENS  > Headnote:

***LEdHN[6]*** [6]

In Bivens--proceeding on the theory that a right suggests a remedy--the U.S. Supreme Court recognizes for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights. Because implied causes of action are disfavored, the Court has been reluctant to extend Bivens liability to any new context or new category of defendants. ( Kennedy ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Thomas ▾, and Alito ▾, JJ.)

PLEADING §179.5 PLEADING §191 PUBLIC OFFICERS §56 PUBLIC OFFICERS §63 > UNCONSTITUTIONAL CONDUCT -- LIABILITY -- ACTS OF SUBORDINATES  > Headnote:

**_LEdHN[7]_**⬇ [7]

In the limited settings where Bivens does apply, the implied cause of action is the federal analog to suits brought against state officials under 42 U.S.C.S. § 1983. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior. It is undisputed that supervisory Bivens liability cannot be established solely on a theory of respondeat superior. A federal official's liability will only result from his own neglect in not properly superintending the discharge of his subordinates' duties. A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties. Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. (Kennedy ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Thomas ▾, and Alito ▾, JJ.)


 [***871] CONSTITUTIONAL LAW §316.8 CONSTITUTIONAL LAW §925 > BIVENS VIOLATION -- FIRST AND FIFTH AMENDMENTS  > Headnote:

**_LEdHN[8]_**⬇ [8]

The factors necessary to establish a Bivens violation will vary with the constitutional provision at issue. Where the claim is invidious discrimination in contravention of the First and Fifth Amendments, the plaintiff must plead and prove that the defendant acted with discriminatory purpose. Under extant precedent purposeful discrimination requires more than intent as volition or intent as awareness of consequences. It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group. (Kennedy ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Thomas ▾, and Alito ▾, JJ.)


PUBLIC OFFICERS §56 PUBLIC OFFICERS §63 > LIABILITY -- QUALIFIED IMMUNITY  > Headnote:

**_LEdHN[9]_**⬇ [9]

Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose Bivens liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities. (Kennedy ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Thomas ▾, and Alito ▾, JJ.)


PLEADING §103 PLEADING §130 > STATEMENT OF CLAIM -- FACTUAL ALLEGATIONS -- DISMISSAL  > Headnote:

**_LEdHN[10]_**⬇ [10]

Under Fed. R. Civ. P. 8(a)(2), a pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief. The pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. (Kennedy ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Thomas ▾, and Alito ▾, JJ.)


PLEADING §103 PLEADING §130 > LEGAL CONCLUSIONS -- FACTUAL ALLEGATIONS -- DISMISSAL  > Headnote:

**_LEdHN[11]_**⬇ [11]

The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Although for the purposes of a motion to dismiss courts must take all of the factual allegations in the complaint as true, they are not bound to accept as true a legal conclusion couched as a factual allegation. Fed. R. Civ. P. 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. ( Kennedy ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Thomas ▾, and Alito ▾, JJ.)


 [***872] PLEADING §103 > MOTION TO DISMISS -- PLAUSIBILITY OF CLAIM  > Headnote:

**_LEdHN[12]_**⬇ [12]

Only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But

where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not shown--that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). (Kennedy ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Thomas ▾, and Alito ▾, JJ.)

PLEADING §103 > MOTION TO DISMISS -- LEGAL CONCLUSIONS -- FACTUAL ALLEGATIONS  > Headnote:

**LEdHN[13]**⬇ [13]

A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. (Kennedy ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Thomas ▾, and Alito ▾, JJ.)

PLEADING §1 > GOVERNING STANDARD  > Headnote:

**LEdHN[14]**⬇ [14]

Fed. R. Civ. 8 governs the pleading standard in all civil actions and proceedings in the United States district courts. Fed. R. Civ. P. 1. ( Kennedy ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Thomas ▾, and Alito ▾, JJ.)

PLEADING §103 PLEADING §171 PLEADING §172 > GENERAL ALLEGATIONS -- FRAUD -- MISTAKE -- DISCRIMINATORY INTENT -- DISMISSAL  > Headnote:

**LEdHN[15]**⬇ [15]

Fed. R. Civ. P. 9(b) requires particularity when pleading fraud or mistake, while allowing malice, intent, knowledge, and other conditions of a person's mind to be alleged generally. But "generally" is a relative term. In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid--though still operative--strictures of Fed. R. Civ. P. 8. And Rule 8 does not empower a plaintiff to plead the bare elements of his cause of action, affix the label "general allegation," and expect his complaint to survive a motion to dismiss. (Kennedy ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Thomas ▾, and Alito ▾, JJ.)

## Syllabus

**[*662]** [***873] [**1939] Following the September 11, 2001, terrorist attacks, respondent Iqbal, a Pakistani Muslim, was arrested on criminal charges and detained by federal officials under restrictive conditions. Iqbal filed a *Bivens* action against numerous federal officials, including petitioner Ashcroft, the former Attorney General, and petitioner Mueller, the Director of the Federal Bureau of Investigation (FBI). See *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619. The complaint alleged, *inter alia,* that petitioners designated Iqbal a person "of high interest" on account of his race, religion, or national origin, in contravention of the First and Fifth Amendments; that the FBI, under Mueller's direction, arrested and detained thousands of Arab Muslim men as part of its September 11 investigation; that petitioners knew of, condoned, and willfully and maliciously agreed to subject Iqbal to harsh conditions of confinement as a matter of policy, solely on account of the prohibited factors and for no legitimate penological interest; and that Ashcroft was the policy's "principal architect" [****2] and Mueller was "instrumental" in its adoption and execution. After the District Court denied petitioners' motion to dismiss on qualified-immunity grounds, they invoked the collateral order doctrine to file an interlocutory appeal in the Second Circuit. Affirming, that court assumed without discussion that it had jurisdiction and focused on the standard set forth in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929, for evaluating whether a complaint is sufficient to survive a motion to dismiss. Concluding that *Twombly*'s "flexible plausibility standard" obliging a pleader to amplify a claim with factual allegations where necessary to render it plausible was inapplicable in the context of petitioners' appeal, the court held that Iqbal's complaint was adequate to allege petitioners' personal involvement in discriminatory decisions which, if true, violated clearly established constitutional law.

*Held:* 1. The Second Circuit had subject-matter jurisdiction to affirm the District [**1940] [***874] Court's order denying petitioners' motion to dismiss. Pp. 671-675.

(a) Denial of a qualified-immunity claim can fall within the narrow class of prejudgment orders reviewable under the collateral-order doctrine **[*663]** so long as the [****3] order "turns on an issue of law." *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S. Ct. 2806, 86 L. Ed. 2d 411. The doctrine's applicability in this context is well established; an order rejecting qualified immunity at the motion-to-dismiss stage is a "final decision" under 28 U.S.C. § 1291, which vests courts of appeals with "jurisdiction of appeals from all final decisions of the district courts." *Behrens v. Pelletier,* 516 U.S. 299, 307, 116 S. Ct. 834, 133 L. Ed. 2d 773. Pp.671-672.

(b) Under these circumstances, the Court of Appeals had, and this Court has, jurisdiction over the District Court's order. Because the order turned on an issue of law and rejected the qualified-immunity defense, it was a final decision "subject to immediate appeal." *Behrens, supra,* at 307, 116 S. Ct. 834, 133 L. Ed. 2d 773. Pp. 672-675.

2. Iqbal's complaint fails to plead sufficient facts to state a claim for purposeful and unlawful discrimination. Pp. 675-687

(a) This Court assumes, without deciding, that Iqbal's First Amendment claim is actionable in a *Bivens* action, see *Hartman v. Moore,* 547 U.S. 250, 254, n. 2, 126 S. Ct. 1695, 164 L. Ed. 2d 441. Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, see, *e.g., Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611, the plaintiff in a suit such as the present one must

plead [****4] that each Government-official defendant, through his own individual actions, has violated the Constitution. Purposeful discrimination requires more than "intent as volition or intent as awareness of consequences"; it involves a decisionmaker's undertaking a course of action "'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870. Iqbal must plead sufficient factual matter to show that petitioners adopted and implemented the detention policies at issue not for a neutral, investigative reason, but for the purpose of discriminating on account of race, religion, or national origin. Pp. 675-677

(b) Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." "[D]etailed factual allegations" are not required, *Twombly*, 550 U.S., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929, but the Rule does call for sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face," *id., at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference [****5] that the defendant is liable for the misconduct alleged. *Id., at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. Two working principles underlie *Twombly*. First, the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements. *Id., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. Second, determining whether a complaint states a plausible claim is context-specific, requiring the **[*664]** reviewing court to draw on its experience and common sense. *Id., at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. A court considering a motion [***875] to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations. When there are well-pleaded [**194] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Pp. 677-680

(c) Iqbal's pleadings do not comply with Rule 8 under *Twombly*. Several of his allegations--that petitioners agreed to subject him to harsh conditions as a matter of policy, solely on account of discriminatory factors and for no legitimate penological interest; that [****6] Ashcroft was this policy's "principal architect"; and that Mueller was "instrumental" in its adoption and execution--are conclusory and not entitled to be assumed true. Moreover, the factual allegations that the FBI, under Mueller, arrested and detained thousands of Arab Muslim men, and that he and Ashcroft approved the detention policy, do not plausibly suggest that petitioners purposefully discriminated on prohibited grounds. Given that the September 11 attacks were perpetrated by Arab Muslims, it is not surprising that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the policy's purpose was to target neither Arabs nor Muslims. Even if the complaint's well-pleaded facts gave rise to a plausible inference that Iqbal's arrest was the result of unconstitutional discrimination, that inference alone would not entitle him to relief: His claims against petitioners rest solely on their ostensible policy of holding detainees categorized as "of high interest," but the complaint does not contain facts plausibly showing that their policy was [****7] based on discriminatory factors. Pp. 680-684

(d) Three of Iqbal's arguments are rejected. Pp. 684-687

(i) His claim that *Twombly* should be limited to its antitrust context is not supported by that case or the Federal Rules. Because *Twombly* interpreted and applied Rule 8, which in turn governs the pleading standard "in all civil actions," Rule 1, the case applies to antitrust and discrimination suits alike, see 550 U.S., at 555-556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 and n.3. P. 684

(ii) Rule 8's pleading requirements need not be relaxed based on the Second Circuit's instruction that the District Court cabin discovery to preserve petitioners' qualified-immunity defense in anticipation of a summary judgment motion. The question presented by a motion to dismiss for insufficient pleadings does not turn on the controls placed on the discovery process. *Twombly, supra, at 559, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. And because Iqbal's **[*665]** complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise. Pp. 684-686

(iii) Rule 9(b) --which requires particularity when pleading "fraud or mistake" but allows "other conditions of a person's mind [to] be alleged generally"--does not require courts to credit a complaint's conclusory statements without [****8] reference to its factual context. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade Rule 8's less rigid, though still operative, strictures. Pp. 686-687

(e) The Second Circuit should decide in the first instance whether to [***876] remand to the District Court to allow Iqbal to seek leave to amend his deficient complaint. P. 23687

490 F.3d 143, reversed and remanded.

Counsel: **Gregory G. Garre** ⏷ argued the cause for petitioners.

**Alexander A. Reinert** ⏷ argued the cause for respondents.

Judges: Kennedy ⏷, J., delivered the opinion of the Court, in which Roberts ⏷, C.J., and Scalia ⏷, Thomas ⏷, and Alito ⏷, JJ., joined. Souter ⏷, J., filed a dissenting opinion, in which Stevens ⏷, Ginsburg ⏷, and Breyer ⏷, JJ., joined, *post*, p. 687. Breyer ⏷, J., filed a dissenting opinion, *post*, p. 699.

Opinion by: KENNEDY ⏷

# Opinion

**[*666]** [**1942]** Justice **Kennedy** ⏷ delivered the opinion of the Court.

Javaid Iqbal (hereinafter respondent) is a citizen of Pakistan and a Muslim. In the wake of the September 11, 2001, terrorist attacks he was arrested in the United States on criminal charges and detained by federal officials. Respondent claims he was deprived of various constitutional protections while in federal custody. To redress the alleged deprivations, respondent filed a complaint against numerous federal officials,

Including John Ashcroft, the former [****9] Attorney General of the United States, and Robert Mueller, the Director of the Federal Bureau of Investigation (FBI). Ashcroft and Mueller are the petitioners in the case now before us. As to these two petitioners, the complaint alleges that they adopted an unconstitutional policy that subjected respondent to harsh conditions of confinement on account of his race, religion, or national origin.

In the District Court petitioners raised the defense of qualified immunity and moved to dismiss the suit, contending the complaint was not sufficient to state a claim against them. The District Court denied the motion to dismiss, concluding the complaint was sufficient to state a claim despite petitioners' official status at the times in question. Petitioners brought an interlocutory appeal in the Court of Appeals for the Second Circuit. The court, without discussion, assumed it had jurisdiction over the order denying the motion to dismiss; and it affirmed the District Court's decision.

Respondent's account of his prison ordeal could, if proved, demonstrate unconstitutional misconduct by some governmental actors. But the allegations and pleadings with respect to these actors are not before us here. [****10] This case instead turns on a narrower question: Did respondent, as the plaintiff in the District Court, [**1943] plead factual matter that, if taken as true, states a claim that petitioners deprived him of his clearly established constitutional rights. We hold respondent's pleadings are insufficient.

**[\*667]** I

Following the 2001 attacks, the FBI and other entities within the Department of Justice began an investigation of vast reach to identify the assailants and prevent them from attacking anew. The FBI dedicated more than 4,000 special agents and 3,000 support personnel to the endeavor. By September 18 "the FBI had received more than 96,000 tips or potential leads from the public." Dept. of Justice, Office of Inspector General, The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks 1, 11-12 (Apr. 2003), [***877] http://www.usdoj.gov/oig/special/0306/full.pdf?bcsi_scan_61073EC0F747 59AD0&bcsi_scan_filenamefull.pdf (as visited May 14, 2009, and available in Clerk of Court's case file).

In the ensuing months the FBI questioned more than 1,000 people with suspected links to the attacks [****11] in particular or to terrorism in general. _Id._, at 1. Of those individuals, some 762 were held on immigration charges; and a 184-member subset of that group was deemed to be "of 'high interest'" to the investigation. _Id._, at 111. The high-interest detainees were held under restrictive conditions designed to prevent them from communicating with the general prison population or the outside world. _Id._, at 112-113.

Respondent was one of the detainees. According to his complaint, in November 2001 agents of the FBI and Immigration and Naturalization Service arrested him on charges of fraud in relation to identification documents and conspiracy to defraud the United States. _Iqbal v. Hasty_, 490 F.3d 143, 147-148 (CA2 2007). Pending trial for those crimes, respondent was housed at the Metropolitan Detention Center (MDC) in Brooklyn, New York. Respondent was designated a person "of high interest" to the September 11 investigation and in January 2002 was placed in a section of the MDC known as the Administrative Maximum Special Housing Unit **[\*668]** _Id._, at 148. As the facility's name indicates, the ADMAX SHU incorporates the maximum security conditions allowable under Federal Bureau of Prisons [****12] regulations. _Ibid._ ADMAX SHU detainees were kept in lockdown 23 hours a day, spending the remaining hour outside their cells in handcuffs and leg irons accompanied by a four-officer escort. _Ibid._

Respondent pleaded guilty to the criminal charges, served a term of imprisonment, and was removed to his native Pakistan. _Id., at 149_. He then filed a _Bivens_ action in the United States District Court for the Eastern District of New York against 34 current and former federal officials and 19 "John Doe" federal corrections officers. See _Bivens v. Six Unknown Fed. Narcotics Agents_, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971). The defendants range from the correctional officers who had day-to-day contact with respondent during the term of his confinement, to the wardens of the MDC facility, all the way to petitioners--officials who were at the highest level of the federal law enforcement hierarchy. First Amended Complaint in No. 04-CV-1809 (JG)(JA), PP 10–11, App. to Pet. for Cert. 157a (hereinafter Complaint).

The 21-cause-of-action complaint does not challenge respondent's arrest or his confinement in the MDC's general prison population. Rather, it concentrates on his [**1944] treatment while confined to the ADMAX SHU. The [****13] complaint sets forth various claims against defendants who are not before us. For instance, the complaint alleges that respondent's jailors "kicked him in the stomach, punched him in the face, and dragged him across" his cell without justification, _id._, P 113, at 176a; subjected him to serial strip and body-cavity searches when he posed no safety risk to himself or others, _id._, PP 143-145, at 182a; and refused to let him and other Muslims pray because there would be "[n]o prayers for terrorists," _id._, P 154, at 184a.

[***878] The allegations against petitioners are the only ones relevant here. The complaint contends that petitioners designated **[\*669]** respondent a person of high interest on account of his race, religion, or national origin, in contravention of the First and Fifth Amendments to the Constitution. The complaint alleges that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11." _Id._, P 47, at 164a. It further alleges that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement [****14] until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001." _Id._, P 69, at 168a. Lastly, the complaint posits that petitioners "each knew of, condoned, and willfully and maliciously agreed to subject" respondent to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." _Id._, P 96, at 172a-173a. The pleading names Ashcroft as the "principal architect" of the policy, _id._, P 10, at 157a, and identifies Mueller as "instrumental in [its] adoption, promulgation, and implementation," _id._, P 11, at 157a.

Petitioners moved to dismiss the complaint for failure to state sufficient allegations to show their own involvement in clearly established unconstitutional conduct. The District Court denied their motion. Accepting all of the allegations in respondent's complaint as true, the court held that "it cannot be said that there [is] no set of facts on which [respondent] would be entitled to relief as against" petitioners. _Id._, at 136a-137a (relying on _Conley v. Gibson_, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)). Invoking the collateral-order [****15] doctrine petitioners filed an interlocutory appeal in the United States Court of Appeals for the Second Circuit. While that appeal was pending, this Court decided _Bell Atlantic Corp. v. Twombly_, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), which discussed the standard for evaluating whether a complaint is sufficient to survive a motion to dismiss.

[*670] The Court of Appeals considered *Twombly*'s applicability to this case. Acknowledging that *Twombly* retired the *Conley* no-set-of-facts test relied upon by the District Court, the Court of Appeals' opinion discussed at length how to apply this Court's "standard for assessing the adequacy of pleadings." *490 F.3d at 155*. It concluded that *Twombly* called for a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Id., at 157-158*. The court found that petitioners' appeal did not present one of "those contexts" requiring amplification. As a consequence, it held respondent's pleading adequate to allege petitioners' personal involvement in discriminatory decisions which, if true, violated clearly established constitutional law. *Id., at 174*.

 [**1945] Judge  [****16] Cabranes concurred. He agreed that the majority's "discussion of the relevant pleading standards reflect[ed] the uneasy compromise . . . between a qualified immunity privilege rooted in the need to preserve the effectiveness of government as contemplated by our constitutional structure and the pleading requirements  [***879] of *Rule 8(a) of the Federal Rules of Civil Procedure*." *Id., at 178* (internal quotation marks and citations omitted). Judge Cabranes nonetheless expressed concern at the prospect of subjecting high-ranking Government officials--entitled to assert the defense of qualified immunity and charged with responding to "a national and international security emergency unprecedented in the history of the American Republic"--to the burdens of discovery on the basis of a complaint as nonspecific as respondent's. *Id., at 179*. Reluctant to vindicate that concern as a member of the Court of Appeals, *ibid.,* Judge Cabranes urged this Court to address the appropriate pleading standard "at the earliest opportunity," *id., at 178*. We granted certiorari, *554 U.S. 902, 128 S. Ct. 2931, 171 L. Ed. 2d 863 (2008)*, and now reverse.

**[*671]** II

We first address whether the Court of Appeals had subject-matter jurisdiction to affirm the District  [****17] Court's order denying petitioners' motion to dismiss. Respondent disputed subject-matter jurisdiction in the Court of Appeals, but the court hardly discussed the issue. We are not free to pretermit the question. **HN1** **LEdHN[1]** [1] Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006) (citing *United States v. Cotton*, 535 U.S. 625, 630, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002)). According to respondent, the District Court's order denying petitioners' motion to dismiss is not appealable under the collateral-order doctrine. We disagree.

A

**HN2** **LEdHN[2]** [2] With exceptions inapplicable here, Congress has vested the courts of appeals with "jurisdiction of appeals from all final decisions of the district courts of the United States." *28 U.S.C. § 1291*. Though the statute's finality requirement ensures that "interlocutory appeals--appeals before the end of district court proceedings--are the exception, not the rule," *Johnson v. Jones*, 515 U.S. 304, 309, 115 S. Ct. 2151, 132 L. Ed. 2d 238 (1995), it does not prevent "review of all prejudgment orders." *Behrens v. Pelletier*, 516 U.S. 299, 305, 116 S. Ct. 834, 133 L. Ed. 2d 773 (1996). Under the collateral-order doctrine a limited set of district-court orders are reviewable "though short  [****18] of final judgment." *Ibid.* The orders within this narrow category "are immediately appealable because they 'finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.'" *Ibid.* (quoting *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949)).

**HN3** **LEdHN[3]** [3] A district-court decision denying a Government officer's claim of qualified immunity can fall within the narrow class  **[*672]** of appealable orders despite "the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985). This is so because qualified immunity--which shields Government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights," *Harlow v. Fitzgerald*,  [**1946]  457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) --is both a defense to liability  [***880] and a limited "entitlement not to stand trial or face the other burdens of litigation." *Mitchell, 472 U.S., at 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411*. Provided it "turns on an issue of law," *id., at 530, 105 S. Ct. 2806, 86 L. Ed. 2d 411*, a district-court order denying qualified immunity  [****19] "'conclusively determine[s]" that the defendant must bear the burdens of discovery; is "conceptually distinct from the merits of the plaintiff's claim"; and would prove "effectively unreviewable on appeal from a final judgment," *id., at 527–528, 105 S. Ct. 2806, 86 L. Ed. 2d 411* (citing *Cohen, supra, at 546, 69 S. Ct. 1221, 93 L. Ed. 1528*). As a general matter, the collateral-order doctrine may have expanded beyond the limits dictated by its internal logic and the strict application of the criteria set out in *Cohen*. But the applicability of the doctrine in the context of qualified-immunity claims is well established; and this Court has been careful to say that a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a "final decision" within the meaning of *§ 1291*. *Behrens, 516 U.S., at 307, 116 S. Ct. 834, 133 L. Ed. 2d 773*.

B

Applying these principles, we conclude that the Court of Appeals had jurisdiction to hear petitioners' appeal. The District Court's order denying petitioners' motion to dismiss turned on an issue of law and rejected the defense of qualified immunity. It was therefore a final decision "subject to immediate appeal." *Ibid.* Respondent says that "a qualified immunity appeal based solely on the complaint's failure to state  [****20] a claim, and not on the ultimate issues relevant to the qualified immunity defense itself, is not a proper subject of interlocutory jurisdiction." Brief for Respondent Iqbal 15 (hereinafter Iqbal Brief). In other words, respondent **[*673]** contends the Court of Appeals had jurisdiction to determine whether his complaint avers a clearly established constitutional violation but that it lacked jurisdiction to pass on the sufficiency of his pleadings. Our opinions, however, make clear that appellate jurisdiction is not so strictly confined.

In *Hartman v. Moore*, 547 U.S. 250, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006), the Court reviewed an interlocutory decision denying qualified immunity. The legal issue decided in *Hartman* concerned the elements a plaintiff "must plead and prove in order to win" a *First Amendment* retaliation claim. *Id., at 257, n. 5, 126 S. Ct. 1695, 164 L. Ed. 2d 441*. Similarly, two Terms ago in *Wilkie v. Robbins*, 551 U.S. 537, 127 S. Ct. 2588, 168 L. Ed. 2d 389 (2007), the Court considered another interlocutory order denying qualified immunity. The legal issue there was whether a *Bivens* action can be employed to challenge interference with property rights. *Id., at 549, n. 4, 127 S. Ct. 2588, 168 L. Ed. 2d 389*. These cases cannot be squared with respondent's argument that the collateral-order doctrine restricts appellate  [****21] jurisdiction to the "ultimate issu[e]" whether the legal wrong asserted was a violation of clearly established law while excluding the question whether the facts pleaded establish such a violation. Iqbal Brief 15. Indeed, the latter question is even more clearly within the category of appealable decisions than the questions presented in *Hartman* and *Wilkie*, since **HN4** **LEdHN[4]** [4] whether a particular complaint sufficiently alleges a clearly

established violation of law cannot be decided in isolation [***881] from the facts pleaded. In that sense the sufficiency of respondent's pleadings is both "inextricably intertwined with," *Swint* v. *Chambers County Comm'n*, 514 U.S. 35, 51, 115 S. Ct. 1203, 131 L. Ed. 2d 60 (1995), and "directly implicated by," *Hartman, supra*, at 257, n. [**1947] 5, 126 S. Ct. 1695, 164 L. Ed. 2d 441, the qualified-immunity defense.

Respondent counters that our holding in *Johnson*, 515 U.S. 304, 115 S. Ct. 2151, 132 L. Ed. 2d 238, confirms the want of subject-matter jurisdiction here. That is incorrect. The allegation in *Johnson* was that five defendants, all of them police officers, unlawfully beat the plaintiff. *Johnson* considered "the appealability of a portion of" the District Court's summary judgment order **[*674]** that, "though entered in a 'qualified immunity' case, determine[d] only" that there was a genuine [****22] issue of material fact that three of the defendants participated in the beating. *Id.*, at 313, 115 S. Ct. 2151, 132 L. Ed. 2d 238.

In finding that order not a "final decision" for purposes of [§ 1291] the *Johnson* Court cited *Mitchell* for the proposition that only decisions turning "'*on an issue of law*'" are subject to immediate appeal. 515 U.S., at 313, 115 S. Ct. 2151, 132 L. Ed. 2d 238. Though determining whether there is a genuine issue of material fact at summary judgment is a question of law, it is a legal question that sits near the law-fact divide. Or as we said in *Johnson*, it is a "fact-related" legal inquiry. *Id.*, at 314, 115 S. Ct. 2151, 132 L. Ed. 2d 238. To conduct it, a court of appeals may be required to consult a "vast pretrial record, with numerous conflicting affidavits, depositions, and other discovery materials." *Id.*, at 316, 115 S. Ct. 2151, 132 L. Ed. 2d 238. That process generally involves matters more within a district court's ken and may replicate inefficiently questions that will arise on appeal following final judgment. *Ibid.* Finding those concerns predominant, *Johnson* held that **HN5**[↑] *LEdHN[5]*[↑] [5] the collateral orders that are "final" under *Mitchell* turn on "abstract," rather than "fact-based," issues of law. 515 U.S., at 317, 115 S. Ct. 2151, 132 L. Ed. 2d 238.

The concerns that animated the decision in *Johnson* are absent when an appellate court considers [****23] the disposition of a motion to dismiss a complaint for insufficient pleadings. True, the categories of "fact-based" and "abstract" legal questions used to guide the Court's decision in *Johnson* are not well defined. Here, however, the order denying petitioners' motion to dismiss falls well within the latter class. Reviewing that order, the Court of Appeals considered only the allegations contained within the four corners of respondent's complaint; resort to a "vast pretrial record" on petitioners' motion to dismiss was unnecessary. *Id.*, at 316, 115 S. Ct. 2151, 132 L. Ed. 2d 238. And determining whether respondent's complaint has the "heft" to state a claim is a task well within an appellate court's core competency. *Twombly*, 550 U.S., at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929. Evaluating the sufficiency of a complaint is not a "fact-based" question of law, so the problem the Court sought to avoid in *Johnson* **[*675]** is not implicated here. The District Court's order denying petitioners' motion to dismiss is a final decision under the collateral-order doctrine over which the Court of Appeals had, and this Court has, jurisdiction. We proceed to consider the merits of petitioners' appeal.

[***882] III

In *Twombly, supra*, at 553-554, 127 S. Ct. 1955, 167 L. Ed. 2d 929, the Court found it necessary first to discuss [****24] the antitrust principles implicated by the complaint. Here too we begin by taking note of the elements a plaintiff must plead to state a claim of unconstitutional discrimination against officials entitled to assert the defense of qualified immunity.

**HN6**[↑] *LEdHN[6]*[↑] [6] In *Bivens*--proceeding on the theory that a right suggests a remedy--this Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Correctional Services Corp.* v. *Malesko*, 534 U.S. 61, 66, 122 S. Ct. 515, 151 L. Ed. 2d 456 [**1948] (2001). Because implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability "to any new context or new category of defendants." 534 U.S. at 68, 122 S. Ct. 515, 151 L. Ed. 2d 456. See also *Wilkie*, 551 U.S., at 549-550, 127 S. Ct. 2588, 168 L. Ed. 2d 389. That reluctance might well have disposed of respondent's First Amendment claim of religious discrimination. For while we have allowed a *Bivens* action to redress a violation of the equal protection component of the Due Process Clause of the Fifth Amendment, see *Davis* v. *Passman*, 442 U.S. 228, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979), we have not found an implied damages remedy under the Free Exercise Clause. Indeed, we have declined to extend *Bivens* to a claim sounding [****25] in the First Amendment. *Bush* v. *Lucas*, 462 U.S. 367, 103 S. Ct. 2404, 76 L. Ed. 2d 648 (1983). Petitioners do not press this argument, however, so we assume, without deciding, that respondent's First Amendment claim is actionable under *Bivens*.

**HN7**[↑] *LEdHN[7]*[↑] [7] In the limited settings where *Bivens* does apply, the implied cause of action is the "federal analog to suits brought against state officials under Rev. Stat. § 1979, 42 U.S.C. § 1983." **[*676]** *Hartman*, 547 U.S., at 254, n. 2, 126 S. Ct. 1695, 164 L. Ed. 2d 441. Cf. *Wilson* v. *Layne*, 526 U.S. 603, 609, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999). Based on the rules our precedents establish, respondent correctly concedes that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. Iqbal Brief 46 ("[I]t is undisputed that supervisory *Bivens* liability cannot be established solely on a theory of *respondeat superior*"). See *Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); see also *Dunlop* v. *Munroe*, 11 U.S. 242, 7 Cranch 242, 269, 3 L. Ed. 329 (1812) (a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); *Robertson* v. *Sichel*, 127 U.S. 507, 515-516, 8 S. Ct. 1286, 32 L. Ed. 203 (1888) [****26] ("A public officer or agent is not responsible for the misfeasances or positive wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the sub-agents or servants or other persons properly employed by or under him, in the discharge of his official duties"). Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

[***883] *LEdHN[8]*[↑] [8] **HN8**[↑] The factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue. Where the claim is invidious discrimination in contravention of the First and Fifth Amendments, our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose. *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U.S. 520, 540-541, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993) (opinion of Kennedy ▾, J.) (First Amendment); *Washington* v. *Davis*, 426 U.S. 229, 240, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976) (Fifth Amendment). Under extant precedent purposeful discrimination requires more than "intent as volition or intent as awareness of consequences." *Personnel Administrator of Mass.* v. *Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979). It instead involves a decisionmaker's [****27] undertaking [*677] a course of action "because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Ibid.* It follows that, to state a claim based on a violation of a clearly established right, respondent must plead sufficient factual matter to show that [**1949] petitioners adopted and implemented the detention policies at issue not for a

neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin.

Respondent disagrees. He argues that, under a theory of "supervisory liability," petitioners can be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees." Iqbal Brief 45-46. That is to say, respondent believes a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. We reject this argument. Respondent's conception of "supervisory liability" is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents. In a §  1983 suit or a *Bivens* action--where masters do not answer for the torts of their  [****28] servants--the term "supervisory liability" is a misnomer. **_HN9_**⚓ **_LEdHN[9]_**⚓ [9] Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of a clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

IV

A

We turn to respondent's complaint. **_HN10_**⚓ **_LEdHN[10]_**⚓ [10] Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is  **[*678]** entitled to relief." As the Court held in *Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929. Nor does a complaint  [****29] suffice if it  [***884] tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (brackets omitted).

Two working principles underlie our decision in *Twombly*. First, **_HN11_**⚓ **_LEdHN[11]_**⚓ [11] the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.*, at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (Although for the purposes of a motion  [****30] to dismiss we must take all of the factual allegations in the complaint as true, we  [**1950] "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for  **[*679]** a plaintiff armed with nothing more than conclusions. Second, **_HN12_**⚓ **_LEdHN[12]_**⚓ [12] only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.*, at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not "show[n]"--"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles **_HN13_**⚓ **_LEdHN[13]_**⚓ [13] a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the  [****31] assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Our decision in *Twombly* illustrates the two-pronged approach. There, we considered the sufficiency of a complaint alleging that incumbent telecommunications providers had entered an agreement not to compete and to forestall competitive entry, in violation of the Sherman Act, 15 U.S.C. §1. Recognizing that §1 enjoins only anticompetitive conduct "effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984), the plaintiffs in *Twombly* [***885]  flatly denied that the defendants "ha[d] entered into a contract, combination or conspiracy to prevent competitive entry . . . and ha[d] agreed not to compete with one another." 550 U.S., at 551, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (internal quotation marks omitted). The complaint also alleged that the defendants' "parallel course of conduct . . . to prevent competition" and inflate prices was indicative of the  **[*680]** unlawful agreement alleged.  [****32] *Ibid.* (internal quotation marks omitted).

The Court held the plaintiffs' complaint deficient under Rule 8. In doing so it first noted that the plaintiffs' assertion of an unlawful agreement was a "'legal conclusion" and, as such, was not entitled to the assumption of truth. *Id.*, at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929. Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce. The Court next addressed the "nub" of the plaintiffs' complaint--the well-pleaded, nonconclusory factual allegation of parallel behavior--to determine whether it gave rise to a "plausible suggestion of conspiracy." *Id.*, at 565-566, 127 S. Ct. 1955, 167 L. Ed. 2d 929. Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior. *Id.*, at 567, 127 S. Ct. 1955, 167 L. Ed. 2d 929. Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed. *Id.*, at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929.

B

Under *Twombly*'s construction  [****33] of Rule 8, we conclude that respondent's complaint [**1951]  has not "nudged [his] claims" of invidious discrimination "across the line from conceivable to plausible." *Ibid.*

We begin our analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth. Respondent pleads that petitioners "knew of, condoned, and willfully and maliciously agreed to subject [him]" to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." Complaint P 96, App. to Pet. for Cert. 173a-174a. The complaint alleges that Ashcroft was the "principal architect" of this invidious policy, **[*681]** *id.,* P 10, at 157a, and that Mueller was "instrumental" in adopting and executing it, *id.,* P 11, at 157a. These bare assertions, much like the pleading of conspiracy in *Twombly*, amount to nothing more than a "formulaic recitation of the elements" of a constitutional discrimination claim, 550 U.S., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929, namely, that petitioners adopted a policy "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," *Feeney*, 442 U.S., at 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870. As such, the allegations are conclusory [***34] and not entitled to be assumed true. *Twombly*, 550 U.S., at 554-555, 127 S. Ct. 1955, 167 L. Ed. 2d 929. To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. We do not so characterize them any more than the Court in [***886] *Twombly* rejected the plaintiffs' express allegation of a "'contract, combination or conspiracy to prevent competitive entry,'" *id.,* at 551, 127 S. Ct. 1955, 167 L. Ed. 2d 929, because it thought that claim too chimerical to be maintained. It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.

We next consider the factual allegations in respondent's complaint to determine if they plausibly suggest an entitlement to relief. The complaint alleges that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11." Complaint P 47, App. to Pet. for Cert. 164a. It further claims that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions [****35] in the weeks after September 11, 2001." *Id.,* P 69, at 168a. Taken as true, these allegations are consistent with petitioners' purposefully designating detainees of "high interest" because of their race, religion, or national origin. But given more likely explanations, they do not plausibly establish this purpose.

**[*682]** The September 11 attacks were perpetrated by 19 Arab Muslim hijackers who counted themselves members in good standing of al Qaeda, an Islamic fundamentalist group. Al Qaeda was headed by another Arab Muslim--Osama bin Laden--and composed in large part of his Arab Muslim disciples. It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims. On the facts respondent alleges the arrests Mueller oversaw were likely lawful and justified by his nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts. As between that "obvious alternative [****36] explanation" for the arrests, *Twombly, supra,* at 567, 127 S. Ct. 1955, 167 L. Ed. 2d 929, and the purposeful, invidious discrimination respondent [**1952] asks us to infer, discrimination is not a plausible conclusion.

But even if the complaint's well-pleaded facts give rise to a plausible inference that respondent's arrest was the result of unconstitutional discrimination, that inference alone would not entitle respondent to relief. It is important to recall that respondent's complaint challenges neither the constitutionality of his arrest nor his initial detention in the MDC. Respondent's constitutional claims against petitioners rest solely on their ostensible "policy of holding post-September-11th detainees" in the ADMAX SHU once they were categorized as "of high interest." Complaint P 69, App. to Pet. for Cert. 168a. To prevail on that theory, the complaint must contain facts plausibly showing that petitioners purposefully adopted a policy of classifying post-September-11 detainees as "of high interest" because of their race, religion, or national origin.

This the complaint fails to do. Though respondent alleges that various other defendants, who are not before us, may **[*683]** have labeled him a [***887] person of "high interest" for impermissible [****37] reasons, his only factual allegation against petitioners accuses them of adopting a policy approving "restrictive conditions of confinement" for post-September-11 detainees until they were "'cleared' by the FBI." *Ibid.* Accepting the truth of that allegation, the complaint does not show, or even intimate, that petitioners purposefully housed detainees in the ADMAX SHU due to their race, religion, or national origin. All it plausibly suggests is that the Nation's top law enforcement officers, in the aftermath of a devastating terrorist attack, sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity. Respondent does not argue, nor can he, that such a motive would violate petitioners' constitutional obligations. He would need to allege more by way of factual content to "nudg[e]" his claim of purposeful discrimination "across the line from conceivable to plausible." *Twombly,* 550 U.S., at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929.

To be sure, respondent can attempt to draw certain contrasts between the pleadings the Court considered in *Twombly* and the pleadings at issue here. In *Twombly*, the complaint alleged general wrongdoing that extended over a [****38] period of years, *id.,* at 551, 127 S. Ct. 1955, 167 L. Ed. 2d 929, whereas here the complaint alleges discrete wrongs--for instance, beatings--by lower level Government actors. The allegations here, if true, and if condoned by petitioners, could be the basis for some inference of wrongful intent on petitioners' part. Despite these distinctions, respondent's pleadings do not suffice to state a claim. Unlike in *Twombly*, where the doctrine of *respondeat superior* could bind the corporate defendant, here, as we have noted, petitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic. Yet respondent's complaint does not contain any factual allegation sufficient to plausibly suggest petitioners' discriminatory state of mind. His pleadings thus do not meet the standard necessary to comply with Rule 8.

**[*684]** It is important to note, however, that we express no opinion concerning the sufficiency of respondent's complaint against the defendants who are not before us. Respondent's account of his prison ordeal alleges serious official misconduct that we need not address here. Our decision is limited to the determination that respondent's complaint does not entitle him to relief [****39] from petitioners.

C

Respondent offers three arguments that bear on our disposition of his case, but none is persuasive.

1 [**1953]

Respondent first says that our decision in *Twombly* should be limited to pleadings made in the context of an antitrust dispute. Iqbal Brief 37-38. This argument is not supported by *Twombly* and is incompatible with the Federal Rules of Civil Procedure. Though *Twombly* determined the sufficiency of a complaint sounding in antitrust, the decision was based on our interpretation and application of Rule 8. 550 U.S., at 554, 127 S. Ct. 1955, 167 L. Ed. 2d 929. *HN14* LEdHN[14] [14] That Rule in turn governs the pleading standard "in all civil actions and proceedings in

the United States district courts. Fed. Rule Civ. Proc. 1. Our decision in *Twombly* expounded the pleading standard for "all civil actions," [***888] *ibid.*, and it applies to antitrust and discrimination suits alike, see 550 U.S., at 555-556, and n. 3, 127 S. Ct. 1955, 167 L. Ed. 2d 929.

2

Respondent next implies that our construction of Rule 8 should be tempered where, as here, the Court of Appeals has "instructed the district court to cabin discovery in such a way as to preserve" petitioners' defense of qualified immunity "as much as possible in anticipation of a summary judgment motion." Iqbal Brief 27. We have [****40] held, however, that the question presented by a motion to dismiss a complaint for insufficient pleadings does not turn on the controls **[*685]** placed upon the discovery process. *Twombly, supra,* at 559, 127 S. Ct. 1955, 167 L. Ed. 2d 929 ("It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side" (internal quotation marks and citation omitted)).

Our rejection of the careful-case-management approach is especially important in suits where Government-official defendants are entitled to assert the defense of qualified immunity. The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including "avoidance of disruptive discovery." *Siegert v. Gilley,* 500 U.S. 226, 236, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991) (Kennedy ▾, J., concurring in judgment). There are serious and legitimate reasons for this. If a Government official is to devote time to his or her duties, and to the formulation of sound and responsible policies, it is counterproductive to require the substantial diversion that [****41] is attendant to participating in litigation and making informed decisions as to how it should proceed. Litigation, though necessary to ensure that officials comply with the law, exacts heavy costs in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government. The costs of diversion are only magnified when Government officials are charged with responding to, as Judge Cabranes aptly put it, "a national and international security emergency unprecedented in the history of the American Republic." 490 F.3d at 179.

It is no answer to these concerns to say that discovery for petitioners can be deferred while pretrial proceedings continue for other defendants. It is quite likely that, when discovery as to the other parties proceeds, it would prove necessary for petitioners and their counsel to participate in the process to ensure the case does not develop in a misleading or slanted way that causes prejudice to their position. Even **[*686]** if petitioners are not yet themselves subject to discovery orders, then, they would not be free from the burdens of discovery.

We decline respondent's invitation to relax [****42] the pleading requirements on the [**1954] ground that the Court of Appeals promises petitioners minimally intrusive discovery. That promise provides especially cold comfort in this pleading context, where we are impelled to give real content to the concept of qualified immunity for high-level officials who must be neither deterred nor detracted from the vigorous performance of their duties. Because respondent's complaint is deficient under [***889] Rule 8, he is not entitled to discovery, cabined or otherwise.

3

Respondent finally maintains that the Federal Rules expressly allow him to allege petitioners' discriminatory intent "generally," which he equates with a conclusory allegation. Iqbal Brief 32 (citing Fed. Rule Civ. Proc. 9). It follows, respondent says, that his complaint is sufficiently well pleaded because it claims that petitioners discriminated against him "on account of [his] religion, race, and/or national origin and for no legitimate penological interest." Complaint P 96, App. to Pet. for Cert. 172a-173a. Were we required to accept this allegation as true, respondent's complaint would survive petitioners' motion to dismiss. But the Federal Rules do not require courts to credit a complaint's [****43] conclusory statements without reference to its factual context.

It is true that *HN15*⬆ *L EdHN[15]*⬆ [15] Rule 9(b) requires particularity when pleading "fraud or mistake," while allowing "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally." But "generally" is a relative term. In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license **[*687]** to evade the less rigid--though still operative--strictures of Rule 8. See 5A C. Wright & A. Miller, Federal Practice and Procedure § 1301, p 291 (3d ed. 2004) ("[A] rigid rule requiring the detailed pleading of a condition of mind would be undesirable because, absent overriding considerations pressing for a specificity requirement, as in the case of averments of fraud or mistake, the general 'short and plain statement of the claim' mandate in Rule 8(a) . . . should control the second sentence of Rule 9(b)"). And Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label "general allegation," and expect his [****44] complaint to survive a motion to dismiss.

V

We hold that respondent's complaint fails to plead sufficient facts to state a claim for purposeful and unlawful discrimination against petitioners. The Court of Appeals should decide in the first instance whether to remand to the District Court so that respondent can seek leave to amend his deficient complaint.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

Dissent by: SOUTER ▾

## Dissent

Justice **Souter,** with whom Justice **Stevens,** Justice **Ginsburg,** and Justice **Breyer** join, dissenting.

This case is here on the uncontested assumption that *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d

619 [1971], allows personal liability based on a federal officer's violation of an individual's rights under the First and Fifth Amendments, and it comes to us with the explicit concession of petitioners Ashcroft and Mueller that an officer may be subject to *Bivens* liability as a supervisor on grounds other than *respondeat* [**1955] *superior.* The Court apparently rejects this concession [***890] and, although it has no bearing on the majority's **[*688]** resolution of this case, does away with supervisory liability [****45] under *Bivens.* The majority then misapplies the pleading standard under *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), to conclude that the complaint fails to state a claim. I respectfully dissent from both the rejection of supervisory liability as a cognizable claim in the face of petitioners' concession, and from the holding that the complaint fails to satisfy Rule 8(a)(2) of the Federal Rules of Civil Procedure.

I

A

Respondent Iqbal was arrested in November 2001 on charges of conspiracy to defraud the United States and fraud in relation to identification documents, and was placed in pretrial detention at the Metropolitan Detention Center in Brooklyn, New York. *Iqbal v. Hasty,* 490 F.3d 143, 147-148 (CA2 2007). He alleges that Federal Bureau of Investigation (FBI) officials carried out a discriminatory policy by designating him as a person "'of high interest'" in the investigation of the September 11 attacks solely because of his race, religion, or national origin. Owing to this designation he was placed in the detention center's Administrative Maximum Special Housing Unit for over six months while awaiting the fraud trial. *Id.,* at 148. As I will mention more fully below, Iqbal contends that Ashcroft and Mueller [****46] were at the very least aware of the discriminatory detention policy and condoned it (and perhaps even took part in devising it), thereby violating his First and Fifth Amendment rights. **1**⬇

Iqbal claims that on the day he was transferred to the special unit, prison guards, without provocation, "picked him up and threw him against the wall, kicked him in the stomach, **[*689]** punched him in the face, and dragged him across the room." First Amended Complaint in No. 04-CV-1809 (JG) (JA), P 113, App. to Pet. for Cert. 176a (hereinafter Complaint). He says that after being attacked a second time he sought medical attention but was denied care for two weeks. *Id.,* PP 187-188, at 189a. According to Iqbal's complaint, prison staff in the special unit subjected him to unjustified strip and body cavity searches, *id.,* PP 136-140, at 181a, verbally berated him as a "'terrorist'" and "'Muslim killer,'" *id.,* P 87, at 170a-171a, refused to give him adequate food, *id.,* P 91, at 171a-172a, [****47] and intentionally turned on air conditioning during the winter and heating during the summer, *id.,* P 84, at 170a. He claims that prison staff interfered with his attempts to pray and engage in religious study, *id.,* PP 153-154, at 183a-184a, and with his access to counsel, *id.,* PP 168, 171, at 186a-187a.

The District Court denied Ashcroft and Mueller's motion to dismiss Iqbal's discrimination claim, and the Court of Appeals affirmed. Ashcroft and Mueller then asked this Court to grant certiorari on two questions:

"1. Whether a conclusory allegation that a cabinet-level officer or other high-ranking official knew of, condoned, or agreed to subject a plaintiff to allegedly unconstitutional acts purportedly committed by subordinate [***891] officials is sufficient to state individual-capacity claims against those officials under *Bivens.*

[**1956] "2. Whether a cabinet-level officer or other high-ranking official may be held personally liable for the allegedly unconstitutional acts of subordinate officials on the ground that, as high-level supervisors, they had constructive notice of the discrimination allegedly carried out by such subordinate officials." Pet. for Cert. I.

The Court granted certiorari on both questions. [****48] The first is about pleading; the second goes to the liability standard.

**[*690]** In the first question, Ashcroft and Mueller did not ask whether "a cabinet-level officer or other high-ranking official" who "knew of, condoned, or agreed to subject a plaintiff to allegedly unconstitutional acts committed by subordinate officials" was subject to liability under *Bivens.* In fact, they conceded in their petition for certiorari that they would be liable if they had "actual knowledge" of discrimination by their subordinates and exhibited "'deliberate indifference'" to that discrimination. Pet. for Cert. 29 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). Instead, they asked the Court to address whether Iqbal's allegations against them (which they call conclusory) were sufficient to satisfy Rule 8(a)(2), and in particular whether the Court of Appeals misapplied our decision in *Twombly* construing that rule. Pet. for Cert. 11-24.

In the second question, Ashcroft and Mueller asked this Court to say whether they could be held personally liable for the actions of their subordinates based on the theory that they had constructive notice of their subordinates' unconstitutional conduct. *Id.,* at 25-33. This [****49] was an odd question to pose, since Iqbal has never claimed that Ashcroft and Mueller are liable on a constructive notice theory. Be that as it may, the second question challenged only one possible ground for imposing supervisory liability under *Bivens.* In sum, both questions assumed that a defendant could raise a *Bivens* claim on theories of supervisory liability other than constructive notice, and neither question asked the parties or the Court to address the elements of such liability.

The briefing at the merits stage was no different. Ashcroft and Mueller argued that the factual allegations in Iqbal's complaint were insufficient to overcome their claim of qualified immunity; they also contended that they could not be held liable on a theory of constructive notice. Again they conceded, however, that they would be subject to supervisory liability if they "had actual knowledge of the assertedly discriminatory nature of the classification of suspects as **[*691]** being 'of high interest' and they were deliberately indifferent to that discrimination." Brief for Petitioners 50; see also Reply Brief for Petitioners 21-22. Iqbal argued that the allegations in his complaint were sufficient under Rule 8(a)(2) [****50] and *Twombly,* and conceded that as a matter of law he could not recover under a theory of *respondeat superior.* See Brief for Respondent Iqbal 46. Thus, the parties agreed as to a proper standard of supervisory liability, and the disputed question was whether Iqbal's complaint satisfied Rule 8(a)(2).

Without acknowledging the parties' agreement as to the standard of supervisory liability, the Court asserts that it must *sua sponte* decide the [***892] scope of supervisory liability here. *Ante,* at 675-677, 129 S. Ct. 1937, 173 L. Ed. 2d, at 882-883. I agree that, absent Ashcroft and Mueller's concession, that determination would have to be made; without knowing the elements of a supervisory liability claim, there would be no way to determine whether a plaintiff had made factual allegations amounting to grounds for relief on that claim. See *Twombly,* 550 U.S., at 557-558, 127 S. Ct. 1955, 167 L. Ed. 2d 929. But deciding the scope of supervisory [**1957] *Bivens* liability in this case is uncalled for. There are several reasons, starting with the position Ashcroft and Mueller have taken and following from it.

First, Ashcroft and Mueller have, as noted, made the critical concession that a supervisor's knowledge of a subordinate's unconstitutional conduct and deliberate indifference to that conduct [****51] are grounds for *Bivens* liability. Iqbal seeks to recover on a theory that Ashcroft and Mueller at least knowingly acquiesced (and maybe more than acquiesced) in the discriminatory acts of their subordinates; if he can show this, he will clearly establish Ashcroft and Mueller's own test for supervisory liability. See *Farmer, supra,* at 842, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (explaining that a prison official acts with "deliberate indifference" if "the official acted or failed to act despite his knowledge of a substantial risk of serious harm"). We do not normally override a party's concession, see, *United States v. International Business Machines Corp.,* 517 U.S. 843, 855, 116 S. Ct. 1793, 135 L. Ed. 2d 124 [*692] (1996) (holding that "[i]t would be inappropriate for us to [e]xamine in this case, without the benefit of the parties' briefing," an issue the Government had conceded), and doing so is especially inappropriate when, as here, the issue is unnecessary to decide the case, see *infra,* at 694, 129 S. Ct. 1937, 173 L. Ed. 2d, at 894. I would therefore accept Ashcroft and Mueller's concession for purposes of this case and proceed to consider whether the complaint alleges at least knowledge and deliberate indifference.

Second, because of the concession, we have received no briefing or argument on the proper [****52] scope of supervisory liability, much less the full-dress argument we normally require. *Mapp v. Ohio,* 367 U.S. 643, 676-677, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, 86 Ohio Law Abs. 513 (1961) (Harlan, J., dissenting). We consequently are in no position to decide the precise contours of supervisory liability here, this issue being a complicated one that has divided the Courts of Appeals. See *infra,* at 693-694, 173 L. Ed. 2d, at 893-894. This Court recently remarked on the danger of "bad decisionmaking" when the briefing on a question is "woefully inadequate," *Pearson v. Callahan,* 555 U.S. 223, 239, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)), yet today the majority answers a question with no briefing at all. The attendant risk of error is palpable.

Finally, the Court's approach is most unfair to Iqbal. He was entitled to rely on Ashcroft and Mueller's concession, both in their petition for certiorari and in their merits briefs, that they could be held liable on a theory of knowledge and deliberate indifference. By overriding that concession, the Court denies Iqbal a fair chance to be heard on the question.

B

The majority, however, does ignore the concession. According to the majority, because Iqbal concededly cannot [***893] recover on a theory of *respondeat superior,* it follows that he cannot recover under [****53] any theory of supervisory liability. *Ante,* at 677, 173 L. Ed. 2d, at 883. The majority says that in a *Bivens* action, "where masters do not answer for the torts of their servants," "the term 'supervisory liability' is a misnomer," and [*693] that "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ibid.* Lest there be any mistake, in these words the majority is not narrowing the scope of *Bivens* supervisory liability entirely. The nature of a supervisory liability theory is that the supervisor may be liable, under certain conditions, for the wrongdoing of his subordinates, and it is this very principle that the majority rejects. *Ante,* at 683, 173 L. Ed. 2d, at 887 (" [P]etitioners cannot be held liable unless they themselves [**1958] acted on account of a constitutionally protected characteristic").

The dangers of the majority's readiness to proceed without briefing and argument are apparent in its cursory analysis, which rests on the assumption that only two outcomes are possible here: *respondeat superior* liability, in which "[a]n employer is subject to liability for torts committed by employees while acting within the scope [****54] of their employment," *Restatement (Third) of Agency § 2.04* (2005), or no supervisory liability at all. The dichotomy is false. Even if an employer is not liable for the actions of his employee solely because the employee was acting within the scope of employment, there still might be conditions to render a supervisor liable for the conduct of his subordinate. See, *e.g., Whitfield v. Melendez-Rivera,* 431 F.3d 1, 14 (CA1 2005) (distinguishing between *respondeat superior* liability and supervisory liability); *Bennett v. Eastpointe,* 410 F.3d 810, 818 (CA6 2005) (same); *Richardson v. Goord,* 347 F.3d 431, 435 (CA2 2003) (same); *Hall v. Lombardi,* 996 F.2d 954, 961 (CA8 1993) (same).

In fact, there is quite a spectrum of possible tests for supervisory liability: it could be imposed where a supervisor has actual knowledge of a subordinate's constitutional violation and acquiesces, see, *e.g., Baker v. Monroe Twp.,* 50 F.3d 1186, 1194 (CA3 1995); *Woodward v. Worland,* 977 F.2d 1392, 1400 (CA10 1992); or where supervisors "'know about the conduct and facilitate it, approve it, condone it, or turn a [*694] blind eye for fear of what they might see,'" *International Action Center v. United States,* 365 F.3d 20, 28, 361 U.S. App. D.C. 108 (CADC 2004) [****55] (Roberts ▾, J.) (quoting *Jones v. Chicago,* 856 F.2d 985, 992 (CA7 1988) (Posner, J.)); or where the supervisor has no actual knowledge of the violation but was reckless in his supervision of the subordinate, see, *e.g., Hall, supra,* at 961; or where the supervisor was grossly negligent, see, *e.g., Lipsett v. University of Puerto Rico,* 864 F.2d 881, 902 (CA1 1988). I am unsure what the general test for supervisory liability should be, and in the absence of briefing and argument I am in no position to choose or devise one.

Neither is the majority, but what is most remarkable about its foray into supervisory liability is that its conclusion has no bearing on its resolution of the case. The majority says that all of the allegations in the complaint that Ashcroft and Mueller authorized, condoned, or even were aware of their subordinates' discriminatory conduct are "conclusory" and therefore are "not entitled to be assumed true." *Ante,* at 681, 173 L. Ed. 2d, at 885. [***894] As I explain below, this conclusion is unsound, but on the majority's understanding of *Rule 8(a)(2)* pleading standards, even if the majority accepted Ashcroft and Mueller's concession and asked whether the complaint sufficiently alleges knowledge and deliberate [****56] indifference, it presumably would still conclude that the complaint fails to plead sufficient facts and must be dismissed. 2 ⬆

II

Given petitioners' concession, the complaint satisfies *Rule 8(a)(2)*. Ashcroft and Mueller admit they are liable for their subordinates' conduct if they "had actual knowledge of the assertedly discriminatory nature of the classification of suspects [*695] as being 'of high interest' and they were deliberately indifferent to that discrimination." Brief for Petitioners 50. Iqbal alleges [***1959] that after the September 11 attacks the FBI "arrested and detained thousands of Arab Muslim men," Complaint P 47, App. to Pet. for Cert. 164a, that many of these men were designated by high-ranking FBI officials as being "'of high interest,'" *id.,* PP 48, 50, at 164a, and that in many cases, including Iqbal's, this designation was made "because of the [****57] race, religion, and national origin of the detainees, and not because of any evidence of the detainees' involvement in supporting terrorist activity," *id.,* P 49, at 164aThe complaint further alleges that Ashcroft was the "principal architect of the policies and practices challenged," *id.,* P 10, at 157a, and that Mueller "was instrumental in the adoption, promulgation, and implementation of the policies and practices challenged," *id.,* P 11, at 157a. According to the complaint, Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject [Iqbal] to these conditions of confinement as a matter of policy, solely on account of [his] religion, race, and/or

national origin and for no legitimate penological interest." *Id.*, P 96, at 172a–173a. The complaint thus alleges, at a bare minimum, that Ashcroft and Mueller knew of and condoned the discriminatory policy their subordinates carried out. Actually, the complaint goes further in alleging that Ashcroft and Mueller affirmatively acted to create the discriminatory detention policy. If these factual allegations are true, Ashcroft and Mueller were, at the very least, aware of the discriminatory policy being implemented and deliberately [****58] indifferent to it.

Ashcroft and Mueller argue that these allegations fail to satisfy the "plausibility standard" of *Twombly*. They contend that Iqbal's claims are implausible because such high-ranking officials "tend not to be personally involved in the specific actions of lower-level officers down the bureaucratic chain of command." Brief for Petitioners 28. But this response bespeaks a fundamental misunderstanding of the enquiry **[*696]** that *Twombly* demands. *Twombly* does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true. We made it clear, on the contrary, that a court must take the allegations as true, no matter how skeptical the court may be. See 550 U.S., at 555, [***895] 127 S. Ct. 1955, 167 L. Ed. 2d 929 (a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"); *id.*, at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable"); see also *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"). The sole exception to [****59] this rule lies with allegations that are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel. That is not what we have here.

Under *Twombly*, the relevant question is whether, assuming the factual allegations are true, the plaintiff has stated a ground for relief that is plausible. That is, in *Twombly*'s words, a plaintiff must "allege facts" that, taken as true, are "suggestive of illegal conduct." 550 U.S., at 564, n. 8, 127 S. Ct. 1955, 167 L. Ed. 2d 929. In *Twombly*, we were faced with allegations of a conspiracy to violate § 1 of the Sherman Act through parallel conduct. The difficulty was that the conduct alleged was "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.*, at 554, 127 S. Ct. 1955, 167 L. Ed. 2d 929. We held that in "that sort of circumstance, "[a]n allegation of parallel conduct is . . . much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of 'entitlement [****60] to relief.'" *Id.*, at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (brackets omitted). Here, by contrast, the allegations in the complaint are neither confined to naked legal conclusions nor consistent **[*697]** with legal conduct. The complaint alleges that FBI officials discriminated against Iqbal solely on account of his race, religion, and national origin, and it alleges the knowledge and deliberate indifference that, by Ashcroft and Mueller's own admission, are sufficient to make them liable for the illegal conduct. Iqbal's complaint therefore contains "enough facts to state a claim to relief that is plausible on its face." *Id.*, at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929.

I do not understand the majority to disagree with this understanding of "plausibility" under *Twombly*. Rather, the majority discards the allegations discussed above with regard to Ashcroft and Mueller as conclusory, and is left considering only two statements in its complaint: that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11," Complaint P 47, App. to Pet. for Cert. 164a, and that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement [****61] until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001," *id.*, P 69, at 168a. See *ante, at 681, 173 L. Ed. 2d, at 886*. I think the majority is right in saying that these allegations suggest only that Ashcroft and Mueller "sought to keep suspected terrorists in the most secure conditions available until the [***896] suspects could be cleared of terrorist activity," *ante, at 683, 173 L. Ed. 2d, at 887*, and that this produced "a disparate, incidental impact on Arab Muslims," *ante, at 682, 173 L. Ed. 2d, at 886*. And I agree that two allegations selected by the majority, standing alone, do not state a plausible entitlement to relief for unconstitutional discrimination.

But these allegations do not stand alone as the only significant, nonconclusory statements in the complaint, for the complaint contains many allegations linking Ashcroft and Mueller to the discriminatory practices of their subordinates. See Complaint P 10, App. to Pet. for Cert. 157a (Ashcroft was the "principal architect" of the discriminatory policy); **[*698]** *id.*, P 11, at 157a (Mueller was "instrumental" in adopting and executing the discriminatory policy); *id.*, P 96, at 172a–173a (Ashcroft and Mueller "knew of, condoned, and willfully [****62] and maliciously agreed to subject" Iqbal to harsh conditions "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest").

The majority says that these are "bare assertions" that, "much like the pleading of conspiracy in *Twombly*, amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim" and therefore are "not entitled to be assumed true." *Ante, at 681, 173 L. Ed. 2d, at 885* (quoting *Twombly, supra, at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929*). The fallacy of the majority's position, however, lies in looking at the relevant assertions in isolation. The complaint contains specific allegations that, in the aftermath of the September 11 attacks, the Chief of the FBI's International Terrorism Operations Section and the Assistant Special Agent in Charge for the FBI's New York Field Office implemented a policy that discriminated against Arab Muslim men, including Iqbal, solely on account of their race, religion, or national origin. See [**1961] Complaint PP 47-53, supra,at 164a-165a. Viewed in light of these subsidiary allegations, the allegations singled out by the majority as "conclusory" are no such thing. Iqbal's claim [****63] is not that Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject" him to a discriminatory practice that is left undefined; his allegation is that "they knew of, condoned, and willfully and maliciously agreed to subject" him to a particular, discrete, discriminatory policy detailed in the complaint. Iqbal does not say merely that Ashcroft was the architect of some amorphous discrimination, or that Mueller was instrumental in an ill-defined constitutional violation; he alleges that they helped to create the discriminatory policy he has described. Taking the complaint as a whole, it gives Ashcroft and Mueller "'fair notice of what the . . . claim is and the grounds upon which it **[*699]** rests.'" *Twombly, 550 U.S., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929* (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)* (omission in original)).

That aside, the majority's holding that the statements it selects are conclusory cannot be squared with its treatment of certain other allegations in the complaint as nonconclusory. For example, the majority takes as true the statement that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' [****64] by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after [***897] September 11, 2001." Complaint P 69, supra, at 168a; see *ante, at 681, 173 L. Ed. 2d, at 886*. This statement makes two points: (1) after September 11, the FBI held certain detainees in highly restrictive conditions, and (2) Ashcroft and Mueller discussed and approved these conditions. If, as the majority says, these allegations are not conclusory, then I cannot see

why the majority deems it merely conclusory when Iqbal alleges that (1) after September 11, the FBI designated Arab Muslim detainees as being of "'high interest'" "because of the race, religion, and national origin of the detainees, and not because of any evidence of the detainees' involvement in supporting terrorist activity," Complaint PP 48-50, App. to Pet. for Cert. 164a, and (2) Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed" to that discrimination, *id.*, P 96, at 172a. By my lights, there is no principled basis for the majority's disregard of the allegations linking Ashcroft and Mueller to their subordinates' discrimination.

I respectfully dissent.

Justice **Breyer,** dissenting.

I agree with Justice Souter and join [****65] his dissent. I write separately to point out that, like the Court, I believe it important to prevent unwarranted litigation from interfering with "the proper execution of the work of the Government." *Ante,* at 685, 173 L. Ed. 2d, at 888. But I cannot find in that need adequate justification for the Court's interpretation of *Bell* **[*700]** Atlantic Corp. v. *Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and Federal Rule of Civil Procedure 8. The law, after all, provides trial courts with other legal weapons designed to prevent unwarranted interference. As the Second Circuit explained, where a Government defendant asserts a qualified immunity defense, a trial court, responsible for managing a case and "mindful of the need to vindicate the purpose of the qualified immunity defense," can structure discovery in ways that diminish the risk of imposing unwarranted burdens upon public officials. See *Iqbal v. Hasty,* 490 F.3d 143, 158 (2007). A district court, for example, can begin discovery with lower level Government defendants before determining whether a case can be made to allow [**1962] discovery related to higher level Government officials. See *ibid.* Neither the briefs nor the Court's opinion provides convincing grounds for finding these alternative [****66] case-management tools inadequate, either in general or in the case before us. For this reason, as well as for the independently sufficient reasons set forth in Justice Souter's opinion, I would affirm the Second Circuit.

## References

28 U.S.C.S. § 1291; U.S.C.S. Court Rules, Federal Rules of Civil Procedure, Rule 8

Moore's Federal Practice §§ 8.04, 9.05, 202.13 (Matthew Bender 3d ed.)

L Ed Digest, Appeal § 23; Pleading § 191

L Ed Index, Bivens Action

When will private right of action for damages ("Bivens" action) be implied from provision of Federal Constitution--Supreme Court cases. 127 L. Ed. 2d 715.

Supreme Court's construction and application of Rules 8 and 9 of Federal Rules of Civil Procedure, concerning general rules of pleading and pleading special matters. 122 L. Ed. 2d 897.

Supreme Court's views as to application or applicability of doctrine of qualified immunity in action under 42 U.S.C.S. § 1983, or in Bivens action, seeking damages for alleged civil rights violations. 116 L. Ed. 2d 965.

What constitutes "collateral order" which is immediately appealable under 28 U.S.C.S. § 1291--Supreme Court cases. 99 L. Ed. 2d 991.

---

**Footnotes**

**1** Iqbal makes no claim against Ashcroft and Mueller based simply on his right, as a pretrial detainee, to be free from punishment prior to an adjudication of guilt on the fraud charges. See *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979).

**2** If I am mistaken, and the majority's rejection of the concession is somehow outcome determinative, then its approach is even more unfair to Iqbal than previously explained, see *supra, at 692, 173 L. Ed. 2d, at 879,* for Iqbal had no reason to argue the (apparently dispositive) supervisory liability standard in light of the concession.

---



Privacy Policy                    Terms & Conditions                    Copyright © 2023 LexisNexis.

## ⚠ AXA Equitable Life Ins. Co. v. Infinity Fin. Group, LLC, 608 F. Supp. 2d 1349

**Copy Citation**

United States District Court for the Southern District of Florida

March 31, 2009, Decided; March 31, 2009, Entered

CASE NO. 08-80611-CIV-HURLEY/HOPKINS

**Reporter**

**608 F. Supp. 2d 1349** \* | 2009 U.S. Dist. LEXIS 42042 \*\* | 21 Fla. L. Weekly Fed. D 629

AXA EQUITABLE LIFE INSURANCE COMPANY, Plaintiff, v. INFINITY FINANCIAL GROUP, LLC, et al., Defendants.

**Subsequent History:** Motion denied by AXA Equitable Life Ins. Co. v. Infinity Fin. Group, LLC, 2009 U.S. Dist. LEXIS 74409 (S.D. Fla., Apr. 1, 2009)

**Prior History:** AXA Equitable Life Ins. Co. v. Infinity Fin. Group, LLC, 608 F. Supp. 2d 1330, 2009 U.S. Dist. LEXIS 33394 (S.D. Fla., 2009)

## Core Terms

insured, policies, alleges, personal jurisdiction, motion to dismiss, amended complaint, assigned, trusts, insurable interest, insurance policy, life insurance policy, misrepresentations, procured, civil conspiracy, fraudulently, non-resident, Defendants', conspiracy, rescission, residents, long-arm

**Counsel:** [\*\*1] For AXA Equitable Life Insurance Company, Plaintiff: Gary John Guzzi ⌄, LEAD ATTORNEY, Antonio DeJesus Morin ⌄, Akerman Senterfitt ⌄, Miami, FL; Michael D. Mulvaney ⌄, LEAD ATTORNEY, PRO HAC VICE, Maynard Cooper & Gale ⌄, Birmingham, AL; Christopher C. Frost ⌄, PRO HAC VICE, John Norman Bolus ⌄, Maynard Cooper & Gale ⌄, Birmingham, AL.

For Infinity Financial Group, LLC, and its unnamed network of investors; Infinity Wealth Advisors, LLC, Infinity Boynton Beach, LLC, Infinity Wealth and Investments, LLC, Infinity Wealth and Insurance LLC, Infinity Wealth and Tax, LLC, Infinity Wealth and Marketing, LLC, Defendants: Ira Gutt ⌄, LEAD ATTORNEY, Behar, Gutt & Glazer, P.A. ⌄, Aventura, FL.

For Steven Brasner, individually and as principal of Infinity Financial Group, LLC, Defendant: Ira Gutt ⌄, LEAD ATTORNEY, Behar, Gutt & Glazer, P.A. ⌄, Aventura, FL; Lawrence Phillip Ingram ⌄, LEAD ATTORNEY, Phelps Dunbar, LLP ⌄, Tampa, FL; Jessica Kirkwood Alley ⌄, Ryan C. Hasanbasic ⌄, PRO HAC VICE, Phelps Dunbar ⌄, Tampa, FL.

For Kevin H Bechtel, individually and as principal of the Kevin H. Bechtel Broker General Agency of Life Brokerage Partners LLC, Gary Richardson, individually and as principal of the Gary Richardson Broker General [\*\*2] Agency of Life Brokerage Equity Group and Life Brokerage Financial Group; Life Brokerage Equity Group, Inc., Defendants: Charles Germain Geitner ⌄, Kelly B. Holbrook ⌄, 2006 Insurance Trust Dated September 1, 2006, The Zachary Adam Harrington ⌄, LEAD ATTORNEYS, Broad & Cassel ⌄, Tampa, FL.

For The Harlan Altman Insurance Trust Dated September 1, 2006, by and through its Trustees; The Walter Glass ⌄ 2006 Insurance Trust Dated September 1, 2006 by and through its Trustees; The Carol Sciolino 2006 Life Insurance Trust dated December 19,2006 by and through its Trustees; Kristine M. Neuhauser and Naticity, Kristine M Neuhauser, The Walter Glass ⌄ 2006 Insurance Trust Dated September 1, 2006, The Carol Sciolino 2006 Life Insurance Trust dated December 19, 2006, NatCity Trust Company of Delaware, as Trustee, Defendants: Mitchell Reid Bloomberg ⌄, LEAD ATTORNEY, Adorno & Yoss ⌄, Miami, FL; Natalie Jessica Carlos ⌄, Neil Preseton Linden ⌄, Adorno & Yoss LLP ⌄, Miami, FL.

For The Geoffrey Glass ⌄ 2007-1 Insurance Trust dated January 1, 2007, by and through its Trustee; the Goeffrey Glass ⌄ 2007-2 Insurance Trust Dated January 1, 2007 by and through its Trustees; Walter Glass ⌄ and Greatbanc Trust Company as Trustees of the Geoffrey Glass ⌄ 2007-1 Insurance Trust Dated January [\*\*3] 1, 2007, The Geoffrey Glass ⌄ 2007-2 Insurance Trust dated January 1, 2007, Defendants,

Counter Claimant: Jonathan Gailer, Matthew Henry Triggs ▾, LEAD ATTORNEYS, Proskauer Rose, Boca Raton, FL.

For Harlan Altman, Individually, Defendant: Stephanie Reed Traband ▾, LEAD ATTORNEY, Jones Walker ▾, Miami, FL.

Geoffrey Glass ▾, individually, Defendant, Pro se, Wheeling, IL.

Walter Glass ▾, individually, Defendant, Pro se, Chicago, IL.

For Carol Sciolino, individually, Defendant: James D. Sallah ▾, Sallah & Cox LLC ▾, Boca Raton, FL; Joshua Arnold Katz ▾, Klein & Sallah LLC ▾, Boca Raton, FL

Walter Glass ▾, Walter Glass ▾, as Trustee, Defendant, Pro se, Miami, FL.

For Greatbanc Trust Company, solely as Administrative Trustee of the Geoffrey Glass ▾ 2007-1 Insurance Trust dated January 1, 2007 and the Geoffrey Glass ▾ 2007-2 Insurance Trust dated January 1, 2007, Defendant: James Thomas Ferrara ▾, LEAD ATTORNEY, Kluger Peretz Kaplan & Berlin PA ▾, Boca Raton, FL; Scott Barry Newman ▾, LEAD ATTORNEY, Holland & Knight ▾, West Palm Beach, FL.

For AXA Equitable Life Insurance Company, Counter Defendant: Gary John Guzzi ▾, LEAD ATTORNEY, Antonio DeJesus Morin ▾, Akerman Senterfitt ▾, Miami, FL; Michael D. Mulvaney ▾, LEAD ATTORNEY, Christopher ▾ [**4] C. Frost, John Norman Bolus ▾, Maynard Cooper & Gale ▾, Birmingham, AL.

**Judges:** Daniel T. K. Hurley ▾, United States District Judge.

**Opinion by:** Daniel T. K. Hurley ▾

## Opinion

**[*1352]** <u>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS**</u>

**THIS CAUSE** comes before the court upon the motion of defendants Harlan Altman Trust Dated September 1, 2006, Walter Glass ▾ 2006 Insurance Trust Dated September 1, 2006, Carol Sciolino 2006 Life Insurance Trust Dated December 16, 2006, Kristine M. Neuhauser and NatCity Trust Company of Delaware (the "Delaware Trust Defendants") to dismiss the complaint [DE # 56]. For the reasons given below, the court will deny defendants'.

### BACKGROUND

This is a suit for rescission of several insurance policies pursuant to the Florida Insurance Code, and alleging claims of fraud and negligence. The complaint alleges that the defendants collaborated in a scheme to recruit elderly applicants for life insurance policies with large face amounts. According to the complaint, the policies were never meant to be retained by the **[*1353]** insured or their family members; rather, from the outset the policies insuring the lives of the applicants were to be paid for and held by outside investors, in violation of state law. The complaint alleges [**5] that this was accomplished by making material misrepresentations to the issuer of the policies, plaintiff Axa Equitable Life Insurance Co., and by creating trusts to hold the insurance policies in order to disguise the policies' true ownership. Three of those trusts were organized in Delaware, and their trustees are citizens of Delaware as well. They comprise the group of defendants who filed the instant motion to dismiss.

### JURISDICTION

This court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1332. Venue is proper in this court pursuant to 28 U.S.C. § 1391 (a)(2) because a substantial part of the events giving rise to plaintiff's claim occurred in the Southern District of Florida.

### DISCUSSION

#### A. Standard on Motion to Dismiss

Granting a motion to dismiss is appropriate when a complaint contains simply "a formulaic recitation of the elements of a cause of action." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). To survive a motion to dismiss, a complaint must contain factual allegations that "raise a reasonable expectation that discovery will reveal evidence" in support of the claim and that plausibly suggest relief is appropriate. *Id.* On a motion to dismiss, the [**6] complaint is construed in the light most favorable to the non-moving party, and all facts alleged by the non-moving party are accepted as true. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984); *Wright v. Newsome*, 795 F.2d 964, 967 (11th Cir. 1986). The threshold is "exceedingly low" for a complaint to survive a motion to dismiss for failure to state a claim upon which relief can be granted. *See Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985). Regardless of the alleged facts, a court may dismiss a complaint on a dispositive issue of law. *See Marshall County Bd. Of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

**B. Defendants' Motion to Dismiss**

*1. Personal Jurisdiction*

The Delaware Trust Defendants first argue that they must be dismissed from this action because the court lacks personal jurisdiction over them.

When sitting in diversity, a federal court must undertake a two-step process in determining whether personal jurisdiction exists. The court must determine whether: (1) jurisdiction over the defendant is conferred by the state long-arm statute; and, if so, whether (2) the exercise of jurisdiction would not violate the Due Process Clause of the Fourteenth Amendment. [**7] *See United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009).

A Florida court has specific personal jurisdiction over a non-resident of Florida to determine a cause of action arising from the non-resident's commission of a tortious act in Florida. *See* Fla. Stat. § 48.193(1)(b). The Florida Supreme Court has held that, for purposes of the long-arm statute, a non-resident may commit a tortious act in Florida "through the nonresident defendant's telephonic, electronic, or written communications into Florida." *Wendt v. Horowitz*, 822 So.2d 1252, 1260 (Fla. 2002). Federal courts, including the Eleventh Circuit Court of Appeals, have acknowledged and applied the Florida Supreme Court's holding in *Wendt*. *See Internet Solutions Corp. v. Marshall*, 557 F.3d 1293, 2009 WL 311301 at *2 (11th Cir. [*1354] 2009); *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1168 (11th Cir. 2005).

Kristine M. Neuhauser, formerly an employee of NatCity Trust Company of Delaware, the trustee of the three Delaware Trusts, submitted an affidavit stating that no telephonic, written, or electronic communications were transmitted to anyone in Florida in relation to the three life insurance [**8] policies housed by the trusts. Neuhauser Aff. P 6. This affidavit evidence in opposition to personal jurisdiction shifts the burden back to the plaintiff to produce evidence in favor of jurisdiction. *See Mazer*, 556 F.3d at 1274, 1277; *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268 (11th Cir. 2002).

Here, the court concludes plaintiff has not met its burden in this regard. One of the insureds, Carol Sciolino, is a resident of Boynton Beach, Florida. Sciolino submitted a sworn statement describing her recruitment by Brasner, and her understanding that the premiums were to be financed by third parties, and that she would immediately assign the policy to a third party in exchange for a fee. *See* DE 96-3. But neither the Sciolino statement, nor any other evidence submitted by plaintiff, identifies any specific communications made between the Delaware Trust Defendants and any person or entity in Florida. Thus plaintiff has not rebutted the evidence submitted by the Delaware Trust Defendants, in the form of the Neuhauser affidavit, that there were no such communications.

However, this is not the end of the analysis. Plaintiff has also alleged that the Delaware Trust Defendants [**9] are liable for engaging in a civil conspiracy with the other defendants in the case. *See* Am. Compl. P 125-132. Florida law construes the state's long-arm statute to reach all of the alleged participants in a civil conspiracy, at least one act in furtherance of which is committed in Florida. *See Machtinger v. Inertial Airline Services, Inc.*, 937 So.2d 730, 734-36 (Fla. 3d DCA 2006); *Wilcox v. Stout*, 637 So.2d 335, 336 (Fla. 2d DCA 1994). Florida courts may exercise personal jurisdiction over parties to a Florida civil conspiracy even if the alleged civil conspirator otherwise has no connection to the state. *See Mazer*, 556 F.3d at 1281-82.

In this case, the complaint as a whole describes a large conspiracy to fraudulently cause plaintiff to issue several life insurance policies based on material misinformation. The majority of the defendants, including Brasner, Kevin H. Bechtel, and Gary Richardson, and at least two of the insured, Harlan Altman and Carol Sciolino, are alleged to be citizens of Florida. *See* Am. Compl. P 11, 12, 18, 21. The entities controlled by Brasner are also alleged to be Florida residents. *See id.* P 6-9. One of the insurance policies alleged to be fraudulently obtained [**10] was issued to Sciolino at her residence in Florida. *See* DE # 96-5. Thus, the complaint as a whole sufficiently alleges that the defendants formed a civil conspiracy, at least some acts in furtherance of which were carried out in Florida. Florida's long-arm statute therefore reaches all participants in that conspiracy, even those not otherwise connected to Florida, such as the Delaware Trust Defendants. *Cf. Arch Aluminum & Glass Co. v. Haney*, 964 So.2d 228, 234-35 (Fla. 4th DCA 2007) (finding personal jurisdiction not supported because "the tort did not occur in Florida, and *neither did the conspiracy*") (emphasis added).

The court is further satisfied that exercise of personal jurisdiction over the Delaware Trust Defendants would not be contrary to the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Delaware Trust [*1355] Defendants may not be sued in Florida unless their contacts with the state are such that they had "fair warning" that they could be subject to suit in Florida. *See Licciardello v. Lovelady*, 544 F.3d 1280, 1284 (11th Cir. 2008). The Delaware Trust Defendants must have been reasonably able to anticipate being sued in a Florida court. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985). [**11] The exercise of jurisdiction must be consistent with "fair play and substantial justice," as determined in light of factors such as the burden on the defendant of litigating in the forum, the forum's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, and the judicial system's interest in resolving the dispute. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980); *International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S. Ct. 154, 90 L. Ed. 95 (1945).

The Eleventh Circuit has held that allegations of intentional torts support the exercise of personal jurisdiction over a nonresident defendant with no other contacts with the forum. *See Licciardello*, 544 F.3d at 1285. As just discussed, the amended complaint alleges that the Delaware Trust Defendants participated in a conspiracy to cause plaintiff to issue life insurance policies based on fraudulent applications. Many of the co-conspirators and several of the named insured are Florida residents. The allegations of the complaint are sufficient to permit the inference that the Delaware Trust Defendants "purposely directed" their activities at residents of the forum. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984).

Moreover, [**12] many of the factors enumerated in *Woodson* weigh in favor of permitting a Florida court to exercise jurisdiction over the Delaware Trust Defendants. There appears to be no particularly significant burden on the Delaware Trust Defendants from litigating in Florida. The plaintiff, meanwhile, has a substantial interest in obtaining convenient and effective relief by asserting its claims against all defendants in a single action. Florida is the most logical forum for such an action in light of the many defendants that reside in the state. Finally, because its citizens are alleged to be involved in the scheme, both as insurance brokers and insureds, Florida and its courts have a significant interest in resolving this dispute.

In sum, the Florida long-arm statute confers personal jurisdiction over the Delaware Trust Defendants in this case, and the exercise of jurisdiction over the Delaware Trust Defendants would not violate the United States Constitution. The motion to dismiss for lack of personal jurisdiction must therefore be denied.

*2. Failure to State a Claim*

The Delaware Trust Defendants next argue that several of plaintiff's claims against them must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) [**13] for failure to state a claim.

Count I asserts a claim for rescission of an insurance contract due to a fraudulent misrepresentation in an application pursuant to Fla. Stat. § 627.409. That section provides that a "misrepresentation, omission, concealment of fact, or incorrect statement" may constitute grounds for rescission, provided certain conditions are met. The Delaware Trust Defendants argue that the amended complaint does not allege that they made any misrepresentations that would permit plaintiff to rescind the policies under the statute.

It is true that the role of the Delaware Trusts in the scheme alleged in the amended complaint was to hold the life insurance policies after they were issued. **[*1356]** The amended complaint does not allege that the trusts themselves made the misrepresentations based upon which the policies were allegedly issued. However, an assignment of an insurance policy places the assignee in the same status with respect to all rights and liabilities under it which the insured occupied before the transfer; the assignee is effectively substituted as the insured. *See* 30A Fl. Jur. 2d Insurance § 1566; *Pendas v. Equitable Life Assurance Soc'y of U.S.,* 129 Fla. 253, 176 So. 104, 110 (Fla. 1937); [**14] *Moon v. Williams,* 102 Fla. 214, 135 So. 555, 557 (Fla. 1931). Therefore, if the policies were subject to rescission under their original ownership, they may be rescinded notwithstanding their assignment to the Delaware Trusts. Thus, because the Delaware Trusts are now the owners of the policies which may be subject to rescission, they are properly joined as defendants even though plaintiff makes no allegation that the Delaware Trust Defendants themselves made any misrepresentations. The motion to dismiss Count I will be denied.

Count II alleges that the insurance policies are void for lack of an insurable interest. *See* Fla. Stat. § 627.404(1) ("[N]o person shall procure or cause to be procured or effected an insurance contract on the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representatives, or to any person having, at the time such contract was made, an insurable interest in the individual insured. The insurable interest need not exist after the inception date of coverage under the contract."). The Delaware Trust Defendants emphasize the last sentence in subsection (1) -- that the insurable interest need [**15] not exist after the inception date of coverage. They argue that because the amended complaint alleges that the insureds procured the insurance before assigning them to the Delaware Trusts, no violation of § 627.404 has been pled.

Florida permits the assignment of life insurance policies to persons without an insurable interest in the life of the insured. *See, e.g.,* *Great West Life Assur. Co. v. Greene,* 678 So.2d 385 (Fla. 3d DCA 1996) (involving a life insurance policy assigned as part of a divorce settlement); *Lewis State Bank v. Travelers Ins. Co.,* 356 So.2d 1344 (Fla. 1st DCA 1978) (policy assigned to bank as security for loan); *Travelers Ins. Co. v. Tallahassee Bank & Trust Co.,* 133 So.2d 463 (Fla. 1st DCA 1961) (same). But this rule extends only to assignments made in good faith, and not to sham assignments made simply to circumvent the law's prohibition on "wagering contracts." *See* *Wages v. Wages,* 202 Ga. 155, 42 S.E.2d 481, 486 (Ga. 1947) (disapproving assignment of a policy where "the insured was but incidentally a party to a transaction which in its inception was contrary to public policy"); *Chamberlain v. Butler,* 61 Neb. 730, 86 N.W. 481, 483 (Neb. 1901) (allowing assignments of policies "taken out [**16] in good faith, and afterwards assigned in good faith," but not where the agreement to assign the policy existed "prior to the issuance of the policy, or contemporaneously therewith"); *Steinback v. Diepenbrock,* 158 N.Y. 24, 52 N.E. 662 (N.Y. 1899) ("The insured, instead of taking out a policy payable to a person having no insurable interest in his life, can take it out to himself and at once assign it to such a person. But such an attempt would not prove successful, for a policy issued and assigned, under such circumstances, would be none the less a wagering policy because of the form of it.").

Assuming the truth of the allegations of the amended complaint as true, as the court must at this stage, the procurement and the assignment of the policies was not done in good faith, but was part of **[*1357]** a scheme devised by defendants to obtain interests in insurance policies, not yet issued, that insured lives in which the defendants had no insurable interest. *See* Am. Compl. P 44-47, 68-70, 77-79, 87-89 (alleging that defendant Brasner falsely represented on the application for each of the policies that the owner had no present intent to sell the policy as part of a viatical settlement). 🔲⤓ If the plaintiff's [**17] allegations are true, the insured never planned to maintain the policies themselves. Rather, the policies were procured only as part of a plan established from the outset, under which third parties were to pay the premiums for the policies and the insured would immediately assign their policies to entities in which other parties would maintain interests. Thus, the amended complaint adequately states allegations that, if proven, would render the policies void for lack of an insurable interest. *See, e.g.,* *Lakin v. Postal Life & Cas. Ins. Co.,* 316 S.W.2d 542, 552 (Mo. 1958) (rejecting the argument that a life insurance policy was validly assigned to a person with no insurable interest where the putative assignee "personally paid the premium [and] simultaneously made arrangements to be designated as beneficiary and to have the policy assigned to him . . . . This unquestionably constituted one transaction whereby appellant caused to be issued for his own benefit a policy of insurance, for which he paid the premium, on the life of [another person] in which he had no insurable interest."). The motion to dismiss Count II must therefore be denied.

Count III alleges a common-law claim of fraud. The Delaware Trust Defendants argue that it must be dismissed for failure to plead the allegations with the specificity required by Fed. R. Civ. P. 9(b). This argument is without merit.

"Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Mizzaro v. Home Depot, Inc.,* 544 F.3d 1230, 1237 (11th Cir. 2008) [**19] (quoting *Tello v. Dean Witter Reynolds, Inc.,* 494 F.3d 956, 972 (11th Cir. 2007)) (internal quotations omitted).

The amended complaint clearly identifies the misrepresentations made with respect to each insurance policy; the time and place of each (i.e., the application for issuance of the policy); the person responsible for making each misrepresentation and the contents of the statements; and what the defendants obtained as a consequence (issuance of the policy, and in the case of the broker defendants, commissions associated therewith). *See* Am. Compl. P 33-94. The allegations of the amended complaint thus satisfy Rule 9(b)'s heightened pleading requirements, and the motion to dismiss Count III must be denied. *Cf.* *American United Life Ins. Co. v. Martinez,* 480 F.3d 1043, 1064-65 (affirming Rule 9(b)

dismissal of claims that insurance policies were fraudulently procured, where the party asserting the claim "presented only general conclusory allegations of fraud").

**[\*1358]** The Delaware Trust Defendants' motion to dismiss Counts IV and V, which assert claims of civil conspiracy and aiding and abetting fraud, must likewise be denied. *Martinez,* in which the Eleventh Circuit upheld the dismissal [\*\*20] of a civil conspiracy claim asserted against the owners of allegedly fraudulently obtained life insurance policies, is distinguishable because in that case the insurers "did not explain how the [policy owners] knew that the policies had been procured by fraud." 480 F.3d at 1068. By contrast, in this case plaintiff has alleged that the trusts were the owners of the policies either from the beginning, as in the case of Geoffrey Glass, *see* Am. Compl. P 64-65, or immediately after the issuance of the policy, as in the case of Harlan Altman, Walter Glass and Carol Sciolino, *see* Am. Compl. P 49, 80, 90. Thus the amended complaint adequately alleges that the trusts both participated in a civil conspiracy to obtain fraudulently procured insurance policies, and aided and abetted that conspiracy.

**CONCLUSION**

For the reasons given above, the court concludes that the exercise of personal jurisdiction over the Delaware Trust Defendants is proper, and that Counts I - V of the amended complaint state valid claims against the Delaware Trust Defendants. Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1. Defendants' motion to dismiss the complaint [DE # 56] is **DENIED.**

**DONE** and **SIGNED** in Chambers at [\*\*21] West Palm Beach, Florida this 31st day of March, 2009.

/s/ Daniel T. K. Hurley ▾

Daniel T. K. Hurley ▾

United States District Judge

---

**Footnotes**

 Although not necessary in light of the rule [\*\*18] requiring the court to credit the allegations in the complaint in deciding a motion to dismiss, the court notes that the allegations are at least somewhat corroborated by the sworn statement of Carol Sciolino, who stated generally that she never intended to keep the policy, but pursuant to a plan developed by Brasner, intended from the outset to sell the policy immediately after it was issued in exchange for a payment. *See* DE # 96-3 at 19-21, 24-26, 30-33.

LexisNexis®

About
Privacy Policy

Cookie Policy
Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

        

bell atl. corp. v. twombly, 550 u.s. 54

Search: Everything

Client: -None- ✓   Folders   History   Help   More

Document:

Bell Atl. Corp. v. Twombly, 550 U.S. 544

Actions ✓

Go to ✓   Page   Page #   Search Document 🔍

 **Bell Atl. Corp. v. Twombly, 550 U.S. 544**

Copy Citation

Supreme Court of the United States

November 27, 2006, Argued ; May 21, 2007, Decided

No. 05-1126

**Reporter**

**550 U.S. 544 \*** | 127 S. Ct. 1955 \*\* | 167 L. Ed. 2d 929 \*\*\* | 2007 U.S. LEXIS 5901 \*\*\*\* | 75 U.S.L.W. 4337 | 2007-1 Trade Cas. (CCH) P75,709 | 68 Fed. R. Serv. 3d (Callaghan) 661 | 20 Fla. L. Weekly Fed. S 267 | 41 Comm. Reg. (P & F) 567

BELL ATLANTIC CORPORATION, et al., Petitioners v.WILLIAM TWOMBLY, et al.

**Prior History:**  [\*\*\*\*1] ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT.

Twombly v. Bell Atl. Corp., 425 F.3d 99, 2005 U.S. App. LEXIS 21390 (2d Cir., 2005)

**Disposition:** Reversed and remanded.

## Core Terms

conspiracy, discovery, allegations, antitrust, set of facts, pleadings, markets, district court, federal rule, Sherman Act, territory, network, cases, local telephone, Telecommunications, compete, resist, factual allegations, motion to dismiss, civil procedure, antitrust case, competitors, entitle, decisions, appears, survive, summary judgment stage, alleged conspiracy, internet service, legal conclusion

## Case Summary

### Procedural Posture

Respondent subscribers to local telephone and Internet services brought an action against petitioner local exchange carriers, alleging that the carriers engaged in parallel conduct to preclude competition in violation of § 1 of the Sherman Act, 15 U.S.C.S. § 1. Upon the grant of a writ of certiorari, the carriers appealed the judgment of the U.S. Court of Appeals for the Second Circuit which held that the subscribers sufficiently stated a claim.

### Overview

The subscribers asserted that the carriers were former local monopolies which engaged in parallel billing and contracting misconduct designed to discourage new competitors from entering their markets through sharing of the carriers' networks. The subscribers also alleged that the carriers agreed not to compete outside their own markets. The U.S. Supreme Court held that the subscribers' allegations that the carriers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, were insufficient to state a claim under § 1 of the Sherman Act. To state such a violation, allegations of parallel conduct were required to be placed in a factual context which raised a plausible suggestion of a preceding agreement rather than identical independent action. Further, the subscribers' complaint did not indicate that the carriers' resistance to competitors was anything more than the natural, unilateral reaction of each carrier which was intent on keeping its regional dominance. Also, the alleged anti-competitive conduct of the carriers itself indicated that a carrier's attempt to compete in another carrier's market would not be profitable.

026

**Outcome**

The judgment finding that the subscribers' complaint stated a claim was reversed, and the case was remanded for further proceedings.

---

▼ LexisNexis® Headnotes

---

Antitrust & Trade Law > Sherman Act ▾ > Scope ▾ > General Overview ▾

**HN1** ⬇ **Sherman Act, Scope**

Liability under § 1 (15 U.S.C.S. § 1) of the Sherman Act requires a contract, combination, or conspiracy, in restraint of trade or commerce. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (204)*    ⚠ 1   ➕ 30

---

Antitrust & Trade Law > Sherman Act ▾ > Scope ▾ > General Overview ▾

**HN2** ⬇ **Sherman Act, Scope**

15 U.S.C.S. § 1 prohibits every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (83)*    ➕ 15

---

Antitrust & Trade Law > Sherman Act ▾ > Scope ▾ > General Overview ▾

**HN3** ⬇ **Sherman Act, Scope**

Because § 1 (15 U.S.C.S. § 1) of the Sherman Act does not prohibit all unreasonable restraints of trade, but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express. While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense. Even conscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful. The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (551)*    ⚠ 2    ➕ 83

---

Civil Procedure > ... > Pleadings ▾ > Complaints ▾ > 📄 Requirements for Complaint ▾

**HN4** ⬇ **Complaints, Requirements for Complaint**

Fed. R. Civ. P. 8(a)(2) requires only a short and plain statement of a claim showing that the pleader is entitled to relief, in order to give a defendant fair notice of what the claim is and the grounds upon which it rests. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (75630)*    ⚠ 25    ➕ 4971

---

Civil Procedure > ... > Defenses, Demurrers & Objections ▾ > Motions to Dismiss ▾ > Failure to State Claim ▾

**HN5** ⬇ **Motions to Dismiss, Failure to State Claim**

While a complaint attacked by a Fed. R. Civ. P. 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (158345)*    ⚠ 12    ➕ 11100

---

Antitrust & Trade Law > Sherman Act ▾ > Scope ▾ > General Overview ▾
Civil Procedure > ... > Defenses, Demurrers & Objections ▾ > Motions to Dismiss ▾ > Failure to State Claim ▾

**HN6** ⬇ **Sherman Act, Scope**

Stating a claim under § 1 (15 U.S.C.S. § 1) of the Sherman Act requires a complaint with enough factual matter (taken as true) to

suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely. In identifying facts that are suggestive enough to render a  § 1 conspiracy plausible, courts have the benefit of the prior rulings and considered views of leading commentators that lawful parallel conduct fails to bespeak unlawful agreement. It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (26576)*    ⚠ 40    ◆ 2021

---

Antitrust & Trade Law  >  **Sherman Act** ⌄  >  **Scope** ⌄  >  **General Overview** ⌄
Civil Procedure  >  ...  >  **Defenses, Demurrers & Objections** ⌄  >  **Motions to Dismiss** ⌄  >  **Failure to State Claim** ⌄
View more legal topics ⌄

**HN7**⬇  **Sherman Act, Scope**

The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement in violation of  § 1 (15 U.S.C.S. § 1) of the Sherman Act reflects the threshold requirement of Fed. R. Civ. P. 8(a)(2) that a plain statement possess enough heft to show that the pleader is entitled to relief. A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a claim under § 1 of the Sherman Act; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (45354)*    ⚠ 21    ◆ 3144

---

Civil Procedure  >  ...  >  **Defenses, Demurrers & Objections** ⌄  >  **Motions to Dismiss** ⌄  >  **Failure to State Claim** ⌄

**HN8**⬇  **Motions to Dismiss, Failure to State Claim**

When the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3097)*    ◆ 126

---

Civil Procedure  >  ...  >  **Defenses, Demurrers & Objections** ⌄  >  **Motions to Dismiss** ⌄  >  **Failure to State Claim** ⌄

**HN9**⬇  **Motions to Dismiss, Failure to State Claim**

A district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (175)*    ◆ 21

---

Evidence  >  **Burdens of Proof** ⌄  >  **General Overview** ⌄

**HN10**⬇  **Evidence, Burdens of Proof**

Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3933)*    ⚠ 2    ◆ 259

---

Civil Procedure  >  ...  >  **Defenses, Demurrers & Objections** ⌄  >  **Motions to Dismiss** ⌄  >  **Failure to State Claim** ⌄

**HN11**⬇  **Motions to Dismiss, Failure to State Claim**

When a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (552)*    ◆ 29

▼  Lawyers' Edition Display

---

**Decision**

[***929] Telephone and Internet service subscribers held to have failed to state claim against local exchange carriers for alleged parallel billing and contracting designed to discourage competition in asserted violation of § 1 of Sherman Act (15 U.S.C.S. § 1).

**Summary**

**Procedural posture:** Respondent subscribers to local telephone and Internet services brought an action against petitioner local exchange carriers, alleging that the carriers engaged in parallel conduct to preclude competition in violation of § 1 of the Sherman Act, 15 U.S.C.S. § 1. Upon the grant of a writ of certiorari, the carriers appealed the judgment of the U.S. Court of Appeals for the Second Circuit which held that the subscribers sufficiently stated a claim.

**Overview:** The subscribers asserted that the carriers were former local monopolies which engaged in parallel billing and contracting misconduct designed to discourage new competitors from entering their markets through sharing of the carriers' networks. The subscribers also alleged that the carriers agreed not to compete outside their own markets. The U.S. Supreme Court held that the subscribers' allegations that the carriers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, were insufficient to state a claim under § 1 of the Sherman Act. To state such a violation, allegations of parallel conduct were required to be placed in a factual context which raised a plausible suggestion of a preceding agreement rather than identical independent action. Further, the subscribers' complaint did not indicate that the carriers' resistance to competitors was anything more than the natural, unilateral reaction of each carrier which was intent on keeping its regional dominance. Also, the alleged [***930] anti-competitive conduct of the carriers itself indicated that a carrier's attempt to compete in another carrier's market would not be profitable.

**Outcome:** The judgment finding that the subscribers' complaint stated a claim was reversed, and the case was remanded for further proceedings.

---

## Headnotes

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES § 5 > SHERMAN ACT LIABILITY  > Headnote:
***LEdHN[1]*** [1]

Liability under § 1 (15 U.S.C.S. § 1) of the Sherman Act requires a contract, combination, or conspiracy, in restraint of trade or commerce. (Souter ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Kennedy ▾, Thomas ▾, Breyer ▾, and Alito ▾, JJ.)

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES § 5 > SHERMAN ACT PROHIBITIONS  > Headnote:
***LEdHN[2]*** [2]

15 U.S.C.S. § 1 prohibits every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations. (Souter ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Kennedy ▾, Thomas ▾, Breyer ▾, and Alito ▾, JJ.)

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES § 14 RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES § 15 > SHERMAN ACT -- TRADE RESTRAINTS PROHIBITED -- PARALLEL BUSINESS BEHAVIOR  > Headnote:
***LEdHN[3]*** [3]

Because § 1 (15 U.S.C.S. § 1) of the Sherman Act does not prohibit all unreasonable restraints of trade, but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express. While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense. Even conscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful. The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. (Souter ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Kennedy ▾, Thomas ▾, Breyer ▾, and Alito ▾, JJ.)

PLEADING § 130 > PLEADING -- PLAIN STATEMENT  > Headnote:

**_LEdHN[4]_**⬇ [4]

Fed. R. Civ. P. 8(a)(2) requires only a short and plain statement of a claim showing that the pleader is entitled to relief, in order to give a defendant fair notice of what the claim is and the grounds upon which it rests. (Souter ⌄, J., joined by Roberts ⌄, Ch. J., and Scalia ⌄, Kennedy ⌄, Thomas ⌄, Breyer ⌄, and Alito ⌄, JJ.)

 [***931] PLEADING § 103 > COMPLAINT -- MOTION TO DISMISS  > Headnote:

**_LEdHN[5]_**⬇ [5]

While a complaint attacked by a Fed. R. Civ. P. 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level. (Souter ⌄, J., joined by Roberts ⌄, Ch. J., and Scalia ⌄, Kennedy ⌄, Thomas ⌄, Breyer ⌄, and Alito ⌄, JJ.)

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES § 63 > SHERMAN ACT -- STATING ANTITRUST CLAIM -- ILLEGAL AGREEMENT -- PARALLEL CONDUCT  > Headnote:

**_LEdHN[6]_**⬇ [6]

Stating a claim under § 1 (15 U.S.C.S. § 1) of the Sherman Act requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely. In identifying facts that are suggestive enough to render a § 1 conspiracy plausible, courts have the benefit of the prior rulings and considered views of leading commentators that lawful parallel conduct fails to bespeak unlawful agreement. It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action. (Souter ⌄, J., joined by Roberts ⌄, Ch. J., and Scalia ⌄, Kennedy ⌄, Thomas ⌄, Breyer ⌄, and Alito ⌄, JJ.)

PLEADING § 176 > PLEADING -- ANTITRUST ALLEGATIONS -- ENTITLEMENT TO RELIEF  > Headnote:

**_LEdHN[7]_**⬇ [7]

The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement in violation of § 1 (15 U.S.C.S. § 1) of the Sherman Act reflects the threshold requirement of Fed. R. Civ. P. 8(a)(2) that a plain statement possess enough heft to show that the pleader is entitled to relief. A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a claim under § 1 of the Sherman Act; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief. (Souter ⌄, J., joined by Roberts ⌄, Ch. J., and Scalia ⌄, Kennedy ⌄, Thomas ⌄, Breyer ⌄, and Alito ⌄, JJ.)

 [***932] PLEADING § 106 > FAILURE TO RAISE CLAIM  > Headnote:

**_LEdHN[8]_**⬇ [8]

When the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court. (Souter ⌄, J., joined by Roberts ⌄, Ch. J., and Scalia ⌄, Kennedy ⌄, Thomas ⌄, Breyer ⌄, and Alito ⌄, JJ.)

PLEADING § 103 > PLEADING -- SPECIFICITY  > Headnote:

**_LEdHN[9]_**⬇ [9]

A district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed. (Souter ⌄, J., joined by Roberts ⌄, Ch. J., and Scalia ⌄, Kennedy ⌄, Thomas ⌄, Breyer ⌄, and Alito ⌄, JJ.)

PLEADING § 130 > PLEADING -- CONSISTENT FACTS > Headnote:

**_LEdHN[10]_**⬇ [10]

Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. (Souter ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Kennedy ▾, Thomas ▾, Breyer ▾, and Alito ▾, JJ.)

[***933] PLEADING § 103 > DISMISSAL OF COMPLAINT  > Headnote:

**_LEdHN[11]_**⬇ [11]

When a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder. (Souter ▾, J., joined by Roberts ▾, Ch. J., and Scalia ▾, Kennedy ▾, Thomas ▾, Breyer ▾, and Alito ▾, JJ.)

## Syllabus

The 1984 divestiture of the American Telephone & Telegraph Company's (AT&T) local telephone business left a system of regional service monopolies, sometimes called Incumbent Local Exchange Carriers (ILECs), and a separate long-distance market from which the ILECs ▾ were excluded. The Telecommunications Act of 1996 withdrew approval of the ILECs ▾' monopolies, "fundamentally restructur[ing] local telephone markets" and "subject[ing] [ILECs] to a host of duties intended to facilitate market entry." _AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 371, 119 S. Ct. 721, 142 L. Ed. 2d 834_. It also authorized them to enter the long-distance market. [****2] "Central to the [new] scheme [was each ILEC's] obligation . . . to share its network with" competitive local exchange carriers (CLECs). _Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 402, 124 S. Ct. 872, 157 L. Ed. 2d 823_.

Respondents (hereinafter plaintiffs) represent a class of subscribers of local telephone and/or high speed Internet services in this action against petitioner ILECs for claimed violations of § 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." The complaint alleges that the ILECs ▾ conspired to restrain trade (1) by engaging in parallel conduct in their respective service areas to inhibit the growth of upstart CLECs; and (2) by agreeing to refrain from competing against one another, as indicated by their common failure to pursue attractive business opportunities in contiguous markets and by a statement by one ILEC's chief executive officer that competing in another ILEC's territory did not seem right. The District Court dismissed the complaint, concluding that parallel business conduct [****3] allegations, taken alone, do not state a claim under § 1; plaintiffs must allege additional facts tending to exclude independent self-interested conduct as an explanation for the parallel actions. Reversing, the Second Circuit held that plaintiffs' parallel conduct allegations were sufficient to withstand a motion to dismiss because the ILECs ▾ failed to show that there is no set of facts that would permit plaintiffs to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence.

_Held:_

1. Stating a § 1 claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. An allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Pp. 6-17

(a) Because § 1 prohibits "only restraints effected by a contract, combination, or conspiracy," _Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S. Ct. 2731, 81 L. Ed. 2d 628_, "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement," _Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540, 74 S. Ct. 257, 98 L._ [***934] Ed. 273. While [****4] a showing of parallel "business behavior is admissible circumstantial evidence from which" agreement may be inferred, it falls short of "conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense." _Id., at 540-541, 540, 74 S. Ct. 257, 98 L. Ed. 273_. The inadequacy of showing parallel conduct or interdependence, without more, mirrors the behavior's ambiguity: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. Thus, this Court has hedged against false inferences from identical behavior at a number of points in the trial sequence, _e.g.,_ at the summary judgment stage, see _Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538_.

(b) This case presents the antecedent question of what a plaintiff must plead in order to state a § 1 claim. Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," _Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80,_ [****5] While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, _ibid.,_ a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. ==Factual allegations must be enough to raise a right to relief above the speculative level== on the assumption that all of the complaint's allegations are true. Applying these general standards to a § 1 claim, stating a claim requires a complaint with enough factual matter to suggest an agreement. Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects Rule 8(a)(2)'s threshold requirement that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A parallel conduct allegation gets the § 1 complaint close to stating a claim, but without further factual

031

enhancement [****6] it stops short of the line between possibility and plausibility. The requirement of allegations suggesting an agreement serves the practical purpose of preventing a plaintiff with "'a largely groundless claim'" from "'tak[ing] up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577. It is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive. That potential expense is obvious here, where plaintiffs represent a putative class of at least 90 percent of subscribers to local telephone or high-speed Internet service in an action against America's largest telecommunications firms for unspecified instances of antitrust violations that allegedly occurred over a 7-year period. It is no answer to say that a claim just shy of plausible [***935] entitlement can be weeded out early in the discovery process, given the common lament that the success of judicial supervision in checking discovery abuse has been modest. Plaintiffs' main [****7] argument against the plausibility standard at the pleading stage is its ostensible conflict with a literal reading of *Conley*'s statement construing Rule 8: "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80. The "no set of facts" language has been questioned, criticized, and explained away long enough by courts and commentators, and is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Conley* described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival.

2. Under the plausibility standard, plaintiffs' claim of conspiracy in restraint of trade comes up short. First, the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct, not on any independent allegation of actual agreement [****8] among the ILECs. The nub of the complaint is the ILECs' parallel behavior, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience. Nothing in the complaint invests either the action or inaction alleged with a plausible conspiracy suggestion. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs ⌄' attempts to compete, the District Court correctly found that nothing in the complaint intimates that resisting the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on preserving its regional dominance. The complaint's general collusion premise fails to answer the point that there was no need for joint encouragement to resist the 1996 Act, since each ILEC had reason to try to avoid dealing with CLECs and would have tried to keep them out, regardless of the other ILECs ⌄' actions. Plaintiffs' second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act to enter into their competitors' territories, leaving the relevant market highly compartmentalized geographically, with minimal competition. This parallel conduct did [****9] not suggest conspiracy, not if history teaches anything. Monopoly was the norm in telecommunications, not the exception. Because the ILECs were born in that world, doubtless liked it, and surely knew the adage about him who lives by the sword, a natural explanation for the noncompetition is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same. Antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid § 1 claim. This analysis does not run counter to *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508, 122 S. Ct. 992, 152 L. Ed. 2d 1*, which held that "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination." Here, the Court is not requiring heightened fact [***936] pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.

425 F.3d 99, reversed and remanded.

**Counsel: Michael Kellogg** argued the cause for petitioners.

**Thomas O. Barnett** ⌄ argued the cause for the United States, as amicus curiae, by special leave of court.

**J. Douglas Richards** ⌄ argued the cause for respondents.

**Judges:** Souter ⌄, J., delivered the opinion [****10] of the Court, in which Roberts ⌄, C. J., and Scalia ⌄, Kennedy ⌄, Thomas ⌄, Breyer ⌄, and Alito ⌄, JJ., joined. Stevens ⌄, J., filed a dissenting opinion, in which Ginsburg ⌄, J., joined, except as to Part IV, *post*, p. 570.

**Opinion by:** SOUTER ⌄

## Opinion

 **[\*548]**  **[\*\*1961]**  Justice **Souter** ⌄ delivered the opinion of the Court.

**HN1**⌐**⌐** **LEdHN[1]**⌐**⌐** [1] Liability under § 1 of the Sherman Act, 15 U.S.C. § 1, requires a "contract, combination . . ., or conspiracy, in restraint of trade or commerce." The question in this putative class action is whether a § 1 complaint can survive a motion to dismiss when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to **[\*549]** competition, absent some factual context suggesting agreement, as distinct from identical, independent action. We hold that such a complaint should be dismissed.

I

The upshot of the 1984 divestiture of the American Telephone & Telegraph Company's (AT&T) local telephone business was a system of regional service monopolies (variously called "Regional Bell Operating Companies," "Baby Bells," or "Incumbent Local Exchange Carriers" (ILECs ▾)), and a separate, competitive market for long-distance service from which the ILECs were excluded. More than a decade [****11] later, Congress withdrew approval of the ILECs' monopolies by enacting the Telecommunications Act of 1996 (1996 Act), 110 Stat. 56, which "fundamentally restructure[d] local telephone markets" and "subject[ed] [ILECs ▾] to a host of duties intended to facilitate market entry." *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 371, 119 S. Ct. 721, 142 L. Ed. 2d 834 (1999). In recompense, the 1996 Act set conditions for authorizing ILECs ▾ to enter the long-distance market. See 47 U.S.C. § 271.

"Central to the [new] scheme [was each ILEC's] obligation . . . to share its network with competitors," *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 402, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004), which came to be known as "competitive local exchange carriers" (CLECs), Pet. for Cert. 6, n 1. A CLEC could make use of an ILEC's network in any of three ways: by (1) "purchas[ing] local telephone services at wholesale rates for resale to end users," (2) "leas[ing] elements of the [ILEC's] network 'on an unbundled basis,'" or (3) "interconnect[ing] its own facilities with the [ILEC's] network." *Iowa Utilities Bd., supra*, at 371, 119 S. Ct. 721, 142 L. Ed. 2d 834 (quoting 47 U.S.C. § 251(c) [****12] ). Owing to the "considerable expense and effort" required to make unbundled network elements available to rivals at wholesale prices, *Trinko, supra*, at 410, 124 S. Ct. 872, 157 L. Ed. 2d 823, the ILECs vigorously litigated the scope of the sharing obligation imposed by the 1996 Act, with the result that the Federal Communications Commission (FCC) [****937] three times **[*550]** revised [**196]2] its regulations to narrow the range of network elements to be shared with the CLECs ▾. See *Covad Communs. Co. v. FCC*, 450 F.3d 528, 533-534 (CADC 2006) (summarizing the 10-year-long regulatory struggle between the ILECs and CLECs).

Respondents William Twombly and Lawrence Marcus (hereinafter plaintiffs) represent a putative class consisting of all "subscribers of local telephone and/or high speed internet services . . . from February 8, 1996 to present." Amended Complaint in No. 02 CIV. 10220 (GEL) (SDNY) P 53, App. 28 (hereinafter Complaint). In this action against petitioners, a group of ILECs, 1 ⬇ plaintiffs seek treble damages and declaratory and injunctive relief for claimed violations of § 1 of the Sherman Act, ch. 647, 26 Stat. 209, as amended, *HN2* 🔼 *LEdHN[2]* 🔼 [2]15 U.S.C. § 1, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

The complaint alleges that the ILECs conspired to restrain trade in two ways, each supposedly inflating charges for local telephone and high-speed Internet services. Plaintiffs say, first, that the ILECs "engaged in parallel conduct" in their respective service areas to inhibit the growth [****14] of upstart CLECs. Complaint P 47, App. 23-26. Their actions allegedly included making unfair agreements with the CLECs ▾ for access to ILEC networks, providing inferior connections to the networks, overcharging, and billing in ways designed to sabotage the CLECs ▾' relations with their own customers. *Ibid.* According to the complaint, the ILECs' **[*551]** "compelling common motivatio[n]" to thwart the CLECs ▾' competitive efforts naturally led them to form a conspiracy; "[h]ad any one [ILEC] not sought to prevent CLECs . . . from competing effectively . . ., the resulting greater competitive inroads into that [ILEC's] territory would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories in the absence of such conduct." *Id.*, P 50, App. 26-27.

Second, the complaint charges agreements by the ILECs to refrain from competing against one another. These are to be inferred from the ILECs' common failure "meaningful[ly] [to] pursu[e]" "attractive business opportunit[ies]" in contiguous markets where they possessed "substantial competitive advantages," *id.*, PP 40-41, App. 21-22, and from a statement of Richard Notebaert, chief executive officer [****15] (CEO) of the ILEC Qwest, that competing in the territory of another ILEC "'might be a good way to turn a quick dollar but that doesn't make it right,'" *id.*, P 42, App. 22.

The complaint couches its ultimate allegations this way:

"In the absence of any meaningful competition between the [ILECs ▾] in one another's markets, and in light of the parallel course of conduct that each engaged in to prevent competition from CLECs within [***938] their respective local telephone and/or high speed internet services markets and the other facts and market circumstances alleged above, Plaintiffs allege upon information [**196]3] and belief that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." *Id.*, P 51, App. 27. 2 ⬇

**[*552]** [****16] The United States District Court for the Southern District of New York dismissed the complaint for failure to state a claim upon which relief can be granted. The District Court acknowledged that "plaintiffs may allege a conspiracy by citing instances of parallel business behavior that suggest an agreement," but emphasized that "while '[c]ircumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy[, . . .] "conscious parallelism" has not yet read conspiracy out of the Sherman Act entirely.'" 313 F. Supp. 2d 174, 179 (2003) (quoting *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 541, 74 S. Ct. 257, 98 L. Ed. 273 (1954); alterations in original). Thus, the District Court understood that allegations of parallel business conduct, taken alone, do not state a claim under § 1; plaintiffs must allege additional facts that "ten[d] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." 313 F. Supp. 2d, at 179. The District Court found plaintiffs' allegations of parallel ILEC actions to discourage competition inadequate [****17] because "the behavior of each ILEC in resisting the incursion of CLECs is fully explained by the ILEC's own interests in defending its individual territory." *Id.*, at 183. As to the ILECs' supposed agreement against competing with each other, the District Court found that the complaint does not "alleg[e] facts . . . suggesting that refraining from competing in other territories as CLECs was contrary to [the ILECs'] apparent economic interests, and consequently [does] not rais[e] an inference that [the ILECs'] actions were the result of a conspiracy." *Id.*, at 188.

**[*553]** The Court of Appeals for the Second Circuit reversed, holding that the District Court tested the complaint by the wrong standard. It held that "plus factors are not *required* to be pleaded to permit an antitrust claim based on parallel conduct to survive dismissal." 425 F.3d 99, 114 (2005) (emphasis in original). Although the Court of Appeals took the view that plaintiffs must plead facts that "include conspiracy among the realm of 'plausible' possibilities in order to survive a motion to dismiss," it then said that "to rule that allegations of parallel anticompetitive conduct [****18] fail to support a plausible conspiracy claim, a court would have to conclude that there is no set of facts that would permit a [***939] plaintiff to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence." *Ibid.*

We granted certiorari to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct, 548 U.S. 903, 126 S. Ct. 2965, 165 L. Ed. 2d 949 (2006), and now reverse.

[**1964] II

A

*HN3* *LEdHN[3]* [3] Because § 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984), "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement, tacit or express," *Theatre Enterprises*, 346 U.S. at 540, 74 S. Ct. 257, 98 L. Ed. 273. While a showing of parallel "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement," it falls short of "conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense." *Id.*, at 540-541, 74 S. Ct. 257, 98 L. Ed. 273. Even "conscious [****19] parallelism," a common reaction of "firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions" **[*554]** is "not in itself unlawful." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993); see 6 P. Areeda & H. Hovenkamp, Antitrust Law P 1433a, p 236 (2d ed. 2003) (hereinafter Areeda & Hovenkamp) ("The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act § 1"); Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv. L. Rev. 655, 672 (1962) ("[M]ere interdependence of basic price decisions is not conspiracy").

The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. See, *e.g.*, AEI-Brookings Joint Center for Regulatory Studies, Epstein, Motions to Dismiss [****20] Antitrust Cases: Separating Fact from Fantasy, Related Publication 06-08, pp 3-4 (2006) (discussing problem of "false positives" in § 1 suits). Accordingly, we have previously hedged against false inferences from identical behavior at a number of points in the trial sequence. An antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict, see *Theatre Enterprises, supra;* proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action, see *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984); and at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently, see *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). [***940]

B

This case presents the antecedent question of what a plaintiff must plead in order to state a claim under § 1 of the **[*555]** Sherman Act. *HN4* *LEdHN[4]* [4] Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in [****21] order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). *HN5* *LEdHN[5]* [5] While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (CA7 1994), a plaintiff's obligation to provide the [**1965] "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp 235-236 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), 3 on the assumption that all the allegations [****22] in the complaint are true (even if doubtful in fact), see, *e.g.*, *Swierkiewicz v.* **[*556]** *Sorema N. A.*, 534 U.S. 506, 508, n. 1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

[****23] In applying these general standards to a § 1 claim, we hold that *HN6* *LEdHN[6]* [6] stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. 4 And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof [***941] of those facts is improbable, and "that a recovery is very remote and unlikely." *Ibid.* In identifying facts that are suggestive enough to render a § 1 conspiracy plausible, we have the benefit [**1966] of the prior rulings and considered views of leading commentators, already quoted, that lawful parallel conduct fails to bespeak unlawful agreement. It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without

**[\*557]** more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when **[\*\*\*\*24]** allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

*LEdHN[7]* [7]  [\*\*\*\*25]  *HN7* The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief." Cf. *DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 56 (CA1 1999) ("[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation--for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court [\*\*\*\*26]  is not required to accept such terms as a sufficient basis for a complaint"). 5⬇

We alluded to the practical significance of the Rule 8 entitlement requirement in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005), when we explained that something beyond the mere possibility of loss causation must be **[\*558]** alleged, lest a plaintiff with "'a largely groundless claim'" be allowed to "'take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" *Id.*, at 347, 125 S. Ct. 1627,  [\*\*\*\*942]  161 L. Ed. 2d 577 (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975)). So, *HN8* *LEdHN[8]* [8] when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, "'this basic deficiency [\*\*\*\*27]  should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" 5 Wright & Miller § 1216, at 233-234 (quoting *Daves v. Hawaiian Dredging Co.*, 114 F. Supp. 643, 645 (Haw. 1953)); see also *Dura, supra*, at 346, 125 S. Ct. 1627, 161 L. Ed. 2d 577; *Asahi Glass Co. v. Pentech Pharmaceuticals, Inc.*, 289 F. Supp. 2d 986, 995 (ND Ill. 2003) (*Posner, J.*, sitting by designation) ("[S]ome threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase").

Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, cf. [\*\*1967]  *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962), but quite another to forget that proceeding to antitrust discovery can be expensive. As we indicated over 20 years ago in *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528, n. 17, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983), *HN9* *LEdHN[9]* [9]"a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy [\*\*\*\*28]  to proceed." See also *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (CA7 1984) ("[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint"); Note, Modeling the Effect of One-Way Fee Shifting on Discovery Abuse in Private Antitrust Litigation, 78 N. Y. U. L. Rev. 1887, 1898-1899 (2003) (discussing the unusually high cost of discovery in antitrust cases); Manual for Complex Litigation, **[\*559]** Fourth, § 30, p. 519 (2004) (describing extensive scope of discovery in antitrust cases); Memorandum from Paul V. Niemeyer, Chair, Advisory Committee on Civil Rules, to Hon. Anthony J. Scirica, Chair, Committee on Rules of Practice and Procedure (May 11, 1999), 192 F.R.D. 354, 357 (2000) (reporting that discovery accounts for as much as 90 percent of litigation costs when discovery is actively employed). That potential expense is obvious enough in the present case: plaintiffs represent a putative class of at least 90 percent of all [\*\*\*\*29]  subscribers to local telephone or high-speed Internet service in the continental United States, in an action against America's largest telecommunications firms (with many thousands of employees generating reams and gigabytes of business records) for unspecified (if any) instances of antitrust violations that allegedly occurred over a period of seven years.

It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through "careful case management," *post*, at 573, 167 L. Ed. 2d, at 951, given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side. See, *e.g.*, Easterbrook, Discovery as Abuse, 69 B. U. L. Rev. 635, 638 (1989) ("Judges can do little about impositional discovery when parties control the legal claims [\*\*\*\*943]  to be presented and conduct the discovery themselves"). And it is self-evident that the problem of discovery abuse cannot be solved by "careful scrutiny of evidence at the summary judgment stage," much less "lucid instructions to juries," *post*, at 573, 167 L. Ed. 2d, at 951; the threat of discovery expense will push cost-conscious defendants to settle even [\*\*\*\*30]  anemic cases before reaching those proceedings. Probably, then, it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no "'reasonably founded hope that the [discovery] process will reveal relevant evidence'" to support a § 1 claim. *Dura*, **[\*560]** 544 U.S., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (quoting *Blue Chip Stamps, supra*, at 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539; alteration in *Dura*). 6⬇

 [\*\*\*\*31]  [\*\*1968] Plaintiffs do not, of course, dispute the requirement of plausibility and the need for something more than merely parallel behavior explained in *Theatre Enterprises*, *Monsanto*, and *Matsushita*, and their main argument against the plausibility standard at the pleading stage is its ostensible **[\*561]** conflict with an early statement of ours construing Rule 8. Justice Black's opinion for the Court in *Conley* v. *Gibson* spoke not only of the need for fair notice of the grounds for entitlement to relief but of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80. This "no set of facts" language can be read in isolation as saying that any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings; and the Court of Appeals appears to have read *Conley* in some such way

when formulating its understanding of the proper pleading standard, see 425 F.3d at 106, 114 (invoking *Conley*'s "no set [****932] of [***944] facts" language in describing the standard for dismissal). **7**

 [****33] On such a focused and literal reading of *Conley*'s "no set of facts," a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some "set of [undisclosed] facts" to support recovery. So here, the Court of Appeals specifically found the prospect of unearthing direct evidence of conspiracy sufficient to preclude dismissal, even though the complaint [**1969] does not set forth a single  **[*562]** fact in a context that suggests an agreement. 425 F.3d, at 106, 114. It seems fair to say that this approach to pleading would dispense with any showing of a "'reasonably founded hope'" that a plaintiff would be able to make a case, see *Dura*, 544 U.S., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (quoting *Blue Chip Stamps*, 421 U.S., at 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539); Mr. Micawber's optimism would be enough.

Seeing this, a good many judges and commentators have balked at taking the literal terms of the *Conley* passage as a pleading standard. See, *e.g.*, *Car Carriers, 745 F.2d at 1106* ("*Conley* has never been interpreted literally" and, "[i]n practice, a complaint . . . must contain either direct or [****34] inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory" (internal quotation marks omitted; emphasis and omission in original)); *Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1155 (CA9 1989)* (tension between *Conley*'s "no set of facts" language and its acknowledgment that a plaintiff must provide the "grounds" on which its claim rests); *O'Brien v. Di Grazia, 544 F.2d 543, 546, n. 3 (CA1 1976)* ("[W]hen a plaintiff . . . supplies facts to support his claim, we do not think that *Conley* imposes a duty on the courts to conjure up unpleaded facts that might turn a frivolous claim of unconstitutional . . . action into a substantial one"); *McGregor v. Industrial Excess Landfill, Inc., 856 F.2d 39, 42-43 (CA6 1988)* (quoting *O'Brien*'s analysis); Hazard, From Whom No Secrets Are Hid, 76 Texas L. Rev. 1665, 1685 (1998) (describing *Conley* as having "turned Rule 8 on its head"); Marcus, The Revival of Fact Pleading Under the Federal Rules of Civil Procedure, 86 Colum. L. Rev. 433, 463-465 (1986) (noting tension between [****35] *Conley* and subsequent understandings of Rule 8).

We could go on, but there is no need to pile up further citations to show that *Conley*'s "no set of facts" language has been questioned, criticized, and explained away long enough. To be fair to the *Conley* Court, the passage should be understood in light of the opinion's preceding summary of the complaint's **[*563]** concrete allegations, which the Court quite reasonably understood as amply stating a claim for  [***945] relief. But the passage so often quoted fails to mention this understanding on the part of the Court, and after puzzling the profession for 50 years, this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: **HN10** **LEdHN[10]** [10]once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. See *Sanjuan*, 40 F.3d at 251 (once a claim for relief has been stated, a plaintiff "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint"); accord, *Swierkiewicz, 534 U.S., at 514, 122 S. Ct. 992, 152 L. Ed. 2d 1*; *National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 256, 114 S. Ct. 798, 127 L. Ed. 2d 99 (1994)*; [****36] *H. J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 249-250, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989)*; *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)*. *Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival. **8**

 [***946]

 [****37] [**1970] **[*564]** III

When we look for plausibility in this complaint, we agree with the District Court that plaintiffs' claim of conspiracy in restraint of trade comes up short. To begin with, the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs. *Supra, at 550-551, 167 L. Ed. 2d, at 937-938*. Although in form a few stray statements speak directly of agreement, **9** on fair reading these are merely legal conclusions resting on the prior allegations. Thus, the complaint **[*565]** first takes account of the alleged "absence of any meaningful competition between [the ILECs] in one another's markets," "the parallel course of conduct that each [ILEC] engaged in to prevent competition from CLECs," "and the other facts and market circumstances alleged [earlier]"; "in light of" these, the complaint concludes "that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry into their . . . markets and have agreed not to compete with one another." Complaint P 51, App. 27. **10** [****39] The nub of the [**1971] complaint, then, is the ILECs' parallel behavior, consisting of steps to keep the CLECs out [****38] and manifest disinterest in becoming CLECs themselves, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience. **11**

 **[*566]** We think that nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, we agree with the District Court that nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance. The 1996 Act did more than just subject the ILECs to competition; it obliged them to subsidize their competitors with their own equipment at  [***947] wholesale rates. The economic incentive to resist was powerful, but resisting competition is routine market conduct, and even if the ILECs flouted the 1996 [****40] Act in all the ways the plaintiffs allege, see *id.,* P 47, App. 23-24, there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing.

The complaint makes its closest pass at a predicate for conspiracy with the claim that collusion was necessary because success by even one CLEC in an ILEC's territory "would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories." *Id.,* P 50, App. 26-27. But, its logic aside, this general premise still fails to answer the point that there was just no

need for joint encouragement to resist the 1996 Act; as the District Court said, "each ILEC has reason to want to avoid dealing with CLECs" and "each ILEC would attempt to keep CLECs out, regardless of the actions of the other ILECs." 313 F. Supp. 2d, at 184; cf. *Kramer v. Pollock-Krasner Foundation*, 890 F. Supp. 250, 256 (SDNY 1995) (while the [****41] plaintiff "may believe the defendants conspired . . ., the defendants' allegedly conspiratorial actions **[\*567]** could equally have been prompted by lawful, independent goals which do not constitute a conspiracy"). **12 ⚓**

 [\*\*1972] Plaintiffs' second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act, which was [****42] supposedly passed in the "'hop[e] that the large incumbent local monopoly companies . . . might attack their neighbors' service areas, as they are the best situated to do so.'" Complaint P 38, App. 20 (quoting Consumer Federation of America, Lessons from 1996 Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer Disaster, p 12 (Feb. 2000)). Contrary to hope, the ILECs declined "'to enter each other's service territories in any significant way,'" Complaint P 38, App. 20, and the local telephone and high speed Internet market remains highly compartmentalized geographically, with minimal competition. Based on this state of affairs, and perceiving the ILECs to be blessed with "especially attractive business opportunities" in surrounding markets dominated by other ILECs, the plaintiffs assert that the ILECs' parallel conduct was "strongly suggestive of conspiracy." *Id.,* P 40, App. 21.

But it was not suggestive of conspiracy, not if history teaches anything. In a traditionally unregulated industry with low barriers to entry, sparse competition among large firms dominating separate geographical segments of the market could very well signify illegal agreement, [****43] but here we have an obvious alternative [***948] explanation. In the decade **[\*568]** preceding the 1996 Act and well before that, monopoly was the norm in telecommunications, not the exception. See *Verizon Communs., Inc. v. FCC*, 535 U.S. 467, 477-478, 122 S. Ct. 1646, 152 L. Ed. 2d 701 (2002) (describing telephone service providers as traditional public monopolies). The ILECs were born in that world, doubtless liked the world the way it was, and surely knew the adage about him who lives by the sword. Hence, a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing.

In fact, the complaint itself gives reasons to believe that the ILECs would see their best interests in keeping to their old turf. Although the complaint says generally that the ILECs passed up "especially attractive business opportunit[ies]" by declining to compete as CLECs against other ILECs, Complaint P 40, App. 21, it does not allege that competition as CLECs was potentially any more lucrative than other opportunities being pursued by the ILECs during the same period, **13 ⚓** and [****45] and [\*\*1973] the complaint is replete with indications that any CLEC faced [****44] nearly insurmountable barriers to profitability owing to the ILECs' flagrant resistance to the network sharing requirements of the 1996 Act, *id.*, P 47, App. **[\*569]** 23-26. Not only that, but even without a monopolistic tradition and the peculiar difficulty of mandating shared networks, "[f]irms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets." Areeda & Hovenkamp P 307d, at 155 (Supp. 2006) (commenting on the case at bar). The upshot is that Congress may have expected some ILECs to become CLECs in the legacy territories of other ILECs, but the disappointment does not make conspiracy plausible. We agree with the District Court's assessment that antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid § 1 claim. **14 ⚓**

Plaintiffs say that our analysis runs counter to *Swierkiewicz v. Sorema N. A.*, 534 U.S. at 508, 122 S. Ct. 992, [***949] 152 L. Ed. 2d 1, which held that "a complaint in an employment discrimination [****46] lawsuit [need] not contain specific facts establishing a prima facie case of discrimination under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." They argue that just as the prima facie case is a "flexible evidentiary standard" that "should not be transposed into a rigid pleading standard for discrimination cases," *Swierkiewicz, supra, at 512, 122 S. Ct. 992, 152 L. Ed. 2d 1,* "transpos[ing] 'plus factor' summary judgment analysis woodenly into a rigid Rule 12(b)(6) pleading standard . . . would be unwise," Brief for Respondents 39. As the District Court **[\*570]** correctly understood, however, "*Swierkiewicz* did not change the law of pleading, but simply re-emphasized . . . that the Second Circuit's use of a heightened pleading standard for Title VII cases was contrary to the Federal Rules' structure of liberal pleading requirements." 313 F. Supp. 2d, at 181 (citation and footnote omitted). Even though Swierkiewicz's pleadings "detailed the events leading to his termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination," the Court of Appeals dismissed [****47] his complaint for failing to allege certain additional facts that Swierkiewicz would need at the trial stage to support his claim in the absence of direct evidence of discrimination. *Swierkiewicz*, 534 U.S., at 514, 122 S. Ct. 992, 152 L. Ed. 2d 1. We reversed on the ground that the Court of Appeals had impermissibly applied what amounted to a heightened pleading requirement by insisting that Swierkiewicz allege "specific facts" beyondthose [\*\*1974] necessary to state his [\*\*1974] claim and the grounds showing entitlement to relief. *Id.*, at 508, 122 S. Ct. 992, 152 L. Ed. 2d 1.

Here, in contrast, we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.

          * * *

The judgment of the Court of Appeals for the Second Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

## Dissent

Justice **Stevens**, with whom Justice **Ginsburg** joins except as to Part IV, dissenting.

In the first paragraph of its 23-page opinion the Court states that the question to be [****48] decided is whether allegations that "major telecommunications providers engaged in certain **[*571]** parallel conduct unfavorable to competition" suffice to state a violation of § 1 of the Sherman Act. *Ante,* at 548-549, 167 L. Ed. 2d, at 936. The answer to that question has been settled for more than 50 years. If that were indeed the issue, a summary reversal citing *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 74 S. Ct. 257, 98 L. Ed. 273 (1954), would adequately resolve [***950] this case. As *Theatre Enterprises* held, parallel conduct is circumstantial evidence admissible on the issue of conspiracy, but it is not itself illegal. *Id.,* at 540-542, 74 S. Ct. 257, 98 L. Ed. 273.

Thus, this is a case in which there is no dispute about the substantive law. If the defendants acted independently, their conduct was perfectly lawful. If, however, that conduct is the product of a horizontal agreement among potential competitors, it is unlawful. The plaintiffs have alleged such an agreement and, because the complaint was dismissed in advance of answer, the allegation has not even been denied. Why, then, does the case not proceed? Does a judicial opinion that the charge is not "plausible" provide a legally acceptable reason [****49] for dismissing the complaint? I think not.

Respondents' amended complaint describes a variety of circumstantial evidence and makes the straightforward allegation that petitioners

> "entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." Amended Complaint in No. 02 CIV. 10220 (GEL) (SDNY) P 51, App. 27 (hereinafter Complaint).

The complaint explains that, contrary to Congress' expectation when it enacted the 1996 Telecommunications Act, and consistent with their own economic self-interests, petitioner Incumbent Local Exchange Carriers (ILECs) have assiduously avoided infringing upon each other's markets and have **[*572]** refused to permit noncumbent competitors to access their networks. The complaint quotes Richard Notebaert, the former chief executive officer of one such ILEC, as saying that competing in a neighboring ILEC's territory "'might be a good way to turn a quick dollar but that doesn't make it right.'" *Id.,* P 42, App. 22. Moreover, respondents allege that petitioners "communicate [****50] amongst themselves" through numerous industry associations. *Id.,* P 46, App. 23. In sum, respondents allege that petitioners entered into an agreement that has long been recognized as a classic *per se* [**1975] violation of the Sherman Act. See Reportof the Attorney General's National Committee to Study the Antitrust Laws 26 (1955).

Under rules of procedure that have been well settled since well before our decision in *Theatre Enterprises,* a judge ruling on a defendant's motion to dismiss a complaint "must accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, n. 1, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002); see *Overstreet v. North Shore Corp.,* 318 U.S. 125, 127, 63 S. Ct. 494, 87 L. Ed. 656 (1943). But instead of requiring knowledgeable executives such as Notebaert to respond to these allegations by way of sworn depositions or other limited discovery--and indeed without so much as requiring petitioners to file an answer denying that they entered into any agreement--the majority permits immediate dismissal based on the assurances of company lawyers that nothing untoward was afoot. The Court embraces the argument of those lawyers that [****51] "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway," *ante,* at 566, 167 L. Ed. 2d, at 947; that "there was just no need for joint encouragement [***951] to resist the 1996 Act," *ibid.*; and that the "natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing," *ante,* at 568, 167 L. Ed. 2d, at 948.

The Court and petitioners' legal team are no doubt correct that the parallel conduct alleged is consistent with the absence **[*573]** of any contract, combination, or conspiracy. But that conduct is also entirely consistent with the *presence* of the illegal agreement alleged in the complaint. And the charge that petitioners "agreed not to compete with one another" is not just one of "a few stray statements," *ante,* at 564, 167 L. Ed. 2d, at 946; it is an allegation describing unlawful conduct. As such, the Federal Rules of Civil Procedure, our longstanding precedent, and sound practice mandate that the District Court at least require some sort of response from petitioners before dismissing the case.

Two practical concerns presumably explain the Court's dramatic departure from settled procedural [****52] law. Private antitrust litigation can be enormously expensive, and there is a risk that jurors may mistakenly conclude that evidence of parallel conduct has proved that the parties acted pursuant to an agreement when they in fact merely made similar independent decisions. Those concerns merit careful case management, including strict control of discovery, careful scrutiny of evidence at the summary judgment stage, and lucid instructions to juries; they do not, however, justify the dismissal of an adequately pleaded complaint without even requiring the defendants to file answers denying a charge that they in fact engaged in collective decisionmaking. More importantly, they do not justify an interpretation of Federal Rule of Civil Procedure 12(b)(6) that seems to be driven by the majority's appraisal of the plausibility of the ultimate factual allegation rather than its legal sufficiency.

I

Rule 8(a)(2) of the Federal Rules requires that a complaint contain "a short and plain statement of the claim showing that the pleader is

038

entitled to relief." The Rule did not come about by happenstance, and its language is not inadvertent. The English experience with Byzantine special pleading rules [****53] --illustrated by the hypertechnical Hilary rules of [*574] 1834 [1 ⬇] -- made [**1976] obvious the appeal of a pleading standard that was easy for the common litigant to understand and sufficed to put the defendant on notice as to the nature of the claim against him and the relief sought. Stateside, David Dudley Field developed the highly influential New York Code of 1848, which required "[a] statement of the facts constituting the cause of action, in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended." An Act to Simplify and Abridge the Practice, Pleadings and Proceedings of the Courts of this State, ch. 379, § 120(2), 1848 N. Y. Laws pp. 497, 521. Substantially similar language appeared in the Federal Equity Rules adopted in 1912. See Fed. Equity Rule 25 (requiring "a short and simple statement of the ultimate facts upon which the plaintiff asks relief, omitting any mere statement of evidence").

[****54] [***952] A difficulty arose, however, in that the Field Code and its progeny required a plaintiff to plead "facts" rather than "conclusions," a distinction that proved far easier to say than to apply. As commentators have noted,

> "it is virtually impossible logically to distinguish among 'ultimate facts,' 'evidence,' and 'conclusions.' Essentially any allegation in a pleading must be an assertion that certain occurrences took place. The pleading spectrum, passing from evidence through ultimate facts to conclusions, is largely a continuum varying only in the degree of particularity with which the occurrences are described." Weinstein & Distler, Comments on Procedural Reform: Drafting Pleading Rules, 57 Colum. L. Rev. 518, 520-521 (1957).

See also Cook, Statements of Fact in Pleading Under the Codes, 21 Colum. L. Rev. 416, 417 (1921) (hereinafter Cook) ("[T]here is no logical distinction between statements which are grouped by the courts under the phrases 'statements of [*575] fact' and 'conclusions of law'"). Rule 8 was directly responsive to this difficulty. Its drafters intentionally avoided any reference to "facts" or "evidence" or "conclusions." See 5 C. [****55] Wright & A. Miller, Federal Practice and Procedure § 1216, p 207 (3d ed. 2004) (hereinafter Wright & Miller) ("The substitution of 'claim showing that the pleader is entitled to relief' for the code formulation of the 'facts' constituting a 'cause of action' was intended to avoid the distinctions drawn under the codes among 'evidentiary facts,' 'ultimate facts,' and 'conclusions' . . .").

Under the relaxed pleading standards of the Federal Rules, the idea was not to keep litigants out of court but rather to keep them in. The merits of a claim would be sorted out during a flexible pretrial process and, as appropriate, through the crucible of trial. See *Swierkiewicz*, 534 U.S., at 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 ("The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim"). Charles E. Clark, the "principal draftsman" of the Federal Rules, [2 ⬇] put it thus:

> "Experience has shown . . . that we cannot expect the proof of the case to be made through the pleadings, and that such proof is really not their function. We can expect a general statement distinguishing the case from all others, so [****56] that the manner and form of trial and remedy expected are clear, and so that a permanent judgment will result." The [**1977] New Federal Rules of Civil Procedure: The Last Phase--Underlying Philosophy Embodied in Some of the Basic Provisions of the New Procedure, 23 A. B. A. J. 976, 977 (1937) (hereinafter Clark ▾, New Federal Rules).

The pleading paradigm under the new Federal Rules was well illustrated by the inclusion in the appendix of new Form 9, [*576] a complaint for negligence. As relevant, the Form 9 complaint states only: "On June 1, 1936, in a public highway called Boylston Street in Boston, Massachusetts, defendant negligently drove a motor vehicle against plaintiff who was then [***953] crossing said highway." Form 9, Complaint for Negligence, Forms App., Fed. Rules Civ. Proc., 28 U.S.C. App., p 829 (hereinafter Form 9). The complaint then describes the plaintiff's injuries and demands judgment. The asserted ground for relief--namely, the defendant's negligent driving-- would have been called a "'conclusion of law'" under the code pleading of old. See, *e.g.*, Cook 419. But that bare allegation suffices under a system that "restrict[s] the pleadings to [****57] the task of general notice-giving and invest[s] the deposition-discovery process with a vital role in the preparation for trial." [3 ⬇] *Hickman* v. *Taylor*, 329 U.S. 495, 501, 67 S. Ct. 385, 91 L. Ed. 451 (1947); see also *Swierkiewicz*, 534 U.S., at 513, n. 4, 122 S. Ct. 992, 152 L. Ed. 2d 1 (citing Form 9 as an example of "'the simplicity and brevity of statement which the rules contemplate'"); *Thomson* v. *Washington*, 362 F.3d 969, 970 (CA7 2004) (Posner ▾, J.) ("The federal rules replaced fact pleading with notice pleading").

II

[****58] It is in the context of this history that *Conley* v. *Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957), must be understood. The *Conley* plaintiffs were black railroad workers who alleged that their union local had refused to protect them against discriminatory discharges, in violation of the National Railway Labor Act. The union sought to dismiss the complaint on the ground that its general allegations of discriminatory treatment by the defendants lacked sufficient specificity. Writing [*577] for a unanimous Court, Justice Black rejected the union's claim as foreclosed by the language of Rule 8. *Id.*, at 47-48, 78 S. Ct. 99, 2 L. Ed. 2d 80. In the course of doing so, he articulated the formulation the Court rejects today: "In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*, at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80.

Consistent with the design of the Federal Rules, *Conley*'s "no set of facts" formulation permits outright dismissal only when proceeding to discovery or beyond [****59] would be futile. Once it is clear that a plaintiff has stated a claim that, if true, would entitle him to relief, matters of proof are appropriately relegated to other stages of the trial process. Today, however, in its explanation of a decision to dismiss a complaint that it regards as a fishing expedition, the Court scraps *Conley*'s "no set of facts " language. Concluding that the phrase has been "questioned, criticized, and explained away long enough," *ante*, at 562, 167 L. Ed. 2d, at 944, the Court dismisses it as

careless composition.

[**1978] If *Conley*'s "no set of facts" language is to be interred, let it not be without a eulogy. That exact language, which the majority says has "puzzl[ed] the profession for 50 years," *ante*, at 563, 167 L. Ed. 2d, at 945, has been cited as authority in a dozen opinions of this Court and four separate [***954] writings. 4 ▲ [****61] In not one of [**578] those 16 opinions was the language "questioned," "criticized," or "explained away." Indeed, today's opinion is the first by any Member of this Court to express *any* doubt as to the adequacy of the *Conley* formulation. Taking their cues from the federal courts, 26 States and the District of Columbia utilize as their standard for dismissal of a complaint the very language [****60] the majority repudiates: whether it appears "beyond doubt" that "no set of facts" in support of the claim would entitle the plaintiff to relief. 5 ▲

[****62] [**1979] [**579] Petitioners have not requested that the *Conley* formulation be retired, nor have any of the six *amici* who filed [***955] briefs in support of petitioners. I would not rewrite the Nation's civil procedure textbooks and call into doubt the pleading rules of most of its States without far more informed deliberation as to the costs of doing so. Congress has established a process--a rulemaking process--for revisions of that order. See 28 U.S.C. §§ 2072-2074 (2000 ed. and Supp. IV).

Today's majority calls *Conley*'s "'no set of facts'" language "an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be [**580] supported by showing any set of facts consistent with the allegations in the complaint." *Ante*, at 563, 167 L. Ed. 2d, at 945. This is not and cannot be what the *Conley* Court meant. First, as I have explained, and as the *Conley* Court well knew, the pleading standard the Federal Rules meant to codify does not require, or even invite, the pleading of facts. 6 ▲ The "pleading standard" label the majority gives to what it reads into the *Conley* opinion--a statement of the permissible factual support for an adequately [****63] pleaded complaint--would not, therefore, have impressed the *Conley* Court itself. Rather, that Court would have understood the majority's remodeling of its language to express an *evidentiary* standard, which the *Conley* Court had neither need nor want to explicate. Second, it is pellucidly clear that the *Conley* Court was interested in what a complaint *must* contain, not what it *may* contain. In fact, the Court said without qualification that it was "appraising the *sufficiency* of [**1980] the complaint." 355 U.S., at 45, 78 S. Ct. 99, 2 L. Ed. 2d 80 (emphasis added). It was, to paraphrase today's majority, describing "the minimum standard of adequate pleading to govern a complaint's survival," *ante*, at 563, 167 L. Ed. 2d, at 945.

[****64] We can be triply sure as to *Conley*'s meaning by examining the three Court of Appeals cases the *Conley* Court cited as support for the "accepted rule" that "a complaint should not [**581] be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of [***956] facts in support of his claim which would entitle him to relief." 355 U.S., at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80. In the first case, *Leimer v. State Mut. Life Assurance Co. of Worcester, Mass.*, 108 F.2d 302 (CA8 1940), the plaintiff alleged that she was the beneficiary of a life insurance plan and that the insurance company was wrongfully withholding proceeds from her. In reversing the District Court's grant of the defendant's motion to dismiss, the Eighth Circuit noted that court's own longstanding rule that, to warrant dismissal, "'it should appear from the allegations that a cause of action does not exist, rather than that a cause of action has been defectively stated.'" *Id.*, at 305 (quoting *Winget v. Rockwood*, 69 F.2d 326, 329 (CA8 1934)).

The *Leimer* court viewed the Federal Rules--specifically Rules 8(a)(2), 12(b)(6), 12(e) (motion for [****65] a more definite statement), and 56 (motion for summary judgment)--as reinforcing the notion that "there is no justification for dismissing a complaint for insufficiency of statement, except where it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of the claim." 108 F.2d at 306. The court refuted in the strongest terms any suggestion that the unlikelihood of recovery should determine the fate of a complaint: "No matter how improbable it may be that she can prove her claim, she is entitled to an opportunity to make the attempt, and is not required to accept as final a determination of her rights based upon inferences drawn in favor of the defendant from her amended complaint." *Ibid.*

The Third Circuit relied on *Leimer*'s admonition in *Continental Collieries, Inc. v. Shober*, 130 F.2d 631 (1942), which the *Conley* Court also cited in support of its "no set of facts" formulation. In a diversity action the plaintiff alleged breach of contract, but the District Court dismissed the complaint on the ground that the contract appeared to be unenforceable under state [****66] law. The Court of Appeals reversed, [**582] concluding that there were facts in dispute that went to the enforceability of the contract, and that the rule at the pleading stage was as in *Leimer*: "No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it." 130 F.2d at 635.

The third case the *Conley* Court cited approvingly was written by Judge Clark ▼ himself. In *Dioguardi v. Durning*, 139 F.2d 774 (CA2 1944), the *pro se* plaintiff, an importer of "tonics," charged the customs inspector with auctioning off the plaintiff's former merchandise for less than was bid for it--and indeed for an amount equal to the plaintiff's own bid--and complained that two cases of tonics went missing three weeks before the sale. The inference, hinted at by the averments but never stated in so many words, was that the defendant fraudulently denied the plaintiff his rightful claim to the tonics, which, if true, would have violated federal law. Writing six years after the adoption of the Federal Rules he held the lead rein in drafting, Judge Clark ▼ said that the defendant [****67]

> "could have disclosed the facts from his point of view, in advance of a trial if he [**1981] chose, by asking for a pre-trial hearing or by moving for a summary judgment with supporting affidavits. But, as it stands, we do not see how the plaintiff may properly be deprived of his day in court to show what he obviously so [***957] firmly believes and what for present purposes defendant must be taken as admitting." *Id.*, at 775.

As any civil procedure student knows, Judge Clark ▼'s opinion disquieted the defense bar and gave rise to a movement to revise Rule 8 to require a plaintiff to plead a "'cause of action.'" See 5 Wright & Miller § 1201, at 86-87. The movement failed, see *ibid.*; *Dioguardi* was explicitly approved in *Conley*; and "[i]n retrospect the case itself seems to be a [**583] routine application of principles that are universally accepted," 5 Wright & Miller § 1220, at 284-285.

In light of *Leimer, Continental Collieries*, and *Dioguardi, Conley's* statement that a complaint is not to be dismissed unless "no set of facts" in support thereof would entitle the plaintiff to relief is hardly "puzzling," *ante*, at 562-563, 167 L. Ed. 2d, at 945. It reflects a philosophy that, unlike [****68] in the days of code pleading, separating the wheat from the chaff is a task assigned to the pretrial and trial process. *Conley's* language, in short, captures the policy choice embodied in the Federal Rules and binding on the federal courts.

We have consistently reaffirmed that basic understanding of the Federal Rules in the half century since *Conley*. For example, in *Scheuer v. Rhodes*, 416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974), we reversed the Court of Appeals' dismissal on the pleadings when the respondents, the Governor and other officials of the State of Ohio, argued that the petitioners' claims were barred by sovereign immunity. In a unanimous opinion by then-Justice Rehnquist, we emphasized:

> "[W]hen a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.*" *Id.*, at 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (emphasis added). [****69]

The *Rhodes* plaintiffs had "alleged generally and in conclusory terms" that the defendants, by calling out the National Guard to suppress the Kent State University student protests, "were guilty of wanton, wilful and negligent conduct." *Krause v. Rhodes*, 471 F.2d 430, 433 (CA6 1972). We reversed the Court of Appeals on the ground that "[w]hatever **[\*584]** the plaintiffs may or may not be able to establish as to the merits of their allegations, their claims, as stated in this complaint, given the favorable reading required by the Federal Rules of Civil Procedure," were not barred by the Eleventh Amendment because they were styled as suits against the defendants in their individual capacities. 416 U.S., at 238, 94 S. Ct. 1683, 40 L. Ed. 2d 90.

We again spoke with one voice against efforts to expand pleading requirements beyond their appointed limits in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993). Writing for the unanimous Court, Chief Justice Rehnquist rebuffed the Fifth Circuit's effort to craft a standard for pleading municipal liability that accounted for "the enormous expense involved today in litigation," [****70] *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, [***958] 954 F.2d 1054, 1057 (1992) (internal quotation marks omitted), by requiring a plaintiff to "state with factual [**1982] detail and particularity the basis for the claim which necessarily includes why the defendant-official cannot successfully maintain the defense of immunity," 507 U.S., at 167, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (internal quotation marks omitted). We found this language inconsistent with Rules 8(a)(2) and 9(b) and emphasized that motions to dismiss were not the place to combat discovery abuse: "In the absence of [an amendment to Rule 9(b)], federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Id.*, at 168-169, 113 S. Ct. 1160, 122 L. Ed. 2d 517.

Most recently, in *Swierkiewicz*, 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1, we were faced with a case more similar to the present one than the majority will allow. In discrimination cases, our precedents require a plaintiff at the summary judgment stage to produce either direct evidence of discrimination or, if the claim is based primarily on circumstantial evidence, to meet the shifting [****71] evidentiary burdens imposed under the framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See, e.g.*, *Trans World Airlines, Inc. v. Thurston*, **[\*585]** 469 U.S. 111, 121, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985). Swierkiewicz alleged that he had been terminated on account of national origin in violation of Title VII of the Civil Rights Act of 1964. The Second Circuit dismissed the suit on the pleadings because he had not pleaded a prima facie case of discrimination under the *McDonnell Douglas* standard.

We reversed in another unanimous opinion, holding that "under a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the *McDonnell Douglas* framework does not apply in every employment discrimination case." *Swierkiewicz*, 534 U.S., at 511, 122 S. Ct. 992, 152 L. Ed. 2d 1. We also observed that Rule 8(a)(2) does not contemplate a court's passing on the merits of a litigant's claim at the pleading stage. Rather, the "simplified notice pleading standard" of the Federal Rules "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious [****72] claims." *Id.*, at 512, 122 S. Ct. 992, 152 L. Ed. 2d 1; see Brief for United States et al. as *Amici Curiae* in *Swierkiewicz v. Sorema N. A.*, O. T. 2001, No. 00-1853, p 10 (stating that a Rule 12(b)(6) motion is not "an appropriate device for testing the truth of what is asserted or for determining whether a plaintiff has any evidence to back up what is in the complaint" (internal quotation marks omitted)). 7

As in the discrimination context, we have developed [****73] an evidentiary framework for evaluating claims under § 1 of the Sherman Act when those claims rest on entirely circumstantial evidence of conspiracy. See *Matsushita* [***959] *Elec. Industrial* **[\*586]** *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Under *Matsushita*, a plaintiff's allegations of an illegal conspiracy may not, at the summary judgment stage, rest solely on the inferences that may be drawn from the parallel conduct of the defendants. In order to survive a Rule 56 motion, a § 1 plaintiff "must present evidence 'that tends [**1983] to exclude the possibility' that the alleged conspirators acted independently.'" *Id.*, at 588, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (quoting *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984)). That is, the plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action." 475 U.S., at 588, 106 S. Ct. 1348, 89 L. Ed. 2d 538.

Everything today's majority says would therefore make perfect sense if it were ruling on a Rule 56 motion for summary judgment and the evidence included nothing more than the Court has described. But it should go without saying in the wake of

*Swierkiewicz*, [****74] that a heightened production burden at the summary judgment stage does not translate into a heightened pleading burden at the complaint stage. The majority rejects the complaint in this case because--in light of the fact that the parallel conduct alleged is consistent with ordinary market behavior--the claimed conspiracy is "conceivable" but not "plausible," *ante, at 570, 167 L. Ed. 2d, at 949*. I have my doubts about the majority's assessment of the plausibility of this alleged conspiracy. See Part III, *infra*. But even if the majority's speculation is correct, its "plausibility" standard is irreconcilable with *Rule 8* and with our governing precedents. As we made clear in *Swierkiewicz* and *Leatherman*, fear of the burdens of litigation does not justify factual conclusions supported only by lawyers' arguments rather than sworn denials or admissible evidence.

This case is a poor vehicle for the Court's new pleading rule, for we have observed that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' . . . dismissals prior to giving the plaintiff ample **[*587]** opportunity for discovery should be granted very sparingly." *Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 746, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976)* [****75] (quoting *Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962)*); see also *Knuth v. Erie-Crawford Dairy Cooperative Asso., 395 F.2d 420, 423 (CA3 1968)* ("The 'liberal' approach to the consideration of antitrust complaints is important because inherent in such an action is the fact that all the details and specific facts relied upon cannot properly be set forth as part of the pleadings"). Moreover, the fact that the Sherman Act authorizes the recovery of treble damages and attorney's fees for successful plaintiffs indicates that Congress intended to encourage, rather than discourage, private enforcement of the law. See *Radovich v. National Football League, 352 U.S. 445, 454, 77 S. Ct. 390, 1 L. Ed. 2d 456 (1957)* ("Congress itself has placed the private antitrust litigant in a most favorable position . . . . In the face of such a policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws"). It is therefore more, not less, important in antitrust cases to resist the urge to [***960] engage in armchair economics at the pleading stage.

The same year we decided *Conley* [****76] , Judge Clark ▼ wrote, presciently,

"I fear that every age must learn its lesson that special pleading cannot be made to do the service of trial and that live issues between active litigants are not to be disposed of or evaded on the paper pleadings, i.e., the formalistic claims of the parties. Experience has found no quick and easy short cut for trials in cases generally *and antitrust cases in particular*." Special Pleading in the "Big Case"? in Procedure--The Handmaid of Justice 147, 148 (C. Wright & H. Reasoner eds. 1965) (hereinafter [**1984] Clark ▼ , Special Pleading in the Big Case) (emphasis added).

**[*588]** In this "Big Case," the Court succumbs to the temptation that previous Courts have steadfastly resisted. 8⬆ While the majority assures us that it is not applying any "'heightened'" pleading standard, see *ante, at 569, n 14, 167 L. Ed. 2d, at 948-949*, I shall now explain why I have a difficult time understanding its opinion any other way.

[****77] III

The Court does not suggest that an agreement to do what the plaintiffs allege would be permissible under the antitrust laws, *see, e.g.*, *Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 526-527, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*. Nor does the Court hold that these plaintiffs have failed to allege an injury entitling them to sue for damages under those laws, see *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489-490, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)*. Rather, the theory on which the Court permits **[*589]** dismissal is that, so far as the Federal Rules are concerned, no agreement has been alleged at all. This is a mind-boggling conclusion.

As the Court explains, prior to the enactment of the Telecommunications Act of 1996 the law prohibited the defendants from competing with each other. The new statute was enacted to replace a monopolistic market with a competitive one. The Act did not merely require the regional monopolists [***961] to take affirmative steps to facilitate entry to new competitors, see *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 402, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004)*; it also permitted the existing firms to compete with each [****78] other and to expand their operations into previously forbidden territory. See *47 U.S.C. § 271*. Each of the defendants decided not to take the latter step. That was obviously an extremely important business decision, and I am willing to presume that each company acted entirely independently in reaching that decision. I am even willing to entertain the majority's belief that any agreement among the companies was unlikely. But the plaintiffs allege in three places in their complaint, PP 4, 51, 64, App. 11, 27, 30, that the ILECs did in fact agree both to prevent competitors from entering into their local markets and to forgo competition with each other. And as the Court [**1985] recognizes, at the motion to dismiss stage, a judge assumes "that all the allegations in the complaint are true (even if doubtful in fact)." *Ante, at 555, 167 L. Ed. 2d, at 940*.

The majority circumvents this obvious obstacle to dismissal by pretending that it does not exist. The Court admits that "in form a few stray statements in the complaint speak directly of agreement," but disregards those allegations by saying that "on fair reading these are merely legal conclusions resting on the prior allegations" of parallel [****79] conduct. *Ante, at 564, 167 L. Ed. 2d, at 946*. The Court's dichotomy between factual allegations and "legal conclusions" is the stuff of a bygone era, *supra, at 574-576, 167 L. Ed. 2d, at 938-939*. That distinction was a defining feature of code pleading, see generally Clark ▼ , The Complaint in **[*590]** Code Pleading, 35 Yale L. J. 259 (1925-1926), but was conspicuously abolished when the Federal Rules were enacted in 1938. See *United States v. Employing Plasterers Assn, 347 U.S. 186, 188, 74 S. Ct. 452, 98 L. Ed. 618 (1954)* (holding, in an antitrust case, that the Government's allegations of effects on interstate commerce must be taken into account in deciding whether to dismiss the complaint "[w]hether these charges be called 'allegations of fact' or 'mere conclusions of the pleader'"); *Brownlee v. Conine, 957 F.2d 353, 354 (CA7 1992)* ("The Federal Rules of Civil Procedure establish a system of notice pleading rather than of fact pleading, . . . so the happenstance that a complaint is 'conclusory,' whatever exactly that overused lawyers' cliché means, does not automatically condemn it"); *Walker Distributing Co. v. Lucky Lager Brewing Co., 323 F.2d 1, 3-4 (CA9 1963)* ("[O]ne purpose of *Rule 8* [****80] was to get away from the highly technical distinction between statements of fact and conclusions of law . . ."); *Oil, Chemical & Atomic Workers*

*Int'l Union v. Delta*, 277 F.2d 694, 697 (CA6 1960) ("Under the notice system of pleading established by the Rules of Civil Procedure, . . . the ancient distinction between pleading 'facts' and 'conclusions' is no longer significant"); 5 Wright & Miller § 1218, at 267 ("[T]he federal rules do not prohibit the pleading of facts or legal conclusions as long as fair notice is given to the parties"). "Defendants entered into a contract" is no more a legal conclusion than "defendant negligently drove," see Form 9; *supra*, at [****962] 575-576, 167 L. Ed. 2d, at 952. Indeed it is less of one. **9**⬇

 [****81]  **[*591]**  Even if I were inclined to accept the Court's anachronistic dichotomy and ignore the complaint's actual allegations, I would dispute the Court's suggestion that any inference of agreement from petitioners' parallel conduct is "implausible." Many years ago a truly great economist perceptively observed that "[p]eople of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices." A. Smith, An Inquiry Into the Nature and Causes of the Wealth of Nations, in 39 Great Books of the Western World 55 (R. Hutchins & M. Adler eds. 1952). I am not so cynical as to accept that sentiment at face value, but I need not do so here. Respondents' complaint [**1986]  points not only to petitioners' numerous opportunities to meet with each other, Complaint P 46, App. 23, **10**⬇ but also to Notebaert's curious statement that encroaching on a fellow incumbent's territory "might be a good way to turn a quick dollar but that doesn't make it right," *id.*, P 42, App. 22. What did he mean by that? One possible (indeed plausible) inference is that he meant that while it would be in his company's economic self-interest [****82] to compete with its brethren, he had agreed with his competitors not to do so. According to the complaint, that is how the Illinois Coalition for Competitive Telecom construed Notebaert's statement, *id.*, P 44, App. 22 (calling the statement "evidence of potential collusion among regional Bell phone monopolies to not compete **[*592]** against one another and kill off potential competitors in local phone service"), and that is how Members of Congress construed his company's behavior, *id.*, P 45, App. 23 (describing a letter to the Justice Department requesting an investigation into the possibility that the ILECs' "very apparent non-competition policy'" was coordinated).

 [****83] Perhaps Notebaert meant instead that competition would be sensible in the short term but not in the long run. That's what his lawyers tell us anyway. See Brief for Petitioners 36. But I would think that no one would know better what Notebaert meant than Notebaert himself. Instead of permitting respondents to ask Notebaert, however, the Court looks to other [****963] quotes from that and other articles and decides that what he meant was that entering new markets as a competitive local exchange carrier would not be a "'sustainable economic model.'" *Ante* at 568, n 13, 167 L. Ed. 2d, at 948. Never mind that--as anyone ever interviewed knows--a newspaper article is hardly a verbatim transcript; the writer selects quotes to package his story, not to record a subject's views for posterity. But more importantly the District Court was required at this stage of the proceedings to construe Notebaert's ambiguous statement in the plaintiffs' favor. **11**⬇ See *Allen* v. *Wright*, 468 U.S. 737, 767-768, n. 1, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984) (Brennan, J., dissenting). The inference the statement supports--that simultaneous decisions by ILECs not even to attempt to poach customers from one another once the law authorized them to **[*593]** do so were the product of an agreement--sits comfortably within [****84]  the realm of possibility. That is all the Rules require.

To be clear, if I had been the trial judge in this case, I would not have permitted the plaintiffs to engage in massive discovery based solely on the allegations in this complaint. On the other hand, I surely would not have dismissed the complaint [**1987]  without requiring the defendants to answer the charge that they "have agreed not to compete with [****85] one another and otherwise allocated customers and markets to one another." **12**⬇ Complaint, P 51, App. 27. Even a sworn denial of that charge would not justify a summary dismissal without giving the plaintiffs the opportunity to take depositions from Notebaert and at least one responsible executive representing each of the other defendants.

Respondents in this case proposed a plan of "'phased discovery'" limited to the existence of the alleged conspiracy and class certification. Brief for Respondents 25-26. Two petitioners rejected the plan. *Ibid.* Whether or not respondents' proposed plan was sensible, it was an appropriate subject for negotiation. **13**⬇ Given the charge in the complaint **[*594]**  --buttressed [****964] by the common sense of Adam Smith--I cannot say that the possibility that joint discussions [****86] [**1988]  and perhaps some agreements played a role in petitioners' decisionmaking process is so implausible that dismissing the complaint before any defendant has denied the charge is preferable to granting respondents even a minimal opportunity **[*595]** to prove their claims. See Clark ▾, New Federal Rules 977 ("[T]hrough the weapons of discovery and summary judgment we have developed new devices, with more appropriate penalties to aid in matters of *proof*, and do not need to force the pleadings to their less appropriate function").

 [****87] I fear that the unfortunate result of the majority's new pleading rule will be to invite lawyers' debates over economic theory to conclusively resolve antitrust suits in the absence of any evidence. It is no surprise that the antitrust defense bar--among whom "lament" as to inadequate judicial supervision of discovery is most "common," see *ante*, at 559, 167 L. Ed. 2d, at 942--should lobby for this state of affairs. But "we must recall that their primary responsibility is to win cases for their clients, not to improve law administration for the public." Clark ▾, Special Pleading in the Big Case 152. As we did in our prior decisions, we should have instructed them that their remedy was to seek to amend the Federal Rules--not our interpretation of them. **14**⬇ See *Swierkiewicz*, 534 U.S., at 515, 122 S. Ct. 992, 152 L. [***965] Ed. 2d 1; *Crawford-El v. Britton*, 523 U.S. 574, 595, 118 S. Ct. 1584, 140 L. Ed 2d 759 (1998); *Leatherman*, 507 U.S., at 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517.

 [****88] IV

Just a few weeks ago some of my colleagues explained that a strict interpretation of the literal text of statutory language **[*596]** is essential to avoid judicial decisions that are not faithful to the intent of Congress. *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, *ante*, p. 108 (Scalia ▾, J., dissenting). I happen to believe that there are cases in which other tools of construction are more reliable than text, but I agree of course that congressional intent should guide us in matters of statutory interpretation. *Ante*, at 106 (Stevens, J. ▾, concurring). This is a case in which the intentions of the drafters of three important sources of law--the Sherman Act, the Telecommunications Act of 1996, and the Federal Rules of Civil Procedure--all point unmistakably in the same direction, yet the Court

marches resolutely the other way. Whether the Court's actions will benefit only defendants in antitrust treble-damages cases, or whether its test for the sufficiency of a complaint will inure to the benefit of all civil defendants, is a question that the future will answer. But that the Court has announced a significant new rule that does not even purport to [****89] respond [**1989] to any congressional command is glaringly obvious.

The transparent policy concern that drives the decision is the interest in protecting antitrust defendants--who in this case are some of the wealthiest corporations in our economy--from the burdens of pretrial discovery. *Ante*, at 558-560, 167 L. Ed. 2d, at 942-943. Even if it were not apparent that the legal fees petitioners have incurred in arguing the merits of their Rule 12(b) motion have far exceeded the cost of limited discovery, or that those discovery costs would burden respondents as well as petitioners, 15⚖ that concern would not provide an adequate justification for this law-changing decision. For in the final analysis it is only a lack of confidence in the ability of trial judges to control discovery, buttressed by appellate judges' independent appraisal of the plausibility of profoundly **[*597]** serious factual allegations, that could account for this stark break from precedent.

 [****90] If the allegation of conspiracy happens to be true, today's decision obstructs the congressional policy favoring competition that undergirds both the Telecommunications Act of 1996 and the Sherman Act itself. More importantly, even if there is abundant evidence that the allegation is untrue, directing that the case be dismissed without even looking at any of that evidence marks a fundamental--and unjustified--change in the character of pretrial practice.

Accordingly, I respectfully dissent.

## References

15 U.S.C.S. § 1

Antitrust Laws and Trade Regulation §§ 11.02, 164.01, 164.02 (Matthew Bender)

Moore's Federal Practice §§ 8.02, 12.03 (Matthew Bender 3d ed.)

L Ed Digest, Restraints of Trade, Monopolies, and Unfair Trade Practices § 45

L Ed Index, Sherman Act

Supreme Court's construction and application of Rules 8 and 9 of Federal Rules of Civil Procedure, concerning general rules of pleading and pleading special matters. 122 L. Ed. 2d 897.

Supreme Court's views as to what constitutes per se illegal "price fixing" under the Sherman Act (15 U.S.C.S. § 1 et seq.). 64 L. Ed. 2d 997.

Applicability of federal antitrust laws as affected by other federal statutes or by Federal Constitution--Supreme Court cases. 45 L. Ed. 2d 841.

---

**Footnotes**

**1⚖**  The 1984 divestiture of AT&T's local telephone service created seven Regional Bell Operating Companies. Through a series of mergers and acquisitions, those seven companies were consolidated into the four ILECs ⯆ named in this suit: BellSouth Corporation, Qwest Communications International, Inc., SBC Communications, Inc., and Verizon Communications, Inc. (successor-in-interest to Bell Atlantic Corporation). Complaint P 21, App. 16. Together, these ILECs ⯆ allegedly control 90 percent or more of the market for local telephone service in the 48 contiguous States. *Id.*, P 48, App. 26.

**2⚖**  In setting forth the grounds for § 1 relief, the complaint repeats these allegations in substantially similar language:

"Beginning at least as early as February 6, 1996, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise allocating customers and markets to one another in violation of Section 1 of the Sherman Act." Id., P 64, App. 30-31.

**3⚖**  The dissent greatly oversimplifies matters by suggesting that the Federal Rules somehow dispensed with the pleading of facts altogether. See *post*, at 580, 167 L. Ed. 2d, at 955 (opinion of Stevens ⯆, J.) (pleading standard of Federal Rules does not

require, or even invite, the pleading of facts"). While, for most types of cases, the Federal Rules eliminated the cumbersome requirement that a claimant "set out *in detail* the facts upon which he bases his claim," *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) (emphasis added), Rule 8(a)(2) still requires a "showing," rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only "fair notice" of the nature of the claim, but also "grounds" on which the claim rests. See 5 Wright & Miller § 1202, at 94, 95 (Rule 8(a) "contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented" and does not authorize a pleader's "bare averment that he wants relief and is entitled to it").

**4¶**    Commentators have offered several examples of parallel conduct allegations that would state a § 1 claim under this standard. See, *e.g.*, 6 Areeda & Hovenkamp P 1425, at 167-185 (discussing "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties"); Blechman, Conscious Parallelism, Signalling and Facilitating Devices: The Problem of Tacit Collusion Under the Antitrust Laws, 24 N. Y. L. S. L. Rev. 881, 899 (1979) (describing "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement"). The parties in this case agree that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason," would support a plausible inference of conspiracy. Brief for Respondents 37; see also Reply Brief for Petitioners 12.

**5¶**    The border in *DM Research* was the line between the conclusory and the factual. Here it lies between the factually neutral and the factually suggestive. Each must be crossed to enter the realm of plausible liability.

**6¶**    The dissent takes heart in the reassurances of plaintiffs' counsel that discovery would be """phased""" and "limited to the existence of the alleged conspiracy and class certification." *Post*, at 593, 167 L. Ed. 2d, at 963. But determining whether some illegal agreement may have taken place between unspecified persons at different ILECs (each a multibillion dollar corporation with legions of management level employees) at some point over seven years is a sprawling, costly, and hugely time-consuming undertaking not easily susceptible to the kind of line-drawing and case management that the dissent envisions. Perhaps the best answer to the dissent's optimism that antitrust discovery is open to effective judicial control is a more extensive quotation of the authority just cited, a judge with a background in antitrust law. Given the system that we have, the hope of effective judicial supervision is slim: "The timing is all wrong. The plaintiff files a sketchy complaint (the Rules of Civil Procedure discourage fulsome documents), and discovery is launched. A judicial officer does not know the details of the case the parties will present and in theory *cannot* know the details. Discovery is used to find the details. The judicial officer always knows less than the parties, and the parties themselves may not know very well where they are going or what they expect to find. A magistrate supervising discovery does not--cannot--know the expected productivity of a given request, because the nature of the requester's claim and the contents of the files (or head) of the adverse party are unknown. Judicial officers cannot measure the costs and benefits to the requester and so cannot isolate impositional requests. Requesters have no reason to disclose their own estimates because they gain from imposing costs on rivals (and may lose from an improvement in accuracy). The portions of the Rules of Civil Procedure calling on judges to trim back excessive demands, therefore, have been, and are doomed to be, hollow. We cannot prevent what we cannot detect; we cannot detect what we cannot define; we cannot define 'abusive' discovery except in theory, because in practice we lack essential information." Easterbrook, Discovery as Abuse, 69 B. U. L. Rev. 635, 638-639 (1989) (footnote omitted).

**7¶**    The Court of Appeals also relied on Chief Judge Clark ✏️'s suggestion in *Nagler v. Admiral Corp.*, 248 F.2d 319 (CA2 1957), that facts indicating parallel conduct alone suffice to state a claim under § 1, 425 F.3d at 114 (citing *Nagler, supra*, at 325). But *Nagler* gave no explanation for citing *Theatre Enterprises* (which upheld a denial of a directed verdict for plaintiff on the ground that proof of parallelism was not proof of conspiracy) as authority that pleading parallel conduct sufficed to plead a Sherman Act conspiracy. Now that *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984), and *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), have made it clear that neither parallel conduct nor conscious parallelism, taken alone, raise the necessary implication of conspiracy, it is time for a fresh look at adequacy of pleading when a claim rests on parallel action.

**8¶**    Because *Conley*'s "no set of facts'" language was one of our earliest statements about pleading under the Federal Rules, it is no surprise that it has since been "cited as authority" by this Court and others. *Post*, at 577, 167 L. Ed. 2d, at 953. Although we have not previously explained the circumstances and rejected the literal reading of the passage embraced by the Court of Appeals, our analysis comports with this Court's statements in the years since *Conley*. See *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S., at 336, 347, 125 S. Ct. 1627, 161 L. Ed 2d 577 (2005) (requiring "'reasonably founded hope that the [discovery] process will reveal relevant evidence'" to support the claim (alteration in *Dura*) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975); alteration in *Dura*)); *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 526, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983) ("It is not . . . proper to assume that [the plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged"); *Wilson v. Schnettler*, 365 U.S. 381, 383, 81 S. Ct. 632, 5 L. Ed. 2d 620 (1961) ("In the absence of . . . an allegation [that the arrest was made without probable cause] the courts below could not, nor can we, assume that respondents arrested petitioner without probable cause to believe that he had committed . . . a narcotics offense"). Nor are we reaching out

to decide this issue in a case where the matter was not raised by the parties, see *post, at 579, 167 L. Ed. 2d, at 955*, since both the ILECs and the Government highlight the problems stemming from a literal interpretation of *Conley*'s "no set of facts" language and seek clarification of the standard. Brief for Petitioners 27-28; Brief for United States as *Amicus Curiae* 22-25; see also Brief for Respondents 17 (describing "[p]etitioners and their amici" as mounting an "attack on *Conley*'s 'no set of facts' standard")

The dissent finds relevance in Court of Appeals precedents from the 1940s, which allegedly gave rise to Conley's "no set of facts" language. *See post, at 580-583, 167 L. Ed. 2d, at 955-957*. Even indulging this line of analysis, these cases do not challenge the understanding that, before proceeding to discovery, a complaint must allege facts suggestive of illegal conduct. See, e.g., *Leimer v. State Mut. Life Assurance Co. of Worcester, Mass., 108 F.2d 302, 305 (CA8 1940)* ("'[I]f, in view of what is alleged, it can reasonably be conceived that the plaintiffs . . . could, upon a trial, establish a case which would entitle them to . . . relief, the motion to dismiss should not have been granted'"); *Continental Collieries, Inc. v. Shober, 130 F.2d 631, 635 (CA3 1942)* ("No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it"). Rather, these cases stand for the unobjectionable proposition that, **HN11⚓ LEdHN[11]⚓** [11] when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder. Cf. *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)* (a district court weighing a motion to dismiss asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims").

**9⚓**   See Complaint PP 51, 64, App. 27, 30-31 (alleging that ILECs engaged in a "contract, combination or conspiracy" and agreed not to compete with one another).

**10⚓**   If the complaint had not explained that the claim of agreement rested on the parallel conduct described, we doubt that the complaint's references to an agreement among the ILECs would have given the notice required by Rule 8. Apart from identifying a 7-year span in which the § 1 violations were supposed to have occurred (*i.e.*, "[b]eginning at least as early as February 6, 1996, and continuing to the present," *id.*, P 64, App. 30), the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies. This lack of notice contrasts sharply with the model form for pleading negligence, Form 9, which the dissent says exemplifies the kind of "bare allegation" that survives a motion to dismiss. *Post, at 576, 167 L. Ed. 2d, at 953*. Whereas the model form alleges that the defendant struck the plaintiff with his car while plaintiff was crossing a particular highway at a specified date and time, the complaint here furnishes no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place. A defendant wishing to prepare an answer in the simple fact pattern laid out in Form 9 would know what to answer; a defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin.

**11⚓**   The dissent's quotations from the complaint leave the impression that plaintiffs directly allege illegal agreement; in fact, they proceed exclusively via allegations of parallel conduct, as both the District Court and Court of Appeals recognized. See 313 F. Supp. 2d 174, 182 (SDNY 2003); 425 F.3d 99, 102-104 (CA2 2005).

**12⚓**   From the allegation that the ILECs belong to various trade associations, see Complaint P 46, App. 23, the dissent playfully suggests that they conspired to restrain trade, an inference said to be "buttressed by the common sense of Adam Smith." *Post, at 591, 594, 167 L. Ed. 2d, at 962, 963-964*. If Adam Smith is peering down today, he may be surprised to learn that his tongue-in-cheek remark would be authority to force his famous pinmaker to devote financial and human capital to hire lawyers, prepare for depositions, and otherwise fend off allegations of conspiracy; all this just because he belonged to the same trade guild as one of his competitors when their pins carried the same price tag.

**13⚓**   The complaint quoted a reported statement of Qwest's CEO, Richard Notebaert, to suggest that the ILECs declined to compete against each other despite recognizing that it "'might be a good way to turn a quick dollar.'" P 42, App. 22 (quoting Chicago Tribune, Oct. 31, 2002, Business Section, p 1). This was only part of what he reportedly said, however, and the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn. See Fed. Rule Evid. 201. Notebaert was also quoted as saying that entering new markets as a CLEC would not be "a sustainable economic model" because the CLEC pricing model is "just . . . nuts." Chicago Tribune, Oct. 31, 2002, Business Section, p 1 (cited at Complaint P 42, App. 22). Another source cited in the complaint quotes Notebaert as saying he thought it "unwise" to "base a business plan" on the privileges accorded to CLECs under the 1996 Act because the regulatory environment was too unstable. Chicago Tribune, Dec. 19, 2002, Business Section, p 2 (cited at Complaint P 45, App. 23).

**14⚓**   In reaching this conclusion, we do not apply any "heightened" pleading standard, nor do we seek to broaden the scope of Federal Rule of Civil Procedure 9, which can only be accomplished "'by the process of amending the Federal Rules, and not by judicial interpretation.'" *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 515, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* (quoting *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d*

917 (1993)). On certain subjects understood to raise a high risk of abusive litigation, a plaintiff must state factual allegations with greater particularity than Rule 8 requires. Fed. Rules Civ. Proc. 9(b)-(c). Here, our concern is not that the allegations in the complaint were insufficiently "particular[ized]," *ibid.;* rather, the complaint warranted dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible.

---

**1** See 9 W. Holdsworth, History of English Law 324-327 (1926).

---

**2** *Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 283, 108 S. Ct. 1133, 99 L. Ed. 2d 296 (1988).

---

**3** The Federal Rules do impose a "particularity" requirement on "all averments of fraud or mistake," Fed. Rule Civ. Proc. 9(b), neither of which has been alleged in this case. We have recognized that the canon of *expressio unius est exclusio alterius* applies to Rule 9(b). See *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993).

---

**4** *SEC v. Zandford,* 535 U.S. 813, 818, 122 S. Ct. 1899, 153 L. Ed. 2d 1 (2002); *Davis v. Monroe County Bd. of Ed.,* 526 U.S. 629, 654, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999); *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 811, 113 S. Ct. 2891, 125 L. Ed. 2d 612 (1993); *Brower v. County of Inyo,* 489 U.S. 593, 598, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989); *Hughes v. Rowe,* 449 U.S. 5, 10, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980) *(per curiam);* *McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 246, 100 S. Ct. 502, 62 L. Ed. 2d 441 (1980); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); *Cruz v. Beto,* 405 U.S. 319, 322, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972) *(per curiam);* *Haines v. Kerner,* 404 U.S. 519, 521, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972) *(per curiam);* *Jenkins v. McKeithen,* 395 U.S. 411, 422, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969) (plurality opinion); see also *Cleveland Bd. of Ed. v. Loudermill,* 470 U.S. 532, 554, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) (Brennan, J., concurring in part and dissenting in part); *Hoover v. Ronwin,* 466 U.S. 558, 587, 104 S. Ct. 1989, 80 L. Ed. 2d 590 (1984) (Stevens, J. ▼, dissenting); *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 561, n. 1, 97 S. Ct. 1885, 52 L. Ed. 2d 571 (1977) (Marshall, J., dissenting); *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 55, n. 6, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976) (Brennan, J., concurring in judgment).

---

**5** See, *e.g., EB Invs., LLC v. Atlantis Development, Inc.,* 930 So. 2d 502, 507 (Ala. 2005); *Department of Health & Social Servs. v. Native Village of Curyung,* 151 P. 3d 388, 396 (Alaska 2006); *Newman v. Maricopa Cty.,* 167 Ariz. 501, 503, 808 P.2d 1253, 1255 (App. 1991); *Public Serv. Co. of Colo. v. Van Wyk,* 27 P. 3d 377, 385-386 (Colo. 2001) (en banc); *Clawson v. St. Louis Post-Dispatch, LLC,* 906 A.2d 308, 312 (D. C. 2006); *Hillman Constr. Corp. v. Wainer,* 636 So. 2d 576, 578 (Fla. App. 1994); *Kaplan v. Kaplan,* 266 Ga. 612, 613, 469 S. E. 2d 198, 199 (1996); *Wright v. Home Depot U.S.A., Inc.,* 111 Haw. 401, 406, 142 P. 3d 265, 270 (2006); *Taylor v. Maile,* 142 Idaho 253, 257, 127 P. 3d 156, 160 (2005); *Fink v. Bryant,* 2001-CC-0987, p. 4 (La. 11/28/01), 801 So. 2d 346, 349; *Gagne v. Cianbro Corp.,* 431 A.2d 1313, 1318-1319 (Me. 1981); *Gasior v. Massachusetts Gen. Hospital,* 446 Mass. 645, 647, 846 N.E.2d 1133, 1135 (2006); *Ralph Walker, Inc. v. Gallagher,* 926 So. 2d 890, 893 (Miss. 2006); *Jones v. Montana Univ. System,* 337 Mont. 1, 7, 155 P. 3d 1247, 1252 (2007); *Johnston v. Neb. Dep't of Corr. Servs.,* 270 Neb. 987, 989, 709 N.W.2d 321, 324 (2006); *Blackjack Bonding v. Las Vegas Munic. Ct.,* 116 Nev. 1213, 1217, 14 P. 3d 1275, 1278 (2000); *Shepard v. Ocwen Fed. Bank,* 361 N. C. 137, 139, 638 S. E. 2d 197, 199 (2006); *Rose v. United Equitable Ins. Co.,* 2001 ND 154, P10, 632 N.W.2d 429, 434; *State ex rel. Turner v. Houk,* 112 Ohio St. 3d 561, 562, 2007-Ohio-814, P5, 862 N.E.2d 104, 105 *(per curiam); Moneypenney v. Dawson,* 2006 OK 53, P2, 141 P. 3d 549, 551; *Gagnon v. State,* 570 A.2d 656, 659 (R. I. 1990); *Osloond v. Farrier,* 2003 SD 28, P4, 659 N.W.2d 20, 22 *(per curiam); Smith v. Lincoln Brass Works, Inc.,* 712 S.W.2d 470, 471 (Tenn. 1986); *Association of Haystack Property Owners, Inc. v. Sprague,* 145 Vt. 443, 446, 494 A.2d 122, 124 (1985); *In re Coday,* 156 Wn. 2d 485, 497, 130 P. 3d 809, 815 (2006) (en banc); *Haines v. Hampshire Cty. Comm'n,* 216 W. Va. 499, 502, 607 S. E. 2d 828, 831 (2004); *Warren v. Hart,* 747 P.2d 511, 512 (Wyo. 1987); see also *Malpiede v. Townson,* 780 A.2d 1075, 1082-1083 (Del. 2001) (permitting dismissal only "where the court determines with reasonable certainty that the plaintiff could prevail on no set of facts that may be inferred from the well-pleaded allegations in the complaint" (internal quotation marks omitted)); *Canel v. Topinka,* 212 Ill. 2d 311, 318, 818 N.E.2d 311, 317, 288 Ill. Dec. 623 (2004) (replacing "appears beyond doubt" in the *Conley* formulation with "is clearly apparent"); *In re Young,* 522 N.E.2d 386, 388 (Ind. 1988) *(per curiam)* (replacing "appears beyond doubt" with "appears to a certainty"); *Barkema v. Williams Pipeline Co.,* 666 N.W.2d 612, 614 (Iowa 2003) (holding that a motion to dismiss should be sustained "only when there exists no conceivable set of facts entitling the non-moving party to relief"); *Pioneer Village v. Bullitt Cty.,* 104 S. W. 3d 757, 759 (Ky. 2003) (holding that judgment on the pleadings should be granted "if it appears beyond doubt that the nonmoving party cannot prove any set of facts that would entitle him/her to relief"); *Corley v. Detroit Bd. of Ed.,* 470 N.W.2d 274, 277, 681 N.W.2d 342, 345 (2004) *(per curiam)* (holding that a motion for judgment on the pleadings should be granted only "'if no factual development could possibly justify recovery'"); *Oberkramer v. Ellisville,* 706 S.W.2d 440, 441 (Mo. 1986) (en banc) (omitting the words "beyond doubt" from the *Conley* formulation); *Colman v. Utah State Land Bd.,* 795 P.2d 622, 624 (Utah 1990) (holding that a motion to dismiss is appropriate "only if it clearly appears that [the plaintiff] can prove no set of facts in support of his claim"); *NRC Mgmt. Servs. Corp. v. First Va. Bank - Southwest,* 63 Va. Cir. 68, 70 (2003) ("The Virginia standard is identical [to the *Conley* formulation], though the Supreme Court of Virginia may not have used the same words to describe it").

**6¶**
The majority is correct to say that what the Federal Rules require is a "'showing'" of entitlement to relief. _Ante, at 555, n 3, 167 L. Ed. 2d, at 940_. Whether and to what extent that "showing" requires allegations of fact will depend on the particulars of the claim. For example, had the amended complaint in this case alleged _only_ parallel conduct, it would not have made the required "showing." See _supra, at 570-571, 167 L. Ed. 2d, at 949_. Similarly, had the pleadings contained _only_ an allegation of agreement, without specifying the nature or object of that agreement, they would have been susceptible to the charge that they did not provide sufficient notice that the defendants may answer intelligently. Omissions of that sort instance the type of "bareness" with which the Federal Rules are concerned. A plaintiff's inability to persuade a district court that the allegations actually included in her complaint are "plausible" is an altogether different kind of failing, and one that should not be fatal at the pleading stage.

**7¶**
See also 5 Wright & Miller § 1202, at 89-90 ("[P]leadings under the rules simply may be a general summary of the party's position that is sufficient to advise the other party of the event being sued upon, to provide some guidance in a subsequent proceeding as to what was decided for purposes of res judicata and collateral estoppel, and to indicate whether the case should be tried to the court or to a jury. No more is demanded of the pleadings than this; indeed, history shows that no more can be performed successfully by the pleadings" (footnotes omitted)).

**8¶**
Our decision in _Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)_, is not to the contrary. There, the plaintiffs failed adequately to allege loss causation, a required element in a private securities fraud action. Because it alleged nothing more than that the prices of the securities the plaintiffs purchased were artificially inflated, the _Dura_ complaint failed to "provid[e] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the [alleged] misrepresentation." _Id., at 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577_. Here, the failure the majority identifies is not a failure of notice--which "notice pleading" rightly condemns--but rather a failure to satisfy the Court that the agreement alleged might plausibly have occurred. That being a question not of _notice_ but of _proof_, it should not be answered without first hearing from the defendants (as apart from their lawyers). Similarly, in _Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)_, in which we also found an antitrust complaint wanting, the problem was not that the injuries the plaintiffs alleged failed to satisfy some threshold of plausibility, but rather that the injuries as alleged were not "the type that the antitrust statute was intended to forestall." _Id., at 540, 103 S. Ct. 897, 74 L. Ed. 2d 723_; see _id., at 526, 103 S. Ct. 897, 74 L. Ed. 2d 723_ ("As the case comes to us, we must assume that the Union can prove the facts alleged in its amended complaint. It is not, however, proper to assume that the Union can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged").

**9¶**
The Court suggests that the allegation of an agreement, even if credited, might not give the notice required by _Rule 8_ because it lacks specificity. _Ante, at 565, n 10, 167 L. Ed. 2d, at 946_. The remedy for an allegation lacking sufficient specificity to provide adequate notice is, of course, a _Rule 12(e)_ motion for a more definite statement. See _Swierkiewicz v. Sorema N. A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)_. Petitioners made no such motion and indeed have conceded that " [o]ur problem with the current complaint is not a lack of specificity, it's quite specific." Tr. of Oral Arg. 14. Thus, the fact that "the pleadings mentioned no specific time, place, or persons involved in the alleged conspiracies," _ante, at 565, n 10, 167 L. Ed. 2d, at 946_, is, for our purposes, academic.

**10¶**
The Court describes my reference to the allegation that the defendants belong to various trade associations as "playfully" suggesting that the defendants conspired to restrain trade. _Ante, at 567, n 12, 167 L. Ed. 2d, at 947_. Quite the contrary: An allegation that competitors meet on a regular basis, like the allegations of parallel conduct, is consistent with--though not sufficient to prove--the plaintiffs' entirely serious and unequivocal allegation that the defendants entered into an unlawful agreement. Indeed, if it were true that the plaintiffs "rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs," _ante, at 564, 167 L. Ed. 2d, at 946_, there would have been no purpose in including a reference to the trade association meetings in the amended complaint.

**11¶**
It is ironic that the Court seeks to justify its decision to draw factual inferences in the defendants' favor at the pleading stage by citing to a rule of evidence, _ante, at 568, n 13, 167 L. Ed. 2d, at 948_. Under _Federal Rule of Evidence 201(b)_, a judicially noticed fact "must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Whether Notebaert's statements constitute evidence of a conspiracy is hardly beyond reasonable dispute.

**12¶**
The Court worries that a defendant seeking to respond to this "conclusory" allegation "would have little idea where to begin." _Ante, at 565, n 10, 167 L. Ed. 2d, at 946_. A defendant could, of course, begin by either denying or admitting the

charge:

**13** The potential for "sprawling, costly, and hugely time-consuming" discovery, *ante*, at 560, n 6, 167 L. Ed. 2d, at 943, is no reason to throw the baby out with the bathwater. The Court vastly underestimates a district court's case-management arsenal. Before discovery even begins, the court may grant a defendant's Rule 12(e) motion; Rule 7(a) permits a trial court to order a plaintiff to reply to a defendant's answer, see *Crawford-El v. Britton*, 523 U.S. 574, 598, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998); and Rule 23 requires "rigorous analysis" to ensure that class certification is appropriate, *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982); see *In re Initial Public Offering Securities Litigation*, 471 F.3d 24 (CA2 2006) (holding that a district court may not certify a class without ruling that each Rule 23 requirement is met, even if a requirement overlaps with a merits issue). Rule 16 invests a trial judge with the power, backed by sanctions, to regulate pretrial proceedings via conferences and scheduling orders, at which the parties may discuss, *inter alia*, "the elimination of frivolous claims or defenses," Rule 16(c)(1); "the necessity or desirability of amendments to the pleadings," Rule 16(c)(2); "the control and scheduling of discovery," Rule 16(c)(6); and "the need for adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems," Rule 16(c)(12). Subsequently, Rule 26 confers broad discretion to control the combination of interrogatories, requests for admissions, production requests, and depositions permitted in a given case; the sequence in which such discovery devices may be deployed; and the limitations imposed upon them. See 523 U.S., at 598-599, 118 S. Ct. 1584, 140 L. Ed. 2d 759. Indeed, Rule 26(c) specifically permits a court to take actions "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by, for example, disallowing a particular discovery request, setting appropriate terms and conditions, or limiting its scope. In short, the Federal Rules contemplate that pretrial matters will be settled through a flexible process of give and take, of proffers, stipulations, and stonewalls, not by having trial judges screen allegations for their plausibility vel non without requiring an answer from the defendant. See Societe Internationale pour Participations Industrielles et *Commerciales, S. A. v. Rogers*, 357 U.S. 197, 206, 78 S. Ct. 1087, 2 L. Ed. 2d 1255 (1958) ("Rule 34 is sufficiently flexible to be adapted to the exigencies of particular litigation"). And should it become apparent over the course of litigation that a plaintiff's filings bespeak an in terrorem suit, the district court has at its call its own in terrorem device, in the form of a wide array of Rule 11 sanctions. See Rules 11(b), (c) (authorizing sanctions if a suit is presented "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation"); see *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 111 S. Ct. 922, 112 L. Ed. 2d 1140 (1991) (holding that Rule 11 applies to a represented party who signs a pleading, motion, or other papers, as well as to attorneys); *Atkins v. Fischer*, 232 F.R.D. 116, 126 (DC 2005) ("As possible sanctions pursuant to Rule 11, the court has an arsenal of options at its disposal").

**14** Given his "background in antitrust law," *ante*, at 560, n 6, 167 L. Ed. 2d, at 943, Judge Easterbrook has recognized that the most effective solution to discovery abuse lies in the legislative and rulemaking arenas. He has suggested that the remedy for the ills he complains of requires a revolution in the rules of civil procedure:

> "Perhaps a system in which judges pare away issues and focus on investigation is too radical to contemplate in this country--although it prevailed here before 1938, when the Federal Rules of Civil Procedure were adopted. The change could not be accomplished without abandoning notice pleading, increasing the number of judicial officers, and giving them more authority . . . . If we are to rule out judge-directed discovery, however, we must be prepared to pay the piper. Part of the price is the high cost of unnecessary discovery--impositional and otherwise." Discovery as Abuse, 69 B. U. L. Rev. 635, 645 (1989).

**15** It would be quite wrong, of course, to assume that dismissal of an antitrust case after discovery is costless to plaintiffs. See Fed. Rule Civ. Proc. 54(d)(1) ("[C]osts other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs").



About    Cookie Policy
Privacy Policy    Terms & Conditions

RELX™
Copyright © 2023 LexisNexis.

# Coastal Wellness Ctrs., 309 F. Supp. 3d 1216

Copy Citation

United States District Court for the Southern District of Florida

April 3, 2018, Decided; April 4, 2018, Filed

CASE NO. 0:17-CV-61951-WPD; CASE NO. 0:17-CV-61974-WPD

**Reporter**

309 F. Supp. 3d 1216 * | 2018 U.S. Dist. LEXIS 61144 ** | 2018 WL 1701995

COASTAL WELLNESS CENTERS, INC., a Florida corporation, a/a/o Janeece Farley, on behalf of itself and all others similarly situated, Plaintiff, v. PROGRESSIVE AMERICAN INSURANCE COMPANY, Defendant.TOWER HEALTH CENTER, INC., a Florida corporation, a/a/o Alston Lawrence; and COASTAL CARE CENTER, INC., a Florida corporation, a/a/o Jinnicka Delhomme; on behalf of themselves and all others similarly situated, Plaintiffs, v. PROGRESSIVE SELECT INSURANCE COMPANY, Defendant.

**Subsequent History:** Motion granted by Coastal Wellness Ctrs., Inc. v. Progressive Am. Ins. Co., 2018 U.S. Dist. LEXIS 197100 (S.D. Fla., May 15, 2018)

## Core Terms

chiropractic, reduction, reimbursement, fee schedule, injunctive relief, benefits, notice, Files, motion to dismiss, declaratory relief, maximum charge, calendar year, percent

**Counsel:** [**1] For Coastal Wellness Centers, Inc., a Florida corporation, on behalf of itself and all others similarly situated, other, Janeece Farley, Plaintiff (0:17cv61951): Barbara Perez ▾, LEAD ATTORNEY, Tod N. Aronovitz ▾, Aronovitz Law ▾, Miami, FL USA; Joel Stephen Perwin ▾, LEAD ATTORNEY, Miami, FL USA; Theophilos George Poulopoulos ▾, LEAD ATTORNEY, Corredor, Husseini and Snedaker, P.A. ▾, Miami, FL USA; Alaina R Fotiu-Wojtowicz, Brodsky Fotiu-Wojtowicz, PLLC, Miami, FL USA.

For Tower Health Center, Inc., other, Alston Lawrence, Plantation Spinal Care Center, Inc., other, Jinnicka Delhomme, Consol Plaintiffs (0:17cv61951): Barbara Perez ▾, Tod N. Aronovitz ▾, LEAD ATTORNEYS, Aronovitz Law ▾, Miami, FL USA; Alaina R Fotiu-Wojtowicz, Brodsky Fotiu-Wojtowicz, PLLC, Miami, FL USA.

For Progressive American Insurance Company, Defendant (0:17cv61951): Ari Gerstin ▾, Marcy Levine Aldrich ▾, Ross Eliot Linzer, LEAD ATTORNEYS, Akerman LLP, Miami, FL USA.

For Progressive Select Insurance Company, Consol Defendant (0:17cv61951): Ari Gerstin ▾, Akerman LLP, Miami, FL USA.

For Tower Health Center, Inc., other, Alston Lawrence, Plaintiff (0:17cv61974): Joel Stephen Perwin ▾, LEAD ATTORNEY, Miami, FL USA; Barbara Perez ▾, Tod N. Aronovitz ▾, [**2] Aronovitz Law ▾, Miami, FL USA.

For Plantation Spinal Care Center, Inc., other, Jinnicka Delhomme, Plaintiff (0:17cv61974): Barbara Perez ▾, Tod N. Aronovitz ▾, LEAD ATTORNEYS, Aronovitz Law ▾, Miami, FL USA.

For Progressive Select Insurance Company, Defendant (0:17cv61974): Ari Gerstin ▾, Marcy Levine Aldrich ▾, Ross Eliot Linzer, LEAD ATTORNEYS, Akerman LLP, Miami, FL USA.

**Judges:** WILLIAM P. DIMITROULEAS ▾, United States District Judge.

**Opinion by:** WILLIAM P. DIMITROULEAS ▾

## Opinion

**[*1218]** ORDER DENYING DEFENDANT PROGRESSIVE AMERICAN INSURANCE COMPANY'S MOTION TO DISMISS

THIS CAUSE is before the Court on Defendant Progressive American Insurance Company's Motion to Dismiss [DE 34], filed herein on March 12, 2018. The Court has carefully considered the Motion [DE 34], and is otherwise fully advised in the premises.

## I. Background [1]⬇

This is an action asserting class action claims for declaratory relief, injunctive relief, and compensatory damages relief pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3). [DE 1] at ¶ 1.

The action arises out of a November 21, 2014 auto accident involving Janeece Farley, who was insured under an automobile insurance policy providing personal injury protection ("PIP") benefits issued by Defendant, Progressive American Insurance Company ("Progressive"). [**3] Following the accident, Farley sought chiropractic treatment for her bodily injuries from Plaintiff, Coastal Wellness Centers, Inc.

On or about November 21, 2014, Farley executed an Assignment of Insurance Benefits, Release & Demand, assigning all of her benefits under the subject policy to Coastal. The purpose of the assignment was to authorize Coastal to bill Progressive directly for the medical services provided to Farley, and to require Progressive to pay Coastal directly at its home office. As the assignee of Farley's PIP benefits, Coastal billed Progressive for medical services Plaintiff provided to Farley. Accordingly, Plaintiff Coastal asserts standing to sue based on the Assignment of Benefits received from Farley.

Included in the treatment Plaintiff provided to Farley were two (2) chiropractic manipulative treatment services billed under CPT code 98940. Plaintiff alleges that, while the correct reimbursement rate for each unit of CPT code 98941 was $46.51, Progressive only paid Plaintiff $45.58 for **[*1219]** each, thus underpaying Plaintiff a total of about $2.

In its three-count Complaint, Plaintiff claims as follows: Count I — Declaratory Judgment; Count II — Injunctive Relief; and [**4] Count III — Breach of Contract for Unpaid PIP Benefits.

Defendant moved to dismiss the Complaint for failure to state a claim pursuant to Fed. R. Civ. P 12(b)(6). [DE 34].

## II. Standard of Review

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). Under Rule 12(b)(6), a motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (abrogating *Conley*, 355 U.S. at 41). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (citing *Twombly*, 550 U.S. at 556). The allegations of the claim must be taken as true and must be read to include any theory on which the plaintiff may recover. *See Linder v. Portocarrero*, 963 F. 2d 332, 334-36 (11th Cir. 1992) (citing *Robertson v. Johnston*, 376 F. 2d 43 (5th Cir. 1967)).

However, the court need not take allegations as true if they are merely "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949. In sum, "a district court weighing a motion to dismiss asks 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled [**5] to offer evidence to support the claims.'" *Twombly*, 550 U.S. at n. 8 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984)).

"A court's review on a motion to dismiss is 'limited to the four corners of the complaint.'" *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) (quoting *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002)). However, "[a] court may consider only the complaint itself and any documents referred to in the complaint which are central to the claims," *id.* (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997)).

## III. Discussion

This case presents a question of interpretation of the Florida No-Fault ("PIP") Statute, Fla. Stat. § 627.736 (2012 to date).

Fla. Stat. § 627.736 sets forth a basic coverage mandate which requires every PIP insurer to reimburse 80% of reasonable expenses for medical services. *See Geico General Insurance Co. v. Virtual Imaging Services, Inc.*, 141 So. 3d 147, 150 (Fla. 2013). There are two different methodologies permitted under the statute for calculating reimbursements to satisfy the PIP mandate: (1) the "reasonableness is a fact dependent inquiry" methodology prescribed under Florida Statutes subsection § 627.726(5)(a) [2]⬇; and (2) the "schedule of maximum charges" provided under Florida Statutes subsection 627.736(5)(a)1 [3]⬇.

**[*1220]** Plaintiff does not contest whether Defendant's automobile insurance policy properly elected the "schedule of maximum charges." The parties agree that Progressive is entitled to limit reimbursement for medical expenses based on the "schedule [**6] of maximum charges" contained in Section 5(a)(a) of the PIP Statute. See Fla. Stat. § 627.736(5)(a). Accordingly, this case is about Defendant's application of the "schedule of maximum charges" to its reimbursements of claims submitted by Plaintiff for chiropractic manipulative treatment services billed under CPT code 98940.

The "schedule of maximum charges" limits payment for the chiropractic services rendered by Plaintiff to "200 percent of the allowable amount under" the "participating physicians fee schedule of Medicare Part B." *See* Fla. Stat. § 627.736(5)(a)1.f.(I). In turn, the Medicare Part B Physicians Fee Schedule (the "Medicare Part B Physicians Fee Schedule" or "PPFS-MPB") prescribes the reimbursement rate for over 7,000 services performed by medical professionals, including the chiropractic medical services that are the subject of this case.

The reimbursement value for services under the PPFS-MPB are calculated by multiplying (1) the relative value of a service; (2) the conversion factor for the particular year; and (3) the geographic adjustment factor applicable to the locality in which the service was provided. *See* 42

U.S.C. § 1395w-4(b)(1). Therefore, using simple arithmetic (addition and multiplication), the reimbursement value for any service, [**7**] from any part of the United States, for any given year can be easily ascertained by the Defendant using the Medicare Part B Physicians Fee Schedule. The tables of values for the cost factors are published each year in the annual Medicare Physicians Fee Schedule Final Rule and are readily available and easily accessible on the Centers for Medicare and Medicaid ("CMS") website. 4

The instant dispute arises from Progressive's application of the PPFS-MPB in effect in 2012-2014. During that timeframe, a 2% reduction was imposed on chiropractic services paid for by Medicare in order to recoup costs for a study/demonstration conducted by Brandeis University to evaluate the feasibility of expanding Medicare coverage for certain chiropractic services. *See* 74 Federal Register 61926-61928. The Medicare Prescription Drug, Improvement and Modernization Act of 2003 (hereinafter "MMA") required that the study be "budget neutral;" therefore, the CMS Office of the Actuary ("OACT") established a plan to recoup the outstanding $50 million apportioned to CMS to fund the study by reducing the payment by Medicare for chiropractic fee codes 98940, 98941 and 98942 by two percent (2%) commencing in calendar year 2010 through [**8**] calendar year 2014. *Id.* OACT estimated that CMS would recoup $10 million per year from 2010 through 2014 by reducing CMS' payment of Medicare claims. *Id.*

The Department of Health and Human Services ("HHS") made it clear that the 2% reduction was only to be applied to Medicare claims:

> Consistent with the proposed rule, for this final rule with comment period, we are reflecting this reduction only in the payment files used by the Medicare contractors **[*1221]** to process Medicare claims rather than through adjusting the RVUs. **Avoiding an adjustment to the RVUs would preserve the integrity of the PFS, particularly since many private payers also base payment on the RVUs**.

74 Fed. Reg. 61927 (emphasis added); *see also* 78 Fed. Reg. 74790 (same). The Medicare Physician Fee Schedule ("PFS") Final Rule authored by HHS for each calendar year from 2010 through 2014 reflected in the Federal Register explicitly reasserts the calendar year 2010 PFS policy establishing the reductions for Medicare claims only. *See* 78 Fed. Reg. 74790 - 74791.

Plaintiff asserts that the Defendant misinterpreted what is the Medicare Part B Physicians Schedule and misapplied the CMS Payment Files instead, which resulted in improper, unauthorized reductions by 2% for each unit of a chiropractic [**9**] manipulation. The Court agrees. Notwithstanding that no provisions of Fla. Stat. § 627.736(5)(a)1 nor of the relevant portions of the federal regulations permit private payers, such as Defendant Progressive, to reduce payment to chiropractors treating under chiropractic fee codes 98940, 98941 and 98942 by two percent (2%), Defendant did so during calendar years 2012-2014, resulting in systematic underpayment of its insured's PIP chiropractic claims.

The Court rejects Defendant's argument that it was permitted to use the 2% fee reduction because those values were calculated into the CMS payment files. Regardless of whether it was easier for a private payer to use those values rather than calculate the formula once a year, such reduction is contradicted by the plain language of § 627.736(5)(a)1, which clearly allows an insurer to limit reimbursement to medical care to the treating chiropractor to "200 percent of the allowable amount under" the "participating physicians fee schedule of Medicare Part B." *See* Fla. Stat. § 627.736(5)(a)1.f.(I). "[W]hen the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must [**10**] be given its plain and obvious meaning." *Holly v. Auld*, 450 So. 2d 217, 219 (Fla. 1984). The Medicare Physician Fee Schedule ("PFS") does not include the two percent (2%) reduction for CPT codes 98940, 98941 or 98942. To the extent that Defendant relied upon the CMS Payment Files to underpay chiropractic claims by 2%, such practice was improper. Additionally, it runs contrary to the stated point of applying the reduction to the payment files rather than the RVU's, so as to preserve the integrity of the RVU's as they are relied upon by many private payers, such as Defendant.

Based upon the foregoing, Defendant could not take advantage of the 2% reduction which was incorporated into the CMS Payment Files to allow Medicare to recoup the cost of a study in order to reduce its payments to Plaintiff. Defendant's motion to dismiss for failure to allege a cognizable claim for declaratory relief, injunctive relief, or damages shall be denied.

Defendant also argues in its Motion that injunctive relief is unnecessary because the chiropractic demonstration ended in 2014, the CMS Payment Files no longer reflect a 2% reduction, and therefore Plaintiff cannot allege that Defendant continues to currently apply the 2% reduction. However, while the [**11**] 2% reduction was only in effect from 2010 to 2014, the statute of limitations has not run on all underpaid claims arising from Defendant's practice at the time, and Plaintiff adequately pleads in the Complaint that Defendant continues to improperly reduce the payments of those claims or refuses to pay the **[*1222]** proper amounts. Accordingly, the Court declines to dismiss the claim for injunctive relief at this time.

Defendant also contends that Plaintiff's counts for declaratory and injunctive relief should be dismissed because Plaintiff has an adequate remedy at law. The Court rejects Defendant's argument that Plaintiff cannot assert a claim for declaratory relief when an adequate alternative remedy exists at law. "Such a position is in direct contravention of Rule 57 of the Federal Rules of Civil Procedure" which provides that "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." *DWF Mgmt., LLC v. Starr Indem. & Liab. Co.*, No. 16-CV-61238-KMM, 2016 U.S. Dist. LEXIS 155560, 2016 WL 6611115, at *2 (S.D. Fla. Nov. 9, 2016) (quoting *Johnson v. Geico Gen. Ins. Co.*, No.: 08-cv-80740, 2008 U.S. Dist. LEXIS 108487, 2008 WL 4793616, *3 (S.D. Fla. Nov. 3, 2008)) (quoting Fed. R. Civ. P. 57). Further, pursuant to Fed. R. Civ. P. 8(d)(3), Plaintiff may plead alternate theories of recovery including injunctive and declaratory relief even if a remedy at law is pled in another count. [**12**] *See, e.g.*, *Adelphia Cable Partners, Inc. v. E & A Beepers Corp.*, 188 F.R.D. 662, 666 (S.D.Fla.1999) (King, J.) ("Although equitable relief ultimately may not be awarded where there exists an adequate remedy at law, Plaintiff certainly may plead alternative equitable relief."). "It is the existence of a legal remedy that bars an equitable cause of action . . . Therefore, until or unless an adequate remedy at law is proved, dismissal of Plaintiffs' claim is premature." *Botting v. Goldstein*, No. 15-CV-62113, 2015 U.S Dist. LEXIS 176463, 2015 WL 10324134, at *3 (S.D. Fla. Dec. 21, 2015) (citations omitted).

Finally, Defendant claims that Plaintiff has failed to allege class-wide compliance with the PIP statute's pre-suit notice requirement. *See* Fla. Stat. § 627.736(10) ("As a condition precedent to filing any action for benefits under this section, written notice of an intent to initiate litigation must be provided to the insurer."). The Court disagrees. As to the claims for declaratory and injunctive relief, the Court agrees with the reasoning and conclusion of the Florida Fourth District Court of Appeal that, as these claims do not seek damages, they do not constitute an action for benefits under the section and therefore the statutory notice requirement is not a condition precedent to these claims. *See* Bristol W. Ins. Co. v. MD Readers, Inc., 52 So. 3d 48, 51 (Fla. 4th DCA 2010). *See also* A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co., No. 16-CV-62610, 2017 U.S. Dist. LEXIS 30332, 2017 WL 850177, at *2 (S.D. Fla. Mar. 3, 2017) (statutory notice pursuant to § 627.736(10) not required in action for declaratory relief). Additionally, as [**13**] to the claim for breach of contract, Plaintiff has adequately pled compliance. *See* [DE 1] at ¶ 88 ("The Plaintiff and the Class members satisfied the pre-suit requirements of Fla. Stat. § 627.736(10) because Plaintiff and the Class members sent Defendant pre-suit demand letters prior to instituting this action."). Whether pre-suit notice is required for every class member is premature for adjudication prior to the class certification stage. However, the Court notes that there is convincing authority that individual

notice by each class member is not required in the class action context, so long as compliance has been met by the class plaintiff. See *Lapidus v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 704 (Fla. 3d DCA 2000); *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1336 (11th Cir. 1984).

**IV. CONCLUSION**

Based upon the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Dismiss [DE 34] is **DENIED**.

**[*1223]** 2. Defendant shall file an answer within fourteen (14) days of the date of this Order.

**DONE AND ORDERED** in Chambers in Fort Lauderdale, Broward County, Florida this 3rd day of April, 2018.

/s/ William P. Dimitrouleas ▾

WILLIAM P. DIMITROULEAS ▾

United States District Judge

---

**Footnotes**

 All facts set forth in the background are according to the allegations of the Complaint [DE 1], which the Court assumes as true for purposes of this Motion.

**2▾** Formerly subsection 627.736(5)(a)(1) under the 2008 version of the PIP statute.

**3▾** Formerly subsection 627.736(5)(a)(2) under the 2008 version of the PIP statute.

**4▾** The Court may take judicial notice of government publications and website materials. *See, e.g.*, *Abdus-Sabur v. Hope Village, Inc.*, 221 F. Supp. 3d 3, 9-10 & n.3 (D.D.C. 2016) (judicial notice of Medicare manual and government healthcare website); *United States ex rel. Fox RX, Inc. v. Omnicare, Inc.*, 38 F. Supp. 3d 398, 405-06 & n.6 (S.D.N.Y. 2014) (judicial notice of CMS website).

---

LexisNexis®

About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

Lexis

New York Times Co. v. Sullivan, 376 U.S. 254 (196

Search: Everything

Client: -None-  Folders  History  Help  More

**New York Times Co. v. Sullivan, 376 U.S. 254**

Copy Citation

Supreme Court of the United States

January 6, 1964, Argued ; March 9, 1964, Decided

No. 39

**Reporter**

376 U.S. 254 * | 84 S. Ct. 710 ** | 11 L. Ed. 2d 686 *** | 1964 U.S. LEXIS 1655 **** | 95 A.L.R.2d 1412 | 1 Media L. Rep. 1527

NEW YORK TIMES CO. v. SULLIVAN

Document:   New York Times Co. v. Sullivan, 376 U.S. 254   Actions

**Disposition:** 273 Ala. 656, 144 So. 2d 25, reversed and remanded.

## Core Terms

advertisement, libel, public official, press, official conduct, damages, actual malice, retraction, malice, criticize, newspaper, public affairs, reputation, courts, arrested, protest, constitutionally protected, punitive damages, words, safeguards, immunity, campus, cases, libel law, demonstration, defamation, defamatory, malicious, freedom of speech, libel action

## Case Summary

**Procedural Posture**
Petitioner newspaper sought review of a decision by the Supreme Court of Alabama upholding a judgment awarding respondent damages in a civil libel action.

**Overview**
Petitioner newspaper sought review of a decision upholding a judgment awarding respondent damages in a civil libel action. The Court held that the rule of law applied by the Alabama courts was constitutionally deficient for failure to provide petitioner the safeguards for freedom of speech and of the press that were guaranteed by the First and Fourteenth Amendments in a libel action brought by a public official against critics of his official conduct. The Court held that petitioner's constitutional guarantees required a rule that prohibited a public official from recovering damages for a defamatory falsehood relating to the public official's official conduct unless the official proved that the statement was made with actual malice. The Court defined actual malice as knowledge that the defamatory statement was false or made with reckless disregard of whether it was false or not. Further, the Court held that under the proper safeguards, the evidence presented against petitioner was constitutionally insufficient to support the judgment for respondent. Respondent presented no evidence to show petitioner was aware of erroneous statements or was in any way reckless in that regard.

**Outcome**
The Court reversed the judgment and remanded the case.

## LexisNexis® Headnotes

Civil Procedure > Remedies > Damages > Punitive Damages
Commercial Law (UCC) > ... > Application & Construction > Remedies > Damages
Torts > ... > Defamation > Remedies > Damages
View more legal topics

*HN1* **Damages, Punitive Damages**
Alabama law denies a public officer recovery of punitive damages in a libel action brought on account of a publication concerning his

official conduct unless he first makes a written demand for a public retraction and the defendant fails or refuses to comply. Ala. Code tit. 7, § 914. 🔍 Like this Headnote

*Shepardize® - Narrow by this Headnote (61)* ⚠️ 4 ♦ 2

---

Constitutional Law > ... > Freedom of Speech ⌄ > 📄 Defamation ⌄ > 📄 Public Figures ⌄
View more legal topics

**HN2** ⬇️ **Defamation, Public Figures**

The rule of law applied by the Alabama courts is constitutionally deficient for failure to provide the safeguards for freedom of speech and of the press that are required by the First Amendment and Fourteenth Amendment in a libel action brought by a public official against critics of his official conduct. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (175)* ⚠️ 6 ♦ 9

---

Constitutional Law > 📄 Substantive Due Process ⌄ > Scope ⌄

**HN3** ⬇️ **Constitutional Law, Substantive Due Process**

The test as to the applicability of the Fourteenth Amendment is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (23)* ⚠️ 1 ♦ 1

---

Constitutional Law > ... > Freedom of Speech ⌄ > 📄 Commercial Speech ⌄ > General Overview ⌄
View more legal topics

**HN4** ⬇️ **Freedom of Speech, Commercial Speech**

If allegedly libelous statements would otherwise be constitutionally protected from judgment, they do not forfeit that protection because they were published in the form of a paid advertisement. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (16)*

---

Torts > Intentional Torts ⌄ > Defamation ⌄ > 📄 Defamation Per Se ⌄
View more legal topics

**HN5** ⬇️ **Defamation, Defamation Per Se**

Under Alabama law, a publication is libelous per se if the words tend to injure a person in his reputation or to bring him into public contempt; the standard is met if the words are such as to injure him in his public office, or impute misconduct to him in his office, or want of official integrity, or want of fidelity to a public trust. The jury must find that the words were published of and concerning the plaintiff, but where the plaintiff is a public official his place in the governmental hierarchy is sufficient evidence to support a finding that his reputation has been affected by statements that reflect upon the agency of which he is in charge. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (17)* ⚠️ 1

---

Civil Procedure > Remedies ⌄ > Damages ⌄ > 📄 Punitive Damages ⌄
Torts > Intentional Torts ⌄ > Defamation ⌄ > 📄 Defamation Per Se ⌄
View more legal topics

**HN6** ⬇️ **Damages, Punitive Damages**

Once libel per se has been established, under Alabama law the defendant has no defense as to stated facts unless he can persuade the jury that they were true in all their particulars. a defendant's privilege of fair comment for expressions of opinion depends on the truth of the facts upon which the comment is based. Unless he can discharge the burden of proving truth, general damages are presumed, and may be awarded without proof of pecuniary injury. A showing of actual malice is apparently a prerequisite to recovery of punitive damages, and the defendant may in any event forestall a punitive award by a retraction meeting the statutory requirements. Good motives and belief in truth do not negate an inference of malice, but are relevant only in mitigation of punitive damages if the jury chooses to accord them weight. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (34)* ♦ 4

---

Constitutional Law > ... > Fundamental Freedoms ⌄ > Freedom of Speech ⌄ > Fighting Words ⌄
Torts > ... > Defamation ⌄ > Public Figures ⌄ > Voluntary Public Figures ⌄
View more legal topics

**HN7** ⬇️ **Freedom of Speech, Fighting Words**

The Constitution does not protect libelous publications. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Constitutional Law > ... > Freedom of Speech ⌄ > 📄 Commercial Speech ⌄ > General Overview ⌄

Torts > ... > Defenses ⌄ > Privileges ⌄ > Constitutional Privileges ⌄
View more legal topics

**HN8** ⬇ Freedom of Speech, Commercial Speech

Like insurrection, contempt, advocacy of unlawful acts, breach of the peace, obscenity, solicitation of legal business, and the various other formulae for the repression of expression that have been challenged in the Supreme Court, libel can claim no talismanic immunity from constitutional limitations. It must be measured by standards that satisfy the First Amendment. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (96)*    1   ◆ 3

Constitutional Law > ... > Freedom of Speech ⌄ > 📄 Commercial Speech ⌄ > General Overview ⌄
View more legal topics

**HN9** ⬇ Freedom of Speech, Commercial Speech

Debate on public issues should be uninhibited, robust, and wide-open, and it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1149)*    7    62

Constitutional Law > ... > Fundamental Freedoms ⌄ > Freedom of Speech ⌄ > Scope ⌄

**HN10** ⬇ Fundamental Freedoms, Freedom of Speech

Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth -- whether administered by judges, juries, or administrative officials -- and especially one that puts the burden of proving truth on the speaker. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (16)*    1

Constitutional Law > ... > Fundamental Freedoms ⌄ > Freedom of Speech ⌄ > Scope ⌄

**HN11** ⬇ Fundamental Freedoms, Freedom of Speech

First Amendment protection does not turn upon the truth, popularity, or social utility of the ideas and beliefs which are offered. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (31)*

Constitutional Law > ... > Freedom of Speech ⌄ > Free Press ⌄ > General Overview ⌄

**HN12** ⬇ Freedom of Speech, Free Press

Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (9)*

Constitutional Law > ... > Fundamental Freedoms ⌄ > Freedom of Religion ⌄ > Free Exercise of Religion ⌄
View more legal topics

**HN13** ⬇ Freedom of Religion, Free Exercise of Religion

In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (19)*

Constitutional Law > ... > Fundamental Freedoms ⌄ > Freedom of Speech ⌄ > Scope ⌄

**HN14** ⬇ Fundamental Freedoms, Freedom of Speech

Erroneous statement is inevitable in free debate, and it must be protected if the freedoms of expression are to have the breathing space that they need to survive. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (239)*    17

Civil Procedure > Sanctions ⌄ > Contempt ⌄ > General Overview ⌄
Constitutional Law > ... > Freedom of Speech ⌄ > 📄 Defamation ⌄ > General Overview ⌄
Governments > Local Governments ⌄ > Administrative Boards ⌄

**HN15** ⬇ Sanctions, Contempt

Injury to official reputation affords no more warrant for repressing speech that would otherwise be free than does factual error. Where

judicial officers are involved, the Supreme Court has held that concern for the dignity and reputation of the courts does not justify the punishment as criminal contempt of criticism of the judge or his decision. This is true even though the utterance contains half-truths and misinformation. Such repression can be justified, if at all, only by a clear and present danger of the obstruction of justice. If judges are to be treated as men of fortitude, able to thrive in a hardy climate, surely the same must be true of other government officials, such as elected city commissioners. Criticism of their official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes their official reputations. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (75)*    1    5

---

Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > General Overview ▾
Criminal Law & Procedure > ... > Miscellaneous Offenses ▾ > 📄 Espionage & Treason ▾ > Elements ▾
View more legal topics

**HN16** ⬇ **Freedom of Speech, Defamation**

If neither factual error nor defamatory content suffices to remove the constitutional shield from criticism of official conduct, the combination of the two elements is no less inadequate. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (26)*    2

---

Constitutional Law > Bill of Rights ▾ > Fundamental Freedoms ▾ > General Overview ▾
View more legal topics

**HN17** ⬇ **Bill of Rights, Fundamental Freedoms**

It is true that the First Amendment was originally addressed only to action by the federal government. But this distinction was eliminated with the adoption of the Fourteenth Amendment and the application to the states of the First Amendment restrictions. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (32)*

---

Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > General Overview ▾
Torts > Intentional Torts ▾ > Defamation ▾ > Libel ▾

**HN18** ⬇ **Freedom of Speech, Defamation**

What a state may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (31)*    1

---

Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > General Overview ▾

**HN19** ⬇ **Freedom of Speech, Defamation**

Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about the clearer perception and livelier impression of truth, produced by its collision with error. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (25)*    2

---

Torts > ... > Defamation ▾ > Public Figures ▾ > Actual Malice ▾
View more legal topics

**HN20** ⬇ **Public Figures, Actual Malice**

Constitutional guarantees require a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with actual malice -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2378)*    14    321

---

Constitutional Law > ... > Fundamental Freedoms ▾ > Freedom of Speech ▾ > Scope ▾
Torts > ... > Defenses ▾ > Privileges ▾ > Constitutional Privileges ▾

**HN21** ⬇ **Fundamental Freedoms, Freedom of Speech**

It is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great. The public benefit from publicity is so great, and the chance of injury to private character so small, that such discussion must be privileged. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (23)*    2

---

Torts > ... > Defenses ▾ > Privileges ▾ > Constitutional Privileges ▾

View more legal topics

**HN22** ⬇ **Privileges, Constitutional Privileges**

Any one claiming to be defamed by a communication must show actual malice or go remediless. This privilege extends to a great variety of subjects, and includes matters of public concern, public men, and candidates for office. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (37)*  3

Civil Procedure > Remedies ▾ > Damages ▾ > 📙 Punitive Damages ▾
Constitutional Law > ... > Freedom of Speech ▾ > 📙 Defamation ▾ > Public Figures ▾
Torts > ... > Defamation ▾ > Public Figures ▾ > Voluntary Public Figures ▾
View more legal topics

**HN23** ⬇ **Damages, Punitive Damages**

The Constitution delimits a state's power to award damages for libel in actions brought by public officials against critics of their official conduct. While Alabama law apparently requires proof of actual malice for an award of punitive damages, where general damages are concerned malice is "presumed." Such a presumption is inconsistent with the federal rule. The power to create presumptions is not a means of escape from constitutional restrictions. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (265)* ⚠ 5    18

Constitutional Law > ... > Fundamental Freedoms ▾ > Freedom of Speech ▾ > Scope ▾
View more legal topics

**HN24** ⬇ **Fundamental Freedoms, Freedom of Speech**

The Supreme Court's duty is not limited to the elaboration of constitutional principles; the Court must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. Particularly where the question is one of alleged trespass across the line between speech unconditionally guaranteed and speech which may legitimately be regulated. In cases where that line must be drawn, the rule is that the Court will examine the statements in issue and the circumstances under which they were made to see whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment protect. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (69)* 3

Constitutional Law > Bill of Rights ▾ > Fundamental Rights ▾ > Trial by Jury in Civil Actions ▾

**HN25** ⬇ **Fundamental Rights, Trial by Jury in Civil Actions**

See U.S. Const. amend. VII. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Jurisdiction on Certiorari ▾ > Considerations Governing Review ▾ > State Court Decisions ▾
Constitutional Law > Bill of Rights ▾ > Fundamental Rights ▾ > Trial by Jury in Civil Actions ▾

**HN26** ⬇ **Considerations Governing Review, State Court Decisions**

The U.S. Const. amend. VII ban on re-examination of facts does not preclude the Court from determining whether governing rules of federal law have been properly applied to the facts. The Supreme Court will review the finding of facts by a State court where a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

Constitutional Law > ... > Freedom of Speech ▾ > 📙 Defamation ▾ > General Overview ▾
Torts > ... > Defamation ▾ > Defenses ▾ > Fair Comment & Opinion ▾
View more legal topics

**HN27** ⬇ **Freedom of Speech, Defamation**

Since the Fourteenth Amendment requires recognition of the conditional privilege for honest misstatements of fact, it follows that a defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact. Both defenses are of course defeasible if the public official proves actual malice. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (84)*  7

▼ Lawyers' Edition Display

**Summary**

The present action for libel was brought in the Circuit Court of Montgomery County, Alabama, by a city commissioner of public affairs whose duties included the supervision of the police department; the action was brought against the New York Times for publication of a paid advertisement describing the maltreatment in the city of Negro students protesting segregation, and against four individuals whose names, among others, appeared in the advertisement. The jury awarded plaintiff damages of $ 500,000 against all defendants, and the judgment on the verdict was affirmed by the Supreme Court of Alabama (273 Ala 656, 144 So 2d 25) on the grounds that the statements in the advertisement were libelous per se, false, and not privileged, and that the evidence showed malice on the part of the newspaper; the defendants' constitutional objections were rejected on the ground that the First Amendment does not protect libelous publications.

On writs of certiorari, the Supreme Court of the United States reversed the judgment below and remanded the case to the Alabama Supreme Court. In an opinion by Brennan ▾, J., expressing the views of six members of the Court, it was held that (1) the rule of law applied by the Alabama courts was constitutionally deficient for failure to provide the safeguards for freedom of speech and press that are required by the constitutional guaranty in a libel action brought by a public official against critics of his official conduct, and in particular, for failure to provide a qualified privilege for honest misstatements of fact, defeasible only upon a showing of actual malice; and (2) under the proper standards the evidence presented in the case was constitutionally insufficient to support the judgment for plaintiff.

Black ▾, J., joined by Douglas ▾, J., and Goldberg ▾, J., joined by Douglas ▾, J., concurred in the result in separate opinions. The concurring opinions expressed the view that the constitutional guaranty of free speech and press afforded the defendants an absolute, unconditional privilege to publish their criticism of official conduct.

## Headnotes

CONSTITUTIONAL LAW §927.5  > freedom of speech and press -- attack on public officials --  > Headnote:

*LEdHN[1]*⤓ [1]

State rules of law governing a libel action brought by a public official against critics of his official conduct are constitutionally deficient where these rules fail to provide the safeguards for freedom of speech and of the press that are required by the First and Fourteenth Amendments in such an action, and evidence disregarding the proper safeguards is constitutionally insufficient to support a judgment for the plaintiff.

APPEAL §799  > from state court -- jurisdiction over foreign corporation --  > Headnote:

*LEdHN[2]*⤓ [2]

A contention of a foreign corporation that the assumption of jurisdiction over its corporate person by a state court overreaches the territorial limits of the due process clause is foreclosed from United States Supreme Court review by a ruling of the state courts, not lacking fair or substantial support in prior state court decisions, that the corporation entered a general appearance in the action and thus waived its jurisdictional objection.

CONSTITUTIONAL LAW §520  > Fourteenth Amendment -- what is state action --  > Headnote:

*LEdHN[3]*⤓ [3]

The rule that Fourteenth Amendment is directed against state action and not private action has no application where the state courts in a civil lawsuit have applied a state rule of law which is claimed to impose invalid restrictions on a party's constitutional freedoms of speech and press; it matters not that the state law has been applied in a civil action between private parties and that it is common law only, though supplemented by statute.

CONSTITUTIONAL LAW §520  > Fourteenth Amendment -- test of state action --  > Headnote:

*LEdHN[4]*⤓ [4]

In determining whether the Fourteenth Amendment is violated by state action, the test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised.

CONSTITUTIONAL LAW §925  > freedom of speech and press --  > Headnote:

*LEdHN[5]*⤓ [5]

The First Amendment secures the widest possible dissemination of information from diverse and antagonistic sources.

ADVERTISING §1  >  CONSTITUTIONAL LAW §930  > freedom of speech and press -- libelous statement --  > Headnote:

*LEdHN[6]*⤓ [6]

An allegedly libelous statement does not forfeit its protection under the constitutional guaranty of freedom of speech and press merely because it was published in the form of a paid advertisement.

CONSTITUTIONAL LAW §927.5 > freedom of speech and press -- libel laws -- criticism of public officials -- > Headnote:

*LEdHN[7]*⤓ [7]

Judicial statements to the effect that the Federal Constitution does not protect libelous publications do not foreclose the United States Supreme Court from measuring, by standards satisfying the First Amendment, the use of libel laws to impose sanctions upon expressions critical of the official conduct of public officials.

CONSTITUTIONAL LAW §930 > freedom of speech and press -- libel -- > Headnote:

*LEdHN[8]*⤓ [8]

Like "insurrection," contempt, advocacy of unlawful acts, breach of the peace, obscenity, solicitation of legal business, and the various other formulae for the repression of expression that have been challenged in the United States Supreme Court as violating the constitutional guaranty of freedom of speech and press, libel can claim no talismanic immunity from constitutional limitations.

CONSTITUTIONAL LAW §925 > freedom of speech and press -- public questions -- > Headnote:

*LEdHN[9]*⤓ [9]

Freedom of expression upon public questions is secured by the First Amendment.

CONSTITUTIONAL LAW §925 > freedom of speech and press -- > Headnote:

*LEdHN[10]*⤓ [10]

The protection given free speech and press by the Federal Constitution was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.

CONSTITUTIONAL LAW §925 > freedom of speech -- > Headnote:

*LEdHN[11]*⤓ [11]

It is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions, and this opportunity is to be afforded for vigorous advocacy no less than abstract discussion.

CONSTITUTIONAL LAW §927 > freedom of speech -- attack on government and public officials -- > Headnote:

*LEdHN[12]*⤓ [12]

The First Amendment requires that debate on public issues should be uninhibited, robust, and wide open, and such debate may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.

CONSTITUTIONAL LAW §927.5 > CONSTITUTIONAL LAW §930 > freedom of speech -- attack on public official -- truth of statements -- > Headnote:

*LEdHN[13]*⤓ [13]

An advertisement published in a newspaper describing the maltreatment in an Alabama city of Negro students protesting segregation qualifies for the First Amendment's protection and does not forfeit that protection merely because of the falsity of some of its factual statements and its alleged defamation of a city official; the First Amendment does not recognize an exception for any test of truth, whether administered by judges, juries, or administrative officials, and especially not one that puts the burden of proving truth on the speaker.

CONSTITUTIONAL LAW §925 > freedom of speech -- > Headnote:

*LEdHN[14]*⤓ [14]

The protection of the constitutional guaranty of freedom of speech and press does not turn upon the truth, popularity, or social utility of the ideas and beliefs which are offered.

CONSTITUTIONAL LAW §927.5 > freedom of speech -- attack on public officials -- > Headnote:

*LEdHN[15]*⤓ [15]

Injury to official reputation affords no more warrant for repressing speech that would otherwise be free than does factual error; criticism of official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes official reputations.

CONSTITUTIONAL LAW §927.5  > attack on official conduct --  > Headnote:

**LEdHN[16]** [16]

Since neither factual error nor defamatory content suffices to remove the protection of the constitutional guaranty of freedom of speech and press from criticism of official conduct, the combination of the two elements is no less inadequate.

CONSTITUTIONAL LAW §925.5  > freedom of speech and press -- applicability to states --  > Headnote:

**LEdHN[17]** [17]

The Fourteenth Amendment makes the First Amendment applicable to the states.

CONSTITUTIONAL LAW §930  > freedom of speech -- libel --  > Headnote:

**LEdHN[18]** [18]

What a state may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel.

CONSTITUTIONAL LAW §930  > freedom of speech -- libel -- defense of truth --  > Headnote:

**LEdHN[19]** [19]

A state law of civil libel which infringes the constitutional guaranty of freedom of speech and press is not saved by its allowance of the defense of truth.

CONSTITUTIONAL LAW §927.5  > attack on public officials -- necessity of actual malice --  > Headnote:

**LEdHN[20]** [20]

The constitutional guaranty of freedom of speech and press prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice," that is, with knowledge that it was false or with reckless disregard of whether it was false or not; such a qualified privilege of honest mistake of fact is required by the First and Fourteenth Amendments.

CONSTITUTIONAL LAW §927.5  > freedom of speech -- attack on public officials -- presumption of malice --  > Headnote:

**LEdHN[21]** [21]

A presumption of malice where general damages in a libel action are concerned is, as applied to a libel action brought by a public official against critics of his official conduct, inconsistent with the constitutional guaranty of freedom of speech and press, which affords the defendant a qualified privilege of honest mistake.

CONSTITUTIONAL LAW §829  > presumptions --  > Headnote:

**LEdHN[22]** [22]

The power of the legislature to create presumptions is not a means of escape from constitutional restrictions.

APPEAL §1641  > reversal -- uncertainty of verdict --  > Headnote:

**LEdHN[23]** [23]

A state judgment affirming a judgment for a public official in his libel action against critics of his official conduct must be reversed by the United States Supreme Court where state law, inconsistent with the requirement of the constitutional guaranty of freedom of speech and press, presumes malice insofar as general damages are concerned, the trial judge did not instruct the jury to differentiate between general and punitive damages, and in view of the general verdict returned by the jury it is impossible to know whether the verdict was wholly an award of one or the other.

APPEAL §745  > from state court -- libel action of public official -- review of evidence --  > Headnote:

**LEdHN[24]** [24]

Considerations of effective judicial administration require the United State Supreme Court to review the evidence in the record for the purpose of determining whether it could constitutionally support a judgment for a public official in his state court libel action against critics of his official conduct, where the judgment is reversed on the ground that the state law applied violates the constitutional guaranty of freedom of speech and press, and the official may seek a new trial.

APPEAL §745  > from state court -- review of evidence --  > Headnote:

*LEdHN[25]* [25]

Upon review of a state court judgment, the United States Supreme Court's duty is not limited to the elaboration of constitutional principles; the Court must also in proper cases review the evidence to make certain that those principles have been constitutionally applied.

APPEAL §751  > from state court -- review of evidence -- freedom of speech and press --  > Headnote:

*LEdHN[26]* [26]

On review of a state court judgment in cases in which a line must be drawn between speech unconditionally guaranteed and speech which may legitimately be regulated, the United States Supreme Court examines for itself the statements in issue and the circumstances under which they were made to see whether they are of a character protected by the constitutional guaranty of freedom of speech; the Court must make an independent examination of the whole record so as to assure itself that the judgment below does not constitute a forbidden intrusion on the field of free expression.

CONSTITUTIONAL LAW §38  > Seventh Amendment -- applicability to state cases --  > Headnote:

*LEdHN[27]* [27]

The Seventh Amendment, providing that no fact tried by a jury shall be otherwise re-examined in any court of the United States than according to the rules of the common law, is applicable to state cases coming to the United States Supreme Court.

JURY §2  > Seventh Amendment -- review of facts by United States Supreme Court --  > Headnote:

*LEdHN[28]* [28]

The Seventh Amendment's ban on re-examination of facts tried by a jury does not preclude the United States Supreme Court from determining whether governing rules of federal law have been properly applied to the facts.

APPEAL §751  > from state court -- review of findings of fact --  > Headnote:

*LEdHN[29]* [29]

The United States Supreme Court will review the findings of fact by a state court where conclusions of law as to a federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the federal question, to analyze the facts.

EVIDENCE §918  > sufficiency -- malice --  > Headnote:

*LEdHN[30]* [30]

In a libel action brought in a state court by a public official against signers of a newspaper advertisement describing the maltreatment in an Alabama city of Negro students protesting segregation, proof presented to show actual malice lacks the convincing clarity which the constitutional standard demands, and hence does not constitutionally sustain a judgment for the plaintiff, where, assuming that the defendants could constitutionally be found to have authorized the use of their names on the advertisement, there was no evidence whatever that they were aware of any erroneous statements or were in any way reckless in that regard.

EVIDENCE §174  > libel -- inference of malice --  > Headnote:

*LEdHN[31]* [31]

In a libel action brought in a state court by a public official against a newspaper for publication of an advertisement describing the maltreatment in an Alabama city of Negro students protesting segregation, a statement by the secretary of the newspaper that he thought that the advertisement was substantially correct affords no constitutional warrant for inferring actual malice from his ignoring the falsity of the advertisement, where his opinion was at least a reasonable one, and there was no evidence to impeach his good faith.

EVIDENCE §174  > libel -- inference of malice --  > Headnote:

*LEdHN[32]* [32]

In a libel action brought in a state court by a public official against a newspaper for publication of an advertisement describing the maltreatment in an Alabama city of Negro students protesting segregation, the newspaper's failure to retract upon plaintiff's demand is not adequate evidence of actual malice for constitutional purposes, even though the newspaper later retracted upon the demand of the governor of Alabama.

EVIDENCE §175  > libel against newspaper -- inference of malice --  > Headnote:
**LEdHN[33]** [33]

In a libel action brought in a state court by a public official against a newspaper for publication of an advertisement describing the maltreatment in an Alabama city of Negro students protesting segregation, evidence that the newspaper published the advertisement without checking its accuracy against the news stories in its own files is not adequate evidence of actual malice for constitutional purposes, where the record shows that the employees of the newspaper having responsibility for the publication of the advertisement relied upon their knowledge of the good reputation of many of the signers of the advertisement and upon a letter from a person known to them as a responsible individual, certifying that the use of the names of the signers was authorized; evidence supporting a finding of negligence in failing to discover the misstatements in the advertisement is constitutionally insufficient to show the recklessness that is required for a finding of actual malice.

EVIDENCE §913  > libel -- identifying defamed person --  > Headnote:
**LEdHN[34]** [34]

In a libel action brought in a state court by a city commissioner of public affairs against a newspaper for publication of an advertisement describing the maltreatment in an Alabama city of Negro students protesting segregation, the evidence is constitutionally incapable of supporting the jury's finding that the allegedly libelous statements were made "of and concerning" plaintiff, where (1) there was no reference to the plaintiff in the advertisement either by name or official position, (2) the statements in the advertisement could not reasonably be read as accusing plaintiff of personal involvement in the acts described therein, (3) these statements, although possibly referring to the police, did not on their face make even an oblique reference to plaintiff as an individual, and (4) none of the plaintiff's witnesses suggested any basis for the belief that plaintiff himself was attacked in the advertisement beyond the bare fact that he was in overall charge of the police department and thus bore official responsibility for police conduct.

LIBEL AND SLANDER §11  > libel of government and government officials --  > Headnote:
**LEdHN[35]** [35]

Prosecution for libel on government has no place in the American system of jurisprudence, and this rule cannot be sidestepped by transmuting criticism of government, however impersonal it may seem on its face, into personal criticism, and hence potential libel, of the officials of whom the government is composed.

LIBEL AND SLANDER §21  > defamation of police commissioner -- fair comment --  > Headnote:
**LEdHN[36]** [36]

In the absence of a showing of actual malice, recovery in a libel action brought by a police commissioner against critics of his ability to run the police department is precluded by the doctrine of fair comment.

CONSTITUTIONAL LAW §927.5  > free speech -- defamation of public official --  > Headnote:
**LEdHN[37]** [37]

Since in an action brought by a public official against critics of his official conduct the Fourteenth Amendment requires recognition of the conditional privilege for honest misstatements of fact, it follows that a defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact, both defenses being defeasible if the public official proves actual malice.

CONSTITUTIONAL LAW §927.5  > freedom of speech -- attack on government operations as attack on government officials --  > Headnote:
**LEdHN[38]** [38]

The constitutional guaranty of freedom of speech and press precludes an otherwise impersonal attack on governmental operations from being treated as a libel of an official responsible for those operations.

## Syllabus

Respondent, an elected official in Montgomery, Alabama, brought suit in a state court alleging that he had been libeled by an advertisement in corporate petitioner's newspaper, the text of which appeared over the names of the four individual petitioners and many others. The advertisement included statements, some of which were false, about police action allegedly directed against students who participated in a civil rights demonstration and against a leader of the civil rights movement; respondent claimed the statements referred to him because his duties included supervision of the police department. The trial judge instructed the jury that such statements were "libelous per se," legal injury being implied without proof of actual damages, and that for the purpose of compensatory damages malice was presumed, so that such damages could be awarded against petitioners if the statements were found [****2] to have been published by them and to have related to respondent. As to punitive damages, the judge instructed that mere negligence was not evidence of actual malice and would not justify an award of punitive damages; he refused to instruct that actual intent to harm or recklessness had to be found before punitive damages could be awarded, or that a verdict for respondent should differentiate between compensatory and punitive damages. The jury found for respondent and the State Supreme

Court affirmed. *Held:* A State cannot under the First and Fourteenth Amendments award damages to a public official for defamatory falsehood relating to his official conduct unless he proves "actual malice" -- that the statement was made with knowledge of its falsity or with reckless disregard of whether it was true or false. Pp. 265-292.

(a) Application by state courts of a rule of law, whether statutory or not, to award a judgment in a civil action, is "state action" under the Fourteenth Amendment. P. 265.

(b) Expression does not lose constitutional protection to which it would otherwise be entitled because it appears in the form of a paid advertisement. Pp. 265-266.

(c) Factual error, content [****3] defamatory of official reputation, or both, are insufficient to warrant an award of damages for false statements unless "actual malice" -- knowledge that statements are false or in reckless disregard of the truth -- is alleged and proved. Pp. 279-283.

(d) State court judgment entered upon a general verdict which does not differentiate between punitive damages, as to which under state law actual malice must be proved, and general damages, as to which it is "presumed," precludes any determination as to the basis of the verdict and requires reversal, where presumption of malice is inconsistent with federal constitutional requirements. P. 284.

(e) The evidence was constitutionally insufficient to support the judgment for respondent, since it failed to support a finding that the statements were made with actual malice or that they related to respondent. Pp. 285-292.

**Counsel:** Herbert Wechsler argued the cause for petitioner in No. 39. With him on the brief were Herbert Brownell, Thomas F. Daly, Louis M. Loeb, T. Eric Embry, Marvin E. Frankel, Ronald S. Diana and Doris Wechsler.

William P. Rogers and Samuel R. Pierce, Jr. argued the cause for petitioners in No. 40. With Mr. Pierce [****4] on the brief were I. H. Wachtel, Charles S. Conley, Benjamin Spiegel, Raymond S. Harris, Harry H. Wachtel, Joseph B. Russell, David N. Brainin, Stephen J. Jelin and Charles B. Markham.

M. Roland Nachman, Jr. argued the cause for respondent in both cases. With him on the brief were Sam Rice Baker and Calvin Whitesell.

Briefs of amici curiae, urging reversal, were filed in No. 39 by William P. Rogers, Gerald W. Siegel and Stanley Godofsky for the Washington Post Company, and by Howard Ellis, Keith Masters and Don H. Reuben for the Tribune Company. Brief of amici curiae, urging reversal, was filed in both cases by Edward S. Greenbaum, Harriet F. Pilpel, Melvin L. Wulf, Nanette Dembitz and Nancy F. Wechsler for the American Civil Liberties Union et al.

**Judges:** Warren ▾, Black ▾, Douglas ▾, Clark ▾, Harlan ▾, Brennan ▾, Stewart ▾, White ▾, Goldberg ▾

**Opinion by:** BRENNAN ▾

## Opinion

**[*256]** [***692] [**713] MR. JUSTICE BRENNAN ▾ delivered the opinion of the Court.

We are required in this case to determine for the first time the extent to which the constitutional protections for speech and press limit a State's power to award damages in a libel action brought by a public official against critics of his [****5] official conduct.

Respondent L. B. Sullivan is one of the three elected Commissioners of the City of Montgomery, Alabama. He testified that he was "Commissioner of Public Affairs and the duties are supervision of the Police Department, Fire Department, Department of Cemetery and Department of Scales." He brought this civil libel action against the four individual petitioners, who are Negroes and Alabama clergymen, and against petitioner the New York Times Company, a New York corporation which publishes the New York Times, a daily newspaper. A jury in the Circuit Court of Montgomery County awarded him damages of $ 500,000, the full amount claimed, against all the petitioners, and the Supreme Court of Alabama affirmed. 273 Ala. 656, 144 So. 2d 25.

Respondent's complaint alleged that he had been libeled by statements in a full-page advertisement that was carried in the New York Times on March 29, 1960. [1 ▾] Entitled "Heed Their Rising Voices," the advertisement began by stating that "As the whole world knows by now, thousands of Southern Negro students are engaged in widespread non-violent demonstrations in positive affirmation of the right to live in human dignity as [****6] guaranteed by the U.S. Constitution and the Bill of Rights." It went on to charge that "in their efforts to uphold these guarantees, they are being met by [***693] an unprecedented wave of terror by those who would deny and negate that document which the whole world looks upon as setting the pattern for modern freedom. . . ." Succeeding **[*257]** paragraphs purported to illustrate the "wave of terror" by describing certain alleged events. The text concluded with an appeal for funds for three purposes: support of the student movement, "the struggle for the right-to-vote," and the legal defense of Dr. Martin Luther King, Jr., leader of the movement, against a perjury indictment then pending in Montgomery.

The text appeared over the names of 64 persons, many widely known for their [**714] activities in public affairs, religion, trade unions, and the performing arts. Below these names, and under a line reading "We in the south who are struggling [****7] daily for dignity and freedom warmly endorse this appeal," appeared the names of the four individual petitioners and of 16 other persons, all but two of whom were identified as clergymen in various Southern cities. The advertisement was signed at the bottom of the page by the "Committee to Defend Martin Luther King and the Struggle for Freedom in the South," and the officers of the Committee were listed.

Of the 10 paragraphs of text in the advertisement, the third and a portion of the sixth were the basis of respondent's claim of libel. They read as follows:

Third paragraph:

in Montgomery, Alabama, after students sang 'My Country, 'Tis of Thee' on the State Capitol steps, their leaders were expelled from school, and truckloads of police armed with shotguns and tear-gas ringed the Alabama State College Campus. When the entire student body protested to state authorities by refusing to re-register, their dining hall was padlocked in an attempt to starve them into submission."

Sixth paragraph:

"Again and again the Southern violators have answered Dr. King's peaceful protests with intimidation and violence. They have bombed his home almost killing his wife and child. They [****8] have **[*258]** assaulted his person. They have arrested him seven times -- for 'speeding,' 'loitering' and similar 'offenses.' And now they have charged him with 'perjury' -- a *felony* under which they could imprison him for *ten years. . . .*"

Although neither of these statements mentions respondent by name, he contended that the word "police" in the third paragraph referred to him as the Montgomery Commissioner who supervised the Police Department, so that he was being accused of "ringing" the campus with police. He further claimed that the paragraph would be read as imputing to the police, and hence to him, the padlocking of the dining hall in order to starve the students into submission. **2.** As to the sixth paragraph, he contended that since arrests are ordinarily made by the police, the statement "They have arrested [Dr. King] seven times" would be read as referring to him; he further contended that the "They" who did the arresting would be equated with the "They" who committed the other described acts and with the "Southern violators." Thus, he argued, the paragraph would be read as accusing the Montgomery police, and hence him, of answering Dr. King's protests with [****9] [***694] "intimidation and violence," bombing his home, assaulting his person, and charging him with perjury. Respondent and six other Montgomery residents testified that they read some or all of the statements as referring to him in his capacity as Commissioner.

It is uncontroverted that some of the statements contained in the two paragraphs were not accurate descriptions of events which occurred in Montgomery. Although Negro students staged a demonstration on the State Capitol steps, they sang the National Anthem and not "My **[*259]** Country, 'Tis of Thee." Although nine students were expelled by the State Board of Education, this was not for leading the demonstration at the Capitol, but for demanding service at a lunch counter in the Montgomery County Courthouse on another day. Not the entire student body, but most of it, had protested [****10] the expulsion, not by refusing to register, but by boycotting classes on [**715] a single day; virtually all the students did register for the ensuing semester. The campus dining hall was not padlocked on any occasion, and the only students who may have been barred from eating there were the few who had neither signed a preregistration application nor requested temporary meal tickets. Although the police were deployed near the campus in large numbers on three occasions, they did not at any time "ring" the campus, and they were not called to the campus in connection with the demonstration on the State Capitol steps, as the third paragraph implied. Dr. King had not been arrested seven times, but only four; and although he claimed to have been assaulted some years earlier in connection with his arrest for loitering outside a courtroom, one of the officers who made the arrest denied that there was such an assault.

On the premise that the charges in the sixth paragraph could be read as referring to him, respondent was allowed to prove that he had not participated in the events described. Although Dr. King's home had in fact been bombed twice when his wife and child were there, [****11] both of these occasions antedated respondent's tenure as Commissioner, and the police were not only not implicated in the bombings, but had made every effort to apprehend those who were. Three of Dr. King's four arrests took place before respondent became Commissioner. Although Dr. King had in fact been indicted (he was subsequently acquitted) on two counts of perjury, each of which carried a possible five-year sentence, respondent had nothing to do with procuring the indictment.

**[*260]** Respondent made no effort to prove that he suffered actual pecuniary loss as a result of the alleged libel. **3.** One of his witnesses, a former employer, testified that if he had believed the statements, he doubted whether he "would want to be associated with anybody who would be a party to such things that are stated in that ad," and that he would not re-employ respondent if he believed "that he allowed the Police Department to do the things that the paper say he did." But neither this witness nor any of the others testified that he had actually believed the statements in their supposed reference to respondent.

[****12] The cost of the advertisement was approximately $ 4800, and it was [***695] published by the Times upon an order from a New York advertising agency acting for the signatory Committee. The agency submitted the advertisement with a letter from A. Philip Randolph, Chairman of the Committee, certifying that the persons whose names appeared on the advertisement had given their permission. Mr. Randolph was known to the Times' Advertising Acceptability Department as a responsible person, and in accepting the letter as sufficient proof of authorization it followed its established practice. There was testimony that the copy of the advertisement which accompanied the letter listed only the 64 names appearing under the text, and that the statement, "We in the south . . . warmly endorse this appeal," and the list of names thereunder, which included those of the individual petitioners, were subsequently added when the first proof of the advertisement was received. Each of the individual petitioners testified that he had not authorized the use of his name, and that he had been unaware of its use until receipt of respondent's demand for a retraction. The manager of the Advertising Acceptability [****13] **[*261]** Department testified that he had approved the advertisement for publication because he knew nothing to cause him to believe that anything in it was false, and because it [**716] bore the endorsement of "a number of people who are well known and whose reputation" he "had no reason to question." Neither he nor anyone else at the Times made an effort to confirm the accuracy of the advertisement, either by checking it against recent Times news stories relating to some of the described events or by any other means.

*HN1* Alabama law denies a public officer recovery of punitive damages in a libel action brought on account of a publication concerning his official conduct unless he first makes a written demand for a public retraction and the defendant fails or refuses to comply. Alabama Code, Tit. 7, § 914. Respondent served such a demand upon each of the petitioners. None of the individual petitioners responded to the demand, primarily because each took the position that he had not authorized the use of his name on the advertisement and therefore had not published the statements that [****14] respondent alleged had libeled him. The Times did not publish a retraction in response to the demand, but wrote respondent a letter stating, among other things, that "we . . . are somewhat puzzled as to how you think the statements in any way reflect on you," and "you might, if you desire, let us know in what respect you claim that the statements in the advertisement reflect on you." Respondent filed this suit a few days later without answering the letter. The Times did, however, subsequently publish a retraction of the advertisement upon the demand of Governor John Patterson of Alabama, who asserted that the publication charged him with "grave misconduct and . . . improper actions and omissions as Governor of Alabama and Ex-Officio Chairman of the State Board of Education of Alabama." When asked to explain why there had been a retraction for the Governor but not for respondent, the **[*262]** Secretary of the Times testified: "We did that because we didn't want anything that was published by The Times to be a reflection on the State of Alabama and the Governor was, as far as we could see, the embodiment of the State of Alabama and the proper representative of the State and, furthermore, [****15] we had by that

time learned more of the actual facts which the ad purported to recite and, [****656] finally, the ad did refer to the action of the State authorities and the Board of Education presumably of which the Governor is the ex-officio chairman . . . ." On the other hand, he testified that he did not think that "any of the language in there referred to Mr. Sullivan."

The trial judge submitted the case to the jury under instructions that the statements in the advertisement were "libelous per se" and were not privileged, so that petitioners might be held liable if the jury found that they had published the advertisement and that the statements were made "of and concerning" respondent. The jury was instructed that, because the statements were libelous *per se*, "the law . . . implies legal injury from the bare fact of publication itself," "falsity and malice are presumed," "general damages need not be alleged or proved but are presumed," and "punitive damages may be awarded by the jury even though the amount of actual damages is neither found nor shown." An award of punitive damages -- as distinguished from "general" damages, which are compensatory in nature -- apparently [****16] requires proof of actual malice under Alabama law, and the judge charged that "mere negligence or carelessness is not evidence of actual malice or malice in fact, and does not justify an award of exemplary or punitive damages." He refused to charge, however, that the jury must be "convinced" of malice, in the sense of "actual intent" to harm or "gross negligence and recklessness," to make such an award, and he also refused to require that a verdict for respondent differentiate between compensatory and punitive damages. The judge rejected petitioners' contention **[*263]** that his rulings abridged the freedoms of speech and of the press that are guaranteed by the First and Fourteenth Amendments.

[**717] In affirming the judgment, the Supreme Court of Alabama sustained the trial judge's rulings and instructions in all respects. 273 Ala. 656, 144 So. 2d 25. It held that "where the words published tend to injure a person libeled by them in his reputation, profession, trade or business, or charge him with an indictable offense, or tend to bring the individual into public contempt," they are "libelous per se"; that "the matter complained of is, under the above doctrine, [****17] libelous per se, if it was published of and concerning the plaintiff"; and that it was actionable without "proof of pecuniary injury . . . , such injury being implied." *Id.,* at 673, 676, 144 So. 2d at 37, 41. It approved the trial court's ruling that the jury could find the statements to have been made "of and concerning" respondent, stating: "We think it common knowledge that the average person knows that municipal agents, such as police and firemen, and others, are under the control and direction of the city governing body, and more particularly under the direction and control of a single commissioner. In measuring the performance or deficiencies of such groups, praise or criticism is usually attached to the official in complete control of the body." *Id.,* at 674-675, 144 So. 2d at 39. In sustaining the trial court's determination that the verdict was not excessive, the court said that malice could be inferred from the Times' "irresponsibility" in printing the advertisement while "the Times in its own files had articles already published which would have demonstrated the falsity of the allegations in the advertisement"; from the Times' failure [****18] to retract for respondent while retracting for the Governor, whereas the falsity of some of the allegations was then [***697] known to the Times and "the matter contained in the advertisement was equally false as to both parties"; and from the testimony of the Times' Secretary that, **[*264]** apart from the statement that the dining hall was padlocked, he thought the two paragraphs were "substantially correct." *Id.,* at 686-687, 144 So. 2d at 50-51. The court reaffirmed a statement in an earlier opinion that "There is no legal measure of damages in cases of this character." *Id.,* at 686, 144 So. 2d at 50. It rejected petitioners' constitutional contentions with the brief statements that "The First Amendment of the U.S. Constitution does not protect libelous publications" and "The Fourteenth Amendment is directed against State action and not private action." *Id.,* at 676, 144 So. 2d at 40.

**LEdHN[1]** [1]Because of the importance of the constitutional issues involved, we granted the separate petitions for certiorari of the individual petitioners and the Times. [****19] 371 U.S. 946.We reverse the judgment. We hold that **HN2** the rule of law applied by the Alabama courts is constitutionally deficient for failure to provide the safeguards for freedom of speech and of the press that are required by the First and Fourteenth Amendments in a libel action brought by a public official against critics of his official conduct. **4** [**718] **[*265]** We further hold that under the proper safeguards the evidence presented in this case is constitutionally insufficient to support the judgment for respondent.

[****20] I.

**LEdHN[3]** [3] **LEdHN[4]** [4]We may dispose at the outset of two grounds asserted to insulate the judgment of the Alabama courts from constitutional scrutiny. The first is the proposition relied on by the State Supreme Court -- that "The Fourteenth Amendment is directed against State action and not private action." That proposition has no application to this case. Although this is a civil lawsuit between private parties, the Alabama courts have applied a state rule of law which petitioners claim to impose invalid restrictions on their constitutional freedoms of speech and press. It matters not that that law has been applied in a civil action and that it is common law only, though supplemented by statute. See, *e. g.,* Alabama Code, Tit. 7, §§ 908-917. **HN3** The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised. See *Ex parte Virginia,* 100 U.S. 339, 346-347; [***698] [****21] *American Federation of Labor* v. *Swing,* 312 U.S. 321.

The second contention is that the constitutional guarantees of freedom of speech and of the press are inapplicable here, at least so far as the Times is concerned, because the allegedly libelous statements were published as part of a paid, "commercial" advertisement. The argument relies on *Valentine* v. *Chrestensen,* 316 U.S. 52, where the Court held that a city ordinance forbidding street distribution of commercial and business advertising matter did not abridge the First Amendment freedoms, even as applied to a handbill having a commercial message on one side but a protest against certain official action on the other. The reliance is wholly misplaced. The Court in *Chrestensen* reaffirmed the constitutional protection for "the freedom of communicating **[*266]** information and disseminating opinion"; its holding was based upon the factual conclusions that the handbill was "purely commercial advertising" and that the protest against official action had been added only to evade the ordinance.

**LEdHN[5]** [5] [***HR6] **LEdHN[6]** [6].[****22] The publication here was not a "commercial" advertisement in the sense in which the word was used in *Chrestensen.* It communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern. See *N. A. A. C. P.* v. *Button,* 371 U.S. 415, 435. That the Times was paid for publishing the advertisement is as immaterial in this connection as is the fact that newspapers and books are sold. *Smith* v. *California,* 361 U.S. 147, 150; cf. *Bantam Books, Inc.,* v. *Sullivan,* 372 U.S. 58, 64, n. 6. Any other conclusion would discourage newspapers from carrying "editorial advertisements" of this type, and so might shut off an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities -- who wish to exercise

their freedom of speech even though they are not members of the press. Cf. *Lovell v. Griffin, 303 U.S. 444, 452;* [****23] *Schneider v. State, 308 U.S. 147, 164.* The effect would be to shackle the First Amendment in its attempt to secure "the widest possible dissemination of information from diverse and antagonistic sources." *Associated Press v. United States, 326 U.S. 1, 20.* [**719] To avoid placing such a handicap upon the freedoms of expression, we hold that HN4 if the allegedly libelous statements would otherwise be constitutionally protected from the present judgment, they do not forfeit that protection because they were published in the form of a paid advertisement. 5

**[*267]** II.

HN5 Under Alabama law as applied in this case, a publication is "libelous per se" if the words "tend to injure a person . . . in his reputation" [****24] or to "bring [him] into public contempt"; the trial court stated that the standard was met if the words are such as to "injure him in his public office, or impute misconduct to him in his office, or want of official integrity, or want of fidelity to a public trust . . . ." The jury [***699] must find that the words were published "of and concerning" the plaintiff, but where the plaintiff is a public official his place in the governmental hierarchy is sufficient evidence to support a finding that his reputation has been affected by statements that reflect upon the agency of which he is in charge. HN6 Once "libel per se" has been established, the defendant has no defense as to stated facts unless he can persuade the jury that they were true in all their particulars. *Alabama Ride Co.* v. *Vance, 235 Ala. 263, 178 So. 438 (1938); Johnson Publishing Co.* v. *Davis, 271 Ala. 474, 494-495, 124 So. 2d 441, 457-458 (1960).* His privilege of "fair comment" for expressions of opinion depends on the truth of the facts upon which the comment is based. *Parsons v. Age-Herald Publishing Co., 181 Ala. 439, 450, 61 So. 345, 350 (1913).* [****25] Unless he can discharge the burden of proving truth, general damages are presumed, and may be awarded without proof of pecuniary injury. A showing of actual malice is apparently a prerequisite to recovery of punitive damages, and the defendant may in any event forestall a punitive award by a retraction meeting the statutory requirements. Good motives and belief in truth do not negate an inference of malice, but are relevant only in mitigation of punitive damages if the jury chooses to accord them weight. *Johnson Publishing Co.* v. *Davis, supra, 271 Ala., at 495, 124 So. 2d, at 458.*

**[*268]** The question before us is whether this rule of liability, as applied to an action brought by a public official against critics of his official conduct, abridges the freedom of speech and of the press that is guaranteed by the First and Fourteenth Amendments.

*LEdHN[7]* [7]*LEdHN[8]* [8]Respondent relies heavily, as did the Alabama courts, on statements of this Court to the effect that [****26] HN7 the Constitution does not protect libelous publications. 6 [****28] Those statements do not foreclose our inquiry here. None of the cases sustained the use of libel laws to impose sanctions upon expression critical of the official conduct of public officials. The dictum in *Pennekamp v. Florida, 328 U.S. 331, 348-349,* that "when the statements amount to defamation, a judge has such remedy in damages for libel as do other public servants," implied no view as to what remedy might constitutionally be afforded to public officials. In *Beauharnais v. Illinois, 343 U.S. 250,* the Court sustained an Illinois criminal libel statute as applied to a publication held to be both defamatory of a racial group and "liable to cause violence and disorder." But the Court was careful to note that it "retains and [**720] exercises authority to nullify action which encroaches on freedom of utterance under the guise of punishing libel"; for "public men, are, as it were, public property," [****27] " and "discussion cannot be denied and the right, as well as the duty, of criticism must not be stifled." *Id., at 263-264,* and n. 18. In the only previous case that did present the question of constitutional limitations upon the power to award damages for libel of a public official, the [***700] Court was equally divided and the question was not decided. *Schenectady Union Pub. Co.* v. *Sweeney, 316 U.S. 642.* **[*269]** In deciding the question now, we are compelled by neither precedent nor policy to give any more weight to the epithet "libel" than we have to other "mere labels" of state law. *N. A. A. C. P.* v. *Button, 371 U.S. 415, 429.* HN8 Like insurrection, 7 contempt, 8 advocacy of unlawful acts, 9 breach of the peace, 10 obscenity, 11 solicitation of legal business, 12 and the various other formulae for the repression of expression that have been challenged in this Court, libel can claim no talismanic immunity from constitutional limitations. It must be measured by standards that satisfy the First Amendment.

*LEdHN[9]* [9]*LEdHN[10]* [10]*LEdHN[11]* [11]The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the [****29] people." *Roth v. United States, 354 U.S. 476, 484.* "The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." *Stromberg v. California, 283 U.S. 359, 369.* "It is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions," *Bridges v. California, 314 U.S. 252, 270,* and this opportunity is to be afforded for "vigorous advocacy" no less than "abstract discussion." *N. A. A. C. P.* v. *Button, 371 U.S. 415, 429.* **[*270]** The First Amendment, said Judge Learned Hand, "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. [****30] To many this is, and always will be, folly; but we have staked upon it our all." *United States v. Associated Press, 52 F. Supp. 362, 372 (D. C. S. D. N. Y. 1943).* Mr. Justice Brandeis, in his concurring opinion in *Whitney v. California, 274 U.S. 357, 375-376,* gave the principle its classic formulation:

"Those who won our independence believed . . . that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, [**721] hope and imagination; that fear breeds repression; that repression [***701] breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law -- the argument of force in its worst form. Recognizing [****31] the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed."

*LEdHN[12]* [12]*LEdHN[13]* [13]Thus we consider this case against the background of a profound national commitment to the principle that HN9 debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. See *Terminiello v. Chicago, 337 U.S. 1, 4; De Jonge v. Oregon, 299 U.S. 353, 365.* **[*271]** The present advertisement, as an expression of grievance and protest on one of the major public issues of our time, would seem clearly to qualify for the constitutional protection. The question is whether it forfeits that protection by the falsity of some of its

067

factual statements and by its alleged defamation of respondent.

*LEdHN[14]* [14]*HN10* [****32] Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth -- whether administered by judges, juries, or administrative officials -- and especially one that puts the burden of proving truth on the speaker. Cf. *Speiser* v. *Randall,* 357 U.S. 513, 525-526.*HN11* The constitutional protection does not turn upon "the truth, popularity, or social utility of the ideas and beliefs which are offered." *N. A. A. C. P.* v. *Button,* 371 U.S. 415, 445. As Madison said, "*HN12* Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press." 4 Elliot's Debates on the Federal Constitution (1876), p. 571. In *Cantwell* v. *Connecticut,* 310 U.S. 296, 310, the Court declared:

*HN13* "In the realm of religious faith, and in [****33] that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy."

*HN14* That erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression **[*272]** are to have the "breathing space" that they "need . . . to survive," *N. A. A. C. P.* v. *Button,* 371 U.S. 415, 433, was also recognized by the Court of Appeals for the District of Columbia Circuit in *Sweeney* v. *Patterson,* 76 U.S. App. D. C. 23, 24, 128 F.2d 457, 458 (1942), cert. denied, 317 U.S. 678. Judge [****34] Edgerton spoke for a unanimous court which affirmed the dismissal of a Congressman's libel suit based upon a newspaper [***702] article charging him with anti-Semitism in opposing a judicial appointment. He said:

"Cases which impose liability for erroneous reports of the political conduct of officials reflect the obsolete doctrine that the governed must not criticize their governors. . . . The interest of the public here outweighs the interest of appellant [***722] or any other individual. The protection of the public requires not merely discussion, but information. Political conduct and views which some respectable people approve, and others condemn, are constantly imputed to Congressmen. Errors of fact, particularly in regard to a man's mental states and processes, are inevitable. . . . Whatever is added to the field of libel is taken from the field of free debate." 13 ±


[****35] *LEdHN[15]* [15]*HN15* Injury to official reputation affords no more warrant for repressing speech that would otherwise be free than does factual error. Where judicial officers are involved, this Court has held that concern for the dignity and **[*273]** reputation of the courts does not justify the punishment as criminal contempt of criticism of the judge or his decision. *Bridges* v. *California,* 314 U.S. 252. This is true even though the utterance contains "half-truths" and "misinformation." *Pennekamp* v. *Florida,* 328 U.S. 331, 342, 343, n. 5, 345. Such repression can be justified, if at all, only by a clear and present danger of the obstruction of justice. See also *Craig* v. *Harney,* 331 U.S. 367; *Wood* v. *Georgia,* 370 U.S. 375. If judges are to be treated as "men of fortitude, able to thrive in a hardy climate," *Craig* v. *Harney, supra,* 331 U.S., at 376, surely the same must be true of other government officials, such [****36] as elected city commissioners. 14 ± Criticism of their official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes their official reputations.

*LEdHN[16]* [16]*HN16* If neither factual [****37] error nor defamatory content suffices to remove the constitutional shield from criticism of official conduct, the combination of the two elements is no less inadequate. This is the lesson to be drawn from the great controversy over the Sedition Act of 1798, 1 Stat. 596, which first crystallized a national awareness of the central meaning of the First Amendment. See Levy, Legacy of Suppression (1960), at 258 *et seq.*; Smith, Freedom's Fetters (1956), at 426, 431, [***703] and *passim.* That statute made it a crime, punishable by a $ 5,000 fine and five years in prison, "if any person shall write, print, utter or publish . . . any false, scandalous and malicious **[*274]** writing or writings against the government of the United States, or either house of the Congress . . . , or the President . . . , with intent to defame . . . or to bring them, or either of them, into contempt or disrepute; or to excite against them, or either or any of them, the hatred of the good people of the United States." The Act allowed the defendant the defense of truth, and provided that the jury were [**723] to be judges both of the law and the facts. Despite these qualifications, the Act was [****38] vigorously condemned as unconstitutional in an attack joined in by Jefferson and Madison. In the famous Virginia Resolutions of 1798, the General Assembly of Virginia resolved that it

"doth particularly protest against the palpable and alarming infractions of the Constitution, in the two late cases of the 'Alien and Sedition Acts,' passed at the last session of Congress . . . . [The Sedition Act] exercises . . . a power not delegated by the Constitution, but, on the contrary, expressly and positively forbidden by one of the amendments thereto -- a power which, more than any other, ought to produce universal alarm, because it is levelled against the right of freely examining public characters and measures, and of free communication among the people thereon, which has ever been justly deemed the only effectual guardian of every other right." 4 Elliot's Debates, *supra,* pp. 553-554.

Madison prepared the Report in support of the protest. His premise was that the Constitution created a form of government under which "The people, not the government, possess the absolute sovereignty." The structure of the government dispersed power in reflection of the people's distrust [****39] of concentrated power, and of power itself at all levels. This form of government was "altogether different" from the British form, under which the Crown was sovereign and the people were subjects. "Is **[*275]** it not natural and necessary, under such different circumstances," he asked, "that a different degree of freedom in the use of the press should be contemplated?" *Id.,* pp. 569-570. Earlier, in a debate in the House of Representatives, Madison had said: "If we advert to the nature of Republican Government, we shall find that the censorial power is in the people over the Government, and not in the Government over the people." 4 Annals of Congress, p. 934 (1794). Of the exercise of that power by the press, his Report said: "In every state, probably, in the Union, the press has exerted a freedom in canvassing the merits and measures of public men, of every description, which has not been confined to the strict limits of the common law. On this footing the freedom of the press has stood; on this foundation it yet stands . . . ." 4 Elliot's Debates, *supra,* p. 570. The right of free public discussion of the stewardship of public officials was thus, in Madison's view, [****40] a fundamental principle of the American form of government. 15 ±

[****41] **[*276]** Although [***704] the Sedition Act was never tested in this Court, the attack upon its validity has carried the day in the court of history. Fines levied in its prosecution were repaid by Act of Congress on the ground that it was unconstitutional. See, *e. g.,* Act of July 4, 1840, c. 45, 6 [**724] Stat. 802, accompanied by H. R. Rep. No. 86, 26th Cong., 1st Sess. (1840). Calhoun, reporting to the Senate on February 4, 1836, assumed that its invalidity was a matter "which no one now doubts." Report with Senate bill No. 122, 24th Cong., 1st

sess., p. 3. Jefferson, as President, pardoned those who had been convicted and sentenced under the Act and remitted their fines, stating: "I discharged every person under punishment or prosecution under the sedition law, because I considered, and now consider, that law to be a nullity, as absolute and as palpable as if Congress had ordered us to fall down and worship a golden image." Letter to Mrs. Adams, July 22, 1804, 4 Jefferson's Works (Washington ed.), pp. 555, 556. The invalidity of the Act has also been assumed by Justices of this Court. See Holmes, J., dissenting and joined by Brandeis ▾, J., in *Abrams v. United States,* 250 U.S. 616, 630; [****42] Jackson, J., dissenting in *Beauharnais v. Illinois,* 343 U.S. 250, 288-289; Douglas, The Right of the People (1958), p. 47. See also Cooley, Constitutional Limitations (8th ed., Carrington, 1927), pp. 899-900; Chafee, Free Speech in the United States (1942), pp. 27-28. These views reflect a broad consensus that the Act, because of the restraint it imposed upon criticism of government and public officials, was inconsistent with the First Amendment.

*LEdHN[17]*🔗 [17]There is no force in respondent's argument that the constitutional limitations implicit in the history of the Sedition Act apply only to Congress and not to the States. *HN17*🔗 It is true that the First Amendment was originally addressed only to action by the Federal Government, and **[*277]** that Jefferson, for one, while denying [****43] the power of Congress "to controul the freedom of the press," recognized such a power in the States. See the 1804 Letter to Abigail Adams quoted in *Dennis v. United States,* 341 U.S. 494, 522, n. 4 (concurring opinion). But this distinction was eliminated with the adoption of the Fourteenth Amendment and the application to the States of the First Amendment's restrictions. See, *e. g., Gitlow v. New York,* 268 U.S. 652, 666; *Schneider v. State,* 308 U.S. 147, 160; *Bridges v. California,* 314 U.S. 252, 268; *Edwards v. South Carolina,* 372 U.S. 229, 235.

[***705] *LEdHN[18]*🔗 [18]*HN18*🔗 What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel. 17⬇ The fear of damage awards under a rule such as that invoked by the Alabama courts here may be markedly more inhibiting than the fear of prosecution under a criminal statute. See *City of Chicago v. Tribune Co.,* 307 Ill. 595, 607, 139 N. E. 86, 90 (1923). [****44] Alabama, for example, has a criminal libel law which subjects to prosecution "any person who speaks, writes, or prints of and concerning another any accusation falsely and maliciously importing the commission by such person of a felony, or any other indictable offense involving moral turpitude," and which allows as punishment upon conviction a fine not exceeding $ 500 and a prison sentence of six months. Alabama Code, Tit. 14, § 350. Presumably a person charged with violation of this statute enjoys ordinary criminal-law safeguards such as the requirements of an indictment and of proof beyond a reasonable doubt. These safeguards are not available to the defendant in a civil action. The judgment awarded in this case -- without the need for any proof of actual pecuniary loss -- was one thousand times greater than the maximum fine provided by the Alabama criminal statute, and one hundred times greater than that provided by the Sedition Act. **[*278]** And since there is no double-jeopardy limitation [****45] applicable to civil [**725] lawsuits, this is not the only judgment that may be awarded against petitioners for the same publication. 18⬇ Whether or not a newspaper can survive a succession of such judgments, the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive. Plainly the Alabama law of civil libel is "a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law." *Bantam Books, Inc., v. Sullivan,* 372 U.S. 58, 70.

[****46] *LEdHN[19]*🔗 [19]The state rule of law is not saved by its allowance of the defense of truth. A defense for erroneous statements honestly made is no less essential here than was the requirement of proof of guilty knowledge which, in *Smith v. California,* 361 U.S. 147, we held indispensable to a valid conviction of a bookseller for possessing obscene writings for sale. We said:

"For if the bookseller is criminally liable without knowledge of the contents, . . . he will tend to restrict the books he sells to those he has inspected; and thus the State will have imposed a restriction upon the distribution of constitutionally protected as well as obscene literature. . . . And the bookseller's burden would become the public's burden, for by restricting him the public's access to reading matter would be restricted. . . . [His] timidity in the face of his absolute criminal liability, thus would tend to restrict the public's access to forms of the printed word [***706] which the State could not constitutionally **[*279]** suppress directly. The bookseller's self-censorship, compelled by [****47] the State, would be a censorship affecting the whole public, hardly less virulent for being privately administered. Through it, the distribution of all books, both obscene and not obscene, would be impeded." (361 U.S. 147, 153-154.)

A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions -- and to do so on pain of libel judgments virtually unlimited in amount -- leads to a comparable "self-censorship." Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. 19⬇ Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars. See, *e. g., Post Publishing Co.* v. *Hallam,* 59 F. 530, 540 (C. A. 6th Cir. 1893); see also Noel, Defamation of Public Officers and Candidates, 49 Col. L. Rev. 875, 892 (1949). Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt [****48] whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which "steer far wider of the unlawful zone." *Speiser v. Randall, supra,* 357 U.S., at 526. The rule thus dampens the vigor and limits the variety of public debate. It is [**726] inconsistent with the First and Fourteenth Amendments.

*LEdHN[20]*🔗 [20]*HN20*🔗 The constitutional guarantees require, [****49] we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made **[*280]** with "actual malice" -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not. An oft-cited statement of a like rule, which has been adopted by a number of state courts, 20⬇ is found in the [***707] Kansas case of *Coleman v. MacLennan,* 78 Kan. 711, 98 P. 281 (1908). The State Attorney General, a candidate for re-election and a member of the commission charged with the management and control of the state school fund, sued a newspaper publisher for alleged libel in an article purporting to state facts relating to his official conduct in connection with a school-fund transaction. The defendant pleaded privilege and the trial judge, over the plaintiff's objection, instructed the jury that

"where an article is published and circulated among voters for the sole purpose of giving what the defendant **[\*281]** believes to be truthful information concerning a candidate for public office and for the purpose of enabling [\*\*\*\*50] such voters to cast their ballot more intelligently, and the whole thing is done in good faith and without malice, the article is privileged, although the principal matters contained in the article may be untrue in fact and derogatory to the character of the plaintiff; and in such a case the burden is on the plaintiff to show actual malice in the publication of the article."

In answer to a special question, the jury found that the plaintiff had not proved actual malice, and a general verdict was returned for the defendant. On appeal the Supreme Court of Kansas, in an opinion by Justice Burch, reasoned as follows (78 Kan., at 724, 98 P., at 286):

**HN21** "It is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the [\*\*\*\*51] public welfare, although at times such injury may be great. The [\*\*727] public benefit from publicity is so great, and the chance of injury to private character so small, that such discussion must be privileged."

The court thus sustained the trial court's instruction as a correct statement of the law, saying:

"In such a case the occasion gives rise to a privilege, qualified to this extent: **HN22** any one claiming to be defamed by the communication must show actual malice or go remediless. This privilege extends to a great variety of subjects, and includes matters of **[\*282]** public concern, public men, and candidates for office." 78 Kan., at 723, 98 P., at 285.

[\*\*\*\*52] Such a privilege for criticism of official conduct 21 is appropriately analogous to the protection accorded a public official when *he* is sued for libel by a private citizen. In *Barr v. Matteo*, 360 U.S. 564, 575, this Court held the utterance of a federal official to be absolutely privileged if made "within the outer perimeter" of his duties. The States accord the same immunity to statements of their highest officers, although some differentiate their lesser officials and qualify the privilege they enjoy. 22 But all hold that all officials are protected unless actual malice [\*\*\*708] can be proved. The reason for the official privilege is said to be that the threat of damage suits would otherwise "inhibit the fearless, vigorous, and effective administration of policies of government" and "dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." *Barr v. Matteo, supra,* 360 U.S., at 571. Analogous considerations support the privilege for the citizen-critic of government. It is as much his duty to criticize as it is the official's duty to administer. See *Whitney v. California,* 274 U.S. 357, 375 [\*\*\*\*53] (concurring opinion of Mr. Justice Brandeis), quoted *supra, p. 270.* As Madison said, see *supra, p. 275,* "the censorial power is in the people over the Government, and not in the Government over the people." It would give public servants an unjustified preference over the public they serve, if critics of official conduct **[\*283]** did not have a fair equivalent of the immunity granted to the officials themselves.

We conclude that such a privilege is required by the First and Fourteenth Amendments.

III.

**LEdHN[21]** [21] [\*\*\*\*54] **LEdHN[22]** [22] **LEdHN[23]** [23] We hold today that **HN23** the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct. Since this is such an action, 23 [\*\*\*\*56] the rule requiring proof of actual malice is applicable. While [\*\*728] Alabama law apparently requires proof of actual malice for an award of punitive damages, 24 [\*\*\*\*57] where general damages are concerned malice is "presumed." Such a presumption is inconsistent **[\*284]** with the [\*\*\*709] federal rule. "The power to create presumptions is not a means of escape from constitutional restrictions," *Bailey v. Alabama,* 219 U.S. 219, 239; "the showing of malice required for the forfeiture of the privilege is not presumed but is a matter for proof by the plaintiff . . . ." *Lawrence v. Fox,* 357 Mich. 134, 146, 97 N.W.2d 719, 725 (1959). [\*\*\*\*55] 25 Since the trial judge did not instruct the jury to differentiate between general and punitive damages, it may be that the verdict was wholly an award of one or the other. But it is impossible to know, in view of the general verdict returned. Because of this uncertainty, the judgment must be reversed and the case remanded. *Stromberg v. California,* 283 U.S. 359, 367-368; *Williams v. North Carolina,* 317 U.S. 287, 291-292; see *Yates v. United States,* 354 U.S. 298, 311-312; *Cramer v. United States,* 325 U.S. 1, 36, n. 45.

**LEdHN[24]** [24] **LEdHN[25]** [25] **LEdHN[26]** [26] Since respondent may seek a new trial, we deem that considerations of effective judicial administration require us to review the evidence in the present record to determine **[\*285]** whether it could constitutionally support a judgment for respondent. **HN24** This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across "the line between speech unconditionally [\*\*\*\*58] guaranteed and speech which may legitimately be regulated." *Speiser v. Randall,* 357 U.S. 513, 525. In cases where that line must be drawn, the rule is that we "examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of [\*\*729] the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect." *Pennekamp v. Florida,* 328 U.S. 331, 335; see also *One, Inc. v. Olesen,* 355 U.S. 371; *Sunshine Book Co. v. Summerfield,* 355 U.S. 372. We must "make an independent examination of the whole record," *Edwards v. South Carolina,* 372 U.S. 229, 235, so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression. 26

**LEdHN[27]** [27] **LEdHN[28]** [28] **LEdHN[29]** [29]

[\*\*\*\*59] **LEdHN[30]** [30] Applying [\*\*\*710] these standards, we consider that the proof presented to show actual malice lacks the convincing **[\*286]** clarity which the constitutional standard demands, and hence that it would not constitutionally sustain the judgment for respondent under the proper rule of law. The case of the individual petitioners requires little discussion. Even assuming that they could

constitutionally be found to have authorized the use of their names on the advertisement; there was no evidence whatever that they were aware of any erroneous statements or were in any way reckless in that regard. The judgment against them is thus without constitutional support.

**_LEdHN[31]_** 👆 [31] **_LEdHN[32]_** 👆 [32]As to the Times, we similarly conclude that the facts do not support a finding of actual malice. The statement by the Times' Secretary that, apart from the padlocking allegation, he thought the advertisement was "substantially correct," affords no constitutional warrant for the [****60] Alabama Supreme Court's conclusion that it was a "cavalier ignoring of the falsity of the advertisement [from which] the jury could not have but been impressed with the bad faith of The Times, and its maliciousness inferable therefrom." The statement does not indicate malice at the time of the publication; even if the advertisement was not "substantially correct" -- although respondent's own proofs tend to show that it was -- that opinion was at least a reasonable one, and there was no evidence to impeach the witness' good faith in holding it. The Times' failure to retract upon respondent's demand, although it later retracted upon the demand of Governor Patterson, is likewise not adequate evidence of malice for constitutional purposes. Whether or not a failure to retract may ever constitute such evidence, there are two reasons why it does not here. _First_, the letter written by the Times reflected a reasonable doubt on its part as to whether the advertisement could reasonably be taken to refer to respondent at all. _Second_, it was not a final refusal, since it asked for an explanation on this point -- a request that respondent chose to ignore. Nor does the retraction upon [****61] the demand of the Governor supply the **[*287]** necessary proof. It may be doubted that a failure to retract which is not itself evidence of malice can retroactively become such by virtue of a retraction subsequently made to another party. But in any event that did not happen here, since the [**730] explanation given by the Times' Secretary for the distinction drawn between respondent and the Governor was a reasonable one, the good faith of which was not impeached.

**_LEdHN[33]_** 👆 [33]Finally, there is evidence that the Times published the advertisement without checking its accuracy against the news stories in the Times' own files. The mere presence of the stories in the files does not, of course, establish that the Times "knew" the advertisement was false, since the state of mind required for [***711] actual malice would have to be brought home to the persons in the Times' organization having responsibility for the publication of the advertisement. With respect to the failure of those persons to make the check, the record shows that they relied upon their knowledge of the good reputation of many of those [****62] whose names were listed as sponsors of the advertisement, and upon the letter from A. Philip Randolph, known to them as a responsible individual, certifying that the use of the names was authorized. There was testimony that the persons handling the advertisement saw nothing in it that would render it unacceptable under the Times' policy of rejecting advertisements containing "attacks of a personal character"; 27⬇ their failure to reject it on this ground was not unreasonable. We think **[*288]** the evidence against the Times supports at most a finding of negligence in failing to discover the misstatements, and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice. Cf. _Charles Parker Co._ v. _Silver City Crystal Co., 142 Conn. 605, 618, 116 A.2d 440, 446 (1955)_; _Phoenix Newspapers, Inc., v. Choisser, 82 Ariz. 271, 277-278, 312 P.2d 150, 154-155 (1957)._

[****63] **_LEdHN[34]_** 👆 [34]We also think the evidence was constitutionally defective in another respect: it was incapable of supporting the jury's finding that the allegedly libelous statements were made "of and concerning" respondent. Respondent relies on the words of the advertisement and the testimony of six witnesses to establish a connection between it and himself. Thus, in his brief to this Court, he states:

"The reference to respondent as police commissioner is clear from the ad. In addition, the jury heard the testimony of a newspaper editor . . . ; a real estate and insurance man . . . ; the sales manager of a men's clothing store . . . ; a food equipment man . . . ; a service station operator . . . ; and the operator of a truck line for whom respondent had formerly worked . . . . Each of these witnesses stated that he associated the statements with respondent . . . ." (Citations to record omitted.)

There was no reference to respondent in the advertisement, either by name or official position. A number of the allegedly libelous statements -- the charges that the dining hall was padlocked and that Dr. [****64] King's home was bombed, his person assaulted, and a perjury prosecution instituted against him -- did not even concern the police; despite the ingenuity of the arguments which would attach this significance to the word "They," it is plain that these statements could not reasonably be read as accusing respondent of personal involvement in the acts **[*289]** in question. The statements upon which respondent [**731] principally relies as referring to him are the two allegations that did concern the police or police functions: that "truckloads of police . . . ringed the Alabama [***712] State College Campus" after the demonstration on the State Capitol steps, and that Dr. King had been "arrested . . . seven times." These statements were false only in that the police had been "deployed near" the campus but had not actually "ringed" it and had not gone there in connection with the State Capitol demonstration, and in that Dr. King had been arrested only four times. The ruling that these discrepancies between what was true and what was asserted were sufficient to injure respondent's reputation may itself raise constitutional problems, but we need not consider them here. Although [****65] the statements may be taken as referring to the police, they did not on their face make even an oblique reference to respondent as an individual. Support for the asserted reference must, therefore, be sought in the testimony of respondent's witnesses. But none of them suggested any basis for the belief that respondent himself was attacked in the advertisement beyond the bare fact that he was in overall charge of the Police Department and thus bore official responsibility for police conduct; to the extent that some of the witnesses thought respondent to have been charged with ordering or approving the conduct or otherwise being personally involved in it, they based this notion not on any statements in the advertisement, and not on any evidence that he had in fact been so involved, but solely on the unsupported assumption that, because of his official position, he must have been. 28⬇ [****67] This reliance on the bare **[*290]** [***713] fact of respondent's [**732] official position 29⬇ was made explicit by the Supreme Court of Alabama. That court, in holding that the trial court "did not err in overruling the demurrer [of the Times] in the aspect that the libelous **[*291]** [****66] matter was not of and concerning the [plaintiff,]" based its ruling on the proposition that:

"We think it common knowledge that the average person knows that municipal agents, such as police and firemen, and others, are under the control and direction of the city governing body, and more particularly under the direction and control of a single commissioner. In measuring the performance or deficiencies of such groups, praise or criticism is usually attached to the official in complete control of the body." 273 Ala., at 674-675, 144 So.2d, at 39.

**_LEdHN[35]_** 👆 [35]**_LEdHN[38]_** 👆 [38]This proposition has disquieting implications for criticism of governmental conduct. For good reason, "no court of last resort in this country has ever held, or even suggested, that prosecutions for libel on government have any place in the American

system of jurisprudence. *City of Chicago v. Tribune Co.*, 307 Ill. 595, 601, 139 N. E. 86, 88 **[*292]** (1923). The present proposition would sidestep this obstacle by transmuting criticism of government, however impersonal it may seem on its face, into personal criticism, and hence potential libel, of the officials of whom the government is composed. There is no legal alchemy by which a State may thus create the cause of action that would otherwise be denied for a publication which, **[****68]** as respondent himself said of the advertisement, "reflects not only on me but on the other Commissioners and the community." Raising as it does the possibility that a good-faith critic of government will be penalized for his criticism, the proposition relied on by the Alabama courts strikes at the very center of the constitutionally protected area of free expression. **30** We hold that such a proposition may not constitutionally be utilized to establish that an otherwise impersonal attack on governmental operations was a libel of an official responsible for those operations. Since it was relied on exclusively here, and there was no other **[***714]** evidence to connect the statements with respondent, the evidence was constitutionally insufficient to support a finding that the statements referred to respondent.

***LEdHN[36]*** [36] ***LEdHN[37]*** [37]

**[****69]** The **[**733]** judgment of the Supreme Court of Alabama is reversed and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*Reversed and remanded*.

**[***715]** [APPENDIX]

**[***716]** [SEE ILLUSTRATION IN ORIGINAL.]


Concur by: BLACK ▾ ; GOLDBERG ▾

## Concur

**[*293]** MR. JUSTICE BLACK ▾ , with whom MR. JUSTICE DOUGLAS ▾ joins, concurring.

I concur in reversing this half-million-dollar judgment against the New York Times Company and the four individual defendants. In reversing the Court holds that "the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct." *Ante*, p. 283. I base my vote to reverse on the belief that the First and Fourteenth Amendments not merely "delimit" a State's power to award damages to "public officials against critics of their official conduct" but completely prohibit a State from exercising such a power. The Court goes on to hold that a State can subject such critics to damages if "actual malice" can be proved against them. "Malice," even as defined by the Court, is an elusive, abstract concept, hard to prove and hard to **[***70]** disprove. The requirement that malice be proved provides at best an evanescent protection for the right critically to discuss public affairs and certainly does not measure up to the sturdy safeguard embodied in the First Amendment. Unlike the Court, therefore, I vote to reverse exclusively on the ground that the Times and the individual defendants had an absolute, unconditional constitutional right to publish in the Times advertisement their criticisms of the Montgomery agencies and officials. I do not base my vote to reverse on any failure to prove that these individual defendants signed the advertisement or that their criticism of the Police Department was aimed at the plaintiff Sullivan, who was then the Montgomery City Commissioner having supervision of the city's police; for present purposes I assume these things were proved. Nor is my reason for reversal the size of the half-million-dollar judgment, large as it is. If Alabama has constitutional power to use its civil libel law to impose damages on the press for criticizing the way public officials perform or fail **[*294]** to perform their duties, I know of no provision in the Federal Constitution which either expressly **[****71]** or impliedly bars the State from fixing the amount of damages.

The half-million-dollar verdict does give dramatic proof, however, that state libel laws threaten the very existence of an American press virile enough to publish unpopular views on public affairs and bold enough to criticize the conduct of public officials. The factual background of this case emphasizes the imminence and enormity of that threat. One of the acute and highly emotional issues in this country arises out of efforts of many people, even including some public officials, to continue state-commanded segregation of races in the public schools and other public places, despite our several holdings that such a state practice is forbidden by the Fourteenth Amendment. Montgomery is one of the localities in which widespread hostility to desegregation has been manifested. This hostility has sometimes extended itself to persons who favor desegregation, particularly to so-called "outside agitators," a term which can be made to fit papers like the Times, which is published in New York. The scarcity of testimony to show that Commissioner Sullivan suffered any actual damages at all suggests that these feelings of hostility **[****72]** had at least as much to do with rendition of this half-million-dollar **[***717]** verdict as did an appraisal of damages. Viewed realistically, this record lends support to an inference that instead of being damaged Commissioner Sullivan's political, social, and financial prestige has likely been enhanced by the Times' publication. Moreover, a second half-million-dollar libel verdict against the Times based on the same advertisement has already been **[**734]** awarded to another Commissioner. There a jury again gave the full amount claimed. There is no reason to believe that there are not more such huge verdicts lurking just around the corner for the Times or any other newspaper or broadcaster which **[*295]** might dare to criticize public officials. In fact, briefs before us show that in Alabama there are now pending eleven libel suits by local and state officials against the Times seeking $ 5,600,000, and five such suits against the Columbia Broadcasting System seeking $ 1,700,000. Moreover, this technique for harassing and punishing a free press -- now that it has been shown to be possible -- is by no means limited to cases with racial overtones; it can be used in other **[****73]** fields where public feelings may make local as well as out-of-state newspapers easy prey for libel verdict seekers.

In my opinion the Federal Constitution has dealt with this deadly danger to the press in the only way possible without leaving the free press open to destruction -- by granting the press an absolute immunity for criticism of the way public officials do their public duty. Compare *Barr v. Matteo*, 360 U.S. 564. Stopgap measures like those the Court adopts are in my judgment not enough. This record certainly does not indicate that any different verdict would have been rendered here whatever the Court had charged the jury about "malice," "truth," "good motives," "justifiable ends," or any other legal formulas which in theory would protect the press. Nor does the record indicate that any of these legalistic words would have caused the courts below to set aside or to reduce the half-million-dollar verdict in any amount.

I agree with the Court that the Fourteenth Amendment made the First applicable to the States. **1** This means to me that since the adoption of the Fourteenth Amendment a State has no more power than the Federal Government to use a civil **[****74]** libel law or any other law to

impose damages for merely discussing public affairs and criticizing public officials. The power of the United **[*296]** States to do that is, in my judgment, precisely nil. Such was the general view held when the First Amendment was adopted and ever since. **2** **[****75]** Congress never has sought to challenge this viewpoint by passing any civil libel law. It did pass the Sedition Act in 1798, **3** which made it a crime -- "seditious libel" -- to criticize federal officials or the Federal Government. As the Court's opinion correctly points out, however, *ante*, pp. 273-276, that Act came to an ignominious end and by common consent has generally been treated as having been a wholly unjustifiable and much to be regretted violation of **[***718]** the First Amendment. Since the First Amendment is now made applicable to the States by the Fourteenth, it no more permits the States to impose damages for libel than it does the Federal Government.

We would, I think, more faithfully interpret the First Amendment by holding that at the very least it leaves the people and the press free to criticize officials and discuss public affairs with impunity. This Nation of ours elects many of its important officials; so do the States, the municipalities, the counties, and even many precincts. These officials are responsible to the people for the way they perform their duties. While our Court has held that some kinds of speech and writings, such as "obscenity," Roth **[**735]** v. *United States*, 354 U.S. 476, and "fighting words," Chaplinsky v. New Hampshire, 315 U.S. 568, are not expression within the protection of the First Amendment, **4** freedom to discuss public affairs and public officials **[*297]** is unquestionably, as the Court today holds, the kind of speech the First Amendment was primarily designed to keep within the area of free discussion. To punish the exercise of this right to discuss public affairs or to penalize it through libel judgments is to abridge **[****76]** or shut off discussion of the very kind most needed. This Nation, I suspect, can live in peace without libel suits based on public discussions of public affairs and public officials. But I doubt that a country can live in freedom where its people can be made to suffer physically or financially for criticizing their government, its actions, or its officials. "For a representative democracy ceases to exist the moment that the public functionaries are by any means absolved from their responsibility to their constituents; and this happens whenever the constituent can be restrained in any manner from speaking, writing, or publishing his opinions upon any public measure, or upon the conduct of those who may advise or execute it." **5** **[****77]** An unconditional right to say what one pleases about public affairs is what I consider to be the minimum guarantee of the First Amendment. **6**

I regret that the Court has stopped short of this holding indispensable to preserve our free press from destruction.

MR. JUSTICE GOLDBERG ▼, with whom MR. JUSTICE DOUGLAS ▼ joins, concurring in the result.

The Court today announces a constitutional standard which prohibits "a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with **[*298]** 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Ante*, at 279-280. The Court thus rules that the Constitution gives citizens and newspapers a "conditional privilege" immunizing nonmalicious misstatements of fact regarding the official conduct of a government officer. The impressive array of history **1** and precedent marshaled by the Court, **[***719]** however, confirms my belief that the Constitution affords greater protection than that provided by the Court's standard to citizen and press in exercising the right **[****78]** of public criticism.

In my view, the First and Fourteenth Amendments to the Constitution afford to the citizen and to the press an absolute, unconditional privilege to criticize official conduct despite the harm which may flow from excesses and abuses. The prized American right "to speak one's **[**736]** mind, **[****79]** " cf. Bridges v. California, 314 U.S. 252, 270, about public officials and affairs needs "breathing space to survive," *N. A. A. C. P.* v. Button, 371 U.S. 415, 433. The right should not depend upon a probing by the jury of the motivation **2** of the citizen or press. The theory **[*299]** of our Constitution is that every citizen may speak his mind and every newspaper express its view on matters of public concern and may not be barred from speaking or publishing because those in control of government think that what is said or written is unwise, unfair, false, or malicious. In a democratic society, one who assumes to act for the citizens in an executive, legislative, or judicial capacity must expect that his official acts will be commented upon and criticized. Such criticism cannot, in my opinion, be muzzled or deterred by the courts at the instance of public officials under the label of libel.

**[****80]** It has been recognized that "prosecutions for libel on government have [no] place in the American system of jurisprudence." City of Chicago v. Tribune Co., 307 Ill. 595, 601, 139 N. E. 86, 88. I fully agree. Government, however, is not an abstraction; it is made up of individuals -- of governors responsible to the governed. In a democratic society where men are free by ballots to remove those in power, any statement critical of governmental action is necessarily "of and concerning" the governors and any statement critical of the governors' official conduct is necessarily "of and concerning" the government. If the rule that libel on government has no place in our Constitution is to have real meaning, then libel on the official conduct of the governors likewise can have no place in our Constitution. Cf. Farmers Educational & Coop. Union v. WDAY, Inc., 360 U.S. 525, 530. The opinion of the **[****82]** Court conclusively demonstrates the chilling effect of the Alabama libel laws on First Amendment freedoms **[*301]** in the area of race relations. The American Colonists were not willing, nor should we be, to take the risk that "men who injure and oppress the people under their administration [and] provoke them to cry out and complain" will also be empowered to "make that very complaint the foundation for new oppressions and prosecutions." *The Trial of John Peter Zenger*, 17 Howell's St. Tr. 675, 721-722 (1735) (argument of counsel to the jury). To impose liability for critical, albeit erroneous or even malicious, comments on official conduct would effectively resurrect "the obsolete doctrine that the governed must not criticize their governors." Cf. Sweeney v. Patterson, 76 U.S. App. D.C. 23, 24, 128 F.2d 457, 458.

We must recognize that we are writing upon a clean slate. **3** As the **[***720]** Court notes, although there have been **[*300]** "statements of this Court to the effect that the Constitution does not protect libelous publications . . . none of the cases sustained the use of libel laws to impose sanctions upon expression critical of the official conduct of public **[****81]** officials." *Ante*, at 268. We should be particularly careful, therefore, adequately to protect the liberties which are embodied in the First and Fourteenth Amendments. It may be urged that deliberately and maliciously false statements have no **[**737]** conceivable value as free speech. That argument, however, is not responsive to the real issue presented by this case, which is whether that freedom of speech which all agree is constitutionally protected can be effectively safeguarded by a rule allowing the imposition of liability upon a jury's evaluation of the speaker's state of mind. If individual citizens may be held liable in damages for strong words, which a jury finds false and maliciously motivated, there can be little doubt that public debate and advocacy will be constrained. And if newspapers, publishing advertisements dealing with public issues, thereby risk liability, there can also be little doubt that the ability of minority groups to secure publication of their views on public affairs and to seek support for their causes will be greatly diminished. Cf.

**[****83]** Our national experience teaches that repressions breed hate and "that hate menaces stable government." Whitney v. California, 274 U.S. 357, 375 (Brandeis ▼, J., concurring). We should be ever mindful of the wise counsel of Chief Justice Hughes:

"Imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if [***721] desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government." *De Jonge v. Oregon,* 299 U.S. 353, 365.

This is not to say that the Constitution protects defamatory statements directed against the private conduct of a public official or private citizen. Freedom of press and of speech insures that government will respond to the will of the people and that changes may be obtained by peaceful means. Purely private defamation has little to do with the political ends of a self-governing society. The imposition of liability for private [****84] defamation does not [*302] abridge the freedom of public speech or any other freedom protected by the First Amendment. **4 ⬇** This, of course, cannot be said "where [**738] public officials are concerned or where public matters are involved. . . . One main function of the First Amendment is to ensure ample opportunity for the people to determine and resolve public issues. Where public matters are involved, the doubts should be resolved in favor of freedom of expression rather than against it." Douglas, The Right of the People (1958), p. 41.

[****85] In many jurisdictions, legislators, judges and executive officers are clothed with absolute immunity against liability for defamatory words uttered in the discharge of their public duties. See, *e. g., Barr v. Matteo,* 360 U.S. 564; *City of Chicago v. Tribune Co.,* 307 Ill., at 610, 139 N. E., at 91. Judge Learned Hand ▾ ably summarized the policies underlying the rule:

"It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the [*303] case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. [****86] Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In [***722] this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. . . .

"The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that [****87] that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him. . . ." *Gregoire v. Biddle,* 177 F.2d 579, 581.

[*304] If the government official should be immune from libel actions so that his ardor to serve the public will not be dampened and "fearless, vigorous, and effective administration of policies of government" not be inhibited, *Barr v. Matteo, supra,* at 571, then the citizen and the press should likewise be immune from libel actions for their criticism of official conduct. Their ardor as citizens will thus not be dampened and they will [***739] be free "to applaud or to criticize the way public employees do their jobs, from the least to the most important." **5 ⬇** If liability can attach to political criticism because it damages the reputation of a public official as a public official, then no critical citizen can safely utter anything but faint praise about [****88] the government or its officials. The vigorous criticism by press and citizen of the conduct of the government of the day by the officials of the day will soon yield to silence if officials in control of government agencies, instead of answering criticisms, can resort to friendly juries to forestall criticism of their official conduct. **6 ⬇**

The conclusion that the Constitution affords the citizen and the press an absolute [****89] privilege for criticism of official conduct does not leave the public official without defenses against unsubstantiated opinions or deliberate misstatements. "Under our system of government, counterargument and education are the weapons available to expose these matters, not abridgment . . . of free speech . . . ." *Wood v. Georgia,* 370 U.S. 375, 389. The public [*305] official certainly has equal if not greater access than most private citizens to media of communication. In any event, despite the possibility that some excesses and abuses may go unremedied, we must recognize that "the people of this nation have ordained in the light of history, that, in spite of the probability of excesses [***723] and abuses, [certain] liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy." *Cantwell v. Connecticut,* 310 U.S. 296, 310. As Mr. Justice Brandeis correctly observed, "sunlight is the most powerful of all disinfectants." **7 ⬇**

[****90] For these reasons, I strongly believe that the Constitution accords citizens and press an unconditional freedom to criticize official conduct. It necessarily follows that in a case such as this, where all agree that the allegedly defamatory statements related to official conduct, the judgments for libel cannot constitutionally be sustained.

## References

The Supreme Court and the right of free speech and press

      Annotation References:

1. The Supreme Court and the right of free speech and press. 93 L ed 1151, 2 L ed 2d 1706.

2. Libel and slander: actionability of statement imputing incapacity, inefficiency, misconduct, fraud, dishonesty, or the like to public employee. 53 ALR2d 8.

3. Doctrine of privilege or fair comment as applicable to misstatements of fact in publication relating to public officer or candidate for office. 110 ALR 412, 150 ALR 358.

4. Constitutionality of statutes or ordinances making one fact presumptive evidence of another. 51 ALR 1139, 86 ALR 179, 162 ALR 495.

5. Retraction as affecting right of action or amount of damages for libel [****91] or slander. 13 ALR 794.

6. Sufficiency of identification of plaintiff by publication or statement complained of as libelous or slanderous. 91 ALR 1161.

7. Libel and slander: publication or statement as defamatory, by reason of extrinsic facts, of person not referred to nor intended to be referred to. 69 ALR 734.

8. What evidence is admissible to identify plaintiff as person defamed. 95 ALR 2d 227.

---

**Footnotes**

**\*⊤** Together with No. 40, Abernathy et al. v. Sullivan, also on certiorari to the same court, argued January 7, 1964.

---

**1⊤** A copy of the advertisement is printed in the Appendix.

**2⊤** Respondent did not consider the charge of expelling the students to be applicable to him, since "that responsibility rests with the State Department of Education."

**3⊤** Approximately 394 copies of the edition of the Times containing the advertisement were circulated in Alabama. Of these, about 35 copies were distributed in Montgomery County. The total circulation of the Times for that day was approximately 650,000 copies.

**4⊤** *LEdHN[2]*⊤ [2]

Since we sustain the contentions of all the petitioners under the First Amendment's guarantees of freedom of speech and of the press as applied to the States by the Fourteenth Amendment, we do not decide the questions presented by the other claims of violation of the Fourteenth Amendment. The individual petitioners contend that the judgment against them offends the Due Process Clause because there was no evidence to show that they had published or authorized the publication of the alleged libel, and that the Due Process and Equal Protection Clauses were violated by racial segregation and racial bias in the courtroom. The Times contends that the assumption of jurisdiction over its corporate person by the Alabama courts overreaches the territorial limits of the Due Process Clause. The latter claim is foreclosed from our review by the ruling of the Alabama courts that the Times entered a general appearance in the action and thus waived its jurisdictional objection; we cannot say that this ruling lacks "fair or substantial support" in prior Alabama decisions. See *Thompson v. Wilson*, 224 Ala. 299, 140 So. 439 (1932); compare *N. A. A. C. P.* v. *Alabama*, 357 U.S. 449, 454-458.

**5⊤** See American Law Institute, Restatement of Torts, § 593, Comment b (1938).

**6⊤** *Konigsberg v. State Bar of California*, 366 U.S. 36, 49, and n. 10; *Times Film Corp.* v. *City of Chicago*, 365 U.S. 43, 48; *Roth v. United States*, 354 U.S. 476, 486-487; *Beauharnais v. Illinois*, 343 U.S. 250, 266; *Pennekamp v. Florida*, 328 U.S. 331, 348-349; *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572; *Near v. Minnesota*, 283 U.S. 697, 715.

**7⊤** *Herndon v. Lowry*, 301 U.S. 242.

**8⊤** *Bridges v. California*, 314 U.S. 252; *Pennekamp v. Florida*, 328 U.S. 331.

**9⊤** *De Jonge v. Oregon*, 299 U.S. 353.

**10⊤** *Edwards v. South Carolina*, 372 U.S. 229.



**11** *Roth v. United States*, 354 U.S. 476.

**12** *N. A. A. C. P.* v. *Button*, 371 U.S. 415.

**13** See also Mill, On Liberty (Oxford: Blackwell, 1947), at 47:

". . . To argue sophistically, to suppress facts or arguments, to misstate the elements of the case, or misrepresent the opposite opinion . . . all this, even to the most aggravated degree, is so continually done in perfect good faith, by persons who are not considered, and in many other respects may not deserve to be considered, ignorant or incompetent, that it is rarely possible, on adequate grounds, conscientiously to stamp the misrepresentation as morally culpable; and still less could law presume to interfere with this kind of controversial misconduct."

**14** The climate in which public officials operate, especially during a political campaign, has been described by one commentator in the following terms: "Charges of gross incompetence, disregard of the public interest, communist sympathies, and the like usually have filled the air; and hints of bribery, embezzlement, and other criminal conduct are not infrequent." Noel, Defamation of Public Officers and Candidates, 49 Col. L. Rev. 875 (1949).

For a similar description written 60 years earlier, see Chase, Criticism of Public Officers and Candidates for Office, 23 Am. L. Rev. 346 (1889).

**15** The Report on the Virginia Resolutions further stated:

"It is manifestly impossible to punish the intent to bring those who administer the government into disrepute or contempt, without striking at the right of freely discussing public characters and measures; . . . which, again, is equivalent to a protection of those who administer the government, if they should at any time deserve the contempt or hatred of the people, against being exposed to it, by free animadversions on their characters and conduct. Nor can there be a doubt . . . that a government thus intrenched in penal statutes against the just and natural effects of a culpable administration, will easily evade the responsibility which is essential to a faithful discharge of its duty.

"Let it be recollected, lastly, that the right of electing the members of the government constitutes more particularly the essence of a free and responsible government. The value and efficacy of this right depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively." 4 Elliot's Debates, *supra*, p. 575.

**16** The Act expired by its terms in 1801.

**17** Cf. *Farmers Union v. WDAY*, 360 U.S. 525, 535.

**18** The Times states that four other libel suits based on the advertisement have been filed against it by others who have served as Montgomery City Commissioners and by the Governor of Alabama; that another $ 500,000 verdict has been awarded in the only one of these cases that has yet gone to trial; and that the damages sought in the other three total $ 2,000,000.

**19** *HN19* Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about "the clearer perception and livelier impression of truth, produced by its collision with error." Mill, On Liberty (Oxford: Blackwell, 1947), at 15; see also Milton, Areopagitica, in Prose Works (Yale, 1959), Vol. II, at 561.

**20** *E. g.*, *Ponder v. Cobb*, 257 N. C. 281, 299, 126 S.E.2d 67, 80 (1962); *Lawrence v. Fox*, 357 Mich. 134, 146, 97 N.W.2d 719, 725 (1959); *Stice v. Beacon Newspaper Corp.*, 185 Kan. 61, 65-67, 340 P.2d 396, 400-401 (1959); *Bailey v. Charleston Mail Assn.*, 126 W. Va. 292, 307, 27 S.E.2d 837, 844 (1943); *Salinger v. Cowles*, 195 Iowa 873, 889, 191 N. W. 167, 174 (1922); *Snively v. Record Publishing Co.*, 185 Cal. 565, 571-576, 198 P. 1 (1921); *McLean v. Merriman*, 42 S. D. 394, 175 N. W. 878 (1920). Applying the same rule to candidates for public office, see, *e. g.*, *Phoenix Newspapers v. Choisser*, 82 Ariz. 271, 276-277, 312 P. 2d 150, 154 (1957); *Friedell v. Blakely Printing Co.*, 163 Minn. 226, 230, 203 N. W. 974, 975 (1925). And see *Chagnon v. Union-Leader Corp.*, 103 N. H. 426, 438, 174 A. 2d 825, 833 (1961), cert. denied, 369 U.S. 830.

The consensus of scholarly opinion apparently favors the rule that is here adopted. *E. g.*, 1 Harper and James, Torts, § 5.26, at 449-450 (1956); Noel, Defamation of Public Officers and Candidates, 49 Col. L. Rev. 875, 891-895, 897, 903 (1949); Hallen, Fair Comment, 8 Tex. L. Rev. 41, 61 (1929); Smith, Charges Against Candidates, 18 Mich. L. Rev. 1, 115 (1919); Chase, Criticism of Public Officers and Candidates for Office, 23 Am. L. Rev. 346, 367-371 (1889); Cooley, Constitutional Limitations (7th ed., Lane, 1903), at 604, 616-628. But see, *e. g.*, American Law Institute, Restatement of Torts, § 598, Comment a (1938) (reversing the position taken in Tentative Draft 13, § 1041 (2) (1936)); Veeder, Freedom of Public Discussion, 23 Harv. L. Rev. 413, 419 (1910).

**21** The privilege immunizing honest misstatements of fact is often referred to as a "conditional" privilege to distinguish it from the "absolute" privilege recognized in judicial, legislative, administrative and executive proceedings. See, *e. g.*, Prosser, Torts (2d ed., 1955), § 95.

**22** See 1 Harper and James, Torts, § 5.23, at 429-430 (1956); Prosser, Torts (2d ed., 1955), at 612-613; American Law Institute, Restatement of Torts (1938), § 591.

**23** We have no occasion here to determine how far down into the lower ranks of government employees the "public official" designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included. Cf. *Barr v. Matteo*, 360 U.S. 564, 573-575. Nor need we here determine the boundaries of the "official conduct" concept. It is enough for the present case that respondent's position as an elected city commissioner clearly made him a public official, and that the allegations in the advertisement concerned what was allegedly his official conduct as Commissioner in charge of the Police Department. As to the statements alleging the assaulting of Dr. King and the bombing of his home, it is immaterial that they might not be considered to involve respondent's official conduct if he himself had been accused of perpetrating the assault and the bombing. Respondent does not claim that the statements charged him personally with these acts; his contention is that the advertisement connects him with them only in his official capacity as the Commissioner supervising the police, on the theory that the police might be equated with the "They" who did the bombing and assaulting. Thus, if these allegations can be read as referring to respondent at all, they must be read as describing his performance of his official duties.

**24** *Johnson Publishing Co.* v. *Davis*, 271 Ala. 474, 487, 124 So. 2d 441, 450 (1960). Thus, the trial judge here instructed the jury that "mere negligence or carelessness is not evidence of actual malice or malice in fact, and does not justify an award of exemplary or punitive damages in an action for libel."

The court refused, however, to give the following instruction which had been requested by the Times:

"I charge you . . . that punitive damages, as the name indicates, are designed to punish the defendant, the New York Times Company, a corporation, and the other defendants in this case, . . . and I further charge you that such punitive damages may be awarded only in the event that you, the jury, are convinced by a fair preponderance of the evidence that the defendant . . . was motivated by personal ill will, that is actual intent to do the plaintiff harm, or that the defendant . . . was guilty of gross negligence and recklessness and not of just ordinary negligence or carelessness in publishing the matter complained of so as to indicate a wanton disregard of plaintiff's rights."

The trial court's error in failing to require any finding of actual malice for an award of general damages makes it unnecessary for us to consider the sufficiency under the federal standard of the instructions regarding actual malice that were given as to punitive damages.

**25** Accord, *Coleman* v. *MacLennan, supra,* 78 Kan., at 741, 98 P., at 292; *Gough* v. *Tribune-Journal Co.*, 75 Idaho 502, 510, 275 P.2d 663, 668 (1954).

**26** The Seventh Amendment does not, as respondent contends, preclude such an examination by this Court. That Amendment, providing that **HN25** "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law," is applicable to state cases coming here. *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U.S. 226, 242-243; cf. *The Justices* v. *Murray,* 9 Wall. 274. **HN26** But its ban on re-examination of facts does not preclude us from determining whether governing rules of federal law have been properly applied to the facts. "This Court will review the finding of facts by a State court . . . where a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts." *Fiske v. Kansas,* 274 U.S. 380, 385-386. See also *Haynes v. Washington,* 373 U.S. 503, 515-516.

**27** The Times has set forth in a booklet its "Advertising Acceptability Standards." Listed among the classes of advertising that the newspaper does not accept are advertisements that are "fraudulent or deceptive," that are "ambiguous in wording and . . . may mislead," and that contain "attacks of a personal character." In replying to respondent's interrogatories before the trial, the Secretary of the Times stated that "as the advertisement made no attacks of a personal character upon any individual and otherwise met the advertising acceptability standards promulgated," it had been approved for publication.

**28** Respondent's own testimony was that "as Commissioner of Public Affairs it is part of my duty to supervise the Police Department and I certainly feel like it [a statement] is associated with me when it describes police activities." He thought that "by virtue of being Police Commissioner and Commissioner of Public Affairs," he was charged with "any activity on the part of the Police Department." "When it describes police action, certainly I feel it reflects on me as an individual." He added that "It is my feeling that it reflects not only on me but on the other Commissioners and the community."

Grover C. Hall testified that to him the third paragraph of the advertisement called to mind "the City government -- the Commissioners," and that "now that you ask it I would naturally think a little more about the police Commissioner because his responsibility is exclusively with the constabulary." It was "the phrase about starvation" that led to the association; "the other didn't hit me with any particular force."

Arnold D. Blackwell testified that the third paragraph was associated in his mind with "the Police Commissioner and the police force the people on the police force." If he had believed the statement about the padlocking of the dining hall, he would have thought "that the people on our police force or the heads of our police force were acting without their jurisdiction and would not be competent for the position." "I would assume that the Commissioner had ordered the police force to do that and therefore it would be his responsibility."

Harry W. Kaminsky associated the statement about "truckloads of police" with respondent "because he is the Police Commissioner." He thought that the reference to arrests in the sixth paragraph "implicates the Police Department, I think, or the authorities that would do that -- arrest folks for speeding and loitering and such as that." Asked whether he would associate with respondent a newspaper report that the police had "beat somebody up or assaulted them on the streets of Montgomery," he replied: "I still say he is the Police Commissioner and those men are working directly under him and therefore I would think that he would have something to do with it." In general, he said, "I look at Mr. Sullivan when I see the Police Department."

H. M. Price, Sr., testified that he associated the first sentence of the third paragraph with respondent because: "I would just automatically consider that the Police Commissioner in Montgomery would have to put his approval on those kind of things as an individual."

William M. Parker, Jr., testified that he associated the statements in the two paragraphs with "the Commissioners of the City of Montgomery," and since respondent "was the Police Commissioner," he "thought of him first." He told the examining counsel: "I think if you were the Police Commissioner I would have thought it was speaking of you."

Horace W. White, respondent's former employer, testified that the statement about "truck-loads of police" made him think of respondent "as being the head of the Police Department." Asked whether he read the statement as charging respondent himself with ringing the campus or having shotguns and tear-gas, he replied: "Well, I thought of his department being charged with it, yes, sir. He is the head of the Police Department as I understand it." He further said that the reason he would have been unwilling to re-employ respondent if he had believed the advertisement was "the fact that he allowed the Police Department to do the things that the paper say he did."

**29** Compare *Ponder v. Cobb, 257 N. C. 281, 126 S.E.2d 67 (1962).*

**30** Insofar as the proposition means only that the statements about police conduct libeled respondent by implicitly criticizing his ability to run the Police Department, recovery is also precluded in this case by the doctrine of fair comment. See American Law Institute, Restatement of Torts (1938), § 607. **HN27** Since the Fourteenth Amendment requires recognition of the conditional privilege for honest misstatements of fact, it follows that a defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact. Both defenses are of course defeasible if the public official proves actual malice, as was not done here.

**1** See cases collected in *Speiser v. Randall, 357 U.S. 513, 530* (concurring opinion).

**2** See, *e. g.*, 1 Tucker, Blackstone's Commentaries (1803), 297-299 (editor's appendix). St. George Tucker, a distinguished Virginia jurist, took part in the Annapolis Convention of 1786, sat on both state and federal courts, and was widely known for his writings on judicial and constitutional subjects.

**3** Act of July 14, 1798, 1 Stat. 596.

**4** But see *Smith v. California, 361 U.S. 147, 155* (concurring opinion); *Roth v. United States, 354 U.S. 476, 508* (dissenting opinion).

**5** 1 Tucker, Blackstone's Commentaries (1803), 297 (editor's appendix); cf. Brant, Seditious Libel: Myth and Reality, 39 N. Y. U. L. Rev. 1.

**6** Cf. Meiklejohn, Free Speech and Its Relation to Self-Government (1948).

**1** I fully agree with the Court that the attack upon the validity of the Sedition Act of 1798, 1 Stat. 596, "has carried the day in the court of history," *ante*, at 276, and that the Act would today be declared unconstitutional. It should be pointed out, however, that the Sedition Act proscribed writings which were "false, scandalous *and malicious*." (Emphasis added.) For prosecutions under the Sedition Act charging malice, see, *e. g.*, Trial of Matthew Lyon (1798), in Wharton, State Trials of the United States (1849), p. 333; Trial of Thomas Cooper (1800), in *id.*, at 659; Trial of Anthony Haswell (1800), in *id.*, at 684; Trial of James Thompson Callender (1800), in *id.*, at 688.

**2** The requirement of proving actual malice or reckless disregard may, in the mind of the jury, add little to the requirement of proving

falsity, a requirement which the Court recognizes not to be an adequate safeguard. The thought suggested by Mr. Justice Jackson in *United States v. Ballard*, 322 U.S. 78, 92-93, is relevant here: "As a matter of either practice or philosophy I do not see how we can separate an issue as to what is believed from considerations as to what is believable. The most convincing proof that one believes his statements is to show that they have been true in his experience. Likewise, that one knowingly falsified is best proved by showing that what he said happened never did happen." See note 4, *infra*.

3 ⬆  It was not until *Gitlow v. New York*, 268 U.S. 652, decided in 1925, that it was intimated that the freedom of speech guaranteed by the First Amendment was applicable to the States by reason of the Fourteenth Amendment. Other intimations followed. See *Whitney v. California*, 274 U.S. 357; *Fiske v. Kansas*, 274 U.S. 380. In 1931 Chief Justice Hughes speaking for the Court in *Stromberg v. California*, 283 U.S. 359, 368, declared: "It has been determined that the conception of liberty under the due process clause of the Fourteenth Amendment embraces the right of free speech." Thus we deal with a constitutional principle enunciated less than four decades ago, and consider for the first time the application of that principle to issues arising in libel cases brought by state officials.

4 ⬆  In most cases, as in the case at bar, there will be little difficulty in distinguishing defamatory speech relating to private conduct from that relating to official conduct. I recognize, of course, that there will be a gray area. The difficulties of applying a public-private standard are, however, certainly of a different genre from those attending the differentiation between a malicious and nonmalicious state of mind. If the constitutional standard is to be shaped by a concept of malice, the speaker takes the risk not only that the jury will inaccurately determine his state of mind but also that the jury will fail properly to apply the constitutional standard set by the elusive concept of malice. See note 2, *supra*.

5 ⬆  MR. JUSTICE BLACK ▾ concurring in *Barr v. Matteo*, 360 U.S. 564, 577, observed that: "The effective functioning of a free government like ours depends largely on the force of an informed public opinion. This calls for the widest possible understanding of the quality of government service rendered by all elective or appointed public officials or employees. Such an informed understanding depends, of course, on the freedom people have to applaud or to criticize the way public employees do their jobs, from the least to the most important."

6 ⬆  See notes 2, 4, *supra*.

7 ⬆  See Freund, The Supreme Court of the United States (1949), p. 61.



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX ™

Copyright © 2023 LexisNexis.

Lexis

Perlman v. Vox Media, Inc, 10046- VCS (De

Search: Everything

Client: -None- ⌄   Folders   History   Help   More

⚠️ **Perlman v. Vox Media Inc., 2015 Del. Ch. LEXIS 248**

Copy Citation

Court of Chancery of Delaware, New Castle

June 10, 2015, Submitted; September 30, 2015, Decided

Civil Action No. 10046-VCP

**Reporter**

**2015 Del. Ch. LEXIS 248 \*** | 2015 WL 5724838

STEPHEN G. PERLMAN, REARDEN LLC, a California limited liability company, and ARTEMIS NETWORKS LLC, a Delaware limited liability company, Plaintiffs, v. VOX MEDIA, INC., a Delaware corporation, Defendant.

**Notice:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**Subsequent History:** Summary judgment granted by, Transferred by [Perlman v. Vox Media, Inc., 2019 Del. Ch. LEXIS 240 (Del. Ch., June 27, 2019)](#)
Summary judgment granted by [Perlman v. Vox Media, Inc., 2020 Del. Super. LEXIS 321 (Del. Super. Ct., June 24, 2020)](#)

## Core Terms

Articles, defamatory, Vox, defamation, website, allegations, conceivable, hyperlink, technology, employees, republication, defunct, motion to dismiss, pCell, statute of limitations, audience, republished, laches, links, Plaintiffs', allegedly defamatory, defamatory statement, cause of action, game-streaming, investor, argues, circumstances, enhanced, modified, reputations

## Case Summary

### Overview

HOLDINGS: [1]-With respect to defamation claims against a website owner, under the significant relationship test California law applied based on the residence of two of the allegedly defamed subjects (ADSs), and under the borrowing statute of [Del. Code Ann. tit. 10, § 8121](#), the shorter limitations period of [Cal. Code Civ. Proc. § 340(c)](#) applied; [2]-Aa laches defense failed because the owner did not show that there were no reasonably conceivable circumstances under which the ADSs could overcome the defense, and it did not show prejudice due to the delay; [3]-The website owner was not entitled to dismissal because it was reasonably conceivable that the articles were false and defamatory, and that the later 2014 article republished statements in the prior 2012 articles because it enhanced, modified, or directed the prior articles to a new audience.

### Outcome

Motion to dismiss denied.

---

▼  **LexisNexis® Headnotes**

---

Civil Procedure > ... > Defenses, Demurrers & Objections ▼ > Motions to Dismiss ▼ > Failure to State Claim ▼
View more legal topics

*HN1* ⬇  **Motions to Dismiss, Failure to State Claim**

Pursuant to Del. Ch. Ct. R. 12(b)(6), the Court of Chancery may grant a motion to dismiss for failure to state a claim if a complaint does not assert sufficient facts that, if proven, would entitle the plaintiff to relief. As reaffirmed by the Supreme Court, the governing pleading

standard in Delaware to survive a motion to dismiss is reasonable "conceivability." That is, when considering such a motion, a court must accept all well-pleaded factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*

---

Civil Procedure > ... > Defenses, Demurrers & Objections ▾ > Motions to Dismiss ▾ > Failure to State Claim ▾
View more legal topics

**HN2⬇ Motions to Dismiss, Failure to State Claim**

The reasonable "conceivability" standard of Del. Ch. Ct. R. 12(b)(6) asks whether there is a "possibility" of recovery. If the well-pled factual allegations of the complaint would entitle the plaintiff to relief under a reasonably conceivable set of circumstances, the court must deny the motion to dismiss. The court, however, need not accept conclusory allegations unsupported by specific facts or draw unreasonable inferences in favor of the non-moving party. Moreover, failure to plead an element of a claim precludes entitlement to relief and, therefore, is grounds to dismiss that claim. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

---

Civil Procedure > ... > Defenses, Demurrers & Objections ▾ > Motions to Dismiss ▾ > Failure to State Claim ▾
Evidence > Judicial Notice ▾ > General Overview ▾
View more legal topics

**HN3⬇ Motions to Dismiss, Failure to State Claim**

Generally, the court will consider only the pleadings on a motion to dismiss under Del. Ch. Ct. R. 12(b)(6). A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint; or (2) the document is not being relied upon to prove the truth of its contents. Additionally, the court may take judicial notice of a fact if that fact is not subject to reasonable dispute in that it is either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Civil Procedure > ... > Responses ▾ > Defenses, Demurrers & Objections ▾ > Motions to Dismiss ▾
Evidence > Judicial Notice ▾ > General Overview ▾

**HN4⬇ Defenses, Demurrers & Objections, Motions to Dismiss**

On a motion to dismiss the court is free to take judicial notice of certain acts that are of public record if they are provided to the court by the party seeking to have them considered. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > ... > Affirmative Defenses ▾ > Statute of Limitations ▾ > General Overview ▾
View more legal topics

**HN5⬇ Affirmative Defenses, Statute of Limitations**

The Supreme Court of Delaware has said that under ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after, the time fixed by the analogous statute of limitations at law; but, if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer period than that fixed by the statute, the court will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it. Although both laches and statutes of limitation operate to time-bar suits, the Supreme Court explained that the limitations of actions applicable in a court of law are not controlling in equity. A court of equity moves upon considerations of conscience, good faith, and reasonable diligence. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Civil Procedure > ... > Federal & State Interrelationships ▾ > Choice of Law ▾ > Significant Relationships ▾
Torts > Intentional Torts ▾ > Defamation ▾ > Procedural Matters ▾
View more legal topics

**HN6⬇ Choice of Law, Significant Relationships**

When determining which state's substantive laws apply, Delaware courts generally rely on the principle that allegedly defamatory statements published over the Internet are treated as "multistate" or "aggregate" communications. Thus, any claim arising from an Internet communication is governed by the law of the state with the "most significant relationship" to the claim. In determining the most significant relationship, the court evaluates the relative importance of: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

Civil Procedure > ... > Federal & State Interrelationships ▾ > Choice of Law ▾ > Significant Relationships ▾

Torts > Intentional Torts ▾ > Defamation ▾ > Procedural Matters ▾

View more legal topics

**HN7** ⬇ **Choice of Law, Significant Relationships**

The state where the injured party is domiciled (for natural persons) or has its principal place of business (for corporations or other legal persons) will usually be the state of most significant relationship for claims of defamation by an aggregate communication that was published in that state. This is because defamation produces a special kind of injury that has its principal effect among one's friends, acquaintances, neighbors and business associates in the place of one's residence. Accordingly, the local law of the state of the plaintiff's domicile applies unless, with respect to the particular issue, one of the other states has a more significant relationship to the occurrence and the parties. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*

Torts > ... > Defamation ▾ > Defenses ▾ > Statute of Limitations ▾

**HN8** ⬇ **Defenses, Statute of Limitations**

California has a one-year statute of limitations for defamation claims. Cal. Code Civ. Proc. § 340(c). Delaware has a two-year statute of limitations for defamation claims. Del. Code Ann. tit. 10, § 8119. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Procedural Matters ▾ > Statute of Limitations ▾ > Borrowing Statutes ▾

**HN9** ⬇ **Statute of Limitations, Borrowing Statutes**

See Del. Code Ann. tit. 10, § 8121. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > ... > Defenses, Demurrers & Objections ▾ > Affirmative Defenses ▾ > Laches ▾

Evidence > Burdens of Proof ▾ > Allocation ▾

View more legal topics

**HN10** ⬇ **Affirmative Defenses, Laches**

Laches is an equitable defense based on the maxim that "equity aids the vigilant, not those who slumber on their rights." Laches is defined generally as an unreasonable delay in enforcing a right that causes prejudice to the defendant. Therefore, laches generally requires the establishment of three things: first, knowledge by the claimant; second, unreasonable delay in bringing the claim, and third, resulting prejudice to the defendant. The touchstone of a laches inquiry is whether inexcusable delay led to an adverse change in the condition or relations of the properties or parties. Nevertheless, even though statutes of limitations are not controlling in equity, the Court of Chancery places great weight on analogous limitations periods in determining whether a plaintiff's claim should be deemed barred by laches. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > ... > Defenses, Demurrers & Objections ▾ > Affirmative Defenses ▾ > Laches ▾

View more legal topics

**HN11** ⬇ **Affirmative Defenses, Laches**

Because the court generally is limited to the facts appearing on the face of the pleadings in ruling on a motion to dismiss, affirmative defenses, such as laches, are not ordinarily well-suited for disposition on such a motion. Thus, unless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based upon an affirmative defense is inappropriate. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*    1

Civil Procedure > ... > Affirmative Defenses ▾ > Statute of Limitations ▾ > General Overview ▾

View more legal topics

**HN12** ⬇ **Affirmative Defenses, Statute of Limitations**

The Supreme Court of Delaware affirmed consideration of the following factors to determine whether "unusual conditions or exceptional circumstances" prevent application of the analogous statute of limitations with respect to a laches analysis: (1) whether the plaintiff had been pursuing his claim, through litigation or otherwise, before the statute of limitations expired; (2) whether the delay in filing suit was attributable to a material and unforeseeable change in the parties' personal or financial circumstances; (3) whether the delay in filing suit was attributable to a legal determination in another jurisdiction; (4) the extent to which the defendant was aware of, or participated in, any prior proceedings; and (5) whether, at the time the litigation was filed, there was a bona fide dispute as to the validity of the claim. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

Civil Procedure > ... > Defenses, Demurrers & Objections ▾ > Affirmative Defenses ▾ > Burdens of Proof ▾
View more legal topics

**HN13** ⬇ **Affirmative Defenses, Burdens of Proof**

On a motion to dismiss, a defendant carries the burden of persuasion when asserting a laches defense. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Evidence > Burdens of Proof ▾ > Allocation ▾
Torts > ... > Defamation ▾ > Elements ▾ > General Overview ▾

**HN14** ⬇ **Burdens of Proof, Allocation**

To sustain a cause of action for defamation, plaintiffs must plead five elements: (1) defamatory communication; (2) publication; (3) reference to each plaintiff asserting a claim; (4) a third party's understanding of the communication's defamatory character; and (5) injury. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > ... > Defenses, Demurrers & Objections ▾ > Motions to Dismiss ▾ > Failure to State Claim ▾
Torts > Intentional Torts ▾ > Defamation ▾ > Procedural Matters ▾
View more legal topics

**HN15** ⬇ **Motions to Dismiss, Failure to State Claim**

Under Delaware and California law, substantial truth is an affirmative defense to defamation. The test in deciding whether an article is substantially true involves a consideration of whether the alleged libel was more damaging to plaintiff's reputation, in the mind of the average reader, than a truthful statement would have been. As part of this evaluation, courts will consider whether the "gist" or "sting" of the article was true. On a motion to dismiss, however, Defendant retains the burden of proving that Plaintiffs cannot recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint. Thus, unless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based upon an affirmative defense is inappropriate. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (4)*     1

Torts > ... > Defamation ▾ > Elements ▾ > General Overview ▾

**HN16** ⬇ **Defamation, Elements**

A defamatory communication is one that tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > ... > Defamation ▾ > Defenses ▾ > Truth ▾

**HN17** ⬇ **Defenses, Truth**

In Delaware and in California, whether a communication is false for purposes of defamation is a question of fact. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > ... > Defamation ▾ > Elements ▾ > General Overview ▾
View more legal topics

**HN18** ⬇ **Defamation, Elements**

In its analysis of the content of an allegedly defamatory statement, the court must look to the fair and natural meaning which will be given it by reasonable persons of ordinary intelligence. In determining whether statements are of a defamatory nature, and therefore actionable, a court is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language of the complaint for libelous publication according to its natural and popular construction. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Business & Corporate Law > ... > Management Duties & Liabilities ▾ > Causes of Action ▾ > General Overview ▾
Torts > Intentional Torts ▾ > Defamation ▾ > Procedural Matters ▾

**HN19** ⬇ **Management Duties & Liabilities, Causes of Action**

A corporation is defamed by defamatory communications of its officers and directors only if those statements also reflect discredit upon the method by which the corporation conducts its business. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (0)

Torts > Intentional Torts ⌄ > Defamation ⌄ > Procedural Matters ⌄

**HN20**⬇ **Defamation, Procedural Matters**

Under California law, the single-publication rule is codified as follows: No person shall have more than one cause of action for damages for libel founded upon any single publication, such as any one issue of a newspaper or book or magazine. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions. Cal. Civ. Code § 3425.3. Notwithstanding the single-publication rule, a new edition or new issue of a newspaper or book still constitutes a new publication, giving rise to a new and separate cause of action and a new accrual date for the purpose of the statute of limitations. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (0)

Torts > Intentional Torts ⌄ > Defamation ⌄ > Procedural Matters ⌄

**HN21**⬇ **Defamation, Procedural Matters**

In California, the single-publication rule restricts to a single cause of action for defamation all damages founded upon a single publication. A single publication is distinguished from a republication. If a defendant republishes material, the protection under the single-publication rule does not apply. The single publication rule applies to Internet publication regardless of how many people actually see it. California appears to consider the following factors in determining whether a republication occurred: (1) whether the original publication was modified; and (2) whether the republication was directed to a new, different audience. As applied to Internet publications, under California law, a statement on a website is not republished unless the statement itself is substantively altered or added to, or the website is directed to a new audience. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (2)

Torts > Intentional Torts ⌄ > Defamation ⌄ > Procedural Matters ⌄

**HN22**⬇ **Defamation, Procedural Matters**

There appears to be no authority in California holding that providing links to statements already published on the Web, without more, republishes those statements for purposes of defamation. Rather, such linking is more reasonably akin to the publication of additional copies of the same edition of a book, which is a situation that does not trigger the republication rule. A hyperlink, alone, does not constitute a republication. Courts addressing the doctrine in the context of Internet publications generally distinguish between linking, adding unrelated content, or making technical changes to an already published website (which they hold is not republication), and adding substantive material related to the allegedly defamatory material to an already published website (which they hold is republication). 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (0)

Torts > Intentional Torts ⌄ > Defamation ⌄ > Procedural Matters ⌄

**HN23**⬇ **Defamation, Procedural Matters**

In California, the critical feature of republication for purposes of defamation is that the original text of the article was changed or the contents of the article presented directly to a new audience. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (0)

Torts > Intentional Torts ⌄ > Defamation ⌄ > Procedural Matters ⌄

**HN24**⬇ **Defamation, Procedural Matters**

In discussing the new audience issue for purposes of defamation claims under California law, the justification for this republication exception to the single publication rule is that the subsequent publication is intended to and actually reaches a new audience. The republication exception has no application at all to the addition of unrelated material on a Web site, for it is not reasonably inferable that the addition was made either with the intent or the result of communicating the earlier and separate defamatory information to a new audience. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (0)

---

**Counsel:** **[*1]** Matthew E. Fischer ⌄, Esq., Jacob R. Kirkham ⌄, Esq., Jacqueline A. Rogers ⌄, Esq., POTTER ANDERSON & CORROON LLP ⌄, Wilmington, Delaware; Neville L. Johnson ⌄, Esq., Douglas L. Johnson ⌄, Esq., James T. Ryan ⌄, Esq., JOHNSON & JOHNSON, LLP ⌄, Beverly Hills, California; Attorneys for Plaintiffs, Stephen G. Perlman, Rearden LLC, and Artemis Ventures LLC.

Peter L. Frattarelli ⌄, Esq., ARCHER & GREINER, P.C. ⌄, Wilmington, Delaware; Attorneys for Defendant, Vox Media, Inc.

**Judges:** Vice Chancellor PARSONS ⌄.

**Opinion by:** PARSONS ⌄

**MEMORANDUM OPINION**

**PARSONS, Vice Chancellor**.

This is an action by a Delaware limited liability company ("LLC"), a California LLC, and an entrepreneur seeking equitable relief and money damages against a Delaware corporation for defamation. The corporation owns and operates a website that, in 2012, published an allegedly defamatory article about a non-party Delaware corporation that is affiliated closely with the Delaware LLC and the entrepreneur. After the website rewrote substantially the article that same day and admitted publicly that it was not vetted properly, the website published another article several days later that the plaintiffs allege is false and defamatory. Then, in 2014, the website published an **[*2]** article about the Delaware LLC that, in its first sentence, referenced and hyperlinked the 2012 articles, allegedly repeated and enhanced the original statements, and imputed those allegedly false and defamatory statements to the Delaware LLC. The corporation moved to dismiss the complaint for failure to state a claim. As to two of the plaintiffs, the corporation argues that their claims arising from the 2012 articles are time-barred under California law and the 2014 article is substantially true. The defendant asserts that none of the challenged statements are defamatory as to the third plaintiff as a matter of law.

For the reasons that follow, I deny the defendant's motion. Taking all well-pled allegations of fact as true and drawing all reasonable inferences in favor of the plaintiffs, the complaint pleads facts sufficient to support claims for defamation against the defendant by all three plaintiffs. As to the defendant's assertion that two of the plaintiffs' claims as to the 2012 articles are time-barred, I conclude the defendant has failed to carry its burden of establishing that affirmative defense. Similarly, as to claims arising from the 2014 articles, I conclude the defendant **[*3]** has failed to show that the plaintiffs cannot prove the statements were false and defamatory under any reasonably conceivable set of circumstances. Finally, I find it is reasonably conceivable that plaintiffs could prove the 2014 article republished the allegedly false and defamatory statements in the 2012 articles.

## I. BACKGROUND 1⤴

### A. The Parties

Plaintiff Stephen G. Perlman is the President and Chief Executive Officer of Plaintiffs Rearden LLC ("Rearden") and Artemis Networks LLC ("Artemis"). Perlman wholly owns Rearden, which wholly owns Artemis. Perlman is an entrepreneur and inventor who is responsible for several innovations in Internet, entertainment, multimedia, consumer electronics, and communications technologies and services.

Rearden, a technology development and incubation company, is a California LLC operating in several states and countries. In addition to founding and incubating Artemis, Rearden **[*4]** also founded and incubated OnLive, Inc.

Artemis is a Delaware LLC. Artemis developed pCell technology (formerly named "DIDO" technology), which allows wireless users to utilize full-speed wireless data rates regardless of how many users are sharing the same wireless data spectrum. Rather than offer services or products to consumers directly, Artemis offers pCell as a service to commercial customers, such as mobile wireless operators.

Defendant, Vox Media, Inc. ("Vox"), a Delaware corporation, owns and operates The Verge website ([www.theverge.com](www.theverge.com)), Polygon ([www.polygon.com](www.polygon.com)), Vox ([www.vox.com](www.vox.com)), and SB Nation ([www.sbnation.com](www.sbnation.com)). Vox holds itself out as one of the country's largest and fastest growing online publishers that owns and operates sites in distinct vertical categories, such as general news, sports, technology and culture, gaming, dining and nightlife, shopping and fashion, and design and real estate. Vox generates revenue through advertising on its websites and tends to charge advertisers more for generating a higher number of page views. Thus, Vox's goal is to generate as much interest and as many page views as possible.

### B. Facts

#### 1. Events at OnLive

Perlman, through Rearden, founded **[*5]** OnLive in 2003 as a California S-corporation. He served as its President, CEO, and Chairman. In 2007, OnLive merged out of the California S-corporation and into a Delaware C-corporation, retained its name, and began operating as a standalone entity engaged in the development of an online video game streaming service, a remote Windows desktop service, and a television video game console. OnLive marketed these services directly to consumers. In 2009, OnLive announced its "OnLive® Game Service" and "OnLive MicroConsole TV adapter" and began testing its remote Windows desktop service. OnLive launched the OnLive Game Service in the United States in June 2010 and in the United Kingdom in September 2011. OnLive introduced "OnLive® Desktop," the Windows desktop service, in early 2012. The OnLive Game Service and OnLive Desktop were regarded as major technology breakthroughs. They received wide press coverage and earned accolades and awards.

When OnLive was unable to raise enough capital to cover its operations overhead, it completed an Assignment for the Benefit of Creditors (the "ABC") on August 17, 2012. An assignee acquired all of OnLive's assets and assigned them to a successor entity, **[*6]** OL2, Inc. ("OL2"). OL2 hired approximately half of the former employees and continued doing business using the OnLive name. The Complaint is silent on what, if any, consideration was paid by OL2 for any of the assets it acquired.

Although Perlman did not join OL2 following the ABC, he remained Chairman of the corporate shell OnLive allegedly to ensure the OnLive Game

Service and OnLive Desktop, which were then owned by OL2, both continued to operate securely and without interruption through the transition to OL2. The Complaint alleges that, beginning with OnLive's launch, all of its services have remained secure and in continuous operation, including through the ABC, OL2 taking over operations, and to this day. Finally, OnLive itself was never dissolved and remains "active" and in good standing to this day, presumably as a corporate shell.

### 2. The 2012 Articles

#### a. August 19 Articles

On August 19, 2012, Vox, through The Verge, published an article titled, "OnLive's bankruptcy protection filing leaves former employees in the dark" (the "August 19 Article"). The Complaint alleges that the August 19 Article contained the following four falsehoods, which The Verge obtained from an unreliable source, Kevin Dent. **[*7]**  First, Perlman, while Chairman and CEO of OnLive, engaged in a scheme to profit from the ABC at the expense of OnLive and its employees. In particular, the article cited Dent's belief that Perlman, through Rearden, owned the patented technology used by OnLive, and, by transferring OnLive and keeping the patents, Perlman was able to restart OnLive with new investors without having to pay OnLive's staff their share of its equity. Second, OnLive's corporate investors went along with Perlman's scheme to profit from the ABC because they had their investments refunded. Third, in response to a truthful press release, the August 19 Article stated, "[Perlman] just lied to the press. . . . What journalist is ever going to trust OnLive again?" Fourth, the August 19 Article accused Perlman and his companies of engaging in criminal activity, stating, "[t]he whole structure of this seems like a Ponzi scheme where you have your original investor, Rearden Labs, and they're getting all of their money back and Perlman has now transferred some of his IP over." Plaintiff alleges that these statements were false and that Defendant knew or should have known they were false when it published them.

That same day, **[*8]**  representatives of OL2 spoke with an editor of The Verge about the falsehoods. Upon confirming with the U.S. Patent and Trademark Office's website that OnLive had owned the patents, rather than Perlman or Rearden, as the article had alleged, the editor agreed to remove the article. With the exception of the first four sentences, however, The Verge, through co-author Sean Hollister, rewrote the article in its entirety, including a one-sentence disclaimer at the bottom, saying, "Update: This story has been heavily modified from its original version, which contained inaccuracies." In fact, The Verge's then editor-in-chief, Joshua Topolsky, later characterized it as a "rewrite" in the following statement:

> Long story short, the piece that was originally published was posted last night without oversight from our senior editorial team, and contained quotes and facts which [sic] were not properly vetted. There was much to the story that *was* accurate, but it required what was essentially a rewrite once our senior staff went over it. . . .

> . . . [S]ome of the typical editing phases we have at the Verge weren't followed. Also, because they were on an overnight schedule and it was a weekend, much of our **[*9]** staff wasn't available (both Verge and Polygon). **2⤓**

Even though The Verge rewrote the original August 19 Article that same day, the Complaint alleges that the original article harmed Plaintiffs' reputations and various uncorrected references to the August 19 Article continue to cause such harm to this day. In the short period during which the uncorrected August 19 Article was available on The Verge's website, it attracted a large number of readers and comments and was shared widely and cited across the Internet and social media networks throughout the United States and internationally. On August 20, 2012, for example, the website Tencent QQ, a Chinese website with approximately 800 million active accounts, translated into Chinese and published portions of the original August 19 Article, including allegedly false allegations contained therein. In addition, on August 21, 2012, the website Techrights.org, which reports on a variety of issues relating to computing, including software patents, cited to the August 19 Article and quoted purportedly false allegations that Perlman and Rearden defrauded OnLive's staff and engaged in unethical business practices. Also, **[*10]** on August 19, 2012, Ron Amadeo, the Reviews Editor for Ars Technica, a highly regarded and influential technology web publication, cited to and quoted the August 19 Article on his Google+ account and added the following commentary: "Wow man. So give employees shares in Company A, funnel the value those employees create to a Company B, and then close Company A, fire all the employees, and leave them with nothing? #f***OnLive." **3⤓**

#### b. August 28 Article

Several days later, The Verge published a new piece on Perlman and OnLive, titled, "OnLive lost: how the paradise of streaming games was undone by one man's ego" (the "August 28 Article"). **4⤓** Even though Hollister, who rewrote the first article because of its inaccuracies and falsehoods, also wrote the August 28 Article, he chose not to fact-check it, saying in an email to OL2's Public Relations Director, Jane Anderson:

> Just wanted to give you a heads up that we're going to be running with a report that I don't think you'll like **[*11]** very much...

> I originally wanted to reach out to you and go through a process and maybe get some of Steve's perspective (which I'd still like, honestly!) but the team decided I'd done enough interviewing already and that the story was getting away from me.

> I just don't want you to read this and have an aneurysm or anything! You're far too nice for that! **5⤓**

Anderson replied within ten minutes offering to fact-check off the record, but Hollister did not respond.

The August 28 Article included a photograph of an OnLive stock certificate allegedly issued to an anonymous source whose name had been blacked out. The month and day of issue also were blacked out, but the year and number of shares printed on the certificate were altered to appear as if the certificate had come from a source within OnLive more senior than the anonymous source. Plaintiffs assert that this document is a forgery, detectable only through expert analysis, and that it was a deliberate attempt to lend credibility to the article's false allegations.

The Complaint **[*12]**  challenges the reliability of the anonymous sources used in the August 28 Article, alleging they were former OnLive

employees, current OL2 employees, and others who had read and believed the false and defamatory statements contained in the August 19 Article before it was revised. Further, Plaintiffs allege that Defendant knew or should have known that a primary anonymous source for the August 28 Article was highly—and obviously—unreliable, was not in a position at OnLive to have knowledge of the facts alleged in the article, and had a history of mental problems. According to the Complaint, these facts demonstrate Vox's motive to vindicate itself for the embarrassment it incurred as a result of the August 19 rewrite, publish a sensationalistic article that its author acknowledged might cause OL2's Public Relations Director to "have an aneurysm," and target Perlman and his companies—a topic that had proven popular among its readers the previous week.

The August 28 Article allegedly contains many false statements about Plaintiffs. These statements allegedly perpetuate Vox's false narrative about Perlman's scheme to profit from the ABC and relate to the treatment of OnLive employees following **[13]** the ABC, the number of OnLive Game Service's registered users, certain business transactions and potential offers to acquire OnLive, the operations and corporate governance of OnLive, and the ABC. Plaintiffs assert that the following represent a sample of the false, misleading, or inaccurate statements in the August 28 Article:

• "One manager told us that [Mr. Perlman] outvoted the board of directors on occasion."

• "...Perlman had seemingly found a legal loophole to extract that value and deprived them [OnLive's employees] of it in the process."

• "Perlman transferred all of OnLive's assets to a brand new company and took over as CEO, hiring back only a skeleton crew to keep the ship afloat."

• "[Perlman had] allegedly turned down offers from Sony, Dell and Adobe in the past. . . . If OnLive had sold to any of the bidders Perlman rejected, they [employees] claim, they might have been able to cash out [their stock]."

• "Two Fridays ago, Steve Perlman told the 200 employees of cloud gaming company OnLive that it was all his fault."

• "... the company ... only ever had 1,600 concurrent users of the service worldwide. Over the past week, OnLive has tried to distance itself from the 1,600 number, **[14]** but every former employee we spoke to in a position to know told us that it was true."

• "Former staffers told us Mass Effect 2 and Dragon Age: Origins were ready and would have launched on day one if it wasn't for Steve Perlman. . . . Perlman told EA he wanted exclusivity . . . When EA refused, Perlman ordered his staff to remove all EA titles from OnLive."

• "[Mr. Perlman] threatened to cease doing business with [Ubisoft]."

• "Employees convinced the new owner, Lauder Partners, to let Steve Perlman go."

• "When Nvidia offered possible solutions, though, employees told us the company decided not to negotiate."

• "Perlman also allegedly scared Valve off with a broad pitch when the company merely wanted to test the waters."

• "It didn't look like Perlman was interested in saving the firm." 6⤓

Finally, the August 28 Article contained embedded links to prior articles about Perlman, which he alleges cast him and his companies in a negative light. Specifically, Plaintiffs allege that "[t]his ready and deliberate access to all of defendant's articles on Mr. Perlman and his companies associate the defamatory statements from the original August 19 Article and the August 28 Article with Mr. **[15]** Perlman's other companies—specifically with Artemis."

**[16]** In the first fifteen minutes after The Verge published the August 28 Article, various journalists and editors associated with The Verge, Polygon, and Vox promoted the article as the "definitive account" based on "exhaustive proof," despite the fact that they had not fact-checked the article with OL2, using social media platforms such as Facebook, LinkedIn, Twitter, Tumblr, and Google+ to reach hundreds of thousands, if not millions, of readers. Readers quickly posted 300 comments (288 in the first two days) responding to the August 28 Article, and the article spread rapidly through social media networks. Soon the August 28 Article became a top Google search result for "OnLive," behind only OnLive's own corporate and service web pages and the OnLive Wikipedia page. In fact, two years later the August 28 Article was still the fourth Google result for "OnLive." Also, when Internet users use Google to search for "Steve Perlman," Google provides three "In-depth articles," which it identifies as "high-quality content to help [users] learn about or explore a subject;" the August 28 Article appears alongside two articles from www.businessweek.com and www.smithsonianmag.com, respectively, both highly credible publications. 7⤓

In addition, several websites cite, link to, or discuss the August 28 Article. GamesIndustry.biz links to the article, has a picture of Perlman, and summarizes false allegations, including the alleged number of peak subscribers and number of employees hired by OL2. MCV UK links to and summarizes the article, and VG 24/7 also links to and summarizes the article. Anderson's efforts to persuade the staffs of these respective websites **[17]** to remove references to the article were unsuccessful.

On March 10, 2014, the MIT Technology Review published an article about Perlman and pCell (the "MIT Article"). As originally published, the MIT Article linked to the August 28 Article when discussing Perlman's history at OnLive. Artemis contacted the author immediately to request that the link be removed based on its false content. After Artemis provided a few examples of the false allegations contained in the August 28 Article, the MIT Article's author allegedly determined that the August 28 Article was not a credible source and replaced the link with another to a Wall Street Journal article. By then, however, the MIT Technology Review already had translated the original MIT Article, including the link to the August 28 Article, into Spanish and posted it on its Spain website. It later was copied to another Spanish language news website, BBVA. Artemis attempted to have these Spanish versions corrected, but it did not succeed.

087

### 3. The 2014 Article

On February 19, 2014, pCell received prominent press at the top of the front page of the New York Times business section, in a live interview of Perlman on Bloomberg Television, and by Wired Magazine, among others. That same day, Vox published an article about **[*18]**  pCell and Perlman's operations with Artemis titled, "The man behind OnLive has a plan to fix your terrible cell phone service" (the "2014 Article") that generated a lot of traffic for its website, The Verge. Plaintiffs allege that because OnLive and OL2 sell remote Windows desktop and video game services to consumers, and Artemis sells wireless services to commercial mobile wireless operators, the 2014 Article catered to and reached a separate and distinct market and audience than the 2012 Articles had.

The 2014 Article opened with the following sentence, including a hyperlink to the August 28 Article, which Plaintiffs allege is defamatory: "Steve Perlman, the creator of the **defunct game-streaming service OnLive**, claims he has the answer to slow wireless service." **8⬇** Thus, before the wireless industry read anything in the 2014 Article about Artemis or pCell, it read that one of Perlman's previous services is now defunct. But, the Complaint alleges that far from being defunct, the OnLive Game Service has been active since its launch in 2010 and remained an active game-streaming service at least until Plaintiffs filed this action. Further, OnLive and OL2 continue to be Delaware corporations in good standing. **[*19]**  Thus, Plaintiffs argue, this first sentence is a new, unfavorable, and defamatory allegation that updates and continues the disparaging narrative of the 2012 Articles.

Specifically, the Complaint avers that "defunct" conveys that the OnLive services, and OnLive itself, no longer exist. **9⬇** As to OnLive's Game Service and Remote Desktop service, Plaintiffs assert that "defunct" tells readers that users' personal information (including messages, login information, Word and Excel files, etc.) is no longer accessible on an uninterrupted basis or secure from hacker attacks. As to OnLive itself, "defunct" purportedly tells readers the company no longer exists, which is confirmed by the August 28 Article and the allegedly defamatory statements therein impugning the competence, ethics, and governance of OnLive and Perlman.

Finally, Plaintiffs allege that the 2014 Article defames Artemis because it compares Artemis's pCell wireless service (which is the subject of the article) **[*20]**  with the "defunct" OnLive Game Service, suggesting to readers that the pCell wireless service will meet a similar end: "OnLive, which like pCell seemed impossibly ambitious when it first debuted, delivered on the initial promise, but the company failed to turn its ambition into profit." **10⬇**

### 4. Damage to Plaintiffs

Plaintiffs allege that Defendant's libelous articles caused them irreparable harm, including lost business opportunities and investments. In particular, Vox's false and misleading statements allegedly caused readers and potential investors to view Plaintiffs' businesses as non-viable, dishonest, and non-reputable and to question Perlman's competency in managing a well-funded start-up. These questions related to subjects such as whether Perlman will turn down acquisition offers that will result in investor liquidity, whether Perlman will override board decisions, and whether Perlman will be able to attract top-tier talent to work for him given the false allegations of fiduciary misconduct and self-dealing. Plaintiffs provide the following two examples of the harm they allegedly have suffered.

First, a potential major foreign investor in Artemis stated that it was impressed **[*21]**  with Artemis's technology and business prospects after conducting due diligence visits and intended to invest $100 million in Artemis and deploy Artemis's technology in several countries through mobile operators that the investor controlled. On a later visit, however, the investor stated, in front of Artemis's executive staff, that a foreign business associate had referred the investor to the August 28 Article and its allegations had raised a number of serious concerns about Perlman. Despite efforts by Perlman and other former OnLive employees then working at Artemis to explain that the August 28 Article's allegations were false, the investor declined to invest in or deploy the Artemis technology.

Second, a major U.S. venture capital firm expressed an intention to invest $100 million in Artemis after having conducted extensive technical and business due diligence. The entire partnership, consisting of more than a dozen partners, traveled to Artemis's office for a business presentation and demonstration of Artemis's technology. At the end of the meeting, one partner remarked that, based on what the August 28 Article revealed about Perlman, he did not think Perlman would be able to attract **[*22]**  the talent needed to build up the company. Perlman explained that the August 28 Article was false and noted that top OnLive employees were working at Artemis and that Artemis had received hundreds of top-talent resumes as evidence of his ability to attract top talent. The former OnLive employees then working for Artemis also confirmed the falsity of the August 28 Article and vouched for Perlman.

As the meeting continued, allegation after allegation from the August 28 Article was raised before the partnership. Defending against so many allegations transformed what was meant to be a closing meeting for a $100 million investment in Artemis's breakthrough wireless technology into an attempt to explain a long list of false allegations of fiduciary misconduct that never occurred. Ultimately, the firm declined to invest in Artemis based on concerns arising from the August 28 Article, despite the firm's confidence in the value of the technology, the business, and Perlman's track record.

Plaintiffs allege, and I consider it reasonable to infer, that the decision to invest tens or hundreds of millions of dollars in a technology start-up like Artemis depends heavily on Perlman's reputation. Before **[*23]**  publication of Vox's libelous articles, Perlman had raised funding at these levels for prior start-ups with weaker prospects than Artemis and in worse economies, including during the 2002 and 2008 recessions. Plaintiffs aver, however, that the allegedly libelous articles paint a negative picture of Perlman and undermined his ability to raise funding for Artemis's breakthrough wireless technology even at a time of demand for its benefits.

### C. Procedural History

Plaintiffs first filed this defamation action on August 18, 2014, and filed a Verified First Amended Complaint on September 24, 2014. On

088

October 17, 2014, Vox moved to dismiss. Plaintiffs moved to amend their complaint further on December 16, 2014. The Court granted the unopposed motion to amend by Order dated December 23, 2014. On December 24, Plaintiffs filed their Verified Second Amended Complaint, which is the operative complaint and seeks damages and injunctive relief in connection with allegedly defamatory statements made in three articles published by Vox's website, The Verge. Count I pleads a cause of action for defamation based on the 2012 Articles and the 2014 Article. Count II seeks a permanent and mandatory injunction to remedy allegedly continuing harm to **[*24]** Plaintiffs' reputations, businesses, and future business endeavors arising from the defamatory articles by declaring that the articles contain false and defamatory statements about Plaintiffs and requiring Vox to: (1) remove all libelous articles and related hyperlinks from any of its websites; and (2) publish and promote a retraction of the articles.

On January 15, 2015, Vox moved to dismiss the Verified Second Amended Complaint for failure to state a claim as a matter of law. After full briefing on that motion, I heard oral argument on it on June 10, 2015.

### D. Parties' Contentions

Vox contends that all claims by Artemis must be dismissed due to the lack of any defamatory content in any of the articles as to Artemis. Vox contends that the 2012 Articles do not mention Artemis and that the 2014 Article states only straightforward facts about Artemis without attributing any defamatory meaning to Artemis. Vox further argues that all claims by Plaintiffs Perlman and Rearden must be dismissed on an article-by-article basis. First, it asserts that Perlman's and Rearden's claims as to the 2012 Articles are time-barred by California's one-year statute of limitations and the 2014 Article did not **[*25]** "republish" the 2012 Articles. Second, according to Vox, Perlman's and Rearden's claims as to the 2014 Article fail because the statement pursued, that OnLive is "defunct," is not defamatory as a matter of law under the substantial truth doctrine.

In opposition to Defendant's motion to dismiss, Plaintiffs contend that the 2014 Article republished the 2012 Articles, thereby restarting the statute of limitations as to the claims by all Plaintiffs. In that regard, Plaintiffs assert that the 2014 Article both enhanced or revised the 2012 Articles and directed the defamatory 2012 Articles to a new audience. Plaintiffs further argue that the defamatory statements about Perlman in the 2012 Articles are also defamatory as to Artemis because Perlman is identified so closely with Artemis that statements defaming him defame Artemis. Finally, Plaintiffs contend that Delaware's two-year statute of limitations should apply because Delaware has the most significant relationship to the parties and their claims. Alternatively, they aver that, even if California's one-year statute of limitation applies, this Court's equity jurisdiction requires application of a laches analysis under which Plaintiffs' delay in asserting their claims **[*26]** was neither unreasonable nor prejudicial to Defendant.

## II. ANALYSIS

### A. Standard of Review

*HN1*⚓ Pursuant to Rule 12(b)(6), this Court may grant a motion to dismiss for failure to state a claim if a complaint does not assert sufficient facts that, if proven, would entitle the plaintiff to relief. As reaffirmed by the Supreme Court, "the governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'" `11` That is, when considering such a motion, a court must "accept all well-pleaded factual allegations in the Complaint as true, . . . draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof." `12`

*HN2*⚓ This reasonable "conceivability" standard asks whether there is a "possibility" of recovery. `13` If the well-pled factual allegations of the complaint would entitle the plaintiff to relief under a reasonably conceivable set of circumstances, the court must deny the motion to dismiss. `14` The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the **[*27]** non-moving party." `15` Moreover, failure to plead an element of a claim precludes entitlement to relief and, therefore, is grounds to dismiss that claim. `16`

*HN3*⚓ Generally, the Court will consider only the pleadings on a motion to dismiss under Court of Chancery Rule 12(b)(6). "A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents." `17` Additionally, the Court may take judicial notice of a fact if that fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." `18`

### B. The 2012 Articles

#### 1. Are Perlman's and Rearden's claims as to the 2012 Articles time-barred?

Defendant argues that this Court must follow the statute of limitations in this case and dismiss Perlman's and Rearden's claims arising from the 2012 Articles as untimely. `19` Relying on *Shearin v. E.F. Hutton Group, Inc.*, Defendant argues that "[a] request for injunctive relief can get a defamation action into Chancery in the first place, but it does not alone justify the court in not applying the same limitations provision as would apply were the facts brought before the Superior Court." `20` For the following reasons, I decline to apply the statute of limitations and conduct a laches analysis instead.

Two Delaware Supreme Court cases, *Reid v. Spazio* `21` and *IAC/InterActiveCorp v. O'Brien*, `22` are instructive on this issue. In *Reid*, *HN5*⚓ the Supreme Court said, "[u]nder ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after, the time

fixed by the analogous **[\*29]** statute of limitations at law; but, if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer period than that fixed by the statute, the [court] will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it." **23⚖** "Although both laches and statutes of limitation operate to time-bar suits," the Supreme Court in *Reid* explained, "the limitations of actions applicable in a court of law are not controlling in equity. A court of equity moves upon considerations of conscience, good faith, and reasonable diligence." **24⚖**

The Delaware Supreme Court reaffirmed this analysis two years later in *O'Brien*. There, the appellant-defendant argued that the Court of Chancery had erred when it found the appellee-plaintiff's indemnification claim, a contract claim at law, to be timely by applying laches instead of the relevant three-year statute of limitations. The Supreme Court affirmed the Court of Chancery's determination that *O'Brien* was one **[\*30]** of the few cases where the analogous statute of limitations should not be applied because of unusual conditions or extraordinary circumstances. **25⚖** The Supreme Court further affirmed that in determining whether the facts of the case constituted unusual conditions or extraordinary circumstances, the Court of Chancery exercised its discretion appropriately in considering all relevant factors, as discussed in greater detail *infra*. **26⚖** Thus, I conclude that, notwithstanding any contrary language in *Shearin*, this Court may conduct a laches analysis here in accordance with *Reid* and *O'Brien* and decide Defendant's timeliness arguments on that basis.

To determine whether Perlman's and Rearden's claims as to the 2012 Articles are time-barred, I first must identify the analogous statute of limitations. To determine the appropriate limitations period for defamation claims, however, I must decide which state's substantive law applies. In conducting a laches analysis, I then determine whether, even if Plaintiffs' claims were brought after the analogous limitations period expired, this is one of those few occasions where the analogous statute of limitations should not be controlling because of "unusual **[\*31]** conditions or extraordinary circumstances."

### a. Choice of law

Defendant argues that this Court must apply California substantive law to Perlman's and Rearden's defamation claims. *HN6*⚖ When determining which state's substantive laws apply, Delaware courts generally rely on the Restatement (Second) of Conflict of Laws (the "Restatement 2d of Conflicts"). **27⚖** Under the Restatement 2d of Conflicts, allegedly defamatory statements published over the Internet are treated as "multistate" or "aggregate" communications. **28⚖** Thus, any claim arising from an Internet communication is governed by the law of the state with the "most significant relationship" to the claim. **29⚖** In determining the most significant relationship, the Court evaluates the relative importance of: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered." **30⚖**

*HN7*⚖ "The state where the injured party is domiciled (for natural persons) or has its principal place of business (for corporations or other legal persons . . .) will usually be the state of most significant relationship for claims of defamation by an aggregate communication that was published in that state." **31⚖** This is because "defamation produces a special kind of injury that has its principal effect among one's friends, acquaintances, neighbors and business associates in the place of one's residence." **32⚖** Accordingly, under the Restatement 2d of Conflicts and Delaware law, the local law of the state of the plaintiff's domicile applies "unless, with respect to the particular issue, one of the other states has a more significant relationship to the occurrence and the parties." **33⚖**

Plaintiffs argue that, because the defamatory allegations contained in the 2012 Articles relate exclusively and directly to Perlman's conduct as a fiduciary of a Delaware corporation, the Complaint focuses on activity of Plaintiffs' that is located principally in Delaware and, thus, **[\*33]** Delaware substantive law should apply. Plaintiffs also argue that Delaware has the most significant relationship to the parties. Vox is a Delaware corporation that published the defamatory articles about Perlman, a Delaware fiduciary, in his capacity as the Chairman and CEO of OnLive, a Delaware company. Artemis also is a company formed under the laws of Delaware. Rearden is a California company, but the vast majority of the companies it incubated and controls are formed under the laws of Delaware. As such, Plaintiffs argue that they are better known in Delaware than in California regarding Perlman's actions as an officer and director and Artemis's and Rearden's business activities. These facts, Plaintiffs contend, support the conclusion that Delaware is the state in which the allegedly defamatory communication caused them the greatest injury to their reputations.

I disagree. The facts of this case are similar to those at issue in *Aoki v. Benihana, Inc.* **34⚖** There, the defendant argued that Florida had the most significant relationship pursuant to Sections 6 and 145 of the Restatement 2d of Conflicts based on the issue of "whether a press release, written and issued in Florida by a Florida headquartered corporation, accurately reflects **[\*34]** allegations made in a Florida [l]awsuit by that Florida-headquartered corporation, against one Florida defendant, and involving the actions of all defendants in Florida, causing injury of that Florida-headquartered corporation in Florida." **35⚖** Despite the *Aoki* defendant's argument that the harm at issue occurred in Florida and arose out of a Florida lawsuit involving Florida parties, the court gave the greatest weight to the residence of the injured parties and applied New York law. **36⚖**

Here, Perlman argues that he occupies residences in several states, including Florida and California, and conducts his business operations throughout the United States and globally. Public patent filings, however, indicate Perlman's domicile is California. Because Perlman elected not to provide his permanent residence, the situs of his driver's license, or other facts supporting a non-California domicile, I conclude that he is a California resident. I reach the same conclusion as to Rearden, whose patent applications indicate its headquarters are in San Francisco, California. Thus, California's substantive law applies as to Perlman's and Rearden's claims arising from the 2012 Articles.

*HN8*⚖ California has a one-year statute of limitations for defamation claims. **37⚖** Delaware has a two-year statute of limitations for defamation claims. **38⚖** Given this conflict between California's and Delaware's limitations periods, I look to Delaware's "borrowing statute" to determine which of the two limitations periods applies. That statute provides:

*HN9* Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of *whichever* **[*36]** *is shorter*, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action. Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply. **39**⬇

Thus, here, where non-residents Perlman and Rearden bring defamation claims that arose in California, Delaware's borrowing statute mandates that the Court select the "shorter" of the two potentially-applicable limitations periods—*i.e.*, California's one-year statute of limitations.

### b. Laches and the *O'Brien* factors

*HN10*⬆ Laches is an equitable defense based on the maxim that "equity aids the vigilant, not those who slumber on their rights." **40**⬇ Laches is defined generally as an unreasonable delay in enforcing a right that causes prejudice to the defendant. **41**⬇ Therefore, "laches generally requires the establishment of three things: first, knowledge by the claimant; second, unreasonable delay in bringing the claim, and third, resulting prejudice to the defendant." **42**⬇ The touchstone of a laches inquiry **[*37]** is whether inexcusable delay led to an adverse change in the condition or relations of the properties or parties. **43**⬇ Nevertheless, even though statutes of limitations are not controlling in equity, the Court of Chancery places great weight on analogous limitations periods in determining whether a plaintiff's claim should be deemed barred by laches. **44**⬇

*HN11*⬆ Because the Court generally is limited to the facts appearing on the face of the pleadings in ruling on a motion to dismiss, affirmative defenses, such as laches, are not ordinarily well-suited for disposition on such a motion. **45**⬇ Thus, unless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based upon an affirmative defense is inappropriate. Here, facts appearing on the face of the Complaint, taken together with all reasonable inferences having been drawn in Plaintiffs' favor, indicate that Plaintiffs had knowledge of an enforceable right to sue Vox for defamation arising from the 2012 Articles, but nonetheless delayed enforcing that right for two years. To receive the benefit of a laches defense at this **[*38]** preliminary stage, however, Defendant carries the burden of establishing not only prejudice, but also that Plaintiffs can prove no set of facts to avoid Defendant's affirmative defense. Turning to the *O'Brien* factors in that context, I conclude Defendant has not met its burden.

In *O'Brien*, *HN12*⬆ the Supreme Court affirmed this Court's consideration of the following factors to determine whether "unusual conditions or exceptional circumstances" prevent application of the analogous statute of limitations: (1) whether the plaintiff had been pursuing his claim, through litigation or otherwise, before the statute of limitations expired; (2) whether the delay in filing suit was attributable to a material and unforeseeable change in the parties' personal or financial circumstances; (3) whether the delay in filing suit was attributable to a legal determination in another jurisdiction; (4) the extent to which the defendant was aware of, or participated in, any prior proceedings; and (5) whether, at the time the litigation was filed, there was a bona fide dispute as to the validity of the claim. **46**⬇

Plaintiffs argue that this action was timely for three reasons. First, they contend that the allegations **[*39]** in the Complaint demonstrate that Plaintiffs responded to the 2012 Articles by exercising self-help rather than running to the courthouse. In other words, Plaintiffs spent time, effort, and money calling websites around the world that were republishing the 2012 Articles, bringing to their attention the defamation therein, and requesting that they remove the links. Plaintiffs argue that this Court, a court of equity, should encourage that form of self-help rather than fault it. Second, and relatedly, Plaintiffs argue that it was not until it began to lose $100 million investors after Defendant published the 2014 Article that Plaintiffs experienced and understood the full extent of the impact of the libelous publications on their reputations and business prospects. Finally, Plaintiffs argue that Defendant has not—and cannot—meet its burden in asserting a laches defense on a motion to dismiss. **47**⬇ For this reason alone, Plaintiffs argue that Vox's laches defense fails.

Defendant protests that Plaintiffs cite no cases for the proposition that an untimely defamation cause of action can be delayed until a plaintiff is aware of the "full **[*40]** extent" of the harm. *HN13*⬆ On a motion to dismiss, however, Defendant carries the burden of persuasion when asserting a laches defense. **48**⬇ Here, Vox has not convinced me that there are no reasonably conceivable circumstances under which Plaintiffs could overcome Defendant's laches defense. Under *O'Brien*, I must exercise my discretion in considering all factors relevant to determining whether "unusual conditions or exceptional circumstances" prevent application of the analogous statute of limitations. I conclude it is reasonably conceivable that Plaintiffs did pursue their claim diligently and in good faith before the statute of limitations expired, even though they did so through self-help rather than litigation. Similarly, it is reasonably conceivable that Defendant was aware of Plaintiffs' extra-judicial efforts to remedy the harm to their reputations. Finally, and most importantly, Vox has not even argued that Plaintiffs' delay resulted in prejudice to it, let alone persuaded me that Plaintiffs could not rebut such an allegation under any reasonably conceivable circumstances.

Because Defendant's laches defense is before me on a motion to dismiss under Rule 12(b)(6), Vox carries a heavy burden of **[*41]** proof. Having considered the arguments of Plaintiffs and Defendant, I hold that Vox has not shown that it is entitled to dismissal of Perlman's and Rearden's claims arising from the 2012 Articles based on laches and, therefore, I decline to grant Defendant's motion.

### C. The 2014 Article

*HN14*⬆ To sustain a cause of action for defamation, Plaintiffs must plead five elements: (1) defamatory communication; (2) publication; (3) reference to each Plaintiff asserting a claim; (4) a third party's understanding of the communication's defamatory character; and (5) injury. **49**⬇ For purposes of this motion to dismiss, Defendant does not challenge whether the 2012 Articles were false and defamatory, but argues that Plaintiffs' pleadings as to the 2014 Article were insufficient. Two statements on the face of the 2014 Article are relevant. First, the statement referring to "Steve Perlman, the creator of the defunct game-streaming service OnLive," is directly at issue. The second statement, *i.e.*, "OnLive, which like pCell seemed impossibly ambitious when it first debuted, delivered on its initial promise, but the company failed to turn its ambition into profit . . . ," is relevant in that it gives context to the first statement. **[*42]**

The content of the 2012 Articles, however, is also relevant to whether Plaintiffs stated a claim as to the 2014 Article for two reasons. The words "defunct game-streaming service OnLive" constituted a hyperlink in the first sentence of the 2014 Article, which, when clicked, connected readers directly to the 2012 Articles. For Artemis, which argues that it was harmed by the 2014 Article's incorporation by reference of the false and defamatory statements in the 2012 Articles, the content of the 2012 Articles is relevant because it provides background and context to the statement at issue in the 2014 Article. And for Perlman and Rearden, whose claims I presume are timely as to the 2012 Articles, as discussed *supra*, the 2014 Article purportedly republished the 2012 Articles by enhancing the defamatory statements therein and presenting them to a new audience.

Defendant argues that Vox's reference to "Steve Perlman, the creator **[*43]** of the defunct game-streaming service OnLive," is not actionable defamation because it is substantially true. Defendant also contends that, under well-settled California law, the hyperlink in the 2014 Article was not a republication of the 2012 Articles. I discuss these arguments below.

## 1. Substantial truth

*HN15* Under Delaware and California law, substantial truth is an affirmative defense to defamation. 50 "The test in deciding whether an article is substantially true involves a consideration of whether the alleged libel was more damaging to plaintiff's reputation, in the mind of the average reader, than a truthful statement would have been. As part of this evaluation, courts will consider whether the 'gist' or 'sting' of the article was true." 51 On a motion to dismiss, however, Defendant retains the burden of proving that Plaintiffs cannot recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint. Thus, as stated above, unless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based upon an affirmative defense is inappropriate. Vox argues **[*44]** that this Court may consider its substantial truth defense on a motion to dismiss. I agree, but, for the following reasons, conclude that it is not clear from the face of the Complaint that Plaintiffs can prove no set of facts to avoid Vox's substantial truth defense.

Defendant has not established that Plaintiffs cannot prove the statements were false and defamatory under any reasonably conceivable set of circumstances susceptible of proof under the Complaint. *HN16* "A defamatory communication is one that tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." 52 "The meaning of a communication is that which the recipient correctly, or mistakenly **[*45]** but reasonably, understands that it was intended to express." 53 Here, Defendant argues that it is substantially true that the "game-streaming service OnLive" was "defunct" as alleged in the 2014 Article; Plaintiffs assert that the statement is false and defamatory.

*HN17* In Delaware and in California, whether a communication is false is a question of fact. 54 Based on the well-pled facts alleged in the Complaint and reasonable inferences drawn from them in favor of Plaintiffs, I conclude it is reasonably conceivable that Plaintiffs will be able to prove the statement at issue in the 2014 Article is false. Defendant disputes whether "defunct game-streaming service OnLive" refers to the game-streaming service or to OnLive, Inc., the company. According to the Complaint, however, neither of these interpretations are substantially true. The Complaint alleges that both the game-streaming service OnLive and the corporate entity OnLive are alive and well, *i.e.*, not defunct. 55 Any contrary argument that the statement, in isolation, is substantially true would present a question of fact, which I cannot decide on a motion to dismiss.

Defendant further **[*47]** asserts that the case law makes clear that context is paramount in assessing substantial truth and that content contained in links in the body of an allegedly defamatory article can provide that context. 56 As discussed in greater detail *infra*, however, the content contained in the links that Defendant urges me to consider does not help Defendant's case. Relying on the content of hyperlinks to establish the substantial truth of a statement practically requires incorporating by reference all of the allegedly defamatory statements in the 2012 Articles. In addition, the link to a New York Times article cited in the Complaint that states that "OnLive remains an active game-streaming service to this day" provides a sufficient basis to infer that Defendant's statement that the game-streaming service was defunct conceivably may have been false. Finally, although Defendant avers that the author's use of the term "defunct" in the 2014 Article was a reference to OnLive, Inc., Plaintiffs have disputed this and thereby raised an issue of fact. 57 Thus, whether the "defunct" statement was defamatory cannot be resolved on a motion to dismiss.

## 2. Artemis

Defendant argues next that Plaintiffs do not, and cannot, allege any defamation as to Artemis. Specifically, the 2012 Articles do not mention Artemis, so they cannot be defamatory as to Artemis. Thus, Vox reasons by extension that the "linking back" in the 2014 Article is literally a link to a "dead end." For the following reasons, I disagree.

*HN19* "[A] corporation is defamed by defamatory communications of its officers and directors only **[*49]** if those statements 'also reflect discredit upon the method by which the corporation conducts its business.'" 58 Here, I understand that the alleged defamation of Artemis all stems from the 2014 Article and its link to the 2012 Articles. Specifically, the alleged defamation is based on: (1) the statement, "Steve Perlman, the creator of the defunct game-streaming service OnLive"; (2) the defamatory content of the 2012 Articles incorporated by reference through the hyperlink; and (3) the statement, "OnLive, which like pCell seemed impossibly ambitious when it first debuted, delivered on its initial promise, but the company failed to turn its ambition into profit . . . ." These statements purportedly defame Artemis by reasserting defamation from the 2012 Articles, adding further defamatory allegations from 2014, and associating them with pCell and Artemis. According to the Complaint:

The February 19 [2014] Article is defamatory to Artemis by comparing the pCell wireless service with the OnLive Game Service and suggesting that the pCell wireless service will become "defunct" like OnLive. The link to the August 28 [2012] Article is in the very first sentence of the February 19 Article in bold. **[*50]** That Artemis will suffer the same fate as OnLive is the explicit

proposition of the February 19 Article given Mr. Perlman's position as President and CEO of Artemis coupled with a prominent link that disparages Mr. Perlman's tenure as CEO of OnLive. The February 19 Article further disparages Artemis, Mr. Perlman as Artemis's founder and CEO, and Rearden as the incubator of Artemis by alleging that the alleged past problems . . . at OnLive are suggestive of future problems at Artemis and any other Perlman or Rearden venture. **59** ⬇

I conclude it is at least reasonably conceivable that Plaintiffs will be able to prove that the typical reader of the 2014 Article will associate Artemis with Perlman and Rearden and will understand that they should not invest with Artemis because of Perlman's history at OnLive as referenced by the hyperlink and set forth in the 2012 Articles. That is, it is reasonably conceivable that Plaintiffs could prove that the 2014 Article and its reference through the hyperlink in the first sentence of the Article to the defamatory allegations against Perlman in the 2012 Articles did reflect discredit upon the method by which Artemis conducts its business.

The facts of *Q-Tone* **[*51]** *Broadcasting Co. v. Musicradio of Maryland* are analogous. **60** ⬇ There, an executive working for the plaintiff radio station's rival remarked to the owner of an advertising agency that advertised with the plaintiff that the plaintiff's "leading male executive was a homosexual who might be likely to 'put the move' on the client." **61** ⬇ As the court later explained, "the allegations were deemed to discredit the plaintiff corporation in the method by which it conducted its business, thereby making the statements actionable by the corporation." **62** ⬇ Thus, although the defamatory statement that the leading executive had homosexual "designs" towards the owner of the advertising agency did not implicate specifically the plaintiff radio station, the court found that the remark defamed the radio station as a business because the comments maligned the leading male executive in his professional conduct, which in turn maligned the company in its business of operating a radio station.

Here, Plaintiffs alleged that the 2012 Articles and the 2014 Article defamed Perlman in his professional capacity in relation to his conduct as an officer and director of a corporation. Specifically, the 2012 Articles allege Perlman used his position as a fiduciary **[*52]** of OnLive to cheat employees and other stockholders out of the value of their stock, misappropriated patents, personally benefited from an assignment for the benefit of creditors, mistreated employees, mistreated game publishers such as EA and Ubisoft, and incompetently turned down offers to sell OnLive to Sony, Dell, or Adobe. **63** ⬇ These allegations discredit Perlman and, perhaps, to the extent it is mentioned, Rearden as well. I do not understand Plaintiffs to allege that the 2012 Articles on their own impugn the reputation of Artemis. The 2014 Article, however, which links directly to the 2012 Articles, conceivably does discredit the way Artemis does business based on Perlman's close association with Artemis in that it suggests that similar misconduct will occur at Artemis. Thus, it is reasonably conceivable that Plaintiffs will be able to prove that the defamatory statements in the 2014 Article are about Artemis in the sense that they reflect discredit on the way Artemis does business. **64** ⬇

Before considering whether the 2014 Article was defamatory as to Perlman and Rearden, I address briefly Plaintiffs' argument, as clarified at oral argument, that Artemis's claim is tied to the defamation of Perlman through the republication of the 2012 Articles in connection with the 2014 Article. As discussed in greater detail below, republication is a legal term of art providing a specific exception to the single publication rule. Here, as discussed above, I construe Plaintiffs' argument to be that the 2014 Article defamed and irreparably harmed Artemis based on the context of **[*54]** the article, the content of the 2012 Articles referenced through the hyperlink, and the discredit arising from Vox's effort to extend the defamatory allegations against Perlman to Artemis. **65** ⬇

### 3. Perlman and Rearden

*HN20* ⬆ Under California law, the single-publication rule is codified as follows: "No person shall have more than one cause of action for damages for libel . . . founded upon any single publication . . . , such as any one issue of a newspaper or book or magazine . . . . Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions." **66** ⬇ "Notwithstanding the single-publication rule, a *new edition* or new *issue* of a newspaper or book still constitutes a new publication, giving rise to a new and separate cause of action and a new accrual date for the purpose of the statute of limitations." **67** ⬇ Thus, under California law, Perlman and Rearden have a separate cause of action if the 2014 Article republished the 2012 Articles.

### a. Republication

*HN21* ⬆ In California, "[t]he [single-publication rule] restricts **[*55]** to a single cause of action all damages founded upon a single publication. A single publication is distinguished from a republication. If a defendant republishes material, the protection under the [single-publication rule] does not apply." **68** ⬇ "The single publication rule applies to Internet publication regardless of how many people actually see it." **69** ⬇ California appears to consider the following factors in determining whether a republication occurred: (1) whether the original publication was modified; and (2) whether the republication was directed to a new, different audience. **70** ⬇ As applied to Internet publications, "under California law, a statement on a website is not republished unless the statement itself is substantively altered or added to, or the website is directed to a new audience." **71** ⬇

### b. Hyperlink

As an initial matter, the hyperlink alone does not resolve whether the 2014 Article republished the 2012 Articles. In 2007, a California court found *HN22* ⬆ "no authority holding that providing links to statements already published on the Web, without more, republishes those statements. Rather, the court finds that such linking is more reasonably akin to **[*56]** the publication of additional copies of the same edition of a book, which is a situation that does not trigger the republication rule." **72** ⬇ Several other courts have concluded that a hyperlink, alone, does not constitute a republication:

[C]ourts addressing the doctrine in the context of Internet publications generally distinguish between linking, adding unrelated

content, or making technical changes to an already published website (which they hold is not republication), and adding substantive material related to the allegedly defamatory material to an already published website (which they hold is republication). **73**⬇

Only one California case addresses hyperlinks directly, and it does so only summarily. **74**⬇ Two other cases, *Salyer v. Southern Poverty Law Center, Inc.* **75**⬇ and *In re Philadelphia Newspapers, LLC,* **76**⬇ provide more useful guidance. In *Salyer*, the plaintiff argued that when the defendant published an article on a new section of its website in 2008 linking back to an allegedly defamatory 2006 article, the 2008 article republished the 2006 article because the purpose of the hyperlink was to entice new readers to click on the link and be directed to the article. **77**⬇ The plaintiff in *Salyer*, however, **[*57]** did not contend that the new article, which itself made no specific mention of the plaintiff, was defamatory, and the court observed that "it would be a different case had the . . . 2008 article restated the defamatory remarks about Plaintiff. In such a case, the . . . 2008 article itself could be the basis for Plaintiff's defamation claim." **78**⬇ Thus, the court concluded that **HN23**🔗 "the critical feature of republication is, again, that the original text of the article was changed or the contents of the article presented directly to a new audience." **79**⬇

Similarly, the plaintiffs in *In re Philadelphia Newspapers* argued that when the defendants published an article that linked to and endorsed a previously published article containing allegedly defamatory, albeit time-barred, statements, the link and reference in the new article republished the old article. **80**⬇ There, however, the court agreed with the reasoning of cases like *Salyer* and *Sundance* that neither a hyperlink to an unchanged article, nor a mere reference, without more, is a republication. **81**⬇ Thus, the court concluded that the link and reference did not amount to the restatement or alteration of the allegedly **[*58]** defamatory material necessary for a republication. **82**⬇

As these cases indicate, even the hyperlink in the 2014 Article and the reference to the 2012 Articles, taken together, may not be sufficient to amount to a republication of the defamatory content of the 2012 Articles. Here, however, Plaintiffs allege that the 2014 Article not only restated and enhanced the allegedly defamatory material, but also directed it to a new and different audience.

### c. Enhancement, modification, or new audience

The familiar, plaintiff-friendly standard of review on a motion to dismiss requires that I conclude Plaintiffs adequately have pled that the 2014 Article enhanced or modified the purportedly defamatory statements in the 2012 Articles. The 2012 Articles accused Perlman, as the CEO and principal shareholder of OnLive, Inc., of scheming to profit from the ABC, mistreating OnLive employees following the ABC, mishandling business transactions and potential offers to acquire OnLive, and otherwise operating and governing OnLive poorly. The Complaint asserts that the 2014 Article goes further by suggesting that Perlman not only exploited OnLive's stockholders, but also victimized its customer base. **83**⬇ Thus, **[*59]** given Perlman's and Rearden's close association with Artemis and the frequency with which both were mentioned in the 2012 Articles, I cannot say on a motion to dismiss that the statement in the 2014 Article, considered in context provided by the content referenced by the hyperlink, could not conceivably have gone beyond merely restating defamatory allegations, and also enhanced and modified those statements. In other words, Defendant has not shown that Plaintiffs cannot prove under any reasonably conceivable circumstances that the 2014 Article enhanced or modified the defamatory allegations first published in the 2012 Articles.

These facts are distinguishable from those of a recent California case, *Kinney v. Barnes*. **84**⬇ There, the respondent's claims, based on appropriation of name or likeness claims subject to a two-year statute of limitations, were held to be within California's statutory single-publication rule. **85**⬇ The appellant issued a press release profiling the respondent when the appellant first hired the respondent, **[*60]** but did not remove the profile from the Internet for years after the respondent was terminated. The respondent argued that the appellant modified, and thus republished, the profile at a later date, but the court rejected this argument, concluding that the appellant's removal of the date on the profile and relocation of it to the archives section of its website were not sufficient to constitute a republication of the article. **86**⬇ In this case, the statement at issue in the 2014 Article modified the defamatory allegations published in the 2012 Articles, but, unlike the insignificant changes alleged in *Kinney*, those at issue here arguably were both substantive and independently false and defamatory.

I also find sufficiently persuasive to survive **[*61]** a motion to dismiss Plaintiffs' argument that the 2014 Article directed the defamation

Document:                                    Perlman v. Vox Media Inc., 2015 Del. Ch. LEXIS 248                          Actions⌄

operators interested in commercial wireless technology—*i.e.*, Artemis's pCell technology featured in the 2014 Article—are unlikely to be familiar with, much less interested in, the details of the consumer video game industry as described in the 2012 Articles. Plaintiffs also allege, and I consider it reasonable to infer, that Defendant knew an article about pCell would generate high traffic on its website because pCell had received news coverage by the New York Times, Bloomberg Television, and Wired Magazine, and intentionally directed readers to the sensationalistic August 28 Article by including a hyperlink in the 2014 Article's very first sentence, which Plaintiffs allege is itself false and defamatory. **87**⬇

The earliest and leading case on Internet republication, upon which California courts consistently rely, **[*62]** supports this conclusion. **88**⬇ In *Firth v. State*, the defendant issued a government report, which was critical of the plaintiff's managerial style and completion of work responsibilities. Another state agency then summarized the report on its Internet site and provided a hyperlink to the full text of the report. **89**⬇ The court rejected the plaintiff's first argument that each new "hit" or viewing of the report should be considered a new publication that retriggers the statute of limitations. **90**⬇ The court also rejected the plaintiff's alternative argument that the defendant should be deemed to have republished the report when it later added an unrelated report on the same Internet site, but that discussion is relevant here. Although analyzing the modification issue, the court focused its **HN24**🔗 discussion on the new audience issue, stating: "The justification for this [republication] exception to the single publication rule is that the subsequent publication is intended to and actually reaches a new audience." **91**⬇ The court further reasoned that "the republication exception has no application at all to the addition of unrelated material on a Web site, for it is not reasonably inferable that the addition was **[*63]** made either with the intent or the result of communicating the earlier and separate defamatory information to a new audience." **92**⬇

By contrast, taking the well-pled allegations in the Complaint as true and drawing all reasonable inferences in favor of Plaintiffs, I conclude that

it is reasonably inferable: (1) that the statement at issue in the 2014 Article modified and enhanced the earlier and separate defamatory information referenced by the hyperlink; and (2) that Defendant intended to communicate that and the prior statements to a new audience.

Therefore, I conclude it is reasonably conceivable that Plaintiffs could prove the 2014 Article republished the defamatory statements contained in the 2012 Articles. In so concluding, I recognize that the single publication rule applies to the online domain. **93** Nevertheless, I have determined that Defendant has **[*64]** failed to carry its burden on a Rule 12(b)(6) motion to dismiss of demonstrating that Plaintiffs could not prove, under any reasonably conceivable set of circumstances, that the 2014 Article enhanced, modified, or directed to a new audience the 2012 Articles. It may be that the 2014 Article did not enhance or modify the allegedly defamatory statements in the 2012 Articles or direct those statements to a new audience, but those questions will have to await further development of the record in this case.

### III. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the Complaint is denied.

**IT IS SO ORDERED**.



**Footnotes**

**1** The facts are drawn from the well-pled allegations of Plaintiff's Verified Second Amended Complaint (the "Complaint" or "Compl."), which are assumed true for purposes of the defendant's motion to dismiss, as well as documents integral to the Complaint or incorporated by reference therein.

**2** Compl. ¶ 41 (emphasis original).

**3** Compl. ¶ 83 (asterisks added). Amadeo posts regularly about technology-related topics on his Google+ account, which was followed by over 25,000 people and viewed over 14 million times as of the commencement of this action.

**4** Sean Hollister, *OnLive Lost: How the Paradise of Streaming Games Was Undone by One Man's Ego*, THE VERGE (Aug. 28, 2012), http://www.theverge.com/2012/8/28/3274739/onlive-report (last visited Sept. 24, 2015).

**5** Compl. ¶ 46.

**6** Compl. ¶¶ 56a-t.

**7** For an analysis of the impact of Google's "In-depth article" feature on a subject's reputation, Plaintiffs cite David Goldman and Richard Dukas, *How Google's 'In-Depth Articles' feature could affect PR*, PR Daily (Aug. 30, 2013), http://www.prdaily.com/Main/Articles/How_Googles_InDepth_Articles_feature_could_affect_15110.aspx ("From our study of consumer-facing Fortune 500 companies, 65 percent of the newly designated in-depth articles were unfavorable . . . . These articles can have a persistent debilitating effect on a company. . . . Given that Google's algorithm has selected these stories as in-depth articles, these unfavorable results are unlikely to be displaced by tomorrows news. Increased activity on the corporate Twitter, Facebook, or Flickr accounts will not displace this content either.").

**8** Compl. ¶ 68 (bold and underlining in original). The bold, underlined text is a hyperlink that, when clicked, forwards readers to the August 28 Article, which itself contains a hyperlink to the August 19 Article.

**9** Compl. ¶¶ 70-71.

**10** Compl. ¶ 72.

**11** *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (footnote omitted).

**12** *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

**13** *Id.* at 537 & n.13.

**14** *Id.* at 536.

**15** *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

**16** *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000) (Steele, V.C., by designation).

**17** *Allen v. Encore Energy P'rs*, 72 A.3d 93, 96 n.2 (Del. 2013); *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 (Del. 1995) (observing that courts consider the relevant publication in libel cases on a Rule 12(b)(6) motion without converting the motion to one for summary judgment).

**18** *Fawcett v. State*, 697 A.2d 385, 388 (Del. 1997) (citing D.R.E. 201(b)). **HN4** "On a motion to dismiss the Court is free to take judicial notice of certain acts that are of public record if they are provided to the Court by the party seeking to have them considered." **[*28]** *Shellburne Civic Ass'n, Inc. v. Brandywine Sch. Dist.*, 2006 Del. Ch. LEXIS 168, 2006 WL 2588959, at *6 n.3 (Del. Ch. Sept. 1, 2006) (quoting *In re Wheelabrator Techs., Inc. S'holders Litig.*, 1992 Del. Ch. LEXIS 196, 1992 WL 212595, at *12 (Del. Ch. Sept. 1, 1992).

**19** Plaintiffs conceded at oral argument that Artemis's claim is tied to the defamation of Perlman through the republication of the 2012 Articles in connection with the 2014 Article. Tr. 6. Thus, I discuss Artemis's claim *infra*.

**20** 652 A.2d 578, 584 (Del. Ch. 1994).

**21** 970 A.2d 176 (Del. 2009).

**22** 26 A.3d 174 (Del. 2011).

**23** *Reid*, 970 A.2d at 183 (quoting *Wright v. Scotton*, 13 Del. Ch. 402, 121 A. 69, 72-73 (Del. 1923)). *See also Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982); *U.S. Cellular Inv. Co. v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del. 1996); 2 Pomeroy's Equity Jurisprudence § 419a (5th ed. 1941).

**24** *Reid*, 970 A.2d at 183 (citations omitted).

**25** *O'Brien*, 26 A.3d at 178.

**26** *Id.*

**27** Smith v. Del. *State Univ.*, 47 A.3d 472, 480 (Del. 2012) (applying the Restatement 2d of Conflicts' "most significant relationship" test to a defamation claim).

096

**28** *Aoki v. Benihana, Inc.,* 839 F. Supp. 2d 759, 765 (D. Del. 2012) (citing Restatement (Second) of Conflict of **[\*32]** Laws (Restatement 2d of Conflicts) § 150).

**29** *See id.*; Restatement 2d of Conflicts §§ 145, 150.

**30** Restatement 2d of Conflicts § 145.

**31** *Aoki,* 839 F. Supp. 2d at 765 (citing Restatement 2d of Conflicts § 150(2), (3)).

**32** *Id.* (quoting *Fuqua Homes, Inc. v. Beattie,* 388 F.3d 618, 622 (8th Cir. 2004) (noting that this conclusion was reached under consideration of Restatement 2d of Conflicts § 150)).

**33** Restatement 2d of Conflicts § 150, cmt. e.

**34** 839 F. Supp. 2d at 768.

**35** *Id.* (citation omitted).

**36** Id. Plaintiffs attempt to distinguish *Aoki,* in which one party disputed whether New York or Delaware law applied and the other party disputed whether New York or Florida law applied, by arguing that the parties there agreed that New York law applied. Therefore, Plaintiffs argue, the *Aoki* court's choice of law analysis was dicta and should be disregarded. I find that argument unpersuasive. Applying Delaware choice of law principles, the court said, "[t]he parties agree that applying the law of these states would yield different results and, therefore, a choice of law analysis is required." *Id.* at 764 (citation omitted). Thus, I do not consider the court's ultimate choice of New York substantive law to be dicta. **[\*35]**

**37** Cal. Civ. Proc. Code § 340(c).

**38** 10 *Del. C.* § 8119.

**39** 10 *Del. C.* § 8121 (emphasis added).

**40** *Adams,* 452 A.2d at 157.

**41** *Reid,* 970 A.2d at 182.

**42** *Homestore, Inc. v. Tafeen,* 888 A.2d 204, 210 (Del. 2005) (citation omitted).

**43** *Adams,* 452 A.2d at 157.

**44** *U.S. Cellular,* 677 A.2d at 502.

**45¶** See *Malpiede v. Townson*, 780 A.2d 1075, 1082-83 (Del. 2001).

**46¶** *O'Brien*, 26 A.3d at 178.

**47¶** See *Whittington v. Dragon Gp. L.L.C.*, 2010 Del. Ch. LEXIS 27, 2010 WL 692584, at *8-9 (Del. Ch. Feb. 15, 2010) (finding "insufficient" prejudice), *aff'd & remanded*, 998 A.2d 852 (Del. 2010).

**48¶** See *Hudak v. Procek*, 806 A.2d 140, 153 (Del. 2002).

**49¶** *Giove v. Holden*, 2014 U.S. Dist. LEXIS 30269, 2014 WL 975135, at *5 (D. Del. Mar. 10, 2014) (citing *Read v. Carpenter*, 1995 Del. Super. LEXIS 251, 1995 WL 945544, at *3 (Del. Super. June 8, 1995)). The parties did not address in depth the conflict of law issue as to Plaintiff Artemis. Artemis is a Delaware LLC; therefore, for purposes of this Memorandum Opinion, I assume its defamation claim based on the 2014 Article arguably is subject to Delaware law.

**50¶** See *Giove*, 2014 U.S. Dist. LEXIS 30269, 2014 WL 975135, at *5 (citing *Ramunno v. Cawley*, 705 A.2d 1029, 1035 (Del. 1998)) ("However, a statement of fact is not defamatory if it is "substantially true."); *Carver v. Bonds*, 135 Cal. App. 4th 328, 344-45, 37 Cal. Rptr. 3d 480, 493 (Cal. Ct. App. 2005) (citing *Masson v. New Yorker Magazine*, 501 U.S. 496, 516-17, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991)) ("California law permits the defense of substantial truth, and thus a defendant is not liable if the substance of the charge be proved true . . . . Put another way, the statement is not considered false unless it would have a different effect on the mind of the reader from that which the . . . truth would have produced.").

**51¶** *Gannett Co. v. Re*, 496 A.2d 553, 557 (Del. 1985) (citing *Williams v. WCAU-TV*, 555 F. Supp. 198, 202 (E.D. Pa. 1983)). *See also* *Masson*, 501 U.S. at 517; *Morningstar, Inc. v. Superior Court*, 23 Cal. App. 4th 676, 686, 29 Cal. Rptr. 2d 547 (Cal. Ct. App. 1994).

**52¶** *Giove*, 2014 U.S. Dist. LEXIS 30269, 2014 WL 975135, at *5 (citing *Henry v. Del. Law Sch. of Widener Univ., Inc.*, 1998 Del. Ch. LEXIS 7, 1998 WL 15897, at *10 (Del. Ch. Jan. 12, 1998), and RESTATEMENT (SECOND) OF TORTS § 559 (1977)).

**53¶** RESTATEMENT (SECOND) OF TORTS § 563 (1977).

**54¶** See *Q-Tone Broad., Co. v. Musicradio of Md., Inc.*, 1994 Del. Super. LEXIS 453, 1994 WL 555391, at *5 (Del. Ct. Aug. 22, 1994) (*HN18* ⬆ "In its analysis of the content of an **[*46]** allegedly defamatory statement, the Court must look to the fair and natural meaning which will be given it by reasonable persons of ordinary intelligence"); *Morningstar*, 23 Cal. App. 4th at 688 ("In determining whether statements are of a defamatory nature, and therefore actionable, a court is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language of the complaint for libelous publication according to its natural and popular construction.").

**55¶** These facts are unlike those at issue in *Giove*, where the plaintiff alleged the defendant published false information in a neighborhood watch bulletin that the plaintiff was a convicted felon. 2014 U.S. Dist. LEXIS 30269, 2014 WL 975135, at *5. The bulletin stated that the plaintiff had been convicted of Unlawful Sexual Intercourse in the First Degree, when in fact he had been convicted of Unlawful Sexual Intercourse in the Third Degree. *Id.* When the plaintiff was convicted, however, the court determined the incorrect statement was no more damaging to the plaintiff's reputation than the correct one in the mind of the average reader because both of the referenced crimes are felonies; in other words, the court determined the statement was substantially true. *Id.*

**56¶** See, e.g., *Carver*, 135 Cal. App. 4th at 344, 37 Cal. Rptr. 3d at 493; *Ramada Inns v. Dow Jones & Co.*, 543 A.2d 313, 325 (Del. Super. 1987). *See also* RESTATEMENT (SECOND) OF TORTS § 563, cmt. d ("The context of a defamatory imputation **[*48]** includes all parts of the communication that are ordinarily heard or read with it.").

**57¶** Defendant argues that, to the extent Plaintiffs purport to assert a cause of action arising from the statement that the OnLive *service* is defunct, Plaintiffs have no standing to pursue such a claim because the OnLive service is wholly owned and operated by the separate entity, OL2. As I observed at argument, however, Perlman and the two Plaintiff entities are claiming that, by virtue of Vox's

false statement, vox impugned his business reputation and that of Rearden and Artemis and caused all three to lose business as a result. Thus, whether or not OL2 may have a claim, Plaintiffs alleged adequately that the statement is defamatory as to them, as discussed *infra*.

**58⸿** *Del. Exp. Shuttle, Inc. v. Older,* 2002 Del. Ch. LEXIS 124, 2002 WL 31458243, at *21 (Del. Ch. Oct. 23, 2002) (quoting RESTATEMENT (SECOND) OF TORTS § 561, cmt. b).

**59⸿** Compl. ¶ 74.

**60⸿** 1996 Del. Super. LEXIS 182, 1996 WL 494177 (Del. Super. Apr. 22, 1996).

**61⸿** 1996 Del. Super. LEXIS 182, [WL] at *1.

**62⸿** *Del. Exp. Shuttle,* 2002 Del. Ch. LEXIS 124, 2002 WL 31458243, at *21.

**63⸿** Compl. ¶¶ 55-57.

**64⸿** Defendant's reliance on *Williams v. Howe,* 2004 Del. Super. LEXIS 130, 2004 WL 2828058 (Del. Super. May 3, 2004), for the proposition that Artemis cannot state a claim because the 2012 Articles did not mention it is misplaced. In *Williams,* the court rejected the plaintiff's defamation claim because **[*53]** she failed to establish proof of understanding by a third party that the communication referred to her in any way, 2004 Del. Super. LEXIS 130, [WL] at *4, whereas here, it is reasonably conceivable that a third party would understand that the statements at issue in 2014, including the hyperlinks to the 2012 Articles, were about Artemis. In this respect, my conclusion that Artemis adequately states a claim for harm arising from allegedly false and defamatory remarks about Perlman is limited to the well-pled facts in the Complaint and the reasons stated herein and is not meant to imply that every company associated with Perlman has similar claims.

**65⸿** In contrast to plaintiffs who rely on republication to restart an expired statute of limitations, Artemis's claims focus on the 2014 Article and are all timely.

**66⸿** CAL. CIV. CODE, § 3425.3.

**67⸿** *Shively,* 31 Cal. 4th 1230, 1246 n.7, 7 Cal. Rptr. 3d 576, 80 P.3d 676, 684 n.7 (Cal. 2003).

**68⸿** *Christoff v. Nestle USA, Inc.,* 152 Cal. App. 4th 1439, 62 Cal. Rptr. 3d 122, 136-37 (Cal. Ct. App. 2007), *aff'd in part, rev'd in part,* 47 Cal. 4th 468, 97 Cal. Rptr. 3d 798, 213 P.3d 132 (Cal. 2009).

**69⸿** *Kinney v. Barnes,* 2014 Cal. App. Unpub. LEXIS 4383, 2014 WL 2811832, at *6 (Cal. Ct. App. June 23, 2014) (quoting *Cole v. Patricia A. Meyer & Assocs., APC,* 206 Cal. App. 4th 1095, 1121 n.8, 142 Cal. Rptr. 3d 646, 667 n.8 (Cal. Ct. App. 2012).

**70⸿** *Christoff,* 152 Cal. App. 4th 1439, 62 Cal. Rptr. 3d at 139.

**71⸿** *Yeager v. Bowlin,* 693 F.3d 1076, 1082 (9th Cir. 2012).

**72⸿** *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.,* 2007 U.S. Dist. LEXIS 16356, 2007 WL 935703, at *7 (S.D. Cal. Mar. 7, 2007).

**73¶** *In re Phila. Newspapers, LLC*, 690 F.3d 161, 174 (E.D. Pa. 2012) (citing *Davis v. Mitan*, 347 B.R. 607, 611 (W.D. Ky. 2006)).

**74¶** *See supra* text accompanying note 72.

**75¶** 701 F. Supp. 2d 912 (W.D. Ky. 2009).

**76¶** 690 F.3d 161 (E.D. Pa. 2012).

**77¶** *Salyer*, 701 F. Supp. 2d at 916.

**78¶** *Id.* at 916 n.5.

**79¶** *Id.* at 916-17.

**80¶** *In re Phila. Newspapers*, 690 F.3d at 165.

**81¶** *Id.* at 175.

**82¶** *Id.*

**83¶** Compl. ¶ 71 ("Stating that OnLive was 'defunct' would immediately raise concerns about the security and accessibility of OnLive's users' personal information . . . .").

**84¶** 2014 Cal. App. Unpub. LEXIS 4383, 2014 WL 2811832 (Cal. App. 2d Dist. June 23, 2014).

**85¶** 2014 Cal. App. Unpub. LEXIS 4383, [WL] at *6.

**86¶** 2014 Cal. App. Unpub. LEXIS 4383, [WL] at *7. *Accord Canatella v. Van de Kamp*, 486 F.3d 1128 (9th Cir. 2007) (holding the defendant did not republish the plaintiff's disciplinary summary when he added a "verbatim copy" of the summary to a different URL within the same domain name); *Yeager v. Bowlin*, 693 F.3d 1076 (9th Cir. 2012) (holding that a statement on a website is not republished unless the statement itself is substantively altered or added to, or the website is directed to a new audience); *Oja v. U.S. Army Corps of Eng'rs*, 440 F.3d 1122 (9th Cir. 2006) (holding that hosting information on a website does not continuously republish the information).

**87¶** Compl. ¶ 106.

**88¶** *Firth v. State*, 98 N.Y.2d 365, 775 N.E.2d 463, 747 N.Y.S.2d 69 (N.Y. 2002). "*Firth* has been cited with approval in two opinions of the California Courts of Appeal." *Yeager*, 693 F.3d at 1083 (citing *Traditional Cat Ass'n, Inc. v. Gilbreath*, 118 Cal. App. 4th 392, 402-04, 13 Cal. Rptr. 3d 353, 361-62 (Cal. Ct. App. 2004) (quoting extensively *Firth*'s holding that the single-publication rule applies to the Internet), and *Christoff*, 152 Cal. App. 4th 1439, 62 Cal. Rptr. 3d at 138 (citing *Firth* for its statement in dicta that "modification to a Web site does not constitute a republication")).

100

**89⊤** *Firth*, 98 N.Y.2d at 367.

**90⊤** *Id.* at 369.

**91⊤** *Id.* at 371 (citing *Rinaldi v. Viking Penguin*, 52 N.Y.2d 422, 435, 420 N.E.2d 377, 438 N.Y.S.2d 496 (N.Y. 1981), and RESTATEMENT (SECOND) OF TORTS § 577A, cmt. d).

**92⊤** *Id.*

**93⊤** *See, e.g., Clark v. Viacom Int'l, Inc.*, 617 Fed. Appx. 495, 2015 U.S. App. LEXIS 11932, 2015 WL 4098320, at *7 (6th Cir. July 8, 2015).



About

Cookie Policy

RELX™

Privacy Policy

Terms & Conditions

Copyright © 2023 LexisNexis.

Document:   Dershowitz v. Cnn, Inc., 541 F. Supp. 3d 1354   | Actions

Go to   Page   Page #   Search Document

Ⓐ **Dershowitz v. Cnn, Inc., 541 F. Supp. 3d 1354**

Copy Citation

United States District Court for the Southern District of Florida

May 24, 2021, Decided; May 25, 2021, Entered on Docket

CASE NO. 20-61872-CIV-SINGHAL

**Reporter**
541 F. Supp. 3d 1354 * | 2021 U.S. Dist. LEXIS 120809 ** | 2021 WL 2621139

ALAN DERSHOWITZ, Plaintiff, v. CABLE NEWS NETWORK, INC., Defendant.

**Prior History:** Dershowitz v. CNN, Inc., 2021 U.S. Dist. LEXIS 120808 (S.D. Fla., May 24, 2021)

## Core Terms

CNN, actual malice, alleges, broadcasts, public interest, argues, quid pro quo, re-election, clip, motion to dismiss, motive, elected, defamation, defamatory, truncated, impeachment, believes, hear, aired, media, mixed, redefining, comments, played, public figure, abridgment, documents, pleadings, quo, expression of an opinion

**Counsel:** [**1] For Alan Dershowitz, Plaintiff: Brian Mitchell Rodier, Rodier & Rodier , Hallandale, FL.

For Cable News Network, Inc., Defendant: George S. LeMieux , LEAD ATTORNEY, Gunster Yoakley & Stewart , Fort Lauderdale, FL; Amanda Levine , Katherine M. Bolger , PRO HAC VICE, Davis Wright Tremaine LLP , New York, NY; Eric Corey Edison , Gunster, Yoakley and Stewart, P.A. , Fort Lauderdale, FL.

**Judges:** RAAG SINGHAL , UNITED STATES DISTRICT JUDGE.

**Opinion by:** RAAG SINGHAL

## Opinion

[*1358] **ORDER**

**THIS CAUSE** is before the Court upon Defendant Cable News Network's Motion to Dismiss (DE [17]). The parties have fully briefed the Motion to Dismiss and the Court heard argument of counsel. For the reasons set forth below, the Motion to Dismiss is denied.

I. INTRODUCTION

Plaintiff Alan Dershowitz ("Dershowitz") has filed a Complaint (DE [1]) against Cable News Network, Inc. ("CNN") seeking damages for defamation. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 .

In January 2020, Dershowitz represented the President of the United States in an impeachment trial before the United States Senate. (Id. ¶ 6). This dispute concerns CNN's coverage of an argument Dershowitz made to the Senate about whether a president can be impeached

and removed from office if he takes [**2] any action that is motivated by a desire to be reelected. **[*1359]** According to the Complaint, Dershowitz gave the following answer to a question by Senator Ted Cruz:

> The only thing that would make a quid pro quo unlawful is if the quo were somehow illegal. Now we talk about motive. There are three possible motives that a political figure could have. One, a motive in the public interest and the Israel argument would be in the public interest. The second is in his own political interest and the third, which hasn't been mentioned, would be his own financial interest, his own pure financial interest, just putting money in the bank. I want to focus on the second one just for one moment. Every public official that I know believes that his election is in the public interest and, mostly you are right, your election is in the public interest, and if a president does something which he believes will help him get elected in the public interest, that cannot be the kind of quid pro quo that results in impeachment. (Id. ¶ 7). **1⤓**

Following the day's impeachment proceedings, CNN aired a clip of this argument that featured only the last sentence and omitted Dershowitz' words that a quid pro quo would be unlawful **2⤓** if the quo were somehow illegal. **2⤓** (Id., ¶ 8). Dershowitz alleges that several CNN commentators responded to the truncated clip and "exploded into a one-sided and false narrative that Professor Dershowitz believes and argued that as long as the President believes his reelection is in the public interest, that he could do anything at all - <u>including illegal acts</u> - and be immune from impeachment." (Id.). Dershowitz alleges CNN commentators made the following defamatory statements **3⤓** (DE [1], ¶ 13):

> Having worked on about a dozen campaigns, there is always the sense that, boy, if we win, it's better for the country. <u>But that doesn't give you license to commit crimes</u> or to do things that are unethical. So, it was absurd. What I thought when I was watching it was this is un-American. This is what you hear from Stalin. This is what you hear from Mussolini, what you hear from authoritarians, from Hitler, from all the authoritarian people who rationalized, in some cases genocide, based on what was in the public interest." -- Joe Lockhart @ 7:11 p.m., January 29, 2020.

> The president's defense team [Dershowitz] seems to be redefining the powers of the president, redefining them towards infinity.". [**4] . . [truncated clip played] . . . "If you look at what he says there it blows your mind. <u>He says if a president is running for re-election because he thinks getting elected will help America, he can do anything, anything</u>. And that redefines the presidency and America." -- John Berman @ 6:17 a.m., January 30, 2020.

> I did not go to Harvard Law, but I did go to the University of Texas School of Law, where I studied criminal law and constitutional law, but never dreamed a legendary legal mind would set them both ablaze on the Senate floor. <u>The Dershowitz Doctrine would make presidents immune from **[*1360]** every criminal act, so long as they could plausibly claim they did it to boost their re-election effort. Campaign finance laws: out the window. Bribery statutes: gone. Extortion: no more.</u> This is Donald Trump's fondest figurative dream: to be able to shoot someone on Fifth Avenue and get away with it." -- Paul Begala on CNN.com, January 29, 2020 @ 9:11 p.m.

This narrative, claims Dershowitz, damaged his reputation as a legal scholar and subjected him to ridicule on news outlets, talk shows, and social media. (Id. ¶¶ 12, 13).

Dershowitz alleges that CNN knew or had serious doubts that its commentators' [**5] statements were false at the time they were made but nonetheless made and/or published the statements with an intent to indulge ill will, hostility, and an intent to harm. (Id. ¶ 20). Dershowitz asserts that CNN's airing of only a portion of his answer was done to falsely paint him "as a constitutional scholar and intellectual who had lost his mind" and that "[w]ith that branding, [his] sound and meritorious arguments would then be drowned under a sea of repeated lies." (Id. ¶ 8). The result of omitting the words "[t]he only thing that would make a quid pro quo unlawful is if the quo were somehow illegal," says Dershowitz, is that CNN could "fool" its viewers into thinking "that the respected Alan Dershowitz believed that the President of the United States could commit <u>illegal</u> acts as long as he thought it would help his reelection and that his reelection was in the public interest, even though it was the opposite of what he said." (Id). Dershowitz alleges he has suffered and continues to suffer damage, including but not limited to damage to his reputation, embarrassment, pain, humiliation, and mental anguish and has sustained past and future loss of earnings. (Id. ¶ 19). He seeks [**6] $50 million in compensatory damages and $250 million in punitive damages from CNN.

CNN moves to dismiss the Complaint for failure to state a claim upon which relief can be granted. (DE [17]). Fed. R. Civ. P. 12(b)(6). First, CNN contends its broadcasts are protected by the fair report privilege, which shields the press from liability for reporting information on official government proceedings. Second, CNN argues that the statements made by its commentators were non-actionable opinions based upon Dershowitz' public testimony. Finally, CNN asserts that Dershowitz has not and cannot plead that CNN acted with the actual malice required for a public figure to sustain a defamation claim. CNN asks the Court to dismiss Dershowitz' Complaint with prejudice.

## II. LEGAL STANDARDS

### A. Motion to Dismiss

To survive a motion to dismiss, "factual allegations must be enough to raise a right to relief above the speculative level" and must be sufficient "to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "The mere possibility the defendant [**7] acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Authority*, 566 U.S. 449, 132 S. Ct.

1702, 182 L. Ed. 2d 720 (2012).

In considering a Rule 12(b)(6) motion to dismiss, the court's review is generally "limited to the four corners of the complaint." **[\*1361]** *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) (quoting *St. George v. Pinellas Cty.*, 285 F.3d 1334, 1337 (11th Cir. 2002)). The court must review the complaint in the light most favorable to the plaintiff, and it must generally accept the plaintiff's well-pleaded facts as true. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984). But "[c]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1262 (11th Cir. 2004) (citation omitted); *see also Iqbal*, 129 S. Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").


B. Defamation

The parties agree that Florida law applies to this dispute. In Florida, a defamation claim has "five elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008).

CNN argues that its broadcasts concerning Dershowitz' statements are protected from liability by the fair report privilege. [\*\*8] The fair report privilege is a qualified privilege given to news media "to accurately report on the information they receive from government officials." *Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502 (Fla. 3d DCA 1993). "If the report of a public official proceeding is accurate or a fair abridgment, an action cannot be constitutionally maintained, either for defamation or for invasion of the right of privacy." *Id.* (quoting Restatement (Second) of Torts § 611, cmt. b (1977)). "The privilege extends to the publication of the contents of official documents, as long as the account is reasonably accurate and fair." *Rasmussen v. Collier County Publ. Co.*, 946 So. 2d 567, 571 (Fla. 2nd DCA 2006).

Next, CNN argues that its commentators offered opinions and, therefore, it cannot be liable for defamation. In Florida, a claim of defamation requires a false statement of fact. *Id.* Statements of pure opinion are not actionable. *Zambrano v. Devanesan*, 484 So. 2d 603, 606 (Fla. 4th DCA 1986). "The distinction between fact and opinion is not always easy to perceive." *Id.* "Thus, the law recognizes that some comments may be pure expressions of opinion whereas others may be mixed expressions of opinion." *Id.*

A mixed opinion is one "based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication." *LRX, Inc. v. Horizon Assocs. Joint Venture ex rel. Horizon-ANF, Inc.*, 842 So. 2d 881, 885 (Fla. 4th DCA 2003). "Even if the speaker states the facts upon which he bases his [\*\*9] opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990).

Whether a challenged statement is one of fact or opinion is a question of law to be decided by the court. *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). "In assessing whether an allegedly libelous statement is opinion, the court must construe the statement in its totality, examining not merely a particular phrase **[\*1362]** or sentence, but all of the words used in the publication." *Rasmussen*, 946 So. 2d at 571 (citing *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. 2d DCA 1984)).

Finally, CNN challenges the sufficiency of Dershowitz' pleading of actual malice. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964) (public figure must prove actual malice to succeed in defamation case). Actual malice "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 500, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991). Rather, actual malice refers to "publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity." *Id. at 511*. To avoid dismissal of a defamation claim, a public figure must plead facts sufficient to give rise to a plausible inference of actual malice. *Michel v. NY Post Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016). The pleading standards of *Iqbal* and *Twombly* [\*\*10] apply to a public figure's allegations of actual malice. *Id.*


III. ANALYSIS

The Court must first address those items that it considered in resolving this Motion. CNN included numerous exhibits with its Motion to Dismiss and argues the Court may properly consider all of them when deciding the Motion. The Court disagrees. At the 12(b)(6) stage, the court may consider the allegations in the complaint as well as documents incorporated into the complaint by reference and matters of which it may take judicial notice. *Lozman v. City of Riviera Beach*, 713 F.3d 1066, 1075 n.9 (11th Cir. 2013) (citations omitted). These items are incorporated by reference in the motion to dismiss stage:

• CNN footage of the impeachment trial aired on January 29, 2020 (DE [17-6], ex. A);

• Transcript and footage of the January 29, 2020, episode of the program Erin Burnett Outfront (DE [17-6], ex. B);

• Transcript and footage of the January 20, 2020, episode of the program New Day (DE [17-6], ex. C); and

• Paul Begala article "Presenting the Ludicrous 'Dershowitz Doctrine'" published January 29, 2020 on cnn.com (DE [17-6], ex. D)

In addition, the Court may take judicial notice of Congressional Record of January 29, 2020 (DE [17-1]). *See Coastal Wellness Centers,*

104

*Inc. v. Progressive American Ins. Co.*, 309 F. Supp. 3d 1216, n.4 (S.D. Fla. 2018)) ("The Court [**11] may take judicial notice of government publications and website materials."). The remaining items 4± - transcripts of shows broadcast by other media outlets, transcripts of interviews given by Dershowitz on January 30 and 31, 2020, and a copy of Dershowitz' book *Defending the Constitution* - fall outside the pleadings. "The clear rule in this Circuit is that consideration of material falling outside the pleadings converts a motion to dismiss into one for summary judgment. And in doing so, the judge must give notice to the parties and allow them 10 days in which to supplement the record." *Michel*, 816 F.3d at 701. The Court declines to make that conversion and, therefore, has only considered those items referenced in the Complaint.

**[*1363]** A. <u>Fair Report Privilege</u>

CNN argues that its airing of verbatim statements that Dershowitz made on the floor of the United States Senate is unquestionably protected by the fair report privilege. *See Woodard*, 616 So. 2d at 502 ("The news media has been given a qualified privilege to accurately report on the information they receive from government officials."). "The fair report privilege is news media's qualified privilege 'to report accurately on information received from government officials.'" *Folta v. New York Times Co.*, 2019 U.S. Dist. LEXIS 34533, 2019 WL 1486776, at *2 (N.D. Fla. 2019) (quoting *Rasmussen*, 946 So. 2d at 570-71). Clearly, [**12] a public broadcast concerning the impeachment trial of the President of the United States triggers the fair report privilege.

The next issue is whether the fair report privilege applies to CNN's broadcasts. The fair report privilege applies "[i]f the report of a public official proceeding is an accurate or a fair abridgment." *Folta*, 2019 U.S. Dist. LEXIS 34533, 2019 WL 1486776, at *2 (quoting *Woodard*, 616 So. 2d at 502). CNN argues that it played a verbatim clip of Dershowitz' actual words spoken during a high-level government proceeding and, therefore, the fair report privilege applies. *See Jamason v. Palm Beach Newspapers, Inc.*, 450 So. 2d 1130, 1132 (Fla. 4th DCA 1984) ("accurate report of judicial proceeding" entitled to fair report privilege). Dershowitz does not dispute that the privilege would probably apply if CNN had merely played the truncated clip without further comment. But that is not Dershowitz' claim. The one-count Complaint alleges that the truncated clip was part of "a deliberate scheme to defraud" CNN's audience (DE [1], ¶ 11) that enabled Lockhart, Berman, and Begala to present Dershowitz's comments in a defamatory manner. Thus, for purposes of applying the fair report privilege the Court must consider the broadcasts and the clip as a whole and not as separate claims. And the question is whether CNN's broadcasts presented an [**13] accurate or fair abridgment of Dershowitz' comments to the Senate. To answer this, we must look to the source documents. *Folta*, 2019 U.S. Dist. LEXIS 34533, 2019 WL 1486776, at *4 ("Determining whether a report is fair and accurate requires a close comparison of the report and the documents and information from which it is drawn."); *Stewart v. Sun-Sentinel Co.*, 695 So. 2d 360, 362 (Fla. 4th DCA 1997) (comparing defamatory information with official documents for "material differences" that would defeat the fair report privilege).

During the impeachment trial, Senator Ted Cruz submitted a question for Dershowitz to answer: "As a matter of law, does it matter if there was a quid pro quo? Is it true that quid pro quos are often used in foreign policy?" *Congressional Record*, 166:19 (Jan. 29, 2020), p. S650. (DE [17-1], p. 7). Dershowitz answered at length and gave several hypotheticals of quid pro quo that he considered would be lawful. At several points in his response, Dershowitz stated that a quid pro quo that is unlawful would be one based on an illegal motive. These points are highlighted below:

> I offered you a hypothetical the other day: What if a Democratic President were to be elected and Congress were to authorize much money to either Israel or the Palestinians and the Democratic President were to say to [**14] Israel "No; I am going to withhold this money unless you stop all settlement growth" or to the Palestinians "I will withhold the money Congress authorized to you unless you stop paying terrorists, and the President said "Quid pro quo. If you don't do it, you don't get the money. If you do it, you get the money"? There is no one in this Chamber who would regard that as in any way unlawful. *The only thing that would make a quid pro quo unlawful is that if the quo were in some way illegal.*

**[*1364]** Now, we talked about motive. There are three possible motives that a political figure can have: One, a motive in the public interest, and the Israel argument would be in the public interest; the second is in his own political interest; and the third, which hasn't been mentioned, *would be in his own financial interest, just putting money in the bank*. I just want to focus on the second one for just one moment.

Every public official whom I know believes that his election is in the public interest. Mostly, you are right. Your election is in the public interest. If a President does something which he believes will help him get elected - in the public interest - that cannot be the kind of quid pro quo that [**15] results in impeachment. . . .

Everybody has mixed motives, and for there to be a constitutional impeachment based upon mixed motives would permit almost any President to be impeached.

How many Presidents have made foreign policy decisions after checking with their political advisers and their pollsters? If you are just acting in the national interest, why do you need pollsters? Why do you need political advisers? Just do what is best for the country. But if you want to balance what is in the public interest with what is in your party's electoral interest and in your own electoral interest, it is impossible to discern how much weight is given to one or the other.

Now, we may argue that it is not in the national interest for a particular President to get reelected or for a particular Senator or Member of Congress - and maybe we are right; it is not in the national interest for everybody who is running to be elected - but for it to be impeachable, you would have to discern that he or she made a decision solely on the basis of, as the House managers put it, corrupt motives, and *it cannot be a corrupt motive if you have a mixed motive that partially involves the national interest, partially* [**16] *involves electoral, and does not involve personal pecuniary interest.*

the House managers do not allege that this decision, this quid pro quo, as they call it - and the question is based on the hypothesis that there was a quid pro quo. I am not attacking the facts. *They never allege that it was based on pure financial reasons. It would be a much harder case.*

If a hypothetical President of the United States said to a hypothetical leader of a foreign country: Unless you build a hotel with my name on it and unless you give me a million-dollar kickback, I will withhold the funds. *That is an easy case. That is purely corrupt and in the purely private interest.*

But a complex middle case is: I want to be elected. I think I am the greatest President there ever was, and if I am not elected the national interest will suffer greatly. That cannot be.

*Congressional Record* 166:19 (Jan. 29, 2020) pp. S650-51 (emphasis added). (DE [17-1], pp. 7-8). 5↧

To compare Dershowitz' answer with the comments made by CNN's commentators, those comments are set forth again, below:

Having worked on about a dozen campaigns, there is always the sense that, boy, if we win, it's better for the country. **[*1365]** But that doesn't [**17] give you license to commit crimes or to do things that are unethical. So, it was absurd. What I thought when I was watching it was this is un-American. This is what you hear from Stalin. This is what you hear from Mussolini, what you hear from authoritarians, from Hitler, from all the authoritarian people who rationalized, in some cases genocide, based what was in the public interest." -- Joe Lockhart @ 7:11 p.m., January 29, 2020.

****

The president's defense team [Dershowitz] seems to be redefining the powers of the president, redefining them towards infinity."... [truncated clip played] . . . "If you look at what he says there it blows your mind. He says if a president is running for re-election because he thinks getting elected will help America, he can do anything, anything. And that redefines the presidency and America." -- John Berman @ 6:17 a.m., January 30, 2020.

****

I did not go to Harvard Law, but I did go to the University of Texas School of Law, where I studied criminal law and constitutional law, but never dreamed a legendary legal mind would set them both ablaze on the Senate floor. The Dershowitz Doctrine would make presidents immune from every criminal act, so long [**18] as they could plausibly claim they did it to boost their re-election effort. Campaign finance laws: out the window. Bribery statutes: gone. Extortion: no more. This is Donald Trump's fondest figurative dream: to be able to shoot someone on Fifth Avenue and get away with it." -- Paul Begala on CNN.com, January 29, 2020 @ 9:11 p.m.

Dershowitz alleges he never said a president could commit illegal acts if he thought it would help his reelection and his reelection was in the public interest. (DE [1], ¶ 8). And he alleges that CNN, through its employee commentators, distorted the meaning of what he said to the Senate in the coverage on CNN.com and the two broadcasts. (DE [1], ¶ 10, 11). Dershowitz contends that by omitting the phrase, "the only thing that would make a quid pro quo unlawful is if the quo were somehow illegal," CNN presented Dershowitz' comments in a misleading context, which enabled the commentators to (falsely) assert that Dershowitz believed a president could extract a quid pro quo for any reason, including an illegal reason, if he believed it would help his re-election. Dershowitz alleges that if the entire clip had been played, no panel guest would have been able to credibly [**19] make that statement. (DE [1], ¶ 9). Thus, Dershowitz argues, CNN presented an official proceeding in a misleading manner and the fair report privilege does not apply.

The Court agrees. CNN presented an abridgment of Dershowitz' answer to Senator Cruz' question. The abridgment is not accurate, to the extent that it omitted a crucial qualification: that an illegal motive for a quid pro quo would be corrupt. As a result, the commentators' statements - that Dershowitz believes a President can do anything, even commit crimes if it would help his re-election - are not based upon a fair and accurate summary of Dershowitz' statement to the Senate.

CNN argues that editors and publishers have great discretion to determine what information to publish. This is correct. But the qualified fair report privilege "merely means that the report of [official] proceedings must be correct." *Jamason*, 450 So. 2d at 1132 (quoting *Walsh v. Miami Herald Publishing Co.*, 80 So. 2d 669, 671 (Fla. 1955)).

**[*1366]** CNN argues that Dershowitz' response to Senator Cruz' statement was ambiguous and that CNN was reasonable in its belief that Dershowitz argued "that presidents cannot be impeached for actions taken to win an election if the President believes his own victory would be in the public interest, regardless of the [**20] legality of those actions." (DE [17], p. 14). That is an argument that CNN may present to a jury. But because the broadcasts did not present a fair and accurate abridgment of Dershowitz' remarks, CNN cannot avail itself of the fair report privilege.

Finally, CNN argues that the media has no obligation to present additional information that would present a subject in a better light. This too is correct. *See Folta*, 2019 U.S. Dist. LEXIS 34533, 2019 WL 1486776, at *5 (media has "the right to focus and color their report to capture and hold the readers' attention" provided the report is "substantially accurate"). Thus, in *Larreal v. Telemundo of Florida, LLC*, 489 F. Supp. 3d 1309 (S.D. Fla. 2020), the fair report privilege applied to a report that the plaintiff was arrested during a raid conducted as part of a long-term undercover narcotics investigation. The Telemundo report was one about the undercover raid and arrests. *Id.* The plaintiff sued Telemundo for defamation and alleged it omitted information that would have clarified that he was arrested on a traffic-related warrant. The Court stated that "regardless of the charges against the other individuals, the fact that Larreal was arrested on a bench warrant alone does not rebut or undermine Telemundo's accurate reporting about the operation's arrests or change the [**21] gist of the story." *Id. at *1322.*

By contrast, the CNN broadcast segments set forth in Dershowitz' Complaint were focused specifically on Dershowitz' comments to the Senate and, as presented on air, changed the gist of what Dershowitz said. For the fair report privilege to apply a defendant must have "presented a fair and accurate report of the source documents." _Folta, 2019 U.S. Dist. LEXIS 34533, 2019 WL 1486776, at *6_. The CNN broadcasts do not meet that standard.

B. Fact v. Opinion

CNN's next ground for dismissal is that the allegedly defamatory statements were non-actionable opinion. CNN argues that the statements at issue were made during commentary shows about the impeachment proceedings and were "rhetorical hyperbole" protected by the First Amendment. _See Horsely v. Rivera, 292 F.3d 695, 701 (11th Cir. 2002)_ (holding non-literal, figurative language not defamatory). Thus, CNN argues that statements referring to Dershowitz' arguments as "un-American," that he was "redefining the powers of the President," that his position "blows your mind," and that his argument "is what you hear from Stalin . . . what you hear from Mussolini, what you hear from authoritarians" are hyperbole for which there can be no liability.

Dershowitz agrees with CNN on the hyperbolic nature of the commentary and that no liability would attach [**22] to those kinds of statements. But he argues that the commentaries also contained untrue, defamatory factual comments - that Dershowitz said a President could do anything without liability (even commit crimes) if he thought it would help his re-election and was in the national public interest - that were contradicted by the full context of Dershowitz' answer to Senator Cruz' question. The Court concludes that the commentators' statements set forth in the Complaint were not pure opinion but instead were mixed expressions of opinion that could reasonably be construed as defamatory. _See Barnes v. Horan, 841 So. 2d 472, 477 (Fla. 3rd DCA 2002)_ (the court must determine whether an expression of opinion can also contain a defamatory [*1367] meaning due to assertion of undisclosed facts).

A mixed expression of opinion is not constitutionally protected. _Madsen v. Buie, 454 So. 2d 727, 729 (Fla. 1st DCA 1984)_. "[A] statement that although ostensibly in the form of an opinion 'implies the allegation of undisclosed defamatory facts as the basis for the opinion' _is_ actionable." _Eastern Air Lines, Inc. v. Gellert, 438 So. 2d 923, 927 (Fla. 4th DCA 1983) disapproved on other grounds, Ter Keurst v. Miami Elevator Co., 486 So. 2d 547 (Fla. 1986)_ (quoting Restatement (Second) of Torts § 566 (1977)) (emphasis in original). Further, "where the speaker or writer neglects to provide the audience with an adequate factual foundation prior to engaging in the offending discourse, liability may [**23] arise." _Zambrano, 484 So. 2d at 607_. The Complaint alleges that CNN's broadcasts lacked the "adequate factual foundation" that would have prevented the commentators from mischaracterizing Dershowitz' argument. The Court concludes that the Complaint plausibly alleges that the comments made on CNN and CNN.com were defamatory statements of mixed opinion.

CNN argues that because the impeachment trial was widely covered by it and other media outlets, the underlying facts were "known to the audience" and, therefore, a finding of pure opinion may still be made. _Id. at 606-07; Rasmussen, 946 So. 2d at 571_. The court must consider numerous factors in determining whether a comment or editorial is based upon publicly disclosed facts. _Rasmussen, 946 So.2d at 571_. These include construing "the statement in its totality," considering "the context in which the statement was published," and accounting for "all of the circumstances surrounding the publication, including the medium by which it was disseminated and the audience to which it was published." _Id._ Although some of these factors are alleged in the Complaint or are available to the Court at the motion to dismiss stage, other factors relating to the context of the broadcasts and its audience are not before the Court. This requires a more [**24] fully developed record. At this stage, the Court concludes that Dershowitz' Complaint meets the plausibility standard for alleging a false statement of fact.

C. Actual Malice

CNN next moves to dismiss the Complaint for failure to plausibly allege the "actual malice" standard of fault applicable to public figures as required by _New York Times Co., 376 U.S. 254_. The plausibility standard of _Iqbal_ and _Twombly_ applies to the actual malice standard in defamation proceedings. _See Michel, 816 F.3d at 702_. A public figure must, therefore, plead "facts giving rise to a reasonable inference that the defendant[] published the story knowing that it was false or with reckless disregard for whether it was false or not." _Id. at 703_. There must be some showing that the defendant intended "to avoid the truth." _Id._

CNN argues that Dershowitz pleads only conclusory statements of actual malice and fails to "home to" the person(s) responsible for the alleged defamation. _New York Times Co., 376 U.S. at 287_ (The state of mind required for actual malice must be "brought home" to the persons having responsibility for publishing the offending material). CNN also argues that it aired live Dershowitz' complete argument earlier in the day and, therefore, it is impossible for Dershowitz to plead malice with [**25] connection to the later showing of the truncated clip. 6⬇ [*1368] Finally, CNN argues that Dershowitz' statement to the Senate was so ambiguous that any misinterpretation by CNN cannot be attributed to actual malice.

In deciding a motion to dismiss, the court must accept as true the plaintiff's well-pleaded facts and construe them in the light most favorable to the plaintiff. _Crawford's Auto Center, Inc. v. State Farm Mut. Auto. Ins. Co., 945 F.3d 1150 (11th Cir. 2019)_. Dershowitz alleges that, after the live broadcast, "CNN then went to work by assembling panels for programming throughout the day in which the hosts shared" only the truncated clip. (DE [1], ¶ 8). He alleges that CNN intentionally omitted the statement that a quid pro quo would be unlawful if the quo were illegal in order to "fool its viewers" into believing that Dershowitz actually said that a President could commit illegal acts so long as he thought it would help his reelection and that his reelection was in the public interest. (_Id._). This was done, he alleges, "to falsely paint Professor Dershowitz as a constitutional scholar and intellectual who had lost his mind." (_Id._). He alleges that CNN knew for certain that he had prefaced his remarks with the qualifier that a quid pro quo could not include an illegal act because [**26] it aired the entire statement earlier in the day, but that CNN knowingly omitted that portion when it played the truncated clip "time and

again. "(*Id.*, ¶¶ 9, 10). He alleges that the truncated clip was created "intentionally and deliberately with knowledge and malice to facilitate its ability to falsely claim that plaintiff said the opposite of what he actually said." (*Id.*, ¶ 18). And, finally, Dershowitz alleges that commentators made their statements with knowledge or reckless disregard that they were false. (*Id.*, ¶ 17).

These allegations, for purposes of surviving the Motion to Dismiss, plausibly plead a factual basis from which "actual malice" can be inferred. The Complaint alleges that CNN knew its reports were false, it explains the reasons CNN and its employees knew the reports were false, it explains the nature of the alleged falsehoods, and it alleges who made the false statements.

To the extent that the Complaint does not identify with specificity the persons (other than the commentators) within the CNN organization who were responsible for the broadcast decisions, that is a matter for discovery. The Court does not accept CNN's argument that a public figure defamation plaintiff [**27] must identify and plead (before discovery) each responsible decision maker within a news organization. The claims in *New York Times Co.*, 376 U.S. 254, went to a jury trial but the plaintiff ultimately failed to establish that the persons responsible for publication of the offending advertisement acted with actual malice. *Id.* at 287. In a case involving a large news organization where the responsible decision makers may not be otherwise known, a plaintiff must be permitted to plead the facts that would plausibly establish actual malice without identifying a specific person. It is then the plaintiff's burden to conduct the discovery necessary to identify and, to be successful, present record evidence that those individuals acted with actual malice. *See, id.* ("[T]he evidence against the Times supports at most a finding of negligence . . . and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice.")

CNN cites the district court's dismissal in *Mejia v. Telemundo Mid-Atl., LLC*, 440 F. Supp. 3d 495, 497 (D. Md. 2020), for support of its argument that Dershowitz was required to plead that a specific individual acted with actual malice. But *Mejia* is inapposite. That case involved a private figure whose punitive damages claim required **[*1369]** allegations that the [**28] defamer acted with actual malice. *Id.* at 499. The case was dismissed because the plaintiff failed to allege any facts that would establish the requisite fault (negligence). *Id.* at 501-502. The court's reference to actual malice, that the complaint contained "no factual allegations referring to the state of mind of the individual in charge of Defendant's banners," referred to the punitive damages claim. 7⚖ *Id.* at 499, 502. *Mejia* has no bearing on the present case.

Next, the fact that CNN played Dershowitz' entire statement earlier in the day does not preclude Dershowitz from alleging that later broadcasts of the truncated clip (and the related commentary) were done with actual malice. Viewers who watched the earlier broadcasts may well have been able to put the truncated clip and the commentators' statements into context. But for those viewers who did not see the earlier broadcasts, Dershowitz' Complaint about the later broadcasts at least reaches the required level of plausibility to sustain his defamation claim. The earlier broadcasts and their effect on the issue of actual malice may be an issue for a jury to consider, but they have no bearing on the sufficiency of the pleadings.

Finally, CNN argues that Dershowitz' answer [**29] to the Senator Cruz question was so "extravagantly ambiguous" that Dershowitz cannot establish that CNN acted with actual malice in airing the clip or discussing his arguments. Citing *Time, Inc. v. Pape*, 401 U.S. 279, 91 S. Ct. 633, 28 L. Ed. 2d 45 (1971), CNN contends that its commentators' analysis of Dershowitz' argument, even if incorrect, cannot create an issue of actual malice.

In *Pape*, the newsmagazine Time published an article about a report issued by the federal Civil Rights Commission. The report detailed numerous incidents of police brutality, including an incident in Chicago that gave rise to a federal lawsuit. But the Time article did not specify that the facts about the Chicago incident were taken from a civil complaint, rather than from an independent finding of the Commission. A police officer named in the report sued Time for defamation, and the issue was whether omission of the word "allegedly" from the Time account was enough to establish actual malice. The trial court entered a directed verdict in favor of the defendant, but the court of appeals reversed. The author of the Time article testified at trial that the context of the report indicated to him that the Commission believed that the incident occurred as described. After reviewing [**30] the totality of the underlying report *and the testimony of the Time writer*, the Supreme Court concluded that "[t]o permit the malice issue to go to the jury because of the omission of a word like 'alleged,' despite the context of that word in the Commission Report and the external evidence of the Report's overall meaning, would be to impose a much stricter standard of liability on errors of interpretation or judgment than on error of fact." *Id.* at 290.

In the present case, the Court has before it only the allegations of the Complaint, which must be taken as true, and the substance of the broadcasts. Dershowitz has adequately pleaded actual malice to survive the Motion to Dismiss. Whether the evidence adduced will ultimately satisfy Dershowitz' burden of proving actual malice by clear and convincing evidence **[*1370]** remains to be seen. But he has alleged enough to go forward.

VI. POLITICAL MALEVOLENCE

In a footnote, CNN argues that Dershowitz' "claims of disinterested political malevolence are insufficient" to establish actual malice. The Court agrees and, further, concludes that these allegations should be stricken as immaterial and impertinent. Fed. R. Civ. P. 12(f). In paragraph 14 of the Complaint, Dershowitz alleges:

Professor [**31] Dershowitz was one of the most revered and celebrated legal minds of the past half century. His reputation relating to his expertise in criminal and constitutional matters was one that lawyers would only dream about attaining in their lifetimes. However, Professor Dershowitz appears to have made one mistake. He chose to defend the President of the United States and defend the U.S. Constitution at a moment in time where CNN has decided that doing so is not permitted. For this, CNN set out to punish him and destroy his credibility and reputation, and unfortunately, succeeded.

The Supreme Court has stated that "[a defendant's] motive in publishing a story ... cannot provide a sufficient basis for finding actual

malice. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 665, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989). Indeed, a defamation claim cannot rest on the argument that "erroneous communications were motivated by differences in political opinions. Doing so would run afoul of the Supreme Court's landmark ruling in *New York Times Co. v. Sullivan*. *See* 376 U.S. at 271-72 (noting that errors are inevitable when there is free debate and that they too must be protected to give breathing room to those exercising their freedom of expression)." *Arpaio v. Robillard*, 459 F. Supp. 3d 62, 66 (D.D.C. 2020).

Paragraph 14 of Dershowitz' Complaint alleges that CNN was [**32] motivated by political animus. As Judge Lamberth noted in *Arpaio*, "Allegations of 'leftist enmity' cannot trump the guarantees of the First Amendment." *Id.* "Striking a pleading or a portion thereof is a drastic remedy to be resorted to only when required for the purposes of justice." *Sanchez v. Selective Ins. Co. of the Southeast*, 2019 U.S. Dist. LEXIS 34, 2019 WL 79282, at *2 (S.D. Fla. Jan. 2, 2019) (quotation omitted). Nevertheless, the allegations in paragraph 14 are immaterial to the claim and are an impertinent salvo that do not belong in this case Rule 12(f)(1). Fed. R. Civ. P., gives the Court the power to strike such matters "on its own." *Sanchez*, 2019 U.S. Dist. LEXIS 34, [WL] at *3 (*sua sponte* striking plaintiffs request for interest). The Court will exercise that power and strike paragraph 14 from the Complaint.

VII. CONCLUSION

For the reasons set forth above, the Court finds that Dershowitz has plausibly alleged facts sufficient to withstand CNN's Motion to Dismiss. The Court is in no way ruling on the merits of the case but concludes merely that Dershowitz has satisfied the pleading requirements of Rule 8(a)(2), Federal Rules of Civil Procedure. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss (DE[17]) is **DENIED**. It is further **ORDERED** that paragraph 14 of Plaintiffs Complaint is **STRICKEN** pursuant to Fed. R. Civ. P. 12(f)(1).

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 24th day of May 2021.

/s/ Raag [**33] Singhal

RAAG SINGHAL

UNITED STATES DISTRICT JUDGE

---

**Footnotes**

[1] The Complaint sets forth only an excerpt of Dershowitz' response. CNN has submitted the Congressional Record (DE [17-1] with the full transcript of Dershowitz' argument found at S650 and asks the Court to take judicial notice of the entirety of Dershowitz' comments.

[2] The Complaint acknowledges that CNN aired the entire statement several times earlier in the day on shows hosted by CNN employees Wolf Blitzer and Jake Tapper. (DE [1] ¶ 9).

[3] In his Memorandum in Opposition (DE [21]), Dershowitz identified the underlined portions of these statements as those he alleges are defamatory.

[4] These items are attached to CNN's Motion to Dismiss (DE [17]) at DE [17-2]; [17-3]; [17-4]; [17-5]; [17-6], ex. E; and [17-6], ex. D.

[5] CNN argues that the paragraph breaks in the Congressional Record signify that Dershowitz is "manipulat[ing] his Senate arguments by merging together *three* separate paragraphs from the Congressional Record to make it appear as one thought." (DE [24], p. 5). The Court must consider the entirety of Dershowitz' remarks, and the editorial judgment of the Government Printing Office staff is not binding on this Court.

[6] The Court will not (at this time) entertain CNN's arguments concerning Dershowitz' subsequent appearances on shows with Wolf Blitzer and Chris Cuomo as those matters are outside the four corners of the Complaint.

[7] In a later decision, the *Mejia* court granted leave to file a third amended complaint where the proposed pleading raised additional factual allegations sufficient to raise a plausible claim that the defendant acted negligently in allowing the false banner to be broadcast. The third amended complaint did not specify a particular individual. *Mejia v. Telemundo Mid-Atlantic LLC*, 2021 U.S.

Dist. LEXIS 28519, 2021 WL 594215, at *3 (D. Md. Feb. 16, 2021).



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX ™

Copyright © 2023 LexisNexis.

Dorleus v. Bank of New York, No. 14-80124-CI

Search: Everything

Client: -None-

Folders    History    Help    More

### ✚ **Dorleus v. Bank of N.Y., 2014 U.S. Dist. LEXIS 58360**

[ Copy Citation ]

United States District Court for the Southern District of Florida

April 22, 2014, Decided; April 23, 2014, Entered on Docket

CASE NO. 14-80124-CIV-MIDDLEBROOKS/BRANNON

**Reporter**
**2014 U.S. Dist. LEXIS 58360** * | 2014 WL 1621941

DAVENIR DORLEUS and ALTIDE DORLEUS, Plaintiffs, vs. BANK OF NEW YORK, as Trustee for CWABS 2006-11, Defendant.

## Core Terms

Mortgage, servicer, allegations, declaratory judgment, quiet title, declaration

**Counsel:**  **[*1]** For Davenir Dorleus, individually, Altide Dorleus, husband and wife, Plaintiffs: S. Tracy Long ▾, LEAD ATTORNEY, Santucci Priore & Long LLP ▾, Fort Lauderdale, FL.

For Bank of New York, as Trustee for CWABS 2006-11, Defendant: Eric Marc Levine ▾, Akerman LLP, Fort Lauderdale, FL.

**Judges:** DONALD M. MIDDLEBROOKS ▾, UNITED STATES DISTRICT JUDGE.

**Opinion by:** DONALD M. MIDDLEBROOKS ▾

## Opinion

**ORDER ON MOTION TO DISMISS**

THIS CAUSE comes before the Court upon Defendant Bank of New York's Motion to Dismiss (DE 3) ("Motion"), filed on January 31, 2014. On March 12, 2014, the Court ordered Plaintiff to show cause why the instant Motion should not be granted by default, since Plaintiff had not yet responded to the Motion. (See DE 10). Plaintiff filed a Response (DE 11) to the Motion on March 17, 2014, but did not set forth good cause or excusable neglect for their failure. While the Motion may be granted by default for failure to comply with this Court's Order, the Court nevertheless opts to resolve the Motion on the merits.

**I. Background**

This is an action for declaratory judgment and quiet title originally filed in state court. The case was subsequently removed to this Court on January 31, 2014. The case involves a promissory note issued **[*2]** by Plaintiffs Davenir and Altide Dorleus on June 1, 2006, in favor of

---

Document:                                          Dorleus v. Bank of N.Y., 2014 U.S. Dist. LEXIS 58360            Actions ▾

received any sort of notice of transfer or assignment for either the ownership or servicing of the loan. Plaintiffs allege that on or about January 25, 2013, they sent a "Debt Validation or Debt Verification Letter" to SLS, the loan servicer, to determine the identity of the claimant or creditor of the mortgage loan. (DE 1-2 at ¶¶ 9-11). The loan servicer allegedly responded by saying that CWABS 2006-11 was the creditor. (DE 1-2 at ¶ 12). According to the Complaint, the loan servicer did not provide any proof that the Note and/or Mortgage had been assigned to the trust or that the loan servicer has been authorized to accept payments, modify the terms of the Note and Mortgage, and, potentially, enforce the Note and Mortgage through default, acceleration, and foreclosure. (DE 1-2 at ¶¶ 14, 15).

The Complaint contains two Counts. In Count I, Plaintiffs **[*3]** seek a declaratory judgment pursuant to Florida Statutes § 86.011, et seq., to determine "if there is any obligation of the Homeowners to make any further payments to the Trustee or Loan Servicer under the Note, and whether there is any continuing or further right of the Trustee or Loan Servicer to receive any payments from the Homeowners under the Note." (DE 1-2 at ¶ 22). Specifically, Plaintiffs seek (1) a declaration that they have no further or continuing obligation to make further payments to the Trustee under the Note; (2) a declaration that the Trustee has no further right to receive any further payments from Plaintiffs under the

Note; and (3) a judicial declaration cancelling the Note as supplemental relief pursuant to Florida Statutes § 86.061. In Count II, Plaintiffs seek to quiet title to the subject property, alleging that "the subject Mortgage is a cloud upon the Plaintiffs' title to the subject property, in consideration that the underlying Note has been paid or the obligations and rights thereunder have been extinguished, and there is no further right of enforcement on the part of the Trustee." (DE 1-2 at ¶ 25).

## II. Legal Standard

A motion to dismiss under Rule 12(b)(6)  **[*4]**  challenges the legal sufficiency of a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing the legal sufficiency of a complaint's allegations, this Court is bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal*. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) [hereinafter *Twombly*]; *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) [hereinafter *Iqbal*]. That is, the complaint "must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *ADA v. Cigna Corp.*, 605 F.3d 1283, 1289 (quoting *Twombly*, 550 U.S. at 570). "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Group, Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (internal quotations omitted) (citing *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)). When reviewing a motion to dismiss, a court must construe plaintiff's complaint in the light most favorable to the plaintiff and take the factual allegations stated therein as true.  **[*5]**  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997); *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406, 122 S. Ct. 2179, 153 L. Ed. 2d 413 (2002). However, pleadings that "are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 129 S. Ct. at 1950; *see also Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (stating that an unwarranted deduction of facts is not considered true for the purpose of determining whether a claim is legally sufficient).

Generally, a plaintiff is not required to detail all the facts upon which he bases his claim. Fed. R. Civ. P. 8(a)(2). Rather, Rule 8(a)(2) requires a short and plain statement of the claim that fairly notifies the defendant of both the claim and the supporting grounds. *Twombly*, 550 U.S. at 555-56. However, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Twombly*, 550 U.S. at 556 n.3. The plaintiff's "obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions,  **[*6]**  and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). "Factual allegations must be enough to raise [the plaintiff's] right to relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *Id.*

## III. Application

As to Count I, Plaintiffs seek declaratory relief pursuant to the Florida Declaratory Judgment Act. In order to be entitled to declaratory relief under Florida law, the following elements must be met:

[1]. . . a bona fide, actual, present practical need for the declaration;

[2] . . . the declaration should deal with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts;

[3] . . . some immunity, power, privilege or right of the complaining party is dependent upon the facts or the law applicable to the facts;

[4] . . . there is some person or persons who have, or reasonably may have an actual, present, adverse and antagonistic interest in the subject matter, either in fact or law;

[5] . . . the antagonistic and adverse interests are all before the court by proper process or class representation and that the relief sought is not merely the  **[*7]**  giving of legal advice by the courts or the answer to questions propounded from curiosity.

*City Of Hollywood v. Petrosino*, 864 So. 2d 1175, 1177 (Fla. 4th DCA 2004) (alterations in original) (quoting *City of Hollywood v. Fla. Power & Light Co.*, 624 So. 2d 285, 286-87 (Fla. 4th DCA 1993)). The granting of declaratory relief under Florida law is discretionary. *Travelers Ins. Co. v. Emery*, 579 So. 2d 798, 800 (Fla. 1st DCA 1991).

Plaintiffs assert that an "actual controversy exists" because if they make further payments to the loan servicer or Defendant, rather than the true owner or loan servicer of the Note and Mortgage, they will be at risk of being declared in default, having the Note and Mortgage accelerated, and perhaps judgment entered against them for enforcement of the loan. (DE 1-2 at ¶ 23). Plaintiffs additionally assert in their Response that they received notice from the loan servicer in 2012 creating a threat of suit. (*See* DE 11 at ¶ 10). In reality, however, Plaintiffs' perception of an "actual controversy" amounts to nothing more than speculation that Plaintiffs might be pursued in a future foreclosure action against them. But "Florida courts will not render, in the form  **[*8]**  of a declaratory judgment, what amounts to an advisory opinion at the instance of parties who show merely the *possibility* of legal injury on the basis of a hypothetical 'state of facts which have not arisen' and are only 'contingent, uncertain, [and] rest in the future.'" *Fla. Dep't of Ins. v. Guarantee Trust Life Ins. Co.*, 812 So. 2d 459, 460-461 (Fla. 1st DCA 2002) (emphasis and alteration in original) (quoting *Santa Rosa Cnty. v. Admin. Comm'n. Div. of Admin. Hearings*, 661 So. 2d 1190, 1193 (Fla. 1995)). Since Plaintiffs have not alleged that an action has been brought in the Florida state courts, it seems as if this claim's only basis is a hypothetical set of facts arising from a legal remedy not yet sought. Accordingly, the Court refuses to exercise its discretion and denies Count I for declaratory judgment.

The Court now turns to Count II, which seeks to quiet title to the subject property. Under Florida law, a complaint to quiet title "must not only show title in the plaintiff to the lands in controversy, but also that a cloud exists, before relief can be given against it." *Stark v. Frayer*, 67 So. 2d 237, 239 (Fla. 1953); *see also Trs. of Internal Improvement Fund of Fla. v. Sutton*, 206 So. 2d 272, 274 (Fla. 3d DCA 1968)  **[*9]**  ("It is well settled that he who comes into equity to get rid of a cloud upon his own title must show clearly the validity of his own title and the invalidity of his opponents.").

Considering all the allegations in the Complaint as true and construing them in the light most favorable to Plaintiffs, the complaint fails to allege even the appearance of a cloud of title. Plaintiffs admit that the note and mortgage were duly executed, but assert bare and conclusory allegations, without factual support, that the mortgage is somehow extinguished or void. But even accepting as true the allegation that the mortgage has been extinguished, this allegation can be raised as an affirmative defense to any future foreclosure proceedings; however, it does not support an independent cause of action. Accordingly, because Plaintiffs have failed to properly allege facts supporting a claim for quiet title under Florida law, Count II is due to be dismissed.

**IV. Conclusion**

For the foregoing reasons, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss (DE 3) is **GRANTED.** Plaintiff's Complaint is **DISMISSED WITHOUT PREJUDICE.** The Clerk of Court shall **CLOSE** this case.

**DONE AND ORDERED** in Chambers  **[*10]** at West Palm Beach, Florida, this 22 day of April, 2014.

/s/  Donald M. Middlebrooks ▾

DONALD M. MIDDLEBROOKS ▾

UNITED STATES DISTRICT JUDGE

About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

Client: -None- ⌄   Folders   History   Help

Ⓐ **Folta v. New York Times Co., 2017 U.S. Dist. LEXIS 234146**

Copy Citation

United States District Court for the Northern District of Florida, Gainesville Division

November 16, 2017, Decided; November 16, 2017, Filed

Case No. 1:17cv246-MW/GRJ

**Reporter**

2017 U.S. Dist. LEXIS 234146 *

KEVIN FOLTA, PH.D., Plaintiff, v. THE NEW YORK TIMES COMPANY, AND ERIC LIPTON, Defendants.

**Subsequent History:** Summary judgment granted by Folta v. New York Times Co., 2019 U.S. Dist. LEXIS 34533, 2019 WL 1486776 (N.D. Fla., Feb. 27, 2019)

## Core Terms

Defendants', defamatory, defamation, alleges, defamation claim, documents

**Counsel:** **[*1]** For KEVIN FOLTA, PHD PROFESSOR AND CHAIR HORTICULTURAL SCIENCES DEPARTMENT UNIVERSITY OF FLORIDA GAINESVILLE FL 32611, Plaintiff: BRYAN DAVID HULL ⌄ , JAMES JOHN EVANGELISTA ⌄ , LEAD ATTORNEYS, BUSH ROSS PA - TAMPA FL, TAMPA, FL; JAMES E BEASLEY, JR., LANE R JUBB, JR ⌄ , THE BEASLEY FIRM LLC ⌄ - PHILADELPHIA PA, PHILADELPHIA, PA.

For THE NEW YORK TIMES COMPANY, Defendant: CAROL JEAN LOCICERO ⌄ , LEAD ATTORNEY, THOMAS & LOCICERO PL ⌄ - TAMPA FL, TAMPA, FL; GREGG DARROW THOMAS ⌄ , LEAD ATTORNEY, MARK RICHARD CARAMANICA ⌄ , THOMAS & LOCICERO ⌄ - TAMPA FL, TAMPA, FL.

For ERIC LIPTON, WASHINGTON DC 20016, Defendant: GREGG DARROW THOMAS ⌄ , THOMAS & LOCICERO ⌄ - TAMPA FL, TAMPA, FL.

**Judges:** Mark E. Walker ⌄ , United States District Judge.

**Document:**      Folta v. New York Times Co., 2017 U.S. Dist. LEXIS 234146      | Actions ⌄

## Opinion

### ORDER ON MOTION TO DISMISS

This is a defamation case. Plaintiff is a professor and chairman of the horticultural sciences department at the University of Florida. In September 2015, Defendants published an article about food-industry executives' strategies to elevate academic voices, including Plaintiff's, in an effort to advance their interests in a so-called "food war" between proponents of genetically modified foods and the organic food industry. See ECF No. 19-1.

Plaintiff takes issue **[*2]** with Defendants' characterization of him in this article. He asserts Defendants falsely spun the facts to paint him as a "covertly paid operative" for Monsanto, a company that produces genetically modified products. ECF No. 19 at 2. After Defendants published the article, Plaintiff alleges he and his family received several threats—some of which were credible. And among other harms, Plaintiff alleges that the publication prompted several event organizers—including universities and media organizations—to cancel prearranged speaking engagements with him. Id. at 21-22.

Plaintiff's amended complaint, ECF No. 19, includes two counts. Count I alleges separate theories of defamation and false light based on the same facts, and Count II alleges a claim for intentional infliction of emotional distress. Defendants have moved to dismiss the amended complaint. ECF No. 28. This Court has considered, without hearing, Defendants' motion and has reviewed the article attached to the amended complaint and the embedded source e-mails central to Plaintiff's claims. See Brooks v. Blue Cross and Blue Shield of Fla., Inc., 116 F.3d 1364, 1368-69 (11th Cir. 1997) ("[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may **[*3]** consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment."). For the reasons stated below, Defendants' motion, ECF No. 28, is **GRANTED** in part and **DENIED** in part.

Defendants assert this Court should dismiss Plaintiff's amended complaint because (1) it fails to state a plausible defamation claim, (2) Florida law does not recognize the tort of false light, and (3) the emotional-distress claim is an improper duplication of the defamation claim. To start, this Court recognizes that the odds that Plaintiff's false light theory survives summary judgment are not good. See Jews for Jesus, Inc. v. Rapp,

997 So. 2d 1098 (Fla. 2008) (declining to recognize false light as a viable cause of action in Florida. But disparate courts are not in the practice of tossing separate theories underlying the same claim at the motion-to-dismiss stage. *See Winstead v. Lafayette Cty. Bd. of Cty. Comm'rs, 197 F. Supp. 3d 1334, 1339-41 (N.D. Fla. 2016).* And Count I is not due to be dismissed in its entirety—though this Court has reservations about allowing Plaintiff's defamation claim to proceed.

Plaintiff claims defamation *per se* and defamation by implication. He points to several statements in the article **[*4]** that he alleges are either patently false and defamatory on their face, or implicitly defamatory by creating the inference that Plaintiff was acting as a puppet for Monsanto. But a thorough reading of the entire article leads this Court to conclude that no reasonable juror could find a number of these statements to be defamatory. *See Jews for Jesus, 997 So. 2d at 1109, 1115* (defining a defamatory statement as one that "injures the plaintiff's reputation" among "a 'substantial and respectable' minority of the community.").

To be sure, an article's "spin," grounded in the author's opinion of the facts, is not actionable. *See From v. Tallahassee Democrat, Inc., 400 So.2d 52, 56-57 (Fla. 1st DCA 1981).* However, this Court cannot find as a matter of law that *all* of the statements and their alleged implications are not defamatory. A few of the article's statements give this Court pause. For example, the article states that Plaintiff conceded that some could view him as "a tool of the industry." ECF No. 19-1 at 2. But Plaintiff contests this assertion, claiming that Defendants twisted the reporter's alleged accusation that Plaintiff was a tool of the industry during his interview and falsely reported that Plaintiff volunteered the concession. *See* ECF No. 19 at 15. Such an admission, reportedly from the **[*5]** mouth of a researcher in academia, could very well injure that researcher's reputation among his peers. As would the statement that Plaintiff "defended" or "promoted" Monsanto's products. Viewing the facts in the light most favorable to Plaintiff, this Court is unable to determine as a matter of law whether these statements are defamatory. This Court will not narrow the claim any further at this stage.

In addition, this Court cannot determine on this record whether the fair reporting privilege bars Plaintiff's defamation claim. *See Alan v. Palm Beach Newspapers, Inc., 973 So. 2d 1177, 1180 (Fla. 4th DCA 2008)* ("A newspaper has a qualified privilege to report accurately on information received from government officials. The privilege extends to the publication of the contents of official documents, as long as the account is reasonably accurate and fair.") (citation and quotation marks omitted). At this early stage, this Court is unable to find as a matter of law that the source e-mails summarized in the article qualify as public records. Moreover, the existence of an affirmative defense like the fair reporting privilege generally does not support a motion to dismiss. *See Quiller v. Barclays American/Credit, Inc., 727 F.2d 1067, 1069 (11th Cir. 1984), aff'd en banc, 764 F.2d 1400 (11th Cir. 1985).* Accordingly, Defendants' motion is **DENIED** as to Count I.

Count II, on the **[*6]** other hand, is properly dismissed for multiple reasons. Count II sets out a claim for intentional infliction of emotional distress and incorporates by reference all preceding paragraphs, including Count I's defamation allegations. First of all, construing the facts as pled in the light most favorable to Plaintiff, this Court finds as a matter of law that the alleged facts are not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See Metropolitan Life Ins. Co. v. McCarson, 467 So. 2d 277, 278-79 (Fla. 1985)* (quoting Restatement (Second) of Torts § 46 (1965)). Moreover, "a plaintiff cannot transform a defamation action into a claim for intentional infliction of emotional distress simply by characterizing the alleged defamatory statements as 'outrageous.'" *Fridovich v. Fridovich, 598 So. 2d 65, 70 (Fla. 1992)* (citing *Boyles v. Mid-Florida Television Corp., 431 So. 2d 627, 636 (Fla. 5th DCA 1983)); see also Callaway Land & Cattle Co. v. Banyon Lakes C. Corp., 831 So. 2d 204, 208 (Fla. 4th DCA 2002)* ("In Florida, a single publication gives rise to a single cause of action."). Plaintiff has failed to state a plausible claim for relief and is further preclude from recasting his defamation claim as a claim for intentional infliction of emotional distress. Defendants' motion is **GRANTED** as to Count II.

Accordingly,

**IT IS ORDERED:**

1. Defendants' motion, ECF No. 28, is **GRANTED** in part and **[*7]** **DENIED** in part.

2. The motion, ECF No. 28, is **GRANTED** as to Count II. Count II is dismissed with prejudice.

3. The motion, ECF No. 28, is otherwise **DENIED**.

**SO ORDERED on November 16, 2017.**

**/s/ Mark E. Walker ▾**

**United States District Judge**



About

Cookie Policy

Privacy Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.



**Lexis**

Buja v. Capital, 15- cv-8100

Search: Everything

**Client: -None-** Folders History Help More

Ⓐ **Buja v. Capital, 2016 U.S. Dist. LEXIS 201575**

Copy Citation

Document: Buja v. Capital, 2016 U.S. Dist. LEXIS 201575 | Actions ∨

CASE NO.: 15-81002-CIV-MARRA

**Reporter**

**2016 U.S. Dist. LEXIS 201575 \***

KEVIN BUJA, Plaintiff, v. NOVATION CAPITAL, LLC, a foreign limited liability company; NOVATION VENTURES, LLC, a foreign limited liability company; both doing business as "Novation Settlement Solutions," an unregistered fictitious entity, Defendants.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part, Motion denied by, As moot, Request denied by, Without prejudice, Request granted Buja v. Capital, 2016 U.S. Dist. LEXIS 201576 (S.D. Fla., Aug. 23, 2016)
Motion granted by, in part, Motion denied by, in part Buja v. Novation Capital, LLC, 2016 U.S. Dist. LEXIS 187456 (S.D. Fla., Dec. 27, 2016)
Motion granted by, in part, Motion denied by, in part, Motion denied by, As moot Buja v. Novation Capital, LLC, 2017 U.S. Dist. LEXIS 231500 (S.D. Fla., Mar. 30, 2017)

## Core Terms

motion to dismiss, Allegations, discovery, motion to stay, prerecorded, factual allegations, cellular telephone, proposed class, make a call, telemarketing, Telephone, drafted, message, motions, survive, dialed

**Counsel:** **[\*1]** For Novation Funding LLC, West Palm Beach FL 33324, Novation Ventures LLC, Novation Settlement Solutions, Novation Funding LLC, STE. 410, Novation Ventures LLC, a foreign limited liability company; both doing business as Novation Settlement Solutions an unregistered fictitious entity, Novation Ventures LLC, agent of, Novation Funding LLC, 1641 Worthington Rd., Novation Capital LLC, agent of, Novation Capital LLC, Novation Settlement Solutions, Novation Capital LLC, a foreign limited liability company, Defendants: Dana Jane McElroy ▾, Thomas & LoCicero PL ▾, Fort Lauderdale, FL.

For Novation Capital LLC, a foreign limited liability company, Novation Ventures LLC, Novation Settlement Solutions, Novation Ventures LLC, agent of, Novation Ventures LLC, a foreign limited liability company; both doing business as Novation Settlement Solutions an unregistered fictitious entity, Novation Capital LLC, Novation Settlement Solutions, Novation Capital LLC, agent of, Defendants: Bryan K. Clark ▾, LEAD ATTORNEY, PRO HAC VICE, Vedder Price PC ▾, Chicago, IL.

For KEVIN BUJA, individually and on behalf of others similarly situated, Plaintiff: Scott David Owens ▾, SCOTT D. OWENS P.A. ▾, Hollywood, FL; Sean Martin Holas ▾, **[\*2]** Scott D. Owens P.A. ▾, Hollywood, FL; Patrick Christopher Crotty ▾, The Law Office of Scott D. Owens, Hollywood, FL; Keith James Keogh ▾, LEAD ATTORNEY, PRO HAC VICE, Keogh Law LTD ▾, Chicago, IL.

Novation Capital LLC, agent of, Novation Capital LLC, Novation Settlement Solutions, Novation Ventures LLC, agent of, Novation Capital LLC, a foreign limited liability company, Novation Ventures LLC, Novation Settlement Solutions, Novation Ventures LLC, a foreign limited liability company; both doing business as Novation Settlement Solutions an unregistered fictitious entity, Defendants: Blaine C. Kimrey ▾, LEAD ATTORNEY, PRO HAC VICE, Vedder Price PC ▾, Chicago, IL.

**Judges:** KENNETH A. MARRA ▾, United States District Judge.

**Opinion by:** KENNETH A. MARRA ▼

## Opinion

---

**ORDER**

This cause is before the Court upon Defendants' Motion to Dismiss [DE 12]; Defendants' Motion to Strike Class Allegations [DE 13]; and Defendants' Motion to Stay or Alternatively to Limit Discovery [DE 23]. All motions are ripe for the Court's consideration. The Court has reviewed all papers submitted in connection with these motions; the entire file; and is otherwise duly advised in the premises.

**1. Defendants' Motion to Dismiss**

With respect to a motion to dismiss for failure **[*3]**  to state a claim pursuant to Rule 12(b)(6), the Court observes first that Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court has held that "[w]hile a complaint attacked by a 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above a speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (internal citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'". *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950.

This is an action alleging that Defendants violated the Telephone **[*4]**  Consumer Protection Act ("TCPA"), 47 U.S.C. §227 *et seq.* [DE 1 at 1]. Defendants argue that Plaintiff's allegations are conclusory and lack factual support. [DE 12 at 2]. They say that Plaintiff has failed to state a claim, because he has not alleged his phone number; the number of calls claimed to have been made; the content of the calls; or the date and time of the alleged calls. [*Id.* at 1]. Defendants state that without this information, they cannot formulate a meaningful response to the Complaint. They also argue that Plaintiff has failed to plead adequately the use of an automated telephone dialing system ("ATDS").

The Court disagrees. Although brief in its allegations, the Complaint satisfies the requirements of Rule 8 of the Federal Rules of Civil Procedure and the Supreme Court cases arising thereunder. Paragraph 20 of the Complaint specifically states that "Plaintiff began receiving unsolicited, automatically dialed and/or prerecorded message, telemarketing calls to his cellular telephone from the number '561-615-9360.'" Paragraph 22 notes that Defendants left prerecorded messages in Plaintiff's voicemail. He further alleges that he "is the registered subscriber, with exclusive dominion and control, of the cellular telephone number to which the violative **[*5]**  telemarketing calls alleged herein were placed." [DE 1 at ¶23].

Defendants can obtain further detail during discovery. Their argument that they cannot respond to the Complaint as drafted is not compelling. If it is their contention that they never used an ATDS, they can simply deny the allegations outright. If they use an ATDS on occasion and do not yet know whether or not they did so as to Plaintiff, they can deny the allegations upon information and belief. Defendants can respond to the Complaint as drafted. Defendants' Motion to Dismiss is denied.

**2. Defendants' Motion to Strike Class Allegations**.

Defendants contend that it is obvious from the face of the Complaint that neither of the proposed classes can be certified. [DE 13 at 2]. They argue that the proposed class definitions are improper fail-safe classes which require individualized merit-based determinations to ascertain class membership. [*Id.* at 4].

The Court finds this inquiry to be premature. The issues raised by Defendants are more properly addressed when Plaintiff brings his motion to certify the class. **1** ⬇ Defendants' Motion to Strike the Class Allegations is denied.

**3. Defendants' [*6]**  Motion to Stay or Alternatively to Limit Discovery

Defendants' motion seeking a stay pending a decision on their motion to dismiss is now moot. Defendants also move to stay

pending a ruling by the United States Circuit Court for the District of Columbia in *ACA International v. FCC, et al.*, Case No. 15-1211 (D.C. Cir.), which Defendants argue will address critical statutory interpretation issues relevant to this case. [DE 23 at 1]. In the alternative, Defendants seek to have discovery limited to the narrow questions of whether Defendants made calls to Plaintiff using an ATDS and whether Defendants made calls to Plaintiff using an artificial or prerecorded voice. [*Id.*].

Regarding the *ACA International* case, Defendants state that the D.C. Circuit "**may** directly address whether the technology used by Defendants is an ATDS." [*Id.* at 6 (bold emphasis added)]. This Court does not view this possibility as a compelling reason to stay the instant case. Defendants' motion to stay on this basis is denied.

Finally, as to Defendants' request to limit discovery, in light of the Court's denial of Defendants' Motion to Dismiss and Motion to Strike Class Allegations, the Court views it as appropriate for discovery **[*7]** to proceed as to the entire case.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

    1. Defendants' Motion to Dismiss [**DE 12**] is **DENIED**.

    2. Defendants' Motion to Strike Class Allegations [**DE 13**] is **DENIED**.

    3. Defendants' Motion to Stay or Alternatively to Limit Discovery [**DE 23**] is **DENIED**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 8th day of January, 2016.

/s/ Kenneth A. Marra ▾

KENNETH A. MARRA ▾

United States District Judge

---

**Footnotes**

---

**1**⚏    Defendants rely heavily upon *Lindsay Transmission v. Office Depot*, 4:12-CV-221(CEJ), 2013 U.S. Dist. LEXIS 9554 (E.D. Mo. January 24, 2013), as "the most closely analogous case" [DE 21 at 7]; however, in *Lindsay*, Defendant submitted a declaration from its Vice-President of North American Retail Operations, stating that Office Depot has not had any national or regional marketing campaigns to send advertisements via facsimile; does not train any employees to distribute ads in this manner; that the canvassing flyers were created to be hand delivered; and that other than the complaint, Home Depot had not received any other complaints. Home Depot also submitted declarations from seven regional managers. Six of them stated that they were unaware of any such activities. Only one regional manager indicated that he discovered, upon the commencement of the lawsuit, that faxes had been sent from one store in 2011. Because of this factual background, the court in *Lindsay* found: "there is no evidence that defendant engaged in blast faxing on its own or through a third party or worked off a nationwide leads list. Indeed, the evidence indicates that there is no national policy of distributing advertising materials via facsimile transmission." In the instant motion, Defendants have submitted no such factual support, relying instead on the legal conclusions in *Lindsay* without any reference to the facts underlying those conclusions.



About           Cookie Policy

Privacy Policy      Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

**Document:**                           Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039                    | Actions ⌄

Go to ⌄   Page   | Page # |   ∧ ∨   | Search Document ⌕ |

⚠️ **Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039**

Copy Citation

United States Court of Appeals for the Eleventh Circuit

March 11, 2015, Decided

No. 13-13672

**Reporter**

780 F.3d 1039 * | 2015 U.S. App. LEXIS 3776 ** | 25 Fla. L. Weekly Fed. C 981

CARLOS URQUILLA-DIAZ, JUDE GILLESPIE, Plaintiffs—Appellants, BEN WILCOX, Plaintiff, versus KAPLAN UNIVERSITY, a.k.a. Iowa College Acquisition Corporation, a.k.a. Kaplan College, KAPLAN HIGHER EDUCATION CORPORATION, a division of Kaplan, Inc.; wholly owned subsidiary of The Washington Post Company, KAPLAN, INC., Defendants—Appellees.

**Subsequent History:** Costs and fees proceeding at, Magistrate's recommendation at United States ex rel. Gillespie v. Kaplan Univ., 2015 U.S. Dist. LEXIS 180417 (S.D. Fla., Dec. 1, 2015)

**Prior History:** [**1] Appeals from the United States District Court for the Southern District of Florida. D.C. Docket No. 1:09-cv-20756-PAS.
United States ex rel. Gillespie v. Kaplan University, 2013 U.S. Dist. LEXIS 173067 (S.D. Fla., Dec. 9, 2013)
United States ex rel. Gillespie v. Kaplan Univ., 2013 U.S. Dist. LEXIS 99093 (S.D. Fla., July 16, 2013)
United States ex rel. Diaz v. Kaplan Univ., 2011 U.S. Dist. LEXIS 91587 (S.D. Fla., Aug. 17, 2011)

**Disposition:** AFFIRMED in part, REVERSED in part, MODIFIED in part, and REMANDED.

## Core Terms

false claim, district court, policies, funds, compliance, implement regulations, regulations, discovery, documents, participation agreement, summary judgment, accreditation, allegations, scienter, enrollments, recruiters, certification, reckless disregard, false statement, eligibility, violations, satisfactory progress, nondiscrimination, particularity, disability, higher education, nonmoving party, jury question, fraudulent, employees

| Case Summary |
| --- |
| **Overview**<br>HOLDINGS: [1]-District court erred in finding that a relator did not state a claim under the False Claims Act based on his allegation that an institution was in violation of the Higher Education Act's ban on recruitment-based incentive compensation, 20 U.S.C.S. § 1094(a)(20), as his failure to include the adverb "solely" did not preclude the inference that he pled a plausible violation, and the inference was not foreclosed by the fact that the institution's compensation policy included nonrecruitment factors; [2]-District court did not err in dismissing his claim insofar as it was based on an alleged violation of the satisfactory-progress regulation, 34 C.F.R. § 668.34; [3]-District court properly dismissed another relator's claim that the institution certified its compliance with the Rehabilitation Act and its implementing regulations with reckless disregard for the truth.<br><br>**Outcome**<br>The court affirmed in part, reversed in part, modified in part, and remanded. |

| ▼ LexisNexis® Headnotes |
| --- |

Education Law > Administration & Operation ⌄ > Student Financial Aid ⌄ > General Overview ⌄

**HN1⬇** **Administration & Operation, Student Financial Aid**

Under Title IV of the Higher Education Act of 1965, the federal government operates a number of programs that disburse funds to students to help defray the costs of higher education. 20 U.S.C.S. §§ 1070-1099d. These programs include the Federal Pell Grant, the Federal Family Educational Loan Program, the William D. Ford Federal Direct Loan Program, and the Federal Perkins Loan. 20 U.S.C.S. §§ 1070a, 1071-1087, 1087a-1087j, 1087aa-1087ii. But these funds are only available to students who attend qualifying schools. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*

Education Law > Administration & Operation ⌄ > Student Financial Aid ⌄ > General Overview ⌄

**HN2⬇** **Administration & Operation, Student Financial Aid**

To be eligible to receive funds under Title IV of the Higher Education Act of 1965, 20 U.S.C.S. §§ 1070-1099d, a school must enter into a program participation agreement with the Department of Education. 20 U.S.C.S. § 1094; 34 C.F.R. § 668.14(a)(1) (2010). In signing such an agreement, the school promises to comply with all federal statutes applicable to Title IV of the Higher Education Act and the regulations promulgated thereunder. 20 U.S.C.S. § 1094; 34 C.F.R. § 668.14(b)(1). The school must also meet a number of additional requirements. But once qualified, students who currently attend or plan to attend the school may apply to receive Title IV funds by completing the Free Application for Federal Student Aid. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (8)*    1

Education Law > Administration & Operation ⌄ > Accreditation ⌄
View more legal topics

**HN3⬇** **Administration & Operation, Accreditation**

A school must be accredited to receive funds under Title IV of the Higher Education Act of 1965, 20 U.S.C.S. §§ 1070-1099d. 34 C.F.R. § 600.4(a)(5)(i). This is equally true for propriety schools. 34 C.F.R. § 600.5(a)(6). While the Department of Education does not directly accredit schools, the Secretary of Education approves accrediting agencies for different types of educational programs, and these accrediting bodies set independent standards for accreditation. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Education Law > Administration & Operation ⌄ > Accreditation ⌄

**HN4⬇** **Administration & Operation, Accreditation**

The regulations define "accredited" as the status of public recognition that a nationally recognized accrediting agency grants to an institution or educational program that meets established requirements. 34 C.F.R. § 600.2. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Education Law > Administration & Operation ⌄ > Career & Technical Schools ⌄

**HN5⬇** **Administration & Operation, Career & Technical Schools**

A propriety institution of higher education is defined as an institution that, among other things, is not a public or other nonprofit institution. 20 U.S.C.S. § 1001(a)(4), 1002(b)(1)(C); 34 C.F.R. § 600.5(a)(1). 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Education Law > Administration & Operation ⌄ > Career & Technical Schools ⌄

**HN6⬇** **Administration & Operation, Career & Technical Schools**

In order to receive funds under Title IV of the Higher Education Act of 1965, 20 U.S.C.S. §§ 1070-1099d, a proprietary school must agree that it will derive not less than 10 percent of its revenues from sources other than funds provided under Title IV of the Higher Education Act of 1965. 20 U.S.C.S. § 1094(a)(24); 34 C.F.R. § 668.14(b)(16). This is known as the "90/10 rule." 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Education Law > Administration & Operation ⌄ > Student Financial Aid ⌄ > General Overview ⌄

**HN7⬇** **Administration & Operation, Student Financial Aid**

In order to receive funds under Title IV of the Higher Education Act of 1965, 20 U.S.C.S. §§ 1070-1099d, a school must agree that it will not award recruiters any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments. 20 U.S.C.S. § 1094(a)(20). In 2002, the Department of Education's implementing regulations created several safe harbors -- arrangements that an institution may carry out without violating this statute. 34 C.F.R. § 668.14(b)(22)(ii). One such harbor shelters a school that pays fixed compensation, as long as that compensation is not adjusted up or down more than twice during any 12 month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid. § 668.14(b)(22)(ii)(A). 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*    1

Education Law > **Administration & Operation** ▾ > **Student Financial Aid** ▾ > **Eligibility for Financial Aid** ▾
View more legal topics

**HN8** Student Financial Aid, Eligibility for Financial Aid

Prior to July 2011, the Department of Education's regulations obligated schools to review their students' academic progress at the end of each year. 34 C.F.R. § 668.34(d). For students enrolled in a program of study of more than two academic years, eligibility under Title IV of the Higher Education Act of 1965, 20 U.S.C.S. §§ 1070-1099d, beyond the second year partially depended on having made "satisfactory progress." 34 C.F.R. § 668.34(a). This meant they had to have a grade point average of at least a "C" or its equivalent or have academic standing consistent with the institution's requirements for graduation at the end of the second year. § 668.34(b).But students who failed to do so would not necessarily lose Title IV eligibility. Schools could find that a student was making satisfactory progress by determining the student's lackluster academic progress was the result of (1) the death of a relative, (2) an injury or illness, or (3) other special circumstances. § 668.34(c). Also, students who lost Title IV eligibility at the two-year checkpoint could later be found to be making satisfactory progress if at the end of a subsequent grading period they came into compliance with the institutions requirements for graduation. § 668.34(d). More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Education Law > **Administration & Operation** ▾ > **Accreditation** ▾
View more legal topics

**HN9** Administration & Operation, Accreditation

Educational institutions that receive federal funds, including under Title IV of the Higher Education Act, are prohibited from discriminating against individuals with disabilities. 29 U.S.C.S. § 794(a), (b)(2)(A), (b)(3)(A). More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Governments > **Federal Government** ▾ > **Claims By & Against** ▾

**HN10** Federal Government, Claims By & Against

The False Claims Act enables private citizens to recover damages on behalf of the United States by filing a qui tam action against a person who: (1) knowingly presents, or causes to be presented, to an officer or employee of the United States government a false or fraudulent claim for payment or approval; or (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government. 31 U.S.C.S. § 3729(a)(1)-(2). More like this Headnote

*Shepardize® - Narrow by this Headnote (29)*  7

Governments > **Federal Government** ▾ > **Claims By & Against** ▾

**HN11** Federal Government, Claims By & Against

Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures. Simply put, the sine qua non of a False Claims Act violation is the submission of a false claim to the government. More like this Headnote

*Shepardize® - Narrow by this Headnote (29)*  1

Education Law > **Departments of Education** ▾ > **US Department of Education** ▾ > **General Overview** ▾
Governments > **Federal Government** ▾ > **Claims By & Against** ▾

**HN12** Departments of Education, US Department of Education

An educational institution can be found liable under 31 U.S.C.S. § 3729(a)(2) of the False Claims Act for falsely certifying to the Department of Education in its program participation agreement that it will comply with federal law and regulations. To prevail under what is called a "false certification theory," a relator must prove: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due. More like this Headnote

*Shepardize® - Narrow by this Headnote (24)*  9

Governments > **Federal Government** ▾ > **Claims By & Against** ▾
View more legal topics

**HN13** Federal Government, Claims By & Against

Congress amended the False Claims Act via the Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. 111-21, 123 Stat. 1617. In doing so, Congress changed the language of 31 U.S.C.S. § 3729(a)(2), replacing the phrase "to get a false or fraudulent claim paid or approved by the government" with "material to a false or fraudulent claim." The Eleventh Circuit has held that this change applies retroactively to claims pending for payment on or after June 7, 2008. More like this Headnote

*Shepardize® - Narrow by this Headnote (18)*  5

Civil Procedure > **Appeals** ▾ > **Standards of Review** ▾ > **De Novo Review** ▾
View more legal topics

**HN14** Standards of Review, De Novo Review

A dismissal with prejudice is reviewed de novo. More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Appeals ▾ > Standards of Review ▾ > Abuse of Discretion ▾
View more legal topics

*HN15* ⬇ **Standards of Review, Abuse of Discretion**

A denial of leave to amend is reviewed for abuse of discretion. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Appeals ▾ > Standards of Review ▾ > De Novo Review ▾
Governments > Federal Government ▾ > Claims By & Against ▾
View more legal topics

*HN16* ⬇ **Standards of Review, De Novo Review**

A court of appeals reviews a dismissal with prejudice for failure to state a claim under the False Claims Act de novo. In doing so, the court accepts the allegations in the complaint as true and construe them along with the reasonable inferences therefrom in the relator's favor. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*

Civil Procedure > ... > Summary Judgment ▾ > Appellate Review ▾ > Standards of Review ▾

*HN17* ⬇ **Appellate Review, Standards of Review**

A court of appeals reviews a district court's grant of summary judgment de novo, construing the evidence and all reasonable inferences therefrom in favor of the nonmoving party. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (14)*

Civil Procedure > ... > Summary Judgment ▾ > Entitlement as Matter of Law ▾ > Appropriateness ▾
View more legal topics

*HN18* ⬇ **Entitlement as Matter of Law, Appropriateness**

Summary judgment is appropriate where the pleadings, affidavits, depositions, admissions, and the like show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (87)*   2

Civil Procedure > ... > Summary Judgment ▾ > Burdens of Proof ▾ > Nonmovant Persuasion & Proof ▾
View more legal topics

*HN19* ⬇ **Burdens of Proof, Nonmovant Persuasion & Proof**

To survive summary judgment, the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (167)*   6

Civil Procedure > ... > Summary Judgment ▾ > Opposing Materials ▾ > Motions for Additional Discovery ▾
View more legal topics

*HN20* ⬇ **Opposing Materials, Motions for Additional Discovery**

A court of appeals reviews a district court's decision to rule on a summary-judgment motion before all discovery disputes have been resolved for abuse of discretion. In doing so, the court considers whether the nonmoving party can show substantial harm from the court's decision and whether the nonmoving party timely informed the district court of any outstanding discovery. Moreover, the nonmoving party must specifically demonstrate how postponement of a ruling on the motion would have enabled him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (6)*   1

Civil Procedure > ... > Pleadings ▾ > Complaints ▾ > 📙 Requirements for Complaint ▾

*HN21* ⬇ **Complaints, Requirements for Complaint**

The Federal Rules of Civil Procedure require a complaint to contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). While the plaintiff's allegations need not satisfy any technical form, they must be simple, concise, and direct. Fed. R. Civ. P. 8(e)(1). Rule 8's pleading standard does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (23)*   1

Civil Procedure > ... > Defenses, Demurrers & Objections ▼ > Motions to Dismiss ▼ > Failure to State Claim ▼
View more legal topics

**HN22**  **Motions to Dismiss, Failure to State Claim**

Where the allegations are merely labels and conclusions or a formulaic recitation of the elements of a cause of action, a plaintiff's claim will not survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). For the claim to survive, the plaintiff's allegations must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim is facially plausible where the facts alleged permit the court to reasonably infer that the defendant's alleged misconduct was unlawful. Factual allegations that are merely consistent with a defendant's liability, however, are not facially plausible. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (68)*   ➕ 3

---

Civil Procedure > ... > Pleadings ▼ > Heightened Pleading Requirements ▼ > 🗎 Fraud Claims ▼
Governments > Federal Government ▼ > Claims By & Against ▼
View more legal topics

**HN23**  **Heightened Pleading Requirements, Fraud Claims**

In an action under the False Claims Act, Fed. R. Civ. P. 8's pleading standard is supplemented but not supplanted by Fed. R. Civ. P. 9(b). Rule 9(b) provides that a party alleging fraud must state with particularity the circumstances constituting fraud but may allege scienter generally. To satisfy this heightened-pleading standard in a False Claims Act action, a relator has to allege facts as to time, place, and substance of the defendant's alleged fraud, particularly, the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (30)*   ➕ 3

---

Civil Procedure > ... > Pleadings ▼ > Heightened Pleading Requirements ▼ > 🗎 Fraud Claims ▼
Governments > Federal Government ▼ > Claims By & Against ▼

**HN24**  **Heightened Pleading Requirements, Fraud Claims**

The mere disregard of federal regulations or improper internal practices does not create liability under the False Claims Act, 31 U.S.C.S. § 3729(a)(1), unless, as a result of such acts, the defendant knowingly asked the government to pay amounts it does not owe. Indeed, the central question regarding whether a relator's allegations state a claim under this subsection is, did the defendant present (or caused to be presented ) to the government a false or fraudulent claim for payment? So to satisfy Fed. R. Civ. P. 9(b)'s heightened-pleading requirements, the relator must allege the actual presentment of a claim with particularity, meaning particular facts about the who, what, where, when, and how of fraudulent submissions to the government. In contrast, § 3729(a)(2) does not demand proof that the defendant presented or caused to be presented a false claim to the government or that the defendant's false record or statement itself was ever submitted to the government. Even so, to state a claim under this subsection, the Eleventh Circuit has held that a plaintiff must show that (1) the defendant made a false record or statement for the purpose of getting a false claim paid or approved by the government; and (2) the defendant's false record or statement caused the government to actually pay a false claim, either to the defendant itself, or to a third party. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (55)*   ➕ 12

---

Civil Procedure > ... > Pleadings ▼ > Heightened Pleading Requirements ▼ > 🗎 Fraud Claims ▼
Governments > Federal Government ▼ > Claims By & Against ▼

**HN25**  **Heightened Pleading Requirements, Fraud Claims**

The submission of a false claim is the sine qua non of a False Claims Act violation. And while 31 U.S.C.S. § 3729(a)(2) does not require the false claim's actual presentment to the government for payment, it also does not impose liability for false statements unless they actually cause the government to pay amounts it does not owe. So to prevail on a claim under this subsection, the relator must prove that the government actually paid a false claim. For this reason, to satisfy Fed. R. Civ. P. 9(b)'s heightened-pleading requirements, a relator has to allege with particularity that the defendant's false statements ultimately led the government to pay amounts it did not owe. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (46)*   ➕ 11

---

Civil Procedure > ... > Pleadings ▼ > Complaints ▼ > 🗎 Requirements for Complaint ▼
Governments > Federal Government ▼ > Claims By & Against ▼

**HN26**  **Complaints, Requirements for Complaint**

To adequately plead a False Claims Act violation under a false certification theory, a relator has to allege facts that, if true, would show: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due. Mere regulatory violations do not give rise to a viable False Claims Act action; instead, it is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit. Thus, the relevant certification of compliance must be both a prerequisite to obtaining a government benefit, and a sine qua non of receipt of government funding. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (40)*   ➕ 12

---

Education Law > Administration & Operation ▼ > Student Financial Aid ▼ > General Overview ▼

View more legal topics

**HN27** Administration & Operation, Student Financial Aid

During the period 2004 through 2009, the United States Department of Education's regulations implementing the incentive-compensation ban included a number of safe harbors. One such safe harbor sheltered schools that paid fixed compensation, as long as that compensation was not adjusted up or down more than twice during any 12 month period, and any adjustment was not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid. 34 C.F.R. § 668.14(b)(22)(ii)(A). In promulgating this safe harbor, the Department of Education made clear that the word "solely" was being used in its dictionary definition. That is, without another or to the exclusion of all else.   More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

**HN28** Motions to Dismiss, Failure to State Claim

Typically, a Fed. R. Civ. P. 12(b)(6) motion to dismiss must be decided without considering matters outside of or unattached to the complaint. So when a court considers an extrinsic document, it must generally convert the motion to dismiss into one for summary judgment. Rule 12(d). But conversion is not always required. In ruling on a motion to dismiss, the court may consider an extrinsic document if (1) it is central to a claim in the complaint, and (2) its authenticity is unchallenged.   More like this Headnote

*Shepardize® - Narrow by this Headnote (7)*   1

Education Law > Administration & Operation > General Overview
View more legal topics

**HN29** Education Law, Administration & Operation

For a school to lose its eligibility to receive funds under Title IV of the Higher Education Act of 1965, 20 U.S.C.S. §§ 1070-1099d, it must derive less than ten percent of its revenues from sources other than Title IV funds for two consecutive institutional fiscal years. 20 U.S.C.S. § 1094(a)(24), (d)(2).   More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims
Governments > Federal Government > Claims By & Against

**HN30** Heightened Pleading Requirements, Fraud Claims

Fed. R. Civ. P. 9(b)'s pleading requirements might be relaxed under the False Claims Act only if a relator has adequately alleged at least some examples of actual false claims to lay a complete foundation for the rest of his allegations.   More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Education Law > Administration & Operation > Accreditation
Governments > Federal Government > Claims By & Against

**HN31** Administration & Operation, Accreditation

Making false statements to an accreditation agency does not expose a school to liability under the False Claims Act, 31 U.S.C.S. § 3729(a)(2), unless the statements were essential to the school having received (or maintained) its accreditation. For while lying to an accreditation agency is a reprehensible business practice, it violates the False Claims Act only if the false statements ultimately led the government to pay amounts it did not owe.   More like this Headnote

*Shepardize® - Narrow by this Headnote (13)*

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion
View more legal topics

**HN32** Standards of Review, Abuse of Discretion

Denial of leave to amend is not an abuse of discretion where a plaintiff fails to include the proposed amendment or the substance thereof with his request.   More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*   1

Governments > Federal Government > Claims By & Against

**HN33** Federal Government, Claims By & Against

The False Claims Act's scienter requirement is actually quite nuanced. For liability to attach, a relator must show that the defendant acted knowingly, which the Act defines as either actual knowledge, deliberate ignorance, or reckless disregard. 31 U.S.C.S. § 3729(b). Although proof of a specific intent to defraud is not required, the statute's language makes plain that liability does not attach to innocent mistakes or simple negligence.   More like this Headnote

*Shepardize® - Narrow by this Headnote (27)*   3

Governments > Federal Government > Claims By & Against

***HN34*** **Federal Government, Claims By & Against**

Congress added the "reckless disregard" provision to the False Claims Act in 1986. 31 U.S.C.S. § 3729(b). This language was added to ensure that "knowingly" captured the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims were being submitted. Liability attaches to only those who act in gross negligence -- those who fail to make such inquiry as would be reasonable and prudent to conduct under the circumstances. In other words, Congress did not intend to turn the False Claims Act, a law designed to punish and deter fraud, into a vehicle either punishing honest mistakes or incorrect claims submitted through mere negligence' or imposing a burdensome obligation on government contractors rather than a limited duty to inquire. ⌕ More like this Headnote

Shepardize® - Narrow by this Headnote (19) ⊕ 2

Governments  >  Federal Government ⌄  >  Claims By & Against ⌄

***HN35*** **Federal Government, Claims By & Against**

Reckless disregard for purposes of the False Claims Act, 31 U.S.C.S. § 3729(b), has uniformly been described as akin to an extension of gross negligence or an extreme version of ordinary negligence. A person acts with reckless disregard when the actor knows or has reason to know of facts that would lead a reasonable person to realize that harm is the likely result of the relevant act. ⌕ More like this Headnote

Shepardize® - Narrow by this Headnote (6)

Civil Procedure  >  ...  >  Summary Judgment ⌄  >  Opposing Materials ⌄  >  Motions for Additional Discovery ⌄
View more legal topics

***HN36*** **Opposing Materials, Motions for Additional Discovery**

The party opposing a motion for summary judgment bears the burden of calling to the district court's attention any outstanding discovery. Courts cannot read minds, so the nonmoving party must give more than vague assertions that additional discovery will produce needed, but unspecified, facts. ⌕ More like this Headnote

Shepardize® - Narrow by this Headnote (9) ⊕ 1

**Judges:** Before MARTIN ⌄ and DUBINA ⌄, Circuit Judges, and RODGERS ⌄, **⁕** ⌄⬇ District Judge.

**Opinion by:** DUBINA ⌄

## Opinion

[*1043] DUBINA ⌄, Circuit Judge:

In this consolidated qui tam action, three relators brought claims under the False Claims Act against an educational institution for falsely certifying to the government that it was in compliance with various federal statutes and regulations to receive financial-aid funds from the federal fisc. The district court ruled against the relators. After final judgment was entered, two relators appealed. Relator Carlos Urquilla-Diaz appeals from the district court's dismissal with prejudice of his claims under the False Claims Act against Defendants Kaplan University, Kaplan Higher Education Corp., and Kaplan, Inc. (Kaplan).  Relator Jude Gillespie appeals from the district court's grant of summary judgment to Kaplan on his claims under the False Claims Act as well as several other [**2] orders. After reviewing the record, reading the parties' briefs, and with the benefit of oral argument, we affirm the district court's judgment in part and reverse in part.

### I. Legal Framework

#### A. Higher Education Act

***HN1*** Under Title IV of the Higher Education Act of 1965, the federal government operates a number of programs that disburse funds to students to help defray the costs of higher education. 20 U.S.C. §§ 1070—1099d. These programs include the Federal Pell Grant, the Federal Family Educational Loan Program, the William T. Ford Federal Direct Loan Program, and the Federal Perkins Loan. ⌄⬇ But these funds are only available to students who attend qualifying schools.

***HN2*** To be eligible to receive Title IV funds, a school must enter into a program participation agreement with the Department of Education. Id. § 1094; see also 34 C.F.R. § 668.14(a)(1) (2010). [*1044] In signing such an agreement, the school promises to comply with all federal statutes applicable to Title IV of the Higher Education Act and the regulations promulgated thereunder. See § 1094; 34 C.F.R. § 668.14(b)(1). The school [**3] must also meet a number of additional requirements. But once qualified, students who currently attend or plan to attend the school may apply to receive Title IV funds by completing the Free Application for Federal Student Aid.

Here, Diaz and Gillespie's claims relate to the following statutory, regulatory, and contractual requirements that Kaplan had to meet or comply with to be eligible to receive Title IV funds.

*Accreditation.* ***HN3*** A school must be accredited. 34 C.F.R. § 600.4(a)(5)(i). ⌄⬇ This is equally true for a propriety school ⌄⬇ like Kaplan. Id. § 600.5(a)(6). While the Department of Education does not directly accredit schools, "the Secretary of Education approves accrediting agencies for different types of educational programs, and these accrediting bodies set independent standards for accreditation." *Thomas M. Cooley Law Sch. v. Am. Bar Ass'n, 459 F.3d 705, 707 (6th Cir. 2006).* Both Kaplan University and Kaplan Higher Education Corp. are accredited by the Higher Learning Commission.

*The 90/10 rule.* ***HN6*** A proprietary school must agree that it will "derive not less than ten percent of [its] revenues from sources other than

funds provided under _Title IV of the Higher Education Act_. § 1094(a)(24); 34 C.F.R. § 668.14(b)(16). This is known as the "90/10 rule."

_Ban on recruitment-based incentive compensation_. **HN7** A school must agree that it will not award recruiters "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments." § 1094(a)(20). In 2002, the Department of Education's implementing regulations created several safe harbors—"arrangements that an institution may carry out without violating" this statute. 34 C.F.R. § 668.14(b)(22)(ii). One such harbor shelters a school that pays "fixed compensation . . . as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." _Id._ § 668.14(b)(22)(ii)(A).

_Satisfactory progress_. When the events in the second amended complaint filed in this case allegedly occurred,**HN8** the Department of [**5] Education's regulations obligated schools to review their students' academic progress at the end of each year. _Id._ § 668.34(d). For students "enrolled in a program of study of more than two academic years," Title IV eligibility beyond the second year partially depended on having made "satisfactory progress." _Id._ § 668.34(a). This meant they had to have "a grade point average of at least a 'C' or its equivalent[ ] or ha[ve] academic standing consistent with the institution's requirements for graduation" at the end of the second year. _Id._ § 668.34(b).

**[*1045]** But students who failed to do so would not necessarily lose Title IV eligibility. Schools could "find that a student [wa]s making satisfactory progress" by determining the student's lackluster academic progress was the result of (1) "[t]he death of a relative," (2) "[a]n injury or illness," or (3) "[o]ther special circumstances." _Id._ § 668.34(c). Also, students who lost Title IV eligibility at the two-year checkpoint could later be found to be making satisfactory progress if "at the end of a subsequent grading period [they came] into compliance with the institutions requirements for graduation." _Id._ § 668.34(d).

_Section 504 of the Rehabilitation Act_. **HN9** Educational institutions that receive federal funds, including under Title IV of the Higher Education Act [**6] , are prohibited from discriminating against the individuals with disabilities. 29 U.S.C. § 794(a), (b)(2)(A), (b)(3)(A). In its 2004 program participation agreement, Kaplan agreed that it would "comply with . . . Section 504 of the Rehabilitation Act and the implementing regulations 34 C.F.R. Part 104 (barring discrimination on the basis of physical handicap)."

## B. False Claims Act

**HN10** The False Claims Act enables private citizens to recover damages on behalf of the United States by filing a qui tam action against a person who

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; [or]

> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

31 U.S.C. § 3729(a)(1)—(2) (2006). **HN11** "Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures." _Corsello v. Lincare, Inc._, 428 F.3d 1008, 1012 (11th Cir. 2005). Simply put, the "_sine qua non_" of a False Claims Act violation "is the submission of a false claim to the government. _Id._ (quoting _United States ex rel. Clausen v. Lab. Corp. of Am._, 290 F.3d 1301, 1311 (11th Cir. 2002)).

Even so, **HN12** an educational institution can be [**7] found liable under § 3729(a)(2) for falsely certifying to the Department of Education in its program participation agreement that it will comply with federal law and regulations. To prevail under what our sister circuits call a "false certification theory"—a theory of liability that we expressly adopt—the relator must prove "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." _United States ex rel. Hendow v. Univ. of Phx._, 461 F.3d 1166, 1174 (9th Cir. 2006). **6**⤓

## [*1046] II. Factual and Procedural Background

### A. Diaz

Diaz worked for Kaplan [**8] University from August 2004 through April 2005 as a professor of paralegal studies. In April 2007, he filed this qui tam action against Kaplan. He then amended his complaint twice. In his second amended complaint, he alleged that Kaplan had violated several provisions of the Higher Education Act and its implementing regulations. These violations in turn rendered Kaplan ineligible to receive Title IV funds. And because these violations were committed with the requisite scienter, Kaplan was liable under the False Claims Act.

Specifically, Diaz alleged that Kaplan committed the following violations:

> (1) improperly paying incentive compensation to recruiters and then falsely asserting in a yearly letter that it was in compliance with the ban on recruitment-based incentive compensation;

> (2) enrolling employees in its courses and paying their tuition from a company scholarship created with Title IV funds, thereby violating the 90/10 rule;

> (3) inflating students' grades and then certifying that they were making satisfactory academic progress; and

> (4) using falsified documents to obtain accreditation.

As a result, Diaz asserted that Kaplan violated subsections (a)(1) and (a)(2) of the False Claims Act. **7**⤓

Kaplan moved to dismiss for failure to state a claim. In granting its motion, the district court found that Diaz had failed to adequately plead a False Claims Act violation. The court thus dismissed Diaz's claims with prejudice and declined to decide whether his claims were also barred by the False Claims Act's first-to-file rule, 31 U.S.C. § 3730(b)(5).

After final judgment was entered, Diaz perfected this appeal.

126

**B. Gillespie**

**1. Jude Gillespie's Employment with Kaplan University**

In April 2004, Gillespie, a licensed Florida attorney since 1992, began working for Kaplan University as an associate professor of paralegal studies. In August, he was promoted to department chair. Two months later, he informed Kaplan that he had a medical disorder and requested several accommodations. His requests were granted.

Even so, in April 2005, Gillespie complained to Karen Ross, then an associate general counsel [**10] for Kaplan, Inc., that Kaplan's grievance policies violated section 504 the Rehabilitation Act and its implementing regulations. At that time, he indicated that he planned to file an administrative complaint with the Department of Education's Office of Civil Rights (the OCR). The next day he did. The following day, Kaplan fired him for job abandonment because he had refused to perform his job duties.

**2. The Office of Civil Rights Proceedings**

In October 2005, after investigating Gillespie's allegations against Kaplan, the OCR rejected his individual claims. The **[*1047]** agency found that Kaplan did not discriminate or retaliate against him. It also found that Kaplan's policies did not prevent him from being "able to voice his grievances and to have them heard by every person at Kaplan he contacted."

But after reviewing the policies and procedures regarding disabled employees in the Kaplan Higher Education Corporation Employee Handbook, Kaplan Field Employee Handbook, and Kaplan University Faculty Handbook, the OCR made seven additional findings:

- The University does not have a published procedure detailing how a disabled employee can request accommodations based on his/her disability.

- The non-harassment [**11] policy only addresses the types of harassment to which an employee might be subjected. As all discrimination does not necessarily rise to the level of harassment, the University needs to provide policies and procedures that address discrimination separately from harassment.

- The discrimination/harassment complaint procedure should be amended to provide the detailed process in which employees might seek informal and formal resolutions to their concerns.

- The University should designate consistently to whom informal [sic] and/or informal complaints may be addressed.

- The University's policies and procedures should be amended so as to provide a definite detailed manner and period of time in which prompt investigations are to be completed (30-60 days).

- The complaint procedures should be amended to require the University to notify complainants in writing of the results of investigations.

- The University's policies and procedures should provide where a complainant and/or one who has been accused may appeal the investigation's findings.

- The University does not have a published procedure detailing how a disabled employee can request accommodations based on his/her disability.

That same month, [**12] Kaplan voluntarily entered into a resolution agreement with the OCR to change its policies. In doing so, Kaplan did not admit to any violation of or noncompliance with section 504 of the Rehabilitation Act or its implementing regulations.

Over the next several months, Kaplan communicated with the OCR as it worked to comply with the terms of the resolution agreement. In May 2007, the agency sent Kaplan a compliance letter stating that no further monitoring was necessary because it had fulfilled its obligations under the resolution agreement. At no time did the agency revoke Kaplan's eligibility to receive Title IV funds.

**3. Gillespie's Complaints**

In April 2007, Gillespie filed this qui tam action against Kaplan. He then amended his complaint twice. In the second amended complaint, he alleged that Kaplan violated the False Claims Act by knowingly (1) submitting false claims for payment to the government, and (2) making false statements that led to false claims for payment from the government. Specifically, he alleged that Kaplan made false statements in its 2004 and 2007 program participation agreements when it certified that it would "comply with . . . Section 504 of the Rehabilitation Act and the implementing [**13] regulations 34 C.F.R. Part 104 (barring discrimination on the basis of physical handicap)."

In August 2011, the district court dismissed with prejudice Gillespie's claim that **[*1048]** Kaplan continued to violate the Rehabilitation Act after May 2007. The court found that Gillespie had not alleged with particularity any ongoing violations. Indeed, the court noted that the May 2007 letter from the OCR to Kaplan—the same letter that Gillespie says proves that Kaplan was noncompliant in the first place—established that Kaplan complied with the terms of the resolution agreement, thereby ending any noncompliance under the Rehabilitation Act and its implementing regulations. 8 ±

**4. The 2004 Program Participation Agreement and Kaplan's Compliance with the Rehabilitation Act**

The 2004 program participation agreement at the center of Gillespie's False Claims Act action against Kaplan was signed by Gary Kerber, the president and chief executive officer of Kaplan Higher Education Corp. at that time. Kerber testified that he signed this agreement in reliance

upon the opinions of his subordinates, including those charged [**15] with compliance. One such person was Karen Ross.

Kaplan hired Ross as vice president of human resources and associate general counsel in 2002. Two years later, she was promoted to senior vice-president of human resources and associate general counsel. Although she was not responsible for ensuring that Kaplan was eligible to receive Title IV funds, she knew that someone in the general counsel's office was. Instead, her responsibilities included ensuring that Kaplan's policies complied with the Rehabilitation Act and its implementing regulations as well as providing nondiscrimination training. Additional compliance training at Kaplan included interactive computer programs that provided nondiscrimination training for all employees, annual meetings for human-resource directors, and annual managers' meetings.

In 2003, Ross revised Kaplan's employee handbook, incorporating nondiscrimination policies and grievance procedures that the Equal Employment Opportunity Commission had approved for use by a prior employer. The revised handbook covered nondiscrimination based on disability and included grievance procedures. According to her testimony, she believed that the revised handbook—that was sent [**16] to various Kaplan entities for use as a template—contained policies that complied with all of Kaplan's legal requirements. No one ever **[*1049]** told her that these policies might not comport with federal law or regulations until Gillespie did so the day before he filed an administrative complaint with the OCR in April 2005.

**5. The Privilege-Log Dispute**

After the district court dismissed Gillespie's continuing-violation claim, discovery commenced and proceeded for the next 15 months. During that period, Gillespie took 8 depositions, served 43 interrogatories, and made 29 requests for production. All told, Kaplan produced more than 18,000 pages of responsive documents.

After discovery closed, but before the parties began briefing on summary judgment, Gillespie requested a discovery conference with the magistrate judge. At the February 2013 hearing, Gillespie requested *in camera* review of about 60 documents that, in his view, gave him the "best shot" of showing that Kaplan had improperly designated documents as privileged.

On July 12, 2013, after considering the parties' briefs on the issue, the magistrate judge ruled that Kaplan had improperly withheld six documents (three of which were duplicates) [**17] and ordered Kaplan to produce the four wrongly withheld documents. Despite this ruling, Gillespie never sought review of any other documents designated as privileged.

**6. Summary Judgment Proceedings**

After discovery closed and the privilege dispute had been briefed, Kaplan and Gillespie each moved for summary judgment. Although the privilege dispute was then unresolved, Gillespie made no mention of it in his briefs, nor did he bring it to the district court's attention in any other manner. Instead, he requested that the court decide the motions on the then-current record.

On July 15, 2013, just two business days after Kaplan was ordered to produce the four wrongly withheld documents, the district court granted summary judgment to Kaplan. The court concluded that Gillespie had not raised a genuine issue of material fact regarding scienter because "Kaplan had policies and procedures in place to ensure compliance and there [wa]s no evidence that those policies and procedures were not followed." *United States ex rel. Gillespie v. Kaplan Univ. (Gillespie I), No. 09-20756-civ, 2013 U.S. Dist. LEXIS 99093, 2013 WL 3762445, at *6 (S.D. Fla. July 16, 2013).* The court noted that Kaplan had relied on counsel, including Karen Ross, who "made a point of staying on top of developments [**18] in the labor and employment fields" and had modeled Kaplan's policies after an example previously approved by the EEOC, in creating the policies that allegedly violated the Rehabilitation Act and its implementing regulations. *Id.*

Additionally, the district court rejected Gillespie's assertion that Ross had drafted Kaplan's policies without considering the Rehabilitation Act, explaining that he had taken her statements "out of context." *2013 U.S. Dist. LEXIS 99093, [WL] at *8.* The court emphasized the undisputed evidence showing that Kaplan "took steps to ensure compliance." *2013 U.S. Dist. LEXIS 99093, [WL] at *7.* Thus, because Gillespie had not established a jury question regarding scienter, the court granted summary judgment to Kaplan.

**7. Gillespie's Motions to Abate and to Reconsider**

Gillespie then filed a motion to abate entry of final judgment and a motion to reconsider. In his motion to abate, he asserted that the district court had entered summary judgment prematurely given that the privilege dispute had been resolved only two business days earlier and the documents ordered to be produced **[*1050]** "could have potentially led [him] to alert the [c]ourt that further discovery may impact the pending summary judgment briefing." In his motion to reconsider, he contended [**19] that the district court had made a number of errors in assessing and characterizing the record.

The district court denied both motions. It pointed out that Gillespie had failed to notify the court that the outstanding discovery was relevant to the parties' pending summary-judgment motions. For this reason, his motion to abate appeared to be "nothing more than an attempt at a second bite at the apple." *United States ex rel. Gillespie v. Kaplan Univ. (Gillespie II), No. 09-20756-civ, 2013 U.S. Dist. LEXIS 173067, 2013 WL 6492830, at *1 (S.D. Fla. Dec. 10, 2013).* While the court could have denied the motion for this reason alone, it did not. After reviewing the four documents that Kaplan was ordered to produce, the court concluded that they did "not contain any information relevant to the scienter issue" and thus "had no effect on the entry of summary judgment." *Id.* Additionally, the court found no basis for reconsideration because Gillespie "simply raised the same arguments he previously made" and had "not shown that the undisputed facts are disputed." *2013 U.S. Dist. LEXIS 173067, [WL] at *2.*

Gillespie now appeals from the district court's grant of summary judgment to Kaplan and all related orders.

**III. Standards of Review**

several standards of review govern this appeal. _**HN16**_ ⚓ We review a dismissal with prejudice [**20] for failure to state a claim under the False Claims Act de novo. _Hopper v. Solvay Pharms., Inc.,_ 588 F.3d 1318, 1324 (11th Cir. 2009). In doing so, we accept the allegations in the complaint as true and construe them along with the reasonable inferences therefrom in the relator's favor. _United States ex rel. McNutt v. Haleyville Med. Supplies, Inc.,_ 423 F.3d 1256, 1259 (11th Cir. 2005).

_**HN17**_ ⚓ We review the district court's grant of summary judgment de novo, construing the evidence and all reasonable inferences therefrom in favor of the nonmoving party. _Battle v. Bd. of Regents for Ga.,_ 468 F.3d 755, 759 (11th Cir. 2006). _**HN18**_ ⚓ Summary judgment is appropriate where the pleadings, affidavits, depositions, admissions, and the like "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); _Celotex Corp. v. Catrett,_ 477 U.S. 317, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." _Harrison v. Culliver,_ 746 F.3d 1288, 1298 (11th Cir. 2014) (quoting _Hickson Corp. v. N. Crossarm Co.,_ 357 F.3d 1256, 1259—60 (11th Cir.2004) (internal citations omitted)) (internal quotation marks omitted). Thus, _**HN19**_ ⚓ to survive summary judgment, the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf. _Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.,_ 446 F.3d 1160, 1162 (11th Cir. 2006).

_**HN20**_ ⚓ We review a district court's [**21] decision to rule on a summary-judgment motion before all discovery disputes have been resolved for abuse of discretion. _See Leigh v. Warner Bros., Inc.,_ 212 F.3d 1210, 1219 (11th Cir. 2000). In doing so, we consider whether the nonmoving party can show "substantial harm" from the court's decision, _see id.,_ and whether the nonmoving party timely informed the district court of any outstanding discovery, **[*1051]** _see Cowan v. J.C. Penney Co.,_ 790 F.2d 1529, 1530 (11th Cir. 1986). Moreover, the nonmoving party "must specifically demonstrate how postponement of a ruling on the motion [would have] enable[d] him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." _Reflectone, Inc. v. Farrand Optical Co.,_ 862 F.2d 841, 843 (11th Cir. 1989) (quoting _Wallace v. Brownell Pontiac-GMC Co.,_ 703 F.2d 525, 527 (11th Cir. 1983)) (quotation marks omitted).


**IV. Discussion**

**A. Diaz**

On appeal, Diaz contends that the allegations in the second amended complaint, when taken as true and viewed holistically, adequately state a claim for relief under § 3729(a)(1) and (a)(2). The district court disagreed and dismissed his claims with prejudice. Because we partially agree, the district court's judgment will be affirmed in part and reversed in part.


**1. Pleading a Claim for Relief Under the False Claims Act**

_**HN21**_ ⚓ The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled [**22] to relief." Fed. R. Civ. P. 8(a)(2). While the plaintiff's allegations need not satisfy any "technical form," they "must be simple, concise, and direct." Fed. R. Civ. P. 8(e)(1). Rule 8's pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." _Ashcroft v. Iqbal,_ 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (citing _Bell Atl. Corp. v. Twombly,_ 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007)).

_**HN22**_ ⚓ Where the allegations are merely "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," the plaintiff's claim will not survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). _Twombly,_ 550 U.S. at 555, 127 S. Ct. at 1965. For the claim to survive, the plaintiff's allegations "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" _Iqbal,_ 556 U.S. at 678, 129 S. Ct. at 1949 (quoting _Twombly,_ 550 U.S. at 570, 127 S. Ct. at 1974). A claim is facially plausible where the facts alleged permit the court to reasonably infer that the defendant's alleged misconduct was unlawful. _Id.,_ 129 S. Ct. at 1949. Factual allegations that are "'merely consistent with' a defendant's liability," however, are not facially plausible. _Id.,_ 129 S. Ct. at 1949 (quoting _Twombly,_ 550 U.S. at 557, 127 S. Ct. at 1966); _see also Chaparro v. Carnival Corp.,_ 693 F.3d 1333, 1337 (11th Cir. 2012).

_**HN23**_ ⚓ In an action under the False Claims Act, Rule 9's pleading standard is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b). _See Clausen,_ 290 F.3d at 1309. Rule 9(b) provides that a party alleging fraud "must state with particularity the circumstances constituting fraud" but may allege scienter [**23] generally. To satisfy this heightened-pleading standard in a False Claims Act action, the relator has to allege "facts as to time, place, and substance of the defendant's alleged fraud," particularly, "the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." _Id._ (quoting _Cooper,_ 19 F.3d at 567—68) (internal quotation marks omitted).

_**HN24**_ ⚓ The mere disregard of federal regulations or improper internal practices does not create liability under § 3729(a)(1) "unless, as a result of such acts, the [defendant] **[*1052]** knowingly ask[ed] the Government to pay amounts it does not owe." _Id._ at 1311. Indeed, the "central question" regarding whether a relator's allegations state a claim under this subsection, did the defendant present (or caused to be presented ) to the government a false or fraudulent claim for payment? _Hopper,_ 588 F.3d at 1326. So to satisfy Rule 9(b)'s heightened-pleading requirements, the relator must allege the "actual presentment of a claim . . . with particularity," _id._ at 1327, meaning particular facts about the "who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government," _Corsello,_ 428 F.3d at 1014.

In contrast, § 3729(a)(2) "does not demand proof that the defendant presented or caused to be presented a false claim to the government or that [**24] the defendant's false record or statement itself was ever submitted to the government." _Hopper,_ 588 F.3d at 1327. Even so, to state a claim under this subsection, we have held "that a plaintiff must show that (1) the defendant made a false record or statement for the purpose of getting a false claim paid or approved by the government; and (2) the defendant's false record or statement caused the government to actually pay a false claim, either to the defendant itself, or to a third party." _Id._

Additionally, our caselaw is clear: _**HN25**_ ⚓ "the submission of a false claim is the '_sine qua non_ of a False Claims Act violation.'" _Id._ at 1328 (quoting _Clausen,_ 290 F.3d at 1311). And while § 3729(a)(2) does not require the false claim's actual presentment to the government for payment, it also does not "impose liability for false statements [unless they] actually cause the government to pay amounts it does not owe." _Id._ So to prevail on a claim under this subsection, the relator must prove that the government actually paid a false claim. _Id._ at 1329. For this

reason, to satisfy Rule 9(b)'s heightened-pleading requirements, the relator has to allege with particularity that the defendant's "false statements actually led the government to pay amounts it did not owe." *Id.*

Here, Diaz argues [**25] that he adequately pleaded a False Claims Act violation under a false certification theory. **HN26** To do so under this theory, he had to allege facts that, if true, would show "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Hendow,* 461 F.3d at 1174. After all, "[m]ere regulatory violations do not give rise to a viable FCA action"; instead, "[i]t is the false *certification* of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." *Id.* at 1171 (alterations in original) (quoting *United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266—67 (9th Cir. 1996)). Thus, "the 'relevant certification of compliance must be both a 'prerequisite to obtaining a government benefit,'" and a '*sine qua non*' of receipt of [government] funding.'" *Id.* at 1172 (alteration in original) (quoting *Anton,* 91 F.3d at 1266, 1267) (internal citation omitted).

### i. Incentive Compensation

Diaz alleged that despite its certifications of compliance with the Higher Education Act's ban on recruitment-based incentive compensation, Kaplan violated this ban by paying its recruiters retention bonuses, cash bonuses, trips, or salaries based on the number of students they enrolled. **9** *See* 20 U.S.C. § 1094(a)(20). **[*1053]** Because Diaz alleged that factors other [**26] than recruitment were formally a part of Kaplan's compensation policy but failed not only to identify those factors but also to plead "any allegations, other than bare conclusions, to show that the other factors that were part of the compensation plan were not actually contained in practice," the district court concluded that he had not stated a claim under the False Claims Act. *United States ex rel. Diaz v. Kaplan Univ.,* No. 09-20756-civ, 2011 U.S. Dist. LEXIS 91587, 2011 WL 3627285, at *5 (S.D. Fla. Aug. 17, 2011). We disagree.

We begin by noting that **HN27** during the relevant period (2004 through 2009) the Department of Education's regulations implementing the incentive-compensation ban included a number of safe harbors. **10** One such safe harbor sheltered schools that paid "fixed compensation . . . as long as that compensation [wa]s not adjusted up or down more than twice during any twelve [**27] month period, and any adjustment [wa]s not based *solely* on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (emphasis added). In promulgating this safe harbor, the Department of Education made clear that "the word 'solely' [wa]s being used in its dictionary definition." Federal Student Aid Programs, 67 Fed. Reg. at 67,055. **11** That is, "without another" or "to the exclusion of all else." *Webster's Ninth New Collegiate Dictionary* 1122 (1986).

To be sure, Diaz did not allege that Kaplan's recruiters were paid solely on enrollments. But he did allege that their compensation was "based primarily on the number of students recruited." He also alleged that while "the official compensation plan looked like there were other factors besides the number of enrollments, it was nothing more than a disguised plan to pay unlawful compensation to the recruiters." These factors included professionalism, attendance, mentoring, [**28] participation in new initiatives, and willingness to work late shifts. **12** In short, Diaz alleged that **[*1054]** the nonrecruitment factors only existed on paper; the real basis on which recruiters received raises was enrollments.

On appeal, Diaz argues that the relevant question is how Kaplan implemented its compensation policy, not the terms of its policy. And he is correct. In response, Kaplan contends that his allegations failed to state a claim under the False Claims Act because he offered no specific facts from which it could be inferred that the nonrecruitment factors were merely pretextual. Based on our review of the record, we conclude that this contention fails for two reasons.

First, contrary to Kaplan's contention, Diaz included specific facts about four former Kaplan employees "whose salaries were increased or decreased based on the number of enrollments." He alleged:

- Dave [**30] Schienberg in Florida [was employed for approximately 19 months at Kaplan, from 2006-2008]. His pay rose from $29,000 a year to $50,000; when he was unable to meet the higher quota that came with the higher pay, he was terminated. . . .

- Paris Henderson was employed from approximately 2005-2008. He is another employee who was paid based on the number of enrollments he obtained. He was ultimately terminated for not meeting the increased requirements.

- Justin Keyes worked for Kaplan from 2006-2008. His pay started at $30,000 and rose to $60,000 based on the number of enrollments he obtained. When his enrollment numbers dropped, so did his salary, as it was reduced to $37,000. When he was not able to increase the number of enrollments to the higher, required levels, he was terminated.

- Mark Anthony Edwards . . . worked as a recruiter for Kaplan for about five years, ending April 10, 2009. His starting salary was approximately $26,000. It was increased to approximately $60,000 based on the number of students he enrolled. His salary was reduced back to $30,000 when he could not maintain higher levels of new enrollments.

Accepting these allegations as true and drawing all reasonable inferences [**31] therefrom in Diaz's favor, as we must in reviewing the ruling on Kaplan's motion to dismiss, *McNutt,* 423 F.3d at 1259, we conclude that Diaz's failure to include the adverb *solely*—a word with no talismanic power—is not enough to preclude the inference that he pleaded a plausible violation of the False Claims Act.

Second, despite Kaplan's contrary contention, this inference is not foreclosed by the fact that the compensation policy in the record included nonrecruitment factors. That is because the policy was not in place during the entire period covered by Diaz's allegations: 2004 to 2009. The policy is dated "5/26/06." So at least for the recruiters who worked for Kaplan before this date and received raises "based on" their enrollment numbers, it is not unreasonable to infer that these raises were based solely on enrollments. Diaz thus plausibly stated a claim under the False Claims Act based on Kaplan's alleged violations **[*1055]** of the incentive-compensation ban that relate to these recruiters. Accordingly, we reverse the district court's judgment dismissing Diaz's claim insofar as it was based on Kaplan's alleged violation of the incentive-compensation ban. **13**

### ii. Grade Inflation

Diaz alleged that Kaplan violated the Department of Education's regulation requiring students seeking Title IV funds beyond their second year of

study to have made "satisfactory progress" (as defined in 34 C.F.R. § 668.34) by engaging in a grade-inflation scheme. Grade inflation could lead to a False Claims Act violation where, among other things, a school certified that a student was making satisfactory progress when he or she was not, thus causing the government [**33] to disburse Title IV funds that were not actually owed to the student. Because Diaz **[*1056]** had not adequately alleged how Kaplan's grade-inflation scheme resulted in the school falsely certifying that students were maintaining satisfactory progress, the district court concluded that he had failed to state a claim under the False Claims Act. We agree.

While Diaz offered some particulars about Kaplan's alleged grade-inflation scheme, he failed to plead with particularity how this scheme led to students being falsely certified as making satisfactory progress. That is, he did not make any specific allegations of students who would not have been making satisfactory progress without grade inflation. Nor did he allege that Kaplan's grading policy precluded students from failing regardless of how poorly they performed. Quite the contrary: he alleged that some students flunked out. Additionally, because he included no allegations about Kaplan's graduation requirements, it is impossible to plausibly infer that the students were not making satisfactory progress consistent with these requirements but for Kaplan's alleged grade-inflation scheme.

In short, to state a claim under the False Claims Act, Diaz [**34] needed to allege with particularity that some students would not have been making satisfactory progress—and thus Kaplan's certifications to this effect were false—*but for* the school's grade-inflation scheme. He did not. We thus conclude that the district court did not err in dismissing his claim insofar as it was based on Kaplan's alleged violation of the satisfactory-progress regulation.

### iii. The 90/10 Rule

Diaz averred that Kaplan violated the 90/10 rule by creating a scholarship program for its employees with money from its students' tuition payments, which in turn may have come from Title IV funds. **HN29** For a school to lose its eligibility to receive Title IV funds, it must derive "less than ten percent of [its] revenues from sources other than" Title IV funds for "two consecutive institutional fiscal years." 20 U.S.C. § 1094(a)(24), (d)(2). Because Diaz had not adequately alleged how Kaplan's Gift of Knowledge scholarship violated the 90/10 rule, the district court concluded that he failed to state a claim under the False Claims Act. Again, we agree.

Diaz did not allege with particularity that Kaplan received more than 90 percent of its revenue from Title IV funds or that it received less than 10 percent of its revenue [**35] from non-Title IV funds. Instead, he alleged that Kaplan endowed the Gift of Knowledge scholarship with some unspecified amount of Title IV funds from the tuition payments of its students. But even if true, absent allegations about Kaplan's total revenue, this fact alone does not make it plausible (as opposed to merely possible) that the school violated the 90/10 rule. *See Chaparro, 693 F.3d at 1337.*

Diaz alleged that (1) "almost 100% of Kaplan money is taken in from federal student loans"; and (2) "Kaplan would in fact use creative accounting techniques to indicate that Kaplan was receiving that cash [payments from the Gift of Knowledge scholarship fund] from the students when it was not." But these general statements were unsupported by any specific factual allegations and thus failed to satisfy his burden to plead a False Claims Act violation with particularity under Rule 9(b). *See Clausen, 290 F.3d at 1314 n.25* (noting that **HN30** Rule 9(b)'s pleading requirements might be relaxed only if the relator has adequately "allege[d] at least some examples of actual false claims to lay a complete foundation for the rest of his allegations").

In sum, Diaz failed to allege facts that, if true, would establish that Kaplan's certification of compliance with the 90/10 rule was false. [**36] At most, his allegations were merely consistent with Kaplan having violated this rule, but that is not enough to state a claim under the False Claims Act. Thus, we conclude that the district court did not err in dismissing his claim insofar as it was based on Kaplan's alleged violation of the 90/10 rule.

### iv. Accreditation

Diaz alleged that Kaplan submitted backdated studies and budgets as well as other "forged" or "false" documents to the Higher Learning Commission, the agency that accredited "certain" of its "college degree programs." In his view, "without the falsified documents, [Kaplan] would not [have] receive[d] the accreditation it desired." Making false statements to an accreditation agency could lead to a False Claims Act violation because whether a school is accredited is material to the government's decision to disburse Title IV funds to the school (or its students). Because Diaz failed to allege with particularity what false statements were made, when they were made, or who made them, the district court concluded that he had failed to state a claim under the False Claims Act. Here, too, we agree.

**HN31** Making false statements to an accreditation agency does not expose a school to liability [**37] under § 3729(a)(2) unless the statements were essential to the school having received (or maintained) its accreditation. For while lying to an accreditation agency is a reprehensible business practice, it violates the False Claims Act only if the "false statements ultimately led the government to pay amounts it did not owe." Hopper, 588 F.3d at 1329. Thus, to survive the motion to dismiss, Diaz had to plead particular facts that provide a plausible connection between Kaplan's allegedly false statements to the Higher Learning Commission and the agency's decision to accredit "certain college degree programs." Because he failed to do so, we conclude that the district court did not err in dismissing his claim insofar as it was **[*1057]** based on Kaplan's alleged violation of the accreditation requirement.

### 2. Dismissal with Prejudice

Diaz contends that the district court was wrong to dismiss his claims with prejudice because the government is the real party in interest in a False Claims Act action. He asserts that if this judgment is left in place, Kaplan could conceivably argue that res judicata bars the government from bringing a properly pleaded False Claims Act action. Here, however, we need not decide whether a Rule 12(b)(6) dismissal [**38] precludes the government (or another relator) from bringing a False Claims Act action against a defendant, especially where the government did not intervene at any stage in the proceedings, to affirm the dismissal with prejudice of Diaz's claims. Three attempts at proper pleading are enough. **14** That said, we modify the judgment of dismissal to be without prejudice to the government. *Cf. United States ex rel. Williams v. Bell Helicopter Textron, Inc., 417 F.3d 450, 456 (5th Cir. 2005).*

**B. Gillespie**

The district court granted summary judgment to Kaplan because Gillespie failed to show that there was a genuine issue of material [**39] fact regarding scienter—a necessary element of his false certification claim. *See Hendow*, 461 F.3d at 1174. Specifically, the court found that nothing in the record supported his contention that Kaplan knew or should have known that its policies violated section 504 of the Rehabilitation Act and its implementing regulations when the 2004 program participation agreement was executed. On appeal, Gillespie contends that the district court's finding was erroneous for four reasons.

> *First*, Gillespie told Karen Ross that the company's policies did not comply with the Rehabilitation Act and its implementing regulations in April 2005.

> *Second*, Ross drafted Kaplan's nondiscrimination policies and grievance procedures to comply with the Rehabilitation Act from language that she had used at a previous employer to comply with the EEOC's regulations—even though that company did not receive federal funds and thus was not subject to the Rehabilitation Act.

> *Third*, Gary Kerber, who signed the 2004 program participation agreement for Kaplan, did not personally ensure that the company's nondiscrimination policies and grievance procedures complied with the Rehabilitation Act.

> *Fourth*, Kaplan could not have entered into a voluntary restoration [**40] agreement with the OCR unless it was in noncompliance with the Rehabilitation Act.

Kaplan responds that even when viewed collectively, this evidence does not create a jury question about whether it acted with actual knowledge or the aggravated form of gross negligence needed to show scienter under the False Claims Act. Because we agree, the district court's grant of summary judgment to Kaplan will be affirmed.

**[*1058] 1. Scienter Under the False Claims Act**

*HN33* The False Claims Act's scienter requirement is "actually quite nuanced." *United States v. King-Vassel*, 728 F.3d 707, 712 (7th Cir. 2013). For liability to attach, the relator must show that the defendant acted "knowingly," which the Act defines as either "actual knowledge," "deliberate ignorance," or "reckless disregard." § 3729(b). Although proof of a "specific intent to defraud" is not required, *id*., the statute's language makes plain that liability does not attach to innocent mistakes or simple negligence, *King-Vassel*, 728 F.3d at 712.

*HN34* Congress added the "reckless disregard" provision to the False Claims Act in 1986. *United States ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 530 (6th Cir. 2012). The Senate Report accompanying this change states that this language was added to ensure that "knowingly" captured "the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple [**41] inquiries which would alert him that false claims are being submitted." S. Rep. 99-345, at 21, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5286. Liability attaches to "[o]nly those who act in gross negligence"—those who fail "to make such inquiry as would be reasonable and prudent to conduct under the circumstances." *Id*. at 20 (quotation marks omitted). In other words, Congress did not intend to turn the False Claims Act, a law designed to punish and deter fraud, *see Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1237 n.1 (11th Cir. 1999), "into a vehicle either 'punish[ing] honest mistakes or incorrect claims submitted through mere negligence'" or imposing 'a burdensome obligation' on government contractors rather than a 'limited duty to inquire,'" *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1274, 393 U.S. App. D.C. 223 (D.C. Cir. 2010) (quoting S. Rep. 99-345, at 6, 19).

*HN35* Our sister circuits have uniformly described *reckless disregard* for purposes of the False Claims Act as akin to "an extension of gross negligence" or an "extreme version of ordinary negligence." *See, e.g., United States v. Krizek*, 111 F.3d 934, 942, 324 U.S. App. D.C. 175 (D.C. Cir. 1997); *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338 & n.9 (5th Cir. 2008). Indeed, as the Seventh Circuit recently noted, this description is consistent with *Black's* definition that "a person acts with reckless disregard 'when the actor knows or has reason to know of facts that would lead a reasonable person to realize' that harm is the likely result of the relevant act." [**42] *King-Vassel*, 728 F.3d at 713 (quoting *Black's Law Dictionary* 540-41 (9th ed. 2009)). 15

On appeal, Gillespie contends that a jury could reasonably conclude from the record evidence that Kaplan certified its compliance with the Rehabilitation Act and its implementing regulations with either actual knowledge that it was not or with reckless disregard for whether this certification was true. We disagree and reject his contentions for the following reasons.

**[*1059] i. Actual Knowledge**

Gillespie identifies nothing in the record that would allow a reasonable jury to conclude that Kaplan entered into the 2004 program participation [**43] agreement with actual knowledge that its policies violated section 504 of the Rehabilitation Act and its implementing regulations. And his attempt to manufacture a triable issue out of a misstatement in the district court's summary-judgment order is unavailing.

Gillespie objects to the district court's framing of this fact: "No one ever told Ross that her policies might not comport with federal law." *Gillespie I*, 2013 U.S. Dist. LEXIS 99093, 2013 WL 3762445, at *3. As the court later acknowledged in its order denying his motions to abate and reconsider, this sentence should have stated: "No one, other than [Gillespie] just before he filed his OCR complaint, told Ross that her policies might not comport with federal law." *Gillespie II*, 2013 U.S. Dist. LEXIS 173067, 2013 WL 6492830, at *2 n.3. Even so, the district court concluded that neither abatement nor reconsideration was warranted because "this change is immaterial to the outcome because it does not show that Ross was aware that the policies might not comply with federal law at the time Kaplan entered into the [program participation agreement] at issue." *Id*.

On appeal, Gillespie ignores the district court's conclusion that this change was immaterial to whether a jury question exists about scienter. Instead, he contends that the district court resolved its mistake by switching [**44] the misstated fact from material to immaterial. But a fair reading of the order denying abatement and reconsideration makes clear that nothing could be further from the truth.

More importantly, Gillespie does not explain how his April 2005 complaint to Ross would allow a reasonable jury to conclude that Kaplan executed the 2004 program participation agreement with actual knowledge that its policies were unlawful. Hence, we conclude that the district court did not err in finding that Gillespie failed to show that a genuine issue of material fact remained regarding the actual-knowledge aspect of scienter.

### ii. Reckless Disregard

Gillespie also fails to identify anything in the record that would allow a reasonable jury to conclude that Kaplan executed the 2004 program participation agreement with reckless disregard for whether its policies violated section 504 of the Rehabilitation Act or its implementing regulations. And his effort to generate a jury question through his personal, hypercritical assessments of Karen Ross and Gary Kerber's job performance—assessments untethered from any binding or persuasive authority—fails.

### a. Karen Ross

According to Gillespie, the record contains admissible evidence [**45] that calls into question whether Karen Ross, the author of the policies at issue, was up to date on the relevant legal issues concerning the Rehabilitation Act. Put simply, he posits that she was not. To support his position, Gillespie leans heavily on the following facts about Ross:

(1) She drafted Kaplan's nondiscrimination policies and grievance procedures in 2003 based on those of a former employer—a retail-brokerage firm concerned with complying with the EEOC's regulations and that was not subject to the Rehabilitation Act.

(2) She admitted in her deposition that she had never heard of a program participation agreement—the document with which Kaplan had to comply [*1060] to be eligible to receive Title IV funds.

(3) She could not recall having checked with anyone about whether the policies she drafted complied with federal law and regulations.

(4) She could not recall whether she read the Rehabilitation Act right before drafting Kaplan's policies.

(5) She could not recall a specific time when she had read the Rehabilitation Act after 1983, but she testified that she would have done so if an employee dispute had arisen.

(6) She could recall working for only one employer subject to the Rehabilitation [**46] Act (in the late-1980s) before joining Kaplan in 2002.

(7) She did not testify that she had ever read or was even familiar with the regulations implementing the Rehabilitation Act—even though the district court found that she was familiar with both the Act and its regulations.

Based on these facts, Gillespie posits that a jury could reasonably conclude that Ross was not up to date on the Rehabilitation Act and thus did not have the skill or experience necessary to draft Kaplan's nondiscrimination policies and grievance policies. In his view, the district court's contrary conclusion was possible only by impermissibly weighing the evidence or assessing the credibility of the evidence and testimony. Neither theory has any merit.

To begin, Gillespie notes that Ross was unfamiliar with the requirements that educational institutions must meet to be eligible to receive Title IV funds (e.g., what a program participation agreement was). But he does not explain why this knowledge (or lack thereof) is material to whether Kaplan acted with reckless disregard. Nor is one readily apparent. Thus, these facts are immaterial. See Harrison, 746 F.3d at 1298.

Next, Gillespie repeatedly emphasizes three facts: first, Ross revised [**47] Kaplan's polices based on those of a former employer that were designed to satisfy the EEOC's regulations; second, Ross could not recall having specifically read the Rehabilitation Act since 1983; and third, Ross's deposition testimony is devoid of any indication that she had read or was familiar with the Rehabilitation Act's implementing regulations. Admittedly, at first blush these facts smack of incompetence. But this is only because they have been presented without any factual or legal context.

First, the factual context. When Ross joined Kaplan in 2002, she had been practicing employment law for over twenty years. Her uncontroverted testimony was that during this time she stayed current on employment-law issues by regularly reading case summaries in the daily labor report and attending continuing-education classes. She also testified that she had read and was familiar with the Rehabilitation Act, though she could not recall having done so before revising Kaplan's policies.

Second, the legal context. From the tenor of Gillespie's brief, one might infer that the Department of Education's regulations implementing section 504 of the Rehabilitation Act are a world apart from those promulgated by [**48] the EEOC to implement nondiscrimination legislation such as the Americans with Disability Act of 1990. After all, what else could account for his attempt to make hay of the fact that Ross modeled Kaplan's policies after those designed to comply with the EEOC's regulations? We are left to guess, however, because Gillespie offers neither reference nor reason to support this implicit argument.

[*1061] Yet this much is clear: Congress looked to the Rehabilitation Act in enacting the ADA. See D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1237 (11th Cir. 2005). So Gillespie's contention that a jury question about scienter exists cannot merely rest on the fact that Ross modeled Kaplan's policies after those that complied with the regulations implementing the ADA. Instead, he had to point to record evidence that would enable a reasonable jury to find that under the circumstances Ross's conduct was either seriously unreasonable or imprudent—akin to gross negligence—or that she knew or reasonably should have known that relying on disability policies and procedures approved by the EEOC would likely lead to Kaplan violating the Rehabilitation Act and its implementing regulations. See King-Vassel, 728 F.3d at 712-13. He did neither. Thus, these facts are immaterial. See Harrison, 746 F.3d at 1298.

Finally, Gillespie's attempt [**49] to turn nothing (the absence of evidence that Ross had read and was familiar with the Rehabilitation Act's implementing regulations) into something (evidence of Kaplan's reckless disregard) falls flat. To survive Kaplan's motion for summary judgment, Gillespie had to point to record evidence that would permit a reasonable jury to find in his favor. See Brooks, 446 F.3d at 1162. Having

determined that the record evidence that he identifies is immaterial, we cannot conclude that the district court's grant of summary judgment to Kaplan should be reversed based on an absence of evidence, especially where the hole in the record exists because Gillespie did not ask Ross about the implementing regulations during her deposition.

At bottom, even if Gillespie's personal assessment that Ross should have performed her job better were true, this would not establish a jury question about whether Kaplan certified its compliance with the Rehabilitation Act and its implementing regulations with reckless disregard for the truth. *See Wang v. FMC Corp.*, 975 F.2d 1412, 1420 (11th Cir. 1992) (holding relator's own affidavit criticizing his employer's performance was not evidence that the employer acted with the requisite intent to be found liable under the False Claims Act).

Finally, [**50] because Gillespie emphasizes facts about Ross that are immaterial, we conclude that his assertion that the district court impermissibly weighed the evidence or made credibility determinations is without merit.


### b. Gary Kerber

Gillespie also takes issue with the fact that Gary Kerber signed the 2004 program participation agreement without independently and specifically verifying that Kaplan's policies complied with the Rehabilitation Act and its implementing regulations. Indeed, in Gillespie's view, the district court's finding that Kerber was "very on board" with meeting these requirements, *see Gillespie I*, 2013 U.S. Dist. LEXIS 99093, 2013 WL 3762445, at *3, is contradicted (or at least called into question) by Kerber's own testimony that he did nothing to independently verify the accuracy of Kaplan's representations in the 2004 program participation agreement. But like his criticism of Ross, Gillespie's criticism of Kerber's job performance lacks the appropriate context.

Context matters. Kerber testified that when he signed the 2004 program participation agreement, he relied on the opinions of his subordinates, including those charged with compliance, and had no reason to believe that Kaplan's policies violated the Rehabilitation Act or its implementing [**51] regulations. And while he did not independently review the agreement or specifically review Kaplan's policies for **[*1062]** compliance with the Rehabilitation Act, Kaplan had hired "the kind of people that had integrity, that had experience, [and] that had knowledge"; the company also used a system where there were "experts who ran the departments," and they were responsible for ensuring Kaplan's compliance. Even so, Kerber knew that Kaplan was required to comply with the Rehabilitation Act, and he testified that Kaplan was "very on board with meeting those requirements." He also knew that Kaplan's obligation to comply with the program participation agreement was ongoing and that failure to do so could result in the loss of eligibility to receive Title IV funds.

In short, Kerber did not sign the 2004 program participation agreement willy-nilly but rather in reliance upon the work of his subordinates. Gillespie has adduced no evidence—either in the district court or on appeal—suggesting (much less showing) that Kerber's reliance on his subordinates was unreasonable under the circumstances. But even if he had, summary judgment would still have been proper unless a reasonable jury could conclude [**52] that Kerber's reliance amounted to gross negligence under the circumstances. *See King-Vassel*, 728 F.3d at 712-13. Given Gillespie's lack of evidence and Kaplan's robust compliance system that relies upon multiple employees as well as the independent advice of outside counsel, we conclude that Gillespie's attempt to create a jury question by cherry-picking Kerber's testimony is unavailing.

Here, the undisputed facts show that Kaplan took compliance with the Rehabilitation Act and its implementing regulations seriously: it assigned Ross, an employment lawyer with over twenty years' experience, to revise its nondiscrimination policies and grievance procedures in 2003; it based these revisions on policies that had been approved by the EEOC; it regularly held compliance training for its employees; and it hired outside counsel to review its training materials. These actions contradict Gillespie's contention that Kaplan's compliance certification was made with reckless disregard for the truth. *Cf. United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 110 (3d Cir. 2007) (holding that the company "demonstrated" its "lack of recklessness" by devoting considerable resources to compliance); *United States v. Renal Care Grp., Inc.*, 696 F.3d 518, 531 (6th Cir. 2012) (concluding that defendants demonstrated a lack of scienter by "consistently s[eeking] clarification on the issue" [**53] and "follow[ing] industry practice in trying to sort through ambiguous regulations").

Given this undisputed evidence, we conclude that the district court did not err by granting summary judgment to Kaplan.


### iii. Kaplan "Judicial Admissions" of Noncompliance

Finally, Gillespie contends that summary judgment was inappropriate because Kaplan voluntarily entered into a restoration agreement with the OCR, which was only possible if the company had been found to violate the regulations that the agency enforced. But even if it were true that the seven defects listed in the OCR's October 2005 letter to Kaplan constituted violations of the Department of Education's regulations implementing section 504 of the Rehabilitation Act, *see* 34 C.F.R. §§ 104.7(b), 108, and that Kaplan admitted to these violations by entering into the restoration agreement, these facts alone would not permit a rational jury to find that Kaplan's compliance certification in the 2004 program participation agreement was made with the requisite scienter. Accordingly, we conclude that Gillespie's final contention fails to show that the district **[*1063]** court erred in granting summary judgment to Kaplan.


### 2. The Timing of Summary Judgment

Gillespie offers another reason to reverse the [**54] district court's grant of summary judgment to Kaplan: the ruling was premature given that Kaplan had been ordered to produce four documents wrongly withheld as privileged just two business days before. According to Gillespie, the district court failed to appreciate the importance of these documents because he had no opportunity to "put them into [the] appropriate context." This is untrue.

In his motion to abate, for example, Gillespie contended that three of the four documents "could have potentially led [him] to alert the [c]ourt that further discovery may impact the pending summary judgment briefing." In response, Kaplan attached each referenced document to its opposition brief. Yet Gillespie's reply brief—like his brief on appeal—provided no "context" explaining how these documents suggest that Kaplan acted with the requisite scienter. 16 Put simply, Gillespie had several chances to place the documents in their appropriate context; he simply failed to avail himself of them. In addition to this shortcoming, Gillespie's contention has an even more fundamental defect: he never advised

the district court that he had asked the magistrate judge to review about 60 documents (from Kaplan's 124-page [**55] privilege log) to determine whether they had been improperly designated as privileged. This dooms his contention.

We have held that **HN36** "the party opposing the motion for summary judgment bears the burden of calling to the district court's attention any outstanding discovery." _Snook v. Trust Co. of Ga. Bank of Savannah, N.A._, 859 F.2d 865, 871 (11th Cir. 1988). "Courts cannot read minds," so the nonmoving party must give more than "vague assertions that additional discovery will produce needed, but unspecified, facts." _Reflectone, Inc._, 862 F.2d at 844; _id. at 843_ (quoting _Wallace_, 703 F.2d at 527) (internal quotation mark omitted). Indeed, as the party opposing summary judgment, Gillespie had to "specifically demonstrate" how postponing the court's ruling would have enabled him, "by discovery or other means, to rebut [Kaplan's] showing of the absence of a genuine issue [**56] of fact" on scienter. _Id. at 843_ (_Wallace_, 703 F.2d at 527) (internal quotation mark omitted).

Yet Gillespie never notified the district court about the discovery dispute. He did not submit to the court a Rule 56(d) notice, affidavit, or anything of the kind. Nor did he reference the allegedly outstanding discovery in his opposition to summary judgment—let alone explain to the district court how the outstanding discovery would have enabled him to show that a jury question on scienter remained. To justify his failure to notify the district court, Gillespie emphasizes the time between when Kaplan was ordered to produce the wrongly withheld documents and when the court ruled on the parties' cross-motions for summary judgment. He says that he did not have a chance to notify the court about the potential value of this evidence during **[*1064]** the two business days between the rulings. But the record belies his assertion.

Gillespie's oral request for _in camera_ review and full briefing on the discovery dispute had been complete for more than two weeks when Kaplan filed its motion for summary judgment—and for more than a month when Gillespie filed his opposition to summary judgment. Thus, he had many opportunities to explain to the district [**57] court the effect that the allegedly outstanding discovery might have had on the motions for summary judgment. And there is no merit to his contention that the district court should have waited to rule on these motions because it was "aware" that the discovery dispute was pending on the docket. Awareness alone is not enough, however. Gillespie needed to specifically alert the court that he needed the then-outstanding discovery in order to properly oppose Kaplan's motion for summary judgment. Because it is undisputed that he did not, we conclude that the district court did not abuse its discretion by ruling on the parties' cross-motions for summary judgment two business days after Kaplan was ordered to produce four wrongly withheld documents. **17**

### V. Conclusion

For [**58] the reasons stated above, we affirm the district court's dismissal of Diaz's claims against Kaplan that were based on its alleged violations of the Department of Education's satisfactory-progress regulation, 34 C.F.R. § 668.34; the 90/10 rule, 20 U.S.C. § 1094(a)(24), (d)(2); and the accreditation requirement, 34 C.F.R. § 600.5(a)(6). But we modify the judgment of dismissal to be without prejudice with respect to the government. We reverse the district court's dismissal of Diaz's claims against Kaplan to the extent that they were based on its alleged violation of the incentive-compensation ban, 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(b)(22)(ii), and remand the case for further proceedings consistent with this opinion.

We affirm the district court's grant of summary judgment to Kaplan on all of Gillespie's claims.

AFFIRMED in part, REVERSED in part, MODIFIED in part, and REMANDED.

---

### Footnotes

**\*** Honorable Margaret C. Rodgers ▾, Chief Judge, United States District Court for the Northern District of Florida, sitting by designation.

---

**1** Kaplan University operates numerous online educational enterprises across the United States and is a wholly owned subsidiary of Kaplan Higher Education Corp., a division of Kaplan, Inc.

---

**2** 20 U.S.C. §§ 1070a, 1071—1087, 1087a—1087i, 1087aa—1087ii.

---

**3** Unless otherwise noted, all regulations cited are to those in effect in 2010.

---

**4** **HN4** The regulations define _accredited_ as "[t]he status of public recognition that a nationally recognized accrediting agency grants to an institution or educational program that meets the agency's established requirements." 34 C.F.R. § 600.2.

---

**5** **HN5** A "propriety institution of [**4] higher education" is defined as an institution that, among other things, is not "a public or other nonprofit institution." 20 U.S.C. §§ 1001(a)(4), 1002(b)(1)(C); _see also_ 34 C.F.R. § 600.5(a)(1).

---

**6** **HN13** Congress amended the False Claims Act via the Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. 111-21, 123 Stat. 1617. In doing so, Congress changed the language of subsection (a)(2), replacing the phrase "to get a false or fraudulent claim paid or approved by the Government" with "material to a false or fraudulent claim." _Id._ § 4, 123 Stat. at 1621. We have held that this change applies retroactively to claims pending for payment on or after June 7, 2008. _Hopper v. Solvay Pharms., Inc._, 588 F.3d 1318,

_1322 (11th Cir. 2009)._ While we adopt the false-certification theory of liability for both pre- and post-FERA claims, _Hendow_ was decided before FERA, and we have no occasion to consider whether FERA might alter the _Hendow_ elements for post-FERA claims. _See infra_ nn. 7, 8.

**7** Although Diaz averred _[**9]_ generally that Kaplan defrauded the government "from January 1, 1999, through the present [June 24, 2009]," he made no specific allegations in the second amended complaint about claims that were pending on or after June 7, 2008. Thus, like the district court, we apply the prior version of the statute. _See supra_ n. 6.

**8** Gillespie moved for leave to file a third amended complaint to expand the temporal reach of his claim beyond May 2007. The district court denied this request as well as his motion for reconsideration. Once again, the court explained that Gillespie had made no specific allegations of continuing violations. The court also noted that the public-disclosure rule barred him from relying upon documents received through a Freedom of Information Act request because he was not their original source.

On appeal, Gillespie mentions both the order dismissing his _[**14]_ claim about Kaplan's alleged post—May 2007 violations and the order denying leave to amend. But his brief pays these orders scant attention. At no point, does he discuss why the dismissal of his claims was error or how the denial of leave to amend was an abuse of discretion. _See Hopper v. Solvay Pharms., Inc._, 588 F.3d 1318, 1324 (11th Cir. 2009) (holding that _HN14_ a dismissal with prejudice is reviewed de novo); _Tampa Bay Water v. HDR Eng'g, Inc._, 731 F.3d 1171, 1178 (11th Cir. 2013) (holding that _HN15_ a denial of leave to amend is reviewed for abuse of discretion). In any event, to the extent that he has not waived these issues, _see Sapuppo v. Allstate Floridian Ins. Co._, 739 F.3d 678, 681 (11th Cir. 2014), we conclude from the record that the district court neither erred nor abused its discretion.

Also, because the district court limited the temporal reach of Gillespie's claims to May 2007—and this decision was not error—the FERA amendments are inapplicable. _See supra_ n.6.

**9** Diaz stated that these violations started in 1999 and continued until 2009, but his complaint only references employees who allegedly received recruitment-based compensation during 2004 through 2009. For this reason, we limit our consideration of his claim that Kaplan violated the False Claims Act by falsely certifying its compliance with the incentive-compensation ban to these years.

**10** _See_ Department of Education, Federal Student Aid Programs, 67 Fed. Reg. 67,048, 67,054 (Nov. 1, 2002) ("We believe that the primary purpose of the regulatory safe harbors is to provide guidance to institutions so they may adopt compensation arrangements that do not run afoul of the incentive compensation provision in section 487(a)(2) of the [Higher Education Act]").

**11** This and other safe harbors were eliminated effective July 2011. Department of Education, Program Integrity Issues, 75 Fed. Reg. 66,832, 66,832 (Oct. 29, 2010).

**12** Although Diaz's complaint does not identify these factors, he did attach a copy of Kaplan's compensation plan for admissions advisors (i.e., recruiters) to his brief in opposition to Kaplan's motion to dismiss. _See_ Doc. 181-4. This document identifies the other compensation factors that were at least formally part of the compensation plan.

_HN28_ Typically, a Rule 12(b)(6) motion to dismiss must be decided without considering matters outside of or unattached to the complaint. _See Trustmark Ins. Co. v. ESLU, Inc._, 299 F.3d 1265, 1267 (11th Cir. 2002); _Homart Dev. Co. v. Sigman_, 868 F.2d 1556, 1562 (11th Cir. 1989). So when the court considers an extrinsic document, it must generally convert the motion to dismiss into one for summary judgment. Fed. R. Civ. P. 12(d); _Trustmark Ins._, 299 F.3d at 1267. But conversion is not always required. In ruling on a motion to dismiss, the court may consider an extrinsic document if (1) it is central to a claim in the complaint, and (2) its authenticity is unchallenged. _Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention_, 623 F.3d 1371, 1379 (11th Cir. 2010).

Here, Kaplan's compensation plan is central to Diaz's claim that Kaplan violated the incentive-compensation ban and neither side challenges its authenticity—indeed, Kaplan _[**29]_ cites this document as the source of its list of factors other than enrollments that were part of the decision to increase the pay of its admissions advisors. Thus, because the district court could have considered the contents of this document without converting Kaplan's motion to dismiss into one for summary judgment, we may also do so on appeal. _Cf. Harris v. Ivax Corp._, 182 F.3d 799, 802 n.2 (11th Cir. 1999) (explaining that "a document central to the complaint that the defense appends to its motion to dismiss is also properly considered, provided that its contents are not in dispute").

**13** On appeal, Kaplan contends that the dismissal of Diaz's _[**32]_ claims could be upheld on two additional grounds: failure to adequately plead scienter and failure to plead the submission of a false claim. Neither ground has any merit. First, to satisfy Rule 9(b), a relator may plead scienter generally, and Diaz did so. Second, we have said that "in the appropriate case, we may consider whether the particularity requirements of Rule 9(b), as to the details of the alleged false claims at issue, are more relaxed for claims under 31 U.S.C. § 3729(a)(2) than for claims under § 3729(a)(1)." _Hopper_, 588 F.3d at 1329. Here, however, we need not reach this question because Diaz has provided specific allegations about three students who applied for and received Title IV funds to attend classes at Kaplan—after Kaplan allegedly "knowingly" violated the incentive-compensation ban.

**14** Diaz does not specifically argue in his briefs that the district court abused its discretion by failing to grant him leave to amend his complaint. Thus, to the extent that he has not waived this argument on appeal, _see Sapuppo_, 739 F.3d at 681, we conclude from the record that the district court did not. Diaz never made a motion to amend his complaint, nor did he ever suggest how he could cure his

defective complaint in a subsequent pleading. Under our precedent, the district court's decision was not an abuse of discretion. *See United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1362 (11th Cir. 2006)* (holding that **HN32** denial of leave to amend was not an abuse of discretion where the relator "failed to include the proposed amendment or the substance thereof" with his request).

**15**  The parties do not cite, nor was our research able to find, a case discussing the meaning of *deliberate ignorance*. Even so, this scienter requirement plainly demands even more culpability than that needed to constitute reckless disregard. Because Gillespie has not adduced evidence that raises a jury question about whether Kaplan certified its compliance with the Rehabilitation Act and its implementing regulations with reckless disregard for the truth, it follows *a fortiori* that he has not shown that a triable question remains regarding whether Kaplan's compliance certification was made with deliberate ignorance.

**16**  On appeal, Gillespie claims that the district court "misapprehended the law and the facts" because one of these documents "provides unquestionable proof that Kaplan remained in knowing, actual violation of Section 504, even as late as March 2007, to wit: a copy of Kaplan University's revised university handbook." But as with many of his other arguments, he never explains how this draft course catalogue "provides unquestionable proof" of scienter. Nor is it obvious to us how it does.

**17**  Gillespie also contends that his failure to direct the district court's attention to the outstanding discovery is "moot" because the court admitted that it had read the documents "before granting summary judgment." Not so. The record is clear that the district court reviewed these documents *after* it granted summary judgment to Kaplan, and then only to confirm that Gillespie's motions for abatement and reconsideration were baseless.



About    Cookie Policy    RELX ™

Privacy Policy    Terms & Conditions    Copyright © 2023 LexisNexis.

# CASES PERTAINING TO DEFAMATION PLEADING STANDARD

Abrams v. Gen. Ins. Co., 460 So. 2d 572 (Fla. Dist. Ct. App. 198

Search: Everything

Document:    Abrams v. General Ins. Co., 460 So. 2d 572    Actions ⌄

Go to ⌄   Page   Page #

Search Document

**A** **Abrams v. General Ins. Co., 460 So. 2d 572**

Copy Citation

Court of Appeal of Florida, Third District

December 18, 1984

No. 84-1848

**Reporter**

460 So. 2d 572 * | 1984 Fla. App. LEXIS 16098 ** | 10 Fla. L. Weekly 69

CAROL A. ABRAMS, Appellant, v. GENERAL INSURANCE COMPANY, INC. and SOUTH CAROLINA INSURANCE COMPANY, Appellees

**Prior History:** [**1] An Appeal from a nonfinal order of the Circuit Court for Dade County, James C. Henderson ⌄, Judge.

## Core Terms

allegations, defamatory, failure to state a cause of action, driver of the vehicle, defamation action, well-pleaded

### Case Summary

**Procedural Posture**

Plaintiff insured appealed an order of the Circuit Court for Dade County (Florida), which dismissed her defamation action for failure to state a cause of action.

**Overview**

Plaintiff filed an action against defendant insurer, alleging defamation in a letter it mailed her denying coverage on a claim, where the letter quoted the statute relating to misrepresentation by applicants, Fla. Stat. ch. 627.409 (1981). Plaintiff insured appealed the circuit court order dismissing her defamation action for failure to state a cause of action. The court reversed the circuit court order, where it found plausible plaintiff's allegation that the letter could be construed to mean that plaintiff was guilty of misrepresentation in the acquisition of her insurance policy. The court was required to accept the allegations in the complaint as true and construe them in the light most favorable to plaintiff. Under such conditions, the court concluded that plaintiff had stated a cause of action for defamation and remanded the cause for further proceedings.

**Outcome**

The court reversed the circuit court order dismissing the defamation action, and remanded the cause for further proceedings. Accepting the well-pleaded allegations as true and construing them in the light most favorable to plaintiff, the court found that plaintiff had stated a viable cause of action for defamation.

▼ LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections ▾ > Motions to Dismiss ▾ > Failure to State Claim ▾
View more legal topics

**HN1** ⬦ **Motions to Dismiss, Failure to State Claim**

When considering a motion to dismiss for failure to state a cause of action, the court must confine itself strictly to the allegations within the four corners of the complaint, and must accept all well-pleaded allegations as true. 🔍 More like this Headnote

Shepardize® - Narrow by this Headnote (3)

Civil Procedure > ... > Defenses, Demurrers & Objections ⌄ > Motions to Dismiss ⌄ > Failure to State Claim ⌄

**HN2** ⬇ **Motions to Dismiss, Failure to State Claim**
Consideration of defendant's affirmative defenses or sufficiency of evidence which plaintiff will likely produce on the merits is wholly irrelevant and immaterial to deciding a motion to dismiss. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

Insurance Law > Liability & Performance Standards ⌄ > Disclosure Obligations by Insureds ⌄ > General Overview ⌄

**HN3** ⬇ **Liability & Performance Standards, Disclosure Obligations by Insureds**
See Fla. Stat. ch. 627.409 (1981). 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Insurance Law > Liability & Performance Standards ⌄ > Disclosure Obligations by Insureds ⌄ > General Overview ⌄

**HN4** ⬇ **Liability & Performance Standards, Disclosure Obligations by Insureds**
Fla. Stat. ch. 627.409 (1981) was rewritten but substantively unchanged by the legislature in 1982. Fla. Stat. ch. 627.409 (1983). 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Pleading & Practice ⌄ > Pleadings ⌄ > Rule Application & Interpretation ⌄

**HN5** ⬇ **Pleadings, Rule Application & Interpretation**
The court must accept all well-pleaded allegations in the complaint as true, and construe them in the light most favorable to plaintiff. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

**Counsel:** George C. Vogelsang ⌄ and Deborah White, for Appellant.

Joe N. Unger ⌄; Kopplow & Flynn ⌄, for Appellees.

**Judges:** Schwartz ⌄, C.J. and Nesbitt ⌄ and Pearson, Daniel S. ⌄, JJ.

**Opinion by:** NESBITT ⌄

## Opinion

**[\*572]**  Plaintiff appeals an order dismissing her defamation action for failure to state a cause of action. We reverse.

It is axiomatic that **HN1** ⚓ when considering a motion to dismiss for failure to state a cause of action, the court must confine itself strictly to the allegations within the four corners of the complaint, and must accept all well-pleaded allegations as true. **HN2** ⚓ Consideration of defendant's affirmative defenses or sufficiency of evidence which plaintiff will likely produce on the merits is wholly irrelevant and immaterial to deciding such a motion. *Parkway General Hospital, Inc. v. Allstate Insurance Co.*, 393 So.2d 1171 (Fla. 3d DCA 1981). *Accord Kaufman v. A-1 Bus Lines, Inc.*, 363 So. 2d 61 (Fla. 3d DCA 1978).

In the present case, the alleged defamatory letter states that there appears to be a violation of section 627.409, Florida Statutes (1981), and then proceeds to [\*\*2]  quote that section in its entirety. 🔢⬇ The letter then states:

   **[\*573]**  Our file indicates that your son, Ronald Frank Abrams, is, in fact, a driver of the vehicle shown on our policy. This information was withheld in Sections II and III of your Application for Insurance dated 10/21/82.

   If the General Insurance Company had been supplied with the proper information, i.e., that Ronald Frank Abrams, is, in fact, a driver of the vehicle we insure, the policy would have been issued at a substantially higher premium based on his record and his date of birth.

   In view of the violation of the Statute, which denied General Insurance Company the information to properly evaluate the application, we hereby decline to provide any insurance coverage for this accident.

The defendant contends that the words attributed to it are not reasonably susceptible of the defamatory meaning contended for by plaintiff. Undoubtedly this was the basis on which the trial court dismissed the action, and it is with some reluctance that we take a different position. We find, however, that it is possible that persons reading the alleged defamatory letter might take it to mean that plaintiff [\*\*3]  was guilty of misrepresentation in the acquisition of her insurance policy. *See Wolfson v. Kirk*, 273 So.2d 774, 778 (Fla. 4th DCA), *cert. denied*, 279 So.2d 32 (Fla. 1973).

[\*\*4]  **HN5** ⚓

Accepting all well-pleaded allegations in the complaint as true, and construing them in the light most favorable to plaintiff, as we must, we find plaintiff has adequately stated a cause of action for defamation. Accordingly, the order dismissing the defamation action is reversed and the cause remanded for further proceedings.

**Footnotes**

 The letter quotes the statute as follows:

*HN3* 627.409 Representations in applications; warranties

(1) All statements and descriptions in any application for an insurance policy or annuity contract, or in negotiations therefor, by or in behalf of the insured or annuitant, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless either:

(a) Fraudulent; or

(b) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

(c) The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate, [. . .] or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been known to the insurer, [sic] as required either by the application for the policy or contract or otherwise.

(2) A breach or violation by the insured of any warranty, condition, or provision of any wet marine or transportation insurance policy, contract of insurance, endorsement, or application therefor, shall not render void the policy or contract, or constitute a defense to a loss thereon, unless such breach or violation increased the hazard by any means within the control of the insured.

*See* § 627.409, Fla. Stat. (1981). *HN4* This section was rewritten but substantively unchanged by the legislature in 1982. *See* § 627.409, Fla. Stat. (1983).

**LexisNexis**

About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

Case 3:22-cv-01059-TJC-PDB   Document 82   Filed 07/25/23   Page 146 of 540 PageID 1245

Go to    Page   _Page #_    Search Document

## Axelrod v. Califano, 357 So. 2d 1048

Copy Citation

Court of Appeal of Florida, First District

April 14, 1978

No. EE-88

**Reporter**

**357 So. 2d 1048** * | 1978 Fla. App. LEXIS 15794 **

Robert AXELROD, Appellant, v. Paul CALIFANO, Appellee

**Subsequent History:** [**1] Rehearing Denied May 17, 1978.

## Core Terms

summary judgment, malice, Slander, qualified privilege

## Case Summary

**Procedural Posture**
Appellant employee sought review of an order from the trial court (Florida), which granted summary judgment in favor of appellee employer in appellant's action for defamation.

**Overview**
Appellant employee was employed as the director of appellee employer's skin diving college. Appellee fired appellant upon receipt of the accusation of another employee that appellant was stealing money from the college. Appellee subsequently advised a third party of the dishonest acts surrounding the firing of appellant. Appellant sued appellee for defamation. The trial court granted appellee's motion for summary judgment based on appellee's claimed defense of a qualified business privilege. The court reversed the judgment of the trial court, finding that where the evidence was conflicting as to the existence or nonexistence of a privilege, and there were mixed questions of law and fact, the fact issues were to be determined by the jury. The court determined that summary judgment should only be granted in those cases where there remained no genuine issue of any material fact that would properly fall to the jury. The court held that the allegations of appellant's complaint, supporting depositions, and affidavits left unresolved conflicting factual allegations sufficient to preclude entry of a summary judgment.

**Outcome**
The court reversed an order that granted summary judgment in favor of appellee employer in appellant employee's action for defamation. The court held that where conflicting evidence regarding the existence or nonexistence of a privilege presented mixed questions of law and fact, the fact issues were to be determined by a jury.

▼ LexisNexis® Headnotes

142

Torts > **Intentional Torts** ▾ > **Defamation** ▾ > 📙**Defamation Per Se** ▾

**View more legal topics**

**HN1**⬇ **Defamation, Defamation Per Se**

Slander may be defined as the speaking of base and defamatory words which tend to prejudice another in his reputation, office, trade, business, or means of livelihood. When the words published concerning a person tend to degrade him, bring him into ill repute, destroy confidence in his integrity, or cause other like injury, such language is actionable per se. Further, a publication which falsely and maliciously charges another with the commission of a crime is actionable per se. 🔍 **More like this Headnote**

*Shepardize® - Narrow by this Headnote (5)*

Civil Procedure > ... > **Summary Judgment** ▾ > **Supporting Materials** ▾ > **General Overview** ▾
Torts > **Intentional Torts** ▾ > **Defamation** ▾ > 📙**Defamation Per Se** ▾

**View more legal topics**

**HN2**⬇ **Summary Judgment, Supporting Materials**

While malice is presumed when a publication is actionable per se for defamation, a showing that defendant actually intended to injure plaintiff is the equivalent of malice in fact. 🔍 **More like this Headnote**

*Shepardize® - Narrow by this Headnote (0)*

Torts > ... > **Defenses** ▾ > **Privileges** ▾ > **Qualified Privileges** ▾

**HN3**⬇ **Privileges, Qualified Privileges**

Actual malice, or malice in fact, constitutes an abuse of a qualified privilege, leaving defendant liable in an action for defamation.
🔍 **More like this Headnote**

*Shepardize® - Narrow by this Headnote (1)*

Torts > ... > **Defenses** ▾ > **Privileges** ▾ > **Qualified Privileges** ▾

**HN4**⬇ **Privileges, Qualified Privileges**

A communication made in good faith on any subject matter by one having an interest therein, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral or social obligation. 🔍 **More like this Headnote**

*Shepardize® - Narrow by this Headnote (4)*

Torts > ... > **Defenses** ▾ > **Privileges** ▾ > **Qualified Privileges** ▾

**HN5**⬇ **Privileges, Qualified Privileges**

The elements essential to the finding of a conditionally privileged publication are: 1) Good faith; 2) an interest to be upheld; 3) a statement limited in its scope to this purpose; 4) a proper occasion; and 5) publication in a proper manner. To be qualifiedly privileged the communication must be made by a person having a duty or interest in the subject matter, to another having a corresponding duty or interest. 🔍 **More like this Headnote**

*Shepardize® - Narrow by this Headnote (9)*    3

Torts > ... > **Defenses** ▾ > **Privileges** ▾ > **Qualified Privileges** ▾

**HN6**⬇ **Privileges, Qualified Privileges**

With respect to a qualified privilege founded on business matters, an otherwise slanderous publication must be in regard to the business, made by one having an interest in the business and solely to others having an interest in the business. 🔍 **More like this Headnote**

*Shepardize® - Narrow by this Headnote (1)*

Civil Procedure > **Judgments** ▾ > **Summary Judgment** ▾ > **General Overview** ▾
Constitutional Law > ... > **Fundamental Rights** ▾ > **Criminal Process** ▾ > **Right to Jury Trial** ▾

**View more legal topics**

**HN7**⬇ **Judgments, Summary Judgment**

Summary judgment serves to expedite the settlement of litigation where it affirmatively appears on the record that there is only a

143

question of law as to whether the party should have judgment in accordance with the motion. However, summary judgment should be sparingly granted so as to not infringe on the constitutional right to a jury trial. If there are issues of fact and the slightest doubt remains, a summary judgment cannot be granted. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > ... > Summary Judgment ⌄ > Entitlement as Matter of Law ⌄ > General Overview ⌄

**HN8**⬇ **Summary Judgment, Entitlement as Matter of Law**

When a judge encounters doubt as to the existence or nonexistence of a genuine issue of fact, the doubt should be resolved against the movant. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > ... > Summary Judgment ⌄ > Opposing Materials ⌄ > General Overview ⌄
View more legal topics

**HN9**⬇ **Summary Judgment, Opposing Materials**

The moving party for a summary judgment is held to a strict standard. The pleadings and proofs supporting such motions are strictly construed against the movant, while those opposing the motion are leniently treated in determining whether the movant has satisfied the burden required of him. The facts in evidence, and all reasonable inferences arising therefrom, must be indulged in favor of the party against whom a motion for summary judgment is asked. The converse is never true. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > ... > Summary Judgment ⌄ > Entitlement as Matter of Law ⌄ > General Overview ⌄

**HN10**⬇ **Summary Judgment, Entitlement as Matter of Law**

Summary judgments should be granted only in those cases where there remains no genuine issue of any material fact that would properly fall to a jury. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Evidence > Weight & Sufficiency ⌄
Torts > Intentional Torts ⌄ > Defamation ⌄ > Procedural Matters ⌄
View more legal topics

**HN11**⬇ **Evidence, Weight & Sufficiency**

When the facts and circumstances under which a communication is made are conceded, whether or not they are sufficient to establish that the communication is privileged is a question of law for the court. However, when the evidence is conflicting as to the existence or nonexistence of privilege there is a mixed question of law and fact, and the fact issue is to be determined by the jury. If a privilege is conditional or qualified, and there is sufficient evidence to indicate that the privilege may have been exceeded or abused, the issue of fact must be submitted to the jury. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (5)*

---

**Counsel:** Lawrence C. Rolfe ⌄ of Rolfe & Stirling, Jacksonville, for appellant.

John Paul Howard, Jacksonville, for appellee.

**Opinion by:** MELVIN ⌄

## Opinion

 **[\*1050]**  Appellant Axelrod takes this appeal for review of a final summary judgment in favor of appellee Califano. We reverse.

Axelrod filed his complaint in defamation alleging that Califano had slandered him by making statements to third persons that Axelrod had, among other things, stolen large sums of money from the Y.M.C.A. and forged certain checks. Califano answered, raising as affirmative defenses the truth of the statements made, his lack of ill motive or malice in making said statements and a qualified privilege founded on the operation of Califano's business. At the same time, Califano filed a motion for summary judgment alleging that all of his statements about Axelrod were: 1) Made at Califano's place of business; 2) to an employee entitled to receive such information; 3) within the scope of the operation of the business; and 4) without ill motive or malice toward Axelrod. Califano also alleged that he had reasonable grounds to believe that what he said was true and, further, that he had  [\*\*2]  given express

Instructions to the employee that the reasons for Axelrod's discharge were not to be made public.

In response, Axelrod filed an affidavit in opposition to summary judgment alleging that the statements Califano made about him were not true and made with malice and ill motive solely for the purpose of harming him.

On October 29, 1976, the trial court entered summary judgment in favor of Califano.

**HN1** Slander may be defined as the speaking of base and defamatory words which tend to prejudice another in his reputation, office, trade, business, or means of livelihood. 20 Fla.Jur. *Libel and Slander*, § 3. When the words published concerning a person tend to degrade him, bring him into ill repute, destroy confidence in his integrity, or cause other like injury, such language is actionable *per se*. *Montgomery v. Knox*, 23 Fla. 595, 3 So. 211 (1887); *Stewart v. Codrington*, 55 Fla. 327, 45 So. 809 (1908); *Harriss v. Metropolis Co.*, 118 Fla. 825, 160 So. 205 (1935). Further, a publication which falsely and maliciously charges another with the commission of a crime is actionable *per se*. *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234 (1933).

In the instant case, the alleged [**3] publication branding Axelrod a thief and forger was actionable per se, and, as such, raised a presumption of malice as a matter of law. *Layne v. Tribune Co.*, *supra*; *Commander v. Pedersen*, 116 Fla. 148, 156 So. 337 (Fla. 1934); and *Tip Top Grocery Co. v. Wellner*, 135 Fla. 518, 186 So. 219 (1938).

Malice may be presumed here by the actionable per se nature of the alleged publication and is an essential element of slander. Another essential element is the falsity of the publication. *Caldwell v. Crowell-Collier Pub. Co.*, 161 F.2d 333 (5th Cir. 1947), cert. den., 332 U.S. 766, 68 S. Ct. 74, 92 L. Ed. 351. Conversely, the truth of the publication is a good defense, assuming that it was made with good motives. *Article I, Section 4, Florida Constitution*. Here, Califano, in his motion for summary judgment, alleged the truth of his statements, while Axelrod, in his affidavit in opposition thereto swore they were false, thus raising an issue of fact. **HN2** While malice is presumed when the publication is actionable per se, a showing that the defendant actually intended to injure the plaintiff is the equivalent of malice in fact. *Jones v. Greeley*, 25 Fla. 629, 6 So. 448 (1889); 20 Fla.Jur. *Libel [**4] and Slander*, § 53.

The issue of malice is critical because in cases in which a qualified privilege exists, the essential element of malice may not be imputed. Rather, in order to recover, the plaintiff must prove express malice or malice in fact. *Coogler v. Rhodes*, 38 Fla. 240, 21 So. 109 (1897); *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591 (1906); and *Myers v. Hodges*, 53 Fla. 197, 44 So. 357 (1907). Thus, **HN3** actual malice, or malice in fact, constitutes an abuse of a qualified privilege, leaving the defendant liable.

**[*1051]** In the instant case, Califano has alleged, among others, the defense of a qualified business privilege.

20 Fla.Jur. *Libel and Slander*, § 61 states that:

**HN4** ". . . A communication made in good faith on any subject matter by one having an interest therein, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral or social obligation."

Thus expressed, **HN5** the elements essential to the finding of a conditionally privileged publication are: 1) Good faith; 2) an interest to be [**5] upheld; 3) a statement limited in its scope to this purpose; 4) a proper occasion; and 5) publication in a proper manner. *Abraham v. Baldwin*, *supra*; and *Leonard v. Wilson*, 150 Fla. 503, 8 So.2d 12 (1942). To be qualifiedly privileged the communication must be made by a person having a duty or interest in the subject matter, to another having a corresponding duty or interest.

**HN6** With respect to the qualified privilege founded on business matters, the otherwise slanderous publication must be in regard to the business, made by one having an interest in the business and solely to others having an interest in the business. *Montgomery v. Knox*, *supra*; *Coogler v. Rhodes*, *supra*; *Arison Shipping Company v. Smith*, 311 So.2d 739 (Fla. 3d DCA 1975); and *Frank Coulson, Inc. Buick v. Trumbull*, 328 So.2d 271 (Fla. 4th DCA 1976).

**HN7** Summary judgment serves to expedite the settlement of litigation where it affirmatively appears on the record that there is only a question of law as to whether the party should have judgment in accordance with the motion. *Meadows v. Edwards*, 82 So.2d 733 (Fla.1955); 30 Fla.Jur. *Summary Judgment*, § 2. However, summary judgment should be sparingly granted so as to not infringe [**6] on the constitutional right to a jury trial. Judge Donald Carroll ▾ reviewed some of the rules controlling entry of summary judgment, for this court, in *Torrence v. Sacred Heart Hospital*, 251 So.2d 899 (Fla. 1st D.C.A.1971), saying:

"1. "Such judgments should be sparingly granted * * *. To sum it all up, if there are issues of fact and the *slightest* doubt remains, a summary judgment cannot be granted.' *Williams v. City of Lake City*, 62 So.2d 732 (Fla.1953). In the later case of *Manning v. Clark*, 71 So.2d 508 (Fla.1954), the Florida Supreme Court thus explained the meaning of the words "slightest doubt' in its *Williams* opinion: '* * * **HN8** when a judge encounters doubt as to the existence or nonexistence of a genuine issue of fact the doubt should be resolved against the movant.'

"2. "* * * Insofar as factual matters are concerned, doubts and inferences must be resolved against the mover. * * *" *Majeske v. Palm Beach Kennel Club*, 117 So.2d 531 (Fla.App.1960).

"3. This court held in *McKean v. Kloeppel Hotels, Inc.*, 171 So.2d 552 (Fla.App.1965): "It is well settled in this jurisdiction that **HN9** the moving party for a summary judgment is held to a strict standard. The pleadings and proofs [**7] supporting such motions are strictly construed against the movant, while those opposing the motion are leniently treated in determining whether the movant has satisfied the burden required of him * * *.'

"4. "The facts in evidence, and all reasonable inferences arising therefrom, must be indulged in favor of the party against

whom a motion for summary judgment is asked. The converse is never true. *Harding v. American Universal Insurance Co.*, 130 So.2d 86 (Fla.App.1961)."

Quite simply, **HN10** summary judgments should be granted only in those cases where there remains no genuine issue of any material fact that would properly fall to a jury.

These rules are applicable to summary judgment proceedings in defamation actions as well. Thus, **HN11** when the facts and circumstances under which a communication was made are conceded, whether or not they are sufficient to establish that the **[*1052]** communication was privileged is a question of law for the court. *Myers v. Hodges, supra*; *Abraham v. Baldwin*, *supra*; and 20 Fla.Jur. *Libel and Slander*, § 135.

However, when the evidence is conflicting as to the existence or nonexistence of privilege there is a mixed question of law and fact, and the fact **[**8]** issue is to be determined by the jury. *Hartley & Parker v. Copeland*, 51 So.2d 789 (Fla.1951). If the privilege is conditional or qualified, and there is sufficient evidence to indicate that the privilege may have been exceeded or abused, the issue of fact must be submitted to the jury.

The limited record in this case reveals that Axelrod was employed as the director of Califano's skin diving college. Upon receipt of the accusation of another employee that Axelrod was stealing certain sums of money from the college, as well as abusing his association with the Y.M.C.A., Califano summarily fired him. Subsequent to the firing, Califano advised one DiPerna of the dishonest acts surrounding Axelrod's firing and showed him certain documentary evidence of same. At the time of publication of these actionable per se remarks DiPerna was a full time high school teacher, who had worked on a part-time basis for Califano. In fact, at the time the remarks were made to him, it may be reasonably inferred that DiPerna was at the college on personal business and had not been employed by Califano for one to two months. This relationship between Califano and DiPerna was the basis for Califano's claim **[**9]** of qualified privilege, which claim was controverted by Axelrod's affidavit arguing that the privilege, even if it was found to exist, was abused.

We hold that the allegations of the complaint, the supporting depositions and the affidavits in opposition to entry of summary judgment, left unresolved conflicting factual allegations sufficient to preclude the entry of a summary judgment.

REVERSED.

ERVIN, J., concurs.

SMITH, Acting C. J., dissents.



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

Document:                      Ball v. Taylor, 416 F.3d 915             Actions

### Ball v. Taylor, 416 F.3d 915

**Copy Citation**

United States Court of Appeals for the Eighth Circuit

May 9, 2005, Submitted ; July 29, 2005, Filed

No. 04-2080

**Reporter**

**416 F.3d 915 \*** | 2005 U.S. App. LEXIS 15584 \*\* | 151 Lab. Cas. (CCH) P60,060 | 23 I.E.R. Cas. (BNA) 392

Larry Ball; Steven Baltzley; Vincent A. Bejarano, Named as: Vincent Berjarano; Michael Bell; Larry Benz; Michael Bolten; Terry Boobyer; Dennis Brummett; Melvern Butts; Luther Carey; Marvin Cason; Robert A. Cerretti, Named as: Robert Cerretti; Michael D. Chance, Named as: Michael Chance; Michael L. Cosner, Named as Michael Cosner; James Couch; James Cruchelow; Kenneth Cruchelow; Larry E. Culver, Named as: Larry Culver; Robert Dale; Richard Dolan; Kevin Ensley; John Flynn; Ronald Gilbert; James Griffin; Virgil Grimm; Kenneth Hagen, Sr.; Harold B. Hathaway, Named as: Harold Hathaway; Michael Heinen; James Hook; Harvey Hunter, Sr.; Gary Jenskins; Richard Keeling; Thomas King; Ronald Leib; Gary D. Loomis, Named as: Gary Loomis; William Lynch; Daniel Maldonado; Michael Marquis; Robert E. McPherson, Named as: Robert McPherson; David McElvogue; Marcus Mireles; Gary Mobley; Dana Mongar; Clyde Parker; John Patton; James Praska; Lloyd Putney; Lee Reinholdt; Thomas Roach; Richard Shafer; Bruce Sheets; Donald Somers; Donald Van Hal; Joseph Vincent; Richard W. West, Named as: Richard West; Kevin White; Dennis V. Wicker, Named as: Dennis Wicker; Kareny Williamson, Appellants, v. Maurice Taylor, Jr., Appellee.

**Subsequent History:** Rehearing denied by, Rehearing, en banc, denied by Ball v. Taylor, 2005 U.S. App. LEXIS 19811 (8th Cir., Sept. 14, 2005)
Subsequent appeal at Brummett v. Taylor, 2009 U.S. App. LEXIS 14102 (8th Cir. Iowa, June 30, 2009)

**Prior History:** [\*\*1] Appeal from the United States District Court for the Southern District of Iowa.

## Core Terms

employees, defamation, summary judgment, press conference, district court, lawsuit, give rise, circumstances, fraudulent, handed, defamatory statement, individual employee, improperly granted, alleged libel, defamatory, disability, announced, ascertain, positions, mail

---

### Case Summary

**Procedural Posture**
Plaintiff employees challenged a judgment from the United States District Court for the Southern District of Iowa, which granted summary judgment in favor of defendant, a principal in three corporations, in the employees' defamation action arising from the principal's statements during a press conference.

**Overview**
At the press conference, the principal announced that the corporations were filing a RICO lawsuit against, inter alia, about 100 employees who had filed fraudulent disability claims. The principal handed out copies of the RICO lawsuit, which specified the names, places of residence, and positions of the employees, and which alleged that the employees had committed mail fraud by sending their fraudulent claims through the mail. The district court held that the group defamation doctrine precluded recovery because the principal had not verbally named the employees individually at the press conference. On appeal, the court held that the employees had established a prima facie case of defamation under Iowa law because, although the principal did not state the employees' names

Individually, he referred to them as a group; stated he was suing them because they had committed fraud; and then handed his audience copies of the complaint, which identified the individual employees by name and contained their names, addresses, and positions. The circumstances reasonably gave rise to the conclusion that the principal's oral statement specifically referenced each of the employees.

**Outcome**

The court reversed the grant of summary judgment in favor of the principal and remanded the cause to the district court.

---

▼  LexisNexis® Headnotes

Torts >  Intentional Torts ▾  >  Defamation ▾  >  General Overview ▾

**HN1**  **Intentional Torts, Defamation**

The group defamation doctrine states that a plaintiff's membership in a defamed group does not give rise to an individual cause of action for defamation unless the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (1)

Torts >  Intentional Torts ▾  >  Defamation ▾  >  Libel ▾
View more legal topics

**HN2**  **Defamation, Libel**

To establish a prima facie case of defamation under Iowa law, a plaintiff must show the defendant (1) published a statement that was (2) defamatory (3) of and concerning the plaintiff. The Iowa Supreme Court has interpreted the third element in a manner consistent with the group defamation exception: although defamatory words must refer to an ascertainable person, the plaintiff need not be named if the alleged libel contains matters of description or other references therein, or the extraneous facts and circumstances show that the plaintiff was intended to be the object of the alleged libel, and was so understood by others. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (4)    2

---

**Counsel:** For LARRY BALL, STEVEN BALTZLEY, VINCENT A. BEJARANO, Named as: Vincent Berjarano, MICHAEL BELL, LARRY BENZ, MICHAEL BENZ, MICHAEL BOLTEN, DENNIS BRUMMETT, MELVERN BUTTS, LUTHER CAREY, MARVIN CASON, MARVIN CASON, ROBERT A. CERRETTI, Named as: Robert Cerretti, MICHAEL D. CHANCE, Named as: Michael Chance, MICHAEL L. COSNER, Named as: Michael Cosner, JAMES COUCH, JAMES CRUCHELOW, KENNETH CRUCHELOW, LARRY E. CULVER, Named as: Larry Culver, ROBERT DOLAN, KEVIN ENSLEY, JOHN FLYNN, RONALD GILBERT, JAMES GRIFFIN, VIRGIL GRIMM, KENNETH HAGEN, SR., HAROLD B. HATHAWAY, Named as: Harold Hathaway, MICHAEL HEINEN, JAMES HOOK, HARVEY HUNTER, SR., GARY JENKINS, RICHARD KEELING, THOMAS KING, RONALD LEIB, GARY D. LOOMIS, Named as: Gary Loomis, WILLIAM LYNCH, DANIEL MALDONADO, MICHAEL MARQUIS, ROBERT E. MCPHERSON, Named as: Robert McPherson, DAVID MCELVOGUE, MARCUS MIRELES, GARY MOBLEY, DANA MONGAR, CLYDE PARKER, JOHN PATTON, LLOYD PUTNEY, LEE REINHOLDT, THOMAS ROACH, RICHARD SHAFER, BRUCE SHEETS, DONALD SOMERS, DONALD VAN HAL, JOSEPH VINCENT, RICHARD W. WEST, Named as: Richard West, DENNIS V. VICKERS, Named as: Dennis  [**2]  Wicker, KARENY WILLIAMSON, Plaintiffs - Appellees: Randall Shanks ▾ , Council Bluffs, IA.

For MAURICE TAYLOR, JR., Defendant - Appellee: Thomas J. Wiegand ▾ , WINSTON & STRAWN ▾ , Chicago, IL. Gene R. Lasuer, Des Moines, IA. Diane M. Stahle ▾ , Sharon K. Malheiro ▾ , DAVIS & BROWN ▾ , Des Moines, IA. Brett Gorman ▾ , SCHMIEDESKAMP & ROBERTSON ▾ , Quincy, IL.

**Judges:** Before BENTON ▾ , LAY ▾ , and FAGG ▾ , Circuit Judges.

## Opinion

**[*916]** PER CURIAM.

Maurice Taylor, Jr., a principal in Titan Tire Corporation, Titan Wheel Corporation, and Titan International, Inc. (collectively Titan) held a press conference and announced Titan was filing a RICO lawsuit against the United Steelworkers of America, local unions, and about one hundred employees who had filed fraudulent disability **[*917]** claims for hearing loss. Taylor announced, "You have a situation here in Des Moines . . . when the strike started . . . over one hundred people filed disability for their hearing. It was fraudulent." Taylor handed out copies of the RICO lawsuit, which specified the names, places of residence, and positions of the employees, and which alleged the employees had committed mail fraud by sending their fraudulent claims through the mail. A news article about  [**3]  the lawsuit appeared in the local paper, but did not identify the employees.

Fifty-eight of the employees then filed this action in Iowa state court alleging Taylor defamed them. Taylor removed the action to federal court and filed a motion for summary judgment alleging the group defamation doctrine precluded the employees' lawsuit. Taylor argued the defamatory statements were directed at a group rather than individual employees and the defamatory statements did not have any particular application to any of the employees. The district court granted summary judgment to Taylor, holding the employees could not prevail on their claims as a matter of law. According to the district court, the group defamation doctrine precluded recovery because Taylor had not verbally named the employees individually at the press conference. The employees appeal, and we reverse and remand.

The employees contend the district court improperly granted summary judgment based on the group defamation doctrine. Specifically, the employees argue the Iowa Supreme Court has not adopted the doctrine, and even if it would, an exception applies. *HN1* The group defamation doctrine states that a plaintiff's membership in [**4] a defamed group does not give rise to an individual cause of action for defamation unless, as relevant here, "the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member." Restatement (Second) of Torts § 564A (1977).

We need not predict whether the Iowa Supreme Court would adopt the doctrine because we believe the quoted exception applies in this case, and thus the district court improperly granted summary judgment based on the doctrine. In any event, Iowa law, which the parties agree controls in this diversity action, *see Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.*, 387 F.3d 705, 711 (8th Cir. 2004), is consistent with the doctrine's exception and precludes summary judgment for Taylor. *HN2* To establish a prima facie case of defamation under Iowa law, the plaintiff must show the defendant "(1) published a statement that was (2) defamatory (3) of and concerning the plaintiff." *Taggart v. Drake Univ.*, 549 N.W.2d 796, 802 (Iowa 1996). The Iowa Supreme Court has interpreted the third element in a manner consistent with the group defamation exception: Although [**5] defamatory words must refer to an ascertainable person, the plaintiff need not be named "'if the alleged libel contains matters of description or other references therein, or the extraneous facts and circumstances . . . show that plaintiff was intended to be the object of the alleged libel, and was so understood by others.'" *Wisner v. Nichols*, 165 Iowa 15, 143 N.W. 1020, 1025 (Iowa 1913).

Here, Taylor's statements and actions at the press conference could reasonably be understood to be of and concerning each employee. Although Taylor did not state the employees names individually, he referred to them as a group, stated he was suing them because they had committed fraud, then handed his audience copies of the complaint, which identified the individual employees by name in the caption and contained their names, addresses, and positions in an appendix. These circumstances reasonably give rise **[*918]** to the conclusion that Taylor's oral statement specifically referenced each of the employees. *See* Restatement (Second) of Torts § 564A; *Wisner*, 143 N.W. at 1025. Unlike the situation in the case relied on by the district [**6] court, those listening to Taylor could easily ascertain the identities of the group members by simply glancing at the document handed to them. *See Alexis v. District of Columbia*, 77 F. Supp. 2d 35, 42 (D.D.C. 1999) (not clearly established for purpose of qualified immunity that group of over one hundred terminated employees allegedly defamed at press conference were sufficiently named and identified by posting of list of their names on worksite door for security personnel).

Because Taylor specifically referred to the employees at the press conference by distributing the complaint containing their names, we reverse the grant of summary judgment for Taylor.



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

Barnes v. Horan, 841 So. 2d 472, 476-77 (Fla. Dist. Ct. App. 200

Search: Everything

**Document:** Barnes v. Horan, 841 So. 2d 472

Actions

🅐 **Barnes v. Horan, 841 So. 2d 472**

Copy Citation

District Court of Appeal of Florida, Third District

November 27, 2002, Opinion Filed

CASE NO. 3D01-2472

**Reporter**

841 So. 2d 472 *  |  2002 Fla. App. LEXIS 17550 **  |  27 Fla. L. Weekly D 2570

MICHAEL R. BARNES, Appellant, v. DAVID PAUL HORAN, KAREN HORAN, EDWARD W. HORAN, DAVID PAUL HORAN, P.A., and EDWARD W. HORAN, P.A., Appellees.

**Subsequent History:** [**1] Released for Publication March 28, 2003.
Rehearing denied by Barnes v. Horan, 2003 Fla. App. LEXIS 6233 (Fla. Dist. Ct. App. 3d Dist., Mar. 28, 2003).

**Prior History:** An Appeal from the Circuit Court for Monroe County, Jon I. Gordon ▾, Judge. LOWER TRIBUNAL NO. 01-195.

**Disposition:** Reversed and remanded.

## Core Terms

public official, defamatory, second amended complaint, public figure, defamation, public concern, falsity, actual malice, trial court, contempt, undisclosed fact, candidate, convinced, disdain

---

### Case Summary

**Procedural Posture**
Appellant, an injured party, appealed from an order by the Circuit Court for Monroe County (Florida) striking his second amended complaint in a defamation and conspiracy action against appellees, including the tortfeasor, after the trial court granted appellee business entities' motion to dismiss, denied appellees' motion to dismiss a conspiracy count, ruled that two statements were not actionable, and permitted discovery.

**Overview**
The tortfeasor, on firm stationary, authored an advertisement in the local paper claiming, inter alia, that the injured party, a candidate, was unfit for public office. The injured party reasserted the claims rejected by the trial court in the amended complaint. The appellate court held that the claims were ripe for appellate review. All of the claims related to a specific publication, so the claims were intertwined and would not have been reviewed had the injured party attempted to appeal the intermediate rulings while the matter proceeded. The claims supported an action for defamation. The advertisement was not merely the opinion of the tortfeasor; it implied that appellees had insider-knowledge that the injured party's former co-workers thought that he was a liar and could not be trusted. The advertisement implied insider knowledge of undisclosed facts as to whether the injured party had earned the unanimous disdain and contempt from most of the county attorneys and nearly all of the judges. Although the appellate court refused to voice an opinion on the ultimate merits of the injured party's claim, he alleged a sufficient factual basis to proceed.

**Outcome**
The order was reversed, and the matter was remanded.

---

▾ LexisNexis® Headnotes

Civil Procedure > ... > Pleadings ▾ > Amendment of Pleadings ▾ > General Overview ▾

**HN1** **Pleadings, Amendment of Pleadings**

An amended pleading that is complete in itself and that does not refer to or adopt a former pleading as a part of it supersedes the former pleading. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > ... > Defenses, Demurrers & Objections ▾ > Motions to Strike ▾ > General Overview ▾

View more legal topics

**HN2** **Defenses, Demurrers & Objections, Motions to Strike**

The striking of a party's pleadings resulting in a dismissal or a default is the most severe sanction and it should be used sparingly and reserved to those instances where the conduct is flagrant, willful or persistent. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > ... > Defamation ▾ > Defenses ▾ > Fair Comment & Opinion ▾

View more legal topics

**HN3** **Defenses, Fair Comment & Opinion**

Statements of pure opinion cannot constitute actionable defamation. However, a statement that although ostensibly in the form of an opinion implies the allegation of undisclosed defamatory facts as the basis for the opinion is actionable. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Torts > Intentional Torts ▾ > Defamation ▾ > General Overview ▾

**HN4** **Intentional Torts, Defamation**

The difference between unactionable, pure opinion and "mixed opinion," is that pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public. Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the article or assumed to exist by the parties to the communication. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

Torts > ... > Defamation ▾ > Defenses ▾ > Fair Comment & Opinion ▾

View more legal topics

**HN5** **Defenses, Fair Comment & Opinion**

It is the court's function to determine from the context whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct. If a defendant's statement would likely be reasonably understood by ordinary persons as a statement of an undisclosed existing defamatory fact, then it is properly the jury's function to determine whether a defamatory meaning was attributed to it by recipients of the communication. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Torts > Intentional Torts ▾ > Defamation ▾ > Slander ▾

**HN6** **Defamation, Slander**

A candidate for public office is a public figure. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

**Counsel:** Michael R. Barnes (Key West); Richard L. Wilson (Orlando), for appellant.

Horan, Horan & Wallace ▾, and David Horan ▾ (Key West), for appellees.

**Judges:** Before GREEN ▾ and SHEVIN ▾, JJ., and NESBITT ▾, Senior Judge. SHEVIN ▾, Judge. GREEN ▾, J. (specially concurring).

**Opinion by:** SHEVIN ▾

## Opinion

**[*473]** SHEVIN ▾, Judge.

Michael Barnes appeals an Order Striking Plaintiff's Second Amended Complaint and Dismissing Action with Prejudice. On the following analysis, we reverse.

Two days before the 16th Judicial Circuit State Attorney election, David Horan ▾ ran a paid political advertisement, entitled "An Apology to the Citizens of the Florida Keys", published in the Key West Citizen. The letter concerned candidate Barnes, who had been a Horan & Horan employee. The publication was printed on Horan & Horan stationery and signed by attorney David Horan ▾. The following is the text of the

letter?

For 30 years I have had the privilege of practicing law in the Keys. I have not, and will not, run for political office.  [**2]  As a former prosecutor, Assistant County Attorney, Special Counsel for the City of Key West, Chairman of the Military Affairs Committee and immediate past President of the Greater Key West Chamber of Commerce, I am acutely aware of how important our political office holders are to our county. It is for this reason I am publishing this apology/explanation.

In late 1990, my firm decided to add an additional associate/attorney, and I was introduced to Michael "Mick" Barnes by a former professor for whom I had a great deal of respect. Mr. Barnes was about to graduate from law school. After his initial office interview, my brother/law partner expressed doubts about Mr. Barnes, and my secretary/wife expressed even stronger concerns, advised me against offering him a position in our firm. I'm apologizing to *everybody* for not following their advice. For a period of three (3) months "Mick" Barnes was an employee of my firm. Toward the end of his employment, every secretary, book- keeper, partner and associate became convinced that Mr. Barnes' employment *had* to be terminated. Because of *numerous* contradictory misrepresentations by Mr. Barnes' to  **[*474]**  everyone in the firm (including [**3]  myself), not one person in my firm could, or would, trust him to tell the truth.

Mr. Barnes has stated that he has practiced law for 11 years but he was not sworn into the Florida Bar until October 18, 1991. In his July 2000 Public Disclosure Statement (filed with our Supervisor of Elections), Mr. Barnes was forced to disclose that having practiced law for nearly ten (10) years, he *still* owes his student loan of nearly $ 28,000.00. In his Financial Disclosure, Mr. Barnes shows his real estate assets as being $ 325,000 and then disclosed his liabilities as including $ 162,838 to Fleet Mortgage and $ 129,324 to Stillwater National Bank. While one could assume these are mortgages on his real estate, such is not the case.

The disclosure of $ 129,324 liabi1ity to the Stillwater National Bank--made by "Mick" Barnes, *under oath* on July 17th, 2000 was false and Mr. Barnes knew it. The Stillwater Bank obtained a personal judgment against Mr. Barnes on January 5th, 1996... "against the Defendant Michael R. Barnes, in the sum of $ 129,324.21, with interest thereon at the rate of 8.5% per annum from the 5th day of January 1996 until paid; plus attorneys fees in the sum of $ 15,500.00 [**4]  and costs accrued and accruing." This language is *directly* from the District Court Order.

Only July 17th, 2000, when Mr. Barnes swore his liability to Stillwater National Bank was $ 129,324.21, he left out a $ 50,382.23 in accrued interest and the $ 15,500.00 in attorney fees. Mr. Barnes' *true* liability on this one Judgment is over $ 195,000.00 and he has failed to pay a penny on it for nearly 5 years. His net worth was overstated by 54%.

Mr. Barnes' conduct in Court has earned him somewhat unanimous disdain and contempt from most of the Monroe County attorneys and nearly all of our Judges. The Code of Judicial Conduct prohibits Judges from publishing their opinions regarding "Mick" Barnes, but attorneys are under no such prohibition. **Mr. Barnes is *not* a viable candidate for our State Attorney.** For 30 years I have built credibility within this community, with my clients and our courts. Since I have a longer personal and professional relationship with Michael "Mick"' Barnes than any other Monroe County citizen, I am asking that you give my informed opinion credibility for purposes of your upcoming decision and vote.

**The Florida Keys deserve better than "Mick"** [**5]  **Barnes. The taxpayers should not have to pay his student loan or his judgement.**

(emphasis in original).

Barnes lost the election. He thereafter filed a defamation and conspiracy action against David Horan ▾, Karen and Edward Horan, individually, as well as David and Edward's P.A., and Horan & Horan, a partnership. Barnes' first amended complaint was based on four claimed false statements appearing in the ad:

a) Toward the end of his employment, every secretary, bookkeeper, partner and associate became convinced that Mr. Barnes' employment had to be terminated. Because of numerous contradictory misrepresentations by Mr. Barnes to everyone in the firm (including myself), not one person in my firm could, or would trust him to tell the truth;

b) Mr. Barnes was forced to disclose that having practiced law for nearly ten (10) years he *still* owes his student loan of nearly $ 28,000.00;

 **[*475]**  c) The disclosure of $ 129,324 liability to the Stillwater National Bank, made by "Mick" Barnes, under oath on July 17, 2000 was false and Mr. Barnes knew it; and

d) Mr. Barnes' conduct in court has earned him somewhat unanimous disdain and contempt from most of the Monroe County Attorneys [**6]  and nearly all of our Judges.

Barnes' complaint also alleged that Edward Horan sent a defamatory E-mail to another attorney, which evidenced Edward's complicity in the publication of the letter.

The defendants filed motions to dismiss. The court entered an omnibus order granting the business entities motion; denying David, Karen, and Edward's motion as to the conspiracy count; ruling that statements (a) and (d) of the first amended complaint were not actionable as defamatory; and permitting discovery. The court denied Barnes' motion for rehearing. The court entered an order on amended motion granting Barnes ten days to file a second amended complaint against the business entities.

Barnes filed a second amended complaint. 1⚖ However, despite the findings in the trial court's omnibus order, Barnes used the second amended complaint to reassert claims (a) and (d), the two claims that the court had previously rejected as a basis for recovery, and dropped claims (b) and (c), the two claims on which the trial court had concluded that the case could proceed. The defendants filed a motion to strike the pleadings. A hearing on the motion was held on July 26, 2001.

 [**7]  At the hearing, David Horan ▾ maintained that the trial court should strike the complaint and dismiss for noncompliance with the omnibus order. Barnes told the court that if it dismissed with prejudice, he could appeal the points raised in the second amended complaint, including the points the trial court had initially rejected. David Horan ▾ maintained that the time for appeal of the rejected points was when the court had ruled that the defamation action could not rest on those points and when Barnes's motion for rehearing of those rulings had been denied. Thus, according to Horan ▾, the time to seek review of the rejected points had passed. He argued that the court could dismiss the second amended complaint even without finding wilful noncompliance.

A reading of the July 26, 2001, transcript shows that the trial court was confused as to the effect an order dismissing the action would have. The judge was troubled that under David Horan ▾'s analysis, he was not sure how Barnes could have gotten appellate review of the court's rulings as to the rejection of the two allegedly defamatory statements, upon which Barnes wanted to proceed. Finally, the trial judge concluded that he was granting **[**8]** the motion to strike, but specifically said he was not making a finding of wilfulness or contempt, observing "[a]nd to the extent the parties will bring the case to the Appellate Court, I will welcome it and God speed."

The order under review specifically provided that the judge had considered the file, the motions and responses, and oral arguments of the parties. Then, in a two sentence adjudication, the court granted **[*476]** the motion to strike and denied further amendment. Additionally, the court dismissed the action with prejudice. Our review of the record leads us to the inescapable conclusion that the trial judge struck the complaint not because he found a violation of a court order that deserved this severest of sanctions, **2 ⬇** but rather, because with the two claims he had decided had no merit stricken, and the plaintiff having abandoned his other claims, the plaintiff had no other basis to proceed. **3 ⬇**

 [**9]

Initially, we note that we do not agree with David Horan ▾'s claim that the time for review of the two claims at issue has passed. Because all of the claims involved relate to a specific publication, the claims are intertwined and would not have been reviewed had Barnes attempted to appeal those intermediate rulings while the matter proceeded. In dismissing the action, the trial judge's statements reflect that he was doing so because all of the claims had been stricken. The dismissal with prejudice marked the end to litigation and allows our review of the case.

In this posture, the only way we can decide if the trial court erred in striking the second amended complaint [**10] is to determine whether the claims as stated can support an action for defamation. Barnes maintains that the statements are of a specific type in that they imply undisclosed facts. In assessing such a claim, we must consider the law as set out in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 111 L. Ed. 2d 1, 110 S. Ct. 2695 (1990), **4 ⬇** and reflected in this court's opinion in *Stembridge v. Mintz*, 652 So. 2d 444, 446 (Fla. 3d DCA 1995), wherein we observed:

> In *Eastern Air Lines, Inc. v. Gellert*, 438 So. 2d 923 (Fla. 3d DCA 1983), this court followed [Restatement (Second) of Torts] section 566 and summarized the applicable principles:

>> [**11]  **HN3⬆** [S]tatements of pure opinion cannot constitute actionable defamation. However, a statement that although ostensibly in the form of an opinion "implies the allegation of undisclosed defamatory facts as the basis for the opinion," Restatement (Second) of Torts § 566 (1977), *is actionable*. **HN4⬆** The difference between the former, unactionable, pure opinion and the latter, sometimes called "mixed opinion," is that:

>>> "Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public. Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff and his conduct that have not been stated in the article or assumed **[*477]** to exist by the parties to the communication."

>> *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981) . . .

>> **HN5⬆** It is the court's function to determine from the context "whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify [**12] the expressed opinion about the plaintiff or his conduct…." Restatement (Second) of Torts § 566, comment c. If [defendant's] statement would likely be reasonably understood by ordinary persons as a statement of an undisclosed existing defamatory fact, then it was properly the jury's function to determine whether a defamatory meaning was attributed to it by recipients of the communication….

*Stembridge*, 652 So. 2d at 446 (citations omitted).

Barnes maintains that applying this standard to the instant occurrence, he has alleged sufficient facts to proceed on a claim that the statements at issue were defamatory under the *Milkovich* standard. We agree.

As the trial court agrees that statements (b) and (c) are actionable, we need only address statements (a) and (d). **5 ⬇** Once again, in statement (a) David Horan ▾ asserted that "every secretary, bookkeeper, partner and associate became convinced that Mr. Barnes' employment had to be terminated. Because of numerous contradictory misrepresentations by Mr. Barnes to everyone in the firm (including myself), not one person in my firm could, or would trust him to tell the truth." The content of statement (a) does [**13] more than merely state the author's opinion. Rather, it implies to the reader that David Horan ▾, through his relationships with the people in his firm, has acquired knowledge of the *fact* that the plaintiff's former co-workers thought he was a liar who could not be trusted. The impression that Horan ▾ was privy to the views of the people in his firm is further emphasized by the fact that the letter was printed on Horan & Horan stationery. The alleged falsity of this statement can be verified by receiving sworn testimony from the employees and other firm members to whom these beliefs were ascribed.

 [**14]  Similarly, statement (d) gives the impression of an insider's knowledge of undisclosed facts. In statement (d), Horan ▾ claims that "Mr. Barnes' conduct in court has earned him somewhat unanimous disdain and contempt from most of the Monroe County **[*478]** Attorneys and nearly all of our judges." Considering that the article also explains that in addition to being Barnes' former employer, Horan ▾ was a "former prosecutor, Assistant County Attorney, Special Counsel for the City of Key West, Chairman of the Military Affairs Committee and immediate past President of the Greater Key West Chamber of Commerce," it is likely that an ordinary reader would conclude that David Horan ▾ was someone who would have insight into whether the plaintiff had in fact earned the "somewhat unanimous disdain and contempt from most of the Monroe

County Attorneys and nearly all of [the] judges. As with statement (d), the falsity of this statement can be denied by receiving sworn testimony from the people to whom the feelings of disdain and contempt have been attributed, namely the attorneys and judges [6 ▲] of Monroe County.

[**15] The implication that Mr. Horan had knowledge of undisclosed facts is further buttressed by the remarks immediately following statement (d), in which he states:

> For 30 years I have built credibility within this community, with my clients and our courts. Since I have a longer personal and professional relationship with Michael "Mick" Barnes than any other Monroe County citizen, I am asking that you give my *informed* opinion credibility for purposes of your upcoming decision and vote.

(emphasis added). Mr. Horan's self-proclamation that his opinion is informed, placed almost immediately following statement (d), leads to the unavoidable conclusion that his sentiments are based on undisclosed facts.

Therefore, although we voice no opinion on the ultimate merits of Barnes' claim, we do believe that he has alleged a sufficient factual basis to proceed in his prosecution of the matter.

Accordingly, the order under review is reversed, and the matter remanded for the plaintiff to proceed under his second amended complaint.

NESBITT ▼, Senior Judge, concurs.

**Concur by:** GREEN ▼

## Concur

GREEN ▼, J. (specially concurring).

I agree with the majority that the allegations contained in the second [**16] amended complaint, taken as true, state a cause of action for defamation, but I write separately because, unlike the majority, I believe that this case is governed by *New York Times v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964), and its progeny rather than *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 111 L. Ed. 2d 1, 110 S. Ct. 2695 (1990).

The appellant in this case, Mr. Barnes, was a candidate for public office, Monroe County State Attorney, and therefore was a "public figure." [7 ▲] *See Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271, 28 L. Ed. 2d 35, 91 S. Ct. 621 (1971) (finding that a candidate for public office is characterized as a public official or public figure). The statements complained of in the second amended complaint were regarding plaintiffs "qualifications" to hold public office and therefore were matters of public concern. *See e.g.*, *Demby v. English*, 667 So. 2d 350 (Fla. 1st DCA 1995) (allegedly defamatory letter regarding job performance of public official was matter of public concern). Thus, a brief discussion of the evolution of the law regarding "public figures" or "public **[*479]** officials" and [**17] matters of "public concern" is warranted.

In *New York Times*, the Supreme Court enunciated:

> a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' -- that is with knowledge that it was false or with reckless disregard of whether it was false or not.

376 U.S. at 279-80. This rule was formed out of the Court's concern that a "state law rule compelling the critic of official conduct [**18] to guarantee the truth of all his factual assertions would deter protected speech." *Gertz v. Robert Welch Inc.*, 418 U.S. 323, 334, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974).

Later, in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967), the high court extended the *New York Times* test to criticisms of "public figures," as well as "public officials." The Court concluded that for both "public officials" and "public figures," "actual malice" must be shown by a clear and convincing standard of proof. *See Gertz*, 418 U.S. at 342; *see also Nodar v. Galbreath*, 462 So. 2d 803, 806 (Fla. 1985) (stating that: "'actual malice,' which must be shown before a public official or public figure may recover for defamation relating to a matter of his official conduct or of public concern, consists of knowledge of falsity or reckless disregard of truth or falsity, and must be shown by clear and convincing evidence.").

In *Gertz*, the Supreme Court declined to extend the *New York Times* rule to private persons defamed by media publications or broadcasts or commentaries on matters of public interest. [**19] As the court explained:

> Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy.
>
> * * *
>
> [More important] public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them. No such assumption is justified with respect to a private individual.

154

*Gertz, 418 U.S. at 345-50.*

Accordingly, the *Gertz* court held that states may establish their own standards of responsibility of news media defendants to defamed private persons, as long as they neither impose liability without fault or award presumed damages in the absence of actual malice. **8** ⚑

[**20]  Next, in *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986), the court found that at least where a media defendant is concerned, an actionable statement on matters of public concern must be provable as false by the plaintiff before there can be liability under state defamation law. The *Hepps* court limited its holding to cases involving media defendants and left open the question of the standard for non-media private defendants raising statements of public concern about public figures. **9** ⚑ This is precisely the issue presented here. That is, this case raises the question of the applicable **[*480]** standard for an alleged defamed public official by a private defendant on matters of great public concern.

In the absence of any direct precedent from either the United States Supreme Court or Supreme Court of Florida on this issue, I believe that at the very minimum, the standard set forth in the *New York Times* [**21]  line of cases, requiring actual malice, must govern. *See Milkovich*, 497 U.S. at 20 n. 6 ("[p]rior to *Hepps*, . . . where public official or public figure plaintiffs were involved, the *New York Times* rule already required a showing of falsity before liability could result." (citations omitted)).

Since actual malice requires more than the mere publication of a falsity, I believe that footnote 6 of the majority's opinion is misplaced. The ultimate issue here is *not* whether Horan's statements were false, but rather whether Horan *knew* or "recklessly disregarded" that his statements were false. *See Nodar*, 462 So. 2d at 806. Thus, it is not necessary, or even desirable, for Barnes to subpoena and depose the attorneys and sitting judges in Monroe County. **10** ⚑ Moreover, the results of the "opinion poll," embraced by the majority, could not reliably discern the truth or falsity of Horan's assertions regarding Monroe County's judges' and lawyers' opinions of Barnes as a lawyer and/or candidate. *See, e.g., Ollman v. Evans*, 242 U.S. App. D.C. 301, 750 F. 2d 970, 1006 (D.C. Cir. 1984) (a community's opinion of a plaintiff's stature [**22]  in the community is incapable of being adjudicated with any expectation of accuracy). (Bork, J., concurring). Accordingly, I believe that such discovery is impermissible and should not be allowed to take place.

Thus, for these reasons, I concur in the reversal of the dismissal of this lawsuit.

## Footnotes

**1** ⚑  *HN1* ⚓ An amended pleading that is complete in itself and that does not refer to or adopt a former pleading as a part of it supersedes the former pleading. *See Dee v. Southern Brewing Co.*, 146 Fla. 588, 1 So. 2d 562, 563 (Fla. 1941) (By the filing of this declaration the plaintiff abandoned the original declaration and it no longer served any purpose in the record).

**2** ⚑  As stated in *Kelley v. Schmidt*, 613 So. 2d 918, 919 (Fla. 5th DCA 1993), *HN2* ⚓ the striking of a party's pleadings resulting in a dismissal or a default is the most severe sanction and it should be used "sparingly and reserved to those instances where the conduct is flagrant, willful or persistent."

**3** ⚑  At one point in the record, counsel for Barnes asked for dismissal "in a way that all the issues go up on appeal." The court asked, "What would be necessary to do that?" Barnes responded "I think that dismissal with prejudice is all that is required." The court immediately thereafter observed: "I think you are entitled to a review, and know that you are all serious about it, and I guess it is a significant issue for the bar."

**4** ⚑  It is undisputed that as *HN6* ⚓ a candidate for public office, Barnes is a public figure. Although *Milkovich* may be distinguished from the instant case in that *Milkovich* does not involve a plaintiff who qualifies as a public figure, the analysis contained therein concerning the differences between pure and mixed opinions is still relevant.

**5** ⚑  Although the plaintiff dropped statements (b) and (c) from the second amended complaint, it is within the trial court's discretion to, upon request, grant the plaintiff leave to amend, so long as it finds that the defendants would not be prejudiced and that the privilege to amend has not been abused. *Video Indep. Med. Examination, Inc. v. City of Weston*, 792 So. 2d 680, 681 (Fla. 4th DCA 2001); *General Container Serv., Inc. v. William H. McGee & Co.*, 734 So. 2d 570 (Fla. 3d DCA 1999).

**6** ⚑  Mr. Horan has expressed concern that allowing the circuit court judges of Monroe County to be subpoenaed in this case would set a dangerous precedent for potential cases in other circuits in which the testimony of hundreds of sitting judges might be required. As the instant case involves only the relatively small pool of Monroe County judges, we need not address these logistical concerns at this time. Although we sympathize with the trial court's hesitance to take the unusual step of issuing subpoenas to sitting judges, sometimes the pursuit of justice requires that extraordinary measures be taken.

**7** ⚑  In contrast, the plaintiff in *Milkovich* was a private high school wrestling coach and the defendant was a newspaper. Since the alleged defamatory statement was made by a media defendant and involved a matter of public concern, the court held that the plaintiff was required to show that the false connotations were made with some level of falsity as required by *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974).

**8** ⚑  Hence, in the aftermath of *Gertz*, the Florida Supreme Court held that a private individual suing a newspaper for libel need only

prove negligence rather than actual malice. *See Miami Herald Publishing, 418 U. 2d. 1452-56, 224 235 (TLG 1984).*

 *See Hepps, 475 U.S. at 779 n. 4.*

**10** Nor may it even be possible for him to question the judges regarding Barnes' qualifications for public office as the code of judicial conduct prohibits the judges from responding to any such inquiries. *See* Fla. Code Jud. Conduct, Cannon 7A(1)(b).



About                    Cookie Policy              RELX™

Privacy Policy           Terms & Conditions

Copyright © 2023 LexisNexis.

Beauharnais v. Illinois, 343 U.S. 250, 266 (195

Search: Everything

Client: -None- | Folders | History | Help | More

Document: | Beauharnais v. Illinois, 343 U.S. 250 | Actions

Go to | Page | Page # | Search Document

## Beauharnais v. Illinois, 343 U.S. 250

Copy Citation

Supreme Court of the United States

November 28, 1951, Argued ; April 28, 1952, Decided

No. 118

**Reporter**

343 U.S. 250 * | 72 S. Ct. 725 ** | 96 L. Ed. 919 *** | 1952 U.S. LEXIS 2799 ****

BEAUHARNAIS v. ILLINOIS

**Prior History:** [****1] CERTIORARI TO THE SUPREME COURT OF ILLINOIS.

The Supreme Court of Illinois sustained petitioner's conviction of a violation of Ill. Rev. Stat., 1949, c. 38 § 471, over his objection that the statute was invalid under the Fourteenth Amendment. 408 Ill. 512, 97 N. E. 2d 343. This Court granted certiorari. 342 U.S. 809. Affirmed, p. 267.

**Disposition:** 408 Ill. 512, 97 N. E. 2d 343, affirmed.

## Core Terms

libel, criminal libel, words, press, punish, free speech, utterance, leaflet, lithograph, clear and present danger, state power, prosecutions, abridged, evil, libel law, safeguards, cases, derision, obloquy, color, limits, religious group, trial court, state law, Constitutions, religion, rights, freedom of speech, breach of peace, public place

---

### Case Summary

**Procedural Posture**

Petitioner presented an application for a writ of certiorari pertaining to a decision of the Illinois Supreme Court, which sustained petitioner's conviction of a violation of § 224a of the Illinois Criminal Code, Ill. Rev. Stat. ch. 38, § 471 (1949), for utterances promoting friction among racial and religious groups, despite petitioner's objection that the statute was invalid under the U.S. Const. amend. XIV.

**Overview**

Petitioner was president of a group called the White Circle League. The league distributed bundles of lithographs and literature that portrayed depravity, criminality, or lack of virtue of black citizens. The league further called on city officials to halt the invasion of white people, their property, neighborhoods, and persons by black citizens. Petitioner was convicted of violating Ill. Rev. Stat. ch. 38, § 471 (1949), a form of criminal libel. Affirming the state supreme court and the trial court, the court held that § 471 did not violate U.S. Const. amend. XIV. Petitioner presented no defense that convinced the jury that he did not violate the law. Petitioner did not show that he had good motives or justifiable ends. The jury could see that petitioner's behavior tended to cause a breach of peace. The court upheld the conviction.

**Outcome**

The court affirmed petitioner's conviction and held that the statute in question was not invalid under U.S. Const. amend. XIV.

▼ LexisNexis® Headnotes

---

Constitutional Law > ... > **Freedom of Speech** ▾ > 📄 **Defamation** ▾ > **General Overview** ▾

**HN1** ⬇ **Freedom of Speech, Defamation**

While the United States Supreme Court sits, it retains and exercises authority to nullify action that encroaches on freedom of utterance under the guise of punishing libel. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (6)*   ◆1

Constitutional Law > ... > **Freedom of Speech** ▾ > 📄 **Defamation** ▾ > **General Overview** ▾

**HN2** ⬇ **Freedom of Speech, Defamation**

As to the defense of truth, Illinois in common with many states requires a showing not only that the utterance state the facts, but also that the publication be made with good motives and for justifiable ends. Ill. Const. art. II, § 4. Both elements are necessary if the defense is to prevail. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Constitutional Law > ... > **Freedom of Speech** ▾ > 📄 **Defamation** ▾ > **General Overview** ▾

View more legal topics

**HN3** ⬇ **Freedom of Speech, Defamation**

Libelous utterances are not within the area of constitutionally protected speech. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (45)*   ⚠1   ◆2

Constitutional Law > ... > **Freedom of Speech** ▾ > 📄 **Defamation** ▾ > **General Overview** ▾
Criminal Law & Procedure > **Criminal Offenses** ▾ > **Miscellaneous Offenses** ▾ > **General Overview** ▾

**HN4** ⬇ **Freedom of Speech, Defamation**

Ill. Rev. Stat. ch. 38, § 471 (1949) is not constitutionally objectionable. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

▼ Lawyers' Edition Display

---

**Summary**

Defendant distributed leaflets setting forth a petition to the mayor and city council of Chicago for the adoption of segregation measures and containing the following statement: "If persuasion and the need to prevent the white race from becoming mongrelized by the negro will not unite us, then the aggressions . . . rapes, robberies, knives, guns and marijuana of the negro, surely will." He was indicted on a charge that he published lithographs portraying "depravity, criminality, unchastity, or lack of virtue" of citizens of the Negro race and exposing them to "contempt, derision, or obloquy," in violation of an Illinois statute which prohibited publications so attacking "citizens of any race, color, creed, or religion." He was not permitted to raise at his trial the defenses of truth, fair comment, and privilege. The trial court decided as a matter of law the libelous character of the utterance, leaving to the jury only the question of publication. He was found guilty and convicted.

His conviction was affirmed by the Supreme Court of Illinois, over his objections that the statute violated the liberty of free speech and press guaranteed against the states by the due process clause of the Fourteenth Amendment, and that the statute was too vague, under the restrictions implicit in the same clause, to support conviction for crime.

Noting that the Illinois Supreme Court construed the statute involved as a form of criminal libel law, prohibiting utterances which tend to cause a breach of the peace, five members of the Supreme Court of the United States, in an opinion by Frankfurter ▾, J., upheld the statute against the constitutional objections. The majority held that the protection of "liberty" in the due process clause of the Fourteenth Amendment did not prevent a state from punishing a criminal libel directed at defined groups, such as specified in the statute. Procedural due process objections were rejected for various reasons see Headnotes 12-15, infra.

The question as to whether the right of free speech, protected by the First Amendment against abridgment by Congress, is included in the Fourteenth Amendment and hence equally protected against state action, was not explicitly answered by the majority, who did not specifically rely on the First Amendment. Jackson ▾, J., answered the question in the negative, expressing the view that the powers of Congress and of the states over free speech are not of the same dimensions. On the other hand, Black ▾, Reed ▾, and Douglas ▾, JJ., adhered to the traditional view that the Fourteenth Amendment embodies the free speech guaranties of the First.

Jackson ▾, J., while agreeing with the majority that a state has power to bring classes "of any race, color, creed, or religion" within the protection of its libel laws, dissented on the ground that the Illinois statute, as applied in the instant case, dispensed with accepted safeguards for the accused, in that rulings of the trial court precluded the defenses of truth, fair comment, and privilege, and that no probability of a "clear and present danger" was shown.

Douglas ▾, J., in a separate dissenting opinion, expressed the view that free speech has a preferred position as contrasted to some other civil rights.

Reed ▾, J., with the concurrence of Douglas ▾, J., dissented on the ground that, assuming the constitutional power of a state to pass group libel laws, the conviction could not stand on the ground that the statute contained, without statutory or judicial definition, words of such ambiguous meaning and uncertain connotation as "virtue," "derision," or "obloquy."

Black ▾, J., also with the concurrence of Douglas ▾, J., held that the statute violated the right of free speech.

## Headnotes

COURTS §805.3  >  Supreme Court following state decisions as to construction of statute attacked as unconstitutional. --  > Headnote:
**LEdHN[1]⤓** [1]

In determining whether a state statute penalizing publication of any lithograph which "portrays depravity, criminality, unchastity, or lack of virtue of a class of citizens, of any race, color, creed, or religion," or which exposes them "to contempt, derision, or obloquy, or which is productive of breach of the peace or riots," violates the due process clause of the Fourteenth Amendment, the Supreme Court will read the statute in the context of welldefined usage and state court construction, which determines its meaning for the Supreme Court.

LIBEL AND SLANDER §23  >  criminal libel -- defenses. --  > Headnote:
**LEdHN[2]⤓** [2]

Illinois law requires that, for the defense in a prosecution for criminal libel to prevail, the truth of all facts in the utterance must be shown together with good motive for publication.

TRIAL §112  >  question for court or jury -- libelous character of publication. --  > Headnote:
**LEdHN[3]⤓** [3]

Under Illinois law the trial court, in a prosecution for criminal libel, decides as a matter of law the libellous character of an utterance.

LIBEL AND SLANDER §22  >  criminal libel. --  > Headnote:
**LEdHN[4]⤓** [4]

The traditional justification for punishing libels criminally is their tendency to cause a breach of the peace.

LIBEL AND SLANDER §23  >  criminal libel -- common law. --  > Headnote:
**LEdHN[5]⤓** [5]

Libel of an individual was a common-law crime to which truth or good motives were no defense.

CONSTITUTIONAL LAW §930  >  limitations on right of free speech. --  > Headnote:
**LEdHN[6]⤓** [6]

The right of free speech does not include the use of lewd and obscene, profane, libelous and insulting, or "fighting" words, which by their very utterance inflict injury or tend to incite to an immediate breach of the peace.

CONSTITUTIONAL LAW §528.5  >  due process -- deprivation of liberty -- criminal group libel. --  > Headnote:
**LEdHN[7A]⤓** [7A]**LEdHN[7B]⤓** [7B]

The protection of "liberty" in the due process clause of the Fourteenth Amendment does not prevent a state from punishing a criminal libel directed at designated collectivities and flagrantly disseminated.

COURTS §153  >  deference to legislature -- race problems. --  > Headnote:
**LEdHN[8]⤓** [8]

In view of the difficult nature of problems arising from the frictions attributable to differences of race, color, or religion, it is out of bounds for the judiciary to deny the legislature a choice of policy, provided it is not unrelated to the problem and not forbidden by some explicit limitation on the state's power.

CONSTITUTIONAL LAW §930  >  freedom of speech -- state's power to punish criminal libel -- abuse. --  > Headnote:
*LEdHN[9]* [9]

The possibility of abuse is no reason for denying a state the power to adopt measures against criminal libels, the Supreme Court of the United States retaining and exercising authority to nullify action which encroaches on freedom of utterance under the guise of punishing libel.

STATUTES §18  >  indefiniteness -- criminal libel. --  > Headnote:
*LEdHN[10]* [10]

A state statute penalizing publication of any lithograph which "portrays depravity, criminality, unchastity, or lack of virtue of a class of citizens, of any race, color, creed, or religion" or which exposes them "to contempt, derision, or obloquy, or which is productive of breach of the peace or riots," is not so vague and lacking in standards as to render a conviction thereunder invalid, where the statute, as construed by the highest court of the state, is a form of criminal libel law, prohibiting utterances which tend to cause a breach of the peace.

APPEAL AND ERROR §1650.5  >  ground for setting aside conviction -- possible infringement of constitutional right. --  > Headnote:
*LEdHN[11]* [11]

A conviction under a state statute penalizing publication which "portrays depravity, criminality, unchastity, or lack of virtue of a class of citizens, of any race, color, creed, or religion" or which exposes them to "contempt, derision, or obloquy, or which is productive of breach of the peace or riots," will not be set aside on the ground that the statute is so broad that the general verdict of guilty on an indictment drawn in the statutory language might have been predicated on constitutionally protected conduct, where the statute, as construed by the highest court of the state, is a form of criminal libel law, prohibiting utterances which tend to cause a breach of the peace.

APPEAL AND ERROR §427  >  review by Supreme Court of state decision -- necessity of raising constitutional question in state court. --  > Headnote:
*LEdHN[12]* [12]

A conviction in a state court of an offense in the nature of criminal libel cannot be attacked by the defendant in the Supreme Court of the United States on the ground that due process was violated by the trial court's refusal to permit him to raise the defense of justification of the utterance as "fair comment," or of its privilege as a means for redressing grievances, where neither by proffer of evidence, requests for instructions, nor motion before or after verdict, did the defendant seek to justify his utterance as "fair comment" or as privileged.

CONSTITUTIONAL LAW §840.3  >  due process -- defamation -- burden of proof. --  > Headnote:
*LEdHN[13]* [13]

Without violating due process, a state may cast the burden of justifying what is patent defamation upon the defamer.

CONSTITUTIONAL LAW §854  >  due process -- defense to criminal libel. --  > Headnote:
*LEdHN[14]* [14]

Without violating due process a state may require that, for the defense in a criminal libel prosecution to prevail, the defendant show not only that the utterance is true, but also that the publication was made with good motive and for justifiable ends.

APPEAL AND ERROR §426  >  review by Supreme Court of state decisions -- necessity of raising constitutional question in state court. --  > Headnote:
*LEdHN[15]* [15]

A conviction in a state court of an offense in the nature of criminal libel cannot be attacked by the defendant in the Supreme Court of the United States on the ground that due process was violated by the trial court's refusal to permit him to raise the defense of truth, where state law required that, for the defense to prevail, the defendant show not only truth but also that the publication was made with good motives and for justifiable ends, and defendant's offer of proof did not satisfy that combined requirement, and, moreover, the question of exclusion of testimony bearing on the defense was not raised by motion in the trial court, nor on appeal in the state courts, nor before the Supreme Court.

CONSTITUTIONAL LAW §930  >  free speech -- libelous utterances. --  > Headnote:

**LEdHN[16]** [16]

Libelous utterances, not being within the area of constitutionally protected free speech, may be punished without a showing of a clear and present danger of a serious substantive evil.

CONSTITUTIONAL LAW §528.5  >  validity of statute penalizing group libel. --  > Headnote:

**LEdHN[17]** [17]

The Constitution of the United States does not prohibit a state from passing a statute penalizing publication of any lithograph which "portrays depravity, criminality, unchastity, or lack of virtue of a class of citizens, of any race, color, creed, or religion" or which exposes them to "contempt, derision, or obloquy, or which is productive of breach of the peace or riots."

COURTS §103  >  wisdom or efficiency of legislation. --  > Headnote:

**LEdHN[18]** [18]

In determining the constitutionality of a statute, it is not for the courts to pass on the wisdom of legislation or on its efficiency.Points from Separate Opinions

CONSTITUTIONAL LAW §925.5  >  free speech -- guaranty as applicable to state action. --  > Headnote:

**LEdHN[19A]** [19A]**LEdHN[19B]** [19B]

The general principle against abridgement of free speech, protected by the First Amendment, is included in the command of the Fourteenth. [Per Black ▾, Reed ▾, and Douglas ▾, JJ.]

APPEAL AND ERROR §427  >  Supreme Court's review of state decisions -- necessity of raising constitutional question in state trial court. -- > Headnote:

**LEdHN[20]** [20]

If the highest court of the state treats a federal question as properly before it, and decides the question, the question is reviewable in the Supreme Court of the United States, regardless of the manner in which it was raised in the inferior courts of the state. [Per Reed ▾ and Douglas ▾, JJ.]

APPEAL AND ERROR §1650.5  >  freedom of speech -- under information based upon broad language of statute. --  > Headnote:

**LEdHN[21]** [21]

The rule that, when a state conviction is challenged in the Supreme Court of the United States on the ground that free speech has been abridged, this Court must first decide whether the portion of the statute upon which the charge is based is so broad as to permit within the scope of its language the punishment of incidents fairly within the protection of the guaranty of free speech, means that, when the verdict and judgment flow from the information as a whole, each and every portion of the statute upon which the information was drawn must be constitutional. [Per Reed ▾ and Douglas ▾, JJ.]

APPEAL AND ERROR §1650.5  >  ground for setting aside conviction -- possible infringement of constitutional rights. --  >  Headnote:

**LEdHN[22]** [22]

A conviction under a general verdict of guilty, challenged in the Supreme Court as an infringement of the right of free speech must stand or fall upon a determination whether all definitions of the acts proscribed by the statute and charged in the information may be banned under the principles of the First Amendment. [Per Reed ▾ and Douglas ▾, JJ.]

CONSTITUTIONAL LAW §925  >  freedom of speech. --  > Headnote:

**LEdHN[23]** [23]

Since the First Amendment prohibits an abridgment of the freedom of speech in absolute terms, speech has a preferred position as contrasted to some other civil rights. [Per Douglas ▾, J.]

CONSTITUTIONAL LAW §925.5  >  free speech -- limitation on state powers. --  > Headnote:

**LEdHN[24]** [24]

As a limitation upon power to punish written or spoken words, the "liberty" which the due process clause of the Fourteenth Amendment protects against denial by the states means, in its context of state powers and functions, something quite different from the "freedom of speech or of the press" which the First Amendment forbids only Congress to abridge. The Fourteenth Amendment does not "incorporate" the First. The federal government has not the same latitude under the First Amendment as a state may require for orderly government of its manifold concerns. State power is qualified only by such general restraints as are essential to the concept of ordered liberty. [Per Jackson ⌄, J.]

CONSTITUTIONAL LAW §528.5  >  due process -- deprivation of liberty -- criminal class libel. --  > Headnote:
**LEdHN[25]⤓** [25]

The "liberty" protected by the due process clause of the Fourteenth Amendment is violated by a statute which brings classes "of any race, color, creed, or religion" within the protection of its libel laws, as applied to the author of a leaflet charging that the white race was becoming mongrelized by the Negro and that the Negro was guilty of various specified crimes, where rulings of the trial court precluded defendant's effort to prove the truth of his statements and his right to comment upon matters of public interest, as well as the defense of privilege, and no finding was made as to the probability of any clear and present danger, or injury to any person or group or to the public peace. [Per Jackson ⌄, J.]

CONSTITUTIONAL LAW §925  >  "clear and present danger" test. --  > Headnote:
**LEdHN[26]⤓** [26]

Punishment of printed words, based on their tendency either to cause breach of the peace or injury to persons or groups, is justifiable only if the prosecution survives the "clear and present danger" test. [Per Jackson ⌄, J.]

## Syllabus

Over his claim that the statute violated the liberty of speech and of the press guaranteed as against the States by the Due Process Clause of the Fourteenth Amendment and was void for vagueness, petitioner was convicted in a state court for distributing on the streets of Chicago anti-Negro leaflets in violation of Ill. Rev. Stat., 1949, c. 38, § 471, which makes it a crime to exhibit in any public place any publication which "portrays depravity, criminality, unchastity, or lack of virtue of a class of citizens, of any race, color, creed or religion" which "exposes the citizens of any race, color, creed or religion to contempt, derision, or obloquy. [****2]  " *Held*:

1. As construed and applied in this case, the statute does not violate the liberty of speech and of the press guaranteed as against the States by the Due Process Clause of the Fourteenth Amendment. Pp. 251-264.

2. As construed and applied in this case, the statute is not void for vagueness. *Winters* v. *New York*, 333 U.S. 507; *Stromberg* v. *California*, 283 U.S. 359; *Thornhill* v. *Alabama*, 310 U.S. 88; and *Terminiello* v. *Chicago*, 337 U.S. 1, distinguished. P. 264.

3. Since petitioner did not, by appropriate steps in the trial court, seek to justify his utterance as "fair comment" or as privileged as a means for redressing grievances, those hypothetical defenses cannot be considered by this Court. Pp. 264-265.

4. Since the Illinois Supreme Court construed this statute as a form of criminal libel law, and truth of the utterance is not a defense to a charge of criminal libel under Illinois law unless the publication is also made "with good motives and for justifiable ends," petitioner was not denied due process by the trial court's rejection of a proffer of proof which did not satisfy [****3]  this requirement. Pp. 253-254, 265-266.

5. Since libelous utterances are not within the area of constitutionally protected speech, it is not necessary for this Court to consider the issues raised by the denial of petitioner's request that the jury be instructed that, in order to convict, they must find that the publication complained of was likely to produce a "clear and present danger" of a substantial evil. Pp. 253, 266.

**Counsel:** Alfred A. Albert argued the cause for petitioner. With him on the brief was Herbert Monte Levy.

William C. Wines, Assistant Attorney General of Illinois, argued the cause for respondent. With him on the brief were Ivan A. Elliott, Attorney General, John T. Coburn, Assistant Attorney General, and Albert I. Zemel.

**Judges:** Vinson ⌄, Black ⌄, Reed ⌄, Frankfurter ⌄, Douglas ⌄, Jackson ⌄, Burton ⌄, Clark ⌄, Minton ⌄

**Opinion by:** FRANKFURTER

## Opinion

**[*251]** [**728] [***924]  MR. JUSTICE **FRANKFURTER** delivered the opinion of the Court.

The petitioner was convicted upon information in the Municipal Court of Chicago of violating § 224a of the Illinois Criminal Code, Ill. Rev. Stat., 1949, c. 38, Div. 1, § 471. He was fined $ 200. The section provides:

"It shall be [****4]  unlawful for any person, firm or corporation to manufacture, sell, or offer for sale, advertise or publish,

present or exhibit in any public place in this state any lithograph, moving picture, play, drama or sketch, which publication or exhibition portrays depravity, criminality, unchastity, or lack of virtue of a class of citizens, of any race, color, creed or religion which said publication or exhibition exposes the citizens of any race, color, creed or religion to contempt, derision, or obloquy or which is productive of breach of the peace or riots. . . ."

Beauharnais challenged the statute as violating the liberty of speech and of the press guaranteed as against the States by the Due Process Clause of the Fourteenth Amendment, and as too vague, under the restrictions implicit in the **[\*252]** same Clause, to support conviction for crime. The Illinois courts rejected these contentions and sustained defendant's conviction. 408 Ill. 512, 97 N. E. 2d 343. We granted certiorari in view of the serious questions raised concerning the limitations imposed by the Fourteenth Amendment on the power of a State to punish utterances promoting friction among racial and **[\*\*\*\*5]** religious groups. 342 U.S. 809.

The information, cast generally in the terms of the statute, charged that Beauharnais "did unlawfully . . . exhibit in public places lithographs, which publications portray depravity, criminality, unchastity or lack of virtue of citizens of Negro **[\*\*\*925]** race and color and which exposes [*sic*] citizens of Illinois of the Negro race and color to contempt, derision, or obloquy . . . ." The lithograph complained of was a leaflet setting forth a petition calling on the Mayor and City Council of Chicago "to halt the further encroachment, harassment and invasion of white people, their property, neighborhoods and persons, by the Negro . . . ." Below was a call for "One million self respecting white people in Chicago to unite . . . ." with the statement added that "If persuasion and the need to prevent the white race from becoming mongrelized by the negro will not unite us, then the aggressions . . . rapes, robberies, knives, guns and marijuana of the negro, surely will." This, with more language, similar if not so violent, concluded with an attached application for membership in the White Circle League of America, Inc.

The testimony **[\*\*\*\*6]** at the trial was substantially undisputed. From it the jury could find that Beauharnais was president of the White Circle League; that, at a meeting on January 6, 1950, he passed out bundles of the lithographs in question, together with other literature, to volunteers for distribution on downtown Chicago street corners the following day; that he carefully organized that distribution, giving detailed instructions for it; and that **[\*253]** the leaflets were in fact distributed on January 7 in accordance with his plan and instructions. The court, together with other charges on burden of proof and the like, told the jury "if you find . . . that the defendant, Joseph Beauharnais, did . . . manufacture, sell, or offer for sale, advertise or publish, present or exhibit in any public place the lithograph . . . then you are to find the defendant guilty . . . ." He refused to charge the jury, as requested by the defendant, that in order to convict they must find "that the article complained of was likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest." Upon this evidence and these instructions, the jury **[\*\*\*\*7]** brought in the conviction here for review.

**[\*\*729]** *LEdHN[1]* 🔼 [1]The statute before us is not a catchall enactment left at large by the State court which applied it. Cf. *Thornhill v. Alabama*, 310 U.S. 88; *Cantwell v. Connecticut*, 310 U.S. 296, 307. It is a law specifically directed at a defined evil, its language drawing from history and practice in Illinois and in more than a score of other jurisdictions a meaning confirmed by the Supreme Court of that State in upholding this conviction. We do not, therefore, parse the statute as grammarians or treat it as an abstract exercise in lexicography. We read it in the animating context of well-defined usage, *Nash v. United States*, 229 U.S. 373, and State court construction which determines its meaning for us. *Cox v. New Hampshire*, 312 U.S. 569; *Chaplinsky v. New Hampshire*, 315 U.S. 568.

*LEdHN[3]* 🔼 [3]*LEdHN[4]* 🔼 [4]The Illinois **[\*\*\*\*8]** Supreme Court tells us that § 224a "is a form of criminal libel law." 408 Ill. 512, 517, 97 N. E. 2d 343, 346. The defendant, the trial court and the Supreme Court consistently treated it as such. The defendant offered evidence tending to prove the truth of parts of the utterance, and the courts below condemned and disposed of **[\*254]** this offer in terms of ordinary criminal libel precedents. 1⬇ Section 224a does not deal with the defense of truth, but **[\*\*\*926]** by the Illinois Constitution, Art. II, § 4, "in all trials for libel, both civil and criminal, the truth, when published with good motives and for justifiable ends, shall be a sufficient defense." See also Ill. Rev. Stat., 1949, c. 38, § 404. Similarly, the action of the trial court in deciding as a matter of law the libelous character of the utterance, leaving to the jury only the question of publication, follows the settled rule in prosecutions for libel in Illinois and other States. 2⬇ Moreover, the Supreme Court's characterization of the words prohibited by the statute as those "liable to cause violence and disorder" paraphrases the traditional justification for punishing libels criminally, namely **[\*\*\*\*9]** their "tendency to cause breach of the peace." 3⬇

*LEdHN[2]* 🔼 [2]

**[\*\*\*\*10]** *LEdHN[5]* 🔼 [5]*LEdHN[6]* 🔼 [6]Libel of an individual was a common-law crime, and thus criminal in the colonies. Indeed, at common law, truth or good motives was no defense. In the first decades after the adoption of the Constitution, this was changed by judicial decision, statute or constitution in most States, but nowhere was there any suggestion that **[\*255]** the crime of libel should be abolished. 4⬇ **[\*\*\*\*12]** Today, every American jurisdiction -- the forty-eight States, the District of Columbia, Alaska, Hawaii and Puerto Rico -- punish **[\*\*730]** libels directed at individuals. 5⬇ **[\*\*\*13]** "There are certain well-defined **[\*\*\*927]** and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words -- those which by their very utterance **[\*\*\*731]** inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances **[\*257]** are no essential **[\*\*\*\*11]** part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' *Cantwell v. Connecticut*, 310 U.S. 296, 309-310." Such were the views of a unanimous Court in *Chaplinsky v. New Hampshire, supra* , at 571-572. 6⬇

*LEdHN[7A]* 🔼 [7A]No one will gainsay that it is libelous **[\*\*\*928]** falsely to charge another with being a rapist, robber, carrier of knives and **[\*258]** guns, and user of marijuana. The precise question before us, then, is whether the protection of "liberty" in the Due Process Clause of the Fourteenth Amendment prevents a State from punishing **[\*\*\*\*14]** such libels -- as criminal libel has been defined, limited and constitutionally recognized time out of mind -- directed at designated collectivities and flagrantly disseminated. There is even authority, however dubious, that such utterances were also crimes at common law. 7⬇ **[\*\*\*\*15]** It is certainly clear that some American jurisdictions have sanctioned their punishment under ordinary criminal libel statutes. 8⬇ We cannot say, however, that the question is concluded by history and practice. But if an utterance directed at an individual may be the object of criminal sanctions, we cannot deny to a State power to punish the same utterance directed at a defined group, unless we can say that this is a wilful and purposeless restriction unrelated to the peace and well-being of the State.

Illinois did not have to look beyond her own borders or await the tragic experience of the last three decades [*****17] **[*259]** to conclude that wilful purveyors of falsehood concerning racial and religious groups promote strife and tend powerfully to obstruct the manifold adjustments required for free, ordered life in a metropolitan, polyglot community. **[**732]** From the murder of the abolitionist Lovejoy in 1837 to the Cicero riots of 1951, Illinois has been the scene of exacerbated tension between races, often flaring into violence and destruction. **[10]** In many of these outbreaks, utterances of the character here in question, so the Illinois legislature could conclude, played a significant part. **[11]** The law was passed on June 29, 1917, at a time when the State was struggling to [*****16] assimilate vast numbers of new inhabitants, as yet concentrated in discrete racial or national or religious groups -- foreign-born brought to it by the crest of the great wave of immigration, and Negroes attracted [***929] by jobs in war plants and the allurements **[*260]** of northern claims. **[12]** [*****18] Nine years earlier, in the very city where the legislature sat, what is said to be the first northern race riot had cost the lives of six people, left hundreds of Negroes homeless and shocked citizens into action far beyond the borders of the State. **[13]** Less than a month before the bill was enacted, East St. Louis had seen a day's rioting, prelude to an outbreak, only four days after the bill became law, so bloody that it led to Congressional investigation. **[14]** A series of bombings had begun which was to culminate two years later in the awful race riot which held Chicago in its grip for seven days in **[*261]** the summer of 1919. **[15]** Nor **[**733]** has tension and violence between the groups defined in the statute been limited in Illinois to clashes between whites and Negroes.

In the face of this history and its frequent obligato of extreme racial and religious propaganda, we would deny experience to say that the Illinois legislature was without reason in seeking ways to curb false or malicious defamation of racial and religious groups, made in public places and by means calculated to have a powerful emotional impact on those to whom it was presented. "There are limits to the exercise of these liberties [of speech and of [*****19] the press]. The danger in these times from the coercive activities of those who in the delusion of racial or religious conceit would incite violence and breaches of the peace in order to deprive others of their equal right to the exercise of their liberties, is emphasized by events familiar to all. These and other transgressions of those limits the States appropriately may punish." **[16]** This was the conclusion, again of a unanimous Court, in 1940. *Cantwell v. Connecticut, supra,* at 310.

[*****20] *LEdHN[8]* [8]It may be argued, and weightily, that this legislation will not help matters; that tension and on occasion **[*262]** violence between racial and religious groups must be traced to [***930] causes more deeply embedded in our society than the rantings of modern Know-Nothings. **[17]** Only those lacking responsible humility will have a confident solution for problems as intractable as the frictions attributable to differences of race, color or religion. This being so, it would be out of bounds for the judiciary to deny the legislature a choice of policy, provided it is not unrelated to the problem and not forbidden by some explicit limitation on the State's power. That the legislative remedy might not in practice mitigate the evil, or might itself raise new problems, would only manifest once more the paradox of reform. It is the price to be paid for the trial-and-error inherent in legislative efforts to deal with obstinate social issues. "The science of government is the most abstruse of all sciences; if, indeed, that can be called a science which has but few fixed principles, and practically consists [*****21] in little more than the exercise of a sound discretion, applied to the exigencies of the state as they arise. It is the science of experiment." *Anderson v. Dunn,* 6 Wheat. 204, 226. Certainly the Due Process Clause does not require the legislature to be in the vanguard of science -- especially sciences as young as human ecology and cultural anthropology. See *Tigner v. Texas,* 310 U.S. 141, 148.

Long ago this Court recognized that the economic rights of an individual may depend for the effectiveness of their enforcement on rights in the group, even though not formally corporate, to which he belongs. *American Foundries v. Tri-City Council,* 257 U.S. 184. Such group-protection on behalf of the individual may, for all we know, be a need not confined to the part that a [*****22] trade union plays in effectuating rights abstractly recognized as belonging **[*263]** to its members. It is not within our competence to confirm or [**734] deny claims of social scientists as to the dependence of the individual on the position of his racial or religious group in the community. It would, however, be arrant dogmatism, quite outside the scope of our authority in passing on the powers of a State, for us to deny that the Illinois legislature may warrantably believe that a man's job and his educational opportunities and the dignity accorded him may depend as much on the reputation of the racial and religious group to which he willy-nilly belongs, as on his own merits. This being so, we are precluded from saying that speech concededly punishable when immediately directed at individuals cannot be outlawed if directed at groups with whose position and esteem in society the affiliated individual may be inextricably involved.

*LEdHN[9]* [9]We are warned that the choice open to the Illinois legislature here may be abused, that the law may be discriminatorily enforced; prohibiting libel of a creed or of [*****23] a racial group, we are told, is but a step from prohibiting libel of a political [***931] party. **[18]** Every power may be abused, but the possibility of abuse is a poor reason for denying Illinois the power to adopt measures against criminal libels sanctioned by centuries of Anglo-American law. *HN1* "While this Court sits" it retains and exercises authority to nullify action which encroaches on freedom of utterance **[*264]** under the guise of punishing libel. Of course discussion cannot be denied and the right, as well as the duty, of criticism must not be be stifled.

[*****24] *LEdHN[10]* [10]*LEdHN[11]* [11]The scope of the statute before us, as construed by the Illinois court, disposes of the contention that the conduct prohibited by the law is so ill-defined that judges and juries in applying the statute and men in acting cannot draw from it adequate standards to guide them. The clarifying construction and fixed usage which govern the meaning of the enactment before us were not present, so the Court found, in the New York law held invalid in *Winters v. New York,* 333 U.S. 507. Nor, thus construed and limited, is the act so broad that the general verdict of guilty on an indictment drawn in the statutory language might have been predicated on constitutionally protected conduct. On this score, the conviction here reviewed differs from those upset in *Stromberg v. California,* 283 U.S. 359, *Thornhill v. Alabama,* 310 U.S. 88, and *Terminiello v. Chicago,* 337 U.S. 1. Even the latter case did not hold that the unconstitutionality of a statute is [*****25] established *because* it permitted the speech prohibited by it raises a ruckus.

It is suggested that while it was clearly within the constitutional power of Illinois to punish this utterance if the proceeding were properly safeguarded, in this particular case Illinois denied the defendant rights which the Due Process Clause commands. Specifically, it is argued that the defendant was not permitted to raise at the trial defenses constitutionally guaranteed in a criminal libel prosecution: (1) the defense of truth; (2) justification of the utterance as "fair comment"; and (3) its privilege as a means for redressing grievances.

*LEdHN[12]* [12]*LEdHN[13]* [13]Neither by proffer of evidence, requests for instructions, nor motion before or after verdict did the defendant seek to justify his utterance as "fair comment" or as privileged. Nor has the defendant urged as a ground for reversing his **[*265]** conviction in this Court his opportunity to make [**735] those defenses was denied below. And so, whether a prosecution for libel of a racial or religious [*****26] group is unconstitutionally invalid where the State did deny the defendant such opportunities is not before us. **[19]**

Certainly the State may cast the burden of justifying what is patent defamation upon the defamer. The benefits of hypothetical defenses, never [***932] raised below or pressed upon us, are not to be invoked in the abstract.

**LEdHN[14]** [14]**LEdHN[15]** [15]**HN2** As to the defense of truth, Illinois in common with many States requires a showing not only that [****27] the utterance state the facts, but also that the publication be made "with good motives and for justifiable ends." Ill. Const., Art. II, § 4. [****28] Both elements are necessary if the defense is to prevail. What has been called "the common sense of American criminal law," as formulated, with regard to necessary safeguards in criminal libel prosecutions, in the New York Constitution of 1821, Art. VII, § 8, has been adopted in terms by Illinois. The teaching of a century and a half of criminal libel prosecutions in this country **[*266]** would go by the board if we were to hold that Illinois was not within her rights in making this combined requirement. Assuming that defendant's offer of proof directed to a part of the defense was adequate, **21** it did not satisfy the entire requirement which Illinois could exact. **22**

[****29] **LEdHN[16]** [16]**HN3** Libelous utterances not being within the area of constitutionally protected speech, it is unnecessary, either for us or for the State courts, to consider the issues behind the phrase "clear and present danger." Certainly no one would contend that obscene speech, for example, may be punished only upon a showing of such circumstances. Libel, as we have seen, is in the same class.

**LEdHN[17]** [17]**LEdHN[18]** [18]We find no warrant in the Constitution for denying to Illinois the power to pass the law here under attack. **23** But **[*267]** [**736] it bears repeating -- although it should not -- that our finding that **HN4** the law is not constitutionally objectionable carries no implication of approval of the wisdom of the legislation or of its efficacy. These questions may raise doubts in our minds as well as in others. It is not for us, however, to make the legislative judgment. We are [****30] not at liberty to erect those doubts into fundamental law.

*Affirmed*.


**Dissent by:** BLACK ▾; REED ▾; DOUGLAS ▾; JACKSON ▾

## Dissent

[***933] MR. JUSTICE BLACK ▾, with whom MR. JUSTICE DOUGLAS ▾ concurs, dissenting.

This case is here because Illinois inflicted criminal punishment on Beauharnais for causing the distribution of leaflets in the city of Chicago. The conviction rests on the leaflet's contents, not on the time, manner or place of distribution. Beauharnais is head of an organization that opposes amalgamation and favors segregation of white and colored people. After discussion, an assembly of [****31] his group decided to petition the mayor and council of Chicago to pass laws for segregation. Volunteer members of the group agreed to stand on street corners, solicit signers to petitions addressed to the city authorities, and distribute leaflets giving information about the group, its beliefs and its plans. In carrying out this program a solicitor handed out a leaflet which was the basis of this prosecution. Since the Court opinion quotes only parts of the leaflet, I am including all of it as an appendix to this dissent, *post*, p. 276.

I.

**LEdHN[19A]** [19A]That Beauharnais and his group were making a genuine effort to petition their elected representatives is not disputed. Even as far back as 1689, the Bill of Rights exacted of William & Mary said: "It is the Right of the Subjects to petition the King, and all Commitments and **[*268]** Prosecutions for such petitioning are illegal." **1** And 178 years ago the Declaration of Rights of the Continental Congress proclaimed to the monarch of that day that his American subjects had "a right peaceably to assemble, consider of their grievances, and petition the King; [****32] and that all prosecutions, prohibitory proclamations, and commitments for the same, are illegal." **2** After independence was won, Americans stated as the first unequivocal command of their Bill of Rights: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Without distortion, this First Amendment could not possibly be read so as to hold that Congress has power to punish Beauharnais and others for petitioning Congress as they were sought to petition the Chicago authorities. See *e. g.*, Bridges v. California , 314 U.S. 252, 277. And we have held in a number of prior cases that the Fourteenth Amendment makes the specific prohibitions of the First Amendment equally applicable to the states. **3**

[****33] In view of these prior holdings, how does the Court justify its holding today that states can punish people for exercising the vital freedoms intended to be safeguarded from suppression by the First Amendment? The prior holdings are not referred to; the [**737] Court simply acts on the bland assumption that the First Amendment is wholly irrelevant. It is not even accorded the respect of a passing mention. This follows [***934] logically, I suppose, **[*269]** from recent constitutional doctrine which appears to measure state laws solely by this Court's notions of civilized "canons of decency," reasonableness, etc. See, *e. g.*, Rochin v. California , 342 U.S. 165, 169 . Under this "reasonableness" test, state laws abridging First Amendment freedoms are declared invalid if found to have a "rational basis." But in *Board of Education* v. *Barnette*, 319 U.S. 624, 639 , we said:

> "In weighing arguments of the parties it is important to distinguish between the due process clause of the Fourteenth Amendment as an instrument for transmitting the principles of the First Amendment and those cases in which it is applied for its own sake. The test [****34] of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First, is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process clause disappears when the specific prohibitions of the First become its standard. The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds."

Today's case degrades First Amendment freedoms to the "rational basis" level. It is now a certainty that the new "due process" coverall offers far less protection to liberty than would adherence to our former cases compelling states to abide by the unequivocal First Amendment

command that its defined freedoms shall not be abridged.

The Court's holding here and the constitutional doctrine behind it leave the rights of assembly, petition, **[*270]** speech and press almost completely at the mercy of state legislative, executive, [****35] and judicial agencies. I say "almost" because state curtailment of these freedoms may still be invalidated if a majority of this Court conclude that a particular infringement is "without reason," or is "a wilful and purposeless restriction unrelated to the peace and well being of the State." But lest this encouragement should give too much hope as to how and when this Court might protect these basic freedoms from state invasion, we are cautioned that state legislatures must be left free to "experiment" and to make "legislative" judgments. We are told that mistakes may be made during the legislative process of curbing public opinion. In such event the Court fortunately does not leave those mistakenly curbed, or any of us for that matter, unadvised. Consolation can be sought and must be found in the philosophical reflection that state legislative error in stifling speech and press "is the price to be paid for the trial-and-error inherent in legislative efforts to deal with obstinate social issues." My own belief is that no legislature is charged with the duty or vested with the power to decide what public issues Americans can discuss. In a free country that is the individual's [****36] choice, not the state's. State experimentation in curbing freedom of expression is startling and frightening doctrine in a country dedicated to self-government by its people. I reject the holding that either state or nation can punish people for having their say in matters of public concern.

II.

The Illinois statute upheld by the Court makes it a crime:

    1. for "any person, firm or corporation,"

    2. to "manufacture, sell, or offer for sale, advertise or publish, present or exhibit in any public place,"

    **[*271]** [**738] 3. any "lithograph [construed to [***935] include any printed matter], moving picture, play, drama or sketch,"

    4. which portrays "depravity, criminality, unchastity, or lack of virtue,"

    5. of "a class of citizens, of any race, color, creed or religion,"

    6. and exposes such a class to "contempt, derision, or obloquy,"

    7. *or* "is productive of breach of the peace or riots."

This statute imposes state censorship over the theater, moving pictures, radio, television, leaflets, magazines, books and newspapers. No doubt the statute is broad enough to make criminal the "publication, sale, presentation or exhibition" of many of the world's [****37] great classics, both secular and religious.

The Court condones this expansive state censorship by painstakingly analogizing it to the law of criminal libel. As a result of this refined analysis, the Illinois statute emerges labeled a "group libel law." This label may make the Court's holding more palatable for those who sustain it, but the sugar-coating does not make the censorship less deadly. However tagged, the Illinois law is not that criminal libel which has been "defined, limited and constitutionally recognized time out of mind." 4⚖ For as **[*272]** "constitutionally recognized" that crime has provided for punishment of false, malicious, scurrilous charges against individuals, not against huge groups. This limited scope of the law of criminal libel is of no small importance. It has confined state punishment of speech and expression to the narrowest of areas involving nothing more than purely private feuds. Every expansion of the law of criminal libel so as to punish discussions of matters of public concern means a corresponding invasion of the area dedicated to free expression by the First Amendment.

[****38] Prior efforts to expand the scope of criminal libel beyond its traditional boundaries have not usually met with widespread popular acclaim. "Seditious libel" was such an expansion and it did have its day, particularly in the English Court of Star Chamber. But the First Amendment repudiated seditious libel for this country. And one need only glance through the parliamentary discussion of Fox's Libel Law passed in England in 1792, to sense the bad odor of criminal libel in that country even when confined to charges against individuals only.

The Court's reliance on *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, is also misplaced. New Hampshire had a state law making it an offense to direct insulting words at an *individual* on a public street. Chaplinsky had violated that law by calling a man vile names "face-to-face." We pointed out in that context that the use of such "fighting" words was not an essential part of exposition of ideas. Whether the words used in their context here are "fighting" words in the same sense is doubtful, but whether so or **[*273]** not they are not addressed to or about *individuals*. [***936] Moreover, the leaflet used here [****39] was also the [**739] means adopted by an assembled group to enlist interest in their efforts to have legislation enacted. And the fighting words were but a part of arguments on questions of wide public interest and importance. Freedom of petition, assembly, speech and press could be greatly abridged by a practice of meticulously scrutinizing every editorial, speech, sermon or other printed matter to extract two or three naughty words on which to hang charges of "group libel." The *Chaplinsky* case makes no such broad inroads on First Amendment freedoms. Nothing Mr. Justice Murphy wrote for the Court in that case or in any other case justifies any such inference.

Unless I misread history the majority is giving libel a more expansive scope and more respectable status than it was ever accorded even in the Star Chamber. For here it is held to be punishable to give publicity to any picture, moving picture, play, drama or sketch, or any printed matter which a judge may find unduly offensive to any race, color, creed or religion. In other words, in arguing for or against the enactment of laws that may differently affect huge groups, it is now very dangerous indeed to say something [****40] critical of one of the groups. And any "person, firm or corporation" can be tried for this crime. "Person, firm or corporation" certainly includes a book publisher, newspaper, radio or television station, candidate or even a preacher.

It is easy enough to say that none of this latter group have been proceeded against under the Illinois Act. And they have not -- yet. But emotions bubble and tempers flare in racial and religious controversies, the kind here involved. It would not be easy for any court, in good conscience, to narrow this Act so as to exclude from it any of those I have mentioned. Furthermore, persons tried under the Act could not even

166

get a jury trial except **[*274]** as to the bare fact of publication. Here, the court simply charged the jury that Beauharnais was guilty if he had caused distribution of the leaflet. Such trial by judge rather than by jury was outlawed in England in 1792 by Fox's Libel Law.

This Act sets up a system of state censorship which is at war with the kind of free government envisioned by those who forced adoption of our Bill of Rights. The motives behind the state law may have been to do good. But the same can be said about most laws [****41] making opinions punishable as crimes. History indicates that urges to do good have led to the burning of books and even to the burning of "witches."

No rationalization on a purely legal level can conceal the fact that state laws like this one present a constant overhanging threat to freedom of speech, press and religion. Today Beauharnais is punished for publicly expressing strong views in favor of segregation. Ironically enough, Beauharnais, convicted of crime in Chicago, would probably be given a hero's reception in many other localities, if not in some parts of Chicago itself. Moreover, the same kind of state law that makes Beauharnais a criminal for advocating segregation in Illinois can be utilized to send people to jail in other states for advocating equality and nonsegregation. What Beauharnais said in his leaflet is mild compared with usual arguments on both sides of racial controversies.

We are told that freedom of petition and discussion are in no danger "while this Court sits." This case raises considerable doubt. Since those who peacefully petition for changes in the law are not to be protected "while this Court sits," who is? I do not agree that the Constitution [****42] leaves freedom of petition, assembly, speech, press or worship at the mercy of a case-by-case, day-by-day majority of this Court. I had supposed that our people could rely for their freedom on the Constitution's commands, rather **[*275]** than on [****937] the grace of this Court on an individual case basis. To say that a legislative body can, with this Court's approval, make it a crime to petition for and publicly discuss proposed legislation seems as farfetched [**740] to me as it would be to say that a valid law could be enacted to punish a candidate for President for telling the people his views. I think the First Amendment, with the Fourteenth, "absolutely" forbids such laws without any "ifs" or "buts" or "whereases." Whatever the danger, if any, in such public discussions, it is a danger the Founders deemed outweighed by the danger incident to the stifling of thought and speech. The Court does not act on this view of the Founders. It calculates what it deems to be the danger of public discussion, holds the scales are tipped on the side of state suppression, and upholds state censorship. This method of decision offers little protection to First Amendment liberties [****43] "while this Court sits."

If there be minority groups who hail this holding as their victory, they might consider the possible relevancy of this ancient remark:

"Another such victory and I am undone."

[For appendix to opinion of MR. JUSTICE BLACK ▾, see *post*, p. 276.]

[For dissenting opinion of MR. JUSTICE REED ▾, see *post*, p. 277.]

[For dissenting opinion of MR. JUSTICE DOUGLAS ▾, see *post*, p. 284.]

[For dissenting opinion of MR. JUSTICE JACKSON ▾, see *post*, p. 287.]

**[*276]** APPENDIX TO OPINION OF MR. JUSTICE BLACK ▾.

[***938] [SEE PEOPLES EXHIBIT 3 IN ORIGINAL]

**[*277]** [**741] [***939] MR. JUSTICE REED ▾, with whom MR. JUSTICE DOUGLAS ▾ joins, dissenting.

The Fourteenth Amendment of our Constitution forbids that any person be deprived by a state of liberty or property without due process of law. This Illinois conviction subjects petitioner to a fine of $ 200. The petitioner challenges the validity of the sentence on the ground that his conviction under § 224a, Division 1, of the Illinois Criminal Code 1 ⤓ violates substantive due process. The petition for certiorari phrases the issue thus: "Is the Illinois statute . . . as construed . . . [****44] or applied . . . invalid . . . because it infringes upon the constitutional guarantee of free speech, press and of assemblage as guaranteed" by the Fourteenth Amendment?

The Supreme Court [****45] of Illinois upheld the conviction of petitioner under an information which charged:

"that defendant on January 7, 1950, at the City of Chicago, did unlawfully publish, present and exhibit in public places, lithographs, which publications portray depravity, criminality, unchastity or lack of virtue of citizens of Negro race and color and which exposes citizens of Illinois of the Negro race and **[*278]** color to contempt, derision, or obloquy, which more fully appears in Exhibit A, which is attached hereto and made a part thereof." 2 ⤓

The evidence was sufficient to justify the jury in finding that Beauharnais caused the lithograph referred to in the information to be published and distributed in public places. The jury did so find under certain general instructions as to the proper attitude of jurors but essentially and specifically under the following instruction:

"(1) The Court instructs the jury that if you find from the evidence that the defendant, Joseph Beauharnais, did on or about January 7, 1950 manufacture, sell, or offer for sale, advertise or publish, present or exhibit in any public place the lithograph, which was allowed in evidence in this case as [****46] Peoples Exhibit Number 3, then you are to find the defendant guilty and fine him not less than $ 50.00 nor more than $ 200.00."

Thus, the judge did not leave to the jury but decided himself, doubtless as a matter of law, that the publication of the lithograph violated the statute. No complaint was made of this state method of trial.

At trial, petitioner filed a motion to quash the information and objected to the above specific instruction. He also moved for a peremptory instruction of "not guilty" and for judgment notwithstanding the verdict. All these contentions were overruled by the trial court, and, although the record does not show a precisely pleaded objection to the conviction on the ground that § 224a is unconstitutional, nonetheless the Supreme Court of Illinois treated [****47] petitioner's contention that the statute was **[*279]** too vague and by virtue of that fact was so broad that it abridged free speech in violation of the Fourteenth Amendment. 3 ⤓ [***940] The petition for certiorari brings these questions here.

167

*LEdHN[20]* [20]

[**742] *LEdHN[19B]* [19B]In carrying out its obligation to conform state legal administration to the "fundamental principles of liberty and justice" imposed on the states by the Fourteenth Amendment, **[4]** this Court [****48] has steadily affirmed that the general principle against abridgment of free speech, protected by the First Amendment, is included in the command of the Fourteenth. **[5]** So important to a constitutional democracy is the right of discussion that any challenge to legislative abridgment of those privileges of a free people calls for careful judicial appraisal. **[6]** It is when speech becomes an incitement to crime that the right freely to exhort may be abridged. *American Communications Assn. v. Douds*, 339 U.S. 382, 395; *Herndon v. Lowry*, 301 U.S. 242, 255.

[****49] **[*280]** When a state conviction is challenged here on the ground that free speech has been abridged, this Court must first decide whether the portion of the statute upon which the charge is based is so broad "as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech." *Winters v. New York*, 333 U.S. 507, 509. In the *Winters* case we set aside the conviction because the indefinite character of the statutory language, as construed by the Court of Appeals of New York, was so broad that protected speech was prohibited. This Court reversed, even though it assumed that Winters' conduct could constitutionally be punished by a statute expressing its prohibitions in reasonably narrow and definite form. **[7]**

*LEdHN[21]* [21] [****50] This requirement means that when the verdict and judgment flow, as here, from the information as a whole, each and every portion of the statute upon which the information was drawn must be constitutional. In *Stromberg v. California*, 283 U.S. 359, Stromberg had been convicted in the California courts for violating a statute of that state forbidding the display of a red flag. **[8]** On appeal, this Court did not consider [***941] whether Stromberg's conduct, as shown by the record, was protected by the Constitution. Instead, despite the fact [**743] that the second and third clauses of the California statute were unquestionably valid under the Federal Constitution, this Court **[*281]** reversed the state court because its conviction of Stromberg might have been based upon the first clause, holding that "if any of the clauses in question is invalid under the Federal Constitution, the conviction cannot be upheld." **[9]** The first clause, forbidding a display of a red flag as a symbol of opposition to organized government, was deemed invalid because it was so broad that it permitted "punishment of the fair use of [the] opportunity [for free political discussion, [****51] and was therefore] repugnant to the guaranty of liberty contained in the Fourteenth Amendment." *Id.*, at 369.

*LEdHN[22]* [22]The judgment in this present case followed from a [****52] determination of judge and jury that petitioner's publication of the lithograph violated the statute. From the general verdict of guilty, nothing appears to show what particular words of the statute the Illinois courts determined the lithograph offended. This conviction must stand or fall upon a determination whether all definitions of the acts proscribed by the statute and charged in the information may be banned under the principles of the First Amendment, for, as the foregoing discussion shows, it is impossible to tell upon what phrase of the statute petitioner's conviction was based. Our examination can begin and end with the inquiry as to what meaning lies in the act's declaration, as charged in the information, that it is unlawful to portray in a lithograph a "lack of virtue of a class of citizens . . . which . . . exposes [them to] derision, or obloquy."

The majority opinion asserts that Illinois has given sufficiently clear and narrow meaning to the words "virtue," "derision" and "obloquy" by characterizing § 224a as "a form of criminal libel law." But the mere description of this statute as a criminal libel law does not **[*282]** clarify the meaning of these vague [****53] words in the statute. To say that the mere presence of the word "virtue" in the individual libel statute **[10]** makes its meaning clear in the group libel statute is a *non sequitur*. No case is cited which defines and limits the meaning of these words. Reliance is also placed by the Court upon Illinois' unfortunate experience with clashes between races. How that experience gives content to the vague words is not explained. The opinion further relies upon "the *clarifying construction* and *fixed usage* which govern the meaning of the enactment before us." (Emphasis added.) No opinions containing such clarification are cited. In addition to the case before us, we find only two reported adjudications on § 224a in the Illinois courts. **[11]** Without caviling that one of these cases is so recent that it antedates the instant case in the reports, certainly neither of them contains any words which [***942] give that "clarifying construction" claimed for Illinois law.

[****54] The majority certainly do not supply that construction by intimating that the publications prohibited by § 224a are only those "liable to cause violence and disorder." Moreover, that phrase was used by the Illinois court, not to limit the prohibition of § 224a, but to describe the lithograph published by Beauharnais. See 408 Ill., at 517, 97 N. E. 2d, at 346. The quoted [**744] language does not limit the statutory words "virtue," "derision" or "obloquy." **[12]**

[****55] **[*283]** The Court speaks at length of the constitutional power of a state to pass group libel laws to protect the public peace. This dissent assumes that power. What is under discussion is whether the conviction of Beauharnais on a general charge of violation of the statute can stand when the statute contains without statutory or judicial definition words of such ambiguous meaning and uncertain connotation as "virtue," "derision," or "obloquy." The Court does not attempt to speak specifically as to that contention.

The importance of a definite ruling on that point is manifest. Racial, religious, and political biases and prejudices lead to charge and countercharge, acrimony and bitterness. If words are to be punished criminally, the Constitution at least requires that only words or expressions or statements that can be reasonably well defined, or that have through long usage an accepted meaning, shall furnish a basis for conviction. **[13]**

[****56] These words -- "virtue," "derision," and "obloquy" -- have neither general nor special meanings well enough known to apprise those within their reach as to limitations **[*284]** on speech. Compare *Connally v. General Construction Co.*, 269 U.S. 385, 391-392. Philosophers and poets, thinkers of high and low degree from every age and race have sought to expound the meaning of virtue, but each teaches his own conception of the moral excellence that satisfies standards of good conduct. Are the tests of the Puritan or the Cavalier to be applied, those of the city or the farm, the Christian or non-Christian, the old or the young? Does the Bill of Rights permit Illinois to forbid any reflection on the virtue of racial or religious classes which a jury or a judge may think exposes them to derision or obloquy, words themselves of quite uncertain meaning as used in the statute? I think not. A general and equal enforcement of this law would restrain the mildest expressions of opinion in all those areas where "virtue" may be thought to have a role. Since this judgment may rest upon these vague and undefined words, which permit within their scope the punishment of [****57] incidents secured by the guarantee of free speech, the conviction should be reversed.

MR. JUSTICE DOUGLAS ▼, dissenting.

Hitler and his Nazis showed how [***943] evil a conspiracy could be which was aimed at destroying a race by exposing it to contempt, derision, and obloquy. I would be willing to concede that such conduct directed at a race or group in this country could be made an indictable offense. For such a project would be more than the exercise of free speech. Like picketing, it would be free speech plus.

I would also be willing to concede that even without the element of conspiracy there might be times and occasions when [**745] the legislative or executive branch might call a halt to inflammatory talk, such as the shouting of "fire" in a school or a theatre.

My view is that if in any case other public interests are to override the plain command of the First Amendment, **[*285]** the peril of speech must be clear and present, leaving no room for argument, raising no doubts as to the necessity of curbing speech in order to prevent disaster.

*LEdHN[23]* [23]The First Amendment is couched in absolute [****58] terms -- freedom of speech shall not be abridged. Speech has therefore a preferred position 1⬆ as contrasted to some other civil rights. For example, privacy, equally sacred to some, is protected by the Fourth Amendment only against unreasonable searches and seizures. There is room for regulation of the ways and means of invading privacy. No such leeway is granted the invasion of the right of free speech guaranteed by the First Amendment. Until recent years that had been the course and direction of constitutional law. Yet recently the Court in this and in other cases 2⬆ has engrafted the right of regulation onto the First Amendment by placing in the hands of the legislative branch the right to regulate "within reasonable limits" the right of free speech. This to me is an ominous and alarming trend. The free trade in ideas which the Framers of the Constitution visualized disappears. In its place there is substituted a new orthodoxy -- an orthodoxy that changes with the whims of the age or the day, an orthodoxy which the majority by solemn judgment proclaims to be essential to the safety, welfare, security, morality, or health of society. Free speech in the constitutional sense [****59] disappears. Limits are drawn -- limits dictated by expediency, political opinion, prejudices or some other desideratum of legislative action.

An historic aspect of the issue of judicial supremacy was the extent to which legislative judgment would be **[*286]** supreme in the field of social legislation. The vague contours of the Due Process Clause were used to strike down laws deemed by the Court to be unwise and improvident. 3⬆ That trend has been reversed. In matters relating to business, finance, industrial [****60] and labor conditions, health and the public welfare, great leeway is now granted the legislature, 4⬆ for there is no guarantee in the Constitution that the [****944] *status quo* will be preserved against regulation by government. Freedom of speech, however, rests on a different constitutional basis. The First Amendment says that freedom of speech, freedom of press, and the free exercise of religion shall not be abridged. This is a negation of power on the part of each and every department of government. Free speech, free press, free exercise of religion are placed separate and apart; they are above and beyond the police power; they are not subject to regulation in the manner of factories, slums, apartment houses, production of oil, and the like.

[****61] The Court in this and in other cases places speech under an expanding legislative [**746] control. Today a white man stands convicted for protesting in unseemly language against our decisions invalidating restrictive covenants. Tomorrow a Negro will be haled before a court for denouncing lynch law in heated terms. Farm laborers in the West who compete with field hands drifting up from Mexico; whites who feel the pressure of orientals; a minority which finds employment going to members of the dominant religious group -- all of these are caught in the mesh of today's decision. Debate and argument even in the courtroom are not always calm and dispassionate. Emotions sway speakers and audiences alike. Intemperate **[*287]** speech is a distinctive characteristic of man. Hotheads blow off and release destructive energy in the process. They shout and rave, exaggerating weaknesses, magnifying error, viewing with alarm. So it has been from the beginning; and so it will be throughout time. The Framers of the Constitution knew human nature as well as we do. They too had lived in dangerous days; they too knew the suffocating influence of orthodoxy and standardized thought. They [****62] weighed the compulsions for restrained speech and thought against the abuses of liberty. They chose liberty. That should be our choice today no matter how distasteful to us the pamphlet of Beauharnais may be. It is true that this is only one decision which may later be distinguished or confined to narrow limits. But it represents a philosophy at war with the First Amendment -- a constitutional interpretation which puts free speech under the legislative thumb. It reflects an influence moving ever deeper into our society. It is notice to the legislatures that they have the power to control unpopular blocs. It is a warning to every minority that when the Constitution guarantees free speech it does not mean what it says.

MR. JUSTICE JACKSON ▼, dissenting.

An Illinois Act, construed by its Supreme Court to be a "group libel" statute, has been used to punish criminally the author and distributor of an obnoxious leaflet attacking the Negro race. He answers that, as applied, the Act denies a liberty secured to him by the Due Process Clause of the Fourteenth Amendment. What is the liberty which that clause underwrites?

The spectrum of views expressed by my seniors shows that disagreement [****63] as to the scope and effect of this Amendment underlies this, as it has many another, division of the Court. All agree that the Fourteenth Amendment does confine the power of the State to make printed **[*288]** words criminal. Whence we are to derive metes and bounds of the state power is a subject to the confusion of which, I regret to say, I have contributed -- comforted in the acknowledgment, however, by recalling that this Amendment is so enigmatic and abstruse that judges more experienced than I have had to reverse themselves as to its effect on state power.

*LEdHN[24]* [24]The assumption of other dissents is that the "liberty" which the Due Process Clause of the Fourteenth Amendment protects against denial [***945] by the States is the literal and identical "freedom of speech or of the press" which the First Amendment forbids only Congress to abridge. The history of criminal libel in America convinces me that the Fourteenth Amendment did not "incorporate" the First, that the powers of Congress and of the States over this subject are not of the same dimensions, and that because Congress probably could [****64] not enact this law it does not follow that the States may not.

I.

As a limitation upon power to punish written or spoken words, Fourteenth Amendment "liberty" in its context of state powers and functions has

meant and should mean something quite different from "freedom" in its context of federal powers and functions. **1** ⬇

This Court has never sustained a federal criminal libel Act. One section of the Sedition  [**747]  Act of 1798 was close to being a "group libel" Act. **2** ⬇. [****66]  While there were convictions  **[*289]**  under it, no attack on its validity reached this Court. I think today's better opinion regards the enactment as a breach of the First Amendment and certainly Mr. Justice Holmes and Mr. Justice Brandeis thought so. **3** ⬇ But even in the absence of judicial condemnation,  [****65]  the political disapproval of the Sedition Act was so emphatic and sustained that federal prosecution of the press ceased for a century. It was resumed with indictment of The Indianapolis News and The New York World for disclosures and criticisms of the Panama Canal acquisition. Both were indicted in the District of Columbia and under the District Code, on the ground that some copies circulated there. That prosecution collapsed when Judge Anderson refused the Government's application to remove the Indiana defendants to the District of Columbia for trial. **4** ⬇

The World, circulated at West Point, was indicted in New York on the theory that an 1825 Act to protect  **[*290]**  fortifications assimilated the New York  [****67]  State law punishing criminal libel. That venture likewise came to grief when Judge Hough rejected that construction of  [***946]  the federal statute and was upheld by this Court. *United States v. Press Publishing Co.,* 219 U.S. 1 (1911). While there has been a demand from official sources for a resumption of criminal libel prosecution, it has not been acceded to. **5** ⬇ Thus, while the jeopardy of such federal prosecutions has never been removed by any decision of this Court, I should think the validity of a federal enactment such as this would be extremely doubtful, to say the least.

The effect of the First Amendment on congressional power to make seditious utterance criminal did receive consideration in the aftermath of the First World War. In such a case, Mr. Justice Holmes formulated for the Court as "the question in every case" the "clear and present danger" test. *Schenck v. United States,* 249 U.S. 47, 52.  [****68]  He and Mr. Justice Brandeis adhered to it as  [**748]  a "rule of reason," dissenting when they thought the rest of the Court apostate. *Abrams v. United States,* 250 U.S. 616, 627, 628; *Schaefer v. United States,* 251 U.S. 466, 482.

Only after research and deliberation in these cases had sharpened their perception did these Justices face the free speech issue as to state power which Mr. Justice Holmes first adverted to, but left undecided, in *Patterson v. Colorado,* 205 U.S. 454. In 1922 they joined the Court's first decision on the subject, which declared that ". . . neither the Fourteenth Amendment nor any other provision of  **[*291]**  the Constitution of the United States imposes upon the States any restrictions about 'freedom of speech' . . . ." *Prudential Insurance Co. v. Cheek,* 259 U.S. 530, 543.

However, these two Justices, who made the only original contribution to legal thought on the difficult problems bound up in these Amendments, soon reversed and took the view that the Fourteenth Amendment did impose some restrictions upon the States. But it was not premised upon the First Amendment [****69]  nor upon any theory that it was incorporated in the Fourteenth. What they wrote, with care and circumspection, I accept as the wise and historically correct view of the Fourteenth Amendment. It was:

> "*The general principle of free speech*, it seems to me, must be taken to be included in the Fourteenth Amendment, in view of the scope that has been given to the word 'liberty' as there used, *although perhaps it may be accepted with a somewhat larger latitude of interpretation than is allowed to Congress* by the sweeping language that governs or ought to govern the laws of the United States." (Emphasis supplied.) *Gitlow v. New York,* 268 U.S. 652, 672.

That reasoning was echoed so recently as 1937, when the Court explicitly rejected the theory of incorporation and, through Mr. Justice Cardozo, announced a view, unanimous except for Mr. Justice Butler, that the Fourteenth did not deflect against the States the literal language of amendments designed to circumscribe federal power but qualified state power only by such general restraints as are essential to "the concept of ordered liberty." *Palko v. Connecticut,* 302 U.S. 319, 324-325. [****70]

It is clear that these do not proscribe state criminal libel Acts. Justices Holmes and Brandeis in 1931 joined Chief Justice Hughes, who spoke for the Court, in striking down a state Act because it authorized restraint by injunction  **[*292]**  previous to publication. He said: "For whatever wrong the appellant has committed or may commit, by his  [***947]  publications, the State appropriately affords both public and private redress by its libel laws." This was amplified: "But it is recognized that punishment for the abuse of the liberty accorded to the press is essential to the protection of the public, and that the common law rules that subject the libeler to responsibility for the public offense, as well as for the private injury, are not abolished by the protection extended in our constitutions. . . . The law of criminal libel rests upon that secure foundation." *Near v. Minnesota,* 283 U.S. 697, 715.

So recently as 1942, a unanimous Court, speaking of state power, said that punishment of libelous words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace" has never been thought to raise any constitutional problem.  [****71]  *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571-572.

More than forty State Constitutions, while extending broad protections to speech and press, reserve a responsibility for their abuse and implicitly or explicitly recognize  [**749]  validity of criminal libel laws. **6** ⬇ [****72]  We are justified  **[*293]**  in assuming that the men who sponsored the Fourteenth Amendment in Congress, and those who ratified it in the State Legislatures, knew of such provisions then in many of their State Constitutions. Certainly they were not consciously canceling them or calling them into question, or we would have some evidence of it. Congresses, during the period while this Amendment was being considered or was but freshly adopted, approved Constitutions of "Reconstructed" States that expressly mentioned state libel laws, **7** ⬇ and also approved similar Constitutions for  [***948]  States erected out of the federal domain. **8** ⬇

 [****73]  **[*294]**  Certainly this tolerance of state libel laws by the very authors and partisans of the Fourteenth Amendment shows either that they were not intending to incorporate the  [**750]  First Amendment or that they believed it would not prevent federal libel laws. Adoption of the incorporation theory today would lead to the dilemma of either confining the States as closely as the Congress or giving the Federal Government the latitude appropriate to state governments. The treatment of libel powers corroborates the conclusions against the incorporationist theory reached by the most comprehensive and objective studies of the origin and adoption of the Fourteenth Amendment. **9** ⬇

The inappropriateness of a single standard for restricting State and Nation is indicated by the disparity between their functions and duties in relation to those freedoms. Criminality of defamation is predicated  [****74]  upon power either to protect the private right to enjoy integrity of reputation or the public right to tranquillity. Neither of these are objects of federal cognizance except when necessary to the accomplishment of

some delegated power, such as **[*295]** protection of interstate commerce. When the Federal Government puts liberty of press in one scale, it has a very limited duty to personal reputation or local tranquility to weigh against it in the other. But state action affecting speech or press can and should be weighed against and reconciled with these conflicting social interests.

For these reasons I should not, unless clearly required, confirm to the Federal Government such latitude as I think a State reasonably may require for orderly government of its manifold concerns. The converse of the proposition is that I would not limit the power of the State with the severity appropriately prescribed for federal power.

As the principle by which to judge the constitutionality of this statute, I accept the dissent in *Gitlow* and the decision in *Palko*.


II.

What restraints upon state power to punish criminal libel are implied by the "concept of ordered liberty"? Experience [****75] by Anglo-Saxon peoples with defamation and laws to punish it extends over centuries and the statute and case books exhibit its teachings. If one can claim to announce the judgment of legal history on any subject, it is that criminal libel laws are consistent with the concept of ordered liberty only when applied with safeguards evolved to prevent their invasion of freedom of expression.

Oppressive application of the English libel laws was partially [***949] checked when Fox's Libel Act of 1792 allowed the jury to determine whether an accused publication was libelous in character and more completely when Lord Campbell's Libel Act of 1843 allowed truth to be proved as a defense.

American experience teaches similar lessons. The leading state case is *People v. Croswell*, 3 Johns. (N. Y.) 337. **[*296]** Since, as the opinion of this Court now points out, the Jeffersonian's objection to federal sedition prosecutions was largely fear of federal usurpation of state powers over the subject, it was consistent for them to prosecute libels under state law. Croswell, publisher of the aptly named Wasp, was indicted for libeling Thomas Jefferson by representing him as, [****76] unworthy of the confidence, respect, and attachment of the people. The trial judge pronounced his statements libelous as a matter of law and allowed the jury to decide no question except whether the accused had published them. The defendant was convicted and on his appeal, argued by Alexander Hamilton, the appellate court divided equally. Justice Kent, however, filed a characteristically learned and vigorous opinion that the trial court must submit the libelous character of the article and libelous intent of its printer to decision by the jury, which was entitled to determine both law and fact. The public response was such that an early session of the Legislature substantially enacted Kent's contentions. Inasmuch as no judgment had been entered upon the earlier equal division, the court at [**751] its August 1805 Term, "in consequence of this declaratory statute," unanimously awarded a new trial. **10**⬇

The New York Constitution at that time contained no free [****77] speech provision but the case led to a provision included in the Constitution of 1821 which both followed Fox's Libel Act and anticipated Lord Campbell's Act and has remained in the several Constitutions of that State since:

> "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments **[*297]** for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact." **11**⬇

It would not be an exaggeration to say that, basically, this provision of the New York Constitution [****78] states the common sense of American criminal libel law. Twenty-four States of the Union whose Constitutions were framed later substantially adopted it. **12**⬇ Twelve States provide that press and speech shall be free but there shall be responsibility for the abuse. **13**⬇ [****79] Five others provide substantially the same but add that truth may be given in evidence in a libel prosecution. **14**⬇ Only [***950] five States, whose Constitutions were framed earlier, were content with the generality about the free press similar to that of Massachusetts. **15**⬇ But all of these States, apart from constitutional **[*298]** provision, have by decisional law recognized the validity of criminal libel prosecutions. **16**⬇

Because of these safeguards, state libel laws have presented no threat to a free press comparable to that from federal sources and have not proved inconsistent with fundamental [****80] liberties. Attacks on the press by States which were frustrated by this Court in *Near v. Minnesota, supra*, and *Grosjean v. American Press Co.*, 297 U.S. 233, were not by libel laws. For near a century and a half this Court's decisions left state criminal libel prosecutions entirely free of federal constitutional limitations. It is a matter of notoriety that the press often has provoked hostility, that editors have been mobbed and horsewhipped, [**752] but criminal libel prosecutions have not been frequent and, as safeguarded by state law, they have been so innocuous that chronicles of American journalism give them only passing mention. **17**⬇

This Court, by construction of the Fourteenth Amendment, has imposed but one addition to the safeguards voluntarily taken upon the States by themselves. It is that where expression, oral or printed, is punished, although it has not actually caused injuries or disorders [****81] but is thought to have a tendency to do so, the likelihood of such consequence must not be remote or speculative. That is the "clear and present danger" test which Mr. Justice Holmes and Mr. Justice Brandeis, eventually with support of the Court, thought implied in both the First **18**⬇ and Fourteenth Amendments, **19**⬇ although the former was **[*299]** not bodily bound up in the latter. Any superficial inconsistency between applying the same standard but permitting a wider range of action to the States is resolved upon reference to the latter part of the statement of the formula: clear and present danger of *those substantive evils which the legislature has a right to prevent*. The evils at which Congress may aim, and in so doing come into conflict with free speech, will be relatively few since it is a government of limited powers. Because the States may reach more evils, they will have wider range to punish speech which presents clear and present danger of bringing about those evils.

[****82] In subjects such as libel does local law, in spite of varying historical influences, afford a consensus of American legal opinion as to what is reasonable and essential to the concept of ordered government. The boundaries are roughly outlined, to be sure, and cannot be stated or applied with mathematical precision, but those widely accepted state constitutional provisions on which is superimposed the "clear and present danger" test for "tendency" [***951] " cases seem to be our best guide.

171

*LEdHN[7B]* [7B]I agree with the Court that a State has power to bring classes "of any race, color, creed or religion" within the protection of its libel laws, if indeed traditional forms do not already accomplish it. **20** But I am equally clear that in doing so it is essential to our concept of ordered liberty that the State also protect the accused by those safeguards the necessity for which is verified by legal history.

 [****83]  III.

*LEdHN[25]* [25]The Illinois statute, as applied in this case, seems to me to have dispensed with accepted safeguards for the accused. Trial of this case ominously parallels the trial of **[\*300]** *People* v. *Croswell, supra,* in that the Illinois court here instructed the jury, in substance, that if it found that defendant published this leaflet he must be found guilty of criminal libel.

Rulings of the trial court precluded the effort to justify statements of fact by proving their truth. The majority opinion concedes the unvarying recognition by the States that truth plus good motives is a defense in a prosecution for criminal libel. But here the trial court repeatedly refused defendant's offer of proof as to the truth of the matter published. Where an offer to prove the dominant element of a defense is rejected as immaterial, we can hardly refuse to consider defendant's constitutional question because he did not go through the useless ceremony of offering proof of a subsidiary element of the defense. If the court would not let him try to prove he spoke truth, how could he show that [****84]  he spoke truth for good ends? Furthermore, the record indicates that defendant was asked to state what he had meant  [\*\*753]  by the use of certain phrases, and the reason for forming the White Circle League -- statements which apparently bore on the issue of motive and ends. But the trial court sustained a sweeping objection "to this whole line of examination." The Supreme Court of Illinois noted the offer of proof of truth and its exclusion, and apparently went on to rule as a matter of law that the statement was not published for justifiable ends. At all events, it is clear that the defense was ruled out as matter of law and defendant was never allowed to present it for decision by either court or jury upon the facts, a practice which I think is contrary to the overwhelming verdict of Anglo-Saxon history and practice. I do not intimate that this defendant stood even a remote chance of justifying what impresses me, as it did the trial court, as reckless and vicious libel. But the point is that his evidence, proffered for that purpose, was excluded instead of being **[\*301]** received and evaluated. Society has an interest in preserving truth as a justification, however obnoxious [****85]  the effort may be. A publication which diffuses its attack over unnamed and impersonal multitudes is likely to be harder to justify than one which concentrates its attack on named individuals, but the burden may properly be cast on an accused and punishment follow failure to carry it.

The same may be said of the right to comment upon matters of public interest insofar as the statement includes matters of opinion, a point, however, which the defense may have inadequately raised. When any naturally cohesive or artificially organized group possesses a racial or sectarian solidarity which is or may be exploited to influence public affairs, that group becomes a legitimate subject for public comment. Of course, one can only deplore the habitual intemperance and bitter disparagement which characterizes [***952]  most such comment. While I support the right of a State to place decent bounds upon it, I am not ready to hold that group purposes, characteristics and histories are to be immunized from comment or may be discussed only at the risk of prosecution free of all usual safeguards.

Another defense almost universally recognized, which it seems the jury were not allowed to consider [****86]  here, is that of privilege. Petition for redress of grievances is specifically privileged by many State Constitutions. I do not think we should hold this whole document to be constitutionally privileged just because, in part, it simulates a petition for redress of grievances. A court or jury could have found that its primary purpose was not to petition but to appeal for members and contributions to the White Circle League. If some part of it were privileged, that, so it has been held, does not extend constitutional protection to unprivileged matter. Cf. *Valentine* v. *Chrestensen,* 316 U.S. 52. But the question of privilege seems **[\*302]** not to have been specifically passed on by the court and certainly was not submitted for the jury's consideration.

In this case, neither the court nor jury found or were required to find any injury to any person, or group, or to the public peace, nor to find any probability, let alone any clear and present danger, of injury to any of these. Even though no individuals were named or described as targets of this pamphlet, if it resulted in a riot or caused injury to any individual Negro, such as being refused living quarters [****87]  in a particular section, house or apartment, or being refused employment, certainly there would be no constitutional obstacle to imposing civil or criminal liability for actual results. But in this case no actual violence and no specific injury was charged or proved.

The leaflet was simply held punishable as criminal libel *per se* irrespective of its actual or probable consequences. No charge of conspiracy complicates this case. The words themselves do not advocate the commission of any crime. The conviction rests on judicial attribution of a likelihood of evil results. The trial court, however, refused to charge the jury that it must find some "clear and present danger," and the  [\*\*754]  Supreme Court of Illinois sustained conviction because, in its opinion, the words used had a tendency to cause a breach of the peace.

Referring to the clear and present danger doctrine in *Dennis* v. *United States,* 341 U.S. 494, 568, I said:

"I would save it, unmodified, for application as a 'rule of reason' in the kind of case for which it was devised. When the issue is criminality of a hot-headed speech on a street corner, or circulation of a few incendiary pamphlets, [****88]  or parading by some zealots behind a red flag, or refusal of a handful of school children to salute our flag, it is not beyond the capacity of the judicial process to gather, comprehend, and weigh the necessary materials for decision whether it is a clear and present danger of **[\*303]** substantive evil or a harmless letting off of steam. It is not a prophecy, for the danger in such cases has matured by the time of trial or it was never present. The test applies and has meaning where a conviction is sought to be based on a speech or writing which does not directly or explicitly advocate a crime but to which such tendency is sought to be attributed by construction or by implication from external circumstances. The formula in such cases favors freedoms that are vital to our society, and, even if sometimes applied too generously, the consequences cannot be grave. . . ."

Not the least of the virtues of this formula in such tendency cases is that it compels the prosecution to make up its mind what particular evil it sought or is seeking to prevent. It must relate its interference with speech or press to some identifiable evil to be prevented. Words  [***953]  on their own account [****89]  are not to be punished in such cases but are reachable only as the root of punishable evils.

*LEdHN[26]* [26]Punishment of printed words, based on their *tendency* either to cause breach of the peace or injury to persons or groups, in my opinion, is justifiable only if the prosecution survives the "clear and present danger" test. It is the most just and workable standard yet evolved for determining criminality of words whose injurious or inciting tendencies are not demonstrated by the event but are ascribed to them on the basis of probabilities.

Its application is important in this case because it takes account of the particular form, time, place, and manner of communication in question. "The moving picture screen, the radio, the newspaper, the handbill, the sound truck and the street corner orator have differing natures, values, abuses and dangers. Each, in my view, is a law unto itself . . . ." *Kovacs v. Cooper,* 336 U.S. 77, 97. It would consider whether a leaflet is so emotionally exciting to immediate action as the spoken word, especially **[*304]** the incendiary street or public [****90] speech. *Terminiello v. Chicago,* 337 U.S. 1, 13; *Kunz v. New York,* 340 U.S. 290, 295. It will inquire whether this publication was obviously so foul and extreme as to defeat its own ends, whether its appeals for money -- which has a cooling effect on many persons -- would not negative its inflammatory effect, whether it would not impress the passer-by as the work of an irresponsible who needed mental examination.

One of the merits of the clear and present danger test is that the triers of fact would take into account the realities of race relations and any smouldering fires to be fanned into holocausts. Such consideration might well warrant a conviction here when it would not in another and different environment.

Group libel statutes represent a commendable desire to reduce sinister abuses of our freedoms of expression -- abuses which I have had occasion to learn can tear apart a society, brutalize its dominant elements, and persecute, even to extermination, [**755] its minorities. While laws or prosecutions might not alleviate racial or sectarian hatreds and may even invest scoundrels with a specious martyrdom, I should be loath [****91] to foreclose the States from a considerable latitude of experimentation in this field. Such efforts, if properly applied, do not justify frenetic forebodings of crushed liberty. But these acts present most difficult policy and technical problems, as thoughtful writers who have canvassed the problem more comprehensively than is appropriate in a judicial opinion have well pointed out. 21⚓

No group interest in any particular prosecution should forget that the shoe may be on the other foot in some prosecution tomorrow. In these, as in other matters, our **[*305]** guiding spirit should be that each freedom is balanced with a responsibility, and every power of the State must be checked with safeguards. Such is the spirit of our American law of criminal libel, which concedes the power to the State, but only as a power restrained [****92] by recognition of individual rights. I cannot escape the conclusion that as the Act has been applied in this case it lost sight of the rights.

---

## Footnotes

**1⚓** 408 Ill. 512, 518, 97 N. E. 2d 343, 346-347. Illinois law requires that for the defense to prevail, the truth of all facts in the utterance must be shown together with good motive for publication. *People v. Strauch,* 247 Ill. 220, 93 N. E. 126; *People v. Fuller,* 238 Ill. 116, 87 N. E. 336; cf. *Ogren v. Rockford Star Printing Co.,* 288 Ill. 405, 123 N. E. 587.

**2⚓** See, *e. g.,* *State v. Sterman,* 199 Iowa 569, 202 N. W. 222; *State v. Howard,* 169 N. C. 312, 313, 84 S. E. 807-808; cf. *Ogren v. Rockford Star Printing Co., supra.*

**3⚓** See, *e. g.,* *People v. Spielman,* 318 Ill. 482, 489, 149 N. E. 466, 469; Odgers, Libel and Slander (6th ed.), 368; 19 A. L. R. 1470. Some States hold, however, that injury to reputation, as in civil libel, and not tendency to breach of the peace, is the gravamen of the offense. See Tanenhaus, Group Libel, 35 Cornell L. Q. 261, 273 and n. 67.

**4⚓** For a brief account of this development see Warren, History of the American Bar, 236-239. See also correspondence between Chief Justice Cushing of Massachusetts and John Adams, published in 27 Mass. L. Q. 11-16 (Oct. 1942). Jefferson explained in a letter to Abigail Adams, dated September 11, 1804, that to strike down the Alien and Sedition Act would not "remove all restraint from the overwhelming torrent of slander which is confounding all vice and virtue, all truth and falsehood in the US. The power to do that is fully possessed by the several state legislatures." See *Dennis v. United States,* 341 U.S. 494, 522, n. 4. See Miller, Crisis in Freedom, 168-169, 231-232. See also provisions as to criminal libel in Edward Livingston's famous draft System of Penal Law for Louisiana, 2 Works of Edward Livingston 100-108.

**5⚓** In eight States the offense is punished as at common law, without legislative enactment. *State v. Roberts,* 2 Marv. (Del.) 450, 43 A. 252; *Cole v. Commonwealth,* 222 Ky. 350, 300 S. W. 907; *Robinson v. State,* 108 Md. 644, 71 A. 433; *Commonwealth v. Canter,* 269 Mass. 359, 168 N. E. 790; *State v. Burnham,* 9 N. H. 34; *State v. Spear,* 13 R. I. 324; *State v. Sutton,* 74 Vt. 12, 52 A. 116; *State v. Payne,* 87 W. Va. 102, 104 S. E. 288. Twelve other jurisdictions make "libel" a crime by statute, without defining the term. Ala. Code, 1940, Tit. 14, § 347; Alaska Comp. Laws Ann., 1949, § 65-4-28; D. C. Code, 1940, § 22-2301; Fla. Stat. Ann., 1944, § 836.01; Burns Ind. Stat., 1933, § 10-3201; Miss. Code, 1942, § 2268; Neb. Rev. Stat., 1943, § 28-440; N. J. Stat. Ann., 1939, § 2:146-1; N. C. Gen. Stat., 1943, § 14-47; Page's Ohio Gen. Code, 1939, § 13383; Wis. Stat., 1949, § 348.41; Wyo. Comp. Stat., 1945, § 9-1601. Thus, twenty American jurisdictions punish "libel" as defined by the case-by-case common-law development.

The remaining jurisdictions have sought to cast the common-law definition in a statutory form of words. Two formulas have been popular. Eleven jurisdictions, Illinois among them, have accepted with minor variations the following:

"A libel is a malicious defamation, expressed either by printing, or by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation or publish the natural defects of one who is alive, and thereby to expose him to public hatred, contempt, ridicule, or financial injury." Smith-Hurd Ill. Ann. Stat., 1934, c. 38, § 402. Ariz. Code Ann., 1939, § 43.3501; Ark. Stat., 1947, § 41-2401; Deering's Cal. Penal Code, 1949, § 248; Colo. Stat. Ann., 1935, c. 48, § 199; Ga. Code Ann., 1936, § 26-2101; Idaho Code, 1947, § 18-4801; Smith-Hurd Ill. Ann. Stat., 1936, c. 38, § 402; Mont. Rev. Codes, 1947, § 94-2801; Nev. Comp. Laws, 1929, § 10110; P. R. Codigo Penal, 1937, § 243; Utah Code Ann., 1943, § 103-38-1; cf. Virgin Islands Code, 1921, Tit. IV, c. 5, § 36.

The other version, again with minor variations, has found favor in twelve jurisdictions.

"A libel is a malicious defamation of a person, made public by any printing, writing, sign, picture, representation or effigy, tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse; or any malicious defamation, made public as aforesaid, designed to blacken and vilify the memory of one who is dead, and tending to scandalize or provoke his surviving relatives or friends."

Iowa Code Ann., 1949, § 737.1; Kan. Gen. Stat., 1935, § 21-2401; Dart's La. Crim. Code, 1943, Art. 740-47; Me. Rev. Stat., 1944, c. 117, § 30; Minn. Stat., 1949, § 619.51; Mo. Rev. Stat., 1949, § 559.410; McKinney's N. Y. Laws, Penal Code, § 1340; N. D. Rev. Code, 1943, § 12-2801; Okla. Stat. Ann., 1936, Tit. 21, § 771; Purdon's Pa. Stat. Ann., 1945, Tit. 18, § 4412; Williams Tenn. Code, 1934, §§ 11021, 11022; Remington's Wash. Rev. Stat., 1932, § 2424.

The remaining nine jurisdictions have definitions of criminal libel which fall into no common pattern. See Conn. Gen. Stat., 1949, § 8518; Hawaii Rev. Laws, 1945, § 11450; Mich. Comp. Laws, 1948, § 750-370; N. M. Stat., 1941, §§ 41-2701, 41-2708; Ore. Comp. Laws, 1940, § 23-437; S. C. Code, 1942, § 1395; S. D. Code, 1939, § 13.3401; Vernon's Tex. Stat., 1948, Arts. 1269, 1275; Va. Code, 1950, § 18-133.

Our examination of the homogeneity of these statutory definitions of criminal libel might well begin and end with the words "virtue" and "ridicule." Of thirty-two jurisdictions, twelve outlaw statements impeaching the "virtue" of another; eleven of these, and fifteen more -- twenty-six in all -- prohibit utterances tending to bring another into "public ridicule."

For the common-law definition, applicable in the twenty jurisdictions first noted above, see L. Hand ▾, J., in *Grant v. Reader's Digest Assn.*, 151 F.2d 733, 735, where he speaks of defining libel "in accordance with the usual rubric, as consisting of utterances which arouse 'hatred, contempt, scorn, obloquy or shame,' and the like." Cf. Restatement, Torts, § 559, *comment* (b); Odgers, Libel and Slander (6th ed.), 16-17; Newell, Slander and Libel (4th ed.), 1-2.

Even a cursory examination of these enactments and common-law pronouncements demonstrates that Illinois, in § 224a, was using a form of words which invoked the familiar common law of libel to define the prohibited utterances. The defendant and the Illinois courts, as we have seen, understood this and acted upon it.

---

**6▾**   In all but five States, the constitutional guarantee of free speech to every person is explicitly qualified by holding him "responsible for the abuse of that right." See *Pennekamp v. Florida*, 328 U.S. 331, 356, n. 5. See Jefferson in Kentucky Resolutions of 1798 and 1799, 4 Elliot's Debates 540-541, and in an undated draft prepared, but not used, for his December 8, 1801, Message to Congress, Library of Congress Jefferson Papers, Vol. 119, Leaf 20569. In *Carlson v. California*, 310 U.S. 106, 112, we noted that the statute there invalidated made "no exceptions with respect to the truthfulness and restraint of the information conveyed . . . ."

---

**7▾**   Compare reports of *King* v. *Osborne* in 2 Barn. K. B. 138, 166, 94 Eng. Rep. 406, 425; 2 Swans. 503, n. (c), 36 Eng. Rep. 705, 717; W. Kel. *230, 25 Eng. Rep. 584 (1732). The present Attorney General of England asserted that this case obviated the need of special group libel legislation for Great Britain. See The [London] Times, March 26, 1952, p. 2, col. 4. See also Odgers, Libel and Slander (6th ed.), 369; Tanenhaus, Group Libel, 35 Cornell L. Q. 261, 267-269.

---

**8▾**   One of the leading cases arose in Illinois. *People* v. *Spielman*, 318 Ill. 482, 149 N. E. 466 (1925), sustaining a conviction for libel on the members of the American Legion. The authorities are collected and discussed in Tanenhaus, Group Libel, 35 Cornell L. Q. 261, 269-276.

---

**9▾**   See, *e. g.*, Loewenstein, Legislative Control of Political Extremism in European Democracies, 38 Col. L. Rev. 591 and 725; Riesman, Democracy and Defamation, 42 Col. L. Rev. 727, 1085 and 1282; Public Order Act, 1936, 1 Edw. VIII and 1 Geo. VI, c. 6, and 317 H. C. Deb. 1349-1473 (5th ser. 1936); 318 H. C. Deb. 49-193, 581-710, 1659-1785, 2781-2784 (5th ser. 1936); 103 H. L. Deb. 741-773, 961-972 (5th ser. 1936).

---

**10▾**   See generally The Chicago Commission on Race Relations, The Negro in Chicago, 1-78, and *passim* (University of Chicago Press, 1922); Research Memorandum No. 5, First Annual Rep. Ill. Inter-Racial Comm'n (1944).

---

**11▾**   The May 28, 1917, riot in East St. Louis, Illinois, was preceded by a violently inflammatory speech to unemployed workmen by a prominent lawyer of the town. Report of the Special Committee Authorized by Congress to Investigate the East St. Louis Riots, H. R. Doc. No. 1231, 65th Cong., 2d Sess. 11; Chicago Commission on Race Relations, The Negro in Chicago, 75. And see *id.*, at 118-122 for literature circulated by real estate associations and other groups during the series of bombings leading up to the Chicago riots of 1919. For the Commission's comments on the role of propaganda in promoting race frictions, see *id.*, at 589, 638-639.

---

**12▾**   Tables in Drake and Cayton, Black Metropolis, 8, show that between 1900 and 1920 the number of foreign-born in Chicago increased by over 1/3 and the Negro population trebled. United States census figures show the following population growth for the State as a whole and selected counties:

| | Illinois | | Cook County | | St. Clair County | |
| | | | (Chicago) | | (East St. Louis) | |
| | Total | Negro | Total | Negro | Total | Negro |
|------|-----------|---------|-----------|---------|---------|--------|
| 1900 | 4,821,550 | 85,078  | 1,8 38,735 | 31,838 | 86,685  | 3,987  |
| 1910 | 5,638,591 | 109,049 | 2,405,233 | 46,627  | 119,870 | 8,110  |
| 1920 | 6,485,280 | 182,274 | 3,05 3,017 | 115,238 | 136,520 | 10,136 |
| 1930 | 7,630,654 | 328,972 | 3,982,123 | 246,992 | 157,775 | 15,550 |
| 1940 | 7,897,241 | 387,446 | 4,063,342 | 249,157 | 166,899 | 21,567 |
| 1950 | 8,712,176 | 645,989 | 4,508,792 | 521,007 | 205,995 | 34,566 |

For an account of these vast population movements entailing great social maladjustments, see Drake and Cayton, Black Metropolis, 8-18, 31-65; Chicago Commission on Race Relations, The Negro in Chicago, 79-105; Carl Sandburg, The Chicago Race Riots, 9-30.

**13▼** See Walling, Race War in the North, 65 The Independent 529 (1908). This article apparently led to the founding of the National Association for the Advancement of Colored People. Ovington, How the National Association for the Advancement of Colored People Began, 8 Crisis 184 (1914). See also Chicago Commission on Race Relations, The Negro in Chicago, 67-71.

**14▼** Report of the Special Committee Authorized by Congress to Investigate the East St. Louis Riots, H. R. Doc. No. 1231, 65th Cong., 2d Sess. See also The Massacre of East St. Louis, 14 Crisis 219 (1917).

**15▼** Chicago Commission on Race Relations, The Negro in Chicago, 122-133.

**16▼** The utterances here in question "are not," as a detached student of the problem has noted, "the daily grist of vituperative political debate. Nor do they represent the frothy imaginings of lunatics, or the 'idle' gossip of a country town. Rather, they indicate the systematic avalanche of falsehoods which are circulated concerning the various groups, classes and races which make up the countries of the western world." Riesman, Democracy and Defamation: Control of Group Libel, 42 Col. L. Rev., at 727. Professor Riesman continues: "Such purposeful attacks are nothing new, of course. . . . What is new, however, is the existence of a mobile public opinion as the controlling force in politics, and the systematic manipulation of that opinion by the use of calculated falsehood and vilification." *Id.*, at 728.

**17▼** See, *e. g.*, L. Hand ▾, J., in a symposium in The Saturday Review of Literature, Mar. 15, 1947, pp. 23-24; Report of the Committee on the Law of Defamation, Cmd. 7536, 11 (1948).

**18▼** It deserves emphasis that there is no such attempt in this statute. The rubric "race, color, creed or religion" which describes the type of group libel of which is punishable, has attained too fixed a meaning to permit political groups to be brought within it. If a statute sought to outlaw libels of political parties, quite different problems not now before us would be raised. For one thing, the whole doctrine of fair comment as indispensable to the democratic political process would come into play. See *People v. Fuller, supra*, at 125, 87 N. E., at 338-339; *Commonwealth v. Pratt*, 208 Mass. 553, 559, 95 N. E. 105, 106. Political parties, like public men, are, as it were, public property.

**19▼** Indeed, such defenses are evidently protected by Illinois law. See Ill. Const., Art. II, § 17, guaranteeing the right of the people to apply for redress of grievances. And see *People v. Fuller*, 238 Ill. 116, 125, 87 N. E. 336, 338-339, on the defense of "fair comment" in criminal libel prosecutions.

**20▼** The present constitution, adopted in 1870, is Illinois' third. The first two preserved the defense of truth in certain types of libel prosecutions: "In prosecutions for the publication of papers investigating the official conduct of officers, or of men acting in a public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels the jury shall have the right of determining both the law and the fact under the direction of the court as in other cases." Ill. Const., 1818, Art. VIII, § 23; Ill. Const., 1848, Art. XIII, § 24. The combined requirement of truth and good motives and justifiable ends, available as a defense in all libel suits, was adopted with the Constitution of 1870.

**21▼** Defendant offered to show (1) that crimes were more frequent in districts heavily populated by Negroes than in those where whites predominated; (2) three specific crimes allegedly committed by Negroes; and (3) that property values declined when Negroes moved into a neighborhood. It is doubtful whether such a showing is as extensive as the defamatory allegations in the lithograph circulated by the defendant.

175

**22** The defense attorney put a few questions to the defendant on the witness stand which tended toward elaborating his motives in circulating the lithograph complained of. When objections to these questions were sustained, no offer of proof was made, in contrast to the rather elaborate offer which followed the refusal to permit questioning tending to show the truth of the matter. Indeed, in that offer itself, despite its considerable detail, no mention was made of the necessary element of good motive or justifiable ends. In any event, the question of exclusion of this testimony going to motive was not raised by motion in the trial court, on appeal in Illinois, or before us.

**23** The law struck down by the New Jersey court in *New Jersey v. Klapprott*, 127 N. J. L. 395, 22 A. 2d 877, was quite different than the one before us and was not limited, as is the Illinois statute, by construction or usage. Indeed, in that case the court emphasized that "It is not a case of libel," and contrasted the history at common law of criminal prosecutions for written and spoken defamation.

**1** 1 William & Mary, Sess. 2, c. 2 (1689).

**2** Eighth Resolution of the Continental Congress of 1774.

**3** *E. g.*, *Grosjean v. American Press Co.*, 297 U.S. 233, 244, 245, 249; *Lovell v. Griffin*, 303 U.S. 444, 450; *Schneider v. State*, 308 U.S. 147, 160; *Thornhill v. Alabama*, 310 U.S. 88, 95; *Minersville District v. Gobitis*, 310 U.S. 586, 593; *Board of Education v. Barnette*, 319 U.S. 624, 639; *Thomas v. Collins*, 323 U.S. 516, 529-530, concurring opinion, 545; *Pennekamp v. Florida*, 328 U.S. 331, 349.

**4** The Court's finding of a close kinship between "criminal libel" and "group libel" because both contain the word "libel" and have some factors in common is reminiscent of what Earl Stanhope said in 1792 in discussing Mr. Fox's Libel Bill. He was arguing that a jury of laymen might more likely protect liberty than judges, because judges were prone to rely too heavily on word books. "He put the case, that an action for a libel was brought for using a modern word, not to be found in any grammar or glossary, viz. for saying that a man was 'a great bore;' a jury would laugh at such a ground of prosecution, but the judges would turn to their grammars and glossaries, and not being able to meet with it, would say they could not find such a phrase as 'a great bore,' but they had found a wild boar, which no doubt it meant; and yet it could not be, as a wild boar had four legs, and a man was a two legged animal; then it must mean, that the plaintiff was like a wild boar in disposition, which was a wicked libel, and therefore let the defendant be hanged." 29 Hansard, Parliamentary History of England, p. 1412.

**1** "It shall be unlawful for any person, firm or corporation to manufacture, sell, or offer for sale, advertise or publish, present or exhibit in any public place in this state any lithograph, moving picture, play, drama or sketch, which publication or exhibition portrays depravity, criminality, unchastity, or lack of virtue of a class of citizens, of any race, color, creed or religion which said publication or exhibition exposes the citizens of any race, color, creed or religion to contempt, derision, or obloquy or which is productive of breach of the peace or riots. Any person, firm or corporation violating any of the provisions of this section, shall be guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than fifty dollars ($ 50.00), nor more than two hundred dollars ($ 200.00)."

**2** *People v. Beauharnais*, 408 Ill. 512, 514, 97 N. E. 2d 343, 344-345. The Exhibit A referred to in the information is the lithograph referred to in the instructions to the jury as People's Exhibit 3.

**3** 408 Ill. 512, at 515-516 and 517, 97 N. E. 2d 343, at 345-346. If the highest court of the state treats the federal question as properly before it, and decides the question, the question is reviewable here, regardless of the manner in which it was raised in the inferior courts of the state. See *Whitney v. California*, 274 U.S. 357, 361, and cases there cited.

**4** *Hebert v. Louisiana*, 272 U.S. 312, 316; *Palko v. Connecticut*, 302 U.S. 319; *Adamson v. California*, 332 U.S. 46, 66.

**5** *Gitlow v. New York*, 268 U.S. 652, 666, 672; *Near v. Minnesota*, 283 U.S. 697, 707; *Pennekamp v. Florida*, 328 U.S. 331, 335.

**6** *De Jonge v. Oregon*, 299 U.S. 353, 365:

"The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that

changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government."

**7** See 333 U.S., at 520. Cf. *Thornhill v. Alabama*, 310 U.S. 88; *Herndon v. Lowry*, 301 U.S. 242, 263-264.

**8** 283 U.S., at 361:

"Any person who displays a red flag, banner or badge or any flag, badge, banner, or device of any color or form whatever in any public place or in any meeting place or public assembly, or from or on any house, building or window as a sign, symbol or emblem of opposition to organized government or as an invitation or stimulus to anarchistic action or as an aid to propaganda that is of a seditious character is guilty of a felony." Then § 403a of the Calif. Penal Code.

**9** 283 U.S. at 368. See also *Williams v. North Carolina*, 317 U.S. 287, 291-292. Cf. *Thomas v. Collins*, 323 U.S. 516, 529; *Cramer v. United States*, 325 U.S. 1, 36, n. 45.

**10** Smith-Hurd Ill. Ann. Stat., 1936, c. 38, § 402, quoted in majority opinion at n. 5.

**11** *People v. Simcox*, 379 Ill. 347, 40 N. E. 2d 525; *People v. White Circle League*, 408 Ill. 564, 97 N. E. 2d 811 (1951). See also *Fox Film Corp. v. Collins*, 236 Ill. App. 281; *Bevins v. Prindable*, 39 F.Supp. 708, aff'd 314 U.S. 573.

**12** Indeed, if the Illinois courts had been inclined to interpret their statute as this Court now interprets it, they could have done so only by reading out of their statute the disjunctive clause "or which is productive of breach of the peace or riots." (Quoted at p. 251 of majority opinion.) If the Illinois courts were inclined to read this disjunctive as a conjunctive, they would presumably have reversed Beauharnais' conviction, for the information in this case did not charge that publication of his lithograph would be productive of breach of the peace or riots.

**13** ". . . the constitution never intended to invest judges with a discretion which cannot be tried and measured by the plain and palpable standard of law . . . . On a special verdict for murder, the life of the prisoner does not depend upon the religious, moral, or philosophical ideas of the judges . . . . If he is condemned . . . his conduct is brought to a precise, clear, intelligible standard, and cautiously measured by it: it is the law, therefore, and not the judge, which condemns him. . . ."

Argument in the King's Bench in the Dean of St. Asaph's case (1783-1784). 21 Howell's State Trials 847, 1006.

**1** *Murdock v. Pennsylvania*, 319 U.S. 105, 115; *Thomas v. Collins*, 323 U.S. 516, 530; *Saia v. New York*, 334 U.S. 558, 561.

**2** *Dennis v. United States*, 341 U.S. 494; *Feiner v. New York*, 340 U.S. 315. Cf. *Breard v. Alexandria*, 341 U.S. 622; *American Communications Assn. v. Douds*, 339 U.S. 382; *Osman v. Douds*, 339 U.S. 846.

**3** *Lochner v. New York*, 198 U.S. 45; *Coppage v. Kansas*, 236 U.S. 1; *Ribnik v. McBride*, 277 U.S. 350.

**4** *Nebbia v. New York*, 291 U.S. 502; *West Coast Hotel Co. v. Parrish*, 300 U.S. 379; *Lincoln Union v. Northwestern Co.*, 335 U.S. 525; *Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421.

**1** First Amendment: "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." Fourteenth Amendment: ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ."

**2** 1 Stat. 596 (1798) § 2: "*And be it further enacted*, That if any person shall write, print, utter or publish . . . any false, scandalous and malicious writing or writings against the government of the United States, or either house of the Congress of the United States, or the President of the United States, with intent to defame the said government, or either house of the said Congress, or the said President, or to bring them, or either of them, into contempt or disrepute . . . such person . . . shall be punished by a fine not

exceeding two thousand dollars, and by imprisonment not exceeding two years. Section 3: . . . It shall be lawful for the defendant . . . to give in evidence in his defence, the truth of the matter contained in the publication charged as a libel. And the jury who shall try the cause, shall have a right to determine the law and the fact, under the direction of the court, as in other cases."

**3 ⚓** _Abrams_ v. _United States_, 250 U.S. 616, 630.

**4 ⚓** _United States_ v. _Smith_, 173 F. 227. In discharging the defendants, Judge Anderson said:

"To my mind that man has read the history of our institutions to little purpose who does not look with grave apprehension upon the possibility of the success of a proceeding such as this. If the history of liberty means anything, if constitutional guaranties are worth anything, this proceeding must fail.

"If the prosecuting officers have the authority to select the tribunal, if there be more than one tribunal to select from, if the government has that power, and can drag citizens from distant states to the capital of the nation, there to be tried, then, as Judge Cooley says, this is a strange result of a revolution where one of the grievances complained of was the assertion of the right to send parties abroad for trial." 173 F., at 232.

**5 ⚓** Riesman, Group Libel, 42 Col. L. Rev. 727, 748. See also 87 Cong. Rec. 5830-5841.

**6 ⚓** The following is a list of such state constitutional provisions, coupled with the year of the adoption of the Constitution in which they are contained: Alabama (1901), Art. I, §§ 4, 12; Arizona (1912), Art. II, § 6; Arkansas (1874), Art. II, § 6; California (1879), Art. I, § 9; Colorado (1876), Art. II, § 10; Delaware (1897), Art. I, § 5; Florida (1887), Decl. Rts., § 13; Georgia (1877), Art. I, § 1, par. 15; Idaho (1890), Art. I, § 9; Illinois (1870), Art. II, § 4; Indiana (1851), Art. I, § 9; Iowa (1857), Art. I, § 7; Kansas (1861), Bill Rts., § 11; Kentucky (1891), §§ 8, 9; Louisiana (1921), Art. I, § 3; Maine (1876), Art. I, § 4; Maryland (1867), Decl. Rts., Art. 40; Michigan (1909), Art. II, § 4; Minnesota (1857), Art. I, § 3; Mississippi (1890), Art. III, § 13; Missouri (1945), Art. I, § 8; Montana (1889), Art. III, § 10; Nebraska (1875), Art. I, § 5; Nevada (1864), Art. I, § 9; New Jersey (1947), Art. I, § 6; New Mexico (1912), Art. II, § 17; New York (1938), Art. I, § 8; North Carolina (1876), Art. I, § 20; North Dakota (1889), Art. I, § 9; Ohio (1851), Art. I, § 11; Oklahoma (1907), Art. II, § 22; Oregon (1859), Art. I, § 8; Pennsylvania (1874), Art. I, § 7; Rhode Island (1843), Art. I, § 20; South Dakota (1889), Art. VI, § 5; Tennessee (1870), Art. I, § 19; Texas (1876), Art. I, § 8; Utah (1895), Art. I, § 15; Virginia (1902), Art. I, § 12; Washington (1889), Art. I, § 5; West Virginia (1872), Art. III, § 7; Wisconsin (1848), Art. I, § 3; Wyoming (1889), Art. I, § 20.

**7 ⚓** Congress required that Reconstructed States approve State Constitutions consistent with the Federal Constitution, and also that each State ratify the Fourteenth Amendment. Examples of state constitutional provisions expressly referring to libel, but which Constitutions were nevertheless approved by Congress, follow: Arkansas: Const. 1868, Art. I, § 2 provides that truth coupled with good motives shall be a complete defense to a criminal libel prosecution; Arkansas readmitted by 15 Stat. 72 (1868); Florida: Const. 1868, Art. I, § 10 provides that truth coupled with good motives shall be a complete defense to a criminal libel prosecution; Florida readmitted by 15 Stat. 73 (1868); Mississippi: Const. 1868, Art. I, § 4 enacts Fox's Libel Act in substance; Mississippi readmitted by 16 Stat. 67 (1870); South Carolina: Const. 1868, Art. I, § 8 enacts Fox's Libel Act in substance, and provides that truth and good motives shall be a complete defense to a criminal libel prosecution; South Carolina readmitted by 15 Stat. 73 (1868); Texas: Const. 1868, Art. I, § 6 enacts Fox's Libel Act in substance; Texas readmitted by 16 Stat. 80 (1870).

**8 ⚓** In the case of States erected out of the public domain, one of two procedures was generally followed. Either Congress would itself enact a statute admitting a particular State, stating therein that the Constitution of the State in question was consistent with the Federal Constitution; or else the Congressional Act would provide that the State would be admitted upon its adoption of a Constitution consistent with the Federal Constitution. In the latter case the actual admission occurred by proclamation of the President.

Colorado: Art. II, § 10 enacts Fox's Libel Act in substance, and provides that truth and good motives shall constitute a complete defense in a libel prosecution; admitted by 18 Stat. 474 (1875), 19 Stat. 665 (1876); Montana: Art. III, § 10 enacts Fox's Libel Act in substance; admitted by 25 Stat. 676 (1889), 26 Stat. 1551 (1889); New Mexico: Art. II, § 17 provides that truth and good motives shall constitute a complete defense to a criminal libel prosecution; admitted by 36 Stat. 557 (1910), 37 Stat. 39 (1911); Utah: Art. I, § 15 like Colorado provisions; admitted by 28 Stat. 107 (1894), 29 Stat. 876 (1896); Wyoming: Art. I, § 20 like Colorado provisions; admitted by 26 Stat. 222 (1890).

**9 ⚓** See Fairman and Morrison, Does the Fourteenth Amendment Incorporate the Bill of Rights? 2 Stan. L. Rev. 5-173.

**10 ⚓** 3 Johns. (N. Y.) 337, 413.

**11 ⚓** Const. 1821, Art. VII, § 8; Const. 1846, Art. I, § 8; Const. 1894, Art. I, § 8; Const. 1938, Art. I, § 8.

178

**12** Arkansas, California, Colorado, Delaware, Florida, Iowa, Kansas, Maine, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Utah, Wisconsin, and Wyoming. For citations to article and section, see n. 6, *supra*.

**13** Arizona, Georgia, Idaho, Kentucky, Louisiana, Maryland, Michigan, Minnesota, North Carolina, Oregon, Virginia, and Washington. The Georgia provision (Const. 1877, Art. I, § 1, par. 15), representative of the rest, reads: ". . . any person may speak, write, and publish his sentiments, on all subjects, being responsible for the abuse of that liberty." For citations to article and section, see n. 6, *supra*.

**14** Alabama, Illinois, Indiana, Rhode Island, and West Virginia. For citations to article and section, see n. 6, *supra*.

**15** Connecticut, Const. 1818, Art. I, § 6; New Hampshire, Const. 1784, Part I, Art. 22; South Carolina, Const. 1895, Art. I, § 4; Vermont, Const. 1793, c. I, Art. 13. The Massachusetts provision (Const. 1780, Part I, Art. XVI) reads as follows: "The liberty of the press is essential to the security of freedom in a state it ought not, therefore, to be restricted in this commonwealth."

**16** *State v. Gardner*, 112 Conn. 121, 151 A. 349; *Commonwealth v. Szliakys*, 254 Mass. 424, 150 N. E. 190; *Noyes v. Thorpe*, 73 N. H. 481, 62 A. 787; *State v. Gurry*, 163 S. C. 1, 161 S. E. 191; *State v. Colby*, 98 Vt. 96, 126 A. 510. Decisional law of other States is collected in Note, 1 Bflo. L. Rev. 258.

**17** Lee, A History of American Journalism (Garden City, 1923).

**18** *Schenck v. United States*, 249 U.S. 47, 52.

**19** *Gitlow v. New York*, 268 U.S. 652, 672.

**20** It appears that group libel was not unknown to common law. See Scott, Publishing False News, 30 Can. B. Rev. 37, 42-43.

**21** Tanenhaus, Group Libel, 35 Cornell L. Q. 261; Riesman, Democracy and Defamation: Control of Group Libel, 42 Col. L. Rev. 727; see also Note, 1 Bflo. L. Rev. 258.



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

lake v. Ann-Marie Giustibelli, P.A., 182 So. 3d 881, 884 (Fla. Dist. Ct. App. 2016

Search: Everything

Client: -None- ⌄   Folders   History

Document:                 Blake v. Ann-Marie Giustibelli, P.A., 182 So. 3d 881              | Actions ⌄

Go to ⌄   Page   *Page #*   ⌃ ⌄   Search Document 🔍

### Blake v. Ann-Marie Giustibelli, P.A., 182 So. 3d 881

**Copy Citation**

Court of Appeal of Florida, Fourth District

January 6, 2016, Decided

No. 4D14-3231

**Reporter**

182 So. 3d 881 * | 2016 Fla. App. LEXIS 244 ** | 41 Fla. L. Weekly D 122

COPIA BLAKE and PETER BIRZON, Appellants, v. ANN-MARIE GIUSTIBELLI, P.A., and ANN-MARIE GIUSTIBELLI, individually, Appellees.

**Subsequent History:** Review denied by Blake v. Ann-Marie Giustibelli, P.A., 2016 FLA5 469 (Fla., Mar. 7, 2016)

US Supreme Court certiorari denied by Blake v. Giustibelli, 2016 U.S. LEXIS 5404 (U.S., Oct. 3, 2016)

**Prior History:** [**1] Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Michael L. Gates ⌄, Judge; L.T. Case No. 12-22244 (12).

## Core Terms

libel, libel per se, internet, charges

---

### Case Summary

**Overview**

HOLDINGS: [1]-A client and her former husband's internet reviews of the attorney who represented the client in divorce proceedings constituted libel because all the reviews contained allegations that the attorney lied to the client regarding the fee, two reviews contained the allegation that the attorney falsified a contract, and the evidence demonstrated that the factual allegations were false.

**Outcome**

Judgment affirmed.

---

### ▼ LexisNexis® Headnotes

---

Civil Procedure > Appeals ⌄ > Appellate Jurisdiction ⌄
View more legal topics

**HN1**⬇ **Appeals, Appellate Jurisdiction**

An appellate court has discretion to retain jurisdiction over an appeal after it has been voluntarily dismissed, particularly where the case presents a question of public importance and substantial judicial labor has been expended. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Torts > Intentional Torts ⌄ > Defamation ⌄ > Elements ⌄
View more legal topics

**HN2**⬇ **Defamation, Elements**

An action for libel will lie for a false and unprivileged publication by letter, or otherwise, which exposes a person to distrust, hatred,

180

contempt, ridicule or obloquy or which causes such person to be avoided, or which has a tendency to injure such person in their office, occupation, business or employment. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote* (1)

---

Torts > ... > Defamation ▾ > Defenses ▾ > Fair Comment & Opinion ▾

**HN3** ⬇ **Defenses, Fair Comment & Opinion**

Statements of pure opinion are not actionable. However, there is no constitutional value in false statements of fact. If a factfinder were to conclude that any of the assertions of fact in the publication were false, this would allow the factfinder to disregard the pure opinion defense. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote* (2)

---

Torts > Intentional Torts ▾ > Defamation ▾ > 📄 Defamation Per Se ▾

View more legal topics

**HN4** ⬇ **Defamation, Defamation Per Se**

A publication is libelous per se, or actionable per se, if, when considered alone without innuendo: (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession. In Gertz, the United States Supreme Court held that so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual. After Gertz, Florida recognized that, with respect to a libel action against the media, it is no longer accurate to say that words amounting to a libel per se necessarily import damage and malice in legal contemplation, so these elements need not be pleaded or proved, as they are conclusively presumed as a matter of law. Thus, after Gertz, in libel cases involving media defendants, fault and proof of damages must always be established. Libel per se otherwise still exists in Florida. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote* (9)      1

---

**Counsel:** Copia Blake, Kansas City, MO, and Peter Birzon, Weston, Pro se.

Ann-Marie Giustibelli, Plantation, for appellees.

**Judges:** CIKLIN ▾, C.J. MAY and FORST ▾, JJ., concur.

**Opinion by:** CIKLIN ▾

## Opinion

**[*882]** Ciklin ▾, C.J.

After a non-jury trial, the trial court awarded the appellee, attorney Ann-Marie Giustibelli, damages in this libel and breach of contract case. In their initial brief on appeal, the appellants, Copia Blake and Peter Birzon, raised five issues. After briefs were filed and the court spent considerable time entertaining the issues raised, Birzon filed a notice that he and the appellee had settled the matter and that he was withdrawing his appeal. Blake did not join in the notice. We note that even if she had, we would not have dismissed the appeal. One issue Blake and Birzon raised involves the application of free speech protections to reviews of professional services posted on the internet. **[*883]** We affirm in all respects, but this issue merits discussion as it presents a scenario that will likely recur, and the public will benefit from an opinion on the matter. *See Caiazzo v. Am. Royal Arts Corp.*, 73 So. 3d 245, 248-49 (Fla. 4th DCA 2011) (recognizing that *HN1* ⬆ appellate [**2] court has discretion to retain jurisdiction over an appeal after it has been voluntarily dismissed, particularly where "the case presents a question of public importance and substantial judicial labor has been expended" (quoting *State v. Schopp*, 653 So. 2d 1016, 1018 (Fla. 1995))).

Attorney Giustibelli represented Copia Blake in a dissolution of marriage proceeding brought against Peter Birzon. After a breakdown in the attorney-client relationship between Giustibelli and her client, Blake and oddly, Birzon as well, took to the internet to post defamatory reviews of Giustibelli. In response, Giustibelli brought suit, pleading a count for libel. She also brought counts for breach of contract and for attorney's fees, alleging that Blake still owed her money related to the divorce representation.

Blake's and Birzon's posted internet reviews contained the following statements:

> This lawyer represented me in my divorce. She was combative and explosive. She took my divorce to a level of anger which caused major suffering of my minor children. She insisted I was an emotionally abused wife who couldn't make rational decisions which caused my case to drag on in the system for a year and a half so her FEES would continue to multiply!! She misrepresented [**3] her fees with regards to the contract I initially signed. The contract she submitted to the courts for her fees were 4 times her original quote and pages of the original had been exchanged to support her claims, only the signature page was the same. Shame on me that I did not have an original copy, but like an idiot . . . I trusted my lawyer. Don't mistake sincerity for honesty because I assure you, that in this attorney's case, they are NOT the same thing. She absolutely perpetuates the horrible image of attorneys who are only out for the money and themselves. Although I know this isn't the case and there are some very good honest lawyers out there, Mrs. Giustibelli is simply not one of the "good ones[.]" Horrible horrible experience. Use anyone else, it would have to be a better result.
>
> ****
>
> No integrity. Will say one thing and do another. Her fees outweigh the truth. Altered her charges to 4 times the original quote with no explanation. Do not use her. Don't mistake sincerity for honesty. In her case, they're not at all the same. Will literally lie to your

face it it means more money for her. Get someone else . . ." Anyone else would do a superior effort to you . . .

****

I accepted an [**4] initial VERY fair offer from my ex. Mrs. Giustibelli convinced me to "crush" him and that I could have permanent etc. Spent over a year (and 4 times her original estimate) to arrive at the same place we started at. Caused unnecessary chaos and fear with my kids, convinced me that my ex cheated (which he didn't), that he was hiding money (which he wasn't), and was mad at ME when I realized her fee circus had gone on long enough and finally said "stop[.]" Altered her fee structures, actually replaced original documents with others to support her charges and generally gave the kind of poor service you only hear about. I'm not a disgruntled ex-wife. I'm just the foolish person who believes that a person's word should be backed by integrity. Not even remotely true in this case. I've had 2 prior attorneys **[*884]** and never ever have I seen ego and monies be so blatantly out of control.

Both Blake and Birzon admitted to posting the reviews on various internet sites. The evidence showed that Blake had agreed to pay her attorney the amount reflected on the written retainer agreement—$300 an hour. Blake and Birzon both admitted at trial that Giustibelli had not charged Blake four times more than what [**5] was quoted in the agreement. The court entered judgment in favor of Giustibelli and awarded punitive damages of $350,000.

On appeal, Blake and Birzon argue that their internet reviews constituted statements of opinion and thus were protected by the First Amendment and not actionable as defamation. We disagree. *HN2* "[A]n action for libel will lie for a 'false and unprivileged publication by letter, or otherwise, which exposes a person to distrust, hatred, contempt, ridicule or obloquy or which causes such person to be avoided, or which has a tendency to injure such person in [their] office, occupation, business or employment.'" *LRX, Inc. v. Horizon Assocs. Joint Venture ex rel. Horizon-ANF, Inc., 842 So. 2d 881, 885 (Fla. 4th DCA 2003)* (quoting *Thomas v. Jacksonville Television, Inc., 699 So. 2d 800, 803 (Fla. 1st DCA 1997)).* 

Here, all the reviews contained allegations that Giustibelli lied to Blake regarding the attorney's fee. Two of the reviews contained the allegation that Giustibelli falsified a contract. These are factual allegations, and the evidence showed they were false.

[**6] As part of their "free speech" claim, Blake and Birzon point out that the judgment references defamation "per se." They argue that libel per se no longer exists as a legal concept after the decision by the United States Supreme Court in *Gertz, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974).**HN4** "[A] publication is libelous per se, or actionable per se, if, when considered alone without innuendo: (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession."* *Richard v. Gray, 62 So. 2d 597, 598 (Fla. 1953)*; *see also Shafran v. Parrish, 787 So. 2d 177, 179 (Fla. 2d DCA 2001)* ("When a statement charges a person with committing a crime, the statement is considered defamatory *per se*." (citation omitted)). In *Gertz*, the Court held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Gertz, 418 U.S. at 347*. After *Gertz*, the Florida Supreme Court recognized that, with respect to a libel action *against the media*, it is no longer accurate to say that "'[w]ords amounting to a libel per se necessarily import damage and [**7] malice in legal contemplation, so these elements need not be pleaded or proved, as they are conclusively presumed as a matter of law.'" *Mid-Fla. Television Corp. v. Boyles, 467 So. 2d 282, 283 (Fla. 1985)* (quoting *Layne v. Tribune Co., 108 Fla. 177, 146 So. 234 (1933)*). Thus, after *Gertz*, in libel cases involving media defendants, **[*885]** fault and proof of damages must always be established.

Notably, the instant case does not involve a media defendant. Libel per se otherwise still exists in Florida. *See Lawnwood Med. Ctr., Inc. v. Sadow, 43 So. 3d 710, 727-29 (Fla. 4th DCA 2010)* (containing discussion of the presumption of damages that applies in defamation per se cases); *Perry v. Cosgrove, 464 So. 2d 664, 666 (Fla. 2d DCA 1985)* (reversing trial court's grant of a motion to dismiss a libel per se action brought by a former editor of a newspaper against his supervisor, who had written a letter to a reader suggesting that the editor was fired for reasons that were shameful); *Owner's Adjustment Bureau, Inc. v. Ott, 402 So. 2d 466, 470 (Fla. 3d DCA 1981)* (concluding that statements in a letter amounted to libel per se as a matter of law).

As to the remaining arguments raised on appeal, we decline to address them as they are not sufficiently briefed, not preserved, or lack merit.

*Affirmed.*

Mᴀʏ and Forst, JJ., concur.

---

### Footnotes

1 *HN3* Statements of pure opinion are not actionable. *Morse v. Ripken, 707 So. 2d 921, 922 (Fla. 4th DCA 1998)*. However, "there is no constitutional value in false statements of fact." *Id.* (quoting *Gertz v. Robert Welch, Inc., 418 U.S. 323, 340, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)*). If a factfinder "were to conclude that any of the [assertions of fact] in the [publication] were false, [this] would allow the [factfinder] to disregard the pure opinion defense." *LRX, 842 So. 2d at 886*.

---



About
Privacy Policy

Cookie Policy
Terms & Conditions


Copyright © 2023 LexisNexis

Brown v. Fawcett Publ'ns, Inc., 196 So. 2d 465 (Fla. Dist. Ct. App. 196

Search: Everything

Client: -None- ⌄   Folders   History   Help

**Document:**   Brown v. Fawcett Publications, Inc., 196 So. 2d 465   | Actions ⌄

Go to ⌄   Page   Page #   ⌃ ⌄   Search Document 🔍

⚠ **Brown v. Fawcett Publications, Inc., 196 So. 2d 465**

Copy Citation

Court of Appeal of Florida, Second District

March 10, 1967

No. 5881

**Reporter**

196 So. 2d 465 * | 1967 Fla. App. LEXIS 5039 **

Woodrow BROWN, Appellant, v. FAWCETT PUBLICATIONS, INC., a Delaware corporation, and Duval Bibb Company, a Florida corporation, d/b/a Hillsboro News Company, Appellees

**Subsequent History:** [**1] Rehearing Denied April 10, 1967.

**Disposition:** Reversed and remanded.

## Core Terms

punitive damages, malice, libel, express malice, defame, ill will, publisher, trial judge, exemplary, hostility, supplied, damages, fair comment, new trial, wantonness, injure, trial court, authorities, magazine, words, exemplary damages, evil intention, actual malice, matter of law, libel action, outrageousness, defamatory, editorials, reckless, commit

## Case Summary

**Procedural Posture**
Plaintiff accused appealed an order of the Hillsborough County Circuit Court (Florida), which granted a new trial on behalf of defendant publisher after a jury returned a verdict in favor of plaintiff in an action for libel.

**Overview**
Plaintiff accused became the subject of a grand jury investigation involving the brutal rape and murder of a young woman. Defendant publisher circulated a magazine story wherein it depicted plaintiff as a lecher, a sodomist, a rapist, a peeping Tom, and a murderer. The grand jury exonerated plaintiff and declined to indict him on any of the charges. Plaintiff invoked Fla. Stat. ch. 770.01 by serving written notice on defendant, demanding apology and retraction of the specified article in the manner required by the statute. When defendant refused to avail itself of the benefit of apology and retraction, plaintiff brought an action for libel. The jury returned a verdict in favor of plaintiff, finding no actual damages but awarding punitive damages. The trial court granted defendant's motion for a new trial, holding that it erred in instructing the jury regarding punitive damages. Plaintiff appealed the order that granted a new trial. The appellate court reversed, holding that jury's verdict should not have been set aside. The court held that punitive damages were appropriate because defendant deliberately spurned plaintiff's request to retract the erroneous publication.

**Outcome**
The appellate court reversed an order that granted a new trial to defendant publisher in a libel action. The court held that the original jury verdict in favor of plaintiff accused should not have been set aside because the trial court fairly and adequately charged the jury as to all aspects of the case.

▼  **LexisNexis® Headnotes**

Civil Procedure > Judgments ▼ > Relief From Judgments ▼ > Motions for New Trials ▼

View more legal topics

**HN1⬇**  **Relief From Judgments, Motions for New Trials**

A stronger showing is required to reverse an order granting a new trial than one denying it. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

---

Torts > Intentional Torts ▾ > Defamation ▾ > Libel ▾

**HN2⬇**  **Defamation, Libel**

See Fla. Stat. ch. 770.01. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Torts > Intentional Torts ▾ > Defamation ▾ > Libel ▾

**HN3⬇**  **Defamation, Libel**

See Fla. Stat. ch. 770.02. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > Remedies ▾ > Damages ▾ > 📙Punitive Damages ▾
Torts > ... > Types of Damages ▾ > Punitive Damages ▾ > Aggravating Circumstances ▾
View more legal topics

**HN4⬇**  **Damages, Punitive Damages**

Punitive damages are authorized where the proof shows either (1) malice in fact, i.e. express malice, or (2) ill will, hostility, or evil intention to defame and injure deducible from the character of the publication itself, which is the equivalent of express malice. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (4)*

---

Civil Procedure > Remedies ▾ > Damages ▾ > 📙Punitive Damages ▾
Torts > ... > Types of Damages ▾ > Punitive Damages ▾ > Aggravating Circumstances ▾
View more legal topics

**HN5⬇**  **Damages, Punitive Damages**

The purpose of punitive damages is not to compensate but only to serve as a deterrent to others inclined to commit a similar offense. They are characterized as an allowance for malice, moral turpitude, wantonness, or outrageousness in the commission of the tort. Accordingly, in a suit for libel, although no special damage may have been proved, the plaintiff may recover what is known as exemplary or punitive damages on a showing that the publication was made from malice or ill will toward the plaintiff. But from implied malice alone an award of exemplary or punitive damages is not authorized. If there is nothing in the character of the publication itself to show express malice -- that is ill will, hostility, or evil intention to defame or injure -- the occasion for exemplary or punitive damages does not arise. In other words, to justify such an award some proof to establish express malice, or malice in fact, is necessary. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (4)*

---

Civil Procedure > Remedies ▾ > Damages ▾ > 📙Punitive Damages ▾
Torts > ... > Types of Damages ▾ > Punitive Damages ▾ > General Overview ▾

**HN6⬇**  **Damages, Punitive Damages**

Punitive damages are allowed, not as compensation to a plaintiff, but as a deterrent to others inclined to commit a similar offense, and their allowance depends on malice, moral turpitude, wantonness or outrageousness of tort. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > Remedies ▾ > Damages ▾ > 📙Punitive Damages ▾
Torts > ... > Types of Damages ▾ > Punitive Damages ▾ > General Overview ▾
View more legal topics

**HN7⬇**  **Damages, Punitive Damages**

Fla. Stat. ch. 770.02, if properly complied with by the publisher, rules out punitive damages. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Torts > ... > Defamation ▾ > Remedies ▾ > Damages ▾
View more legal topics

**HN8⬇**  **Remedies, Damages**

Where, under the rule prevailing in the particular jurisdiction, the recovery of exemplary or punitive damages is authorized or permitted, an award of compensatory damages for defamation may be supplemented by an allowance of punitive damages whenever it is made to appear that the defendant acted with malice, or with such gross and reckless negligence as to amount thereto. Furthermore, where the defamation complained of is actionable per se, it is generally held that punitive damages may be awarded. But where the defamation is not actionable per se, punitive damages cannot be allowed unless either general or special damage is shown. 🔍 More like this Headnote

Shepardize® - Narrow by this Headnote (0)

Torts > Intentional Torts ▾ > Defamation ▾ > Defamation Per Se ▾
View more legal topics

**HN9**⬇ **Defamation, Defamation Per Se**

A publication is libelous per se; that is, actionable, per se; without a showing of special damage, if it imputes to another (a) a criminal offense amounting to a felony; or (b) a presently existing venereal or other loathsome and communicable disease; or (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office; or (d) the other being a woman, acts of unchastity. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ▾ > Defamation ▾ > 📄 Defamation Per Se ▾
View more legal topics

**HN10**⬇ **Defamation, Defamation Per Se**

The principle defenses to an action upon a publication, libelous, per se, are consent, justification and privilege. The defense of privilege has been by some subdivided into three distinct classifications, i.e., (1) absolute privilege; (2) qualified privilege; and (3) fair comment. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Remedies ▾ > Damages ▾ > 📄 Punitive Damages ▾
Torts > ... > Types of Damages ▾ > Punitive Damages ▾ > General Overview ▾
View more legal topics

**HN11**⬇ **Damages, Punitive Damages**

Punitive or exemplary damages is an amount allowed over and above actual or compensatory damages. Its allowance depends on malice, moral turpitude, wantonness, or the outrageousness of the tort and is awarded as a deterrent to others inclined to commit a like offense. It is in the province of the trial court to determine as a matter of law whether or not there is a basis for punitive damages and instruct the jury accordingly. Whether or not the elements are present to warrant it is for the jury in the light of all the facts of the case. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > ... > Types of Damages ▾ > Punitive Damages ▾ > Aggravating Circumstances ▾
View more legal topics

**HN12**⬇ **Punitive Damages, Aggravating Circumstances**

In libel actions, punitive damages depend on malice or moral turpitude or wantonness or the outrageousness of the tort, and are awarded as a deterrent to others inclined to commit a like offense. Evidence of malice may be either intrinsic, that is, inferable from the very nature of the defamatory language itself, or extrinsic. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

**Counsel:** H. Eugene Johnson and John D. Menas, Tampa, for Appellant.

Louis M. Jepeway, of Jepeway & Gassen, Miami, for Appellees.

**Judges:** Pierce ▾ , Judge. Shannon ▾ , Acting C.J., concurs. Lane, A.H., Associate Judge, concurs specially with opinion.

**Opinion by:** PIERCE ▾

## Opinion

**[*466]** This is an appeal by appellant Woodrow Brown, plaintiff in the Court below, from an order entered on January 6, 1965, by the Hillsborough County Circuit Court granting new trial on behalf of Fawcett Publications, Inc., defendant below, after a jury verdict in favor of Brown against Fawcett Publications upon suit of an action brought for libel.

The jury had returned a verdict against the publisher defendant finding no actual damages but awarding $45,000 punitive damages. The defendant, by motion for new trial, contended that the trial Court was in error in failing to give Jury Instruction No. 7, requested by the defendant, which was as follows:

"Under the facts before you, it will be your duty to determine whether punitive damages should be assessed against the defendant if you find that the defendant did in fact libel the plaintiff. Before [**2] punitive damages can be assessed against the defendant, however, there must be proof of express malice. In other words, while some malice is inferred automatically from a libelous publication, this type of malice is not sufficient for the awarding of punitive damages and before such punitive damages can be awarded, the plaintiff must prove by a preponderance of the evidence that express malice, or malice in fact, exists. This type of malice is such as would indicate ill-will, hostility or an intention to defame or injure the plaintiff."

Plaintiff contended that the matter of punitive damages was fairly covered by the trial Court in the instructions as given. The trial Court upheld the defendant publisher and granted a new trial, citing Montgomery v. Knox, 1887, 23 Fla. 595, 3 So. 211; 20 Fla.Jur. 612; and an excerpt in 33

Am.Jur., page 289. From this other plaintiff has appealed to this Court and urges that upon the entire record and considering the given instructions to the jury in their entirety, the trial Judge was in error in granting defendant's motion and ordering a new trial. We hold that the trial Judge fairly and adequately charged the jury as to all aspects [**3] of the case, that said requested Jury Instruction No. 7 was defective, and that the verdict of the jury should not have been set aside.

We interpolate at this point to observe that we are cognizant "HN1 a stronger showing is required to reverse an order granting a new trial than one denying it", Mead v. Bentley, Fla.1952, 61 So.2d 428, but here, the point being one strictly of law uncontaminated with factual conflict, the area of discretion is drastically diminished if not entirely eliminated. We interpolate further to mention that plaintiff voluntarily withdrew special damages from the jury, leaving punitive damages the only practical element of damages for consideration.

The basic facts of the case are without substantial conflict. Fawcett Publications, Inc. is the New York owner and publisher of a magazine called "True Police Cases" of general circulation throughout the country, including Hillsborough and Pasco counties, Florida. In its monthly issue of April, 1961, the magazine featured a story entitled "Girl In The Open Grave" wherein is depicted the lurid, sensational and sordid story made the basis of the subject libel suit. In the article, which not only names plaintiff [**4] but also features his picture, he is held up, in effect, as a lecher, a sodomist, a rapist, a "Peeping Tom", a murderer and a generally animalistic brute. The *facts*, as they may be gleaned from the morass of morbidly sensational expletives and interjectories, concern the ravishing and murder of young twenty year old Patricia S   , a housewife and mother of an infant daughter, in the rural community of Zephyrhills, Pasco County, near Tampa, Hillsborough County, on the night of October 7, 1960. To illustrate the tenor of the thoroughly disreputable story we quote **[*467]** the following passages which are a fair example of its contents:

"He had peeped in a lot of windows, but he had never seen anything like this before * * *

'Like what I was born to see, born to have,' he kept whispering over and over inside his mind where the evil urges festered and bubbled.

* * *

"He had to have her. He had to have her if he had to kill to have her.

* * *

"In the bedroom, his mind a turmoil of passion and raging need, he stood for a moment, breathing raggedly, staring at Patricia, the outline of her body against the fabric of her night gown.

* * *

"The man hitting [**5] him (Ed Suits) was strong, muscled, and he was putting all his frantic impulses into the blows.

* * *

"The man struck Patricia again, the pine board breaking at last, blood clotted, smeared. He threw it behind him, part of it falling into the baby's crib.

* * *

"His quivering fists reached out, caught the insensible blonde's gown, ripped it away so nothing would be between that beautiful body and him again.

* * *

"In the darkness then, he lifted her again, panting, and ran across a weed-grown field with her to the deeper shadows of a moss-choked fallen tree. And there he had everything he wanted from her, every way he wanted it, his perverted mind driven to wild excesses by his own violence and by her clean and radiant-looking young beauty.

* * *

"Then sated, like an animal wearied and exhausted, there was nothing for him to do but slink away in the dark, return softly and silently into the black night from which he had come.

* * *

"Three men questioned on October 9 by deputies were regarded with suspicion. These men were Lucas Tidings, Wood-row Brown and John Bement.

* * *

"Brown's address was ascertained to be that of a boarding house in Tampa, Florida [**6] * * *

"Gaining admittance, the lawmen found the suspect's room a vile rookery of dirty stories, lewd pictures, smutty magazines -- all the soothing literature of an ailing mind.

* * *

"Meanwile in Zephyrhills, Sheriff Bessenger ran a check on Woodrow Brown, learned the following facts about him: Born May 13, 1913, Brown, a carpenter by trade, was a sodomite by choice.

* * *

"And Sheriff Bessenger had proof that this unsavory ex-convict with a long criminal record had been in the area of the murder on the night Patricia Ann was slain. He was a convicted Peeping Tom, and worse, no one could swear that he was in bed on that fatal evening -- as his family had supposed and so stated on questioning.

* * *

"This lawbreaker had gone casually about his life during these past weeks, coming and going in Zephyrhills, working at his job as

Carpenter.

To further pin-point the article as being directed toward plaintiff Woodrow Brown, there was appended to the narration the printed note: "the names Lucas Tidings and John Bement, as used in the foregoing story, are fictitious. The real names have been changed to protect the identities of the actual persons concerned." Woodrow [**7] Brown was not included in this "delousing", [*468] the significance of which is pointedly obvious.

At the time the April, 1961, issue hit the newsstands plaintiff Brown was in the Pasco County jail for suspicion of the crimes, but on April 4, 1961 the Pasco County grand jury exonerated Brown of any part in the criminal business by declining to indict him upon grossly insufficient evidence. He was forthwith released from custody.

On December 29, 1961, and again on January 29, 1962, plaintiff invoked F.S. Sec. 770.01, F.S.A. by serving written notice on Fawcett, the publisher, demanding apology and retraction of the specified article in the manner required by the statute. 1 ⬆ Fawcett refused to avail itself of the benefit of apology and retraction afforded by F.S. Sec. 770.02, F.S.A. 2 ⬆ [**9] which would legally have restricted plaintiff to actual damages. On the contrary, Fawcett ignored such notice and demand until its magazine issue of some *thirteen months* later, wherein is contained the following belated advice to the public:

> "Woodrow Brown is innocent. When our story 'Girl In The Open Grave', was published in the April 1961 issue of 'True Police Cases',
> Woodrow [**8] Brown was awaiting trial. 3 ⬆ We are pleased to report that on April 4, 1961, the Pasco County, Florida, Grand
> Jury decided that there was insufficient evidence against Woodrow Brown to justify indictment for prosecution for the murder of
> Patricia     . (deleted here). Woodrow Brown was therefore immediately released from the County Jail where he had been held
> since November 16, 1960".

In his charge to the jury the trial Judge held the article to constitute libel per se as a matter of law, in the following language:

> "Now, in this regard, gentlemen, I have ruled, I have determined as a matter of law that the Plaintiff, the article about the Plaintiff
> contains certain items, that in the law of libel we call libel per se, that is as to his being a peeping tom and as to his having
> pornographic and lewd literature in his house."

The trial Judge was generous to defendant publisher in giving to the jury in elaborate detail the defenses of "good faith", also "good motives", also "the right of comment", also "qualified privilege", and even "the defense of truth".

On the question of malice and punitive damages, the Court charged the jury as follows:

> "Malice may be implied or inferred where the plaintiff is accused of a crime. In other words, if you are reasonably satisfied from
> the evidence that the Defendant accused the Plaintiff of a crime he did not commit, then you may infer that [**10] it was
> maliciously made, and it is not necessary to prove any express malice in order to warrant a verdict for the plaintiff under those
> circumstances.

> \* \* \*

> "Punitive damages are awarded for the purpose of punishing the Defendant, if you find from the evidence in this case that such are
> called for, to punish the [*469] Defendant for the wrongful action of libel, and to set an example before the community, in the
> event that you find that this libel was a per se libel, and is one that justifies or calls for your applying a punishment of this nature
> to them, not only as an example to them, but also to deter others, who might see this example, from doing the same thing.

> "As I say, they are awarded for the purpose of punishing the Defendant from the wrongful act of a libel, and so set an example for
> others. Its purpose is to serve as a warning to prevent this Defendant and others from being guilty of committing a libel in this
> instance."

We now consider the authorities cited by the trial Judge as supporting his order granting a new trial, and we preface our review by saying that they are actually authority to the contrary.

Montgomery v. Knox was an 1887 opinion [**11] reviewing a judgment for plaintiff in a libel action based upon a written publication imputing to plaintiff the intentional burning of a stock of goods in his store and making a fraudulent insurance claim thereon. The article in question had been first published in the "Mutual Observer", a trade paper of limited publication, and thereafter reproduced in the "Orange Growers' Gazette", a local public newspaper. The question of exemplary or punitive damages was involved, and the Supreme Court, in passing upon the point, said (3 So. text 217):

> "Under the plea of not guilty, where the publication is actionable per se, malice is implied, which is sometimes termed legal malice,
> and this malice does not necessarily authorize the finding of exemplary or punitive damages. *If there is nothing in the character of
> the publication itself to show express malice, -- that is ill will, hostility, evil intention to defame and injure, -- the occasion for
> exemplary or punitive damages does not arise, unless there is some proof to establish such express malice; in other words, proof
> of malice in fact.*" (Emphasis supplied)

Thus *Montgomery* holds in so many words that **HN4⬆** punitive [**12] damages are authorized where the proof shows *either* (1) malice in fact, i.e. express malice, *or* (2) ill will, hostility, or evil intention to defame and injure deducible *from the character of the publication itself*, which is the equivalent of express malice.

In the 8th headnote in *Montgomery*, the Court approved a charge to the jury that if they were satisfied the publication was made from "ill will" they could find exemplary or punitive damages to such extent as the facts and circumstances in evidence might justify.

Also Montgomery further held *inter alia* that --

> "if the belief which prompted the publication was an unreasonable one, that and falsity did not *necessarily* imply express malice;
> *but were facts to be left to the jury along with others. It was their province to decide upon the sufficiency of the evidence to show
> express malice.*" (Emphasis supplied)

So *Montgomery* does not support the trial Judge's order.

20 Fla.Jur., page 612, § 90, the second authority cited by the Judge in his order, reads as follows:

188

§ 90. Punitive Damages.

"*HN5* *The purpose of punitive damages is* not to compensate but *only to* [**13] *serve as a deterrent to others inclined to commit a similar offense.* They are characterized as *an allowance for malice, moral turpitude, wantonness, or outrageousness in the commission of the tort.* Accordingly, in a suit for libel, although no special damage may have been proved, the plaintiff may recover what is known as exemplary or punitive damages on a showing that the publication was made from malice *or ill will toward the plaintiff.* But from implied malice alone an award of exemplary or punitive damages is not authorized. If there is nothing in the character **[*470]** *of the publication itself* to show express malice -- that is *ill will, hostility, or evil intention to defame or injure* -- the occasion for exemplary or punitive damages does not arise. In other words, to justify such an award some proof to establish express malice, *or malice in fact, is necessary.*" (Emphasis supplied).

The above text cites in support only the cases of Montgomery v. Knox, supra, also Ross v. Gore, Fla.1950, 48 So.2d 412 and Miami Herald Pub. Co. v. Brown, Fla.1953, 66 So.2d 679.

Montgomery v. Knox has already been discussed.

In Ross v. Gore, the only reference [**14] to punitive damages is the following comment (text 48 So.2d at 414):

"As to * * * *HN6* 'punitive damages,' such damages are allowed, not as compensation to a plaintiff, but *as a deterrent to others* inclined to commit a similar offense, and their allowance *depends on malice, moral turpitude, wantonness or outrageousness of tort.* Dr. P. Phillips & Sons, Inc. v. Kilgore, 152 Fla. 578, 12 So.2d 465." (Emphasis supplied).

Miami Herald v. Brown holds that *HN7* Sec. 770.02, *if properly complied with by the publisher*, rules out punitive damages. Here Fawcett defied Sec. 770.02, which action in effect invited punitive damages.

So Fawcett can find neither solace nor comfort in its quest for a new trial in 20 Fla.Jur. as quoted, nor the authorities cited in support of the text.

We come to the last of the trial Judge's citations in his new trial order.

In 33 Am.Jur., on page 289, appears the following observation made by the text writer:

"It is clear, of course, that an instruction which authorizes an award of punitive damages without finding actual malice is incorrect."

In the first place we have no such *affirmative* instruction in the instant case. [**15] In the second place, the quotation deals with an instruction that *had* been given; here we are dealing with an instruction (No. 7) that was *refused.* In the third place, the quotation itself was based upon *only one case*, that of The Philadelphia, Wilmington, & Baltimore Railroad Company v. Quigley, 62 U.S. (21 How.) 202, 16 L. Ed. 73, which again *does not support the text.* In that case, which was decided in 1859 before the Civil War, the U.S. Supreme Court reviewed a judgment for the plaintiff in a libel action brought against the railroad company. The libel consisted of a communication from an architect to the company President disparaging a "general foreman" of the railroad, which was included in a report printed for the use of the President and Directors. The main issue upon appeal was the question of whether or not the communication was *privileged*, but the high Court disposed of the case because the suit was *prematurely brought* inasmuch as the critical publication "took place after the commencement of the suit." But in the course of the opinion the matter of exemplary damages was touched upon and the high Court, citing Day v. Woodworth, 54 U.S. (13 How.) [**16] 363, 371, 14 L. Ed. 181, said:

"Whenever the injury complained of has been inflicted maliciously or wantonly, and *with circumstances of contumely or indignity*, the jury are not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved person. But the malice spoken of in this rule is not merely the doing of an unlawful or injurious act. *The word* (malice) *implies that the act complained of was conceived in the spirit of mischief, or of criminal indifference to civil obligations.*" (Emphasis supplied).

Holding that the evidence in that particular case did not measure up to the quoted language, the Court held that --

"The circumstances under which the evidence was collected, and the publication **[*471]** made, repel the presumption of the existence of malice on the part of the corporation * * *".

The Supreme Court did not think enough of the materiality of exemplary damages in that case to make it the subject of a headnote, and the only discussion of it in the opinion are the above quotations. Yet the text writer in American Jurisprudence made the entirely misleading observation hereinbefore quoted [**17] upon the sole authority of the railroad case.

Elsewhere in the same volume of American Jurisprudence, the text writer is more articulate in discussion of exemplary or punitive damages in libel actions. In 33 Am.Jur. page 190, § 202, the rule is ably laid down:

"*HN8* Where, under the rule prevailing in the particular jurisdiction, the recovery of exemplary or punitive damages is authorized or permitted, an award of compensatory damages for defamation may be supplemented by an allowance of punitive damages whenever it is made to appear that the defendant acted with malice, *or with such gross and reckless negligence as to amount thereto.* Furthermore, *where the defamation complained of is actionable per se, it is generally held that punitive damages may be awarded* * * *. But where the defamation is not actionable per se, punitive damages cannot be allowed unless either general or special damage is shown. [4] There seems, however, to be some difference of opinion as to the character of malice that will support an award of punitive damages. While some tribunals insist upon a showing of actual or express malice, or of a reckless disregard of the plaintiff's rights, or of such [**18] a clear absence of basis for the publication as to warrant an inference of ill-will or hatred, others hold proof of actual malice to be unnecessary when the language used was defamatory per se or when the occasion was unprivileged and no valid excuse is offered." (Emphasis supplied).

No Florida case was cited under either of the latter alternative "difference[s] of opinion", but even under the first alternative of the more rigid rule there would be ample basis for support of the jury's verdict in the "reckless disregard of the plaintiff's rights" or the bitter salaciousness pervading the language of the article to "warrant an inference of ill will". And there is no question under the second alternative that the article was defamatory per se. The lower Court so found as a matter of law.

Further support for our view is found in Judge Horton's very excellent opinion in the 3rd District [**19] Court case of Miami Herald Publishing Co. v. Brautigam, Fla.App.1961, 127 So.2d 718. In that case Brautigam was the incumbent state attorney, and the grand jury, which was

attended by Brautigam in his official capacity, was attempting to "release and file a 'grand jury report' criticizing certain local officials (not including Brautigam or any member of his staff) without indicting them, which report Brautigam was seeking to prevent being filed and to be suppressed. While the matter was hanging in a state of flux, the Miami Herald published two editorials critical of Brautigam, and refused retraction. Brautigam later brought action for libel against the newspaper. The issues as made up in the case were strikingly similar to the instant case. The jury returned a verdict for Brautigam, awarding him compensatory damages in the sum of $25,000 and *punitive damages* in the sum of $75,000.

The *Brautigam* opinion discusses the legal status of a libel per se in the following language (text 127 So.2d at 722):

> "The reported decisions of this state, as well as others, clearly establish that **HN9** a publication is libelous per se; that is, actionable, per se; without a showing of **[*472]** **[**201** special damage, if it imputes to another (a) a criminal offense amounting to a felony; *or* (b) a presently existing venereal or other loathsome and communicable disease; *or* (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office; *or* (d) the other being a woman, acts of unchastity. Teare v. Local Union No. 295, Fla.1957, 98 So.2d 79.

> "**HN10** The principle defenses to an action upon a publication, libelous, per se, are consent, justification and privilege. The defense of privilege has been by some subdivided into three distinct classifications, i.e., (1) absolute privilege; (2) qualified privilege; and (3) fair comment. See 3 Restatement, Torts, Chap. 25. Others classify the defense of fair comment as merely another aspect of the defense of qualified privilege. See Prosser, Torts, 2d Ed., § 95, p. 607. Cf. Jones v. Townsend's Administratrix, 21 Fla. 431; and Montgomery v. Knox, 23 Fla. 595, 3 So. 211; with State ex rel. Arnold v. Chase, 94 Fla. 1071, 114 So. 856, and White v. Fletcher, Fla.1956, 90 So.2d 129." (Emphasis supplied).

In *Brautigam* the trial Judge refused to charge the **[**211**] jury that the burden was upon Brautigam to prove *actual malice*, the identical point here involved. The opinion in Brautigam had this to say upon that question (text 127 So.2d at 723):

> "The appellant contends that *the trial judge erroneously failed to instruct the jury that the burden of proof was upon Brautigam to show* the falsity of the editorials and *the newspaper's actual malice in the publication thereof*. The trial judge did instruct the jury that the defense of truth, plus good motives and fair comment, are affirmative defenses as to which the defendant has the burden of proof. He further charged the jury, as a matter of law, that the editorials were matters of public interest.

> "As to the defense of fair comment, the jury was instructed that *if it should find the editorials met the test of fair comment*, the defendant would have then carried the burden of proof as to this affirmative defense, *and in such event, the burden was on the plaintiff to prove the defendant's publication of the editorials was motivated by actual malice*." (Emphasis supplied).

This is *exactly what happened* in the instant case and *exactly what the Court charged* **[**221**] *the jury*; only the trial Court here charged that "fair comment", if the jury found the article to be such, would be a *complete defense*, rather than merely shifting the burden to plaintiff. The instant jury's necessary finding *against* the issue of "fair comment" is conclusively shown in its verdict, which awarded plaintiff $45,000 punitive damages.

The Brautigam opinion sums up the question of punitive damages in the following language (text 127 So.2d at 723-4):

> "The appellant further complains that the court erred in permitting the issue of punitive damages to go to the jury. As stated in Phillips & Sons v. Kilgore, 152 Fla. 578, 12 So.2d 465, 467:

> "**HN11** Punitive or exemplary damages is an amount allowed over and above actual or compensatory damages. *Its allowance depends on malice, moral turpitude, wantonness, or the outrageousness of the tort and is awarded as a deterrent to others inclined to commit a like offense*. It is in the province of the trial court to determine as a matter of law whether or not there is a basis for punitive damages and instruct the jury accordingly. Whether or not the elements are present to warrant it is for the jury in the light of **[**231**] all the facts of the case.'" (Emphasis supplied).

This last observation concisely states the law as to punitive damages **HN12** in libel actions. Such damages depend on **[*473]** "malice [or] moral turpitude [or] wantonness [or] the outrageousness of the tort, and is awarded as a deterrer to others inclined to commit a like offense".

In Abram v. Odham, Fla.1956, 89 So.2d, 334, text 336, the Supreme Court said:

> "Evidence of malice may be either intrinsic, that is, inferable from the very nature of the defamatory language itself, or extrinsic. Myers v. Hodges, supra, 53 Fla. 197, 44 So. 357, 365."

Jury Instruction No. 7 requested by defendant was deficient because it stated that before punitive damages could be awarded "there must be proof of express malice" which is a "type of malice * * * as would indicate ill will, hostility or an intention to defame or injure the plaintiff". The vice is that it fails to make ill will, hostility, an intention to defame or injure, wantonness, or outrageousness of the tort *equivalent* or the *alternative* of express malice, but on the contrary only an *indication* thereof. The numerous authorities, supra, **[**241**] clearly show that all such elements are the *equivalent* of express malice.

And the rationale of all this is obvious. If malice necessary to warrant exemplary damages had to be *express*, such as "I hate you", or "I'm going to ruin your character even if I have to lie about you to do it", it would reduce the law of punitive damages in libel actions to a farce and a mockery. People just don't advertise their libels in advance

Getting back to the case at bar, the publisher Fawcett depicted the plaintiff in a magazine widely distributed all over the country, as a murderer, a sodomist, a rapist, a lecher, and a degenerate brute, when in fact and in truth he was an innocent man. And when Fawcett was notified in writing, not once but twice, that such defamatory accusations were false, it deliberately spurned the request to retract and apologize, which would have immunized it from exemplary damages, and chose instead to figuratively thumb its nose at not only the unfortunate victim of its journalistic assassination but also the world at large. Can there be any doubt or question that the magazine publisher had toward the plaintiff anything but ill will, or a hostile attitude, or **[**251**] an intent to injure and defame, or at least a callous disregard for the resultant effect of its cruel indifference? **5**

The article was so defamatory on its face that the jury had ample reason to find that it was the consequence of the aforesaid elements, which are equivalent to and in fact constitute express malice. To contend otherwise would be to make a play on words or to engage in a meaningless game of semantics, the niceties of which have no place in a matter of such serious import.

To paraphrase the language of the Supreme Court in the libel case of O'Neal v. Tribune Company, Fla.1965, So.2d 930, after careful review of the instructions, we find that, when considered in their totality, there was no prejudicial error."

The order appealed from is therefore reversed and the cause remanded with directions to enter the judgment called for by the jury's verdict.

Reversed and remanded.

SHANNON ▼, [**26] Acting C.J., concurs.

LANE, A.H., Associate Judge, concurs specially with opinion.

**Concur by:** LANE

## Concur

LANE, A.H., Associate Judge (concurring specially). I concur in the foregoing opinion.

My consideration of the record in the case has lead me to the conclusion, however, **[*474]** that the law of libel has itself become somewhat of a "game of semantics" which has created another thicket from which we need escape. It appears to me that a first step would be the abandonment of the term "express malice" since this term is not accurate to describe the element of libel necessary to support the award of punitive damages. Almost without exception, the authorities, including the case of Montgomery v. Knox, 23 Fla. 595, 3 So. 211, define express malice as ill will, hostility or evil intention to defame and injure and hold that this "express malice" may be *implied or inferred* from the character of the publication itself. It is also well established in the law that the publisher of a libel may be answerable in punitive damages if the publication is made with willful, wanton or reckless disregard for the rights of the party libeled. In short, the term "express malice" carries with [**27] it the connotation of animosity by the publisher specifically directed toward the complainant, while it is apparent that evidence of such an attitude or condition of mind on the part of the publisher is not necessary to support the award of punitive damages against him.

In the appropriate case and when supported by the evidence, the trial court should go directly to the meat in the coconut and after definition and explanation of punitive damages instruct the jury to the effect that if it finds from the evidence, including the character of the publication itself, that the defendant was motivated by ill will, hostility or evil intention to defame and injure or that the defendant acted with willful, wanton or reckless disregard for the rights of the plaintiff, it should award punitive damages against the defendant.

The problem of clear and concise explanation to the jury which confronts the trial judge under the present state of the law is pointed up in this case by the concern which the learned trial judge here manifested.

---

**Footnotes**

1⚏ F.S. Sec. 770.01, F.S.A. provides: "**HN2**⚏ Before any civil action is brought for publication, in a newspaper or periodical, of a libel, the plaintiff shall, at least five days before instituting such action, serve notice in writing on defendant, specifying the article, and the statements therein, which he alleges to be false and defamatory."

2⚏ F.S. Sec. 770.02, F.S.A. provides: "**HN3**⚏ If it appears upon the trial that said article was published in good faith, that its falsity was due to an honest mistake of the facts, and that there were reasonable grounds for believing that the statements in said article were true, and that within ten days after the service of said notice a full and fair correction, apology and retraction was published in the same editions or corresponding issues of the newspaper or periodical in which said article appeared, and in as conspicuous place and type as was said original article, then the plaintiff in such case shall recover only actual damages."

3⚏ Brown was not "awaiting trial" but was "awaiting" grand jury consideration.

4⚏ In the instant case the trial Court actually held the defamation to be actionable per se and so charged the jury.

5⚏ Libel in this regard has an identical analogy in the field of negligence and of fraud.

---

 LexisNexis

About
Privacy Policy

Cookie Policy
Terms & Conditions

RELX™
Copyright © 2023 LexisNexis

191

Byrd v. Hustler Magazine, 433 So. 2d 593, 5!

Search: Everything

Client: -None-

Folders    History    Help    More

### Byrd v. Hustler Magazine, 433 So. 2d 593

**Copy Citation**

District Court of Appeal of Florida, Fourth District

June 8, 1983; Rehearing Denied July 13, 1983.

No. 81-2410.

**Reporter**

**433 So. 2d 593 \*** | [1983 Fla. App. LEXIS 20083 \*\*](#)

Julian BYRD, Appellant/Cross Appellee, v. HUSTLER MAGAZINE, INC., a foreign corporation, Appellee/Cross Appellant.

## Core Terms

picture, caption, photograph, advertising, magazines, libel, false impression, defamatory, retouched, headline

## Case Summary

**Procedural Posture**

Appellant professional model received a jury award in his claim that appellee magazine publisher defamed him and invaded his privacy by retouching a photograph that he had posed for and then printing the retouched photograph in which he appeared to be making an obscene gesture. Appellant and appellee both challenged the judgment entered on the verdict.

**Overview**

Appellant professional model posed for a cigarette advertising campaign. The photograph was retouched and reprinted in appellee magazine publisher's magazine. When printed by appellee, the retouched photo bore the caption stating that it had been changed from its original by a magazine reader. Appellant claimed that the effect of retouching the photograph was to make it appear that he was making an obscene gesture. He filed a suit for libel and invasion of privacy, alleging in both counts, that the retouched picture defamed him by creating the false impression that he posed for the picture as it appeared. Appellee contended that the picture and caption, taken together, did not convey a false impression. The court reversed with directions to enter a judgment for appellee. The court reasoned that when the publication was considered in its entirety, taking into account both the picture and its caption, it was clear that the picture had been retouched, and that it was not reasonable to infer that appellant had posed for the picture. Taken together, the photograph and caption were not defamatory.

**Outcome**

The judgment of defamation in favor of appellant professional model was reversed on appellee magazine publisher's cross appeal because when viewed in its entirety, the caption clarified the meaning of the photograph, and the two taken together were not false nor defamatory. As the privacy claim was based on the same facts, that claim failed as well. The case was remanded for entry of judgment in favor of appellee.

## ▼ LexisNexis® Headnotes

Torts > [Intentional Torts ▾](#) > [Defamation ▾](#) > [General Overview ▾](#)

**HN1** **Intentional Torts, Defamation**

Defamation (libel and slander) may generally be defined as the unprivileged publication of false statements which naturally and proximately result in injury to another. 🔍 [More like this Headnote](#)

*Shepardize®* - [Narrow by this Headnote (20)](#)     3

Civil Procedure > ... > Defenses, Demurrers & Objections ▾ > Motions to Dismiss ▾ > Failure to State Claim ▾

Criminal Law & Procedure > Juries & Jurors ▾ > Province of Court & Jury ▾ > Sentencing Issues ▾

Torts > Intentional Torts ▾ > Defamation ▾ > Procedural Matters ▾

View more legal topics

**HN2** ⬇  **Motions to Dismiss, Failure to State Claim**

To evaluate the contention that a false statement was made, the court must employ three fundamental principles of libel law. First, a publication must be considered in its totality. The court must consider all the words used, not merely a particular phrase or sentence. The second and third principles involve the trial court's "prominent function" in determining whether a libel case should be submitted to a jury. Where the court finds that a communication could not possibly bear a defamatory or harmful effect, the court is justified in either dismissing the complaint for failure to state a cause of action or in granting a directed verdict at the proof stage. A correlative principle is that the trial court must evaluate the publication, not by extremes, but as the common mind would naturally understand it. In other words, the statement should be considered in its natural sense without a forced or strained construction. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (18)       1

---

**Counsel:** [**1] DiGiulian, Spellacy & DiChiara, Fort Lauderdale, and Larry Klein, West Palm Beach, for appellant/cross appellee.

Larry S. Stewart ▾ and Ellen C. Freidin ▾ of Floyd, Pearson, Stewart, Richman, Greer & Weil, P.A. ▾, Miami, for appellee/cross appellant.

**Judges:** Before HURLEY ▾, Judge. DOWNEY ▾ and ANSTEAD ▾, JJ., concur.

**Opinion by:** HURLEY ▾

## Opinion

**[*594]** HURLEY ▾, Judge.

The pivotal question in this libel case is whether a picture and its caption must be viewed as a composite to determine if the publication is defamatory. We answer in the affirmative and, because the composite is neither false nor defamatory, we reverse.

Julian Byrd, a professional model, posed for a Viceroy cigarette advertising campaign. The resulting photograph, which was used as part of a printed advertisement, depicted Mr. Byrd dressed in informal outdoor wear making the famous "V for victory" sign. Hustler magazine retouched and reprinted the photograph in its January 1978 edition. In the Hustler version, one of Mr. Byrd's fingers was air-brushed out. Thus, it gave the impression that Mr. Byrd was making an obscene gesture. The following caption appeared directly beneath the picture: "*Up Your Ad* When you saw this [**2] ad in magazines or on billboards, you might remember having seen this gentleman with two fingers -- rather than one -- raised in front of his face. But the reader who sent us this couldn't resist the temptation to change the picture. We can't blame him -- this is probably what the cigarette companies are saying to Americans."

Mr. Byrd sued Hustler for libel and invasion of privacy. The libel count alleged that the picture defamed Mr. Byrd by creating the false impression that he posed for the picture as it appeared in Hustler. Similarly, the invasion of privacy count alleged portrayal in a false light, *i.e.,* Mr. Byrd contended that the publication gave the false impression that he posed for the picture as it appeared in Hustler. In support of these allegations, Mr. Byrd testified that the publication injured his professional reputation. He explained that he purposefully cultivated a conservative, wholesome image in order to be attractive to certain advertisers. Additionally, he offered expert testimony to indicate that these advertisers would not hire the "rebellious... anti-establishment kind of character" portrayed in the magazine.

Hustler defended on two grounds. [**3] First, it contended that the picture and caption, taken together, did not convey a false impression. Second, it asserted that the publication was a constitutionally privileged expression of opinion. 1⬆ To demonstrate the societal benefits from such protection, Hustler called a health economics expert who testified that only eight national magazines are willing to publish anti-smoking

---

The case was submitted to a jury which returned a verdict for Mr. Byrd in the amount of $ 10,000. The case is now before the court because of an appeal by Mr. Byrd and a cross appeal by Hustler. In light of our resolution of the cross appeal, we need not address the various errors asserted by Mr. Byrd.**HN1**⬆

**[*595]** "Defamation [**4] (libel and slander) may generally be defined as the unprivileged publication of false statements which naturally and proximately result in injury to another." *Wolfson v. Kirk, 273 So.2d 774, 776 (Fla. 4th DCA 1973).* See also *Cooper v. Miami Herald Publishing Co., 159 Fla. 296, 31 So.2d 382, 384 (Fla.1947).* A false statement of fact is the *sine qua non* for recovery in a defamation action.

The false statement of fact in this case, according to Mr. Byrd, is the implication that he posed for the picture as it appeared in Hustler. To evaluate this contention, we must employ three fundamental principles of libel law. First, a publication must be considered in its totality. "The court must consider all the words used, not merely a particular phrase or sentence." *Information Control Corp. v. Genesis One Computer Corp., 611 F.2d 781, 784 (9th Cir. 1980).* When words and pictures are presented together, each is an important element of what, *in toto,* constitutes the publication. Articles are to be considered with their illustrations; pictures are to be viewed with their captions; stories are to be read with their headlines. *Cooper v. Miami Herald Publishing Co., supra,* [**5] (headline and article); *O'Neal v. Tribune Co., 176 So.2d 535 (Fla. 2d DCA 1965)* (headline and article); *Jacova v. Southern Radio & Television Co., 83 So.2d 34 (Fla.1955),* (TV news-film with voice-over); *Harrison v.*

---

194

*Washington Post Co., 391 A.2d 781 (D.C.1978)* (TV news film with voice-over); *Bourgeau v. New York News,* 5 Med.L.Rprt. 1799 (N.Y.Sup.Ct.1979) (photograph, caption and article); *Shapiro v. Newsday,* 5 Med.L.Rprt. 2607 (N.Y.Sup.Ct.1980) (photograph, headline and article); *Roskos v. New York News,* 4 Med.L.Rprt. 2148 (N.Y.Sup.Ct.1979) (photograph, headline and article).

The second and third principles involve the trial court's "prominent function," *Wolfson v. Kirk, supra, at 778,* in determining whether a libel case should be submitted to a jury. "Where the court finds that a communication could not possibly have a defamatory or harmful effect, the court is justified in either dismissing the complaint for failure to state a cause of action or in granting a directed verdict at the proof stage." *Ibid.* A correlative principle is that the trial court must evaluate the publication, not by "extremes, but as the common mind would naturally understand [**6] it." *McCormick v. Miami Herald Publishing Co., 139 So.2d 197, 200 (Fla. 2d DCA 1962).* In other words, the statement should be considered in its natural sense without a forced or strained construction.

In the instant case, Mr. Byrd's picture was retouched in a manner which, but for the caption, would have conveyed the impression that he posed for the photograph. The caption, however, plainly indicates that the photograph has been retouched. Viewing the photograph and its caption as a composite, we hold that the common mind could reach but one conclusion: Mr. Byrd did not pose for the picture as it was published in Hustler. The composite does not convey a false impression.

Mr. Byrd's contention at trial was not that the retouching of the picture itself was in any way defamatory, but that the retouching conveyed the false impression that he had posed for the picture and thereby endorsed the view expressed in the publication. We find, to the contrary, that the caption sufficiently clarified the meaning of the picture so that the two, taken together, formed a publication that was neither false nor defamatory. Furthermore, because the invasion of privacy claim was based on [**7] the same factual allegations and legal argument, it too must be rejected. Accordingly, the judgment is reversed and the cause is remanded with instructions to enter a judgment in favor of Hustler Magazine, Inc.

DOWNEY ▾ and ANSTEAD ▾, JJ., concur.

---

**Footnotes**

 Since the case can be resolved on the first defense, we have not considered the second.

---



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX ™

Copyright © 2023 LexisNexis.



# Cape Publications, Inc. v. Adams, 336 So. 2d 1197

**Copy Citation**

Court of Appeal of Florida, Fourth District

August 27, 1976

Nos. 74-1731, 74-1760

**Reporter**

336 So. 2d 1197 * | 1976 Fla. App. LEXIS 15411 **

CAPE PUBLICATIONS, INC. et al., Appellants, v. Donald F. ADAMS, Appellee. CAPE PUBLICATIONS, INC., Appellant, v. Donald F. ADAMS et al., Appellees

**Subsequent History:** [**1] Rehearing Denied October 1, 1976.

## Core Terms

articles, libel, contractor

## Case Summary

**Procedural Posture**

Appellant newspaper and its employees sought review of an order of the trial court (Florida) that awarded, pursuant to a jury verdict, appellee public official compensatory and punitive damages in appellee's libel action, which arose out of articles written and published by appellants.

**Overview**

Appellee public official sued appellant newspaper and its employee for libel and for conspiracy to libel. The jury returned a verdict on the libel count for compensatory and punitive damages against appellants. Appellee was a public official, therefore, in order for appellee to recover it was essential that he prove actual malice on the part of appellants with convincing clarity. Actual malice meant that the material was published with knowledge that it was false or with reckless disregard of whether it was false or not. The court noted that appellants should have been aware of the fact that there were issues with credibility of witnesses and statements before writing and publishing the articles that imputed criminal conduct to appellee. The editorial staff of the newspaper, after giving full consideration to the content and the possible libelous implications arising therefrom, decided to print the articles. The judgment was affirmed because there was clear and convincing support for a finding that appellants exhibited a reckless disregard of whether the charges were true or false.

**Outcome**

The jury verdict returned in favor of appellee public official in a libel action instituted against appellant newspaper and its employees was affirmed because the evidence showed that appellants evidenced a clear and convincing disregard for the truth when publishing an article accusing appellee of criminal conduct.

## ▼ LexisNexis® Headnotes

Torts > Intentional Torts ▾ > Defamation ▾ > Libel ▾

**HN1** ⬇ **Defamation, Libel**

Actual malice means that the material was published with knowledge that it was false or with reckless disregard of whether it was false or not. 🔍 More like this Headnote

196

**Counsel:** S. Lindsey Holland, Jr., of Crofton, Holland, Starling, Harris & Severs, P.A., Melbourne, for Appellants.

Larry Klein and Cone, Wagner, Nugent, Johnson & McKeown, P.A., West Palm Beach, for Appellee-Donald F. Adams.

**Judges:** Downey ⏷, J. Walden ⏷, J., and James A., McCauley ⏷, Associate Judge, concur.

**Opinion by:** DOWNEY ⏷

## Opinion

**[*1198]**  Appellee (Donald Adams) sued appellants in one count for libel and several other defendants who are not involved in this appeal (Sardella, Stone, and St. Pierre) in a second count for conspiracy to libel. The trial court granted a directed verdict for all the defendants as to the conspiracy count. The jury returned a verdict on the libel count for $114,000 compensatory damages against all the appellants and $100,000 punitive damages solely against appellant, Cape Publications, Inc.

Appellee was the Building Official of the City of Vero Beach, Florida and Indian River County. Appellant Newcome was a reporter and bureau chief for a Brevard County newspaper named Today, which was owned by the predecessor of appellant Cape Publications, Inc. Appellant Buddy Baker was the managing editor of Today. In the course of his **[**2]** employment Newcome wrote several articles about appellee and the conduct of his office. Baker approved the articles, and Cape Publications' predecessor published them. Two of the articles forming the primary basis for the alleged libel essentially charge appellee with: a) soliciting a construction supervisor (Bernard) for a $1000 bribe and attempting to make Bernard return to appellee in cash $150 which appellee had paid by check for three mirrors; and b) attempting to persuade the Mayor of Indian River Shores to pay appellee $2000 (plus $400 for appellee's secretary) annually for work for which appellee had already been compensated. The article involving Bernard set forth that both Bernard and appellee denied either of the wrongful acts. But it nevertheless stated that Wilcox, Bernard's supervisor, had told Today that Bernard had in fact reported the two solicitations to Wilcox. The article involving Miller, the Mayor of Indian River Shores, set forth that Miller had stated that appellee had requested the improper payments from him. Miller testified at trial that he had denied the statements attributed to him and had advised Newcome of the true facts by furnishing copies **[**3]** of the town's records or telling Newcome where he could obtain them.

Thus, we have a newspaper and its employees charged with libelling a public official. All parties agree that appellee is a public official and that the rule announced in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), regarding the necessary quality of proof applies in this case. Therefore, in order for appellee to recover it was essential that he prove actual malice on the part of appellants with convincing clarity. **HN1**⏷ "Actual malice" in the New York Times sense means that the material was published with knowledge that it was false or with reckless disregard of whether it was false or not. This court in the recent case of *Palm Beach Newspapers, Inc. v. Early*, 334 So.2d 50 (Fla.4th DCA 1976), noted that the New York Times case stated:

> "'The constitutional guarantees require, we think, a federal rule that prohibits a  **[*1199]**  public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice" - that is, with knowledge that it was false or with reckless disregard **[**4]** of whether it was false or not.' (376 U.S. at 279-80, 84 S. Ct. at 726)"

Adverting now to the evidence adduced at trial, which we must view in the light most favorable to the verdict, **1**⏶ it is our considered opinion after reviewing the entire record, as we must on appeal in a libel case involving a public official, **2**⏶ that the proof of actual malice was more than adequate to meet the burden of convincing clarity.

The evidence, in brief, shows the following things. Newcome, St. Pierre, and Sardella were close friends. St. Pierre, a contractor, and appellee had a running feud stemming from appellee's having St. Pierre arrested for violating a stop work order on a construction job. Sardella and Newcome knew this. St. Pierre **[**5]** told Newcome that a contractor named Wilcox had told him and Sardella that appellee had solicited a bribe from Wilcox's supervisor. Newcome talked to Wilcox about this statement and on cross examination Wilcox admitted that his statement was evasive about the entire matter. Wilcox testified that he had never made such a statement to St. Pierre, Sardella, or Newcome, and that Bernard had never made any such statement to him. Newcome then talked to Bernard, who denied that appellee had solicited a bribe or that he had ever told Wilcox of such an event.

Sardella told Newcome that Wilcox had told him that appellee had purchased three mirrors from Wilcox on a construction site with a $150 check and that later appellee approached Wilcox's supervisor, Bernard, and demanded that the $150 be returned to him in cash. Wilcox denied that Bernard ever told him of this demand and denied he ever made any such statement to Sardella. Newcome contacted Bernard and the latter denied that any such demand had been made or that he had ever so advised Wilcox.

Sardella told Newcome that Miller had stated that appellee asked Miller, the Mayor of Indian River Shores, to personally pay him $2,000 per year **[**6]** and his secretary $400 for work they were doing for Indian River Shores for which work they had already received compensation. Miller denied making any such statement and said he had told Newcome that there had been open discussions between appellee and Miller and the Town Council of Indian River Shores relative to compensation for appellee for the extra work appellee had been doing for the town. Miller either gave Newcome copies of the relevant files or told him where they could be obtained.

Newcome contacted Barclay Henderson, Executive Director of the Florida East Coast Chapter of the General Contractors of America, to see if his organization might take some action against appellee. Newcome met with Henderson and gave him information about appellee. Henderson then conducted an investigation and met with various contractors and appellee. Thereafter, Henderson advised Newcome that he found no basis for any action against appellee and advised Newcome not to print any articles on the matter.

Sardella introduced Newcome to another contractor named DiBassie. During a meeting with DiBassie at which Newcome was present, DiBassie did not accuse appellee of any wrongdoing. He testified **[**7]** at trial that Newcome and Sardella said they were going to get appellee and that they were going to put him in jail.

The jury could properly conclude that every time Newcome went to the sources of the information concerning alleged wrongdoing (Bernard and

Miller, the only persons with personal knowledge of the facts), they told Newcome the statements were untrue. This did not happen with just one of the **[*1200]** events but with all three! In addition, Newcome knew his source St. Pierre had a feud going with appellee, so he was on notice as to his questionable credibility. Finally, DiBassie, who, according to Today, accused appellee of improper conduct, denied making any accusation. On the other hand he testified Newcome and Sardella said they were going to get appellee and put him in jail.

In the face of all those red flags flying, Newcome wrote the articles complained of, imputing criminal conduct to appellee. The editorial staff of the newspaper, after giving full consideration to their content and the possible libellous implications arising therefrom, decided to print the articles.

As we view the credible evidence which the jury had before it, there is clear and convincing [**8] support for a finding that appellants exhibited a reckless disregard of whether the charges were true or false, i.e., that they published the articles with a high degree of awareness of the probable falsity of the statements involved ( *Garrison v. Louisiana*, 379 U.S. 64, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964)) and with serious doubt as to the truth of the publication ( *St. Amant v. Thompson*, 390 U.S. 727, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968)).

Appellants posed eleven points on appeal. We have given each serious consideration and find that they fail to demonstrate reversible error.

Accordingly, the judgment appealed from in each of these appeals is affirmed.

WALDEN ▾, J., and McCAULEY ▾, JAMES A. ▾, Associate Judge, concur.

---

**Footnotes**

1 ⬆ *Alioto v. Cowles Communications, Inc.*, 519 F.2d 777, 780 (9th Cir. 1975), cert. denied 423 U.S. 930, 96 S. Ct. 280, 46 L. Ed. 2d 259; *Mahnke v. Northwest Publications, Inc.*, 280 Minn. 328, 160 N.W.2d 1, 3-4 (1968).

2 ⬆ *New York Times Co. v. Sullivan, supra.*

---



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

198



Depp v. Heard, 108 Va. Cir. 382

Copy Citation

Circuit Court of Fairfax County, Virginia

August 17, 2021, Decided

Case No. CL-2019-2911

**Reporter**

108 Va. Cir. 382 * | 2021 Va. Cir. LEXIS 173 **

John C. Depp, II v. Amber Laura Heard

**Prior History:** Depp v. Heard, 2019 Va. Cir. LEXIS 269, 102 Va. Cir. 324 (July 25, 2019)

## Core Terms

privity, collateral estoppel, mutuality, res judicata, parties, comity, defamation, litigated, nonmutual, libel, plea in bar, preclusive, courts, public policy, cases, foreign judgment, occurrence, rights, cause of action, relitigating, judgments

---

### Case Summary

#### Overview

HOLDINGS: [1]-In plaintiff's defamation action against defendant for statements defendant made in a newspaper's op-ed that plaintiff believed falsely characterized him as a domestic abuser, the court overruled defendant's supplemental plea in bar to dismiss the complaint based on collateral estoppel due to plaintiff's prior defamation lawsuit against a United Kingdom (UK) newspaper for publication of a column referring to plaintiff as a wife beater because defendant and the UK newspaper were not in privity, as the statements being defended in the UK case were inherently different than the statements published by defendant. In addition, defendant and the UK newspaper were not mutual, defendant did not persuasively present an applicable exception, and defendant was not a party to that action.

#### Outcome

Supplemental plea in bar overruled.

---

▼  LexisNexis® Headnotes

Civil Procedure  >  ...  >  Responses ▼  >  Defenses, Demurrers & Objections ▼  >  Affirmative Defenses ▼
Evidence >  Burdens of Proof ▼  >  Allocation ▼

**HN1**⬇  **Defenses, Demurrers & Objections, Affirmative Defenses**

A plea in bar is a defensive pleading alleging a single issue of facts or circumstances, which if proven, constitutes a complete bar to the plaintiff's claims. Such pleading does not address the merits of the issues raised by the bill of complaint. The burden of establishing the grounds of a defense in a plea in bar rests with the party raising the defense. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure  >  ...  >  Preclusion of Judgments ▼  >  Estoppel ▼  >  📄 Collateral Estoppel ▼

**HN2**⬇  **Estoppel, Collateral Estoppel**

Collateral estoppel is the preclusive effect impacting a subsequent action based on a collateral and different cause of action. In the subsequent action, the parties to the first action and their privies are precluded from litigating any issue of fact actually litigated and essential to a valid and final personal judgment in the first action. Accordingly, the following requirements must be met for the doctrine of collateral estoppel to apply: (1) the parties to the two proceedings must be the same; (2) the issue of fact sought to be litigated must have been actually litigated in the prior proceeding; (3) the issue of fact must have been essential to the prior judgment: and (4) the prior proceeding must have resulted in a valid, final judgment against the party against whom the doctrine is sought to be applied. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure  >  Judgments ▼  >  Preclusion of Judgments ▼  >  📄 Res Judicata ▼

**HN3**⬇  **Preclusion of Judgments, Res Judicata**

Ordinarily, for estoppel to be effective there must be privity or mutuality amongst the parties. Accordingly, a litigant is generally prevented from invoking the preclusive force of a judgment unless he would have been bound had the prior litigation of the issue reached the opposite result. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure  >  ...  >  Preclusion of Judgments ▼  >  Estoppel ▼  >  📄 Collateral Estoppel ▼
View more legal topics

**HN4**⬇  **Estoppel, Collateral Estoppel**

Collateral estoppel precludes a party or a party's privies from relitigating a factual issue determined in the prior litigation, There is no single fixed definition of privity for purposes of res judicata or collateral estoppel. For privity to exist, Virginia law holds that a party must be so identical in interest with another that he represents the same legal right. Whether privity exists is determined by a careful review of the circumstances of each case. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure  >  ...  >  Preclusion of Judgments ▼  >  Estoppel ▼  >  📄 Collateral Estoppel ▼
View more legal topics

**HN5**⬇  **Estoppel, Collateral Estoppel**

The Virginia Supreme Court has held privity, in the context of collateral estoppel or res judicata, does not embrace relationships between persons or entities, but rather it deals with a person's relationship to the subject matter of the litigation. The Court also articulated that Virginia narrowly construes privity. While the Virginia Supreme Court did

200

note in Lane that privity deals with a person's relationship to the subject matter of the case, the Court has not expounded the constraints of such statement. Consequently, a court looks to the legal rights and interests of the parties and whether they are identical. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > ... > Preclusion of Judgments ▾ > Estoppel ▾ > 📄 Collateral Estoppel ▾

**HN6**⬇ **Estoppel, Collateral Estoppel**

The Virginia Supreme Court made a considered, unanimous decision to resist the so-called modern trend and not to abrogate the mutuality requirement. Therefore, Virginia upholds the mutuality requirement, thus limiting the influence of an initial adjudication by requiring that to be effective the estoppel of the judgment must be mutual. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > ... > Preclusion of Judgments ▾ > Estoppel ▾ > 📄 Collateral Estoppel ▾

**HN7**⬇ **Estoppel, Collateral Estoppel**

Although mutuality is typically required for issue preclusion, few exceptions to this rule exist. There are two kinds of nonmutual collateral estoppel. One kind, nonmutual defensive collateral estoppel, occurs when the defendant, a stranger to the prior proceeding, attempts to preclude the plaintiff, a party to the former proceeding, from relitigating an issue plaintiff lost in the earlier case. The second kind, nonmutual offensive collateral estoppel, occurs when a plaintiff, who was a stranger to the former litigation, seeks to preclude the defendant, a party to the prior action, from relitigating an issue defendant lost in the prior case. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > ... > Preclusion of Judgments ▾ > Estoppel ▾ > 📄 Collateral Estoppel ▾

**HN8**⬇ **Estoppel, Collateral Estoppel**

Mutuality of parties need not he mechanistically applied when it is compelling clear that the party against whom collateral estoppel is asserted has fully and fairly litigated and lost an issue of fact which was essential to the prior judgment. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Evidence > Admissibility ▾ > Conduct Evidence ▾ > Prior Acts, Crimes & Wrongs ▾

**HN9**⬇ **Conduct Evidence, Prior Acts, Crimes & Wrongs**

Typically, criminal convictions are not admissible in subsequent civil actions for the truth of the facts on which it was rendered, partly because there is a lack of mutuality and partly because the procedures of the two trials are different. Further, the Virginia Supreme Court appeared to narrow the Eagle Star exception in Godbolt to apply when a plaintiff attempts to recover for a harm that is the direct result of his or her own criminal conduct, and the dispositive issue in the civil action is the precise issue that the criminal conviction addressed. This exception exists because courts will not assist the participant in an illegal act who seeks to profit from the act's commission. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > Discovery & Disclosure ▾ > Disclosure ▾ > Mandatory Disclosures ▾

**HN10**⬇ **Disclosure, Mandatory Disclosures**

Third-party disclosures may be ordered only when the documents sought are likely to support the case of the applicant or adversely affect the case of one of the parties and disclosure is necessary in order to dispose fairly of the claim. Senior Courts Act 1981 c. 54, § 34; CPR 31.17. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > ... > Preclusion of Judgments ▾ > Estoppel ▾ > 📄 Collateral Estoppel ▾

View more legal topics

**HN11** ⬇ **Estoppel, Collateral Estoppel**

Res judicata encompasses four preclusive effects: merger, bar, direct estoppel, and collateral estoppel. Res judicata-bar is commonly referred to as simply res judicata and works by barring the re-litigation of a same cause of action, or any part thereof which could have been litigated between the same parties and their privies. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Judgments ▾ > Preclusion of Judgments ▾ > 📄 Res Judicata ▾

**HN12** ⬇ **Preclusion of Judgments, Res Judicata**

Essentially, res judicata applies if: (1) The first case involves a final judgment on the merits; (2) The claim arises from the same transaction or occurrence, unless such claim involves property damage or personal injury; and (3) The parties are the same or in privity. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Judgments ▾ > Preclusion of Judgments ▾ > 📄 Res Judicata ▾
Evidence > Burdens of Proof ▾ > Preponderance of Evidence ▾

**HN13** ⬇ **Preclusion of Judgments, Res Judicata**

Under the common law doctrine of res judicata, a final judgment on the merits of a claim precludes the parties from further litigation based on that claim. Such doctrine is designed to protect litigants from duplicative lawsuits and ensure the finality of judgments. Res judicata applies unless specifically abrogated by statute. The party asserting the defense of res judicata must prove by a preponderance of the evidence that the claim should be precluded by the prior judgment. Further, res judicata bars subsequent litigation for the same cause of action or any part thereof which could have been litigated in the original case. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Judgments ▾ > Preclusion of Judgments ▾ > 📄 Res Judicata ▾

**HN14** ⬇ **Preclusion of Judgments, Res Judicata**

Res judicata requires that the claim in the first litigation and the second litigation arise from the same transaction or occurrence. Va. R. Sup. Ct. 1:6. The elements of a defamation claim include: (1) publication of (2) an actionable statement with (3) the requisite intent. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Contracts Law > Contract Interpretation ▾ > 📄 Parol Evidence ▾ > Custom & Usage ▾

**HN15** ⬇ **Parol Evidence, Custom & Usage**

Courts consider whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage. No single factor is dispositive. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ▾ > Defamation ▾ > Elements ▾

**HN16** ⬇ **Defamation, Elements**

The specific statements uttered in defamation cases are incredibly important. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Governments > Courts ▾ > Judicial Comity ▾
International Law > ... > Comity Doctrine ▾ > Comity Doctrine Procedures ▾ > Discretion Regarding Procedures ▾

202

**HN17** ⬇ **Courts, Judicial Comity**

The Virginia Supreme Court has recognized the doctrine of comity. Comity is defined as the recognition and effect which a forum jurisdiction gives within its territory to the legislative, executive, and judicial acts of a foreign jurisdiction, giving due regard to a number of factors, including: duty; mutual interests in reciprocity; courtesy; convenience; the public policy and preservation of valued morals in the forum; the rights of the forum's citizens and those under the protection of its laws; and the factual circumstances surrounding each claim for its recognition. 🔍

*More like this Headnote*

*Shepardize® - Narrow by this Headnote (0)*

Business & Corporate Compliance > ... > Judgments ▾ > Enforcement & Execution ▾ > 📄 Foreign Judgments ▾
International Law > ... > Comity Doctrine ▾ > Comity Doctrine Procedures ▾ > Discretion Regarding Procedures ▾
Governments > Courts ▾ > Judicial Comity ▾

**HN18** ⬇ **Business & Corporate Compliance, Foreign Judgments**

When determining whether to afford comity to a foreign judgment, trial courts must consider the following four factors: (1) Did the foreign court have personal and subject matter jurisdiction? (2) Are the procedural and substantive law applied by the foreign court reasonably comparable to that of Virginia? (3) Was the foreign court's order falsely or fraudulently obtained? (4) Is enforcement of the foreign court's order contrary to the public policy of Virginia? Put another way, Virginia courts should grant comity to any order of a foreign court of competent jurisdiction, entered in accordance with the procedural and substantive law prevailing in its judicatory domain, when that law, in terms of moral standards, societal values, personal rights, and public policy, is reasonably comparable to that of Virginia. However, comity is not a matter of obligation. It is a matter of favor or courtesy. 🔍 *More like this Headnote*

*Shepardize® - Narrow by this Headnote (0)*

Business & Corporate Compliance > ... > Judgments ▾ > Enforcement & Execution ▾ > 📄 Foreign Judgments ▾
Governments > Courts ▾ > Authority to Adjudicate ▾

**HN19** ⬇ **Business & Corporate Compliance, Foreign Judgments**

Virginia courts should not recognize a foreign decree which was falsely or fraudulently obtained or one which is contrary to the morals or public policy of this State or that would prejudice Virginia's own rights or the rights of its citizens. 🔍 *More like this Headnote*

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Trials ▾ > Jury Trials ▾ > Right to Jury Trial ▾

**HN20** ⬇ **Jury Trials, Right to Jury Trial**

In Virginia, plaintiffs are entitled to a trial by jury if so demanded. However, such right is not available in the United Kingdom. Instead, in cases of libel, judgments are based on the reasoned decision of one judge, as opposed to a bald verdict of a jury. 🔍 *More like this Headnote*

*Shepardize® - Narrow by this Headnote (0)*

Governments > Courts ▾ > Judicial Comity ▾

**HN21** ⬇ **Courts, Judicial Comity**

Comity is not a matter of obligation, but rather a matter of courtesy. 🔍 *More like this Headnote*

*Shepardize® - Narrow by this Headnote (0)*

Business & Corporate Compliance > ... > Judgments ▾ > Enforcement & Execution ▾ > 📄 Foreign Judgments ▾
Constitutional Law > Relations Among Governments ▾ > Full Faith & Credit ▾
Civil Procedure > ... > Preclusion of Judgments ▾ > Full Faith & Credit ▾ > Enforcement of Judgments ▾
Evidence > Burdens of Proof ▾ > Allocation ▾

**HN22** ⬇ **Business & Corporate Compliance, Foreign Judgments**

The Uniform Foreign-Country Money Judgments Recognition Act (UFCMJRA) provides that the Commonwealth shall

recognize certain foreign judgments of other countries, Va. Code Ann. § 8.01-465.13:3. The foreign judgments may be for a grant or denial for recovery of a sum of money, Va. Code Ann. § 8.01-465.13:2. The party seeking recognition of the foreign judgment bears the burden of establishing that the UFCMJRA applies. However, if a party resists the recognition of the foreign judgment, that party must show that a ground for nonrecognition exists. § 8.01-465.13:3. One ground of nonrecognition is based on whether the cause of action on which the judgment is based is repugnant to the public policy of the Commonwealth. If the court finds the foreign judgment is entitled to recognition, such recognition is conclusive between the parties to the same extent as the judgment of a sister state entitled to full faith and credit in the Commonwealth would be conclusive. § 8.01-465.13-6. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

**Counsel:**  [**1] Elaine Charlson Bredehoft ▾, Esq., Adam S. Nadelhoft, Esq, Clarissa K. Pintado ▾, Esq., David E. Murphy ▾, Esq., CHARLSON BREDEHOFT COHEN & BROWN, P.C. Reston, VA.

J. Benjamin Rotten born, Esq., Joshua R. Treece ▾, Esq., Elaine D. McCafferty ▾, Esq., WOODS ROGERS, PLC ▾, Roanoke, VA.

Benjamin G. Chew ▾, Esq., Andrew C. Crawford ▾, Esq., BROWN RUDNICK, LLP ▾, Washington, DC.

Camille M. Vasquez ▾, Esq., BROWN RUDNICK, LLP ▾, Irvine, CA.

Jessica N. Meyers ▾, Esq., BROWN RUDNICK, LLP ▾, New York, NY.

**Judges:** Penney S. Azcarate ▾, Chief Judge.

**Opinion by:** Penney S. Azcarate ▾

## Opinion

 **[\*382]**  This came before the Court on July 22, 2021, for a hearing on Defendant Amber Laura Heard's Supplemental Plea in Bar to Plaintiff John C. Depp II's Complaint, Having taken the matter under advisement and after reviewing the memoranda of law and arguments submitted by Counsel, the Court issues the following opinion overruling Defendant's Supplemental Plea in Bar,

BACKGROUND

In the underlying action for defamation. Plaintiff John C. Depp II ("Plaintiff") is suing Defendant Amber Laura Heard ("Defendant") for statements Defendant made in an op-ed published by *The Washington Post* in 2018, Plaintiff believing that Defendant's statements falsely characterized him as a domestic abuser, [**2]  filed his defamation claim on March 1, 2019. Prior to the commencement of Plaintiff's suit in Fairfax County Circuit Court, Plaintiff brought suit in the United Kingdom ("UK") against News Group Newspapers, the publisher of *The Sun* newspaper, for claims of defamation regarding *The Sun's* publication of a 2018 column referring to Plaintiff as a "wife beater". On November 2, 2020, the Judge in the UK litigation ruled against Plaintiff, finding *The Sun's* statements were substantially true and thus a defense to defamation. On March 25, 2021, the UK Court of Appeal upheld the trial court's ruling against Plaintiff and denied his application for permission to appeal. Plaintiff's litigation in the UK against *The Sun* became final on  **[\*383]**  April 6, 2021, and Defendant subsequently moved for leave to amend her plea in bar to dismiss Plaintiff's Complaint based on collateral estoppel, res judicata, comity, and the Uniform Foreign-Country Money Judgments Recognition Act.

Ultimately, Defendant argues the UK's finding that Plaintiff is a "wife beater" should be given preclusive effect in this Court given Plaintiff's previous opportunity to fully and fairly adjudicate such issue.

ANALYSIS

I. LEGAL STANDARD [**3]

204

*HN1* A plea in bar is a defensive pleading alleging a single issue of facts or circumstances, which if proven, constitutes a complete bar to the plaintiff's claims. *Smith v. McLaughlin,* 289 Va. 241, 252, 769 S.E.2d 7 (2015). Such pleading "does not address the merits of the issues raised by the bill of complaint." *Nelms v. Nelms,* 236 Va. 281, 289, 374 S.E.2d 4, 5 Va. Law Rep. 883 (1988). The burden of establishing the grounds of a defense in a plea in bar rests with the party raising the defense. *Cooper Indus., Inc. v. Melendez,* 260 Va. 578, 594-95, 537 S.E.2d 580 (2000).

## II. COLLATERAL ESTOPPEL

*HN2* "Collateral estoppel is the preclusive effect impacting a subsequent action based on a collateral and different cause of action. In the subsequent action, the parties to the first action and their privies are precluded from litigating any issue of fact actually litigated and essential to a valid and final personal judgment in the first action." *Bates v. Devers,* 214 Va. 667, 671, 202 S.E.2d 917 (1974). Accordingly, the following requirements must be met for the doctrine of collateral estoppel to apply:

> (1) the parties to the two proceedings must be the same; (2) the issue of fact sought to be litigated must have been actually litigated in the prior proceeding; (3) the issue of fact must have been essential to the prior judgment; and (4) the prior proceeding must have resulted in a valid, final judgment against the party against whom the doctrine is sought to [**4] be applied.

*Glasco v. Ballard,* 249 Va. 61, 64, 452 S.E.2d 854 (1995).

*HN3* Ordinarily, for estoppel to be effective there must be privity or mutuality amongst the parties. *Nero v. Ferris,* 222 Va. 807, 812, 284 S.E.2d 828 (1981). Accordingly, "a litigant is generally prevented from invoking the preclusive force of a judgment unless he would have been bound had the prior litigation of the issue reached the opposite result." *Id.*

**[*384]** A. Privity

*HN4* As mentioned above, collateral estoppel precludes a party or a party's privies from relitigating a factual issue determined in the prior litigation, *Nero,* 222 Va. at 812. "There is no [single] fixed definition of privity" for purposes of res judicata or collateral estoppel. *See id.* at 813; *Storm v. Nationwide Mut. Ins. Co.,* 199 Va. 130, 134, 97 S.E.2d 759 (1957); *see also State Water Control Bd. v. Smithfield Foods, Inc.,* 261 Va. 209, 214, 542 S.E.2d 766 (2001), For privity to exist, Virginia law holds that a party must be "so identical in interest with another that he represents the same legal right." *Nero,* 222 Va. at 813. Whether privity exists is determined by a careful review of the "circumstances of each case." *Id.*

*HN5* More recently, the Virginia Supreme Court held privity, in the context of collateral estoppel or res judicata, "does not embrace relationships between persons or entities, but rather it deals with a person's relationship to the subject matter of the litigation." *Lane v. Bayview Loan Servicing, LLC,* 297 Va. 645, 656, 831 S.E.2d 709 (2019) (internal citations omitted). The Court also articulated that Virginia narrowly construes privity. [**5] *See id.* (finding that "an attorney does not share the same legal interest as . . . [the attorney's] client merely by virtue of. . . [the attorney's] representation of that client."). *Cf. Nero,* 222 Va. at 813 (finding that an employer and employee were in privity for the purpose of collateral estoppel.) While the Virginia Supreme Court did note in *Lane* that privity deals with a person's relationship to the subject matter of the case, the Court has not expounded the constraints of such statement. *Lane,* 297 Va. at 656, Consequently, this Court looks to the legal rights and interests of the parties and whether they are identical.

Defendant argues she was in privity with *The Sun* because they both had the same interest in the case. However, for privity to exist, Defendant's interest in the case must be *so identical* with *The Sun's* interest such that *The Sun's* representation of its interest is also a representation of Defendant's legal right. *The Sun's* interests were based on whether the statements the newspaper published were false, Defendant's interests relate to whether the statements she published were false. Although the claims are similar in the sense they both relate to claims of abuse by Plaintiff, the statements being defended [**6] in the UK case are inherently different than the statements published by Defendant. Therefore, given Virginia's narrow construction of privity, Defendant and *The Sun* are not in privity.

B. Mutuality

Defendant argues, "[t]he U.S. Supreme Court and the majority of jurisdictions in the United States allow defensive use of nonmutual estoppel." Def.'s Mem. 19. *HN6* However, the Virginia Supreme Court "made a considered, unanimous

decision to resist the so-called "modern trend" and **[*385]** not to abrogate the mutuality requirement." *Selected Risks Ins. Co. v. Dean*, 233 Va. 260, 264, 355 S.E.2d 579, 3 Va. Law Rep. 2345 (1987) (discussing *Norfolk & W. Ry Co. v. Bailey*, 221 Va. 638, 641, 272 S.E.2d 217 (1980), Therefore, Virginia upholds the mutuality requirement, thus "limit[ing] the influence of [an] initial adjudication by requiring that to be effective the estoppel of the judgment must be mutual." *Id.*

**HN7**⬆ Although mutuality is typically required for issue preclusion, few exceptions to this rule exist. *Norfolk & W. Ry. Co. v. Bailey Lumber Co.*, 221 Va. 638, 641, 272 S.E.2d 217 (1980). There are two kinds of nonmutual collateral estoppel. *Id.* One kind, nonmutual defensive collateral estoppel, occurs when "the defendant, a stranger to the prior proceeding, attempts to preclude the plaintiff, a party to the former proceeding, from relitigating an issue plaintiff lost in the earlier case." *Id.* The second kind, nonmutual offensive collateral estoppel, occurs **[**7]** when "a plaintiff, who was a stranger to the former litigation, seeks to preclude the defendant, a party to the prior action, from relitigating an issue defendant lost in the prior case." *Id.* Here, because Defendant was not a party of the UK litigation but seeks to preclude Plaintiff, who was a party of the UK litigation, from relitigating the issue of whether Plaintiff abused Defendant, nonmutual defensive collateral estoppel is sought.

**HN8**⬆ The Court in *Bates* held mutuality of parties need not he "mechanistically applied when it is compelling clear" that the party against whom collateral estoppel is asserted has "fully and fairly litigated and lost an issue of fact which was essential to the prior judgment." *Bates*, 214 Va. at 670 n.7 (refusing to apply collateral estoppel despite the existence of privity between the nonmutual parties because no essential issue was actually litigated in the first case). Defendant appears to rely on this language to assert mutuality is not required when the issue has been fully and fairly litigated in the prior case, Notably, however, the Court in *Bates* held collateral estoppel was not applicable, and the discussion of mutuality was constricted to a single footnote. *Id.*

After the **[**8]** *Bates* case, the Virginia Supreme Court reexamined the issue of mutuality in *Bailey*, noting "a litigant is generally prevented from invoking the preclusive force of a judgment unless he would have been bound had the prior litigation of the issue reached the opposite result." *Bailey*, 221 Va. at 640. *See also Trans Dulles Center, Inc. v. Sharma*, 252 Va. 20,23, 472 S.E.2d 274 (1996). Finally, the Virginia Supreme Court again confirmed the mutuality requirement in *Angstadt v. Atlantic Mut. Ins. Co.*, 249 Va. 444, 447, 457 S.E.2d 86 (1995) (holding nonmutual defensive collateral estoppel was inappropriate when the nonmutual party "would not be bound by the prior litigation had the "opposite result been reached").

Defendant relies heavily on a Virginia Supreme Court case decided in 1927, prior to *Bailey* and *Angstadt*, In *Eagle Star*, Heller sought to recover under a fire insurance policy for damages done to a stock of goods. *Eagle,* **[*386]** Star & British Dominions Ins. Co. v. Heller, 149 Va. 82, 85, 140 S.E. 314 (1927). Prior to such recovery. Heller was convicted for the willful burning of those same goods with the intent to injure his insurer. *Id.*, The Virginia Supreme Court noted, in overturning the trial court's refusal to apply res judicata, that lack of mutuality was not fatal given 'the different rules of evidence and procedure which prevail in civil and criminal cases and the differing degrees of proof required." *Id. at 88*.

However, *Eagle Star* is an "exception **[**9]** to the general rule." *Smith v. New Dixie Lines, Inc.*, 201 Va. 466, 473, 111 S.E.2d 434 (1959). **HN9**⬆ Typically, criminal convictions are not admissible in subsequent civil actions for "the truth of the facts on which it was rendered," partly because there is a lack of mutuality and partly because the '*procedures* of the two trials are different." *Godbolt v. Brawley*, 250 Va. 467, 470, 463 S.E.2d 657 (1995) (emphasis added) (internal citations omitted). Further, the Virginia Supreme Court appeared to narrow the *Eagle Star* exception in *Godbolt* to apply "when a plaintiff attempts to recover for a harm that is the *direct* result of his or her own criminal conduct, and the dispositive issue in the civil action is the precise issue that the criminal conviction addressed," *Id. at 471* (emphasis in original). This exception exists because "courts will not assist the participant in an illegal act who seeks to profit from the act's commission." *Zysk v. Zysk*, 239 Va. 32, 34, 404 S.E.2d 721, 6 Va. Law Rep. 966 (1990).

The case before this Court is markedly different than *Eagle Star* and *Bates*. The initial criminal conviction in *Eagle Star* required proof beyond a reasonable doubt. *Eagle Star*, 149 Va. at 88, The subsequent civil case only required proof by a preponderance of the evidence. *See id.* The burden of the UK trial and the burden here are not so drastically different. While it is true *The Sun* held the burden of proof in the UK litigation, **[**10]** such burden was by a preponderance of the evidence, That is the same burden applicable here. *See Pendleton v. Newsome*, 290 Va. 162, 174, 772 S.E.2d 759 (2015) (noting that a plaintiff in a defamation action based on libel-by-implication must prove the plaintiff's case by a preponderance of the evidence). Further, the Court in *Bates* did not touch on the issue of mutuality or privity, as an essential issue was not previously litigated in the initial case. *Bates*, 214 Va. at 672,

Defendant also appears to rely on *Nero* as "recognizing the existence of 'nonmutuality grounds' that do not require a showing of privity." Def.'s Mem, 19, To be clear, the holding in *Nero* expressly declines "the invitation of the parties that the issue be decided on a broader ground, the so-called 'nonmutuality rule,' that would not require a showing of privity," *Nero*, 222 Va. at 813, It is fallacious to suggest the Court in *Nero* recognized the existence of nonmutuality grounds in

Virginia.

This is not a matter of first impression; it is a matter of stare decisis. Based on the abundance of binding case law holding mutuality is still a requirement in Virginia, collateral estoppel is not appropriate here. However, even if an **[*387]** exception to mutuality applied, the Court is not persuaded by Defendant's argument that Plaintiff **[**11]** had a full and fair opportunity to litigate the UK Action, Defendant was not a party in the UK action and was not treated as one. Because she was not a named defendant, she was not subject to the same discovery rules applicable to named parties. In fact, Defendant *could not* have been a named defendant to the UK litigation because her allegedly defamatory statements were made *after* the UK action commenced.

Attachment 3 to Defendant's Reply Brief includes a ruling from the UK Judge regarding whether Defendant should be ordered to make certain third-party disclosures, Def.'s Reply Mem. Att. 3. **HN10⚓** Such third-party disclosures *may* be ordered *only* when the documents sought "are likely to support the case of the applicant or adversely affect the case of one of the parties" and "disclosure is necessary in order to dispose fairly of the claim." Senior Courts Act 1981 c. 54, § 34; CPR 31.17. **1⚓** Thus, to argue Plaintiff fully and fairly participated in the UK Trial action because Defendant "was an active participant, providing evidence, seven witness statements, and sitting for four days of live testimony" is incongruous with the UK Judge's ruling regarding Defendant's discovery obligations. Specifically, the judge "refuse[d] the Claimant's **[**12]** application for a third-party disclosure order against Ms. Heard." Def.'s Reply Mem. All. 3,

Accordingly, Defendant and *The Sun* were not in privity. Defendant and *The Sun* were not mutual. Defendant did not persuasively present an applicable exception to the general rule of mutuality. Thus, collateral estoppel is inappropriate in this matter.


III. RES JUDICATA

**HN11⚓** Res judicata "encompasses four preclusive effects": merger, bar, direct estoppel, and collateral estoppel. *Bates,* 214 Va. at 670. Res judicata-bar is commonly referred to as simply "res judicata" and works by barring the re-litigation of a same cause of action, "or any part thereof which could have been litigated between the same parties and their privies." *Id.* at 670-71. Here, res judicata-bar will be referred to as "res judicata".

The current governing law of res judicata and claim preclusion in the Commonwealth is Rule 1:6. The rule states in pertinent part:

> A party whose claim for relief arising from identified conduct, a transaction, or an occurrence, is decided on the merits by a final judgment, is forever barred from prosecuting any second or subsequent civil action against the same opposing party or parties on any claim or cause of action that arises from that same **[**13]** conduct, transaction or occurrence, whether or not the legal theory or rights asserted in the second or subsequent action were raised in the prior lawsuit, and regardless of the legal elements or the evidence upon which any claims in the **[*388]** prior proceeding depended, or the particular remedies sought. A claim for relief pursuant to this rule includes those set forth in a complaint, counterclaim, cross-claim or third-party pleading.

Va. R. Sup. Ct. 1:6. **HN12⚓** Essentially, res judicata applies if:

(1) The first case involves a final judgment on the merits;

(2) The claim arises from the same transaction or occurrence, unless such claim involves property damage or personal injury; and

(3) The parties are the same or in privity.

**HN13⚓** "Under the common law doctrine of res judicata, a final judgment on the merits of a claim precludes the parties from further litigation based on that claim." *State Water Control Bd.*, 261 Va. at 214. Such doctrine is designed to protect litigants from duplicative lawsuits and ensure the finality of judgments. *Id.* Res judicata applies "unless specifically abrogated by statute." *Id.* The party asserting the defense of res judicata must prove by a preponderance of the evidence that the claim "should be precluded by the prior judgment." *Bates,* 214 Va. at 671-72 **[**14]**. Further, res judicata bars subsequent litigation for the same cause of action or any part thereof which could have been litigated in the original case. *Id.* at 670. Because res judicata requires the parties be the same or in privity, the privity analysis discussed for collateral estoppel is also applicable, and fatal to Defendant's claim of res judicata.

**HN14⚓** Res judicata also requires that the claim in the first litigation and the second litigation arise from the same transaction or occurrence. Va. R. Sup. Ct. 1:6. The elements of a defamation claim include: "(1) publication of (2) an

actionable *statement* with (3) the requisite intent." *Schaecher v. Bouffault*, 290 Va. 83, 91, 772 S.E.2d 589 (2015) (emphasis added) (internal citations omitted).

Previously, to determine if two things arose from the same transaction or occurrence, courts would implement a "same-evidence" test, precluding a second action if the evidence for maintaining the second action would be based on the same evidence needed to sustain the first one. *Funny Guy, LLC v. Lecego*, LLC, 293 Va. 135, 145, 795 S.E.2d 887 (2017). The General Assembly later adopted Rule 1:6 in 2006, thus superseding the "same-evidence" test. *Id.* at 150. **HN15** Now, courts consider "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit [**15] conforms to the parties' expectations or business understanding or usage." *Id.* at 146. No single factor is dispositive. *Id.* at 155.

Defendant's claim of res judicata is especially puzzling. At the time Plaintiff initialed his suit against *The Sun*, Defendant had not even released her op-ed. Plaintiff's defamation claim in the UK was based on completely different statements than the present case. **HN16** The specific statements uttered in defamation cases are incredibly important. *See Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 8, 82 S.E.2d 588 (1954). That is why this **[\*389]** Court, after Defendant's demurrer, analyzed the four statements originally sued upon to determine if each statement met the requirements for defamation. The statements from *The Sun* and from Defendant are not related in time; several months passed between the publication of the two collective statements. They are not related in motivation; they are not related in space. The only relation is the origin, as both statements arose from Plaintiff's alleged abuse. However, it would be nonsensical to find that any statement relating to whether Plaintiff abused Defendant arose from the same transaction or occurrence simply because they come from the same origin. Therefore, given the lack of privity and the separate occurrences [**16] in question, res judicata is inapplicable.


## IV. COMITY

**HN17** The Virginia Supreme Court has recognized the doctrine of comity. *McFarland v. McFarland*, 179 Va. 418, 430, 19 S.E.2d 77 (1942). Comity is defined as

> the recognition and effect which a forum jurisdiction gives within its territory to the legislative, executive, and judicial acts of a foreign jurisdiction, giving due regard to a number of factors, including: duty; mutual interests in reciprocity; courtesy; convenience; the public policy and preservation of valued morals in the forum; the rights of the forum's citizens and those under the protection of its laws; and the factual circumstances surrounding each claim for its recognition.

*Clark v. Clark*, 11 Va. App. 286, 296-97, 398 S.E.2d 82, 7 Va. Law Rep. 938 (1990). **HN18** When determining whether to afford comity to a foreign judgment, trial courts must consider the following four factors:

(1) Did the foreign court have personal and subject matter jurisdiction?

(2) Are the procedural and substantive law applied by the foreign court reasonably comparable to that of Virginia?

(3) Was the foreign court's order falsely or fraudulently obtained?

(4) Is enforcement of the foreign court's order contrary to the public policy of Virginia?

*Am. Online, Inc. v. Nam Tai Elecs., Inc*, 264 Va. 583, 591-92, 571 S.E.2d 128 (2002). Put another way, Virginia courts "should grant comity to any order of a foreign court of competent jurisdiction, [**17] entered in accordance with the procedural and substantive law prevailing in its judicatory domain, when that law, in terms of moral standards, societal values, personal rights, and public policy, is reasonably comparable to that of Virginia." *Am. Online, Inc. v. Anonymous Publicly Traded Co.*, 261 Va. 350, 360, 542 S.E.2d 377 (2001). However, "[c]omity is not a matter of obligation. It is a matter of favor or courtesy." *Id.* at 361. Defendant relies on the factors in *Hilton* for her position that comity is appropriate in this case. *Hilton v. Guyot*, 159 U.S. 113, 123, 16 S. Ct. 139, 40 L. Ed. 95 (1895) (noting comity is appropriate when (t) "there has been opportunity for **[\*390]** a full and fair trial before a foreign court of competent jurisdiction", (2) the trial was conducted "on regular proceedings", (3) there is personal jurisdiction over the defendant, and (4) the foreign judgment was created "under a system of jurisprudence likely to secure an impartial administration of justice between the citizens" of its own country and those of foreign countries).

**HN19** Virginia courts should not recognize a foreign decree which was "falsely or fraudulently obtained or one which is contrary to the morals or public policy of this State" or that would "prejudice [Virginia's] own rights or the rights of its citizens." *McFarland*, 179 Va. at 430; *see also Williard v. Aetna Cos. & Sur. Co.*, 213 Va. 481, 483, 193 S.E.2d 776 (1973) (holding comity will not be granted where the [**18] foreign order is contrary to Virginia public policy); *Doulgeris v.*

208

*Bambacus*, 203 Va. 670, 675-76, 127 S.E.2d 145 (1962) (ruling comity should not be granted to adoption proceedings in a foreign country which are offensive to the public policy of Virginia); *Eastern Indemnity Co. v. Hirschler, Fleischer*, 235 Va. 9, 14, 366 S.E.2d 53, 4 Va. Law Rep. 1922(1988) (refusing to grant comity where to do so would prejudice the rights of the state or its citizens).

Importantly, the libel laws of Virginia are starkly different than those of England. The Declaration of Independence and the First Amendment of the United States Constitution represent major departures from the English Common Law with respect to freedom of speech and freedom of the press. *Telnikoff v. Matusevitch*, 347 Md. 561, 584, 702 A.2d 230 (1997). In fact. England's overreaching suppression of free speech during the eighteenth century drove the United States to relegate the freedom of speech into a solid foundation of civil liberty. *See id.* To hold that the two countries have similar libel laws is untenable.

Not only are the substantive laws of the UK different than Virginia, but so too are the procedural laws. *Compare* Va. Const. art. 1, § 11 (noting that in suits between persons, "trial by jury is preferable to any other, and ought to be held sacred"), *with* Senior Courts Act 1981. c. 54 § 69 (finding that a party in a civil trial for fraud, malicious prosecution, or false imprisonment may request a jury trial), *and* Def.'s Reply Br. Att. 3 ¶ 30(v) (noting Parliament [**19] allowed civil jury trials for libel actions in the past, but "now it is usual for defamation actions to be tried by judge alone"). *HN20* In Virginia, plaintiffs are entitled to a trial by jury if so demanded. However, such right is not available in the UK. Instead, in cases of libel, judgments are based on the reasoned decision of one judge, as opposed to "a bald verdict of a jury." *See* Def.'s Reply Br. Att. 3 ¶ 30(v). Of course, this Court means no disrespect to the procedure adopted in the UK.

Notably, during oral argument Defendant maintained the position that Virginia has never denied a request to apply comity. That position is incorrect. *See Middleton v. Middleton*, 227 Va. 82, 99, 314 S.E.2d 362 (1984) (noting that the Uniform Child Custody Jurisdiction Act did not require the **[*391]** trial court to grant comity to an English custody order). Furthermore, many previous cases decided by Virginia appellate courts granting comity to UK cases were domestic law cases. *See Oehl v. Oehl*, 221 Va. 618, 624-25, 272 S.E.2d 441 (1980) (finding in a divorce proceeding that comity should have been granted to an English court order limiting father's access to children because English law regarding child custody and parental rights is not contrary to Virginia's laws of the same topics). Other cases relied on by Defendant, [**20] such as *Pony Express*, are not binding on this Court, and the holdings from such cases have not been recognized in Virginia. *See, e.g.,* *Schuler v. Rainforest Alliance, Inc.*, 684 Fed. App'x. 77, 79-80 (2d Or. 2017); *Stevens v. Redwing*, 146 F.3d 538, 547 (8th Cir. 1998); *Pony Express Records, Inc. v. Springsteen*, 163 F.Supp.2d 465, 474 (D.N.J. 2001); *Apostolou v. Merrill Lynch & Co.*, No. 06 CV 4944(RJD)(LB), 2007 U.S. Dist. LEXIS 74682, 2007 WL 2908074 *5 (E.D.N.Y. Oct. 5, 2007).

Given the differences between Virginia and UK law regarding trials by jury and libel laws, the Court is hesitant to apply preclusive effect to the UK finding, especially considering Defendant was not a party in the UK suit and was not subject to the same discovery' requirements in that suit. Thus, even under the factors of *Hilton*, the substantive and procedural differences between this case and the UK case do not warrant a granting of comity.

Defendant draws attention to Plaintiff's "more favorable" burden of proof in the UK. Plaintiff did indeed have a more favorable burden of proof in the UK litigation—but that is not the only factor to be considered. As previously mentioned, the procedural and substantive laws regarding libel claims in the UK are vastly different than the laws in Virginia. *HN21* Moreover, comity is not a matter of obligation, but rather a matter of courtesy. *See Am. Online, Inc.*, 261 Va. at 361. To enforce the UK defamation judgment in this case would go against public policy. Therefore, comity is inappropriate in this instance and does not serve to bar Plaintiff [**21] from arguing his case before a jury in the Commonwealth.

## V. UNIFORM FOREIGN-COUNTRY MONEY JUDGMENTS RECOGNITION ACT

*HN22* The Uniform Foreign-Country Money Judgments Recognition Act ("UFCMJRA") provides that the Commonwealth shall recognize certain foreign judgments of other countries, Va. Code Ann. § 8.01-465.13:3. The foreign judgments may be for a grant or denial for recovery of a sum of money, *Id.* § 8.01-465.13:2, The party seeking recognition of the foreign judgment bears the burden of establishing that the UFCMJRA applies. *Id.* However, if a party resists the recognition of the foreign judgment, that party must show that a ground for nonrecognition exists. *Id.* § 8.01-465.13:3. One ground of nonrecognition is based on whether "the cause of action on which the judgment is based is repugnant to the public policy of the Commonwealth." *Id.* If the court finds the foreign judgment is entitled to recognition, such recognition is "[conclusive *between the parties* to the **[*392]** same extent as the judgment of a sister state entitled to full faith and credit in the Commonwealth would be conclusive." *Id.* § 8.01-465.13-6 (emphasis added).

Defendant is correct in her assertion that this Court should enforce the UK Court's judgment precluding Plaintiff from recovering against *The Sun* for libel. But Plaintiff has not brought suit against [**22] *The Sun* in this case. Instead,

Plaintiff brought forth a different suit with a different defendant based on different statements. Further, legal recognition of a judgment and preclusive recognition of a fact are not synonymous, and Defendant has cited no Virginia case applying the UFCMJRA when the parties are not mutual, Consequently, the UFCMJRA is inapplicable here and does not mandate the dismissal of Plaintiff's ease.

### VI. CHILLING EFFECT

Defendant's claim that refusing to recognize the UK Judgment in this case would set a dangerous precedent is unfounded. In fact, allegedly defamed parties are more likely to bring suit in England in general due to their more favorable defamation laws. *See, e.g.*, John Cooper, *Defamation By Satellite*, 132 Solic. J. 1021 (1988); Don J. DeBendictis, *Moving Abroad: Libel Plaintiffs Say It's Easier Suing U.S. Media Elsewhere*, 75 A.B.A. J. 38 (Sept. 1989); Amy Dockser, *Plaintiffs Take Libel Suits Abroad, to Favorable Laws*, Wall St. J., June 6, 1989, at B1; Robin Pogrebin, *Libel Gripes Go Offshore: London is a Town Named Sue*, N.Y. Observer, Sept. 23, 1991, at 1. If anything, upholding English libel judgments in the United States would create the chilling effect and could create a dangerous [**23] precedent. Accordingly, this Court is unpersuaded by Defendant's argument.

### CONCLUSION

For the foregoing reasons, Defendant's Supplemental Plea in Bar is overruled. Regarding Plaintiff's request for sanctions, such request is denied. While Defendant's Supplemental Plea in Bar was misguided and only thinly supported by preexisting law, it is not sanctionable. However, based on this opinion. Paragraph 13 of Defendant's Grounds of Defense is hereby stricken as moot. An Order is attached.

/s/ Penney S. Azcarate

Penney S. Azcarate, Chief Judge

Fairfax County Circuit Court

### ORDER

THIS MATTER CAME BEFORE THE COURT on July 22, 2021, on the Defendant's Supplemental Plea in Bar.

**ADJUDGED, ORDERED**, and **DECREED** as follows:

The Court, having considered the arguments of the parties and for the reasons set forth in the Court's letter opinion of today's date, hereby OVERRULES Defendant's Supplemental Plea in Bar. Paragraph 13 of Defendant's Grounds of Defense is hereby stricken as moot.

Entered this 17th day in of August, 2021.

/s/ Penney S. Azcarate

Chief Judge Penney S. Azcarate

---

**Footnotes**

 Compare this standard to Virginia's discovery rules in Rule 4:1(b)(1) of the Supreme Court of Virginia.



About

Cookie Policy

RELX ™

Privacy Policy

Terms & Conditions

Copyright © 2023 LexisNexis.

⸬  ◐ **Lexis**   🔍   See Dietrich v. Hauser, 257 N.Y.S.2d 716 (Sup. Ct. 196    🔍    **Client:** -None- ⌄    Folders    History    Help    More

Search: Everything   〉

Document:    Dietrich v. Hauser, 45 Misc. 2d 805    | Actions ⌄

📁⌄   🖨   ✉   ⬇   ⬡   🗐   Go to ⌄   Page  Page #   ∧ ∨   Search Document 🔍                        ‹ **1** of 1  | **Results list** ›

### ❶ Dietrich v. Hauser, 45 Misc. 2d 805

**Copy Citation**

Supreme Court of New York, Special Term, Kings County

March 5, 1965

No Number in Original

**Reporter**

45 Misc. 2d 805 * | 257 N.Y.S.2d 716 ** | 1965 N.Y. Misc. LEXIS 2199 ***

Mortimer M. Dietrich, Plaintiff, v. Max Hauser, Defendant

**Disposition:** [***1] Defendant's motion is denied.

## Core Terms

words, slanderous, cheat, profession, defamatory, fair intendment, hold office, circumstances, confidence, synonymous, attending, overreach, utterance, indirect, bargain, deceive, defraud, spoken, crook, gouge

### Case Summary

**Procedural Posture**

In a slander action, defendant speaker filed a motion pursuant to N.Y. C.P.L.R. art. 3211 to dismiss the complaint of plaintiff subject on the ground that the words "He's a cheat and a fraud" failed to plead a cause of action without injury to the officer in his business or profession. The subject filed an opposing affidavit that amplified the allegations of the complaint to show that the words were spoken in relation to his presidency of a club.

**Overview**

The speaker argued that the words were not slanderous per se and that the subject was required to allege and prove that the defamatory words injured him in his business or profession. The court held that words were to be taken in their natural meaning and that the court would not strain to interpret them in their mildest and most inoffensive sense in order to hold them non-libelous and non-slanderous. The court found the word "crook," which had been held to be slanderous per se depending on context, was not precisely synonymous with "cheat" or "fraud," but that in their ordinary and well-understood meaning, the words were not much different. The court noted that liability for words slanderous per se was not restricted to injury to a person in his business or profession and extended as well to an injury to one holding an office of confidence or trust. The court held that there was an inference under the circumstances that these words referred, directly or indirectly, to the subject's office and necessarily reflected on his character or conduct in that office and impaired confidence in his ability to hold the office. The court held that the words were slanderous per se.

**Outcome**

The court denied the speaker's motion to dismiss the slander suit for failure to state a cause of action.

▼  LexisNexis® Headnotes

Torts > Intentional Torts ⌄ > Defamation ⌄ > 📄 Defamation Per Se ⌄
View more legal topics

**HN1**⬇  **Defamation, Defamation Per Se**

words charged to be defamatory are to be taken in their natural meaning, and the courts will not strain to interpret them in their mildest and most inoffensive sense in order to hold them non-libelous and non-slanderous. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ▾ > Defamation ▾ > 📄 Defamation Per Se ▾

View more legal topics

**HN2**⬇ **Defamation, Defamation Per Se**

Liability for words slanderous per se is not restricted to injury to a person in his business or profession and extends as well to an injury to one holding an office of confidence or trust. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Remedies ▾ > Damages ▾ > General Overview ▾

View more legal topics

**HN3**⬇ **Remedies, Damages**

The test of actionable defamation of one holding a trust is: There must be some reference, direct or indirect, in the words or in the circumstances attending their utterance, which connects the slander with such office or profession or trade. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

▾ Headnotes/Summary

---

**Headnotes**

**Libel and slander -- slander -- statement spoken of president of club at meeting of board of governors that plaintiff is "cheat" and "fraud" is slanderous per se.**

The words, spoken of plaintiff before a meeting of the board of governors of a club of which plaintiff was president, "He's a cheat and a fraud" are slanderous per se. The reference, direct or indirect, in the circumstances attending the utterance reasonably relates to plaintiff's office as president, and necessarily reflects on his character or conduct in that office and cannot but impair confidence in his ability to hold the office. An allegation of actual damage is not needed in the complaint.

---

**Counsel:** *Spector & Meissner* for defendant.

*Richard M. Schwartz* for plaintiff.

**Judges:** Benjamin Brenner ▾, J.

**Opinion by:** BRENNER ▾

## Opinion

**[*805]** **[**717]** Defendant moves pursuant to CPLR 3211 to dismiss the complaint on the ground that the words "He's a cheat and a fraud" fail to plead a cause of action in slander.

The alleged words were spoken of the plaintiff before a meeting of the board of governors of the Lincoln Club at a time when plaintiff was its president. Plaintiff's opposing **[***2]** affidavit also amplifies the allegations of the complaint to the effect that the words were spoken in relation to his action as president of the club and this appears to be the fair intendment of the allegations.

Defendant urges that these words are not slanderous per se and that plaintiff is required to allege and prove that the defamatory words injured him in his business or profession; that in any case, the words are not defamatory in that they are expressions of a general nature and were not directed specifically to plaintiff's business or profession.

The word "crook" is differently considered in the First and Second Departments. In *Villemin v. Brown* (193 App. Div. 777) and *Hofstadter v. Beinstock* (213 App. Div. 807) (1st Dept. cases) it is held not to be slanderous per se. In *Weiner v. Leviton* (230 App. Div. 312) it is held to be slanderous per se. The word "crook" may not be precisely synonymous with "cheat" or "fraud" but, in their ordinary and well-understood meaning ( *Mencher v. Chesley*, 297 N. Y. 94, 100; *Nowark v. Maguire*, 22 A D 2d 901 [2d Dept.]), they are not much different. In *Nowark {supra}*, the court stated: **HN1**🔝 "Words **[***3]** charged to be defamatory are to be taken in their natural meaning, and the courts will not strain to interpret them in their mildest and most inoffensive sense in order to hold them nonlibelous and nonslanderous."

**[*806]** **[**718]** The very word "cheat," which is here involved, was held to be synonymous with the word "gouge" and was held to be libelous per se in *Shubert v. Variety, Inc.* (128 Misc. 428, 429), affd. 221 App. Div. 856) as follows: "Among the definitions of 'gouge' contained in the Century Dictionary and Cyclopedia are the following: 'to cheat in a bold or brutal manner; overreach in a bargain.' Funk & Wagnall's Standard Dictionary (1916) contains, among others, the following definitions of the word: 'to get the better of in a bargain; cheat; overreach.' Webster's New International Dictionary (1910) in part defines the word as follows: 'to cheat; to defraud.' The Century Dictionary and Cyclopedia

defines the word "cheat" as follows: 'to deceive and defraud; impose upon; trick; to mislead; deceive.'"

As is well known, **_HN2_** liability for words slanderous per se is not restricted to injury to a person in his business or profession and extends as well to an injury *[***4]* to one holding an office of confidence or trust ( _Musacchio v. Maida, 137 N. Y. S. 2d 131_; _Lennox v. Schramm, 282 App. Div. 667_; _Shakun v. Sadinoff, 272 App. Div. 721_).

**_HN3_** The test of actionable defamation of one holding a trust was stated in *Shakun* (p. 722): "There must be some reference, direct or indirect, in the words or in the circumstances attending their utterance, which connects the slander with such office or profession or trade."

I believe that the words alleged in the complaint meet the required test because the reference, direct or indirect, in the circumstances attending the utterance reasonably relates to plaintiff's office as president of the club. Those words necessarily reflect on his character or conduct in that office and cannot but impair confidence in his ability to hold the office ( _Sanderson v. Caldwell, 45 N. Y. 398_). They are slanderous per se and no proof of actual damages suffered need be alleged in the complaint.

As thus pleaded, the complaint is entitled to every fair intendment and favorable inference ( _Schwartz v. Heffernan, 304 N. Y. 474_; _Sorin v. Shahmoon, 2 A D 2d 678_). Defendant's motion is denied. *[***5]* He may serve his answer within 10 days following service of a copy of the order to be entered hereon.

 LexisNexis®

About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

214

Edelstein v. WFTV, Inc., 798 So. 2d 797 (Fla. Dist. Ct. App. 200

Search: Everything

**Document:**      Edelstein v. WFTV, Inc., 798 So. 2d 797      Actions

**Edelstein v. WFTV, Inc., 798 So. 2d 797**

Copy Citation

Court of Appeal of Florida, Fourth District

October 24, 2001, Opinion Filed

CASE NO. 4D01-1192

**Reporter**

798 So. 2d 797 * | 2001 Fla. App. LEXIS 15036 ** | 26 Fla. L. Weekly D 2547

RUSSELL EDELSTEIN, Appellant, v. WFTV, INC., a Delaware corporation, d/b/a THE PALM BEACH POST, Appellee.

**Subsequent History:** [**1] Rehearing Denied November 21, 2001. Released for Publication November 21, 2001.

**Prior History:** Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Catherine M. Brunson , Judge; L.T. Case No. CL 01-0549 AH.

## Core Terms

actual injury, defamatory, legitimate state interest, affirming, argues

**Counsel:** Kenneth W. Shapiro  of Shapiro Abrams Zedeck, Plantation, for appellant.

L. Martin Reeder, Jr., of Greenberg Traurig, P.A. , West Palm Beach, and Jerold I. Budney  of Greenberg, Traurig, P.A. , Fort Lauderdale, for appellee.

**Judges:** DELL , FARMER  and HAZOURI , JJ., concur.

## Opinion

**[*797]** PER CURIAM.

We write to explain our rationale for affirming the dismissal of the complaint.

Plaintiff's employment was terminated. Whether it was by unilateral action of his employer, as defendant argues, or by common agreement, as he argues, is not the important issue for purposes of the legal question presented. What is important is that the Palm Beach Post published a news item that he had been "fired," that plaintiff alleges that this statement is defamatory "per se" and damages from it are presumed and that he declined the privilege of further amending his complaint.

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974), the Court [**2] recognized the "strong and legitimate **[*798]** state interest in compensating private individuals for injury to reputation," 418 U.S. at 348, but concluded that under the First Amendment such a legitimate state interest "extends no further than compensation for actual injury." 418 U.S. at 349. In *Mid-Florida Television Corp. v. Boyles*, 467 So. 2d 282 (Fla. 1985), the court held that *Gertz* signaled the end of the theory of libel "per se" in Florida, except as a "useful shorthand" for the notion that the defamatory words are actionable without resort to innuendo. 467 So. 2d at 283.

<mark>The court's decision in *Boyles* makes clear that since *Gertz* a plaintiff suing a media defendant must nevertheless plead and prove actual injury. Yet, actual injury is precisely what plaintiff abjures having to plead and prove in this action for defamatory falsehood.</mark> Under *Gertz* and *Boyles* we have no alternative to affirming the trial court's dismissal of the action.

DELL , FARMER  and HAZOURI , JJ., concur.



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

Document:                          Fawcett Publs., Inc. v. Morris, 377 P.2d 42          | Actions

Go to    Page  | Page #    Search Document

⚠️ **Fawcett Publs., Inc. v. Morris, 377 P.2d 42**

Copy Citation

Supreme Court of Oklahoma

July 17, 1962

No. 39485

**Reporter**

1962 OK 183 * | **377 P.2d 42 ** | 1962 Okla. LEXIS 517 ***

FAWCETT PUBLICATIONS, INC., Plaintiff in Error, v. Dennit MORRIS, Defendant in Error

**Subsequent History:** [***1] Rehearing Denied October 11, 1962. Dissenting Opinion October 16, 1962.

## Core Terms

libel, amphetamine, team, defamatory, magazines, players, words, cases, libel and slander, libelous per se, football team, athletes, appears, damages, pills, libel per se, trial court, supplied, spray, libelous publication, privileged, retailers, picture, season, pages, truck, punitive damages, extrinsic, contempt, football

## Case Summary

**Procedural Posture**
Defendant publisher challenged a decision of the trial court (Oklahoma), which entered judgment in favor of plaintiff football player and against the publisher in a libel action. The football player appealed the directed verdict in favor of defendant distributor.

**Overview**
The suit grew out of an article in the publisher's magazine entitled "The Pill That Can Kill Sports," which concerned the use of amphetamines and other similar drugs by athletes throughout the country. The football player was a member of the state university football team. The trial court had directed a verdict on liability because the article had imputed to the football player a crime and was libelous per se. On appeal, the publisher argued that the trial court erred because the football player was not named specifically in the article. The court disagreed and affirmed the judgment. In doing so, the court held that (1) the reader was unequivocally informed that the members of the team illegally used amphetamines, (2) because the article was libelous on its face without the aid of extrinsic facts to make it so, it was libelous per se, (3) the article libeled every member of the team, including the football player, although he was not specifically named therein, and (4) it was not necessary that the football player's name appear in the article to have maintained the action.

**Outcome**
The judgment was affirmed.

## ▼ LexisNexis® Headnotes

Business & Corporate Law > Foreign Corporations ▾ > General Overview ▾
Governments > Legislation ▾ > Interpretation ▾

**HN1** ⭐ **Business & Corporate Law, Foreign Corporations**

The question of whether a foreign corporation is "doing business" within Oklahoma within the meaning of Okla. Stat. tit. 18, §§ 1.17 and 472 (1961) must depend upon the facts in each particular case. Doing business involves not only ownership, possession or control of property, but also such functions as dealing with others in reference thereto, the exercise of discretion, the making of business decisions, the execution of contracts, the marketing of products by advertising and solicitation, collecting accounts, and kindred functions. Wherever an important combination of these functions is being performed, it is the doing of business at the place of such performance. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Torts > **Intentional Torts** ⌄ > **Defamation** ⌄ > **Libel** ⌄

View more legal topics

**HN2**⬇ **Defamation, Libel**

Words charged to be libelous may be divided into three classes: First, those that cannot possibly bear a defamatory meaning; second, those that are reasonably susceptible of a defamatory meaning, as well as an innocent one; third, those that are clearly defamatory on their face. In determining whether the article is libelous on its face the article must be measured by its natural and probable effect upon the mind of the average lay reader. In Okla. Stat. tit. 12, § 1441 (1961), libel is defined as a false publication by writing, printing, or picture, which exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*

---

Torts > **Intentional Torts** ⌄ > **Defamation** ⌄ > **Libel** ⌄

**HN3**⬇ **Defamation, Libel**

It is not necessary for a plaintiff to be identified by name in the libelous article. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Torts > **Intentional Torts** ⌄ > **Defamation** ⌄ > **Libel** ⌄

**HN4**⬇ **Defamation, Libel**

If defamatory language is used towards an entire group, including every one of them, it may be said to refer to each member of the group so that each may sue. On the other hand if the charge is against a class, and is, or may be, made of definite application, any one of that class may maintain an action upon showing that the words applied especially to him. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

---

Governments > **Fiduciaries** ⌄
Torts > ... > **Defenses** ⌄ > **Privileges** ⌄ > **Qualified Privileges** ⌄

View more legal topics

**HN5**⬇ **Governments, Fiduciaries**

With regard to privilege generally, in order to be shielded on this ground, the communication must be a privileged one uttered on a privileged occasion by a privileged person to one within the privilege. With regard to qualified or conditional privilege, it relates more particularly to private interests. An examination of the cases in which the defense of qualified privilege has been held applicable reveals that as a general rule some special private relationship has been involved, such as fraternal, fiduciary, business, or professional. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (4)*

---

Civil Procedure > **Appeals** ⌄ > **Reviewability of Lower Court Decisions** ⌄ > **Preservation for Review** ⌄

View more legal topics

**HN6**⬇ **Reviewability of Lower Court Decisions, Preservation for Review**

Okla. R. Civ. P. 630, Okla. Stat. tit. 12, § 630 (1961) provides that formal exceptions to rulings of the trial court are not necessary but it does require that a party make known to the trial court the action that he desires the trial court to take and his grounds therefor. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*    1

---

Civil Procedure > **Remedies** ⌄ > **Damages** ⌄ > 📙**Punitive Damages** ⌄
Torts > ... > **Types of Damages** ⌄ > **Punitive Damages** ⌄ > **General Overview** ⌄

View more legal topics

**HN7**⬇ **Damages, Punitive Damages**

In an action wherein punitive damages are proper, evidence of the financial worth of the defendant is competent and admissible. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*    1

Torts > Intentional Torts ▾ > Defamation ▾ > 📄 Defamation Per Se ▾

View more legal topics

**HN8⬇** **Defamation, Defamation Per Se**

A recovery of general damages for libel per se without actual proof thereof is permitted. The term "proof" as used in Okla. R. Civ. P. 1446, Okla. Stat. tit. 12, § 1446 (1961) includes any proof on any point properly presented by either party in the presentation of the case. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > Trials ▾ > Jury Trials ▾ > Province of Court & Jury ▾

Torts > ... > Defamation ▾ > Remedies ▾ > Damages ▾

View more legal topics

**HN9⬇** **Jury Trials, Province of Court & Jury**

The amount of general damages to be awarded in a libel action is peculiarly within the province of the jury. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

## Syllabus

*Syllabus by the Court*

1. The question of whether a foreign corporation is doing business in this state within the meaning of 18 O.S.1961 §§ 1.17 and 472, involves not only the ownership, possession or control of property, but also such functions as dealing with others in reference thereto, the exercise of discretion, the making of business decisions, the execution of contracts, the marketing of products by advertising or solicitation, collecting accounts, and kindred functions. Where an important combination of these functions is being performed within the state, such corporation is doing business in the state, and is amenable to service of process as provided in said sections of the statute.

2. A publication which when measured by its natural and probable effect upon the mind of the average lay reader is clearly defamatory on its face, is libelous per se.

3. Whether an article is of a libelous character per se, and whether it has application to a particular party plaintiff, are entirely separate and distinct questions, and should not be confused. The answer to the first question is to be found [***2] in the article itself. The answer to the second question is to be found in the proof supporting allegations in the complaint. Those proofs may consist of either the article itself, or of extrinsic evidence.

4. In a damage action arising from the defamation of a group, the question of whether an individual member thereof may maintain his separate action for damages depends in some degree upon the size of the group, but more upon the likelihood that the complaining member of the group has been damaged.

5. In a libel action, in order for the alleged defamatory publication to be shielded on the ground that it was qualifiedly or conditionally privileged, the communication must be a privileged one, uttered on a privileged occasion, by a privileged person, to one within the privilege.

6. In an action where punitive damages are proper, evidence of the financial worth of defendant is competent.

7. The amount of general damages to be awarded for a publication libelous per se is peculiarly within the province of the jury, and a verdict rendered by the jury will not be disturbed unless excessive.

**Counsel:** Butler, Rinehart & Morrison, Oklahoma City, for plaintiff in error, Fawcett Publications, [***3] Inc., and cross-defendant in error, Mid-Continent News Co.

Robert G. Grove, Leo Winters, Oklahoma City, for defendant in error and cross-plaintiff in error, Dennit Morris.

Appeal from the District Court of Oklahoma County; Clarence M. Mills, Judge.

Action for damages for libel by plaintiff, Dennit Morris, against Fawcett Publications, Inc., publisher, and Mid-Continent New Company, distributor; from judgment in favor of plaintiff against Fawcett Publications, Inc., said defendant appeals; and from judgment sustaining defendant Mid-Continent News Company's motion for directed verdict and dismissal of action, plaintiff, Dennit Morris, cross-appeals. Affirmed.

**Opinion by:** JACKSON ▾

## Opinion

**[**44]** JACKSON ▾, Justice. [*P1] In the trial court, plaintiff Dennit Morris sued Fawcett Publications, Inc., the publisher of 'True' Magazine, and Mid-Continent News Company, its distributor, for damages for libel. The suit grew out of an article in a 1958 issue of 'True' Magazine entitled 'The Pill That Can Kill Sports', concerning the use of amphetamine and other similar drugs by athletes throughout the country.

[*P2] Plaintiff alleged in his petition that he was a member of the 1956 Oklahoma University football [***4] team; that the article imputed to

219

him a crime against the laws of the state of Oklahoma and was libelous per se; and asked for general damages in the amount of $ 100,000, and punitive damages in the amount of $ 50,000.

 [*P3]  At the conclusion of the evidence, the trial court instructed the jury to return a verdict against Fawcett, leaving only the amount of the damages for jury determination. Mid-Continent's motion for directed verdict in its favor was sustained.

 [*P4]  The jury returned a verdict for plaintiff and against Fawcett in the amount of $ 75,000 for actual damages.

 [*P5]  [**45]  Fawcett is a foreign corporation without a service agent in this state, and service was had upon Fawcett herein by serving the Secretary of State pursuant to statute. On appeal, Fawcett, for its first proposition, argues that the court had no jurisdiction for the reason that Fawcett was not 'doing business' in the state within the meaning of 18 O.S.1961, Sections 1.17 and 472, which authorize service upon the Secretary of State.

 [*P6]  From uncontradicted evidence in the record, it appears that Fawcett had contracted with Mid-Continent to distribute its magazines in a portion of the State of Oklahoma. The 'territory'  [***5]  is not described in the contract, and is left for all practical purposes to the discretion of Fawcett. Magazines were to be forwarded to Mid-Continent without specific orders, in amounts entirely within the discretion of Fawcett. Mid-Continent agreed to distribute not only the magazines and books named in the contract, but all 'other matter' which Fawcett might choose to forward. All prices, sales dates and release dates were to be fixed by Fawcett and were subject to change at any time by Fawcett. Mid-Continent agreed to keep dealer records acceptable to Fawcett, showing 'initial distribution, re-orders, pickups, returns and net sales.' Provision was made for 'returns', and credit thereon, and Mid-Continent agreed to dispose of unsold copies in any manner Fawcett should direct. Mid-Continent agreed to distribute to its retail dealers all 'advertising, dealers' helps, posters, circulars, and other material' which Fawcett chose to supply. It agreed to furnish Fawcett a complete list of its dealers, showing address and line of business, and showing each dealer's 'draw' of each of Fawcett's magazines, publications and other matter. The contract was for 10 years, but could be terminated [***6]  by either party 'at any time with or without cause by giving ten (10) days written notice' to the other party.

 [*P7]  Fawcett also employed a 'traveling representative' whose duty it was to call on both wholesalers and retailers, to 'check up' on the manner of distribution, display and sale of Fawcett's publications and other matter. He testified that the wholesalers '* * * have an agreement with our company to do certain things, such as the putting out of our magazines on certain dates and displaying them in certain ways in the retail outlets, drugstores, supermarkets and so forth, and it is just my job to go around and see that they are fulfilling their agreement with our company'. Although he testified that he actually had no authority, he did make reports to Mid-Continent and to his home office concerning his findings. He also made 'suggestions' to Mid-Continent and the retailers as to the proper display and sale of his company's publications.

 [*P8]  It thus appears that although the contract refers to Mid-Continent as an independent contractor, Fawcett retained almost unlimited discretion as to the details of the distribution, promotion, display and sale of its publications.

 [*P9]  It should [***7]  be noted here that the jurisdictional question raised in the brief of plaintiff in error (Fawcett) is restricted entirely to the question of whether Fawcett was 'doing business' in Oklahoma within the meaning of 18 O.S.1961 §§ 1.17 and 472. No question of due process under the Fourteenth Amendment of the United States Constitution is presented.

 [*P10]  HN1  The question of whether a foreign corporation is 'doing business' within this state within the meaning of the statute must depend upon the facts in each particular case. Howes Company v. W. P. Milling Co., Okl., 277 P.2d 655 at page 657; 20 C.J.S. Corporations § 1920, at page 151.

 [*P11]  In Wills v. National Mineral Co., 176 Okl. 193, 55 P.2d 449, this court held:

'Doing business involves not only ownership, possession or control of property, but also such functions as dealing with others in reference thereto, the exercise of discretion, the making of business decisions, the execution of contracts, the marketing of products by advertising and solicitation, collecting accounts, and kindred functions.  [**46]  Wherever an important combination of these functions is being performed, it is the doing of business at the place of such performance.'

 [*P12]  [***8]  Without belaboring the question of when title to the magazines published by Fawcett actually moved to Mid-Continent (and thus the question of whether Fawcett owned property in Oklahoma) we have no doubt that Fawcett had practical control over such property even after it had reached the magazine racks of the retailer. As shown above, practically unlimited discretion, under the Fawcett contract with Mid-Continent, was reserved in Fawcett. As to the 'marketing of products by advertising and solicitation', under the contract Mid-Continent was bound to distribute any advertising matter the company might send; as to solicitation, Mid-Continent was bound to 'cooperate with the Company's plans to increase the sale of its magazines' (emphasis supplied). Note that Fawcett was not required to cooperate with Mid-Continent's plans. From the practical standpoint, Fawcett could diminish or increase Mid-Continent's territory at will; it could set up and do business with any other competing distributor; it could require 'check-up' reports on the retailers as often as it desired; it could send Mid-Continent as many, or as few, copies of any particular publication as it deemed advisable;  [***9]  it could cancel the contract without cause upon ten days' notice.

 [*P13]  Considering the terms of the contract, and the activities of Fawcett's 'traveling representative', we are forced to the conclusion that for all practical purposes Mid-Continent was little more than a mere conduit through which Fawcett exercised its own free and unhampered discretion as to all pertinent details of the business. Such being the case, and pursuant to the cited rule from Wills v. National Mineral Company, supra, Fawcett was doing business in Oklahoma within the meaning of 18 O.S.1961 §§ 1.17 and 472. It follows that service upon the Secretary of State was authorized in this case, and that the court had jurisdiction of the defendant so served. Defendant's first proposition is therefore without merit.

 [*P14]  The remaining propositions urged on appeal go to the merits of the case, and we therefore summarize the alleged libelous publication. The article is approximately seven full pages in length; was studiously prepared after what purports to be painstaking research; and starts at pages 44 and 45 of the magazine. Across the center of pages 44 and 45, we find in large letters and bold type the following:

'THE [***10]  PILL that can KILL SPORTS'.

In the upper left hand corner of page 44 are these words: 'Simply by using a phony letterhead, the author purchased by mail enough drugs to

'hop up over 100 football teams.' Immediately under this statement is the following: 'A SHOCKING REPORT,' which is emphasized by a red line underneath. In the middle of pages 44 and 45 is a picture of five bottles of pills; the sixth bottle is of the shape and type commonly used for hypodermic needle injections; and there are two hypodermic needles. In the upper right hand corner of page 44 is found the following:

'You can go to jail for selling amphetamine to a truck driver or injecting it into a racehorse, yet this same drug is being handed out to high school and college athletes all over the country.'

In the lower half of page 45, and flowing over onto page 44, is pictured a heavily loaded dual-wheeled truck bearing the sign or label on its side, 'DOPE'. In the body of the truck are two individuals labeled 'Avarice' and 'Ignorance' shovelling out dope to athletes, including football players, who are running behind the truck and catching the pills. Another person is handing out pills to a football player from [***11] the cab of the truck. Above the engine of the truck are these words: 'Victory at any Cost'.

 [*P15]  Across the center of pages 46 and 47 is a picture of a stable with the heads of horses appearing from the windows. In front of  [**47]  the horses are what appear to be uniformed officials and trainers. Underneath this picture is printed the following: 'Racehorses are scrupulously guarded against doping violations, yet the same drugs are given freely to young athletes.'

 [*P16]  While the article is too lengthy to be quoted, a few excerpts which appear to be fairly representative of the entire article are quoted as follows:

'Definite proof that doping was a common practice came on September 13, 1956, when I received this report from the USOA's attorney, John T. McGovern. 'I have communicated with record executives of Olympic, university, A.A.U. organizations, athletic directors and others * * * At every point of contact I was informed * * * that substantially the entire population in schools and colleges have been using this type drug * * *.'

'The *amphetamines are administered to athletes* by hypodermic injection, *nasal spray*, or in tablets or capsules, but pills are the most common form, [***12]  at least according to those athletic figures who are willing to talk.

'There is, however, one statistic which is available, and which strongly indicates that consumption is rapidly increasing. Recently *I was able to buy 30 cc.'s of dextroamphetamine sulphate for 95 cents*. This amount -- enough to hop up an entire football team -- cost three times this much a few years ago. Also, I was able to buy a thousand amphetamine pills for $ 1.40 less than a third of the 1954 price. When sales go up, prices go down.

'*Speaking of football teams*, during the 1956 season, *while Oklahoma was increasing its sensational victory streak*, several *physicians observed Oklahoma players being sprayed in the nostrils with an atomizer. And during a televised game, a close-up showed Oklahoma spray jobs to the nation*.' 'Ten years ago,' Dr. Howe observed acidly, 'when that was done to a horse, the case went to court. Medically, there is no reason for such treatment. If *players* need therapy, they shouldn't be on the field.'

'*The lifter*' (amphetamine user) can and *does become heroic, boisterous, pugnacious, or vicious*.

'*These results are what make amphetamines useful* [***13]  *in the field of athletics*. They promote aggression, increase the competitive spirit, and work the same as the epinephrine (adrenalin) produced in your body. The adrenal cortex, however, is wiser than victory-hungry coaches and athletes, * * *.' (Emphasis supplied.)

 [*P17]  The article refers to several nationally known brutal crimes as being committed by users of amphetamine.

 [*P18]  Plaintiff's evidence at the trial shows that the substance administered to Oklahoma players and members of the 1956 football team was 'spirits of peppermint', a harmless substance used for the relief of 'cotton mouth', or dryness of mouth, resulting from prolonged or extreme physical exertion; that plaintiff did not use amphetamine or any other narcotic drug, and there was no evidence that any other member of the team used amphetamine or narcotic drugs.

 [*P19]  Plaintiff's evidence further shows that plaintiff was fullback on the alternate squad of the 1956 football team; that he played in all games during the 1956 season, except two, when he was 'side-lined' because of injuries; that the team won all ten regular games during the season and won the Bowl game at the end of the season in Miami, Florida; that plaintiff played [***14]  in the Bowl game; that plaintiff was a sophomore in 1956 and continued to play on the team in 1957 and 1958; and that he was a member of the University baseball team while at the university. That there were sixty or seventy members of the team in 1956.

 [*P20]  [**48]  Plaintiff's evidence further shows that many people asked plaintiff about the article in True, beginning shortly after its publication, and continuing until shortly before trial.

In Fawcett's answer it was alleged that the facts set forth in the article were true; that the comments were fair and fairly warranted by the facts truly stated; that the article was privileged; that defendant was without malice and relied upon trustworthy sources; and that the article did not refer to plaintiff. However, since no attempt was made to prove any of these allegations it may be said that the article, together with plaintiff's evidence is undisputed.

 [*P21]  In Fawcett's second proposition it is said:

'The Article is not libelous per se.'

'(A) The plaintiff was not named or referred to in the Article.

'(B) No person understood or believed the Article referred to the plaintiff.

'(C) The Article does not allege the plaintiff engaged in [***15]  criminal activity and is not libel per se.

'(D) Plaintiff is a member of a large and changing group class and therefore the article is not libel per se.'

 [*P23]  We think the first question requiring attention under Fawcett's second proposition is whether the article is defamatory or libelous on its face. In this connection the courts have classified libelous words in the following categories: (See Kee v. Armstrong, Byrd & Co., 75 Okl. 84, 182 P. 494, 5 A.L.R. 1349)

'words charged to be libelous may be divided into three classes: First, those that cannot possibly bear a defamatory meaning; second, those that are reasonably susceptible of a defamatory meaning, as well as an innocent one; third, those that are clearly defamatory on their face.'

 [*P24]  In determining whether the article is libelous on its face the article must be measured by its natural and probable effect upon the mind of the average lay reader. Hargrove v. Oklahoma Press Publishing Co., 130 Okl. 76, 265 P. 635.

 [*P25]  In 12 O.S.1961 § 1441, libel is defined as a false publication by writing, printing, or picture, which exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence,  [***16]  or to injure him in his occupation.

 [*P26]  After reading the entire article and considering its effect upon the mind of the average lay reader, we are convinced that the article is clearly defamatory on its face and does expose the entire O. U. team to public hatred and contempt and tends to deprive the team and its membership of public confidence. The reader was unequivocally informed that the members of the team illegally used amphetamine; the article explained that amphetamine could be administered with a nasal spray and that for 95 cents one could purchase 'enough to hop up an entire football team'. The use of the phrase 'hop up' negates any implication that the amphetamine was legally administered under the direction of a physician for medical purposes. The reference to the 1956 O. U. football team is so well tied into, or interwoven, into the article that the full weight and import of the article falls upon the O. U. team.

 [*P27]  Having concluded that the article is defamatory and libelous on its face we think it follows that the article is *libelous per se*. However, in view of the prominence given to the subject of *libel per se* in Fawcett's brief and its contention that plaintiff's [***17]  name must appear in the face of the article; and the superficial lack of harmony in the decisions from this court on what constitutes libel per se, we find it appropriate to consider the matter extensively.

 [*P28]  Fawcett states that words alleged to be libelous fall within one of three categories as set forth in our quotation from Kee v. Armstrong, supra. That is: (1) those that cannot bear a defamatory meaning; (2) those that are reasonably susceptible of a defamatory meaning as well as non-defamatory meaning, and, (3) those whose only meaning is defamatory *of the plaintiff* on **[**49]** its face. It should be noticed at the outset, however, that our quotation of the first syllabus from Kee v. Armstrong, supra, does not contain the words 'of the plaintiff'.

 [*P29]  Fawcett then states that the second class of libel, supra, 'is referred to as libel per quod or libel per innuedo while the third class of libel is libel *per se*.' We are in complete agreement that the third class is libel per se. However, we do not agree (as Fawcett seems to conclude) that it is necessary for plaintiff's name to appear in the article to render it libelous per se. The article in True falls into the third category.

 [*P30]  [***18]  Kelly v. Roetzel (1917), 64 Okl. 36, 165 P. 1150, and Oklahoma Pub. Co. v. Tucker (1927), 124 Okl. 202, 254 P. 975, are cases wherein this court held that the *words used* in the articles were *defamatory per se* and that each of the articles was *libelous per se*. The publications complained of in those cases did not name the plaintiff.

 [*P31]  Fawcett invites our attention to Hargrove v. Oklahoma Press Pub. Co. (1928), 130 Okl. 76, 265 P. 635; Fite v. Oklahoma Pub. Co. (1930), 146 Okl. 150, 293 P. 1073; Wimmer v. Oklahoma Pub. Co. (1931), 151 Okl. 123, 1 P.2d 671; Tulsa Tribune Co. v. Kight (1935), 174 Okl. 359, 50 P.2d 350; and Marland Ref. Co. v. Harrel (1934), 167 Okl. 548, 31 P.2d 121, wherein we said, or held, as follows:

'A publication is actionable per se when the language used therein is susceptible of but one meaning, and that an opprobrious one, *and the publication on its face shows that the derogatory statements, taken as a whole, refer to the plaintiff, and not some other person*.' (Emphasis supplied.)

 [*P32]  If we correctly understand Fawcett's argument it is to the effect that the cited cases are authority for the proposition that the plaintiff must be named in the face [***19]  of the article. This requires an examination of those cases.

 [*P33]  In Hargrove, supra, the libelous publication was directed at William Hargrove, 'a Negro'. In the article it was said that 'Hargrove's wife appeared at the office of the United States marshall * * * and paid Hargrove's fine.' William Hargrove's wife, Florence Hargrove, a white woman, filed an action for damages upon the theory that she had been libeled. This court found that the article was *about* William Hargrove *and not* about Florence Hargrove. Obviously the court felt that it made a difference as to *whom* the article was written about. The applicable law where the article is not *about* the plaintiff is considered in an annotation in 69 A.L.R. at page 734, entitled 'publication or statement as defamatory, by reason of extrinsic facts, of person not referred to nor intended to be referred to'. However, this court in attempting to find the applicable law utilized the last above emphasized quotation which was taken from Rowan v. Gazette Printing Co., 74 Mont. 326, 239 P. 1035. (See Hargrove, supra.) The Rowan case dealt with a libelous article wherein the circumstances related cast suspicion upon any one [***20]  (but only one) of five or six people, all of whom were named in the article. Obviously the law applicable in the Rowan case did not apply precisely to the Hargrove case.

 [*P34]  In Fite, Wimmer, and Tulsa Tribune, supra, the problem was *what* was libelous per se and not *who* was libeled. In fact in these cases the plaintiffs were named on the face of the allegedly libelous publications.

 [*P35]  In Marland Refining Co., supra, the libelous affidavit referred to a distributor of Marland products who may have been in Sapulpa, Ponca City, or any other place in Oklahoma where Marland products were being sold. Plaintiff was a distributor in Sapulpa, but not necessarily the one libeled. In the Marland case the court correctly followed the rule from the Montana case as expressed in the Hargrove case.

 [*P36]  Fawcett also refers to Owens v. Clark (1931) 154 Okl. 108, 6 P.2d 755, wherein the court again utilized the rule announced in the Montana case and followed in Hargrove, Fite and Wimmer, supra. It will be observed that the libelous article in the Owens case dealt with 'certain members' of the Oklahoma Supreme Court and not **[**50]** *all* of its members. Without attempting to defend the Owens [***21]  case we do observe that it is distinguishable from the case now under consideration. In that case the court said:

'The article was not published about the Supreme Court, *but about certain members* of the Supreme Court * * *. (Emphasis supplied.)

'We are not unmindful of the rule that one who publishes matter about a board or jury or family in its collective capacity assumes the risk of its being libelous.'

 [*P37]  One obvious distinction between the Owens case and the instant case is that the article by Fawcett in True magazine is levelled at the

entire team.

[*P38]  The rule that *HN3* it is not necessary for plaintiff to be identified by name in the libelous article is lucidly explained in National Ref. Co. v. Benzo Gas Motor Fuel Co., 20 F.2d 763, 55 A.L.R. 406, wherein it is said:

'* * * Whether an article is of a libelous character per se, and whether it has application to a particular party plaintiff, *are entirely distinct questions*, and should not be confused. The answer to the first question is to be found in the article itself. The answer to the second question is to be found in the proof supporting proper allegations in the complaint. Those proofs may consist of either of the article [***22]  itself, *or of extrinsic*  evidence.' (Emphasis supplied.)

[*P39]  The statement just quoted is in harmony with 12 O.S.1961 §§ 303 and 1444, and the better reasoned decisions from this and other courts. See Chapa v. Abernethy, Texas Civil Appeals, 175 S.W. 166; E. I. DuPont de Nemours & Co. v. Nashville Banner Publ., 6 Cir., 12 F.2d 231; and annotation appearing in 91 A.L.R. at pages 1163, 1169, and 1171.

[*P40]  The additional and final legal argument presented under Fawcett's second proposition is that a defamatory publication concerning a large group is not libelous per se as to an unnamed member of that group. In this connection it appears that the courts have generally held that defamatory words used broadly in respect to a large class or group will not support a libel action by an individual member of the group. 70 A.L.R.2d 1382. This doctrine appears to stem from the early decision of Sumner v. Buel, 12 Johns 475 (New York 1815), wherein the court concluded that a *civil*  action would not lie for a libelous publication against all of the nine officers of three named rifle companies, because of the uncertainty as to who was libeled. In that case the court said:

'* * * A writing which [***23]  inveighs against mankind in general, or against a particular order of men, is no libel, nor is it even indictable. It must descend to particulars and individuals, to make it a libel. (3 Salk. 224, 1 Ld.Raym. 486).'

[*P41]  We have examined the cited case, King v. Alme & Nott, as reported in 3 Salk. 224 (1700), 91 English Reports 790, and notice that the head notes refer to King v. Orme and Nott as the same case, reported in Trin. 11 Will. 3, B.R. 1 Ld.Raym. 486, 91 English Reports 1224. In our examination of the case as reported in these two citations it is apparent that it was a criminal case, but moreover it appears from King v. Orme and Nott that the reason why the indictment was set aside was because the jurors were unable from the proof to determine who had been libeled. In that report it was said:

'An indictment for a libel upon persons to the jurors unknown is insufficient even after verdict. * * * For the jurors did not know the persons who were affected by the libel; therefore they could not properly say that the matter was false and scandalous, when they did not know the persons of whom it was spoken; nor could they say that any one was defamed by it.'

[*P42]  **[**51]**  Thus it [***24]  is quite apparent that the case is not authority for the proposition that plaintiff in a suit based upon a libelous publication against nine identifiable officers of three named rifle companies could not recover in a libel action. In 34 Columbia Law Review, beginning at page 1332, is a very thorough and studiously prepared article entitled 'Liability for Defamation of a Group.' In the article it is said of Sumner v. Buel, supra, that 'the misinterpretation of a dictum in an early English criminal libel case (King v. Alme, supra) gave rise to the doctrine that because of the absence of specific mention of any person, no action would lie for a statement of this nature.'

[*P43]  Sumner v. Buel, supra, is explained in People v. Eastman, 188 N.Y. 478, 81 N.E. 459, in the following language:

'* * * the charges in the article (Sumner v. Buel) being against a *whole class*  no single individual could maintain an action for libel against the author, * * * but not so, however, as regards a criminal prosecution for libel.' (Emphasis supplied.)

[*P44]  Sumner v. Buel did not involve a *whole class*  (but only nine officers who were easily identified -- see the strong dissenting opinion). Furthermore, [***25]  that court utilized a criminal case to support its decision in a civil case, but it was observed by People v. Eastman that the civil case of Sumner v. Buel could not be used in support of a criminal case. People v. Eastman was later used by our Court of Criminal Appeals in pointing up a distinction between group libel in civil and criminal cases. Crane v. State, 14 Okl.Cr. 30, 166 P. 1110, 19 A.L.R. 1455.

[*P45]  From our examination of the authorities we have reached the conclusion that the English courts have never barred recovery in Group libel cases unless the group is extremely large. In Ortenberg v. Plamondon et al., Quebec Court of Appeals, 35 Can. Law Times 262, American Annotated Cases, Ann.Cas.1915C, Page 347, it was held that a member of the Jewish race in Quebec, consisting of 75 families out of a total city population of 80,000 people, could maintain an action of defamation of the entire group even though he was not assailed individually, but only as a member of the group.

[*P46]  In 23 L.R.A.,N.S., 726, the author of the annotation finds a distinction between 'Class libel' and 'Group libel'. He concludes from the cases cited that a member of a 'Class' which has been libeled may [***26]  not maintain an action for libelous matter in derogation of a class. In reference to 'Group libel', he concludes:

'If the defamatory matter is used toward the entire group -- that is, includes all of them, -- it may generally be said to refer to each, so that each may sue. On the other hand, if the language is used indefinitely or impersonally toward one or a few of several members of a group, any member must establish its application to him in order to maintain his action.'

[*P47]  In Anno., 97 A.L.R. 281, the author states:

'The general rule is that *HN4* if defamatory language is used towards an entire group, including every one of them, it may be said to refer to each member of the group so that each may sue.'

[*P48]  In 36 C.J. Libel and Slander, § 26; 53 C.J.S. Libel and Slander § 11, it is said:

'* * * on the other hand if the charge is against a class, and is, or may be, made of definite application, any one of that class may maintain an action upon showing that the words applied especially to him.'

[*P49]  While there is substantial precedent from other jurisdictions to the effect that a member of a 'large group' may not recover in an individual action for a libelous publication unless he [***27]  is referred to personally, we have found no substantial reason why *size*  alone should be conclusive. We are not inclined to follow such a rule where, as here, the complaining member of the group is as well known and

identified in connection with the group as was the plaintiff in this **[**52]** case. In 31 Columbia Law Review 1322, supra, in considering group libel, it said with good measure:

'* * * the primary consideration would properly seem to be whether the plaintiff was in fact defamed, although not specifically designated. Considerations adduced in support of the absolute denial of recovery are inconclusive, as against the desirability of providing a remedy for actual injury.

'A more realistic approach would recognize that even a general derogatory reference to a group does affect the reputation of every member, and would adopt as its test the intensity of the suspicion cast upon the plaintiff.'

 **[\*P50]**  Measured by the foregoing considerations, and uncontradicted facts in this case, it cannot be successfully contended that the plaintiff was not defamed by the article in question.

 **[\*P51]**  We hold, in answer to Fawcett's second proposition, that since the article is libelous on its face **[\*\*\*28]** without the aid of extrinsic facts to make it so, it is libelous per se; that the article libels every member of the team, including the plaintiff, although he was not specifically named therein; that the average lay reader who was familiar with the team, and its members, would necessarily believe that the regular players, including the plaintiff, were using an amphetamine spray as set forth in the article; that the article strongly suggests that the use of amphetamine was criminal; and that plaintiff has sufficiently established his identity as one of those libeled by the publication.

 **[\*P52]**  In reaching the conclusion that plaintiff has established his identity in the mind of the average lay reader as one of those libeled, we are mindful that a full-back on the alternate squad of a university team who has played in nine out of eleven all victorious games in one season will not be overlooked by those who were familiar with the team, and the contribution made by its regular players. It should be remembered that plaintiff was a constant player, and not a part of the 'changing' element of that group.

 **[\*P53]**  We conclude that Fawcett's second proposition is without substantial merit.

 **[\*P54]**  Fawcett's third **[\*\*\*29]** proposition is that the article was qualifiedly or conditionally privileged. Our statutory definition of 'privileged publication' (12 O.S.1961 § 1443) refers to the type of privilege commonly called absolute. It is not contended that the publication here comes within that definition. Qualified privilege, however, has broader scope. Definitions of qualified privilege are usually very general in nature and difficult of precise construction. See 53 C.J.S. Libel and Slander § 89 et seq.; 33 Am.Jur. Libel and Slander, Sec. 126. **HN5** With regard to privilege generally, it is said that '* * * in order to be shielded * * * on this ground, the communication must be a privileged one uttered on a privileged occasion by a privileged person to one within the privilege'; 53 C.J.S. Libel and Slander § 87. With regard to qualified, or conditional privilege, it is said in 53 C.J.S. Libel and Slander § 89, that 'It relates more particularly to private interests * * *.' An examination of the cases in which the defense of qualified privilege has been held applicable reveals that as a general rule some special private relationship has been involved, such as fraternal, fiduciary, business, or professional. **[\*\*\*30]** Such is not the case here. No special relationship is shown, and no privileged person or privileged occasion is shown.

 **[\*P55]**  We have examined the cases cited by Fawcett in support of this proposition and do not find them controlling under the facts presented in this case. We hold that the publication dealt with in this case was not a qualifiedly, or conditionally privileged publication.

 **[\*P56]**  In Fawcett's fourth proposition it is said that the court erred in excluding competent evidence during the cross-examination of the plaintiff. During cross-examination, **[\*\*53]** counsel for Fawcett inquired if plaintiff had not left the Oklahoma University in 1958 to play professional football in San Francisco. Upon receiving an affirmative answer the further question and proceeding were as follows:

'Q. Now, at San Francisco on a professional football team that you were with, did you hear people say that they used something?

'A. Yes sir.'

'Mr. Grove (for plaintiff): 'If the Court please, I think that it is incompetent, irrelevant, and immaterial. What he did at the University of Oklahoma would be material, but some other team I think is immaterial and we object to it. He testified he didn't **[\*\*\*31]** use it and it is immaterial whether others use it or not.'

'The Court: 'I think that is right, that will be sustained.'

 **[\*P57]**  It is urged in Fawcett's brief that this inquiry was made for the purpose of showing that players on the San Francisco team took stimulants and that plaintiff knowingly played with such team mates, and that such evidence was competent to establish plaintiff's reputation in order to establish what damages, if any, the plaintiff was entitled to receive.

 **[\*P58]**  Fawcett did not make an offer of proof and did not make disclosure of the reason for this line of inquiry. The statute, 12 O.S.1961 § 630, **HN6** provides that formal exceptions to rulings of the court are not necessary but it does require that a party make known to the Court the action which he desires the Court to take and his grounds therefor. Since this was not done we cannot say that the trial court committed reversible error in sustaining the objection. Garret v. Lacquement, Okl., 306 P.2d 696.

 **[\*P59]**  Fawcett's fifth proposition is that 'TV, movie and photographic equipment in the courtroom and publicity resulting therefrom deprived defendant of a fair trial.' In that connection, the record of the trial proper does not **[\*\*\*32]** show that such equipment was used during the progress of the trial itself, and the only information in the record before us in that regard is contained in an ex parte affidavit of an attorney for defendant, attached to the motion for new trial. It tends to show that such equipment was used during times when the court was in recess, and with the consent and under the supervision of the court. On this showing, we are unable to say that defendant was deprived of a fair trial.

 **[\*P60]**  The sixth proposition is that the admission of evidence of the financial worth of defendant prevented defendant from having a fair trial.

 **[\*P61]**  It is well settled that **HN7** in an action wherein punitive damages are proper, evidence of the financial worth of the defendant is competent and admissible. Smith v. Autry, 69 Okl. 28, 169 P. 623. In the petition herein, plaintiff asked for punitive damages, and the evidence was sufficient to support punitive damages if the jury had awarded the same.

 **[\*P62]**  Defendant, Fawcett, makes a further argument under this proposition to the general effect that under the circumstances existing in this case, plaintiff had the burden of proving malice on the part of the defendant; that he did not **[\*\*\*33]** do so and was therefore not entitled to

224

punitive damages; that the evidence of defendant's financial condition was therefore not admissible. However, under the authorities cited by defendant, this is true only where the publication is privileged. As we have seen, such is not the case here.

 [*P63]  Fawcett's last proposition is that the damages awarded here were excessive, and not justified by the law or the evidence.

 [*P64]  In this connection, defendant points out that there was no proof of 'pecuniary loss', and calls attention to the first sentence of 12 O.S.1961 § 1446, to the effect that a verdict for plaintiff in a libel action shall never be '* * * less than one hundred dollars and costs, and may be for a greater sum *if the proof justifies the same*.' (Emphasis supplied.) Defendant argues, in effect, that the verdict may not **[**54]** be for more than one hundred dollars unless the proof *of damages* justifies the same. The words 'of damages' are not in the statute, and we do not believe they should be read into the statute. To do so would be to limit the meaning of the word 'proof' in a manner not apparent from the statute itself and not contemplated by the Legislature. Such an [***34] interpretation would also completely nullify the rule, well established when this section of the statute was enacted, HN8⬆ permitting a recovery of general damages for libel per se without actual proof thereof. No legislative intention to that affect appears. We think the term 'proof' as used in this section includes any proof on any point properly presented by either party in the presentation of the case. See Kelly v. Roetzel, supra.

 [*P65]  On the question of the amount of damages, it is said that 'determination of the amount of compensation that should be paid in a particular case is peculiarly a matter for the jury, although if the amount allowed is excessive the court may interfere'; and that '* * * such factors as the nature of the imputation made, the circumstances surrounding its publication, * * * and the general status and position of the parties, may all be taken into consideration'. 33 Am.Jur. Libel and Slander, Sec. 209.

 [*P66]  In the instant case, the defamatory publication imputed the commission of a crime -- the illegal use of amphetamine; it was made in a magazine of general circulation; the natural result or such publication was to expose the plaintiff to hatred, ridicule and [***35] contempt; the plaintiff was a young man whose character and reputation was not questioned, and he was not guilty of the crime charged.

 [*P67]  Considering these facts, and in view of the principle that HN9⬆ the amount of general damages to be awarded in a libel action is peculiarly within the province of the jury, we are unable to say that the damages awarded here were excessive. 35 A.L.R.2d 218.

 [*P68]  We now consider on behalf of plaintiff his proposition that the trial court erred in directing a verdict for the defendant Mid-Continent, and against the plaintiff. In support of this proposition plaintiff states that Mr. Albro, who was called as a witness for the plaintiff, testified that he was the manager of the Oklahoma City News Agency, a subsidiary of Mid-Continent; that he (Albro) testified that he read a newspaper article published concerning the article 'The Pill That Can Kill Sports.' Counsel says that the newspaper article referred to was dated February 8, 1958, and that in this newspaper article it was reported that an official at O. U. branded the article (in True Magazine) as wholly untrue. Plaintiff concludes therefrom that 'Mid-Continent, through its agent (Albro) had notice of the [***36] nature of the article (in True) and of the denial which had been made as to the truthfulness thereof.' For the foregoing reason plaintiff argues that Albro, having read the newspaper article prior to the distribution of True Magazine, it was error to direct a verdict in favor of Mid-Continent.

 [*P69]  From our examination of the record we are unable to determine that Albro so testified. He did testify that he believed there was an article in the paper. He then testified:

'Q. Do you remember reading any article in the paper?

'A. No, I can't say as I do.

'Q. Do you remember any discussion that you might have had with anyone concerning this particular article?

'A. No.'

 [*P70]  The record does not show, as contended by plaintiff, that Mid-Continent had knowledge of the article prior to its distribution and we are unable to conclude from the argument that the trial court erred in directing a verdict for Mid-Continent.

 [*P71]  The judgment in favor of plaintiff and against Fawcett Publications, Inc., is affirmed; and the action of the trial court in sustaining the motion for directed verdict and entering judgment for the defendant, **[**55]** Mid-Continent News Company, is also affirmed.

 [*P72]  WILLIAMS,  [***37]  C. J., and WELCH, JOHNSON and IRWIN, JJ., concur.

 [*P73]  BLACKBIRD, V. C. J., and DAVISON ⬇ and BERRY ⬇, JJ., concur in part and dissent in part.


**Dissent by:** HALLEY

# Dissent

HALLEY, Justice (dissenting).  [*P1]  It is impossible for me to agree with the majority opinion.

 [*P2]  Nowhere in the alleged libelous article did it say that the use of amphetamine by the individual player was a crime. Neither did the paragraph in the article where the University of Oklahoma was referred to did it say that amphetamine was given to the players. Here in that paragraph:

'Speaking of football teams, during the 1956 season, while Oklahoma was increasing its sensational victory streak, several physicians observed Oklahoma players being sprayed in the nostrils with an atomizer. And during a televised game, a close-up showed Oklahoma spray jobs to the nation. 'Ten years ago,' Dr. Howe observed acidly, 'when that was done to a horse, the case went to court. Medically, there is no reason for such treatment. If players need therapy, they shouldn't be on the field.'

 [*P3]  There is nothing in the article that is libelous per se as to Dennit Morris. Nowhere does it say that he partook of the amphetamine nor does it say that he would have [***38] been violating the law if he had.

225

[*P4]  In Section 1441 of 12 O.S. 1961, libel is defined as follows:

'Libel is a false or malicious unprivileged publication by writing, printing, picture, or effigy or other fixed representation to the eye, which exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation, or any malicious publication as aforesaid, designed to blacken or vilify the memory of one who is dead, and tending to scandalize his surviving relatives or friends.'

To me it is unthinkable that the article in question would expose Dennit Morris to public hatred, contempt, ridicule or obloquy or injure him in any way. He was trained by a highly respected coaching staff. His own evidence showed that he was a professional football player after leaving school and that he received employment with one of the major oil companies of this country.

[*P5]  For this judgment to stand up the article must be libelous 'per se' which means by itself, simply as such in its own nature or without reference to its relations, and in connection with libel and slander is applicable to words which are actionable because [***39]  they of themselves, without anything more, are opprobrious. Tulsa Tribune Co. v. Kight, 174 Okl. 359, 50 P.2d 350 (1935); Marland Refining Co. v. Harrel, 167 Okl. 548, 31 P.2d 121 (1934); Wimmer v. Oklahoma Pub. Co., 151 Okl. 123, 1 P.2d 671 (1931); Fite v. Oklahoma Pub. Co., 146 Okl. 150, 293 P. 1073 (1931); Hargrove v. Oklahoma Press Pub. Co., 130 Okl. 76, 265 P. 635 (1928).

[*P6]  In Libel and Slander, 53 C.J.S. § 8, we find this statement:

'In general, defamatory words may be divided into those that are actionable per se, which on their face and without the aid of extrinsic proof are recognized as injurious, and those that are actionable per quod, as to which the injurious character appears only in consequence of extrinsic facts.'

[*P7]  To me the most that can be made of this article as to Dennit Morris is that it is 'libel per quod' and failure of trial court to require plaintiff to plead and prove special damage constituted reversible error. Oklahoma Publishing Co. v. Gray, 138 Okl. 71, 280 P. 419. See also 53 C.J.S. Libel and Slander, §§ 162, 170 and 262.

[*P8]  I dissent.



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

⚠️ **Harte-Hanks Communications v. Connaughton, 491 U.S. 657**

Copy Citation

Supreme Court of the United States

March 20, 1989, Argued ; June 22, 1989, Decided

No. 88-10

**Reporter**

491 U.S. 657 * | 109 S. Ct. 2678 ** | 105 L. Ed. 2d 562 *** | 1989 U.S. LEXIS 3133 **** | 57 U.S.L.W. 4846 | 16 Media L. Rep. 1881

HARTE-HANKS COMMUNICATIONS, INC. v. CONNAUGHTON

**Prior History:** [****1] CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT.

**Disposition:** 842 F. 2d 825, affirmed.

## Core Terms

actual malice, interview, tapes, charges, newspaper, allegations, malice, witnesses, reckless disregard, public figure, candidate, promised, listen, clear and convincing proof, credibility, falsity, publisher, election, confirm, cases, libel, convincing, reporting, campaign, defamatory, finding of actual malice, extreme departure, municipal court, subsidiary, questions

## Case Summary

**Procedural Posture**

Following a jury verdict in the district court in favor of respondent judicial candidate in his action for libel against petitioner newspaper, the United States Court of Appeals for the Sixth Circuit affirmed. The newspaper petitioned for review.

**Overview**

A judicial candidate won a judgment against a newspaper for libel after the paper published a story alleging that he acted unethically, lied, and extorted witnesses. The appellate court affirmed. On final appeal, the Supreme Court affirmed, holding that the appellate court applied the correct substantive legal standard in reviewing the action because its opinion ultimately rested on a finding of the paper's reckless disregard for the truth and actual malice. The appellate court properly conducted its review independently of the jury's verdict, and determined that the record supported the finding of actual malice where testimony proved that the paper purposely avoided the truth when it published the story based on the allegations of a single source without verifying her claims against the taped interview of another key source, and that it intentionally ignored the contrary assertions of other witnesses and the candidate's denials. Further, a conclusion of actual malice logically followed the jury's rejection of testimony by the paper's witnesses as to their reasons for failing to corroborate the allegations.

**Outcome**

The Supreme Court affirmed the appellate court's decision, which upheld the judgment against the newspaper for libel.

## ▼ LexisNexis® Headnotes

Torts > ... > Defamation ▾ > Public Figures ▾ > Actual Malice ▾

View more legal topics

**HN1** ⬆ **Public Figures, Actual Malice**

A public figure may not recover damages for a defamatory falsehood without clear and convincing proof that the false statement was made

with actual malice -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not. Judges in such cases have a constitutional duty to exercise independent judgment and determine whether the record establishes actual malice with convincing clarity.  More like this Headnote

*Shepardize® - Narrow by this Headnote (129)*   ➕ 10

Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > General Overview ▾
Torts > Intentional Torts ▾ > Defamation ▾ > Libel ▾
View more legal topics

**HN2**⬇ **Freedom of Speech, Defamation**
In a libel action, a public figure plaintiff must prove more than an extreme departure from professional standards. A newspaper's motive in publishing a story -- whether to promote an opponent's candidacy or to increase its circulation -- cannot provide a sufficient basis for finding actual malice. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (125)*    ⚠ 4   ➕ 8

Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > General Overview ▾
Torts > ... > Defamation ▾ > Public Figures ▾ > Actual Malice ▾
View more legal topics

**HN3**⬇ **Freedom of Speech, Defamation**
Public figure libel cases are controlled by the New York Times standard of reckless disregard for the truth and actual malice, not by the professional standards rule, representing highly unreasonable conduct resulting in an extreme departure from the standards of responsible journalism. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (110)*    ⚠ 1    ➕ 9

Torts > ... > Defamation ▾ > Public Figures ▾ > Actual Malice ▾
View more legal topics

**HN4**⬇ **Public Figures, Actual Malice**
The actual malice standard for libel actions is not satisfied merely through a showing of ill will or "malice" in the ordinary sense of the term. A public figure must show that the publication contains a false statement of fact that was made with knowledge that the statement was false or with reckless disregard as to whether or not it was true. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (188)*    ➕ 14

Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > General Overview ▾
Torts > Intentional Torts ▾ > Defamation ▾ > Libel ▾

**HN5**⬇ **Freedom of Speech, Defamation**
In the context of a libel claim, although the concept of "reckless disregard" cannot be fully encompassed in one infallible definition, the defendant must have made the false publication with a high degree of awareness of probable falsity or must have entertained serious doubts as to the truth of his publication. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (338)*    ⚠ 1    ➕ 38

Civil Procedure > Appeals ▾ > Standards of Review ▾ > De Novo Review ▾
Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > General Overview ▾
Torts > Intentional Torts ▾ > Defamation ▾ > Procedural Matters ▾
View more legal topics

**HN6**⬇ **Standards of Review, De Novo Review**
The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (156)*    ⚠ 1    ➕ 12

Civil Procedure > Appeals ▾ > Standards of Review ▾ > De Novo Review ▾
Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > General Overview ▾

**HN7**⬇ **Standards of Review, De Novo Review**
Judges, as expositors of the Constitution, have a duty to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (40)*    ➕ 5

Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > General Overview ▾
Torts > ... > Defamation ▾ > Public Figures ▾ > Actual Malice ▾

View more legal topics

**HN8**  **Freedom of Speech, Defamation**

If a false and defamatory statement is published with knowledge of falsity or a reckless disregard for the truth, the public figure may prevail. A "reckless disregard" for the truth, however, requires more than a departure from reasonably prudent conduct. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. The standard is a subjective one -- there must be sufficient evidence to permit the conclusion that the defendant actually had a high degree of awareness of probable falsity. As a result, failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. In a case involving the reporting of a third party's allegations, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (505)*   ⚠ 3   ➕ 55

Civil Procedure > Appeals ⏷ > Standards of Review ⏷ > Clearly Erroneous Review ⏷
Torts > ... > Defenses ⏷ > Privileges ⏷ > Constitutional Privileges ⏷
View more legal topics

**HN9**  **Standards of Review, Clearly Erroneous Review**

In determining whether the constitutional standard for a finding of libel has been satisfied, the reviewing court must consider the factual record in full. Although credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the opportunity to observe the demeanor of the witnesses, the reviewing court must examine for itself the statements in issue and the circumstances under which they were made to see whether they are of a character which the principles of the First Amendment protect. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (63)*   ➕ 3

Constitutional Law > ... > Freedom of Speech ⏷ > 📄 Defamation ⏷ > General Overview ⏷
Torts > Intentional Torts ⏷ > Defamation ⏷ > Libel ⏷

**HN10**  **Freedom of Speech, Defamation**

In the context of a libel action, although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (140)*   ⚠ 2   ➕ 14

Constitutional Law > ... > Freedom of Speech ⏷ > 📄 Defamation ⏷ > General Overview ⏷
Torts > Intentional Torts ⏷ > Defamation ⏷ > Libel ⏷

**HN11**  **Freedom of Speech, Defamation**

Where there is reason to question an informant's veracity, and where newspaper editors do not interview a witness who had the same access to the facts as the informant and do not listen to tapes that revealed what actually happened, that evidence of an intent to avoid the truth is not only sufficient to prove that there has been an extreme departure from professional publishing standards, but it is also sufficient to satisfy the more demanding actual malice standard. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (103)*   ⚠ 7   ➕ 8

---

▼  Lawyers' Edition Display

---

**Decision**

Federal Court of Appeals' judgment affirming public-figure libel judgment against newspaper affirmed, where evidence reviewed in its entirety sufficiently supported finding of actual malice.

**Summary**

In September 1983, a candidate for a municipal judgeship in Hamilton, Ohio conducted a tape-recorded interview with a witness who made bribery charges against the incumbent judge's court administrator. Based on these charges, the candidate filed a complaint against the administrator, who was subsequently arrested, indicted by a grand jury, and convicted. A grand jury witness, who was the sister of the first witness, told a local newspaper's editorial director and reporter that (1) the candidate had told the two sisters that his purpose in conducting the tape-recorded interview with the first witness was to privately confront the administrator and the incumbent judge and force them into resigning, and (2) the candidate had promised the two sisters that he would pay for a vacation for them, buy a restaurant for their parents to operate, provide the sisters with jobs, and perform other favors for them. The newspaper, which supported the re-election of the incumbent judge, published an editorial on October 30, 1983 predicting that further information concerning the integrity of the candidate and the incumbent might surface in the last few days of the campaign. An article appeared in the newspaper 2 days later in which the grand jury witness was quoted as stating that the candidate had used "dirty tricks" and had offered her and her sister jobs and a vacation in appreciation for their help in the investigation of the administrator. Before this article was published, the newspaper had chosen not to question the first witness or to listen to tape recordings of the interview that had been made available to it by the candidate. The candidate filed a libel action in Federal District Court. After a trial, the jury found that the article was false and defamatory and that it had

been published with actual malice, and the candidate was awarded compensatory and punitive damages. The District Court denied a motion for judgment notwithstanding the verdict. The United States Court of Appeals for the Sixth Circuit, affirming, (1) did not attempt to make an independent evaluation of the credibility of conflicting oral testimony concerning the subsidiary facts underlying the jury's finding of actual malice, but instead (2) identified 11 subsidiary facts, comprising the candidate's theory of the case, that the jury could have found, and (3) held that such findings would not have been clearly erroneous and that--based on the Court of Appeals' independent review--such findings, when considered cumulatively, provided clear and convincing evidence of actual malice (842 F2d 825).

On certiorari, the United States Supreme Court affirmed. In an opinion by Stevens ▾, J., joined by Rehnquist ▾, Ch. J., and Brennan ▾, White ▾, Marshall ▾, Blackmun ▾, O'Connor, and Kennedy ▾, JJ., it was held that (1) the Court of Appeals judged the case by the correct substantive standard of "actual malice"--under which a public figure must prove that a defamatory statement was made with knowledge that it was false or with reckless disregard for the truth--even though certain statements in the Court of Appeals' opinion, when read in isolation, appeared to indicate that the Court of Appeals at times substituted a "professional standards" rule--under which a public figure would need to make a showing only of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers--for the "actual malice" requirement and at other times inferred actual malice from the newspaper's motive in publishing the article; (2) the Supreme Court's own review of the entire record indicated that the jury must have made certain findings that, when considered alongside the undisputed evidence, led inextricably to the conclusion that the newspaper acted with actual malice; and (3) the Court of Appeals' judgment would accordingly be affirmed even though the case should have been decided on a less speculative ground than what the jury "may" have found.

White ▾, J., joined by Rehnquist ▾, Ch. J., concurring, expressed the view that the court's opinion was consistent with (1) the view that a trial court's findings of historic fact are reviewable only under the clearly erroneous standard, (2) the view that a trial court's determination of the "reckless disregard" component of the actual malice standard is to be reviewed independently by the appellate court, and (3) the views expressed by Scalia ▾, J., in his opinion concurring in the judgment.

Blackmun ▾, J., concurring, expressed the view that (1) the court could not give full consideration to aspects of the article's content that perhaps were of constitutional significance, because the newspaper had abandoned the defense of truth and had not relied on a defense based on the "neutral reportage" theory, which would immunize from liability the accurate and disinterested reporting of serious charges made against a public figure by a responsible, prominent organization; (2) the form and content of an allegedly defamatory news story are relevant not only to the falsity and neutral reportage questions, but also to the question of actual malice; and (3) the court's opinion cannot fairly be read to hold that the form and content of such an article is irrelevant to the actual malice inquiry, although several aspects of the opinion might be so interpreted.

Kennedy ▾, J., concurring, expressed the view that the court's opinion was not inconsistent with the analysis set out in the separate concurrence of Scalia ▾, J.

Scalia ▾, J., concurring in the judgment, expressed the view that (1) highly unreasonable conduct constituting an extreme departure from ordinary standards of investigation and reporting is not enough alone to establish the malice necessary to assess liability in public-figure libel cases, and (2) the Court of Appeals' analysis of the jury's findings should have been adopted in its entirety, and the Supreme Court should not have consulted only a limited number of the permissible findings, but should have made its independent assessment whether malice was clearly and convincingly proved on the assumption that the jury made all the supportive findings that it reasonably could have made.

## Headnotes

CONSTITUTIONAL LAW §948 > libel -- public figure -- actual malice --  > Headnote:
*LEdHN[1A]⤓**LEdHN[1B]⤓* [1B]*LEdHN[1C]⤓* [1C]

Under the Federal Constitution, a public figure may not recover damages for a defamatory falsehood without clear and convincing proof that the false statement was made with actual malice--that is, with knowledge that it was false or with reckless disregard for the truth; public-figure libel cases are not controlled by the "professional standards" rule, under which a public figure would need to make a showing only of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.

APPEAL §1673 > affirmance --  > Headnote:
*LEdHN[2A]⤓* [2A]*LEdHN[2B]⤓* [2B]*LEdHN[2C]⤓* [2C]*LEdHN[2D]⤓* [2D]

On certiorari to review a United States Court of Appeals decision that, in affirming a libel judgment against a newspaper in favor of a public figure, (1) did not attempt to make an independent evaluation of the credibility of conflicting oral testimony concerning the subsidiary facts underlying the jury's finding of actual malice, but instead (2) identified 11 subsidiary facts that the jury could have found, and (3) held that such findings would not have been clearly erroneous and that--based on the Court of Appeals' independent review--such findings, when considered cumulatively, provided clear and convincing evidence of actual malice, the United States Supreme Court will affirm the Court of Appeals' judgment, where the Supreme Court finds, based on its review of the entire record, that the jury must have made certain findings that, when considered alongside the undisputed evidence, lead inextricably to the conclusion that the newspaper acted with actual malice. ( Scalia ▾, J., dissented in part from this holding.)

APPEAL §1087.5 > Headnote:
*LEdHN[3A]⤓* [3A]*LEdHN[3B]⤓* [3B]

On certiorari to review a United States Court of Appeals decision that affirmed a Federal District Court's judgment that a newspaper article libeled a candidate for a judgeship by publishing false allegations against the candidate by a grand jury witness, the United States Supreme Court will not review the aspect of the District Court's judgment in which it was held that the defense of the "neutral reportage doctrine"--which would immunize from liability the accurate and disinterested reporting of serious charges made against a public figure by

230

"responsible, prominent organization"-was unavailable to the newspaper, where the newspaper did not argue in its petition for certiorari and does not argue before the Supreme Court, that such a doctrine immunized its coverage of the grand jury witness' allegations.

CONSTITUTIONAL LAW §948  >  EVIDENCE §918 > sufficiency -- actual malice -- libel -- public figure --  > Headnote:
**LEdHN[4A]** [4A]**LEdHN[4B]** [4B]

For purposes of the federal constitutional rule that a public figure may not recover damages for a defamatory falsehood without clear and convincing proof that the false statement was made with actual malice, the "actual malice" standard is not satisfied merely through a showing of "malice" in the ordinary sense of the word--that is, actual malice may not be inferred alone from evidence of personal spite, ill will, or intention to injure on the part of the writer--nor can the fact that the defendant published the defamatory material in order to increase its profits suffice to prove actual malice; instead, actual malice requires at a minimum that the statements in question were made with a reckless disregard for the truth.

CONSTITUTIONAL LAW §948 > libel -- public figure -- correct standard of judgment --  > Headnote:
**LEdHN[5]** [5]

A United States Court of Appeals judges by the correct substantive standard of "actual malice"--under which a public figure must prove that a defamatory statement was made with knowledge that it was false or with reckless disregard for the truth--a case involving a newspaper's alleged libel of a public figure, although certain statements in the Court of Appeals' opinion, when read in isolation, appear to indicate that the Court of Appeals at times substituted a "professional standards" rule--under which a public figure would need to make a showing only of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers--for the "actual malice" requirement and at other times inferred actual malice from the newspaper's motive in publishing the story in question, where it is nevertheless clear, when the opinion is read as a whole, that the conclusion concerning the newspaper's departure from accepted standards and the evidence of motive were merely supportive of the Court of Appeals' ultimate conclusion that the record demonstrated a reckless disregard as to the truth or falsity of the allegations in question and thus provided clear and convincing proof of actual malice as found by the jury in the case.

EVIDENCE §787  >  EVIDENCE §809  >  EVIDENCE §815  >  EVIDENCE §871  >  EVIDENCE §884  >  EVIDENCE §918 > relevancy -- weight -- motive -- malice -- care -- circumstantial evidence -- libel --  > Headnote:
**LEdHN[6]** [6]

In cases involving an alleged libel of a public figure, the plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, and it cannot be said that evidence concerning motive or care never bears any relation to the inquiry as to the defendant's actual malice, although courts must be careful not to place too much reliance on such factors.

EVIDENCE §918 > weight and sufficiency -- malice -- libel --  > Headnote:
**LEdHN[7]** [7]

In a libel case, the fact that an impartial jury unanimously reached the conclusion that the plaintiff was telling the truth and that a third party's allegations against him were false does not demonstrate that the defendant acted with actual malice in publishing the allegations; difference of opinion as to the truth of a matter--even a difference of 12 to 1--does not alone constitute clear and convincing evidence that the defendant acted with a knowledge of falsity or with a high degree of awareness of probable falsity.

EVIDENCE §918 > sufficiency -- actual malice --  > Headnote:
**LEdHN[8A]** [8A]**LEdHN[8B]** [8B]**LEdHN[8C]** [8C]**LEdHN[8D]** [8D]**LEdHN[8E]** [8E]

A finding that a newspaper acted with actual malice when it published an article quoting a third party's false and defamatory statements concerning a candidate for a judgeship is supported by unmistakably sufficient evidence, where it has been shown that (1) before the article was published, the third party's allegations were denied by the candidate and by 5 other witnesses, (2) the newspaper chose not to interview the one witness that both the third party and the candidate claimed would verify their conflicting accounts of the relevant events, (3) the newspaper decided not to listen to tape recordings that had been made available to it by the candidate and that might have raised additional doubts concerning the third party's veracity, (4) on the day before the defamatory article appeared, the newspaper published an editorial predicting that information concerning the integrity of the candidates for the judgeship might surface in the last few days of the campaign, (5) there were discrepancies in the testimony of newspaper employees that might have given the jury the impression that the newspaper's failure to conduct a complete investigation involved a deliberate effort to avoid the truth, and (6) in a tape recording of the newspaper's interview with the third party, the tone of the third party's answers to various leading questions raised obvious doubts about her veracity.

TRIAL §113 > question of law -- defamation -- actual malice --  > Headnote:
**LEdHN[9]** [9]

The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law; this rule is premised not simply on common-law tradition, but on the unique character of the interest protected by the actual malice standard.

CONSTITUTIONAL LAW §948  >  TRIAL §113 > defamation -- actual malice -- judge's duty to decide --  >  Headnote:

*LEdHN[10]* ⬇ [10]

The meaning of terms such as "actual malice" and "reckless disregard," in connection with defamation cases involving public figures, is not readily captured in one infallible definition; rather, only through the course of case-by-case adjudication can courts give content to such constitutional standards; most fundamentally, this rule is premised on the recognition that judges, as expositors of the Federal Constitution, have a duty to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice.

APPEAL §1477  >  CONSTITUTIONAL LAW §948 > defamation -- actual malice -- independent review -- candidates --  >  Headnote:

*LEdHN[11]* ⬇ [11]

Public discussion of the qualifications of a candidate for elective office presents the strongest possible case for (1) the application of the federal constitutional rule that a public figure may not recover damages for a defamatory falsehood without clear and convincing proof that the false statement was made with actual malice, and (2) the rule that the sufficiency of the evidence of actual malice is subject to a reviewing court's independent review.

CONSTITUTIONAL LAW §940.5 > political speech --  >  Headnote:

*LEdHN[12A]* ⬇ [12A]*LEdHN[12B]* ⬇ [12B]

That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Federal Constitution, for the use of the known lie as such a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected.

CONSTITUTIONAL LAW §948  >  EVIDENCE §918 > malice -- defamation -- reckless disregard for truth --  >  Headnote:

*LEdHN[13]* ⬇ [13]

For the purpose of the federal constitutional rule that a public figure may prevail in an action for defamation if the false and defamatory statement in question is published with actual malice--that is, with knowledge that it was false or with a reckless disregard for the truth-- such a "reckless disregard" requires more than a departure from reasonably prudent conduct; rather, there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication; such a standard of proof is a subjective one, requiring that there be sufficient evidence to permit the conclusion that the defendant actually had a high degree of awareness of probable falsity; a failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard; in a case involving the reporting of a third party's allegations, recklessness may properly be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

APPEAL §1477 > review of facts -- court's findings -- defamation --  >  Headnote:

*LEdHN[14]* ⬇ [14]

In determining whether the federal constitutional standard of liability has been satisfied in cases of defamation of a public figure, the reviewing court must consider the factual record in full; although credibility determinations are reviewed under the clearly erroneous standard, because the trier of fact has had the opportunity to observe the demeanor of the witnesses, the reviewing court must examine for itself the statements in issue and the circumstances under which they were made, in order to see whether they are of a character which the principles of the Federal Constitution's First Amendment protect.

LIBEL AND SLANDER §23 > defenses -- plaintiff's confirmation --  >  Headnote:

*LEdHN[15A]* ⬇ [15A]*LEdHN[15B]* ⬇ [15B]

With respect to an action against a newspaper for libel arising out of the publication of a third party's allegations against a public figure, the newspaper cannot maintain a claim of immunity from suit on the ground that portions of the third party's account of the relevant events were confirmed by the public figure.

CONSTITUTIONAL LAW §948 > libel -- public figure -- denials --  >  Headnote:

*LEdHN[16A]* ⬇ [16A]*LEdHN[16B]* ⬇ [16B]

With respect to the federal constitutional rule that a public figure may prevail in an action for defamation if the false and defamatory statement in question is published with knowledge that it was false or with a reckless disregard for the truth, the press need not accept denials, however vehement, of defamatory statements, since such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.

## Syllabus

Respondent was the unsuccessful challenger for the position of Municipal Judge of Hamilton, Ohio, in an election conducted on November 8,

1983. A local newspaper, the Journal News, published by petitioner supported the reelection of the incumbent. A little over a month before the election, the incumbent's Director of Court Services resigned and was arrested on bribery charges, and a grand jury investigation of those charges was in progress on November 1, 1983. On that day, the Journal News ran a front-page story quoting a grand jury witness (Thompson) as stating that respondent had used "dirty tricks" and offered her and her sister jobs and a trip to Florida "in appreciation" for their help in the investigation. Respondent filed a diversity action against petitioner for libel in Federal District Court, alleging that the story was false, had damaged his personal and professional reputation, and had been published with actual malice. After listening to six days of testimony and three taped interviews -- one conducted by respondent and two by Journal News reporters [****2] -- and reviewing the contents of 56 exhibits, the jury was given instructions defining the elements of public figure libel and directed to answer three special verdicts. It found by a preponderance of the evidence that the story in question was defamatory and false, and by clear and convincing proof that the story was published with actual malice, and awarded respondent $ 5,000 in compensatory damages and $ 195,000 in punitive damages. The Court of Appeals affirmed. It separately considered the evidence supporting each of the jury's special verdicts, concluding that neither the finding that the story was defamatory nor the finding that it was false was clearly erroneous. In considering the actual malice issue, but without attempting to make an independent evaluation of the credibility of conflicting oral testimony concerning the subsidiary facts underlying the jury's finding of actual malice, the court identified 11 subsidiary facts that the jury "could have" found and held that such findings would not have been clearly erroneous, and, based on its independent review, that when considered cumulatively they provided clear and convincing evidence of actual malice.

*Held:*

 [****3]  1. A showing of "'highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers'" cannot alone support a verdict in favor of a public figure plaintiff in a libel action. Rather, such a plaintiff must prove by clear and convincing evidence that the defendant published the false and defamatory material with actual malice, *i. e.*, with knowledge of falsity or with a reckless disregard for the truth. Although there is language in the Court of Appeals' opinion suggesting that it applied the less severe professional standards rule, when read as a whole, it is clear that this language is merely supportive of the court's ultimate conclusion that the Journal News acted with actual malice. Pp. 663-668.

2. A reviewing court in a public figure libel case must "exercise independent judgment and determine whether the record establishes actual malice with convincing clarity" to ensure that the verdict is consistent with the constitutional standard set out in *New York Times Co. v. Sullivan,* 376 U.S. 254, and subsequent decisions. See *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485.  [****4]  Based on this Court's review of the entire record, the Court of Appeals properly held that the evidence did in fact support a finding of actual malice, but it should have taken a somewhat different approach in reaching that result. While the jury *may* have found each of the 11 subsidiary facts, the case should have been decided on a less speculative ground. Given the trial court's instructions, the jury's answers to the three special interrogatories, and an understanding of those facts not in dispute, it is evident that the jury *must* have rejected (1) the testimony of petitioner's witnesses that Thompson's sister, the most important witness to the bribery charges against the Director of Court Services, was not contacted simply because respondent failed to place her in touch with the newspaper; (2) the testimony of the editorial director of the Journal News that he did not listen to the taped interviews simply because he thought that they would provide him with no new information; and (3) the testimony of Journal News employees who asserted that they believed Thompson's allegations were substantially true. When those findings are considered alongside the undisputed evidence,  [****5]  the conclusion that the newspaper acted with actual malice inexorably follows. The evidence in the record in this case, when reviewed in its entirety, is "unmistakably" sufficient to support a finding of actual malice. Pp. 685-693.

**Counsel:** Lee Levine argued the cause for petitioner. With him on the briefs were Richard L. Creighton, Jr. ▾, Kevin E. Irwin ▾, Michael D. Sullivan, and James E. Grossberg ▾.

John A. Lloyd, Jr., argued the cause for respondent. With him on the brief were Sallie Conley Lux ▾ and Jeanette H. Rost ▾.  [✓⬇]

**Judges:** Stevens ▾, J., delivered the opinion of the Court, in which Rehnquist ▾, C. J., and Brennan ▾, White ▾, Marshall ▾, Blackmun ▾, O'Connor, and Kennedy ▾, JJ., joined. White ▾, J.,  [****6]  filed a concurring opinion, in which Rehnquist ▾, C. J., joined, post, p. 694. Blackmun ▾, J., post, p. 694, and Kennedy ▾, J., post, p. 696, filed concurring opinions. Scalia ▾, J., filed an opinion concurring in the judgment, post, p. 696.

**Opinion by:** STEVENS ▾

## Opinion

 [*659]   [***571]   [**2681]  JUSTICE STEVENS ▾ delivered the opinion of the Court.

*LEdHN[1A]*⊕ [1A] *LEdHN[2A]*⊕ [2A]*HN1*⊕ A public figure may not recover damages for a defamatory falsehood without clear and convincing proof that the false "statement was made with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. 254, 279-280 (1964). See *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 162 (1967) (opinion of Warren, C. J.). In *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485 (1984), we held that judges in such cases have a constitutional duty to "exercise independent judgment and determine whether the record establishes actual malice with convincing clarity." *Id.,*  [**2682]  at 514. In this case the Court of Appeals affirmed a libel judgment  [****7]  against a newspaper without attempting to make an independent evaluation of the credibility of conflicting oral testimony concerning the subsidiary facts underlying the jury's finding of actual malice. We  [***572]  granted certiorari to consider whether the Court of Appeals' analysis was consistent with our holding in *Bose.* 488 U.S. 907 (1988).

 [*660]  I

Respondent, Daniel Connaughton, was the unsuccessful candidate for the office of Municipal Judge of Hamilton, Ohio, in an election conducted on November 8, 1983. Petitioner is the publisher of the Journal News, a local newspaper that supported the reelection of the incumbent, James Dolan. A little over a month before the election, the incumbent's Director of Court Services resigned and was arrested on bribery charges. A grand jury investigation of those charges was in progress on November 1, 1983. On that date, the Journal News ran a front-page story quoting Alice Thompson, a grand jury witness, as stating that Connaughton had used "dirty tricks" and offered her and her sister jobs and a trip to Florida "in appreciation" for their help in the investigation.

233

*LEdHN[5A]* [5A] [5A]invoking the federal court's diversity [**] jurisdiction, Connaughton filed an action for damages, alleging that the article was false, that it had damaged his personal and professional reputation, and that it had been published with actual malice. After discovery, petitioner filed a motion for summary judgment relying in part on an argument that even if Thompson's statements were false, the First Amendment protects the accurate and disinterested reporting of serious charges against a public figure. The District Court denied the motion, noting that the evidence raised an issue of fact as to the newspaper's interest in objective reporting and that the "neutral reportage doctrine" did not apply to Thompson's statements. **1** The case accordingly proceeded to trial.

*LEdHN[3B]* [3B]

[****9]  **[*661]**  After listening to six days of testimony and three taped interviews -- one conducted by Connaughton and two by Journal News reporters -- and reviewing the contents of 56 exhibits, the jury was given succinct instructions accurately defining the elements of public figure libel and directed to answer three special verdicts. **2** It [**2683] unanimously found by a [***573] preponderance of the evidence that the November 1 story was defamatory and that it was false. It also found by clear and convincing proof that the story was published with actual malice. After a separate hearing on damages, the jury awarded Connaughton $ 5,000 in compensatory damages and $ 195,000 in punitive damages. Thereafter, the District Court denied a motion for judgment notwithstanding the verdict, App. to Pet. for Cert. 83a, and petitioner appealed.

[****10]  **[*662]**  The Court of Appeals affirmed. 842 F. 2d 825 (CA6 1988). In a lengthy opinion, the majority detailed why its "independent examination of the entire record" had demonstrated that "the judgment does not pose a forbidden intrusion into the First Amendment rights of free expression." *Id.,* at 828. The opinion identified the "core issue" as "simply one of credibility to be attached to the respective parties on behalf of the respective parties and the reasonableness and probability assigned to their testimony." *Id.,* at 839-840. It separately considered the evidence supporting each of the jury's special verdicts, concluding that neither the finding that the article was defamatory **3** [****11] nor the finding that it was false **4** was clearly erroneous.

[****12]  The Court of Appeals' review of the actual malice determination involved four steps. It first noted the wide disparity between the respective parties' versions of the critical evidence, observing that if the jury had credited petitioner's evidence it "could have easily concluded that Thompson's **[*663]** charges were true and/or that the *Journal*'s conduct in determining Thompson's credibility was not a highly unreasonable departure from the standards of investigation and reporting ordinarily adhered to by reasonable publishers." *Id.,* at 840. Second, it [***574] inferred from the jury's answers to the three special interrogatories that "it obviously elected to assign greater credibility to the plaintiff's witnesses and proof [and that] the jury simply did not believe the defendants' witnesses, its evidentiary presentations or its arguments." *Ibid.* Third, having considered what it regarded as the "subsidiary or operative facts" that constituted the plaintiff's theory of the case, it concluded that the jury's findings concerning those operative facts were not clearly erroneous. *Id.,* at 843-844. Fourth, "in [****13] the exercise of its independent judgment" based on its evaluation of the "cumulative impact of the subsidiary facts," the court concluded that "Connaughton proved, by clear and convincing evidence, that the *Journal* demonstrated its actual malice when it published the November 1, 1983, article despite the existence of serious doubt which attached to Thompson's veracity and the accuracy of her reports." *Id.,* at 846.

Judge Guy dissented. In his opinion the admissions made by Connaughton in his [**2684] interview with Journal News reporters the day before the story was published sufficiently corroborated Thompson's charges to preclude a finding of actual malice. *Id.,* at 853-854. He was satisfied, as a matter of law, that respondent had failed to prove actual malice by clear and convincing evidence, regardless of whether determinations of credibility made by the jury are subject to a *de novo* standard of review. *Id.,* at 855.

II

Petitioner contends that the Court of Appeals made two basic errors. First, while correctly stating the actual malice standard announced in *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964), [****14] the court actually applied a less severe **[*664]** standard that required a showing of "'highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.'" 842 F. 2d, at 845 (quoting *Curtis Publishing Co. v. Butts,* 388 U.S. at 155 (opinion of Harlan ▾, J.)). Second, the court failed to make an independent *de novo* review of the entire record and therefore incorrectly relied on subsidiary facts implicitly established by the jury's verdict instead of drawing its own inferences from the evidence.

There is language in the Court of Appeals' opinion that supports petitioner's first contention. For example, the Court of Appeals did expressly state that the Journal News' decision to publish Alice Thompson's allegations constituted an extreme departure from professional standards. **5** [****16] Moreover, the opinion attributes [***575] considerable weight to the evidence that the Journal News was motivated by its interest in the reelection of the candidate it supported and its economic interest in gaining a competitive advantage over [****15] the Cincinnati **[*665]** Enquirer, its bitter rival in the local market. **6** [**2685] Petitioner is plainly correct in recognizing that *HN2* a public figure plaintiff must prove more than an extreme departure from professional standards and that a newspaper's motive in publishing a story -- whether to promote an opponent's candidacy or to increase its circulation -- cannot provide a sufficient basis for finding actual malice.

[****17]  *LEdHN[1B]* [1B]The language in the Court of Appeals' opinion discussing professional standards is taken from Justice Harlan ▾'s plurality opinion in *Curtis Publishing Co. v. Butts, supra,* at 155.In that case, Justice Harlan ▾ had opined that the *New York Times* actual malice standard should be reserved for cases brought by public officials. The *New York Times* decision, in his view, was primarily driven by the repugnance of seditious libel and a concern that public official libel "lay close" to **[*666]** this universally renounced, and long-defunct, doctrine. 388 U.S. at 153. In place of the actual malice standard, Justice Harlan ▾ suggested that a public figure need only make "a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Id.* at 155. This proposed standard, however, was emphatically rejected by a majority of the Court in favor of the stricter *New York Times* actual malice rule. See 388 U.S., at 162 (opinion of Warren, C. J.); *id.,* at 170 [****18] (Black, J., dissenting); *id.,* at 172 (Brennan ▾, J., dissenting). Moreover, [***576] just four years later, Justice Harlan ▾ acquiesced in application of the actual malice standard in public figure cases, see *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 69-70 (1971) (dissenting opinion), and by the time of the Court's decision in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974), the Court was apparently unanimously of this view. Today, there is no question that *HN3* public figure libel cases are controlled by the *New York Times* standard and not by the professional standards rule, which never commanded a majority of this Court.

*LEdHN[4A]* [4A]It is also worth emphasizing that *HN4* the actual malice standard is not satisfied merely through a showing of ill will or "malice" in the ordinary sense of the term. **7** See *Beckley* **[*667]** *Newspapers Corp. v. Hanks,* 389 U.S. 81 (1967)*(per curiam); see Henry v.*

*Collins, 480 U.S. 321, 1385 (1985)(per curiam).* Indeed, just last term we unanimously held that a public figure may not recover for the tort [****19] of intentional infliction of emotional distress . . . without showing . . . that the publication contains a false statement of fact which was made . . . with knowledge that the statement was false or with reckless disregard as to whether or not it was true." *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 56 (1988). Nor can the fact that the defendant published the defamatory material in order to increase its profits suffice to prove actual malice. The allegedly defamatory statements at issue in the *New York Times* case were themselves published as part of a paid advertisement. [**2686] 376 U.S. at 265-266. If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels. Actual malice, instead, requires at a minimum that the statements were made with a reckless disregard for the truth. And *HN5* although the concept of "reckless disregard" "cannot be fully encompassed in one infallible definition," *St. Amant v. Thompson,* 390 U.S. 727, 730 (1968), we have [****20] made clear that the defendant must have made the false publication with a "high degree of awareness of . . . probable falsity," *Garrison v. Louisiana,* 379 U.S. 64, 74 (1964), or must have "entertained serious doubts as to the truth of his publication," *St. Amant, supra, at 731.*

**LEdHN[4B]** [4B]

[****21] **LEdHN[5]** [5]**LEdHN[6]** [6]Certain statements in the [***577] Court of Appeals' opinion, when read in isolation, appear to indicate that the court at times substituted the professional standards rule for the actual malice requirement and at other times inferred actual malice from the newspaper's motive in publishing Thompson's story. Nevertheless, when the opinion is read as a whole, it is clear that the conclusion concerning the newspaper's departure [*668] from accepted standards and the evidence of motive were merely supportive of the court's ultimate conclusion that the record "demonstrated a reckless disregard as to the truth or falsity of Thompson's allegations and thus provided clear and convincing proof of 'actual malice' as found by the jury." 842 F. 2d. at 847. Although courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, see *Herbert v. Lando,* 441 U.S. 153, 160 (1979); *Tavoulareas v. Piro,* 260 U. S. App. D. C. 39, 66, 817 F. 2d 762, 789 (en banc), cert. denied, 484 U.S. 870 (1987), [****22] and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry. Thus, we are satisfied that the Court of Appeals judged the case by the correct substantive standard.

The question whether the Court of Appeals gave undue weight to the jury's findings -- whether it failed to conduct the kind of independent review mandated by our opinion in *Bose* -- requires more careful consideration. A proper answer to that question must be prefaced by additional comment on some of the important conflicts in the evidence.

III

The most important witness to the bribery charges against the Director of Court Services was Patsy Stephens, Alice Thompson's older sister. In a tape-recorded interview conducted in Connaughton's home between 12:30 and 4:30 a.m. on September 17, 1983, Stephens explained how, on 40 or 50 occasions, she had visited with the Court Administrator, Billy Joe New, in his office and made cash payments to dispose of "DUI" and other minor criminal charges against her former husband and various other relatives and acquaintances. **8** On September 22, pursuant to an arrangement [*669] made by Connaughton at the suggestion of the county [****23] prosecutor, Stephens took a lie detector test. After learning that she [**2687] had passed the test, Connaughton filed a written complaint against New. In due course, New was arrested, indicted, and convicted.

[****24] Alice Thompson was one of the eight persons present at the tape-recorded interview on September [***578] 17. **9** One of the cases Patsy Stephens described was a shoplifting charge against her sister. Thompson volunteered some comments about the incident, but otherwise had little to say during the long interview with Stephens. Thompson was also present on the 22d, when Stephens took the polygraph test, but Thompson declined to submit to such a test. App. 301. On that day, the two sisters spent several hours in the company of Connaughton, his wife, and two of his supporters. They discussed a number of subjects, including the fact that Billy Joe New had just resigned, the question whether there was reason to be concerned about the safety of the two sisters, the fact that Martha Connaughton might open an ice cream parlor sometime in the future, the possibility that the two sisters might be employed there as waitresses, and a vacation in Florida planned by the Connaughtons for after the election.

[****25] [*670] Late in October, New's lawyer, Henry Masana ▾, met with Jim Blount, the editorial director of the Journal News, and Joe Cocozzo, the newspaper's publisher, to arrange a meeting with Alice Thompson. Masana ▾ explained that Thompson wanted to be interviewed about the "dirty tricks" Connaughton was using in his campaign. Thereafter, on October 27, Blount and Pam Long, a Journal News reporter, met with Thompson in the lawyer's office and tape-recorded the first of the two interviews that provided the basis for the story that Long wrote and the Journal News published on November 1.

The tape of Alice Thompson's interview is 1 hour and 20 minutes long. Significant portions of it are inaudible or incoherent. It is clear, however, that Thompson made these specific charges:

-- that Connaughton had stated that his purpose in taping the interview with Patsy Stephens was to get evidence with which he could confront New and Judge Dolan ▾ and "scare them into resigning" without making any public use of the tapes; **10** [****27]

**[*671]** -- that he would pay the expenses for a 3-week vacation in Florida for the two sisters; **11**

-- [***579] [**2688] that he would buy a restaurant for the two sisters' parents [****26] to operate; **12** [****28]

**[*672]** -- that he would provide jobs for both Patsy Stephens and Alice Thompson; **13** [****29]

-- that he would take them out to a victory dinner at an expensive French restaurant after the election; **14** and

-- that Connaughton would not allow knowledge of the sisters' involvement to become public. **15**

**[*673]** [***580] During the course of the interview, Thompson indicated that she had told her story to the Cincinnati Enquirer, which declined to print it, *id., at 284,* and that the local police, likewise, were not interested, *id., at 310.* **16** Thompson indicated that she was "against" Connaughton becoming a judge. *Id., at 311.* She also asserted that since Connaughton had made public that she and her sister had provided evidence against New, friends had accused her "of being a snitch and a rat" -- epithets [****30] to [**2689] which she took great offense -- and that one reason she came to the Journal News was to "get that cleared up." **17** [****31] In her description of the interview

In Connaughton's home on September 17, Thompson stated that Connaughton had frequently turned on the tape recorder, [**18⬇] that his voice would not be heard [*674] on the tape, [**19⬇] and, somewhat inconsistently (and in response to a leading question), that most of her comments had been made in response to leading questions by Connaughton. [**20⬇]

[****32] [***581] Toward the end of the interview, Blount made two significant comments. He announced that "Pam will, of course, write the story," _id., at 314,_ and he asked "[w]hat would happen if we called your sister," _id., at 316._ In response to the first comment, Thompson volunteered a somewhat improbable explanation for her motivation in seeking the interview, [**21⬇] [****33] [*675] and in response to the second she gave an equivocal answer, [**22⬇] even though she had previously assured Blount that Stephens would [**2690] confirm everything she had said. [**23⬇]

[****34] On Sunday, October 30, an editorial appeared in the Journal News under the headline "Municipal Court Race will have More than One Loser." [**24⬇] App. to Pet. for Cert. 45a. In the column, Blount observed that the campaign "battle has been all it was expected to be and more," and predicted that "[a] lot could still happen in the next eight to nine days." _Ibid._ He went on to discuss the charges pending against New, stating that the "array of charges and counter charges probably has taken some votes from Dolan." _Ibid._ He cautioned, however, that the race was still wide open and quoted an unidentified voter as saying, "I resent voting for a person who I later find has been deceitful or dishonest [*676] in campaigning." _Id., at 46a._ Significantly, this unidentified person did not express indignation at dishonesty in the administration of the Municipal Court -- a concern one would think the arrest of New might have prompted -- but rather, a distaste for dishonesty _in campaigning_ -- a concern that the then-uninvestigated and unwritten November 1 story would soon engender. After questioning the Cincinnati Enquirer's coverage of a story critical of Dolan and suggesting that [****35] "the Connaughton forces have a wealthy, influential link to _Enquirer_ decisionmakers," the column indicated that the Journal News had not yet decided [***582] which candidate it favored, but implied that an endorsement was forthcoming. _Id., at 48a._

On October 31, a reporter for the Journal News telephoned Connaughton and asked him to attend a meeting with Jim Blount, stating "that the endorsement may hang in the balance." Tr. 457 (Aug. 9, 1985). Connaughton met with the reporter, Blount, and Cocozzo that afternoon and discussed a variety of subjects. One of the subjects was the rumor that Connaughton had an influential link to the Cincinnati Enquirer. Connaughton asserted that he had "no extraordinary pull or any inside track to anybody down there," and that any rumor to the contrary was "a lie." _Id.,_ at 458. Another subject was Connaughton's participation [****36] in the investigation of Billy Joe New. Connaughton provided a chronology of the events that led to his filing of the complaint against New and explained that he believed that he had an obligation "as an attorney and officer of the court to report [New's] crimes." _Id.,_ at 458-459. No mention was made of Thompson's interview or her charges against Connaughton. _Id.,_ at 460. After about an hour, Jim Blount received a telephone call and then told Connaughton that a reporter wanted to interview him. _Id.,_ at 462.

Connaughton then went to another office where Blount and Long advised him that they had interviewed Alice Thompson [*677] and were "trying to find out . . . how much of her statement was true." App. 256. The ensuing tape-recorded interview lasted 55 minutes. Connaughton acknowledged that the meetings that Thompson described had taken place and that there had been some speculative discussion about each of the subjects that Thompson mentioned. He stated, however, that Thompson's account of their meetings was "obviously shaded and bizarre," _id.,_ at 276, and that there was "absolutely" no "_quid pro quo_ for information." [**25⬇]

[****37] [**2691] Thus, while categorically denying that he intended to confront New and Judge Dolan⌄ with the tape of the Stephens interview to scare them into resigning, Connaughton admitted that he might well have speculated about what they would say or do if they heard the tapes. [**26⬇] Similarly, while denying [*678] that he had promised Stephens and Thompson anonymity, he agreed that he had [***583] told them that he had hoped that they could remain anonymous. [**27⬇] [****39] He also categorically denied that he had promised Thompson a job as a waitress, promised Stephens a job at the Municipal Court, or promised to set their parents up in a restaurant, although he did acknowledge a general conversation in which his wife had discussed the possibility that if her dream of opening "a gourmet ice cream shop" should materialize, the sisters might work there. [**28⬇] [****40] There were similar acknowledgments of references [*679] to a possible Florida trip and postelection victory dinner, but denials of any promises. [**29⬇] [****41] At the end [***584] of [**2692] the interview, Long went back -- stressing that Thompson's charge was a "hefty" [*680] one -- and asked for a second time whether Connaughton had promised Stephens a job at [****38] the Municipal Court if he was elected. He once again unequivocally denied the allegation. [**30⬇]

The following day the lead story in the Journal News -- under the headline "Bribery case witness claims jobs, trip offered" -- reported that "[a] woman called to testify before the . . . Grand Jury in the Billy Joe New bribery case claims Dan Connaughton, candidate for Hamilton Municipal Judge, offered her and her sister jobs and a trip to Florida 'in appreciation' for their help." [**31⬇] _Id., at 329._ The article, which carried Pam Long's byline, stated that Thompson accused Connaughton of using "'dirty tricks'" to gain her cooperation in [****42] investigating New and that Connaughton, although admitting that he did meet with Thompson, "denied any wrongdoing." _Ibid._ Each of Thompson's allegations was accurately reported, including her claims that Connaughton had promised to "protect her anonymity," _id., at 330,_ that he had promised Stephens "a municipal court job" and Thompson some other sort of work, that he had invited both sisters on "a post-election trip to Florida," and that he had offered "to set up Thompson's parents . . . in the restaurant business," _id., at 333._ The article conveyed Thompson's allegation that "the tapes were turned off and on during a session [that] lasted until 5:30 a.m.," and that these promises were [*681] made "[w]hen the tape was turned off." _Ibid._ In addition, Long wrote, "Thompson claimed Connaughton had told her the tapes he made of her . . . statement . . . were to be presented to Dolan" with the hope that Dolan might resign, thereby allowing Connaughton to assume the municipal judgeship. _Id., at 335._ Connaughton's contrary version of the events was also accurately reported.

[****43] As the Court of Appeals correctly noted, there was evidence in the record -- both in the Thompson tape and in the Connaughton tape -- that would have supported the conclusion that Thompson was telling the truth and that Connaughton was dissembling. See 842 F. 2d, at 840. On the other hand, notwithstanding the partial confirmation of Thompson's charges in the Connaughton tape, there remained a sharp conflict between their respective versions of the critical events. There was unquestionably ample evidence in the record to support a finding that Thompson's principal charges were false, either because she misinterpreted remarks by Connaughton and his wife, or because Thompson was deliberately lying.

**_LEdHN[7]⬆_** [7] **_LEdHN[8A]⬆_** [8A]The jury listened to the tape recordings of the two conflicting [***585] interviews and also observed the demeanor of the two witnesses as they testified in open court. They found that Connaughton was telling the truth and that Thompson's charges [**2693] were false. The fact that an impartial jury unanimously reached that conclusion does not, however, demonstrate that the Journal News acted with actual malice. Unlike a newspaper, a jury is often required to decide [****44] which of two plausible stories is correct. Difference of opinion as to the truth of a matter -- even a difference of 11 to 1 -- does not alone constitute clear and convincing evidence that the defendant acted with a knowledge of falsity or with a "high degree of awareness of . . . probable falsity," _Garrison, 379 U.S., at 74._ The

236

jury a verdict in this case; however, derived additional support from several critical pieces of information that strongly support the inference that the Journal **[\*682]** News acted with actual malice in printing Thompson's false and defamatory statements.

IV

_LEdHN[8B]_ [8B]On October 27, after the interview with Alice Thompson, the managing editor of the Journal News assembled a group of reporters and instructed them to interview all of the witnesses to the conversation between Connaughton and Thompson with one exception -- Patsy Stephens. No one was asked to interview her and no one made any attempt to do so. See App. 56-57, 61, 83-85. This omission is hard to explain in light of Blount's and Long's repeated questions during the Connaughton and Thompson interviews concerning whether Stephens would confirm Thompson's allegations. See [\*\*\*\*45] _id., at 277, 313, 316_. It is utterly bewildering in light of the fact that the Journal News committed substantial resources to investigating Thompson's claims, yet chose not to interview the one witness who was most likely to confirm Thompson's account of the events. However, if the Journal News had serious doubts concerning the truth of Thompson's remarks, but was committed to running the story, there was good reason not to interview Stephens -- while denials coming from Connaughton's supporters might be explained as motivated by a desire to assist Connaughton, a denial coming from Stephens would quickly put an end to the story.

The remaining six witnesses, including Connaughton, were all interviewed separately on October 31. Each of them denied Alice Thompson's charges and corroborated Connaughton's version of the events. Thus, one Journal News reporter testified at trial that Jeanette and Ernest Barnes denied that any promises, offers, or inducements were made and that he had known the Barneses for several years and considered them both credible. _Id., at 89-90_. Another reporter testified that she interviewed Dave Berry and that Berry stated that absolutely no promises [\*\*\*\*46] or offers were made. _Id., at 91-92_. By the time the November 1 story appeared, **[\*683]** six witnesses had consistently and categorically denied Thompson's allegations, yet the newspaper chose not to interview the one witness that both Thompson and Connaughton claimed would verify their conflicting accounts of the relevant events.

The newspaper's decision not to listen to the tapes of the Stephens interview in Connaughton's home [\*\*\*586] also supports the finding of actual malice. During the Connaughton interview, Long and Blount asked if they could hear the tapes. _Id., at 259_. Connaughton agreed, _ibid._, and later made the tapes available, _id., at 48, 142_. Much of what Thompson had said about the interview could easily have been verified or disproved by listening to the tapes. Listening to the tapes, for example, would have revealed whether Thompson accurately reported that the tape recorders were selectively turned on and off and that Thompson was careful not to speak while the recorders were running. Similarly, the tapes presented a simple means of determining whether Stephens and Thompson had been asked leading questions, as Thompson claimed. Furthermore, [\*\*\*\*47] if Blount was truly in equipoise about the question whether to endorse the incumbent judge for reelection -- as he indicated in the column that he published on Sunday, October 30 -- it is difficult to understand his lack of interest in a detailed description of the [\*\*2694] corrupt disposition of 40 to 50 cases in Judge _Dolan_ ▼'s court. Even though he may have correctly assumed that the account given by the tapes would be a matter in which an editor in the process of determining which candidate to endorse would normally have an interest. 32⚖ Although simply one piece of **[\*684]** evidence in a much larger picture, one might reasonably infer in light of this broader context that the decision not to listen to the tapes was motivated by a concern that they would raise additional doubts concerning Thompson's veracity.

[\*\*\*\*48] Moreover, although also just a small part of the larger picture, Blount's October 30 editorial can be read to set the stage for the November 1 article. Significantly, this editorial appeared before Connaughton or any of the other witnesses were interviewed. Its prediction that further information concerning the integrity of the candidates might surface in the last few days of the campaign can be taken to indicate that Blount had already decided to publish Thompson's allegations, regardless of how the evidence developed and regardless of whether or not Thompson's story was credible upon ultimate reflection.

Finally, discrepancies in the testimony [\*\*\*587] of Journal News witnesses may have given the jury the impression that the **[\*685]** failure to conduct a complete investigation involved a deliberate effort to avoid the truth. Thus, for example, Blount's superiors testified that they understood that Blount had directed reporter Tom Grant to ask the police whether Thompson had repeated her charges against Connaughton to them and whether they considered her a credible witness. _Id., at 86-87 (Walker), 95 (Cocozzo)_. Blount also so testified. _Id., at 37-38_. Grant, however, [\*\*\*\*49] denied that he had been given such an assignment. _Id., at 88_. Similarly, at the early stages of the proceeding, there was testimony that on October 31 Pam Long had tried to arrange a meeting with Patsy Stephens over the telephone, _id., at 94_, that Blount was standing at her desk during the conversation and overheard Long talking to Stephens, _id._, at 36-37, and that Connaughton had volunteered that he would have Stephens get in touch with them, _id., at 57_. Connaughton categorically denied that the issue of getting in touch with Stephens was even discussed, _id., at 142_, and ultimately Blount and Long agreed that there was no contact -- and no attempt to make contact -- with Stephens on the 31st or at any other time before the story was published, _id., at 48-49 (Blount), 56-57 (Long)_.

V

_LEdHN[9]_ [9]_LEdHN[10]_ [10]HN6▼ The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law. _Bose Corp. v. Consumers Union of United States, Inc., 466 U.S., at 510-511_.This rule is not simply premised on common-law [\*\*2695] tradition, 33⚖ but on the **[\*686]** unique character of the interest protected [\*\*\*\*50] by the actual malice standard. Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of "'breathing space'" so that protected speech is not discouraged. _Gertz, 418 U.S., at 342_ (quoting _NAACP v. Button, 371 U.S. 415, 433 (1963)_); _New York Times Co., 376 U.S., at 272_ (same). The meaning of terms such as "actual malice" -- and, more particularly, "reckless disregard" -- however, is not readily captured in "one infallible definition." _St. Amant v. Thompson, 390 U.S., at 730_. Rather, only [\*\*\*588] through the course of case-by-case adjudication can we give content to these otherwise elusive constitutional standards. _Bose, supra, at 503_. Moreover, such elucidation is particularly important in the area of free speech for precisely the same reason that the actual malice standard is itself necessary. Uncertainty as to the scope of the constitutional protection can only dissuade protected speech -- the more elusive the standard, [\*\*\*\*51] the less protection it affords. Most fundamentally, the rule is premised on the recognition that HN7▼ "[j]udges, as expositors of the Constitution," have a duty to "independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" _Bose, supra, at 511_.

[\*\*\*\*52] _LEdHN[11]_ [11]_LEdHN[12A]_ [12A]There is little doubt that "public discussion of the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the _New York Times_ rule," _Ocala Star-Banner Co. v. Damron, 401 U.S. 295, 300 (1971)_, and the strongest possible case for independent **[\*687]** review. As Madison observed in 1800, just nine years after

ratification of the First Amendment.

"Let it be recollected, lastly, that the right of electing the members of the government constitutes more particularly the essence of a free and responsible government. The value and efficacy of this right depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively." 4 J. Elliot, Debates on the Federal Constitution 575 (1861).

This value must be protected with special vigilance. When a candidate enters the political arena, he or she "must expect that the debate will sometimes be rough and personal," *Ollman v. Evans*, 242 U. S. App. D. C. 301, 333, 750 F. 2d 970, 1002 (1984) [****53] (en banc) (Bork, J., concurring), cert. denied, 471 U. S. 1127 (1985), and cannot "cry Foul!" when an opponent or an industrious reporter attempts to demonstrate" that he or she lacks the "sterling integrity" trumpeted in campaign literature and speeches, *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 274 [**2696] (1971). Vigorous reportage of political campaigns is necessary for the optimal functioning of democratic institutions and central to our history of individual liberty. **34**⬇

**LEdHN[12B]**⬆ [12B]

[****54]

**[*688]** **LEdHN[1C]**⬆ [1C]**LEdHN[13]**⬆ [13]We have not gone so far, [****589] however, as to accord the press absolute immunity in its coverage of public figures or elections. **HN8**⬆ If a false and defamatory statement is published with knowledge of falsity or a reckless disregard for the truth, the public figure may prevail. See *Curtis Publishing Co. v. Butts*, 388 U.S., at 162 (opinion of Warren, C. J.). A "reckless disregard" for the truth, however, requires more than a departure from reasonably prudent conduct. "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant*, 390 U.S., at 731. The standard is a subjective one -- there must be sufficient evidence to permit the conclusion that the defendant actually had a "high degree of awareness of . . . probable falsity." *Garrison v. Louisiana*, 379 U.S., at 74. As a result, failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. See *St. Amant, supra, at 731, 733*. [****55] See also *Hunt v. Liberty Lobby*, 720 F. 2d 631, 642 (CA11 1983); *Schultz v. Newsweek, Inc.*, 668 F. 2d 911, 918 (CA6 1982). In a case such as this involving the reporting of a third party's allegations, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant, supra, at 732*.

**LEdHN[2B]**⬆ [2B]**LEdHN[14]**⬆ [14]**HN9**⬆ In determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record in full. Although credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the "opportunity to observe the demeanor of the witnesses," *Bose*, 466 U.S., at 499-500, the reviewing court must "'examine for [itself] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect,'" *New York Times Co.*, 376 U.S., at 285 (quoting *Pennekamp v. Florida*, 328 U.S. 331, 335 **[*689]** (1946)). [****56] **35**⬇ Based on our review of the entire record, we agree with the Court of Appeals that the evidence did in fact support a finding of actual malice. Our approach, however, differs somewhat from that taken by the Court of Appeals.

[****57] **LEdHN[2C]**⬆ [2C]In considering the actual malice [****590] issue, the Court of Appeals identified 11 subsidiary [**2697] facts that the jury "could have" found. **36**⬇*842 F. 2d, at 843-844*. The court held that such **[*690]** findings would not have been not clearly erroneous, *id., at 844*, and, based on its independent review, that when considered cumulatively they provide clear and convincing evidence of actual malice, *id., at 847*. We agree that the jury *may* have found each of those facts, but conclude that the case should be decided on a less speculative ground. Given the trial court's instructions, the jury's answers to the three special interrogatories, and an understanding of those facts not in dispute, it is evident that the jury *must* have rejected (1) the testimony of petitioner's witnesses that Stephens was not contacted simply because Connaughton failed to place her in touch with the newspaper; (2) the testimony of Blount that he did not listen to the tapes simply because he thought they would provide him with no new information; and (3) the testimony of those Journal News employees who asserted that [****58] they believed Thompson's allegations were substantially true. When these findings are considered alongside the undisputed **[*691]** evidence, the conclusion that the newspaper acted with actual malice inexorably follows.

[****59] **LEdHN[8C]**⬆ [8C] **LEdHN[15A]**⬆ [15A] **LEdHN[16A]**⬆ [16A]There is no dispute that Thompson's charges had been denied not only by Connaughton, but also by five other witnesses before the story was published. Thompson's most serious charge -- that Connaughton [***591] intended to confront the incumbent judge with the tapes to scare him into resigning and otherwise not to disclose the existence of the tapes -- was not only highly improbable, but inconsistent with the fact that Connaughton had actually arranged a lie detector test for Stephens and then delivered the tapes to the police. These facts were well known to the Journal News before the story was published. Moreover, because the newspaper's interviews of Thompson and Connaughton were captured on tape, there can be no dispute as to what was communicated, nor how it was said. The hesitant, inaudible, and sometimes unresponsive and improbable tone of Thompson's answers to various leading questions raise obvious doubts about her veracity. Moreover, contrary to petitioner's contention [**2698] that the prepublication interview with Connaughton confirmed the factual basis of Thompson's statements, Brief for Petitioner 47, review of the tapes makes clear that Connaughton unambiguously denied [****60] each allegation of wrongful conduct. Connaughton's acknowledgment, for instance, that his wife may have discussed with Stephens and Thompson the possibility of working at an ice cream store that she might someday open, hardly confirms the allegations that Connaughton had promised to buy a restaurant for the sister's parents to operate, that he would provide Stephens with a job at the Municipal Court, or even that he would provide Thompson with suitable work. **37**⬇ It is extraordinarily unlikely that the **[*692]** reporters missed Connaughton's denials simply because he confirmed certain aspects of Thompson's story.

**LEdHN[15B]**⬆ [15B] **LEdHN[16B]**⬆ [16B]

[****61] **LEdHN[8D]**⬆ [8D]It is also undisputed that Connaughton made the tapes of the Stephens interview available to the Journal News and that no one at the newspaper took the time to listen to them. Similarly, there is no question that the Journal News was aware that Patsy Stephens was a key witness and that they failed to make any effort to interview her. Accepting the jury's determination that petitioner's explanations for these omissions were not credible, it is likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of Thompson's charges. **HN10**⬆ Although failure to investigate will not alone support

a finding of actual malice; see *St. Amant*, 390 U.S., at 731-733, the purposeful avoidance of the truth is in a different category.

There is a remarkable similarity between this case -- and in particular, the newspaper's failure to interview Stephens and failure to listen to the tape recording of the September 17 interview at Connaughton's home -- and the facts that supported the Court's judgment in *Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967). [***62] In [***592] *Butts* the evidence showed that the Saturday Evening Post had published an accurate account of an unreliable informant's false description of the Georgia athletic director's purported agreement to "fix" a college football game. **HN11** Although there was reason to question the informant's veracity, just as there was reason to doubt Thompson's story, the editors did not interview a witness who had the same access to the facts as the informant and did not look at films that revealed what actually happened **[*693]** at the game in question. **38** [***63] This evidence of an intent to avoid the truth was not only sufficient to convince the plurality that there had been an extreme departure from professional publishing standards, but it was also sufficient to satisfy the more demanding *New York Times* standard applied by Chief Justice [**2699] Warren, **39**, Justice Brennan ▾, and Justice White ▾, **40**

**LEdHN[2D]** [2D] **LEdHN[8E]** [8E]As in *Butts*, the evidence in the record in this case, when reviewed [***64] in its entirety, is "unmistakably" sufficient to support a finding of actual malice. The judgment of the Court of Appeals is accordingly

*Affirmed.*

Concur by: WHITE ▾; BLACKMUN ▾; KENNEDY ▾; SCALIA ▾

## Concur

**[*694]** JUSTICE WHITE ▾, with whom THE CHIEF JUSTICE joins, concurring.

In my view, in cases like this the historical facts -- *e. g.*, who did what to whom and when -- are reviewable only under the clearly-erroneous standard mandated by Federal Rule of Civil Procedure 52. Credibility determinations fall in this category, as does the issue of knowledge of falsity. But as I observed in dissent in *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 515 (1984), the reckless disregard component of the *New York Times Co.* v. *Sullivan* "actual malice" standard is not a question of historical fact. A trial court's determination of that issue therefore is to be reviewed independently by the appellate court.

[***593] As I read it, the Court's opinion is consistent with these views, and -- as Justice Kennedy ▾ observes -- is consistent with the views expressed by Justice Scalia ▾ in his concurrence. Based on these premises, I join the Court's opinion.

[***65] JUSTICE BLACKMUN ▾, concurring.

I agree with the majority's analysis and with the result it reaches. I write separately, however, to stress two points.

First, the case reaches us in an odd posture, one which stands in the way of giving full consideration to aspects of the content of the article under attack that perhaps are of constitutional significance. Petitioner has abandoned the defense of truth, see *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986), despite the fact that there might be some support for that defense. We therefore must presume that the jury correctly found that the article was false, see *ante*, at 681, and decide whether petitioner acted with knowledge or reckless disregard of its falsity. In addition, petitioner has eschewed any reliance on the "neutral reportage" defense. Cf. *Edwards v. National Audubon Society, Inc.*, 556 F. 2d 113, 120 (CA2), cert. denied, 434 U.S. 1002 (1977). This strategic decision appears to have been unwise in light of the facts of this case. The article accurately reported **[*695]** newsworthy allegations that Daniel Connaughton, [***66] a political candidate, had used "dirty tricks" to elicit information from Alice Thompson and her sister, information that had become central to the political campaign, and also accurately reported Connaughton's response, which confirmed the existence of discussions with Thompson that touched upon the subject matter of her allegations but claimed that Thompson's version of these discussions was incorrect. Were this Court to adopt the neutral reportage theory, the facts of this case arguably might fit within it. That question, however, has also not been squarely presented.

Second, I wish to emphasize that the form and content of the story are relevant not only to the falsity and neutral reportage questions, but also to the question of actual malice. In the past, this Court's [**2700] decisions dealing with actual malice have placed considerable emphasis on the manner in which the allegedly false content was presented by the publisher. See *Greenbelt Cooperative Publishing Assn., Inc. v. Bresler*, 398 U.S. 6, 12-13 (1970) (truthful and accurate reporting of what was said at public meeting on issues of public importance not actionable); *Time, Inc. v. Pape*, 401 U.S. 279, 290-292 (1971) [***67] (erroneous interpretation of Government report not "actual malice"). Under our precedents, I find significant the fact that the article in this case accurately portrayed Thompson's allegations *as* allegations, and also printed Connaughton's partial denial of their truth. The form of the story in this case is markedly different from the form of the story in *Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967), where the informant's description of the events was presented as truth rather than as contested allegations. These differences in presentation are relevant to the question whether the publisher acted in reckless disregard [***594] of the truth: presenting the content of Thompson's allegations as though they were established fact shows markedly less regard of their possible falsity.

**[*696]** Several aspects of the majority's opinion in this case might be interpreted as breaking with our practice of considering the form and content of the article in making malice determinations. The majority notes the form of the story, see *ante*, at 680-681, but its account of the evidence it finds probative of actual malice, *ante*, at [***68] 682-685, deals exclusively with evidence extrinsic to the story itself. The absence of any discussion of *Pape* and *Bresler* also might be understood as a suggestion that the manner in which the contested statements are presented is irrelevant to the malice inquiry. Finally, the majority relies upon *Butts* in the course of its discussion of petitioner's purposefully incomplete investigation of its story, *ante*, at 692-693, in a manner that suggests it might not have accorded significance to the difference between the forms of the respective stories in *Butts* and in this case.

I am confident, however, that these aspects of the majority's opinion are omissions in explanation rather than in analysis, and that the majority's opinion cannot fairly be read to hold that the content of the article is irrelevant to the actual malice inquiry. Because I am convinced that the majority has considered the article's content and form in the course of its painstaking "review of the entire record," see *ante*, at 689, and because I conclude that the result the majority reaches is proper even when the contents of the story are given due weight, I concur.

JUSTICE KENNEDY ▾, concurring.

[***69] I join the opinion of the Court, for in my view it is not inconsistent with the analysis set out in Justice Scalia ▾ 's separate

Concurrence

JUSTICE SCALIA ▾, concurring in the judgment.

I agree with the Court's disposition of this case, and with its resolution of the second legal issue on which we granted certiorari, namely whether "highly unreasonable conduct constituting an extreme departure from ordinary standards of investigation and reporting" is alone enough to establish **[*697]** (rather than merely evidence of) the malice necessary to assess liability in public figure libel cases.

I disagree, however, with the Court's approach to resolving the first and most significant question upon which certiorari was granted, which was the following:

> "Whether, in a defamation action instituted by a candidate for public office, the First and Fourteenth Amendments obligate an appellate court to conduct an independent review of the entire factual basis for a jury's finding of actual malice -- a review that examines both the subsidiary facts underlying the jury's finding of actual malice and the jury's ultimate finding of actual malice itself."

 [**2701]  That question squarely raised the conflict  [****70]  that the Sixth Circuit perceived it had created with an earlier decision of the District of Columbia Circuit, en banc, concerning the requirement we set forth in _Bose Corp._ v.  [****595]  _Consumers Union of United States, Inc._, 466 U.S. 485 (1984), that judges "exercise independent judgment" on the question "whether the record establishes actual malice with convincing clarity," _id._, at 514. The nub of the conflict, which is of overwhelming importance in libel actions by public figures, is whether this means, as the Sixth Circuit understood the District of Columbia Circuit to have held in _Tavoulareas_ v. _Piro_, 260 U.S. App. D. C. 39, 817 F. 2d 762 (1987) (en banc), that the trial judge and reviewing courts must make their own "independent" assessment of the facts allegedly establishing malice; or rather, as the Sixth Circuit held here (explicitly rejecting _Tavoulareas_), that they must merely make their own "independent" assessment that, _assuming all of the facts that could reasonably be found in favor of the plaintiff were found in favor of the plaintiff_, clear  [****71]  and convincing proof of malice was established.

Today's opinion resolves this issue in what seems to me a peculiar manner. The Court finds it sufficient to decide the present case to accept, not all the favorable facts that the **[*698]** jury _could reasonably_ have found, but rather only the adequately supported favorable facts that the jury _did_ find. Exercising its independent judgment just on the basis of those facts (and the uncontroverted evidence), it concludes that malice was clearly and convincingly proved. The crucial passage of the Court's opinion is the following:

> "Given the trial court's instructions, the jury's answers to the three special interrogatories, and an understanding of those facts not in dispute, it is evident that the jury _must_ have rejected (1) the testimony of petitioner's witnesses that Stephens was not contacted simply because Connaughton failed to place her in touch with the newspaper; (2) the testimony of Blount that he did not listen to the tapes simply because he thought they would provide him with no new information; and (3) the testimony of those Journal News employees who asserted that they believed Thompson's allegations were substantially  [****72]  true. When these findings are considered alongside the undisputed evidence, the conclusion that the newspaper acted with actual malice inextricably follows." _Ante_, at 690-691 (emphasis in original).

This analysis adopts the most significant element of the Sixth Circuit's approach, since it accepts the jury's determination of at least the necessarily found controverted facts, rather than making an independent resolution of that conflicting testimony. Of course the Court examines the evidence pertinent to the jury determination -- as a reviewing court always must -- to determine that the jury _could reasonably_ have reached that conclusion. But the Court does not purport to be exercising its own independent judgment as to whether Stephens was not contacted simply because Connaughton failed to place her in touch with the newspaper, whether Blount did not listen to the tapes because he thought they would provide no new information, or whether the Journal News employees believed Thompson's allegations to be substantially true.

 **[*699]** While I entirely agree with this  [***596]  central portion of the Court's analysis, I do not understand the Court's approach in conducting [****73]  that analysis only on the basis of the three factual determinations the Court selects. To begin with, I am dubious of the Court's conclusion that the jury _must_ have made all three of those findings in order to bring in the verdict that it did under the judge's instructions, and in order to answer as it did the only relevant "special interrogatory," which was "Do you unanimously find by clear and convincing proof that the publication in question was published with actual malice?" It seems to me, for example, that even if one believed Blount's explanation of why he did not listen to the tapes, it would still be reasonable to find  [**27021  (and I would find) clear and convincing proof of malice from the utterly inexplicable failure to interview Stephens plus the uncontroverted evidence.

More important, however, even if each of these factual findings happened to be _necessary_ to the verdict and interrogatory response, I see no reason to make them the exclusive focus of our analysis, instead of consulting (as the Sixth Circuit did, and as courts invariably do when reviewing jury verdicts) all the reasonably supported findings that the jury could have made. It may well be true that "we  [****74]  need only consider those factual findings that were essential to the jury verdict" in the sense that referring to those alone is enough to establish clear and convincing proof of malice. But one could pick out any number of categories of permissible jury findings that would meet that test. For example, it might be true that we could find the requisite proof of malice by considering, not all the evidence in its light most favorable to the plaintiff, but only that evidence produced by a particular witness. We could then say "we need only consider the findings the jury might have made based on the testimony of Mr. Smith to decide this case." I see no more logic in limiting the inquiry the way the Court has done than in limiting it in this latter fashion.

 **[*700]** That can be made plain by applying the Court's approach to a situation in which the facts essential to the jury verdict happen _not_ to establish clear and convincing proof of malice. Assume a case in which there are innumerable controverted allegations, dozens of which, if the plaintiff's version is credited, would suffice to establish malice; but in which _only one_ controverted  [****75]  allegation -- the defendant's allegation that he knew firsthand the truth of the libelous charges -- could not _possibly_ have been found against the plaintiff if the jury was to come in with the verdict that it did. If we applied today's analysis to that situation, we would then proceed to ask whether the fact that the defendant did not know firsthand the truth of the charges, and that he lied about that, is alone enough to establish clear and convincing proof of malice. It clearly would not be. Surely, however, we would not reverse the judgment for the plaintiff, when dozens of other disputed contentions which the jury might have resolved in the plaintiff's favor _would_ establish clear and convincing proof. We would, as the Sixth Circuit did, assume that all those disputes were resolved in the plaintiff's favor -- unless, of course, we again devised some nonfunctional category of the remaining disputes that we could look to, perhaps  [***597]  those pertaining to testimony by Mr. Smith.

In sum, while the Court's opinion is correct insofar as the critical point of deference to jury findings is concerned, I see no basis for consulting only a limited number of the permissible  [****76]  findings. I would have adopted the Sixth Circuit's analysis in its entirety, making our

independent assessment of whether malice was clearly and convincingly proved on the assumption that the jury made all the supportive findings it reasonably could have made. That is what common-law courts have always done, and there is ultimately no alternative to it.

## References

32 Am Jur 2d, Federal Practice and Procedure 363; 50 Am Jur 2d, Libel and Slander 135, 296-303, 462

2 Federal Procedure, L Ed, Appeal, Certiorari, and Review 3:649; 33 Federal Procedure, L Ed, Trial 77:243-77:246

16 Am Jur Pl & Pr Forms (Rev), Libel and Slander, Forms 29, 184, 297

14 Am Jur Proof of Facts 2d 49, Defamation with Actual Malice

17 Am Jur Trials 223, Libel Actions by Public Officials

USCS, Constitution, Amendment 1

US L Ed Digest, Appeal 1673; Constitutional Law 948; Evidence 918

Index to Annotations, Findings of Fact; Libel and Slander; New York Times Rule

  [****77]     Annotation References:

Supreme Court's views as to what constitutes factual issue under "clearly erroneous" standard of Federal Rule of Civil Procedure 52(a), providing that findings of fact shall not be set aside unless clearly erroneous. 72 L Ed 2d 890.

Progeny of New York Times v Sullivan in the Supreme Court. 61 L Ed 2d 975.

The Supreme Court and the right of free speech and press. 93 L Ed 1151, 2 L Ed 2d 1706, 11 L Ed 2d 1116, 16 L Ed 2d 1053, 21 L Ed 2d 976.

Criticism or disparagement of character, competence, or conduct of candidate for office as defamation. 37 ALR4th 1088.

What constitutes actual malice, within federal constitutional rule requiring public officials and public figures to show actual malice. 20 ALR3d 988.

Constitutional aspects of libel or slander of public officials. 95 ALR2d 1450.

---

**Footnotes**

**\* ⚓**  A brief of *amici curiae* urging reversal was filed for the Associated Press et al. by *P. Cameron DeVore, Daniel M. Waggoner, Douglas P. Jacobs, Alice N. Lucan, Mark L. Tuft, Harvey L. Lipton, Jeffrey N. Paule, Lois J. Schiffer, Robert D. Sack, E. Susan Garsh, William A. Niese, Deborah R. Linfield, Samuel E. Klein, W. Terry Maguire, Rene P. Milam, Richard M. Schmidt, Roslyn A. Mazer, Lawrence Gunnels, Steven R. Shapiro, Robert J. Brinkmann, J. Laurent Scharff, Jane Kirtley*, and *Bruce W. Sanford*.

**1 ⚓**  The District Court explained that the neutral reportage doctrine, as defined by the Ohio Court of Appeals, see *J. V. Peters & Co. v. Knight Ridder Co.*, 10 Media L. Rptr. 1576 (1984), and the United States Court of Appeals for the Second Circuit, see *Edwards v. National Audubon Society. Inc.*, 556 F. 2d 113, cert. denied, 434 U.S. 1002 (1977), "immunizes from liability the accurate and disinterested reporting of serious charges made against a public figure by a responsible, prominent organization." App. to Pet. for Cert. 78a. Because the court was convinced that Thompson did not qualify as "a responsible, prominent organization on a par with the State Attorney General's Office in *J. V. Peters* or the National Audubon Society in *Edwards*," it concluded that the defense was unavailable. *Ibid.*

Petitioner did not argue in its petition for a writ of certiorari, and does not now argue, that the neutral reportage doctrine immunized its coverage of Thompson's allegations. Accordingly, we do not review this aspect of the District Court's judgment.

**2 ⚓**  The jury was asked:

1. "Do you unanimously find by a preponderance of the evidence that the publication in question was defamatory toward the plaintiff?"

2. "Do you unanimously find by a preponderance of the evidence that the publication in question was false?"

3. "Do you unanimously find by clear and convincing proof that the publication in question was published with actual malice?" App. 201.

There is some debate as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence. Compare *Firestone v. Time. Inc.*, 460 F. 2d 712, 722-723 (CA5) (Bell, J., specially concurring), cert. denied, 409 U.S. 875 (1972), with *Goldwater v. Ginzburg*, 414 F. 2d 324, 341 (CA2 1969), cert. denied, 396 U.S. 1049 (1970). See also *Tavoulareas v. Piro*, 260 U. S. App. D. C. 39, 63-64, n. 33, 817 F. 2d 762, 786, n. 33 (en banc), cert. denied, 484 U.S. 870 (1987); Franklin & Bussel, The Plaintiff's Burden in Defamation: Awareness and Falsity, 25 Wm. & Mary L. Rev. 825, 863-865 (1984). We express no view on this issue.

**3¶** The Court of Appeals observed that "the article was defamatory in its implication that Connaughton was an unethical lawyer and an undesirable candidate for the Hamilton Municipal judgeship who was capable of extortion, who was a liar and an opportunist not fit to hold public office, particularly a judgeship." 842 F. 2d, at 840-841.

**4¶** As to the finding of falsity, the Court of Appeals wrote:

"Equally apparent from the jury's answer to the second special interrogatory is that it considered the published Thompson charges to be false. Its finding is understandable in light of the plaintiff's proof which disclosed that the *Journal*'s effort to verify her credibility ended in an avalanche of denials by knowledgeable individuals; [and] its inability to produce a single person who supported Thompson's accusations. . . .

"Moreover, the jury obviously refused to credit the *Journal*'s construction of Connaughton's interview of October 31. It accepted Connaughton's express denials of each Thompson charge and considered the significant language interpreted by the *Journal* to constitute his admissions of those charges, when read in context, as nothing more than conjecture elicited by structured questions calculated to evoke speculation. Thus, upon reviewing the record in its entirety, this court concludes that the jury's determinations of the operational facts bearing upon the falsity of the article in issue were not clearly erroneous." *Id.*, at 841.

**5¶** The Court of Appeals wrote:

"In *Curtis Publishing Co.* v. *Butts*, the Supreme Court accorded public figures as well as public officials recovery of damages for the publication of 'defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.' 388 U.S. at 155." *Id.*, at 845.

At another point, the court wrote:

"Accordingly, this court concludes that the *Journal*'s decision to rely on Thompson's highly questionable and condemning allegations without first verifying those accusations through her sister, [Stephens], and without independent supporting evidence constituted *an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers* which demonstrated a reckless disregard as to the truth or falsity of Thompson's allegations and thus provided clear and convincing proof of 'actual malice' as found by the jury. *Butts*, 388 U.S. at 153." *Id.*, at 847 (emphasis supplied).

See also *id., at 840*.

**6¶** As to the newspaper's motives, the Court of Appeals asserted:

"A review of the entire record of the instant case discloses substantial probative evidence from which a jury could have concluded (1) that the *Journal* was singularly biased in favor of [the incumbent] and prejudiced against Connaughton as evidenced by the confidential personal relationship that existed between [the incumbent] and Blount, the *Journal* Editorial Director, and the unqualified, consistently favorable editorial and daily news coverage received by [the incumbent] from the *Journal* as compared with the equally consistent unfavorable news coverage afforded Connaughton; (2) that the *Journal* was engaged in a bitter rivalry with the *Cincinnati Enquirer* for domination of the greater Hamilton circulation market as evidenced by Blount's vituperous public statements and criticism of the *Enquirer;* (3) that the *Enquirer*'s initial expose of the questionable operation of the [incumbent's] court was a high profile news attraction of great public interest and notoriety that had 'scooped' the *Journal* and by Blount's own admission was the most significant story impacting the . . . campaign[;] (4) that by discrediting Connaughton the *Journal* was effectively impugning the *Enquirer* thereby undermining its market share of the Hamilton area." *Id.*, at 843.

Later in the opinion, the court again stressed that "the evidence adduced at trial demonstrated that the *Journal* was motivated to publicize Thompson's allegations, not only by a desire to establish its preeminence in the reporting of Hamilton political news, but also by a desire to aid the [incumbent's] campaign." *Id.*, at 846.

**7¶** The trial judge correctly instructed the jury that "[a]ctual malice may not be inferred alone from evidence of personal spite, ill will or intention to injure on the part of the writer." App. 199.

The phrase "actual malice" is unfortunately confusing in that it has nothing to do with bad motive or ill will. See *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 52, n. 18 (1971) (opinion of Brennan ▾, J.). By instructing the jury "in plain English" at appropriate times during the course of the trial concerning the not-so-plain meaning of this phrase, the trial judge can help ensure that the *New York Times* standard is properly applied. *Tavoulareas*, 260 U. S. App. D. C., at 84, 817 F. 2d, at 807 (R. B. Ginsburg ▾, J., concurring). See also *Westmoreland v. CBS Inc.*, 596 F. Supp. 1170, 1172-1173, n. 1 (SDNY 1984) (suggesting that jury confusion can be minimized if a less confusing phrase, such as "state-of-mind," "deliberate or reckless falsity," or "constitutional limitation" is used in the jury's presence).

**8¶** Early in September Connaughton's wife Martha was advised that Patsy Stephens was willing to disclose important information about the special treatment her former husband had received in the Hamilton Municipal Court. The source of this advice was the president of the local chapter of Mothers Against Drunk Driving. Martha Connaughton and her brother then visited with Patsy Stephens in her mother's home for about 30 minutes and arranged for a later interview with Connaughton. Alice Thompson was present at a part of that meeting, as well as at the subsequent interview. Shortly before midnight on September 16, after Patsy Stephens and Alice Thompson had returned home from work, two of Connaughton's supporters (Berry and Cox) picked the two sisters up and drove them to Connaughton's home where they remained until about 4:30 a.m. on September 17.

9 ▼ the other seven were: Patsy Stephens, Ben and Martha Connaughton, Martha Connaughton's brother, Dave Berry, Connaughton's campaign manager, Joe Cox, and two of Connaughton's neighbors, Jeanette and Ernest Barnes.

10 ▼ "A. They started asking me a bunch of questions so I asked Dan Connaughton. . . . I said why are you doing this. . . . And of course, he turned off the tape recorder. And he said, I'll tell you the truth. He said, all I want is to get enough evidence on Billy, he said, and have Billy resign. And he said, of course, if Billy resigns, Dolan ▾ will resign, and he said, then I can just step up on the bench. . . . But he said right out of his own mouth, all I want to do is to get a story in evidence on them, to meet them face to face, and show them what evidence he had against him, or whatever, to get them to resign, and no more would be said about it.

. . .

"Q. Okay. So in other words, based on what he said to you, you believed him?

"A. Blackmail. I mean, you know, the way he phrased it, the way he said it, you know. He said all he wanted to do was get enough evidence on Billy, and he also used Dolan ▾'s name, which I don't know what he was going to get on Dolan ▾ -- to scare them into resigning. I said what happens when they resign? Nothing more will be said about anything. He said when I take the bench nothing will be said." App. 291-292.

11 ▼ "A. . . . I asked them what I was going to get out of it.

"Q. What did they promise you? Or what did they say when you asked them?

"A. They said my help would be deeply appreciated. And they went on to talk about the three weeks vacation they were planning on taking when the election was . . .

"Q. He was planning to take three weeks vacation?

"A. Yes, the family -- Dave Berry and Martha, and Dan.

"MR. BLOUNT: They wanted you to go along?

"A. Me and my sister would be welcome to go along with Dave . . .

"(By Mrs. Long)

"Q. Did they say they would pay your expenses?

"A. Yeah. I made it clear to them that I couldn't afford a trip to Florida.

"MR. BLOUNT: Was the tape recorder on at that time?

"A. Oh, no.

"(By Mrs. Long)

"Q. Now where were they going to go?

"A. Three weeks in Florida.

"Q. And they added Disneyworld?

"A. (Inaudible) a three weeks trip to Florida. And they had a friend in Florida that wouldn't be home at the time, that we could stay at their condominium." Id., at 293-294.

12 ▼ "A. . . . [Connaughton] said he was thinking about putting a restaurant in there, and he was wanting to know if my mother and father [Zella and Brownie Breedlove] would run it for him. And I said oh yeah, my mother would love to get back into the restaurant business. He said good, when the lease is up, he said, we'll tear the inside out and put a restaurant in there, and he said, your mother and father can run it, and he said that way, he said you girls can help run it too, and put your sisters in there working too; he said just . . . he even made up a name -- Breedlove's Lunch or something like that. Ma Breedlove's Cooking, you know. He had the names figured out and everything. He offered to buy us a restaurant, you know, and put us in that building.

"Q. Okay. So it would just be your parents being a manager, they wouldn't have to buy -- did you understand him that they wouldn't have to . . .

"A. Oh, they was going to do everything, you know. They was just going to put us in there to work, or to run it. They wanted my mother to run the business for them." Id., at 307.

13 ▼ "Q. Did he promise you to find a job?

"A. Yeah.

"Q. Why did he offer to find you a job?

"A. Because the day at the house, going back to the first time I met them, Martha was asking me did I work, or anything, and I was telling her I was looking for work. I had been out of a job. Evidently she must have talked to her husband about it, and that night over at his home, he said are you employed now, you know, . . . and I said no. So he said, we'll see if we can't do something about that. I told him I wanted away from bartending and stuff; he said we'll see if we can't do something about it. You know, a decent job." Id., at 295-296.

243

~~me something: I am going to interject. What about the job you were promised?~~

"A. Oh, when they promised me, you know, the secure job and everything, they also promised -- they promised Patsy a job too.

(By Mrs. Long)

"Q. That she would be in with Breedlove's Lunch, or cafe?

"A. No, they promised Patsy a decent job, you know.

"Q. That she would be (inaudible).

"A. That she would be good up in Court. That come out of his own mouth. That come out of Dan's mouth; he said we need somebody like you up at the courthouse. Municipal Court." *Id., at 309.*

**14**🖝    "A. . . . And he said he wanted me and Pat to definitely be there, and for a victory dinner he wanted to take me and Patsy to dinner at the Maisonette.

"Q. This would be after he wins the election?

"A. Ummm-hmmm." *Id., at 306.*

**15**🖝    "A. . . . But as far as anybody else, the public, or anything like that -- or it going to Court, we wouldn't have to worry about it; we wouldn't have to go to Court and our names wouldn't be on there." *Id., at 296.*

"A. [T]hey had already promised that our names wouldn't be mentioned that nobody would know about us . . . ." *Id., at 302.*

**16**🖝    The transcript of the interview quotes Thompson as saying: "I explained to them the whole story, how it got off to this, or that, you know. They was embarrassed evidently." *Id., at 310.* However, the tape recording of the interview, which the jury heard, makes clear that Thompson actually stated: "I explained to them the whole story, how I got offered this and that, you know. They wasn't interested in this evidently." Defendant's Exh. J.

**17**🖝    "A. . . . Can't get any worse than what Dan (inaudible). Makes it sound like I'm the bad guy.

"Q. Have you had any repercussions from this?

"A. I've been under a lot of (inaudible) strain. I guess.

"Q. Other people calling you besides the Enquirer?

"A. Yeah. I've had people that I thought were my friends call me and accuse me of being a snitch and a rat. I don't like to carry that name, and that's what a lot of people is thinking. That knows me.

"MR. BLOUNT: They were just mad, they didn't threaten you?

"A. (inaudible) a snitch. You name it, and I'm that. I just want to get that cleared up." App. 320.

**18**🖝    "A. . . . I said, what's the whole deal? And of course, he turned off the tape recorder. . . .

. . .

"MR. BLOUNT: Was being questioned by the Connaughtons tougher than going to Court?

"A. Ummm-hmmm. They turned that tape recorder on and off so many times, you know, left out what they wanted to.

. . .

"MR. BLOUNT: Was the tape recorder on at that time?

"A. Oh, no." *Id., at 291-293.*

**19**🖝    "MR. BLOUNT: They had it on when you were talking and off when they were talking?

"A. I don't think Dan Connaughton's voice is on it." *Id., at 293.*

"MR. BLOUNT: Was it Dan Connaughton himself who talked about the trip?

"A. Yeah. He did most of the talking in the living room. Like I said though the tape recorde[r] was off when Dan spoke." *Id., at 295.*

**20**🖝    "MR. MASANA ▾: Off the record -- you were saying something about Dan was encouraging you to say things in a certain way?

"A. Oh, yeah. He was leading me in questions, you know.

"Q. Can you give us an example?

"A. Well, he kept on trying to get me to say that Dolan ▾ had something to do with this, you know?

"Q. Would he phrase it in a question? Like, did Judge Dolan ▾ have anything to do with it?

"MR. BLOUNT: Wasn't it true that Judge Dolan ▾ did this, or something?

"A. Yeah, you know, and so on. But like I say, if you listen to the tapes you're not going to hear it, because his voice ain't on the tape. . . .

. . .

"Q. Sure. So it was a yes, no, situation for you in that he'd phrase it a certain way and all you had to do was yes or no?

"A. Ummm-hmmm. And then, you know, he'd say to repeat that." *Id.,* at 296-298.

**21**▾ "A. I just want people to know. Because they shouldn't vote for a man that is this dirty, you know, because I call it blackmail, what he was trying to do." *Id.,* at 314.

There is some tension between this civic interest in fair procedure and Thompson's reluctant participation in the exposure of the corrupt procedures at the Municipal Court, her assertion that although she realized that Connaughton's offers were improper, she would have accepted them if her name had never been mentioned because "that's the way [the system] works," *id.,* at 315, and her displeasure at being called a "snitch and a rat," *id.,* at 320.

**22**▾ "A. I think she's scared right now to talk to anyone, because the Cincinnati Enquirer has been trying to get her to talk to them. She's getting scared now since this is all reality. My sister is . . . she's kind of weakminded when it comes to anything like that. She won't do nothing for nobody unless she thinks she's benefiting from it. And she honestly thought she was a getting a job out of this, and would make something of herself out of this. And the Connaughtons just used her all the way. And now since she's seeing that it's coming down to where she ain't going to get nothing out of it, she's brought up in the middle of all this and everything, she's scared." *Id.,* at 316.

**23**▾ "MR. BLOUNT: Obviously, we can't quote your sister from you (inaudible). What's your sister's position in this, would she support you or would she support him? In other words, if somebody said to her, who's telling the truth here?

"A. She'll tell you about the trips, the dinner at the Maisonette, the jobs and everything. She'll tell you that's the truth, because they was offered to her too." *Id.,* at 313.

**24**▾ The full text of this editorial is reprinted as Appendix A to the Court of Appeals' opinion. 842 F. 2d, at 848-849.

**25**▾ The transcript of the Connaughton interview states:

"MR. CONNAUGHTON: No, and it had nothing to do with (inaudible) for information or something, i[f] that's what the point of this question is. That's absolutely no, if that's that question. Well, the tape will speak for itself." App. 265.

The tape recording of this interview makes clear that Connaughton said, "No, and it had nothing to do with a *quid pro quo* for information. . . ." Defendant's Exh. I.

**26**▾ "A. . . . . I think it would be fair to say, sometime during those three or four hours that they were there, that I probably made a remark along the lines that I just can't believe what I'm hearing, and, you know, I would think if they could hear what we're hearing, they would probably resign. I mean, I thought the allegation was that serious. But to tell her that -- to answer that -- and if she's saying that was my announced purpose of what I had them there for and what we were going to do with the information, my answer would be no.

"MR. BLOUNT: You didn't tell her you were going to take the tapes to him? And play them for them?

"A. No. No. What I might have said is, boy, I'd sure like to let them hear these tapes and see what they've got to say for themselves, you know, in a fashion such as that.

"MR. BLOUNT: In an expression of shock.

"MR. CONNAUGHTON: Yeah. Yeah, as I almost fell off of the fireplace. Right." App. 262-263.

**27**▾ "Q. Did you ever promise Alice Thompson anonymity?

"A. That question was discussed, and I was hoping to her, and I told her it would be my intention and hope that she could remain anonymous, yes. But did I promise her anonymity, the answer would be no. Did we discuss it, we sure did, and I expressed to her my desire as well as her desire that she could remain anonymous." *Id.,* at 264.

245

**28**⚑   "Q. Did you ever talk to Alice about getting a job for her in appreciation for her help with your investigation of New and Dolan?"

"A. No.

"Q. Not a waitress job?"

"A. No.

"Q. Did you promise a Municipal Court job for her sister Patsy Stephens?"

"A. No.

"Q. Did you offer to have 'the sisters go on a post election trip to Florida with you and your family to stay in a condominium?'

"A. No.

"Q. Did you offer to set up Thompson's parents, the Breedloves, in what is now Walt's Chambers, which you own and lease?

"A. Absolutely not.

"Q. Why would she say this to us?

"A. What was discussed in an off-handed way, the people who own that bar, who we're not very pleased with, their lease expires next September. My wife has the idea that she wants to open an ice cream type shop like Graeters, or some such thing as that, and I heard her discussing with them that maybe, since Patty had run this Homette Restaurant or something of that nature, that maybe she would help out and participate in the operation of this -- whatever you want to call it -- deli shop or gourmet ice cream shop. Yes, and I was present when that took place.

"Q. And when was that?

"A. Well, I don't think it was that night. As I recall, this was a later time that we had seen them.

"Q. But that would only be for Patty (unclear)?

"A. I guess Alice was there, and the offer may have been extended to her in that fashion, that she could work there or something -- I wouldn't be surprised if that was said." *Id.,* at 264-265.

**29**⚑   "Q. What about this post election trip to Florida? . . .

"MR. BLOUNT: Did you talk about anything like that?

"A. Ummm-hmmm. After getting over the initial shock it became a little clearer to me of -- kind of how scary this thing was with the information they gave to us, as far as, if their personal safety was at stake. . . . I do remember in an off-handed way it being discussed . . . they could go down to Hilton Head or Florida, or something like that, or maybe hide out or something like that, I don't know. But I own no property and have nothing to offer them.

"Q. But there was talk about a friend that had a condominium that would be vacant and it was in terms of a full blown trip, you know, you, the Berrys, the whole group going down to Florida and they were welcome to go along. . . .

"A. No. The only conversation I remember along those lines was in connection with, if their personal safety might be in question because of going out on the line and making these serious allegations. . . ." *Id.,* at 266.

"Q. One last statement. At lunch Thompson said that you promised to take her and her sister out to a post election victory dinner at the Maisonette?

"A. I promised to take them to the Maisonette? Hell, I haven't been to the Maisonette for years.

"MR. BLOUNT: Was it discussed? . . .

"A. It may have been. It may have been. I won't deny that some loose discussion in a kidding way was . . .

. . .

"A. . . . If she says that I made a firm statement that we were going to definitely plan a party at the Maisonette, that's not true. . . ." *Id.,* at 272-273.

**30**⚑   "Q. So her sister Patty, again getting back and going over the promises -- pardon me for going back to them but that seems to be a hefty charge against you.

"A. That's alright.

"Q. Her sister Patty is not going to get a job in the Municipal Court if you're elected?

"A. Not that I know of.

"Q. And she's not going to be disappointed to find that out, right?

"[A. She's not going to be disappointed at that. Right.]" *Id.,* at 277.

The bracketed response does not appear in the written transcript, but can be heard on the tape recording. Defendant's Exh. I.

**31** The full text of this article is reprinted as Appendix B to Judge Guy's dissenting opinion. 842 F. 2d, at 858-859.

**32** Blount testified at trial as follows:

"Q. . . . Did you listen to any of the tapes of the interview conducted by Dan Connaughton with Miss Stephens and Miss Thompson on the 17th of September? Did you listen to any of those tapes before you approved and published the article about Dan Connaughton on the figures of November 18, 1983?

"A. No, because we had from several sources what was on the tape, there was several sources including Mr. Connaughton, that there was no mention of things we were exploring at this time[.]

. . .

"Q. You were, I presume, concerned that you were dealing with a credible person in Alice Thompson, were you not?

"A. Correct.

"Q. Wouldn't one of the simplest ways to determine her credibility be to play the tape to see whether her statement that Dan's voice is not on it is true?

"A. No, because we had been told from other sources that this matter, as I previously said, saying it was not on the tape. This was not discussed on the tape. We had been told by other persons that the tape was junk as far as evidence.

"Q. The tape was what?

"A. Junk." App. 30-31.

Blount further testified that by the time of trial, almost two years after he received the tapes, he had only listened to 15 minutes of the 2 1/2 hours of tape. *Id., at 33.*

**33** The following cases are illustrative of this tradition: *Bose, 466 U.S., at 510-511* (actual malice); *Jenkins v. Georgia, 418 U.S. 153, 161 (1974)* (obscenity); *Hess v. Indiana, 414 U.S. 105, 108-109 (1973) per curiam)* (incitement); *Miller v. California, 413 U.S. 15, 25 (1973)* (obscenity); *Time, Inc. v. Pape, 401 U.S. 279, 284 (1971)* (actual malice); *Greenbelt Cooperative Publishing Assn., Inc. v. Bresler, 398 U.S. 6, 11 (1970)* (defamation); *Street v. New York, 394 U.S. 576, 589, 592 (1969)* (fighting words); *Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 83 (1967) per curiam)* (actual malice); *New York Times Co. v. Sullivan, 376 U.S. 254, 285 (1964)* (actual malice); *Edwards v. South Carolina, 372 U.S. 229, 235 (1963)* (peaceful assembly); *Niemotko v. Maryland, 340 U.S. 268, 271 (1951)* (failure to issue license for religious meeting in public park); *Pennekamp v. Florida, 328 U.S. 331, 335 (1946)* (clear and present danger to integrity of court).

**34** Of course, the protection of "calculated falsehoods" does not promote self-determination. As we observed in *Garrison v. Louisiana, 379 U.S. 64 (1964)*:

"At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration. Cf. Riesman, Democracy and Defamation: Fair Game and Fair Comment I, 42 Col. L. Rev. 1085, 1088-1111 (1942). That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected." *Id., at 75.*

**35** Petitioner concedes that "when conducting the independent review mandated by *New York Times* and *Bose,* a reviewing court should properly hesitate to disregard a jury's opportunity to observe live testimony and assess witness credibility." Brief for Petitioner 36, n. 45. It contends, however, that this Court did reject the trial court's credibility determination in *Bose.* We disagree with this reading of *Bose.* In *Bose* we accepted the trial court's determination that the author of the report at issue did not provide credible testimony concerning the reason for his choice of words and his understanding of the meaning of the word "about." 466 U.S., at 511-512. Unlike the District Court, however, we were unwilling to infer actual malice from the finding that the witness "refused to admit [his mistake] and steadfastly attempted to maintain that no mistake had been made -- that the inaccurate was accurate." *Id., at 512.*

**36** The Court of Appeals asserted:

"A review of the entire record of the instant case disclosed substantial probative evidence from which a jury could have concluded (1) that the *Journal* was singularly biased in favor of Dolan and prejudiced against Connaughton as evidenced by the confidential personal relationship that existed between Dolan and Blount, the *Journal* Editorial Director, and the unqualified, consistently favorable editorial and daily news coverage received by Dolan from the *Journal* as compared with the equally consistently unfavorable news coverage afforded Connaughton; (2) that the *Journal* was engaged in a bitter rivalry with the *Cincinnati Enquirer* for domination of the greater Hamilton circulation market as evidenced by Blount's vituperous public statements and criticism of the *Enquirer;* (3) that the *Enquirer's* initial expose of the questionable operation of the Dolan court was a high profile news attraction of great public interest and notoriety that had 'scooped' the *Journal* and by Blount's own admission was the most significant story impacting the Connaughton-Dolan campaign[;] (4) that by discrediting Connaughton the *Journal* was effectively impugning the *Enquirer* thereby undermining its market share of the Hamilton area; (5) that Thompson's emotional instability coupled with her obviously vindictive and antagonistic attitudes toward Connaughton as displayed during an interview on October 27, 1983, arranged by Billy New's defense attorney, afforded the *Journal* an ideal vehicle to accomplish its objectives; (6) that the *Journal* was aware of Thompson's prior criminal convictions and reported psychological infirmities and the treatment she had received for her mental condition; (7) that every witness interviewed by

*Journal* reporters discredited Thompson's accusations; (8) that the *Journal* intentionally avoided interviewing Stephens between October 27, 1983, the date of its initial meeting with Thompson, and November 1, 1983 when it printed its first story even though it knew that Stephens could either credit or discredit Thompson's statements; (9) that the *Journal* knew that publication of Thompson's allegations charging Connaughton with unethical conduct and criminal extortion and her other equally damaging statements would completely discredit and irreparably damage Connaughton personally, professionally and politically; (10) that its prepublication legal review was a sham; (11) that the *Journal* timed the release of the initial story so as to accommodate follow-up stories and editorial comments in a manner calculated to peak immediately before the election in an effort to maximize the effect of its campaign to discredit Connaughton and the *Enquirer*." 842 F. 2d, at 843-844.

**37** Nor can petitioner claim immunity from suit because portions of Thompson's account of the relevant events were confirmed by Connaughton. "[T]he defamer may be [all] the more successful when he baits the hook with truth." *Afro-American Publishing Co. v. Jaffe*, 125 U. S. App. D. C. 70, 76, 366 F. 2d 649, 655 (1966) (en banc). See also *Tavoulareas, 260 U. S. App. D. C., at 64, 817 F. 2d, at 787*. Of course, the press need not accept "denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Edwards v. National Audubon Society, Inc., 556 F. 2d, at 121*.

**38** As Justice Harlan ▾ observed in *Butts*:

"Burnett's notes were not even viewed by any of the magazine's personnel prior to publication. John Carmichael who was supposed to have been with Burnett when the phone call was overheard was not interviewed. No attempt was made to screen the films of the game to see if Burnett's information was accurate, and no attempt was made to find out whether Alabama had adjusted its plans after the alleged divulgence of information." 388 U.S., at 157.

In this passage, "Stephens" might easily be substituted for "Carmichael," "Thompson" for "Burnett," and "the tapes" for "Burnett's notes" and "the films of the game."

**39** Chief Justice Warren wrote:

"The slipshod and sketchy investigatory techniques employed to check the veracity of the source and the inferences to be drawn from the few facts believed to be true are detailed at length in the opinion of Mr. Justice Harlan ▾. Suffice it to say that little investigative effort was expended initially, and no additional inquiries were made even after the editors were notified by respondent and his daughter that the account to be published was absolutely untrue. Instead, the Saturday Evening Post proceeded on its reckless course with full knowledge of the harm that would likely result from publication of the article." *Id., at 169-170*.

**40** Although concluding that the case should be remanded for a new trial, Justice Brennan ▾, joined by Justice White ▾, agreed with Chief Justice Warren that the evidence presented at the original trial "unmistakably would support a judgment for Butts under the *New York Times* standard." *Id., at 172*.



About
Privacy Policy

Cookie Policy
Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

Harwood v. Bush, 223 So. 2d 359, 362 (Fla. Dist. Ct. App. 1969)

Search: Everything

⚠️ **Harwood v. Bush, 223 So. 2d 359**

Copy Citation

Court of Appeal of Florida, Fourth District

May 5, 1969

No. 2058

**Reporter**

223 So. 2d 359 * | 1969 Fla. App. LEXIS 5661 **

John W. HARWOOD, Appellant, v. Betty BUSH and Jupiter-Tequesta Beacon, Inc., a Florida corporation, Appellees

## Core Terms

counts, libel, libelous per se, profession, amend, cause of action, proper exercise, incompatible, Rat, motion to dismiss, special damage, libel per se, circumstances, defamation, newspaper, distrust, concurs, imparts, notice, tends, yacht

## Case Summary

**Procedural Posture**

Appellant private investigator challenged a judgment from the trial court (Florida), which dismissed his libel action against appellees, writer and newspaper.

**Overview**

Appellees, writer and newspaper, published articles over which appellant private investigator filed suit because appellant alleged that the articles were libelous. Appellees moved to dismiss the suit for failure to allege special damages or to state a cause of action in libel per se. The trial court granted the motion with leave for appellant to amend his complaint, which appellant failed to amend his complaint. Appellant challenged the dismissal of the action with prejudice. On appeal, the court affirmed the dismissal of one count of the complaint, as it contained no demand for a retraction, a prerequisite to a libel action. With respect to the other two counts, the court reversed the dismissal. The court held that they sufficiently stated claims for libel per se because they attributed dishonest and disreputable conduct to the story's main character, which appellant sufficiently alleged was meant to portray him and that was incompatible with appellant's profession as a private investigator.

**Outcome**

Trial court's dismissal of one count of appellant private investigator's complaint was upheld because it failed to state a claim. The dismissal of the other two counts was reversed because the allegations were sufficient to show that the articles were libelous per se since they tended to disparage appellant in his profession.

## ▼ LexisNexis® Headnotes

Civil Procedure > Judgments ▾ > Pretrial Judgments ▾ > Judgment on Pleadings ▾

**HN1** ⬇ **Pretrial Judgments, Judgment on Pleadings**

Upon a motion to dismiss, a complaint is to be construed most strictly against the pleader, and essential allegations will not be imported by inference. 🔍 More like this Headnote

Shepardize® - Narrow by this Headnote (0)

Torts > Intentional Torts ▾ > Defamation ▾ > Libel ▾

View more legal topics

**HN2** ⬇ **Defamation, Libel**

Fla. Stat. ch. 770.01 makes notice or demand for a retraction a condition precedent to a libel action against a newspaper or periodical. 🔍

More like this Headnote

Torts > Intentional Torts ▾ > Defamation ▾ > 📄 Defamation Per Se ▾

View more legal topics

**HN3** ⬇ **Defamation, Defamation Per Se**

A publication is libelous per se if, when considered alone without innuendo, it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace, or tends to injure one in his trade or profession; or if it imparts conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (5)*

Torts > Intentional Torts ▾ > Defamation ▾ > Libel ▾

**HN4** ⬇ **Defamation, Libel**

It is not essential that the person defamed be named in the publication if, by intrinsic reference, the allusion is apparent, or if the publication contains matters of description or reference to facts and circumstances from which others may understand that he is the person referred to, or if he is pointed out by extraneous circumstances so that persons knowing him can and do understand that he is the person referred to; and it is sufficient if those who know the plaintiff can make out that he is the person meant. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

**Counsel:** [**1] J. Ralph Mabie, West Palm Beach, for Appellant.

Joseph D. Farish, Jr., and Martin J. A. Yeager, of Farish & Farish ▾, West Palm Beach, for Appellees.

**Judges:** Walden ▾, Chief Judge. Reed ▾, J., concurs. McCain ▾, J., concurs as to the affirmance and dissents as to the reversal.

**Opinion by:** WALDEN ▾

## Opinion

**[\*360]** Plaintiff, John W. Harwood, filed a complaint in three counts charging defendants with libel. Attached as exhibits were the allegedly libelous newspaper articles.

Defendants moved to dismiss the complaint for failure either to allege special damages or to state a cause of action in libel per se. Their motion was granted with leave for plaintiff to amend his complaint within 15 days. Apparently satisfied that his cause of action was sufficiently pled, plaintiff declined to amend. Accordingly the trial court dismissed the cause with prejudice. We affirm in part, and reverse in part.

It is settled law that **HN1**⬆ upon a motion to dismiss, a complaint is to be construed most strictly against the pleader, and essential allegations will not be imported by inference. E.g. Drady v. Hillsborough County Aviation Authority, Fla.App.1966, 193 So.2d 201. Behind this is, of course, the assumption [**2] that the litigant has stated his case or defense as strongly as the facts permit. McComb v. Hygeia Coca-Cola Bottling Works, 1939, 137 Fla. 260, 188 So. 219. Adding pertinence to this assumption is the fact that this plaintiff declined to amend his complaint after it was first dismissed with leave to amend. **[\*361]** We observe in passing that it would have been a happier circumstance had plaintiff taken advantage of the opportunity to replead and thereby improve his complaint by meeting the legal objections to it. Had this been done the complaint could have been removed from the borderline category and the decision as to its sufficiency made apparent. Quite likely the need for appeal would have been thereby eliminated to the advantage of all concerned.

As we noted at the outset, plaintiff's complaint is in three counts. Count III is clearly defective in that it contains no allegation of a notice or demand for retraction of the objectionable article. Since **HN2**⬆ Section 770.01, F.S.1967, F.S.A., makes notice a condition precedent to a libel action against a newspaper or periodical, Count III must fall. Hevey v. News-Journal Corp., Fla.App.1963, 148 So.2d 543. This infirmity does [**3] not affect the two remaining counts.

Counts I and II herein do not allege special damages, nor do they allege defamation by virtue of extrinsic facts. To stand, therefore, they must sufficiently allege a publication which is libelous per se.

---

So.2d 535.

The article alleged to be libelous in Count I of plaintiff's complaint was an allegorical tale of one "Harwood the Rat." 1⬇ Construed as the common mind would understand it, Walsh v. Miami Herald Publishing Co., Fla.1955, 80 So.2d 669, this article conveys the impression that "Harwood" was a rat; that he had trespassed on the yacht in question and had, some time previously, pillaged another yacht. Measured by the above mentioned standards, it is clearly libelous per se of "Harwood" since it portrays **[\*362]** him as one to be distrusted. The **[\*362]** conduct attributed to "Harwood" is also incompatible with the proper exercise of plaintiff's profession as a private investigator.

[**5] Although the article fails to identify plaintiff directly as "Harwood the Rat" plaintiff has sufficiently alleged that the article was meant to refer to him, and that many persons reading the article so understood it. It was held in the O'Neal case, supra:

"**HN4**⬆ It is not essential that the person defamed be named in the publication if, by intrinsic reference, the allusion is apparent, or if the publication contains matters of description or reference to facts and circumstances from which others may understand that he is the person referred to, or if he is pointed out by extraneous circumstances so that persons knowing him can and do understand that he is the person referred to; and it is sufficient if those who know the plaintiff can make out that he is the person meant. 33 Am.Jur., Libel and Slander, section 89, page 102; and for numerous jurisdictions holding to this effect, see 91 A.L.R.

We conclude then that Count I of plaintiff's complaint does state a cause of action in libel per se.

Count II was directed at an article published in the Beacon News on July 20, 1967. Without elaboration, this article is also libelous per se. It reflects upon plaintiff's [**6] honesty and imparts to him conduct clearly incompatible with the proper exercise of his profession. Therefore the dismissal of this count was also erroneous.

We affirm the dismissal of Count III of plaintiff's complaint, but reverse as to Counts I and II.

Affirmed, in part; reversed, in part.

REED , J., concurs.

McCAIN , J., concurs as to the affirmance and dissents as to the reversal.

---

**Footnotes**

 The entire text of the article reads as follows:

"TRUTH OR CONSEQUENCES

by Betty Bush

"You Think YOU Have Rats?

"If Cat Cay lived up to its name, chances are I wouldn't have seen Harwood. Harwood is a rat. (The name was chosen because of its fine English sound. Harwood comes from a long and distinguished line of rats. The resemblance to any person living or dead is purely coincidental.)

"I was sitting in the lounge of the C'est La Vie reading the Bahamian Cruising Guide one midnight when I glimpsed movement.

"I looked up, and there was Harwood sitting on the step regarding me with a black, beady, steady stare. I stared back. His glossy coat was touched with gray, he was sleek, fat. Harwood obviously was no ordinary rat. He had boarded the vessel without so much as a 'May I?', had entered the lounge and taken a seat. His years of experience as a snooper came to the fore when I rose to my feet and started toward him. With one leap, he cleared the steps, hit the deck and was gone.

"I closed the lounge door, and went back to the Guide. A little later I heard a scratching noise, not unlike that made by a 16mm miniature camera. There was Harwood peering through the window. Enough is enough. At this point, I threw the Bahamian Guide at the window, and saw Harwood disappear again.

"He surely would return, not having completed his mission, whatever it might be. I closed the windows, the hatches, the Guide, looked outside, and there was Harwood, climbing a palm tree. Probably looking for a better vantage point.

"Next morning, I learned that weeks before, Harwood had pillaged a visiting yacht, and destroyed the owner's entire food supply, leaving him with nothing but an appetite.

"Since this happened, a crop of cats are 'coming along' on Cat Cay. With rats of Harwood's ilk, they will doubtless be more effective than a .38."

---



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

Hay v. Indep. Newspapers, Inc., 450 So. 2d 293, 295 (Fla. Dist. Ct. App. 1984)

Search: Everything

**Client:** -None-   Folders   History

Document:   **Hay v. Independent Newspapers, Inc., 450 So. 2d 293**   | Actions ⌄

Go to ⌄   Page   `Page #`   Search Document 🔍

⚠️ **Hay v. Independent Newspapers, Inc., 450 So. 2d 293**

**Copy Citation**

Court of Appeal of Florida, Second District

May 2, 1984

No. 83-215

**Reporter**
450 So. 2d 293 * | 1984 Fla. App. LEXIS 12904 ** | 10 Media L. Rep. 1928

LEROY HAY, Appellant, v. INDEPENDENT NEWSPAPERS, INC., and PHILLIP A. PETTUS, Appellees

**Prior History:** [**1] Appeal from the Circuit Court for DeSoto County; Stephen L. Dakan, Judge.

## Core Terms

libel, defamatory, crook, private person, fault

---

### Case Summary

**Procedural Posture**
Appellant sought review of a judgment from the Circuit Court for DeSoto County (Florida) that dismissed his libel action against appellees, newspaper and author. Appellant asserted that letter to the editor, published under the heading of "Opinion," which referred to him as a crook and a criminal and criticized the judicial system, was libel.

**Overview**
The court affirmed a judgment that dismissed appellant's libel action against appellees, newspaper and author. Appellees published a letter to the editor, under the heading "Opinion," that referred to appellant as a crook and a criminal. The court held that when appellant was a private citizen he must allege false statements made without reasonable care as to their truth and falsity and damages. The court found that the letter was pure opinion when it was based upon facts that were otherwise known or available to the reader as a member of the public, that criminal charges had been filed against appellant, and was vaguely labeled opinion. The court further found that appellant failed to allege fault on the part of appellees in publishing statements without regard to their falsity. Finding that appellant had not properly alleged either false and defamatory statements or fault, the court held that dismissal was proper.

**Outcome**
The court affirmed the judgment that dismissed appellant's libel action. The court found that appellant, a private citizen, had failed to allege false and defamatory statements when the letter to the editor was pure opinion and when appellant failed to allege that appellees acted without reasonable care as to the truth or falsity of the statements.

---

### ▼ LexisNexis® Headnotes

Torts > Intentional Torts ⌄ > Defamation ⌄ > Libel ⌄
View more legal topics

_HN1_ ⬇ **Defamation, Libel**
To state a cause of action for libel, a private person must allege publication (1) of false and defamatory statements of and concerning that private person, (2) without reasonable care as to the truth or falsity of those statements, (3) resulting in actual damage to that private person. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (8)* 

Torts > Intentional Torts ⌄ > Defamation ⌄ > Libel ⌄

**HN2** 🔖 **Defamation, Libel**

Whether a statement is one of fact or one of opinion is a question of law. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

Torts > Intentional Torts ⌄ > Defamation ⌄ > Libel ⌄

**HN3** 🔖 **Defamation, Libel**

False statements of fact of or concerning a private person are not protected by the Constitution, but expressions of opinion are. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Torts > ... > Defamation ⌄ > Defenses ⌄ > Fair Comment & Opinion ⌄
View more legal topics

**HN4** 🔖 **Defenses, Fair Comment & Opinion**

There is a distinction between pure expression of opinion and mixed expression of opinion. Pure opinion is based upon facts that the communicator sets forth in a publication, or that are otherwise known or available to the reader or the listener as a member of the public. Mixed opinion is based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication. Rather, the communicator implies that a concealed or undisclosed set of defamatory facts would confirm his opinion. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (21)* 🔶 3

Torts > Intentional Torts ⌄ > Defamation ⌄ > Libel ⌄

**HN5** 🔖 **Defamation, Libel**

Pure opinion is protected under U.S. Const. amend. I, but mixed opinion is not. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Torts > ... > Defamation ⌄ > Defenses ⌄ > Fair Comment & Opinion ⌄
View more legal topics

**HN6** 🔖 **Defenses, Fair Comment & Opinion**

In determining whether an alleged libelous statement is pure opinion, the court must construe the statement in its totality, examining not merely a particular phrase or sentence, but all of the words used in the publication. The court must consider the context in which the statement was published and accord weight to cautionary terms used by the person publishing the statement. All of the circumstances surrounding the publication must be considered, including the medium by which it was disseminated and the audience to which it was published. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (14)*  3

Torts > Intentional Torts ⌄ > Defamation ⌄ > 📄 Defamation Per Se ⌄
View more legal topics

**HN7** 🔖 **Defamation, Defamation Per Se**

The Supreme Court of Florida has held that a person commits libel per se when he charges that another is a crook, unless the communication is privileged. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ⌄ > Defamation ⌄ > 📄 Defamation Per Se ⌄
View more legal topics

**HN8** 🔖 **Defamation, Defamation Per Se**

The law conclusively implies malice and damage if the defamatory language was libel per se. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ⌄ > Defamation ⌄ > Libel ⌄

**HN9** 🔖 **Defamation, Libel**

So long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Torts > Intentional Torts ▾ > Defamation ▾ > Libel ▾

**HN10**⬇ **Defamation, Libel**

The Florida court has adopted the negligence standard as the appropriate standard of liability in connection with defamatory statements concerning a private individual. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ▾ > Defamation ▾ > 📄 Defamation Per Se ▾

View more legal topics

**HN11**⬇ **Defamation, Defamation Per Se**

Although libel per se still exists in Florida where nonprivileged defamatory words are deemed injurious upon their face without resort to extrinsic proof, it is not sufficient for a plaintiff to merely raise a presumption of malice. Fault must be alleged. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

**Counsel:** David C. Holloman ▾ of Holloman & Lambert, Arcadia, for Appellant.

W. Cort Frohlich ▾ of Wotitzky, Wotitzky, Mandell, Batsel, Wilkins & Frohlich, Punta Gorda ▾, for Appellees.

**Judges:** Schoonover ▾, Judge. Grimes ▾, A.C.J., and Lehan ▾, J., concur.

**Opinion by:** SCHOONOVER ▾

## Opinion

**[*294]**  This is an appeal from a final judgment dismissing a libel action with prejudice. We affirm.

Appellant, Leroy Hay, filed an action alleging that appellees, Independent Newspapers, Inc., publisher of the Arcadian, a newspaper in DeSoto County, Florida, and Phillip A. Pettus, Editor, committed libel by publishing an article in the Arcadian referring to appellant as a crook and a criminal.

The article, a letter to the editor, published in the "The Forum, Opinion" section of the newspaper, provided as follows:

What's happened to our laws? Editor:

What has happened to our laws? Monday the state attorney's office announced its intention not to prosecute Leroy Hay, Fort Ogden, and Rich Heath, Fort Lauderdale, and the judge fines Henry Hay $5,000 and gives him 5 years probation.

This makes me sick! Catch a crook, pat him on [**2] the back and let him go free. I wonder how many laughs they have had on this, at the taxpayers expense.

No wonder the young people today have no respect for law and order - look at the fine examples you judges and lawyers give them. You twist the laws so the crooks can go free. It makes one wonder who really is the criminal.

It's time, you judges, lawyers, and leaders of our land, to take a good look at yourselves. Who are you really trying to protect, the crook, the innocent, or maybe your pocketbooks?

Concerned

Name withheld by request.

The trial court held the alleged libelous language was an expression of unactionable opinion protected by the First Amendment of the United States Constitution and granted appellees' motion to dismiss the complaint. After appellant declined an opportunity to further amend his complaint, a final judgment dismissing the action with prejudice was entered. This appeal timely followed.

It is undisputed that appellant is a private person and not a public official or public figure. **HN1**⬆ To state a cause of action for libel, a private person must allege publication (1) of false and defamatory statements of and concerning that private [**3] person, (2) without reasonable care as to the truth or falsity of those statements, (3)  **[*295]**  resulting in actual damage to that private person. *Miami Herald Publishing Co. v. Ane*, 423 So.2d 376 (Fla. 3d DCA 1982); *Boyles v. Mid-Florida Television Corp.*, 431 So.2d 627 (Fla. 5th DCA 1983); *Tribune Co. v. Levin*, 426 So.2d 45 (Fla. 2d DCA 1982).

**HN2**⬆ Whether a statement is one of fact or one of opinion is a question of law. *From v. Tallahassee Democrat, Inc.*, 400 So.2d 52 (Fla. 1st DCA 1981) *petition for review denied* 412 So.2d 465 (Fla. 1982). **HN3**⬆ False statements of fact of or concerning a private person are not protected by the Constitution, but expressions of opinion are. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974).

**HN4**⬆ There is a distinction between pure expression of opinion and mixed expression of opinion. Pure opinion is based upon facts that the communicator sets forth in a publication, or that are otherwise known or available to the reader or the listener as a member of the public. Mixed opinion is based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist [**4]  by a party exposed to the communication. *From*. Rather, the communicator implies that a concealed or undisclosed set of defamatory facts would confirm his opinion. *Kotlikoff v. The Community News*, 89 N.J. 62, 444 A.2d 1086 (N.J. 1982). **HN5**⬆ Pure opinion is protected under the First Amendment, but mixed opinion is not. *See From*.

**HN6**⬆ In determining whether an alleged libelous statement is pure opinion, the court must construe the statement in its totality, examining not merely a particular phrase or sentence, but all of the words used in the publication. The court must consider the context in which the statement was published and accord weight to cautionary terms used by the person publishing the statement. All of the circumstances

254

surrounding the publication must be considered, including the medium by which it was disseminated and the audience to which it was published. *Information Control v. Genesis One Computer Corp., 611 F.2d 781 (9th Cir. 1980) cited with approval in From.*

The complaint in the case sub judice was defective because it was based upon an expression of pure opinion and therefore failed to allege a false and defamatory statement of and concerning [**5] the appellant. The complaint alleged that statements contained in the article referred to the appellant as a crook and a criminal. These statements were based in part upon facts disclosed in the article, but the fact that criminal charges had been filed against the appellant was either known or readily available to the reader as a member of the public. Furthermore, the statements were made in a letter to the editor published in a section of the newspaper titled "The Forum, Opinion," and the letter was directed not toward the appellant, but toward the judicial system. Applying the principles hereinabove set forth, we hold the statement was a pure expression of opinion and accordingly protected by the First Amendment of the United States Constitution. *See also Demoya v. Walsh, 441 So.2d 1120 (Fla. 3d DCA 1983)* (characterization of co-worker as "raving maniac" and "raving idiot" was pure opinion based on disclosed facts); *Kotlikoff* (accusations of mayor's involvement in "huge cover-up" and "conspiracy" were, in context, protected expressions of opinion); *contra Rinaldi v. Holt, Rinehart & Winston, Inc., 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, cert. denied [**6] , 434 U.S. 969, 98 S. Ct. 514, 54 L. Ed. 2d. 456 (1977)* (accusations of criminal activity, even in form of opinion, are not constitutionally protected).

The complaint was further defective because it failed to allege fault upon the part of appellee in publishing statements without regard to their truth or falsity. The complaint alleged that the published matter referred to appellant as a crook and a criminal and was therefore libel per se. **HN7** The Supreme Court of Florida has held that a person commits libel per se when he charges that another is a crook, unless the communication is privileged. *Commander v. Pedersen, 116 Fla. 148, 156 So. 337* **[*296]** (1934). Assuming arguendo that we had held the references to the appellant as a crook and criminal to be nonprivileged, false, and defamatory fact statements as opposed to pure opinion, this allegation would have been sufficient to satisfy the fault requirement prior to *Gertz*. Until *Gertz*, **HN8** the law conclusively implied malice and damage if the defamatory language was libel per se. *Johnson v. Finance Acceptance Co., 118 Fla. 397, 159 So. 364 (1935).*

In *Gertz*, however, the United States Supreme Court stated: [**7]

> We hold that, **HN9** so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual.

418 U.S. at 347.

Pursuant to *Gertz*, **HN10** this court has adopted the negligence standard as the appropriate standard of liability in connection with defamatory statements concerning a private individual. *Tribune v. Levin; see also Miami Herald* (negligence standard adopted by Third District Court of Appeal); *Boyles* (negligence standard adopted by Fifth District Court of Appeal). **HN11** Although libel per se still exists in Florida where nonprivileged defamatory words are deemed injurious upon their face without resort to extrinsic proof, it is not sufficient for a plaintiff to merely raise a presumption of malice. Fault must be alleged. *Miami Herald; Boyles.* Therefore, the trial court properly dismissed the complaint because the alleged libelous language was an expression of unactionable opinion, but even if the expression had been actionable, dismissal would have been proper because appellant failed to allege fault.

AFFIRMED.

[**8] GRIMES , A.C.J., and LEHAN , J., Concur.



About          Cookie Policy          RELX™

Privacy Policy          Terms & Conditions

Copyright © 2023 LexisNexis.

255

Henderson v. Todd Rhyne, Inc., 2019 U.S. Dist. LEXIS 224784 (M.D. Fla. Dec. 13, 201

Search: Everything

**Document:**   Henderson v. Todd Rhyne, Inc., 2019 U.S. Dist. LEXIS 224784

Actions⌄

Go to   Page   | Page # |   Search Document

### ◆ Henderson v. Todd Rhyne, Inc., 2019 U.S. Dist. LEXIS 224784

**Copy Citation**

United States District Court for the Middle District of Florida, Ocala Division

December 13, 2019, Decided; December 13, 2019, Filed

Case No: 5:19-cv-327-Oc-30PRL

**Reporter**

2019 U.S. Dist. LEXIS 224784 * | 2019 WL 7567811

JAMES HENDERSON, JOHN HORRELL and CHRISTOPHER MORENO, Plaintiffs, v. TODD RHYNE, INC., Defendant.

**Subsequent History:** Adopted by, Motion denied by Henderson v. Todd Rhyne, Inc., 2020 U.S. Dist. LEXIS 5206, 2020 WL 136520 (M.D. Fla., Jan. 13, 2020)

Request granted Henderson v. Todd Rhyne, Inc., 2021 U.S. Dist. LEXIS 39650 (M.D. Fla., Mar. 3, 2021)

Summary judgment granted by, in part Henderson v. Todd Rhyne, Inc., 2022 U.S. Dist. LEXIS 128040 (M.D. Fla., July 19, 2022)

## Core Terms

allegations, employees, damages, interstate commerce, tortious interference, defamation, enterprise, coverage, engaged in commerce, commerce, argues

**Counsel:** [*1] For James Henderson, John Horrell, Christopher Moreno, Plaintiffs: Matthew W. Birk ⌄ , LEAD ATTORNEY, Matthew Birk ⌄ , Esq., Law Office ⌄ , Gainesville, FL.

For Todd Rhyne, Inc., Defendant: Charles Edward Emanuel , Jr., LEAD ATTORNEY, The Emanuel Firm, PA, Orlando, FL.

**Judges:** PHILIP R. LAMMENS ⌄ , United States Magistrate Judge.

**Opinion by:** PHILIP R. LAMMENS ⌄

## Opinion

**REPORT AND RECOMMENDATION** 1⬇

Plaintiffs, James Henderson, John Horrell, and Christopher Moreno, 2⬇ are previous employees of Defendant, and allege claims under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"), as well as state law claims for breach of contract, tortious interference with a contractual relationship, and defamation. (Doc. 3). Defendant now moves to dismiss Plaintiffs' amended complaint. (Doc. 8). For the reasons discussed below, I submit that Defendant's motion is due to be denied.

**I. BACKGROUND** 3⬇

This case arises from Plaintiffs' alleged employment with Defendant Todd Rhyne, Inc., a roofing company. (Doc. 3, ¶¶ 9, 11). Around June 2018, Defendant hired James Henderson as a project manager to sell, build, and collect for post-hurricane roof repairs, primarily in Sumter County, Florida. (Doc. 3, ¶ 9). Defendant originally paid Henderson hourly, and he worked [*2] seven days a week, from 6:30 a.m. or 7:30 a.m. until around 11:00 p.m. (Doc. 3, ¶¶ 10, 13). Henderson alleges that he was not paid overtime wages and when he complained to Defendant, he was "constructively discharged" and Defendant took a $5,000 deduction from his pay. (Doc. 3, ¶ 34).

In June 2018, Defendant hired Christopher Moreno as the director of sales and to collect $3,000,000 in receivables. (Doc. 3, ¶ 11). Moreno remained the director of sales until he resigned in April 2019 and started working for his current employer, Universal Contracting of Florida. (Doc. 3, ¶¶ 11, 37). Moreno alleges that after he resigned, Defendant told his new employer that he was a thief and had cost Defendant money. (Doc. 3, ¶¶ 39, 43). As a result, Moreno claims that he had less opportunity for growth with his current employer. (Doc. 3, ¶¶ 41, 44).

Defendant paid Horrell and Moreno on a percentage basis: they each received a percentage of the job cost but also shared a percentage of the job's profit with the Defendant. (Doc. 3, ¶ 28).

In August 2018, Defendant hired John Horrell to work as a salesperson, but he became a project manager shortly after. (Doc. 3, ¶ 9). Moreno was paid a weekly base salary **[*3]** of $1,250 plus a 1.5 percent bonus on any amounts he collected, a housing allowance of $2,450 per month, $800 per month for health insurance, and paid vacation. (Doc. 3, ¶ 28). Plaintiffs claim that they performed all of their work, but Defendant still owes Horrell around $15,000, Henderson around $80,000, and Moreno 4⬇ around $100,000. (Doc. 3, ¶ 29).

Now, in Counts I and III, Henderson seeks relief against Defendant under the FLSA for failing to pay him overtime wages and retaliation. In Count II, all three Plaintiffs seek relief against Defendant for breach of contract. And in Counts IV and V, Moreno seeks relief against Defendant for tortious interference with a contractual relationship and defamation.


## II. Legal Standard

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While detailed factual allegations are not required, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to **[*4]** relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). The court must view the allegations of the complaint in the light most favorable to the plaintiff, consider the allegations of the complaint as true, and accept all reasonable inferences from there. *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). In considering the sufficiency of the complaint, the court limits its "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *Id.*

The Eleventh Circuit uses a two-pronged approach in applying the holding in *Ashcroft* and *Twombly*. First, the Court must "eliminate any allegations in the complaint that are merely legal conclusions," and then, "where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *ADA v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).

A well-pled complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and "that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. The issue to be decided when considering a motion to dismiss is not whether the claimant will ultimately prevail, but "whether the claimant is entitled to offer evidence to support **[*5]** the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974), overruled on other grounds by *Davis v. Scherer*, 468 U.S. 183, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984).


## III. Discussion

### A. FLSA claims

Plaintiff Henderson brings two claims under FLSA: in Count I Henderson alleges that Defendant failed to pay him overtime wages and in Count III he alleges that Defendant constructively discharged him for complaining about the wages. Defendant argues that Counts I and III should be dismissed because Henderson failed to allege that the FLSA applies to it.

The FLSA applies to employers who have employees "engaged in commerce or in the production of goods for commerce" (*i.e.*, individual coverage) or "employed in an enterprise engaged in commerce or in the production of goods for commerce" (*i.e.*, enterprise coverage). 29 U.S.C. § 207(a)(1); *see Thorne v. All Restoration Servs., Inc.*, 448 F.3d 1264, 1265-66 (11th Cir. 2006).

Individual coverage exists when an employee is "engaged in commerce," which requires the employee to be

> directly participating in the actual movement of persons or things in interstate commerce by (i) working for an instrumentality of interstate commerce, *e.g.*, transportation or communication industry employees, or (ii) by regularly using the instrumentalities of interstate commerce in his work, *e.g.*, regular and recurrent use of interstate telephone, telegraph, mails, or travel.

*Thorne*, 448 F.3d at 1266 (citing 29 C.F.R. §§ 776.23, 776.24). Henderson **[*6]** alleges that as a project manager, he sold, built, and collected for post-hurricane roof repairs primarily in Sumter County, Florida. (Doc. 3, ¶ 9). He further contends that Defendant, for whom he worked, "regularly engages in commerce and its employees, including Plaintiff Henderson, handled and used materials, which have moved in interstate commerce." (Doc. 3, ¶ 17). Those allegations appear insufficient to establish individual coverage, but Plaintiff's primary position, which does appear sufficient (even if barely so), is that Defendant is a covered enterprise. Indeed, this is Plaintiff's express contention. (see Doc. 3, ¶ 7).

Enterprise coverage exists where an employer (1) grosses more than $500,000 and (2) has employees engaged in commerce or in the production of goods for commerce, or has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person. 29 U.S.C. § 203(s)(1); *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1299 (11th Cir. 2011). Here, Henderson has alleged that Defendant grosses more than $500,000, had "two or more employees who regularly handled goods that moved in or were produced for interstate commerce", and, indeed, that it was an "enterprise engaged in commerce." (Doc. 3, **[*7]** ¶¶ 6, 7).

Although Defendant argues that these allegations are "without any further facts and [is] simply a recitation of the elements of the cause of action" (Doc. 8), at this stage of the proceedings, Henderson only must plead facts that, if true, establish a claim under the FLSA. *See Twombly*, 550 U.S. at 544. While Plaintiff doesn't say exactly what came from a specific state, he alleges the nature of the business, the nature of the work, and under the "handling clause," the materials used in Defendant's roof repair business moved in interstate commerce. Accordingly, Plaintiff's motion to dismiss should be denied as to Counts I and III because Plaintiff sufficiently alleged that the FLSA applies to the Defendant. *Cf. Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1144 (11th Cir. 2018) (finding a defendant not entitled to summary judgment on FLSA "enterprise coverage" because "a jury could find that the valet tickets used by [the defendant's] employees constitute 'materials,'" and "a jury could also find . . . that the tickets were manufactured outside of Florida and moved in interstate commerce").

257

**B. Breach of contract claim**

In Count II, all three Plaintiffs bring a breach of contract claim against Defendant for failing to compensate Plaintiffs for their work. (Doc. **[*8]** 3, ¶¶ 27-31). Defendant argues that Count II should be dismissed because Plaintiffs failed to comply with Florida Rule of Civil Procedure § 1.130(a), which requires all contracts or documents upon which an action may be brought to be incorporated in the complaint.

Defendant's argument is without merit. The Federal Rules of Civil Procedure govern this case, and there is no requirement that a plaintiff attach a contract to a complaint under the federal rules. *See Lamonaco v. USAA Cas. Ins. Co.*, No. 8:08-CV-787-T-27MAP, 2008 U.S. Dist. LEXIS 128133, 2008 WL 11334887, at *1 (M.D. Fla. May 22, 2008); *see also Spring Air Int'l, LLC v. R.T.G. Furniture Corp.*, No. 8:10-CV-1200-T-33TGW, 2010 U.S. Dist. LEXIS 114490, 2010 WL 4117627, at *5 (M.D. Fla. Oct. 19, 2010) ("This Court finds that [plaintiff] is not required to attach a copy of the contract to the complaint in order to state a claim upon which relief may be granted."); *Coyne v. Lucky M.K., Inc.*, No. 205CV25FTM29SPC, 2005 U.S. Dist. LEXIS 46958, 2005 WL 1309267, at *2 (M.D. Fla. May 31, 2005) ("There is no requirement that such contracts be attached, and the complaint adequately alleges the existence of such contracts.").

Although Defendant claims that a Florida rule applies to Count II, Defendant also argues that Count II violates Fed. R. Civ. P. 8(a)(2) and 10(b). Defendant asserts that Count II "comingles allegations of all three Plaintiffs and fails to set out separate claims and allegations that **[*9]** places [Defendant] on reasonable notice as to the claim brought against [it]." (Doc. 8).

The critical issue under Rule 8(a) is whether Plaintiffs have alleged "a short and plain statement of the claim," which they have done. *Lamonaco*, 2008 U.S. Dist. LEXIS 128133, 2008 WL 11334887, at *1. Rule 10(b) requires that the allegations of a claim be "in numbered paragraphs, each limited as far as practicable to a single set of circumstances. . . [and] [i]f doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense." Although Plaintiffs did include the details of three contractual agreements in a single paragraph (Doc. 3, ¶ 28), and the amount Defendant owed Plaintiffs in a single paragraph (Doc. 3, ¶ 28), doing so did not impede the clarity of the allegations, and Count II adequately placed Defendant on notice of what the claim was and the ground on which it rested. *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1325 (11th Cir. 2015) ("A dismissal under Rule 8(a)(2) and 10(b) is appropriate where 'it is *virtually impossible* to know which allegations of fact are intended to support which claim(s) for relief.'") (quoting *Anderson v. District Bd. Of Trustees*, 77 F.3d 364, 366 (11th Cir. 1996)). Therefore, Defendant's motion to dismiss should be denied as to Count II as well.

**C. Tortious interference claim**

In **[*10]** Count IV, Plaintiff Moreno alleges that Defendant tried to get Moreno to lose his job by telling his new employer that he had cost Defendant money and was a thief. (Doc. 3, ¶¶ 37-39). Moreno claims that because of Defendant's actions, he "suffered damages, including less opportunity for growth with his current employer." (Doc. 3, ¶ 41).

Defendant seeks the dismissal of Count IV for "failure to state a claim of damages." (Doc. 8). Defendant relies on *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812 (Fla. 1994) for its contention that Moreno's damages are speculative and insufficient to allege a tortious interference claim. (Doc. 8). In *Ethan Allen, Inc.*, the court decided that "as a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all provability would have been completed if the defendant has not interfered." *Id.* at 815.

Even so, at this stage in the proceedings, Moreno need not provide actual evidence of his damages, or evidence of an actual agreement with his employer that would have been completed if Defendant had not interfered. Instead, Moreno must plead facts that, if true, show that Defendant tortiously interfered **[*11]** with a contractual relationship. *See Twombly*, 550 U.S. at 544. This he has done. Whether Moreno has actually suffered damages, including less opportunity for growth with his current employer, is one that should be left to the discovery phase. *See, e.g.*, *Orange Lake Cty. Club, Inc. v. Reed Hein & Assocs. LLC*, Case No. 6:17-cv-1542-Orl-31DCI, 2018 U.S. Dist. LEXIS 182131, 2018 WL 5279135, at *4 (M.D. Fla. Oct. 24, 2018) (declining to dismiss a tortious interference claim because whether a party was predisposed to breach a contract "is a fact-intensive inquiry inappropriate for resolution at this stage"). Therefore, Defendant's motion to dismiss should be denied as to Count IV.

**D. Defamation claim**

Finally, in Count V, Plaintiff Moreno alleges a defamation claim based on Defendant's statements to his employer. (Doc. 3, ¶¶ 42-44). In Florida, defamation requires a plaintiff to show (1) publication; (2) falsity; (3) that the defendant acted negligently on a matter about a private person; (4) actual damages; and (5) that the statement was defamatory. *Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008).

Defendant argues that Count V should be dismissed for failure to allege actual malice and damages. However, actual malice is not an element of a defamation claim in Florida, and a plaintiff must only allege malice if a qualified privilege is established. **[*12]** *See Hoon v. Pate Constr. Co.*, 607 So. 2d 423, 429 (Fla. Dist. Ct. App. 1992). Neither party claims that qualified privilege applies to Defendant's statements. And, while not stating something specific like he was denied a promotion of a particular type on a specific date, Moreno does allege that he "has suffered damages, including less opportunity for growth with his current employer" (Doc. 3, ¶ 44). Accordingly, Defendant's motion to dismiss should be denied as to Count V.

**IV. Recommendation**

For the foregoing reasons, it is respectfully RECOMMENDED that Defendant's Motion to Dismiss Plaintiffs' Amended Complaint (Doc. 8) be DENIED.

Recommended in Ocala, Florida on December 13, 2019.

/s/ Philip R. Lammens ▾

258



United States Magistrate Judge

---

**Footnotes**

**1** Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions. *See* Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B); Local Rule 6.02. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

**2** Plaintiffs spell Christopher Moreno's name both "Moreno" and "Merino." The Court will refer to him as Mr. Moreno.

**3** At this stage in the proceedings, the facts alleged in Plaintiffs' First Amended Complaint (Doc. 3) are accepted as true and construed in the light most favorable to the plaintiff. *See ADA v. Cigna Corp.,* 605 F.3d 1283, 1288 (11th Cir. 2010).

**4** Plaintiffs state that Defendant owes "HORNELL" over $100,000. However, the sentence directly before states that Horrell is owed approximately $15,000, so it appears Plaintiffs mistakenly wrote "Hornell" instead of "Moreno." (Doc. 3, ¶ 29).

LexisNexis®

About
Privacy Policy

Cookie Policy
Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

Hood v. Connors, 419 So. 2d 742 (Fla. Dist. Ct. App. 198

Search: Everything

**Client:** -None-

Folders  History  Help  More

**Document:**  Hood v. Connors, 419 So. 2d 742  Actions

Go to  Page  *Page #*  Search Document

## Hood v. Connors, 419 So. 2d 742

Copy Citation

District Court of Appeal of Florida, Fifth District

September 22, 1982

NO. 81-1280

**Reporter**

419 So. 2d 742 * | 1982 Fla. App. LEXIS 21183 **

THOMAS E. (GENE) HOOD, Appellant, v. WALT CONNORS, Appellee.

**Prior History:** [**1] Appeal from the Circuit Court for Citrus County, E. C. Aulls, Jr., Judge.

## Core Terms

remarks, slander, paved, public office, defamatory, defamed, quod, slander per se, parking lot, rallies, cases, county commissioner, private business, punitive damages, actual malice, circumstances, allegations, taxpayers, election, presumed, damages, funds

---

### Case Summary

**Procedural Posture**
Appellant public official challenged an order of the Circuit Court for Citrus County (Florida), which dismissed a portion of appellant's complaint for slander and ruled that appellee candidate's remarks were slander per quod, not slander per se.

**Overview**
During a campaign for elective office, appellee candidate accused appellant public official of using public funds to pave parking lots for a private business and to pave the streets of a subdivision in which appellant owned an interest. Appellant sued appellee for slander. The trial court dismissed a count that alleged slander per se because it determined that the remarks were slander per quod. The court said that the defamatory character of the remarks required some explanation of the circumstances during which they were made and the identity and status of appellant. It also ruled that punitive damages were inappropriate. The appellate court disagreed on both points and reversed. The court held that appellant stated a cause of action for slander per se. The court reasoned that the substance of the slander - lack of honesty and abuse of public trust - was obvious. The court noted that the circumstances, time, and place of the defamatory statement and the situation of the person defamed always had to be considered in a slander case. The court found that the allegations were sufficient to charge actual malice and to support a demand for punitive damages.

**Outcome**
The appellate court reversed an order that dismissed a slander per se count in appellant public official's complaint. The court found that the allegations to support the count were sufficient to charge actual malice and that the appellant sufficiently stated a cause of action for slander per se. The court also held that the allegations sufficiently supported appellant's demand for punitive damages.

---

▼  LexisNexis® Headnotes

---

Civil Procedure > Remedies ▼ > Damages ▼ > Special Damages ▼
Torts > ... > Defamation ▼ > Remedies ▼ > General Overview ▼
View more legal topics

**HN1** **Damages, Special Damages**

slander "per se" is actionable on its face, but slander "per quod" requires additional explanation of the words used to show they have a defamatory meaning or that the person defamed is the plaintiff. The primary difference between them is that for per se actions general damages will be presumed, but for per quod actions the plaintiff must allege and prove special damages. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (7)*   🔷 1

Torts > ... > Defamation ⌄ > Public Figures ⌄ > Actual Malice ⌄
View more legal topics

**HN2⬇ Public Figures, Actual Malice**
Actual malice must be alleged and proved in a slander case when the plaintiff is a public figure. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ⌄ > Defamation ⌄ > 📄 Defamation Per Se ⌄
View more legal topics

**HN3⬇ Defamation, Defamation Per Se**
Statements that accuse a public figure of dishonest acts committed while holding public office, and the substance of the remarks directly impact on the public figure's character and trustworthiness to hold public office usually constitute slander per se. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Torts > ... > Defamation ⌄ > Public Figures ⌄ > Political Candidates ⌄
View more legal topics

**HN4⬇ Public Figures, Political Candidates**
The circumstances, time, and place of the defamatory statement and the situation of the person defamed should always be considered in determining what the average person who heard the remarks thought upon hearing them. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

**Counsel:** A. P. Gibbs ⌄, of Gibbs & McAlvanah, P.A., Dade City, for Appellant.

Richard S. Fitzpatrick ⌄, of Fitzpatrick & Fitzpatrick, P.A. ⌄, Inverness, for Appellee.

**Judges:** Before SHARP ⌄, W., J. ORFINGER ⌄, CJ. and COWART ⌄, J., concur.

**Opinion by:** SHARP ⌄

## Opinion

**[\*742]** SHARP, W. ⌄, J.

Hood appeals from the dismissal of Court I of his First Amended Complaint. Hood sued Connors for slander because of remarks made by Connors about Hood at political rallies during their 1980 campaign for elective office in Citrus County. The trial court dismissed Count I because it ruled Connors' remarks were slander per quod, and not slander per se, since their defamatory character required some explanation of the circumstances during which they were made and the identity and status of Hood. It also ruled punitive damages were inappropriate. We disagree on both points.

**[\*743]** *HN1*⬆ Slander "per se" is actionable on its face, but slander "per quod" requires additional explanation of the words used to show they have a defamatory meaning or that the person defamed is the plaintiff. [1⬇] The primary difference between them is that for per [\*\*2] se actions general damages will be presumed, but for per quod actions the plaintiff must allege and prove special damages. [2⬇] Older Florida cases also held that in per se cases, malice was presumed, and need not be pled or proved. [3⬇] However, this aspect of the Florida common law of defamation has been altered by the Federal cases which require that *HN2*⬆ actual malice be alleged and proved when the plaintiff is a public figure, here a candidate for public office. *See New York Times v. Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)*; *Times Publishing Company v. Huffstetler, 409 So.2d 112 (Fla. 5th DCA 1982)*.

In this case we think Count I stated a cause of action for slander per se. [4⬇] Hood alleged that he and Connors were running for political office (clerk of the county court), that he had previously served on the Board of County Commissioners, and that Connors was the incumbent. At five different political rallies, and during one radio broadcast, Connors [\*\*3] accused Hood of using public funds to pave parking lots for a private business and to pave the streets of a subdivision in which Hood owned an interest while Hood was county commissioner. The allegations were:

> Gene Hood had the parking lot of the W-D Pub paved with County funds when he was in office.

> Gene Hood paved their parking lot while he was in office and he paved Sunrise Estates with taxpayers [sic] money before he left office.

The alleged *HN3*⬆ statements accuse Hood of dishonest acts committed while holding public office, and the substance of the remarks directly impacts on his character and trustworthiness to hold public office. Such remarks usually constitute slander per se. *Campbell v. Jacksonville Kennel Club, 66 So.2d 495 (Fla. 1953)*; *Lundquist v. Alewine, 397 So.2d 1148 (Fla. 5th DCA 1981)*; *Glynn v. City of Kissimmee, 383 So.2d 774 (Fla. 5th DCA 1980)*. They could not be much more direct had Connors called Hood a thief and plunderer of the taxpayers of the County. [5⬇]

[*34].

Connors argues the slander was not per se because it was necessary for Hood to explain in his complaint that he was a former office holder seeking public office, that the remarks were made at rallies during a political election contest between them, and that the alleged paving was done to further Hood's private business interests. However, **HN4** the circumstances, time, and place of the defamatory statement and the situation of the person defamed should always be considered in determining what the average person who heard the remarks thought upon hearing them. **6** That does not make a per se slander per quod. **7** This is not a case where the defamatory nature of the remark is unclear without such explanations. Here the substance of the slander -- lack of honesty and abuse of public trust -- was obvious. *See Harwood v. Bush, 223 So.2d 359 (Fla. 4th DCA 1969).*

Also, in Count I Hood alleged that Connors made these false remarks either knowing they were false or "with a reckless disregard for the truth and without reasonable [**5] grounds for the Defendant" to believe they were true. He further alleged Connors **[*744]** made these remarks with intent to injure and defame him. These allegations are sufficient to charge actual malice **8** and we also think they are sufficient to support a demand for punitive damages. **9** Accordingly, this case is

REVERSED AND REMANDED.

ORFINGER, CJ. and COWART, J., concur.

---

**Footnotes**

**1** Campbell v. Jacksonville Kennel Club, Inc., 66 So.2d 495 (Fla. 1953).

**2** Tip Top Grocery Co. v. Wellner, 135 Fla. 518, 186 So. 219 (1938).

**3** Wolfson v. Kirk, 273 So.2d 774 (Fla. 4th DCA 1973).

**4** Even if we concluded that the Connors' remarks were slander per quod, Count I should not have been dismissed because Hood did allege items of special as well as general damages.

**5** *Stewart v. Codrington, 55 Fla. 327, 45 So. 809 (Fla. 1908).*

**6** *Campbell v. Jacksonville Kennel Club, Inc., 66 So.2d 495 (Fla. 1953).*

**7** *Id.*

**8** New York Times v. Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964).

**9** Lundquist v. Alewine, 397 So.2d 1148 (Fla. 5th DCA 1981); Matthews v. Deland State Bank, 334 So.2d 164 (Fla. 1st DCA 1976).



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

✛ **Isaac v. Twitter, Inc., 557 F. Supp. 3d 1251**

[ Copy Citation ]

United States District Court for the Southern District of Florida

August 30, 2021, Decided; August 30, 2021, Entered on Docket

Case No. 21-cv-20684-BLOOM/Otazo-Reyes

**Reporter**

557 F. Supp. 3d 1251 * | 2021 U.S. Dist. LEXIS 163399 ** | 2021 WL 3860654

JOHN PAUL MAC ISAAC, Plaintiff, v. TWITTER, INC., Defendant.

## Core Terms

Explanations, defamation, defamatory, anti-SLAPP, Shop, Repair, defamation per se, Lawsuit, attorney's fees, allegations, costs, extrinsic, recovered, corners, words

**Counsel:** [**1] For John Paul Mac Isaac, Plaintiff: Brian R. Della Rocca ⌄, PRO HAC VICE, Compass Law Partners, Rockville, MD; Wesley Reid Harvin, II, Harvin, Harvin, LLP ⌄, Stuart, FL.

For Twitter, Inc., Defendant: Alexander J. Kasner ⌄, PRO HAC VICE, Cooley LLP, Palo Alto, CA; Araizu Sheila Oretsky ⌄, Buchanan Ingersoll & Rooney PC, Miami, FL; Jennifer Olmedo-Rodriguez ⌄, Buchanan Ingersoll, Miami, FL; Kathleen R. Hartnett ⌄, Kyle C. Wong ⌄, PRO HAC VICE, Cooley LLP, San Francisco, CA.

**Judges:** BETH BLOOM ⌄, UNITED STATES DISTRICT JUDGE.

**Opinion by:** BETH BLOOM ⌄

## Opinion

[*1253] <u>ORDER ON MOTION TO DISMISS</u>

**THIS CAUSE** is before the Court upon Defendant Twitter, Inc.'s ("Defendant") Motion to Dismiss Plaintiff's Amended Complaint, ECF No. [52] ("Motion"), filed on June 7, 2021. The Court has carefully reviewed the Motion, all opposing and supporting materials, the record in this case, the applicable law, and is otherwise fully advised. The Court also held a hearing and considered further argument of counsel. For the reasons set forth below, the Motion is granted.

### I. FACTUAL BACKGROUND

On February 18, 2021, Plaintiff John Paul Mac Isaac ("Plaintiff") initiated this action against Defendant Twitter, Inc. ("Defendant"), asserting a single count for defamation *per* [**2] *se*. ECF No. [1]. According to the Amended Complaint for Defamation, ECF No. [44] ("Amended Complaint"), Plaintiff formerly owned a Mac computer repair shop in Delaware ("Mac Shop"). *Id.* ¶¶ 18-19. On April 12, 2019, Plaintiff was asked to recover information from damaged Mac computers owned by Hunter Biden ("Biden"). *Id.* ¶ 25; *see also* ECF No. [44-17] ("Repair Authorization"). ⓘ ⤓ The following day, at Plaintiff's request, Biden returned to the Mac Shop with an external hard drive to which Plaintiff could transfer the recovered data. ECF No. [44] ¶ 26. Upon completing the job, Plaintiff contacted Biden to pick up the hard drive and sent him an electronic invoice. *Id.* ¶¶ 27-29; *see also* ECF No. [44-18]. Biden, however, never returned to the Mac Shop or paid his invoice. ECF No. [44] ¶ 30.

Starting in late July 2019 to October 14, 2020, Plaintiff had multiple interactions with the Federal Bureau of Investigations ("FBI"), U.S. Congressional staff members, and Robert Costello ("Costello")—attorney for Rudolph Giuliani ("Giuliani"). ECF No. [44] ¶ 32. On December 9, 2019, in response to a grand jury subpoena, Plaintiff turned over Biden's laptop and hard drive to the FBI. *Id.* ¶ 33; *see also* [**3] ECF No. [44-19]. Thereafter, in August 2020, Plaintiff connected with Costello, to whom he provided a copy of the recovered data. ECF No. [44] ¶ 34. Plaintiff asked Costello not to identify Plaintiff when discussing the recovered data with Giuliani, as Plaintiff desired to remain anonymous. ECF No. [44] ¶ 35. After August 26, but prior to October 14, 2020, Giuliani provided information from the recovered data to the New York Post newspaper ("NY Post"). *Id.* ¶ 37. Plaintiff also spoke with the NY Post to verify how Plaintiff came into possession of the recovered data, and explicitly told the NY Post that he did not want to be identified. *Id.* ¶ 41.

On October 14, 2020, at approximately 5:00 a.m., the NY Post published an article entitled, "Smoking-gun email reveals how Hunter Biden

introduced Ukrainian businessman to VP Biden" ("Article"). *Id.* ¶ 39; *see also* ECF Nos. [44-17] & [44-21]. The Article explained that the NY Post obtained materials extracted from a laptop computer owned by Biden, which was **[*1254]** dropped off at a repair shop in Biden's home state of Delaware in April 2019. ECF No. [41-21]. While Plaintiff was not "explicitly identified" in the Article, the Article referenced the "store[] owner" of the Delaware repair shop. *Id.*; *see also* ECF No. [44] ¶ 43. Included in the Article was a photo of the Repair Authorization, which identified the name of the Mac Shop. ECF [**4]  No. [44] ¶ 44; ECF No. [44-17]. After realizing its disclosure, the NY Post updated the Article to redact the Mac Shop's name from the Repair Authorization. ECF No. [44] ¶ 39; ECF No. [44-21]. Thus, "as a result of the NY Post's mistaken disclosure, Plaintiff's identity was revealed by media outlets, including writers from the Daily Beast purportedly investigating the NY Post [Article]." ECF No. [44] ¶ 45; *see also* ECF No. [44-23].

On October 14, 2020, following the NY Post's dissemination of the Article on its Twitter account, Defendant determined that the Article "[v]iolated [its] rules against 'distribution of hacked material'" 2 ⬆ and took several actions in response. ECF No. [44] ¶¶ 48-52. Specifically, Defendant locked the NY Post's Twitter account, and issued the following explanation to the NY Post regarding its decision:



ECF No. [44-26] at 2 ("Private Explanation"); *see also* ECF No. [44] ¶¶ 47-49. Defendant also prevented its users from accessing, posting, or sharing the Article on its platform:

**[*1255]**



ECF No. [44-26] at 2 ("User Explanation"); *see also* ECF No. [44] ¶¶ 50-51. Lastly, Defendant issued the following public statement regarding its decision to prevent the dissemination of the [**5]  Article on its platform:



ECF No. [44-26] at 3 ("Public Explanation"); *see also* ECF No. [44] ¶¶ 52-53. 3 ⬆

**[*1256]** According to Plaintiff, Defendant's Explanations notified its users that the materials contained in the NY Post Article violated its Hacked Materials Policy, thereby spreading the false belief that Plaintiff is a hacker. ECF No. [44] ¶¶ 50, 58-59, 61, 64. As a result of Defendant's conduct, Plaintiff received threats to his person and property, and was forced to close his business. *Id.* ¶¶ 65-66. Based on the foregoing allegations, Plaintiff asserts a single claim against Defendant for defamation *per se*.

**II. PROCEDURAL BACKGROUND**

On December 28, 2020, Plaintiff filed a substantively identical lawsuit against Defendant in the United States District Court for the Southern District of Florida, *Isaac v. Twitter, Inc.*, No. 20-cv-25264-BB, 2020 U.S. Dist. LEXIS 243247 (S.D. Fla. 2020) ("2020 Lawsuit"). This Court *sua sponte* dismissed the 2020 Lawsuit without prejudice for lack of subject matter jurisdiction due to Plaintiff's failure to allege complete diversity between the parties. *Isaac*, No. 20-cv-25264-BB, 2020 U.S. Dist. LEXIS 243247 (S.D. Fla. Dec. 29, 2020), ECF No. [5].

On February 18, 2021, Plaintiff filed the instant lawsuit against Defendant [**6]  and its subsidiary, Madbits, LLC (collectively, "Defendants"). *Isaac v. Twitter, Inc. et al.*, No. 21-cv-20684-UU, 2021 U.S. Dist. LEXIS 163399 (S.D. Fla. 2021) ("2021 Lawsuit"). The 2021 Lawsuit was

originally assigned to the Honorable Ursula Ungaro and subsequently transferred to the undersigned based on the related nature of the *Bot* Lawsuit. *Isaac*, No. 21-cv-20684-BB (S.D. Fla. Mar. 3, 2021), ECF No. [16]. On April 20, 2021, Defendants filed a motion to dismiss, ECF No. [39], identifying multiple grounds for dismissal. Rather than respond to the motion to dismiss, Plaintiff filed the operative Amended Complaint, ECF No. [44], and voluntarily dismissed Madbits, LLC from this action. ECF No. [49].

On June 7, 2021, Defendant filed the instant Motion seeking to dismiss the Amended Complaint with prejudice because the Explanations do not meet any of the elements required of a defamation *per se* claim. *See generally* ECF No. [52]. Specifically, Defendant contends that: (1) the Explanations do not concern or identify Plaintiff or his business by name or implication; (2) the Explanations do not relate to criminal conduct, but rather to violations of Defendant's Hacked Materials Policy; (3) Plaintiff failed to plead special [**7] damages; (4) Plaintiff failed to plead that the Explanations were false, published, or made with the requisite degree of fault; and (5) Defendant is entitled to a mandatory award of attorneys' fees and costs under Florida's Anti-SLAPP statute. *Id.* On June 21, 2021, Plaintiff filed a Response to the Motion, ECF No. [53] ("Response"), to which Defendant filed a Reply, ECF No. [57] ("Reply"). Thereafter, on July 21, 2021, the Court heard oral argument on the Motion. ECF No. [58].

The Motion is now ripe for consideration.

### III. LEGAL STANDARD

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). Nor can a complaint rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

**[*1257]** When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations [**8] as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). However, this tenet does not apply to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678; *Thaeter v. Palm Beach Cnty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). Moreover, "courts may infer from the factual allegations in the complaint 'obvious alternative explanations,' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 682).

A court, in considering a Rule 12(b)(6) motion, "may consider only the complaint itself and any documents referred to in the complaint which are central to the claims." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997)) (citing *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity." (citing *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002))).

### IV. DISCUSSION

Defendant argues that the Amended Complaint should be dismissed because Plaintiff failed to plausibly allege a claim for defamation *per se*. *See generally* ECF No. [52]. Defendant also seeks mandatory attorneys' fees and costs pursuant to Florida's anti-SLAPP statute, Fla. Stat. § 768.295. The Court addresses each argument in turn.

#### a. Defamation [**9] *Per Se*

Document:                                        Isaac v. Twitter, Inc., 557 F. Supp. 3d 1251                                    Actions ⌄

273 So. 2d 774, 776 (Fla. 4th DCA 1973)). To state a claim for defamation, a plaintiff must plead the following elements: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008) (citing Restatement (Second) of Torts §§ 558B, 580A-580B). 5 ±

**[*1258]** Additionally, a defamatory statement is of a *per se* "character when, 'considered alone without innuendo,' they contain (1) charges that a person has committed an infamous crime, or (2) has contracted an infectious disease, or (3) they carry statements tending to subject a person to hatred, distrust, ridicule, contempt or disgrace, or (4) to injure a person in his trade or profession." *Adams v. News-Journal Corp.*, 84 So. 2d 549, 551 (Fla. 1955) (citing *Richard v. Gray, Fla.*, 62 So. 2d 597(Fla. 1953)); *see also Harwood v. Bush*, 223 So. 2d 359, 361 (Fla. 4th DCA 1969). "In a *per se* action, the statements are 'so obviously defamatory' and 'damaging to reputation' that the injurious nature of the statement is apparent from the words in the statement itself[.]" *Paulson v. Cosm. Dermatology, Inc.*, No. 17-cv-20094, 2017 U.S. Dist. LEXIS 88031, 2017 WL 2484197, at *3 (S.D. Fla. June 8, 2017) (citing *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015)). Thus, [**10] in determining whether a publication is defamatory *per se*, "consideration is given only to the 'four corners' of the publication and the language used should be interpreted as the 'common mind' would normally understand it." *Paulson*, 2017 U.S. Dist. LEXIS 88031, 2017 WL 2484197, at *3 (citing *Ortega Trujillo v. Banco Central Del Ecuador*, 17 F. Supp. 2d 1334, 1339 (S.D. Fla. 1998); *McIver v. Tallahassee Democrat, Inc.*, 489 So. 2d 793, 794 (Fla. 1st DCA 1986)).

In the present case, Plaintiff alleges that the Explanations are defamatory *per se* because they created the belief among members of the community that Plaintiff: (1) committed a crime—hacking; (2) was subject to hatred, ridicule, contempt, or disgrace—threats of harm and negative business reviews; and (3) was injured to his trade or business as a result—closed his business. ECF No. [44] ¶¶ 61-66, 77-78, 81-83. As noted, Defendant contends that Plaintiff has failed to assert a plausible claim for defamation, let alone defamation of a *per se* character.

specifically, Defendant first argues that Plaintiff's defamation claim fails as a matter of law because the Explanations "do not name Plaintiff, his business" or even "permit an 'ascertainable implication' that they were about Plaintiff." *Id.* 15 (citing *Horsley*, 304 F.3d at 1136); *see also Parekh v. CBS Corp.*, 820 F. App'x 827, 833 (11th Cir. 2020) ("[A] defamatory statement must be 'of and concerning' the plaintiff to be actionable." (citing *Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 802 (Fla. 1st DCA 1997))). Plaintiff, however, maintains that the [**11] Explanations themselves need not specifically identify Plaintiff to be defamatory and Plaintiff is permitted to present extrinsic evidence in the form of the NY Post Article to demonstrate that the Explanations referred to him. ECF No. [53] at 9.

As Plaintiff correctly argues, there is no strict requirement in Florida that an allegedly defamed person be named in a publication for the statement to be actionable. *See Wolfson*, 273 So. 2d at 779. However, Florida courts have long held that if a defamed person is *not* named in the defamatory publication, "the communication as a whole [must] contain[] sufficient facts or references from which the injured person may be determined by the persons receiving the communication." *Id.* (citing *O'Neal v. Trib. Co.*, 176 So. 2d 535, 548 (Fla. 2d DCA 1965); *Harwood*, 223 So. 2d at 362); *see also Zimmerman v. Buttigieg*, No. 8:20-cv-1077-CEH-CPT, 521 F. Supp. 3d 1197, 2021 U.S. Dist. LEXIS 33278, 2021 WL 694797, at *9 (M.D. [*1259] Fla. Feb. 23, 2021) ("[A] tortfeasor could juxtapose a series of facts in such a way that a specific person is identifiable even though that person's name has not been used."). The relevant inquiry is whether "the average person upon reading [the] statements could reasonably have concluded that the plaintiff [ ] was implicated[.]" *Miami Herald Pub. Co. v. Ane*, 423 So. 2d 376, 389 (Fla. 3d DCA 1982), *aff'd*, 458 So. 2d 239 (Fla. 1984).

Here, while the Amended Complaint alleges that the NY Post "published a photo of the Repair Authorization [**12] . . . without blurring the business name thereby notifying the public where Biden had dropped off his laptop[,]" ECF No. [44] ¶ 44, the Explanations did not include the subject photo. *See* ECF No. [44-26]. Nor did the Explanations mention Plaintiff, the Mac Shop, or provide any other descriptive information identifying Plaintiff as a purported "hacker." *Id.*; *see also Sloan v. Shatner*, No. 8:17-cv-332-T-27AAS, 2018 U.S. Dist. LEXIS 138485, 2018 WL 3769968, at *6 (M.D. Fla. June 22, 2018) (plaintiff failed to plead that the subject radio interview was "of and concerning" him because the transcript did "not mention [p]laintiff, his business, or identifying characteristics.").

In his submissions, Plaintiff seemingly concedes that the Explanations did not reveal his identity, but nonetheless avers that the Explanations "should not be evaluated in a vacuum and extrinsic evidence such as the NY Post article should be considered in order to show that the [Explanations] were referring to Plaintiff as a 'hacker' and/or the source of the confidential information." ECF No. [53] at 4-6; *see also* ECF No. [44] ¶ 45 (alleging that "as a result of the NY Post's mistaken disclosure, Plaintiff's identity was *revealed by media outlets*, including writers from the Daily Beast purportedly [**13] investigating the NY Post exposé." (emphasis added)). As such, Plaintiff seeks to impose liability upon Defendant based upon external facts and statements attributed not to Defendant, but rather unaffiliated third parties. However, Plaintiff's extrinsic evidence is flawed for several reasons.

First, the law in Florida dictates that defamation *per se* must be "actionable on its face" and does not "require[] additional explanation of the words used to show that they have a defamatory meaning or that the person defamed is the plaintiff." *Thompson v. Orange Lake Country Club, Inc.*, 224 F. Supp. 2d 1368, 1377 (M.D. Fla. 2002) (citing *Hoch v. Rissman*, 742 So. 2d 451 (Fla. 5th DCA 1999)). For example, in *Scobie v. Taylor*, No. 13-60457-CIV, 2013 U.S. Dist. LEXIS 99786, 2013 WL 3776270, at *2 (S.D. Fla. July 17, 2013), the court explained that defamation claims can be proven in either of the following ways: (1) defamation *per quod*, which "requires an additional explanation of, or an interpretation of innuendo suggested by the words used to demonstrate the defamatory meaning or that the plaintiff is the subject of the statement[,]" or (2) defamation *per se*, which "does not require any additional explanation in order to prove the defamatory nature of the statement." *Id.* (citations omitted). The critical distinction between these actions is that in *per se* cases, "consideration is given only to the 'four corners' of the publication and [**14] 'the injurious nature of the statement'" must be apparent from the words of the publication itself. *Id.* (citing *Ortega Trujillo*, 17 F. Supp. 2d at 1339; *Campbell v. Jacksonville Kennel Club Inc.*, 66 So. 2d 495 (Fla. 1953)). Thus, because Plaintiff has asserted a claim for defamation *per se*, looking outside the four corners of the Explanations to show that "the person defamed is plaintiff" would run afoul the very nature of a *per se* action. *Thompson*, 224 F. Supp. 2d 1377; *see also Paulson*, 2017 U.S. Dist. LEXIS 88031, 2017 WL 2484197, at *4 ("When context is considered and 'extrinsic [*1260] facts and innuendo are needed to prove the defamatory nature of the words,' the statements are not defamatory *per se*." (citation omitted)).

Additionally, the cases Plaintiff cites in support of his position that he may reference extrinsic facts to establish he is the target of the Explanations are readily distinguishable. Specifically, each case involved statements in which there was a clear description of an ascertainable person *within the communication itself*, thereby permitting the plaintiff to demonstrate that he or she was implicated. *See Harwood*, 223 So. 2d at 362 (article identified plaintiff's last name in the allegorical tale of "Harwood the Rat"); *O'Neal*, 176 So. 2d at 548 (article identified "operator of the nursery," as well as the address and name of a child and her parents who attended the nursery); *Horsley*, 304 F.3d at 1137 (broadcast identified website created [**15] and maintained by plaintiff); *Sparrow Fund Mgmt. LP v. MiMedx Grp., Inc.*, No. 18-cv-4921, 2019 U.S. Dist. LEXIS 55932, 2019 WL 1434719, at *11 (S.D.N.Y. Mar. 31, 2019) (statement referred to an "anonymous blogger" who defendants publicly claimed was plaintiff); *Daytree at Cortland Square, Inc. v. Walsh*, 332 F. Supp. 3d 610, 632 (E.D.N.Y 2018) (statement identified name of plaintiffs' business); *La Luna Enterprises, Inc.*, 74 F. Supp. 2d at 391 (report included footage of plaintiff's restaurant); *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 923, 925 (2d Cir. 1987) (publication identified plaintiff's maiden name and address).

Here, in contrast, the only persons identified in the Explanations are the NY Post, Hunter Biden, "Ukranian biz man" and "dad"—not Plaintiff, his business, or any other descriptive information that made Plaintiff's identity readily ascertainable. ECF No. [44-26]. The Court is certainly sympathetic to the events that took place and could envision a plausible claim had the explanations identified the "Mac Shop," "a Delaware repair shop" or even included a photo of the Repair Authorization. However, such is not the case here, and the law will not subject Defendant to liability where it was "meticulous enough" to preserve Plaintiff's anonymity. *See Vantassell-Matin v. Nelson*, 741 F. Supp. 698, 710 (N.D. Ill. 1990); *see also Sloan*, 2018 U.S. Dist. LEXIS 138485, 2018 WL 3769968, at *6. Thus, based on the four corners of the Explanations, the Court cannot conclude that an individual reading the Explanations would be able to identify them with Plaintiff. Accordingly, for this reason alone, the Explanations fail to provide [**16] a sufficient basis upon which to ground an action for defamation *per se*. 6⚖

### [*1261] b. Florida's Anti-SLAPP Statute

Defendant also argues that the Amended Complaint falls within Florida's anti-slapp statute and is therefore entitled to mandatory attorneys' fees and costs. ECF No. [52] at 25. 7⚖ Florida's anti-SLAPP statute prohibits a person from filing a cause of action "against another person or entity without merit and primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue[.]" Fla. Stat. § 768.295(3); *see also* Fla. Stat. § 768.295(2)(a) (defining "[f]ree speech in connection with public issues" as "any written or oral statement that is protected under applicable law and . . . is made in or in connection with a . . . magazine article, musical work, news

report, or other similar work.") The anti-SLAPP statute also provides that "[t]he court shall award the prevailing party reasonable attorneys' fees and costs incurred in connection with a claim that an action was filed in violation of this section." Fla. Stat. § 768.295(4) (emphasis added). "At bottom, Florida's statute is a garden variety fee shifting provision, which the Florida legislature enacted to accomplish [**17] a 'fundamental state policy'— deterring SLAPP suits." *Bongino*, 477 F. Supp. 3d at 1323 (quoting Fla. Stat. § 768.295(1)).

The Court agrees that Defendant is entitled to an award of attorneys' fees and costs under Florida's anti-SLAPP statute. First, for the reasons set forth above, Plaintiff's defamation claim is without merit. *See id.* at 1322 ("Because Plaintiff's suit fails to state a claim for defamation, it was without merit under Florida Statute § 768.295(3)."); *Parekh v. CBS Corp.*, 820 F. App'x 827, 836 (11th Cir. 2020) (same).

Second, the instant suit arose from Defendant's protected First Amendment activity—i.e., preventing the dissemination of the NY Post Article on its platform for violation of its content moderation policies. *See Corsi v. Newsmax Media, Inc.*, No. 20-cv-81396-RAR, 519 F. Supp. 3d 1110, 2021 U.S. Dist. LEXIS 28315, 2021 WL 626853, at *11 (S.D. Fla. Feb. 12, 2021) (first amendment protection for "hosting and moderating a debate on matters of public concern."). Plaintiff maintains that the anti-SLAPP statute is inapplicable because "[Defendant] was not *moderating* a discussion of public issues[,]" but instead "attempting to *suppress* a discussion of public issues[.]" ECF No. [53] at 14. While this precise issue has not yet been addressed in the context of Florida's anti-SLAPP Statute, the Court agrees with the numerous decisions of other courts that Defendant has a "First Amendment right to decide what to publish and what not to publish on its platform." [**18] *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991 (S.D. Tex. 2017) (citations omitted); *see also Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190, 202, 222 Cal. Rptr. 3d 250 (Cal. App. 1 Dist. 2017) (applying California's anti-SLAPP statute, "the content of the pages and [defendant's] decision not to remove them, [is] an act 'in furtherance of the . . . right to petition or free speech.'"); *Greater Los Angeles Agency on* [*1262] Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 424-25 (9th Cir. 2014) ("[W]here . . . an action directly targets the way a content provider chooses to deliver, present, or publish news content on matters of public interest, that action is based on conduct in furtherance of free speech rights[.]").

Therefore, Defendant is entitled to an award of attorneys' fees and costs under Florida's anti-SLAPP statute, Fla. Stat. § 768.295(4).

### V. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. The Motion, **ECF No. [52]**, is **GRANTED**.

2. The Amended Complaint, **ECF No. [44]**, is **DISMISSED WITH PREJUDICE**.

3. Pursuant to Federal Rule of Civil Procedure 58, Final Judgment will be entered by separate order.

4. To the extent not otherwise disposed of, all pending motions are denied as **MOOT** and all deadlines are **TERMINATED**.

5. The Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Chambers at Miami, Florida, on August 30, 2021.

/s/ Beth Bloom

**BETH BLOOM**

**UNITED STATES DISTRICT JUDGE**

### FINAL JUDGMENT

Pursuant to the Court's Order **GRANTING** Defendant's Motion to Dismiss Plaintiff's Amended Complaint, [**19] **ECF No. [59]**, this action is dismissed with prejudice, and Plaintiff shall take nothing by his Amended Complaint, ECF No. [44].

**DONE AND ORDERED** in Chambers at Miami, Florida, on August 30, 2021.

/s/ Beth Bloom

**BETH BLOOM**

**UNITED STATES DISTRICT JUDGE**

---

**Footnotes**

1⚏ Pursuant to the Repair Authorization, "[e]quipment left with the Mac Shop after 90 days of notification of completed service will be treated as abandoned and you agree to hold the Mac Shop harmless for any damage or loss of property." ECF No. [44-17] at 2.

2⚏ Pursuant to Defendant's Hacked Materials Policy, a "hack" is defined as "an intrusion or access of a computer, network, or electronic device that was unauthorized or exceeded authorized access." ECF No. [44-29] at 3.

3⚏ The Private Explanation, User Explanation, and Public Explanation are collectively referred to as the "Explanations."

4⚏ A claim for slander is confined to defamatory spoken words, whereas a claim for libel refers to defamatory written statements. *See Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1378, n.11 (S.D. Fla. 2006) (citing *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1191 (11th

**5** Whether a statement is "reasonably capable of a defamatory interpretation" is a question of law for the Court to determine "prior to the jury's evaluation of whether the statement was in fact understood as defamatory." *Silvester v. Am. Broad. Companies, Inc.*, 650 F. Supp. 766, 770 (S.D. Fla. 1986), *aff'd*, 839 F.2d 1491 (11th Cir. 1988). "Only when a publication is 'susceptible of two reasonable interpretations,' one of which is defamatory, does the issue become one of fact for the jury." *Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1318 (S.D. Fla. 2020) (citing *Turner v. Wells*, 879 F.3d 1254, 1269 (11th Cir. 2018)). Thus, a court may properly dismiss an action pursuant to Rule 12(b)(6) where the statement "could not possibly have a defamatory or harmful effect[.]" *Id.* (citing *Rubin v. U.S. News & World Report, Inc.*, 271 F.3d 1305, 1306 (11th Cir. 2001)).

**6** Defendant raises additional dispositive challenges regarding the remaining elements of Plaintiff's defamation claim—defamatory meaning *per se*, special damages, falsity, publication, and requisite degree of fault. *See* ECF No. [52] at 16-26. However, Plaintiff failed to address Defendant's challenges in his Response, thereby conceding the implausibility of his claim. *See generally* ECF No. [53]; *see also Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116, 1126 n.4 (S.D. Fla. 2019) ("Generally, a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The court will not do his research for him." (internal quotations omitted) (citation omitted)); *Resolution Trust. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it[.]"); *W. Coast Life Ins. Co. v. Life Brokerage Partners LLC*, No. 08-80897-CIV, 2009 U.S. Dist. LEXIS 81764, 2009 WL 2957749, at *11 (S.D. Fla. Sept. 9, 2009) (recognizing that the plaintiff's failure to respond to an argument raised on a motion to dismiss enables a court to dismiss a claim by default). As such, the Court will not address Defendant's remaining arguments, as Plaintiff's failure to respond constitutes an independent ground for the Court to dismiss the defamation claim by default.

**7** In his Response, Plaintiff argues that because the Amended Complaint "makes no mention of a purpose to suppress [Defendant's] free speech[,]" Defendant's claim to fees under Florida's anti-SLAPP statute is a "matter outside the pleading" and necessarily converts the instant Motion to one for summary judgment. ECF No. [53] at 15; *see also* Fed. R. Civ. P. 12(b). However, Plaintiff has failed to cite to any authority in support of his contention that Defendant's invocation of Florida's anti-SLAPP statute creates a factual dispute necessitating discovery and summary judgment. Rather, the law is to the contrary. *See Parekh v. CBS Corp.*, 820 F. App'x 827, 836 (11th Cir. 2020) (affirming district court's judgment dismissing plaintiff's defamation claim for failure to state a claim and awarding defendant fees under Florida's Anti-SLAPP statute).



About     Cookie Policy     RELX™

Privacy Policy     Terms & Conditions     Copyright © 2023 LexisNexis.

Lexis

Johnston v. Borders, 36 F.4th 1254 (11th Cir. 202

Search: Everything

Client: -None-     Folders     History     Help     More

Document:                           Johnston v. Borders, 36 F.4th 1254                    | Actions

Go to     Page     Page #                Search Document

## Johnston v. Borders, 36 F.4th 1254

Copy Citation

United States Court of Appeals for the Eleventh Circuit

June 9, 2022, Filed

No. 18-14808, No. 19-13269

**Reporter**

36 F.4th 1254 * | 2022 U.S. App. LEXIS 15929 ** | 112 Fed. R. Serv. 3d (Callaghan) 2004 | 29 Fla. L. Weekly Fed. C 1259

JACQUELYN JOHNSTON, Plaintiff-Appellee, versus GARY S. BORDERS, individually and in his official capacity as Sheriff of Lake County, Florida, JENNIFER FERGUSON, Defendants-Appellants.JACQUELYN JOHNSTON, Plaintiff-Appellee-Cross Appellant versus GARY S. BORDERS, individually and in his official capacity as Sheriff of Lake County, Florida, JENNIFER FERGUSON, Defendants-Appellants-Cross Appellees.

**Prior History:** [**1] Appeal from the United States District Court for the Middle District of Florida. D.C. Docket No. 6:15-cv-00936-PGB-DCI. Johnston v. Borders, 2019 U.S. Dist. LEXIS 228217, 2019 WL 8105896 (M.D. Fla., July 30, 2019)

## Core Terms

Sheriff, animals, district court, name-clearing, due process claim, euthanize, defamation claim, attorney's fees, lodestar, sheriff's office, costs, euthanasia, defamatory, shelter, stigmatizing, press release, billing, damages, spent, deprivation, termination, defamation, space, matter of law, due process, Counts, summary judgment, state court, argues, absolute privilege

## Case Summary

### Overview

HOLDINGS: [1]-The judgment in favor of the former director of animal services was upheld because a reasonable jury could find that the October 10, 2014, press release—which the Sheriff admitted he approved—was false and stigmatizing; [2]-The former director's defamation claim was based on the false statement that the former director of animal services instructed all animals that had been at the shelter for a certain amount of time to be euthanized and a reasonable jury could find the statement was false.

### Outcome

In Appeal No. 18-14808 judgment affirmed; in Appeal No. 19-13269 judgment of costs affirmed and judgment as to attorney's fees vacated and remanded to district court for further proceedings.

## ▼ LexisNexis® Headnotes

Constitutional Law > ... > Fundamental Rights > ▼ Procedural Due Process ▼ > Scope of Protection ▼
Labor & Employment Law > Employee Privacy ▼ > Disclosure of Employee Information ▼ > Public Employees ▼

**HN1** **Procedural Due Process, Scope of Protection**

To establish a right to a name-clearing hearing, an employee has to prove: (1) a false statement (2) of a stigmatizing nature (3) attending her discharge (4) made public (5) by her government employer (6) without a meaningful opportunity for employee name-clearing. ⌕ More like this Headnote

*Shepardize®* - Narrow by this Headnote (0)

Business & Corporate Compliance > ... > Employee Privacy ▾ > Disclosure of Employee Information ▾ > Personnel Files ▾

**HN2**⤓ **Employee Privacy, Disclosure of Employee Personnel Files**

Government employees are entitled to a meaningful opportunity for a name clearing hearing after an employer places allegedly false and stigmatizing information in their personnel files. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (0)

---

Civil Rights Law > ... > Immunity From Liability ▾ > Local Officials ▾ > Customs & Policies ▾

Governments > Local Governments ▾ > Claims By & Against ▾

View more legal topics

**HN3**⤓ **Local Officials, Customs & Policies**

In Monell, the United States Supreme Court held that municipalities are not subject to respondeat superior liability under 42 U.S.C.S. § 1983. Rather, municipalities are only liable for a constitutional tort committed by employees insofar as the tort results from a municipal policy or custom. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (0)

---

Civil Procedure > Trials ▾ > Judgment as Matter of Law ▾ > Alternative Motions for New Trials ▾

View more legal topics

**HN4**⤓ **Judgment as Matter of Law, Alternative Motions for New Trials**

District courts lack authority to grant a Fed. R. Civ. P. 50(b) motion on a ground not previously raised in a Rule 50(a) motion prior to the submission of the case to the jury. A post-trial motion for judgment can be granted only on grounds advanced in the pre verdict motion. Thus, the appellate court will not review arguments raised only in a Rule 50(b) motion. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (3)

---

Civil Procedure > Appeals ▾ > Standards of Review ▾ > De Novo Review ▾

View more legal topics

**HN5**⤓ **Standards of Review, De Novo Review**

The appellate court reviews a district court's application of the law of the case doctrine de novo. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (0)

---

Civil Procedure > Judicial Officers ▾ > Judges ▾ > Discretionary Powers ▾

Evidence > Types of Evidence ▾ > Judicial Admissions ▾ > Admissions During Trials ▾

View more legal topics

**HN6**⤓ **Judges, Discretionary Powers**

While parties cannot bind the court to an interpretation of the law via a pretrial stipulation, they can stipulate to the issues to be tried. A district court has broad discretion in determining whether to hold a party to its stipulation. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (0)

---

Civil Procedure > Appeals ▾ > Standards of Review ▾ > De Novo Review ▾

View more legal topics

**HN7**⤓ **Standards of Review, De Novo Review**

The appellate court reviews a district court's denial of a Fed. R. Civ. P. 50(a) motion for judgment as a matter of law de novo. The question is whether a legally sufficient evidentiary basis exists for a reasonable jury to find for the nonmoving party. In answering the question, the appellate court views the record in the light most favorable to the nonmoving party and draw all reasonable inferences in her favor. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (0)

---

Constitutional Law > ... > Fundamental Rights ▾ > 🗎 Procedural Due Process ▾ > 🗎 Scope of Protection ▾

Labor & Employment Law > Employee Privacy ▾ > Disclosure of Employee Information ▾ > 🗎 Public Employees ▾

**HN8**⤓ **Procedural Due Process, Scope of Protection**

The Fourteenth Amendment to the United States Constitution provides that no state shall deprive any person of life, liberty, or property, without due process of law. U.S. Const. amend. XIV. A government employee's liberty interests are implicated, and with them the requirements of procedural due process, whenever a state terminates the employee and makes a charge against him that might seriously damage his standing and associations in his community. In this situation, where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (0)

Constitutional Law > ... > Fundamental Rights ⌄ > 🗎 Procedural Due Process ⌄ > 🗎 Scope of Protection ⌄
Labor & Employment Law > Employee Privacy ⌄ > Disclosure of Employee Information ⌄ > 🗎 Public Employees ⌄

**HN9**⬇ **Procedural Due Process, Scope of Protection**

When an employer publishes a false and stigmatizing statement about an employee in connection with his discharge, due process requires a meaningful opportunity to clear one's name—through what is called a name-clearing hearing, upon request—whether before or after the termination or publication. The purpose of such a hearing is not to avert the unjustified denial of a specific benefit, but to allow the aggrieved party to clear his name. To recover, a plaintiff must show that (1) a false statement, (2) of a stigmatizing nature, (3) attending a governmental employee's discharge, (4) was made public, (5) by the governmental employer, (6) without a meaningful opportunity for an employee name clearing hearing. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Torts > Intentional Torts ⌄ > Defamation ⌄ > Procedural Matters ⌄

**HN10**⬇ **Defamation, Procedural Matters**

To prove defamation under Florida law, a plaintiff must establish the following elements:(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Civil Procedure > Sanctions ⌄ > Contempt ⌄ > Civil Contempt ⌄
Torts > ... > Defamation ⌄ > Elements ⌄ > General Overview ⌄

**HN11**⬇ **Contempt, Civil Contempt**

Words are defamatory under Florida law when they tend to subject one to hatred, distrust, ridicule, contempt or disgrace or tend to injure one in one's business or profession. Even if the words are not literally false, they may still be defamatory if the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Trials ⌄ > Jury Trials ⌄ > Province of Court & Jury ⌄
Torts > Intentional Torts ⌄ > Defamation ⌄ > Procedural Matters ⌄

**HN12**⬇ **Jury Trials, Province of Court & Jury**

In determining whether language is defamatory under Florida law, the publication made should be construed as the common mind would understand it, and not in their mildest or most grievous sense. The publication must also be considered in its totality and in context rather than piecemeal and in isolation. Where a statement is subject to two possible interpretations and one is defamatory, it is for the jury to decide whether the statement is in fact defamatory. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > ... > Defenses ⌄ > Privileges ⌄ > Absolute Privileges ⌄
View more legal topics

**HN13**⬇ **Privileges, Absolute Privileges**

Generally speaking, the qualified privilege inquiry looks to whether the speaker and the listener share a legitimate mutual interest in the message conveyed, while the question regarding absolute privilege—which is only available to public officials—is whether the communication was within the scope of the officer's duties. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Appeals ⌄ > Reviewability of Lower Court Decisions ⌄ > Preservation for Review ⌄

**HN14**⬇ **Reviewability of Lower Court Decisions, Preservation for Review**

As a court of appeals, the appellate court reviews claims of judicial error in the trial courts, and it is therefore a deviation from the essential nature, purpose, and competence of an appellate court to address questions not passed upon by a district court. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > ... > Costs & Attorney Fees ⌄ > Attorney Fees & Expenses ⌄ > 🗎 Reasonable Fees ⌄
Civil Rights Law > ... > Procedural Matters ⌄ > Costs & Attorney Fees ⌄ > Reasonable Fees ⌄

**HN15**⬇ **Attorney Fees & Expenses, Reasonable Fees**

Under the lodestar method, district courts determine attorney's fees based on the product of the hours reasonably spent on a case multiplied by a reasonable hourly rate. The resulting product is known as the lodestar, which is strongly presumed to represent an appropriate attorney's fee. In exceptional circumstances, a district court may enhance a fee by applying a multiplier to the lodestar. With

certain exceptions, a district court generally must reduce a proposed lodestar to account for the attorney's limited success in the litigation.

🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

---

Civil Procedure > ... > Costs & Attorney Fees ▾ > Attorney Fees & Expenses ▾ > 🟧 Reasonable Fees ▾

**HN16**⬇ **Attorney Fees & Expenses, Reasonable Fees**

Block billing is defined as billing multiple unrelated tasks in one billing entry, such that it becomes difficult, if not impossible, to calculate with any precision the number of hours an attorney devoted to a particular task. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Civil Procedure > Appeals ▾ > Standards of Review ▾ > Abuse of Discretion ▾
Civil Rights Law > ... > Procedural Matters ▾ > Costs & Attorney Fees ▾ > Appellate Review ▾
View more legal topics

**HN17**⬇ **Standards of Review, Abuse of Discretion**

The appellate court reviews a district court's award of attorney's fees and costs for an abuse of discretion. An abuse of discretion occurs when a court makes a clear error of judgment, fails to follow the proper legal standard or process for making a determination, or relies on clearly erroneous findings of fact. A finding of fact—whether adopted by the court from a magistrate judge's report and recommendation or made by the court independently—is clearly erroneous if the evidence, viewed in the light most favorable to the finding, does not support the finding. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > ... > Costs & Attorney Fees ▾ > Attorney Fees & Expenses ▾ > 🟧 Reasonable Fees ▾
Civil Rights Law > ... > Procedural Matters ▾ > Costs & Attorney Fees ▾ > Award Calculations ▾
View more legal topics

**HN18**⬇ **Attorney Fees & Expenses, Reasonable Fees**

The American Rule holds that each party in a case bears its own attorney's fees. Congress can override this common law rule via statute. Under 42 U.S.C.S. § 1988(b), when a party prevails on a 42 U.S.C.S. § 1983 claim, it is entitled to a reasonable attorney's fee for the work expended on that claim. It goes without saying that the work cannot include hours spent on an unrelated matter that is non-compensable under § 1988. Thus, a reasonable fee, sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case, must be awarded. The proper approach in applying a federal fee-shifting statute like § 1988 is to take a reasonable number of hours and multiply it by a reasonable fee and thereby create a lodestar. Then, once created, there is a strong presumption that this lodestar will produce a reasonable attorney's fee. The United States Supreme Court observes, however, that fee-shifting rules are generally applicable in all cases in which Congress has authorized an award of fees to a prevailing party. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

---

Civil Procedure > ... > Costs & Attorney Fees ▾ > Attorney Fees & Expenses ▾ > 🟧 Reasonable Fees ▾
Civil Rights Law > ... > Procedural Matters ▾ > Costs & Attorney Fees ▾ > Award Calculations ▾

**HN19**⬇ **Attorney Fees & Expenses, Reasonable Fees**

Under 42 U.S.C.S. § 1988, an attorney's fee may be awarded for time spent in pursuing a non-fee shifting claim, if the time spent is related to a fee-shifting claim based on a common core of fact or related legal theories. Although there is no certain method for determining relatedness, an attorney representing a party prosecuting a fee-shifting claim, as in the case here, should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Evidence > Admissibility ▾ > Procedural Matters ▾ > Rulings on Evidence ▾

**HN20**⬇ **Procedural Matters, Rulings on Evidence**

Whether two claims are related turns on the evidence needed to prove them. Most circuits addressing the issue take an evidentiary approach, focusing on any overlap in the development of the needed evidence and how such evidence will be presented at trial. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Evidence > Relevance ▾ > 🟧 Relevant Evidence ▾

**HN21**⬇ **Relevance, Relevant Evidence**

While the interrelatedness inquiry is hardly precise, a variety of factors can be helpful to consider. They include the elements of the claims, the evidence that would be relevant at trial, and whether separate trials would be proper. At all times, a court should focus on the evidence that will be introduced to prove the claims at trial. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

**HN22** **Judges, Discretionary Powers**

The United States Supreme Court in Hensley notes that in deciding whether claims are related the district court has discretion, something necessarily at odds with a jurisdictional inquiry. Though exercising supplemental jurisdiction is discretionary once a common nucleus of operative fact is shown, if there is no common nucleus of fact, the district court has no jurisdictional power to hear a state law claim at all.

🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Labor & Employment Law > Employee Privacy > Disclosure of Employee Information > 📄 Public Employees

**HN23** **Disclosure of Employee Information, Public Employees**

The elements of common law defamation under Florida law are,(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory. By contrast, a name-clearing hearing claim (disregarding for a moment) requires,(1) a false statement, (2) of a stigmatizing nature, (3) attending a governmental employee's discharge, (4) that was made public, (5) by the governmental employer, (6) without a meaningful opportunity for an employee name clearing hearing. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Constitutional Law > ... > Fundamental Rights > 📄 Procedural Due Process > 📄 Scope of Protection
Labor & Employment Law > Employee Privacy > Disclosure of Employee Information > 📄 Public Employees
Torts > Intentional Torts > Defamation > 📄 Defamation Per Quod

**HN24** **Procedural Due Process, Scope of Protection**

While the defamatory language element of defamation is similar to the stigmatizing statement element of the due process claim, the evidence used to satisfy these elements may differ significantly. Stigma plus is essentially defamation, implicating a person's good name, reputation, honor, or integrity, combined with an alteration in legal status. The difference in evidence stems from the fact that the proof of defamation turns on the individualized qualities of the statements and the context in which they are made. A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. Accordingly, there is little evidentiary overlap when the statements and their contexts are different, even if the statements may impugn a person's reputation in similar ways. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > 📄 Reasonable Fees

**HN25** **Attorney Fees & Expenses, Reasonable Fees**

The appellate court's goal in the inquiry is to focus on the overall picture of the case—whether the facts are inextricably intertwined. That a shred of evidence could be relevant to another claim should not be the basis of awarding a substantial attorney's fee for the work done in a non-fee-shifting setting. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > 📄 Reasonable Fees

**HN26** **Attorney Fees & Expenses, Reasonable Fees**

In Norman, the Eleventh Circuit has held that in determining reasonable hours the district court must deduct time spent on discrete and unsuccessful claims. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Administrative Law > 📄 Judicial Review > Standards of Review > Arbitrary & Capricious Standard of Review

**HN27** **Standards of Review, Arbitrary & Capricious Standard of Review**

A district court must do more than eyeball the request and if it seems excessive cut it down by an arbitrary percentage. It is obligated to articulate the decisions it made, give principled reasons for those decisions, and show its calculation. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Civil Procedure > Attorney Fees & Expenses > Basis of Recovery > English Rule

**HN28** **Basis of Recovery, English Rule**

Costs are generally awarded to the prevailing party under Fed. R. Civ. P. 54(d)(1). Fed. R. Civ. P. 54(d). These costs are limited to the six categories listed in 28 U.S.C.S. § 1920. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

**HN29⬇** **Costs Recoverable, Reproduction Costs**

Some of the costs are clearly unrecoverable, such as postage costs. Other costs require that a party show that they were necessarily obtained for use in the case. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Appeals ▾ > Costs & Attorney Fees ▾

**HN30⬇** Appeals, Costs & Attorney Fees

Under the Federal Rules of Appellate Procedure, if a judgment is affirmed in part, reversed in part, modified, or vacated, costs are taxed only as the court orders. Fed. R. App. Proc. 39(a). 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

**Counsel:** For JACQUELYN JOHNSTON, Plaintiff - Appellee: Jason Gordon, Law Offices of Jason Gordon, PA ▾, HOLLYWOOD, FL; Angelena M. Conant, Angelena M. Root ▾, PA, FT LAUDERDALE, FL.

For JENNIFER FERGUSON, GARY S. BORDERS, individually and in his official capacity as Sheriff of Lake County, Florida, Defendant - Appellants: Brian Koji ▾, Allen Norton & Blue, PA ▾, TAMPA, FL; Mark E. Levitt ▾, Marc Aaron Sugerman ▾, Matthew Christian Neff ▾, Allen Norton & Blue, PA ▾, WINTER PARK, FL.

For LAKE COUNTY SHERIFF'S OFFICE, Defendant - Appellant: Brian Koji ▾, Allen Norton & Blue, PA ▾, TAMPA, FL.

**Judges:** Before JORDAN ▾, NEWSOM ▾, and TJOFLAT ▾, Circuit Judges. JORDAN ▾, Circuit Judge, concurring. TJOFLAT ▾, Circuit Judge, Specially Concurring.

## Opinion

**[\*1259]** PER CURIAM:

These appeals involve two conceptually different causes of action against separate defendants. These claims were pled together and tried to a jury empaneled for each claim. In one claim, the plaintiff, an at-will employee of a sheriff's office, sued the sheriff, alleging that he made false and stigmatizing statements in terminating her employment that deprived her of a liberty [\*\*2] interest in her reputation without affording her a post-termination hearing to clear her name in violation of the Due Process Clause of the Fourteenth Amendment. In the other claim, the plaintiff alleged that a sheriff's office co-employee, whom she supervised, defamed her in violation of state tort law. The jury found for the plaintiff on both claims.

The defendants appeal the judgments entered pursuant to the jury's verdicts in No. 18-14808. In No. 19-13269, the sheriff appeals the judgment awarding the plaintiff an attorney's fee on the claim brought against him. Having considered the parties' briefs and with the benefit of oral argument, we affirm the judgments in No. 18-14808 and vacate and remand for further proceedings the judgment for attorney's fee in No. 19-13269.

### I.

In October 2014, Gary S. Borders, Sheriff of Lake County, Florida (the "Sheriff"), took control of the Lake County Animal Shelter from the Board of County Commissioners amidst public outcry over high **[\*1260]** euthanasia rates. 🔍1⬇ The Sheriff intended eventually to run the shelter as a "no-kill" or "low-kill" shelter. The terms are interchangeable, but "no-kill" is a misnomer—it simply refers to any shelter that maintains a euthanasia rate of no more than 10 percent for [\*\*3] at least a year. The Sheriff's plan to achieve "no-kill" status was simple: the shelter would not euthanize animals merely to create space for other animals.

On October 1, 2014, the Sheriff hired Jacquelyn Johnston as Director of Animal Services. Before being hired, she was interviewed by the Sheriff and Major Wayne Longo—who oversaw the animal services division of the Sheriff's Office. Both Major Longo and the Sheriff told Johnston that the shelter's euthanasia practices had been under "public scrutiny" and that the goal was to reduce euthanasia rates. The Sheriff also told Johnston that he "wanted to make sure that all adoptable pets had the opportunity to be adopted," and that he "was interested in moving toward no-kill." At the same time, the Sheriff let Johnston know that he "understood that there would still be issues regarding public safety in cases of dangerous [] or aggressive dogs . . . [or animals] that came in very injured or ill."

On her first day of work, Johnston met with her immediate supervisors—Major Longo and Captain Todd Luce—who told her to review the governing policies that the Sheriff's Office had inherited from Lake County. Among the policies Johnston reviewed [\*\*4] was one governing when animals would be eligible for euthanasia. The gist was that euthanasia was permitted only for animals that were not adoptable, and animals would generally be considered adoptable unless they were dangerous, sick, or injured. Even for unadoptable animals, euthanasia was not permitted unless alternatives—such as returning the animal to its owner or transferring the animal to a rescue facility—would be unavailable.

Major Longo and Captain Luce also introduced Johnston to Jennifer Ferguson, who would be Johnston's immediate supervisee. Because Ferguson had been working at the shelter for five months and was acting interim director before Johnston was hired, Major Longo and Captain Luce told Johnston that she would be a useful resource in learning shelter policies and practices.

274

After a staff meeting on October 9, 2014, Ferguson told Johnston that the shelter had received two dogs that were being kept outside because there was no room for them in the shelter. Johnston asked Ferguson whether she had contacted any rescue facilities or foster homes to house the dogs, and Ferguson replied that she had, but that they were "all full."

Johnston then did a "walkthrough" of the [**5] shelter to see whether she could find space for the dogs. The shelter was divided into two areas —the "adoption area," which was open to the public, and the "isolation area," which was not. An animal's location in either the adoption or isolation areas did not indicate whether the animal was fit for adoption. Each animal had a "kennel card" with information about the animal, and Johnston noticed "about 10 to 15 kennel cards" in the adoption area indicating that the animals had either "bitten or attacked another animal [] or had other behavior notes." In the isolation area, by contrast, Johnston observed only one dog that had behavioral notes on its kennel card; otherwise, the isolation area contained several "friendly and young dogs." Johnston **[*1261]** judged that the 10 or 15 dogs in the adoption area with kennel cards indicating aggression were unadoptable under the governing policy.

Johnston asked Ferguson how she ordinarily dealt with such situations, and Ferguson replied that she would usually euthanize the animals in the isolation area. Because Johnston thought euthanizing the animals in the isolation area would be contrary to shelter policy, she ordered Ferguson to "re-evaluate the dogs [**6] that were [i]n the adoption [area] since, according to [Sheriff's Office] policies and according to the notes on the kennel card[s], many of those dogs were not adoptable[.]"

Johnston left work around noon that day to attend evening classes in Miami. 2 Before she left, she told Ferguson to use Facebook to connect with rescue facilities and to try to "get some pets placed that way." And while she "understood that there were some unadoptable animals that were going to have to be euthanized," she admonished Ferguson to "follow our policies as written . . . and to euthanize no more than necessary." Johnston did not tell Ferguson how many animals to euthanize or which animals to euthanize.

After Johnston left for Miami, Ferguson selected 23 or 24 animals for euthanization. Diane Hagan and Melanie Hollis, two euthanasia techs at the shelter, then proceeded to euthanize 20 of the animals but spared the rest because they saw no legitimate reason to euthanize them.

Hagan filled out a euthanasia log listing the reason why each animal was euthanized. She recorded that six animals were euthanized for "no space," 10 for aggression toward other animals, two for illness or injury, and two for a combination [**7] of space and health issues. Five of the notations of "no space" were written over whiteout. Hagan testified that she had originally written "behavior" as the reason for those five and that she did not remember changing them to "no space."

Later that day, Ferguson had a conversation with a shelter volunteer named Whitney Boylston. She told Boylston that she had been "directed to pull or euthanize any number of animals that had been [at the shelter] over a certain amount of time." Boylston asked her why she obeyed the direction, and Ferguson replied that she feared she would lose her job if she went outside her chain of command.

The next day, Johnston received a phone call from Major Longo asking her to report to the shelter. Major Longo told Johnston that "people were complaining" that adoptable pets had been euthanized and that "the sheriff wasn't happy and somebody was going to have to answer for what happened." Johnston indicated she was willing to "review each animal case by case and do a full investigation." But Major Longo told her she "was not going to be allowed to investigate, [] was not going to be allowed to review any records, [and] [] was not going to be allowed to talk to any [**8] of the[] [animal-rights] advocates or investigate what happened." Major Longo then told Johnston she was fired.

Later that evening, the Sheriff's Office issued the following press release with the Sheriff's approval:

> On October 10th 2014 the director of the Lake County Sheriff's Office Animal Services division was terminated from her employment. Ms. Jacquelyn Johnston was hired by the Sheriff's Office as Animal Services Director from a pool of applicants on October 1st.

> On October 9th Sheriff's Office administration became aware that several animals were euthanized under now former **[*1262]** Director Johnston's direction and outside of the Sheriff's Office policy of utilizing euthanasia as a last resort.

> Sheriff Borders re-stated the Sheriff's Office philosophy regarding animal services as being a shelter that utilizes any means available to find homes for animals in our care and only euthanizes as a last resort.

> "This decision was made on our watch and we have taken swift action to ensure it does not happen again"— Sheriff Gary Borders.

On October 14, 2014, Johnston's attorney, Angelena Root ⌄, sent a letter to the Sheriff's Office requesting "a meeting to discuss a resolution of the current situation." [**9] The letter called the October 10 press release a "wholly fabricated version of events" which "wrongfully and publicly vilified" Johnston. In fact, it was Ferguson and not Johnston, the letter asserted, who "went completely rogue and . . . pulled far more animals than necessary and euthanized more animals than needed." "If I do not hear from anyone within five (5) business days from the date of this letter in an attempt to schedule a meeting to be had within the next two (2) weeks," Root ⌄ concluded, "my client will be left with no choice but to explore all available legal options." The Sheriff's Office never responded to the letter.

Despite Johnston's belief that the Sheriff's Office press release was false and stigmatizing, she never requested a hearing to rebut the charges in the release and present her side of the story. Nor did the Sheriff's Office give her notice of her right to such a hearing.

## II.

On June 8, 2015, Johnston sued the Sheriff and Ferguson in the United States District Court for the Middle District of Florida for compensatory and punitive damages. Her amended complaint contained eight counts. Count I asserted a claim against the Sheriff in his official and individual [**10] capacities under 42 U.S.C. § 1983, alleging that he denied Johnston due process of law by publishing false and stigmatizing statements in connection with her termination without thereafter giving her an opportunity to clear her name. Counts II through V asserted defamation claims under Florida law against the Sheriff, in his official capacity, and Ferguson, and Count VI alleged a defamation claim against the Sheriff in his official capacity. 3 Count VII alleged that the Sheriff and Ferguson violated 42 U.S.C. § 1985 by conspiring to "injure [Johnston] by ruining her professional reputation." Count VIII alleged that the Sheriff and Ferguson violated 42 U.S.C. § 1986 in "[f]ailing to stop the conspiracy." 4

[*1263] The Sheriff and Ferguson separately moved the District Court to dismiss the amended complaint for failure to state a claim for relief. **5** The Sheriff argued that he was immune from suit in his *individual* capacity on Counts I, VII, and VIII on the ground that absolute immunity under Florida law protected him from suit for any false and defamatory statements he allegedly made because he made them within the scope of his employment. **6** The Sheriff sought the dismissal of Count I on an additional ground, under the federal doctrine of qualified [**11] immunity, by claiming that he could not be sued in his *individual* capacity because it was not "clearly established" that that the statements he made in connection with Johnston's termination had violated "any 'clearly established' laws." As for Count VII, the Sheriff argued that the "doctrine of intracorporate conspiracy" barred a conspiracy claim. And Count VIII failed, he argued, because its sufficiency depended on the viability of Count VII. **7**

Ferguson argued that she was entitled to absolute immunity under Florida law on Counts II through V **8** because her allegedly defamatory statements were made in the course of her duties. In the alternative, she argued that those counts should be dismissed because they failed to state facts constituting defamation. **9** On May 9, 2016, the District Court granted their motions to dismiss in part and denied them in part. The Court denied the motion to dismiss Count I—to the extent it sought damages against the Sheriff in his *individual* capacity—on two grounds. First, the Sheriff was not entitled to absolute immunity under Florida law for his allegedly false and defamatory statements because Count I was not a defamation claim. Rather, it [**12] alleged that the statements infringed Johnston's **Fourteenth Amendment** liberty interest in her good name and reputation, and because the Sheriff made the statements in terminating her employment, due process required that he "provide [her] a name-clearing hearing." Second, the Sheriff was not entitled to qualified immunity because the right to a name-clearing hearing was "clearly established law." **10** The Court granted the Sheriff's (and Ferguson's) motion to dismiss Counts VII and VIII as legally insufficient, although with leave to amend. **11**

The Court denied Ferguson's motion to dismiss Counts II through V. It rejected her arguments that she was entitled to absolute immunity under Florida law and that Counts II through V failed to sufficiently allege the elements of a defamation claim.

 [*1264]  On receiving the District Court's rulings on their motions to dismiss, the Sheriff and Ferguson separately answered the amended complaint. They both denied the allegations of wrongdoing and asserted several affirmative defenses, as indicated below. **12**

After discovery closed, the Sheriff and Ferguson jointly moved the District Court for summary judgment. The Sheriff argued that the Count I due process claim brought against him in [**13] his *official* capacity failed because "adequate state [judicial] remedies were available" to provide Johnston with the process that was due: an "opportunity for a name clearing hearing." He argued that the Count I claim brought against him in his *individual* capacity failed because the doctrine of qualified immunity protected him from the damages Johnston was seeking. **13** He argued that he was entitled to summary judgment on Counts II through VI because the Florida doctrine of absolute privilege barred the claims; he issued the press release containing the allegedly defamatory statements about Johnston in carrying out his duties as a Lake County executive officer.

Ferguson argued that she was entitled to summary judgment on the defamation claim of Counts II through V because her statement to Boylston, on which the claims were based, was true and, in any case, protected by a qualified privilege applicable to statements "made by managerial employees to non-managerial personnel."

On January 11, 2017, the District Court granted the Sheriff and Ferguson summary judgment. The Court dismissed the Count I due process claim against the Sheriff, in his *individual* and *official* capacities, on the [**14] merits and declined to exercise its supplemental jurisdiction over the state law defamation claim lodged against him in Counts II through VI.

As to Count I, the District Court adhered to the position from its order on the motion to dismiss, that the **Due Process Clause of the Fourteenth Amendment** required the Sheriff to provide Johnston with "a meaningful opportunity to clear her name" of the reputational stigma his statements had caused. In other words, Johnston had a constitutional right to a name-clearing hearing. If the Sheriff wouldn't provide one, she could sue him in state court for an injunction ordering him to provide one. But the District Court also found that Johnston had not (yet) suffered a due process violation. Such a violation could not occur, the District Court reasoned, until Johnston had sought and failed to secure a state court injunctive order requiring the Sheriff to provide her a name-clearing hearing. The need to seek a state court injunctive order, according to the Court, stemmed from our holding in *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994) (en banc). But Johnston, in her complaint, [*1265] did not seek a state court injunctive order. She didn't have to, she contended, because the "Sheriff never notified her of her right to a name-clearing hearing, never [**15] offered her a name-clearing hearing, and never denied her a name-clearing hearing." The District Court was not persuaded.

> Whether a public employer deprives a terminated employee of due process by denying the employee's request for a name-clearing hearing—which did not happen in this case—or by failing to provide the employee with notice of his or her rights to a name-clearing hearing **14**—which did happen in this case—the employee "has not suffered a *violation* of his procedural due process rights unless and until the [state] refuses to make available a means to remedy the deprivation." *McKinney*, 20 F.3d at 1563. Because an adequate state court remedy was available to Johnston, her failure to pursue that remedy dooms her procedural due process claim in this Court. **15**

Having found that Johnston failed to seek a state court injunctive order and thus suffered no due process violation, the Court granted the Sheriff summary judgment on Count I. **16** Since Johnston's only federal claim failed as a matter of law, the Court declined to exercise its supplemental jurisdiction under 28 U.S.C. § 1367 over the state-law defamation claim of Counts II through VI and dismissed them without prejudice.

Johnston appealed the summary judgment. [**16] *Johnston v. Borders*, 724 F. App'x. 762 (11th Cir. 2018). She presented two issues: (1) whether the record showed that she had established a violation of her due process right to a name-clearing hearing, and (2) whether the District Court erred in holding that, under *McKinney*, she could obtain an injunctive order requiring the Sheriff to provide her with a name-clearing hearing. We resolved both issues in her favor.

**HN1** In deciding the first issue, we held that to establish her right to a name-clearing hearing, Johnston had to prove: "(1) a false statement (2) of a stigmatizing nature (3) attending [her] discharge (4) made public (5) by [her] government employer (6) without a meaningful opportunity for employee name clearing." *Id. at 766* (quoting *Buxton v. City of Plant City*, 871 F.2d 1037, 1042-43 (11th Cir. 1989)). We concluded that the evidence in the record created a genuine dispute as to the sixth element. Contrary to the Sheriff's position, "releasing her

complaint letter in response to a media request . . . was . . . a "meaningful opportunity for employee name clearing." *Id.* (quoting *Buxton*, 871 F.2d at 1042-43)

Turning to the second issue, we held that the District Court incorrectly concluded that the Florida courts would order the Sheriff to give Johnston a name-clearing hearing. **17** *Id.* at 766-68. We rejected the **[*1266]** Sheriff's argument that those courts would provide **[**17]** Johnston with a name-clearing hearing via a writ of certiorari or a writ of mandamus. *Id.* Certiorari was unavailable because it consists of appellate court review of "the record of an inferior tribunal hearing" and no such hearing had been held. *Id.* at 766-67. Mandamus was unavailable because although the Sheriff contended that "mandamus was adequate to cure Johnston's 'lack of notice,'" *Id.* at 767, a writ of mandamus wouldn't provide Johnston "a chance to clear her name." **18** *Id.* We therefore vacated the District Court's order granting the defendants' summary judgment and remanded the case for further proceedings. *Id.* at 768. **19**

On remand, the District Court considered whether the Sheriff and Ferguson were entitled to summary judgment on the state law defamation claim it had dismissed, Counts II through VI. The Court found that the October 10, 2014, press release was issued "within the scope of the **[**18]** Sheriff's Office's authority" and was therefore protected by the doctrine of absolute privilege, but also that triable issues of fact existed regarding Ferguson's statement to Boylston. Accordingly, the Court granted the Sheriff summary judgment on Counts II through VI but denied it as to Ferguson.

At this point, Johnston moved the District Court to enforce our mandate in *Johnston v. Borders*. **20** She made two points relevant here. First, she argued that *Johnston* implicitly held that she was not required to satisfy the "policy or custom" requirement established by *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), to obtain damages from the Sheriff in his official capacity on the Count I due process claim. **21** Second, she argued that *Johnston* found that,

a) [she] was not informed of her right to a name clearing hearing, and b) she was not given a hearing for name clearing **[*1267]** purposes. As a "meaningful opportunity" for name clearing, according to the Eleventh Circuit, required a hearing at which Johnston could "cross-examine witnesses or rebut their claims", law of the case requires finding that this last element of the Section 1983 claim - "without a meaningful opportunity for an employee name clearing" - is met and does not require proof at trial.

The District Court **[**19]** agreed with Johnston's first point with this statement:

The Eleventh Circuit . . . established six (6) elements for a § 1983 deprivation of liberty interest claim. The Court's pronouncement in this case is consistent with *Buxton*, and this Court declines to add additional elements of proof not required by the appellate court. The Eleventh Circuit is well-aware of *Monell* and its progeny, yet, the Court omitted the 'policy, custom or usage' language from its analysis of the elements of a § 1983 deprivation of liberty interest claim.

The Court disposed of the second point by interpreting *Johnston* as holding that the Sheriff's concession that he did not notify Johnston of her right to a name clearing hearing established the sixth element of her due process claim—that is, he denied her a meaningful opportunity to clear her name.

The case then proceeded to trial on the Count I due process claims against the Sheriff and the Count II defamation claim against Ferguson. The trial lasted nine days. Johnston's counsel called nine witnesses. Johnston testified first, followed by Major Longo and two expert witnesses. The first expert testified about the cost of cleansing internet-search-engine **22** results of negative articles **[**20]** about Johnston. The second testified about Johnston's lost earning capacity. Then, the two euthanasia techs who euthanized the animals, Hagan and Hollis, testified. The Sheriff, Ferguson, and Boylston were Johnston's final witnesses.

Defendants rested without presenting any evidence and moved the Court for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). Ferguson made three arguments with respect to the defamation claim. First, she argued that her statement to Boylston was not defamatory as a matter of law. Second, she argued that even if a jury could conclude that the statement was defamatory, it was nonetheless protected by an "intracorporate . . . privilege to speak to other employees." Third, she argued that a reasonable jury could not award punitive damages because there was insufficient evidence to conclude she acted with "the malice or the intent necessary to warrant any type of punitive [damages]."

The Sheriff argued he was entitled to judgment as a matter of law on the due process claim because he "never personally denied [Johnston] a [name-clearing] hearing" and "was never advised by anyone that he should" give her a hearing. **23** In the alternative, he argued he was at least entitled **[**21]** to judgment on Johnston's claim for punitive damages because such damages **[*1268]** "require[] evil motive, callous disregard for the plaintiff's rights" and he "just [did]n't know" that Johnston was entitled to a name-clearing hearing. The District Court granted the motion in part and denied it in part, entering judgment for the Sheriff on the punitive damages claim and sending the defamation and due process claims to the jury.

On the fifth and final day of trial, the District Court held a charge conference. Each party submitted a set of jury instructions. The Court resolved the disputed instructions, including those on § 1983 liability and damages, and informed counsel of its final charge. **24** The Court noted that Johnston could recover for emotional pain and mental anguish, tangible and intangible **[*1269]** injury, damage to her career and reputation, and lost earnings. The Court then instructed the jury with no further objections. **25**

The jury returned a verdict for Johnston on both claims, awarding $65,000 in compensatory damages against Borders and **[**25]** the Sheriff's Office on the due process claim and $35,000 against Ferguson on the defamation claim. **26** Because the jury found that Ferguson defamed Johnston "with ill will, hostility, and intent to harm," it also awarded $100 in punitive damages against Ferguson. On October 23, 2018, the District Court entered a final judgment for Johnston against Borders and the Sheriff's Office in the sum of $65,000, and against Ferguson in the sum of $35,100.

On November 16, 2014, Ferguson and the Sheriff separately appealed the District Court's judgment. **27** Four days later on November 20, Johnston moved the District Court for attorney's fees and costs, **28** and to amend the judgment to add prejudgment interest to the § 1983 claim against the Sheriff. **29** Defendants filed a notice of non-objection to the motion, and on December 12, 2018, the District Court granted the motion to amend the judgment "to include an additional $5,000 in prejudgment interest." The amended final judgment was entered on

December 17, 2018.

On January 9, 2019, Defendants filed a renewed motion for judgment as a matter of law under Rule 50(b) and alternatively moved for a new trial under Rule 59. They contended that the motion was timely even though [**26] made over 28 days after entry of the original judgment, *see* Fed. R. Civ. P. 50(b) & 59(b), because Johnston's Rule 59(e) motion "suspended the finality of the judgment" and the amended judgment "restart[ed] the time in which to file a motion under Rule 50, Rule 59, or an appeal."

Defendants presented four arguments in their renewed motion under Rule 50(b) that were not presented in their Rule 50(a) motion. First, in order to establish the Sheriff's liability in his *official* capacity on Count I, *Monell* required Johnston to prove that his conduct was pursuant to the "policy or custom" of the Sheriff's Office and she failed to do that. **30** Second, Johnston failed to prove that she suffered damages from Ferguson's defamatory statement. Third, Johnston failed to prove damages resulting from the denial of a name-clearing hearing. Fourth, Ferguson's defamatory statement was protected by the *absolute* privilege that covers statements made by public officials "in the course of [their] duties" and not just the "intracorporate" *qualified* privilege, as she argued in the Rule 50(a) motion.

On June 28, 2019, the District Court denied Defendants' renewed Rule 50(b) motion as untimely. Johnston's Rule 59(e) motion to alter the judgment did not, in the Court's view, toll the clock for filing a Rule 50(b) or 59 motion, [**27] because Johnston's 59(e) motion "address[ed] prejudgment interest only" and "Defendants' Motion [was] completely unrelated to prejudgment interest." On July 19, 2019, Defendants filed an amended notice of appeal, which included among the orders appealed the District Court's denial of their renewed Rule 50(b) motion.

Merits Appeal (No. 18-14808):

I.

As a preliminary matter, we need not address the grounds presented to the District Court for the first time in Defendants' Rule 50(b) motion—grounds which the District Court itself did not address. **31**

 **[\*1271]**  In subpart A below, we address the Sheriff's argument that the District Court abused its discretion in refusing to instruct the jury on *Monell* as an element of the due process claim in Count I. In subpart B, we address the argument that the evidence was insufficient for a jury to find that the Sheriff or his staff made false and stigmatizing statements about Johnston (a precondition to her procedural due process right to a name-clearing hearing). In Part II, we address Ferguson's argument that her statement to Boylston was non-defamatory as a matter of law, and further explain why her argument based on an absolute privilege is not before us. After this appeal, we address the [**28]  issues relating to the separate appeal on the award of attorney's fees and costs.

A.

Before trial, the District Court determined that *Johnston v. Borders* established as law of the case that Johnston was not required to prove that she was deprived of a name-clearing hearing pursuant to a municipal policy or custom under *Monell*. **HN5** We review a district court's application of the law of the case doctrine *de novo*. *United States v. Bobo*, 419 F.3d 1264, 1267 (11th Cir. 2005).

The Sheriff argues that the District Court erred in concluding that Johnston did not have to prove that her constitutional injury resulted from a policy or custom under *Monell*. Johnston defends the District Court's determination on four grounds. First, she insists that *Johnston* established the six elements of the due process claim and they became the law of the case. And since *Johnston* did not list *Monell* among those elements, it is also the law of the case that she wasn't required to show that the Sheriff acted pursuant to a policy or custom. Second, she claims that the Sheriff is estopped from asserting that *Monell* was an element of her due process claim because the parties' joint pretrial stipulation listed the elements of the claim without mentioning *Monell*. Third, Johnston asserts in a footnote that the Sheriff in his *official* capacity is [**29] not a municipal entity because he "operates independently from Lake County[,] [] has [his]own budget[,] and is defending this case under [his] own insurance policy having nothing to do with Lake County." And fourth, even if *Monell* did apply as an element of her due process claim, it is of no moment because the evidence at trial showed that *Monell* was satisfied as a matter of law.

We agree that the Sheriff conceded that *Monell* was not an element of Johnston's due process claim in the parties' pretrial stipulation. The Sheriff argued that Johnston need only prove the six elements laid out in *Cotton v. Jackson*, 216 F.3d 1328 (11th Cir. 2000), to prevail on her due process claim; indeed, neither *Monell* nor any "policy or custom" issue is anywhere to be found in the issues of law to be tried in the same stipulation. **HN6** While parties cannot bind the court to an interpretation of the law via a pretrial stipulation, they can stipulate the issues to be tried. *See United States v. One 1978 Bell Jet Ranger Helicopter*, 707 F.2d 461, 462-63 (11th Cir. 1983); *Morrison v. Genuine Parts Co.*, 828 F.2d 708, 709 (11th Cir. 1987) (noting that a "district court has broad discretion in determining whether to hold a party to its stipulation"). In essence, this precludes our review because the Sheriff admitted *Monell* was not an issue to be tried. We feel obligated (based on the precedential value of this case) to note in passing, however, [**30]  that *Johnston* did not hold, either explicitly or implicitly, that *Monell* **[\*1272]**  did or did not apply to due process claims under *Buxton*. That issue was simply not before the Court.

B.

**HN7** We review a district court's denial of a Rule 50(a) motion for judgment as a matter of law *de novo*. *Gowski v. Peake*, 682 F.3d 1299, 1310 (11th Cir. 2012). The question is whether a legally sufficient evidentiary basis exists for a reasonable jury to find for the nonmoving party. *Id.* In answering the question, we view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in her favor. *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016).

**HN8** The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. A government employee's liberty interests are implicated, and with them the requirements of procedural due process, whenever a state terminates the employee and makes a "charge against him that might seriously

damage his standing and associations in his community. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972). In this situation, "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Id.* (alterations adopted) (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S. Ct. 507, 510, 27 L. Ed. 2d 515 (1971)).

**HN9** Thus, we have held that when an employer publishes a false [**31] and stigmatizing statement about an employee in connection with her discharge, due process requires a meaningful opportunity to clear one's name—through what is called a "name-clearing hearing," upon request—whether before or after the termination or publication. *Buxton*, 871 F.2d at 1046; *Cotton*, 216 F.3d at 1330. The purpose of such a hearing is "not to avert the unjustified denial of a specific benefit, but to allow the aggrieved party to 'clear his name.'" *Buxton*, 871 F.2d at 1046 (quoting *Codd v. Velger*, 429 U.S. 624, 627, 97 S. Ct. 882, 884, 51 L. Ed. 2d 92 (1977)). To recover, a plaintiff must show that "(1) a false statement, (2) of a stigmatizing nature, (3) attending a governmental employee's discharge, (4) [was] made public, (5) by the governmental employer, (6) without a meaningful opportunity for an employee name clearing hearing." *Cotton*, 216 F.3d at 1330 (alterations in original) (quoting *Warren v. Crawford*, 927 F.2d 559, 565 (11th Cir. 1991)).

The Sheriff argues that he was entitled to judgment as a matter of law because Johnston failed to establish the first two elements—that is, that "Sheriff Borders or any Sheriff's Office personnel made false, stigmatizing statements concerning Johnston." **32**

Because we conclude a reasonable jury could find that the October 10, 2014, press release—which the Sheriff admits he approved—was false and stigmatizing, we affirm the District Court's decision to deny [**32] the motion.

The Sheriff's press release stated:

> [*1273] On October 10th 2014 the director of the Lake County Sheriff's Office Animal Services division was terminated from her employment. Ms. Jacquelyn Johnston was hired by the Sheriff's Office as Animal Services Director from a pool of applicants on October 1st.
>
> On October 9th Sheriff's Office administration became aware that several animals were euthanized under now former Director Johnston's direction and outside of the Sheriff's Office policy of utilizing euthanasia as a last resort.
>
> Sheriff Borders re-stated the Sheriff's Office philosophy regarding animal services as being a shelter that utilizes any means available to find homes for animals in our care and only euthanizes as a last resort.
>
> "This decision was made on our watch and we have taken swift action to ensure it does not happen again" — Sheriff Gary Borders.

The press release made two separate assertions about Johnston's actions that a jury could reasonably believe to have been false. First, the assertion that "several animals were euthanized under now former Director Johnston's direction" may be true if construed in one sense and false if construed in another. "Direction" means "guidance [**33] or supervision of action, conduct or operation." Webster's Third New International Dictionary 640 (1993). And Johnston did, in fact, direct or guide Ferguson to euthanize animals in the simple sense that she told Ferguson, her subordinate, to euthanize animals to the extent necessary.

However, the press release can also reasonably be read to imply that Johnston played a more active role in selecting the particular animals and the number of animals to euthanize. *See* Webster's Third New International Dictionary 2296 ("supervise" means "to coordinate, direct, and inspect continuously and at first hand the accomplishment of"). If taken in this sense, the press release would convey a false impression, given that Johnston left for Miami directly after telling Ferguson to euthanize animals and did not learn any details of what unfolded until the next day. Therefore, a reasonable jury could conclude the statement was false. *See Southard v. Forbes, Inc.*, 588 F.2d 140, 143 (5th Cir. 1979) ("If the publication has no necessarily defamatory meaning, but can be understood in more than one way, one of which is defamatory, then it is for the jury to decide if . . . the publication in fact had that defamatory meaning."); *see also Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 705 (Fla. 3d Dist. Ct. App. 199) ("If the statement is capable [**34] of more than one meaning, however, the trier of fact should determine whether the language used was actually understood in its defamatory sense."). **33**

Second, a reasonable jury could find that the press release falsely stated that Johnston ordered animals to be euthanized in a manner contrary to Sheriff's Office policy. According to the press release itself, the Sheriff's policy was to "utilize[] any means available to find homes for animals . . . and [to] only euthanize[] as a last resort." Johnston argues this statement misrepresented the policy and therefore constitutes a false statement in and of itself because the Sheriff's Office did not have a written policy containing the precise words "last resort." But "[s]light inaccuracies of expression are immaterial provided that the . . . charge is true in substance," and we find the statement was a largely accurate [*1274] summary of the policy in effect. Restatement (Second) of Torts § 581A cmt. f (Am. Law Inst. 1977).

The euthanasia policy in effect on October 9, 2014, appears to have been a combination of the written policy inherited from Lake County and an unwritten rule of the Sheriff's Office. **34**

The Lake County policy stated:

> Euthanasia is reserved only for situations involving [**35] animals that cannot besafely [*sic*] handled - either because of aggression or contagious disease, or in situations where the animal is suffering and a reasonable level of treatment would not be effective at providing a good quality of life. Prior to a euthanasia decision being made, all other options are explored including: return to owner (if an owner can be identified), adoption, transfer to a rescue group or shelter capable of providing better care and/or rehabilitation, and treatment.

The Sheriff's unwritten rule about euthanasia was expressed in various ways at trial. The Sheriff explained "the goal was to not euthanize animals that we could adopt out and for space." Stated slightly differently, animals would not be euthanized "solely because of space" or "simply because of lack of space." Major Longo similarly articulated the rule as prohibiting animals from being "put down for space and space alone."

Reading the Lake County policy together with the Sheriff's unwritten rule, the following composite policy emerges: Euthanasia would be permissible if and only if (1) the animal was sick, injured, or dangerous (i.e., unadoptable); (2) "all other options" had been explored; and (3) the [**36] reason for the euthanasia was not *solely* to create space.

A jury could reasonably find that the instructions Johnston gave Ferguson before leaving for Miami were consistent with this policy. Johnston cautioned Ferguson against euthanizing the dogs in the isolation area because she observed that many of them were "friendly and young" (i.e., were adoptable), whereas several dogs in the adoption area had "either bitten or attacked another animal" or "had other behavioral [issues]" (i.e., were unadoptable). Moreover, before resorting to euthanasia, Johnston asked Ferguson whether she had contacted rescue facilities and foster homes. Finally, just before she left for Miami, Johnston again told Ferguson to reach out to rescue facilities on Facebook and admonished her to "follow our policies as written . . . and to euthanize no more than necessary."

To be sure, it was the arrival of two dogs for which the shelter lacked space that instigated the euthanasia. And at least six animals were apparently euthanized for no reason other than to create space. However, Johnston generally directed **[*1275]** Ferguson toward animals with qualities that justified euthanasia under the policyin other words, animals that [**37] could be euthanized for some reason other than mere space creation. Thus, a reasonable jury could find that Johnston's instructions did not contravene Sheriff's Office policy.

The question remains whether the press release was stigmatizing to Johnston. As stated in _Johnston_, "there is no doubt" that it was so. _Johnston_, 724 F. App'x at 766. "That Johnston received death threats and cannot find work illustrates the stigma that attaches to [the press release]." _Id._

## II.

**HN10** To prove defamation under Florida law, a plaintiff must establish the following elements:

(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory.

_Jews for Jesus, Inc. v. Rapp_, 997 So. 2d 1098, 1105-06 (Fla. 2008) (citing Restatement (Second) of Torts §§ 558B, 580A-580B).

**HN11** Words are defamatory under Florida law when "they tend to subject one to hatred, distrust, ridicule, contempt or disgrace or tend to injure one in one's business or profession." _Am. Airlines, Inc. v. Geddes_, 960 So. 2d 830, 833 (Fla. 3d Dist. Ct. App. 2007) (citation and quotation marks omitted). Even if the words are not literally false, they may still be defamatory if "the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates [**38] a defamatory implication by omitting facts." _Jews for Jesus_, 997 So. 2d at 1108.

**HN12** In determining whether language is defamatory under Florida law, "[t]he publication made should be construed as the common mind would understand it," and not "in their mildest or most grievous sense." _Loeb v. Geronemus_, 66 So. 2d 241, 245 (Fla. 1953). The publication must also be "considered in its totality" and in context rather than piecemeal and in isolation. _Byrd v. Hustler Mag., Inc._, 433 So. 2d 593, 595 (Fla. 4th Dist. Ct. App. 1983) (citation omitted); _see Jews for Jesus_, 997 So. 2d at 1107. Where a statement is subject to two possible interpretations and one is defamatory, it is for the jury to decide whether the statement is in fact defamatory. _Hallmark Builders, Inc. v. Gaylord Broad. Co._, 733 F.2d 1461, 1463 (11th Cir. 1984).

Ferguson argues she was entitled to judgment as a matter of law because no reasonable jury could have found that she made a defamatory statement about Johnston. **35** According to Ferguson, her statement to Boylston could not have been defamatory because the statement was not false and because she did not specifically mention Johnston by name.

Johnston's defamation claim was based on Ferguson's statement to Boylston on October 9 after the animals were euthanized. Specifically, Ferguson told Boylston she "was directed to pull or euthanize any number of animals that had been [at the shelter] over a certain amount of time." Although Ferguson did not [**39] expressly say Johnston was the one who told her to **[*1276]** euthanize the animals, she did tell Boylston she did not resist the instruction because she was worried she would lose her job if she went outside the chain of command.

A reasonable jury could find the statement was false because Johnston did not direct Ferguson to euthanize animals "that had been [at the shelter] over a certain amount of time." Rather, she directed Ferguson to euthanize animals that were documented as having behavioral or medical issues that made them unadoptable.

A jury could also reasonably infer that the statement was _about_ Johnston and that Boylston understood it to be so. Although Ferguson did not mention Johnston's name, she did say she was "directed" to euthanize the animals and was afraid to resist the direction because of the "chain of command." Boylston knew Ferguson was directly supervised by Johnston and she therefore could have inferred that Johnston was the one who gave the command. _See_ Restatement (Second) of Torts § 564 cmt. b ("It is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended. [**40] Extrinsic facts may make it clear that a statement refers to a particular individual although the language used appears to defame nobody."). We therefore reject Ferguson's argument that the statement was not defamatory as a matter of law.

Ferguson argues in the alternative that her statement to Boylston was protected by the doctrine of absolute privilege; so, the District Court erred, she argues, in denying her motion for judgment as a matter of law or, if not, in refusing to instruct the jury on the doctrine. We find, however, that Ferguson neither raised the doctrine of absolute privilege in her Rule 50(a) motion nor requested the Court to instruct the jury on it. Rather, she requested the Court to instruct the jury on the doctrine of _qualified_ privilege. The Court held that that doctrine did not apply. Ferguson does not challenge its ruling here. Thus, we limit our discussion to absolute privilege issues, which we find was forfeited at the District Court level.

**HN13** Generally speaking, the qualified privilege inquiry looks to whether the speaker and the listener share a legitimate mutual interest in the message conveyed, _see_ Thomas v. Tampa Bay Downs, Inc., 761 So. 2d 401, 404 (Fla. 2d Dist. Ct. App. 2000); _Drennen v. Westinghouse Elec. Corp._, 328 So. 2d 52, 55 (Fla. 1st Dist. Ct. App. 1976), while the question regarding absolute privilege—which is only available [**41] to public officials—is "whether the communication was within the scope of the officer's duties," _City of Miami v. Wardlow_, 403 So. 2d 414, 416 (Fla. 1981). Ferguson relied on the doctrine of qualified privilege in her motion for summary judgment, in her proposed jury instructions, and in her Rule 50(a) motion for judgment as a matter of law. Unlike the Sheriff—who successfully raised the absolute privilege defense in moving for

summary judgment—Ferguson never used the phrase "absolute privilege" or otherwise argued she was a public official acting within the scope of her duties.

To be sure, Ferguson did raise the absolute privilege argument in her Rule 50(b) renewed motion for judgment as a matter of law, but the District Court, finding the motion untimely, never reached the issue. And even if it had, the argument that Ferguson was entitled to judgment on the defamation claim because of absolute privilege would have been barred by the rule that "[a] posttrial motion for judgment **[*1277]** can be granted only on grounds advanced in the pre-verdict motion." Fed. R. Civ. P. 50 advisory committee's note to the 2006 amendment; *see also McGinnis, 817 F.3d at 1262.*

HN14 "[A]s a court of appeals, we review claims of judicial error in the trial courts," and it is therefore a deviation "from the essential nature, purpose, and [**42] competence of an appellate court" to address questions not passed upon by a district court. *Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004).* Accordingly, we do not address Ferguson's absolute privilege argument.

Attorney's Fee Appeal (No. 19-13269):

**I.**

On November 20, 2018, following the entry of the final judgment in this case, Johnston moved the District Court pursuant to 42 U.S.C. § 1988, to award her an attorney's fee of $173,572, for the work performed by the Law Offices of Jason Gordon, P.A. ▾, in litigating her due process claim under 28 U.S.C. § 1983 and the costs the Offices incurred, $17,452. Eight days later, Johnston filed a similar motion for the work performed by Angelena M. Root, P.A. The motion asked for an attorney's fee of $395,415 and costs of $25,466. Defendants opposed both motions. Among other things, they argued that Johnston was requesting attorney's fees for work they performed in litigating her state-law defamation claim, work that was not compensable under § 1988.

On January 29, 2019, the District [**43] Court held a status conference on Johnston's motions and denied them without prejudice with this statement,

> Because of the piecemeal, belated, and deficient briefing associated with the foregoing motions, and for the reasons further stated on the record, the Court finds that the foregoing motions are due to be denied without prejudice to allow the relief requested to be re-pled (and opposed) in a concise and orderly manner.

On March 1, 2019, Johnston filed a renewed motion for attorney's fees and costs. Using the "lodestar" method, **[*1278]** she requested fees for the work of Jason Gordon's Office: $180,768 in attorney's fees and $10,057 in paralegal fees. However, though the language in the fee application is vague, our calculations show that the correct number is $170,711 in attorney's fees and $10,057 in paralegal fees. Gordon billed for 510.7 hours at a rate of $375 per hour, totaling $191,512. He reduced these hours by $20,801, which resulted in an attorney's fee of $170,711. Gordon's paralegal billed 74.5 hours at a rate of $135 per hour, totaling $10,057. So, Gordon claimed a lodestar of $180,768, the sum of $170,711 in attorney's fees and $10,057 in paralegal fees.

For the work of [**44] Angelena Root's Office, Johnston claimed $318,570 in attorney's fees and paralegal fees of $16,635. Root billed a total of 1,334 hours. Root billed 1230.8 of those hours at her attorney rate of $300 per hour, totaling $369,240. Her fees were reduced by $50,670, so she claimed an attorney's fee of $318,570. Root billed 110.9 of the 1,334 hours at her paralegal rate of $150 per hour, totaling $16,635. Together, these totaled a lodestar of $335,205. According to Johnston, the work that the attorneys and paralegal performed yielded a combined lodestar of $526,031—though, adjusting for a calculation error made by Gordon, the correct number is $515,973. Johnston also requested a 20 percent enhancement to the lodestar because, according to Johnston, the case was "exceptional." Finally, Johnston sought costs of $24,765 for Jason Gordon's Office and $28,109 for Angelena Root's Office.

Johnston represented that the hourly rates the attorneys charged were reasonable and the time they and the paralegal spent on the case was devoted to the presentation of her § 1983 due process claim against the Sheriff. She supported her fee requests with charts showing the hours the attorneys and the paralegal [**45] worked on the case. The charts covered their work on the due process claim and the defamation claim against the Sheriff and Ferguson as well. The charts, apparently based on documents the attorneys compiled daily for monthly billing purposes, presented a brief description of the work performed on a given date and the time spent doing it. Notably, with minor exception, the entries—specifically the descriptions of the work performed—did not specify whether the work was performed on the due process claim or the defamation claim or both.

Defendants responded to Johnston's renewed **[*1279]** motion on March 15, 2019. Pointing to the charts, they objected to the hours billed based on "block billing," duplicative entries, vagueness, excessiveness, and travel time. Moreover, they contended that, due to Johnston's "limited success," the lodestar she proposed should be reduced by 60 percent.

The District Court referred the renewed motion for attorney's fees and costs to a Magistrate Judge for a report and recommendation ("R&R"). The Magistrate Judge considered the motion solely based on Johnston's submission (the charts and the expert's opinion) and Defendant's objections, and he did so without oral argument.

On June 19, 2019, the Magistrate Judge issued his R&R. He recommended that the District Court "calculate the lodestar as $367,369," that the Court "reduce that lodestar amount by 25 percent to account for Plaintiff's limited success in this case," and that the Court "award Plaintiff attorney fees in the amount of $275,526 and costs in the amount of $18,333."

The **[*1280]** Magistrate Judge arrived at the attorney's fee award using the lodestar method, in which he determined reasonable hourly rates for the time Gordon, Root, and the paralegal separately spent on the case. He did so on the basis of the charts Johnston presented and the expert witness' opinion as to the reasonableness of the hours the attorney's worked and their [**47] hourly rates. The expert stated that Gordon's and Root's hours should be reduced for excessiveness, and the Magistrate Judge agreed. That point aside, in reviewing the time the attorneys spent as depicted in the charts, the Magistrate Judge, in examining the chart's descriptions of the work performed, found it "difficult, if not impossible" to assess the reasonableness of several billing entries due to block billing. Although Johnston was unable to prove by a preponderance of the evidence the number of hours spent on each compensable task, the Magistrate Judge nonetheless found that a reduction

of 10 percent of Gordon's hours and 15 percent of Roof's hours was appropriate to account for block billing and excessiveness of hours. His findings were arbitrary in that they were not based on what the charts disclosed; rather, his findings were the product of pure guesswork. The Magistrate Judge also cut the attorney's travel time from the hours they spent on the case. He did so because Johnston failed to show that satisfactory local attorneys were not available. **50** 🔖

The Magistrate Judge made several other rulings in fixing the lodestar at $367,369. First, he denied Johnston's request for a 20 [**48] percent enhancement to the lodestar because, to her, the case was "exceptional." Second, he reduced the lodestar Johnston proposed to account for her limited success on the due process claim: she sought $4,200,000, and the jury awarded her only $100,100. Third, he denied Defendant's request to reduce the lodestar Johnston proposed by 60 percent. He did reduce it by 25 percent, though. Finally, he rejected Defendant's request to reduce the lodestar because the state-law defamation claim against Ferguson was unrelated, finding that it was related to the due process claim against Borders. **51** 🔖

After addressing the attorney's fee issues, the Magistrate Judge turned to Johnston's request for the imposition of costs under Federal Rule of Civil Procedure 54(d)(1). Defendants challenged the following costs: (1) expert fees, including cost of travel and lodging for experts; (2) **[*1281]** travel expenses; (3) a transcript of a local media story; (4) videotaping a deposition of retired Major Longo; (5) meals, postage, and parking at the courthouse as overhead; (6) copies of case law, transcripts, and expert reports for trial; (7) transcripts of certain recordings; and (8) rush service on subpoenas. Due to a lack of documentation and justification, [**49] the Magistrate Judge concluded that Johnston failed to carry her burden of proof on these items and reduced her costs to $18,333.

Both sides filed objections to the R&R, reiterating for the most part the objections they had tendered to the Magistrate Judge. **52** 🔖 The District Court overruled their objections and adopted the R&R's resolution of the attorney's fee issues. But the Court differed with its resolution of an item of costs. The Court agreed with Johnston that the meal and lodging expenses incurred by counsel during trial were recoverable and awarded her costs of $20,079.98. Defendants now appeal the District Court's attorney's fee award. Johnston cross-appeals the Court's refusal to award the attorney's fees she requested and the denial of certain costs.

II.

Defendants present two arguments on appeal. First, the District Court erred in including the time Johnston's attorneys spent on her defamation claim, which was not compensable under § 1988, in the lodestar for the § 1988 attorney's fee awarded against the Sheriff on the due process claim. More broadly, Defendants argue that there is "no legal basis to award fees [to Johnston] for . . . prevailing" against them on the defamation claim at all. [**50] Second, the District Court erred in not reducing the lodestar to account for Johnston's limited success on her due process claim; she received only a fraction of the damages she sought.

On cross-appeal, Johnston presents three arguments. First, Johnston argues that the District Court improperly reduced the lodestar for block billing, excessive billing, and travel time.

Second, Johnston argues that the District Court erred in reducing the lodestar for limited success on her due process claim for three reasons. She first argues that she vindicated important rights. Thus, a reduction based on the amount of her recovery was too mathematical. Second, she argues that courts should not reduce the lodestar when there are multiple claims based on "common facts and related legal theories," and only some related theories fail. The time her attorneys spent on her defamation claim, she argues, was properly included in the lodestar because those claims were intertwined with the due process claim; hence, the District Court's ruling was correct on this point. And third, she argues that the reductions to the lodestar improperly discounted her prior successes, such as her victory in the earlier appeal, [**51] *Johnston v. Borders*, and because many of the hours her attorneys spent **[*1282]** were incurred in opposing Defendants' vexatious litigation.

Third, Johnston argues that the District Court erred in failing to tax the following as costs against Defendants: (1) a videotaped deposition of Major Longo; (2) the transcript of a video news piece; (3) photocopying of caselaw, deposition transcripts, and expert reports; (4) the filing fee for appeal; and (5) rush service for subpoenas.

*HN17* 🔖 We review a district court's award of attorney's fees and costs for an abuse of discretion. *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1351 (11th Cir. 2008) (per curiam); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). An abuse of discretion occurs when a court makes "a clear error of judgment, fails to follow the proper legal standard or process for making a determination, or relies on clearly erroneous findings of fact." *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 846 F.3d 1159, 1163 (11th Cir. 2017). A finding of fact—whether adopted by the court from a magistrate judge's report and recommendation or made by the court independently—is clearly erroneous if the evidence, viewed in the light most favorable to the finding, does not support the finding. *LoConte v. Dugger*, 847 F.2d 745, 750 (11th Cir. 1988). With these standards in hand, we turn to the issues the parties have raised.

A.

We first address the issue of whether the District Court erred in including in the lodestar [**52] the time the attorneys spent working on the defamation claim. We conclude that the Court erred.

*HN18* 🔖 The "American Rule" holds that each party in a case bears its own attorney's fees. Congress can override this common law rule via statute. Under § 1988(b), when a party prevails on a § 1983 claim, it is entitled to a reasonable attorney's fee for the work expended on that claim. *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 1939, 76 L. Ed. 2d 40 (1983). It goes without saying that the work cannot include hours spent on an unrelated matter that is non-compensable under § 1988. *Norman v. Housing Auth. of Montgomery*, 836 F.2d 1292, 1302 (11th Cir. 1988).

The parties do not dispute that Johnston was a prevailing party on her § 1983 due process claim against the Sheriff. Thus, a reasonable fee, "sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case," must be awarded. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552, 130 S. Ct. 1662, 1672, 176 L. Ed. 2d 494 (2010). The proper approach in applying a federal fee-shifting statute like § 1988 is to take a reasonable number of hours and multiply it by a reasonable fee and thereby create a "lodestar." *Perdue*, 559

282

U.S. at 552, 130 S. Ct. at 1672), _Ne. Eng'rs Fed. Credit Union v. Home Depot, Inc. (In re Home Depot)_, 931 F.3d 1065, 1090 (11th Cir. 2019), **53** Then, once created, there is a strong presumption that this lodestar will produce a reasonable attorney's fee. _Perdue_, 559 U.S. at 554, 130 S. Ct. at 1673.

**HN19** Under § 1988, an attorney's fee may be awarded for time spent in pursuing a non-fee shifting claim, if the time spent is related to a fee-shifting claim based on [**53] a "common core of fact or . . . related legal theories." _Hensley_, 461 U.S. at 435, 438. **54** **[*1283]** Although there is "no certain method" for determining relatedness, an attorney representing a party prosecuting a fee-shifting claim, as in the case here, should "maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." _Id._ at 437 & n.12.

The question we must answer is whether the District Court erred in including the time counsel spent working on Johnston's state-law defamation claim in the lodestar . **55** The District Court held that the defamation claim was related to the due process claim because the claims were "necessarily intertwined." Hence, the hours Johnston's attorneys spent in working on the defamation claim were properly included in creating the lodestar.

On appeal, Defendants argue that these claims are unrelated. Johnston counters with the argument that they share a common core of fact, such that it was appropriate to include the time spent litigating the defamation claim in the lodestar. Johnston points out that Ferguson's defamatory comments to a volunteer led that volunteer to talk to others, and the resulting clamor alerted Captain Luce and Major Longo to the euthanasia issue—which [**54] resulted in her termination.

**HN20** Whether two claims are related turns on the evidence needed to prove them. **56** _Cazares_, 638 F.2d at 1291; _Williams v. Roberts_, 904 F.2d 634, 640 (11th Cir. 1990). Most circuits addressing the issue take an "evidentiary approach," focusing on any overlap in the development of the needed evidence and how such evidence will be presented at trial. **57** _See, e.g._, _Gen. Dynamics Corp. v. Horrigan_, 848 F.2d 321, 326 (1st Cir. 1988) ("Although **[*1284]** some of the preparation may be material to both claims (e.g., discussions with the plaintiff, preparations for the plaintiff's testimony), much of it will be readily demarcated between claims."); _Goodwin v. Metts_, 973 F.2d 378, 383 (4th Cir. 1992) ("Appellants' attorneys could easily have presented evidence establishing each element of Appellants' malicious prosecution claims without developing the facts surrounding the entire sequence of events from the arrest of Goodwin and Hallman to their acquittal."); _Tidwell v. Fort Howard Corp._, 989 F.2d 406, 412-13 (10th Cir. 1993) (stating that claims were related because "there was one bundle of proof presented on the three issues" and it was impossible to separate "work on the core issue"). In this area, we have stated that a district court "wisely declined to dissect the interlocking evidence and consider it in isolation as supporting only one claim or the other." _Williams_, 904 F.2d at 640. **HN21** While the interrelatedness inquiry is hardly precise, a variety of factors can be [**55] helpful to consider. They include the elements of the claims, the evidence that would be relevant at trial, and whether separate trials would be proper. At all times, a court should focus on the evidence that will be introduced to prove the claims at trial.

Once again, the question here is whether Johnston was entitled to seek an attorney's fee under § 1988 for time her attorneys spent litigating the defamation claim against Ferguson, because such time was necessarily intertwined with the time spent litigating the due process claim. **58** The vast majority of work performed on Johnston's due process claim and her defamation claim is severable. While we have stated that "courts have expansively treated claims as being related," we have never held claims this disparate as related. _See Popham_, 820 F.2d at 1579. **HN23** As we noted earlier, the elements of common law defamation under Florida law are,

(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory.

_Jews for Jesus, Inc. v. Rapp_, 997 So. 2d 1098, 1105-06 (Fla. 2008). By contrast, a name-clearing hearing claim (disregarding _Monell_ for [**56] a moment) requires,

(1) a false statement, (2) of a stigmatizing nature, (3) attending a governmental employee's discharge, (4) that was made public, (5) by the governmental employer, (6) without a meaningful opportunity for an employee name clearing hearing.

_Cotton_, 216 F.3d at 1330. Most of these elements as applied to this case have no evidentiary overlap. First, it is critical that the Sheriff's public statement supplied almost all the evidence that Johnston needed to prove her due process claim and was irrelevant to her defamation claim against Ferguson. **59** Further, Ferguson's mental state, her statement to one volunteer, Boylston, and the resulting injury to Johnston were inapposite and irrelevant in prosecuting the procedural due process **[*1285]** case against the Sheriff. **60** Likewise, evidence of the Sheriff's press release, Johnston's discharge, and the failure of the Sheriff to provide Johnston with a meaningful opportunity to clear her name has no bearing on the defamation claim against Ferguson. And even if Ferguson's comment to Boylston was the sole impetus for Johnston's termination, the _reason_ for the firing was irrelevant to the injury that the denial of a name-clearing hearing may have caused Johnston. _See_ [**57] Fed. R. Evid. 401.

**HN24** Moreover, while the defamatory language element of defamation is similar to the stigmatizing statement element of the due process claim, the evidence used to satisfy these elements may differ significantly. _Cannon v. City of W. Palm Beach_, 250 F.3d 1299, 1302 (11th Cir. 2001) (stating that stigma plus is essentially defamation, implicating "a person's good name, reputation, honor, or integrity," combined with an alteration in legal status). The difference in evidence stems from the fact that the proof of defamation turns on the individualized qualities of the statements and the context in which they are made. Restatement (Second) of Torts § 559 ("A communication is defamatory if it tends only to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."). Accordingly, there is little evidentiary overlap when the statements and their contexts are different, even if the statements may impugn a person's reputation in similar ways. In proving Ferguson's statement defamatory, the evidence relating to the Sheriff 's press release would simply be irrelevant, and vice versa.

It is true that falsity is an element of both the due process and defamation claims. But again, the differences [**58] in the statements here are stark; they were made by different persons at different times. Both statements dealt with Johnston's involvement in the euthanasia. Ferguson's defamatory statement was that Johnston told her that she was to euthanize animals that had been at the shelter "over a certain amount of time." This statement was proven false because the evidence showed that Johnston had different euthanasia criteria: behavioral or medical issues making the animals unadoptable. The Sheriff's defamatory statement was that Johnston "directed" the euthanasia, meaning that she played an active role. The Sheriff's statement, however, would not be disproved by evidence of differing criteria, and that evidence, which

played a central role in showing Ferguson's statement to be false, would be irrelevant in proceedings against the Sheriff. Johnston could have played an active role even if her criteria for euthanasia were different. It was the fact that she was unaware of the euthanization and not present at the shelter that made the Sheriff's statement false. And the development of these strands of evidence would also have been different. The uncovering of evidence showing that Johnston was [**59] in Miami at the time is far different from uncovering what Johnston had initially told Ferguson about euthanasia criteria.

**HN25** Moreover, our goal in this inquiry is to focus on the overall picture of the case—whether the facts are "inextricably intertwined." _Metts, 973 F.3d at 378_. That a shred of evidence could be relevant to another claim should not be the basis of awarding a substantial attorney's fee for the work done in a non-fee-shifting setting. **61** The minute evidentiary overlap **[\*1286]** present here cannot constitute common cores of fact. The claims against Ferguson arose primarily from Ferguson's statement made before Johnston's firing, whereas the claim against the Sheriff arose from Johnston's termination and a press release later that day. _See Lenard v. Argento, 808 F.2d 1242, 1247 (7th Cir. 1987)_ ("Sequential claims—claims that are causally related (Lenard wouldn't have been beaten if he hadn't been arrested) but do not depend on the same facts—are not related for purposes of _Hensley_."). And finally, the evidence adduced at trial confirms our analysis, because most of that evidence was related to the defamation claim against Ferguson, not Johnston's due process claim. **62** It would not have been, as the District Court asserted, "impossible to accurately apportion the time" [**60] spent on developing evidence between these two claims. Thus, the state-law defamation claim and the due process claim were and are unrelated.

Because the defamation claim and the due process claim are unrelated, it was error for the District Court to consider the hours expended on the defamation claim in determining the lodestar. _Norman, 836 F.2d at 1302_; _see also Millea v. Metro-North R. Co., 658 F.3d 154, 168 (2d Cir. 2011)_. **HN26** In Norman, we held that "in determining reasonable hours the district court must deduct time spent on discrete and unsuccessful claims." _Norman, 836 F.2d at 1302_ (citing _Hensley, 461 U.S. at 435, 103 S. Ct. at 1940_). This error rendered the District Court's attorney's fee award an abuse of discretion and requires that we vacate it. On remand, the District Court must hold Johnston to her burden of proof so that it can identify the non-compensable hours and adjust the lodestar accordingly. **63** _See Loranger, 10 F.3d at 783_; _Hensley, 461 U.S. at 437, 103 S. Ct. at 1941_.

It bears repeating that Johnston had the burden of establishing the hours her attorneys spent in preparing for and prosecuting her due process claim against the Sheriff. _Norman, 836 F.2d 1292, 1303 (11th Cir. 1988)_. So that she could carry that burden, her attorneys had to maintain records so to enable the District Court, in complying with _Federal Rule of Civil Procedure 52(a)(1)_, to make findings of fact and conclusions of law that would allow **[\*1287]** this Court to conduct meaningful appellate review. [**61] _Loranger, 10 F.3d at 782_; _In re Home Depot, 931 F.3d at 1089_; _Johnson v. NPAS Sols., LLC, 975 F.3d 1244, 1261 (11th Cir. 2020)_. The District Court found that,

> A review of the records submitted by both attorney Gordon and attorney Root shows substantial use of block billing, much of which involves seemingly unrelated tasks. While the hours expended might be reasonable, it is impossible for the Court to make such a determination because the billing fails to specify the amount of time spent on the various tasks.

The Magistrate Judge said that "Gordon's failure to refrain from block billing has made review of Defendants' claims that [he] spent excessive time litigating this case and preparing Plaintiff for her testimony at trial difficult, if not impossible."

We encountered a similar situation in _ACLU of Georgia v. Barnes, 168 F.3d 423 (11th Cir. 1999)_. Because the attorney's lumping together of two or more unrelated tasks in a single billing entry made it "difficult, if not impossible, to calculate with any precision the number of hours an attorney devoted to a particular task," we set aside the fee award. _Id. at 429_.

In this case, the District Court solved the problem by reducing Gordon's hours by 10 percent and Root's by 15 percent. The reductions were arbitrary. This resolution was as if the Court put its finger on the scale in Johnston's favor—absolving her of her burden [**62] of proof. **HN27** A district court "must do more than eyeball the request and if it seems excessive cut it down by an arbitrary percentage." _Hejar v. Crawford Cnty., 746 F.2d 1190, 1204 (7th Cir. 1984)_. It is obligated to "articulate the decisions it made, give principled reasons for those decisions, and show its calculation." _In re Home Depot, 931 F.3d at 1089_.

B.

Lastly, we conclude that the Court did not err with respect to costs.

**HN28** Costs are generally awarded to the prevailing party under _Federal Rule of Civil Procedure 54(d)(1)_, _Fed. R. Civ. P. 54(d)_. These costs are limited by the six categories listed in _28 U.S.C. § 1920_. **64** On appeal, Johnston objects to five costs the District Court refused to tax: (1) a videotaped deposition of Major Longo; (2) the transcript of a video news piece; (3) photocopying of caselaw, deposition transcripts, and expert reports; (4) the filing fee for appeal; and (5) rush service for subpoenas.

The Magistrate Judge found in his R&R that Johnston provided "little argumentation or information" with respect to costs and "failed to explain, cite to authority, **[\*1288]** or otherwise justify why the challenged costs are recoverable." Thus, the Magistrate Judge concluded that Johnston failed to meet her burden of proof. _See Loranger, 10 F.3d at 784_.

Both sides filed objections to the R&R. The District Court overruled all but one of Johnston's objections and partially adopted the R&R stating that Johnston "has not shown that costs incurred were reasonable or necessary." The District Court necessarily reviewed the Magistrate Judge's determinations in light of the record before the Magistrate Judge because he did not consider any supplemental evidence. _See United States v. Raddatz, 447 U.S. 667, 675, 100 S. Ct. 2406, 2412, 65 L. Ed. 2d 424 (1980)_. Based on the record and the rationales in the objections, however, we cannot say that the reading of the evidence by the Court was impermissible. _See Anderson, 470 U.S. at 574, 105 S. Ct. at 1511_. **65**

Additionally, Johnston claims that her entitlement to the appellate filing fee is self-evident from the mere fact that [**64] the appeal was docketed. We disagree. **HN30** Under the Federal Rules of Appellate Procedure, "if a judgment is affirmed in part, reversed in part, modified, or vacated, costs are taxed only as the court orders." _Fed. R. App. Proc. 39(a)_. When we vacated and remanded the case in _Johnston v. Borders, 724 F. App'x 762, 768 (11th Cir. 2018)_, our opinion did not say anything about appellate costs. Thus, it would have been improper to grant an appellate filing fee associated with that appeal. _See Golden Door Jewelry Creations, Inc. v. Lloyds Under-writers Non-Marine Ass'n, 117_

F.3d 1328, 1340 (11th Cir. 1997) ("where this court's order fails to explicitly grant a class of costs, we must interpret that silence as a rejection of those costs."). We accordingly affirm the District Court's determinations as to costs.

In Appeal No. 18-14808, we **AFFIRM** the District Court's judgment. In Appeal No. 19-13269, we **AFFIRM** the Court's judgment as to costs, and **VACATE** its judgment as to attorney's fees and **REMAND** the issue of attorney's fees for further proceedings.

**SO ORDERED**.

Concur by: JORDAN ▾; TJOFLAT ▾

## Concur

[*1289]  JORDAN ▾, Circuit Judge, concurring:

As to Case No. 18-14808—the appeal of the jury verdicts—I concur with the court's opinion. But I do so subject to two caveats.

First, having been on the panel that decided the first appeal in this case, see Johnston v. Borders, 724 F. App'x 762 (11th Cir. 2018), I would not characterize the due process portion of that decision—which arose [**65] in a summary judgment posture—as "dubious." Maj. Op. at 19 n. 18. We take cases as briefed by the parties, and the Sheriff argued that certiorari and mandamus were available to Ms. Johnston to cure the alleged lack of notice. See Answer Br. of Gary Borders, No. 17-10642, 2017 WL 2463102, at *14 (June 5, 2017) ("[A] petition for writ of mandamus or certiorari in a Florida state court could have cured [Ms. Johnston's] lack of notice."). Ms. Johnston's claim, however, was not limited to lack of notice and also included reputational harm due to the lack of a name-clearing hearing. The panel therefore found the Sheriff's argument wanting. See Johnston, 724 F. App'x at 766-67.

Second, I respectfully disagree with the court's suggestion (in dicta) and Judge Tjoflat's express statement (in a separate concurrence) that an injunction requiring a name-clearing hearing is the only remedy available in a case like this one. See Maj. Op. at 14 n. 13, 27 n. 25; Tjoflat Concurrence at 2-10. As a number of courts have held, nominal and compensatory damages may be available to a discharged employee if granting a name-clearing hearing many years after the fact would not "reverse any ill effects" from the denial or inadequacy of a hearing. See Patterson v. City of Utica, 370 F.3d 322, 337-38 (2d Cir. 2004); McGhee v. Draper, 639 F.2d 639, 644-45 (10th Cir. 1981); Burt v. Abel, 585 F.2d 613, 616 (4th Cir. 1978); Snowden v. Adams, 814 F. Supp. 2d 854, 874 (C.D. Ill. 2011). See also Ersek v. Township of Springfield, 102 F.3d 79, 84 n.6 (3d Cir. 1996) (noting uncertainty on the issue but remarking in dicta [**66] that "a name-clearing hearing might be insufficient to cure all the harm caused by stigmatizing government comments"). Cf. Howe v. Baker, 796 F.2d 1355, 1358-60 (11th Cir. 1986) (holding that defendants were entitled to qualified immunity in 42 U.S.C. § 1983 "stigma plus" action for damages). Given the way this case was litigated, we have no occasion to opine on the availability of compensatory damages.

With respect to Case No. 19-13269—the appeal of the award of attorney's fees and costs—I concur in and join Part II.B of the court's opinion. As to Part II.A, I agree that we must reverse and remand because not all of the time spent by Ms. Johnston's counsel on the defamation claim is compensable under 42 U.S.C. § 1988. I therefore concur in the judgment in Part II.A.

I do not join Part II.A because the "relatedness" of the due process claim and the defamation claim presents a closer question for me. Although the due process claim stems initially from the Sheriff's press release and the defamation claim stems initially from Ms. Ferguson's comments, the two claims revolve around the core accusation that Ms. Johnston directed the euthanasia of more animals than necessary or warranted in violation of standing policy. And both claims require a number of common elements — (1) [**67] the falsity of the accusation; (2) the publication of the accusation; and (3) the stigmatizing or defamatory nature of the accusation. See Maj. Op. at 64-66. In my opinion, some of the time spent by Ms. Johnston's counsel on the defamation claim could be compensable under § 1988 (assuming, of course, that counsel has satisfied her burden of satisfactorily explaining the overlapping work [*1290] through billing records and other evidence).

Finally, the court says that the district court's percentage reductions were "arbitrary." Maj. Op. at 69. If the court is basing that conclusion on its understanding that the district court did not hold Ms. Johnston to her burden of proof, then the statement is sufficiently qualified. But if the court is making a broader pronouncement, I do not agree. Our precedent permits across-the-board reductions of the number of hours or the final lodestar figure in some cases so long as the district court provides a "concise[ ]" and "clear[ ]" explanation of its reasons. See Loranger v. Stierheim, 10 F.3d 776, 783 (11th Cir. 1994).

TJOFLAT ▾, Circuit Judge, Specially Concurring:

I concur in the Court's judgment and the reasons expressed in support of it. I write separately to point out that Count I was insufficient to state a Due Process Clause claim [**68] for damages. I concur in the Court's judgment on Count I because the Sheriff effectively consented to the District Court's submission of the claim for damages to the jury.

The gravamen of Count I was that the Sheriff did not inform Johnston of her right to a post-termination name-clearing hearing and thus did not provide her with one. As explained in Part I below, a name-clearing hearing, not money damages, was the process the Due Process Clause required the State—here the Sheriff (in his official capacity) qua State—to provide. If the Sheriff actually denied her request for such process and the Florida courts would not thereafter provide it, the District Court would provide it under 42 U.S.C. § 1983. It would issue an injunction ordering the Sheriff to afford Johnston the hearing she requested. 1 ☒

But Johnston took none of these steps. Instead of a nameclearing hearing, she sought damages, a remedy the Due Process Clause did not require the State to provide. In essence, she converted the Count I due process claim into a state law tort claim, one that closely resembled the defamation claim she brought against Ferguson.

"Defamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation." *Siegert v. Gilley*, 500 U.S. 226, 233, 111 S. Ct. 1789, 1794, 114 L. Ed. 2d 277 (1991) (citing [**69] *Paul v. Davis*, 424 U.S. 693, 708-09, 96 S. Ct. 1155, 1164-65, 47 L. Ed. 2d 405 (1976)). If the defamation "occur[s] in the course of the termination of employment," however, the due process right to a name-clearing hearing is triggered. **2** *Paul v. Davis*, 424 U.S. at 710, 96 S. Ct. at 1165. **[*1291]**  This linking of the defamation with the loss of employment is known as the "stigma-plus" test. *Cannon v. City of West Palm Beach*, 250 F.3d 1299, 1302 (11th Cir. 2001) (quoting *Moore v. Otero*, 557 F.2d 435, 437 (5th Cir. 1977)). A name-clearing hearing *is the remedy* the Due Process Clause provides. *Codd v. Velger*, 429 U.S. 624, 627, 97 S. Ct. 882, 883-84, 51 L. Ed. 2d 92 (1977) ("[T]he remedy mandated by the Due Process Clause of the Fourteenth Amendment is 'an opportunity to refute the charge.' "). **3** A name-clearing hearing is an equitable remedy. The federal courts only provide the remedy if the state courts are unable to do so. Equity steps in for the obvious reason that the remedy at law, money damages, is inadequate to compensate for the denial of the hearing. **4** With these thoughts in mind, I consider the errors the District Court committed in handling Count I. **5** The errors were committed without the Sheriff's objection and thus are not before us now.

Count I sought compensatory and punitive damages for the Sheriff's failure to provide Johnston with a name-clearing hearing, remedies having no support in the relevant due process jurisprudence. The Sheriff, acting in his individual capacity only, unsuccessfully moved the District Court to dismiss Count I for failure to state a claim, but not on the theory that the Due Process Clause did not support its claim for damages. He subsequently moved the Court for summary judgment on Count I in his individual and official capacities on the ground that Johnston failed to "show that the State of Florida 'refused to provide a process sufficient to remedy the procedural deprivation,'" citing *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994)." **6** The District Court **[*1292]** granted the motion on the ground that Johnston failed to secure a state court injunctive order requiring the Sheriff to provide her a name-clearing hearing. "Because an adequate state court remedy was available to Johnston, her failure to pursue that remedy dooms her procedural due process claim," the Court so held. **7**

Johnston appealed the ruling. The issue before the panel of this Court was whether the state courts could order the Sheriff to provide Johnston a name-clearing hearing. The Sheriff argued that the state courts could do so via "a writ of certiorari [**72]  or a writ of mandamus." **8** *Johnston v. Borders*, 724 F. App'x 762, 766 (11th Cir. 2018). The panel held that neither remedy was available under Florida law and therefore reversed the District Court's summary judgment holding to the contrary. The panel's opinion does not indicate whether the panel considered whether a Florida circuit court, which is the State's court of general jurisdiction, **9** would entertain a federal constitutional claim—specifically, the Fourteenth Amendment due process claim asserted in Count I. I assume it would.

The panel's holding was, in effect, that Johnston had established a due process violation. The deprivation of Johnston's right to a name-clearing hearing was "complete" because, according to the panel, "the State [would have] fail[ed] to provide due process." *Zinermon v. Burch*, 494 U.S. 113, 126, 110 S. Ct. 975, 983, 108 L. Ed. 2d 100 (1990). Because the deprivation was complete, the District Court, on remand, would have to provide the process due Johnston—a name-clearing hearing. But Johnston was not seeking the process that was due. *Codd*, 429 U.S. at 627, 97 S. Ct. at 883-84. Instead, she wanted compensatory and punitive damages. **10**

  **[*1293]** On remand, Johnston moved the District Court to enforce the *Johnston v. Borders* mandate. Among other points, she argued that the mandate established that because the Sheriff failed to inform her of her right to a name-clearing hearing [**73] **11** and then provide one, she did not need to prove the sixth element of her Count I due process claim: that she was discharged "without a meaningful opportunity for employee name clearing." *742 F. App'x at 766*. The District Court agreed. It held, albeit implicitly, that to establish her Count I claim, Johnston did not have to request a name-clearing hearing; the mere fact that the Sheriff had not provided one on his own initiative proved that he had denied her due process of law.

The District Court's ruling was inexplicable, especially so when one considers what, according to the Court, Johnston had to prove in seeking damages (for the Sheriff's failure to provide a name-clearing hearing) and what she would have had to prove if she had sought an injunction (ordering the Sheriff to provide a name-clearing hearing). To obtain an injunction, Johnston would have had to prove (1) that she requested the Sheriff to provide a hearing because the statements in his October 10, 2014, press release were false and stigmatizing; (2) that he denied her request, and (3) that the Florida courts refused to entertain her application for an injunction ordering the Sheriff to provide a hearing. As the Supreme Court stated in [**74] *Zinermon*, "[t]he constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *494 U.S. at 126, 110 S. Ct. at 983*.

Now consider what the District Court required Johnston to prove to establish her claim for damages under § 1983. She did not have to prove points (1) through (3) above. All she had to prove was that the Sheriff's statements were false and stigmatizing, and that he failed to give her a name-clearing hearing. The Sheriff admitted that she did not receive a name-clearing hearing, so her burden was simply to establish that statements in the Sheriff's Office press release were false and stigmatizing and caused her to sustain the losses described in the Court's jury instructions. **12** In time, Johnston recovered damages even though the deprivation she complained of was not complete and a due process claim could not lie.

I close my discussion with an observation about a statement this Court made in *Buxton v. City of Plant City*, a case in which stigmatizing information was placed in discharged police officer's personnel file was made public necessitating a post-termination name-clearing hearing. *871 F.2d 1037, 1046 (11th Cir. 1989)*. After acknowledging that ordering [**75]  "a post-termination hearing [is the] proper remedy for employee deprived of liberty interest during termination," the Court held that when stigmatizing information is made part of the public record in connection with a state employee's termination, "[n]otice of the right to [a name-clearing hearing] is required." *Id.* In the instant case, the District Court effectively concluded that the Sheriff's failure to notify Johnston of the right to a name-clearing hearing standing alone was sufficient to prove the denial of due process alleged in Count I. The conclusion cannot be squared with *Zinermon* and *Codd*. *Codd*, 429 U.S. at 627, 97 S. Ct. at 883-84 **[*1294]** (stating that the remedy for a stigma-plus claim is "an opportunity to refute the charge"); *see also Perry v. Sindermann*, 408 U.S. 593, 603, 92 S. Ct. 2694, 2700, 33 L. Ed. 2d 570 (1972) (stating that due process requires the government "to grant a hearing at [the employee's] request."). **13** The employee is the party who should say that the employer's statement is false and stigmatizing.

But putting that notion aside, the employee standing in Johnston's shoes does not have a § 1983 claim for the deprivation of due process until the deprivation has actually occurred—until the state courts fail to provide a name-clearing hearing because the employer's statement on discharge was [**76]  false, stigmatizing and public.

286

**Footnotes**

1. Under the Florida Constitution, Article VIII, § 1(d), the Sheriff is an officer of Lake County.

2. The shelter—located in Tavares, Florida—was approximately 265 miles from Miami.

3. Counts II through V asserted different theories of defamation against Ferguson and the Sheriff in his official capacity. Count II alleged defamation based on a theory of slander per se. Count III alleged defamation based a theory of slander. Count IV alleged defamation based a theory of libel per se. Count V alleged defamation based a theory of libel. Count VI alleged defamation based a theory of defamation by implication only against the Sheriff in his official capacity. We refer to these theories in the singular, as the defamation claim brought by Johnston.

4. Johnston brought Count I (and Counts VII and VIII) against the Sheriff in his individual and official capacities, invoking the District Court's federal question jurisdiction, 28 U.S.C. §§ 1331 and 1343. The judgment the District Court entered against the Sheriff does not state that it was entered against him in his individual capacity. We therefore treat the judgment as having been entered against him solely in his official capacity. Johnston brought Counts II through VI against the Sheriff and Jefferson under the Court's supplemental jurisdiction, 28 U.S.C. § 1367.

5. The Sheriff and Ferguson were represented by the same law firm throughout the litigation.

6. See Fla. Stat. § 768.28(9)(a). The Sheriff's motion stood silent as to whether Count I stated a claim against him in his *official* capacity.

7. The Sheriff moved to dismiss Counts VII and VIII in both his *official* and individual capacities.

8. See Fla. Stat. § 768.28(9)(a).

9. Ferguson argued that those counts failed to allege the five elements required to establish a claim of defamation: "(1) publication to a third person; (2) falsity; (3) negligence; (4) actual damages; and (5) statement must be defamatory."

10. The Sheriff's motion to dismiss Count I contained no reference to Count I's allegation that the deprivation of a "name-clearing hearing" constituted a denial of due process. Rather, the motion appears to have interpreted Count I as alleging a due process claim based solely on the Sheriff's statements.

11. Johnston failed to amend Counts VII and VIII, so they are not implicated in these appeals.

12. The Sheriff's answer presented six affirmative defenses. None are pertinent here. Ferguson's answer presented four affirmative defenses. One defense, the fourth, is relevant: the defamation claim in Counts II through V were barred by the doctrine of absolute privilege under Fla. Stat. § 768.28(9)(a), because Ferguson's statements were made "in connection with her official duties." Ferguson asserted this privilege in her motion to dismiss Counts II through V as well as in the fourth affirmative defense.

13. Nothing in the Sheriff's motion for summary judgment or elsewhere in the record indicated that the Sheriff was aware that the due process Johnston was entitled to, a name-clearing hearing, would be an injunction ordering him to provide such a hearing and that if Florida law could not provide one, the District Court could. Count I, though, *did not* seek a name-clearing hearing; it sought damages only. This explains why the Sheriff invoked the doctrine of qualified immunity in his individual capacity; it was a defense to Count I's due process claim for damages.

14. The District Court cited *Buxton v. City of Plant City*, 871 F.2d 1037, 1042-43 (11th Cir. 1989), for its position.

287

**15** query whether the Court necessarily implied that if the state failed to order the Sheriff to provide Johnston with a name-clearing hearing, it would enter an injunction ordering a hearing.

**16** The Court granted the Sheriff summary judgment on Count I in his *official* capacity but did not rule on the defense he asserted in his *individual* capacity that he was entitled to summary judgment based on the doctrine of qualified immunity.

**17** We impliedly held that, because the Florida courts would not enjoin the Sheriff to provide a name-clearing hearing, she would have to seek one from the District Court. As it turned out, though, she never sought one from the Florida courts or the District Court. Instead, she sought damages from the District Court.

**18** We note that this non-precedential conclusion is dubious, though, considering that the writ of mandamus in Florida is available if there was an "indisputable legal duty to perform the . . . action, and . . . no other adequate remedy [was] available." *Fla. Agency for Health Care Admin. v. Zuckerman Spaeder, LLP*, 221 So.3d 1260, 1263 (Fla. 1st Dist. Ct. App. 2017).

**19** Recall that the District Court did not rule on the Sheriff's argument that he was entitled to summary judgment on Count I brought against him in his *individual* capacity based on the defense of qualified immunity. In his answer brief in *Johnston v. Borders*, the Sheriff asked us to determine whether he was entitled to the defense. We said no.

Several of our published decisions gave Sheriff Borders "fair warning" that his conduct was unconstitutional. **HN2** We have held that government employees are entitled to a meaningful opportunity for a name clearing hearing after an employer places allegedly false and stigmatizing information in their personnel files. *See Cotton* [*v.* *Jackson*], 216 F.3d [1328,] 1330 [(11th Cir. 2000)]; *Buxton*, 871 F.2d at 1038, 1045-46.

*Johnston*, 724 F. App'x. at 768.

**20** Johnston styled her motion as one under Federal Rule of Civil Procedure 50. The District Court found Rule 50 relief unavailable because the case had not gone to trial, so it construed Johnston's motion as one *in limine* "to set forth the trial court's understanding of the Eleventh Circuit's opinion and to provide guidance to the parties." Because the motion sought to enforce Johnston's interpretation of the mandate, we refer to it as a motion to enforce the mandate.

**21** **HN3** In *Monell*, the Supreme Court held that municipalities are not subject to *respondeat superior* liability under § 1983. 436 U.S. at 691, 98 S. Ct. at 2036. Rather, municipalities are only liable for a constitutional tort committed by employees insofar as the tort results from a municipal policy or custom. *Id.* at 690, 98 S. Ct. at 2035-36.

**22** A "search engine" is "computer software used to search data (such as text or a database) for specified information." *Search Engine*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/search%20engines. Common search engines include Google.com, Yahoo.com, and Bing.com.

**23** The *Johnston* holding that the Sheriff was not entitled to qualified immunity at the summary judgment stage, 724 F. App'x at 768, did not prevent him from raising the defense again in his individual-capacity motion for judgment as a matter of law. *See Cottrell v. Caldwell*, 85 F.3d 1480, 1488 (11th Cir. 1996). Nonetheless, the Sheriff did not raise the defense.

**24** The Court's damages instructions on the Count I due process claim brought under § 1983 were in relevant part as follows,

If you find for Ms. Johnston on her 1983 claim, you must then decide the amount of damages to award her for a violation of her constitutionally protected liberty interest. You should only consider the amount of damages stemming from the failure to provide her a meaningful name-clearing [**22] opportunity. You should not consider any damages stemming from Ms. Johnston's termination because the Sheriff's Office had a right to terminate her employment. You should consider whether the statement published by Sheriff Borders or the Sheriff's Office was false concerning Ms. Johnston and was of a stigmatizing nature.

In considering the issue of Ms. Johnston's damages, you are instructed that you should assess the amount you find to be justified by a preponderance of the evidence as full just, and reasonable compensation for all of Ms. Johnston's damages, no more or no less. . . .

[C]ompensatory damages cover both mental and physical aspects of the injury, tangible and intangible. You should determine an amount that will fairly compensate Ms. Johnston for those claims of damages that stem from the failure to provide a name-clearing hearing. There is no exact standard to be applied. Any such award should be fair and just in light of the evidence.

You may consider the following categories of damages to the extent you find them proved by a preponderance of the

288

evidence and no others.

(a) emotional pain and mental anguish, including impairment of reputation and personal humiliation stemming [**23] from the failure to provide a name-clearing hearing; and,

(b) damage to her career and reputation, including lost earnings and lost earning capacity stemming from the failure to provide a name-clearing hearing.

To determine whether and how much Ms. Johnston should recover for emotional pain, mental anguish, and injury to reputation, you may consider both the mental and physical aspects of injury, tangible and intangible. Ms. Johnston does not have to introduce evidence of a monetary value for intangible things like mental anguish. You will determine what amount fairly compensates her for her claim. There is no exact standard to apply, but the award should be fair in light of the evidence. . . .

Any amounts which you allow in damages for loss of ability to earn money in the future should be reduced to their present money value, and you should state in the verdict form provided to you both the total of such future damages and their present value.

The Sheriff had no objection to these instructions. The Sheriff did challenge the sufficiency of Johnston's proof to establish the damages covered by these instructions. He did so in his post-verdict Federal Rule of Civil Procedure 50(b) and in his brief on appeal. Appellant's Br. at 39 ("III. THE DISTRICT COURT ERRED BY DENYING THE SHERIFF'S RULE 50(b) MOTION AS JOHNSTON FAILED TO PROVE ACTUAL DAMAGES CAUSALLY RELATED TO THE DENIAL OF A NAME-CLEARING HEARING."). As we hold *infra* in Part I of the merits appeal, No. 18-14808, and note 31, the District Court properly denied the motion as untimely, and we affirm. The upshot is that the Sheriff cannot argue that Johnston's proof of damages on her due process claim was insufficient or that the above instructions were erroneous. And the Sheriff's brief does not ask us to review the damages issues for plain error.

The Court's instructions on the damages claims against Ferguson were as follows,

If you find in favor of Ms. Johnston, you must next consider damages, and you should consider the following elements of damage:

A, injury to reputation or health stemming from the defamatory statement; and,

B, lost earnings, lost working time, [**24] lost earning capacity stemming from the defamatory statement.

Any injury to reputation or health means any shame, humiliation, mental anguish, or hurt feelings experienced in the past or to be experienced in the future. There is no exact standard for fixing the compensation to be awarded on account of such elements of damage. Any award should be fair and just in light of the evidence.

Lost earnings are earnings lost in the past and any loss of ability to earn money in the future. To be entitled to an award of lost wages, the employee must be ready, willing, and able to accept employment. If you find that Ms. Johnston voluntarily removed herself from the workforce for any period of time, you should not award lost earnings for that period of time. . . .

Any amounts which you allow in damages for loss of ability to earn money in the future should be reduced to their present monetary value, and you should state in the verdict form provided to you both the actual -- pardon me -- both the total of such future damages and their present value.

**25** Prior to the appeal in *Johnston* and later before the trial began, the Sheriff objected to the testimony of both of Johnston's damages experts in motions *in limine*. The Court denied the motions as to the first expert, who testified as to reputational clean-up costs, and deferred ruling on the second expert's testimony until the trial. There, overruling a defense objection, the Court allowed the second expert to testify about Johnston's lost wages. Defendants had argued in their pretrial motion *in limine* that none of the experts' testimony could be traced to the Sheriff's failure to hold a name-clearing hearing. At the charge conference, Defendants objected to certain types of damages, rehashing what they had said in their motion *in limine*, but they never objected on the ground that, under *McKinney*, the remedy for the deprivation of a name-clearing hearing is an injunction ordering the employer to provide a hearing, not damages. *McKinney*, 20 F.3d at 1557; *see also Codd v. Velger*, 429 U.S. 624, 627, 97 S. Ct. 882, 883-84, 51 L. Ed. 2d 92 (1977).

**26** The jury was not instructed to consider separately the issues of the Sheriff's liability in his individual and official capacities. Rather, the verdict form asked simply whether "a false statement was made by the Sheriff's Office or Sheriff Borders concerning Ms. Johnston" and if so, "[w]hat amount of damages, if any, should Ms. Johnston be awarded **[*1270]** against the Sheriff's Office and Sheriff Borders for violating Ms. Johnston's constitutional rights?"

**27** The Sheriff *served* his notice of appeal on Johnston on November 16, 2018; the notice was dated November 21, 2018, and it was entered by the Clerk on the case's docket on November 26, 2018.

**28** *See* Fed. R. Civ. P. 54. The motion was for attorney's fees and costs to be awarded to the Law Offices of Jason Gordon, P.A. ▾ Johnston filed a similar motion for attorney's fees and costs for Angelena Root, P.S., on November 28, 2018.

**29** *See* Fed. R. Civ. P. 59(e). Defendants filed a notice of non-objection to the motion.

**30** This was an argument the Sheriff had made in opposition to Johnston's pretrial motion *in limine*.

**31** *HN4* District courts lack authority to grant a Rule 50(b) motion on a ground not previously raised in a Rule 50(a) motion prior to the submission of the case to the jury. *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 902–03 (11th Cir. 2004); Fed. R. Civ. P. 50 advisory committee's note to 2006 amendment ("A post-trial motion for judgment can be granted only on grounds advanced in the preverdict motion."). Thus, we will not review arguments raised only in a Rule 50(b) motion. *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 812–13 (11th Cir. 2015).

Defendants ask us to reverse the District Court's refusal to enter judgment as a matter of law on the basis of several arguments they raised only post-verdict and which the District Court never addressed. Specifically, they challenge the sufficiency of the evidence on damages for both claims; the Sheriff argues that he was entitled to judgment as a matter of law on the due process claim because *Monell*'s "policy or custom" requirement was not satisfied; Ferguson argues that her statement to Boylston was protected by absolute privilege because she made the statement within the scope of her official duties. We do not address these arguments because they were not preserved for our review. *Big Apple Consulting*, 783 F.3d at 813.

**32** We note that the sixth element—whether the Sheriff provided a meaningful opportunity for a hearing—is not before us. The District Court in its instructions to the jury stated that Defendants agreed that there was no meaningful opportunity for a hearing. Moreover, Defendants did not appeal this instruction or brief the issue. Thus, we need not address the "meaningful opportunity" element of Johnston's due process claim.

**33** All decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

**34** Johnston's brief makes much of the fact that the Sheriff's rule was unwritten. But we reject Johnston's assumption that an unwritten policy is no policy at all. A "policy" is "a definite course or method of action selected . . . from among alternatives and in the light of given conditions to guide and usu[ally] determine present and future decisions" or "a specific decision or set of decisions designed to carry out such a chosen course of action." Webster's Third New International Dictionary 1754. No reasonable reader could take as false the statement that Johnston ordered euthanasia "outside of the Sheriff's Office policy" merely because part of the policy was unwritten. *See* Restatement (Second) of Torts § 563 cmt. c ("The question to be determined is whether the communication is reasonably understood in a defamatory sense by the recipient. . . . In determining the reasonableness of the recipient's understanding, that meaning is to be given to words which is ordinarily attached to them by persons familiar with the language used."); *see also Southard*, 588 F.2d at 143.

**35** Ferguson also argues that Johnston failed to prove the fourth element—actual damages—but as we said in Part I of this appeal, No. 18-14808 *supra*, that argument has not been preserved because it was raised for the first time in Defendant's renewed motion for judgment as a matter of law.

**36** Section 1988 states,

> In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . .

§ 1988(b).

**37** For convenience, the numbers indicating attorney's fees and costs are rounded down to the nearest dollar.

**38** On April 17, 2018, our mandate issued in *Johnston v. Borders*. Three days later, on April 20, 2018, Johnston entered into an "Engagement Agreement" with the Law Offices of Jason Gordon, P.A. ▼ ("Gordon ▼"). Johnston agreed to pay Gordon $375 per hour plus monthly expenses for representing her in this case.

**39** Angelena M. Root's representation of Johnston preceded Gordon's by three and a half years. At the time Johnston hired Root, Root was a Ft. Lauderdale, Florida, lawyer in her second year of law practice. On June 8, 2015, in a letter from Root to Johnston (which Johnston signed "agreed and accepted"), Root undertook Johnston's representation *nunc pro tunc* to October 11, 2014, at an hourly rate of $200 plus expenses payable monthly. On October 14, 2014, Root wrote the Sheriff's Office requesting "a meeting to discuss a resolution of the current situation." Johnston gave Root a $10,000 "refundable retainer." On June 9, 2015, Root filed the complaint that commenced the instant action.

**40** *HN15* Under the lodestar method, district courts determine attorney's fees based on the produce of the hours reasonably spent on a case multiplied by a reasonable hourly rate. *Ne. Eng'rs Fed. Credit Union v. Home Depot, Inc. (In re Home Depot), 931 F.3d 1065, 1076 (11th Cir. 2019)*. The resulting product is known as the lodestar, which is strongly presumed to represent an appropriate attorney's fee. *Id. at 1082*. In exceptional circumstances, a district court may enhance a fee by applying a multiplier to the lodestar. *Id.* With certain exceptions, a district court generally must reduce a proposed lodestar to account for the attorney's limited success in the litigation. *See Norman v. Hous. Auth. of Montgomery, 836 F.2d 1292, 1302 (11th Cir. 1988)*.

**41** Gordon reduced his fee by $2,062 for travel time and by $18,738 for billing judgment, for a total reduction of $20,801.

**42** Gordon made an error at the end of the application by claiming $180,768 in attorney's fees and $10,057 in paralegal fees, which counts twice the paralegal fees of his office, when he was only entitled to claim $180,768 in attorney's fees and paralegal fees combined.

**43** Although Root initially stated that she billed 1334 hours at an hourly rate of $300, she later made clear that this 1334 figure included 110.9 hours of paralegal time.

**44** As explained *supra* in note 42, Gordon double counted his paralegal's work, and so the lodestar of $526,031 needs to be reduced by $10,057.

**45** Ferguson joined the Sheriff in responding to Johnston's renewed motion even though Johnston could not recover an attorney's fee against her pursuant to *§ 1988*. Ferguson nonetheless thought that Johnston was seeking attorney's fees against her given these statements in Johnston's renewed motion,

> Johnston obtained a jury verdict in her favor as to both her Section 1983 claim and her state law defamation claim. There is no dispute that Johnston is the prevailing party in this matter for purposes of attorney's fees under *Section 1988*. . . . The result in this case was a complete vindication of Johnston's liberty interest and state law [**46] rights she alleged were violated by Defendants as Johnston obtained a verdict in her favor on each of those claimed violations.

**46** *HN16* Block billing is defined as billing multiple unrelated tasks in one billing entry, such that it becomes "difficult, if not impossible, to calculate with any precision the number of hours an attorney devoted to a particular task." *Barnes, 168 F.3d at 429*. For example, an attorney might detail all of their day's work in one entry—saying that they spent 12 hours writing a memo, talking to the client, preparing for a deposition, and reviewing evidence. A court looking at this entry would be unable to tell whether the lawyer spent 11 hours drafting the memo and one hour doing the other tasks, or whether they spent 11 hours talking to their client. In this case, the block billing generally failed to differentiate whether the attorney was working on the due process or statelaw defamation claim.

**47** *See 28 U.S.C. § 636(b)(1)*.

**48** Johnston was not entitled to recover an attorney's fee under *§ 1988* or any other rule of law for prevailing against Ferguson on her defamation claim. But the Magistrate Judge, in calculating the lodestar for the attorney's fee, $275,526, and in recommending that the District Court award Johnston an attorney's fee in that amount, included the work the attorneys and paralegal performed in litigating the defamation claim against the Sheriff (which were dismissed) and Ferguson. (As we explain *infra*, by including the work the attorneys and the paralegal performed in litigating the defamation claim in the lodestar, the District Court erred.) The District Court adopted the Magistrate Judge's recommendation but ordered the attorney's fee imposed against all Defendants rather than the Sheriff alone. The judgment the Clerk of the District Court entered in response to the Court's order was therefore entered against all Defendants—the Sheriff, the Sheriff's Office, and Ferguson.

On appeal, Ferguson challenges the assessment of attorney's fees against her personally (as opposed to the Sheriff's liability for the time spent on the defamation claim against Ferguson—which we address *infra* Part II.B). We are of the opinion that Ferguson is liable for costs, under *Federal Rule of Civil Procedure 54(d)*, because Johnston prevailed against her in a case in federal court. *See Lipscher v. LRP Publ'ns, Inc., 266 F.3d 1305, 1321 (11th Cir. 2001)*. However, Ferguson is not liable for attorney's fees (unlike the Sheriff), because Johnston did not prevail against Ferguson on a fee-shifting claim, and the § 1983 claim against the Sheriff was not related to Johnston's state law defamation claim against Ferguson. *See Kentucky v. Graham, 473 U.S. 159, 168, 105 S. Ct. 3099, 3106, 87 L. Ed. 2d 114 (1985)* ("[F]ee liability runs with merits liability; . . . *Section 1988* simply does not create fee liability where merits liability is nonexistent.").

In our disposition of this appeal, we direct the Clerk to amend the judgment on attorney's fees and costs to reflect that it applies to the Sheriff only as to the attorney's fees and to the Sheriff and Ferguson as to costs. In discussing the matter of the *§ 1988* attorney's fee award *infra*, we accordingly omit reference to Ferguson.

**49¶** The Sheriff does not challenge these hourly rates on appeal.

**50¶** The trial was held in Orlando, Florida, and both Root and Gordon maintained their offices in the Ft. Lauderdale area.

**51¶** In determining the lodestar, the Magistrate Judge did not differentiate between the time Gordon, Root, and the paralegal spent on the due process claim and the defamation claim because he concluded that the claims had (1) stemmed from the "same nucleus of fact" and (2) that the hours were impossible to adequately apportion the time spent on each claim. He drew this two-part test from Fifth Circuit precedent in _Church of Scientology of California v. Cazares_, 638 F.2d 1272, 1290 (5th Cir. 1981). Because the Magistrate Judge found that the defamation claim against Ferguson and the due process claim against the Sheriff met this two-part test, he concluded that the claims were related and thus the hours spent on litigating Ferguson's claim were compensable under § 1988.

**52¶** The Sheriff presented four interrelated objections. He argued that the Magistrate Judge erred (1) in relying on inadequate records that included time spent on the defamation claim; (2) in finding the defamation claim against Ferguson related to the § 1983 due process claim against the Sheriff and thus compensable; (3) in not reducing the lodestar to account for Johnston's failure to prevail on the defamation claim against him in his official capacity; and (4) in failing to reduce the lodestar to account for the time the attorney's spent on the due process claim only. Johnston presented three objections to the attorney's fee award. Johnston argued that the Magistrate Judge erred (1) in reducing the lodestar for block billing; (2) in refusing to include travel time in the lodestar; and (3) in reducing the lodestar for limited success. She also objected to the Magistrate Judge's denial of some of her requested costs pursuant to Defendants' objections.

**53¶** Johnston argues that fee-shifting cases outside the civil rights context are not germane to the analysis in this case. The Supreme Court observed, however, that fee-shifting rules "are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'" _Hensley_, 461 U.S. at 433 n.7, 103 S. Ct. at 1939 n.7.

**54¶** Of course, the hours spent may also be compensable under state law. As we note later on, however, there is no argument in this case that the state-law defamation claim Johnston pursued would be compensable under Florida law.

**55¶** Recall that the defamation claim was asserted against the Sheriff, in his official capacity, and Ferguson in Counts II through V of Johnston's amended complaint and against the Sheriff in his official capacity in Count VI.

**56¶** Both parties miss the mark by citing supplemental jurisdiction cases to support their contentions about the common "core" of fact test. We think the proper test is not one of supplemental jurisdiction under 28 U.S.C. § 1367, which has a "common nucleus of operative fact" test developed by the Supreme Court in _United Mine Workers v. Gibbs_, 383 U.S. 715, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966). Though the "common core of fact" test under _Hensley_ sounds like the "common nucleus of operative fact" test under _Gibbs_, they are different tests because they focus on different aspects of the case. One is jurisdictional—the power of the court to try claims together—while the other is an award of attorney's fees—focusing on how difficult it is to separate out compensable and non-compensable tasks. **HN22⬆** The Supreme Court in _Hensley_ noted that in deciding whether claims are "related" the district court has discretion, something necessarily at odds with a jurisdictional inquiry. _Hensley_, 461 U.S. at 436-37. Though exercising supplemental jurisdiction is discretionary once a common nucleus of fact is shown, if there is no common nucleus of fact, the district court has no jurisdictional power to hear a state law claim at all. _See Ray v. Tenn. Valley Auth._, 677 F.2d 818, 826 (11th Cir. 1982); _Owen Equipment & Erection Co. v. Kroger_, 437 U.S. 365, 371, 98 S. Ct. 2396, 57 L. Ed. 2d 274 (1978) ("Gibbs delineated the constitutional limits of federal judicial power.").

**57¶** Alternatively, the Seventh and Ninth Circuits state their interpretation of the relevant test as "whether relief sought on the unsuccessful claim 'is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised.'" _Thorne v. City of El Segundo_, 802 F.2d 1131, 1141 (9th Cir. 1986) (quoting _Mary Beth G. v. City of Chicago_, 723 F.2d 1263, 1279 (7th Cir. 1983)).

**58¶** As noted _supra_ in note 48, Johnston is not entitled to seek any attorney's fees against Ferguson.

**59¶** The Sheriff's October 10, 2014, statement would have established publicity, stigma, and that the statement attended her discharge. With minimal effort, Johnston could also prove that the statement was false, and that the Sheriff is a government employer. This was confirmed by the fact that most evidence at trial related to Johnston's defamation claim against Ferguson. _See infra_ note 62.

**60**🔖 We say this although the District Court's instructions on damages on the due process claim and the defamation claim were much alike. *See supra* note 24.

**61**🔖 And if time developing evidence for a non-fee-shifting claim inevitably would be spent on a fee-shifting claim, those hours would be reasonable and thus compensable. *See Webb v. County Bd. of Educ.*, 471 U.S. 234, 243, 105 S. Ct. 1923, 1928-29, 85 L. Ed. 2d 233 (1985) (focusing on whether "any discrete portion of the work product from the administrative proceedings was work that was both useful and of a type ordinarily necessary" to later successful litigation).

**62**🔖 The testimony of four of Johnston's nine witnesses—volunteer (and later Director of Animal Services) Whitney Boylston, veterinarian tech Diane Hagan, euthanasia tech Melonie Hollis, and Ferguson—almost exclusively developed evidence on Johnston's defamation claim against Ferguson. It is true that some of these witnesses briefly discussed the Sheriff's Office euthanasia policy, which was relevant to proving that the Sheriff's press release contained false statements. However, their discussions were relatively brief and largely duplicative of the testimony elicited from Major Longo and the Sheriff on the policy. Johnston's two expert witnesses, Christopher Anderson and Robert Tremp, talked about Johnston's damages to her reputation. Their testimony addressed her defamation claim against Ferguson, given that damages are not the proper remedy for a name-clearing hearing. *See Codd*, 429 U.S. at 627, 97 S. Ct. at 884. The witnesses used to build out the due process claim were Major Longo and the Sheriff. Johnston's own testimony relayed the factual background of the case and supported both claims by showing why both Ferguson and the Sheriff's statements were false.

**63**🔖 Because we vacate the attorney's fee award, we need not discuss other issues the parties have presented concerning the award.

**64**🔖 Section 1920 states:

A judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;

(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title; [**63**]

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree. 28 U.S.C. § 1920.

**65**🔖 *HN29*🔖 Some of these costs are clearly *unrecoverable*, such as postage costs. *Duck-worth v. Whisenant*, 97 F.3d 1393, 1399 (11th Cir. 1996). Other costs require that a party show that they were "necessarily obtained for use in the case." *Loughan v. Firestone Tire & Rubber Co.*, 749 F.2d 1519, 1526 n.2 (11th Cir. 1985). It was not clear error to find unnecessary a transcript of a video news piece that was already before the jury simply so they could have it in the jury room. *See EEOC v. W & O, Inc.*, 213 F.3d 600, 623 (11th Cir. 2000). And while we have not resolved whether "rush service" from private processors are compensable, it would be a permissible reading of this record that service of Sheriff's Office employees could have been served in advance. *See id.* at 624. As for the denial of costs for additional copies of caselaw and deposition transcripts, we do not see clear error.

The only cost the Magistrate Judge took into detailed consideration is the cost of a video deposition. Johnston asserts the same argument here as

**1**🔖 The deprivation of a name-clearing hearing "is not complete," and a claim under the Due Process Clause does not arise "unless and until the State fails to provide due process," i.e., a name-clearing hearing. *Zinermon v. Burch*, 494 U.S. 113, 126, 110 S. Ct. 975, 983, 108 L. Ed. 2d 100 (1990). Therefore, Johnston's due process claim for a name-clearing hearing would not arise until the Florida courts refused to order the Sheriff to provide her with one.

**2**🔖 In *Paul v. Davis*, the Supreme Court stated that its cases,

ha[d] recognized the serious damage that could be inflicted by branding a government employee as "disloyal," and thereby stigmatizing his good name. But [it] ha[d] never held that the mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process absent an accompanying [**70**] loss of government employment.

424 U.S. at 706, 96 S. Ct. at 1163. We reiterated this point in *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1303 (11th Cir. 2001)

("*Absent a discharge or more, injury to reputation* is not a protected liberty interest" under the Due Process Clause" (emphasis added)).

**3** ¶ "Because [the hearing] is provided simply to cleanse the reputation of the claimant, the hearing need not take place prior to his termination or to the publication of related information adverse to his interests." *Campbell v. Pierce County*, 741 F.2d 1342, 1345 (11th Cir. 1984). This is so because the hearing is "not to avert the unjustified denial of a specific benefit, but to allow the aggrieved party to 'clear his name.'" *Id.* (citing *Codd*, 429 U.S. at 627, 97 S. Ct. at 884). Thus, in Johnston's situation, the hearing would not be for the purpose of saving her job; rather, it would be convened for the sole purpose of clearing her name.

**4** ¶ *See Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1527 (11th Cir. 1994) ("It is axiomatic that equitable relief is only available where there is no adequate remedy at law; cases in which the remedy sought is the recovery of money damages do not fall within the jurisdiction of equity."). In fashioning an equitable remedy—specifically an order requiring a name-clearing hearing—a court could award the employee the expenses incurred in obtaining the hearing. But the sort of money damages awardable pursuant to the District Court's jury instructions on the Count I due process claim in this case would be out of the question.

**5** ¶ The errors resulted from the District Court's failure to recognize that the process due Johnston under the Due Process Clause was a name-clearing hearing, not damages. The failure was invited by the attorneys representing Johnston and the Sheriff who treated Count I as a claim for damages.

**6** ¶ The Sheriff's position was this:

The Sheriff's Office and Sheriff Borders individually are entitled to judgment as a matter of law with respect [**71] to Plaintiff's claim that she was denied procedural due process. In order to recover on a procedural due process claim for deprivation of liberty interest, Johnston must show that (1) a false statement (2) of stigmatizing nature, (3) attending her termination, (4) was made public (5) by the public employer (6) without a meaningful opportunity for an employee name clearing hearing. *Cotton v. Jackson*, 216 F.3d 1328, 1330 (11th Cir. 2000). She must also show that the State of Florida "refused to provide a process sufficient to remedy the procedural deprivation." *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994). Johnston cannot establish a claim for deprivation of her liberty interest because (1) neither the Sheriff's Office, nor Borders made a false statement; (2) Johnston was afforded a nameclearing hearing; (3) adequate state remedies were available to provide Johnston with the opportunity for a name clearing hearing. Additionally, Plaintiff's liberty interest claim against Sheriff Borders individually is barred by the doctrine of qualified immunity.

Notably, the Sheriff did not expressly contend that to make out a due process claim (cognizable under 42 U.S.C. § 1983) against him for failure to provide a name clearing hearing, Johnston had to first ask him to provide a hearing and, if he declined to provide one, the Florida state courts refused to order him to do so.

**7** ¶ At this point, no one—not Johnston, nor the Sheriff nor the District Court—expressly noted for the record that Count I was not seeking "an adequate state court remedy," i.e., an injunctive order requiring the Sheriff to provide a name-clearing hearing.

**8** ¶ The en banc *McKinney* Court held that certiorari review was available under Florida law as the remedy in that case. 20 F.3d at 1563.

**9** ¶ The Florida Constitution states that "[c]ircuit courts of the State of Florida have exclusive jurisdiction of all cases in equity, all cases at law, and all criminal cases not cognizable by inferior courts." Fla. Const. art V, § 11; *see also English v. McCrary*, 348 So. 2d 293, 297 (Fla. 1977) ("In this state, circuit courts are superior courts of general jurisdiction, and nothing is intended to be outside their jurisdiction except that which clearly and specially appears so to be."). Florida statutes state that the circuit courts have "exclusive original jurisdiction" over "all actions at law not cognizable by the county courts," as well as "all cases in equity." Fla. Stat. § 26.012.

**10** ¶ The Sheriff, at least in his individual capacity, understood this, which explains why he interposed the defense of qualified immunity. *See supra* notes 12, 19. Qualified immunity is a defense to a claim for damages. It is not a defense to a claim for injunctive relief—here, an order requiring the provision of a name-clearing hearing.

**11** ¶ As the panel stated in *Johnston v. Borders*, "Sheriff Borders admitted that he did not know what a name-clearing hearing was." 742 F. App'x at 766.

**12** ¶ Recall that the instructions were administered without the Sheriff's objec.

   I also note that most of the circuit courts to consider this issue have, either implicitly or explicitly, rejected a notice requirement for stigma-plus claims. *See, e.g., Wojcik v. Mass. State Lottery Comm'n,* 300 F.3d 92, 103 (1st Cir. 2002) (holding that a due process violation does not occur in the stigma-plus context until an employee requests a hearing); *Grillo v. N.Y. City Transit Auth.,* 291 F.3d 231, 234 (2d Cir. 2002); *Rosenstein v. City of Dall.,* 876 F.2d 392, 396 (5th Cir. 1989); *Quinn v. Shirey,* 293 F.3d 315, 321-22 (6th Cir. 2002); *Winskowski v. City of Stephen,* 442 F.3d 1107, 1111 (8th Cir. 2006).

About

Privacy Policy

Cookie Policy

Terms & Conditions

Copyright © 2023 LexisNexis.

Jones, Varnum & Co. v. Townsend's Adm

Search: Everything

Client: -None-

Folders   History   Help   More

Document:          Jones, Varnum & Co. v. Townsend's Adm'x, 21 Fla. 431          Actions

Go to   Page   Page #          Search Document          1 of 4   Results list

**Jones, Varnum & Co. v. Townsend's Adm'x, 21 Fla. 431**

Copy Citation

Supreme Court of Florida

January, 1885, Decided

No Number in Original

Reporter

21 Fla. 431 * | 1885 Fla. LEXIS 32 **

JONES, VARNUM & CO., APPELLANTS, vs. TOWNSEND'S ADMINISTRATRIX, APPELLEE.

**Prior History:** [**1] Appeal from Circuit Court for Duval county.

The appellants published in their newspaper, The Florida Times-Union, on March 20, 1883, at Jacksonville, of the intestate J. F. Townsend, who departed this life subsequent to the entry of this appeal, the following article: "We support Mr. DeCoursey for Assessor because he is one of the young colored men of this city who stands highest for character and ability. His opponent, Mr. Townsend, is a retail liquor dealer, and we are informed that he is now under indictment for not cancelling the stamps on empty liquor casks, the contents of which he had sold." The first count of the declaration sets out the article and charges that plaintiff is the Townsend meant or referred to, and that the laws of the United States provide that "whoever shall not cancel the stamps required by law, etc., on liquor casks, etc., when the same shall become empty, shall be deemed guilty of a felony," etc., yet that the defendant "well knowing the premises, but contriving wickedly and maliciously, and intending to injure the plaintiff in his good name, fame and credit, and to bring him into public scandal and disgrace with and among all his neighbors and other [**2] good and worthy people of this State and the United States, and to cause it to be suspected and believed by those neighbors and other people that he had been and was guilty of the offence and misconduct mentioned to have been charged and imputed to him, and to vex, harass and oppress him," did publish such article, "meaning thereby that the said plaintiff was then under indictment for the commission of a felony, the said offence imputed to said plaintiff being indictable under the said laws and statutes of the United States."

The second count alleges that an election was to be held in said city on the second day of April, 1883, for, among other officers, an Assessor, for which office he was a candidate, and that defendants, well knowing the premises, contriving and maliciously intending to injure him in his capacity as a candidate, and to bring him into public scandal, infamy, etc., etc., and to cause it to be suspected and believed, etc., that he had been and was guilty, etc., etc., and to cause the electors and citizens not to vote for him, or to give him their support for said office, and to otherwise vex, harass and oppress him, did falsely, wickedly and maliciously compose, [**3] print and publish their said newspaper of and concerning plaintiff, and of and concerning him "as such candidate," the said article "meaning thereby that the said plaintiff had committed a felony, and was then under indictment for the same, the said offence imputed to said plaintiff as aforesaid being indictable" under the laws of the United States. The declaration charges also that by such grievances the plaintiff is greatly injured in his good name, fame and credit, and in his said trade and business, and brought into public scandal and disgrace among all his neighbors and other citizens and electors aforesaid, and all other good and worthy people, etc., and claims $ 5,000 damages.

The defendants demurred because each count "is bad in substance and neither sets forth a cause of action, the 'words' imputed by the former to the defendant not being actionable," and the "language" imputed to him by the latter "not constituting a cause of action." The plaintiff joined in demurrer and upon argument the demurrer was overruled by the Circuit Judge, which ruling is assigned as error.

The other facts are stated in the opinion.

**Disposition:** Judgment reversed and remanded.

296

Core Terms

libel, malice, newspaper, words, publish, privileged, candidate, cases, cask, circumstances, demurrer, communications, indictment, motives, empty, damages, stamps, mitigation of damages, mitigate, slander, transport, election, imputed, general issue, declaration, efface, press, pleas, private character, calculated

---

## Case Summary

**Procedural Posture**

Appellant publishers sought review of an order of the Circuit Court of Duval County (Florida), which overruled their demurrer to allegations that were made by appellee administrator of decedent's estate that they had published a libelous article that accused the decedent of a felony.

**Overview**

The administrator of decedent's estate continued a libel action that had been filed by decedent against the publishers for publishing a newspaper article that informed the public that the decedent, who was a candidate for public office, was under indictment for not cancelling the stamps on empty liquor casks, which constituted a felony. The publishers' demurrer was overruled by the trial court. Although the article was actionable per se as a libel, the court reversed the judgment of the trial court because it was for the jury, and not the publishers, to say whether the latter had any reason to believe the charge was true, but the publishers, after being permitted to show circumstances calculated to reasonably create a belief, were entitled to state their belief. The result of the election was not the proper subject of testimony for it had no connection with the publishers' motives.

**Outcome**

The court reversed and remanded for further proceedings the judgment of the trial court that overruled the publishers' demurrer to allegations that were made by the administrator of decedent's estate's in a libel action, which allegedly accused the decedent of committing a felony.

---

## ▼ LexisNexis® Headnotes

---

Torts > [Intentional Torts ▾] > [Defamation ▾] > 📄[Defamation Per Se ▾]
[View more legal topics]

[HN1⬇] **Defamation, Defamation Per Se**
An article is libelous per se if it tends to bring its subject into reproach and disgrace, and to degrade him in society, and is calculated to prejudice him in his trade, and injure him in his reputation, and deprive him of public confidence. 🔍 [More like this Headnote]

*Shepardize®* - Narrow by this Headnote (0)

---

Civil Procedure > ... > [Pleadings ▾] > [Amendment of Pleadings ▾] > [General Overview ▾]
[View more legal topics]

[HN2⬇] **Pleadings, Amendment of Pleadings**
Where, in civil cases, a party pleads over or amends his pleading after judgment upon any demurrer he shall not thereby be held or considered to have waived or abandoned his exception to the judgment upon such demurrer, and in all cases where an appeal or writ of error shall hereafter be taken from any final judgment in any civil cause, the party suing out such appeal or writ of error shall have the right to have any ruling or judgment upon any demurrer in the cause reviewed and passed upon by the appellate court, whether such party shall have pleaded over or amended his pleading after such ruling upon such demurrer or not. 🔍 [More like this Headnote]

*Shepardize®* - Narrow by this Headnote (1)

---

Civil Procedure > ... > [Responses ▾] > [Defenses, Demurrers & Objections ▾] > [Defects of Form ▾]
[View more legal topics]

[HN3⬇] **Defenses, Demurrers & Objections, Defects of Form**
Where no waiver exists, the error of the judgment on a demurrer, if it be erroneous, is error apparent on the record, and it is a well established rule that where there is error apparent, and it is not waived, no formal exception is necessary to enable the party damaged to question it. 🔍 [More like this Headnote]

*Shepardize®* - Narrow by this Headnote (0)

---

Torts > ... > [Defamation ▾] > [Defenses ▾] > [General Overview ▾]

View more legal topics

**HN4** ⬇  **Defamation, Defenses**

It is a well-established rule that a plea of justification should fully meet the declaration in every substantial particular. Great certainty of averment is requisite. It must justify the substance of the publication, its character and imputations, and also the sense in which the innuendoes explain it, if they do so fairly. If the plea does not aver that the words are true, in the sense imputed to them in the complaint by proper innuendo, it is bad. It must be as broad as the charge, and must justify the specific charge claimed to be libelous.

🔍 **More like this Headnote**

*Shepardize® - Narrow by this Headnote (0)*

Torts > ... > Defamation ⌄ > Remedies ⌄ > Damages ⌄
View more legal topics

**HN5** ⬇  **Remedies, Damages**

Actionable words in libel imply, in contemplation of law, malice sufficient at least to sustain an action, and entitle the plaintiff to a verdict, but the amount of the damages depends in part on the degree of malice, the malignity and wantonness of intention to injure, with which the words used were spoken, and though this malice cannot, under the plea of not guilty, be entirely overcome so as to defeat the action, where the words are actionable, evidence may be, and should be, received to show a less degree of malice and an absence of wanton intention to injure. Whether or not circumstances which of themselves are insufficient to establish the truth of the charge, yet may be introduced to show a less degree of malice and mitigate damages are admissible, is a vexed question. 🔍 **More like this Headnote**

*Shepardize® - Narrow by this Headnote (2)*

Civil Procedure > Trials ⌄ > Jury Trials ⌄ > Province of Court & Jury ⌄
Torts > Intentional Torts ⌄ > Defamation ⌄ > Libel ⌄
View more legal topics

**HN6** ⬇  **Jury Trials, Province of Court & Jury**

It is peculiarly the province of the jury to weigh and determine what effect is to be given to mitigating circumstances. The quo animo with which the words are spoken, or the written article published, should, in a case where no special damage is alleged and proven, regulate the amount of damages; but whatever is calculated to show that the defendant acted in good faith, and with reasonable belief of the truth of the charge, and with good motives, should be permitted to go to the jury, who will give it the effect it should have. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ⌄ > Defamation ⌄ > Libel ⌄

**HN7** ⬇  **Defamation, Libel**

Evidence offered in mitigation under the general issue must be treated as a conclusive admission that the words or charge are not in fact true; but the defendant may show to the jury that he believed them to be true, and had reasonable grounds to do so. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ⌄ > Defamation ⌄ > Libel ⌄

**HN8** ⬇  **Defamation, Libel**

The liberty of the press means simply that no previous license to publish shall be required, but not that the publisher of a newspaper shall be any less responsible than another person would be for publishing otherwise the same libelous matter. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

Constitutional Law > Bill of Rights ⌄ > General Overview ⌄
Torts > Intentional Torts ⌄ > Defamation ⌄ > Libel ⌄

**HN9** ⬇  **Constitutional Law, Bill of Rights**

The liberty of the press will not be invaded by requiring the conductors of our presses to stand responsible for the truth of what they publish. Nor by requiring them to show the same good motives which the bill of rights requires of all. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Torts > ... > Defamation ⌄ > Defenses ⌄ > Fair Comment & Opinion ⌄
View more legal topics

HN10 ⬇ **Defenses, Fair Comment & Opinion**

A candidate for office, it is true, puts the character of his fitness, abilities and qualifications for the office, in issue. His conduct and acts, whatever they may be, may be freely commented on and boldly censured. The mere injustice of criticism made of his real acts or conduct, is no ground of recovery, whether such harsh criticism be made by a newspaper or by a voter, or other person having an interest in the election; no malice will be implied in such cases. But defamatory assaults on his private character, the publication of falsehood in imputing to him crime or moral delinquency, cannot be justified on the ground of criticism, nor claimed to be privileged, or to be presumed to have been made without malice, but with good motives. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > ... > Defamation ⌄ > Remedies ⌄ > Damages ⌄
View more legal topics

HN11 ⬇ **Remedies, Damages**

An intention to serve the public good does not authorize a defamation of private character. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ⌄ > Defamation ⌄ > Libel ⌄
View more legal topics

HN12 ⬇ **Defamation, Libel**

In general an action lies for the malicious publication of statements which are false in fact, and injurious to the character of another (within the well-known limits as to verbal slander), and the law considers such publication as malicious unless it is fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned, In such cases the occasion prevents the inference of malice, which the law draws from unauthorized communications, and affords a qualified defense, depending upon the absence of actual malice. If fairly warranted by any reasonable occasion or exigency, and honestly made, such communications are protected for the common convenience and welfare of society; and the law has not restricted the right to make them within any named limits. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ⌄ > Defamation ⌄ > Libel ⌄
View more legal topics

HN13 ⬇ **Defamation, Libel**

The protection of a privilege may be lost by the manner of its exercise, though the belief in the truth of the charge exist. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Torts > Intentional Torts ⌄ > Defamation ⌄ > Libel ⌄
View more legal topics

HN14 ⬇ **Defamation, Libel**

The court's conclusion is that the liberty of the press is no wise infringed upon by the rule that when newspapers publish charges imputing crime, or moral delinquency, to candidates for elective offices the publishers should previously see to their correctness. Moreover the court does not recognize the moral obligation upon the publisher, whatever may be the candidate's want of mental or other qualifications for office, to publish contrary to the fact that he is under indictment for a felony or to otherwise assail his private character or impute moral delinquency to him. It is enough to permit him to show all circumstances indicative of a less degree of malice, and in mitigation of damages. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ⌄ > Defamation ⌄ > Libel ⌄
View more legal topics

HN15 ⬇ **Defamation, Libel**

The court does not mean to gainsay the doctrine of Wilson vs. Marks that good motives are essential to a justification for publishing libelous matter which is true. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

▼ Headnotes/Summary

299

**Headnotes**

1. Under section 3324 of the Revised Statutes of the United States, the failure to efface and obliterate the internal revenue stamps on a cask at the time of emptying the same of distilled spirits is a felony, punishable by fine and imprisonment. Intent to transport the empty cask with the stamp on it, or to procure it to be transported, is not an element of the above offence.

2. To publish in a newspaper of a person who is a candidate for an elective municipal office that he is "a retail liquor dealer, and we are informed is under indictment for not canceling the stamps on empty liquor casks, the contents of which he had sold," such person not being under indictment for the above or any such crime, is a libel, and is actionable *per se*, and is not privileged.

3. A declaration, in the usual form, setting out the publication, and the above provision of the United States Statutes, and alleging that the defendant meant by such publication that the plaintiff was under indictment for the commission of the above felony, is good in law, although it alleges no *special* damage to the plaintiff.

4. Under chapter 3430, Laws of Florida, approved March 5, 1883, pleading over in bar, after demurrer to the declaration has been overruled, is not a waiver of the demurrer, but the judgment or ruling on the demurrer may be reviewed on appeal or writ of error, and no exception need be taken or noted in the lower court to secure such right of review.

5. In a plea of justification to an action for libel great certainty of averment is requisite. It must be as broad as, and justify the substance of, the specific charge or publication, its character and imputations. If it does not aver that the words are true in the sense imputed to them by proper innuendo, it is bad.

6. Good motives are essential to a justification or exoneration of publishing libelous matter which is true, under the Constitution of Florida.

7. The language of a publication alleged to be libelous should be construed as the common mind would naturally understand it.

8. The publication of matter otherwise libelous or actionable is not relieved of its libelous or actionable character by the statement that it is made on information.

9. The plea of "*not guilty*," in an action for libel, the charge being actionable *per se*, admits that it is false in fact. Where under such plea the publication is proved or admitted, and the alleged libel is actionable, malice cannot be so overcome by proof as to establish a defense, and defeat the plaintiff of his verdict; yet to repel the presumption of or prove a less degree of malice, and thus mitigate damages, defendant may show that at the time the publication was made he had good reason to believe and did believe the charge to be true. Facts and circumstances showing that the defendant had reasonable grounds to believe the charge to be true may be introduced to repel malice and in mitigation of damages, though they tend to establish the truth of the alleged libel, or to create suspicion thereof, if they are not such as amount to proof of the truthfulness of the charge. Evidence so offered in mitigation, is to be treated as involving a conclusive admission that the charge is not true in fact.

10. When the special fact in controversy is whether the words of a third person, not under oath, were spoken or written, and not whether they were true, testimony as to whether they were spoken or written is not to be excluded as hearsay: so also, where language or statements, whether written or spoken, are the natural or inseparable concomitants of the principal facts in controversy.

11. Newspapers have no privilege that will excuse them in printing libels of which any other publication would not be excused. The liberty of the press means that no previous license to publish shall be required, but not that the publisher of a newspaper shall be any less responsible than another person would be for publishing otherwise the same libelous matter.

12. The publication concerning a candidate for an elective office in a municipality, by a newspaper admitted to have at the time a large circulation beyond the limits of the municipality, of articles stating that he is under indictment for a felony, when such is not the fact, is not privileged.

13. The defendant in a libel suit should not be permitted to testify whether or not he exercised any care in ascertaining the truthfulness of the charge; this is for the decision of the jury.

14. The result of the election at which the plaintiff is a candidate is not proper evidence for the defendant in the absence of allegation of special damage.

**Counsel:** Randall, Walkers [**4] & Foster and R. B. Archibald for Appellants.

H. H. Buckman for Appellee.

**Judges:** MR. JUSTICE RANEY ▾.

**Opinion by:** RANEY ▾

# Opinion

[*435]   MR. JUSTICE RANEY ▾ delivered the opinion of the court:

1. (*a*.) The appellants in support of their demurrer to the declaration assert the gravamen of the charge to be that the libel imputed to the plaintiff the commission of a felony and that he had been indicted for such felony, the **[*436]** charge being that he had been, as defendants were informed, indicted for not canceling the stamps on empty liquor casks, the contents of which he had sold. This charge they contend is not an offence against the State or United States laws.

Section 3324 of the Revised Statutes of the United States provides that "every person who empties or draws off any distilled spirits from a cask or package bearing any * * * stamps required by law, shall, at the time of emptying such cask, * * efface or obliterate said mark, stamp or brand. * * * * And every railroad company * * or person who receives or transports, or has in possession with intent to transport or procure to be transported, any such empty cask * * or any part thereof, having thereon any * * stamps required by [**5] law to be placed on any cask containing distilled spirits shall forfeit $ 300 for each such cask * * so received or transported or had in possession with intent aforesaid. * * *Every person who fails to efface and obliterate said stamp at the time of emptying such cask*, or who receives any such cask * * or part thereof *with the intent aforesaid*, or who transports the same, or knowingly aids or assists therein * * * * shall be deemed guilty of a felony, and shall be fined not less than $ 500, nor more than $ 10,000, and imprisoned not less than one year nor more than five years." Counsel assert that the words first italicized are qualified by the words "with the intent aforesaid," which we have also italicized, and that "*failing to efface,*" etc., is not punishable under the statute unless such failure is "with the intent to transport or cause to be transported such empty casks." We think such construction is contrary to the plain reading of the statute, and is strained. The statute enjoins it as an active duty upon every one emptying a cask to efface or obliterate at the time the stamp; and, this, regardless of any intent as to the use or **[*437]** disposition to be made [**6] of the cask. It also prohibits the receiving or transporting or having in possession any empty cask whose stamp has not been effaced, with intent to transport it, or procure the transportation thereof. It was clearly the purpose of the statute to punish, as well an omission to perform the active duty imposed, as the commission of that which is forbid. Not only do we think it evident that our construction gives the real meaning of the section, but it is a very natural and reasonable provision, as the performance of such duty is security against a possibility of the commission of the other offences contemplated by the section, and hence the advisability of punishing a failure to perform it. [Since the adjournment of the term at which this decision was made we have had access to Dillon's Reports, and find our views supported by the opinion of Mr. Justice Miller, speaking for the U.S. Circuit Court, in U.S. vs. Ulrici, 3 Dillon, 532, 536, *et seq.*]

(*b*.) The article published is, in our opinion, actionable *per se* as a libel. It is not necessary to go into an explanation of the distinction between slander and libel, as to what words are actionable, and what are not. We are [**7] dealing now with *libel*, and not mere slander. There is, in view of the construction we have given the United States Statute, nothing in any authority we have seen which does not sustain the position that the article is a libel and *per se* actionable. *HN1* It certainly tends to bring him into reproach and disgrace, and to degrade him in society, and is calculated to prejudice him in his trade, and injure him in his reputation, and deprive him of public confidence. It accuses him of being indicted for the commission of a crime punishable by law, and declared a felony, and is calculated to bring him into odium, contempt and ridicule. 37 Ohio State, 31; 6 Ohio, 532; 120 Mass. 177; 68 Maine, 295; Townshend **[*438]** on Slander and Libel, § 176. We think the demurrer to the declaration was properly overruled.

2. After the preceding demurrer was overruled the defendants filed pleas to the declaration. Under the former practice in civil cases at law, pleading over after such demurrer overruled was a waiver of the demurrer. 17 Fla. 744. And the record stood as if no demurrer had been filed, and consequently as if no judgment [**8] had been rendered on it; hence no exception could be taken to the judgment on appeal. Johnson vs. P. R. R. Co., 16 Fla. 623. By chapter 3430 of our statute, approved March 5, 1883, it is provided that *HN2* where, in civil cases, a party "pleads over or amends his pleading after judgment upon any demurrer he shall not thereby be held or considered to have waived or abandoned his exception to the judgment upon such demurrer, and in all cases where an appeal or writ of error shall hereafter be taken from any final judgment in any civil cause, the party suing out such appeal or writ of error shall have the right to have any ruling or judgment upon any demurrer in the cause reviewed and passed upon by the appellate court, whether such party shall have pleaded over or amended his pleading after such ruling upon such demurrer or not." This act applies only to common law cases, as is evident from its language, and it has always been the practice in this State that upon an appeal from a final decree in chancery all such interlocutory orders on demurrers may be reviewed, and this, too, without any exception to them having been noted in the court below. It is contended, as we understand, [**9] that it is necessary to formally except to the "*judgment*" or "*ruling*," and to have the same noted of record in the lower court in order to take advantage of this statute upon appeal. We do not think the language of the statute sufficient to impose such requirement. The purpose of the statute was to do away **[*439]** with the waiver of the demurrer, which filing pleas constituted, and to keep it and the proceedings thereon on the record for all purposes, unqualified by subsequent pleading. *HN3* No waiver existing now, the error of the judgment on the demurrer, if it be erroneous, is *error apparent on the record*, and it is a well established rule that where there is "error apparent," and it is not waived, no formal exception is necessary to enable the party damaged to question it. Hinote vs. Simpson & Co., 17 Fla. 444; Pittman's vs. Myrick, 16 Fla. 692. Where, prior to this statute, the demurrant suffered final judgment to go against him on his demurrer being overruled, no formal entry of exception was necessary to enable him to avail himself on appeal of the exception taken in reality to such judgment by his appeal, and proceedings in the appellate [**10] court. We think the same rule applicable under this statute, particularly as it does not require the noting of any exception, or other method, as a means of taking advantage of it.

3. The defendants filed two pleas. The first is to the first count and alleges that the plaintiff was, in January, 1881, a retail liquor dealer in Duval county, Florida, and then had in his possession at his place of business three empty liquor casks out of which he had drawn off distilled spirits, but that he *had not*, at the time of such emptying of said casks, destroyed, effaced and obliterated the revenue stamps, but had failed to do so, contrary to section 3324 of the United States Revised Statutes. The second plea is to the second count of the declaration, and is the same as the other except that it alleges that the plaintiff *did* not, at the time of drawing off and emptying such casks, *efface or obliterate* the stamps. The pleas conclude that "whereupon defendants * * in good faith, and, as they believed, for the public good, * * published the article, as it was **[*440]** lawful for them to do, for the reason aforesaid." The plaintiff demurs.

*HN4* It is a well-established rule that a plea [**11] of justification should fully meet the declaration in every substantial particular. Great certainty of averment is requisite. It must justify the substance of the publication, its character and imputations, and also the sense in which the innuendoes explain it, if they do so fairly. If the plea does not aver that the words are true, in the sense imputed to them in the

complaint by proper innuendo, it is bad. It must be as broad as the charge, and must justify the specific charge claimed to be libelous. 2 Chitty's Pl., 662, note (q); Ames vs. Hazard, 8 R.I. 143; Stillwell vs. Barter, 19 Wend. 487; Downey vs. Dillon, 52 Ind. 442; Skinner vs. Powers, 1 Wend. 451; 13 Johns. 475; Skinner vs. Grant, 12 Vt. 456; Stow vs. Converse, 4 Conn. 17; Andrews vs. Van Duser, 11 John. 37; 15 Mo. 480.

The charge complained of is not that the plaintiff was a retail liquor dealer, and had in his possession at his place of business three empty liquor casks, out of which he had drawn off distilled spirits, and that he had not at the time of such emptying effaced the revenue [**12] stamps, or did not efface the same, but it is more--that he was a retail liquor dealer and was *under indictment* for not canceling the stamps, and the innuendo is that the defendant meant that the plaintiff was under indictment for the commission of a felony, the offence imputed to the plaintiff being indictable under the laws of the United States. The pleas do not meet the declaration; they say nothing as to the indictment. It is one thing for one individual to publish of another that he has committed an offence which is a felony, and another thing to say that he has actually been indicted therefor.

The language used can be reasonably given no other **[*441]** meaning than that the plaintiff was under indictment by a grand jury for the offence alluded to. Such is the sense in which the common mind would naturally understand it. Townshend, § 133, note 3. If of course makes no difference that they are given "*on information*," so far as the question of their being actionable, considered with reference to the demurrer to the declaration, or in considering these pleas, is concerned. Treat vs. Browning, 4 Conn. 408; Kenny vs. McLaughlin, 5 Gray 3; 8 Johns. 74; [**13] Skinner vs. Powers, 1 Wend. 452; 10 Johns. 447; 2 Gr. Ev. 390, note 2; 57 Wis. 570.

The pleas are no answer to, or justification of, the charge, and were properly overruled.

4. The defendants then plead the general issue, not guilty. A consideration of Circuit Court Rules 71 and 72 makes it plain that this plea puts in issue having published the article maliciously, and in the defamatory sense imputed. It is not necessary to say more now as to what is put in issue by this plea.

The defendants upon the trial introduced as a witness Mr. Varnum. They had previously admitted in open court that they "were proprietors and publishers of the newspaper on March 20, 1883, and are still, and published the article complained of, that the same is not true; that the paper had a large circulation at the time in the State, the United States, and even to Europe." Mr. Varnum was asked by their counsel who penned the article, and upon whose information it was written, and from whom he derived his information. Each of these questions was objected to by attorney for the plaintiff, the first as *immaterial*, and the second and third as *improper* and [**14] *immaterial*, and, the objection being overruled no exception was taken; when the witness answered that the article was penned by Mr. Charles H. Jones, one of the defendants, upon information **[*442]** furnished by the witness, who derived it "from the office of Collector of Revenue of the United States--from Mr. S. C. Thompson." Witness was then asked what the information he obtained was, when the plaintiff objected on the ground that it was improper, hearsay, and that no evidence was admissible to prove or tending to prove the truth of the alleged libel. The objection was sustained and defendants excepted.

Mr. Thompson, being introduced by defendants as a witness, testified that he knew Mr. Townsend; that he, Thompson, was, in March, 1883, Deputy Collector of Revenue for the United States, and in charge of the books and office of the Collector at that time. He was then asked: "Did Mr. Varnum get any information relative to Mr. Townsend being under indictment for selling liquor out of casks without the stamps having been cancelled thereon?" This question was objected to on the same grounds as the last question put to Mr. Varnum.

It is settled that this plea admits that the words [**15] published are not true in fact, and under it the defendant cannot prove their truthfulness as a justification. It is also clear, as a general rule, that under such plea evidence is admissible to show a less degree of malice, and overcome, in part at least, the presumption thereof, and thus mitigate the damages. *HN5* Actionable words in libel imply, in contemplation of law, malice sufficient at least to sustain an action, and entitle the plaintiff to a verdict, but the amount of the damages depends in part on the degree of malice, the malignity and wantonness of intention to injure, with which the words used were spoken, and though this malice cannot, under the plea of not guilty, be entirely overcome so as to defeat the action, where the words are actionable, evidence may be, and should be, received to show a less degree of malice and an absence of wanton intention **[*443]** to injure. Lick vs. Owen, 47 Cal. 252, 258; 6 Gill & John. 413; 43 Maine, 287. Whether or not circumstances which of themselves are insufficient to establish the truth of the charge, yet may be introduced to show a less degree of malice and mitigate damages are admissible, [**16] is a vexed question. In Huson vs. Dale, 19 Mich. 17, it is said: "No question in modern times has perhaps given rise to a greater amount of judicial controversy. The conflict in the decisions upon it is absolutely appalling and the attempt to trace the line of mere authority through the maze of hostile decisions would be calculated to only confuse and lead the mind astray from the real principles of justice involved in it, and could serve no useful end." See also Bush vs. Prosser, 11 N.Y. 347, *et seq.* In Huson vs. Dale, it is decided that to rebut malice, and thus mitigate damages, but not to establish a defence, it is competent to show under the general issue that at the time the slanderous words were uttered the defendant reasonably believed them to be true, and facts which may tend to establish the truth of the words are not for that reason inadmissible under the general issue. If they tend to rebut malice, and are offered for that purpose only, and are not such as must have been pleaded as justification, they are admissible.

It seems that prior to the decision in Underwood vs. Parks, 2 Strange, (17 George II,) 1200, the truth of the charge itself [**17] might be proved to rebut malice and mitigate damages, though the matter proven would have constituted a full defence had it been pleaded in justification. In this case upon the defendant offering to prove the *truth* of the words in mitigation, it was refused, the Chief-Justice saying that "at a meeting of all the judges upon a case that arose in the Common Pleas, a large majority of them had determined not to allow it *for the future*, but it should be **[*444]** pleaded, whereby the plaintiff might be prepared to defend himself as well as to prove the speaking of the words."

This we understand to have been an attempt to prove the truth of the words to such an extent as had they been specially pleaded would have constituted a justification. It was a new rule of pleading for the protection of the plaintiff against surprise--against proving as true that which the plea admitted to be false. Prior to this case it was the law that no facts not amounting to a complete defence could be specially pleaded, and all facts going only in mitigation of damages could be shown under the general issue. The only necessary deduction from this

case was that the defendant should not be permitted [**18] to prove a *justification* under the general issue, *in mitigation of damages*. This was a logical and reasonable rule. To apply this rule to cases where the defendant believed, and had reason to believe the charge was true, and he had acted in good faith thereupon in making it, but, seeing his mistake, he does not seek to assert its truthfulness, but admits by his plea (or, as in the case at bar, also specially in open court,) that it is not true, would be to prevent him from showing that he did so believe, and had good reason to believe it, and was not therefore actuated by that degree of malice which might otherwise be inferred from the making of the charge or from other evidence of malice introduced by the plaintiff. The plaintiff is permitted to give evidence in aggravation of damages, to prove at least a repetition by the defendant of the slander or libel, and, according to some authorities, more. "And for the very reason for which the plaintiff is permitted to give evidence of a degree of malice beyond that which the law implies, in order to aggravate the damages, should the defendant be allowed to give evidence in mitigation by showing that he uttered the words imputed [**19] to him upon probable grounds of suspicion of the plaintiff's guilt, calculated [*445] at the time to impress the belief of their truth; and that they were not spoken for the fiend-like purpose of falsely and wantonly destroying his character." Ridgen vs. Wolcott, 6 Gill & John. 413. It is held in this case to be a general rule that under such plea the defendant may give evidence of such facts and circumstances as show a ground of suspicion of the truth of the matters charged, not amounting to a justification or proof of guilt of the plaintiff, in mitigation of damages but not in bar of the action. "To deny," says the court, "to the defendant the right to show in the mitigation of damages only, on the plea of not guilty, the probable grounds of suspicion on which he spoke the words complained of, and thus to explain his conduct when he may subsequently to the time of speaking them have seen reason to change his opinion, would be to drive him, whether he will or not, and contrary to his own conviction at the time of pleading, to put in the plea of justification, which, if he fails to sustain, must often have the effect to increase the damages by furnishing proof on [**20] record of continued malice, though none in fact may continue to exist."

In Saunders vs. Mills, 6 Bingham, the defendant was permitted to show under the general issue in mitigation of damages that he copied a statement, held not to be privileged, from another newspaper. See also 23 Minn. 178. In Blackburn vs. Blackburn, 3 C. & P. 495, a letter received by the defendant was admitted to show the *bona fides* with which he acted in writing a letter containing statements slanderous and actionable. In Galloway vs. Courtney, 10 Richardson, 414, it was held a defendant might show in mitigation of damages, that before the words were spoken what another had said, with reference to the same offence as committed by the plaintiff, had been communicated to him. The witness in this case said that soon after [*446] the alleged offence, which was the subject of the slander, was committed, he had talked with one Prothro about it. He would have testified what Prothro said, and that he, the witness, had communicated the same to the defendant. It was held that what a party cannot plead in justification he may give in evidence by way of mitigation, and that under [**21] the general issue he may prove facts and circumstances not amounting to actual proof, but going to create suspicion. 1 Nott & McC., 268. The evidence was held to be competent. In Williams vs. Miner, 18 Conn. 464, it was held that under the general issue without notice of special matter in defence or justification the defendant may prove, to repel the presumption of malice, or in mitigation of damages, facts and circumstances showing a reasonable ground of belief in the defendant of the truth of the words, but not amounting to proof of their actual truth. See also 1 Blackford, 369; 30 Mo. 502; 1 Kernan, 347; 9 Mich. 352; 1 Binney, 84-90; 2 Pick. 310; 27 Miss. 239; 1 Wend. 451; 5 M. & G. 366.

It is useless to deny that there is much authority to the contrary of the rule indicated by the preceding decisions, and holding that although circumstances tending to disprove, repel or lessen the degree of malice, and mitigate damages, may be introduced, yet that if the circumstances or proof be such as tend to prove the truth of the charge, or constitute a link in the chain [**22] of evidence of its truth, or tend to cast suspicion in the public mind of the defendants' guilt, that it is inadmissible. We not only think the other doctrine the better, and more just, and that the latter by its exception not only nearly emasculates itself, but moreover that its practical application is a matter of great difficulty without encroaching upon the very principle the exception embodies.

HN6 It is peculiarly the province of the jury to weigh and [*447] determine what effect is to be given to all such mitigating circumstances. The *quo animo* with which the words are spoken, or the written article published, should, in a case where no special damage is alleged and proven, regulate the amount of damages; but whatever is calculated to show that the defendant acted in good faith, and reasonable belief of the truth of the charge, and with good motives, should be permitted to go to the jury, who will give it the effect it should have. In Storey vs. Early, 86 Ill. 461, where the doctrine against admitting circumstances tending to prove the truth or cast suspicion is adopted, it was held that the defendant might, in mitigation of damages, show that he received [**23] *forged* letters, purporting to be written by respectable citizens, charging the plaintiff in substance, as did the libelous article, whereby the defendant was imposed on, and induced to publish the article. In Huson vs. Dale, the evidence which it was held should have been received, was in part verbal communications to the defendants by third persons. In Coleman vs. Smithwick, 9 Johns. 45, the objection was not to the verbal character of the communication made by Stanley to defendant, but to the manner of proving it, *i. e.,* by North, a bystander. It may be that verbal communications relied upon may, in some cases, be of less weight than written, but it seems to us that their source of character, and the reasonableness of the defendants' belief as indicated by any circumstances bearing upon the question, would control their weight with the jury. We think that Mr. Varnum and Mr. Thompson should have been permitted to answer the questions successfully objected to. What this information was, the ruling of the judge has prevented us from knowing. The mere fact that it may have tended to prove the truth is not ground of exclusion. Nor is the testimony of Varnum, one [**24] of the defendants, inadmissible as [*448] hearsay, on the ground asserted by Chancellor Kent, speaking for a majority of the court in Coleman vs. Southwick, 9 Johns. 45, for excluding North's testimony, and denied by Judges Spencer and Yates, in the, to my mind, conclusive reasoning of Judge Spencer. Mr. Greenleaf, in his work on Evidence, § 100, says it happens in many cases that the very fact in controversy is, whether the words of a third person, not under oath, were written or spoken, and not whether they were true, and in other cases, such language or statements, whether written or spoken, may be the natural or inseparable concomitants of the principal facts in controversy. In such cases, he says, it is obvious the words or writings are not within the meaning of hearsay, but are original and independent facts, admissible in proof of the issue, 10 Rich. 414; 1 Nott & McC., 268.

HN7 Evidence offered in mitigation under the general issue must be treated as a conclusive admission that the words or charge are not in fact true; but the defendant may show to the jury that he believed them to be true, and had reasonable grounds to do so. Had [**25] there been anything in the answers which the witnesses should have made justifying their exclusion, they could have been excluded; still the questions were proper. Information received from the office of the Internal Revenue of the General Government, though erroneous,

might very reasonably have caused one, though mistakenly, to believe that the libelous charge was true and if one, under such circumstances, impelled by a good motive, is not in *fact* that malicious slanderer which proof of the mere publication would of itself imply without showing such circumstances, he will, nevertheless, in *law* be such, unless he is permitted to show them. We think he should on every principle of right, be permitted to do so, and then the jury can give them their proper weight.

**[*449]**  5. It is claimed by the appellants that the publication is privileged. The Supreme Court of the United States, in White vs. Nichols, 3 Howard, 291, lays down the following conclusions: "1st. That every publication, either by writing, printing or pictures, which charges upon or imputes to any person that which renders him liable to punishment, or which is calculated to make him infamous or odious or ridiculous [**26]  is *prima facie* a libel, and implies malice in the author and publisher towards the person concerning whom the publication is made; and that proof of malice can never be required in such cases of the party complaining, beyond proof of the publication itself, but justification, excuse or extenuation must each be shown, if either can be, by the defendant. 2d. That the description of cases, recognized as privileged communications, must be understood as exceptions to the above rule, and as being founded upon some apparently recognized obligation or motive, legal, moral, or social, which may fairly be presumed to have led to the publication, and, therefore, *prima facie*, relieves it from that just implication from which the above general rule of law is deduced. The rule of evidence as to such excepted cases is accordingly changed so as to impose it on the plaintiff to remove those presumptions flowing from the seeming obligations and situation of the parties, and to require of him to bring home to the defendant the existence of malice as the true motive of his conduct." In these excepted cases, as we understand the law, the seeming obligations and relations of the parties standing [**27]  in them create of themselves in law a presumption that the defendant was not instigated by malice in making the publication, and this presumption must be overcame by the plaintiff. In such excepted or privileged cases malice may exist, but it is not *prima facie* presumed **[*450]** to exist; still it may be shown by the excess of the language used by the defendant, or by other attendant circumstances indicating malice, and overcoming the presumption naturally obtaining in such excepted cases. Atwell vs. McIntosh, 120 Mass. 183; Fryer vs. Kennersly, 15 C. B., (N. S.) 422; 5 E. & B. 528. Malice is implied from newspaper publications the same as from the publication otherwise of similar matter. 39 Mich. 376; 7 Cowen, 713; 42 N. H. 137, and *supra;* 87 Penn. St. 385; 47 Wis. 659.

We do not think the publication in question privileged though made by a newspaper and of a candidate for office.

Our Bill of Rights provides that "every citizen may freely speak and write his sentiments on all subjects, being responsible for the abuse of that right, and no law shall be passed to restrain or [**28]  abridge the liberty of speech or the press. In all criminal prosecutions or civil actions for libel the truth may be given in evidence to the jury, and if it should appear that the matter charged as libelous is true, but was published for good motives, the party shall be acquitted or exonerated."

HN8 The liberty of the press means simply that no previous license to publish shall be required, but not that the publisher of a newspaper shall be any less responsible than another person would be for publishing otherwise the same libelous matter. Davidson vs. Duncan, 7 E. & B. 229; Sheekell vs. Jackson, 10 Cush. 25; Sweeney vs. Baker, 13 W. Va. 182; 57 Wis. 570; 58 Maine, 295; 42 N. H. 137.

On the introduction of the printing press into England it was regarded as a State right, and subject to the coercion of the Crown; and was regulated by the King's proclamations, charters and licenses, and star chamber decrees; and it was licensed by the Long Parliament. Townshend on Libel and Slander, note 3. The press does not possess any **[*451]** immunities or privileges as to publishing libels which are not shared by [**29]  every individual. 9 Minn. 133. It has no privilege excusing it in printing libels of which any other publication would not be excused. 39 Mich. 376.

In King vs. Root, Savage, C. J., said: "It has been contended that indulgence should be shown to the defendants as conductors of the press, whose duty it is to communicate to their readers what passes in the Legislature; but that their relation to the public is one which takes the case out of the general rule and imposes proof of express malice on the plaintiff. Their right to publish the truth is not questioned, but it is denied that in the capacity of editors of a newspaper they have any rights than such as are common to all. HN9 The liberty of the press will not be invaded by requiring the conductors of our presses to stand responsible for the truth of what they publish." Nor, we will add, by requiring them to show the same "good motives" which the bill of rights requires of all. In Davidson vs. Duncan, 7 E. & B. 231, Lord Campbell said, "in what an unhappy situation the calumniated person would be if the calumny might be published, and yet he could not bring an action and challenge the publishers [**30]  to prove its truth."

HN10 A candidate for office, it is true, puts the character of his fitness, abilities and qualifications for the office, in issue. His conduct and acts, whatever they may be, may be freely commented on and boldly censured. The mere injustice of *criticism* made of his real acts or conduct, is no ground of recovery, whether such harsh *criticism* be made by a newspaper or by a voter, or other person having an interest in the election; no malice will be implied in such cases. But defamatory assaults on his private character, the publication of falsehood in imputing to him crime or moral delinquency, cannot be justified on the ground of criticism, nor claimed to be privileged, or to be presumed to have been **[*452]** made without malice, but with good motives. In King vs. Root, 7 Cow. 26, the Chief-Justice said: "I fully subscribe to the doctrine of Chief-Justice Parsons, (4 Mass. 169,) that when any man shall become a candidate for an elective office, he puts his character in issue with respect to his fitness and qualifications for the office; that publications of the truth on that subject are not libelous, and that the publication [**31]  of falsehood against public officers or candidates deserves punishment." In Lewis vs. Few, 5 John., Thompson, Justice, said: "It would, in my judgment, be a monstrous doctrine to establish that when a man becomes a candidate for an elective office, he thereby gives to others a right to accuse him of any imaginable crime with impunity. If a man has committed a crime any one has a right to charge him with it, and is not responsible for the accusation, and can any one wish for more latitude than this?" In Hamilton vs. Eno, 81 N.Y. 116, it is held that the official acts of a public functionary may be fully criticized and entire freedom of expression used in argument, sarcasm and ridicule upon the act itself, and that the occasion will excuse everything but actual malice and evil purpose in the critic; but the occasion will not of itself excuse an attack upon the character and motive of the officer; to excuse this the critic must show the truth of what he has uttered. To accuse one holding a public office of an offence is not privileged, and if the charge be false the utterer is liable, however good his motives, and this although the libel relate to an act of the officer [**32]  in discharge of his official duties. In Duncombe vs. Daniel, *supra*, (8 C. & P. 222,) the libel was published in a newspaper and reflected on the character of a candidate, and Chief-Justice Denman said that although the privileges of electors are large they will not justify the publication of every fact relating to

the private character of a candidate. In Sweeny vs. Baker, 13 W. Va. **[*453]** it was held that if a publication be made in a newspaper of a candidate for office with reference to his moral qualifications, which is libelous in its character, the party making such a publication may be held liable therefor, unless he proves the charge made to be true, and it will not in such case be sufficient to prove that the party publishing had good reason to believe and did believe it to be true. From the publication of such libelous charges the law implies malice as well as damages to the plaintiff, and the jury may, upon proof of the publication only, render a verdict for substantial damages.

In Duncombe vs. Daniel, it is held squarely that the fact that plaintiff was a candidate and the defendant a voter did not bring the case within the rules respecting privileged [**33] communications, (8 C. and P., 222,) and in Commonwealth vs. Clap, 4 Mass. 163, that publication of the *truth* concerning the character of a public elective officer, and relating to his qualifications for such office, with intent to inform the people, is not libel, and that the publication of *falsehood* and *calumny* against public officers and candidates is a very high offence; and in Curtis vs. Mussey, 6 Gray 261, that a discourse delivered pending the canvass for an election of a member of Congress upon the opinion and decision of a Commissioner of the United States Circuit Court, remanding a fugitive from service under the fugitive slave law, and containing passages accusing the Commissioner of "legal jesuitism," of prejudice and want of feeling, "of a partisan and ignoble act," and comparing him to Pilate and Judas, is not a privileged communication. In Enslow vs. Cramer, 57 Wis. 570, a newspaper article, stating among other things that it was charged against the plaintiff while holding the office of scaler of weights and measures he had made a practice of tampering with the weights of scales in order to swell the fees [**34] of the office, was held not to be privileged. **[*454]** In Rearick vs. Wilcox, 81 Ill. 77, it was held that the fact that the defendant, as the proprietor of a newspaper, in publishing a libelous article against the plaintiff, who was a candidate for office was actuated by what he believed to be for the public good, cannot be taken and considered in mitigation of damages. *HN11* An intention to serve the public good does not authorize a defamation of private character. "We are aware," says the court, "of no case which goes so far as to hold that private character of a person who is a candidate for office can be destroyed by the publication of a libelous article in a newspaper, notwithstanding the election may be attended with the excitement and feeling that not infrequently enters into our elections. * * The law required the appellee as the publisher of a journal to publish facts, and not libelous articles. The character and reputation of the appellant were as sacred, and as much entitled to protection, when a candidate for office as at any other time." In Aldrich vs. Press Printing Co., 9 Minn. 133, libelous matter published against a candidate for a public [**35] office is held not to be privileged communication. "We have never supposed that the freedom of speech in this country could be carried to such an extent, yet if such is the law as to an article published in a public journal, there can be no good reason why it does not extend to all channels of communication pending an election." Assuming that the case of Marks vs. Baker, 28 Minn. 162, is to be taken as in conflict with the preceding case we prefer the rule of Aldrich vs. Press Printing Company. In Marks vs. Baker, the libelous article was a discussion of two official reports, between which there was a discrepancy, the plaintiff having failed to charge himself with, but had in fact accounted for, certain moneys. We do not see that a charge of *embezzlement* was necessary or fair, though there was much to go in mitigation of damages. We consider **[*455]** the doctrine of Hamilton vs. Eno, 81 N.Y. 116, to be preferable, it too being the case of an official report. In Palmer vs. City of Concord, 48 N.H. 211, it was held that publications charging an army with cowardice, or with improper treatment of non-combatants, are *prima facie* libelous, [**36] and unless justified or excused are punishable by indictment; and that newspaper publications alleging maladministration of public affairs are not libelous by reason of any *prima facie* defamatory matter therein contained, if the publisher, believing upon reasonable grounds that the facts alleged were true, published them in good faith for the purpose of inducing a reform, but if his motive was not a justifiable one, the truth of the facts alleged would not constitute a defence to an indictment for libel. There was nothing in the allegations of *maladministration* which reflected on the private character or motives of the officers of the General Government. "If information given in good faith to a private individual of the misconduct of his servant is privileged, equally so must be a communication to the voters of a *nation* concerning the misconduct of those whom they are taxed to support, and whose continuance in any service virtually depends on the *national* voice. To be effectual, the latter communication must be made in such form as to reach the public." We see nothing in the matter of the criticism upon the national administration which is libelous, nor is there any [**37] showing of communication to any one not interested. There is nothing in Crane vs. Boston, 13 Reporter, 650, reflecting on the personal character of the plaintiff.

The canon that "a communication made *bona fide* upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged if made to a person *having a corresponding interest or duty*, although it contained criminating matter, which, **[*456]** without this privilege, would be slanderous and actionable," is invoked by appellants. Baron Parke, in Toogood vs. Spyring, 1 C.M.R. 193, said: *HN12* "In general an action lies for the malicious publication of statements which are false in fact, and injurious to the character of another (within the well-known limits as to verbal slander), and the law considers such publication as malicious unless it is fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned, In such cases the occasion prevents the inference of malice, which the law draws from unauthorized communications, and affords a qualified defence, [**38] depending upon the absence of actual malice. If *fairly* warranted by any reasonable occasion or exigency, and honestly made, such communications are protected for the common convenience and welfare of society; and the law has not restricted the right to make them within any named limits."

Admitting for the sake of argument that the above legal canon will cover the case of an elector or citizen of a municipality who makes solely to the other electors or citizens or inhabitants and persons happening to be in it at the time, a communication of the kind in question, though false, and places the burden upon the plaintiff to show malice, still this does not cover the case where it is of a candidate for office in such municipality, and is published in a newspaper having the circulation that the defendants' paper is shown to have had. The case of Toogood vs. Spyring teaches nothing if it does not establish this. There was no necessity for so publishing it. *HN13* The protection of the privilege may be lost by the manner of its exercise, though the belief in the truth of the charge exist. In Duncombe vs. Daniel, *supra*, it was claimed that the publication in the *Morning Post* [**39] was privileged on the ground **[*457]** that an elector is justified in apprising constituents of any circumstances affecting the character of a candidate, if he *bona fide* believes it to be true. Coleridge, J., said: "You must carry the argument further and show that he is at liberty to make the communication to all the world." The express admissions made upon the record as to the circulation of the defendants' newspaper are conclusive against any contention that the communication complained of was made solely to persons having a corresponding interest, or that they did not knowingly publish it to numbers having no interest in the matter, and this, too, without any necessity therefor. Admitting that the subject matter might have been privileged if made solely to fellow

electors of others in the municipality, the defendants are not relieved of the broadcast publication by the fact that they are publishers of a newspaper. In Padmore vs. Lawrence, 11 A. & E. 380, there is nothing inconsistent with the above. The defendant, in the presence of a third person, not an officer or a justice, charged plaintiff with having stolen his property, and afterwards repeated the charge [**40] to another person, also not an officer of justice, who was called in to search plaintiff with the consent of the latter, and it was held that the charge was privileged if defendant believed in its truth, acted *bona fide*, and did not make the charge before more persons or in stronger language than was *necessary*, and that it was a question for the jury and not the judge, whether the facts brought the case within the rule.

In Davidson vs. Duncan, 7 E. & B. 229, (A. D. 1857,) it is held that the *publication* of matter defamatory of an individual is not privileged because the libel is contained in a fair report in a newspaper of what passed at a public meeting, and it is said that a fair account of proceedings not *ex parte* in a court of justice is privileged, the reason being that the balance of public benefit from publicity is **[*458]** great, and the inconvenience arising from the chance of injury to private character being small as compared to the convenience of publicity, and the proceedings being under the control of the judges, "but it has never yet been contended that such a privilege extends to a report of what takes place at all public meetings. [**41] Even if confined to a report of what was *relevant* to the object of the meeting it would extend the privilege to an alarming extent. * * The Legislature may think fit to extend the privilege of publication beyond the limits to which it now goes. If it does it can impose such restrictions on the extension as it thinks fit. We, in a court of law, can only say how the law now stands; and according to that, it is clear the action lies and the plea is bad." Speaking of the privilege, as to judicial proceedings, Wightman, J., said, "*prima facie* it is actionable to publish a repetition of what is injurious to another, unless justified by truth, or by its being a fair report of what has been said in a public judicial proceeding, not *ex parte*, or it may be in Parliament." In Hearn vs. Stowell, 12 A. & E. 719, it was held that if the publication had been libelous it would not have been justifiable, on the ground that it was promulgated at public meeting called to petition Parliament against making a grant in support of a Roman Catholic College. In Smith vs. Higgins, 16 Gray 251, the communication was by a voter and taxpayer to a town meeting having power [**42] to decide on the application of the plaintiffs for a reimbursement; there was no newspaper publication. In Harrison vs. Bush, 5 E. & B. 344, (1855,) the communication praying for a removal from office was claimed not to be privileged because addressed to the Home Secretary, whereas properly it should have been addressed to the Keeper of the Great Seal. It was held that the above canon applies when the communication is made to a person not, in fact, having **[*459]** such interest or duty, but who might reasonably be, and is supposed by the party making such communication to have such interest or duty, and that though in this case it should have been addressed to the Keeper of the Great Seal, whose advice was generally acted upon in such cases, yet it might be considered as addressed to the Queen though the Home Secretary, who might himself have caused the inquiry to be made, have communicated with the Keeper, and in effect recommended the removal of the plaintiff. There was no newspaper publication. If we assume a case where the matter is privileged if made to the inhabitants of a municipality having a corresponding interest to that of the person communicating it, and [**43] then assume that said person is not the publisher of a newspaper, yet communicates it to a degree equivalent to the circulation of the defendants' newspaper, does not the privilege become entirely lost in the manner of its exercise?

HN14 Our conclusion is that the liberty of the press is no wise infringed upon by the rule that when newspapers publish charges imputing crime, or moral delinquency, to candidates for elective offices the publishers should previously see to their correctness. Moreover we do not recognize the moral obligation upon the publisher, whatever may be the candidate's want of mental or other qualifications for office, to publish contrary to the fact that he is under indictment for a felony or to otherwise assail his private character or impute moral delinquency to him. It is enough to permit him to show all circumstances indicative of a less degree of malice, and in mitigation of damages.

Considering all the testimony in this case, we are unable to say that a communication of qualified privilege throwing the burden on the plaintiff is shown; nor does the declaration upon its face make a case of such privilege. Enslow vs. Cramer, 47 Wis. 659.

**[*460]** [**44] 6. We do not mean by anything we have said, or the language of any authority we have quoted from, HN15 to gainsay the doctrine of Wilson vs. Marks, 18 Fla. 322, that "good motives" are essential to a *justification* for publishing libelous matter which is true.

7. We do not see that it was proper for the defendants, or either of them, to say whether or not they exercised any care in ascertaining the truthfulness of the charge, but we think evidence of acts and circumstances showing an honest purpose to arrive at the truth, followed by action on information which it was reasonable to believe, and was actually believed, would be admissible with such information in mitigation. It was for the jury, and not the defendants, to say whether the latter had any reason to believe the charge to be true, but defendants, after being permitted to show circumstances calculated to reasonably create a belief, should be allowed to state their belief. The result of the election, we think, was not a proper subject of testimony; it has no connection with defendants' motives, nor is any *special* damage alleged in the declaration.

8. What we have said is sufficient without going specially over [**45] each of the numerous exceptions. The verdict must be set aside, the judgment is reversed and the case remanded for such proceedings as may be proper.



About      Cookie Policy      RELX ™

Privacy Policy      Terms & Conditions      Copyright © 2023 LexisNexis.

Joopanenko v. Gavagan, 67 So. 2d 434 (Fla. 195

Search: Everything

Client: -None-

Folders   History   Help   More

**Document:**   Joopanenko v. Gavagan, 67 So. 2d 434   Actions

Go to   Page   Page #   Search Document

## Joopanenko v. Gavagan, 67 So. 2d 434

Copy Citation

Supreme Court of Florida, Division A

October 6, 1953

[NO DOCKET NUMBER]

**Reporter**
**67 So. 2d 434 \*** | 1953 Fla. LEXIS 1665 **\*\***

JOOPANENKO v. GAVAGAN

## Core Terms

slander, words, charges, contempt, amended complaint, loathsome, words spoken, crook

## Case Summary

**Procedural Posture**
Plaintiff apartment owner appealed a final judgment from the trial court (Florida), which granted defendant's motion to dismiss the complaint for slander that was based on defendant's statement that plaintiff was a Communist.

**Overview**
Plaintiff was the owner of a duplex apartment in Jacksonville Beach. At a public meeting in the city that was attended by approximately 1500 people, defendant stated that plaintiff was a Communist. In plaintiff's complaint for against defendant, he alleged that the words were false and defamatory, and were intended to injure his good name and reputation. The trial judge granted defendant's motion to dismiss because calling someone a Communist did not charge the person with having committed a crime. On appeal, the court found that it was unnecessary to determine whether it was a crime to be a Communist. The court reviewed the clear public policy of the state of Florida with respect to Communism. The court reasoned that to charge that a person was a member of the Communist party was equivalent to a charge that one was a traitor to his country. The court held that those words were slanderous per se and found it difficult to imagine words that were more slanderous. Thus, the court reversed the dismissal of the complaint and determined that it was sufficient to require an answer.

**Outcome**
Final judgment that granted defendant's motion to dismiss plaintiff apartment owner's complaint for slander was reversed. The court concluded that plaintiff's complaint, which alleged that defendant stated that plaintiff was a Communist, established slander per se and was sufficient to require an answer from defendant.

▼ LexisNexis® Headnotes

Torts > Intentional Torts ▼ > Defamation ▼ > 📄 Defamation Per Se ▼
View more legal topics

**HN1** Defamation, Defamation Per Se

Where a publication is false and not privileged, and is such that its natural and proximate consequence necessarily causes injury to a

person in his personal, social, official or business relations of life, wrong and injury are presumed or implied, and such publication is actionable per se. These words are applicable to a slander case.  🔍 *More like this Headnote*

*Shepardize® - Narrow by this Headnote (6)*

---

Civil Procedure > Remedies ▾ > Damages ▾ > Special Damages ▾
Evidence > Judicial Notice ▾ > Adjudicative Facts ▾ > Facts Generally Known ▾
Torts > Intentional Torts ▾ > Defamation ▾ > 📄 Defamation Per Se ▾

View more legal topics

**HN2** 👤  **Damages, Special Damages**

Words may be actionable in themselves or per se, or they may be actionable only on allegation and proof of special damage or per quod. The noxious quality in both lies in the fact that they are the natural and proximate cause of pecuniary damage to those concerning whom they are maliciously uttered. In the case of words actionable per se, their injurious character is a fact of common notoriety established by the general consent of men and the court consequently takes judicial notice of it. They necessarily import damage and, therefore, in such cases general damages need not be pleaded or proved but are conclusively presumed to result and special damages need not be shown to sustain the action. 🔍 *More like this Headnote*

*Shepardize® - Narrow by this Headnote (2)*

---

Criminal Law & Procedure > ... ▾ > Accusatory Instruments ▾ > Indictments ▾ > General Overview ▾
Torts > Intentional Torts ▾ > Defamation ▾ > 📄 Defamation Per Se ▾

View more legal topics

**HN3** 👤  **Accusatory Instruments, Indictments**

Words spoken which are false and not privileged may be slanderous per se without being used with such particularity that they would constitute a crime in an information or an indictment. To say of a person that he is a murderer, a rapist, a burglar or a thief would not meet the requirements of charging a crime in an information or an indictment, but they may be sufficient to be slanderous per se. 🔍 *More like this Headnote*

*Shepardize® - Narrow by this Headnote (0)*

---

Torts > Intentional Torts ▾ > Defamation ▾ > Slander ▾

**HN4** 👤  **Defamation, Slander**

In determining the basic question of whether certain language is defamatory, so as to give rise to an action for slander, the words used are not to be construed or taken in their mildest or most grievous sense, but in that sense in which they may be understood and in which they appear to be used and according to the ideas which they are adopted to convey to those who hear them or to whom they are addressed. The publication made should be construed as the common mind would understand it. 🔍 *More like this Headnote*

*Shepardize® - Narrow by this Headnote (1)*

---

Constitutional Law > Bill of Rights ▾ > Fundamental Freedoms ▾ > Freedom of Assembly ▾
Torts > Intentional Torts ▾ > Defamation ▾ > Slander ▾

View more legal topics

**HN5** 👤  **Fundamental Freedoms, Freedom of Assembly**

To charge that one is a member of the Communist Party which has as its object the overthrow of the Government of the United States and Florida by force or violence and the abolishment of free speech, free assembly and freedom of religion, which is the complete antithesis of the American constitutional form of government, and that the methods used by such Communist Party include treachery, deceit, infiltration into governmental and other institutions, espionage, sabotage, and terrorism, maliciously causes injury to the person spoken of in his social, official and business relations of life. Such words hold him up to scorn, contempt and ridicule, causing such person to be shunned by his neighbors, and in effect charges such person with being a traitor to his country and with being a member of an organization with a primary purpose of the destruction by force or violence of the very Government which protects him. 🔍 *More like this Headnote*

*Shepardize® - Narrow by this Headnote (4)*

---

Torts > Intentional Torts ▾ > Defamation ▾ > Slander ▾

**HN6** 👤  **Defamation, Slander**

Time, place, and circumstances are always important and should be considered in determining the effect and meaning of words spoken in a case for slander. 🔍 *More like this Headnote*

*Shepardize® - Narrow by this Headnote (0)*

---

**Counsel:**  [**1]  Gregory G. G. Joopanenko, in pro. per.

Neal D. Evans, Jr., Jacksonville, for appellee.

309

Judges: MATHEWS ▼, Justice, ROBERTS ▼, C.J., and TERRELL ▼ and SEBRING, JJ., concur.

Opinion by: MATHEWS ▼

## Opinion

[*434] MATHEWS ▼, Justice.

This is an appeal from a final judgment based on a motion to dismiss a complaint in an action for slander.

According to the allegations of the amended complaint, the plaintiff was a resident of Jacksonville Beach in Duval County, Florida, and was the owner and operator of a duplex apartment in that city. On the 24th of April, 1950 at the city hall of Jacksonville Beach a public meeting was held and there were approximately 1500 people present. The defendant (appellee) in the presence of all these people maliciously spoke of and concerning the plaintiff (appellant) the following false and defamatory words: "Don't let that man speak, I know him and he is a Communist." The amended complaint then charges that the words were meant and intended to be understood and were understood and that they were false and defamatory and spoken with the intent to injure and damage the plaintiff in his good name and reputation and by reason thereof he has been injured in his good name, [**2] reputation and business, has suffered great pain and mental anguish and has been held up to ridicule and contempt. The appellee filed a motion to dismiss which was granted by the trial Judge. In the order of dismissal it is stated:

"* * * Slander is distinguishable from libel, and in the view of this [*435] Court, before any words spoken of a man can be slanderous per se, as distinguished from per quod, they must impute, in general, (a) criminal offense, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics or a condition incompatible with the proper exercise of his lawful business, trade, profession or office. While there may be no doubt that under present conditions it would be libelous to charge a man with being a Communist, yet it also appears that to so charge him does not impute any of the matters set forth above. I find no law which indicates that calling a person a Communist charges such person as having committed a crime; in order to constitute a crime there must be a failure to register or some overt act to overthrow established government, or something done in addition. * * *"

A motion for rehearing [**3] was filed which was denied.

It should be noted that the Court below based its order upon the failure of the amended complaint to charge (a) a criminal offense, or (b) a present existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics or a condition incompatible with the proper exercise of his lawful business, trade, profession or office.

It is unnecessary to pass upon the question of whether or not the offense charged was a criminal offense, or that he has an existing or other loathsome communicable disease, but it certainly charges him with having a loathsome state of mind or loathsome ideas which are communicable. As a matter of fact he alleges in the amended complaint that the words spoken were intended to be understood and were understood and that they held appellant up to ridicule and contempt among his friends, customers and the public in general.

In the case of Sharp v. Bussey, 137 Fla. 96, 187 So. 779, 780, 121 A.L.R. 1148, the case of Briggs v. Brown, 55 Fla. 417, 46 So. 325, was cited with approval, and a portion of the opinion quoted as follows:

"HN1 ▲ 'Where a publication is false and not privileged, and is such that its natural [**4] and proximate consequence necessarily causes injury to a person in his personal, social, official or business relations of life, wrong and injury are presumed or implied, and such publication is actionable per se.'"

The case of Sharp v. Bussey, supra, was not a case for libel but was a case for slander and by quoting from the case of Briggs v. Brown, supra, this Court made applicable to a slander case the words hereinabove quoted. The Court then discussed in Sharp v. Bussey, supra, what was common and general knowledge and where the conduct which was such that it would cause a person to be held in contempt and despised by self-respecting citizens would constitute slander per se. The Court then said:

"It is our view that the language alleged to have been used by the defendant of and concerning the plaintiff, if false and not privileged, was such that its natural and proximate consequences necessarily caused injury to the plaintiff in his social, official and business relations of life. * * *"

The case of Sharp v. Bussey, supra, was not decided because the words spoken charged a crime or a loathsome disease, but because the language used was such that its natural and proximate [**5] consequences necessarily caused injury to the plaintiff in his social, official and business relations of life.

In the case of Le Moine v. Spicer, 146 Fla. 758, 1 So.2d 730, 733, the Court pointed out the difference between charging a person with the statutory crime of intoxication by the use of intoxicating liquor and such a charge without respect to the criminal feature, and then said:

"He or she who so indulges will become an object of contempt and an outcast [*436] from society and the world of business and worthwhile enterprise."

In the case of Commander v. Pedersen, 116 Fla. 148, 156 So. 337, 340, the defendant had called the plaintiff a "crook." There is no crime defined as a crook. This Court said:

"* * * The word 'crook' has come to have a very definite meaning amongst the people of all English speaking countries. To charge that one is a 'crook' is in effect to charge that such a one is unscrupulous, dishonest, and not worthy of confidence and, therefore, a person deliberately and outside of a privileged communication charges, either orally or in writing, that another is a 'crook,' such language is actionable per se, because such words come within the purview [**6] of the authorities hereinbefore cited. We have seen that in 17 R.C.L. 263 et seq., it is said, HN2 ▲ 'Words may be actionable in themselves or per so, or they may be actionable only on allegation and proof of special damage or per quod * * *. The noxious quality in both lies in the fact that they are the natural and proximate cause of pecuniary damage to those concerning whom they are maliciously uttered * * *. In the case of words actionable per se their injurious character is a fact of common notoriety established by the general consent of men and the court consequently takes judicial notice of it. They necessarily import damage and, therefore, in such cases

general damages need not be pleaded or proved but are conclusively presumed to result and special damages need not be shown to sustain the action.'"

HN3 Words spoken which are false and not privileged may be slanderous per se without being used with such particularity that they would constitute a crime in an information or an indictment. To say of a person that he is a murderer, a rapist, a burglar or a thief would not meet the requirements of charging a crime in an information or an indictment, but they may be sufficient to be [**7] slanderous per se.

In the case of Loeb v. Geronemus, Fla., 66 So.2d 241, 244, which was a case of slander and not of libel, the Court in an opinion by Mr. Justice Sebring held that the complaint was sufficient to withstand an attack by motion to dismiss and required an answer. In the course of the opinion it was stated:

"As appears from the other allegations of the complaint, however, the defendants at various times falsely stated, orally, that the plaintiff was not a Jew; that he was a disgrace to a Jewish organization; that his conduct was scandalous; that he was guilty of evil conduct, and that he was a man of low moral character. While it is true that these statements were apparently made at a meeting of the religious group involved, and hence may have enjoyed a measure of qualified privilege, the allegations of the complaint are further that after the meeting adjourned, one of the defendants, at the direction of the others, stated to the members of the press, for publication purposes, 'the accusations against the plaintiff were so bad they could not be repeated'; while still another defendant made the public statement, 'He is a bad actor * * * no respectable person will [**8] have anything to do with him * * * somebody told me he had to leave Chicago.'

* * *

"HN4 In determining the basic question of whether certain language is defamatory, so as to give rise to an action for slander, the words used 'are not to be construed or taken in their mildest or most grievous sense, but in that sense in which they may be understood and in which they appear to have been used and according to the ideas which they were adopted to convey to those who hear them or to whom they are addressed.' Budd v. J.Y. Gooch Co., 157 Fla. 716, 27 So.2d 72, 74. The publication [*437] made should be construed as the common mind would understand it. Cooper v. Miami Herald Pub. Co., 159 Fla. 296, 31 So.2d 382; Richard v. Gray, Fla., 62 So.2d 597; Sharp v. Bussey, 137 Fla. 96, 187 So. 779, 121 A.L.R. 1148."

Without deciding the question of whether or not the charge made constituted a crime, the public policy of this State with reference to Communism is clearly established by F.S. Chapter 876, F.S.A.

In the case of State v. Sullivan, Fla., 37 So.2d 907, 908, a rule nisi was issued in a contempt proceeding because the appellant had refused to answer certain questions propounded by [**9] the County Solicitor of Dade County. Among the questions propounded were the following:

"Are you a member of the Communist Party?

* * *

"Did you attend the meeting that was held at the Edwards Hotel, Miami Beach, on February 15, 1948, at 8 o'clock * * *?"

A motion was filed to discharge the rule on the ground of self-incrimination, which was denied. Appellant was then adjudged guilty of contempt and sentenced to jail. In a habeas corpus proceeding the prisoner was remanded and appeal was prosecuted from the order of remand. This Court said:

"The petition for the rule nisi shows that the county solicitor was investigating charges of criminal communism as defined by Sections 876.01 to 876.04 inclusive, Florida Statutes 1941, F.S.A., the gist of which condemns advocating, publishing, organizing or becoming a member of an association which teaches the overthrow of Government by force, assassination, sabotage or other forcible resistance of constituted authority or who permits any building, over which he had dominion or control to be used for that purpose."

After citing a number of cases the Court then said:

"So the real point here is whether or not the answers to [**10] the inquiries propounded to appellant tended directly or indirectly to incriminate her * * *."

The order remanding the prisoner was reversed.

F.S. Sections 876.05 through 876.10, F.S.A., were enacted in 1949 as Chapter 25046. If there was any doubt about the public policy of this State prior to that time, such doubt was removed by the legislative findings and determinations as set forth in Chapter 25046, some of which are:

"Whereas, there is a world movement under the domination of a foreign power which operates under the name of Communism, but having as its real objective the establishment of totalitarian dictatorship in all parts of the world under the domination and control of its central organization; and

"Whereas, such a dictatorship is characterized by the liquidation of all political parties other that the Communist Party, the abolishment of free speech, free assembly, and freedom of religion, and is the complete antithesis of the American constitutional form of government; and

"Whereas, the methods used by such a police state include treachery, deceit, infiltration into governmental and other institutions, espionage, sabotage, terrorism and other unlawful means; [**11] and

"Whereas, the World Communist movement is not a political movement, but is a world-wide conspiracy having sections in each country; and

* * *

"Whereas, it is the finding of the Legislature of the State of Florida that the Communist Party is in fact and in truth not a political party but is rather and instead a union and organization [*438] whose members are devoted adherents to the doctrine and belief in the overthrow of the government of the United States and of Florida by force or violence;

311

"Now Therefore, the better to protect its government, its citizens and its schools from the infiltration of these conspiratorial fanatics whose first allegiance this Legislature finds to be not to the good of this State but rather to its forceful destruction, * * *."

The Act requires all employees of the State of Florida or any of its departments and agencies, subdivisions, counties, cities, school boards and districts of the free public school system of the State or counties or the institutions of higher learning, and all candidates for public office to take an oath "that I am not a member of the Communist Party". *HN5*

To charge that one is a member of the Communist Party which [**12] has as its object the overthrow of the Government of the United States and Florida by force or violence and the abolishment of free speech, free assembly and freedom of religion, which is the complete antithesis of the American constitutional form of government, and that the methods used by such Communist Party include treachery, deceit, infiltration into governmental and other institutions, espionage, sabotage, and terrorism, necessarily causes injury to the person spoken of in his social, official and business relations of life. Such words hold him up to scorn, contempt and ridicule, causing such person to be shunned by his neighbors, and in effect charges such person with being a traitor to his country and with being a member of an organization with a primary purpose of the destruction by force or violence of the very Government which protects him.

The words spoken of the appellant are to be construed in the sense in which they may be understood and in which they appear to have been used and according to the ideas which they conveyed to those who hear them or to whom they are addressed. *HN6* Time, place and circumstances are always important and should be considered in determining [**13] the effect and meaning of words spoken in a case for slander.

It is difficult for us to conceive of any words or charge which would be more slanderous per se than the words used in this case, at the time and place and under the circumstances set forth in the complaint as amended. The amended complaint is sufficient to require an answer.

The order dismissing the amended complaint should, be, and is hereby, reversed, with directions to proceed further in accordance with this opinion.



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

Lawnwood Med. Ctr. Inc. v. Sadow, 43 So. 3d 710, 72

Search: Everything

Client: -None- ⌄    Folders    History    Help    More

Document:    Lawnwood Med. Ctr. Inc. v. Sadow, 43 So. 3d 710    | Actions ⌄

Go to ⌄    Page    Page #    Search Document

⚠️ **Lawnwood Med. Ctr. Inc. v. Sadow, 43 So. 3d 710**

Copy Citation

Court of Appeal of Florida, Fourth District

March 24, 2010, Decided

No. 4D08-1968

**Reporter**
43 So. 3d 710 * | 2010 Fla. App. LEXIS 3813 ** | 35 Fla. L. Weekly D 655

LAWNWOOD MEDICAL CENTER INC., Appellant, v. SAMUEL H. SADOW, M.D., Appellee.

**Subsequent History:** Review denied by Lawnwood Med. Ctr., Inc. v. Sadow, 36 So. 3d 84, 2010 Fla. LEXIS 673 (Fla., 2010)
US Supreme Court certiorari denied by Lawnwood Med. Ctr. v. Sadow, 2011 U.S. LEXIS 265 (U.S., Jan. 10, 2011)

**Prior History:** [**1] Appeal from the Circuit Court for the Nineteenth Judicial Circuit, St. Lucie County; James Midelis ⌄, Judge; L.T. Case No. 561999CA001429BC.
Wiggins v. Sadow, 925 So. 2d 1152, 2006 Fla. App. LEXIS 5987 (Fla. Dist. Ct. App. 4th Dist., 2006)

## Core Terms

punitive damages, slanders, medical staff, privileges, malicious, ratio, damages, surgery, staff, reprehensibility, surgeon, credentialing, compensatory damages, cases, patients, defamation per se, defamation, elected, malice, intentionally, recommendations, wrongdoing, presumed, carrier, misconduct, slander per se, proportionality, cardiovascular, reputation, Bylaws

---

## Case Summary

**Procedural Posture**
Appellant hospital sought review of a judgment from the Circuit Court for the Nineteenth Judicial Circuit, St. Lucie County (Florida), which found the hospital liable on appellee surgeon's breach of contract claim, found the hospital liable in a slander per se claim, and found that the surgeon was entitled to punitive damages.

**Overview**
With regard to the breach of contract claim, the hospital asserted immunity from liability to the surgeon under § 395.0191(7), Fla. Stat. (2009). Otherwise, the hospital only sought review of the amount of punitive damages claiming that the amount was excessive. On appeal, the court found that the breach of contract claim was not barred by the statutory immunity provision as the surgeon did not allege or rely on any violation of the statute bur rather alleged and proved that, contrary to its own bylaws, the hospital invalidly granted an outside surgeon exclusive cardiovascular surgery privileges and used it to stop the surgeon from performing cardiovascular surgeries. In addition, the court determined that a reasonable jury could conclude that repeatedly defaming the skill and proficiency of a practicing surgeon was likely to have significant and long-lasting public and professional consequences. Finally, not only did the extraordinary wrongdoing justify the extraordinary civil punishment without limiting ratios, but the jury's verdict was not disproportionate under federal law and allowed under § 768.73, Fla. Stat. (2009).

**Outcome**
The court affirmed the trial court's judgment.

---

▼ LexisNexis® Headnotes

313

Governments > Legislation > Interpretation ▾

**HN1**⬇ **Legislation, Interpretation**

A statute must be construed as written. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Healthcare Law > Healthcare Litigation ▾ > Actions Against Healthcare Workers ▾ > General Overview ▾
View more legal topics

**HN2**⬇ **Healthcare Litigation, Actions Against Healthcare Workers**

See § 395.0191(7), Fla. Stat. (2009). 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Governments > Legislation > Interpretation ▾

**HN3**⬇ **Legislation, Interpretation**

The first principle of statutory interpretation that the meaning of statutes is derived primarily from the text employed by the Legislature. If the Legislature's words are not ambiguous, a reviewing court accords them their plain meaning. All parts of a statute should be given effect if possible, for the Legislature is presumed not to have enacted statutory terms having no purpose. Thus the reviewing court strives to avoid reading statutes so that part of its terms have no effect. The reviewing court is precluded from construing an unambiguous statute in a way which would extend, modify, or limit, its express terms or its reasonable and obvious implications. To do so would be an abrogation of legislative power. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Healthcare Law > Business Administration & Organization ▾ > Hospital Privileges ▾ > General Overview ▾
View more legal topics

**HN4**⬇ **Business Administration & Organization, Hospital Privileges**

The provisions of § 395.0191, Fla. Stat. (2009) lay down general rules for hospitals in setting up procedures and standards for staff membership and clinical privileges. The immunity of § 395.0191(7) is not a broad, general grant immunizing every kind of hospital liability after granting clinical privileges. The plain text confines its immunity only to actions arising out of or related to carrying out the provisions of this section. It is thus a specific, targeted, grant of partial immunity extending only to its credentialing decisions. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Civil Procedure > Remedies ▾ > Damages ▾ > 📙 Punitive Damages ▾

**HN5**⬇ **Damages, Punitive Damages**

Differing standards of review, one under state law and another under federal law, may apply to punitive damages in Florida. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Remedies ▾ > Damages ▾ > 📙 Punitive Damages ▾

**HN6**⬇ **Damages, Punitive Damages**

In the federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. Only when an award can fairly be categorized as grossly excessive in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Remedies ▾ > Damages ▾ > 📙 Punitive Damages ▾

**HN7**⬇ **Damages, Punitive Damages**

The precise award in any case must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff. States may vary the level of punitive damages in disparate classes of cases to reflect different policies. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Remedies ▾ > Damages ▾ > 📙 Punitive Damages ▾

**HN8**⬇ **Damages, Punitive Damages**

Because no two cases are truly identical, meaningful comparisons of jury awards of punitive damages are difficult to make. 🔍 More like this Headnote

314

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Remedies ⌄ > Damages ⌄ > 📄 Punitive Damages ⌄

**HN9**⬇️  **Damages, Punitive Damages**

State law and policy play a critical role in review of punitive damages. Florida has codified specific policies for punitive damages in civil litigation. By statute the general Florida rule provides that an award of punitive damages may not exceed the greater of three times the amount of compensatory damages or the sum of $ 500,000. § 768.73, Fla. Stat. (2009). But in a significant exception to this limiting ratio, the statute specifies that where the fact finder determines that at the time of injury the defendant had a specific intent to harm the claimant and determines that the defendant's conduct did in fact harm the claimant, there shall be no cap on punitive damages. Plainly this Florida statute eliminates mathematical proportionality with compensatory damages as a matter of state law and policy in cases of intentionally malicious harmful misconduct. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*

Civil Procedure > Remedies ⌄ > Damages ⌄ > 📄 Punitive Damages ⌄
Torts > ... > Punitive Damages ⌄ > Measurement of Damages ⌄ > Constitutional Requirements ⌄
View more legal topics

**HN10**⬇️  **Damages, Punitive Damages**

Florida's statutory law, § 768.73, Fla. Stat. (2009), removing a ceiling on punitive damages for intentionally malicious harm suggests that any proportional ratio analysis required in negligence or business practices cases with only modest monetary or financial loss, would be incongruent when the claim involves the intentional infliction of malicious harm to an individual. Under Florida law applying to intentionally malicious harm, punitive damages is tied to unusually reprehensible misconduct, rather than some ratio relating to compensable losses. This statute gives all who would consider such misconduct clear warning that for intentional and malicious harm they can lawfully be punished to the extent of their personal ability to pay. The statute's provision allowing punitive damages without proportionality for intentional, malicious harm satisfies the concern for fair notice. The Due Process Clause is thus satisfied by this statute. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

Civil Procedure > Remedies ⌄ > Damages ⌄ > 📄 Punitive Damages ⌄
Torts > ... > Punitive Damages ⌄ > Measurement of Damages ⌄ > Determinative Factors ⌄

**HN11**⬇️  **Damages, Punitive Damages**

When punitive damages are substantial the first issue is the enormity factor: whether the misconduct involves a high degree of culpability and blameworthiness. State courts are to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Remedies ⌄ > Damages ⌄ > 📄 Punitive Damages ⌄
Torts > ... > Punitive Damages ⌄ > Measurement of Damages ⌄ > Determinative Factors ⌄

**HN12**⬇️  **Damages, Punitive Damages**

Although much civil litigation involves misconduct, the reprehensibility required for harsh punitive damages entails a high degree of culpability. To meet the reprehensibility required for high punitive damages, the misconduct should be intentional, perhaps be gravely deplorable, deserving of severe condemnation, even threatening basic interests of an individual beyond purely economic loss. Conduct deserving the harshest punitive damages would be odious. It would pass moral bounds, be wicked or outrageous, and constitute a grave offense against right or decency. The disapproval expressed by state law should be avowedly strong and severe. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Torts > Intentional Torts ⌄ > Defamation ⌄ > 📄 Defamation Per Se ⌄

**HN13**⬇️  **Defamation, Defamation Per Se**

Florida's concern for individual reputation is reflected in art. I, § 4, Fla. Const. Florida has thus singled out defamation per se for special rules in civil tort litigation. Statements defamatory per se are presumed harmful as a matter of law. With defamation per se the law presumes malice in their utterance making it unnecessary to prove express malice. The law's condemnation of defamation per se has been affirmed from earliest times, explaining that the injurious character of defamation per se is a fact of such common notoriety established by the general consent of men, that the courts must of necessity take judicial notice of its harmful effect. Malice becomes therefore the gist of every actionable libel. Without malice, either express or implied by law, no tort could result from the publication of a defamatory statement concerning another, however untrue it might be. But the law always conclusively implied malice and damage when false and defamatory statements were deliberately published without excuse. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (6)*

Torts > ... > Defamation ⌄ > Remedies ⌄ > Damages ⌄
View more legal topics

*HN14* Remedies, Damages

General damages are conclusively presumed to result from defamation per se and special damages need not be shown to sustain the action. General damages for defamation per se are those which the law presumes must naturally, proximately, and necessarily result from the publication of the libelous matter. They arise by inference of law, and are not required to be proved by evidence. Damages are presumed to result from defamation per se and need not be proved. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Torts > ... > Types of Damages ▼ > Punitive Damages ▼ > Aggravating Circumstances ▼
View more legal topics

### HN15⬇ Punitive Damages, Aggravating Circumstances

Punitive damages may be the primary relief in a cause of action for defamation per se. Malice is an intrinsic part of actions for defamation per se in order that the jury may consider punitive damages. The express malice for punitive damages under Florida law is present where the evidence shows that an intention to injure the plaintiff was the primary motive for statements defamatory per se. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (14)*

---

Torts > ... > Types of Damages ▼ > Punitive Damages ▼ > Aggravating Circumstances ▼
View more legal topics

### HN16⬇ Punitive Damages, Aggravating Circumstances

Liability alone for intentionally malicious defamation per se will support substantial punishment in punitive damages. This unique aspect sets defamation per se apart from a comparable intentional tort, one that rightly could be considered its twin. Both fraud in the inducement and defamation per se depend on intentionally false statements meant to deceive and harm. But the critical distinction between them is that defamation harms persons and reputation, while fraud affects property rights and results only in financial loss. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

---

Torts > ... > Types of Damages ▼ > Punitive Damages ▼ > Aggravating Circumstances ▼
View more legal topics

### HN17⬇ Punitive Damages, Aggravating Circumstances

Actual damages and the measure thereof are essential as a matter of law in establishing a claim of fraud. Damage is of the very essence of an action for fraud or deceit. Without proof of actual damage the fraud is not actionable. Thus, to prevail in an action for fraud, a plaintiff must prove its actual loss or injury from acting in reliance on the false representation. A nominal damage award is not enough to justify a punitive damage award in a fraud case. Punitive damages for fraud cannot be based on nominal damages alone. In short, a claim for punitive damages from fraud in the inducement fails if no amount of compensatory loss resulting from the fraud was actually proved. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

---

Torts > ... > Types of Damages ▼ > Punitive Damages ▼ > Aggravating Circumstances ▼
View more legal topics

### HN18⬇ Punitive Damages, Aggravating Circumstances

When the claim is defamation per se, liability itself creates a conclusive legal presumption of loss or damage and is alone sufficient for the jury to consider punitive damages. Therefore a finding of liability for slander per se, coupled with an express finding that the slander was intended to injure plaintiff and did in fact cause injury, authorizes the jury to consider and assess punitive damages without any finding of an amount of compensatory damages. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (13)*  ⚠ 1

---

Torts > Intentional Torts ▼ > Defamation ▼ > 📄 Defamation Per Se ▼

### HN19⬇ Defamation, Defamation Per Se

The personal interest in one's own good name and reputation surpasses economics, business practices or money. It is a fundamental part of personhood, of individual standing and one's sense of worth. For slander per se, reprehensibility is at its highest. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > Remedies ▼ > Damages ▼ > 📄 Punitive Damages ▼

### HN20⬇ Damages, Punitive Damages

Extraordinary wrongdoing justifies extraordinary civil punishment without limiting ratios. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

316

Civil Procedure > Remedies > ... > Damages > ... > Punitive Damages

Torts > ... > Defamation > Remedies > Damages

View more legal topics

**HN21** **Damages, Punitive Damages**

The reprehensibility of the wrongdoing, not the amount of actual harm or loss, is equivalent to the punishment. When a claim involves harm resulting from the intentionally malicious destruction of reputation, reprehensibility is not a function of any dollar loss involved.

More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > ... > Defamation > Remedies > Damages

View more legal topics

**HN22** **Remedies, Damages**

General damages are conclusively presumed to result in cases of defamation per se. If the jury finds defendant liable for slander per se, it must be instructed that nominal damages are deemed established as a matter of law. It is error to instruct instead that nominal damages may be awarded if you wish to do so. More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

**Counsel:** Arthur J. England Jr., Edward G. Guedes and Kerri L. McNulty of Greenberg Traurig, P.A. , Miami, and William A. Kebler of Banker Lopez Gassler, P.A. , St. Petersburg, for appellant.

Major B. Harding , John Beranek and Ruth E. Vafek of Ausley & McMullen , Tallahassee, and Richard H. Levenstein of Kramer Sewell Sopko & Levenstein, Stuart, for appellee.

**Judges:** FARMER , J. CIKLIN , J. and LEBAN , J., MARK KING, Associate Judge, concur.

**Opinion by:** FARMER

## Opinion

**[\*712]** FARMER , J.

A surgeon with staff privileges sued a hospital for breach of contract, and later added a claim for slander per se, seeking compensatory damages for both claims, as well as punitive damages for the slander. He alleged that the hospital had breached its contract with its medical staff, the Medical Staff Bylaws, by invalidly giving another surgeon exclusive privileges for cardiovascular surgery. The excusive grant barred him from such surgery even though he had been approved for it by the hospital's credentialing committee and medical staff leadership. The slander claim involved statements during the litigation by senior executive [\*\*2] officers of the hospital that, among others, the doctor was not even "qualified to perform surgery on a dog."

The jury found the hospital liable on the breach of contract claim and fixed his total damages at $ 2,817,000, reduced to $ 1,517,000 because he could have mitigated his losses. In separate proceedings on the slander per se claim, the jury found Lawnwood liable for the slanders; that Lawnwood specifically intended to harm him by its per se slanderous statements; that, in fact, it had actually injured him by the statements; and that he suffered no compensatory damages from the slanders but that he was entitled to punitive damages of $ 5 million from the hospital. After extensive hearings, the trial court denied Lawnwood's post trial motions for directed verdict and a new trial or a remittitur of punitive damages to a reduced sum.

In the appeal of the contract claim, Lawnwood repeats its trial court argument of statutory immunity from liability to the surgeon. As to the claim of slander per se, Lawnwood presents no appellate issues regarding liability or entitlement to punitive damages. Instead it appeals solely the amount of punitive damages, confining its argument to the contention [\*\*3] that $ 5,000,000 is excessive under the United States Constitution. Before addressing these two issues, we must first examine the evidence supporting the verdicts. **1**

---

*A. Facts*

*1. The Background to Breach of Contract*

Dr. Sadow is a graduate of the University of Chicago Medical School. His residency was in general thoracic and cardiac surgery at the Chicago Heart and Lung Institute. That was followed by a 2-year fellowship in cardiovascular and thoracic surgery at Wayne State University in Detroit. He is board certified in cardiovascular, thoracic and vascular surgery.

He settled in south Florida in 1985, beginning his practice on the staffs at hospitals located in Palm Beach Gardens and Jupiter. Patients are typically referred to [\*\*4] surgeons in his specialty by cardiologists and primary care physicians. Although he began doing both general thoracic and cardiac surgery, in time he concentrated on cardiovascular surgery (CVS). **2**

**[\*713]** He entered into a partnership with a Dr. Downing. Over the years, he perceived that 60-70% of his patients came by referrals from physicians in Martin and St. Lucie counties. He thereupon opened offices in Fort Pierce and Tequesta to handle what was becoming the principal part of his practice. He also observed that a significant number of his patients were indigent, some with only Medicaid benefits.

Lawnwood is a profit seeking corporation. It is owned by Hospital Corporation of America, now known as HCA, based in Tennessee, whose stock

is held by investors. The corporation's senior executive staff -- Chief Executive Officer (CEO) and Chief Financial Officer (CFO) -- are not elected by the medical staff but are instead appointed by corporate directors. [**5] During the time of the events involved in this lawsuit, none of these senior executives were themselves physicians.

Lawnwood is the principal hospital in St. Lucie County. Martin Memorial Hospital is the principal hospital in Martin County, located in Stuart, just south of Fort Pierce (St. Lucie County). At that time, neither Lawnwood nor Martin Memorial were authorized to offer cardiovascular surgery. Hence cardiac surgical patients in these two counties were referred by their cardiologists and primary care physicians to surgeons in Palm Beach County for the surgical procedure. In the late 1980's Dr. Sadow began seeing increasing numbers of such referrals. He undertook frequent trips to Lawnwood to examine patients and assist referring physicians in assessing their surgical needs.

In 1993 Lawnwood itself decided to seek state governmental agency approval for authority to offer CVS surgery. The hospital prepared an application to the Florida Agency for Health Care Administration for a Certificate of Need (CON) to perform CVS.

Lawnwood's application was opposed by a number of hospitals in the south Florida region, including Martin Memorial, JFK in Lake Worth, St. Mary's and Good Samaritan [**6] in West Palm Beach, Palm Beach Gardens Hospital, and a Boynton Beach hospital. The CEO of Lawnwood, Trezona, approached Dr. Sadow to assist the institution in the effort to obtain the CON for cardiovascular surgery. At Trezona's request, Dr. Sadow worked closely with him in preparing the application to the state agency, supplying relevant information and strategy for making the application meritorious.

In its application, Lawnwood explicitly relied on Dr. Sadow's credentials and experience as a board certified cardiovascular surgeon and his written commitment to practice CVS at Lawnwood when the planned new facility for that purpose finally opened. Accordingly Dr. Sadow planned relocating his practice to the area of Lawnwood, meanwhile ending his partnership with Dr. Downing by mutual agreement.

He [**7] wrote letters on Lawnwood's behalf. He traveled to testify in favor of the CON application. He spoke to various people and groups to generate support for the CON's approval. He called attention to the fact that a significant number of CVS patients in the Lawnwood service area were indigent, and thereby secured the support of other groups serving the indigent population to favor the application.

Dr. Sadow gave his support for the CON without asking for any commitment that he be given exclusive staff privileges to perform CVS if the CON was approved. And during all of his efforts on Lawnwood's behalf, it is clear that Lawnwood did nothing to suggest that Dr. Sadow would be barred from any CVS privileges. To the contrary, in every way Lawnwood [*714] fostered the expectation that Dr. Sadow would become a member of the Lawnwood staff for CVS when it became available.

The process for approval took nearly three years. It was not until midyear 1996 that Lawnwood's CON was finally approved. At about the same time, the corporate owners of Lawnwood changed CEOs, appointing Cantrell as the new chief administrator. With the approval in hand, Lawnwood and its new CEO began work on designing and constructing [**8] new facilities for CVS, which would not be completed until 1999.

Several years before this approval, Lawnwood had adopted a set of rules of governance for its Medical Staff, as required by law. 3⬇ Under these Medical Staff Bylaws, staff physicians had the right to elect, retain, and remove medical staff officers, the members of the Medical Executive Committee (MEC), and the various department chairs and vice chairs. These rules specified that the medical staff would recommend which doctors should be allowed to practice in which medical areas. They also provided that exclusive privileges would be limited to only four specified areas. Cardiovascular surgery was not a specialty designated for exclusive privileges.

The Bylaws provided for a Credentialing Committee to recommend initial grants of staff privileges, and a Re-credentialing Committee to recommend renewals of privileges previously granted. The medical staff elects members of these committees in annual elections. The committees make the initial [**9] decisions on all applications for first-time grants of privileges and renewals, and then forward their recommendations to the MEC. 4⬇

The corporate entity operating Lawnwood is directly governed by a Board of Trustees with its own separate bylaws. The Medical Staff Bylaws specified that the Board of Trustees of the corporate entity owning the Hospital could not "unreasonably withhold" approval of final credentialing recommendations of the MEC. In short, the Board of Trustees agreed that it would approve recommendations by the MEC as to privileges unless it could state a reason with just cause.

The trial evidence as to Dr. Sadow's competence as a surgeon was substantial and unchallenged. From the late 1980s through 1999, Dr. Sadow had been doing an average of about 150 surgeries per year at Palm Beach Gardens and Jupiter Hospitals, the majority of which were high risk, open heart procedures. He demonstrated [**10] a constant mortality rate in the area of 3-4%, which is low for these high risk procedures. Moreover the evidence was that he had been sued only once for medical malpractice, and that suit had resulted in a verdict in his favor (which this court declined to disturb on appeal). 5⬇

[*715] In April 1997 Dr. Sadow filed a formal application for non-exclusive surgical privileges in general thoracic surgery and CVS. There was never any question of his competence, qualifications or experience to perform CVS. His was the only pending application [**11] for CVS privileges. Cantrell assured him that his application would be formally approved by the corporation. The Credentialing Committee and the MEC approved his application. In January 1998 Lawnwood formally accepted the recommendations and approved his application, but for general thoracic surgery only. Lawnwood refused to consider his application for CVS, stating only that the new facility was as yet undeveloped.

Actually Cantrell and the corporate owners of Lawnwood had privately decided by then that CVS would be given only under an exclusive grant to a single surgeon or group. They had also privately decided that Dr. Sadow would not be considered for CVS and would be limited solely to general thoracic surgery, in spite of the fact that CVS was his area of practice. In fact, Lawnwood decided that Dr. Sadow's former partner, Dr. Downing, would be its only candidate for the CVS exclusive privilege. 6⬇

Dr. Sadow nevertheless filed new applications for nonexclusive CVS privileges in March and April 1998. In June 1998 Cantrell acknowledged to Dr. [**12] Sadow that the Board of Trustees wanted CVS privileges to be given exclusively to a single provider. Dr. Sadow tried to dissuade Lawnwood from such exclusivity. He argued that it would be bad for patient care; that patients and their cardiologists need readily available sources in the area for second opinions as to open heart surgery and its alternatives; that competition between surgeons doing CVS benefits the community and patients; and that in any case an exclusive grant to a group normally rejecting Medicaid patients would be against the specific needs of the Lawnwood indigent community -- a subject that had figured prominently in their CON application.

In early 1999 Lawnwood received a certificate of occupancy for its new cardiac surgical facility. Once again Dr. Sadow applied for CVS privileges. Once again the MEC approved his application. Once again the Board of Trustees denied it. Significantly, Lawnwood stipulated at trial that its denial of CVS privileges was not based on his competency or qualifications as a surgeon. After a protracted dispute with its medical staff over the issue, Lawnwood ultimately contracted with Dr. Downing exclusively to perform CVS at Lawnwood and [**13] refused to allow Dr. Sadow to perform CVS.

*2. The Defamation*

By August 1998 when Pentz became the next CEO of Lawnwood, relations between the Board of Trustees and the Medical Staff had become tense as a result of the decision of the Board of Trustees to override medical staff recommendations as to credentialing, specifically including CVS. Learning of the intent to award CVS privileges exclusively to the single surgeon/group, the MEC created a special committee to determine whether CVS privileges should be added to the Lawnwood list of exclusive privileges. In July **[*716]** 1998 the MEC decided that CVS should be open to all qualified staff surgeons at Lawnwood and not limited to a single provider. Dr. Sadow promptly filed another application for CVS.

In refusing to consider Dr. Sadow's pending requests for CVS privileges, the Board of Trustees adopted a resolution barring further applications from its current staff, an action pointedly directed at Dr. Sadow. Pentz wrote the Staff Committees and MEC that the search for candidates for CVS privileges was now closed, while simultaneously telling Dr. Downing to file his application with the Credentials Committee. Pentz "tabled" Dr. Sadow's. In fact [**14] the burial of his application for CVS lasted for several years, long after the new cardiac surgical facility opened.

In late 1998 the MEC met once again to consider the CVS issue. Pentz attended the meeting and sought to force the MEC to reject Dr. Sadow's application in accordance with the resolution of the Board of Trustees. The Chair of the MEC repeatedly ruled Pentz out of order, that Pentz was attempting to interfere on a matter of medical qualifications. Pentz heatedly retorted that the Chair was obstructing the CEO. The MEC again recommended that Dr. Sadow be approved for CVS privileges.

Shortly thereafter, the Board of Trustees wrote the MEC and the two credentialing committees that it had granted Pentz the sole authority to contract for exclusive CVS privileges and to negotiate with Dr. Downing for that purpose. It added that the moratorium on CVS privileges had been modified to that extent only and the committees should begin to review and recommend Dr. Downing and his group. Meanwhile the Board of Trustees requested its corporate parent to investigate the physicians in charge of the credentialing committees at Lawnwood, and especially the Chair of the MEC, to determine whether [**15] they had violated their "fiduciary duty" to the stockholders of Lawnwood.

As provided in the Medical Staff Bylaws, in March 1999 the medical staff held its regular annual elections for staff officers, who *ex officio* determine the compositions of the credentialing committees and the MEC. The Chair of the MEC now became elected President of the medical staff. The Board of Trustees of Lawnwood responded to the election by passing an emergency resolution removing all these newly elected officers, department chairs and members of the credentialing committees. In their place the Board of Trustees appointed its own choices for all these medical staff positions to govern the medical staff until the next regularly scheduled election. The Board of Trustees justified its unprecedented action by asserting that a "crisis" existed, caused by an alleged failure of the medical staff to engage in "good faith peer review," a failure to apply credentialing standards properly, a failure to comply with applicable federal and state law, and failure to comply with the standards required by accrediting entities.

In response, the recently elected medical staff officers filed an action in the circuit court for [**16] an injunction against the corporate action. They sought an order requiring the Board of Trustees to rescind its action and to reinstate the elected officers. They specifically requested that the injunction require the Board of Trustees to refrain from taking any action restricting, reducing, or impeding the full exercise of authority possessed by the Elected MEC under the provisions of the Medical Staff Bylaws, from exercising or attempting to exercise any powers or authority as Medical Staff Officers or members of the MEC; and for the corporate appointees to relinquish **[*717]** their respective offices to the Elected Officers and the Elected MEC.

The circuit court held an evidentiary hearing on the injunction and essentially granted all of the relief sought. [7⬇] This court affirmed the injunction, subject to a new hearing on the amount of the bond. [8⬇] While that injunction was on appeal, Dr. Sadow filed the present action, initially claiming only breach of contract.

As a result of the refusal of the Medical Staff to submit to corporate control [**17] of credentialing decisions at the hospital, Lawnwood convinced the Florida Legislature to enact the "Hospital Governance Law" applying only to hospitals in St. Lucie County. In disregard of the contract with the medical staff that had by then been in force for several years, the statute gave the Board of Trustees of Lawnwood full authority to override credentialing decisions. The Medical Staff officers sued for a declaratory judgment that the statute unconstitutionally impaired the contract between the Medical Staff and the corporation. The trial judge agreed with the medical staff and was affirmed on appeal. *See Lawnwood Med. Ctr. Inc. v. Seeger, 959 So.2d 1222 (Fla. 1st DCA 2007).* Lawnwood persisted in trying to salvage its legislative victory, but the Florida Supreme Court found the statute unconstitutional. *See Lawnwood Med. Ctr. Inc. v. Seeger, 990 So.2d 503 (Fla. 2008).*

While Dr. Sadow's lawsuit was pending, in November 2001 Lawnwood hired Dr. Pinon as a new emergency room physician to staff Lawnwood's Walk-In Clinic in Fort Pierce, several blocks from the hospital. A few weeks after he arrived, Lawnwood arranged for an "open house" reception at the Clinic to introduce Dr. Pinon [**18] and its remodeled Walk-In Clinic facilities to the community. The occasion was held in the early evening hours after work. Just a day or two before the open house, however, another new CFO of Lawnwood, Dunwoody, then made these statements to Dr. Pinon: that Dr. Sadow was a bad doctor, that he had been suing the hospital, that he was not a good person, and that he was not someone to whom he should refer patients.

At the open house, there were "a lot of people" at the Clinic for the occasion. Some were patients, some were referring physicians, and there were others. It was on this occasion that Dr. Pinon met Dr. Sadow for the first time. He had stepped into Pinon's office at the Walk-In Clinic during the reception, accompanied by other physicians to introduce himself. At that point, Pentz and Dunwoody (CEO and CFO) also approached Dr. Pinon in the same area. Dr. Sadow left, crossing paths with the two corporate officers.

Now inside the office -- having just encountered Dr. Sadow leaving the area -- Dunwoody stated to Dr. Pinon: "this is part of the problem that we've discussed to [sic] you about … Dr. Sadow and doctors in the community." [9⬇] Pinon responded that he was new to the area and [**19] didn't know the doctors in the community. Pentz and Dunwoody then referred to a book containing a list of all the doctors in the community and their photographs, saying it would reveal the "problem doctors".

A day or two later, Dunwoody, a Mr. Loveless, and the office manager Ms. Robertson **[*718]** met with Dr. Pinon in his office. Dunwoody

proceeded to show him a book of staff physicians at Lawnwood. He placed a dot next to the entry for "certain colleagues you should not refer patients to," one of whom he specifically recognized from the open house as Dr. Sadow. Dr. Pinon responded that Dr. Sadow seemed to him "like a really nice guy" and asked Dunwoody what the problem was with him. Dunwoody responded that it was a long story but then made these statements:

" 'Dr. Sadow was in partner[ship] with another doctor who we gave an exclusive contract to for open heart surgery. There was some disagreement between Dr. Sadow and his partner. He didn't get the contract. And now he is suing us. *And he is* [**20] *not a good doctor. He has had multiple lawsuits filed against him. He is a bad person. And quite frankly, Dr. Pinon, I would not send my dog to him for surgery. And you, being from the military, and if you care about your patients, you would do the same,*' quote unquote." [e.s.]

Dr. Pinon confirmed that Dunwoody's statements were in the presence of Loveless and Robertson. Dr. Pinon also made clear that he understood Dunwoody to be speaking on behalf of the Lawnwood corporation.

Dr. Pinon testified, describing the comments' impact on him:

"When Mr. Dunwoody made those statements, he was the chief financial officer of Lawnwood Medical Center. In my mind it would have been like a general telling me, 'You are not to do this, this, and that.' So I had very mixed, confused feelings. I hadn't been here very long. So I was -- I was -- I want to use the word appalled. I was concerned because this was my first civilian job, and I knew Lawnwood HCA, the corporation, sub-corporations, was a very big corporation. And I couldn't -- I couldn't conceive that they would allow that type of action to happen."

Dr. Pinon admitted that he related Dunwoody's statements about the competency of Dr. Sadow to other [**21] doctors. He testified that he repeated the comments to Dr. Fromang, a urologist; Dr. Marshall, a radiologist; Dr. Ramesh, a pulmonologist; Dr. Perry Lloyd, a pulmonologist; and Dr. Shadani, a cardiologist. He further explained that he had been told the same bad things about each of them; that a couple of them who had been "fired" were also suing the hospital because of some issue that happened with the medical staff, that these fired doctors were replaced with other doctors appointed by the corporation, that all of them were "bad doctors, troublemakers, and that I had no business referring any patients to them." He said, "I have been told that they were just as horrible and malicious, and as horrible as Dr. Sadow." He explained that "the dots" on the photos to which he referred included the doctors just mentioned: Fromang, Nayyar, Lloyd, Marshal; that all had lawsuits against the hospital, that all had been treated the same way; and that Dunwoody's statements made all of that clear. Sometime later, Dr. Pinon again asked CEO Pentz what was wrong with Dr. Sadow. Pentz responded: "That is a closed case. As long as I am CEO of this hospital, Dr. Sadow will never practice cardiovascular [**22] surgery."

At no time after the claim of slanders per se had been brought to its attention by plaintiff's counsel did Lawnwood ever offer a retraction. In its pleadings, Lawnwood denied that any such statements had been made. By way of affirmative defense, Lawnwood also pleaded that even if the statement about not sending a dog to Dr. Sadow had been spoken, it was merely **[*719]** "rhetorical hyperbole". At trial it offered testimony that if the jury found that Dunwoody had made the statements he was "just kidding", that the statements were "just an epithet", and that they were "not really anything" and should be given little weight.

Dr. Sadow testified that he felt embarrassed, humiliated and shamed by the slanders. He said that every time he entered Lawnwood Hospital he was reminded of them and could hardly escape thinking about them. He explained that, as a result of the credentialing dispute and the slanderous statements of the Hospital, in time all his referrals from St. Lucie and Martin counties "dried up" and eventually his practice of open heart surgery came virtually to an end in this area. He added that he was also in a contentious divorce when these events were occurring. Ultimately [**23] he was offered surgical positions in Chicago and Tennessee, but he turned them down because his young children resided primarily with their mother here, and he did not want to live far away from them.

At the close of the first phase of the trial, Dr. Sadow's counsel argued that Lawnwood's slanders were "outrageous and intentional". He argued that: "No doctor on the medical staff in good standing of the hospital should be subjected to that type of treatment by a member of the senior management team of the hospital, speaking on behalf of that hospital." More specifically he argued that the surgery-on-a-dog statement could not possibly be considered forgivable hyperbole, "rhetorical or otherwise" because it conveyed only one meaning: "It exposed Dr. Sadow to ridicule in his business and profession. And that was the intent."

At the close of the first phase of trial the Court instructed the Jury as to entitlement to punitive damages for the slander per se claim that:

"Punitive damages are warranted if you find, by clear and convincing evidence, that Lawnwood's primary purpose in making the statement was to indulge ill will and hostility and intent to harm Dr. Sadow. If you find for Dr. Sadow [**24] and against Lawnwood, and you also find that clear and convincing evidence shows that Robert Dunwoody was personally guilty of an intentional misconduct which was a substantial cause of loss, injury or damage to Dr. Sadow, and that such conduct would warrant an award of punitive damages against him, in accordance with the standards that I have mentioned, then in your discretion, you may determine that punitive damages are warranted against Lawnwood."

The jury returned a verdict finding liability against Lawnwood for the slanders per se. As to compensatory damages for the defamations, it specified zero damages as to each category, including nominal damages. The Jury found, nonetheless, that punitive damages were warranted.

The evidence in the second phase of the trial was devoted almost exclusively to the financial condition of the corporate structure of Lawnwood. Dr. Sadow offered evidence, not contradicted by Lawnwood, that at the time of trial Lawnwood had a net worth exceeding $ 100 million. Dr. Sadow's financial expert witness relied primarily on annual financial statements of the corporation for the years preceding trial. The expert testified that punitive damages from $ 30-38 million [**25] would not financially destroy the hospital. On its part, Lawnwood produced as its only witness a Director of Public Relations and Marketing who testified primarily as to new ethics training recently started at the hospital.

**[*720]** In closing argument, Dr. Sadow's counsel never suggested a specific sum for punishment. He did make clear, however, that he was not seeking the amount his expert had suggested as the ceiling on damages that would not ruin the corporation, the figure of $ 30-38 million. He stressed several times that he sought only an amount the Jury determined would be sufficient to punish and deter, not a sum that would financially destroy the institution.

He emphasized that the slanders were not limited to a single statement, but included all the statements described by Dr. Pinon. He added that

the slanderous statements were not solely about Dr. Sadow but were actually directed at all physicians who had sued the hospital, who were described as being "just as bad as he was," suggesting a pattern or practice on the part of Lawnwood.

He described the slanders as egregious, pointing out they came from one of the most senior officers of the corporation. He argued that the statements had [**26] "a high probability of injury and damage" to Dr. Sadow. He argued that Lawnwood's slanders about its own physicians were "improper, unethical and immoral" and had in fact damaged him.

The trial Judge gave the Florida Standard Jury Instruction on punitive damages, adapted to the issues in the case. 10± [*721] The trial Judge also used the form of verdict contained in the standard instructions. The Jury's unanimous verdict was that Lawnwood specifically intended to harm Dr. Sadow, that Lawnwood had in fact harmed him by the slanders per se. The Jury also found that in slandering Dr. Sadow Lawnwood had not been motivated solely by unreasonable financial gain. The Jury assessed punitive damages against Lawnwood in the sum of $ 5,000,000.

*B. The Claim of Immunity from Contract Liability* Lawnwood's claim of immunity is founded on § 395.0191(7) 11± It argues that *HN1* the statute must be construed as written. 12± We agree with that ever-present rule of statutory comprehension.

It is indeed *HN3* the first principle of statutory interpretation that the meaning of statutes is derived primarily from the text employed by the Legislature. 13± If the Legislature's words are [**30] not ambiguous, we accord them their plain meaning. 14± All parts of a statute should be given effect if possible, for the Legislature is presumed not to have enacted statutory terms having no purpose. 15± Thus we strive to avoid reading statutes so that part of its terms have no effect. 16± As the court cautioned in *Donato v. American Telephone and Telegraph Company,* 767 So. 2d 1146 (Fla. 2000): "we are precluded from construing an unambiguous statute in a way which would *extend, modify, or limit*, its express terms or its reasonable and obvious implications. To do so would be an abrogation of legislative power." [e.s.] 767 So.2d at 1150-51. 17± We conclude that Lawnwood's construction of the statutory immunity text would have us ignore an explicit limitation as to its extent, thereby enlarging the grant of immunity beyond its plain meaning.

*HN4* The provisions of § 395.0191 lay down general rules for hospitals in setting up procedures and standards for staff membership and clinical privileges. The immunity of § 395.0191(7) is not a broad, general grant immunizing every kind of hospital liability *after* granting clinical privileges. The plain text confines its immunity only to "action[s] arising out of or related to *carrying out the provisions of this section*" [e.s.]. It is thus a specific, targeted, grant of partial immunity extending only for its credentialing decisions. 18±

[*722] Dr. Sadow did not allege or rely on any violation of the *statute*. Instead he alleged and proved that, contrary to its own Medical Staff Bylaws, Lawnwood invalidly granted an outside surgeon exclusive CVS privileges, and used it to stop Dr. Sadow from performing CVS. He showed that the Medical Staff Bylaws, accepted and approved by the corporate Board of Trustees, did not authorize exclusivity in CVS. He proved that he had been repeatedly recommended for CVS by the hospital's own Credentialing Committee and approved by the MEC. He proved that Lawnwood's refusal to accept the MEC approval was not supported by "a valid reason under the circumstances", the standard instructed by the trial Judge. By giving one surgeon an unauthorized exclusive and using that invalid action to bar Dr. Sadow from CVS, he proved that Lawnwood was simply guilty of breach of contract. 19±

Under the facts and circumstances proven at trial, we agree with the trial judge that his claim for breach of contract was not barred by the statutory immunity provision. We therefore affirm on this issue.

*C. Punitive Damages*

We now confront Lawnwood's contention that the amount of punitive damages is excessive under the United States Constitution. In *Engle v. Liggett Group Inc.*, 945 So.2d 1246 (Fla. 2006), the court recognized that *HN5* differing standards of review, one under state law and another under federal law, may now apply to punitive damages in Florida. But Lawnwood does not here challenge the amount of punitive damages under Florida law -- its sole contention is that the amount is excessive under federal law. We therefore review the federal issue raised by Lawnwood under its de novo standard of review. 20±

The federal law argued by Lawnwood is part of a series of decisions by the United States Supreme Court. It relies on two of those decisions, *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003) [**34] [*State Farm*], and *BMW of North America Inc. v. Gore*, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996) [*BMW*]. Lawnwood argues that *BMW* and *State Farm* both hold that the Due Process Clause of the Fourteenth Amendment categorically bars any punitive damages exceeding a stated ratio with compensatory damages, usually 3:1 or 4:1. Dr. Sadow responds that Lawnwood is incorrect as to the scope of these holdings. He contends that *State Farm* and *BMW* actually disclaim applying the ratio to all punitive damages awards, and that both decisions explicitly hold that the ratio may not apply in cases involving intentional and malicious conduct. We conclude that *TXO Production Corporation v. Alliance Resources Corporation*, 509 U.S. 443, 113 S. Ct. 2711, 125 L. Ed. 2d 366 (1993), would also seem [*723] applicable. *TXO* held that punitive damages of $ 10 million reasonable for intentionally malicious misconduct are not improper even though actual losses were less than $ 20,000.

*BMW* was the first to apply a ratio as the proper test of proportionality in a specific case. But the opinion declared that proportionality is not always a matter of numerical comparison between compensatory and punitive damages:

"we have consistently rejected the notion that the constitutional line is marked [**35] by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. Indeed, *low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages*. A higher ratio may also be justified in cases in which the injury is hard to detect or *the monetary value of noneconomic harm might have been difficult to determine. It is appropriate, therefore, to reiterate our rejection of a categorical approach*. Once again … we need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." [e.s.]

517 U.S. at 582-83. The Court explained:

*HN6* "In our federal system, States necessarily have *considerable flexibility* in determining the level of punitive damages that they will allow *in different classes of cases and in any particular case*. Most States that authorize exemplary damages afford the

jury similar latitude, requiring only that the damages awarded be reasonably necessary to *vindicate the State's legitimate interests in punishment [**36] and deterrence. Only when an award can fairly be categorized* as 'grossly excessive' *in relation to these interests* does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." [e.s., c.o.]

517 U.S. at 569.

*State Farm* was the next case to apply a ratio but repeated that: "We decline again to impose a bright-line ratio which a punitive damages award cannot exceed." 538 U.S. at 425. The Court made clear that "ratios greater than those we have previously upheld may comport with due process where '*a particularly egregious act has resulted in only a small amount of economic damages*.' " [e.s.] 538 U.S. at 425. *State Farm* underlined *HN7* that "[t]he precise award in any case … *must be based upon the facts and* circumstances of the *defendant's conduct and the harm to the plaintiff*." [e.s.] 538 U.S. at 425. States may vary the level of punitive damages in disparate classes of cases to reflect different policies.

In considering these cases, we understand that the federal rule of a fixed ratio between punitive and compensatory damages was intended to apply primarily to the kind of "wrongdoing" involved in *State Farm* and *BMW*. We read *State Farm* and *BMW* both [**37] to recognize that nevertheless the States may specify some unusually reprehensible conduct for punitive damages that need not be proportioned to compensatory losses. The issue we face today is whether this case is governed by *State Farm* and *BMW* or perhaps instead by *TXO* where no ratio was used. We proceed to that analysis.

*TXO* involved intentional wrongdoing. Alliance, the owner of mineral rights on a 1,000 acre tract of land with significant oil and gas deposits, sued TXO for slander of title. Alliance had leased the oil and gas **[*724]** rights to TXO for substantial payments over a period of years. Evidence showed that TXO sued Alliance to claim a cloud on title TXO knew to be baseless. TXO had already obtained a quit claim deed from the remote vendor whose former interest it claimed had clouded the interest of Alliance. It had also attempted to procure a false affidavit from a witness. TXO sought to force Alliance into renegotiating the lease to reduce royalty payments and thereby enhance its own financial interests. The suit resulted in a verdict awarding $ 19,000 in compensatory damages and $ 10 million in punitive damages to Alliance. TXO argued that the punitive damages were 526 times [**38] greater than actual losses and therefore facially excessive under the Fourteenth Amendment.

The Supreme Court first pointed out the great difficulty in comparing jury awards of punitive damages: *HN8* "Because no two cases are truly identical, meaningful comparisons of such awards are difficult to make." 509 U.S. at 457. The Court emphasized a policy of refusing to draw a single test applicable to all awards. Instead it highlighted some of the factors on which the state court relied in affirming the award. In upholding the punitive damages, the critical factor was intentionally malicious conduct causing harm. The Supreme Court also accepted the State's policy rationale that "punitive damages should bear a reasonable relationship *to the harm that is likely to occur* from the defendant's conduct as well as to the harm that actually has occurred." [e.s.] 509 U.S. at 459-60.

In *TXO* Justice Kennedy -- who would later become the author of the majority opinion in *State Farm* -- explained that he concurred with upholding the substantial punitive damage award even though it lacked proportionality with compensatory damages because:

"*TXO acted with malice*. This was not a case of negligence, strict liability, [**39] or respondeat superior. TXO was found to have committed, through its senior officers, *the intentional tort of slander of title*. The evidence at trial demonstrated that it acted … 'through a pattern and practice of fraud, trickery and deceit' and employed 'unsavory and malicious practices' in the course of its business dealings with respondent. '[T]he record shows that this was not an isolated incident on TXO's part -- a mere excess of zeal by poorly supervised, low level employees -- but rather part of a pattern and practice by TXO to defraud and coerce those in positions of unequal bargaining power.' " [e.s.]

509 U.S. at 468-69. He agreed that:

"*it was rational for the jury to place great weight on the evidence of TXO's deliberate, wrongful conduct in determining that a substantial award was required in order to serve the goals of punishment and deterrence*. I confess to feeling a certain degree of disquiet in affirming this award, but the record, when viewed as a whole, makes it probable that *the jury's verdict was motivated by a legitimate concern for punishing and deterring TXO, rather than by bias, passion, or prejudice. There was ample evidence of willful and malicious conduct by [**40] TXO in this case*; the jury heard evidence concerning several prior lawsuits filed against TXO accusing it of similar misdeeds; and respondent's attorneys informed the jury of TXO's vast financial resources and argued that TXO would suffer only as a result of a large judgment." [e.s.]

509 U.S. at 469. Notably, when he became the author of the later majority opinion in *State Farm*, Justice Kennedy's opinion did not recede from, **[*725]** disapprove, or indicate in any way that *TXO* was no longer good law. In fact his *State Farm* opinion relied on *TXO* to restate the holding that no simple mathematical formula controls the issue of excessiveness for every case. 509 U.S. at 470.

*TXO* appears specially apt for the wrongdoing in this case. In denying the motion to set aside the punitive damages, the trial judge described the evidence as basically showing that Lawnwood set out to destroy Dr. Sadow. Lawnwood engaged in a pattern and practice of slandering any doctor conflicting with hospital administration. Willfully and maliciously destroying the reputation of respected physicians and surgeons could reasonably be high on any list of reasons for severe punishment of wrongdoing. Indeed it could be thought worse [**41] than merely slandering title to property. Here too it was rational for the jury to find defendant had acted willfully and with express malice to harm the plaintiff. *TXO* supports considerable punishment without proportionality for conduct willfully and maliciously harming the plaintiff.

These federal authorities also make clear that *HN9* state law and policy play a critical role in review of punitive damages, so we must consider Florida's applicable statutory and decisional law relating to punitive damages and defamation. We point out that Florida has codified specific policies for punitive damages in civil litigation. By statute the general Florida rule now provides that "an award of punitive damages may not exceed the greater of … three times the amount of compensatory damages … or … the sum of $ 500,000." 21 But in a significant exception to this limiting ratio, the statute specifies:

"Where the fact finder determines that at the time of injury the defendant had a specific intent to harm the claimant and determines that the defendant's conduct did in fact harm the claimant, *there shall be no cap on punitive damages*." 22 [e.s.]

Plainly this Florida statute eliminates mathematical proportionality [**42] with compensatory damages as a matter of state law and policy in cases of intentionally malicious harmful misconduct. 23

322

**HN10** Florida's statutory law removing a ceiling on punitive damages for intentionally malicious harm suggests that any proportional ratio analysis required in negligence or business practices cases with only modest monetary or financial loss, would be incongruent when the claim involves, as here, the intentional infliction of malicious harm to an individual. Under Florida law applying to intentionally malicious harm, punitive damages is tied to unusually reprehensible misconduct, rather than some ratio relating to compensable losses.

This statute gives all who [**43] would consider such misconduct here clear warning that for intentional and malicious harm they can lawfully be punished to the extent of their personal ability to pay. It is apparent to us that the statute's provision allowing punitive damages without proportionality for intentional, malicious harm satisfies any *BMW* and *State Farm* concern **[*726]** for fair notice. The Due Process Clause is thus satisfied by this statute.

We further perceive that this Florida statute would not apply to the conduct in *State Farm* and *BMW* involving commercial policy and trade practices, with purely economic consequences of only slight individual financial harm. The express disclaimer disavowing universal ratios in *State Farm* and *BMW* implies that the *State Farm* and *BMW* ratios are intended mainly for modestly reprehensible business or commercial trade practices causing individual damages limited in size, extent or amount. Declining to apply the *State Farm* and *BMW* ratios would not necessarily conflict if state law eliminates proportional ratios in cases of unusual reprehensibility. The punitive damages in this case thus require us to examine the reprehensibility of Lawnwood's wrongdoing under Florida law.

*1. Reprehensibility* [**44] *of Lawnwood's Conduct*

Under these federal cases, **HN11** when punitive damages are substantial the first issue is the *enormity* 24 factor: whether the misconduct involves a *high degree of culpability* and *blameworthiness. The Court has instructed State courts to consider three guideposts*:

    (1) the degree of *reprehensibility* of the defendant's misconduct;

    (2) the *disparity between* the actual or potential *harm suffered* by the plaintiff *and the punitive damages award*; and

    (3) the *difference between the punitive damages* awarded by the jury and the civil penalties authorized or imposed *in comparable cases*. [e.s.]

*State Farm*, 538 U.S. at 418; *BMW*, 517 U.S. at 575. The first of these is explicitly the critical one and in this case appears to be dispositive. 25

*Reprehensible, more blameworthy* and *enormity* are essential to an understanding of the Supreme Court's meaning. **HN12** Although much civil litigation involves misconduct, the *reprehensibility* required for harsh punitive damages entails a *high degree of culpability*. 517 U.S. at 580. To meet the reprehensibility required for high punitive damages, the Court implied that (as in *TXO*) the misconduct should be intentional, perhaps be gravely deplorable, deserving [**46] of severe condemnation, even threatening basic interests of an individual beyond purely economic loss. Conduct deserving the harshest punitive damages would be odious. It would pass moral bounds, be wicked or **[*727]** outrageous, and constitute a grave offense against right or decency. The disapproval expressed by state law should be avowedly strong and severe. We see that as the true meaning of the Court's *enormity* factor.

*a. Defamation under Florida law*

The wrongdoing here is slander *per se*. In *Miami Herald Publishing Company v. Ane*, 458 So.2d 239, 241 (Fla. 1984), the court pointed out that **HN13** "Florida's concern for individual reputation is reflected in article I, section 4, of the Florida Constitution." Florida has thus singled out defamation per se for special rules in civil tort litigation. In *Montgomery v. Knox*, 23 Fla. 595, 3 So. 211, 217 (Fla. 1887), the court held that statements defamatory per se are presumed harmful as a matter of law. In *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591, 592 (Fla. 1906), the court held that with defamation per se "the law presumes malice in their utterance" making it unnecessary to prove express malice. In *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 239 (Fla. 1933), the court pointed out that [**47] the law's condemnation of defamation per se "has been affirmed from earliest times," explaining that "the injurious character" of defamation per se "is a *fact of such common notoriety established by the general consent of men*, that the *courts must of necessity take judicial notice of its harmful effect*." [e.s.] 146 So. at 236. *Layne* went on to hold:

    "Malice ... becomes therefore the gist of every actionable libel. Without malice, either express or implied by law, no tort could result from the publication of a defamatory statement concerning another, however untrue it might be. But the law always *conclusively implied* malice and damage when false and defamatory statements were deliberately published without excuse." [e.s., c.o.]

146 So. at 238-39.

In *Hartley & Parker v. Copeland*, 51 So.2d 789 (Fla. 1951), and *Commander v. Pedersen*, 116 Fla. 148, 156 So. 337 (Fla. 1934), the court held that **HN14** general damages are conclusively presumed to result from defamation per se and that "special damages need not be shown to sustain the action." 156 So. at 341. In *Miami Herald Publishing Company v. Brown*, 66 So.2d 680-81 (Fla. 1953), the court made clear that general damages for defamation per se are "those which [**48] the law presumes must naturally, proximately, and necessarily result from the publication of the libelous matter. They arise by inference of law, and are not required to be proved by evidence." *Campbell v. Jacksonville Kennel Club*, 66 So.2d 495 (Fla. 1953), agreed that damages are presumed to result from defamation per se and need not be proved.

The singular protection afforded by Florida law to personal reputation in actions for defamations per se is further seen by the fact that **HN15** punitive damages may be the primary relief in a cause of action for defamation per se. *Jones v. Greeley*, 25 Fla. 629, 6 So. 448, 450 (Fla. 1889), held that malice is an intrinsic part of actions for defamation per se in order that the jury may consider punitive damages. In *Nodar v. Galbreath*, 462 So.2d 803 (Fla. 1984), the court added that the express malice for punitive damages under Florida law is present where the evidence shows that an intention to injure the plaintiff was the primary motive for statements defamatory per se. 26

    **[*728]** The history of Florida law makes clear that **HN16** liability alone for intentionally malicious defamation per se will support substantial punishment in punitive damages. This unique aspect sets defamation per se apart from a comparable intentional tort -- one that rightly could be considered [**51] its twin. Both fraud in the inducement and defamation per se depend on intentionally false statements meant to deceive and harm. But the critical distinction between them is that defamation harms persons and reputation, while fraud affects property rights and results only in financial loss. This difference plays an important role in a recent decision of this court, not cited by either party on appeal but

referred to during the trial. 27±

In *Morgan Stanley & Company v. Coleman (Parent) Holdings Inc.,* 955 So.2d 1124 (Fla. 4th DCA 2007), one party to a stock transaction sued the other party, claiming fraud in the inducement. A jury awarded both compensatory and punitive damages. On appeal, we held that the evidence supporting the compensatory damages [**52] was entirely insufficient and that consequently no compensatory loss had been proved. We rejected plaintiff's argument in support of punitive damages, however, that no compensatory damages were necessary to support an entitlement to punitive damages:

"It is fundamental **HN17** that '[a]ctual damages and the measure there are essential as a matter of law in establishing *a claim of fraud.' 'Damage is of the very essence of an action for fraud or deceit.' Without proof of actual damage the fraud is not actionable.* Thus, to prevail in an action for fraud, a plaintiff must prove its actual loss or injury from [*729] acting in reliance on the false representation.

"Even if CPH established the *fact* of some unquantified damage … a *nominal damage* award … is *not enough* to justify a punitive damage award *in a fraud case. Punitive damages for fraud cannot be based on nominal damages alone.* [e.s., c.o.]

955 So.2d at 1132. In short, a claim for punitive damages from fraud in the inducement failed if no amount of compensatory loss resulting from the fraud was actually proved.

But **HN18** when the claim is defamation per se, liability itself creates a conclusive legal presumption of loss or damage and is alone sufficient [**53] for the jury to consider punitive damages. *Commander,* 156 So. at 341; *see also Bobenhausen v. Cassat Ave. Mobile Homes,* 344 So.2d 279, 281 (Fla.1st DCA 1977), *cert. discharged,* 363 So.2d 1065 (Fla. 1978) (malice is presumed as a matter of law from the publication of such words). Therefore a finding of liability for slander per se, coupled with an express finding that the slander was intended to injure plaintiff and did in fact cause injury, authorizes the jury to consider and assess punitive damages without any finding of an amount of compensatory damages. *See Lundquist v. Alewine,* 397 So.2d 1148, 1150 (Fla. 1st DCA 1981) (where defamation is actionable per se, punitive damages may be awarded even though the amount of actual damages is neither found nor shown); *Saunders Hardware Five and Ten v. Low,* 307 So.2d 893 (Fla. 3d DCA 1975), *cert. denied,* 330 So.2d 21 (Fla. 1976) (same); *Bobenhausen,* 344 So.2d at 281 (in libel per se even though no special damages proven, plaintiff may still recover punitive damages upon a showing that publication was made for malice or ill-will toward him); *see also Nodar,* 462 So.2d 803 (express malice under Florida common law is present where primary motive [**54] for defamation per se is shown to be intent to injure plaintiff); *Jones v. Greeley,* 25 Fla. 629, 6 So. 448, 450 (Fla. 1889) (same).

To sum up, Florida's unusually high protection of personal reputation derives from the common sense of humankind and has ancient roots. It is highly valued by civilized people. Our state constitution and common law powerfully support it. This is a value as old as the Pentateuch and the Book of Exodus, and its command as clear as the Decalogue: "Thou shall not bear false witness against thy neighbor." **HN19** The personal interest in one's own good name and reputation surpasses economics, business practices or money. It is a fundamental part of personhood, of individual standing and one's sense of worth. In short, the wrongdoing underlying the punitive damages in this case has Florida law's most severe condemnation, its highest blameworthiness, its most deserving culpability. 28± For slander per se, reprehensibility is at its highest.

**[*730]** *b. Comparison of economic injuries with defamation*

In contrast to that vital personal interest here, the conduct in *State Farm* and *BMW* seems almost trivial. The minor economic injuries in those cases pale into insignificance [**56] next to the calumnies proven here. *BMW* is simpler, while the details of the *State Farm* case are extensive, but their differences become vivid when examined.

*BMW's* conduct is nearly a trifle. The claim lay in a manufacturer failing to tell a consumer about minor paint damage to a new automobile during transit to the dealer, in which acid rain had tarnished the finish. The $ 600 cost of repainting represented 1.5% of the sale price. As a matter of policy, BMW did not disclose such presale repairs if less than 3% of the MSRP. Some may think the policy wrong; others may be left searching for the harm if the manufacturer corrects the blemish before delivery.

BMW's buyer sued for fraud, praying for $ 555,000, including punitive damages. His evidence was the repainting reduced the value of a new $ 40,000 car by 10%. The jury found $ 4,000 in compensatory damages and assessed $ 4 million in punitive damages for the nondisclosure, finding "gross oppressive and malicious" fraud. The finding was largely based on BMW's nationwide policy outside the State of Alabama and case at hand. In post trial motions BMW showed the policy was lawful in 25 of the States. The Alabama supreme court reduced the [**57] punitive damages to $ 2 million and thus allowed the judgment to stand.

The Supreme Court accepted the rationale that BMW suppressed a material fact state law obligated it to disclose. But the Court stressed that reasonable people could disagree as to whether the nondisclosure policy was even wrong. If reasonable people could disagree whether conduct should be deemed improper, its disapproval quotient must be very low and reprehensibility small by any measure. Yet, even as reduced by the state court, the Supreme Court found the punitive damages "grossly excessive" for the conduct in question. And in spite of the fact that the business practice may have been deemed actionable for state tort liability, the Court held it lacked the *high degree of culpability* needed to warrant more than a modest amount of punitive damages. 517 U.S. at 580.

*State Farm* concerned a liability insurance carrier refusing to settle a wrongful death claim against its insured during extensive litigation, with the insured suffering a money judgment in excess of the policy limits. During the litigation the carrier insisted on disputing liability for the accident even though the witnesses placed the blame on the insured [**58] in attempting to pass other vehicles unsafely, causing the collision. The carrier declined offers to settle within policy limits, meanwhile assuring the insured that their assets were safe from judgment. The carrier took the case to trial and suffered a judgment well above policy limits.

When the carrier refused supersedeas, the insured handled the appeal and entered into a settlement with the plaintiff. In time, the carrier paid the entire excess judgment and expenses. Nevertheless, the insured sued the carrier for bad faith, fraud and infliction of emotional distress. Over the carrier's objection, the trial court **[*731]** allowed evidence of its practice over two decades of minimizing payouts in claims handling in other states. The jury awarded actual damages of $ 2.6 million and punitive damages of $ 145 million. These were reduced to $ 1 million and $ 25 million respectively.

After applying the *BMW* standards, *State Farm* demolished any reprehensibility quotient with the dismissive observation that its conduct merely "merit[ed] no praise." 538 U.S. at 419. If the worst thing one can say about conduct is only that it merits no praise, is it even blameworthy?

The Court held that "a more modest [**59] punishment" would have satisfied any legitimate state objectives in punishment for the carrier's conduct. 538 U.S. at 419-20. Here again, the state court punishment was largely based on conduct in other states in other cases, some of which was lawful but none of which harmed the plaintiff. **29**

Obviously whatever trace of reprehensibility for failure to settle a claim within policy limits was left to be squeezed out of the carrier's conduct is minor by any objective culpability standard. Indeed the carrier's conduct could reasonably be deemed as lacking any culpability at all, for the insured had already been [**60] made whole by the ultimate payment of the entire judgment above policy limits and expenses. **30**

The conduct here is in stark contrast. The jury obviously found Lawnwood's offense despicable. To repeat, the trial judge described the evidence as essentially showing that Lawnwood set out to destroy Dr. Sadow's career in the community. The jury's finding of a specific intent to harm [**61] Dr. Sadow, together with its finding of actual harm, is the very incarnation of both express and actual malice. It was a purposeful act of malevolent destruction of the reputation of one of its surgeons, done repeatedly as a matter of policy.

A reasonable jury could conclude that repeatedly defaming the skill and proficiency of a practicing surgeon was likely to have significant and long-lasting public and professional consequences. **31** It could rationally [*732] have equated the slanders to feathers loosed into the wind, with no one ever knowing where they all landed or whom they touched. The effects could be seen as insidious and unknowable. **32** The jury could deem this the very worst institutional wrongdoing conceivable -- wicked enough for considerable punishment with a strong corrective impact on the defamer. Hence the applicable rule of decision for this case is really from *TXO*: **HN20** extraordinary wrongdoing justifies extraordinary civil punishment without limiting ratios.

*2. Proportionality*

The United States Supreme Court has itself recognized a "compelling need for judicial redress of libelous utterances" equal to the compelling interests of the First Amendment. **33** The proportionality analysis in the federal decisions requires us to insure only that **HN21** the reprehensibility of the *wrongdoing* -- not the amount of actual harm or loss -- is equivalent to the punishment. As we have also seen in Florida law, when a claim involves harm resulting from the intentionally malicious destruction of reputation, reprehensibility is not a function of any dollar loss involved. **34**

Nothing in *BMW* and *State Farm* hints how an arithmetical ratio used in cases of purely economic misconduct would function against this kind of premeditated calumny and the considerable harm the general consent of humankind recognizes is caused by it. **35** Indeed this may be precisely the case the Court had in mind in allowing exceptions to the ratio: "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *BMW, 517 U.S. at 582-83*.

Given the obvious enormity of the offense, the jury's role was to assess punishment powerful enough to be felt and deter further actions of the kind by one shown to be a repeat offender. **36** It was required to [*733] fix a sum of money large enough to equal the reprehensibility of the wrongdoing and significant enough to punish and deter this particular actor. But this actor's assets exceed its liabilities by $ 100,000,000. A fine of $ 5,000,000 is thus only 5% of its net worth. Such a small part -- if a roll of quarters symbolized net worth, just two of its coins -- might rationally be thought by some as inadequate for a malicious defamer of such resources. **37**

*State Farm* and *BMW* hold damages reasonable when they "vindicate the State's legitimate interests in punishment and deterrence." 517 U.S. at 568. The Due Process Clause's concern for excessiveness is measured against the peculiar interests involved in the case. When the tortfeasor has a $ 100,000,000 pile of unencumbered wealth, nothing in federal or Florida law **38** suggests that 5% of that pile is arbitrary or excessive for maliciously and intentionally slandering a respected surgeon to destroy his professional reputation. The sum of $ 5,000,000 is legally equal to the reprehensibility of the intentionally malicious harm inflicted. That is the true application of federal proportionality in this punitive damages case. We conclude the jury's verdict is not disproportionate under federal law in the intended sense.

*D. Jury Instruction and Verdict Form*

In closing we find we must disclose an error in the jury instruction. Although the instruction and verdict form used in this case did not affect the outcome or our analysis on appellate review, we point out that the instruction may have resulted in the jury's failure to find even nominal compensatory damages for the slander per se. **39**

 [*734]  To repeat, Commander v. Pedersen, 116 Fla. 148, 156 So. 337, 341 (Fla. 1934), held that **HN22** "general damages … are *conclusively presumed to result*" in cases of defamation per se. [e.s.] *See also* Campbell v. Jacksonville Kennel Club, 66 So.2d 495 (Fla. 1953) (words actionable per se import damage and *general damages are presumed to result and need not be proved*); Wagner Nugent Johnson Roth Romano Erikson & Kupfer P.A. v. Flanagan, 629 So.2d 113, 116 n. 4 (Fla. 1994) (quoting Restatement (Second) of Torts § 558: "one who is liable for a slander actionable per se … is liable for at least nominal damages."); Myers v. Jim Russo Prison Ministries Inc., 3 So.3d 411 (Fla. 2d DCA 2009) (same); 19A Fla. Jur. 2d *Defamation and Privacy*, § 133. If the jury finds defendant liable for slander per se, it must be instructed that nominal damages are deemed established as a matter of law. It is error to instruct instead that nominal damages *may* be awarded *if you* [**69] wish to do so*. Dr. Sadow's trial counsel raised this legal inconsistency in the verdict during post verdict proceedings but ultimately decided not to press the matter. Nonetheless on review we have presumed that slanders per se caused at least nominal damages.

*E. Conclusion*

After giving the exacting appellate review of this case required under the de novo standard of State Farm and BMW, we conclude that the amount of punitive damages assessed conforms to applicable law and is neither excessive nor arbitrary so as to exceed federal Constitutional norms. Because the issue presented is of great public importance as to the imposition and assessment of punitive damages under Florida law for cases involving intentionally malicious, harmful defamation per se under TXO, BMW and State Farm, we certify to the Florida Supreme Court the following question:

*Are punitive damages of $ 5,000,000 arbitrary or excessive under the Federal Constitution where the jury awarded no*

*compensation beyond presumed nominal damages but found that defendant intentionally and maliciously harmed plaintiff by slanders per se?*

*Affirmed.*

CIKLIN ▾, J. and LEBAN ▾, MARK KING, Associate Judge, concur.

---

**Footnotes**

**1⬆** On appellate review the verdict in Dr. Sadow's favor compels us to accept his version of disputed issues of fact. *See TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 447, 113 S. Ct. 2711, 125 L. Ed. 2d 366 (1993) (jury verdict in favor of one party makes it appropriate to accept that party's version of disputed issues of fact); *Helman v. Seaboard Coast Line R.R. Co.*, 349 So.2d 1187 (Fla. 1977) (not function of appellate court to reevaluate evidence and substitute its judgment for jury).

**2⬆** This surgery is described as "high risk" or "open heart" surgery. Typically it involves valve replacements, repairs with or without coronary bypass grafts, left ventricular aneurysm repairs, and thoracic aortic dissections and aneurysms.

**3⬆** § 395.0193, Fla. Stat. (1998) (each licensed facility shall provide for peer review of physicians and shall develop written, binding procedures by which such peer review shall be conducted).

**4⬆** The Medical Staff Bylaws provide that: "The Medical Executive Committee shall consist of the officers of the Medical Staff, the Chairman of the Departments of Medicine and Surgery, four (4) members elected at large from the Active Staff, and the Past President of the Medical Staff."

**5⬆** *Wiggins v. Sadow*, 925 So.2d 1152 (Fla. 4th DCA 2006) (jury verdict in favor of surgeon in medical malpractice action not against manifest weight of evidence requiring new trial; case simply presented disputed issues of fact resolved by jury; surgeon lacerated patient's renal vein during surgery because of patient's anatomical anomaly found in just 1-2% of population; defense expert testified surgeon met standard of care because many radiologists would not have recognized anomaly from pre-surgery CT scan; not unreasonable that surgeon failed to recognize it during surgery; plaintiff's expert conceded he once failed to recognize same anomaly before surgery).

**6⬆** It should be noted that Lawnwood ultimately approved the Downing group for exclusive privileges in CVS before its facility was finally opened.

**7⬆** *See Lloyd v. Lawnwood Med. Ctr. Inc.*, 2000 WL 309305 (Fla. 19th Cir. Feb. 16, 2000).

**8⬆** *See Lawnwood Med. Ctr. Inc. v. Lloyd*, 773 So.2d 114 (Fla. 4th DCA 2000).

**9⬆** Conspicuously, the evidence does not show Pentz correcting or stopping Dunwoody from making these comments, but apparently remaining silent while Dunwoody spoke about Sadow and the "problem doctors".

**10⬆** *See* Fla. Std. Jury Instr. (Civ.) MI 4.4*g.(1)* and PD 1. Specifically, in phase 1 the Jury was instructed as follows:

"Punitive damages are warranted if you find, by clear and convincing evidence, that Lawnwood's primary purpose in making the statement was to indulge ill will and hostility and intent to harm Dr. Sadow. If you find for Dr. Sadow and against Lawnwood, and you also find that clear and convincing evidence shows that Robert Dunwoody was personally guilty [**27] of an intentional misconduct which was a substantial cause of loss, injury or damage to Dr. Sadow, and that such conduct would warrant an award of punitive damages against him, in accordance with the standards that I have mentioned, then in your discretion, you may determine that punitive damages are warranted against Lawnwood. Intentional misconduct means that Robert Dunwoody had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to Dr. Sadow would result, and despite that knowledge, intentionally pursue that course of conduct resulting in injury or damage. Now, clear and convincing evidence differs from the greater weight of the evidence in that it is more compelling and persuasive. Greater weight of the evidence means the more persuasive and convincing force and effect of the entire evidence in the case. In contrast, clear and convincing evidence is evidence that is precise, lacking in confusion, and of such weight that it produces a firm belief or conviction without hesitation about the matter in issue."

In phase 2 it was instructed:

Ladies and gentlemen of the jury, you will now determine the amount of punitive damages, if any, to [**28] be assessed as punishment and as a deterrent to others. This amount would be in addition to the compensatory damages you have previously awarded. In making this determination, you should consider the following: The nature, and degree of misconduct, and the related circumstances including the following, whether the wrongful conduct was motivated solely by unreasonable financial gain; whether the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was actually known by Lawnwood; whether, at the time of the loss, injury or damage to Dr. Sadow, Lawnwood had a specific intent to harm Dr. Sadow and the conduct of Lawnwood did, in fact, harm Dr. Sadow, and Lawnwood's financial resources. However, you may not award an amount that would financially destroy Lawnwood. You may, in your discretion, decline to assess punitive damages. Your verdict on the issues raised by the punitive damages claim of Dr. Sadow against Lawnwood must be based on the evidence that has been received during the trial of the first phase of this case, and on the evidence that has been received in these proceedings, and on the law which I have instructed [**29] you."

**11** § 395.0191(7), Fla. Stat. (2009) (**HN2** "There shall be no monetary liability on the part of, and no cause of action for injunctive relief or damages shall arise against, any licensed facility, its governing board or governing board members, medical staff, or disciplinary board or against its agents, investigators, witnesses, or employees, or against any other person, for any action arising out of or related to carrying out the provisions of this section, absent intentional fraud").

**12** *Arnold, Matheny & Eagan P.A. v. First Am. Holdings Inc.,* 982 So.2d 628, 633 (Fla. 2008) (statutes must be construed by looking primarily at the statutory language; if the language is clear and unambiguous, then the court has no further reason to apply the rules of statutory construction).

**13** *McLaughlin v. State,* 721 So.2d 1170, 1172 (Fla. 1998); *St. Petersburg Bank & Trust Co. v. Hamm,* 414 So.2d 1071, 1073 (Fla. 1982).

**14** *Golf Channel v. Jenkins,* 752 So.2d 561, 564 (Fla. 2000); *Moonlit Waters Apts. Inc. v. Cauley,* 666 So.2d 898, 900 (Fla. 1996).

**15** *Forsythe v. Longboat Key Beach Erosion Control Dist.,* 604 So.2d 452, 455 (Fla. 1992).

**16** *State v. Goode,* 830 So.2d 817, 824 (Fla. 2002).

**17** *See* [**31] also *Fla. Dept. of Bus. and Prof'l Regulation, Div. of Pari-Mutuel Wagering v. Inv. Corp. of Palm Beach,* 747 So.2d 374, 382-83 (Fla. 1999) (same quote); *Hill v. State,* 688 So.2d 901, 908 (Fla. 1996) (same quote).

**18** For this reason, we disagree with Lawnwood's able appellate counsel that *Feldman v. Glucroft,* 522 So.2d 798 (Fla. 1988) and *Noble v. Martin Memorial Hosp. Ass'n Inc.,* 710 So.2d 567 (Fla. 4th DCA 1997), support immunity in this case. In *Feldman* the medical review board was obviously acting within the scope of its authorized function relating to the standard of care. *Noble* involved a denial of all privileges, in contrast to the case we confront [**32] today involving a simple breach of contract between the hospital and one of its staff surgeons. *See also Fla. Dept. of Envtl. Protection v. ContractPoint Florida Parks LLC,* 986 So.2d 1260 (Fla. 2008) (broad meaning of immunity in two provisions limited by provisions in another).

**19** *See Hosp. Corp. of Lake Worth v. Romaguera,* 511 So. 2d 559, 560 (Fla. 4th DCA 1986) [**33] (contract between hospital and physician affected by modification of bylaws).

**20** *See Cooper Indus. Inc. v. Leatherman Tool Group Inc.,* 532 U.S. 424, 121 S. Ct. 1678, 149 L. Ed. 2d 674 (2001); *Engle,* 945 So.2d at 1263.

**21** § 768.73(1)(a), Fla. Stat. (2009). *See also* § 768.73(4), Fla. Stat. (2009) (jury may not be instructed as to these provisions). In oral argument Lawnwood argued that the excess above $ 500,000 should be remitted.

**22** § 768.73(1)(c), Fla. Stat. (2009).

**23** *See Owens-Corning Fiberglas Corp. v. Ballard,* 749 So.2d 483, 489 n.9 (Fla. 1999) ("The Legislature has placed no cap on punitive

damages awards where the defendant specifically intended to harm the plaintiff and the defendant's conduct did in fact harm the plaintiff").

**24** *See* AMERICAN HERITAGE DICT. (Electronic Edition) (search term *enormity*: "The quality of passing all moral bounds; excessive wickedness or outrageousness. A monstrous offense or evil; an outrage"); MERRIAM-WEBSTER UNABRIDGED DICT. (CD-ROM ed.) (search term *enormity*: the quality or state of exceeding a measure or rule, or of being immoderate, monstrous, or outrageous; as 'the enormity of the offense'; a grave offense against order, right, or decency"). [**45] Modern usage of the term *enormity* misuses it to describe merely large in physical size. But the *BMW* sense in which it is used obviously refers to the traditional meaning of the word.

**25** The reprehensibility of defendant's misconduct in a claim for punitive damages is by far the most significant factor. *BMW* said:

"[punitive] damages imposed on a defendant should reflect 'the *enormity* of his offense.' This principle reflects the accepted view that some wrongs are *more blameworthy than others*. Thus, we have said that 'nonviolent crimes are less serious than crimes marked by violence or the threat of violence.' Similarly, 'trickery and deceit, are more reprehensible than negligence." [e.s., c.o.]

517 U.S. at 575-76; *State Farm*, 538 U.S. at 419.

**26** These state cases have consistently held that proof of liability for defamation per se -- especially when based as here on a specific finding that the defamer acted with specific intent to [**49] injure the plaintiff -- is alone sufficient for the jury to consider punitive damages and that plaintiff need not show any proof of monetary loss. *Bobenhausen v. Cassat Ave. Mobile Homes Inc.*, 344 So.2d 279 (Fla. 1st DCA 1977), the court said:

"We reject the … argument that it is necessary before a plaintiff recover punitive damages that the amount of pecuniary loss be determined to a reasonable certainty. The general rule is that *in libel actions, even though no special damages may have been proven, a plaintiff may still recover punitive damages upon a showing that the publication was made for malice or ill-will toward him.*" [e.s., c.o.]

344 So.2d at 282. To the same effect is *Saunders Hardware Five and Ten, Inc. v. Low*, 307 So.2d 893 (Fla. 3d DCA 1974), where the court said:

"we hereby adopt the general rule that where the defamation complained of is actionable per se, punitive damages may be awarded even though the amount of actual damages is neither found nor shown, for in such a case the requirement of a showing of actual damages as a basis of an award of exemplary damages is satisfied by the presumption of injury which arises from a showing of libel or slander that is actionable [**50] per se."

307 So.2d at 894. In *Matthews v. Deland State Bank*, 334 So.2d 164 (Fla.1st DCA 1976), the court followed the decision in *Saunders Hardware*, holding that "[t]he instruction given by the trial court on actual malice is defective in that it does not fully inform the jury that the malice necessary for the award of punitive damages can be deduced from the publication itself" and that the trial court erred in instructing the jury that punitive damages could not be awarded unless an award of compensatory damages was made. 334 So.2d at 166. The Eleventh Circuit has so recognized Florida law on punitive damages in actions for defamation per se as set forth above. *Hunt v. Liberty Lobby*, 720 F.2d 631 (11th Cir. 1983) (verdict for punitive damages can be returned only if jury finds defendant acted with type of ill will identified in *Matthews*). There are no conflicting decisions by any Florida appellate court.

**27** At one point Lawnwood sought to convince the trial judge that even in cases involving slander per se plaintiff had to prove a specific monetary amount of injury to have the jury consider punitive damages. Ultimately, however, the hospital withdrew the argument and recognized the many Florida cases holding to the contrary. In this appeal, Lawnwood is consistent with its ultimate position in the trial court, and has not renewed the argument.

**28** Florida is not alone in this regard. *See* Note, *Punitive Damages and Libel Law*, 98 Harv. L. Rev. 847, 854 n.43 (1985) ("Some federal judges and state courts have expressly recognized that *the standard for punitive damages in libel suits differs* [**55] *from the one applied in other tort actions*. [e.s.] … Because most courts will grant punitive damages upon a showing of actual malice, such damages have been assessed even in cases in which actual damages were absent or merely nominal. See, e.g., *Goldwater v. Ginzburg*, 414 F.2d 324, 340-41 (2d Cir. 1969), *cert. denied*, 396 U.S. 1049, 90 S. Ct. 701, 24 L. Ed. 2d 695 (1970) (upholding award of $ 1 in actual damages and of awards of $ 25,000 and $ 50,001 in punitive damages); … *Newson v. Henry*, 443 So. 2d 817, 824 (Miss. 1983) (it is 'not necessary to award actual damages as a prerequisite to awarding punitive damage[s]'); *Snodgrass v. Headco Indus.*, 640 S.W.2d 147, 157 (Mo. Ct. App. 1982) (upholding award of $ 1 in actual damages and $ 75,000 in punitive damages); *Newspaper Publishing Corp. v. Burke*, 216 Va. 800, 805, 224 S.E.2d 132, 136 (1976) (remanding, on the basis of a faulty actual malice instruction, a case in which the jury had awarded no compensatory damages and $ 10,000 in punitive damages)).

**29** As the Court put it, "defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." 538 U.S. at 423. The Court held:

"The reprehensibility guidepost does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance, which in this case extended for a 20-year period. In this case, because the Campbells have shown no conduct by State Farm similar to that which harmed them, the conduct that harmed them is the only conduct relevant to the reprehensibility analysis."

538 U.S. at 424.

**30** In *BMW* where the conduct was only "purely economic in nature," 517 U.S. at 576, the Court found such conduct unworthy of anything more than token punishment beyond compensatory damages. *Id. State Farm* made the same distinction: "[w]e have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic …." *State Farm* made clear that if the harm was only economic, reprehensibility would turn on whether the tortious conduct:

> "evinced an indifference to or a reckless disregard of the *health or safety* of others; the target of the conduct had *financial vulnerability*; the conduct involved *repeated actions* or was an isolated incident; and the harm was the *result of intentional malice, trickery, or deceit*, or mere accident."

538 U.S. at 419.

**31** Jurors could fairly find that when a hospital speaks about the competency of a surgeon it speaks *ex cathedra*. As the pre-eminent institution of health care within the community, a jury could logically infer, a hospital's [**62] perceptions of the competency of its professionals should be taken as powerfully authoritative.

**32** *TXO* specifically approved consideration of harm "likely to result" as a factor supporting substantial punitive damages for malicious harm. 509 U.S. at 459-60.

**33** *See Gertz v. Robert Welch Inc.,* 418 U.S. 323, 347, 350, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974) (so long as liability is based on fault States may define appropriate standard of liability for a publisher of defamatory falsehood injurious to a private individual; award of punitive damages must be based on actual malice); *Bose Corp. v. Consumers of United States Inc.,* 466 U.S. 485, 104 S. Ct. 1949, 80 L. Ed. 2d 502, (1984)  [**63] (constitutional rule of independent review of determination of actual malice in defamation action recognized trial judge's opportunity to observe demeanor of witnesses). There is no question that the jury's finding of clear and convincing evidence of intentional falsity, harmful intent, and actual harm in this case satisfies *Gertz.*

**34** § 768.73(1)(c), Fla. Stat. (2009).

**35** It is a significant harm we ourselves have previously recognized in a case of strikingly similar circumstances. Substantial misconduct in the defamation of a physician was the subject in *Zambrano v. Devanesan,* 484 So.2d 603 (Fla. 4th DCA 1986), where  [**64] in upholding an equally substantial award of punitive damages we said that "punitive damages are to be measured 'by the enormity of the offense, entirely aside from the measure of compensation of the injured plaintiff.'" 484 So.2d at 609. This case is identical to *Zambrano.*

**36** *See Owens-Corning Fiberglass Corp. v. Ballard,* 749 So. 2d 483, 486 (Fla. 1999) (under Florida law purpose of punitive damages is not to further compensate plaintiff but to punish defendant for wrongful conduct and deter similar misconduct by it and other actors in  [**65] the future); *Ingram v. Pettit,* 340 So.2d 922, 923-24 (Fla. 1976) (long established in Florida law that availability of punitive damages reserved to cases where private injuries partake of public wrongs, including intentional infliction of harm); *Zuckerman v. Robinson,* 846 So.2d 1257, 1258 (Fla. 4th DCA 2003) (punitive damages are premised on the enormity of the act resulting in the injury to the plaintiff).

**37** In response to Lawnwood's argument that it could not have predicted the size of the punitive damages assessed by the jury, Dr. Sadow calls our attention to a few cases involving defamation claims in the health care setting. *See Reis v. Cedars Med. Ctr.,* 1995 WL 865054 (Fla. 11th Cir. Ct. Nov. 1995) ($ 3,334,857 verdict for defamation); *Prof'l Med. Educ. Inc. v. Palm Beach Co. Health Care Dist.,* 2007 WL 2197752 (Fla. 15th Cir. Ct. July 3, 2007) ($ 692,400 verdict for defamation, tortious interference with business relations and civil conspiracy); *Scheer v. Entel Radiological Assoc.,* 1989 WL 527221 (Fla. 6th Cir. Ct. Dec. 1989) ($ 1,856,927 verdict for plaintiff on defamation and breach of contract counts). To those, we take special note of our own decision in *Zambrano v. Devanesan,* 484 So.2d 603 (Fla. 4th DCA 1986) [**66] (affirming verdict of $ 700,000 in punitive damages for defamatory per se falsehood of physician by another staff physician). All of these cases arose in south Florida. All of them involve comparable parties and comparable amounts, and surface similarities with this case. None of them raise any concern suggesting excessiveness in the present case.

**38** *Cooper Indus. Inc. v. Leatherman Tool Group Inc.,* 532 U.S. 424, 432, 121 S. Ct. 1678, 149 L. Ed. 2d 674 (2001);  [**67] *Engle,* 945 So.2d at 1262.

**39** The court followed Standard Jury Instruction MI 4.4, saying:

> If you find for Dr. Sadow, you shall consider the following elements of damage: any injury to reputation or health and any shame, humiliation, mental anguish, and hurt feelings experienced in the past or to be experienced in the future. *… If you find for Dr. Sadow, but find that no damage has been proved, you **may** award nominal damages.* [e.s.]

Then the verdict form specified:

329

Question 6: What is the amount of compensatory damages, if any, that Dr. Sadow has sustained as a result of slander by Lawnwood for injury to Dr. Sadow's reputation, health, and shame, humiliation, mental anguish and hurt feelings?

A. experienced in the past: __

B. to be experienced in the future: __

C. present value of future damages.__

D. total: __

Question 7: If [**68] you find that Dr. Sadow has not proven any amount of compensatory damages, then do you wish to award nominal damages? And if so, in what amount? (if you elect not to assess nominal damages, then enter 0). [e.s.]

We have emphasized the parts we find troublesome.



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

Lexis

Legrande v. Emmanuel, 889 So. 2d 991 (Fla. Dist. Ct. App. 200...

Search: Everything

Client: -None-   Folders   History   Help   Mor

Document:   Legrande v. Emmanuel, 889 So. 2d 991   Actions

Go to   Page   Page #   Search Document

## ◆ Legrande v. Emmanuel, 889 So. 2d 991

Copy Citation

Court of Appeal of Florida, Third District

December 22, 2004, Opinion Filed

CASE NO. 3D03-3328

**Reporter**
889 So. 2d 991 * | 2004 Fla. App. LEXIS 19648 ** | 30 Fla. L. Weekly D 33

DEVIL LEGRANDE and ELIAMISE LEGRANDE, his wife, Appellants, vs. JOSEPH JOHNSON EMMANUEL and JACQUES ST. LOUIS, Appellees.

**Subsequent History:** [**1] Released for Publication January 10, 2004.

**Prior History:** An Appeal from the Circuit Court for Miami-Dade County, Roberto M. Pineiro , Judge. LOWER TRIBUNAL NO. 03-21985.

**Disposition:** Affirmed in part, reversed in part and remanded in part.

## Core Terms

church, slander, cause of action, allegations, intentional infliction of emotional distress, indispensable party, congregation, outrageous, grounds, motion to dismiss

## Case Summary

**Procedural Posture**
Appellants, a Baptist minister and his wife, sought review of an order of the Circuit Court for Miami-Dade County (Florida), which granted appellee congregational members' motion to dismiss appellants' complaint. The complaint made claims for slander, slander per se, negligent infliction of emotional distress (NIED), intentional infliction of emotional distress (IIED), and loss of consortium.

**Overview**
During a church meeting with some 250 people in attendance, the members accused the minister of purchasing a luxury vehicle with money stolen from the church. The members' motion asserted that appellants' complaint failed to state any cause of action. The court reversed in part and affirmed in part, holding that (1) the complaint, which alleged statements that the minister committed a crime, was sufficient to state a claim for slander and slander per se; (2) the complaint did not, on its face, run afoul of the First Amendment because the allegations involved a neutral principal of tort law that did not involve excessive entanglement in internal church matters; (3) the complaint did not state a claim for IIED because the members' conduct did not rise to the level of extreme, outrageous conduct necessary to support such an action; (4) the complaint did not state a cause of action for NIED because it did not allege an appropriate physical injury caused by psychological trauma; and (5) the claim that appellants failed to include indispensible parties in the complaint was better dealt with as an affirmative defense.

**Outcome**
The court reversed the dismissal of the slander and slander per se claims and the dismissal for failure to join indispensible parties. It affirmed the dismissal of the IIED and NIED claims. The case was remanded for further proceedings.

▼ LexisNexis® Headnotes

Torts > Intentional Torts ▾ > Defamation ▾ > Defamation Per Se ▾

View more legal topics

**HN1** Defamation, Defamation Per Se

A publication that falsely and maliciously charges another with the commission of a crime, i.e. theft, is actionable per se. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Torts > Intentional Torts ⌄ > 📄 Intentional Infliction of Emotional Distress ⌄ > Elements ⌄

View more legal topics

**HN2** Intentional Infliction of Emotional Distress, Elements

The elements for intentional infliction of emotional distress are: (1) the wrongdoer's conduct was intentional or reckless, that is, he intended his behavior when he knew or should have known that emotional distress would likely result; (2) the conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community; (3) the conduct caused emotion distress; and (4) the emotional distress was severe. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (49)*  20

---

Torts > Intentional Torts ⌄ > 📄 Intentional Infliction of Emotional Distress ⌄ > General Overview ⌄

**HN3** Intentional Torts, Intentional Infliction of Emotional Distress

The requisite extreme and outrageous conduct for intentional infliction of emotional distress is that which is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (40)* ◈ 6

---

Torts > ... > Types of Negligence Actions ⌄ > 📄 Negligent Infliction of Emotional Distress ⌄ > Elements ⌄

View more legal topics

**HN4** Negligent Infliction of Emotional Distress, Elements

The elements required negligent infliction of emotional distress are: (1) the plaintiff must suffer a discernable physical injury; (2) the physical injury must be caused by the psychological trauma; (3) the plaintiff must be involved in the event causing the negligent injury to another; and (4) the plaintiff must have a close personal relationship to the directly injured person. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (12)* ◈ 1

---

Civil Procedure > ... > Defenses, Demurrers & Objections ⌄ > Affirmative Defenses ⌄ > General Overview ⌄

View more legal topics

**HN5** Defenses, Demurrers & Objections, Affirmative Defenses

Although Fla. R. Civ. P. 1.140 provides that the failure to join indispensable parties may be raised by motion, the question of whether entities or individuals are indispensable parties to a suit is better raised as a matter of an affirmative defense in an answer. That is because on a motion to dismiss, the trial court's function is to determine whether the allegations contained in the four corners of the complaint state a cause of action. Unless affirmative defenses appear on the face of the complaint, they may not be considered on a motion to dismiss. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > ... > Defenses, Demurrers & Objections ⌄ > Affirmative Defenses ⌄ > General Overview ⌄

View more legal topics

**HN6** Defenses, Demurrers & Objections, Affirmative Defenses

A plaintiff should not have the burden of anticipating a defense and then overcoming it in his initial pleading. Furthermore the burden is on the defendant to prove his affirmative defenses, which cannot be done in proceedings on a motion to dismiss. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

**Counsel:** Remer & Georges-Pierre, P.A. ⌄ and Anthony M. Georges-Pierre ⌄, for appellants.

Carl A. Richardson ⌄, for appellees.

**Judges:** Before GREEN ⌄, FLETCHER ⌄, and RAMIREZ ⌄, JJ.

## Opinion

   **[*993]** PER CURIAM.

Devil Legrande, a Baptist minister, and his wife Eliamise, sued two congregational members, appellees Joseph Johnson Emmanuel and Jacques St. Louis, for slander, slander per se, negligent infliction of emotional distress, intentional infliction of emotional distress, and loss of consortium.

Prior to filing an answer, the appellees moved to dismiss the complaint with prejudice for failure to state a cause of action on various grounds. The trial court granted the motion and dismissed the action with prejudice. This appeal followed.

The bases for all of the counts in the complaint are encompassed in the following allegations:

7. On November 15, 2002, during a church meeting at New Bethany Baptist Mission Church, Inc. 6311 N.E. 2nd Avenue, Miami, Florida 33139, [**2] consisting of a congregation numbering at or about 250 persons in attendance, Defendants both spoke the following false and defamatory words in the congregation [sic] presence and hearing: "Pastor Legrande purchased a 2002 Mercedes in cash and used money he stole from the church to purchase the car." Moreover, Defendants referred to Pastor Legrande as "Satan" and "Makout" (name for oppressive secret police from Haitian dictator Duvalier's regime). Defendants further detailed that Plaintiff's name means Satan. Defendants knew of good name, credit, and reputation of Plaintiff on November 15, 2002 in which, among other things, the following false scandalous and defamatory statement concerning Plaintiff was made including maliciously intending to injure Plaintiff and to bring Plaintiff into public scandal and disgrace by publicly calling him a thief and creating and publishing specific instances of theft from the church by Plaintiff.

8. By these words, Defendants mean, and was so understood by those who heard the words, to charge that Plaintiff was "Satan" and a "Makout."

9. On the day of Defendants' false, slanderous, and defamatory statements concerning the plaintiff, plaintiff had [**3] for forty-five (45) years been a pastor and began New Bethany Baptist Mission church in 1988.

10. As a result of Defendants' false statements, plaintiff lost over sixty (60) percent of his congregation and his reputation and good name and reputation [sic] were destroyed, causing him to suffer great mental pain and anguish, all to his damage in the sum of $ 750,000.00. Also, as a result of Defendants' statements, Plaintiff has lost the consort, companionship, society, affection, services, and support of his spouse.

11. Moreover, as a result of the Defendants' statements and publication of said statements as described above, the Plaintiff suffered severe emotional damages **[*994]** and resulting pain and suffering which still continues to this day. The emotional injuries sustained by Plaintiff are permanent. The Plaintiff has incurred medical bills and expenses and will incur the same in the future as well as lost income which will continue into the future. Plaintiff has suffered economic damages from said slanderous statements.

Based upon these allegations, the appellees moved to dismiss on the grounds that: (1) the complaint failed to state a cause of action for slander; intentional [**4] infliction of emotional distress; and negligent infliction of emotional distress; (2) the First Amendment barred the court from resolving this dispute and (3) the plaintiffs failed to join the church and the Florida Baptist Convention as indispensable parties.

We, first of all, reverse the dismissal of the counts for slander and slander per se because they state a cause of action. The allegation that the appellees told third parties that Pastor Legrande purchased a 2002 Mercedes with cash stolen from the church is legally sufficient to state a cause of action for slander. *See Shedeke v. Gomez*, 837 So. 2d 1122, 1122 (Fla. 4th DCA 2003) ("The statement that appellant was a forger stated a cause of action for slander"); *Axelrod v. Califano*, 357 So. 2d 1048, 1050 (Fla. 1st DCA 1978) (holding that *HN1* a publication that falsely and maliciously charges another with the commission of a crime, i.e. theft, is actionable per se.) *Bobenhausen v. Cassat Ave. Mobile Homes, Inc.*, 344 So. 2d 279, 281 (Fla. 1st DCA 1977) ("[s]poken words falsely imputing a criminal offense to another[, i.e. 'thief' and a crook,] are actionable per se.").

Moreover, we [**5] do not think that it can be concluded from the face of these allegations that the First Amendment is a bar to this litigation. Because the well-pled bare allegations of the complaint preliminarily reveal that this suit involves a neutral principle of tort law that does not involve "excessive" entanglement in internal church matters or in the interpretation of religious doctrine or ecclesiastical law, the dismissal of this complaint, at this stage of the proceedings, on First Amendment grounds was error. ⬚[↓] *See Malicki v. Doe*, 814 So. 2d 347 (Fla. 2002); *Doe v. Evans*, 814 So. 2d 370 (Fla. 2002); *Carnesi v. Ferry Pass United Meth. Church*, 826 So. 2d 954 (Fla. 2002), *cert. denied Ferry Pass United Meth. Church v. Carnesi*, 537 U.S. 1190, 154 L. Ed. 2d 1023, 123 S. Ct. 1270 (2003).

[**6] We do, however, affirm the trial court's dismissal of the count for intentional infliction of emotional distress. We do not believe that the conduct complained of, taken as true, rises to the level of extreme conduct necessary to support a claim for the intentional infliction of emotional distress. *HN2*⬚ The elements for this tort are:

(1) The wrongdoer's conduct was intentional or reckless, that is, he intended his behavior when he knew or should have known that emotional distress would likely result;

(2) the conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community;

(3) the conduct caused emotion distress; and

(4) the emotional distress was severe.

**[*995]** *Clemente v. Horne*, 707 So. 2d 865, 866 (Fla. 3d DCA 1998). As we held in *Clemente*, the allegations in this case fail to rise to that level of extreme and outrageous conduct necessary to satisfy element two. *Id.* The Restatement of Torts, defines *HN3*⬚ the requisite extreme and outrageous conduct as that which is

so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and [**7] to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

RESTATEMENT (SECOND) OF TORTS, § 46 cmt. d (1965). Although we recognize that being branded a thief in front of one's parishioners might

certainly be unsettling, embarrassing, and/or humiliating for a member of the clergy, we do not believe that this alleged conduct is the type of extreme and outrageous conduct needed to support a claim for the intentional infliction of emotional distress as a matter of law. *Id. See, e.g., Shedeke v. Gomez, 837 So. 2d 1122, 1123 (Fla. 4th DCA 2003).*

We likewise affirm the dismissal of the count for negligent infliction of emotional distress. *HN4* The elements required for this cause of action are: (1) the plaintiff must suffer a discernable physical injury; (2) the physical injury must be caused by the psychological trauma; (3) the plaintiff must be involved in the event causing the negligent injury to another; and (4) the [**8] plaintiff must have a close personal relationship to the directly injured person. *See Zell v. Meek, 665 So. 2d 1048, 1052 (Fla. 1995).* In the instant case, the appellant pastor alleges that as a result of the appellee's alleged slanderous statement, his pre-existing diabetes condition was aggravated; he experienced memory loss; and he lost over sixty-percent (60%) of his congregation. These allegations are wholly insufficient to state a cause of action for the negligent infliction of emotional distress. It is clear that this tort is wholly inapplicable to the gravamen of this action. We therefore affirm the dismissal of this count with prejudice.

Finally, the appellees argued for the dismissal of the complaint below on the grounds that the appellants failed to join the church and the Florida Baptist Convention as indispensable parties to this action pursuant to *Florida Rule of Civil Procedure 1.140(b).* In support of this argument, in their motion, the appellees went outside of the allegations contained in the four corners of the complaint and asserted that:

> The [alleged] statements as presented and recorded were prepared by the aggrieved [**9] congregational members of the Church consisting of up to 80% of the Church body and were read at the meeting by Defendant EMMANUEL, a member of the Church designated to present such statements on behalf of the Church, New Bethany Baptist Mission Church . . . .

Further, the appellees asserted that the subject church meeting was convened and/or officiated by the Florida Baptist Convention. For these reasons, the appellees maintained that this cause could not proceed without the joinder of New Bethany Baptist Mission Church and the Florida Baptist Convention.

*HN5* Although Rule 1.140 certainly provides that the failure to join indispensable parties may be raised by motion, we believe that the question of whether the church and the Florida Baptist Convention are indispensable parties to this suit would be better raised as a matter of an affirmative defense in an answer. *See City Nat'l Bank of Miami v. Simmons, 351 So. 2d 1109, 1110 (Fla. 4th DCA 1977).* That is **[*996]** because on a motion to dismiss, the trial court's function is to determine whether the allegations contained in the four corners of the complaint state a cause of action. *See Goodman v. Habif, 424 So. 2d 171, 172 (Fla. 3d DCA 1983). [**10]* Unless affirmative defenses appear on the face of the complaint, they may not be considered on a motion to dismiss. *Id.*

As the supreme court has instructed:

> *HN6* [T]he plaintiff should not have the burden of anticipating a defense and then overcoming it in his initial pleading. Furthermore the burden is on the defendant to prove his affirmative defenses, which cannot be done in proceedings on a motion to dismiss.

*See Hough v. Menses, 95 So. 2d 410, 412 (Fla. 1957)* (citations omitted).

In the instant case, since it does not conclusively appear from the face of the complaint that either the church and/or the Florida Baptist Convention are indispensable parties to this action, this action should not be dismissed on these grounds at this juncture. Therefore, to the extent that the trial court's dismissal of this action was premised on these grounds, it is reversed without prejudice to the appellees to raise and prove this defense by way of an affirmative defense.

For all of the foregoing reasons, we therefore reverse the dismissal of the defamation counts and the dismissal of the action for failing to join indispensable parties. We affirm the dismissal of [**11] the counts for intentional infliction of emotional distress and the negligent infliction of emotion distress.

Reversed and remanded in part. Affirmed in part.

---

**Footnotes**

1🔝 Our reversal is of course without prejudice for the appellees to assert any excessive entanglement claims in a summary judgment proceeding if the evidence so warrants. *See The House of God Which is The Church of the Living God, The Pillar and Ground of the Truth Without Controversy, Inc. v. White, 792 So. 2d 491, 495 (Fla. 4th DCA 2001).* We, however, express no opinion as to the merits of any such assertion at this juncture.



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

334

⊞  ◉ Lexis®  🔍   Liberty Lobby v. Anderson, 241 U.S. App. D.C. 246, 746 F.2d 1563 (198   🔍   **Client:** -None- ⌄   Folders   History   Help

Search: Everything   ⟩

**Document:**   Liberty Lobby v. Anderson, 746 F.2d 1563   | Actions ⌄

🗁⌄  🖨  ✉  ⬇  ⬡  ⛶  | Go to ⌄ | Page | Page # | ⌃ ⌄ | Search Document 🔍

● **Liberty Lobby v. Anderson, 746 F.2d 1563**

Copy Citation

United States Court of Appeals for the District of Columbia Circuit

January 20, 1984, Argued ; November 2, 1984, Decided

No. 83-1471

**Reporter**
746 F.2d 1563 * | 1984 U.S. App. LEXIS 17096 ** | 241 U.S. App. D.C. 246 | 11 Media L. Rep. 1001

LIBERTY LOBBY, INC., et al., Appellants v. JACK ANDERSON, et al.

**Prior History:** [**1] Appeal from the United States District Court for the District of Columbia (Civil Action No. 81-02240).

## Core Terms

actual malice, allegations, summary judgment, defamatory, articles, libel, reputation, convincing, Deposition, assertions, district court, anti-Semitism, falsity, attributed, defamation, clarity, lawsuit, malice, summary judgment motion, Investigator, illustrations, clear and convincing evidence, derogatory, good-faith, interview, telephone, magazine, neo-Nazi, cases

### Case Summary

**Procedural Posture**
Appellants, corporation and founder, sought review of a summary judgment from the United States District Court for the District of Columbia, which was granted in favor of appellees, magazine and staff, in a suit that charged appellees with libel. The issue raised on review was whether the district court properly granted appellees' motion for summary judgment on the ground that all the elements of libel had not been adequately established.

**Overview**
Following a summary judgment that was granted in favor of appellees, magazine and staff, in a libel suit, appellants, corporation and founder sought review. Appellees contended summary judgment was proper when all the elements of libel had not been adequately established. The court on review affirmed in part and reversed in part, holding that summary judgment was proper for those statements which it was shown were based on reports previously published in reputable sources. Additionally, the court reasoned that because appellants adduced nothing that permitted a jury to conclude that appellees had reason to doubt the published sources and had therefore acted with actual malice, summary judgment was appropriate. Further, the court found that a jury could have reasonably concluded that nine of appellants allegations were defamatory, false, and were made with actual malice. Additionally, it was held that a jury could reasonably have concluded that defamatory statements based wholly on a certain article were made with actual malice. The court concluded that summary judgment as to those claims was reversed and remanded.

**Outcome**
The summary judgment that was granted in favor of appellees, magazine and staff, in a libel suit was affirmed in part and reversed and remanded in part because appellants, corporation and founder, adduced nothing that permitted a jury to conclude that appellees had acted with actual malice in respect to certain articles and that a jury could have reasonably concluded that there was actual malice with regards to other articles.

▼ **LexisNexis® Headnotes**

Torts > ... > Defenses ⌄ > Privileges ⌄ > Absolute Privileges ⌄

335

*HN1* **Privileges, Absolute Privileges**

Actual malice is not simply ill will; it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true. Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice. This does not mean, that actual malice cannot be proved inferentially. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*

Torts > ... > Defamation ▾ > Public Figures ▾ > Actual Malice ▾
View more legal topics

*HN2* **Public Figures, Actual Malice**

To prevail in a libel trial, not only must the public-figure plaintiff prove the existence of actual malice; he must prove it with convincing clarity, or with clear and convincing proof. Moreover, judges are not merely to determine whether the finder of fact could reasonably find such convincing clarity to exist, but are independently to decide that point, as expositors of the constitution. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

Torts > ... > Defenses ▾ > Privileges ▾ > Absolute Privileges ▾

*HN3* **Privileges, Absolute Privileges**

The constitutional requirements of clear and convincing proof and independent judicial determination of the ultimate issue of actual malice are to be applied only after the plaintiff has had an opportunity to present his evidence. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > ... > Summary Judgment ▾ > Motions for Summary Judgment ▾ > General Overview ▾
Torts > ... > Defenses ▾ > Privileges ▾ > Absolute Privileges ▾

*HN4* **Summary Judgment, Motions for Summary Judgment**

Unless the court finds, on the basis of pretrial affidavits, depositions or other documentary evidence, that the plaintiff can prove actual malice, it should grant summary judgment for the defendant. If the case survives the defendant's summary judgment motion, the trial court at the close of the plaintiff's case must decide whether actual malice has been shown with convincing clarity. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*   ⚠️ 1

Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > General Overview ▾
Torts > ... > Defenses ▾ > Privileges ▾ > Constitutional Privileges ▾
View more legal topics

*HN5* **Freedom of Speech, Defamation**

Under the U.S. Const. amend. I, there is no such thing as a false idea. However pernicious an opinion may seem, the Supreme Court depends for its correction not on the conscience of judges and juries but on the competition of other ideas. Since opinions cannot be false, they cannot be the basis of a defamation action. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

**Counsel:** Mark Lane of the Bar of the Supreme Court of New York, pro hac vice by special leave of the Court, with whom Fleming Lee ▾ was on the brief, for Appellants.

Michael D. Sullivan, with whom David J. Branson ▾ and Leonard Appel ▾ were on the brief, for Appellees.

**Judges:** Edwards ▾ and Scalia ▾, Circuit Judges, and Harris, 🟩⭐ District Judge of the United States District Court for the District of Columbia. Opinion for the Court filed by Circuit Judge Scalia ▾.

**Opinion by:** SCALIA ▾

## Opinion

**[*1565]** SCALIA ▾, Circuit Judge:

Liberty Lobby, a not-for-profit incorporated under the laws of the **[*1566]** District of Columbia, and Willis Carto, its founder and treasurer, a citizen of California, brought this suit in the District Court for the District of Columbia against Bill E. Adkins, a Texas citizen, Jack Anderson, a Maryland citizen, and the Investigator Publishing Company, a corporation formed under the laws of the State of Texas. [1⬇] [**3] Their suit, founded on diversity of citizenship, 28 U.S.C. § 1332 [**2] (1982), charged that the defendants had libeled them in two articles printed in the October 1981 issue of *The Investigator* magazine, which was published by Jack Anderson. The District Court granted summary judgment for the defendants, *Liberty Lobby, Inc. v. Anderson*, 562 F. Supp. 201 (D.D.C. 1983), and the plaintiffs now appeal. [2⬇] The appeal

presents issues regarding the asserted doctrine of a "libel-proof" plaintiff, *i.e.*, one whose reputation has already been so damaged that further defamation can do no harm; the assertion that a pre-publication warning of falsity given by the plaintiff establishes the malice necessary to sustain judgment on behalf of a public-figure plaintiff; application of the "clear and convincing evidence" standard and the requirement of independent judicial determination of actual malice to a motion for summary judgment; and, of course, the merits consideration (under summary judgment standards) of whether the allegations were factual (as opposed to opinion), were defamatory, were false, and were made in good-faith reliance upon reputable sources.

**I**

Three stories published in the October 1981 issue of *The Investigator* are relevant to this lawsuit. The shortest of them, "America's Neo-Nazi Underground: Did *Mein Kampf* Spawn Yockey's *Imperium*, a Book Revived by Carto's Liberty Lobby?," was written by Jack Anderson and contained four of the thirty statements identified in the complaint as defamatory. That piece was an introduction to the two other articles: "Yockey: Profile of an American Hitler," telling the story of Francis Parker Yockey, a lawyer and author who took his own life in 1960, and "The Private World of Willis Carto," the source of the remainder of the statements identified as defamatory.

The "Yockey" and "Private World" articles were written by Charles Bermant, although the former appeared under the by-line of the magazine's staff writer Jon Obert, because [**4]  Anderson did not like more than one piece attributed to a single author in any issue. Bermant joined Anderson's staff in March 1981, having previously worked in Anderson's office as an intern, but the story, according to the appellants, began much earlier. In November 1969, Joseph Trento and Joseph Spear published an article in *True* magazine entitled "How Nazi Nut Power Has Invaded Capitol Hill." 3 ± Carto and Liberty Lobby sued *True*, claiming that the article defamed them. The lawsuit ended with a settlement under which *True* paid Carto a sum of money and published a favorable article about Liberty Lobby. In May 1981, Spear was working for Anderson, now as the Managing Editor 4 ± of *The Investigator*. He assigned Bermant to investigate the Yockey and Carto stories and, plaintiffs claim, gave him drafts containing the statements **[*1567]**  made in the *True* article from which to work. Appellants' Brief at 29-30. Although the affidavit that Bermant filed with the district court does not list the Trento and Spear article as a source, *see* Bermant Affidavit at paras. 8-17, the detailed appendix to the affidavit does identify it as a source, occasionally as the [**5]  sole source, for some of Bermant's claims. *See, e.g.*, Bermant Affidavit Appendix at 16-17.

Bermant conducted other research, which the district court characterized as "exhaustive" and "thorough[]." 562 F. Supp. at 206, 209. He reviewed the products of a Freedom of Information Act request, sought information about Carto and Yockey in libraries, and interviewed a number of people. One of his major sources was Robert Eringer, a freelance journalist; several of the allegedly defamatory statements were based solely on Eringer's [**6]  claims. Bermant never met Eringer and his deposition recounts only one telephone conversation with him. Eringer sent Bermant a draft of an article containing some information about Liberty Lobby. That draft has since been lost, probably "thrown away." Bermant Deposition at 71-72. Eringer never identified any of his sources to Bermant, nor did Bermant inquire. Anderson testified that it did not matter to him whether Eringer was reliable, for "we did not intend to use his material." Anderson Deposition at 51. Eringer, believed at the time of the proceedings below to live in London, was not deposed for this lawsuit. Another of Bermant's major sources was William Cox, an attorney representing a plaintiff who had sued an organization related to the appellants in the California courts. 5 ± Bermant interviewed Cox and also relied on the "Declaration of William Cox Regarding the Urgency of the Proceedings," a document apparently produced for the California lawsuit.

 [**7]  Bermant "spent . . . several days" writing first drafts of the articles, which were then edited by Obert. Bermant Affidavit at para. 17. There is evidence that several of the allegedly defamatory statements were added to the "Private World" article during the editing process. Bermant Deposition at 119. *The* Investigator's art department produced several illustrations for the issue -- two of which are also subjects of defamation claims.

Before the issue was published, William McGaw, editor of *The Investigator*, told the magazine's president that the articles were "terrible" and "ridiculous." He also viewed the illustrations and informed the art director that they "could be libelous." McGaw Affidavit at paras. 13, 17. Also before the issue was published, the appellants delivered written notification to the appellees of those statements they thought were defamatory, without apparent malice.

The articles, analyzed in detail in Parts IV and V of this opinion, convey the message that Carto is racist, fascist, anti-Semitic, and a neo-Nazi, and that Liberty Lobby was established to pursue his goals. The introductory article, written by Anderson over the by-line "The Editors, [**8]  " stated that upon Yockey's death Carto was able "to pick up the torch and fan it into a prairie fire." His strategy "to capture political power" was "to put a benign face on his operation. . . . Thus Carto called his base organization Liberty Lobby." The "Private World" article was to the same effect. It asked, for example, such rhetorical questions as whether "Carto's opinions march goosesteps beyond the pale of responsible American conservatism?"; repeated such claims of others as the assertion that Carto was "the leading anti-Semite in the country"; and, in words and illustrations, noted that Carto physically resembled and emulated the mannerisms of Hitler.

Carto and Liberty Lobby filed suit on September 15, 1981, challenging two of the  **[*1568]**  illustrations and twenty-eight statements contained in the articles, including some of the statements repeated above.

**II**

We turn first to arguments which both parties bring forward as a means of avoiding the difficult inquiry into the issues of falsity and malice. Appellees ask us to affirm the grant of summary judgment without further ado because the appellants are, on two theories, "libel-proof." First, they claim that [**9]  the reputations of Liberty Lobby and Willis Carto have been irreparably strained by prior publications. Whether these prior publications are truthful is not relevant, they assert, because the tort of libel, which redresses injury to reputation, has no application when the plaintiff, for whatever reason, has a reputation that cannot be damaged.

We are not yet ready to adopt for the law of libel the principle that 10,000 repetitions are as good as the truth. We see nothing to be said for the rule that a conscious, malicious libel is not actionable so long as it has been preceded by earlier assertions of the same untruth. To begin with, we cannot envision how a court would go about determining that someone's reputation had already been "irreparably" damaged -- *i.e.*, that *no* new reader could be reached by the freshest libel. More important, however, no significant First Amendment values would be furthered by the rule appellees suggest, since, where a person has been widely libeled by reputable sources, the defendant's *good faith* reliance upon those sources provides, as we shall later discuss, a complete defense. Proving such good faith reliance (or actually, even less [**10]  than that, merely preventing the plaintiff from proving the opposite by "clear and convincing evidence") is not such a burden that a prophylactic rule need be adopted sanctioning willful character-assassination so long as it is conducted on a massive scale.

The appellees' second libel-proof theory is somewhat different. They claim that the unchallenged portions of these articles attribute to the

appellants characteristics so much worse than those attributed in the challenged portions, that the latter cannot conceivably do any incremental damage. This apparently equitable theory loses most of its equity when one realizes that the reason the unchallenged portions are unchallenged may not be that they are true, but only that appellants were unable to assert that they were willfully false. In any event, the theory must be rejected because it rests upon the assumption that one's reputation is a monolith, which stands or falls in its entirety. The law, however, proceeds upon the optimistic premise that there is a little bit of good in all of us -- or perhaps upon the pessimistic assumption that no matter how bad someone is, he can always be worse. It is shameful that Benedict Arnold [**11] was a traitor; but he was not a shoplifter to boot, and one should not have been able to make that charge while knowing its falsity with impunity. So also here. Even if some of the deficiencies of philosophy or practice which the appellees' articles are lawfully permitted to attribute to the appellants (which is not necessarily to say they are true) are in fact much more derogatory than the statements under challenge, the latter cannot be said to be harmless. Even the public outcast's remaining good reputation, limited in scope though it may be, is not inconsequential. ("He was a liar and a thief, but for all that he was a good family man.") **6**↧

[**12] None of the opinions the appellees cite -- all decisions of federal courts interpreting [*1569] state law in the absence of state court guidance -- extend the libel-proof doctrine as far as appellees would go. In fact, the Second Circuit, an early proponent of the doctrine, has narrowed it to the facts presented in its earlier cases. *See Buckley v. Littell,* 539 F.2d 882, 889 (2d Cir. 1976). Because we think it a fundamentally bad idea, we are not prepared to assume that it is the law of the District of Columbia; nor is it part of federal constitutional law.

Appellants, for their part, argue that we can dispense with inquiry into the existence of actual malice, *see* slip op. pages 17-25, *infra,* because that element of liability is automatically established (to a degree sufficient to go to the jury) by the fact that appellees proceeded with these publications despite a warning from appellants that the articles were defamatory and a demand that they not be printed. These were allegedly contained in a letter to Jack Anderson which was "as explicit and detailed as the complaint filed in this matter," Appellants' Reply Brief at 6. It may be enough to [**13] note that that letter was not mentioned in the plaintiffs' papers in opposition to summary judgment, and is not part of the record on this appeal. Even if it were before us, however, the letter described could not conceivably constitute, in and of itself, sufficient evidence of malice to overcome a summary judgment motion. That effect might be achieved by a prior notice citing specific, verifiable facts contradicting the allegations so directly as to cause any reasonable person to conduct further inquiry; but mere general allegations of falsity similar to those contained in the complaint do not suffice. If the case reaches the jury, of course, such a notice can be considered as evidence of malice along with other factors -- but standing alone it cannot take the case there.

### III

We must address, then, whether the District Court properly granted the defendants' motion for summary judgment on the ground that all the elements of libel had not been adequately established. The nature of those elements is not in dispute, but the degree of certitude with which one of them had to be established, and the nature of the judgment that the District Court was to bring to bear upon it [**14] (*i.e.,* independent or deferential) will require some discussion.

Appellants do not question the District Court's ruling that they were so-called limited purpose public figures, and that the alleged libels pertained to the area in which they held this status. This means that, as a constitutional matter, in order to recover damages from these media defendants, the plaintiffs had to prove that they acted with actual malice. *See, e.g., Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974). **HN1**⚓ Actual malice is not simply ill will; it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true. *Id. at 328.* The test is not an objective one, for the Supreme Court has noted that

> reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant *in fact* entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual [**15] malice.

*St. Amant v. Thompson,* 390 U.S. 727, 731, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968) (emphasis added). This does not mean, of course, that actual malice cannot be proved inferentially. The plaintiff need not obtain an admission of fault from the defendant.

> [*1570] Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation.

*Id. at 732.*

**HN2**⚓ To prevail in a libel trial, not only must the public-figure plaintiff prove the existence of actual malice; he must prove it with "convincing clarity," *New York Times v. Sullivan,* supra, 376 U.S. at 285-86, or to use the Court's more recent language, with "clear and convincing proof," *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974). Moreover, judges are not merely to determine whether the finder [**16] of fact could reasonably find such "convincing clarity" to exist, but are "independently [to] decide" that point, "as expositors of the Constitution." *Bose Corp. v. Consumers Union,* 466 U.S. 485, 104 S. Ct. 1949, 1965, 80 L. Ed. 2d 502 (1984). The issue we address in this portion of our opinion is whether these requirements of "convincing clarity" and "independent judicial determination" apply at the summary judgment stage. Even though this is a diversity case, that issue is governed by federal law -- either because the Constitution imposes the more demanding requirements at the summary judgment stage, or because, if it does not, the matter is determined by the rules of the forum court under *Erie R.R. v. Tompkins,* 304 U.S. 64, 82 L. Ed. 1188, 58 S. Ct. 817 (1938). *Anchorage-Hynning & Co. v. Moringiello,* 225 U.S. App. D.C. 114, 697 F.2d 356, 360 (D.C. Cir. 1983) (applying *Erie* to the District of Columbia); *see Schultz v. Newsweek, Inc.,* 668 F.2d 911, 917 (6th Cir. 1982).

With regard to the "clear and convincing evidence" requirement, the issue can be framed as follows: whether, in order to deny the defendant's [**17] motion for summary judgment, the court must conclude that a reasonable jury not only could (on the basis of the facts taken in the light most favorable to the plaintiff) find the existence of actual malice, but could find that it had been established with "convincing clarity." We conclude that the answer is no. Imposing the increased proof requirement at this stage would change the threshold summary judgment inquiry from a search for a minimum of facts supporting the plaintiff's case to an evaluation of the weight of those facts and (it would seem) of the weight of at least the defendant's uncontroverted facts as well. It would effectively force the plaintiff to try his entire case in pretrial affidavits and depositions -- marshalling for the court *all* the facts supporting his case, and seeking to contest as many of the defendant's facts as possible. Moreover, a "clear and convincing evidence" rule at the summary judgment stage would compel the court to be more liberal in its application of that provision of FED. R. CIV. P. 56(e) which states that the court "may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. [**18] " In other words, disposing of a summary judgment motion

would likely be the relatively quick process it is supposed to be. Finally, if summary judgment were supposed to be based on a "clear and convincing" standard, it is hard to explain the Supreme Court's statement questioning the asserted principle that in public figure libel cases "summary judgment might well be the rule rather than the exception," and affirming to the contrary that "the proof of 'actual malice' . . . does not readily lend itself to summary disposition." _Hutchinson v. Proxmire_, 443 U.S. 111, 120 & n. 9, 99 S. Ct. 2675, 61 L. Ed. 2d 411 (1979). There is slim basis for such a statement if, in order to survive a motion for summary judgment, the plaintiff must establish an arguably "clear and convincing" case.

We believe, in short, that application of the "clear and convincing evidence" constitutional **[*1571]** standard in public figure libel cases is similar to application of the "beyond a reasonable doubt" constitutional standard in criminal cases. There, "probable cause" is sufficient to take the case to trial, _see Brown v. Department of Justice_, 230 U.S. App. D.C. 188, 715 F.2d 662, 667 (D.C. Cir. 1983), **[**19]** and the heightened standard applies only after the government has had an opportunity to present its full case, _United States v. Davis_, 562 F.2d 681, 683-84 (D.C. Cir. 1977) (on motions for acquittal, court must determine whether there is any evidence "upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt").

We realize that some other courts have expressed a different rule. _See, e.g., Yiamouyiannis v. Consumers Union_, 619 F.2d 932, 940 (2d Cir. 1980) ("a judge in denying a defendant's summary judgment motion must conclude that, based on the evidence asserted in the plaintiff's affidavits, 'a reasonable jury _could find_ malice with convincing clarity,'" _quoting Nader v. de Toledano_, 408 A.2d 31, 50 (D.C. 1979), _cert. denied_, 444 U.S. 1078, 62 L. Ed. 2d 761, 100 S. Ct. 1028 (1980). These formulations were set forth, however, with no analysis of the point here discussed. In fact, the court's attention was directed to the question of whether the normal procedural standard governing summary judgment applied (_i.e._, the test "could a reasonable jury find," as opposed to some test **[**20]** more favorable to the defendant) rather than to the question of what burden of proof that standard would be applied to. Moreover, those courts' analyses of the facts demonstrate that they rested their decisions upon lack of evidence of malice, not upon lack of "convincing clarity" in that evidence. _See Yiamouyiannis v. Consumers Union, supra_, 619 F.2d at 942 ("no showing has been made that they were published with actual malice, let alone a showing that achieves 'convincing clarity'"); _Nader v. Toledano, supra_, 408 A.2d at 56 ("in sum, . . . we agree with the trial court that appellant has demonstrated no genuine issue of fact as to whether Copley had reason to doubt de Toledano's veracity").

With regard to the _Bose_ requirement of independent judicial determination we reach the same conclusion, for the same compelling practical reason: it is simply incompatible with the preliminary nature of the summary judgment inquiry. If it were to be applied at that early stage, summary judgment would be converted from a search for the minimum amount of evidence that could persuade a reasonable person into the final assessment of "actual malice" **[**21]** by the court itself -- final, at least, if the court concludes actual malice has not been established. That would compel the plaintiff to present his full case prematurely, with the undesirable consequences described above. In addition, courts of appeal would be burdened with the unusual task of making the largely factual determination of actual malice in many cases where a judge or jury verdict against the plaintiff would render that unnecessary.

For the foregoing reasons, we believe that _HN3_⊕ the constitutional requirements of "clear and convincing" proof and independent judicial determination of the ultimate issue of actual malice are to be applied only after the plaintiff has had an opportunity to present his evidence. We thus agree with the two-stage approach set forth by Judge Wright, joined by Judge Robinson, in his concurrence in _Wasserman v. Time, Inc._, 138 U.S. App. D.C. 7, 424 F.2d 920, 922 (D.C. Cir.), _cert. denied_, 398 U.S. 940, 26 L. Ed. 2d 273, 90 S. Ct. 1844 (1970):

> _HN4_⊕ Unless the court finds, on the basis of pretrial affidavits, depositions or other documentary evidence, that the plaintiff can prove actual malice in the _Times_ **[**22]** sense, it should grant summary judgment for the defendant. . . .

> If the case survives the defendant's summary judgment motion, the trial court at the close of the plaintiff's case must decide whether actual malice has been shown with "convincing clarity."

One further clarification is needed: In reviewing the district court's application of the foregoing principle, we do not defer **[*1572]** to its conclusions and reverse only if they are clearly erroneous. Since in granting or denying summary judgment a district court by definition makes a determination of law rather than fact, we review the matter anew. _Western Casualty & Surety Co. v. National Union Fire Insurance Co._, 677 F.2d 789, 791 n.1 (10th Cir. 1982).

**IV**

A. _Nondefamatory Allegations_

We proceed, then, to a discussion of the merits. Preliminarily, we can eliminate from our inquiry those statements asserted to be false in the Complaint which cannot, as a matter of law, be libelous since they do not "tend[] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him," RESTATEMENT **[**23]** (SECOND) OF TORTS § 559 (1977). The plaintiffs' challenges to the following numbered allegations represent no more than a charge of journalistic inaccuracy, which is not an actionable fault:

3. Assertion that Liberty Lobby is tax exempt.

4. Assertion that Yockey's book _Imperium_ is "circulated only among the elect"; that Carto's admiration for Yockey is a "secret thing"; and that Carto "hides in the shadows of reclusion and anonymity."

10. Use of word "drifting" to describe Carto's movement among various right-wing groups. (Even if this can be thought sufficiently derogatory to be actionable, it is a characterization which would qualify as an opinion and thus be protected. _See_ Section B below.)

12. Assertion that Liberty Lobby's magazine, _The Spotlight_, "boasts 335,000 _readers_," when in fact it had a _paid circulation_ of 335,000.

18. Description of Jeremy Horne as a veteran employee.

B. _Opinions_

We can also eliminate from our consideration three other allegations, which are constitutionally protected opinion, and therefore not actionable. In _Gertz v. Robert Welch, Inc., supra_, the Supreme Court stated that:

339

*HN5* Under [**24] the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.

418 U.S. at 339-40. Since opinions cannot be false, they cannot be the basis of a defamation action. While it is often difficult to draw a line between statements of fact and opinion, *see, e.g.,* Ollman v. Evans, 230 U.S. App. D.C. 44, 713 F.2d 838 (D.C. Cir. 1983), *vacated,* October 6, 1983, *reh'g en banc,* March 6, 1984, we are of the view that the following numbered allegations qualify as the latter:

7. Description of Carto as seeking to "destabilize society," and to "create[] a climate of fear and danger," in order to "seize real political power."

30. Statement that Carto's appeal to "American traditions" is inconsistent with the racial, ethnic and religious equality central to the "American idea." **7**⬇

There are no objective criteria by which the truth or falsity of these statements can be evaluated. A proposal to eliminate what one favors in the social structure is "destabilization," and to eliminate [**25] what one opposes is "progress." One man's "climate of fear and danger" is another man's "realistic assessment of the perils that confront us." The essence of the "American idea," **[*1573]** and what is or is not consistent with it is preeminently a matter for political (*i.e.,* opinionated) debate rather than scientific inquiry.

In our view, all of the assertions in allegation 25 except those repeated elsewhere **8**⬇ also qualify as opinion. Since, with regard to one of the assertions, this assessment depends heavily upon context, we set forth that allegation in full:

"In this scrutiny of Willis Carto and what he represents, five of the characteristics John Roy Carlson said identify inherent or incipient fascism have manifested themselves in greater [**26] or lesser degree. They are; [*sic*] a virulent anti-Semitism to dissolve the social fabric; the pitting of group against group and race against race to weaken national unity; incessant Red-baiting to smokescreen fascist propaganda [*sic*]; superpatriotism and a perverted brand of nationalism; and the creation of a 'survivor mentality' to further fragment society. Three other characteristics are also evident in the Carto record; the use of lies and half-truths to win the support of the politically ignorant; adulation of Adolf Hitler; denigration of democracy and agitation for an authoritarian New Order."

What one person may consider "the pitting of group against group" another might regard as the championing of minority rights or opposition to exorbitant and divisive minority demands. What is "Red-baiting" or "superpatriotism" or "perverted nationalism" to some may seem no more than appropriate awareness of Communist subversion and love of country to others. Whether a person is creating a "survivor mentality" or merely urging sensible immediate precautions surely depends upon one's estimation of how close the world is to the brink of disaster. Whether democracy [**27] is being "denigrated" depends upon what elements one considers central to that political form, and except to the anarchist what is "authoritarian" is necessarily a matter of political judgment and degree. As for "fascism": Although, the word has a particular meaning in political science discourse, in the arena of political commentary we are engaged in here it has long been used to describe nothing more specific than right-of-center views of which the writer disapproves. **9**⬇ *See* Buckley v. Littell, 539 F.2d 882, 894 (2d Cir. 1976). We have no difficulty in denominating all of the statements relating to these terms as statements of opinion.

[**28] The statement that Carto's record was characterized by "the use of lies and half truths" is more problematic, but we are of the view that in this context it constitutes a statement of opinion as well. The assertion that a person has "lied" in the sense of intentionally making a misrepresentation of fact is unquestionably defamatory. *See* 50 Am. Jur. 2d *Libel and Slander* § 89 (1970). It seems to us, however, that when a charge of unspecified "lies and half truths" is made in the midst of a paragraph making such opinionated indictments as "fascism," " Red baiting," "perverted nationalism," and "denigration of democracy," the reader would not be justified in believing that the misrepresentations referred to are distortions of demonstrable fact rather than distortions of similar political assessments which the opinionated writer takes to be as unquestionable as fact -- for example (to hypothesize a few that would fit in nicely with the rhetoric of this case), whether the Communist world intends to "bury us," or whether Adolf Hitler saved Europe from Communism. This interpretation is suggested not merely by the statements with which the charge of "lies and half truths" **[*1574]** [**29] is surrounded, but also by the fact that the asserted purpose of the " lies and half truths" is to "win the support of the *politically ignorant*" (emphasis added), rather than "to deceive the uninformed." As recently stated by an Illinois court:

The allegation that a public figure is a "liar" can be seen as a factual assertion unprotected by absolute privilege when the derogatory remark is laden with factual content, as opposed to mere name-calling.

*Costello v. Capital Cities Media, Inc.,* 111 Ill. App. 3d 1009, , 445 N.E.2d 13, 18, 67 Ill. Dec. 721 (1982). In the present case the alternative to factual content is not name-calling, but rather political opinion -- and we think it is with the latter that the remarks were laden. We emphasize it is not our holding that specific factual assertions are immunized from defamation liability by accompanying political rhetoric; but that the politically rhetorical context of vague and ambiguous assertions (Carto uses "lies and half-truths") can determine their meaning as opinion rather than fact.

C. *Allegations Unaccompanied by Evidence of Malice*

As to those challenged statements that [**30] could be defamatory, and were factual, appellees' defense was based not upon truth of the assertions but upon good-faith reliance on reputable sources. If established, that unquestionably eliminates the necessary element of actual malice. Inquiry into the question, however, cannot be conducted in gross. It is the individual allegedly libelous statement (taken in its proper context) rather than the accuracy of the publication as a whole, which is on trial. A falsehood published with actual malice is no less actionable for being surrounded by an array of well documented and carefully researched allegations. The accompanying truth cannot eliminate the libel, and is indeed the most effective means of increasing its harm by increasing its credibility. The district court appears to have acknowledged this principle, since it found that "the information contained within [Bermant's] sources substantiates each allegation contained in the articles." 562 F. Supp. at 209.

We turn first to the two remaining statements (not already disposed of as nonlibelous in our earlier discussion) contained in the introductory

article, that article was written in its entirety by *Anderson* [**31], rather than Bermant -- so that Bermant's affidavit setting forth published sources that "I relied upon" for these statements cannot be regarded as demonstrating good-faith reliance of the author. It is true that the Appendix to the Bermant affidavit states, unlike the body of the affidavit, that it sets forth the authorities upon which "defendants" (rather than "I") relied -- but in view of the contradictory statement in the body of the affidavit, that is not a sufficiently clear allegation that *Anderson* relied upon these authorities to sustain summary judgment. Indeed, it is questionable whether the second-hand assertion of Bermant as to what was in Anderson's mind would meet the requirement of FED. R. CIV. P. 56(e) that affidavits "be made on personal knowledge, . . . set forth such facts as would be admissible in evidence, and . . . show affirmatively that the affiant is competent to testify to the matters stated therein."

Nonetheless, in light of the manner in which, according to uncontroverted evidence, the Anderson introduction was written, we think no reasonable jury could find that Anderson personally acted with actual malice *with regard to statements whose defamatory* [**32] *content does not go beyond statements made by Bermant in one of the last two articles*. Bermant's deposition stated that "he [Anderson] was given finished drafts of both [the second and third] pieces and took certain facts and quotes out and . . . based on or coupled with his own knowledge and his own background, wrote the introduction." Bermant Deposition at 97. Anderson's deposition (at 107) stated that in preparing the introduction **[*1575]** "I had no independent information. I based it on the information in front of me. So I was relying . . . on the reporters who work for us. . . . I took material either from the two articles or asked someone else to prepare a draft which I disliked and then rewrote." Anderson was entitled to rely upon Bermant's research, unless he had reason to doubt Bermant's accuracy. No such reason was presented by the record here. **10**⬇

[**33] As it happens, both of the remaining defamations attributed to the Anderson article are reformulations of Bermant's allegations, some of which are challenged here and some of which are not. Both the reference to "America's neo-Nazi underground" (allegation 1) and the reference to "a more sinister neo-Nazi cabal, men of influence and cunning, lurk[ing] in the shadows" (allegation 2) find support in such assertions made by the "Private World" and "Yockey" articles as the assertion that "Carto [was] a Hitler fan" and "Liberty Lobby was 'infiltrated by Nazis who revere the memory of Hitler'" (allegation 6), and the assertion that the admirers of Yockey's book *Imperium*, among whom Carto is identified, constitute "a neo-Nazi underground," whose members "control a publishing-propaganda network stretching to the far corners of America" (unchallenged assertion). Allegations 1 and 2, therefore, are nonactionable on the basis of Anderson's actual malice. Whether they are actionable under the doctrine of *respondeat superior* against Anderson or any other defendant, on the basis of Bermant's actual malice, *see* Gertz v. Robert Welch, Inc., 680 F.2d 527, 539 n.19 (7th Cir. 1982), [**34] *cert. denied*, 459 U.S. 1226, 75 L. Ed. 2d 467, 103 S. Ct. 1233 (1983), depends upon the outcome of our inquiry into Bermant's good faith reliance on other sources, particularly with regard to allegations 6 and 9, as discussed below. **11**⬇

[**35] We turn, then, to the remaining statements in Bermant's articles, to determine whether, as to each, the trial court's finding of exculpating reliance upon reputable sources was correct. The plaintiffs' theory is that some of the defendants' sources were inherently unreliable, and since a jury can infer that Bermant was aware of this fact, Bermant's protestations that he had no malicious intent are insufficient to support summary judgment. **12**⬇

[**36] We find that summary judgment was proper for those statements which **[*1576]** Bermant could show were based on reports previously published in reputable sources. Many of the claims contained in *The Investigator's* stories were not new. They had been made in previous articles about Carto and the Liberty Lobby. Bermant's sworn statement claimed that he relied on these published sources, and the appellants' evidence did not dispute that. Since the plaintiffs adduced nothing that would permit a jury to conclude that Bermant had reason to doubt these published sources and had therefore acted with actual malice, we think summary judgment was appropriate. The following numbered allegations are in this category.

5. Allegation that Carto is "the leading anti-Semite in the country." Many published sources, from Anti-Defamation League publications to *The National Review*, claimed Carto anti-Semitic. (The prominence of Carto in this regard -- whether he is "the *leading* anti-Semite" -- is, if derogatory apart from the anti-Semitism itself, a matter of opinion.)

6. Reference to Carto as a "Hitler fan" and assertions that Liberty Lobby was "infiltrated [**37] by Nazis." A prior Drew Pearson publication referred to Liberty Lobby as "a nest of Nazis"; a statement by Rep. Eilberg in the *Congressional Record* and the Cox Declaration in the *Mermelstein* lawsuit described Carto's admiration of Hitler." **13**⬇

8. Allegation of anti-Semitism. *See* allegation 5.

9. Neo-fascist [Yockey] as Carto's role model. Carto's introduction to *Imperium* adequately supports the claim that Yockey was Carto's role model, inasmuch as the defamatory content of that claim (if any) consists of the implication that Carto admired Yockey's ideas: "I was in the presence of a great force. . . . We understood the I [Carto] would not desert him." The claim that Yockey was a "neo-fascist" was supported by several publications, and is in any case opinion, *see* slip op. page 17, *supra*.

16. Allegation of anti-Semitism. *See* allegation 5.

20. Purpose of establishing the Institute for Historical Review was to disprove Hitler's mass extermination of Jews. This was supported in substance by an article in the Long Beach Press-Telegram and by the Cox declaration filed in the *Mermelstein* lawsuit.

21. Details of Mermelstein-Institute for [**38] Historical Review lawsuit. This was supported by the Cox declaration filed in the lawsuit, and by a *Los Angeles Times* story about the controversy.

26. Attribution to *Spotlight* of the term "'Jew-Zionist' international bankers." The derogatory content was sufficiently supported by (1) numerous published allegations of anti-Semitism, *see* allegation 5, and (2) *Spotlight's* claim that the energy crisis was the result of "Israel in cahoots with the multinational corporations."

28. Allegation that a fine was levied against Liberty Lobby by the FEC. This was supported by an article in *Spotlight*.

[**39] We also find that summary judgment was proper for those statements **[*1577]** which Bermant's affidavit asserted were based on *unpublished* interviews with Robert Bartell and Irving Suall, specifically the following:

22. Statement that Carto, "outraged over whistle blowing," required employees to submit to lie detector tests as a condition of employment, attributed to Robert Bartell, Chairman of Liberty Lobby's Board of Policy.

24. Statement that a plan, called "Operation Survival," was a plan to establish a dictatorship, attributed to ADL official Irving Suall.

Each of these individuals occupied a position or engaged in activities which made it reasonable to believe that he was knowledgeable concerning

the matters relating to Liberty Lobby or Carto to which the attributed statement pertains. Each, moreover, was available (and ample time was provided) for deposition by plaintiffs which could establish that the interview had not occurred, that the statement had not been made, or that the subject of the interview could not reasonably have been thought to be a reliable source. In these circumstances we do not believe that the plaintiffs' mere general assertion [**40] that these statements were false and were maliciously published suffices to overcome the good-faith defense established by Bermant's affidavit.

**V**

The district court was correct in entering summary judgment in favor of the appellees on the foregoing twenty-one allegations, and we affirm its findings. As to each of them, one element of the cause of action -- either defamatory content, factual nature or malice -- absent. **14** Our examination of the record, however, reveals that a jury could reasonably conclude that the nine remaining allegations were defamatory, false, and made with actual malice. As to these claims, then, we must reverse and remand to the district court. *See* J. MOORE & J. WICKER, 6 Pt. 2 MOORE'S FEDERAL PRACTICE para. 56.27[1] at p. 56-1560 (2d ed. 1982) (remand for limited issues in dispute proper). *See, e.g., McBride v. Merrell Dow and Pharmaceuticals, Inc.,* 230 U.S. App. D.C. 403, 717 F.2d 1460 (D.C. Cir. 1983).

 [**41] Allegation 11 asserts that Liberty Lobby occupies a building in Washington, D.C., owned by the Government Educational Foundation, "the chairman and owner of [which] is Willis Carto, who bought the building with money contributed by many of Liberty Lobby's members in response to an urgent appeal"; and that Liberty Lobby pays the Government Educational Foundation $6,000 per month rent. The implication is that Carto is deriving personal profit from an excessive rental to Liberty Lobby. The plaintiffs deny all elements of the allegation, asserting that the building is not owned by the Government Educational Foundation, that Carto is neither chairman nor owner of that organization, and that Liberty Lobby pays no rent for the building. The sources allegedly relied upon by Bermant (other than Eringer, whose reliability for purposes of the good-faith defense is inadequate, as we shall discuss below) do not assert ownership of the Foundation by Carto or the payment of any rent, much less a specific figure of $6,000. It is for a jury to determine the truth or falsity of these matters and whether, if false, they are defamatory. On the basis of evidence adduced at this state, it is impossible [**42] to say that no actual malice could be found.

Allegation 15, in addition to once more characterizing Carto's movement **[*1578]** among various right-wing groups as "drifting" (a statement we have disposed of in the context of another allegation earlier, *see* slip op. page 15, *supra*), asserted that Carto "organized and promoted the Joint Council for Repatriation. What he meant by 'repatriation' was the forced deportation of all blacks to Africa." The published sources relied upon by defendants support the assertion that Carto created this organization, and that its purpose was to "send[] American blacks back to Africa." They do not establish, however, that the proposal envisioned "forced deportation" -- in fact, to the contrary, one of them asserted that Carto (overtly at least) only sought "voluntary" repatriation. While the latter detail reduces not at all the repugnant racism of the scheme, it is possible to be a racist without being guilty of the quite separate fault of advocating the forced deportation of United States citizens. It is the distinction between the actions of White Citizen Councils, during the worst days of the civil rights struggle, in subsidizing bus [**43] fares for blacks willing to emigrate from the South, and the action of groups such as the Ku Klux Klan in driving blacks out by physical force. As far as racism is concerned, there is no distinction between the two, but the latter contains an additional and quite distinct repugnancy. Since the published sources referred to by the defendants not only do not establish this point but to the contrary assert that Carto's scheme was formally for "voluntary" repatriation, we think it is a jury question whether this allegation, if false, was made with actual malice.

We find that a jury could reasonably conclude that defamatory statements based wholly on the *True* article were made with actual malice. That article was the subject of a prior defamation action which was settled to Carto's satisfaction, a fact likely known to Bermant's editors, if not Bermant. Whether the particular statements relied on were false and whether the appellees were actually aware of that falsity are matters for a jury to determine. Allegation 19, the illustration suggesting that Carto emulated Hitler, and allegation 29, that Carto joined the singing of "Hitler's 'Horst Wessel Lied'" and delivered a speech [**44] in an attempt to emulate Hitler's style and charisma, were based solely on the *True* article. There is no other evidence that Carto emulates Hitler in appearance or in action, allegations the jury could find to be defamatory.

We turn next to the five allegations based solely upon the conversation with Robert Eringer:

> 13. Statement that Carto "conducts his business by way of conference calls from a public telephone," which arguably suggests criminality;

> 14. Claim that in 1968 a Carto front organization "used a direct mail blitz to support G. Gordon Liddy's Congressional campaign in New York" (since Liddy was later convicted of felony in connection with political activities, the allegation could be considered defamatory);

> 17. Illustration showing Carto secretly observing prospective employees through a one-way mirror;

> 23. One-way mirror allegation, in text;

> 27. Claim that a lead story in an issue of *The Spotlight* was a total hoax.

We find that a jury could reasonably conclude that Bermant made these allegations with a disregard for their truth or falsity that constituted actual malice. For one thing, there is only Bermant's word for the fact [**45] that Eringer ever said anything that supports the statements. The same was true for the statements, discussed earlier, attributed to Bartell and Suall -- but as we noted, *see* slip op. pages 24-25, *supra*, those individuals were present at known locations in this country and could have been deposed by the plaintiffs, whereas the mysterious Mr. Eringer was thought to be somewhere in England. Moreover, Bermant's dealings with Eringer display a much lesser degree **[*1579]** of care, despite the scurrilous allegations for which he is the sole source. Bermant not only did not inquire how Eringer came to know these details of Carto's operations; he never even looked the unknown Eringer in the eye until after the story was published, but spoke to him only once over the telephone. Anderson admits that he did not care whether Eringer was reliable. These actions came close to the hypothetical case of actual malice the Supreme Court described in *St. Amant*, a story "based wholly on an unverified anonymous telephone call." 390 U.S. at 732. Eringer was identified by name, but he was in all other respects unknown to the appellees. These allegations, which defendants [**46] claim were based solely on Eringer's assertions, should have gone to the jury.

We affirm the District Court's grant of summary judgment as to all claims of defamation except those addressed in Part V of this opinion. As to the latter, we reverse and remand for further proceedings consistent with this opinion.

*So ordered.*

---

**Footnotes**



**\*** Sitting by designation pursuant to 28 U.S.C. § 292(a) (1982).

**1** Two other employees of the Investigator Publishing Company were also named in the original complaint, but have since been dismissed from the suit.

**2** Anderson's counterclaim, in which he claimed that he had been defamed by Liberty Lobby, and the second count of the plaintiff's complaint, asserting a conversion of Liberty Lobby's files, were both dismissed by the District Court with no appeal taken.

**3** At oral argument, counsel for the appellees conceded that *when* the *True* article was published, Trento and Spear worked for Jack Anderson. Jan. 20, 1984 Tr. at 33-34.

**4** In their briefs, both sides identify Spear as the magazine's managing editor, although he was listed as an associate editor on the masthead of the October 1981 issue. Regardless of title, he was in a position of authority over Bermant, also listed on the masthead as an associate editor.

**5** Cox's client, Mermelstein, sued the Institute for Historical Review, an association associated with Carto. The Institute had offered an award of $50,000 to the first person able to prove that Hitler's mass extermination of Jews had occurred. Mermelstein claimed the prize, and the Institute allegedly refused to pay.

**6** There may be validity to the proposition that at some point the erroneous attribution of incremental evidence of a character flaw of a particular type which is in any event amply established by the facts is not derogatory. If, for example, an individual is said to have been convicted of 35 burglaries, when the correct number is 34, it is not likely that the statement is actionable. That is so, however, not because the object of the remarks is "libel-proof," but because, since the essentially derogatory implication of the statement ("he is an habitual burglar") is correct, he has not been libeled. That issue is not presented here, both because *none* of the repulsive attributes which the appellees imputed to the appellants have been established or conceded to be true, and because the statements which we find to have been improperly taken from the jury impute attributes which, while less heinous than those for which the appellees have a good-faith defense, are nevertheless quite separate and distinct from them.

**7** To the extent other portions of this allegation contained the imputation that Carto supported racial and religious bigotry, the good-faith defense discussed below in connection with allegation 5 was applicable, *see* slip op. pages 2-23, *infra*.

**8** The portions of this allegation asserting anti-Semitism and adulation of Hitler are subject to the good-faith defense. *See* the discussion of allegations 5 and 6, slip op. pages 22-23, *infra*.

**9** George Orwell commented on this phenomenon in 1946: "Many political words are . . . abused. The word *Fascism* has now no meaning except in so far as it signifies 'something not desirable.'" G. ORWELL, *Politics and the English Language*, in A COLLECTION OF ESSAYS 162 (1953).

**10** Even if there was evidence indicating that Anderson knew of the *True* libel suit, *see* note 3, *supra*, nothing suggests that he thought Bermant was relying exclusively upon the *True* article as a source for these allegations -- as in fact Bermant was not.

**11** The judgment of the District Court was based exclusively upon absence of malice on the part of any defendant. We have not been asked to consider, nor do we express any opinion upon, the principal-agent relationship among the various defendants. The precise relationship between Anderson and Bermant, for example, is unclear. *Compare* Anderson Deposition at 42 ("Q: Was [Bermant] . . . an employee of yours or of Jack Anderson Enterprises? A: No.") *with* Bermant Deposition at 9 ("Q: Who pays you for your work? In other words, who signs the checks? A: Jack Anderson.").

In the District of Columbia an employer can be held liable for torts committed by employees acting within the scope of their employment. *See Jordan v. Medley*, 228 U.S. App. D.C. 425, 711 F.2d 211, 213 (D.C. Cir. 1983); *Smith v. District of Columbia*, 399 A.2d 213, 218 n.3, 221-22 (.D.C. 1979) (slander case); RESTATEMENT (SECOND) OF AGENCY § 247 (1958).

**12** For a discussion of the inconclusiveness of "self-serving, albeit plausible" affidavit statements regarding intent, see *Stewart v. Credit Bureau, Inc.*, 236 U.S. App. D.C. 146, 734 F.2d 47, 54-55 (D.C. Cir. 1984). There, although the affidavit was "uncontested," we held that because the record "manifest[ed] enough possibility" that the self-serving affidavit statement was incorrect the court properly did not conclude its inquiry with the affidavit, but instead permitted the matter to be explored at trial. Likewise here, Bermant's

assertion that he acted without actual malice does not end our inquiry. There is no inconsistency in our accepting, for purposes of the summary judgment decision, Bermant's self-serving statements as to the sources he relied upon. The fact that he relied upon a concededly existing source is not at all likely to be disproved by circumstantial evidence, whereas the fact that he *believed* what the source said *is* -- for example, by evidence that many other sources which he must have been aware of said the opposite.

**13**    Appellants assert that the unreliability of Cox and therefore the malice of Bermant follows automatically from the fact that Cox had been involved in a lawsuit against Liberty Lobby. We do not agree. It is assuredly not the case that every journalistic reliance upon the version of a story given by one of the protagonists demonstrates malice. The Cox assertions relied on here (*see*, in addition to the present allegation, allegations 20 and 21, *infra*) were directly supported by at least one other (impartial) source, and were given plausibility by allegations of neo-Nazism and anti-Semitism from many other sources.

**14**   We have not discussed separately the contention that the juxtaposition of an article entitled "The Private World of Willis Carto" to an article about an alleged "American Hitler" (to wit, Yockey) is defamatory. In light of what we have found regarding the nonactionability of allegations regarding Carto's admiration of Hitler, *see* discussion of allegation 6 at slip op. page 23, *supra*, and also Carto's acknowledged admiration of Yockey, *see* discussion of allegation 4 at slip op. page 15, *supra*, there is no substance to this claim.

About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

  Lexis 

Marron v. Moros, 2023 U.S. Dist. LEXIS 11240 (S.D. Fla. Jan. 20, 202

Search: Everything

Client: -None- ⌄   Folders   History   Help

---

Document:   **Marron v. Moros, 2023 U.S. Dist. LEXIS 11240**   | Actions ⌄

---

Go to ⌄   Page  [Page #]   Search Document 🔍

---

### Ⓐ Marron v. Moros, 2023 U.S. Dist. LEXIS 11240

[ Copy Citation ]

United States District Court for the Southern District of Florida, Miami Division

January 20, 2023, Decided; January 23, 2023, Entered on Docket

Case Number: 21-23190-CIV-MORENO

**Reporter**

**2023 U.S. Dist. LEXIS 11240 \*** | 2023 WL 357592

CARLOS EDUARDO MARRON, JANE DOE, C.R., a minor, and S.A., a minor, Plaintiffs, vs. NICOLAS MADURO MOROS, FUERZAS ARMADAS REVOLUCIONARIOS DE COLOMBIA, CARTEL OF THE SUNS, VLADIMIR PADRINO LOPEZ, MAIKEL JOSE MORENO PEREZ, NESTOR LUIS REVEROL TORRES, TAREK WILLIAM SAAB, and TARECK EL AISSAMI, Defendants.

**Subsequent History:** Motion denied by [Marron v. Moros, 2023 U.S. Dist. LEXIS 91083 (S.D. Fla., May 24, 2023)](#)

## Core Terms

damages, kidnapping, torture, personal jurisdiction, defamation, default, default judgment, narcoterrorism, captivity, trebling, murder, conspiracy, extorting, suffering, Cartel, pain, emotional distress, defamation per se, imprisonment

**Counsel:  [\*1]** For Carlos Eduardo Marron, JANE DOE, C.R., A Minor, S.A., A Minor, Plaintiffs: [Alex C. Lakatos](#) ⌄, [Jonathan Samuel Klein](#) ⌄, [Stephen M. Medlock](#) ⌄, LEAD ATTORNEYS, [Mayer Brown LLP](#) ⌄, Washington, DC; [Jaime D. Guttman](#) ⌄, [Scale Law Partners, LLC](#) ⌄, Miami, FL.

Fuerzas Armadas Revolucionarios De Colombia, also known as, FARC, also known as, Revolutionary Armed Forces of Colombia, Defendant, Pro se, Florence, CO.

**Judges:** [FEDERICO A. MORENO](#) ⌄, UNITED STATES DISTRICT.

**Opinion by:** [FEDERICO A. MORENO](#) ⌄

## Opinion

**DEFAULT FINAL JUDGMENT**

THIS CAUSE came before the Court upon Plaintiffs' Motion for Default Final Judgment (**D.E. 41**), filed on **October 18, 2022**.

THE COURT has considered the motion, the affidavits of the parties, the pertinent portions of the record, and being otherwise fully advised in the premises, it is

**ADJUDGED** that the motion is GRANTED as set forth in this Order. Defendants have failed to respond to the Complaint and the Plaintiffs' Motion for Final Default Judgment. The time for doing so has passed. The Clerk of Court entered defaults against the Defendants. The Court entered a default judgment against Fuerzas Armadas Revolucionarias de Colombia (FARC) and the Cartel of the Suns. The Court now enters default judgments against the remaining **[\*2]**  Defendants and awards damages in favor of the Plaintiffs.

### I. Background

On September 2, 2021, Plaintiffs filed this complaint asserting claims against Defendants for orchestrating the torture and kidnapping of Carlos Eduardo Marrón. Marrón was kidnapped, tortured, and detained for more than a year. Marrón, his wife, Maria, and their two minor children, C.R. and S.A., filed this case.

Plaintiffs served the complaint in a variety of ways. Plaintiffs served the FARC and the Cartel of the Suns by serving its leaders, Juvenal Ovidio Ricardo Palmera Pineda and Cliver Antonio Alcala Cordones. Both are in prison in the United States. The Clerk entered default as to both cartels

as neither responded to the complaint. The Court also granted default judgment against both Defendants and reserved the decision of damages until the Plaintiffs served the remaining Defendants.

The Court granted Plaintiffs' motion for alternative service on Defendants Nicholas Maduro Moros, Vladimir Padrino Lopez, Maikel Jose Moreno Perez, Nestor Luis Reverol Torres, Tarek William Saab, and Tareck El Aissami. Plaintiffs employed Rule 4(f) to serve these individual Defendants by alternative service, and none have responded to the Complaint. **[\*3]**  On October 18, 2022, the Clerk entered default as to the remaining Defendants. Plaintiffs are now moving for final default judgment against the Defendants.

## II. Legal Standard

Federal Rule of Civil Procedure 55 sets forth a two-step process for obtaining a default judgment. First, when a defendant fails to plead or otherwise defend a lawsuit, the Clerk of Court is authorized to enter a clerk's default. *See* Fed. R. Civ. P. 55(a). The Clerk has entered defaults as to all the Defendants in this case. Second, after entry of the Clerk's Default, the Court may enter default judgment against the defendants so long as the defendants are not minors or incompetent. Fed. R. Civ. P. 55(b)(2). By defaulting, a defendant admits the truth of the well-pleaded factual allegations in the Complaint. *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009).

"While a complaint . . . does not need detailed factual allegations," a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (internal citations omitted). If the admitted facts are sufficient to establish liability, the Court must then ascertain the appropriate amount of damages and enter final judgment in that amount. *See PetMed Express, Inc. v. MedPets.com, Inc.*, 336 F. Supp. 2d 1213, 1217 (S.D. Fla. 2004).

Damages may be awarded **[\*4]**  only if the record adequately reflects the basis for the award, which can be shown with submission of detailed affidavits establishing the facts necessary to support entitlement to the damages requested by the plaintiff. *See Adolph Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985). Rule 55 does not require an evidentiary hearing on the appropriate amount of damages, and it is within the Court's discretion to choose whether such a hearing should take place. *See SEC v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005). Plaintiffs in this case have submitted detailed affidavits on damages and the Court finds an evidentiary hearing is unnecessary to determine damages.

## III. Legal Analysis

A default judgment is proper where the Court has subject matter jurisdiction over the action, personal jurisdiction over the defaulted defendants and where the record establishes the plaintiff's right to relief *Nat'l Loan Acquisitions Co. v. Pet Friendly, Inc.*, 743 F. App'x 390, 392 (11th Cir. 2018).

### A. Jurisdiction

Both subject matter and personal jurisdiction are established in this case. Plaintiffs have stated a claim under the Anti-Terrorism Act, 18 U.S.C. § 2333. The Court, therefore, has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

The Court also has personal jurisdiction over Defendants. Plaintiffs served the Cartel of the Suns and the PARC by serving their officers, who are incarcerated **[\*5]**  in the United States. Serving an officer of a foreign criminal association through one of its leaders effectuates valid service on the criminal organization. *See Caballero v. FARC*, No. 1: 18-CV-25337 (S.D. Fla. Mar. 18, 2019) (serving FARC through Juvenal Ovidio Palmera Pineda, an imprisoned FARC leader, and granting default). Plaintiffs also served the individual defendants by alternative means as allowed by the Court pursuant to Federal Rule of Civil Procedure 4(f)(3).

The Court also may exercise personal jurisdiction under Florida's long-arm statute and under principles of due process. Under the Florida long-arm statute, a person or entity is subject to personal jurisdiction in Florida if the defendant or its agent committed tortious acts giving rise to a plaintiff's claims within this state. *See* Fla. Stat. § 48.193(1)(a)(2). It is not necessary for the defendant to be physically present in Florida, so long as the defendant commits an element of the tort in Florida. *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002). Defendants, in this case, were offended by Plaintiff Carlos Marrón's Florida business and they kidnapped and tortured him until it collapsed. They also tortured him until they obtained access to his Miami bank accounts, and stole funds from those accounts. Defendants also contacted Plaintiff Maria Marrón, who was in Miami, Florida, to extort money **[\*6]**  from her as they threatened to kill her husband. Defendants defamed Marrón in Florida, which also subjects them to personal jurisdiction here. *See Adam J. Rubinstein MD., P.A. v. Ourian*, No. 20-21948-CIV-MORENO, 2020 U.S. Dist. LEXIS 210019, 2020 WL 6591559, at \*1 (S.D. Fla. Nov. 10, 2020) (nonresident defendant was subject to personal jurisdiction where he posted defamatory statement online, which was accessed in Florida). Finally, to the extent the Defendants did not each commit the torts described in the complaint, the Defendants acted as co-conspirators. *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281 (11th Cir. 2009) (stating that Florida's long-arm statute "support[s] personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy.").

Having found Florida's long-arm statute satisfied, the Court must next examine whether due process considerations for the exercise of personal jurisdiction are met. The Eleventh Circuit's three-part due process test examines "(1) whether the plaintiff's claims 'arise out of or related to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction **[\*7]**  comports with 'traditional notions of fair play and substantial justice.'" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013).

The 'arise out of or relate to' standard requires only "an affiliation between the forum and the underlying controversy." *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1025, 209 L. Ed. 2d 225 (2021). That standard is met here where the Defendants actions led to the destruction of Plaintiff Marrón's business, the theft of his money from his Florida bank accounts, the extortion of money from Maria Marrón in Florida, and the defamation of Marrón in Florida.

As to the second prong, the Defendants purposefully availed themselves of the privilege of conducting activities in Florida. They stole money from his Florida bank accounts, and extorted money from Maria Marrón. Defendants also engage in narcoterrorism in Florida. Finally, the Court finds the third due process element is met as the exercise of personal jurisdiction does not violate notions of due process and substantial justice.

*B. Default Judgment on Liability*

*1. The Florida and Federal Anti-Terrorism Act*

The Florida Anti-Terrorism Act and the Federal Anti-Terrorism Act create private rights of action when individuals are injured by acts of terrorism. *See* § 772.13(1), Fla. Stat.; 18 U.S.C. § 2331. The Florida Anti-Terrorism Act makes actionable "terrorism," which is "intended **[*8]** to (1) [i]ntimidate, injure, or coerce a civil population; (2) [i]nfluence the policy of a government by intimidation or coercion; or (3) [a]ffect the conduct of government through destruction of property, assassination, murder, kidnapping or aircraft piracy." § 775.30(1)(b), Fla. Stat.

Defendants have committed predicate offenses for a Florida Anti-Terrorism Act violation, including narcoterrorism in violation of 21 U.S.C. § 960a. Acts of narcoterrorism are appropriate predicates for a violation of the Florida Anti-Terrorism Act. Narcoterrorism is dangerous to human life in the United States. Defendant Nicolas Maduro was criminally indicted for narcoterrorism and is the leader of Defendant the Cartel of the Suns. *United States v. Maduro Moros*, 11-cr-205 (S.D.N.Y. 2011). Defendants' violations of the Florida Anti-Terrorism Act — using narcotics sales in Florida to fund their acts of terrorism at home — gave rise to Mr. Marrón's injuries. Under the facts of this case, Defendants exchange drugs for hard foreign currency. The hard currency allows the Defendants to stay in power in Venezuela. Defendants leverage that power to kidnap and torture dissidents like Plaintiff. These actions against dissidents like the Plaintiff enhance the Defendants control in Venezuela. By controlling Venezuela, **[*9]** Defendants are able to traffic drugs and shelter the cartels. But for the narcoterrorism fundraising, Defendants would not have been able to fund the kidnapping and torture of Plaintiff. These unrefuted allegations establish a violation of the Florida Anti-Terrorism Act. Likewise the Plaintiffs establish a violation of the Federal Anti-Terrorism Act. Plaintiffs Maria Marrón and her minor children are U.S. nationals, who have a right of action under the Act for largely the same reasons as there is a claim under the Florida Act. By engaging in narcoterrorism in Florida, the Defendants engaged in activities that violate state law, are dangerous to human life, are intended to coerce a population, and transcend boundaries. The proceeds of narcoterrorism fund acts of terrorism in Venezuela and the Defendants inflicted injuries on the U.S. population from Venezuela. These actions give rise to the injuries suffered by Maria Marrón and her children.

*2. False Imprisonment*

False imprisonment is the "unlawful restraint of a person against his will." *Escambia Cnty. Sch. Bd. v. Bragg*, 680 So. 2d 571, 672 (Fla. 1st DCA 1996). To succeed, a plaintiff need show only "imprisonment contrary to his will and the unlawfulness of the detention." *Rivers v. Dillards Dep't Store, Inc.*, 698 So. 2d 1328, 1331 (Fla. 1st DCA 1997) (quoting *Rotte v. City of Jacksonville*, 509 So. 2d 1252 (Fla. 1st DCA 1987)). Plaintiff Marrón was **[*10]** held against his will. His detention was unlawful as he had not committed a crime.

*3. Intentional Infliction of Emotional Distress*

To state a cause of action for intentional infliction of emotional distress, a complaint must allege four elements: (1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct; (3) the conduct caused the emotional distress; and (4) the distress was severe. *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 594 (Fla. 2d DCA 2007). A defendant satisfies the intent requirement if he knows that the emotional distress is "substantially certain[] to result from his conduct" or if it "acts reckless . . . in deliberate disregard of a high degree of probability that the emotional distress will follow." *E. Airlines, Inc. v. King*, 557 So. 2d 574, 576 (Fla. 1990) (citing § 500, Restatement (Second) of Torts (1965)). The kidnapping and torture of Plaintiff Marrón was deliberate and outrageous. It caused severe emotional and physical distress to his wife and children. This was exacerbated by Defendants extorting money from Maria Marrón with threats of murdering her husband. She has suffered outbreaks of carbuncles, pain in her extremities from Raynaud's Syndrome, post traumatic stress disorder, severe anxiety, and insomnia.

*4. Defamation Per Se*

Defendants, acting through Nestor Luis Reverol Tones and Tarek William **[*11]** Saab, defamed Plaintiff Carlos Marrón by falsely stating that he was a financial terrorist, money launderer, and worse than a mass murderer. These false statements were published through internationally available media. To state a claim for defamation, the plaintiff must show that "'1) the defendant published a false statement; (2) about the plaintiff; (3) to a third party; and (4) that the falsity of the statement caused injury to the plaintiff.'" *Matonis v. Care Holdings Grp., LLC*, 423 F. Supp. 3d 1304, 1315 (S.D. Fla. 2019) (quoting *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015)). A statement is defamatory *per se* if it charges that a person has committed an infamous crime. *See Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953) (en banc) (per curiam); *Scott v. Busch*, 907 So. 2d 662, 667 (Fla. 5th DCA 2005). Reverol's and Saab's statements meet the definition of defamation *per se* as they were false, made with malice, published, and state that Plaintiff Carlos Marrón committed felonies.

*5. Civil Conspiracy*

Civil conspiracy requires an agreement between two or more people to participate in an unlawful act, an overt act performed by any party to the agreement in furtherance of the agreement's purpose, and a resulting injury. *See Walters v. Blankenship*, 931 So. 2d 137, 140 (citing § 500, Restatement (Second) of Torts (1965)). The kidnapping and torture of Plaintiff Marrón was deliberate and outrageous. It caused severe emotional and physical distress to his wife and children. This was exacerbated **[*12]** by Defendants extorting money from Maria Marrón with threats of murdering her husband. She has suffered outbreaks of carbuncles, pain in her extremities from Raynaud's Syndrome, post traumatic stress disorder, severe anxiety, and insomnia.

347

*4. Defamation Per Se*

Defendants, acting through Nestor Luis Reverol Torres and Tarek William Saab, defamed Plaintiff Carlos Marrón by falsely stating that he was a financial terrorist, money launderer, and worse than a mass murderer. These false statements were published through internationally available media. To state a claim for defamation, the plaintiff must show that "'(1) the defendant published a false statement; (2) about the plaintiff; (3) to a third party; and (4) that the falsity of the statement caused injury to the plaintiff.'" *Matonis v. Care Holdings Grp., LLC*, 423 F. Supp. 3d 1304, 1315 (S.D. Fla. 2019) (quoting *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015)). A statement is defamatory *per se* if it charges that a person has committed an infamous crime. *See Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953) (en banc) (per curiam); *Scott v. Busch*, 907 So. 2d 662, 667 (Fla. 5th DCA 2005). Reverol's and Saab's statements meet the definition of defamation *per se* as they were false, made with malice, published, and state that Plaintiff Carlos Marrón committed felonies.

*5. Civil Conspiracy*

Civil conspiracy requires an agreement between two or more people to participate **[*13]** in an unlawful act, an overt act performed by any party to the agreement in furtherance of the agreement's purpose, and a resulting injury. *See Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006). The kidnapping, torture, robbery, bank fraud, money laundering, extortion, false imprisonment, and defamation of Carlos Marrón were overt acts in furtherance of that conspiracy by Defendants.

*C. Damages*

After entering default judgment on liability, a court must determine the amount of damages to be awarded.

*1. Damages to Plaintiff Carlos Marrón under the Anti-Terrorism Acts*

Courts considering the Federal Anti-Terrorism Act, on which the Florida Anti-Terrorism Act is modeled, have concluded that the purpose of the statute is best achieved if it is interpreted to subject terrorists to the broadest range of damages. *See Alban v. Maduro*, 21-20706-CIV-Gayles, (S.D. Fla. Sept. 5, 2007); *Knox v. Palestine Liberation Org.*, 442 F. Supp. 2d 62, 77 (S.D.N.Y. 2006).

For the kidnapping and torture of Plaintiff Carlos Marrón, courts have generally awarded $10,000 per day (before trebling, which is statutorily required). *See Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 51 (D.D.C. 2001) (holding in Foreign Sovereign Immunities Act case that the "formula which has evolved as a standard in hostage cases . . .grants the former hostage roughly $10,000 for each day of his captivity."). Adjusting this formula for inflation, this comes to $18,164 per day in today's **[*14]** dollars. *Miller v. Juarez Cartel*, 20-cv-00132, 2022 U.S. Dist. LEXIS 112463, 2022 WL 2286952, at *35 (D.N.D. June 24, 2022) (adjusting damages for inflation). Plaintiff Marrón was in captivity for 878 days, and therefore, the total due Plaintiff Carlos Marrón is $15,947,992.

In cases where pain and suffering is heightened by torture, courts have added a lump sum. *Stansell v. Revolutionary Armed Forces of Colombia (PARC)*, No. 09-cv-2308-T-26MAP, 2010 WL 11507790, at *3 (M.D. Fla. June 14, 2010) (adding $5 million for five years in captivity); *Levin v. Islamic Republic of Iran*, No. 05-2494, 2007 WL 9759002, *16 (D.D.C. 2007), R&R adopted, 11493474 (adding $15 million lump sum to per diem of 343 days in captivity). In this case, the Court finds a $10 million lump sum is appropriate, which brings the compensation due to Plaintiff Marrón to $25,947,992, which is $77,843,976 after trebling as set forth by the Florida Anti-Terrorism Act. *See* § 772.13(1), Fla. Stat.

*2. Defamation Damages due to Plaintiff Carlos Marrón*

The Defendants defamed Plaintiff Marrón by blaming him for his own kidnapping and torture and claiming he was a financial terrorist. They asserted he engaged in conduct worse than mass murder and called him a coward. In *Alban v. Maduro*, 21-20706-DPG, which involved the same defendants as in this case, the Court awarded $1 million in damages for defamation. Alban was unable to defend his reputation because he was murdered, unlike Plaintiff Marrón who escaped captivity, but nevertheless suffered harm to his reputation. The Court finds this award is **[*15]** also appropriate in this case as the statements constitute defamation *per se*.

*3. Damages to Plaintiff Maria Marrón and her minor children*

Maria Marrón and her children suffered hardship and loss of companionship of Plaintiff Carlos Marrón while he was being held captive. Maria Marrón's suffering was compounded because she received routine phone calls demanding money by threatening to torture and kill her husband. She suffered physical ailments as a result of the Defendants' actions.

In *Delloye v. Revolutionary Armed Forces of Colombia (FARC)*, No. 18-cv-1307, 2022 WL 36292, at *4 (M.D. Pa. Jan. 4, 2022), the court awarded $12 million in compensatory damages to the child of a woman kidnapped and held captive by FARC for six years. In *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62, 70 (D.D.C. 1998), the court awarded $10 million to each of the spouses of two men who had been kidnapped for 5 years and 3 years, respectively. *See also Levin v. Islamic Republic of Iran*, No. 0-2494, 529 F. Supp. 2d 1, 2007 WL 9759002, *16 (D.D.C. Dec. 31, 2007), R&R adopted, 2008 U.S. Dist. LEXIS 132206, 2008 WL 11493474 (D.D.C. Jan. 14, 2008) (awarding $10 million to spouse whose husband was in captivity for 343 days); *Sutherland*, 151 F. Supp. 2d at 51 (awarding wife whose husband was kidnapped for 6.5 years damages of $10 million).

Under the extraordinary circumstances here, Maria Marrón is entitled to a compensatory-damages award of $15 million, and S.A. and C.R. are awarded compensatory damages in the amount of $5 million each, *i.e.*, $25 million total, which is $75 million after the trebling **[*16]** required under the Anti-Terrorism Act. This chart summarizes the damages award in this case:

348

| Plaintiff | Injury | Amount (Before Trebling) | Amount (Trebled) |
|---|---|---|---|
| Carlos Marrón | Kidnapping and Torture | $25,947,992 | $77,843,976 |
| Maria de Marrón | Solatium, pain and suffering | $15,000,000 | $45,000,000 |
| C.R. | Solatium, pain and suffering | $5,000,000 | $15,000,000 |
| S.A. | Solatium, pain and suffering | $5,000,000 | $15,000,000 |
| Carlos Marrón | Defamation | $1,000,000 | $1,000,000 (no trebling) |

*4. Punitive Damages*

Plaintiffs request $300 million in punitive damages. In *Alban*, the district court found that the trebling component of the Anti-Terrorism Acts functioned as punitive damages. So to here, the damages under the Anti-Terrorism Acts have been trebled and therefore, a separate punitive damages award is superfluous.

*5. Attorney's Fees and Post-Judgment Interest*

The Court reserves jurisdiction to award attorneys' fees pursuant to the Florida and Federal Anti-Terrorism Acts. The Court also reserves jurisdiction to award post-judgment interest under 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court.").

DONE AND ORDERED in Chambers at Miami, Florida, this 20th January 2023.

/s/ Federico A. Moreno ▾

FEDERICO A. MORENO ▾

UNITED **[\*17]** STATES DISTRICT JUDGE



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

⚠ **Metropolis Co. v. Croasdell, 145 Fla. 455**

Copy Citation

Supreme Court of Florida

January 10, 1941

[NO DOCKET NUMBER]

**Reporter**

145 Fla. 455 * | 199 So. 568 ** | 1941 Fla. LEXIS 715 ***

THE METROPOLIS COMPANY, Plaintiff in Error, v. ROY CROASDELL, Defendant in Error

**Prior History:**  [***1]  A Writ of Error from the Circuit Court for Duval County, DeWitt T. Gray, Judge.

## Core Terms

cashiered, libelous per se, abolished, admission of testimony, assistant engineer, actual malice, use of a word, libel per se, declaration, knocked, slander, libel

## Case Summary

### Procedural Posture

Defendant newspaper appealed a judgment from the Circuit Court of Duval County (Florida) which entered a verdict for plaintiff individual in his action alleging the false and malicious publication of an article which described him as having been "cashiered" from his job as assistant county engineer.

### Overview

Plaintiff individual brought an action against defendant newspaper alleging the false and malicious publication of an article which described him as having been "cashiered" from his job as assistant county engineer. The trial court overruled defendant's demurrer, and held that the publication was libelous per se. The jury returned a verdict in favor of plaintiff, and defendant appealed. Finding no reversible error, the court affirmed. The court agreed that the word "cashiered" was libelous per se. Testimony of the mental sufferings of plaintiff's family was properly admitted, the court held, to show aversion or contempt manifested as a consequence of the libelous publication to show its harmful tendency. Holding that words amounting to libel per se necessarily imported malice, the court found sufficient evidence of actual malice to support the jury's verdict. The court noted that defendant's failure to print a retraction within 10 days after receipt of notice as required by 1933 Fla. Laws ch. 16070 would also have been evidence of actual malice.

### Outcome

Finding no reversible error, the court affirmed the verdict in favor of plaintiff in his slander action against defendant newspaper.

▼ **LexisNexis® Headnotes**

Business & Corporate Compliance > ... > Workers' Compensation & SSDI ▾ > Administrative Proceedings ▾ > Fraud ▾

Torts > Intentional Torts ▾ > Defamation ▾ > 📄 Defamation Per Se ▾

View more legal topics

**HN1**⬇ **Workers' Compensation, Fraud**

Libel per se is false and unprivileged publication of unfounded statements which tend to injure a person in office, occupation, business, or employment and which in natural and proximate consequence will necessarily cause injury. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (10)*   ⚠ 1   ✚ 1

Civil Procedure > Appeals ▾ > Reviewability of Lower Court Decisions ▾ > Preservation for Review ▾
Evidence > ... > Procedural Matters ▾ > Objections & Offers of Proof ▾ > Objections ▾

**HN2**⬇ **Reviewability of Lower Court Decisions, Preservation for Review**

The appellate court will consider only such grounds of objection to the admissibility of evidence as were made in the court below. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ▾ > Defamation ▾ > Libel ▾

View more legal topics

**HN3**⬇ **Defamation, Libel**

Evidence is admissible in an action for slander or libel to show aversion or contempt manifested as a consequence of libelous or slanderous publications to show their harmful tendency. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ▾ > Defamation ▾ > 📄 Defamation Per Se ▾

View more legal topics

**HN4**⬇ **Defamation, Defamation Per Se**

Words amounting to libel per se necessarily import malice. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ▾ > Defamation ▾ > 📄 Defamation Per Se ▾

View more legal topics

**HN5**⬇ **Defamation, Defamation Per Se**

General damages for the use of words defamatory per se need not be proved. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

**Counsel:** *Harry W. Reinstine,* for Plaintiff in Error;

*Julian E. Fant,* for Defendant in Error.

**Judges:** TERRELL ▾, C.J., WHITFIELD ▾, BROWN ▾, BUFORD ▾, THOMAS ▾, and ADAMS ▾, J.J., concur; CHAPMAN ▾, J., dissents.

## Opinion

EN BANC

[**569]   [*456]   Per Curiam.

The defendant in error, Roy Croasdell, plaintiff below, filed a declaration alleging the false and malicious publication of an article which described him as having been "cashiered" from his job as assistant county engineer. A demurrer to the declaration was overruled, the order stating that the publication was libelous *per se.* On pleas of not guilty, truth and privilege, the jury returned a verdict of $3,000. Upon motion for new trial, the court suggested a remittitur of $750, which was entered, and judgment for $2,250 damages to the plaintiff was rendered. Writ of error was taken by defendant.

The first question raised by the plaintiff in error is whether or not it is libelous *per se* to publish in a newspaper, concerning the plaintiff as engineer, the following:

"The new county board held its organization session today. First off, it handed [***2] out nine jobs. Next, it abolished four -- the four jobs abolished were in the county engineering department. Solee moved up from one of assistant engineer jobs, which was knocked out, and the other assistant, Roy Croasdell, was cashiered. From now on there will be no assistant engineers -- Since one of the jobs was held by Solee, who moved up, the abolition of the four jobs knocked only three men out of jobs -- Croasdell, Crooks and Lewis."

**HN1**⬆ Libel *per se* is false and unprivileged publication of unfounded statements which tend to injure a person in office, occupation, business,

351

or employment and which in natural and proximate consequence will necessarily cause injury. McClellan v. Engle, 74 Fla. 581, 77 So. 270; Layne v. Tribune Co., 108 Fla. 177, 146 So. 234, 86 A.L.R. 466; Sharp v. Bussey, 137 Fla. 96, 187 So. 779, 121 A.L.R. 1148. We find no error in the ruling that the use of the word "cashiered" in the quoted publication and applying the above definition was libelous *per se*. It is true the **[*457]** meaning given the word is "to dismiss" or "to discharge." However, it does not mean an ordinary dismissal but one with ignomy, or with dishonor, or in disgrace. It **[***3]** is of significance that although four jobs were abolished and three employees were left without jobs, only the defendant in error was "cashiered."

The second question submitted is in regard to the admissibility of testimony of the mental suffering of plaintiff's wife and family. The objection to this testimony was not sufficiently definite in the court below to apprise the court and opponent of the precise objection raised here, namely, its admissibility as an element of damages. See McKennon v. Johnson, 57 Fla. 120, 48 So. 910; Caldwell v. Peoples Bank of Sanford, 73 Fla. 1165, 75 So. 848. *HN2* The appellate court will consider only such grounds of objection to the admissibility of evidence as were made in the court below. Cross v. Aby, 55 Fla. 311, 45 So. 820; Peninsular Naval Stores Co. v. Mathers, 96 Fla. 620, 119 So. 333. The objection raised below was to the admissibility of testimony offered by the witness as to the state of mind of the plaintiff's family. It is well settled that *HN3* evidence is admissible in an action for slander or libel to show aversion or contempt manifested as a consequence of libelous or slanderous publications to show their harmful tendency. See Luna v. Seattle **[***4]** Times Co., 186 Wash. 618, 59 P. 2d) 753, 105 A.L.R. 932, Note, page 944.

The third question presented is whether or not there was evidence of actual malice in the record. *HN4* Words amounting to libel *per se* necessarily import malice. **[**570]** Layne v. Tribune Co., *supra*; Johnson v. Finance Acceptance Co. of Georgia, 118 Fla. 397, 159 So. 364. *HN5* General damages for the use of words defamatory *per se* need not be proved. Piplack v. Mueller, 97 Fla. 440, 121 So. 459; Layne v. Tribune Co., *supra*; Commander v. Pedersen, 116 Fla. 148, 156 So. 337; **[*458]** Johnson v. Finance Acceptance Co. of Georgia, *supra*; Harris v. Metropolis Co., 118 Fla. 825, 160 So. 205. The evidence adduced by the plaintiff, if believed by the jury, was ample to support a verdict, and, coupled with the failure of the defendant to print a retraction within ten days after receipt of notice as required by Chapter 16070, Acts of 1933, would be some evidence of actual malice on the part of the defendant. See 37 C.J. 78, Sec. 484, and note; Augusta Chronicle Publ. Co. v. Arrington, 42 Ga. App. 746, 157 S.E. 394.

A careful examination of the record discloses no reversible error and the judgment **[***5]** must therefore be affirmed.

Affirmed.



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

⋮⋮ 🌀 **Lexis**   🔍     | Miami Herald Pub. Co. v. Ane, 423 So. 2d 37 | 🔍 |   **Client:** -None- ⌄   Folders   History   Help   More

Search: Everything                                                         ⟩

**Document:**                   Miami Herald Pub. Co. v. Ane, 423 So. 2d 376                    Actions ⌄

📁⌄  🖨  ✉  ⬇  ⬡  ▣   | Go to ⌄ |  Page | Page # |  ⌃ ⌄  | 🔍 Search Document |

⚠️ **Miami Herald Pub. Co. v. Ane, 423 So. 2d 376**

[ **Copy Citation** ]

District Court of Appeal of Florida, Third District

October 12, 1982; Rehearing Denied January 7, 1983

NO. 79-1463

**Reporter**

423 So. 2d 376 * | 1982 Fla. App. LEXIS 21403 **

THE MIAMI HERALD PUBLISHING COMPANY, Appellant, v. AURELIO ANE, Appellee.

**Prior History:** [**1] An Appeal from the Circuit Court for Monroe County, M. Ignatius Lester ⌄, Judge.

## Core Terms

truck, actual malice, beer, media, defamation, marijuana, damages, defamatory falsehood, defamatory statement, defamation action, Leasing, private individual, public figure, defamatory, press, general concern, libel action, decisions, newspaper, licensed, matters, libel, constitutionally protected, public official, free press, courts, fault, seized, qualified privilege, reckless disregard

## Case Summary

**Procedural Posture**

Defendant newspaper company challenged the decision of the Circuit Court for Monroe County (Florida), returning a verdict in favor of plaintiff beer distributor in a libel action against defendant and awarding compensatory damages to plaintiff. Punitive damages were not awarded; thus, plaintiff brought a cross-appeal.

**Overview**

Deputies seized a beer truck containing three tons of marijuana. A reporter for defendant newspaper company spoke to law enforcement officials and learned the details of the marijuana seizure, including the name of the licensed owner of the seized beer truck. The reporter called an official of the company that had formerly leased the truck and was informed that the truck had been sold to plaintiff beer distributor. The reporter did not obtain any documentation or verification of the alleged sale to plaintiff. No other source implicated plaintiff with the seized truck, and law enforcement officials specifically told the reporter that plaintiff was not a suspect. However, an article appeared in defendant's newspaper that falsely identified plaintiff as the owner of the truck. Plaintiff brought a libel suit against defendant. The trial court ruled in favor of plaintiff and awarded compensatory damages. The appellate court affirmed the decision because a private individual was not required to show actual malice and there was sufficient evidence of journalistic negligence and defamatory falsehood. Without actual malice, however, plaintiff was not entitled to punitive damages.

**Outcome**

The court affirmed the award of compensatory damages to plaintiff and the denial of punitive damages in the libel action against defendant newspaper company. The law did not require plaintiff, as a private individual, to produce evidence of actual malice on the part of defendant for publishing defamatory material where the evidence revealed that defendant acted with a reckless disregard for whether the article was false or not.

▼ **LexisNexis® Headnotes**

Constitutional Law > ... > Freedom of Speech ⌄ > 📄 Defamation ⌄ > 📄 Public Figures ⌄

Torts > ... > Defamation ⌄ > Public Figures ⌄ > Actual Malice ⌄

View more legal topics

**HN1** ⬇ **Defamation, Public Figures**

A non-public figure plaintiff is not required under any circumstances to make an actual malice showing in a libel case as an element of his cause of action, it being sufficient if a plaintiff establishes that a defendant published the alleged false and defamatory statements with negligence, that is, without reasonable care as to whether the alleged false and defamatory statements are actually true or false. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (6)*

Torts > ... > Defamation ⌄ > Public Figures ⌄ > Actual Malice ⌄

View more legal topics

**HN2** ⬇ **Public Figures, Actual Malice**

Actual malice is never required where a defamation plaintiff is a private individual and not a public official or public figure. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Constitutional Law > Bill of Rights ⌄ > Fundamental Freedoms ⌄ > General Overview ⌄

Torts > ... > Defamation ⌄ > Public Figures ⌄ > Voluntary Public Figures ⌄

View more legal topics

**HN3** ⬇ **Bill of Rights, Fundamental Freedoms**

It is well-settled that the free speech and free press guarantees of U.S. Const. amend. I, as made enforceable against the states under the due process clause of U.S. Const. amend. XIV, require a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement is made with actual malice, meaning with knowledge that it is false or with reckless disregard of whether it is false or not. This rule also applies to a public figure. It does not apply, however, to a private individual who is neither a public official nor public figure. As to the latter, a rule of negligence precludes the imposition of liability without fault in a defamation action, and requires a private individual plaintiff to produce evidence of some fault on the part of a defendant publishing defamatory material. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (8)*   🔷 1

Constitutional Law > ... > Case or Controversy ⌄ > Constitutional Questions ⌄ > General Overview ⌄

Governments > Courts ⌄ > Judicial Precedent ⌄

View more legal topics

**HN4** ⬇ **Case or Controversy, Constitutional Questions**

It is a fundamental principle of federal constitutional law that no state court is authorized to interpret any provision of the United States Constitution, including U.S. Const. amend. I, in a manner that is contrary to decisions from the highest court in the nation interpreting the same provision of the constitution. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Public Entity Liability ⌄ > Liability ⌄ > General Overview ⌄

View more legal topics

**HN5** ⬇ **Public Entity Liability, Liability**

One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if he knows that the statement is false and that it defames the other, acts in reckless disregard of these matters, or acts negligently in failing to ascertain them. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*

Torts > Intentional Torts ⌄ > Defamation ⌄ > General Overview ⌄

**HN6** ⬇ **Intentional Torts, Defamation**

The language of the publication declared upon should not be interpreted by extremes, but should be construed as the common mind would normally understand it. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

354

Civil Procedure > Trials ▾ > Jury Trials ▾ > Province of Court & Jury ▾
Torts > Intentional Torts ▾ > Defamation ▾ > Procedural Matters ▾
View more legal topics

*HN7*⬇ **Jury Trials, Province of Court & Jury**

The law is well-settled that where a publication is susceptible of two reasonable interpretations, one of which is defamatory, the issue of whether the publication is defamatory becomes one of fact and must be submitted to a jury for a fact-finding determination. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*

Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > General Overview ▾
Torts > Intentional Torts ▾ > Defamation ▾ > 📄 Defamation Per Se ▾
View more legal topics

*HN8*⬇ **Freedom of Speech, Defamation**

A false and defamatory statement accusing someone of a crime is considered to be per se actionable without proof of special damage. U.S. Const. amend. I, however, requires proof of some actual damage before monetary damage can be awarded in a defamation action involving negligence. One element of such damages may be mental anguish and personal humiliation. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

**Counsel:** Steel, Hector & Davis ▾ and Talbot D'Alemberte and Donald M. Middlebrooks ▾; James D. Spaniolo ▾, for appellant.

Adams and Ward and Robert Ward and James W. Kaufman ▾, for appellee.

**Judges:** Before HUBBART ▾, C.J., and HENDRY ▾ and DANIEL S. PEARSON ▾, JJ.

**Opinion by:** HUBBART ▾

## Opinion

**[\*378]** HUBBART ▾, Chief Judge

This is an appeal and cross-appeal from a final judgment awarding compensatory damages against a newspaper in a libel action brought in the Circuit Court for the Sixteenth Judicial Circuit in and for Monroe County, Florida.

The central question presented for review is whether a plaintiff [who is neither a public official nor public figure] in a libel action is required under Florida law to establish as an element of his cause of action that the defendant published the alleged false and defamatory statements sued upon with "actual malice" as defined in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964) [*i.e.*, either with knowledge of its falsity or with reckless disregard of its truth or falsity] when the alleged false and defamatory statements relate to an [\*\*2] event of public or general concern. We hold, in accord with established First Amendment law and the overwhelming weight of authority throughout the country, that under Florida law such *HN1*⬆ a non-public figure plaintiff is not required under any circumstances to make such an "actual malice" showing as an element of his cause of action, it being sufficient if the plaintiff establishes, as here, that the defendant published the alleged false and defamatory statements with negligence [*i.e.*, without reasonable care as to whether the alleged false and defamatory statements were actually true or false].

We, accordingly, reject all contrary contentions, together with other related points, made upon this appeal and cross-appeal, and affirm the final judgment under review. We further certify that our decision herein passes upon a question, stated above, which is of "great public importance," so as to permit further review of this case by the Florida Supreme Court under Article V, Section 3(b)(4) of the Florida Constitution.

I

The facts of this case are as follows. On Monday, November 21, 1977, Monroe County **[\*379]** Sheriff's deputies seized an "Old Milwaukee" beer truck containing [\*\*3] three tons of marijuana outside Marathon, Florida, in the Florida Keys. Greg Kirstein, a reporter for the defendant Miami Herald, was dispatched from his Key West office to cover this event for his newspaper. In connection with this assignment, Mr. Kirstein spoke on several occasions to various officials from the Monroe County Sheriff's office and learned the details of the marijuana seizure, including the fact that Lillian Fernandez of Key West, Florida, was the licensed owner of the seized beer truck. He further checked with the Florida Department of Motor Vehicles in Tallahassee and confirmed the information that the beer truck was, in fact, licensed to Lillian Fernandez.

Mr. Kirstein, however, continued to make other inquires concerning the ownership of the subject beer truck. He tracked down the former owner of the truck, Island Leasing Corporation, and the company which had formerly leased the truck from Island Leasing Corp., Universal Brands; this was done by tracing the fleet number of the truck and an expired beverage commission sticker on the truck. Mr. Kirstein had one brief telephone conversation with a person from Island Leasing Corp., and two longer telephone conversations [\*\*4] with an official from Universal Brands, the defendant Marvin Kimmel.

Mr. Kimmel stated that his company no longer leased the beer truck, that the people from Island Leasing had told him that they had sold the truck to the plaintiff Aurelio Ane the prior Thursday for $ 2,750 cash. Mr. Kirstein made no attempt to verify this hearsay information by again

contacting Island Leasing; he further was unable to obtain any documentation which would verify such a sale, but, to the contrary, discovered that the licensed, present owner of the truck was Lillian Fernandez of Key West. Moreover, he made no effort to contact Lillian Fernandez.

No other source contacted by Mr. Kirstein implicated the plaintiff Ane in any way with this truck; indeed, Monroe County Sheriff's officials investigating the case specifically told Mr. Kirstein that the plaintiff Ane was not a suspect in the case. A brief background check on the plaintiff Ane revealed him to be a beer distributor in Key West who was considered to be an honest man; efforts to locate Mr. Ane in Key West were unsuccessful as he was out of town at the time. Also Mr. Kirstein traced a decal on the license plate of the beer truck through [**5] a tag agency in Miami and discovered that the decal did not belong on the subject license tag, that it properly belonged to a 1964 Chevrolet pick-up truck owned by a man in North Miami, who was in no way connected with the plaintiff Ane.

On Tuesday, November 22, 1977, a news article written by Mr. Kirstein appeared in the Keys local section of the defendant Miami Herald newspaper which was widely circulated in the Florida Keys. The lead paragraph of the article stated that Monroe County Sheriff's officials had reported that a Key West distributor - identified in the fourth paragraph as the plaintiff Ane - was the owner of an "Old Milwaukee" beer truck containing three tons of marijuana which had been seized the day before by the Monroe County Sheriff's office. The truth was, however, that the Monroe County Sheriff's office had specifically excluded the plaintiff Ane as a suspect in the case, had named Lillian Fernandez as the licensed owner of the beer truck, and had never identified the plaintiff Ane as the owner of the subject beer truck. The article also repeated in the fourth paragraph the defendant Kimmel's unverified statement that the truck in question had been purchased [**6] the Thursday prior thereto by the plaintiff Ane. The article stated as follows:

"TRUCK ADVERTISED BEER: CARRIED MARIJUANA BALES"

*"An 'Old Milwaukee' beer truck, sold only last Thursday by a Miami firm to a Key West distributor, was confiscated early Monday carrying about three tons of baled marijuana on U.S. 1 in Marathon, Monroe County Sheriff's officials said.*

The driver of the truck, 40-year-old William W. Horton, Slip 22, Tropical Marina, Key West, was charged with possession **[*380]** of more than 100 pounds of marijuana and an invalid driver's license. He was being held on $ 150,000 bond at the sheriff's Marathon sub-station late Monday.

Sheriff's officials promised 'a full-scale investigation' and said they have 'several other suspects' in the case.

*THE LARGE red-and-white truck, which Monday contained bales either wrapped in burlap or packaged in cartons from Colombia, had been purchased Thursday by Aurelio Ane, Key West Distributors Inc. president, according to Marvin Kimmel, president of Miami's Universal Brands Inc."* [emphasis added] **1⬇**

[**7] It is undisputed in this case that the plaintiff Ane had at no time purchased the subject beer truck from Island Leasing, that the defendant Kimmel's unverified and contradicted hearsay information concerning such a sale was entirely inaccurate, and that the plaintiff Ane had no connection whatever with the said beer truck. There is also uncontradicted testimony from the plaintiff Ane that he was personally shamed and humiliated by these admittedly false accusations which appeared in the above-stated news article.

In a follow-up article in the Miami Herald the next day, the correct ownership of the truck was acknowledged, but no effort was made [either then or later after proper written notice was served, see §§ 770.01 -.02, Fla.Stat. (1979)] to retract the false statements that the Monroe County Sheriff's office had accused the plaintiff Ane of **[*381]** owning the marijuana-laden truck in question, and that the plaintiff had purchased this truck the Thursday prior to the marijuana seizure. **2⬇**

[**8] The plaintiff Ane subsequently brought suit for libel against the defendant Miami Herald and Mr. Marvin Kimmel in the Circuit Court for the Sixteenth Judicial Circuit in and for Monroe County, Florida. The above-cited false statements were alleged, *inter alia*, as among the libelous statements appearing in the defendant Miami Herald's news article. After appropriate answers were filed and defense motions for summary judgment denied, the case was tried below before a jury. The above facts were established by the evidence as adduced at the trial and motions by all parties for a directed verdict were denied. The court instructed the jury that the plaintiff could recover in his libel action if the greater weight of the evidence showed that the **[*382]** defendants negligently published the false and defamatory statements sued upon. The jury returned a verdict for the plaintiff and awarded $ 5,000 in compensatory damages against the defendant Miami Herald and $ 10,000 in compensatory damages against the defendant Marvin Kimmel; no punitive damages were awarded.

The defendant Miami Herald appeals; the plaintiff Aurelio Ane cross-appeals. No appeal has been taken by the [**9] defendant Marvin Kimmel.

II

The central contention made by the defendant Miami Herald upon this appeal is that the trial court erred in denying its motion for a directed verdict because the plaintiff Ane failed to establish at trial that the defendant Miami Herald acted with "actual malice" as defined in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), in publishing the false and defamatory statements sued upon in the November 22, 1977, news article; it is urged that such a showing of actual malice is an essential element of a libel action under Florida law where, as here, the publication in question relates to an event of public or general concern, to wit: a police investigation of a criminal act. We cannot agree because, in our view, a showing of New York Times *HN2⬆* "actual malice" is never required where, as here, the defamation plaintiff is a private individual and not a public official or public figure; it is also our view that there was sufficient evidence of journalistic negligence, defamatory falsehood, and actual damages to send this case to the jury.

A

*HN3⬆* It is well-settled that the free speech and free press guarantees of the [**10] First Amendment to the United States Constitution, as made enforceable against the states under the Due Process Clause of the Fourteenth Amendment to the United States Constitution "require... a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' - that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). This First Amendment rule also applies to

a public figure. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 162-65, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967) (Warren, C.J., concurring, joined by four justices), as further explained in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 335-37, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974). It does not apply, however, to a private individual who is neither a public official nor public figure. *Gertz v. Robert Welch, Inc.*, 418 U.S. at 342-48, 94 S. Ct. at 3008. As to the latter, a First Amendment rule of negligence obtains which precludes the imposition of "liability without fault" [**11] in a defamation action, *Gertz v. Robert Welch, Inc.*, 418 U.S. at 347, 94 S. Ct. at 3010, and requires the private individual plaintiff to produce "evidence of some fault on the part of a defendant publishing defamatory material." *Time, Inc. v. Firestone*, 424 U.S. 448, 461, 96 S. Ct. 958, 47 L. Ed. 2d 154 (1976). At one time the *New York Times* "actual malice" rule was restated so as to be applicable, regardless of the identity of the plaintiff, to any action for defamatory falsehood where "the utterance involved concerns an issue of public or general concern…" *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 44, 91 S. Ct. 1811, 29 L. Ed. 2d 296 (1971) (plurality opinion). This reformulation of the *New York Times* rule, however, has since been receded from and no longer represents good First Amendment law. *Gertz v. Robert Welch, Inc.*, 418 U.S. at 345-47, 94 S. Ct. at 3009.

B

The *New York Times* line of decisions, as discussed above, represents "unquestionably the greatest victory won by the defendants in the modern history of the law of torts." W. PROSSER, LAW OF TORTS § 118 (4th ed. 1971). It has literally revolutionized the **[*383]** law of defamation in Florida and every other jurisdiction [**12] in the country.

Prior to the *New York Times* decision in 1964, Florida tort law followed the common law of defamation. In company with the settled law on this subject throughout the country, Florida has long imposed a strict liability standard in defamation actions requiring the plaintiff merely to prove that the material published was defamatory, that it referred to the plaintiff, and that the plaintiff was damaged thereby [which was presumed if the defamation was libel per se or slander per se] - with various affirmative defenses being recognized, including truth with good motives. *See e.g.*, *Hartley & Parker, Inc. v. Copeland*, 51 So.2d 789, 791 (Fla. 1951); *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234 (1933); *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591 (1906); W. PROSSER, LAW OF TORTS, § 113 (4th ed. 1971). Florida law had never required proof that the defendant acted negligently - as *Gertz v. Robert Welch, Inc., supra* and *Firestone v. Time, Inc., supra*, now require - in publishing the allegedly defamatory material, much less that the defendant acted with *New York Times* "actual malice." *See e.g.*, *Firestone v. Time,* [**13] *Inc.*, 271 So.2d 745, 747 (Fla. 1972); *Barry College v. Hull*, 353 So.2d 575, 578 (Fla. 3d DCA 1978).

All of the above Florida law has been changed - correctly we think - by the *New York Times* line of decisions. Plaintiffs in defamation actions in Florida and throughout the country are now required to prove that the defendant acted negligently in publishing the allegedly false and defamatory material and, in the case of a plaintiff who is a public official or public figure, that the defendant acted with *New York Times* "actual malice." *See e.g.*, *Holter v. WLCY T.V., Inc.*, 366 So.2d 445, 450-52 (Fla. 2d DCA 1978), *cert. denied*, 373 So.2d 462 (Fla. 1979). All of these higher standards are, however, not prerequisites of the Florida common law of defamation or Florida constitutional law; they are prerequisites of the First Amendment to the United States Constitution which heretofore did not exist under Florida law. Florida courts, in turn, have consistently sought to follow these federal standards in defamation actions in the post-*New York Times* era. *See e.g.*, *Holter v. WLCY T.V., Inc., supra.*

Specifically, as it relates to this [**14] case, Florida courts initially followed the reformulation of the *New York Times* rule as announced in *Rosenbloom v. Metromedia, Inc., supra*, *Firestone v. Time, Inc.*, 271 So.2d 745 (Fla. 1972); *Nigro v. Miami Herald Publishing Co.*, 262 So.2d 698 (Fla. 3d DCA), *cert. denied*, 267 So.2d 834 (Fla. 1972). Later, when *Rosenbloom* was receded from in *Gertz v. Robert Welch, Inc., supra*, Florida courts ceased following *Rosenbloom* and instead followed the federal standard of negligence for non-public figures in defamation cases as established in *Gertz* and subsequently elaborated in *Time, Inc. v. Firestone, supra*, *Karp v. Miami Herald Publishing Co.*, 359 So.2d 580 (Fla. 3d DCA), *appeal dismissed*, 365 So.2d 712 (Fla. 1978); *Helton v. United Press International*, 303 So.2d 650 (Fla. 1st DCA 1974).

It is true that the Florida Supreme Court in *Firestone v. Time, Inc.*, 305 So.2d 172 (Fla. 1974), a post-*Gertz* decision, did not appear to follow the *Gertz* standard of negligence in a non-public-figure defamation case, and seemingly reverted to the strict standard of liability applicable at common law in defamation actions, [**15] although the Court referred in its decision to "clear and convincing evidence" of negligence on the part of the defendant in the case. *Id.* at 178. In any event, the United States Supreme Court reversed the Florida Supreme Court for failure to apply, at least, a *Gertz* standard of negligence liability to the case. Upon remand, the Florida Supreme Court entered an order on the mandate in which it noted that the United States Supreme Court had made no determination as to whether the defendant, [Time, Inc.] was at fault in publishing the subject defamation, vacated the prior Fourth District Court of Appeal decision in the cause, *see* 279 So.2d 389, and directed the Fourth District Court of Appeal to vacate the trial court judgment previously entered in the plaintiff's **[*384]** favor "for further proceedings in the trial court not inconsistent with the decision by the Supreme Court of the United States in this matter." *Firestone v. Time, Inc.*, 332 So.2d 68 69 (Fla. 1976). It is, therefore, clear that the ultimate decision of the Florida Supreme Court in this litigation adopted, without discussion, the *Gertz-Firestone* standard of negligence, and no higher standard, [**16] as the controlling law in the case which the trial court was to apply upon remand. This result is in perfect accord with the post-*Gertz* decisions in Florida previously cited; when *Rosenbloom* died at the federal level, it died in the Florida courts as well.

In this connection, we have not overlooked the defendant Miami Herald's analysis of Florida defamation cases in which it is urged that Florida has adopted, as a matter of state law, the *Rosenbloom* reformulation of the *New York Times* rule which, it concedes, has been repudiated at the federal level. We respectfully disagree with that analysis.

1

The central decision relied upon by the defendant Miami Herald is *Firestone v. Time, Inc.*, 271 So.2d 745 (Fla. 1972), a pre-*Gertz* decision following *Rosenbloom v. Metromedia, Inc., supra*. This decision, purely and simply, interprets the First Amendment to the United States Constitution in the context of a libel action and does not even mention, much less interpret, Florida's counterpart to the First Amendment, to wit: Article I, Section 4 of the Florida Constitution. The following opening paragraphs from the opinion should dispel all doubt that the [**17] issue before the court was whether the First Amendment protected the instant defamatory publication, for if it did not, Florida law clearly imposed strict liability therefor.

"In any case, in this libel action the District Court reversed a judgment in favor of plaintiff-petitioner concluding that because the petitioner's ex-husband was an heir to the immense Firestone rubber fortune, and because their divorce action itself together with sensational predivorce marital difficulties had received nationwide publicity, *the foregoing publication was constitutionally protected under the* First Amendment of the United States Constitution as being 'an event of great public interest' within the rationale of the so-called 'New York Times doctrine.'

I

"*The paramount question we must answer, therefore, is whether the publication herein, under the circumstances of its making, is thus constitutionally protected.* If it is, then the New York Times standard does apply, viz., assuming a defamatory falsehood, petitioner must prove, with convincing clarity, actual malice, i.e., knowledge of the falsity or a reckless disregard of whether it was false or not. If not constitutionally protected, [**18] and again assuming a defamatory falsehood, then the publication herein renders respondent amenable under the Florida common law on the subject, to-wit: that a published defamatory falsehood which is libelous *per se*, unless otherwise privileged, is actionable absolutely and no malice need be shown - truth being the only defense." Id., at 747. [emphasis added] [footnotes omitted]

The entire discussion in the case centers around various United States Supreme Court decisions interpreting the First Amendment including Rosenbloom v. Metromedia, Inc., supra, which the Court, in turn, follows, but finds inapplicable to the subject publication. Nothing in the opinion indicates that the Court was in any sense interpreting Florida constitutional law.

As the *Firestone* decision is solely a First Amendment case following the *Rosenbloom* decision, it no longer represents the law in view of Gertz v. Robert Welch, Inc., supra, which subsequently receded from *Rosenbloom*. **HN4** It is a fundamental principle of federal constitutional law that no state court is authorized to interpret any provision of the United States Constitution, including the First Amendment, [**19] in a manner which is contrary to United States Supreme **[*385]** Court decisions interpreting the same provision of the United States Constitution. *See e.g.*, Lego v. Twomey, 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); Henry v. City of Rock Hill, 376 U.S. 776 84 S. Ct. 1042, 12 L. Ed. 2d 79 (1964). Nor can the decision here be revived, as urged, as an interpretation of the Florida Constitution according greater constitutional protection for defamation defendants than that afforded by the First Amendment, unless one is willing, as we are not, to rewrite the Court's entire opinion.

2

The defendant Miami Herald also relies on various other Florida decisions to wit: Gibson v. Maloney, 231 So.2d 823 (Fla. 1970); Abram v. Odham, 89 So.2d 334 (Fla. 1956); Jacova v. Southern Radio & Television Co., 83 So.2d 34 (Fla. 1955); Coogler v. Rhodes, 38 Fla. 240, 21 So. 109 (1897); Nigro v. Miami Herald Publishing Co., 262 So.2d 698 (Fla. 3d DCA), *cert. denied*, 267 So.2d 834 (Fla. 1972). We do not read any of these cases, however, to announce in any sense a *Rosenbloom* rule.

The *Gibson* and *Abram* cases stand for the proposition, [**20] inapplicable here, that a defamation defendant has a qualified privilege, which he must raise as an affirmative defense, to publish a "fair comment" on or "fair account" of a public matter involving a public figure; here, "[t]he great majority of American courts hold that no comment can be fair if it is based on misstatements of fact." Miami Herald Publishing Co. v. Brautigam, 127 So.2d 718, 723 (Fla. 3d DCA), *cert. denied*, 135 So.2d 741 (Fla. 1961), *cert. denied*, 369 U.S. 821, 82 S. Ct. 828, 7 L. Ed. 2d 786 (1962). The *Jacova* case involves an invasion of privacy suit and Coogler v. Rhodes, 38 Fla. 240, 21 So. 109 (1897), is an early defamation case on qualified privilege; neither case adopts or even discusses a *Rosenbloom* rule. Finally, *Nigro* is a pre-*Gertz* First Amendment defamation case following *Rosenbloom* which was not based in any way on Florida law; in view of *Gertz* which recedes from *Rosenbloom*, *Nigro* no longer represents good First Amendment law today.

In sum, none of the above cases can be fairly read, as urged, to adopt as a matter of state law the *Rosenbloom* reformulation of the *New York Times* rule, [**21] and the attempt to do so, in our view, stands Florida defamation law on its head.

C

The prevailing First Amendment and Florida law, as discussed above, is supported by the overwhelming weight of authority in the country on this subject which has followed a *Gertz-Firestone* standard of negligence in defamation actions where the plaintiff is neither a public official nor a public figure. **3** This majority view has, in **[*386]** turn, been adopted by the American Law Institute's Restatement of Torts. RESTATEMENT (2d) OR TORTS § 580B (1977). **4** The established law here is also fully supported by sound constitutional considerations which are more fully discussed in Gertz v. Robert Welch, Inc., 418 U.S. at 339-48, 94 S. Ct. at 3006.

[**22] Beyond that, we think the prevailing law here is both sensible and fair. On the one hand, we recognize that the constitutional free press and free speech guarantees at stake in this area of law are absolute preconditions to a free society and deserve the most vigilant and wide-ranging protection. *See e.g.*, United States v. Carolene Products Co., 304 U.S. 144, 152 n. 4, 58 S. Ct. 778, 82 L. Ed. 1234 (1937). Indeed, these freedoms seem particularly precious and essential to our democracy when viewed against the backdrop of an age where such liberty has been so ruthlessly suppressed on such a wide-spread scale by the rise of totalitarianism, both on the left and the right, in many parts of the world. We, therefore, strongly share the view that:

"The public has an interest in the free dissemination of news. This interest was well stated by that great American, Thomas Jefferson, in the following words: 'The only security of all is in a free press. The force of public opinion cannot be resisted, when permitted freely to be expressed. The agitation it produces must be submitted to. It is necessary to keep the waters pure. *No government ought to be without censors:* [**23] **[*387]** *and where the press is free no one ever will*.' It is true that there are occasions when the freedom of the press is abused, just as some individuals abuse their right to speak and write their sentiments

freely. But, in discussing this problem, Thomas Jefferson said: 'Some degree of abuse is inseparable from the proper use of every
thing; and in no instance is this more true, than in that of the press. It has accordingly been decided by the practice of the States,
that it is better to leave a few of its noxious branches to their luxuriant growth, than by pruning them away, to injure the vigor of
those yielding the proper fruits.'" *Ross v. Gore*, 48 So.2d 412, 415 (Fla. 1950). (emphasis in original).

Moreover, a free and vigorous press, in spite of crass and politically motivated attacks upon it, has performed important service over the years
to the cause of responsible, democratic government, as shown, for example, by its service to the country in uncovering the Watergate scandals
and in publishing the Pentagon Papers. In addition, the defendant Miami Herald, itself a nationally respected, Pulitzer prize-winning newspaper,
has produced journalistic work, [**24] often of the highest excellence, to sustain an enlightened, informed citizenry and to encourage honest,
competent government. Beyond that, the news media - although hardly monolithic in any sense - is one of few independent power sources in
the country which can "without fear or favor" effectively expose egregious wrongdoing committed by powerful public and private institutions in
this country. We dare not censor a free press if we wish to remain truly a free and open society.

Still, we cannot help reflecting that the defamation action, properly limited, also plays an important role in a free society as it represents the
individual's sole remedy against the occasional excesses of the print and electronic media which often have vast resources to inflict untoward
damage upon an individual. Surely, a decent, open society cannot, in the name of press and speech freedom, so thoroughly undermine this
remedy as to render it useless to those people who have been damaged by a defamatory falsehood negligently uttered in the mass media and
have not in any way sought the public limelight. [5⬇] This small modicum of privacy for the average person deserves, in our view, protection
under the [**25] existing law, particularly in a country such as ours which is dedicated to the preservation of the free individual. Moreover, this
conclusion takes on added strength in view of the fact that the price for protecting such limited privacy under our law has not, so far as we are
aware, exacted a sacrifice of, or even posed a significant threat to, the free flow of information and ideas in this country or hindered free, robust
debate on public issues upon which our democracy so vitally depends. It therefore seems neither sensible nor fair to push the parameters of
free press and free speech to such an extent, as urged here, that we needlessly plow under other important individual rights.

In this [**26] connection, Judge Learned Hand ⬇ has aptly noted:

"[Liberty] is not the ruthless, the unbridled will; it is not freedom to do as one likes. That is the denial of liberty, and leads straight
to its overthrow. A society in which men recognize no check upon their freedom soon becomes a society where freedom is the
possession of only a savage few; as we have learned to our sorrow." L. HAND ⬇, THE SPIRIT OF LIBERTY 190 (Dillard 3d ed.
1974).

It accordingly follows that one may strongly endorse Thomas Jefferson's libertarian views on a free press, as we surely do, without at the same
time gutting the average person's right to protect his privacy **[*388]** against negligent libel through the defamation action - a common law
remedy which Jefferson, as an astute common law scholar, never even remotely suggested that we alter or abolish. [6⬇] Indeed, it is a basic
tenet of democracy that all power - public as well as private - must be subject to effective limitation lest the power be abused. [7⬇] In our
judgment, the primary limitation against the excesses of the power of the mass media - a power which by any standard is considerable in this
country [8⬇] - is the defamation action. We think [**27] the established law sensibly declines to erode that action, as urged, because to do so
would be to undermine great principles of ordered liberty.

[**28] D

Turning to the instant case, we have no difficulty in concluding that the trial court properly denied the defendant Miami Herald's motion for
directed verdict in this case. Without dispute, the plaintiff Ane was a private individual who was neither a public official nor a public figure.
Under the applicable First Amendment and Florida law, he was entitled to recover in his libel action if he established at trial that the defendant
Miami Herald published (1) false and defamatory statements of and concerning him, (2) without reasonable care as to whether those
statements were true or false, (3) resulting in actual damage to himself. Clearly, the plaintiff Ane produced enough evidence at trial to survive a
defense motion for directed verdict and to have a jury consider his case under proper instructions.

1

First, it is plain that the defendant Miami Herald published false and defamatory **[*389]** statements of and concerning the plaintiff Ane in its
November 22, 1977 news article. The article falsely stated in its lead paragraph that Monroe County Sheriff's officials had reported that a Key
West distributor - identified in the fourth paragraph as the plaintiff Ane - was, [**29] in effect, the owner of a recently purchased "Old
Milwaukee" beer truck containing three tons of marijuana which had been seized the day before by the Monroe County Sheriff's office. The truth
was, however, that Monroe County Sheriff's officials had never identified the plaintiff Ane as the owner of the marijuana-laden beer truck which,
admittedly, they had seized the day before; on the contrary, these officials had stated that Lillian Fernandez was the licensed owner of the
seized beer truck, and that the plaintiff Ane was not even a suspect in the case. In addition, the fourth paragraph of the article repeats, without
naming the hearsay source, the defendant Kimmel's admittedly false statement that the plaintiff Ane had purchased the marijuana-laden beer
truck the Thursday prior to the police seizure of the said truck; without dispute, the plaintiff Ane had no connection whatever with this truck.

These concededly false statements of and concerning the plaintiff were susceptible, in our view, to a defamatory meaning. A reasonable person
could have interpreted these statements to mean that the plaintiff Ane was heavily implicated in a serious drug offense as the owner of a
beer [**30] truck containing three tons of marijuana which had been seized by the police. *HN6⬆* "The language of the publication declared
upon should not be interpreted by extremes, but should be 'construed as the common mind would normally understand it.'" *Walsh v. Miami
Herald Publishing Co.*, 80 So.2d 669, 671 (Fla. 1955). Surely, the average person upon reading these statements could reasonably have
concluded that the plaintiff Ane was implicated in the crime of illegal possession of marijuana.

The defendant Miami Herald argue that another reasonable construction could be placed on these statements, namely, that the plaintiff Ane
owned a beer truck which was stopped by police while being operated by another person and found to contain an illegal drug, but that the
plaintiff Ane did not actually possess the marijuana when the truck was stopped and, therefore, was entirely innocent of any wrongdoing. We
think that is a bit strained and not at all what the average person would have thought. In any event, *HN7⬆* ==the law is well-settled that where a
publication is susceptible of two reasonable interpretations, one of which is defamatory, the issue of whether the publication was defamatory==

becomes one [*31] of fact and must be submitted to a jury, as here, for a fact-finding determination. *Bell v. Orlando Daily Newspapers, Inc.*, 389 F.2d 579 (5th Cir. 1967). As such, the plaintiff Ane produced sufficient evidence here from which a jury could have reasonably concluded that the defendant Miami Herald published false and defamatory statements of and concerning him.

2

Second, it is equally plain that sufficient evidence was presented in the instant case from which a jury could have reasonably concluded that the defendant Miami Herald, through its reporter Greg Kirstein, negligently published the false and defamatory statements in this case, that is, that it published these statements without reasonable care as to whether such statements were true or false.

The only information Mr. Kirstein had which connected the plaintiff Ane to the subject beer truck was the hearsay statement of the defendant Kimmel, to wit, that the people from Island Leasing had told him "[Kimmel] that the plaintiff Ane had purchased the truck from Island Leasing the Thursday prior to the marijuana seizure. Mr. Kirstein made no attempt to verify this hearsay information by again contacting the people from [**32] Island Leasing, the purported seller in this transaction; moreover, he was unable to obtain any documentation for this sale, but, to the contrary, discovered from two independent **[*390]** sources [the police and the Florida Department of Motor Vehicles] that the licensed owner of the truck was Lillian Fernandez. The Monroe County Sheriff's office also flatly told Mr. Kirstein that the plaintiff Ane was not a suspect in the case and at no time identified the plaintiff Ane as the owner of the subject beer truck.

Yet, Mr. Kirstein wrote in the lead paragraph of the subject news article that Monroe County Sheriff's officials had reported that the plaintiff Ane had recently purchased the subject beer truck the Thursday prior to the marijuana seizure; he also repeated in the fourth paragraph Mr. Kimmel's unverified, contradicted hearsay statement concerning the purported sale of the truck. Both statements were false and surely he should have known better, given the information he had before him. We deal, in our view, with a clear case of journalistic negligence, the evidence of which in this case was more than ample to go to the jury for final resolution. *See e.g., Tiny's [**33] Liquors, Inc. v. Davis*, 353 So.2d 168, 169 (Fla. 3d DCA 1977).

3

The subject false and defamatory statements herein also caused, according to the uncontradicted testimony of the plaintiff Ane, considerable mental anguish and humiliation to the plaintiff Ane. This is understandable as most people, for good reason, are apt to be tremendously shaken by seeing their good names denigrated in the media. Under Florida law, *HN8* a false and defamatory statement accusing someone of a crime, as here, is considered to be per se actionable without proof of special damage. *Miami Herald Publishing Co. v. Brautigam*, 127 So.2d 718, 722 (Fla. 3d DCA), *cert. denied*, 135 So.2d 741 (Fla. 1961), *cert. denied*, 369 U.S. 821, 82 S. Ct. 828, 7 L. Ed. 2d 786 (1962). The First Amendment, however, requires proof of some actual damage before monetary damage can be awarded in a defamation action involving negligence; one element of such damages may be, as here, mental anguish and personal humiliation. *Gertz v. Robert Welch, Inc.*, 418 U.S. at 348-50, 94 S. Ct. at 3011. We think, therefore, that there was sufficient evidence of mental suffering in this case to go to the jury for an assessment of damages, [**34] and that the $ 5,000 awarded by the jury for such suffering was well within the reasonable range of permissible compensation allowed under our law.

In all, the trial court was eminently correct in denying the defendant Miami Herald's motion for directed verdict in this case. We reject all contrary contentions made upon this appeal by the defendant Miami Herald.

III

Finally, we find no merit in the plaintiff Ane's cross-appeal attacking the jury verdict for failing to assess punitive damages against the defendant Miami Herald and, by implication, the trial court's denial of its motion for directed verdict. It seems clear that there was sufficient evidence for the jury to conclude, as it did, that the defendant Miami Herald acted negligently, but not with actual malice, in publishing the defamatory matter herein. The fact remains that the first newspaper article did contain a statement, albeit in the eighth paragraph of the article, which correctly reported that the Monroe County Sheriff's office had identified Lillian Fernandez as the owner of the truck; moreover, a follow-up article appearing the next day acknowledged *Fernandez* 's ownership of the beer truck and stated that [**35] the plaintiff Ane was not the owner thereof. Based on these facts, the jury obviously felt that the defendant Miami Herald had exercised some degree of responsibility here, and, consequently, was unwilling to award punitive damages. We are not disposed to upset this finding. *See e.g., Shaw v. Shaw*, 334 So.2d 13, 16 (Fla. 1976).

Based on the foregoing reasons, the final judgment under review is in all respects

Affirmed.

Concur by: PEARSON ▾

## Concur

DANIEL S. PEARSON ▾, Judge, specially concurring.

I concur in Judge *Hubbart* ▾'s thorough and excellent analysis. While for the reasons **[*391]** set forth in *From v. Tallahassee Democrat, Inc.*, 400 So.2d 52 (Fla. 1st DCA 1981), I would place little or no reliance on the precedential importance of *Karp v. Miami Herald Publishing Co., supra*, and *Helton v. United Press International, supra*, I think Judge *Hubbart* ▾ is, nonetheless, perfectly correct in his observation that the Florida Supreme Court in the post-*Gertz* proceedings of *Firestone v. Time, Inc.* adopted, without discussion, a negligence standard of liability.

The basis upon which the United States Supreme Court majority vacated the judgment [**36] in *Firestone v. Time, Inc.*, 305 So.2d 172 (Fla. 1974), was its conclusion that no fact-finder had made a conscious determination of fault and its unwillingness to equate the Florida Supreme Court's determination that there was sufficient -- indeed, clear and convincing -- evidence of negligence, with the requisite constitutional finding

of fault. While it is certainly arguable that a pronouncement that there was sufficient evidence to support a finding differs from the actual finding, the fact remains (and for present purposes, the critical fact) that the evidence which the Florida Supreme Court declared to be sufficient was evidence of *negligence*. Whether, as expressed in the dissenting views of Justice White, 424 U.S. at 481, 96 S. Ct. at 978, 47 L. Ed. 2d at 178, and Justice Marshall, 424 U.S. at 484, 96 S. Ct. at 980, 47 L. Ed. 2d at 180, the Florida Supreme Court's determination that there was clear and convincing evidence of negligence was tantamount to a finding of fault, or, as in the view of the United States Supreme Court majority, that determination was not a finding, is immaterial to the present inquiry. What is material is that with *Gertz v. Welch* before [**37] it (and as Justice White points out, "referred to... by name"), the Florida Supreme Court pointed out that *negligence* had been established, to me a clear indication that no higher standard of fault was required. I think that this confirms Judge Hubbart ⬇'s conclusion that the Florida Supreme Court, post-*Gertz*, adopted a negligence standard of liability for a publisher of a defamatory falsehood made in a matter of public concern which injures a non-public figure.

Dissent by: HENDRY ⬇

## Dissent

HENDRY ⬇, Judge (dissenting).

Although I do not treat lightly the well written opinions of my colleagues, arrived at after long and serious consideration, I must dissent.

It is my opinion that the Florida supreme court adopted as state precedent the *New York Times* "actual malice" standard for publications relating to events of public or general concern in *Firestone v. Time, Inc.*, 271 So.2d 745 (Fla. 1972) [cited hereinafter as *Firestone I*], *after remand*, 305 So.2d 172 (Fla. 1974) [cited hereinafter as *Firestone II*], *reversed on other grounds*, 424 U.S. 448, 96 S. Ct. 958, 47 L. Ed. 2d 154 (1976). Furthermore, to the extent this precedent is in doubt, [**38] I would use the opportunity this case provides to adopt a standard requiring private individuals who bring libel actions, arising from news reports of general or public interest, to prove that the defamatory falsehood was published with knowledge of its falsity or with reckless disregard of the truth.

A brief review of the chronology of federal and state defamation decisions supports my belief that Florida has already adopted the actual malice standard of *New York Times*.

In the landmark case *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), the United States Supreme Court first gave constitutional protection to concededly false and defamatory news reports. The Court ruled that a public official could not recover damages for a defamatory falsehood relating to his official conduct absent proof that the statement was made with actual malice -- "that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279-80, 84 S. Ct. at 725, 11 L. Ed. 2d at 706. The Court later extended the *New York Times* privilege to media comments on matters of public interest concerning "public figures" in *Curtis Publishing* [**39] *Co. v. Butts*, 388 U.S. 130, 87 S. Ct. 1975, **[*392]** 18 L. Ed. 2d 1094 (1967) (Warren, C.J., concurring, joined by four other justices).

Justice Brennan, joined by two others on the Court, subsequently delivered a plurality opinion in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S. Ct. 1811, 29 L. Ed. 2d 296 (1971), that the "actual malice" standard of liability protected media coverage of events of public or general concern, even where the libeled individual was not a public figure or official. The first amendment, Justice Brennan observed, compelled the courts to focus upon an event's public importance rather than the notoriety or official position of the individuals involved.

The *Rosenbloom* plurality opinion was repudiated in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974); a majority of the Court felt that Justice Brennan's focus upon the character of the event, rather than the status of the persons involved, protected media defendants to too great a degree. *Gertz* held that the First Amendment required no more than proof of mere negligence to hold the press accountable when it libeled a private individual.

However, [**40] when *Gertz* was handed down, the Florida supreme court had already decided *Firestone I* and embraced the *Rosenbloom* plurality view. *Firestone I* held that an inaccurate news report regarding a divorce was not constitutionally protected by the actual malice standard of liability only because the divorce was *not a matter of real public or general concern*. *Firestone I* extensively discussed the concept of "matters of public or general concern" and reached the following conclusion:

> [I]t can be broadly said that matters of real public or general concern are those which invoke common and predominant public activity, participation or indulgence, and cogitation, study and debate; and they include such matters as sporting events, the performing and fine arts, morality and religion, the sciences, and matters relating generally to the health, well-being and general comfort of the public as a whole. Accordingly, *news items or featured articles or commentaries by communications media relating to these matters are and should be constitutionally protected notwithstanding that obscure or prominent individuals may be caught up in the current and regretfully defamed.*

[**41] *Firestone I* at 749 (footnotes omitted, emphasis supplied). This conclusion led in turn to adoption of the following test, which coincides with the public issue test of *Rosenbloom*:

> [W]e think that as a workable test the question is whether there is a *logical relationship* between the reported activities of the prominent person or between the subject matter of the conduct, occasion or event reported or recorded, and the real concern of the public.

*Id.* at 751.

Thus, the court in *Firestone I* established in Florida an actual malice standard for defamation suits brought by private individuals involved in "matters of public or general concern." *Accord Nigro v. Miami Herald Publishing Co.*, 262 So.2d 698 (Fla. 3d DCA), *cert. denied*, 267 So.2d 834 (Fla. 1972) (newspaper articles indicating that plaintiffs were members of the Mafia were constitutionally privileged since law enforcement

actions and grand jury inquiries directed to acts or suspected organized crime activities fell within the classification of an event of great public interest a la *Rosenbloom*.) In my view, the news report at issue in this case involved matters of public concern as [**42] defined in *Firestone I*. The crucial question, therefore, is whether *Firestone I* is still the law in Florida.

By its terms, *Gertz* merely refused to compel state acceptance of the actual malice standard in private actor/public event cases, leaving the choice open to each state:

> [W]e conclude that the States should retain *substantial latitude* in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual…. We hold that, *so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability* for a publisher or broadcaster of [*393] defamatory falsehood injurious to a private individual.

*Gertz*, 418 U.S. at 345-46, 94 S. Ct. at 3009, 41 L. Ed. 2d at 809 (emphasis supplied). Whether the Florida standard of liability is mere negligence or actual malice is, therefore, a matter of Florida law, and the latest statement of the Florida standard is found in *Firestone I*.

We need not determine whether *Firestone I* would be binding precedent had its rendition originally been compelled by a federal Supreme Court decision itself subsequently reversed. For [**43] in fact, the *Rosenbloom* plurality opinion never achieved precedential weight **1⤓** and thus did not represent a federal mandate to the Florida supreme court. Consequently, *Firestone I* was neither "explained" by *Rosenbloom* nor undermined by *Gertz*. What is important is that in *Firestone I* the Florida supreme court adopted the actual malice test for this type of libel action and has not expressly disavowed that standard, despite the United States Supreme Court's opinion in *Gertz*. And, since *Gertz* in no way precludes use of the actual malice standard enunciated in *Firestone I*, and no pre- or post-*Gertz* Florida supreme court decisions have dislodged Florida from the *Firestone I* philosophy, the latter represents valid Florida law. **2⤓**

[**44] That this conclusion is correct is reinforced by the fact that the Florida supreme court was confronted with *Firestone II* after the United States Supreme Court rendered the *Gertz* decision and did not repudiate or question the standard adopted in *Firestone I*, although *Firestone II* was the appropriate time for the Florida supreme Court to abandon *Firestone I* if adoption of a new standard was intended. **3⤓**

[**45] [*394] Even were I to agree with the majority's view that *Firestone I* was "reversed" by *Gertz*, I would take this opportunity to adopt as Florida law the principle that actual malice must be established by all plaintiffs in "public event" libel cases.

Article I, Section 4 of the Florida Constitution secures the right to speak, write and publish. The Florida supreme court has long and consistently recognized the vital role of a free press in our society and applied a qualified media privilege to matters of public concern.

Beginning in the 1930's, the Florida supreme court, in recognition of the unique function of journalism and the reality that reporting errors are inevitable, relaxed the harsh common law doctrine of strict liability by granting a qualified privilege to publications reporting incidents of public interest. As a consequence, the media was not liable for publication of false statements in the absence of affirmative proof of express malice or abuse of this qualified privilege. *See, e.g.*, *Ross v. Gore*, 48 So.2d 412, 415 (Fla. 1950) (the preservation of democracy depends on rapid news dissemination to the public and the press' function of [**46] policing society by reporting events should not be unreasonably restrained); *Cooper v. Miami Herald Publishing Co.*, 159 Fla. 296, 31 So.2d 382 (1947) (newspaper's responsibility to supply world-wide news coverage requires special consideration); *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234 (1933) (judicial recognition that early common law did not take into account the complexities of the modern daily newspapers). *See also*, *White v. Fletcher*, 90 So.2d 129 (Fla. 1956); *Abram v. Odham*, 89 So.2d 334 (Fla. 1956); *Leonard v. Wilson*, 150 Fla. 503, 8 So.2d 12 (1942). Florida's recognition and media privilege preceded, by at least a decade, the United States Supreme Court's similar adoption in *New York Times*.

More recently, the Florida supreme court in *Gibson v. Maloney*, 231 So.2d 823 (Fla. 1970), promulgated a qualified privilege of "fair comment on a public matter," focusing on the subject matter of the communication rather than the status of the defamed individual. *Id.* at 826. Relying on its prior holding in *Jacova v. Southern Radio and Television Co.*, 83 So.2d 34 (Fla. 1955), and *New York Times*, the *Gibson* court concluded that [**47] an actual malice standard should protect the qualified privilege to comment on public matters. *Gibson*, 231 So.2d at 826. *See also* *Nigro v. Miami Herald Publishing Co.*, *supra*; *Bishop v. Wometco Enterprises, Inc.*, 235 So.2d 759 (Fla. 3d DCA), *cert. denied*, 240 So.2d 813 (Fla. 1970).

As stated above, in *Firestone I* the Florida supreme court concluded that publications about matters of public concern should be constitutionally protected regardless of [*395] whether they relate to prominent or obscure individuals. Accordingly, I think a long line of Florida decisions creates a foundation for the application of an actual malice standard in this type of news report.

In my opinion, the majority's holding severely threatens media freedom. Error by a rigorous press is inevitable, and by permitting financial sanctions to be imposed solely for negligent errors, the majority's decision will inevitably reduce the flow of vital information and ideas to the public. As a consequence of this decision, many smaller newspapers unable or unwilling to defend against libel litigation will be apt to self-censor, resulting in narrower coverage of newsworthy [**48] events. I consider this a very real and substantial danger which far outweighs the occasional harm caused by the type of careless errors which occurred in this case.

I do not doubt that the plaintiff below was harmed by the carelessness of the Herald. Yet the courts have continuously admonished the public that our society must tolerate occasional reporting errors as the price of preserving a truly free press. The chilling effect of the majority's view can not be overlooked: without the benefit of the hindsight which a record on appeal supplies, an editor will now often have to suppress printing a story having public import merely because he is unsure of all the facts. As a practical matter, imposing a simple negligence standard on the press, for stories of admitted public significance, is a grave step which threatens the core of our asserted commitment to "uninhibited, robust, and wide-open" debate on public issues. *New York Times*, 376 U.S. at 270, 84 S. Ct. at 720, 11 L. Ed. 2d at 701. As Justice Douglas ▾ noted in his dissent in *Gertz*, "it may well be the reasonable man who refrains from speaking." 418 U.S. at 360, 94 S. Ct. at 3017, 41 L. Ed. 2d at 817.

Defamation cases brought by private plaintiffs [**49] illustrate the type of information which may fail to reach the public if a simple negligence standard is imposed in "public event" cases, since such information, even when its sources appear reliable and accurate, can be neither verified before publication nor proved accurate in court: drug distribution, *El Meson Espanol v. NYM Corp.*, 389 F. Supp. 357 (S.D.N.Y. 1974), *aff'd*, 521 F.2d 737 (2d Cir. 1975); toy safety, *F & J Enterprises, Inc. v. CBS*, 373 F. Supp. 292 (N.D. Ohio 1974); organized crime, *Time, Inc. v. Ragano*, 427 F.2d 219 (5th Cir. 1970); business kick-backs, *Lawlor v. Gallagher Presidents' Report, Inc.*, 394 F. Supp. 721 (S.D.N.Y. 1975); and the flammability of baby cribs, *ABC v. Smith Cabinet Mfg. Co.*, 160 Ind.App. 367, 312 N.E.2d 85 (Ind. Ct. App. 1974).

Such an impediment to the free flow of information to the public is unnecessary since the actual malice rule allows recovery for intentional or reckless defamation, without precipitating self-censorship by the press. The actual malice standard permits freedom of speech and press to dominate, but not eradicate, the individual interest of reputation and privacy. An additional advantage of this [**50] standard is its certainty -- reports on matters of public concern would be protected and therefore could be published with relative immunity while individuals, whether public *or* private, would be shielded from gross media responsibility.

In summary, I would adopt an actual malice standard for private individuals in defamation actions arising from news reports of general or public concern. This standard provides both the courts and the media with certainty as to those matters appropriate for public comment while still allowing recovery for the knowing or reckless disregard of individual rights. Accordingly, I would reverse the judgment below and remand to the trial court to properly instruct the jury in that regard.

---

## Footnotes

 The balance of the article appearing in the November 22, 1977, newspaper reads as follows:

"Kimmel's firm formerly leased the 1970 Chevrolet truck from Miami's Island Leasing, but Kimmel said Island Leasing officials told him Ane bought the confiscated truck and a similar vehicle bearing the Schlitz beer trademark for $ 2,750 cash each last week.

'He (Ane) told us the trucks would be used for spare trucks to haul beer in Key West,' Kimmel said.

Ane could not be reached for comment Monday.

ALTHOUGH KIMMEL said Ane purchased the trucks, both sheriff's officials and state Motor Vehicle Department officials said the truck's plate was registered to another Key West resident, Lillian Fernandez, 2718 Harris Ave.

Sheriff's officials said they did not know whether Fernandez is involved in the case. She could not be reached for comment Monday.

'It may be that the truck's changed hands two or three times recently. We're just starting (the investigation),' Detective Joe Valdes said of the confusion over the truck's ownership. 'We find a lot of this in these cases.'

Adding more confusion to the case was a registration sticker pasted on the beer truck's license plate that did not coincide with Dade County Auto Tag Division records for that plate. A division spokeswoman said the sticker found on the beer truck rightfully belonged on a 1964 Chevrolet pick-up truck owned by a Miami man.

'THAT STICKER doesn't belong on that tag,' Monroe County Sheriff William Freeman said.

The truck also bears a state beverage license registered to Universal Brands, which expired Sept. 30, according to state beverage officials. State officials said that license has been renewed but could not determine who now owned it.

'Somebody forgot to scrape the sticker off,' Universal's Kimmel said. 'It's not one of ours and you can rest assured that driver (Horton) is not on our payroll.'

Sheriff's officials said they had received confidential information that a beer truck might be carrying marijuana up the Keys and had officers patrolling U.S. 1 Sunday night.

THE CONFISCATED truck was northbound when stopped in Marathon near 110th Street shortly after midnight by Deputies Jack Sweeting and Carl Bailey, according to Detective Tom Allen.

'We never had seen that kind of beer truck before,' Allen said. 'Then when we checked the driver he had an operator's license rather than a chauffeur's license.'"

"'While the officers were looking over the truck, they noticed a side door cracked,' Allen added. 'The crack let an odor out.'

The truck's contents, valued approximately at $1.5 million wholesale in Miami, were all marked with red ink listing each bale's approximate weight in kilograms. Some were boxed in cartons reading 'Carton de Colombia, Biquilla, Col.' (Colombia)."

A photograph of the confiscated beer truck accompanied the article with this caption underneath the picture:

"Confiscated Beer Truck Was Unloaded in Key West… deputies said three tons of marijuana was inside."

 This article appeared on November 23, 1977, in the Keys local section of the Miami Herald distributed in the Florida Keys. The article stated as follows:

WOMAN OWNS POT-LADEN BEER TRUCK

"Ownership of a marijuana-laden beer truck, confiscated by Monroe County Sheriff's officials in Marathon Monday, has been traced to a Key West woman who bought the vehicle last week in Miami, Sheriff's Detective Joe Valdes said Tuesday.

The truck, which contained more than three tons of marijuana, had been purchased Thursday from Island Leasing Corp., Miami, by Lillian M. Fernandez, 2718 Harris Ave.

FERNANDEZ IS the wife of Key West boat yard owner Mike Brito who lives at 2718 Harris, according to Artistides Brito, Brito's son and vice president of the family boat yard.

Artistides Brito said Fernandez currently lives in Miami. Mike Brito could not be reached for comment.

Police and a Miami beer distributor said Tuesday that Aurelio (Porky) Ane, president of Key West Distributors, Inc., was not involved in the purchase of the truck. They blamed earlier reports of his involvement on a 'misunderstanding.'

Ane's firm distributes Old Milwaukee beer in Key West. Old Milwaukee is the trademark painted on the confiscated truck.

VALDES, HEADING investigation of the case, said Fernandez and an unknown Cuban male bought the confiscated truck and another beer truck from Island Leasing for $ 5,550. They paid Island Leasing Operations Manager Joe Ross in cash, he added.

The trucks were part of Island Leasing's surplus fleet.

Ross said the unknown Cuban male first came to Island Leasing two weeks ago and inquired about purchasing trucks. The man returned last Wednesday, Ross said, leaving a $ 5,000 down-payment for the two vehicles.

Fernandez then called Ross last Thursday, he said, identifying herself as 'the wife of the man that bought the trucks.'

Along with the Cuban male; a man she told Ross was her father; and a third male, Fernandez appeared at Island Leasing Thursday and gave him another $ 550, Ross said.

"'SHE'S (Fernandez is) the one that picked the trucks up and came in and payed [sic] for 'em,' Ross said. 'There were four people - They just walked in and said "We want to buy some trucks." I showed them where they were parked and they said 'We'll take these two.'

Fernandez and the trio departed after the trucks' titles were put in her name, he added.

'This is just a plain, everyday deal,' Ross said, 'We sold 'em just like we would to you. I never saw her (Fernandez) but once in my life.'

Marvin Kimmel, president of Miami's Universal Brands, Inc., which formerly leased the trucks, had said Monday that Island Leasing officials told him the trucks were sold to Ane.

Kimmel said Tuesday, however, that a 'misunderstanding' occurred and that Island Leasing personnel were led to believe it was Ane who purchased the trucks.

ANE SAID Tuesday he has previously purchased trucks from Island Leasing but not recently. He also said, however, that his employes are aware the Miami firm sells trucks.

'Ross knew the trucks weren't for me,' Ane said. He added that one of his employes might have falsely represented Ane's firm when purchasing the trucks, thus leading Island Leasing officials to believe the vehicles were for Ane.

Ross also said Ane was 'in no way involved in this thing.'

'Somebody might have surmised that (Ane's involvement),' Ross said, 'because it involved Key West and Porky (Ane) is the Old Milwaukee distributor in Key West.'

ROSS SAID he did not tell Kimmel or anyone else at Universal Brands that Ane bought the trucks.

Valdes said Fernandez's whereabouts are unknown but said she will be questioned once police find her.

The driver of the confiscated truck, William W. Horton, 40, remained jailed in Key West Tuesday."

---

[3F]     Seventeen (17) states and the District of Columbia have expressly adopted the *Gertz* standard of negligence in defamation actions similar to the instant case as a matter of state law: ARIZONA: *Peagler v. Phoenix Newspapers, Inc.*, 114 Ariz. 309, 560 P.2d 1216 (1977); ARKANSAS: *Dodrill v. Arkansas Democrat Co.*, 265 Ark. 628, 590 S.W.2d 840 (1979), *cert. denied*, 444 U.S. 1076, 100 S. Ct. 1024, 62 L. Ed. 2d 759 (1980); DISTRICT OF COLUMBIA: *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78 (D.C. 1980), *cert. denied*, 451 U.S. 989, 101 S. Ct. 2327, 68 L. Ed. 2d 848 (1981); HAWAII: *Cahill v. Hawaiian Paradise Park Corp.*, 56 Hawaii 522, 543 P.2d 1356 (1975); ILLINOIS: *Troman v. Wood*, 62 Ill.2d 184, 340 N.E.2d 292 (1975); KANSAS: *Gobin v. Globe Publishing Co.*, 216 Kan. 223, 531 P.2d 76 (1975); LOUISIANA: *Wilson v. Capital City Press*, 315 So.2d 393 (Ct. App.), *cert. denied*, *specifically approving decision*, 320 So.2d 203 (La. 1975); MARYLAND: *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 350 A.2d 688 (1976); MASSACHUSETTS: *Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 330 N.E.2d 161 (1975); MONTANA: *Madison v. Yunker*, 180 Mont. 54, 589 P.2d 126 (Mont. 1978); OHIO: *Thomas H. Maloney & Sons, Inc. v. E.W. Scripps Co.*, 43 Ohio App.2d 105, 334 N.E.2d 494 (Ct. App. 1974), *cert. denied*, 423 U.S. 883, 96 S. Ct. 151, 46 L. Ed. 2d 111 (1975); OKLAHOMA: *Martin v. Griffin Television, Inc.*, 549 P.2d 85 (Okla. 1976); SOUTH CAROLINA: *Jones v. Sun Publishing Co.*, 278 S.C. 12, 292 S.E.2d 23 (1982); TENNESSEE: *Memphis Publishing Co. v. Nichols*, 569 S.W.2d 412 (Tenn. 1978); TEXAS: *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809 (Tex. 1976), *cert. denied*, 429 U.S. 1123, 97 S. Ct. 1160, 51 L. Ed. 2d 573 (1977); UTAH: *Seegmiller v. KSL, Inc.*, 626 P.2d 968 (Utah 1981); WASHINGTON:

*Tasket v. King Broadcasting Co.*, 86 Wash.2d 439, 546 P.2d 81 (1976); WISCONSIN: *Denny v. Mertz*, 106 Wis.2d 636, 318 N.W.2d 141 (1982).

Eight (8) states have, like Florida, assumed without discussion, that *Gertz* represents the law of the state, and have, accordingly, applied the *Gertz* standard of negligence in defamation actions similar to the instant case: ALABAMA: *Browning v. Birmingham News*, 348 So.2d 455 (Ala. 1977); CONNECTICUT: *Corbett v. Register Publishing Co.*, 33 Conn.Sup. 4, 356 A.2d 472 (Super. Ct. 1975); GEORGIA: *Williams v. Trust Co. of Georgia*, 140 Ga.App. 49, 230 S.E.2d 45 (Ct. App. 1976); *Savannah News-Press Div. v. Whetsell*, 149 Ga.App. 233, 254 S.E.2d 151 (Ct. App. 1979); IDAHO: *Bandelin v. Pietsch*, 98 Idaho 337, 563 P.2d 395, *cert. denied*, 434 U.S. 891, 98 S. Ct. 266, 54 L. Ed. 2d 177 (1977); OREGON: *Wheeler v. Green*, 286 Or. 99, 593 P.2d 777 (1979); RHODE ISLAND: *De Carvalho v. da Silva*, 414 A.2d 806 (R.I. 1980); VERMONT: *Colombo v. Times-Argus Ass'n.*, 135 Vt. 454, 380 A.2d 80 (1977); WYOMING: *Adams v. Frontier Broadcasting Co.*, 555 P.2d 556 (Wyo. 1976).

Only four (4) states have adopted the *Rosenbloom* standard as a matter of state law: CALIFORNIA: *Rollenhagen v. City of Orange*, 116 Cal.App.3d 414, 172 Cal.Rptr 49 (Ct. App. 1981), *but cf.*, *Widener v. Pacific Gas & Electric Co.*, 75 Cal.App.3d 415, 142 Cal.Rptr 304 (Ct. App. 1977), *cert. denied*, 436 U.S. 918, 98 S. Ct. 2265, 56 L. Ed. 2d 759 (1978); COLORADO: *Walker v. Colorado Springs Sun. Inc.*, 188 Colo. 86, 538 P.2d 450 (Colo.), *cert. denied*, 423 U.S. 1025, 96 S. Ct. 469, 46 L. Ed. 2d 399 (1975); INDIANA: *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.*, 162 Ind.App. 671, 321 N.E.2d 580 (Ct. App. 1974), *cert. denied*, 424 U.S. 913, 96 S. Ct. 1112, 47 L. Ed. 2d 318 (1976); MICHIGAN: *Peisner v. Detroit Free Press, Inc.*, 82 Mich.App. 153, 266 N.W.2d 693 (Ct. App. 1978).

Moreover, in three (3) cases, federal courts have interpreted state law as having adopted *Gertz*: MISSISSIPPI: *Brewer v. Memphis Publishing Co.*, 626 F.2d 1238, 1247 (5th Cir. 1980), *cert. denied*, 452 U.S. 962, 101 S. Ct. 3112, 69 L. Ed. 2d 973 (1981) (applying Mississippi law); PENNSYLVANIA: *Mathis v. Philadelphia Newspapers, Inc.*, 455 F. Supp. 406 (E.D. Pa. 1978) (applying Pennsylvania law); VIRGINIA: *Mills v. Kingsport Times-News*, 475 F. Supp. 1005 (W.D. Va. 1979) (applying Virginia law); only one federal court has interpreted state law as having adopted *Rosenbloom*: ALASKA: *Gay v. Williams*, 486 F. Supp. 12 (D. Alaska 1979) (applying Alaska law); *Cf.*, New York which declines to follow either *Gertz* or *Rosenbloom*, adopting instead an intermediate standard of *gross* negligence: NEW YORK: *Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975) (Private individuals must prove gross negligence in matters of public concern.)

---

**4** 🖝  RESTATEMENT (2d) OF TORTS, § 580B (1977) states as follows: **HN5**🖝

" § 580B. Defamation of Private Person

One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he

(a) knows that the statement is false and that it defames the other,

(b) acts in reckless disregard of these matters, or

(c) acts negligently in failing to ascertain them."

---

**5** 🖝  Counsel for the Miami Herald, with characteristic candor and accuracy, conceded at oral argument in this cause that precious little which appears in the daily newspaper is *not* a matter of public or general concern. As such, all agree that the *Rosenbloom* rule effectively precludes a non-public person from recovering in most cases for defamatory falsehoods appearing in the daily press when such falsehoods are negligently uttered without due care as to their truth or falsity.

---

**6** 🖝  In his second inaugural address on March 4, 1805, Jefferson, quite to the contrary, clearly endorsed the enforcement of state defamation laws. "No inference is here intended, that the laws, provided by the State against false and defamatory publications, should not be enforced; he who has time, renders a service to public morals and public tranquility, in reforming those abuses by the salutory coercions of the law...." THE LIFE AND SELECTED WRITINGS OF THOMAS JEFFERSON 343 (A. Koch & W. Peden eds. 1944). Indeed, Jefferson was often exasperated by the excesses of the press of his day. "It is a melancholy truth, that a suppression of the press could not more completely deprive the nation of its benefits, than is done by its abandoned prostitution to falsehood. Nothing can now be believed which is seen in a newspaper. Truth itself becomes suspicious by being put in that polluted vehicle." THE LIFE AND SELECTED WRITINGS OF THOMAS JEFFERSON, *supra* at 581 (June 11, 1807 letter to John Norvell). It is in that context that Dumas Malone, perhaps the country's most distinguished Jeffersonian scholar, writes: "His [Jefferson's] advocacy of freedom for the press was subject to certain qualifications. He believed that falsehood and defamation could and should be punished under state laws." D. MALONE, JEFFERSON THE PRESIDENT: SECOND TERM 1805-1809 9 (1974). Moreover, Merrill Peterson, a prominent Jefferson biographer, adds: "There were very few principles he [Jefferson] held as absolutes and freedom of the press was not one of them. A press unrestrained to truth had not earned the right to unrestrained freedom." M. PETERSON, THOMAS JEFFERSON AND THE NEW NATION 716 (1970).

---

**7** 🖝  "It is of great importance in a republic not only to guard the society against the oppression of its rulers, but to guard one part of the society against the injustice of the other part." THE FEDERALIST NO. 51 (J. Madison) 227 (Beard ed. 1964). "Man's capacity for justice makes democracy possible; but man's inclination to injustice makes democracy necessary." R. NIEBUHR, THE CHILDREN OF LIGHT AND THE CHILDREN OF DARKNESS xiii (2d ed. 1960).

**8⚖** *See e.g.*, H. SALISBURY, WITHOUT FEAR OR FAVOR (1980); D. HALBERSTAM, THE POWERS THAT BE (1979). "[T]echnology has immeasurably increased the power of the press to do both good and evil. Vast communication combines have been built into profitable ventures." *Rosenbloom v. Metromedia, Inc.*, 403 U.S. at 60, 91 S. Ct. at 1828 (White, J., concurring). Indeed, the mass media today is largely composed of business enterprises with a vast circulation and audience having often an immediate and significant impact on public opinion. It is surely beyond dispute, for example, that the Washington Post's courageous expose of the sordid Watergate scandal in 1972-73 - which coverage was itself news and was widely publicized by other segments of the mass media - put in motion a series of public events which led to the resignation of President Richard Nixon in the face of almost certain impeachment, the only such resignation in our history. A power which decisively assists to bring down a President of the United States by the sheer might of the twentieth century pen is a force which cannot be dismissed as trifling.

**1⚖** Two members of the Court joined Justice Brennan's opinion. Justice Douglas ▾ took no part in the disposition of the case. Justices White, Marshall, Harlan ▾ and Stewart expressly disavowed the proposition that the libel of a private individual in the reporting of a public event is not actionable absent actual malice. Thus, that proposition did not receive approval of the majority (five) of the quorum (eight) necessary to give it precedential effect. *United States v. Pink*, 315 U.S. 203, 216, 62 S. Ct. 552, 86 L. Ed. 796, 810 (1942); *Hertz v. Woodman*, 218 U.S. 205, 213-14, 30 S. Ct. 621, 54 L. Ed. 1001, 1005-06 (1910). *See Laird v. Tatum*, 409 U.S. 824, 837-38, 93 S. Ct. 7, 34 L. Ed. 2d 50, 60 (1972) (memorandum of Rehnquist, J.); *Chappell v. Emco Machine Works Co.*, 601 F.2d 1295, n. 6 (5th Cir. 1979); *Baker v. State*, 15 Md.App. 73, 289 A.2d 348 (Ct. Spec. App. 1972), *cert. denied*, 411 U.S. 951, 93 S. Ct. 1940, 36 L. Ed. 2d 413 (1973).

**2⚖** Contrary to Judge Hubbart ▾'s assertion, our recent decision in *Karp v. Miami Herald Publishing Co.*, 359 So.2d 580 (Fla. 3d DCA), *appeal dismissed*, 365 So.2d 712 (Fla. 1978), affirming a summary judgment in favor of the publisher does not contradict this conclusion. The proper standard of liability was not in issue in *Karp*, the parties having agreed to the trial judge's determination that negligence was the standard of fault for private plaintiffs; a standard applied in reliance on the Florida supreme court's opinion in *Firestone II*, which was subsequently reversed by the United States Supreme Court. *See* note 4, *infra*. Since a decision in favor of the defendant on a negligence standard *a fortiori* would have compelled the same result under the stricter "actual malice" analysis, we were not required to address the issue we now decide. *See also Sobel v. Miami Daily News, Inc.*, 395 So.2d 282 (Fla. 3d DCA 1981) (mem. decision -- court affirmed judgment for the publisher, citing to *Rosenbloom*). Other Florida courts have been similarly unsuccessful in attempts to delineate a post-*Gertz* stance. The Fourth District addressed this issue in a case involving a public figure libel action and although the court noted that defamation suits were governed by a dual standard for public and private individuals, it neglected to articulate what standard applied to private individuals. *Finkel v. Sun Tattler Co.*, 348 So.2d 51 (Fla. 4th DCA 1977), *cert. denied*, 358 So.2d 135 (Fla. 1978). Another district stated that under *Gertz*, private plaintiffs no longer need prove actual malice, but also failed to state which standard of fault would apply. *See Helton v. United Press International*, 303 So.2d 650 (Fla. 1st DCA 1974), cited by the majority. That same court, as recently as last year, stated that "the Supreme Court of our state has not had or taken the opportunity to adopt an actual malice or simple negligence standard, and we restrain ourselves from doing so in this case." *See From v. Tallahassee Democrat, Inc.*, 400 So.2d 52, 55 (Fla. 1st DCA 1981), *petition for review denied*, 412 So.2d 465 (Fla. 1982).

**3⚖** In so concluding, I have not overlooked the language of the penultimate paragraph of the Florida supreme court opinion in *Firestone II*, providing in pertinent part:

> Furthermore, this erroneous reporting is clear and convincing evidence of the *negligence* in certain segments of the news media in gathering the news…. A careful examination of the final decree prior to the publication would have clearly demonstrated that the divorce had been granted on the grounds of extreme cruelty, and thus the wife would have been saved the humiliation of being accused of adultery in a nationwide magazine. This is a flagrant example of "journalistic *negligence*."

*Firestone II*, 305 So.2d at 178 (e. s.) After carefully reviewing the language of the entire opinion, I find that the two references to "negligence" captioned above were not intended as an exposition of a new state standard of liability in private actor/public event cases (particularly since the court did not so state); rather, they were meant merely as comment upon the indifference of certain news purveyors toward injuries inflicted upon private persons through inaccurate reporting. Even if my own analysis did not dispose me toward this conclusion, I would nonetheless be compelled to this view because it was on this basis that the decision was reversed in the United States Supreme Court, as contravening the requirement of *Gertz*:

> There is nothing in the court's opinion which appears to make any reference to the relevance of some concept of fault in determining petitioner's liability.

*Time, Inc. v. Firestone*, 424 U.S. 448, 462, 96 S. Ct. 958, 47 L. Ed. 2d 154, 168, n. 7 (1976). Although it reversed the Florida supreme court's decision because recovery was allowed without proof of fault in contravention of the rule in *Gertz*, the United States Supreme Court *did* uphold the Florida court's finding that the Firestones' divorce action was not a matter of public concern. 424 U.S. at 453-55, 96 S. Ct. at 964, 47 L. Ed. 2d at 162-63. Thus, even if *Firestone II* does indicate a tendency for Florida to adopt a negligence standard, this tendency would only apply to defamation suits *not* involving a matter of public concern.

366



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX ™

Copyright © 2023 LexisNexis.

Miller v. Sawant, 2023 U.S. Dist. LEXIS 40015 (W.D. Wash. Mar. 9, 202

Search: Everything

Client: -None- ⌄    Folders    History    Help

| Document: | Miller v. Sawant, 2023 U.S. Dist. LEXIS 40015 | Actions ⌄ |

⚠️ **Miller v. Sawant, 2023 U.S. Dist. LEXIS 40015**

Copy Citation

United States District Court for the Western District of Washington

March 9, 2023, Decided; March 9, 2023, Filed

CASE NO. C18-506 MJP

**Reporter**
2023 U.S. Dist. LEXIS 40015 * | __ F.Supp.3d __ | 2023 WL 2428144

SCOTT MILLER, MICHAEL SPAULDING, Plaintiffs, v. KSHAMA SAWANT, Defendant.

**Subsequent History:** Appeal filed, 03/21/2023

**Prior History:** Miller v. Sawant, 2018 U.S. Dist. LEXIS 161970, 2018 WL 4538935 (W.D. Wash., Sept. 21, 2018)

## Core Terms

murder, inquest, remarks, rally, summary judgment, shooting, actual malice, Declaration, audience, defamation, killed, shot, falsity, protest, undisclosed fact, defamatory, invited, jurors, defamation claim, exaggeration, investigate, false statement, no evidence, city hall, disclosure, rhetoric, charges, color, spoke, terms

**Counsel:** **[*1]** For Scott Miller, an individual, Michael Spaulding, an individual, Plaintiffs: Jessica Marie Cox ⌄, Daniel Andrew Brown ⌄, WILLIAMS KASTNER & GIBBS ⌄ (SEA ⌄), SEATTLE, WA.

For Kshama Sawant, an individual, Defendant: Dmitri Iglitzin ⌄, BARNARD IGLITZIN & LAVITT LLP ⌄, SEATTLE, WA; James E Lobsenz ⌄, CARNEY BADLEY SPELLMAN PS ⌄, SEATTLE, WA.

**Judges:** Marsha J. Pechman ⌄, Senior United States District Judge.

**Opinion by:** Marsha J. Pechman ⌄

## Opinion

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendant Kshama Sawant's Motion for Summary Judgment. (Dkt. No. 119.) Having reviewed the Motion, Plaintiffs' Opposition (Dkt. No. 125), the Reply (Dkt. No. 135), and all supporting materials, the Court GRANTS the Motion and enters summary judgment in Sawant's favor on the remaining claims in this action.

**SUMMARY**

Seattle Police Officers Scott Miller and Michael Spaulding claim that Seattle City Councilmember Kshama Sawant twice defamed them by referring to them as the murderers of Andre Che Taylor. Miller and Spaulding shot and killed Taylor on February 21, 2016 while attempting to arrest him. Miller and Spaulding claimed they acted in self-defense and were found to have acted within Seattle Police Department **[*2]** policy. They also pursue a claim of "outrage" that is dependent on a valid defamation claim.

Sawant asks that the claims not advance to trial because Miller and Spaulding have failed to identify sufficient evidence that her words were defamatory. The Court agrees and finds in Sawant's favor for three independent reasons.

First, Sawant's remarks are inactionable statements of opinion. Second, even if the Court were to construe Sawant's remarks as actionable, factual statements, Miller and Spaulding have failed to provide evidence that might allow a jury to find them to be false. Third, Miller and

368

Spaulding have failed to provide sufficient evidence that Sawant acted with "actual malice."

Each of these findings separately and independently support entry of summary judgment in Sawant's favor on Plaintiffs' claims. The Court's ruling makes a trial and any further proceedings unnecessary.

## BACKGROUND

Plaintiffs Michael Spaulding and Scott Miller, both Seattle Police Department (SPD) Officers, accuse Sawant, a Seattle City Councilmember, of defaming them on two separate occasions. Spaulding and Miller allege that at two public rallies, Sawant branded them as murderers for their participation in **[*3]**  the shooting death of Andre Che Taylor. Discovery has closed and Sawant asks the Court to find that Plaintiffs have failed to develop sufficient facts to prevail on their defamation and outrage claims. Sawant's Motion requires the Court to examine Plaintiffs' involvement in killing Che Taylor, Sawant's first and second remarks, the King County inquest and city-level reviews conducted of the killing, and Plaintiffs' claimed damages.

### A. Police Killing of Che Taylor

On February 21, 2016, Miller and Spaulding were conducting surveillance on an apartment complex on NE 85th Street, in Seattle. (Declaration of Dmitri Iglitzin ▾ Ex. 15 at 1 (Final Interrogatories to the Inquest Jury) (Dkt. No. 120).) Miller and Spaulding observed Andre Che Taylor, a forty-six year-old Black man, arrive near the apartment complex at about 3:30 PM. (Iglitzin ▾ Decl. Ex. 1 at 18 (Force Investigation Report).) Miller observed a handgun in a holder on Taylor's right hip as Taylor entered the apartment complex. (Id. at 18-19) Miller and Spaulding knew that Taylor was a convicted felon and could not legally possess a firearm. (Id.) Miller and Spaulding determined to arrest Taylor and called for assistance shortly after **[*4]**  seeing him enter the apartment complex. (Id. at 7.)

Roughly twenty minutes later, Miller and Spaulding saw Taylor exit the apartment complex. (Iglitzin ▾ Decl. Ex. 1 at 20.) Taylor did not immediately return to his car and Miller and Spaulding lost sight of him. (Id. at 20.) A short while later, a white Ford Taurus carrying Taylor in the front passenger seat drove past Miller and Spaulding and parked behind Taylor's car. (Id. at 20-21.) Taylor got out of the Taurus and began speaking with the driver and other passenger from outside the car. (Id. at 21.)

Miller and Spaulding decided the execute the arrest and got out of their unmarked vehicle in plain clothes wearing black SPD jackets with police markings on their chest and back. (Iglitzin ▾ Decl. Ex. 1 at 21; Iglitzin ▾ Decl. Ex. 3 at 1190-91 (Inquest Transcript).) Spaulding was armed with a rifle, while Miller carried a shotgun. (Iglitzin ▾ Decl. Ex. 3 at 1014-15.) They surprised Taylor and commanded him to show his hands and get on the ground next to the white car, which Taylor did. (Id. at 1040, 1076, 1194; Iglitzin ▾ Decl. Ex. 7.) When Taylor was prone on the ground, both Miller and Spaulding thought Taylor was reaching for and drawing a firearm **[*5]**  from his right hip. (Iglitzin ▾ Decl. Ex. 1 at 21; Iglitzin ▾ Decl. Ex. 3 at 1040-41, 1257-58.) Spaulding shot Taylor six times at close range with a rifle, while Miller shot him once with a shotgun. (Iglitzin ▾ Decl. Ex. 1 at 21; Iglitzin ▾ Decl. Ex. 3 at 1160, 1207.) Taylor died shortly after being transported to Harborview Medical Center. (Iglitzin ▾ Decl. Ex. 1 at 21-22.) No gun was found on Taylor's body and neither Miller nor Spaulding saw him holding a firearm at the time of the attempted arrest. (Iglitzin ▾ Decl. Ex. 3 at 888, 1098, 1266.) A gun was found in the Taurus under the passenger seat, but there were no fingerprints or DNA that could be matched to Taylor and no records indicated he purchased or registered the gun. (Iglitzin ▾ Decl. Ex 8 at 4 (CSI Vehicle Report); Iglitzin ▾ Decl. Ex. 3 at 1551-53, 1548-50.)

### B. Sawant's First Remarks

The day after the Taylor died, SPD released video of the shooting taken from the dashcam of an SPD vehicle arriving on the scene while Miller and Spaulding were attempting to arrest Taylor. (Iglitzin ▾ Decl. Ex. 7.) Two days later at a news conference, the president of the Seattle King County NAACP called Taylor's death a "coldblooded murder" and an "execution **[*6]**  without due process at the hands of the police." (See Iglitzin ▾ Decl. Ex. 10 (Seattle Times Article dated Feb. 24, 2016).) The president elaborated: "It was clear to me that they come with the intent to kill, not to arrest." (Id.) The same Seattle Times article that reported on the news conference identified Spaulding and Miller as the officers who shot Taylor. (Id.)

On February 25, 2016, four days after the shooting, a group of around one-hundred people gathered outside of SPD headquarters across the street from City Hall to demand criminal charges be filed against the officers involved in Taylor's death. (Iglitzin ▾ Decl. Ex. 11 (Seattle Times Article dated Feb. 26, 2016); Declaration of Kshama Sawant ¶ 3 (Dkt. No. 121); Deposition of Kshama Sawant at 52-3 (Exhibit A to the Declaration of Daniel Brown ▾ (Dkt. No. 134)).) Sawant had seen the police video of the shooting and read news reports and decided to join the protest in solidarity with the protestors, though her participation was unplanned. (Sawant Decl. ¶¶ 6-7.) Sawant, whose offices are in City Hall, described the event as "a rally outside city hall on the issue of Che Taylor and the overall issues of the police department in relation **[*7]**  to communities of color." (Sawant Dep. at 51.) According to Sawant, "[m]any people who were present and several speakers described Che Taylor's death as a 'murder,'" including the president of the local NAACP branch. (Sawant Decl. ¶¶ 8-9.) In relevant part, Sawant told those gathered:

> This is dramatic racial injustice, in this city and everywhere in this nation. The brutal murder of Che Taylor, just a blatant murder at the hands of the police, show how urgently we need to keep building our movement for basic human rights for black people and brown people. I want to let you know that I stand here both as an elected official, as a brown person, as an immigrant woman of color, and as someone who has been in solidarity with the Black Lives Matter movement, and our movement for racial, economic and social justice....

> And I am here as an elected official because I am completely committed, unambiguously committed, to holding the Seattle Police Department accountable for their reprehensible actions, individual actions. We need justice on the individual actions and we need to turn the tide on the systematic police brutality and racial profiling.

(Iglitzin ▾ Decl. Ex. 12.)

In support of summary judgment, **[*8]**  Sawant declares that throughout her time on the City Council she has "been outspoken about police violence against people of color, working people, and the poor, and about the need for reform and increased accountability." (Sawant Decl. ¶ 4.)

Sawant is not a lawyer and asserts that she did not understand anyone who described the shooting as a "murder" to be using it in a technical, legal sense, but only as a layperson would, to describe a wrongful killing that should be considered criminal." (Id. ¶ 8; see id ¶ 5.) She maintains that it was her opinion that "Taylor's death could fairly be described as a 'murder,' because, as a layperson, I meant to convey that I believed the officers' actions were wrongful and should be considered criminal." (Id. at ¶ 9.) And when she spoke at the rally, she did not know the names of the officers who shot Taylor. (Id. ¶ 10; Sawant Dep. at 57 ("When I was speaking at the rally, I had no knowledge of their names[.]").)

**C. Investigations into the Shooting**

The SPD Force Investigation Team (FIT) investigated Miller and Spaulding's use of deadly force against Taylor. (See Iglitzin ▾ Decl. Ex. 1.) In June 2016, the Force Review Board (FRB) then reviewed those **[*9]** findings and concluded that Miller and Spaulding acted within SPD policy. ( Iglitzin ▾ Decl. Ex. 13 (Seattle Times Article Dated June 29, 2016).) The review process was mandated by a 2012 consent decree between the City of Seattle and United States Department of Justice. See United States v. City of Seattle, No. 12-CV-1282 JLR, Dkt. No. 3-1 at ¶¶ 38, 66, 112, 124 (Consent Decree) (W.D. Wash. July 27, 2012). Before entering into the consent decree the DOJ's reported to the City its investigatory finding of "a pattern or practice of constitutional violations regarding the use of force that result from structural problems, as well as serious concerns about biased policing." (Iglitzin ▾ Decl. Ex. 14 at 2.)

An inquest into Taylor's death was convened in accordance with a King County Executive Order and the King County Charter, which required an inquest to "'be held to investigate the causes and circumstances of any death involving a member of any law enforcement agency of the county in the performance of his duties.'" See Conducting Inquests in King County, King County Exec. Order No. PHL 7-1-1 (Mar. 16, 2010) (quoting King County Charter § 895); (Iglitzin ▾ Decl. Ex. 3 at 17). King County District Court Judge Janet E. Garrow ▾ presided over the inquest, which began on January 30, 2017. (Iglitzin ▾ Decl. Ex. 3 at 1.) Judge Garrow ▾ explained that "[t]he purpose of an inquest is to serve as a fact-finding hearing, to attempt to determine what **[*10]** events happened to cause" a person's death during an encounter with law enforcement. (Id. at 17-18.) She explained that "[a]n inquest is not a trial to determine whether someone is guilty of a crime, nor is it an indictment process to determine whether someone should be charged with a crime." (Id. at 18.) "The function of an inquest is simply to determine what happened, for the benefit of the persons involved and the public." (Id.) The King County Prosecutor served as a neutral and asked questions, while lawyers for Miller, Spaulding, and Taylor's family were only allowed to cross-examine witnesses. (Id. at 19.) The Court disallowed any evidence or testimony related to SPD "tactics, policies, and practices." (Id. at 39.)

Represented by counsel, Miller and Spaulding provided testimony under oath to questions posed by the Prosecuting Attorney. (Iglitzin ▾ Decl. Ex. 3 at 6, 19, 988, 1229.) Eight jurors heard the testimony and answered fifty-five different interrogatories on a "more likely than not" basis. (Id. at 1610, 1619.) The jury provided its answers to the final interrogatories on February 10, 2017. (Iglitzin ▾ Decl. Ex. 15.)

In response to the interrogatories, six of the jurors believed **[*11]** that Miller saw a handgun on Taylor's right hip approximately 30 minutes before the shooting. (Iglitzin ▾ Decl. Ex. 15 at 3.) Although all eight jurors found that Spaulding did not see the gun, they agreed that Miller told him Taylor was carrying a holstered handgun on his right hip. (Id.) The jurors answered unanimously that Miller and Spaulding ordered Taylor to "show his hands" and "get on the ground" and that Taylor complied with these commands. (Id. at 7-8.) Six of the jurors believed that Spaulding saw Taylor move his right hand to his right hip area while he was on the ground during the arrest. (Id. at 9.) All eight jurors agreed that Spaulding believed Taylor was drawing a handgun. (Id.) Seven of eight jurors found that Spaulding had reason to believe Taylor posed a threat of death or serious bodily injury when he shot Taylor, while only six of eight jurors believed Miller thought Taylor posed a threat of death or serious bodily injury when he shot Taylor (Id. at 9-10.)

In March 2017, after the inquest concluded, King County Prosecuting Attorney Dan Satterberg ▾ declined to file criminal charges against Miller or Spaulding. (Iglitzin ▾ Decl. Ex. 17.) At the time of Satterberg ▾'s decision, **[*12]** Washington law required prosecutors to prove beyond a reasonable doubt that police acted with "malice" to be guilty of criminal homicide. RCW 9A.16.040(3) (2016). Satterberg ▾ stated that there was "insufficient evidence to overcome this complete defense"—that Miller and Spaulding had not acted with malice. (Iglitzin ▾ Decl. Ex. 17.)

**D. Sawant's Second Remarks**

Sawant made her second statements on June 20, 2017 at a rally organized by Che Taylor's brother "to protest the recent police killing of Charleena Lyles." (Sawant Decl. ¶ 12.) Two days earlier, SPD officers shot and killed Lyles, a pregnant Black woman and mother of four, in her home and in front of her children. (Iglitzin ▾ Decl. Ex. 24 (The Guardian Article dated June 19, 2017).) The rally was attended by hundreds outside of the apartment building where Lyles was shot and killed. (Iglitzin ▾ Decl. Ex. 25 (Seattle P-I Article dated June 20, 2017.) Notably, the attorney who represented Taylor's family at the inquest, called the shooting of Lyles a murder and led the audience in the following refrain: "Murder is murder is murder is murder is murder is murder." (Id.)

At the rally, Sawant stated in relevant part:

I join the NAACP in demanding such **[*13]** a transparent public hearing. When Che Taylor was murdered by the police, the community and I demanded such a hearing from the Mayor and from Council member Gonzalez whose committee oversees the SPD, but neither the Mayor nor Council member Gonzalez responded. In . . . light of the horrific killing of Charleena now I again urge . . . I publicly urge the City Council to hold such a hearing. I have also earlier today sent a number of important questions to the SPD.

. . . We demand that the City of Seattle appoint an independent committee to review this case . . . with . . . with full public accountability. We cannot rely on the existing process to determine why Charleena was killed because that process has failed Che Taylor. . . that process has failed every person who was killed at the hands of the Police. Sisters and brothers, I will add one more thing for our movement that is standing with Charleena to think about, a deeply unequal society such as ours also implies that the lives of poor and low-income people, black and brown people, homeless people, those who have mental health issues and challenges . . . the system treats our lives as expendable.

(Iglitzin ▾ Decl. Ex. 26.)

### E. Plaintiffs' [*14] Damages

Plaintiffs allege that Sawant's remarks caused them to endure a variety of damages. Miller declares that "[a]fter she [Sawant] called me a murderer and a racist, my life was turned upside down." (Declaration of Scott Miller at ¶ 2 (Dkt. No. 126).) Miller avers that his "children attended school in the Seattle School District and we were forced to move to a different county in order to avoid being publicly berated and chastised as that started after her [Sawant's] public lies about me and my friend and colleague Michael Spaulding." (Id.) Miller also claims based on hearsay that SPD Chief O'Toole had told him that he and Spaulding "were scheduled to receive two awards," but that after "Sawant's statements calling us murderers . . . we were told we would need to wait until the political climate was diffused." (Id. ¶ 3.) The two officers "never received these awards, despite being told we were going to receive them, which has hurt our careers." (Id.)

Spaulding avers that "[b]eing called a racist and a murderer by Kshama Sawant as she did publicly on more than one occasion directly and negatively impacted many aspects of my life." (Declaration of Michael Spaulding ¶ 2 (Dkt. No. 127).) [*15] Spaulding claims that Sawant "started a rhetoric (a false one) that was horrible to endure." (Id.) He states that "threats were made on social media" and he "was screamed at on the street, and once even on my property" when "[s]omeone came onto [his] property and drove on the grass and yelled at me, having something to do with the Che Taylor incident." (Id. ¶ 3.) This was "very scary" and he "had security cameras installed at [his] home." (Id.) His parents also installed a security system "because of the threats and the hostile environment," though he does not identify any threats to his parents. (Id.)


**ANALYSIS**

### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving [*16] party. Id. at 248. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. Anderson, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323-24.


### B. Defamation Claim Elements

"A defamation action consists of four elements: (1) a false statement, (2) publication, (3) fault, and (4) damages." Duc Tan v. Le, 177 Wn.2d 649, 662, 300 P.3d 356 (2013). The plaintiff has the burden of proving that the communication was made of and concerning him or her. Sims v. KIRO, Inc., 20 Wn. App. 229, 233, 580 P.2d 642 (1978), cert. denied, 441 U.S. 945, 99 S. Ct. 2164, 60 L. Ed. 2d 1047 (1979). And the plaintiff must also show that the defendant acted with actual malice. "Actual malice must be shown in cases involving both public figures and public officials." Tan, 177 Wn.2d at 662 (citing Curtis Publ'g Co. v. Butts, 388 U.S. 130, 155, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967) (plurality opinion)). Given that Plaintiffs and Defendant here are indisputably public figures, "the plaintiff must prove 'actual malice'—that is, knowledge of falsity or reckless disregard of the truth or falsity—to recover." Caruso v. Loc. Union No. 690 of Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., 100 Wn.2d 343, 352, 670 P.2d 240 (1983) (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974); citing New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)).

Under Washington law, "a defamation plaintiff resisting a defense motion for summary [*17] judgment by a media defendant must establish a prima facie case as to each element of defamation, i.e., falsity, an unprivileged communication, fault, and damages, by evidence of convincing clarity." Camer v. Seattle Post-Intelligencer, 45 Wn. App. 29, 36, 723 P.2d 1195 (1986) (citing Mark v. Seattle Times, 96 Wn.2d 473, 486-87, 635 P.2d 1081 (1981)). This standard would apply given that Sawant and Plaintiffs are public figures. But the Ninth Circuit has instructed the Court to apply only Rule 56 in resolving the summary judgment motion. See Miller v. Sawant, 18 F.4th 328, 337 n.10 (9th Cir. 2021) (stating that "a federal court must apply Federal Rule of Civil Procedure 56, rather than a state's heightened summary judgment standard, to claims arising under state law") (citation omitted). In resolving the Motion, the Court applies only Rule 56, and not a "convincing clarity" standard.


### C. Defamation Claims Fall Short

The Court finds at least three fatal defects in Plaintiffs' defamation claims. First, Sawant's statements are inactionable statements of opinion. Second, even if her statements were actionable factual statements, Plaintiffs have not shown them to be false. Third, there is inadequate evidence of actual malice.

The Court reviews whether: (1) Sawant's statements are per se defamatory; (2) Sawant's statements are actionable false statements or inactionable opinions; (3) Sawant's statements, if factual, are false; (4) Plaintiffs [*18] have provided sufficient facts that Sawant acted with actual malice; (5) Plaintiffs have identified adequate evidence of harm; (6) whether the statements were "of and concerning" Plaintiffs; (7) Sawant's statements are privileged; and (8) Sawant's statements receive heightened protection under the Washington Constitution.


### 1. Sawant's Statements Were Per Se Defamatory

Plaintiffs argue that Sawant made per se defamatory statements and that therefore this action must proceed to trial. (Pls. Opp. at 11-12.) While the Court agrees that Sawant's remarks are per se defamatory, this only alleviates Plaintiffs' burden to prove special damages. Plaintiffs must otherwise prove all other elements of their claims.

371

not every misstatement of fact, however insignificant, is actionable as defamation". Sisley v. Seattle Pub. Sch., 180 Wn. App. 83, 87, 321 P.3d 276 (2014) (quoting Mark, 96 Wn.2d at 493). As a gateway matter for any defamation claim, the plaintiff must show that "'the substance of the statement makes substantial danger to reputation apparent.'" Id. (quoting Mark, 96 Wn.2d at 493). A plaintiff may satisfy this specific burden by showing that the statement is per se defamatory. See Caruso, 100 Wn.2d at 353). A statement can be "defamatory per se (actionable without proof of special damages) if it '(1) exposes a living **[\*19]** person to hatred, contempt, ridicule or obloquy, to deprive him of the benefit of public confidence or social intercourse, or (2) injures him in his business, trade, profession or office.'" Life Designs Ranch, Inc. v. Sommer, 191 Wn. App. 320, 328, 364 P.3d 129 (2015) (quoting Caruso, 100 Wn.2d at 353). "The imputation of a criminal offense involving moral turpitude has been held to be clearly libelous per se." Caruso, 100 Wn.2d at 353 (citing Ward v. Painters' Local 300, 41 Wn.2d 859, 252 P.2d 253 (1953)). But even if the statement is per se defamatory, the plaintiff must still satisfy all other elements of the claim, except proof of special damages. See Maison de France, 126 Wn. App. at 34, 45, 108 P.3d 787 (2005). And "[t]ruth is an absolute defense to a per se defamatory statement." Id. (citing Ward, 41 Wn.2d at 863). "Whether a given communication constitutes defamation per se may be either a question of law or a question of fact." Id. at 43. "In all but extreme cases the jury should determine whether the article was libelous per se." Caruso, 100 Wn.2d at 354.

Here, the Court finds that Sawant's use of the term "murderer" renders her statements per se defamatory because they impute a criminal offense involving moral turpitude. See Caruso, 100 Wn.2d at 353 ("The imputation of a criminal offense involving moral turpitude has been held to be clearly libelous per se."). Plaintiffs have satisfied their burden to show that the statements are defamatory—that they had the capacity to damage Plaintiffs' reputations—and **[\*20]** they are entitled to a presumption of special damages. See Maison de France, 126 Wn. App. at 45. But Plaintiffs must still prove that Sawant's statements were actionable, false statements, that Sawant acted with actual malice, and that the statements were "of and concerning" them. That is because a per se defamatory statement only relieves the plaintiff of the burden of proving the statement had the capacity to damage their reputation and special damages. See id. at 44-45, 47; Sisley, 180 Wn. App. at 91 (noting that a per se defamatory statement failed to be actionable because it was not shown to be false or anything other than an opinion).

### 2. Sawant's Statements Constitute Inactionable Opinions

"Before the truth or falsity of an allegedly defamatory statement can be assessed, a plaintiff must prove that the words constituted a statement of fact, not an opinion." Robel v. Roundup Corp., 148 Wn.2d 35, 55, 59 P.3d 611 (2002). "Rhetorical hyperbole and statements that cannot reasonably be interpreted as stating actual facts are protected under the First Amendment." Tan, 177 Wn.2d at 662 (citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 20, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990)). "Whether the allegedly defamatory words were intended as a statement of fact or an expression of opinion is a threshold question of law for the court." Robel, 148 Wn.2d at 55 (citation omitted).

Under Washington law, the court "examin[es] a statement in the totality of the circumstances **[\*21]** in which it was made . . . to determine whether a statement should be characterized as nonactionable opinion." Dunlap v. Wayne, 105 Wn.2d 529, 539, 716 P.2d 842 (1986). "To determine whether a statement is nonactionable, a court should consider at least (1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts." Id. (regarding an inactionable opinion, counsel's statement to plaintiff's employer that plaintiff had been soliciting a kickback); see Robel, 148 Wn.2d at 56 (applying Dunlap test to a claim of defamation).

### a. First Dunlap Factor

Examining the first Dunlap factor, the Court concludes that Sawant's remarks were opinions.

The first Dunlap factor focuses on "the nature of the medium" because it "can affect whether a statement is received as 'fact' or 'opinion': statements of opinion are expected to be found more often in certain contexts, such as editorial pages or political debates." Dunlap, 105 Wn.2d at 539. "The court should consider the entire communication and note whether the speaker qualified the defamatory statement with cautionary 'terms of apparency.'" Id. Terms of apparency include stating "In my opinion," for example.

Sawant has provided undisputed evidence that she made her comments **[\*22]** at rallies and protests organized in response to police shootings of people of color which invited political opinion and criticism of police-involved-shootings. Sawant made her first statements four days after Taylor's death in February 2016 outside of SPD headquarters across the street from City Hall. (Sawant Dep. at 52-3.) Sawant described it as "a rally outside city hall on the issue of Che Taylor and the overall issues of the police department in relation to communities of color." (Sawant Dep. at 51.) According to Sawant, "[m]any people who were present and several speakers described Che Taylor's death as a 'murder,'" including the President of the Seattle King County NAACP. (Sawant Decl. ¶¶ 8-9.) Sawant made her second statements on June 20, 2017 at a rally organized by Che Taylor's brother "to protest the recent police killing of Charleena Lyles." (Id. ¶ 12.) The rally was attended by hundreds outside of the apartment building where Lyles was shot and killed by two SPD officers two days earlier. (Iglitzin Decl. Ex. 25.) Notably, the attorney representing Taylor's family at the inquest called the shooting of Lyles a murder and led the audience in the following refrain: "Murder **[\*23]** is murder is murder is murder is murder is murder." (Id.) The Court notes that Plaintiffs offer no contrary evidence or evidence to help explain the context.

Considering the first Dunlap factor, the Court finds that both rallies were events that invited exaggeration, hyperbole, and rhetoric critical of the police given the temporal proximity to both Taylor's and Lyles's death and nature and purpose of the rallies. The protests were not press briefings or official City Council meetings. Both events brought protestors together in a context not unlike a workplace gathering that the Washington Supreme Court similarly found to be a place "that invited exaggeration and personal opinion." Robel, 148 Wn.2d at 56 (finding that name-calling during a workplace meeting involving coworkers and superiors was a context which "invited exaggeration and personal opinion"). Indeed, other speakers referred to Taylor's death as a murder, and Sawant's statement echoed theirs. The protests also invited "political debate," which the Washington Supreme Court suggests invites opinion, not factual statements. Dunlap, 105 Wn.2d at 539. And Plaintiffs have offered no contrary evidence. This factor supports Sawant's position that her comments reflect opinions, **[\*24]** not facts.

Plaintiffs' response focuses instead on the fact Sawant did not use any terms of apparency to preface her remarks. It is true that Sawant did not expressly identify her remarks as being her opinion, and the Court construes this fact in Plaintiffs' favor. But the Court is not persuaded that this outweighs the substantial evidence suggesting that the context in which Sawant spoke invited opinion statements. When Sawant spoke, she addressed crowds who were protesting and engaging in political rhetoric where terms of apparency were unnecessary. See Robel, 148 Wn.2d at 56 (holding that the unqualified use of the words "snitch, squealer, and liar" were nonactionable opinion because the oral statements were made

372

to others who were "interested in discrediting" or "ostracizing the plaintiff". And when she spoke the first time, Sawant qualified her remarks as being those of an elected city councilmember and as a "brown person, as an immigrant woman of color, and as someone who has been in solidarity with the Black Lives Matter movement, and our movement for racial, economic, and social justice." (Dkt. No. 120 at Ex. 12.) This introduction suggests that she was providing her opinion based on her personal **[\*25]** experience and not reporting facts.

Plaintiffs also argue because Sawant made her first remarks outside of City Hall, she was making factual statements. Divorced from the overall context, the proximity to City Hall might suggest that Sawant was speaking at what might have been a press briefing or an event that invited the audience to expect a factual report. But the undisputed evidence shows that she was instead appearing at a protest during which the speakers directed their ire at SPD in stark terms. So the fact that City Hall was nearby does little to alter the Court's contextual analysis.

The Court finds that the overall context of both rallies invited hyperbole and opinion. The undisputed evidence shows that the events were political in nature and organized in support of racial and social justice in the immediate wake of two different police shootings of persons of color. Sawant and others who spoke referred to the shooting as a murder, a point which reinforces the exaggerated and political nature of the rallies. Although the Court notes the lack of express terms of apparency, it finds that this fact does not alter the overall contextual analysis. And although Plaintiffs suggest **[\*26]** that the jury should decide the overall context and the question of whether Sawant's remarks were opinions, their argument fails to track Washington law. (Pls. Opp. at 14-15.) "Whether the allegedly defamatory words were intended as a statement of fact or an expression of opinion is a threshold question of law for the court." [Robel, 148 Wn.2d at 55](#) (citation omitted). As such, it is within the Court's purview to resolve this threshold question based on the factual record before it, construing the evidence in the light most favorable to Plaintiffs. Having done so, the Court finds that this [Dunlap](#) factor favors finding Sawant's statements were opinions.

### b. Second **Dunlap** Factor

The second [Dunlap](#) factor—the nature of the audience at both rallies—favors finding that Sawant provided statements of opinion, not fact.

Within the second [Dunlap](#) factor the "court should . . . consider whether the audience expected the speaker to use exaggeration, rhetoric, or hyperbole." [Dunlap, 105 Wn.2d at 539.](#) The Washington Supreme Court has suggested that "in the context of ongoing public debates, the audience is prepared for mischaracterizations and exaggerations, and is likely to view such representations with an awareness of the subjective biases of the speaker." [Id.](#) **[\*27]** (citation and quotation omitted).

Both rallies were attended by people sympathetic to the shooting victims—Taylor and Lyles—and they were organized to protest police treatment of people of color. The undisputed evidence suggests that the audiences were drawn to the events to hear opinions, express anger, and show solidarity for the victims of the police shootings. (Sawant Decl. ¶¶ 7-9; Iglitzin Decl. Exs. 10, 24, 25.) As part of these politically-charged rallies where many called Taylor's death a murder, the audience would have "expected the speaker to use exaggeration, rhetoric, or hyperbole." [Dunlap, 105 Wn.2d at 539.](#) This is evidenced in Taylor's family's attorney to lead the second rally goers in a chant of: "Murder is murder is murder is murder is murder is murder is murder." (Iglitzin Decl. Ex. 25.)

Curiously, Plaintiffs fault Sawant for not having polled audience members to see if they thought she was providing her opinions or facts. (See Pls. Opp. at 14.) But it is Plaintiffs' burden to "prove that the words constituted a statement of fact, not an opinion." [Robel, 148 Wn.2d at 55.](#) And Plaintiffs have offered no evidence that might contradict the evidence Sawant has provided showing that the audience members were participating **[\*28]** in political criticism of police shootings and would have expected the use of exaggeration, hyperbole and rhetoric. Nothing in the record suggests that the audience at the rallies would have believed Sawant was providing factual statements. This factor clearly favors Sawant.

### c. Third **Dunlap** Factor

Plaintiffs offer no evidence to support the third and "most crucial" [Dunlap](#) factor—that Sawant's calling Plaintiffs murderers was supported by undisclosed facts. See [Dunlap, 105 Wn.2d at 539-40.](#)

"The third and perhaps most crucial factor to consider is whether the statement of opinion implies that undisclosed facts support it." [Dunlap, 105 Wn.2d at 539-40.](#) The Washington Supreme Court adopted the reasoning of the Restatement (Second) of Torts, which "specifically defines an opinion as actionable only if it 'implies the allegation of undisclosed defamatory facts.'" [Id. a 540](#) (quoting [Restatement (Second) of Torts § 566](#)). The Restatement explains that:

> A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is. But an expression of opinion that is not based on disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, **[\*29]** is treated differently.

[Restatement (Second) of Torts § 566, comment c.](#) In other words, "[a]rguments for actionability disappear when the audience members know the facts underlying an assertion and can judge the truthfulness of the allegedly defamatory statement themselves." [Dunlap, 105 Wn.2d at 540.](#)

Plaintiffs argue that Sawant's "statements imply the existence of undisclosed facts," by not identifying the source of "information she based her statements on (e.g., by watching the dashboard video)." (Pls. Opp. at 15-16.) But Plaintiffs fail to articulate what part of her statements implies that Sawant was basing her comments on undisclosed, superior knowledge of the incident. This is fatal to their contention and leaves the Court to guess. When Sawant made her first statements, it is possible that some members of the protest could have believed that Sawant knew more than was publicly known given the recency of the events and her position on the City Council. But at the time Sawant spoke, the public already knew the police had shot Taylor and they had access to the SPD video of Taylor's shooting death. (See Iglitzin Decl. Exs. 10, 11.) In this context, Plaintiffs' "[a]rguments for actionability disappear" because "the audience members know the **[\*30]** facts underlying an assertion and can judge the truthfulness of the allegedly defamatory statement themselves." [Dunlap, 105 Wn.2d at 540.](#) And the Court finds nothing specific in Sawant's remarks that imply she knew more about whether the shooting was justified. See [RCW 9A.16.040(3)](#) (2016). And when Sawant made her second statements, the results of the inquest and SPD reviews were public, which allowed the public even more information to make its own determinations about Sawant's remarks were truthful. See [Dunlap, 105 Wn.2d at 540.](#)

As an aside, Sawant confirmed in her deposition that she had no inside information about the shooting when she made either set of her comments. (See Sawant Dep 110-13.) This buttresses her assertion that she was making her opinion known based on the same facts available

373

to the public. See Dunlap, 105 Wn.2d at 540. The Court does not rely on this fact, though, because the relevant inquiry is what her statements implied to the audience, not what Sawant knew. See id.

Plaintiffs also argue that Sawant did not "state what information she specifically did not have (i.e., that no charges had been filed against Plaintiffs—although even if charges had been filed, that still would not provide her latitude to call Plaintiffs murderers)." (Pls. Opp. at 15-16.) **[*31]** Plaintiffs fail to identify what part of her statements imply that Sawant was supporting her comments with undisclosed facts about whether charges had been filed or not. And this argument fails to track the law. The relevant question is whether Sawant supported her statements with undisclosed facts, not whether she failed to disclose countervailing facts. See Dunlap, 105 Wn.2d at 539-40. Sawant's first statements demanded accountability from SPD and "justice on the individual actions" of the officers. But this did not imply undisclosed facts about whether charges would or would not be brought. And when Sawant made her second statements, the results of the inquest and the King County Prosecutor's decision not to charge Plaintiffs had been made publicly available. At that point, the audience members had access to the same facts and could have judged the truthfulness of Sawant's remarks. See Dunlap, 105 Wn.2d at 540.

The Court finds that Plaintiffs have failed to identify any evidence that Sawant supported either statement with undisclosed facts.

#### d. Summary

The Court finds that Sawant's remarks constitute inactionable opinions. The first and second Dunlap factors strongly favor concluding that Sawant was making politically-charged statements of **[*32]** personal opinion in the context of political rallies that invited exaggeration and hyperbole. See Robel, 148 Wn.2d at 56; Dunlap, 105 Wn.2d at 539. Aside from the lack of express terms of apparency, Plaintiffs point to no evidence that might support their position as to these two Dunlap factors. And construing the missing terms of apparency in Plaintiffs' favor does little to alter the context and what the audience—who self selected to join the protests where Taylor's death was described by several speakers as a murder—would have expected. The Court also finds that final Dunlap factor favors Sawant. Plaintiffs have failed to identify what portions of Sawant's remarks imply any undisclosed facts. And, even if they did, the Court finds it undisputed that the audience and public had access to sufficient information to gauge the truthfulness of Sawant's statements. See Dunlap, 105 Wn.2d at 540. As the Washington Supreme Court has explained, "the context and audience often ensure that any implicit facts will be perceived as 'merely a characterization of those facts.'" Robel, 148 Wn.2d at 57 (quoting Ollman v. Evans, 750 F.2d 970, 985, 242 U.S. App. D.C. 301 (D.C. Cir. 1984)). Considering both statements in their full context and in light of the Dunlap factors, the Court finds that Sawant's remarks were opinions, not facts. On this basis, the Court GRANTS the Motion for **[*33]** Summary Judgment.

#### e. Plaintiffs Misrepresent the Record in their Opposition

The Court separately notes that Plaintiffs grossly misrepresent the record in asserting that Sawant has admitted her statements were factual, and not opinions. Plaintiffs write:

> As an initial matter, during her deposition, Defendant Sawant admitted that the public statements calling Plaintiffs "murderers" was a fact. See e.g., Brown Decl., Ex. A (Sawant Transcript, 76: 20-22) ("It's also a fact. It's very clear to everybody. It's not just my opinion. It's also a fact.").

The quoted portion of the deposition transcript is taken entirely out of context. Sawant made no concession. In full, the deposition testimony is as follows (with the quoted portion underlined):

> [Q] My next question is, you are saying that everybody who listens to a politician would understand what is opinion and what is fact. Is that what you are saying?

> A. I'm saying that within any reasonable understanding, you know, it's hard to answer your question, because you are putting it in a such a blanket way. But if you were to talk about general things, I think that, for example, in this case, when I said "murder," I believe that everybody understands **[*34]** -- and I can say this -- I don't understand how anybody would think that I was speaking as if a judge would be speaking, where they're actually delivering a legal, you know, legal verdict.

> This is -- everybody knows I'm not a lawyer, and everybody knows I was there at the rally as an elected representative when I was expressing my opinion, and that it is not being spoken in a legal framework as a judge. I mean, you know, but it's slightly different than if I were to say, Today is Thursday. Today is Thursday. It's also a fact. It's very clear to everybody. It's not just my opinion. It's also a fact.

> But I think reasonable people have the ability to understand that when it is something like this, that this is not being said from a legal -- when Kshama Sawant, the city council member, said this was a brutal murder of Che Taylor, reasonable people, as far as I know, everybody would understand that this is your opinion. Whether you share that opinion or not is a different story.

(Sawant Dep. at 75-77 (emphasis added).) This makes clear that Sawant was merely stating that whether a day of the week is a Thursday is a fact, not that her statements were facts. Plaintiffs briefing misrepresents **[*35]** the record on this point. This type of misrepresentation misleads the Court and undermines the credibility of counsel's work.

#### 3. Falsity of the Statements

Even if the Court construes Sawant's comments as factual, Plaintiffs have failed to raise a genuine dispute of fact as to whether they are false.

"With respect to falsity, Washington does not require a defamation defendant to 'prove the literal truth of every claimed defamatory statement.'" Mohr v. Grant, 153 Wn.2d 812, 825, 108 P.3d 768 (2005) (quoting Mark, 96 Wn.2d at 494). "A defendant need only show that the statement is substantially true or that the gist of the story, the portion that carries the 'sting', is true." Id. (quoting Mark, 96 Wn.2d at 494). "The 'sting' of a report is defined as the gist or substance of a report when considered as a whole." Id. (citation and quotation omitted). "In applying this test, we require plaintiffs to show that the false statements caused harm distinct from the harm caused by the true portions of a communication." Id. "Stated another way, [w]here a report contains a mixture of true and false statements, a false statement (or statements)

affects the "sting of a report only when significantly greater opprobrium" results from the report containing the falsehood than would result from the **[*36]** report without the falsehood. Id. at 826 (citation omitted). It is for the Court to determine the "gist" of a report. Id.

Plaintiffs argue that Sawant's statements are false because they accuse them of committing a crime for which they have never been charged or convicted. (Pls. Opp. at 16.) It remains true that Plaintiffs were never charged or found guilty of murder. But this fact does not prove the falsity of Sawant's statements. First, Sawant never stated that the officers had been charged or convicted of murder. Second, to the extent that Sawant accused Plaintiffs of engaging in conduct that could technically constitute murder, there are no facts proving this to be false. Plaintiffs misstate the record in arguing that they were cleared of any wrongdoing:

> The King County prosecutor convened an inquest to determine whether charges should be brought for the shooting. After the inquest took place, an impartial jury cleared the Plaintiffs of any wrongdoing. No charges were ever brought against the Plaintiffs, and certainly no conviction has ever occurred.

(Pls. Opp. at 16.) The inquest was not convened to determine criminal liability or to determine whether the officers could or would be charged **[*37]** for any criminal conduct. See Conducting Inquests in King County, King County Exec. Order No. PHL 7-1-1 (Mar. 16, 2010). As the judge who presided over the inquest explained: "An inquest is not a trial to determine whether someone is guilty of a crime, nor is it an indictment process to determine whether someone should be charged with a crime." (Iglitzin Decl. Ex. 3 at 18.) And the inquest jury's response to the interrogatories did not answer the question of whether the shooting was intentional or justified. In fact, their response to the final interrogatories were mixed on certain questions that might be construed to relate to criminal liability. For example, all eight jurors found that Taylor complied with police commands and that no gun or holster was found on Taylor's body after he was shot. (Iglitzin Decl. Ex. 15 at 8, 10-11.) Seven of eight jurors found that Spaulding had reason to believe Taylor posed a threat of death or serious bodily injury when he shot Taylor, while only six of eight believed Miller thought Taylor posed a threat of death or serious bodily injury when he shot Taylor. (Id. at 9-10.) This evidence cannot be construed to prove the falsity of Sawant's statements.

Plaintiffs also misstate the record in arguing that the FIT, FRB, and SPD "cleared them **[*38]** of any wrongdoing." (Pls. Opp. at 16-17.) First, they cite to no evidence in the record in making these assertions. (See Pls. Opp. at 5, 16-17.) This is a clear failure of proof. Second, based on evidence Sawant has provided, the FIT and FRB merely concluded that Plaintiffs had acted within SPD policy. (See Iglitzin Decl. Ex. 13.) That is not dispositive of the possibility that they could have been charged and/or found guilty of murder—i.e., that they acted with malice. See RCW 9A.16.040(3) (2016). As such, these investigations do not show proof of falsity.

On the record before the Court, it finds the lack of sufficient evidence that the statements are false and the Court GRANTS the Motion for Summary Judgment on this independent ground.

### 4. No Evidence of Actual Malice

Plaintiffs fail to provide evidence of actual malice, which constitutes an alternative reason their defamation claims fail.

Under Washington law, Plaintiffs "must prove with clear and convincing evidence that the defendant made the statements with 'actual malice.'" Tan, 177 Wn.2d at 668. Actual malice "is, knowledge of falsity or reckless disregard of the truth or falsity." Caruso, 100 Wn.2d at 352 (citation and quotation omitted). "Actual malice can, however, be inferred from circumstantial **[*39]** evidence, including a defendant's hostility or spite, knowledge that a source of information about a plaintiff is hostile, and failure to properly investigate an allegation." Tan, 177 Wn.2d at 669. "These factors in isolation are generally insufficient to establish actual malice; they must cumulatively amount to clear and convincing evidence of malice to sustain a verdict in favor of a plaintiff." Id. "The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." Id. at 668-69 (citing Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 510-11, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)). The Court notes, however, that it has not applied the "clear and convincing" standard as to this element of the claim, given the Ninth Circuit's direction. See Miller, 18 F.4th at 337 n.10.[14]

Plaintiffs have failed to raise a genuine issue of material fact concerning actual malice. As to the first statements, Plaintiffs assert that Sawant "did not investigate anything before she spoke" and recklessly used her position as a councilmember to "pronounce[e] her verdict" that Plaintiffs' committed murder. (Pls. Opp. at 21.) But Plaintiffs contradict that assertion by admitting in the same paragraph that she did "watch a video." (Id.) There is insufficient evidence of actual malice. As Plaintiffs **[*40]** concede, Sawant reviewed the video of the shooting and based her statements on that video. (Id.) Sawant has also provided uncontroverted evidence that she also read news reports and talked to constituents about the shooting before she spoke. (See Sawant Decl. ¶ 6.) This was an investigation and there is no evidence that this review gave Sawant any reason to believe her statements were false. And while she did not speak to the officers involved or other members of the police before speaking, her "[f]ailure to investigate is not sufficient to prove recklessness." Herron v. KING Broad. Co., 112 Wn.2d 762, 777, 776 P.2d 98 (1989) (but noting that "when a reporter does in fact conduct an investigation and his investigation does not support his false statement or brings to his attention facts which rebut the false statement, that is evidence from which a jury can infer reckless disregard"). As Sawant articulated during her deposition, she had no reason to believe she would learn anything useful from contacting SPD. (Sawant Dep at 113-115, 118, 126-27.) There is no evidence that Sawant knew her statement was false or in reckless disregard for the truth when she made her statements based on the video of the shooting, news reports, and her discussions with **[*41]** constituents.

Plaintiffs also fail to identify what information Sawant would have learned from the inquest or FIT/FRB/SPD investigations that would have made her second comments reckless or knowingly false. Neither the inquest nor the city-level reviews determined conclusively whether Plaintiffs' decision to shoot Taylor was justified. The results of this investigations did not render Sawant's statements reckless or knowingly false.

Plaintiffs argue that "[a]t a minimum, the circumstantial evidence is something that needs to go to the jury." (Pls. Opp. at 21.) While actual malice can be inferred from circumstantial evidence, Tan, 177 Wn.2d at 669, Plaintiffs have failed to identify any evidence from which a jury could find actual malice on Sawant's part. Applying Rule 56, the Court finds Plaintiffs have failed to identify sufficient facts to allow the reasonable factfinder to find in their favor that Sawant acted with actual malice. The Court GRANTS the Motion for Summary Judgment on this alternative basis.

### 5. The Statements are "Of and Concerning" Plaintiffs

Plaintiffs have provided sufficient evidence to a raise a dispute of fact as to whether Sawant's statements were of and concerning them. Before

Sawant made **[*42]** her first remarks, Miller and Spaulding had been identified in the press as the officers involved. And Plaintiffs present the declarations of five individuals who state that they understood Sawant to refer to Plaintiffs in her remarks. These declarations are sufficient to raise a dispute of fact, as each declarant explains their basis for finding the remarks concerned and referred to Plaintiffs.

Sawant asks the Court to strike all five declarations because they are from witnesses who were not identified in Plaintiffs' initial disclosures. (Reply at 11.) Except as to one witness, the Court disagrees with Sawant. According to Sawant's counsel, Plaintiffs have never served initial disclosures. (Iglitzin Decl. ¶ 13 (Dkt. No. 102).) Technically, Sawant is correct that all of these witnesses who support Plaintiffs' case-in-chief should have been disclosed pursuant to Fed. R. Civ. P. 26(a). The failure to do so is grounds to strike the witnesses unless the failure to disclose was "substantially justified or harmless." See Fed. R. Civ. P. 37(c)(1). This is where Sawant's argument runs into trouble. All but one of these five witnesses was disclosed to Sawant when Plaintiffs opposed the dismissal of their third amended complaint in August **[*43]** 2020. (See Dkt. Nos. 61-64.) So while the failure to identify them in initial disclosures deviated from the letter and spirit of Rule 26(a), the result was harmless. The Court accepts the declarations of these four previously-disclosed witnesses. But the Court strikes the statements of Jared Keller, whose August 2020 declaration was only filed with the opposition to summary judgment in 2023. (See Declaration of Jared Keller (Dkt. No. 129).) The submission of this declaration with the opposition to Sawant's Motion was untimely and Plaintiffs provide no grounds to find the failure substantially justified or harmless given that the discovery period has already run and Sawant had no notice of this declarant. The Court STRIKES this declaration.

### 6. Evidence of Harm

Because the statements here constitute defamation per se, there is no requirement to prove special damages. As such, the Court declines to grant summary judgment on this basis.

As an aside, the Court notes that Plaintiffs misprepent the record with regard to Spaulding's claim of injury. Plaintiffs' Opposition states "Officer Spaulding had to install a security system at his parents' home after they received numerous death threats." (Pls. Opp. **[*44]** at 6 (citing Spaulding Decl., ¶ 3).) But Spaulding's declaration only states that he received "threats" on social media and was screamed at in public and "once even on [his] property." (Spaulding Decl. ¶ 3.) He does not describe any incident involving death threats.

### 7. Privilege

In her opening brief, Sawant argues that her statements are privileged because they fall either within an absolute legislative privilege or the Washington Constitution's Speech and Debate Clause. (Mot. at 20-21.) Sawant also argues that her statements enjoy an absolute privilege because Washington recognizes a common law absolute privilege for citizen complaints concerning policy conduct. (Id. at 22-23.) But Sawant has abandoned these arguments in her reply. Given this posture and the fact that the defamation claim fails for three independent reasons, the Court does not reach these issues.

### 8. Washington Constitution

Sawant argues that the guarantee of free speech in Article I, Section 5 of the Washington Constitution protects her from the defamation and outrage claims. This is a novel issue that the Court does not reach given the failure of proof on at least three elements of Plaintiffs' defamation claim.

### D. Outrage Claim Fails as a Matter of Law

Sawant seeks summary judgment on Plaintiffs' outrage claim on the **[*45]** theory that it is dependent on the defamation claim. (Mot. at 29.) Plaintiffs do not address this argument and provide no reason why it should survive. The Court GRANTS summary judgment on the outrage claim given the absence of any disputed facts that might support it.

### E. Expert Reports

Both sides ask the Court to strike expert reports submitted by their opponent.

First, Plaintiffs ask the Court to exclude all opinions from Lisa Daugaard, Sawant's expert. (Pls. Opp. at 7-11.) But in deciding the issues presented in the Motion, the Court has not relied on Daugaard's opinions and DENIES the request to strike as MOOT.

Second, Sawant asks the Court to strike as untimely the expert reports of John A. Hawkins, Plaintiffs' expert. The Court finds merit in this argument and GRANTS the request because Plaintiffs failed to timely provide either of Hawkins' reports and the failure to do so was neither justifiable nor harmless.

Plaintiffs failed to disclose either of Hawkins' reports in a timely fashion. Plaintiffs provided Hawkins' opening report on November 18, 2022, roughly one month after the expert disclosure deadline. (Dkt. No. 80.) And Plaintiffs served Hawkins' rebuttal report on January 17, **[*46]** 2023, which was well more than a month after Daugaard's report was served and over a month after the close of discovery. (See id.; Iglitzin Decl. ¶ 30 (noting that Daugaard's declaration was "submitted in this matter on October 16, 2022); Id. Ex. 29 at 10 (Daugaard's report dated October 16, 2022).) Under Fed. R. Civ. P. 26(a)(2)(D)(ii), any rebuttal report was due by November 15, 2022, making the service of the rebuttal report untimely.

The Court finds that the proper remedy here is exclusion. See Fed. R. Civ. P. 37(c)(1). Although Plaintiffs claim to have provided Hawkins' original report to Sawant in 2017 when they filed a state action, they did not identify Hawkins as a witness in this federal action until well after the expert disclosure deadline. The earlier disclosure does not temper the sting of the late disclosure in this action. By providing Hawkins' opening report after the expert deadline and with only a few days left in discovery, Sawant had insufficient time to depose Hawkins—a problem

compounded by the fact Hawkins was out of the country and not available during the remaining the discovery period. (See Igiltzin Decl. ¶ 9 (Dkt. No. 111).) The failure to timely disclose Hawkins as an expert in this action was not excusable **[*47]** or justifiable. Nor was the failure to timely provide his rebuttal report. Under Rule 37(c)(1), the proper remedy is exclusion. The Court therefore STRIKES both reports and has not considered them.

Separately, the Court notes that Plaintiffs failed to invoke any of Hawkins' opinions to support their arguments in opposition to raise a dispute of fact. True, Plaintiffs cite Hawkins' reports in a section of Plaintiffs' brief entitled "Evidence Relied Upon," and they filed both reports with the opposition. (See Pls. Opp. at 6.) But nowhere in the brief do Plaintiffs cite to, invoke, or rely on Hawkins' statements and opinions to oppose summary judgment. As such, the Court finds that Plaintiffs failed to properly invoke any of Hawkins' opinions to raise a dispute of material fact on any issue.


### CONCLUSION

In opposing summary judgment, Plaintiffs largely rely on fiery rhetoric, rather than admissible evidence that could create a genuine issue of material fact . (See, e.g., Pls. Opp. at 3 ("This case arises out of what may be the single most justified police shooting in the history of the state.").) Having considered the record before it, the Court finds that there are no genuine issues of material fact to **[*48]** support Plaintiffs' claims. Sawant's remarks, while impolitic and rash, were inactionable statements of opinion. Even if the Court construed them as factual, Plaintiffs have failed to point to any admissible evidence that might allow the factfinder to determine them to be false. And Plaintiffs similarly fail to provide any admissible evidence to support a finding that Sawant acted with actual malice. The Court therefore finds that Sawant is entitled to summary judgment on the defamation and outrage claims. The Court GRANTS Sawant's Motion for Summary Judgment and directs entry of judgment in her favor on the remaining claims. The Court also STRIKES the expert reports of John Hawkins and the declaration of Jared Keller. And the Court DENIES as MOOT the request to strike the expert report and opinions of Lisa Daugaard.

The clerk is ordered to provide copies of this order to all counsel.

Dated March 9, 2023.

/s/ Marsha J. Pechman ▾

Marsha J. Pechman ▾

United States Senior District Judge

---

**Footnotes**

 Even if the Court applied the "clear and convincing" standard, it would not change the outcome of its decision.



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

Document:    Newton v. National Broadcasting Co., 930 F.2d 662    Actions

⚠ **Newton v. National Broadcasting Co., 930 F.2d 662**

Copy Citation

United States Court of Appeals for the Ninth Circuit

April 13, 1990, Argued and Submitted, Pasadena, California ; August 30, 1990, Filed

Nos. 89-55220, 89-55285

**Reporter**
930 F.2d 662 * | 1990 U.S. App. LEXIS 25912 ** | 19 Fed. R. Serv. 3d (Callaghan) 370

Carson Wayne Newton, aka: Wayne Newton, Plaintiff-Appellee, v. National Broadcasting Company, Inc.; Brian Elliot Ross; Ira Silverman; Paul Greenberg, et al., Defendants-Appellants. Carson Wayne Newton, aka: Wayne Newton, Plaintiff /Cross-Appellant, v. National Broadcasting Company, Inc.; Brian Elliot Ross; Ira Silverman; Paul Greenberg, et al., Defendants-Cross /Appellees

**Subsequent History:** [**1] Amended and Rehearing Denied, April 5, 1991.

**Prior History:** Appeal from the United States District Court for the Central District of California; D.C. No. CV-88-5848-MDC;
Myron D. Crocker ▾, Senior District Judge, Presiding.

## Core Terms

broadcast, journalists, actual malice, interview, Gaming, district court, impression, threats, Hotel, credibility, convincing, organized crime, investigated, authorities, defamatory, hidden, words, independent review, deference, sentence, fact-finding, financing, reckless disregard, death threat, entertained, television, newspaper, helped, public figure, conversations

## Case Summary

**Procedural Posture**
Appellants, a television broadcasting company and associated individuals, sought review of a decision of the United States District Court for the Central District of California, which awarded appellee entertainer damages in appellee's defamation action alleging appellants knowingly broadcast false statements about him and his alleged association with organized crime.

**Overview**
Appellee entertainer asserted that he was entitled to damages in a defamation action because appellants, a television broadcasting company and associated individuals, knowingly broadcast false statements about him and his alleged association with organized crime. The trial court found in favor of appellee. Appellants challenged the judgment, contending that the jury erred in finding that appellant journalists acted with actual malice. The court agreed with appellants' contention, holding that appellee failed to prove actual malice because there was insufficient evidence for the finding that appellants made false and defamatory statements about appellee knowing that the statements were false or doubting the statements' truth. The court noted that the test for actual malice was subjective. The court ruled that the trial court erred in relying on the proposition that the jury could have based it finding on a determination that appellant journalists' testimony concerning their state of mind was not credible because discredited testimony was not a basis for drawing a contrary conclusion. Thus, the court reversed the judgment.

**Outcome**
The court reversed the judgment of the trial court that found for appellee entertainer in appellant's defamation action. The court held that that the trial court erred in using an objective test for actual malice, and that appellee failed to prove actual malice because there was insufficient evidence to support the jury's finding that appellants, a television broadcasting company and associated individuals, knowingly made false statements.

▼  LexisNexis® Headnotes

Constitutional Law > ... > Freedom of Speech ⌄ > Defamation ⌄ > Public Figures ⌄

Torts > ... > Defamation ⌄ > Public Figures ⌄ > Judicial Review ⌄

View more legal topics

**HN1** **Defamation, Public Figures**

Appellate courts independently review jury findings of actual malice in public figure defamation cases. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*

Civil Procedure > Appeals ⌄ > Reviewability of Lower Court Decisions ⌄ > General Overview ⌄

View more legal topics

**HN2** **Appeals, Reviewability of Lower Court Decisions**

A plaintiff in federal court may not appeal from a remittitur order he has accepted. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Constitutional Law > ... > Freedom of Speech ⌄ > Defamation ⌄ > General Overview ⌄

**HN3** **Freedom of Speech, Defamation**

Actual malice consistently has been deemed subjective in nature, provable only by evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement. Even an extreme departure from accepted professional standards of journalism will not suffice to establish actual malice; nor will any other departure from reasonably prudent conduct, including the failure to investigate before publishing. Only the existence of sufficient evidence to permit the conclusion that the defendant actually had a high degree of awareness of probable falsity will suffice to meet the subjective test. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (22)*   1

Civil Procedure > Trials ⌄ > Bench Trials ⌄

View more legal topics

**HN4** **Trials, Bench Trials**

Fed. R. Civ. P. 52(a) provides that findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of witnesses. Appellate courts accord the same deference to the fact-finding function of the jury that Rule 52(a) mandates for trial courts. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Constitutional Law > ... > Bill of Rights ⌄ > Fundamental Freedoms ⌄ > General Overview ⌄

Torts > ... > Defamation ⌄ > Public Figures ⌄ > Clear & Convincing Evidence ⌄

View more legal topics

**HN5** **Bill of Rights, Fundamental Freedoms**

A public figure cannot recover damages for defamation without clear and convincing proof that a false statement was made with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was false or not. In public figure defamation cases, the appellate court must make an independent examination of the whole record so as to assure itself that the judgment does not constitute a forbidden intrusion on the field of free expression. The question whether the evidence in the record is of the convincing clarity required to strip the utterance of U.S. Const. amend. I protection is not merely a question for the trier of fact. Rather, the appellate court must simultaneously ensure the appropriate appellate protection of U.S. Const. amend. I values and still defer to the findings of the trier of fact. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (8)*

Constitutional Law > ... > Fundamental Rights ⌄ > Procedural Due Process ⌄ > Scope of Protection ⌄

Evidence > Burdens of Proof ⌄ > Clear & Convincing Proof ⌄

View more legal topics

**HN6** **Procedural Due Process, Scope of Protection**

The clear and convincing standard of proof is a higher standard which reflects a societal judgment about the greater importance of particular types of adjudication. The function of a standard of proof, as that concept is embodied in the due process clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Appeals ⌄ > Standards of Review ⌄ > De Novo Review ⌄

View more legal topics

**HN7** **Standards of Review, De Novo Review**

In de novo review, the reviewing court makes an original appraisal of all the evidence to decide whether or not judgment should be entered for the plaintiff. As a general rule, the appellate court has conducted a de novo review of the record when the district court has held a restriction on speech to be constitutional. The rule of independent review applies regardless of whether the factfinder is a jury or a

Trial Judge. ◇   *More like this Headnote*

*Shepardize® - Narrow by this Headnote (1)*

---

Civil Procedure > Appeals ▾ > Standards of Review ▾ > De Novo Review ▾
View more legal topics

**HN8**⬇ **Standards of Review, De Novo Review**
The rule of independent review assigns judges a constitutional duty that cannot be delegated to the trier of fact; however, it is not actually necessary to review the entire record to fulfill the function of independent appellate review on the actual malice question. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Civil Procedure > Appeals ▾ > Standards of Review ▾ > Clearly Erroneous Review ▾
Evidence > ... > 📄 Presumptions ▾ > Particular Presumptions ▾ > Regularity ▾
View more legal topics

**HN9**⬇ **Standards of Review, Clearly Erroneous Review**
Although the clearly erroneous standard of Fed. R. Civ. P. 52(a) requires the appellate court to defer to the jury's or trial court's factual findings, the presumption of correctness that attaches to factual findings is stronger in some cases than in others. Thus, although the appellate court generally reviews all purely factual findings for clear error, when it reviews evidence on the dispositive constitutional issue of actual malice, it is required to be more discriminating in its deference. The presumption of correctness carries its maximum force when the appellate court reviews findings of fact that turn on credibility determinations because of the factfinder's unique opportunity to observe the demeanor of the witnesses. On the other hand, the presumption applies with less force when a factfinder's findings rely on its weighing of evidence and drawing of inferences. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (9)*

---

Civil Procedure > Trials ▾ > Jury Trials ▾ > Province of Court & Jury ▾

**HN10**⬇ **Jury Trials, Province of Court & Jury**
The factfinding function includes credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Civil Procedure > Appeals ▾ > Standards of Review ▾ > De Novo Review ▾
Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > General Overview ▾
Evidence > ... > Testimony ▾ > Examination ▾ > General Overview ▾

**HN11**⬇ **Standards of Review, De Novo Review**
Even when the appellate court accords credibility determinations the special deference to which they are entitled, it must nevertheless examine for itself the factual record in full. A determination of actual malice cannot be predicated on the factfinder's negative assessment of the speaker's credibility at trial. Although discredited testimony does not rebut any inference of actual malice that the record otherwise supports, it is equally clear that it does not constitute clear and convincing evidence of actual malice. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (12)* ➕ 1

---

Civil Procedure > Appeals ▾ > Standards of Review ▾ > De Novo Review ▾
Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > Public Figures ▾
Torts > ... > Defamation ▾ > Public Figures ▾ > Voluntary Public Figures ▾
View more legal topics

**HN12**⬇ **Standards of Review, De Novo Review**
The appellate court must evaluate the nature of Fed. R. Civ. P. 52(a)'s restriction upon its independent review of jury credibility determinations in light of the fundamental U.S. Const. amend. I values at stake in public figure defamation cases. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > General Overview ▾
Torts > ... > Defamation ▾ > Public Figures ▾ > Actual Malice ▾
View more legal topics

**HN13**⬇ **Freedom of Speech, Defamation**
What "should have been foreseen" is an objective negligence test while the actual malice test of New York Times v. Sullivan is deliberately subjective. The relevant inquiry asks whether a journalist realized that his statement was false or whether he subjectively entertained serious doubt as to the truth of his statement. Negligence, weighed against an objective standard, can never give rise to liability in a public figure defamation case. A reckless disregard for the truth requires more than a departure from reasonably prudent conduct. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (28)* ➕ 1

380

Evidence > ... > Testimony ⌄ > Examination ⌄ > General Overview ⌄

**HN14**⬇ **Testimony, Examination**

When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Constitutional Law > ... > Freedom of Speech ⌄ > 📄 Defamation ⌄ > General Overview ⌄

**HN15**⬇ **Freedom of Speech, Defamation**

A journalist who relies on a source whose reliability is unknown, has not published false information with actual malice if the journalist made some effort to verify the source's information. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Civil Procedure > Appeals ⌄ > Standards of Review ⌄ > General Overview ⌄
Constitutional Law > ... > Freedom of Speech ⌄ > 📄 Defamation ⌄ > General Overview ⌄

**HN16**⬇ **Appeals, Standards of Review**

The credibility of a journalist's source is a separate inquiry from the credibility of the journalist himself and that we apply a heightened review to the evidence regarding whether the publisher was reckless or knowingly false when he relied upon information provided by his source. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Constitutional Law > ... > Freedom of Speech ⌄ > Free Press ⌄ > General Overview ⌄
View more legal topics

**HN17**⬇ **Freedom of Speech, Free Press**

Complaints or disagreements about choice of language are editorial decisions that do not give rise to liability. U.S. Const. amend. I cautions courts against intruding too closely into questions of editorial judgment, such as the choice of specific words. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

Civil Procedure > Appeals ⌄ > Standards of Review ⌄ > De Novo Review ⌄
Constitutional Law > ... > Freedom of Speech ⌄ > 📄 Defamation ⌄ > General Overview ⌄
View more legal topics

**HN18**⬇ **Standards of Review, De Novo Review**

The appellate court does not review a publication for the purpose of replicating the review it would receive from the average reader or listener. The appellate court reviews speech that has been alleged to be defamatory to determine whether or not it falls outside the protection of U.S. Const. amend. I. Accordingly, the appellate court evaluates facts that have been deemed to have constitutional significance. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Appeals ⌄ > Standards of Review ⌄ > Clearly Erroneous Review ⌄
Constitutional Law > ... > Freedom of Speech ⌄ > Free Press ⌄ > General Overview ⌄

**HN19**⬇ **Standards of Review, Clearly Erroneous Review**

The clearly erroneous standard of Fed. R. Civ. P. 52(a) does not prescribe the standard of review to be applied in reviewing a determination of actual malice in a case governed by New York Times v. Sullivan. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

**Counsel:** Floyd Abrams ⌄, Ira J. Dembrow ⌄, Albert Robbins ⌄, Cahill Gordon & Reindel ⌄, New York, New York and Robert S. Warren ⌄, Rex S. Heinke ⌄, Kelli L. Sager ⌄, Gibson, Dunn & Crutcher, Los Angeles, California, for the Defendants-Appellants and Defendants-Cross-Appellees.

Morton R. Galane ⌄, Las Vegas, Nevada, for the Plaintiff-Appellee and Plaintiff-Cross-Appellant.

P. Cameron DeVore ⌄, Davis Wright & Jones ⌄, Seattle, Washington; Sam Antar ⌄, Capital Cities, ABC, Inc., Douglas P. Jacobs, CBS, Inc., and Muriel Henle Reis ⌄, Fox Television Stations, Inc., New York New York, for the Amici Curiae.

**Judges:** Alfred T. Goodwin ⌄, Chief Judge, Dorothy W. Nelson ⌄ and William A. Norris ⌄, Circuit Judges.

**Opinion by:** NORRIS ⌄

## Opinion

**[*665]** OPINION

NORRIS ⏷, Circuit Judge:

In the Report on the Virginia Resolutions of 1798, James Madison wrote:

> In every state, probably, in the Union, the press has exerted a freedom in canvassing the merits and measures of public men, of every description, [**2] which has not been confined to the strict limits of the common law. On this footing, the freedom of the press has stood; on this foundation it yet stands . . . .

**[*666]** 4 Elliot's Debates on the Federal Constitution 570 (1876). In _New York Times Co. v. Sullivan, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964)_, the Supreme Court secured for the press the ability to write and publish freely without risking vindictive reprisals from local juries. The Court in _New York Times_ adopted as a constitutional rule the requirement that **HN1**⏏ appellate courts independently review jury findings of "actual malice" in public figure defamation cases. There, the rule of independent review was applied to set aside a verdict of an all-white Alabama jury against a New York newspaper and several black civil rights leaders in favor of the local Commissioner of Public Affairs. Here, we consider the largest punitive damages verdict in American libel history returned against a different New York news organization by a Las Vegas jury in favor of a hometown hero. We must decide the extent to which the rule of independent review in _New York Times_ and its progeny requires [**3] us to depart from the traditional rule of deference to the fact-finding function of the jury. Just as the Supreme Court struggled in _Bose Corp. v. Consumers Union of United States, 466 U.S. 485, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984)_ and _Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989)_ to strike the proper balance between our constitutional (Seventh Amendment) deference to the factfinder and our constitutional duty to safeguard First Amendment values, we now face the daunting task of reconciling our duty to respect the jury's fact-finding role with our duty to protect the values enshrined in the First Amendment.

On October 6, 1980, National Broadcasting Company, Inc. (NBC) broadcast on television a three and one-half minute story called "Wayne Newton and the Law" on the NBC Nightly News. Relevant excerpts from the script of that story read as follows:

> . . . [Guido] Penosi is a New York hoodlum from the Gambino Mafia family, a man with a long criminal record, now believed to be the Gambino family's man on the West Coast, in the narcotics business, and also in show business. Penosi [**4] is also a key figure in a federal grand jury investigation . . . that involves one of the big casinos here [Las Vegas], the Aladdin; and one of Las Vegas's top performers, singer Wayne Newton. Newton is said to make a quarter of a million dollars a week for his nightclub act, and late last week, Newton and a partner were given state approval to buy the Aladdin Hotel in Las Vegas for 85 million dollars. A federal grand jury is now investigating the role of Guido Penosi and the mob in Newton's deal for the Aladdin. Despite his big income, authorities say Newton has had financial problems. Investigators say that last year, just before Newton announced he would buy the Aladdin, Newton called Guido Penosi for help with a problem. Investigators say whatever the problem was, it was important enough for Penosi to take it up with leaders of the Gambino family in New York. Police in New York say that this mob boss, Frank Piccolo, told associates that he had taken care of Newton's problem and had become a hidden partner in the Aladdin hotel deal. At a hearing of the State Gaming Board, Wayne Newton said he had no hidden partners, and Newton said under oath that he knew Guido Penosi . . . but [**5] that Penosi was just a long-time family friend.

> . . .

> Federal authorities say that Newton is not telling the whole story, and that Newton is expected to be one of the first witnesses in the grand jury investigation. Newton became angry when we tried to talk to him about his relationship with Guido Penosi.

> . . .

> Guido Penosi told us he doesn't know anyone named Wayne Newton. Federal authorities say they know of at least 11 phone calls Penosi made to Newton's house in one two-month period, and authorities say those phone calls and Penosi's relationship with Newton and other entertainment figures are now part of a broad year-long FBI investigation of the **[*667]** investment of East Coast mob money from narcotics and racketeering into the entertainment business in Las Vegas and Hollywood. 1⬇

On April 10, 1981 appellant Carson Wayne Newton filed a defamation action against NBC and three of its journalists: Brian Ross, the reporter, Ira Silverman, the field [**6] producer, and Paul Greenberg, the executive producer. Newton claimed that the October 6 broadcast, and two subsequent broadcasts concerning the grand jury investigation and indictment, either falsely stated or conveyed the false impression that "the Mafia and mob sources" helped Newton buy the Aladdin in exchange for a hidden share of the hotel/casino and that Newton, while under oath, deceived Nevada gaming authorities about his relationship with the Mafia. 2⬇

[**7] Discovery proceedings commenced in Las Vegas, the venue in which Newton had filed his complaint. When discovery was completed, NBC moved for summary judgment and a change of venue from Las Vegas. The district court denied summary judgment on the ground that the jury could find that the NBC broadcasts left a false and defamatory impression about Newton, notwithstanding the fact that NBC had "made a substantial and persuasive showing that each of the statements made are either true or protected under the common law privilege of fair reporting." ER at 160. The district court also denied the motion for a change of venue.

Following a 37-day trial, the jury returned a special verdict, finding all four defendants liable for defaming Newton. The jury explicitly found that at least one statement and one impression about Newton conveyed by one or more of the three broadcasts was defamatory, of a factual nature, and was false. 3⬇ The jury also found that two of the three NBC journalists had made a false and defamatory statement with knowledge of falsity or with serious subjective doubts about the statement's truth or accuracy and that all three individual defendants intended to convey a false [**8] or defamatory impression about Newton with knowledge of falsity or serious subjective doubt about the truth of the impression. The district court, in considering NBC's motion for judgment notwithstanding the verdict, discussed only what it considered to be the false impression created by the broadcasts. _Newton v. National Broadcasting Co., Inc., 677 F. Supp. 1066, 1067 (D. Nev. 1987)_ ("The clear and inescapable impression made by the broadcasts was that [Newton] did not have enough money to buy the Aladdin Hotel so he called a friend, Guido Penosi, who had ties to organized crime; and that Mr. Penosi helped him raise the money and thus obtained a hidden interest in the Aladdin Hotel").

[**9] The jury awarded Newton more than $ 19 million in compensatory and punitive damages, to which prejudgment interest of

approximately $ 3.5 million was added. In response to NBC's motion for judgment notwithstanding the verdict and in the alternative for a new trial, the district court **[*668]** upheld the jury's verdict of liability and its awards of damages for pain and suffering and punitive damages. It set aside the verdict on the jury's award of $ 9,046,750 for Newton's claims of lost past and future income, ruling that Newton "failed to establish by a preponderance of the evidence that the broadcasts in question had any causal connection to any alleged loss of past or future income . . . ." *Id.* at 1069.

The district court also set aside the jury's award of $ 5 million for damage to Newton's reputation, concluding that the award "shocks the conscience of the court because the broadcasts did not tarnish [Newton's] outstanding reputation." *Id.* at 1068. The court directed Newton to file a remittitur of all sums except $ 225,000 for physical and mental injury, $ 50,000 as presumed damages to reputation, and $ 5 million in punitive damages **[**10]** or there would be a new trial on all issues. In addition to ordering a new trial if the remittitur were not filed, the district court ruled that the interests of justice required that the new trial be held in the Central District of California. *Id.* at 1069. Put to the choice of a new trial outside Las Vegas or filing the remittitur, Newton filed the remittitur. **4⬇** Final judgment for $ 5,275,000 was entered on February 10, 1989. This timely appeal followed.

**[**11]**  The issue of actual malice disposes of this appeal. **5⬇ [**12]**  Newton now concedes that he is a "public figure" as that term is defined in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 345, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974) for purposes of this case **6⬇** and therefore the First Amendment, as interpreted in *New York Times Co. v. Sullivan,* 376 U.S. 254, 279-80, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964), precludes recovery unless Newton proved at trial by clear and convincing evidence that NBC and its journalists made a false, disparaging statement with "actual malice."

*HN3⬆* Actual malice consistently has been deemed subjective in nature, provable only by evidence that the defendant "realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose,* 466 U.S. at 511 n.30; *see also Harte-Hanks,* 109 S. Ct. at 2685; *Hustler Magazine v. Falwell,* 485 U.S. 46,  **[*669]**  108 S. Ct. 876, 880, 99 L. Ed. 2d 41 (1988); *see also St. Amant v. Thompson,* 390 U.S. 727, 731, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968); *New York Times,* 376 U.S. at 279-80. Even an extreme departure from accepted professional standards of journalism will not suffice to establish actual malice; nor will any other departure from reasonably prudent conduct, including the failure to investigate before publishing. Only the existence [**13]  of "sufficient evidence to permit the conclusion that the defendant actually had a 'high degree of awareness of . . . probable falsity'" will suffice to meet the subjective test. *Harte-Hanks,* 109 S. Ct. at 2696 (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74, 13 L. Ed. 2d 125, 85 S. Ct. 209 (1964)).

In this opinion, we assume, without deciding, that the broadcasts spoke in terms of fact, rather than opinion, and that at least one of these factual statements was false. **7⬇** *See supra* at slip op. pg. 9885; *see also* Special Verdict 4A, SER251. We therefore review only the jury determination that NBC and three of its journalists acted with actual malice. After reviewing the evidence with the searching care required to protect First Amendment values, we conclude that Newton has failed to prove actual malice with "convincing clarity." *Bose,* 466 U.S. at 511.

 [**14]  II

We first consider the appropriate standard of appellate review of a jury's finding of actual malice. In reviewing the evidentiary record before us, we are particularly concerned about when and to what degree our responsibility under *New York Times* to review the record independently requires us to depart from the special deference with which we would normally treat each and every one of a jury's factual determinations. **8⬇** As Justice Stevens noted in *Bose,* 466 U.S. at 498, the independent review standard and the clearly erroneous standard of Rule 52(a) "point in opposite directions." As we consider the direction in which we should proceed, our compass is the Supreme Court's decisions in *New York Times, Bose* and *Harte-Hanks.*

 [**15]  In *New York Times*, the Supreme Court established the constitutional rule that *HN5⬆* a public figure such as Wayne Newton cannot recover damages for defamation without clear and convincing proof **9⬇ [**17]**  that a **[*670]** false "statement was made with 'actual malice' - that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279-80. The Supreme Court also mandated that in public figure defamation cases, we must "'make an independent examination of the whole record' so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." **10⬇** *Id.* at 285 (quoting *Edwards v. South Carolina,* 372 U.S. 229, 235, 9 L. Ed. 2d 697, 83 S. Ct. 680 (1963)). The requirement of independent appellate review established in *New York Times,* 376 U.S. at 285, is a rule of federal constitutional law which "reflects" a deeply held conviction that judges . . . must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. *Bose,* 466 U.S. at 510-11. Thus, "the question whether [**16]  the evidence in the record . . . is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact." **11⬇** *Id.* Rather, we must simultaneously assume the appropriate appellate protection of First Amendment values and still defer to the findings of the trier of fact.

*HN8⬆* The rule of independent [**18]  review assigns judges a constitutional duty that cannot be delegated to the trier of fact; however, "it is not actually necessary to review the 'entire' record to fulfill the function of independent appellate review on the actual malice question . . . ." *Id.* at 514 n.31. The Supreme Court has stressed that the rule "is law in its purest form" under the Constitution and our common-law heritage. *Bose,* 466 U.S. at 510-511. *See also New York Times,* 376 U.S. at 285. Under the rule of independent review, we may accept all the purely factual findings of the district court and nevertheless hold as a matter of law that the record does not contain clear and convincing evidence that the NBC journalists prepared the October 6 broadcast with knowledge that it contained a false statement or with reckless disregard of the truth.

*HN9⬆* Although the clearly erroneous standard of Rule 52(a) requires us to defer to the jury's or trial court's factual findings, "the presumption of correctness that attaches to factual findings is stronger in some cases than in others." *Bose,* 466 U.S. at 500. Thus, although we generally review all purely [**19]  findings for clear error, *see United States v. United States Gypsum Co.,* 333 U.S. 364, 394-96, 92 L. Ed. 746, 68 S. Ct. 525 (1948), when we review evidence on the dispositive constitutional issue of actual malice, we are required to be more discriminating in our deference. **12⬇ [**20]**  The presumption  **[*671]**  of correctness carries its maximum force when we review findings of fact that turn on credibility determinations because of the factfinder's unique "'opportunity to observe the demeanor of the witnesses.'" *Harte-Hanks,* 109 S. Ct. at 2696 (quoting *Bose,* 466 U.S. at 499-500). On the other hand, the presumption applies with less force when a factfinder's findings rely on its weighing of evidence and drawing of inferences. **13⬇**

But *HN11⬆* even when we accord credibility determinations the special deference to which they are entitled, we must nevertheless "'examine for ourselves'" the factual record in full. *New York Times,* 376 U.S. at 285 (quoting *Pennekamp v. Florida,* 328 U.S. 331, 335, 90 L. Ed. 1295, 66 S. Ct. 1029 (1946). *See Harte-Hanks,* 109 S. Ct. at 2695. In sum, we read *Bose* and *Harte-Hanks* as creating a "credibility exception" to the *New York Times* rule of independent review. However, a determination of actual malice cannot be predicated on the factfinder's negative assessment of the speaker's credibility at trial. Although discredited testimony "does not rebut any inference of actual malice that the record

otherwise supports, . . . it is equally clear that it does not constitute clear [**21] and convincing evidence of actual malice." *Bose*, 466 U.S. at 512.

Finally, *HN12* we must evaluate the nature of *Rule 52(a)*'s restriction upon our independent review of jury credibility determinations in light of the fundamental First Amendment values at stake in public figure defamation cases. In *New York Times*, the case in which the Supreme Court mandated heightened appellate review of actual malice determinations, the Court was obviously concerned about its constitutional responsibility to protect First Amendment values from the prejudice of local juries against alien speakers. **14** [**23]  Similarly, Wayne Newton's case poses the danger that First Amendment values will be subverted by a local jury biased in favor of a prominent local public figure against an alien speaker who criticizes that local hero. Such was the backdrop against which the Supreme Court decided *New York Times*, and it is the scenario we face here, sixteen years later. Although our case resembles *New York Times* in this respect, it differs from *Harte-Hanks*, in which the jury resolved a dispute between a local politician and a local newspaper, and *Bose*, in which the plaintiff was an obscure [**22]  corporation. Wayne Newton is a revered figure in Las Vegas. **15** His fellow citizens celebrate Wayne Newton Day and have named a major boulevard in his honor. As jurors, they awarded him $ 5 million in damages to reputation which "shocked the conscience" of the district court, precisely because the court itself determined that Newton's "outstanding reputation" had been unharmed by the stories. *Newton, 677 F. Supp. at 1068.*

We recognize that the risk of unbridled favoritism of local juries generally informs our decision about venue rather than standard **[*672]** of review. **16** However, in a case involving core First Amendment values, we cannot ignore the risk that a jury's credibility determinations may also subvert those values. <mark>We must attempt to discharge our constitutional responsibility to protect First Amendment values without unduly trenching on the fact-finding role of the jury and trial judge. We are mindful that in *New York Times, Bose*, and *Harte-Hanks*, the Supreme Court was fashioning a process for reviewing the evidence which permits judicial protection of First Amendment values while still paying due deference to the fact-finding role of juries, and particularly the jury's opportunity to observe [**24]  the demeanor of the witnesses.</mark> Striking the proper balance is a daunting task. Although many of the crucial facts bearing on the issue of actual malice are uncontroverted, we face a voluminous trial record. The Supreme Court has left us with a line drawn between highly deferential review of credibility determinations and less deferential review of the factfinder's evaluation of other evidence relevant to the actual malice issue. **17** The line is a thin one, but tread it we must to ensure that future speakers need not fear to rush in. As Justice Roberts wrote for the Supreme Court in *Cantwell v. Connecticut*:

[**25]

> In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.

*310 U.S. 296, 310, 60 S. Ct. 900, 84 L. Ed. 1213 (1940).*

III

Before conducting the independent review mandated by *New York Times, Bose*, and *Harte-Hanks* - a review in which we give special deference to the jury's and district court's credibility determinations but conduct a more searching review of other evidence germane to the actual malice determination - it is necessary to state in some detail the evidence on the actual malice issue.

For the most part, the facts in this case are not in dispute. Much of the [**26]  evidence about the federal investigation involving Newton's possible connection to East Coast organized crime families is uncontroverted. This evidence falls into three categories: Newton's involvement with the Mafia, Newton's testimony before Nevada state gaming authorities, and the federal investigation of the Gambino family's efforts to enter the Las Vegas casino business.

Newton himself testified at trial about his relationship with Guido Penosi. Newton testified that his office calendar noted Guido Penosi's birthday, that Penosi had attended his brother's wedding, and that he had eaten a dinner prepared by Penosi's wife at the couple's home. Reporter's Transcript (RT) at 3:408-10; 3:371-99; 6:974. Newton also performed on a television special without compensation for Penosi's son, arranged for Penosi to visit Las Vegas, and visited with Penosi for approximately 20 minutes at Newton's home. **18**

[**27]  **[*673]**  The most important contact between Newton and Penosi came in early 1980 when Newton, alarmed about threats directed at both himself and his daughter by members of an organized crime syndicate, asked Penosi if he could stop the threats. **19** [**28]  Penosi told Newton to call Frank Piccolo and provided Newton with Piccolo's Connecticut phone number. Newton thereupon called Piccolo and explained his problem while Penosi listened on an extension phone. **20** FBI tapes recording telephone conversations between Piccolo and Penosi reveal that Piccolo arranged with members of the Genovese family, which was threatening Newton, to stop the threats. **21** Penosi came to Las Vegas after the threats against Newton had ended. He visited with Newton in his dressing room and Newton thanked him for his help.

Around the same time, Mark Moreno, Newton's old friend and business advisor, began receiving threats. He went to [**29]  Newton, who told Moreno to call Penosi. Penosi then told Moreno to call Piccolo. Moreno did so. A few days later, Penosi asked Newton to call Piccolo personally. Once again, Newton called Piccolo and asked for his assistance. In this call, Newton told Piccolo (as Penosi had told him to do) that Moreno was "with" Newton and was part of Newton's team. **22** Once again, Piccolo met with members of the Genovese family. At the meeting, agreement was reached for Penosi to pay $ 3,500 to have the threats against Moreno called off.

Having helped Newton out of his difficulties, by [**30]  applying pressure, using personal contacts, and paying money, Piccolo sought to "earn" from Newton. First, he pressed Moreno to buy life insurance for Lola Falana, a Las Vegas entertainer managed by Moreno, and a friend of Newton's, through an insurance agent introduced to Moreno by Piccolo. Taped telephone calls between Piccolo and Penosi contain references to the Mafia's desire to "earn" from Newton, and to Piccolo's particular interest in the Aladdin. **23**

**[*674]**  In July 1980, these taped telephone conversations came to the attention of Brian Ross and Ira Silverman, two NBC journalists who specialized in organized crime reporting. Ross and Silverman first learned that Piccolo was being investigated and that tapes existed [**31]  of telephone conversations between Piccolo and Penosi and Mark Moreno. The conversations, the reporters learned, seemed to involve Wayne Newton and the Aladdin Hotel. Federal law enforcement officials were interested in investigating the connection between high-level Mafia figures and Newton's contemplated purchase of the Aladdin. Ross and Silverman, too, became interested and started their own investigation.

At the same time, the Nevada gaming authorities were conducting their own investigation of Newton in connection with his application to own and operate the Aladdin. On a number of occasions in July and August 1980, Newton was interviewed by Nevada Gaming Board investigators. The tape of the August 27, 1980 interview was admitted into evidence in the defamation trial. In that interview, Newton, under oath, answered several questions asked by a group of Gaming Board investigators led by Fred Balmer.

Balmer told Newton during the interview that Penosi was involved in organized crime. **24** **[**33]** According to Balmer, Newton "was asked very specific questions, based on the information that we had, with regard to his contacts with Mr. Penosi, and in addition to that he was asked if there **[**32]** had been any additional contacts or is there any other financial or business or any other contacts he had with relation to Mr. Penosi." **25** RT 11:1963-64. Newton told Balmer that Penosi had seen him perform at the Copacabana Club in the early sixties and that he had had some contact with Penosi during the last six months after Newton had received threatening telephone calls. Newton professed to being unclear about how he had involved Penosi, however. "Either Guido called me or I called him and I don't remember which . . .," he told Balmer. Ex. 91 at 1; ER at 206 (transcript of taped interview). Somewhat later in the interview, Balmer said:

> And we are also aware that after you did contact Mr. Penosi, he made contact with an individual who is from back East in the New England states, ah Piccolo, who is heavily involved with organized crime, also. He did come to the Las Vegas area and our information is he did take care of these individuals for you.

Ex. 91 at 7; ER at 206. To which Newton responded, "Well, if it did happen, ah, I don't know who that is and I'm still getting threats as of last week." **26** *Id.*

**[**34]** **[*675]** At the conclusion of Balmer's interviews with Newton, Balmer and his colleagues remained unaware of the following: Newton's sending a car to pick up Penosi when Penosi came to Las Vegas; Penosi's visiting Newton's house; any meeting between Penosi and Newton after the threats against Newton stopped; and Newton's speaking with Frank Piccolo or anybody else at Penosi's request in an effort to stop the threats.

Meanwhile, Ross and Silverman continued to gather their own information. Here, an important conflict in the oral testimony emerged. Ross testified that upon his return to the East Coast, he learned from a knowledgeable, confidential source with whom he had worked both before and after the Wayne Newton story, that police in New York had learned, either through an undercover agent or a listening device planted at a well-known meeting place for members of the Gambino family, that Piccolo's associates in the Gambino family had asked him if he wanted to go in with them in Atlantic City. Piccolo said he did not, because he had taken care of a problem for Wayne Newton and was going to have some sort of interest in the Aladdin Hotel. **27** **[**36]** At trial, Newton offered the testimony **[**35]** of two New York City police department officials who stated that, based upon a thorough search of department records in which such information would be retained, no such overheard conversation came to **[*676]** the attention of the New York City Police Department. **28** On cross-examination, however, one officer testified that while it would be contrary to policy and practice for a member of the Police Department to have had a conversation with Ross or Silverman about the kind of information in the broadcast, it is possible that members of the Police Department did so. RT 18:3601-04. The second officer went further, testifying that he assumed that members of the Police Department do talk to the press without advising the intelligence division. RT 22:4615.

**[**37]** Silverman also testified that he had a confidential source inside federal government, whom he called "source B." Silverman said he learned from source B that Piccolo and Penosi considered Newton to be a "mob asset" in Las Vegas. According to source B, Piccolo and Penosi were hoping to exploit their relationship with Wayne Newton and were trying to profit from that relationship. RT 23:4790-91. Silverman also testified that source B told him that Newton had not told Nevada gaming authorities the whole story about his relationship with Penosi. RT 23:4699-4700; 4702. **29**

**[**38]** On September 25, 1980, the Nevada Gaming Board held a public hearing on Newton's application for a license to own and operate the Aladdin Hotel. Ross and Silverman attended the hearing as part of their investigation. In his sworn public testimony before the Gaming Board, Newton stated that he first met Penosi when he was sixteen or seventeen years old. He acknowledged seeing Penosi in Florida at Penosi's home but testified falsely that Penosi had never visited him at his home. **30** **[*677]** Newton summed up his relationship with Penosi by stating:

> In the approximately 21 years from the time I met him, I might have seen this man four times. So, my relationship is just that of a fan, really.

RT 5A:49A-50A; ER 210. After he had been advised by a Gaming Board member that Penosi was a purported member of the Gambino organized crime family, Newton was asked if he were going to continue any relationship with him. Newton replied:

> Well, on the basis of which I have known him, I don't think that there has been a relationship, Mr. Mauldin. The direct answer to your question obviously is no if he has those kind of connections.

*Id.* at 50A-51A.

**[**39]** Newton also testified falsely before the Gaming Board that Mark Moreno was only a friend, that Moreno had no business or contractual position with him, and that Moreno was not his manager. In response to a specific question asking whether Moreno was "a representative of [his] in any way, shape or form," Newton replied that they had "no association whatsoever." *Id.* at 58A-59A. **31** Moreno testified at trial that he had checked out one proposal to purchase the Aladdin and prepared a back-up deal for another; arranged and attended meetings on Newton's behalf relating to the purchase of the Aladdin; sought potential partners for Newton; and drafted Newton's contract to become executive director of entertainment at the Aladdin. **32** RT 15:2784-93; 12A:30A.

**[**40]** At the Gaming Board hearing, representatives of the Valley Bank of Nevada also testified that the Valley Bank was providing financing to help Newton acquire his interest in the Aladdin. Newton, with financing from Valley Bank, planned to buy a 50 percent interest in the Aladdin and to commit to perform there at least 20 to 26 weeks a year. The Gaming Board concluded the hearing by recommending that Newton be licensed.

Immediately after the hearing, Ross sought to interview Newton. In response to questions from Ross, Newton falsely stated that he had last spoken with Penosi "maybe a year ago" and that Penosi had made no phone calls to him. **33** Ross followed **[*678]** Newton as Newton left the building in which the Gaming Board had met and walked to a car in the parking lot. At the car, Ross asked Newton about threats made upon his family, inquiring whether Penosi had ever been in Las Vegas to provide protection for Newton or his children. Frank Fahrenkopf, Newton's attorney, replied, "come on, that's silly." Fahrenkopf and Newton offered no other answer or explanation. RT 5B:9B.

[**41] The granting of a license to operate a casino in Nevada requires approval from both the Gaming Board and the Nevada Gaming Commission. On September 26, 1980, the Commission held a hearing, approved the recommendation of the Gaming Board, and granted Newton a license to own and operate the Aladdin Hotel. At the hearing, Fahrenkopf submitted an affidavit signed by Newton stating that the affidavit was to "supplement the record in addition to the testimony made by Mr. Newton [before the Gaming Board] yesterday concerning" Penosi. In the affidavit, Newton disclosed that he had seen Penosi once in the last 13 years when Penosi had visited Las Vegas. The affidavit also stated that Newton had appeared on a television special produced by Penosi's son. The affidavit did not disclose Penosi's visit to Newton's home, or Newton's arrangements for Penosi to stay in one of his rooms at a hotel. The affidavit also failed to mention the calls to, conversations with, and meeting with Penosi during the death-threat episode.

In preparation for the October 6, 1980 broadcast, Ross and Silverman investigated some additional sources. On September 26, the journalists met with Johnny Carson, who had [**42] unsuccessfully bid for the Aladdin earlier. Ross and Silverman asked Carson questions about his earlier negotiation for the hotel. Although Penosi's name was mentioned during the interview, Carson had never heard of Penosi and could not offer any information about him. **34**⚖

[**43] The NBC journalists and Moreno testified that Ross and Silverman also interviewed Mark Moreno to discuss Moreno's and Newton's possible connections with Penosi and Piccolo. Moreno testified, and Ross agreed, that Moreno told Ross that the contacts between Penosi and Newton had nothing to do with the purchase of the Aladdin, but concerned death threats against Newton and his family. According to Silverman, Moreno said that there were local hoods in Las Vegas who had given Newton trouble. **35**⚖ Moreno also testified that he told the journalists that Penosi's involvement in stopping the threats directed at Newton and his family would be revealed in an affidavit being prepared by Fahrenkopf. That affidavit, as discussed earlier, did not mention any threats.

[**44] Ross and Silverman also sought to interview Newton, although there was conflicting **[*679]** testimony about the strength of their efforts to schedule the interview before the October 6 broadcast. The NBC journalists claim that they continually sought and were denied permission to interview Newton. Newton, on the other hand, testified that he did not know that NBC wanted to interview him about Penosi. RT 5:707-708. However, it is undisputed that Ross and Silverman made some attempts to interview Newton and that Newton rebuffed them at least once. For example, the testimony of Newton and his secretary, Mona Matoba, shows that when Silverman called to ask for an interview, Newton instructed Matoba to find out "what kind of story they wanted to do." RT 7:1097. According to Newton, his secretary told him that the journalists' answer had been "the Aladdin and Guido Penosi" and that when he was advised of that, Newton told her to decline the interview. It is also undisputed that the journalists asked Moreno and a public relations executive named Ramon Hervey to help them arrange an interview with Newton. **36**⚖ Finally, it is undisputed that Ross actually interviewed Newton outside the [**45] hearing room in Carson City after Newton testified before the Gaming Board.

In sum, almost all of the facts reported by NBC in the October 6, 1980 broadcast are uncontroverted. Newton went to Penosi with a problem and Penosi called Piccolo who helped solve the problem. Piccolo and Penosi later discussed "earning off" Newton and possibly "earning off" his ownership of the Aladdin Hotel. Piccolo and Penosi were investigated and indicted by a federal grand jury, which heard the testimony of Wayne Newton. All these facts are beyond dispute.

IV

We now review the evidence to decide if it yields a clear and convincing basis on which the jury's verdict that NBC and its journalists made a false and defamatory statement about Newton, [**46] knowing that the statement was false or entertaining serious subjective doubt about the statement's truth, may be sustained. We conclude that the jury verdict cannot stand because the evidence fails to prove constitutional malice with "convincing clarity." *Bose, 466 U.S. at 511*.

A

We begin by reviewing the basis for the district court's approval of the jury's actual malice finding. Although we review the district court's JNOV decision de novo, *see Peterson v. Kennedy, 771 F.2d 1244, 1252 (9th Cir. 1985)*, cert. denied, 475 U.S. 1122, 90 L. Ed. 2d 187, 106 S. Ct. 1642 (1986), we believe that opinion to be a helpful point of departure for our independent review of the actual malice evidence. The district court upheld the jury's liability verdict because

> the clear and inescapable impression made by the broadcasts was that [Newton] did not have enough money to buy the Aladdin Hotel so he called a friend, Guido Penosi, who had ties to organized crime; and that Mr. Penosi helped him raise the money and thus obtained a hidden interest in the Aladdin Hotel.

*Newton, 677 F. Supp. at 1067*. The district [**47] court concentrated on what it believed to be the impression created by the broadcast that the Mafia obtained a hidden interest in the Aladdin by helping to finance Newton's acquisition of the hotel. **37**⚖ Like the district court, we do not tarry with Newton's contention that actual malice is proven by NBC's statement that "federal authorities say that Newton is not telling [Nevada **[*680]** Gaming officials] the whole story." **38**⚖ We therefore turn to the district court's reasons for finding actual malice on the part of the NBC journalists in connection with the deal for the Aladdin.

[**48] The court offered two arguments in support of its ruling. Even if NBC had unintentionally left the impression that organized crime had financed Newton's purchase of the Aladdin, the court concluded, it "should have been foreseen" by NBC and the failure to foresee it "shows a reckless disregard for the truth." *Id. at 1068*. The court also concluded that since NBC had "voluntarily edited and combined the audio with the visual portions of the broadcast in a way that created the defamatory impressions" and since those impressions were "clear and unescapable," the jury could reject as incredible the testimony of the NBC journalists that they had not intended to leave the false impression. *Id. at 1067-68*. Both of these rulings conflict with the principles of *New York Times* and *Bose*.

The district court erred in its ruling that an interpretation of the broadcast that "should have been foreseen" by the NBC journalists can give rise to liability. The district court's standard of **HN13**⚓ what "should have been foreseen" is an objective negligence test while the actual malice test of *New York Times* is deliberately subjective. *Harte-Hanks, 109 S. Ct. at 2696*. [**49] The relevant inquiry asks whether a journalist "realized that his statement was false" or whether he "subjectively entertained serious doubt as to the truth of his statement." *Bose, 466 U.S. at 511 n.30*. Negligence, weighed against an objective standard like the one used by the district court, can never give rise to liability in a public figure defamation case. "A 'reckless disregard' for the truth . . . requires more than a departure from reasonably prudent conduct." *Harte-Hanks, 109 S. Ct. at 2696*. Accordingly, the district court erred in basing liability on an objective standard.

386

The district court also erred in relying on the proposition that the jury could have based a finding of actual malice on a determination that the journalists' testimony about their state of mind was not credible. In *Bose*, the Supreme Court held that:

*HN14* When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion. **39**

*Bose*, 466 U.S. at 512; *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). [**50]

The district court's analysis is strikingly similar to that of the district court in *Bose*, the reversal of which was affirmed by the Supreme Court, 466 U.S. 485, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984). In *Bose*, the **[*681]** district court found that the author of an article had lied when he testified that the words he had used in an article [**51] about a stereo system meant something other than what the court interpreted them to mean. Since the witness was "an intelligent, well-educated person" and since the words had "the same meaning for [the witness] as they do for the populace in general," the district court determined that the witness's testimony was not credible. *Id.* at 511-12. The Supreme Court, in upholding the First Circuit's reversal of the district court's finding of constitutional malice, concluded:

[The author of the article] of course had insisted 'I know what I heard.' The trial court took him at his word, and reasoned that since he did know what he had heard, and he knew that the meaning of the language employed did not accurately reflect what he heard, he must have realized the statement was inaccurate at the time he wrote it. 'Analysis of this kind may be adequate when the alleged libel purports to be an eyewitness or other direct account of *events that speak for themselves.*' *Time, Inc. v. Pape*, 401 U.S. 279, 285, 91 S. Ct. 633, 28 L. Ed. 2d 45 (1991). See generally *The Santissima Trinidad*, 20 U.S. 283, 7 Wheat. 283, 338-339, 5 L. Ed. 454 (1822). [**52] Here, however, adoption of the language was 'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' and descriptive challenges for the writer. *Time, Inc. v. Pape, supra*, at 290. The choice of such language, though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella. Under the District Court's analysis, any individual using a malapropism might be liable, simply because an intelligent speaker would have to know that the term was inaccurate in context, even though he did not realize his folly at the time.

*Id.* at 512-13 (emphasis in original).

As *Bose* demonstrates and as *Harte-Hanks* reasserts, 109 S. Ct. at 2696 n.35, constitutional malice does not flow from a finding that an "intelligent speaker" failed to describe the words he used as the finder of fact did. Nor is it permissible to uphold the jury's verdict against NBC on the ground that, because the defendants are trained journalists (or, as in *Bose*, "intelligent speakers") or because the broadcast may be capable of supporting the impression Newton claims, [**53] NBC must therefore have intended to convey the defamatory impression at issue here.

Yet that ground, in the end, is the basis for the district court's ruling: since the implication it took from the broadcast was "clear and inescapable" to the court, it concluded that the jury could properly find that NBC and its journalists intended to leave that impression. Such an approach eviscerates the First Amendment protections established by *New York Times*. It would permit liability to be imposed not only for what was not said but also for what was not intended to be said.

The district court erred because it substituted its own view as to the supposed impression left by the broadcast for that of the journalists who prepared the broadcast. This substitution gave the trier of fact an expanded role which *New York Times*, *Bose*, and *Harte-Hanks* do not permit.

B

We now turn to the record and conduct our own independent review of the evidence to determine if it provides a clear and convincing basis for the jury's finding of actual malice.

1.

Newton argues that an inference of actual malice is raised by NBC's failure to mention in the October 6, 1980 broadcast the death threats [**54] as a possible explanation for his contact with Penosi. NBC replies that Newton's argument is irrelevant because mention of the death threats would not have lessened the defamatory impact of the broadcast.

We agree with NBC. A hypothetical broadcast comprised of both the information **[*682]** actually disclosed in the October 6, 1980 broadcast and the undisclosed possibility that Newton may have contacted the mob seeking protection from death threats would have been no less defamatory than the October 6, 1980 broadcast itself. We fail to see how disclosing the fact that Newton had appealed to the mob for such protection would have changed the defamatory impact of the broadcast. All the essential ingredients of the broadcast would have remained: the ongoing federal investigation; the fact that Newton had had financial difficulties; the fact that he had sought and obtained the assistance of organized crime; the fact that that assistance had included high level criminal figures helping Newton out; and the fact that those figures then spoke with each other about "earning" off Newton after he was licensed to run the Aladdin. The inclusion of the additional fact that Newton had contacted [**55] the mob seeking protection from death threats would not have changed the substance of the broadcast.

Even if we agreed with Newton that failure to mention the death threats increased the defamatory impact of the October 6 broadcast, that fact would not support an inference of actual malice because the evidence still fails to show with convincing clarity that the journalists acted with the requisite state of mind. The primary inquiry is whether in failing to mention the death threats they "realized that [their] statement was false or that [they] subjectively entertained serious doubt as to the truth of [their] statement." *Bose*, 466 U.S. at 511 n.30 (citing *New York Times*, 376 U.S. at 280).

Ross and Silverman testified that they did not have sufficient credible evidence to state in the first broadcast (as they did in later broadcasts) that threats had been made. The major source of the information that the "problem" Penosi and Piccolo had solved for Newton concerned threats against Newton and his family was Moreno, who the NBC journalists had decided was unreliable. **40** The question of Moreno's credibility poses the double-layered credibility [**56] dilemma faced by the Supreme Court in *Harte-Hanks*. In *Harte-Hanks*, the Supreme Court reviewed a jury finding of actual malice which involved conflicting oral testimony of two sorts: discrepancies in the testimony of the newspaper's witnesses, 109 S. Ct. at 2694, and irreconcilable disagreement between the newspaper's sources. We face the same situation.

Newton argues that the NBC journalists knew that he called Penosi and Piccolo with a security problem, not a financial one, and he predicates his argument on the assumption that the journalists should have considered Moreno a credible witness. In other words, Newton argues that because the journalists claimed that they found Moreno to be incredible, the jury must have concluded that the sources were lying. This convoluted credibility assessment rests squarely before us because, like the jury in *Harte-Hanks*, the Newton jury heard testimony from and observed the demeanor of both the journalists and the source, Moreno.

[**57] *New York Times* and its progeny protect journalists and publishers from liability based on errors of fact that arise from reliance on a credible source. In *St. Amant v. Thompson*, 390 U.S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968), the Supreme Court held that **HN15** a journalist who relies on a source whose reliability is unknown, has not published false information with actual malice if the journalist made some effort to verify the source's information. The Court in *St. Amant* reviewed a **[*683]** record which contained "no evidence . . . of [the source's] reputation for veracity" but nevertheless concluded that the defendant had not published false information with constitutional malice. 390 U.S. at 733. The Court suggested that reckless disregard for truth could be predicated on reliance "wholly on an unverified anonymous telephone call," *id. at 732*, but found that when the publisher had not deemed the source to be "unsatisfactory," and had verified aspects of the information, *id. at 733*, there was no reckless disregard. *Id.* One of our colleagues has also noted the important free speech values inherent [**58] in a journalist's evaluation of a source:

> Newspapers and other media regularly digest a veritable avalanche of facts; these facts must be gathered from diverse sources, not all of equal reliability; judgments as to accuracy must often be made on the basis of incomplete information and under the pressure of a deadline. Newspapers might never be published if they were required to guarantee the accuracy of every reported fact; time and manpower do not permit the type of verification that would prevent all mistakes.

*Masson v. New Yorker Magazine, Inc.*, 895 F.2d 1535, 1557 (9th Cir. 1989) (Kozinski ▾, J. dissenting). We conclude that the importance of protecting a journalist's use of diverse sources and investigative techniques requires that we apply the heightened First Amendment standard of review to the question of Moreno's credibility in the eyes of the NBC journalists. Accordingly, we will not pay special deference to how the jury *may* have regarded Moreno's credibility as a trial witness. **41** The credibility of a source goes directly to the circumstances under which a journalist writes a story. The importance of permitting journalists to interview [**59] diverse sources, pursue multiple story lines, and draw their own honest and independent conclusions from their research dictates that the media should not fear that its journalists' professional judgments will be second-guessed by juries without the benefit of careful appellate review. As *New York Times* makes clear, "we 'examine for ourselves the statements in issue and the circumstances under which they were made.'" 376 U.S. at 285 (citing *Pennekamp v. Florida*, 328 U.S. 331, 335, 90 L. Ed. 1295, 66 S. Ct. 1029 (1946)).

We find support for our conclusion in *Harte-Hanks*. In assessing the evidence of actual malice before the jury in that [**60] case, Justice Stevens, writing for the Court, drew his own conclusions about the credibility of the newspaper's source. He noted that "the hesitant, inaudible and sometimes unresponsive and improbable tone of [the source's] answers to various leading questions raise obvious doubts about her veracity." *Harte-Hanks*, 109 S. Ct. at 2698. Accordingly, we hold that **HN16** the credibility of a journalist's source is a separate inquiry from the credibility of the journalist himself and that we apply a heightened review to the evidence regarding whether the publisher was reckless or knowingly false when he relied upon information provided by his source.

In this case, the undisputed evidence shows that NBC and its journalists were not reckless in disregarding Moreno's information about threats. Ross and Silverman testified that they were uncomfortable with Moreno because they knew that federal and state authorities had investigated Moreno's own considerable connections with organized crime figures. The journalists also testified that they believed Moreno to be an unreliable source because he had claimed that he had been intimately involved in the purchase of the Aladdin on behalf [**61] of Newton, in contradiction to Newton's testimony at the Board hearing that he had "no association whatsoever" with Moreno. **42** *Supra*, at p. 677. Newton's denial persuaded **[*684]** the NBC journalists to attach no weight to what Moreno had told them. This conclusion derives support from Moreno's statement to the journalists that Newton's affidavit would explain all relations with Penosi, when the affidavit contained only sparse information about the television special Newton had helped make for Penosi's son. *Supra* slip op. at p. 9918. Finally, Newton's attorney, Fahrenkopf, who enjoyed an excellent reputation in the community and with NBC, flatly denied, in Newton's presence, that Penosi had protected Newton from threats. Regardless of whether the jury believed Ross and Silverman about their states of mind in considering the possibility of referring to threats in the broadcast, the uncontroverted facts about discrepancies between Moreno's information and the information the journalists heard from Newton or his representatives, negates a finding of reckless disregard for truth. Newton cannot fault NBC for relying on his own statements. As one court put it, "It would be ironical [**62] and certainly inequitable for the plaintiff to profit here from his own misstatements." *Friedman v. Boston Broadcasters, Inc.*, 13 Media L. Rep. (BNA) 1742, 1744 (Mass. Super. Ct. 1986), *rev'd on other grounds*, 402 Mass. 376, 522 N.E.2d 959 (1988). We agree, and conclude that NBC's failure to refer to the threats in the October 6 broadcast fails to provide clear and convincing proof of actual malice.

2. Newton also argues that the inclusion of a reference to his "financial problems" **43** in the October 6 broadcast suggests that NBC tried to bolster the idea that Piccolo had a hidden share of the Aladdin and so knowingly attempted [**63] to defame Newton. According to Newton, the fact that an early draft of the broadcast called his financial problems "serious" indicates that Ross and Silverman sought to exaggerate his financial situation in order to suggest falsely that he had gone to the Mafia for money to help purchase the Aladdin. Newton offers NBC editor Gilbert Millstein's removal of the word "serious" from the final transcript as clear and convincing proof of actual malice.

We reject this argument on several grounds. First, the statement that authorities said that Newton had financial problems was true, and, as such, is incapable of supporting a finding of actual malice. The testimony of Glen Mauldin, a former member of the Nevada Gaming Board, shows that the Gaming Board was concerned about Newton's general financial situation, including his ability to finance his purchase and subsequent operation of [**64] the Aladdin. Prior to his purchase of the hotel, Newton was $75,000 a month short in meeting his current obligations. The Aladdin purchase involved adding an additional monthly obligation of $85,000. **44**

[**65] Second, it is undisputed that a disagreement over an amount not less than $20,000 caused a fight between Newton and at least one low-level member of an **[*685]** organized crime family. It was this disagreement that precipitated the threats to Newton and his daughter. NBC points out that $20,000 is a significant sum and that a debt to a mobster which leads to death threats presents a serious problem. We agree with NBC that its choice of words was reasonable. Although there is arguably some ambiguity in the broadcast about the severity of Newton's financial difficulties, that ambiguity, alone, does not sustain the burden of establishing with clear and convincing clarity that the journalists acted with knowing or reckless disregard of falsity.

Finally, Newton's argument about the deletion of the word "serious" falls short of the mark. Editing to make "a broadcast more understated and cautious cannot possibly be grounds for actual malice. The removal of the word "serious" has little, if any, probative value on the question of whether NBC knew that the statement in the broadcast was false. *Cf. Pierce v. Capital Cities Communications, Inc.*, 576 F.2d 495, 508 (3d [**66] Cir.), *cert. denied*, 439 U.S. 861, 58 L. Ed. 2d 170, 99 S. Ct. 181 (1978) (fact that defendants, prior to broadcast at issue, considered charging plaintiff with using his public office for private gain and decided not to do so does "*not* demonstrate that they knew that utterances in the broadcast were of questionable validity"). To the contrary, as we demonstrate above, the statement appears to be accurate.

3.

Newton also claims that NBC published the statement "Piccolo told associates that he . . . had become a hidden partner in the Aladdin" with actual malice because Ross and Silverman heard testimony at the Gaming Board hearing that the Valley Bank was providing the Aladdin financing. The knowledge that the Valley Bank was financing the Aladdin deal should have ruled out the possibility that Newton could have a hidden partner, or so Newton's argument goes. This argument is also wide of the mark. As the testimony of Newton's own organized crime expert, Prof. Robert Blakely, made plain, the fact that the Valley Bank provided financing for the Aladdin did not answer the question of whether any hidden interest existed. Prof. Blakely testified that a hidden [**67] interest in a casino is normally not actual ownership of a hotel but an interest in the "skim," the amount of casino receipts not reported to the appropriate authorities as receipts. Such an interest would not be reflected in corporate documents or materials "available for public surveillance and public review." RT 13:2417-19. Accordingly, the fact that Ross and Silverman knew about the Valley Bank financing has little probative value on the issue of the journalists' actual malice in stating that Piccolo claimed to be a hidden partner in the Aladdin.

4.

Newton also takes issue with several language choices and editing decisions made by the NBC reporters and editors. First, Newton objects to the wording of the sentence describing the grand jury investigation. Newton argues that NBC should have inserted the words "if any" or "possible" into the sentence "[a] federal grand jury is investigating the role of Guido Penosi and the mob in Newton's deal for the Aladdin." The broadcast would then have referred to "Penosi's role, if any," or to "Penosi's possible role." Quibbles over the precise wording of a sentence Newton concedes is true do not contribute meaningfully to the actual malice [**68] inquiry. Although Newton is correct that the insertion of his suggested language would have sharpened the meaning of the sentence, the omission has minimal probative value on the issue of actual malice. The sentence does not mislead listeners about the nature of the grand jury's investigation. **45⚖ HN17⚓** Complaints or disagreements **[*686]** about choice of language are editorial decisions that do not give rise to liability. As the Eighth Circuit has observed, "the First Amendment cautions courts against intruding too closely into questions of editorial judgment, such as the choice of specific words." *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir.), *cert. denied*, 479 U.S. 883, 93 L. Ed. 2d 249, 107 S. Ct. 272 (1986). At the worst, NBC's sentence was slightly ambiguous. Our circuit has barred the imposition of liability in a public figure defamation case based upon the use of ambiguous language. *Masson v. New Yorker Magazine, Inc.*, 895 F.2d 1535, 1544-45 (9th Cir. 1989) (interpreting *Time, Inc. v. Pape*, 401 U.S. 279, 28 L. Ed. 2d 45, 91 S. Ct. 633 (1971)). *See also McCoy v. Hearst Corp.*, 42 Cal. 3d 835, 862, 727 P.2d 711, 729, 231 Cal. Rptr. 518, 536 (1986), [**69] *cert. denied*, 481 U.S. 1041, 95 L. Ed. 2d 822, 107 S. Ct. 1983 (1987) (ambiguous evidence insufficient to establish constitutional malice).

Newton's complaints about two other NBC editing decisions fare no better. Newton objects to NBC's not including in the broadcast his entire response to a question [**70] asked of him at the Board hearing: "Are you planning to continue any relationship with Mr. Penosi?" The broadcast contained the first sentence of the answer: "Well, on the basis of which I've known him, I don't think there's been a relationship," but not the second sentence, "The direct answer to your question obviously is no if he has those kind of connections." RT 5A:50A-51A; ER 211; *supra* at p. 677. Newton also objects to the broadcast's showing Newton's anger at Ross' questions in the parking lot without showing the earlier portion of the attempted interview which Newton claims provoked his anger. These objections challenge editing decisions by NBC about what material to include and exclude from the broadcast. Although the material included in the broadcast does not portray Newton in the most flattering light possible, that fact is irrelevant to the actual-malice inquiry. The challenged material was a true depiction of Mr. Newton's conduct during and after the Board hearing and was relevant to the NBC story. We decline to substitute our judgment for that of NBC in presenting its story. Editorial decisions about broadcasts are best left to editors, not to judges and juries.

[**71] 5.

Newton also alleges that Ross and Silverman did not try hard enough to interview him and that their lack of vigorous pursuit provides evidence that they did not want to hear his side of the story. In *Harte-Hanks*, the Supreme Court found that the newspaper had engaged in the "purposeful avoidance of the truth," 109 S. Ct. at 2698, by, *inter alia*, deliberately choosing not to interview a critical eye-witness and deliberately determining not to listen to a critical audio tape. In this case, however, it is undisputed that Ross and Silverman tried at least twice to interview Newton and that Ross did in fact interview him once. The record contains no evidence that the NBC journalists deliberately tried to avoid the truth as they investigated the October 6 broadcast.

6.

Finally, we address a general argument pertaining to the jury's determination of actual malice. Newton asks us to consider as we review the broadcast that television allows the media to interpose sound and picture over words and to manipulate the impressions it creates with powerful broadcasting technologies. Because the average viewer only watches a television broadcast once, that viewer cannot [**72] parse each sentence with care to ascertain each word's precise meaning. According to Newton, we should refrain from carefully parsing each sentence because the overall **[*687]** impression of television is bound to images and not to words. **46⚖**

Newton misperceives the function of appellate review in a First Amendment case. **HN18⚓** We do not review a publication for the purpose of replicating the review it would receive from the average reader or listener. We review speech that has been alleged to be defamatory to determine whether or not it falls outside the protection of the First Amendment. Accordingly, we evaluate facts that have been deemed to have constitutional significance. *See Bose*, 466 U.S. at 505. If we accepted Newton's suggestion, we would abdicate the constitutional responsibility embedded in the concept of judicial review. Reviewing [**73] a television broadcast less carefully because the average viewer sees it only once defies the constitutional values protected by the rule of independent judicial review.

V

In conclusion, we have applied the holding of the Supreme Court in *Bose* that **HN19⚓** the clearly erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure does not prescribe the standard of review to be applied in reviewing a determination of actual malice in a case governed by *New York Times v. Sullivan*. *Bose*, 466 U.S. at 514. Our review of the uncontroverted testimony, together with the cumulation of

the circumstantial and documentary evidence, reveals almost no evidence of actual malice, much less clear and convincing proof. Accordingly, we REVERSE the judgment entered against appellants. Judgment should be entered dismissing the complaint. The cross-appeal is DISMISSED.

SO ORDERED.

With the above amendments, the panel unanimously votes to deny the petition for rehearing and to reject the suggestion for a rehearing en banc.

The full court has been advised of the suggestion for en banc rehearing and no judge of the court has requested a vote on the suggestion for rehearing [**74] en banc Fed. R. App. P. 35(b).

The petition for rehearing is DENIED, and the suggestion for a rehearing en banc is REJECTED.

**Footnotes**

1 Excerpts of Record (ER) at 43-47.

2 The trial judge in the jury instructions described the following impressions possibly conveyed by NBC's broadcasts:

> 1. Financing of Wayne Newton's acquisition of his interest in the Aladdin Hotel and Casino, Las Vegas, Nevada, was obtained by and through mafia and mob sources, and Wayne Newton holds a hidden ownership in said Aladdin Hotel and Casino for the benefit of said Mafia and mob sources.
>
> 2. Wayne Newton has not truthfully related to Nevada gaming authorities the facts of his relationship with Guido Penosi and Wayne Newton is associated with Guido Penosi who is involved in both narcotics business [sic] and show business on the west coast;
>
> 3. Visually depicts Wayne Newton testifying, under oath, before the Nevada gaming authorities and in connection with said testimony, states that Federal authorities say Newton is not telling the whole story.

Appellee's Supplemental Excerpt of Record (SER) at 231-32.

3 Special Verdict Question 4A asked the jury "Has Mr. Newton proved by clear and convincing evidence that any false and defamatory statement of a factual nature about him was stated in one or more of the three broadcasts complained of with knowledge of falsity or with serious subjective doubt about its truth on the part of any of the defendants?" SER at 251.

4 This partial grant of judgment notwithstanding the verdict is the subject of a cross appeal by Newton. Newton asks us to reinstate the verdict of the jury on his claims of lost past and future income notwithstanding the fact that he accepted a remittitur and judgment was entered on the reduced award. NBC filed a motion to dismiss Newton's cross-appeal in which it contends that Newton may not attack the district court's reduction of damages because he has filed a remittitur. NBC's argument is persuasive. It is well settled that ***HN2*** "a plaintiff in federal court . . . may not appeal from a remittitur order he has accepted." *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 650, 51 L. Ed. 2d 112, 97 S. Ct. 835 (1977) (per curiam). This rule applies to cross-appeals. *999 v. C.I.T. Corp.*, 776 F.2d 866, 873 (9th Cir. 1985) ("the rule in this circuit long has been that the plaintiff cannot contest the validity of a remittitur to which he has consented, even on cross-appeal"). Although our circuit has never addressed the question of an appeal from a portion of a remittitur order to which a party has agreed on a single cause of action, courts in other jurisdictions have rejected such attempted appeals. *E.g., Lanier v. Sallas*, 777 F.2d 321, 326 (5th Cir. 1985) (where appeal is sought from the trial court's refusal to instruct the jury as to punitive damages on a single claim, and a remittitur has been filed as to another aspect of damages on that same claim, "acceptance of the remittitur must put an end to the litigation").

5 Appellant NBC raises a myriad of issues in this appeal. NBC questions whether liability for defamation based on a false impression, as opposed to a false statement, may be imposed without contravening the First Amendment. NBC also asks us to consider whether the district court impermissibly allowed the jury to determine which statements in the broadcasts were ones of fact and not opinion and whether the district court violated provisions of the Jury Selection and Service Act in the selection of the jury. Appellant challenges the district court's denial of its motion for a change of venue and also raises numerous challenges to the computation of damages, including an attack on the law of our circuit regarding punitive damages in a First Amendment case. Because the actual malice issue disposes of this case in its entirety, we reach none of these questions.

6 Newton strongly contested his public-figure status before the district court. The district court held Newton to be a public figure and imposed sanctions of $ 55,000 on Newton for requiring his public figure status to be proved.

7 There is some conflict among the circuits as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 n.2, 109 S. Ct. 2678, 2682, 105 L. Ed. 2d 562 (1989) (comparing *Firestone v. Time, Inc.*, 460 F.2d 712, 722-23 (5th Cir.) (Bell, J., specially concurring), *cert. denied*, 409 U.S. 875, 34 L. Ed. 2d 127, 93 S. Ct. 120 (1972) with *Goldwater v. Ginzburg*, 414 F.2d 324, 341 (2d Cir. 1969), *cert. denied*, 396 U.S. 1049, 24 L. Ed. 2d 695, 90 S. Ct. 701 (1970)). The *Harte-Hanks* court explicitly refused to consider this issue. 109 S. Ct. at 2682 n.2.

The standard of review for the falsity element is also unresolved. The Court of Appeals in *Harte-Hanks* reviewed the jury's determinations of the operational facts bearing on falsity under the clearly erroneous standard of Rule 52(a). *Id.* at 2683 n.4 (quoting

Communications, 543 A.2d 682, 692 (1988)). The District of Columbia Circuit has held that whether speech is capable of defamatory meaning, however, is a question of law for the court. *See* Tavoulareas v. Piro, 260 U.S. App. D.C. 39, 817 F.2d 762, 779-80 (D.C. Cir.) (en banc), *cert. denied*, 484 U.S. 870, 108 S. Ct. 200, 98 L. Ed. 2d 151 (1987). *See also* Restatement (Second) of Torts § 614(i), at 311 (1977).

**8** **HN4** Federal Rule of Civil Procedure 52(a) provides:

> Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of witnesses.

Appellate courts accord the same deference to the fact-finding function of the jury that Rule 52(a) mandates for trial courts. For example, in *Harte-Hanks*, the Supreme Court applied Rule 52(a) principles to its review of the credibility determinations of a jury. 109 S. Ct. at 2696-97.

**9** The Supreme Court has recently noted that **HN6** the "clear and convincing" standard of proof is a higher standard which reflects a societal judgment about the greater importance of particular types of adjudication. *Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, ___ 58 U.S.L.W. 4916, 4921, 111 L. Ed. 2d 224, 110 S. Ct. 2841 (1990) (No. 88-1503). "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" *Addington v. Texas*, 441 U.S. 418, 423, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979) (quoting *In re Winship*, 397 U.S. 358, 370, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970) (Harlan, J., concurring)).

**10** This independent examination of the record is "not equivalent to a 'de novo' review of the ultimate judgment itself." *Bose*, 466 U.S. at 514 n.31. **HN7** In de novo review, the reviewing court makes an original appraisal of all the evidence to decide whether or not judgment should be entered for the plaintiff. *Id.* As a general rule, we have conducted a de novo review of the record when the district court has held a restriction on speech to be constitutional. *Daily Herald Co. v. Munro*, 838 F.2d 380, 383 (9th Cir. 1988).

**11** We note that the rule of independent review applies regardless of whether the factfinder is a jury or a trial judge. *Bose*, 466 U.S. at 501 (responsibility of independent review "cannot be delegated to the trier of fact, whether the factfinding function be performed . . . by a jury or by a trial judge"). *See also* id. at 509 n.27 ("The intermingling of law and fact in the actual-malice determination is no greater in state or federal jury trials than in federal bench trials").

**12** Our independent review of actual malice has a peculiar twist. Actual malice involves a subjective analysis in which the trier of fact and the reviewing court discern the state of mind of the defamation defendant. A state of mind issue such as actual motive is a "pure question of fact" normally subjected to review under the "clearly erroneous" standard. *Pullman-Standard v. Swint*, 456 U.S. 273, 289, 72 L. Ed. 2d 66, 102 S. Ct. 1781 (1982). *See also* *United States v. McConney*, 728 F.2d 1195, 1203 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 83 L. Ed. 2d 46, 105 S. Ct. 101 (1984).

**13** **HN10** The factfinding function includes "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

**14** In *New York Times*, the Commissioner of Public Affairs for Montgomery, Alabama, brought a civil libel suit against the *Times* and four individual black civil rights activists, including Dr. Martin Luther King, Jr. The publication at issue was a full-page advertisement entitled "Heed Their Rising Voices" and asked readers to contribute money to the Committee to Defend Martin Luther King and the Struggle for Freedom in the South. The advertisement charged that "in their efforts to uphold the[] guarantees [of the Constitution and the Bill of Rights], . . . [thousands of Southern Negro students] are being met by an unprecedented wave of terror by those who would deny and negate that document which the whole world looks upon as setting the pattern for modern freedom . . . ." *New York Times*, 376 U.S. at 256.

**15** For example, Newton was named "Distinguished Citizen of the Year" in 1980 by the Clark County Chapter of the National Conference of Christians and Jews (RT 6:935) and at a Lincoln Day dinner in his honor in 1981, Newton was named the "Republican Man of the Year" in the state of Nevada (RT 8:1309).

**16** We note, however, that some courts have referred to the decision as to venue of public figure defamation cases as being of "constitutional stature." *Buckley v. New York Post Corp.*, 373 F.2d 175, 183-84 (2d Cir. 1967); *Westmoreland v. CBS, Inc.*, 8 Media L. Rep. (BNA) 2493, 2496 (D.S.C. 1982).

**17** This is the line drawn by the First Circuit Court of Appeals in *Bose* when it held that its review of the actual malice determination was not limited to the clearly erroneous standard of Rule 52(a) but added that it was "in no position to consider the credibility of witnesses and must leave questions of demeanor to the trier of fact." *Bose Corp. v. Consumers Union of United States*, 692 F.2d 189, 195 (1st Cir. 1982).

**18⟨T⟩**   Newton testified about Penosi's visit to his home at trial. That testimony went as follows:

"Q. And he [Penosi] then came to your house, did he not?

"A. The next day, yes, sir.

"Q. You sent a car for him?

"A. Yes, sir.

"Q. What's your best estimate of how long he was at your house?

"A. I would guess anywhere from 15 to 25 minutes, 15 minutes, 30 minutes, I don't know. (RT 6:987)

**19⟨T⟩**   Newton testified at trial as follows:

"Q. Now, before you called Guido Penosi [about the threats], did you even think of contacting any other body of law enforcement other than [Las Vegas] Metro . . .?

"A. No, sir.

"Q. Did you even consider calling the FBI?

"A. It wouldn't have helped.

"Q. You know that, Mr. Newton?

"A. Yes, sir.

"Q. You knew that then?

"A. No, sir." (RT 6:1015-16)

**20⟨T⟩**   Newton claimed ignorance as to the identity and location of the individual Penosi told him to call. He testified at trial as follows:

"A. So he [Penosi] called back . . . . And he said, 'When I call you back I'm going to give you a number, . . . a guy will answer, and I will be on the extension.' And he said, 'Simply tell him the story, nothing more, nothing less.' I said 'okay.'

. . .

"I did call, a guy did answer. Guido was on the extension. I said, 'This is Wayne Newton.' And I related the entire story." (RT 3:441)

**21⟨T⟩**   The arrangements between the Gambino family and the Genovese family on behalf of Newton and Moreno, *see supra*, at slip op. pp. 9905-06, are the one event in the story of Wayne Newton's relationship with various persons involved in organized crime about which Newton himself did not testify. This information came from FBI tapes, which were played to the jury, and portions of the grand jury testimony, which were also released to the parties.

**22⟨T⟩**   Newton testified as follows:

A. "Mark came to me and said, 'Guido called and you're to call this number and ask for Frank, and you're to tell him that Lola Falana is part of your team and Mark works for you.'

. . .

So I called the number again and I asked for Frank, and he said 'Yes.' And I said, 'This is just to let you know that Mark Moreno works for me . . . .'

. . .

He said 'Okay, that's all I need to know.'" (RT 6:870)

**23⟨T⟩**   One taped telephone conversation contained the following exchange. Penosi: "they're throwing roadblocks and all that . . . you know . . . and, ah . . . they don't want him to have the hotel . . . ." Piccolo: "Yeah, but it would be nice if [Newton] would." Ex. 356 at 2; ER 195-96.

**24⟨T⟩**   Newton testified at trial as follows:

"Q. Did you believe Mr. Balmer that Mr. Penosi was involved in organized crime?

"A. I have no reason to consider it either way, Mr. Abrams.

"Q. Is it a matter of indifference to you?

A relatively did yes" (RT 6:1029)

**25** Mr. Balmer testified at trial as follows:

"Q. Did you ever . . . ask Mr. Newton to tell you every contact and every conversation he had ever had with Guido Penosi, in those words?

"A. No, not in those exact words. But he was asked very specific questions, based on the information that we had, with regard to his contacts with Mr. Penosi, and in addition to that he was asked if there had been any additional contacts or is there any other financial or business or any other contacts he had with relation to Mr. Penosi.

"Q. And he told you no business?

"A. That's correct, yes.

"Q. And he told you he did a - a something for charity for Penosi's son Anthony?

"A. Yes, after we had learned that, he told us that, yes.

. . .

"Q. Is it your best recollection that you gave Mr. Newton a fair chance to set forth the entirety of his dealings through the years with Guido Penosi?

"A. I would say that we gave him a more than adequate opportunity during the interviews that we conducted with him to tell us anything that he knew about Mr. Penosi, other than, you know, what we specifically knew and we specifically questioned him about." (RT 11:1963-64; 11:1968-69)

**26** This testimony contradicts Newton's testimony at trial in which he stated that the threats had ended. RT 7:1046. Newton's response at trial to questions asking why he had not told Agent Balmer that he had spoken with any individual in the east at Penosi's request was as follows:

"Q. When Mr. Balmer said to you, Mr. Newton, that after you did contact Mr. Penosi made contact with an individual who was back east in the New England states, did you tell him that, in fact, you had called someone in the New England states -

"A. No, sir, I didn't.

"Q. - at the request of Mr. Penosi?

"A. No, sir, I didn't. I didn't know where I called.

"Q. You dialed an area code, Mr. Newton?

"A. Yes, sir.

"Q. You had no idea what part of the country the area code was in?

"A. No sir.

"Q. And when Mr. Balmer said to you, Mr. Penosi made contact with an individual who was from back east in the New England states, 'Piccolo' he called him, who was heavily involved in organized crime, why didn't you tell him that you had made two calls at Mr. Penosi's explicit request to someone else to help solve your problem?

"A. It didn't occur to me, Mr. Abrams." (RT 6:1030)

**27** Ross testified at trial as follows:

"Q. Reading from your deposition of September 3, 1982 . . .

Answer: Source three provided information that Frank Piccolo was a capo in the Gambino Mafia family who had been given the Connecticut territory to run for gambling, loansharking, and other mob rackets, that Piccolo had become very wealthy, had had a lot of money to invest.

Piccolo was a frequent visitor to the Ravenite Social Club in lower Manhattan, a known meeting place for the Gambino Mafia family.

And for more than a year the FBI had been investigating Frank Piccolo with other members of the Gambino Mafia family. On at least one occasion Mr. Piccolo was overheard to be in a conversation with other mobsters in which he was asked whether he would be interested in investing in Atlantic City in supposed mob rackets down there.

He said, no, he was involved with Wayne Newton in Las Vegas and he was going to be in the Aladdin, unquote.

Did you so testify?

"A. Yes, I did.

"Q. And was the testimony truthful?

"A. Yes it was.

. . .

"Q. Were you certain, in your mind, when the broadcast was broadcast on October 6, 1980, that you had been told by a reliable source that Frank Piccolo had told associates that he had taken care of Newton's problem and had become a hidden partner in the Aladdin Hotel deal?

"A. I was certain of that. No doubt in my mind.

. . .

"Q. Isn't one source too few to broadcast a statement such as the last part of this statement, that Mr. Piccolo was saying he had become a hidden partner in the Aladdin Hotel deal?

"A. Not really, for two reasons.

One, this source is really a top quality source who Ira [Silverman] and I had worked with before and since, was very knowledgeable, just given his position.

Secondly, other information that we heard tended to confirm what we were being told, that from the source called source B Ira was hearing that Piccolo was, in fact, telling mobsters in conversations that they were hearing on the phone that he had taken care of a problem for Wayne Newton, he was going to earn from the singer, he was going to earn from Newton, he was going to be involved in this life insurance policy. The information tended to - one set of information tended to confirm the other set of [information].

"Q. And why does that matter?

"A. It matters because nothing stuck out as a red flag, nothing suggested that it was wrong." (RT 27:5600-5601; 27:5603-5606)

**28** The following excerpt from Lieutenant John Ferguson's deposition was read to the jury at trial:

"Q. Was it contrary to the usual practice of the police department of the City of New York . . . to supply to a member of the news media information which pertained to or was reflected by the statement on television quote, police in New York say that this mob boss Frank Piccolo told associates he had taken care of Newton's problem and had become a hidden partner in the Aladdin Hotel deal, unquote?

"A. Yes.

"Q. If information had been obtained by the police department of the City of New York . . . which pertained to or was reflected by the statement made during a television broadcast on October 6, 1980, quote, police in New York say that this Mob Boss Frank Piccolo told associates he had taken care of Newton's problem and had become a hidden partner in the Aladdin Hotel deal, unquote, would that have been the type of information which would have been reflected, contained, referred to or mentioned in a record, report, statement, memorandum or data compilation made and preserved by the police department of the City of New York?

"A. If such information had been obtained, it is the policy of the New York City Police Department to record such information.

"Q. Has a diligent search been made to find out whether there exists any [of the above-mentioned] records . . .?

"A. Yes.

"Q. What has been the result of the search . . .?

"A. A search was made of the records of the investigation and analysis section of the Organized Crime Control Bureau and no such recording or writing has been found." (RT 18:3591-93)

**29** Silverman testified as follows:

"Q. Do you recall attending the hearing of the Nevada State Gaming Control Board regarding Wayne Newton's licensure on Thursday, September 25, 1980?

"A. Yes, I do.

"Q. Do you recall listening to Wayne Newton's testimony when Board Member Mauldin asked Mr. Newton whether he, Mr. Newton, was planning to continue his relationship with Guido Penosi?

"A. Yes, I did.

"Q. I take it sir, you watched the out-take showing that question by Board Member Mauldin and the complete answer by Wayne Newton?

"A. A number of times.

"Q. So the language of Mr. Newton's answer in totality is fresh in your memory, correct, sir?

"A. I watched it. I think it's fresh.

"Q. Did you shortly after that hearing call source B and tell source B on the telephone that Wayne Newton had given testimony under oath before the Nevada State Gaming Control Board in which Wayne Newton had under oath denied any relationship with Penosi?

"A. I would think something like that, a relationship, yes.

"Q. Did you in reliance on what source B answered you when you reported that to source B, whether it be man or woman, on the telephone, in part formulate the script language 'Federal authorities say Newton is not telling the whole story'?

"A. In part, yes." (RT 23:4699-4700)

394

**30¶** "Gaming Board member [Mauldin]: Has he [Penosi] ever visited you in your home?

"Newton: No, sir." (RT 5A:50A; ER at 211).

Newton's explanation at trial of this false testimony was as follows:

"Q. Mr. Newton, that was not true, was it?

"A. No, sir, not in the context in which you are stating it. It was true in the context in which I interpreted the question.

"Q. Mr. Penosi had come to your home, had he not?

"A. I sent a car for him, yes, sir.

"Q. Mr. Penosi talked with you at your home?

"A. I assume we talked, yes, sir.

"Q. He stayed at your home for 20, 25, 30 minutes, I think you said?

"A. Approximately 15, 30 minutes, somewhere in there.

"Q. He went away from your home in the car that you had provided him."

"A. I didn't provide him a car. I provided him a ride. I believe I had someone pick him up and take him back."

"Q. You believe you told the whole story when you responded to the question has he ever visited you in your home and you said no, sir?

"A. In the context in which I understood the question, yes, sir." (RT 7:1114-15)

**31¶** Newton explained at trial that he understood the question from the Gaming Board asking him if Moreno was "a representative of [his] in any way, shape or form" to ask instead if he had a "contractual arrangement" with Moreno. RT 7:1089-90.

**32¶** Moreno testified at trial as follows:

"A. I was not employed by Mr. Newton at that time. I was not being paid by Mr. Newton, I was not asking for compensation. I was doing what I could as a friend and being in a position myself because of my long association with the Aladdin to put Mr. Newton where he wanted to be.

"Q. But you had been representing Mr. Newton in various matters that you have described to us, were you not?

"A. As I said before, I don't know if representing in the legal sense is a correct term. I was doing everything I possibly could so that Mr. Newton could purchase the Aladdin Hotel.

"Q. And what you were doing was very substantial in terms of your own time, was it not?

"A. I would say yes.

"Q. You were working round the clock at certain points at least to try to get the Aladdin for Mr. Newton, right?

"A. That's correct, sir." (RT 15:2793-94)

**33¶** At trial, Newton testified as follows about his response to Ross as to when he had last spoken with Penosi:

"Q. Was that true, Mr. Newton?

"A. No, it wasn't. But I didn't realize I was under oath to Mr. Wimp [Brian Ross] over there." (RT 7:1146)

**34¶** The following excerpt from Carson's deposition was read to the jury:

"Q. Is there anything else you recall these gentlemen [Ross and Silverman] saying to you?

"A. The name Penosi was brought up. I did not know the gentleman, had never heard of the name.

. . .

"Q. You remembered the name Penosi. What did they indicate to you?

"A. They didn't indicate anything to me. I didn't know the name or know the gentleman." (RT 16:3175; 16:3176)

Newton uses this deposition testimony to insinuate that Ross and Silverman told Carson that Newton was involved with Penosi in the purchase of the hotel. Appellee's Brief at 79. By eliminating 20 lines of Carson's deposition testimony, Newton distorts the substance of Carson's remarks and suggests that the journalists tried to drop sinister references to Penosi into their questions about Newton's deal for the Aladdin.

**35¶** Moreno testified at trial about his conversation with Ross and Silverman as follows:

they basically told me that I was not the crow of the story and that Miss Falana was not the true crux of the story. This was just to get my attention that who they really wanted to get was Wayne Newton. And if I would come down and speak to them about Mr. Newton's reported organized crime connections concerning his purchase at the Aladdin Hotel, that I would not in any way be implicated in their story, and Miss Falana would not in any way be implicated in their story. I refused to do that.

RT 14:2715-16.

**36**▼   Hervey testified that Silverman told him that Newton was a "hard guy to get to and I really would like to talk to him, just for a few minutes," RT 23:4688, and that Silverman was "persistent" in trying to enlist his assistance in getting an interview with Newton, *id.* at 4694.

**37**▼   Because the district court did not identify any false statement of fact, our review of its ruling speaks in terms of the impression which the district court considered. By our review of the district court's ruling we do not suggest that liability may be imposed for false impressions arising out of true statements. As we noted earlier, we do not reach that question. *Supra* n.5.

**38**▼   The record is clear that Newton, in fact, did not tell the whole story to Nevada state gaming authorities. Newton's testimony before both the federal grand jury and the Nevada gaming authorities is a matter of public record. Assistant United States Attorney, Richard Gregoire ▾, who represented the United States before the grand jury, testified at trial that, in his view, Newton had not told Nevada gaming authorities the whole story about his relationship with Penosi. RT 18:3498. And the record reveals that NBC's statement was accurate, even without attribution to federal authorities. For example, Newton falsely told the Board that Penosi had never come to his home or visited his dressing room. RT 6:987 (Newton testimony about Penosi's visit to Newton's home); RT 5A:50A; ER 211 (Newton testimony to Board that Penosi had never visited Newton's home); RT 7:1114-15 (Newton's trial testimony about testimony to Board). Silverman testified at trial that the ease with which Penosi gained access to Newton, who was protected from most fans by a private body guard at his home and dressing room, aroused NBC's suspicion early in the investigation. RT 24:4699-4700; 4702.

**39**▼   Similarly, in *Dyer v. MacDougall*, 201 F.2d 265, 268-69 (2d Cir. 1952), Judge Learned Hand ▾ held that a plaintiff could not meet his burden of proving that a defamatory statement had been made by showing that the jury disbelieved those who denied making it. Judge Hand ▾ stated that:

> Nevertheless, although it is therefore true that in strict theory a party having the affirmative might succeed in convincing a jury of the truth of his allegations in spite of the fact that all the witnesses denied them, we think it plain that a verdict would nevertheless have to be directed against him. *Id.* at 269.

**40**▼   Appellee argues that both source B and an agent of the Nevada Gaming Control Board told Ross and Silverman that Newton had contacted Penosi because of the death threats. However, the message conveyed by these sources, as recounted in the testimony of the agent, as well as that of Silverman and Ross, is quite ambiguous and couched in terms of a *possible* explanation for the Newton-Penosi contact. *See* RT 16: 3038-39 (testimony of Agent Shepard); RT 23: 4782-83 (testimony of Silverman); RT 25: 5225-26 (testimony of Ross). Such statements cannot serve as support for a finding that the reporters' decision to refrain from making a statement in the broadcast constituted actual malice. Thus, we restrict our examination to the reporters' decision to discount Moreno's statements.

**41**▼   *Harte-Hanks* supports this conclusion. There, the Court rejected the approach of the Court of Appeals, which had considered the facts which that jury "could have" found, and instead the Court concentrated on the less speculative ground of what the jury "*must*" have rejected. *Harte-Hanks*, 109 S. Ct. at 2697.

**42**▼   The ultimate fact that Newton was disingenuous in making this response does not alter the fact that Ross and Silverman had reason to believe that Moreno, rather than Newton, was lying. The actual-malice inquiry looks at circumstantial evidence of what the journalists knew rather than at circumstantial evidence of what turned out to be correct.

**43**▼   The October 6 broadcast stated "despite his big income, authorities say Newton has had financial problems." *Supra* at p. 666.

**44**▼   Mauldin testified at trial as follows:

"Q. At the rump session, Mr. Mauldin, did you make any statement with respect to the financial aspects of Mr. Newton's application?

"A. As I recall, I indicated that based upon my review and my staff's review of the financial information, Mr. Newton is having trouble meeting his current liabilities, and to add $ 85,000 a month to that could be very damaging to Mr. Newton's overall financial condition.

"Q. Did you understand at that time that Mr. Newton's income was very substantial?

"A. Yes. Very substantial. I think it was eight million, as I recall.

"Q. Did you hold the views you've just expressed notwithstanding that?

"A. A tremendous amount of expenses. He had - I was offering expenses for all of his properties. He had considerable obligations on

most if not all of the properties he owned. There was expenses with regard to helicopters and airplanes [.] He had borrowed a great deal of money just before that which appeared to be working capital. It appeared to me that he was having financial problems already." (RT 28:5804-05)

**45** ▼  The transcript of Newton's grand jury testimony was produced to the parties at the commencement of the trial in October, 1986. Newton was asked a number of questions about whether there was any relationship between Penosi and Newton's purchase of the Aladdin:

- "Does he [Penosi] have any business interests with you or financial?"

- "Were you ever approached by anybody, either connected with Mr. Penosi or connected with this gentleman by the name of Frank, about their possibly assisting in the financing of the Aladdin?"

- "Are there any points sold for the Aladdin now that aren't a matter of record with the Gaming Commission?"

Ex. 729 at 28-29, 31, 35; ER 224, 227, 228.

**46** ▼  We note in passing that it is exactly this type of careful parsing which Newton earlier requested that we require of NBC, *see supra* section IV B 4.

 LexisNexis®

About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

Nix v. ESPN, Inc., 2018 WL 880288

Search: Everything

Client: -None-

Folders  History  Help  More

Document:  **Nix v. ESPN, Inc., 2018 U.S. Dist. LEXIS 149345**  Actions

Go to  Page  Page #  Search Document

# Nix v. ESPN, Inc., 2018 U.S. Dist. LEXIS 149345

**Copy Citation**

United States District Court for the Southern District of Florida

August 30, 2018, Decided; August 30, 2018, Entered on Docket

Case No. 1:18-cv-22208-UU

**Reporter**

**2018 U.S. Dist. LEXIS 149345** * | 2018 Media L. Rep. 363 | 2018 WL 8802885

NIEMAN NIX and DNA SPORTS PERFORMANCE LAB, INC., Plaintiffs, v. ESPN, INC., et al., Defendants.

**Subsequent History:** Affirmed by Neiman Nix v. ESPN, Inc., 772 Fed. Appx. 807, 2019 U.S. App. LEXIS 14334 (11th Cir. Fla., May 15, 2019)

**Prior History:** Nix v. Major League Baseball, 190 So. 3d 79, 2015 Fla. App. LEXIS 6160 (Fla. Dist. Ct. App. 3d Dist., Apr. 27, 2015)

## Core Terms

Plaintiffs', defamation, motion to dismiss, statute of limitations, defamation claim, articles, republished, antlers, parties, bio-identical, Defendants', defamatory, banned, affirmative defense, synthetic, publish, wire service, allegations, Emotional, distress, players, sports, press

**Counsel:** **[*1]** For Neiman Nix, DNA Sports Performance Lab, Inc., Plaintiffs: David H. Pollack , LEAD ATTORNEY, David H. Pollack , Coral Gables, FL.

For ESPN, Inc., The Associated Press, Inc., USA Today, a Division of Gannett Satellite Information Network, LLC, Defendants: Allison Kirkwood Simpson , Thomas & LoCicero , Tampa, FL; Carol Jean LoCicero , Thomas & LoCicero PL , Tampa, FL.

**Judges:** URSULA UNGARO , UNITED STATES DISTRICT JUDGE.

**Opinion by:** URSULA UNGARO

## Opinion

**ORDER**

THIS CAUSE comes before the Court upon Defendants' Motions to Dismiss Plaintiffs' Complaint ("The Motions") (D.E. 10 and D.E. 11).

THE COURT has considered the motions, the pertinent portions of the record and is otherwise fully advised in the premises.

**BACKGROUND**

398

The following allegations are taken from Plaintiff's Complaint (D.E. 1-2).

This defamation action arises out of a news article published or republished by three media companies reporting on a lawsuit that Plaintiff Neiman Nix ("Nix") filed in the Southern District of New York. *See generally* D.E. 1-2.

Nix is a former professional baseball player. *Id.* ¶ 8. In April 2012, he launched a "state-of-the-art sports science center" in Miami Beach, Florida, named DNA Sports Performance Lab, Inc. ("DNA"). *Id.* ¶ 13. DNA provided **[\*2]** diagnostic sports training and fitness services in addition to selling health supplements. *Id.*

DNA sells a natural supplement derived from antler tissue naturally shed by elk. *Id.* ¶ 14. DNA claims that the supplement increases physical strength, enhances athletic performance, increases energy levels, retards the aging process, sharpens memory and concentration, rejuvenates the libido, and provides many other health benefits. *Id.* The active ingredient in these supplements is a naturally occurring compound called IGF-1. *Id.* ¶ 15.

In 2013, the MLB launched an investigation into the illegal sale of performance enhancing drugs to MLB players. *Id.* ¶ 16. This investigation targeted Nix along with other "anti-aging" clinics in Florida. *Id.* On July 14, 2016, Nix filed a tortious interference suit against the MLB in Federal Court for the Southern District of New York, Case No. 1:16-cv-05604, for harm to Nix's reputation resulting from the investigation. *Id.* ¶ 18. On the same day, Defendant AP published a news article about the lawsuit, and Defendants ESPN and USA Today republished it. *Id.* The articles all contained the following statement about Nix's tortious interference suit: "The suit admits **[\*3]** Nix and his company used bioidentical insulin like growth factor (IGF-1), which is derived from elk antlers and is on baseball's list of banned substances." *Id.*

This statement gives rise to Plaintiffs' defamation claim. *Id.* ¶ 22. Plaintiffs allege that it is defamatory because it does not differentiate between natural and synthetic IGF-1. *Id.* The synthetic form of IGF-1 is a Schedule III illegal drug in the same category as cocaine and methamphetamine. *Id.* Because Defendants' statement does not distinguish between natural and synthetic forms of IGF-1, Plaintiffs allege that it implies that Nix and DNA sold illegal drugs, or legal drugs in an illegal manner. *Id.* ¶¶ 22-23. Further, Plaintiffs allege that Defendants' statement implies that Nix and DNA sold substances banned by MLB rules to MLB players, even if they were not controlled or illegal substances. *Id.* ¶ 22.

Plaintiffs also allege that the statement itself is false, and that the tortious interference complaint actually states: (1) naturally occurring, bio-identical IGF-1, extracted from the antlers of elk and deer, is not a controlled or illegal substance, (2) the use of naturally occurring, bio-identical IGF-1, extracted from the **[\*4]** antlers of elk and deer, is not prohibited by MLB or MLB Player's Association, (3) naturally occurring, bio-identical IGF-1 is also found in milk, meat, fish, whey protein, and in every human body, (4) neither Nix nor DNA ever sold any extracts or compounds derived from elk or deer antlers to any MLB players, and (5) extracts from elk or deer antlers are not considered illegal by the U.S. Drug Enforcement Agency ("DEA") nor are these banned by the World Anti-Doping Agency ("WADA"). *Id.* ¶ 20-21.

On December 26, 2017, Plaintiffs demanded that Defendants AP and ESPN print a retraction of the article, but they refused because "IGF-1 appears at entry number 68 on MLB's 'Prohibitive Substance List'." *Id.* ¶ 31. In addition, MLB confirmed to Defendant AP that "all natural and bioidentical versions of any prohibited substances — including but not limited to IGF-1 — are considered banned." *Id.*

Plaintiffs allege that Defendants' statement has damaged Plaintiffs' reputations for integrity and honesty. *Id.* ¶ 23. They also allege damages in the form of past, present, and future losses of business contracts, income, profits, market value, opportunities, and relationships. *Id.* ¶ 42. Plaintiff Nix also **[\*5]** alleges damages in the form of mental anguish, humiliation, and emotional distress. *Id.* ¶ 43.

Based on these allegations, Plaintiffs bring three claims against Defendants: (1) Defamation; (2) Intentional Infliction of Emotional Distress; and (3) Temporary and Permanent Injunction to remove and/or retract the article.


## LEGAL STANDARD

To state a claim, Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." While the Court must consider the allegations contained in the plaintiff's complaint as true, this rule "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). In addition, the complaint's allegations must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (*citing Twombly*, 550 U.S. at 555).

In practice, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference **[\*6]** that the defendant is liable for the misconduct alleged. *Id.* The plausibility standard requires more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *Id.* Determining whether a complaint states a plausible claim for relief is a context-specific undertaking that requires the court to draw upon its judicial experience and common sense. *Id.* at 679.

## ANALYSIS

All Defendants move to dismiss the defamation claim for the following reasons: (1) it is barred by the statute of limitations; (2) it is barred by the fair report privilege; and (3) Plaintiffs cannot establish fault. Defendants move to dismiss the intentional infliction of emotional distress claim because it violates Florida's single cause of action rule and is not based on outrageous conduct. Lastly, they move to dismiss the request for injunctive relief because it constitutes an unconstitutional prior restraint. Defendants ESPN and USA Today additionally assert the "wire service defense" in their motion to dismiss. D.E. 11.


## I. Defamation


## A. Choice of [*7] Law

Defendant AP argues that New York law should apply to its affirmative defenses to defamation. D.E. 10. Defendants ESPN and USA Today incorporate the arguments made in AP's motion to dismiss, and therefore agree that New York law should apply. D.E. 11.

The Court is required to conduct a choice-of-law analysis where there is a true conflict between the laws of the states with an interest in the case. A true conflict exists when "two or more states have a legitimate interest in a particular set of facts in litigation and the laws of those states differ or would produce a different result." *Pycsa Panama, S.A. v. Tensar Earth Techs., Inc.*, 625 F. Supp. 2d 1198, 1219 (S.D. Fla. 2008), aff'd, 329 Fed. Appx. 257 (11th Cir. 2009). A false conflict, by contrast, exists "'when the potentially applicable laws do not differ.'" *Fioretti v. Massachusetts Gen. Life Ins. Co.*, 53 F.3d 1228, 1234 n. 20 (11th Cir. 1995) (quoting Restatement (Second) of Conflict of Laws § 1 cmt. b (1971)).

As to the statute of limitations defense, there is a conflict. New York's statute of limitations is one year, while Florida's is two years. (NY CPLR 215(3)) (FLA STAT 95.11(4)(g)). The alleged defamation in this case occurred on July 14, 2016, when Defendants published the articles. D.E. 1-2 ¶ 18. Plaintiffs filed their complaint on March 13, 2018. D.E. 1-2. If New York law governs, Plaintiffs' defamation claim is time-barred as it was filed eight months after the statute of limitations elapsed. However, if Florida [*8] law governs, Plaintiffs' defamation claim is permitted, as it was filed four months before the statute of limitations elapsed. Accordingly, the Court must conduct a choice-of-law analysis for the second affirmative defense.

There is also a conflict with respect to the fair report privilege. In Florida, the privilege is qualified; in New York, it is absolute. *Compare Woodard*, 616 So. 2d at 502, *with Cholowsky v. Civiletti*, 69 A.D.3d 110, 114, 887 N.Y.S.2d 592 (N.Y. App. 2009). Accordingly, if New York law applies, the privilege may serve as a basis to dismiss the complaint at the pleading stage. *See, e.g., Adelson v. Harris*, 973 F. Supp. 2d 467 (S.D.N.Y. 2013), aff'd, 876 F.3d 413 (2d Cir. 2017).

There is no conflict, however, as to the wire service defense. Both Florida and New York afford a special protection for those who re-publish news reports from reliable news sources. *See Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 238 (Fla. 1933); *Rakofsky v. Washington Post*, 39 Misc. 3d 1226[A], 971 N.Y.S.2d 74, 2013 NY Slip Op 50739[U] [Sup. Ct. 2013] (citing *Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 550, 416 N.E.2d 557, 435 N.Y.S.2d 556 (1980)). The privilege is substantially identical in both jurisdictions, and so there is no conflict.

A federal court sitting in diversity must apply the conflict-of-laws rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941). As a preliminary matter, the court must characterize the legal issue before it and determine whether it sounds in tort, contract, property law, etc. *Acme Circus Operating Co., Inc. v. Kuperstock*, 711 F.2d 1538, 1540 (11th Cir.1983). Once it has done so, the court determines the choice of law rule that the forum state applies to that type of issue. *Id.*

Here, the issues before [*9] the court are the applicability of two affirmative defense to defamation; these issues, therefore, arise in tort. With respect to issues in tort, Florida applies the "most significant relationship" test outlined in the Restatement (Second) of Conflict of Laws section 145. *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007) (citing *Bishop v. Florida Specialty Paint Co.*, 389 So.2d 999, 1001 (Fla. 1980)). This test is applied "not to the collective sum of issues in dispute, but to each individual issue which arises in the case." *Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1578 (11th Cir. 1990). "Thus the law of a foreign state may control one issue while the law of Florida controls another." *Id.* Section 145 provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative [*10] importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145 (1971).

#### 1. The Place Where The Injury Occurred

Plaintiffs' generally allege injuries both in New York, Florida, and more broadly in the "business community." D.E. 1-2 ¶ 23, 39. However, Plaintiffs' only specific injuries occurred in New York. They allege that the article was used against them in connection with a business agreement which, but for the alleged defamation, would have allowed Plaintiffs to expand their sports centers to three locations in Manhattan. D.E. 1-2 ¶ 29. Plaintiffs cite no specific instances of harm within Florida. Additionally, in the usual case of multistate defamation, there is "little reason in logic or persuasiveness to say that one state rather than another is the place of injury . . . ." Restatement (Second) of Conflicts of Laws § 145 cmt. 3 (1971). Here, the articles were published online and therefore accessible anywhere in the world. D.E. 1-2 ¶ 18. Accordingly, this factor weighs somewhat in favor of applying New York law because an identifiable injury occurred there.

#### 2. The Place Where the Conduct Occurred

As with the previous factor, the place where the conduct occurred is of "less significance" in cases of multistate defamation. Restatement § 145 cmt. e. Here, the articles were **[*11]** published online and therefore were viewable anywhere. Nevertheless, this factor weighs somewhat in favor of applying New York law because the decision to publish the original article was made by Defendant AP in New York. D.E. 10 at 9.

#### 3. The Location of the Parties

This factor is of neutral weight because all parties are from different locations. Defendant AP is a New York corporation. D.E. 1-2 ¶ 3. Defendant ESPN is a Connecticut corporation. D.E. 1-2 ¶ 2. And Defendant USA Today is a Delaware corporation. D.E. 1-2 ¶ 4. Plaintiffs do not state their respective domiciles in the complaint. 1 ⬇

#### 4. The Place Where the Parties' Relationship is Centered

This factor is also of neutral weight. The parties do not allege any relationship to one another besides the alleged defamation.

#### 5. Other Considerations

As this Court discussed at length in *Gubarev, et al. v. BuzzFeed, Inc., et al.*, affirmative defenses to defamation exist to protect speakers, not to provide Plaintiffs a remedy. *See generally, Alexksej Gubarev, et al. v. BuzzFeed, Inc., et al.*, Case No. 1:17-cv-60426-UU, ECF No. 171. New York, therefore, has a stronger interest in determining the applicability of affirmative defenses where, as **[*12]** here, the decision to publish was made in New York. *See id.*

In sum, the Restatement factors weigh in favor of applying New York law, and so the Court will apply New York law to determine whether Plaintiffs' defamation claim is barred by the statute of limitations and the fair report privilege.

#### B. **Application of the Affirmative Defenses to the Defamation Claim**.

#### 1. Statute of Limitations

New York's statute of limitations for defamation claims is one year. (NY CPLR 215(3)). The statute of limitations begins to run "from the date of the first publication of the defamatory statement." *Boda v. Phelan*, 2012 U.S. Dist. LEXIS 110304, 2012 WL 3241213 at *2 (E.D.N.Y. Aug. 6, 2012). Defendants published the statement at issue on July 14, 2016. D.E. 1-2 ¶ 18. Plaintiffs filed their complaint on March 13, 2018. D.E. 1-2. Plaintiff's claim is therefore time-barred, as it was filed eight months after the statute of limitations elapsed. Accordingly, Plaintiffs' defamation claim must be dismissed.

#### 2. Fair Report Privilege

The fair report privilege is codified in New York Civil Rights Law section 74, which reads:

> A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report **[*13]** which is a fair and true headnote of the statement published.

This section does not apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof.

The purpose of this statute is to protect reports of proceedings which are "made in the public interest." *Williams v. Williams*, 23 N.Y.2d 592, 599, 246 N.E.2d 333, 298 N.Y.S.2d 473 (N.Y. 1969). The press acts as the agent of the public, gathering and compiling diffuse information in the public domain. The press also provides the public with the information it needs to exercise oversight of the government, and with information concerning the public welfare. The fair report privilege exists to protect the press as it carries out these functions. *See, e.g., Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 714 (4th Cir. 1991) (holding that the privilege exists so that the press is not punished for serving its basic function).

Where, as here, the parties have submitted the allegedly defamatory materials to the Court, the Court "may determine as a matter of law whether allegedly defamatory publications are 'fair and true' reports of official proceedings.'" *Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 457 (E.D.N.Y. 2013) (quoting *Fine v. ESPN, Inc.*, No. 12-CV-0836, 2013 U.S. Dist. LEXIS 17729, 2013 WL 528468, at *3 (N.D.N.Y. Feb. 11, 2013)). And in making this determination, "the language used [in the report] should not be dissected **[*14]** and analyzed with a lexicographer's precision." *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 68, 399 N.E.2d 1185, 424 N.Y.S.2d 165 (1979).

Here, the allegedly defamatory statement reads: "The suit admits Nix and his company used bioidentical insulin like growth factor (IGF-1), which is derived from elk antlers and is on baseball's list of banned substances." D.E. 1-2 ¶ 18. The suit referred to in this statement is Plaintiff's tortious interference suit filed in the Southern District of New York on July 13, 2016. *Id.* Plaintiff's complaint in that suit alleged, "[o]ne of the main ingredients used by Nix and DNA Sports Lab come [sic] from Bio-identical Insulin like Growth Factor ("IGF-1"), which is derived from elk antlers." D.E. 10-4 ¶ 40. Major League Baseball's list of banned substances, effective July 1, 2015, includes "Insulin-like Growth Factor (IGF-1), including all isomers of IGF-1 sometimes referred to as Mechano Growth Factors," as number 68 on the list of prohibited performance enhancing substances. D.E. 10-5. 2± Based on these two statements, the reported statement at issue is substantially correct, and therefore falls within the protection of the fair report privilege.

3. Wire Service Defense

Both Florida and New York courts recognize that "a republisher may rely on **[*15]** the research of the original publisher, 'absent a showing that the republisher had, or should have had, substantial reasons to question the accuracy of the articles or the *bona fides* of the reporter.'" *See Rakofsky*, 39 Misc. 3d 1226(A), 971 N.Y.S.2d 74 (quoting *Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 550, 416 N.E.2d 557, 435 N.Y.S.2d 556 (1980)); *See Layne*, 146 So. at 238 (articulating the privilege in substantially the same fashion). In *Rakofsky*, the defendants republished direct quotes or summarized the content of a Washington Post article. *Id.* The Court held that the defendants were protected by the wire service defense because the Washington Post was "a reputable news agency" and its article was substantially accurate. *Id.* So too here. The Associated Press is a reputable news agency, and its article was a substantially accurate summary of judicial proceedings. Accordingly, under either New York or Florida law, Plaintiffs' claims against the republishers, ESPN, Inc. and USA Today, are barred by the wire service defense. *See id.* ("To the extent that defendants republished content from The Washington Post Articles, plaintiffs' claims for defamation are barred by the "republication" exception."); *Layne*, 146 So. at 239 ("No newspaper could afford to warrant the absolute authenticity of every item of its news, nor assume in advance the burden of specially verifying every item of news **[*16]** reported to it by established news gathering agencies, and continue to discharge with efficiency and promptness the demands of modern necessity for prompt publication, if publication is to be had at all.").

4. Defamation by Implication

More importantly, however, the reports—by Plaintiffs' own admission—are true; in his complaint in the Southern District of New York, Nix did admit to selling IGF-1. D.E. 1-2 ¶ 22. Plaintiffs attempts to plead around this problem by asserting that the articles are defamatory because they *imply* that Plaintiffs sold an illegal substance by not specifying that Plaintiff sold natural, not synthetic, IGF-1. D.E. 1-2 ¶¶ 23, 37. Whether a defendant's statement constitutes defamation by implication is a matter of law for the court to decide. *Turner v. Wells*, 879 F.3d 1254, 1269 (11th Cir. 2018) (affirming dismissal at the motion to dismiss stage because the challenged statements were substantially true, even though the plaintiff challenged the implications to be drawn from them). Additionally, a statement does not become defamatory if it omits facts unless the omission renders the report untrue. *Id.* And lastly, courts afford news media defendants wide editorial discretion. *Id.* ("[W]e hold that this argument fails **[*17]** in deference to the Defendants' editorial discretion in what to publish in their Report.") (citing *Perk v. Reader's Digest Ass'n*, 931 F.2d 408, 412 (6th Cir. 1991) (" [Publishers] have no legal obligation to present a balanced view of what led up to [the publicized event].")); *Janklow v. Newsweek, Inc.*, 759 F.2d 644, 648 (8th Cir. 1985) (holding Newsweek was not liable for omission of additional facts where the omission did not make what was published untrue)).

Here, Plaintiffs allege that the articles imply that Nix and DNA sold illegal drugs because they do not specify whether Plaintiffs sold synthetic or natural IGF-1. D.E. 1-2 ¶ 23. But as in *Turner* and *Janklow*, this omission does not render the report untrue. Nix admitted to selling IGF-1, and it was a banned substance. *Id.* ¶ 22. Additionally, the decision to omit the words "natural" or "synthetic" from the articles was an editorial decision that the Court may not disturb. *See Turner*, 879 F.3d at 1270 (deferring to the media defendants' editorial discretion because "the law of defamation is concerned with whether a publisher reports a story truthfully, not generously.") (emphasis in original) (internal quotations omitted).

402

For these reasons Plaintiffs' defamation claim must be dismissed with prejudice. *See Id. at 1274*.

## II. Intentional Infliction of Emotional Distress & Injunctive Relief

 **[*18]** Defendants move to dismiss Plaintiffs' intentional infliction of emotion distress claim on the grounds that Florida's single cause of action rule bars it. They move to dismiss Plaintiffs' claim for injunctive relief on the grounds that it is an unconstitutional prior restraint. Plaintiffs do not respond to these arguments and so concede them. *See, e.g., Anderson v. Branch Banking & Tr. Co., 119 F. Supp. 3d 1328, 1345 (S.D. Fla. 2015); Slugocki v. U.S. By & Through Dep't of Labor, Office of Workers' Comp. Programs, Div. of Fed. Employees' Comp., 988 F.Supp. 1443, 1447 (S.D.Fla. 1997); Hudson v. Norfolk S. Ry. Co., 209 F.Supp.2d 1301, 1324 (N.D.Ga.2001),* (citing *Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir.1995)* ("When a party fails to respond to an argument or otherwise address a claim [in a response to a motion to dismiss], the Court deems such claim or claim abandoned.")).

## CONCLUSION

For the reasons set forth above, it is hereby

ORDERED AND ADJUDGED that Defendants' Motions to Dismiss Plaintiff's Complaint (D.E. 10 & D.E. 11) are GRANTED. The complaint is DISMISSED WITH PREJUDICE. It is further

ORDERED AND ADJUDGED that the case is CLOSED for administrative purposes. All hearings are CANCELLED; all other motions DENIED AS MOOT.

DONE AND ORDERED in Chambers, Miami, Florida, this 30th day of August, 2018.

/s/ Ursula Ungaro ▾

URSULA UNGARO ▾

UNITED STATES DISTRICT JUDGE

---

**Footnotes**

**1**⇧     In an affidavit attached to Plaintiffs' response in opposition to Defendants' motion to dismiss, Plaintiff states that he has been domiciled in Florida at all relevant times including July 14, 2016. D.E. 17-1. As an initial matter, it is well established that a plaintiff cannot amend his complaint through a response to a motion to dismiss. *Burgess v. Religious Technology Center, Inc., 600 Fed. Appx. 657, 665 (11th Cir. 2015)*. But second, the Court is concerned that Plaintiff is being untruthful either to this Court or to the Southern District of New York, because in the complaint Plaintiff filed in the Southern District of New York, he alleges domicile in Texas. *See* D.E. 10-4. Regardless, even if Plaintiff was a resident of Florida, this factor would not outweigh the others.

**2**⇧     The Court may take judicial notice of this document because it is central to Plaintiffs' claims, and Plaintiffs do not dispute its accuracy. *Horsley v. Feldt, 304 F.3d 1125, 1134 (11th Cir.2002)*



About          Cookie Policy          RELX ™

Privacy Policy          Terms & Conditions          Copyright © 2023 LexisNexis.

Peerenboom v. Perlmutter, 2017 Fla. LEXIS 14957

Search: Everything

Document:  Peerenboom v. Perlmutter, 2017 Fla. Cir. LEXIS 14957   Actions

**(A) Peerenboom v. Perlmutter, 2017 Fla. Cir. LEXIS 14957**

Copy Citation

Circuit Court of the Fifteenth Judicial Circuit of Florida, Palm Beach County

January 23, 2017, Decided

CASE NO.: 2013-CA-015257

**Reporter**

2017 Fla. Cir. LEXIS 14957 *

HAROLD PEERENBOOM, Plaintiff, v. ISAAC ("IKE") PERLMUTTER, LAURA PERLMUTTER, and JOHN/JANE DOES 1 TO 10, Defendants.ISAAC PERLMUTTER, and LAURA PERLMUTTER, Counterclaim Plaintiffs, vs. HAROLD PEERENBOOM, WILLIAM DOUBERLEY, CHUBB & SON, a division of FEDERAL INSURANCE COMPANY, JULIE HOWENSTINE, and SPECKIN FORENSICS, LLC, d/b/a SPECKIN FORENSIC LABORATORIES, Counterclaim Defendants.

**Subsequent History:** Summary judgment granted by, Dismissed by _Peerenboom v. Perlmutter, 2021 Fla. Cir. LEXIS 10939 (Fla. Cir. Ct., Sept. 27, 2021)_

## Core Terms

Counterclaim, genetic, cause of action, conversion, motion to dismiss, pleaded, defamation, allegations, conspiracy, intrusion, spoliation, genetic material, deposition, private facts, theft, inappropriate, campaign, lawsuit, personal jurisdiction, abuse of process, proper pleading, third-party, defamatory, implicate, civil conspiracy, property right, collection, purposes, Counts, invasion of privacy

**Judges:** [*1] MEENU SASSER ▾, CIRCUIT JUDGE.

**Opinion by:** MEENU SASSER ▾

## Opinion

**ORDER GRANTING IN PART AND DENYING IN PART THE COUNTER-DEFENDANTS' MOTIONS TO DISMISS THE COUNTERCLAIM AND DISMISSING THE COUNTERCLAIM IN PART**

**THIS MATTER** came before the Court on Plaintiff's Motion to Dismiss Counterclaim; Counter-Defendant William Douberley, Esq.'s Motion to Dismiss Counterclaim; Chubb & Son, a Division of Federal Insurance Company's Motion to Dismiss with Prejudice the Counterclaim Filed by Isaac ("Ike") Permutter and Laura Perlmutter, all filed on September 16, 2016; and Speckin Forensics LLC's Motion to Dismiss Third Party Complaint filed on September 30, 2016 (collectively "motions to dismiss"). The Court has carefully considered the motions to dismiss, the Counterclaim, Counter-Plaintiffs Isaac and Laura Perlmutter's ("the Perlmutters") Response in Opposition to the Motions to Dismiss filed by Counterclaim Defendants, Counter-Defendant Chubb & Son's ("Federal") [1⬇] Reply, the argument of counsel, the court file and relevant case law, and is otherwise fully advised in the premises.

**FACUTAL AND PROCEDURAL BACKGROUND** [2⬇]

Counter-Defendant Harold Peerenboom ("Peerenboom") sued the Perlmutters in October, 2013, for [*2] claims arising out of arising out of an alleged hate-mail campaign against Peerenboom and others. Counter-Defendant William Douberley ("Douberley") is an attorney employed by Counter-Defendant Federal, who previously represented Peerenboom in the matter of _Kaye-Dee Donnelly and Karen Donnelly v. Monique Matheson, et. al._, case number 50-2011CA006192 ("_Kay-Dee Sportswear_" litigation). The _Kay-Dee Sportswear_ litigation involved a dispute separate and apart from the present litigation.

Peerenboom had been the subject of an extensive hate-mail campaign during the time of the _Kay-Dee Sportswear_ litigation and had identified

the Perlmutters as potential culprits. In an attempt to implicate the Perlmutters in this scheme, Peerenboom enlisted the help of the Counter-Defendants to collect the Perlmutters' DNA to have it tested and compared with the hate mail at issue. Peerenboom saw the *Kay-Dee Sportswear* litigation—a lawsuit through which the Perlmutters had tangential involvement—as an opportunity to surreptitiously collect the Perlmutters' DNA.

Peerenboom, through his attorney Douberley, issued a subpoenas *duces tecum* for the deposition of the Perlmutters in the *Kay-Dee Sportswear* litigation. **[*3]** A deposition was held on February 27, 2013. The Counterclaim states that this entire deposition was, in actuality, a ruse created by the Counter-Defendants who were conspiring together to collect the Perlmutters' DNA. At the deposition, the Perlmutters handled certain documents that were provided by a representative of Counter-Defendant Speckin Forensic Laboratories, LLC ("Speckin"). These documents were made of a material that was able to capture the Perlmutters' genetic material after they were handled. Peerenboom, Douberley, and Speckin's representative retained these documents after the deposition. Peerenboom, Douberley, and Speckin's representative also collected plastic water bottles and a bottle cap left at the deposition by the Perlmutters.

After collecting the items from the deposition, the Counter-Defendants attempted to implicate the Perlmutters in the hate-mail campaign through testing the items for DNA to compare with the hate mail. The items in question were sent to several different testing facilities. The results of these tests, though, exculpated the Perlmutters from involvement in the campaign against Peerenboom. The Counterclaim explains that despite these exculpatory **[*4]** results, Speckin (including its employee, Counter-Defendant Julie Howenstine ("Howenstine")) reinterpreted and distorted the results of these reports to cast a negative light on the Perlmutters. Speckin also issued a report that relied on only one of numerous tests that concluded the Perlmutters could not be excluded as potential perpetrators of the letter campaign. The Counterclaim states that the reports and analyses conducted by and released through Speckin are false and misleading. The Counterclaim states Peerenboom disseminated these reports to others, including law enforcement officials, prosecutors, and the press. The Counterclaim also states that the Counter-Defendants intentionally withheld and otherwise destroyed evidence of the DNA collection scheme in an attempt to conceal it from the courts.

On July 12, 2016, the Perlmutters filed the instant Counterclaim. In it, they accuse all Counter-Defendants of being involved in a civil conspiracy to steal the Perlmutters' genetic information in order to implicate them in the hate-mail campaign against Peerenboom. Specifically, the Perlmutters seek relief for eight counts: Count I: Conversion as to all Counter-Defendants; Count Civil **[*5]** Remedy for Theft as to all Counter-Defendants; Count III: Abuse of Process as to Peerenboom, Douberley, and Federal; Count IV: Defamation as to all Counter-Defendants; Count V: Intentional Infliction of Emotional Distress as to all Counter-Defendants; Count VI: Invasion of Privacy — Intrusion and Publication of Private Facts as to all Counter-Defendants; Count VII: Third-Party Spoliation as to Douberley, Federal, Howenstine, and Speckin; and (h) Count VIII: Civil Conspiracy as to all Counter-Defendants. The motions to dismiss followed.

**LEGAL ANALYSIS AND RULINGS**

The Counter-Defendants all seek dismissal of the Counterclaim. The question to be answered on a motion to dismiss is "whether, assuming all the allegations in the complaint to be true, the plaintiff would be entitled to the relief requested." *Cintron v. Osmose Wood Preserving, Inc.*, 681 So. 2d 859, 860-61 (Fla. 5th DCA 1996). In conducting this analysis, all reasonable inferences must be drawn in favor of the non-movant. *Republic Servs. of Fla. v. Workers Temporary Staffing, Inc.*, 123 So. 3d 650, 653 (Fla. 4th DCA 2013). "[I]f the analysis of a claim is factually intensive, it is better addressed on a summary judgment motion, or at trial, but certainly not on a motion to dismiss." *Chodorow v. Porta Vita, Ltd.*, 954 So. 2d 1240, 1242 (Fla. 3d DCA 2007).

The motions to dismiss seek dismissal of the Counterclaim's eight counts based on failures to state causes of action. Counter-Defendants **[*6]** also seek to dismiss the Counterclaim premised on several procedural arguments. The Court addresses the procedural issues first before exploring each of the Counterclaim's individual counts.

**A. The Proper Pleading of the Counterclaim and Personal Jurisdiction**

Before proceeding to the Counterclaim's merits, the Court first addresses two arguments raised by the Counter-Defendants: (1) that the Counterclaim is actually a third-party complaint and whether that requires its dismissal and (2) that the Court lacks personal jurisdiction over Counter-Defendant Howenstine. **3⚖** For the reasons set forth below, the Court rejects the first argument and finds merit in the second.

1. The Counterclaim is properly pleaded as a counterclaim and not a third-party complaint and dismissal as to Federal on that basis is inappropriate.

Federal asserts that the Perlmutters' case against them cannot proceed because it is not a plaintiff in Peerenboom's lawsuit against the Perlmutters. According to Federal, this means that the case must be dismissed and that, if anything, the action can only be pleaded as a third-party complaint. Federal's argument is counter to Florida Rule of Civil Procedure 1.170(h), which states in relevant part that "[w]hen the **[*7]** presence of parties other than those to the original action is required to grant complete relief in the determination of a counterclaim . . . they shall be named in the counterclaim . . . and be served with process and shall be parties to the action thereafter . . . ." Plainly Federal's status as a non-party to Peerenboom's lawsuit is not, in and of itself, grounds for dismissal of the Counterclaim. Federal disputes this conclusion by arguing that Peerenboom's lawsuit against the Perlmutters is "unrelated to the original action." (Federal Reply 4.) To the contrary, a counterclaim is compulsory, thereby triggering Rule 1.170(h), when "it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . ." Fla. R. Civ. P. 1.170(a). Peerenboom's lawsuit against the Perlmutters is premised on an alleged hate-mail campaign orchestrated by the Perlmutters. (*See generally* Fourth Am. Compl.) The Counterclaim arises out of that same transaction, as the Perlmutters argue the Counter-Defendants have committed tortious acts in attempting to implicate the Perlmutters in that same alleged campaign. The Court rejects Federal's arguments on this point. **4⚖**

2. The counts against Howenstine are dismissed **[*8]** for lack of personal jurisdiction.

Howenstine argues dismissal is proper because this Court lacks personal jurisdiction to resolve the Perlmutters' claims against her. In an affidavit filed with her motion to dismiss, Howenstine states that she is an employee for Speckin in their East Lansing, Michigan office and has lived in Michigan since 1967. (Speckin Mot. Ex. 1.) Howenstine states that she has never lived in Florida, never conducted any business in Florida, and has only traveled to Florida for business reasons twice in the last three years. (*Id.*) Howenstine states that she did not attend the *Kay-Dee Sportswear* deposition at issue in the Counterclaim and has not attended any proceedings of any kind regarding the Perlmutters' suit. **5** (*Id.*)

In *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989), the Supreme Court of Florida set forth a two-step inquiry for determining whether a Florida court has personal jurisdiction over a non-resident defendant. First, the court must determine whether the plaintiff has alleged sufficient jurisdictional facts to bring the action within the ambit of Florida's long-arm statute, section 48.193, Florida Statutes. *Id.* If so, the court must then inquire into whether the non-resident defendant possesses sufficient minimum contacts with Florida **[*9]** to satisfy constitutional due process requirements. *Id.* "Both parts must be satisfied for a court to exercise personal jurisdiction over a non-resident defendant." *Am. Fin. Trading Corp. v. Bauer*, 828 So. 2d 1071, 1074 (Fla. 4th DCA 2002). "The inquiry under the statutory prong of *Venetian Salami* is not whether the tort actually occurred, but whether the tort, as alleged, occurred in Florida." *NHB Advisors, Inc. v. Czyzyk*, 95 So. 3d 444, 448 (Fla. 4th DCA 2012). The operative question in determining whether the tort as alleged occurred in Florida is whether "the nonresident defendant 'committed *a substantial aspect* of the alleged tort in Florida.'" *Id.* (quoting *Watts v. Haun*, 393 So. 2d 54, 56 (Fla. 2d DCA 1981)) (emphasis added).

The Court finds the Perlmutters have not satisfied the *Venetian Salami* test in pleading that this Court has personal jurisdiction over Howenstine. The Counterclaim asserts that Howenstine was a co-conspirator with the other Counter-Defendants, but at no point is Howenstine's specific role made clear. Instead, as pleaded, it appears that all of Howenstine's actions are imputed onto actions by Speckin. By way of example, paragraphs 82 through 86 discuss the perpetrator of the purportedly defamatory reports as "Speckin (including Howenstine)." It is not sufficient in this instance to plead that Howenstine merely worked for Speckin or otherwise had a **[*10]** general role in the conspiracy alleged in the Counterclaim. Instead, the Perlmutters are required to detail the "specific aspect" of the conspiracy in Florida Howenstine committed. *See NHB Advisors, Inc.*, 95 So. 3d at 448. Absent this detail, the Court lacks personal jurisdiction over Howenstine and so the Counterclaim must be dismissed as to her.

The Perlmutters' counterarguments on this point must be rejected. The Perlmutters assert the fact that they have successfully stated a cause of action for conspiracy among some of the Counter-Defendants alone is sufficient to bring Howenstine under the Court's jurisdiction. This argument is mistaken. It is true that "if a plaintiff has successfully alleged a cause of action for conspiracy among the defendants to commit tortious acts toward the plaintiff . . . then all of the conspirators are subject to the jurisdiction of Florida . . ." *NHB Advisors, Inc.*, 95 So. 3d at 448. But "a court will decline to apply the co-conspirator theory to extend jurisdiction over nonresident if the plaintiff fails to plead with specificity any facts supporting the existence of the conspiracy and provides nothing more than vague and conclusory allegations regarding a conspiracy involving the defendants." *Id.* As explained in detail **[*11]** below, the Perlmutters have stated a cause of action for civil conspiracy as to Peerenboom, Douberley, Federal, and Speckin. But the Perlmutters' allegations as to the Howenstine are conclusory and lacking in detail as to her role in the purported scheme to steal the Perlmutters' genetic information. This lack of detail precludes application of the co-conspirator theory and so the Perlmutters' argument must be rejected. Because the Court finds that the Counterclaim fails to sufficiently plead personal jurisdiction over Howenstine, the Counterclaim as it relates to her is dismissed.

Aside from these procedural objections, the Counter-Defendants all argue the Perlmutters' Counterclaim must be dismissed in its entirety. The Court addresses the propriety of dismissing the Counterclaim by discussing each count in turn below.

**B. Count I - Conversion**

The Counter-Defendants first seeks dismissal of the Perlmutters' count for conversion. A properly pleaded cause of action for conversion alleges "the exercise of wrongful dominion or control over property to the detriment of the rights of the actual owner." *DePrince v. Starboard Cruise Servs., Inc.*, 163 So. 3d 586, 597 (Fla. 3d DCA 2015). A plaintiff must plead "facts sufficient to show ownership of the subject property and **[*12]** facts that the other party wrongfully asserted dominion over that property." *Edwards v. Landsman*, 51 So. 3d 1208, 1213 (Fla. 4th DCA 2011).

The Perlmutters' conversion claim asserts the Counter-Defendants asserted wrongful dominion "of the genetic information encoded in [the Perlmutters'] genetic material" when they participated in the conspiracy to collect the Perlmutters' DNA at the *Key-Dee Sportswear* deposition. (Countercl. ¶¶ 115-20.) The Counter-Defendants seeks dismissal of this cause of action because they claim the collection of DNA, by law, cannot constitute conversion. The Counter-Defendants also argue that even if there is a property right in genetic information, the count must be dismissed for failure to allege demand. Finally, Counter-Defendant Douberley argues there are insufficient facts to state a cause of action for conversion against him.

1. A property right exists in the Perlmutters' genetic information.

Implicit in the Counter-Defendants' argument against the Perlmutters' conversion count is the question of whether genetic information such as DNA constitutes "property" for purposes of common law conversion. No binding authority has definitively answered this question and so the Court must rely on persuasive authority to resolve **[*13]** the issue. In *In re Corbin's Estate*, the Third District Court of Appeal observed that a cause of action for conversion can lie where there is a wrongful taking of "intangible interests;" in that case, interests in a business venture. 391 So. 2d 731, 732 (Fla. 3d DCA 1980). In coming to this conclusion, the Third District noted that though conversion is typically limited to cases involving tangible chattel, there may be situations where such a limitation is inappropriate. *Id.* at 732 n. 1. The *Corbin's Estate* court found such a situation exists when the defendant "has dispossessed the [plaintiff] of a bundle of rights not immediately reducible to tangible form, and has done so in such fashion that restitution may well be an inadequate remedy . ." *Id.*

Courts throughout the country have observed the important privacy interest one has in his or her genetic information. *See, e.g., Norman-*

_Bloodsaw v. Lawrence Berkley Lab._, 135 F.3d 1260, 1269 (9th Cir. 1998) ("One can think of few subject areas more personal and more likely to implicate privacy interests than that of one's . . . genetic make-up."); _United States v. Davis_, 657 F. Supp. 2d 630, 649-50 (D. Md. 2009) (observing difference between genetic material and genetic information when concluding criminal defendant retained a privacy interest in his DNA). Though examined with less frequency than in the context of privacy, courts **[\*14]** have also observed that a property right exists in genetic information. _See, e.g._, _Midwest Oilseeds, Inc. v. Limagrain Genetics Corp._, 231 F. Supp. 2d 942, 953-54 (S.D. Iowa 2002) ("Genetic information can be property, and, therefore, can form the basis for a common law conversion claim."). _But see Greenberg v. Miami Children's Hosp. Research Inst., Inc._, 264 F. Supp. 2d 1064, 1075 (S.D. Fla. 2003) (rejecting argument that a property right exists in genetic information).

In light of the above, the Court finds a property right exists in the Perlmutters' genetic information thereby rendering dismissal inappropriate. The Perlmutters plainly retain important intangible rights to their genetic information. The authority discussed above makes this clear—at the very least, one possesses important privacy interests in such information. The wrongful dominion of this interest is an intrusion that would not necessarily be remedied adequately by restitution. As _Corbin's Estate_ did with business interests, the Court finds an extension of conversion's definition of property to one's intangible rights in his or her genetic information is therefore appropriate. As noted earlier, this conclusion is not novel. _See Midwest Oilseeds_, 231 F. Supp. 2d at 953-54. Further, Florida law itself already recognizes a property right in one's DNA in limited circumstances. _See_ § 760.40(2)(a), Fla. Stat. (stating the results of a DNA test, "whether held by a public or private **[\*15]** entity, are exclusive property of the person tested"). **6⬇** While the Court recognizes section 760.40(2)(a) deals with civil rights and disclosure of DNA test results—not conversion—the Court finds it significant that the legislature has recognized _some_ property right exists in genetic information. This result is consistent with Florida courts' acceptance of conversion for other intangible pieces of "property." _See, e.g._, _Warshall v. Price_, 629 So. 2d 903, 905 (Fla. 4th DCA 1993) (finding property right sufficient to state a cause of action for conversion in copy of patient list where original remained on computer). In sum, the Perlmutters retained a property interest in their genetic information for purposes of a common law action for conversion.

The Counter-Defendants' arguments against this result must be rejected. As a threshold matter, Counter-Defendants rely on cases regarding genetic _materials_ for the proposition that the Perlmutters lack a property interest in their genetic _information. See, e.g._, _Moore v. Regents of Univ. of Cal._, 51 Cal. 3d 120, 271 Cal. Rptr. 146, 793 P.2d 479 (Cal. 1990) (finding genetic material is not "property" for purposes of conversion). These cases are inapplicable to the question of whether genetic _information_ constitutes property for purposes of conversion. Counter-Defendants also ask the Court to apply the holding of _Greenberg **[\*16]**_, which specifically determined no property right exists in genetic information for purposes of conversion. 264 F. Supp. 2d at 1076. _Greenberg_, though, involved the cases interpreting the conversion of genetic materials, not genetic information—a significant distinction. _Id._ at 1075. _Greenberg_ is also factually distinct from the one at bar in that there, the plaintiffs voluntarily provided tissue to a researcher to find a cure for Canavan disease and sued when the researcher commercialized its findings for profit against plaintiffs' wishes. _Id._ at 1066. These facts factored in the _Greenberg_ court's decision, as in distinguishing contrary case law, the court noted the cases "d[id] not involve voluntary donations to medical research." _Id._ at 1075. As _Greenberg_ is not binding authority and is distinguishable from this case, the Court declines to follow its reasoning and rejects the Counter-Defendants' arguments otherwise. **7⬇**

2. <u>Demand for return of the genetic information is unnecessary to state a cause of action for conversion in this case.</u>

The Counter-Defendants argue that even if genetic information is property for purposes of conversion, the count must be dismissed for failure to allege any demand was made for the return of the genetic **[\*17]** information. In support, Counter-Defendants rely on _Ginsberg v. Lennar Fla. Holdings, Inc._, 645 So. 2d 490, 500 (Fla. 3d DCA 1994), for the proposition that failure to allege a demand for the return of converted property was made is fatal to a cause of action for conversion. While this general proposition is true, "demand and refusal are unnecessary where the act complained of amounts to a conversion regardless of whether a demand is made." _Columbia Bank v. Turbeville_, 143 So. 3d 964, 969 (Fla. 1st DCA 2014) (quoting _Mayo v. Allen_, 973 So. 2d 1257, 1259 (Fla. 1st DCA 2008)). As pleaded in this case, the Counter-Defendants' actions would be conversion even if the Perlmutters demanded the return of their genetic information—the Counter-Defendants have exerted wrongful dominion over the Perlmutters' DNA and have done so to their detriment through the purported defamatory reports and through implying the Perlmutters are a part of a hate-mail campaign against Peerenboom. This fact remains true regardless of whether the genetic information is returned and so the Court finds there is no need for the Perlmutters to plead demand. This argument is rejected.

3. <u>The Counterclaim pleads sufficient facts to allow for a cause of action for conversion against Douberley.</u>

Counter-Defendant Douberley makes the unique argument that this claim against him must be dismissed because "no allegation is made **[\*18]** that [he] took DNA or anything else from the Counter-Plaintiffs." (Douberley Resp. ¶ 23.) This is incorrect. The Perlmutters have alleged that Douberley was personally involved in the secret collection and taking of the Perlmutters' genetic information. (Countercl. ¶¶ 56, 60.) The Perlmutters allegations against Douberley, as pleaded, show he was critical in Peerenboom's efforts to convert the Perlmutters' genetic information. As this Court is required to take those allegations as true, dismissal against Douberley is inappropriate. **8⬇**

As the Court finds the Perlmutters had a property right in their genetic information, the Court finds they have stated a cause of action for conversion. The Perlmutters have pleaded in their Counterclaim that the Counter-Defendants took their genetic information through surreptitious means at the _Kay-Dee Sportswear_ deposition and that they used this information to the Perlmutters' detriment. As pleaded, this satisfies the elements of conversion and so the Court declines dismissal against the Counter-Defendants on this count.

**C. Count II - Civil Theft**

The Counter-Defendants next seek dismissal of the Perlmutters' count for civil theft. **9⬇** "In order to establish **[\*19]** an action for civil theft, the claimant must prove the statutory elements of theft, as well as criminal intent." _Gersh v. Cohen_, 769 So. 2d 407, 409 (Fla. 4th DCA 2000). The statutory elements of theft are:

> A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:

(a) Deprive the other person of a right to the property or a benefit from the property.

(b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.

§ 812.014(1), Fla. Stat. Criminal intent is defined as the intent to deprive another person of his or her property. *Country Manors Ass'n, Inc. v. Master Antenna Sys., Inc.*, 534 So. 2d 1187, 1191 (Fla. 4th DCA 1988).

The Perlmutter' have stated a cause of action for civil theft. The Counterclaim alleges that the Counter-Defendants intentionally obtained the Perlmutters' genetic information without their permission and did so for their own use. (Counterc. ¶¶ 121-128.) This is sufficient to state a cause of action for civil theft. While the Counter-Defendants challenge the sufficiency of the pleaded facts as to criminal intent, the Court is required to take the allegations in the Counterclaim as true for purposes of a motion to dismiss and is not permitted to weigh the evidence at this **[*20]** stage of the proceedings. Therefore, the Court must take as true the Counter-Defendants' purported intent to surreptitiously collect the Perlmutters' genetic information and deprive them of its use. (*E.g.*, Counterc. ¶ 40.) Accordingly, the Perlmutters have stated a cause of action for civil theft.

Even if the Perlmutters' civil theft count is properly pleaded, Counter-Defendants argue the count must be dismissed because of the Perlmutters' failure to plead compliance with pre-suit demand requirements under section 772.11, Florida Statutes. Section 772.11(1) states in relevant part:

[T]he person claiming injury must make a written demand for $200 or the treble damage amount of the person liable for damages under this section. If the person to whom a written demand is made complies with such demand within 30 days after receipt of the demand, that person shall be given a written release from further civil liability for the specific act of theft or exploitation by the person making the written demand.

Even though the Counterclaim does not state the Perlmutters have satisfied this pre-suit demand requirement, the Court finds this is not a sufficient ground for dismissal. "[T]he failure to comply with pre-suit notice requirements should **[*21]** not result in dismissal of a complaint unless notice cannot be given with the limitation period." *Seymour v. Adams*, 638 So. 2d 1044, 1049 n.9 (Fla. 5th DCA 1994). As there has been no indication that even if demand has not yet been made it cannot still be made in the limitation period, the Court finds this is an inappropriate basis for dismissal. While Counter-Defendants remain free to re-raise this argument at summary judgment, they are advised that

[u]nless it appears on the record that the statute was not complied with *and* the five year statute of limitations established by section 772.17 . . . had expired so that [plaintiff] would be unable to comply with the requirements of the statute, summary judgment is inappropriate on this basis.

*Id.* at 1049 (emphasis added).

In sum, the Perlmutters have stated a cause of action for civil theft. The Counter-Defendants arguments against this result, procedural or otherwise, are rejected.


**D. Count III - Abuse of Process**

The Counter-Defendants next seek dismissal of the Perlmutters' count for abuse of process.

A cause of action for abuse of process contains three elements: (1) that the defendant made an illegal, improper, or perverted use of process; (2) that the defendant had ulterior motives or purposes in exercising **[*22]** such illegal, improper, or perverted use of process; and (3) that, as a result of such action on the part of the defendant, the plaintiff suffered damage.

*S & I Invs. v. Payless Flea Mkt.*, 36 So. 3d 909, 917 (Fla. 4th DCA 2010). The Perlmutters assert Peerenboom, Douberley, and Federal committed abuse of process when they served or caused to be served a subpoenas *duces tecum* for the deposition on the Perlmutters ostensibly to depose them in the *Key-Dee Sportswear* case but in reality to secretly collect their genetic information. (Counterc. ¶¶ 129-33.) The Counter-Defendants, citing to *Scozari v. Barone*, 546 So. 2d 750 (Fla. 3d DCA 1989), argue dismissal of this count is appropriate because there was a valid reason for the process regardless of any genetic information being taken. The Counter-Defendants also argue they are immunized from the cause of action under the litigation privilege.

Counter-Defendants' first argument must be rejected. *Scozari*, a case decided at summary judgment, stands for the proposition that

[f]or [abuse of process] to exist, there must be a use of the process for an immediate purpose other than that for which it was designed. There is no abuse of process, however, when the process is used to accomplish the result for which it was created, regardless of an incidental or concurrent **[*23]** motive of spite or ulterior purpose.

546 So. 2d at 751. As a threshold matter, *Scozari* is of limited value at the motion to dismiss stage. More critically, as alleged in the Counterclaim, the Counter-Defendants issued the subpoenas *duces tecum* "for the *primary ulterior purpose* of ensuring that the Perlmutters' genetic material could be collected under controlled conditions . . . ." (Counterc. ¶ 131 (emphasis added).) As pleaded in the Counterclaim, it is clear that the immediate purpose of the challenged process was not the purpose for which it was designed. To the extent the Counter-Defendants dispute this conclusion they raise arguments that are best raised at a later stage of the proceedings when the Court is not required to take all allegations in the Counterclaim as true.

The Counter-Defendants' litigation privilege argument must also be rejected. While the litigation privilege applies to abuse of process claims, "a claimant may . . . pursue a claim for an abuse of process when the claim is based on actions taken outside of a judicial proceeding *or on actions that are taken during a judicial proceeding but which are unrelated to the judicial proceeding*." *LatAm Invs., LLC v. Holland & Knight, LLP*, 88 So. 3d 240, 243 (Fla. 3d DCA 2011) (emphasis added). Plainly the secret collection **[*24]** of genetic materials and information is unrelated to a deposition in a civil lawsuit. The allegations in the Counterclaim, taken as true, show that this privilege does not mandate dismissal of the abuse of process claim. The Counter-Defendants' arguments regarding dismissal of the Perlmutters' claim for abuse of process are rejected.

**E. Count IV - Defamation**

Counter-Defendants next seek dismissal of the Perlmutters' count for defamation. The elements for defamation are "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). The Perlmutters allege Counter-Defendants defamed them when they published or otherwise caused to be published false records, including "findings concerning the Perlmutters' genetic material[ ] and false reports that the Perlmutters offered to settle this civil action for substantial amounts of money . . . ." (Countercl. ¶ 135.) The Perlmutters assert these publications were published intentionally, were made with the malicious intent to defame them, **[*25]** and are otherwise defamatory *per se*. (Countercl. ¶¶ 136-40.) The Court finds that the Perlmutters have stated a cause of action as to some—but not all—of the Counter-Defendants as detailed below.

1. The Perlmutters have not stated a cause of action as to Douberley and Federal.

Before reaching the merits of Counter-Defendants' arguments regarding the defamation claim, the Court must first address that the Perlmutters have failed to show how Douberley or Federal defamed them at all. While, as noted above, the Perlmutters sufficiently alleged Douberley and Federal were implicit in the purported scheme to secretly take the Perlmutters' genetic material, there has been no allegation that these Counter-Defendants were a part of the actual publication of any false or misleading reports. In coming to this conclusion, the Court notes that the Counterclaim effectively alleges two periods of alleged tortious action—the surreptitious taking of the Perlmutters' genetic information and the creation of false, defamatory reports as a result of the taking. While the Counterclaim sufficiently implicates Douberley and Federal in the former, it is silent as to their participation in the latter. The Court **[*26]** therefore finds the Perlmutters have failed to state a cause of action for defamation against Douberley and Federal as to this cause of action.

2. The Perlmutters have stated a cause of action for defamation as to the rest of the Counter-Defendants.

The remaining Counter-Defendants dispute the sufficiency of the Perlmutters' defamation claim. As a threshold matter, the parties dispute whether the Perlmutters are public or private figures for purposes of determining the correct standard of defamation necessary for this case. The Perlmutters assert in their Counterclaim that they are private figures. (Countercl. ¶¶ 41, 43.) At the motion to dismiss stage, this Court is required to take all allegations in the Counterclaim as true, a task that requires accepting the Perlmutters' assertion that they are not public figures. *See Dockery v. Fla. Democratic Party*, 719 So. 2d 9, 11 (Fla. 2d DCA 1998) ("On a motion to dismiss, the trial court was required to accept the plaintiff's allegations that he was not a public figure."). Accordingly, the Court proceeds by assuming the Perlmutters are private figures. To the extent the Counter-Defendants argue otherwise, their arguments should be raised at the summary judgment stage of the proceedings. *See id.* (noting the **[*27]** trial court erred in deciding that the plaintiff was a public figure without an evidentiary basis for this ruling").

The Counter-Defendants argue the claim for defamation must be dismissed because the Perlmutters have failed to either attach the purportedly defamatory publications or otherwise provide the actual defamatory words used. "The general rule in Florida is that allegedly defamatory words should be set out in the complaint for the purpose of fixing the character of the alleged libelous publication as being libel per se." *Edward L. Nezelek, Inc. v. Sunbeam Television Corp.*, 413 So. 2d 51, 55 (Fla. 3d DCA 1982). This "set out" requirement "does not necessarily require that the statements be set out verbatim," especially "where the statements may not easily be retained because they were made orally either in conversation or by radio or television broadcast." *Id.*

Under the standard of cases such as *Edward L. Nezelek, Inc.*, the Court finds that dismissal is inappropriate. Contrary to the Counter-Defendants' assertions, the case law requires neither that the pleader attach the actual offending publication 10⬆ nor that the pleader provide the actual defamatory language. Instead, the operative question is whether the pleader has "state[d] the essence of what the alleged defamer **[*28]** said." *Scott v. Bush*, 907 So. 2d 662, 667 (Fla. 5th DCA 2005). The Court finds that standard has been satisfied here—the Perlmutters have alleged that the Counter-Defendants published "false records, reports and findings concerning the Perlmutters' genetic material, and false reports that the Perlmutters offered to settle this civil action for substantial sums of money . . . ." (Countercl. ¶ 135.) The Court finds this pleading sufficiently states the essence of what the alleged defamer has said and therefore sufficiently withstands a motion to dismiss. The Counter-Defendants' arguments otherwise are rejected. 11⬆

The Counter-Defendants also assert that the defamation claim must be dismissed on the basis of the litigation privilege. Specifically, they argue the Perlmutters have effectively admitted that the alleged defamatory statements "have some relation to" this proceeding and that therefore the statements are absolutely privileged. "Generally, immunity is an affirmative defense that should be pled by the party asserting it, and which may thereafter be considered *after the facts are fleshed out by summary judgment or trial.*" *Fariello v. Gavin*, 873 So. 2d 1243, 1245 (Fla. 5th DCA 2004) (emphasis added). The Court declines to recede from the general rule noted in *Fariello* **[*29]** . While the Counter-Defendants assert that this privilege applies because the Perlmutters' defamation claim is "based on a purportedly false statement concerning a 'settlement offer,'" (Peerenboom Mot. 19), the Court notes that the litigation privilege does not bar claims seeking recovery for any statement concerning any reference to a proceeding at all. Rather, the privilege bars claims seeking recovery for statements "made either in front of a judicial officer or in pleadings or documents filed with the court or quasi-judicial body." *DelMonico v. Traynor*, 116 So. 3d 1205, 1217 (Fla. 2013). The Perlmutters' claim does not fall into this category and so the Court rejects the Counter-Defendants' argument. To the extent the Counter-Defendants dispute the nature of the Perlmutters' characterization of the reports, their arguments are better addressed at the summary judgment stage of the proceedings. The Perlmutters can proceed in their action as pleaded against Peerenboom and Speckin.

**F. Count V - Intentional Infliction of Emotional Distress**

The Counter-Defendants next seek dismissal of the Perlmutters' claim for intentional infliction of emotional distress ("IIED"). A properly pleaded claim for IIED asserts:

(1) The wrongdoer's conduct was intentional **[*30]** or reckless, that is, he intended his behavior when he knew or should have

409

known that emotional distress would likely result;

(2) The conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community;

(3) The conduct caused emotional distress; and

(4) The emotional distress was severe.

*Stewart v. Walker*, 5 So. 3d 746, 749 (Fla. 4th DCA 2009). The Perlmutters assert in their Counterclaim that the Counter-Defendants intentionally deprived them of their genetic information through surreptitious means to falsely implicate them in criminal activity and that these actions caused the Counter-Defendants severe emotional distress. (Countercl. ¶¶ 141-46.) The Counter-Defendants seek dismissal of this claim because the alleged conduct is not sufficiently severe to sustain a claim of IIED and otherwise because it fails to allege physical harm or threats of physical harm.

At the outset, the Court notes the exceedingly high bar a party must meet to adequately plead a cause of action for IIED: "the plaintiff must show conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable **[\*31]** in a civilized community." *Byrd v. BT Foods, Inc.*, 948 So. 2d 921, 928 (Fla. 4th DCA 2007). Under this high standard, truly intolerable conduct has been found to be offensive or reprehensible but not found to meet IIED's requirement for "outrageous" conduct. For example, in *Williams v. Worldwide Flight SVCS., Inc.*, the Third District Court of Appeal found an employer's repeated uses of racial epithets in front of others and over radio, creation of false disciplinary records to justify termination, false accusations of stealing, and other racial discrimination against an employee did not amount to conduct "outrageous" enough for an IIED claim. 877 So. 2d 869 (Fla. 3d DCA 2004). Similarly, in *LeGrande v. Emmanuel*, the Third District determined a congregational member of a church falsely accusing the minister of stealing in front of the congregation, calling the minister "Satan," and doing so intentionally so as to scandalize and disgrace the minister did not rise to the level of IIED. 889 So. 2d 991 (Fla. 3d DCA 2004). By way of contrast, an insured properly pleaded a claim for IIED where her insurance company had been ordered by an administrative judge to authorize a lung transplant surgery but failed to do so for nine months despite knowing that the insured "could well hasten her demise." *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592 (Fla. 2d DCA 2007).

The Court agrees with the **[\*32]** Counter-Defendants and finds that the Perlmutters' claim for IIED must be dismissed for failure to allege conduct sufficiently outrageous to satisfy the burden of sustaining a claim for IIED. Taking the facts pleaded as true, there can be no doubt that the secret collection and misuse of a person's genetic information is reprehensible conduct. Despite this, the Court does not find the allegations as pleaded arise to the extreme levels necessary to sustain an action for IIED. Simply stated, it is difficult to conclude the Perlmutters' accusations rise to the same level of outrage generated by a case such as *Liberty Mutual*, where a party's actions were literally a matter of life-and-death. Instead, the Court finds this case to be more akin to *Williams* or *LeGrande*—a situation involving unsavory facts and, at least as pleaded, intentional or malicious conduct made to embarrass and harass a plaintiff. As those cases did not contain sufficient facts to sustain a claim for IIED, the Court finds this case does not either. The Perlmutters' claim for IIED must be dismissed. 12±

**G. Count VI - Invasion of Privacy**

The Counter-Defendants next seek dismissal of the Perlmutters' invasion of privacy count. **[\*33]** Specifically, the Perlmutters seek recovery for two forms of invasion of privacy: intrusion and publication of private facts. Intrusion involves "physically or electronically intruding into one's private quarters." *Agency for Health Care Admin. v. Associated Indus. of Fla., Inc.*, 678 So. 2d 1239, 1252 n.20 (Fla. 1996). Publication of private facts involves "the dissemination of truthful private information which a reasonable person would find objectionable." *Id.* The Perlmutters assert that the Counter-Defendants intruded on their privacy when the Counter-Defendants secretly gathered the Perlmutters' genetic information for unauthorized testing and misled the court and law enforcement officials about the process. (Countercl. ¶ 151.) The Perlmutters allege that their genetic information was private and is not a legitimate concern to the public. (Countercl. ¶¶ 148-49.) The Counter-Defendants argue the Perlmutters have failed to state a claim for either form of invasion of privacy.

1. <u>The Perlmutters have failed to state a cause of action for intrusion.</u>

The Court first agrees that the Perlmutters have failed to state a claim for intrusion. The Counterclaim contains no indication whatsoever that the Counter-Defendants "physically or electronically intrud[ed] into one's private quarters." *See* **[\*34]** *Agency for Health Care Admin.*, 678 So. 2d at 1252 n.20. This requirement refers to "a 'place' where there is a reasonable expectation of privacy . . . ." *Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 162 (Fla. 2003). This standard requires intrusion into an actual physical place and is satisfied where, for example, a plaintiff's home is invaded. *Guin v. City of Riveria Beach*, 388 So. 2d 604, 606 (Fla. 4th DCA 1980). As alleged, the Perlmutters have failed to show such an intrusion occurred and instead ask the Court to apply a broader definition of intrusion as reflected in the Restatement (Second) of Torts. The broader definition states an intrusion has occurred when one "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs of concerns ... if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (1977). As the Perlmutters concede, though, this definition has not been adopted in Florida courts. *See Bradley v. City of St. Cloud*, No. 6:12-CV-1348-ORL-37TBS, 2013 WL 3270403 at * (M.D. Fla. June 26, 2013) (noting "[t]he Florida Supreme Court has not expressly adopted the definition of [intrusion] found in the Restatement (Second) of Torts" while applying narrower definition used in *Ginsberg*). The Court declines to adopt a broader reading of intrusion when the tort has already been sufficiently defined by the Supreme **[\*35]** Court of Florida. The Perlmutters' intrusion claim is therefore rejected.

2. <u>The Perlmutters publication claim fails against Douberley ▼ and Federal but can proceed as to Peerenboom and Speckin.</u>

As to the issue of publication of private facts, the Court finds that the count as pleaded fails to state a cause of action against Douberley ▼ and Federal. The count as pleaded as to Peerenboom and Speckin, though, is sufficient to withstand a motion to dismiss.

410

*a. The Perlmutters have not stated a cause of action for publication of private facts as to* Douberley ▾ *and Federal.*

As with the earlier defamation claim, the Perlmutters' cause of action for publication of private facts is deficient as to Douberley ▾ and Federal due to the Perlmutters' failure to implicate these Counter-Defendants in the "publication" portion of the tort. While, as noted above, the Perlmutters have successfully pleaded that Douberley ▾ and Federal were involved in the unauthorized taking of genetic material from the Perlmutters, there are no allegations regarding their involvement in the publication of the results of that taking. As publication is naturally a requirement for a claim of publication of private facts, the Court finds **[*36]** that the Perlmutters have failed to state a cause of action for publication of private facts as to Douberley ▾ and Federal.

*b. The Perlmutters have stated a cause of action for publication of private facts as to Peerenboom and Speckin.*

The Court rejects the remaining Counter-Defendants' argument for dismissal of the publication of private facts, though, and finds the Perlmutters have properly pleaded a cause of action for the tort. Unauthorized publication of a plaintiff's private medical records is considered publication of private facts sufficient to state a claim for invasion of privacy. *E.g.,* *Doe v. Univision Television Grp., Inc.,* 717 So. 2d 63, 64-65 (Fla. 3d DCA 1998). The Court finds the Counter-Defendants' surreptitious taking of the Perlmutters' genetic material and subsequent, unauthorized publication of their genetic information falls directly into this category of tort. While the Counter-Defendants argue this claim is duplicitous of the Perlmutters' defamation claim, the Court rejects such a reading. Rather, the claims are inherently different—while the Perlmutters seek to recover under a theory of defamation based on the purportedly false reports published by the Counter-Defendants, the Perlmutters seek to recover under a theory of invasion of privacy **[*37]** for any *true* information regarding their genetic information published by the Counter-Defendants. To the extent the reports contain no truth (or no falsity), these claims can be revisited at the summary judgment stage after discovery. 13 ⬇ At this time and as pleaded, though, dismissal is inappropriate. The Perlmutters have stated a claim for invasion of privacy as to publication of private facts and so Peerenboom's argument is rejected.

## H. Count VII - Third-Party Spoliation

Counter-Defendants seek dismissal of the Perlmutters' third-party spoliation count. The elements of third-party spoliation are:

(1) existence of a potential civil action, (2) a legal or contractual duty to preserve evidence which is relevant to the potential civil action, (3) destruction of that evidence, (4) significant impairment in the ability to prove the lawsuit, (5) a causal relationship between the evidence destruction and the inability to prove the lawsuit, and (6) damages.

*Continental Ins. Co. v. Herman,* 576 So. 2d 313, 315 (Fla. 3d DCA 1990). The Perlmutters assert Douberley ▾, Federal, Howenstine, and Speckin committed third-party spoliation when they knew or should have known that taking the Perlmutters' genetic information in secret and without their authorization would result **[*38]** in a legal suit. (Countercl. ¶¶ 156-57.) The Perlmutters assert these Counter-Defendants therefore had a duty to preserve any evidence of the scheme but that they destroyed critical evidence of the scheme instead, thereby causing the Perlmutters damages. (Countercl. ¶¶ 158-63.)

The Counter-Defendants argue this count should be dismissed first because the Perlmutters' action is actually a claim of first-party spoliation, a tort no longer recognized in Florida. A first-party spoliation claim arises "when the defendant in the spoliation claim is also the defendant in the underlying claim allegedly impaired by the loss or destruction of the evidence." *Martino v. Wal-Mart Stores, Inc.,* 835 So. 2d 1251, 1254 (Fla. 4th DCA 2003) (*Martino I*). *Martino I* held "an independent cause of action for spoliation of evidence is unnecessary and will not lie where the alleged spoliator and the defendant in the underlying litigation are one and the same." *Id.* at 1256. The Florida Supreme Court adopted *Martino I*'s reasoning on appeal. *See* *Martino v. Wal-Mart Stores, Inc.,* 908 So. 2d 342, 347 (Fla. 2005) (*Martino II*) ("Martino has not demonstrated that there is any need to . . . recognize an independent cause of action for first-party spoliation of evidence.").

The Court rejects the Counter-Defendants' argument on this point. The Perlmutters' claim is not **[*39]** for first-party spoliation because, as pleaded, the purported destruction of evidence did not harm the Perlmutters in *their* action against the Defendants, but rather harmed them in *Peerenboom's* lawsuit against the Perlmutters. 14 ⬇ As the Counterclaim makes clear, the actions of these Counter-Defendants "significantly impaired the Perlmutters' ability to *defend* themselves in the *civil action.*" (Countercl. ¶ 162 (emphasis added).) Douberley ▾, Federal, Howenstine and Speckin are not parties to Peerenboom's suit against the Perlmutters. Therefore the Perlmutters' cause of action seeks relief for the actions of non-parties to an underlying lawsuit. This renders the cause of action properly pleaded and so dismissal on this ground is inappropriate.

Counter-Defendants also argue dismissal is required because the Perlmutters have not alleged there was a statute or contract requiring preservation of the allegedly destroyed evidence. This argument is also rejected. A duty to preserve evidence can arise on bases other than statutes or contracts, particularly when a duty to preserve evidence exists. *See* *Am. Hospitality Mgmt. Co. of Minn. v. Hettiger,* 904 So. 2d 547, 549 (Fla. 4th DCA 2004) (noting "we have held that a defendant could be charged with **[*40]** a duty to preserve evidence where it could reasonably have foreseen the claim"). The Perlmutters allege such a duty existed in this case. (Countercl. ¶¶ 158-60.) As pleaded, then, a duty existed based on the foreseeability of a civil suit and so the Counter-Defendants' argument on this point is rejected.

Lastly, the Counter-Defendants argue that a cause of action for third-party spoliation is not appropriate until the underlying action is complete. In other words, the Counter-Defendants argue this cause of action cannot proceed until it is shown that the Perlmutters lost in Peerenboom's suit against them and that this defeat was the result of a lack of evidence. The Fourth District has cautioned that "[t]here is little reason to wait for final judgment in the underlying lawsuit before bringing an action for the spoliation of evidence." *St. Mary's Hosp., Inc. v. Brinson,* 685 So. 2d 33, 35 (Fla. 4th DCA 1996). The Court agrees with this principle and sees no reason to dismiss the otherwise properly pleaded count because the underlying lawsuit is not yet completed. Even the Counter-Defendants' proffered case law does not mandate such a result. *See* *Jiminez v. Cmty. Asphalt Corp.,* 968 So. 2d 668, 672 (Fla. 4th DCA 2007) (noting "courts have held that the proper remedy for bringing claims prematurely is abatement rather than dismissal"). **[*41]** The Perlmutters' cause of action for third-party spoliation is properly pleaded and so dismissal is inappropriate. The Counter-Defendants' arguments as to this issue are rejected.

411

**I. Count VIII - Civil Conspiracy**

Finally, the Counter-Defendants seek dismissal of the Perlmutters' claim of civil conspiracy.

> The elements of a civil conspiracy are: (a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy.

*Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006). The Counter-Defendants argue dismissal on this count is appropriate because the Perlmutters have failed to state a cause of action for every other count in their Counterclaim. As discussed in this Order, that is plainly not the case. Similarly, the Counter-Defendants argue that the facts underlying the conspiracy are too conclusory to withstand a motion to dismiss. The Court disagrees—the Counterclaim plainly sets forth facts detailing a conspiracy between the Counter-Defendants to surreptitiously collect the Perlmutters' genetic information through the use of a deposition. The ultimate **[*42]** goal of this conspiracy was the unauthorized collection of the Perlmutters' DNA for use in implicating them as perpetrators of a hate-mail campaign against Peerenboom. The Counterclaim states that the Counter-Defendants each took overt acts in furtherance of this conspiracy. These facts are sufficient to state a cause of action for civil conspiracy.

Counter-Defendants also argue that dismissal of the civil conspiracy count is appropriate because the Counterclaim, as pleaded, fails the "single publication/action rule" through which a litigant is barred from asserting multiple actions "when they arise from the same publication upon which a failed defamation claim is based." *Ovadia v. Bloom*, 756 So. 2d 137, 141 (Fla. 3d DCA 2000). Even though the Court has dismissed the Perlmutters' defamation count as to Douberley ▾ and Federal, the conspiracy count is not dismissed under this rule because the conspiracy outlined in the Counterclaim involves more purportedly wrongful conduct than just defamation. As detailed above, the Perlmutters allege the Counter-Defendants stole their genetic material under the guise of taking a deposition so as to implicate them in the letter-writing campaign against Peerenboom. This is sufficient to state a cause of action **[*43]** for civil conspiracy independent of the Perlmutters' defamation count and so the argument regarding the single publication/action rule is rejected.


**CONCLUSION**

The Counter-Defendants have challenged the merits of the Counterclaim in its entirety. While many of the Counter-Defendants' arguments are compelling, the Court concludes by noting that the majority of the Counter-Defendants' arguments and relied-upon authority stem from cases brought after summary judgment or trial. These arguments are inappropriate at this time. Instead, this Court is constrained by the fact that all allegations in the Counterclaim must be taken as true. Under that standard, and for the reasons set forth above, the Counterclaim is dismissed in its entirety for lack of personal jurisdiction as to Counter-Defendant Howenstine. Count IV is dismissed as to Douberley ▾ and Federal. Count V is dismissed as to all Counter-Defendants. Count VI is dismissed as to all Counter-Defendants to the extent it seeks a cause of action for intrusion. Count VI is dismissed as to Douberley ▾ and Federal to the extent it seeks a cause of action for publication of private facts.

Count V and Count VI's cause of action for intrusion are dismissed **[*44]** with prejudice, as the Perlmutters cannot re-plead the facts of this case in such a way as to cure the defects discussed above. *See Depaola v. Town of Davie*, 872 So. 2d 377, 383 (Fla. 4th DCA 2004) (noting dismissal with prejudice is appropriate when "it is clear the pleading cannot be amended so as to state a cause of action"). The remaining dismissals are without prejudice to the Perlmutters' ability to file an amended counterclaim. *See id.*

Accordingly, it is hereby,

**ORDERED** that Plaintiff's Motion to Dismiss Counterclaim is **GRANTED IN PART AND DENIED IN PART**. Counts V and VI are **DISMISSED WITH PREJUDICE** as to Counter-Defendant Harold Peerenboom.

It is further **ORDERED** that Counter-Defendant William Douberley ▾, Esq.'s Motion to Dismiss Counterclaim is **GRANTED IN PART AND DENIED IN PART**. Counts IV and VI are **DISMISSED WITHOUT PREJUDICE** and Counts V and VI are **DISMISSED WITH PREJUDICE** as to Counter-Defendant William M. Douberley ▾.

It is further **ORDERED** that Chubb & Son, a Division of Federal Insurance Company's Motion to Dismiss with Prejudice the Counterclaim Filed by Isaac ("Ike") Permutter and Laura Perlmutter is **GRANTED IN PART AND DENIED IN PART**. Counts V and VI are **DISMISSED WITH PREJUDICE** as to Counter-Defendant Chubb & Son, a Division of Federal **[*45]** Insurance Company.

It if further **ORDERED** that Speckin Forensics LLC's and Julie Howenstine's Motion to Dismiss Third Party Complaint is **GRANTED IN PART AND DENIED IN PART**. The Counterclaim is **DISMISSED WITHOUT PREJUDICE** as to Counter-Defendant Julie Howenstine. Counts V and VI are **DISMISSED WITH PREJUDICE** as to Counter-Defendant Speckin Forensics, LLC.

It is further **ORDERED** that Counter-Plaintiffs Isaac ("Ike") and Laura Perlmutter shall have thirty (30) days from the date of this order to file an amended counterclaim not inconsistent with the Court's rulings above.

**DONE AND ORDERED** in West Palm Beach, Palm Beach County, Florida, on this 23rd day of January, 2017.

/s/ Meenu Sasser ▾, Circuit Judge

**Meenu Sasser** ▾, Circuit Judge

---

**Footnotes**

1⇑  Chubb & Son is not a legal entity but rather a division of Federal Insurance Company.

**2** This section reflects the Counterclaim's allegations taken as true. The Court makes no comment as to the actual accuracy of the allegations in the Counterclaim.

**3** The Counter-Defendants also argued that the Counterclaim was improperly filed without leave of court. This argument is correct. *See* Fla. R. Civ. P. 1.170(e), (f). As indicated at the Court's hearings on the motions to dismiss, leave of court should be sought—and will be granted—before any further amendment to the Counterclaim is permitted. *See Fuente v. S. Ocean Transp., Inc.,* 933 So. 2d 651, 654 (Fla. 3d DCA 2006) (noting "refusal to grant leave to assert a counterclaim would be an abuse of discretion if the counterclaim were compulsory").

**4** For the reasons set out in this section, the Court also rejects Speckin and Howenstine's characterization of the Counterclaim as a third-party complaint.

**5** The Court finds that these facts render section 48.193(2), Florida Statutes, inapplicable to this case. This Order therefore applies the test for "specific" jurisdiction outlined in section 48.193(1) to determine whether there is personal jurisdiction over Howenstine.

**6** The Counter-Defendants incorrectly characterize the Perlmutters' conversion count—and at times the entire Counterclaim—as a private action under section 760.40, Florida Statutes. This is a mischaracterization of the Counterclaim. As pleaded, the Perlmutters have not sought any private relief under the statute, and for good reason—the statute allows for no such cause of action. Because the Perlmutters' claims exist independent of the statute, the Counter-Defendants arguments are rejected to the extent they seek dismissal premised on the Perlmutters' Counterclaim allegedly being an action under section 760.40.

**7** Counter-Defendants also argue that the Perlmutters are improperly attempting to pursue a conversion action based on voluntarily abandoned items, such as water bottles, that the Counter-Defendants collected genetic information from. The Court rejects this characterization of the count. Notwithstanding that the Perlmutters assert the Counter-Defendants collected genetic information from items that were not voluntarily discarded, (*see, e.g.,* Countercl. ¶¶ 60, 62), the Court finds the Perlmutters' allegation that the Counter-Defendants took DNA from abandoned items is clearly distinguishable from a claim that the Counter-Defendants converted the actual items themselves.

**8** Douberley also claims that this count should be dismissed against him on the basis of the litigation privilege. This argument is premised on the idea that the alleged conversion both occurred "during the course of a judicial proceeding" and also "has some relation to the proceeding." *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.,* 639 So. 2d 606, 608 (Fla. 1994). The Court finds that converting the property of another is not related to a deposition and therefore finds the privilege does not require dismissal of the Counterclaim as pleaded. Douberley remains free to raise this defense—along with other arguments—at summary judgment after discovery.

**9** The Court notes that the crux of the Counter-Defendants' argument on this count is that a cause of action for civil theft must be dismissed where no conversion has occurred. As the Court has determined a facially sufficient cause of action for conversion exists, this argument is summarily rejected. This section addresses the Counter-Defendants' remaining arguments.

**10** This requirement is logical particularly where, as alleged by the Perlmutters in their response, the publications have not been disclosed to the pleader in question.

**11** The Court recognizes that cases such as *Scott* and *Edward L. Nezelek, Inc.,* involve oral communications rather than, as here, written instances of defamation. Regardless, the Court finds the cases persuasive where, as here, the Perlmutters assert the reports are in the Counter-Defendants' custody. In such a situation, the essence of the communication is sufficient to defeat a motion to dismiss and permit the case to proceed to discovery.

**12** Because the Court finds dismissal appropriate on grounds of failure to allege sufficient outrageous conduct, there is no need to reach the question of whether physical contact was necessary to sustain a claim of IIED. As the parties disputed this issue in their papers, though, the Court notes that a valid claim for IIED is "normally associated" with physical contact. *Williams,* 877 So. 2d at 870.

**13** This conclusion is similarly applicable to the remainder of the Counter-Defendants' arguments. For example, while the Counter-Defendants argue that the publication of the Perlmutters' genetic information is not "offensive" so as to rise to the level of an actionable claim for publication of private facts, the Counterclaim asserts otherwise. (*See* Countercl. ¶ 148.) As this Court is required to take the Counterclaim as pleaded as true, the resolutions of such arguments are more appropriate at summary judgment.

413

[145] Federal incorrectly characterizes the operative suit not as Peerenboom's action against the Perlmutters but rather the *Kay-Dee Sportswear* litigation. This misconstrues the Counterclaim, as the Perlmutters' action as pleaded states that the spoliated evidence impaired their ability to defend themselves in the Peerenboom suit, not in any capacity in the *Kay-Dee Sportswear* case. (Countercl. ¶¶ 157-58.)



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX ™

Copyright © 2023 LexisNexis.

Go to Page [Page #]  Search Document

# Perry v. Cosgrove, 464 So. 2d 664

**Copy Citation**

Court of Appeal of Florida, Second District

March 6, 1985

No. 84-796

**Reporter**
**464 So. 2d 664** * | 1985 Fla. App. LEXIS 12625 ** | 11 Media L. Rep. 1931 | 10 Fla. L. Weekly 608

JOHN L. PERRY, Appellant, v. RICHARD W. COSGROVE and CLEARWATER NEWSPAPERS, INC., Appellees

**Prior History:** [**1] Appeal from the Circuit Court for Pinellas County; B. J. Driver, Judge.

## Core Terms

cause of action, libel, counts

## Case Summary

**Procedural Posture**
Plaintiff former editor appealed from the Circuit Court for Pinellas County (Florida), which granted defendant newspaper president and publisher and newspaper owner's motion to dismiss the complaint alleging libel, fraud, and breach of contract for failure to state a cause of action.

**Overview**
Plaintiff former editor brought an action against defendant newspaper president and publisher and newspaper owner claiming libel, fraud, and breach of contract after plaintiff was terminated and defendant president and publisher wrote a letter to a concerned reader regarding the dismissal. The trial court granted defendants' motion to dismiss for failure to state a cause of action and plaintiff appealed. The court reversed the dismissal of plaintiff's claims, holding that libel per se required a trier of fact to determine whether a publisher's letter was understood by the reader in a defamatory sense. The court held that plaintiff had alleged common-law fraud, namely that defendant publisher told plaintiff he had a permanent job, that defendant publisher did not intend to keep that promise, that it was intended to and caused plaintiff's reliance, that plaintiff performed additional services, and that plaintiff incurred debt in reliance on the representation. The court held that plaintiff had alleged a breach of contract by alleging the existence an oral contract for continued employment and a pay raise, an obligation taken by plaintiff, and a breach by defendants.

**Outcome**
The court reversed the dismissal of plaintiff former editor's complaint, holding that whether the letter constituted libel per se was an issue of fact for the trier of fact, that allegations of a false statement, knowledge that statement was false, inducement, reliance, and damage were sufficient to allege common-law fraud. The court held that allegations of oral contract, reliance, and breach were sufficient to allege breach of contract.

▼ LexisNexis® Headnotes

Civil Procedure > ... > Responses ▾ > Defenses, Demurrers & Objections ▾ > Motions to Dismiss ▾

View more legal topics

**HN1** ⬇ **Defenses, Demurrers & Objections, Motions to Dismiss**

For purposes of a motion to dismiss for failure to state a cause of action, the movant admits as true all material facts well-pleaded and all reasonable inferences arising from those facts. To state a cause of action, a complaint must allege sufficient ultimate facts to show that the pleader is entitled to relief. Fla. R. Civ. P. 1.110(b). 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (9)*

---

Torts > Intentional Torts ▾ > Defamation ▾ > 📙 Defamation Per Se ▾

View more legal topics

**HN2** ⬇ **Defamation, Defamation Per Se**

A publication is libelous per se if, when considered alone without innuendo, it tends to subject a person to hatred, distrust, ridicule, contempt, or disgrace, or tends to injure him in his trade or profession, or if it imputes to another conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office. Neither the court nor the jury may go beyond the four corners of the publication in determining whether there is libel per se. The language of the document should not be interpreted by extremes, but should be construed as the common mind would naturally understand it. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (6)*    1

---

Torts > Intentional Torts ▾ > Defamation ▾ > Libel ▾

**HN3** ⬇ **Defamation, Libel**

Where a communication is ambiguous and reasonably susceptible to a defamatory meaning, it is for the trier of fact to decide whether the communication was understood in the defamatory sense. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (6)*

---

Torts > Business Torts ▾ > Fraud & Misrepresentation ▾ > General Overview ▾

**HN4** ⬇ **Business Torts, Fraud & Misrepresentation**

The essential elements of common-law fraud are as follows: (1) a false statement of fact; (2) known by the defendant to be false at the time it was made; (3) made for the purpose of inducing the plaintiff to act in reliance thereon; (4) action by the plaintiff in reliance on the correctness of the representation; and (5) resulting damage to the plaintiff. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (9)*    3

---

Torts > Business Torts ▾ > Fraud & Misrepresentation ▾ > General Overview ▾

**HN5** ⬇ **Business Torts, Fraud & Misrepresentation**

Generally, a false statement of fact, to constitute a ground for fraud, must be of a past or existing fact. An exception arises, however, where the promise to perform a material matter in the future is made without any intention of performing or is made with the positive intention not to perform. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (8)*

---

Business & Corporate Compliance > ... > Contracts Law ▾ > Types of Contracts ▾ > 📙 Oral Agreements ▾

Contracts Law > Contract Interpretation ▾ > General Overview ▾

**HN6** ⬇ **Types of Contracts, Oral Agreements**

When the existence of a contract is clear, the jury may properly determine the exact terms of an oral contract. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (6)*    2

---

**Counsel:** Gary Robert Preston and Dennis P. Thompson of Richards, Nodine, Gilkey, Fite, Meyer & Thompson, P.A., Clearwater, for Appellant.

George A. Vaka ▾, Fowler, White, Gillen, Boggs, Villareal & Banker, P.A. ▾, Tampa, for Appellees.

**Judges:** Schoonover ▾, A.C.J., and Lehan ▾, J., and Shafer, Robert T. ▾, Associate Judge, concur.

**Opinion by:** PER CURIAM

## Opinion

**[\*665]** John L. Perry, appellant, appeals from an order dismissing with prejudice three counts of his amended complaint for failure to state a cause of action. We reverse on all three counts.

Perry, former editor of the Clearwater Sun Newspaper, sued the appellees, Richard W. Cosgrove, president and publisher of the newspaper, and Clearwater Newspapers, Inc., the owner. His complaint contained six counts. This appeal involves the three counts alleging libel, fraud, and breach of contract. The suit arose after Cosgrove fired Perry and another newspaper reported that the dismissal occurred following a dispute over a "no-food" office policy. Two days after the story was published, Cosgrove wrote a letter to a concerned reader stating that the article was inaccurate [\*\*2] and that the termination was based on factors other than the dispute. Perry's libel claim was founded on this letter. His fraud claim was based upon Cosgrove's alleged misrepresentation that Perry's position with the Sun was permanent. His breach of contract claim was based on Cosgrove's alleged unfulfilled promise to increase Perry's salary.

Initially, we note that **HN1**⬆ for purposes of a motion to dismiss for failure to state a cause of action, the movant admits as true all material facts well-pleaded and all reasonable inferences arising from those facts. *Orlando Sports Stadium, Inc. v. State*, 262 So. 2d 881 (Fla. 1972); *Simon v. Tampa Electric Co.*, 202 So. 2d 209 (Fla. 2d DCA 1967). To state a cause of action, a complaint must allege sufficient ultimate facts to show that the pleader is entitled to relief. Fla. R. Civ. P. 1.110(b). We hold that the amended complaint set forth sufficient facts to state a cause of action on all three counts.

First, Perry alleged that the letter written by Cosgrove constitutes libel per se. Although the appellees are members of the media, they are not "media defendants," for the purposes of the elements of a cause of action for libel [\*\*3] per se. The letter written by Cosgrove was not published in the Sun, but was mailed to one of its readers. **1**⬆ The letter stated in part as follows:

> Mr. Perry's termination was based on several factors and not the incident mentioned in the Times story. Rather than embarrass Mr. Perry and further on the **[\*666]** matter, we decided not to issue a statement.

Generally, **HN2**⬆ a publication is libelous per se if, when considered alone without innuendo, it tends to subject a person to hatred, distrust, ridicule, contempt, or disgrace, or tends to injure him in his trade or profession, *Richard v. Gray*, 62 So. 2d 597 (Fla. 1953), or if it imputes to another conduct, characteristics, or a condition incompatible with the [\*\*4] proper exercise of his lawful business, trade, profession, or office. *Barry College v. Hull*, 353 So. 2d 575 (Fla. 3d DCA 1977). Neither the court nor the jury may go beyond the four corners of the publication in determining whether there is libel per se. *Barry College*; *Wolfson v. Kirk*, 273 So. 2d 774 (Fla. 4th DCA 1973). The language of the document should not be interpreted by extremes, but should be construed as the common mind would naturally understand it. *McCormick v. Miami Herald Publishing Co.*, 139 So. 2d 197 (Fla. 2d DCA 1962).

The letter indicated that the appellees did not wish to embarrass Perry any further by issuing a statement concerning the factors leading up to his dismissal. Although the term "embarrass" may have been intended to convey and perhaps did convey only an innocuous meaning, a person of common mind might have construed it to mean that Perry had conducted himself in a shameful manner, or in a manner inconsistent with the proper exercise of his profession. **HN3**⬆ Where a communication is ambiguous and reasonably susceptible of a defamatory meaning, it is for the trier of fact to decide whether the communication was understood in the defamatory [\*\*5] sense. *Wolfson*. Accordingly, the motion to dismiss count I should have been denied.

Next, Perry alleged a tort action for fraud on the ground that Cosgrove misled him to believe that his job with the Sun was permanent. **HN4**⬆ The essential elements of common-law fraud are as follows: (1) a false statement of fact; (2) known by the defendant to be false at the time it was made; (3) made for the purpose of inducing the plaintiff to act in reliance thereon; (4) action by the plaintiff in reliance on the correctness of the representation; and (5) resulting damage to the plaintiff. *Vance v. Indian Hammock Hunt and Riding Club, Ltd.*, 403 So. 2d 1367 (Fla. 4th DCA 1981).

The complaint states that Cosgrove told Perry he was "here to stay" and that "we take care of our permanent executives." The complaint avers these statements were false because Cosgrove subsequently fired Perry and that Cosgrove knew the statements were false at the time he made them. It is then averred that the statements were made to induce Perry to perform additional services and to incur a debt for Cosgrove's benefit. Perry allegedly became involved in community organizations, took out a second mortgage to purchase [\*\*6] a home, and performed additional job-related services, all in reliance on Cosgrove's statements.

**HN5**⬆ Generally, a false statement of fact, to constitute a ground for fraud, must be of a past or existing fact. An exception arises, however, where the promise to perform a material matter in the future is made without any intention of performing or is made with the positive intention not to perform. *Home Seekers' Realty Co. v. Menear*, 102 Fla. 7, 135 So. 402 (1931); *Hamlen v. Fairchild Ind., Inc.*, 413 So. 2d 800 (Fla. 1st DCA 1982). The complaint alleges that Cosgrove lacked the intention to permanently employ Perry when he made the statements and that Perry, as a result, suffered damages.

Appellees rely on *Muller v. Stromberg Carlson Corp.*, 427 So. 2d 266 (Fla. 2d DCA 1983), and argue that statements by an employer concerning salary and duration do not create binding terms, but are mere expectations. Their reliance is misplaced because the cause of action in *Muller* had been brought under theories of breach of an employment contract and tortious interference with an employment

relationship. The elements of those theories differ from the elements of common-law fraud. [**7]  We [*667] find, therefore, that the complaint set forth sufficient facts to state a cause of action for fraud. Accordingly, the motion to dismiss count IV should have been denied.

Lastly, Perry claimed breach of an oral contract. The complaint alleges that in March, 1983, Cosgrove informed Perry that, for the third time, the Sun was increasing his annual salary, this time by $5000. The complaint also states that Perry was advised that the increase would become effective in March, 1983, but that payment would be deferred until May, 1983. It then avers that Perry was not compensated at his increased salary rate at the time of his termination in May, 1983.

The complaint alleged the execution of an oral contract, the obligation thereby assumed, and a breach. It therefore set forth sufficient facts which taken as true, would state a cause of action for breach of contract. *Industrial Medicine Publishing Co. v. Colonial Press of Miami, Inc.*, 181 So. 2d 19 (Fla. 3d DCA 1965).

Appellees argue that the alleged contract is too indefinite to be enforced. We disagree. As long as an essential ingredient is not missing from an agreement, courts have been reluctant to hold [**8]  contracts unenforceable on grounds of uncertainty, especially where one party has benefited from the other's reliance. *Gulf Solar, Inc. v. Westfall*, 447 So. 2d 363 (Fla. 2d DCA 1984); *Community Design Corp. v. Antonell*, 459 So. 2d 343 (Fla. 3d DCA 1984). *HN6* When the existence of a contract is clear, the jury may properly determine the exact terms of an oral contract. *Community Design Corp.* Accordingly, the motion to dismiss count V should have been denied.

We therefore reverse and remand for proceedings consistent herewith.

SCHOONOVER ▾, A.C.J., and LEHAN ▾, J., and SHAFER ▾, ROBERT T., Associate Judge, Concur.

---

**Footnotes**

 If Cosgrove's letter had been published, appellees would have been entitled to broader first amendment protection. Pursuant to *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974), Perry would have been required to allege fault and actual damage.

About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.



Document:                          Readon v. WPLG, LLC, 2021 Fla. App. LEXIS 5251                          | Actions ⌄

**Copy Citation**

Court of Appeal of Florida, Third District

April 14, 2021, Opinion Filed

No. 3D20-340

**Reporter**

317 So. 3d 1229 * | **2021 Fla. APP. LEXIS 5251 ** | 46 Fla. L. Weekly D 836 | 2021 WL 1395240

Eric Readon, Appellant, vs. WPLG, LLC, et al., Appellees.

**Subsequent History:** Rehearing denied by Readon v. WPLG, LLC, 2021 Fla. App. LEXIS 9435 (Fla. Dist. Ct. App. 3d Dist., May 12, 2021)

Review denied by Readon v. WPLG, LLC, 2021 Fla. LEXIS 1333, 2021 WL 3523557 (Fla., Aug. 11, 2021)

Decision reached on appeal by, Remanded by Shapiro v. Wplg, 2023 Fla. App. LEXIS 3308 (Fla. Dist. Ct. App. 3d Dist., May 17, 2023)

**Prior History:  [**1]** An Appeal from the Circuit Court for Miami-Dade County, Alexander Bokor ⌄, Judge. Lower Tribunal No. 17-13336.

## Core Terms

defamation, allegations, actual malice, reporting, defamatory, third amended complaint, business dealings, investigate, broadcast, picture, false statement, lawsuits, stories, gist, cause of action, public figure, profession, abused, spouse, dead

## Case Summary

### Overview

HOLDINGS: [1]-Plaintiff's third amended complaint contained no actionable false statement and, as such, the claim for defamation was properly dismissed because the only "false" statement attributed to defendant contained in the complaint did not affect the gist of the story by creating a different impression in the mind of the viewer; the gist of the story was that plaintiff had emailed a picture of a dead body to an attorney serving as a child's guardian; [2]-The third amended complaint also failed to show that defendant acted with actual malice because plaintiff did not show that defendant's investigation was deliberately skewed to avoid uncovering what plaintiff called "the whole truth."

### Outcome

Order affirmed.

▼ LexisNexis® Headnotes

Civil Procedure > Appeals ⌄ > Standards of Review ⌄ > De Novo Review ⌄

419

View more legal topics

**HN1** ⬇ **Standards of Review, De Novo Review**

An appellate court reviews a trial court's order granting a motion to dismiss de novo. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > 📄 Public Figures ▾

Torts > ... > Defamation ▾ > Public Figures ▾ > Actual Malice ▾

**HN2** ⬇ **Defamation, Public Figures**

To state a claim for defamation of a public figure, a plaintiff is required to allege that the defendant's reports contained statements that were: (1) false; (2) defamatory; (3) damaging; and (4) that the publisher acted with actual malice. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > 📄 Public Figures ▾

Torts > ... > Defamation ▾ > Public Figures ▾ > Limited Purpose Public Figure ▾

View more legal topics

**HN3** ⬇ **Defamation, Public Figures**

Normally, to determine if a plaintiff in a defamation lawsuit is a public figure, Florida courts employ a two-step process: First, the court must determine whether there is a public controversy. Second, the court must determine whether the plaintiff played a sufficiently central role in the instant controversy to be considered a public figure for purposes of that controversy. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > ... > Pleadings ▾ > Complaints ▾ > 📄 Requirements for Complaint ▾

Torts > ... > Defamation ▾ > Public Figures ▾ > Voluntary Public Figures ▾

**HN4** ⬇ **Complaints, Requirements for Complaint**

In a defamation action against a media defendant, the Constitution requires that the plaintiff allege a false statement. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Torts > ... > Defamation ▾ > Defenses ▾ > Exaggerations & Imaginative Commentary ▾

View more legal topics

**HN5** ⬇ **Defenses, Exaggerations & Imaginative Commentary**

Florida recognizes the substantial truth doctrine in defamation cases. Under the substantial truth doctrine, a statement does not have to be perfectly accurate if the gist or the sting of the statement is true. As long as a report is substantially correct, it is not necessary that it be exact in every immaterial detail or that it conform to the precision demanded in technical or scientific reporting. Further, Florida law recognizes a difference between statements presented as fact and statements presented as an opinion or rhetorical hyperbole. The key distinction is whether the incorrectly reported material would have had a different effect on the mind of the viewer by affecting the gist of the story. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > 📄 Public Figures ▾

Torts > ... > Defamation ▾ > Public Figures ▾ > Actual Malice ▾

View more legal topics

**HN6** ⬇ **Defamation, Public Figures**

The First Amendment safeguards publishers from defamation suits brought by public figures unless the publisher acts with actual malice. Actual malice is defined as knowledge that the statement was false or reckless disregard of whether it was false or not. This standard requires more than mere negligence. Instead, reckless conduct, as defined by the United States Supreme Court includes reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice. A plaintiff is therefore required to plead facts sufficient to give rise to a

420

reasonable inference of actual malice. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

---

Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > 📄 Public Figures ▾
Torts > ... > Defamation ▾ > Public Figures ▾ > Actual Malice ▾
View more legal topics

**HN7**⬇ **Defamation, Public Figures**
Actual malice requires more than a departure from reasonable journalistic standards thus, a failure to investigate, standing on its own, does not indicate the presence of actual malice. Instead, there must be some showing that the defendant purposefully avoided further investigation with the intent to avoid the truth. Care must be taken not to construe cases which have found a failure to investigate too broadly because the First Amendment demands that the law of libel carve out an area of breathing space so that protected speech is not discouraged. The analysis in this regard must always be informed by the safeguards provided by the First Amendment fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > 📄 Public Figures ▾
Torts > ... > Defamation ▾ > Public Figures ▾ > Actual Malice ▾

**HN8**⬇ **Defamation, Public Figures**
It is not enough that a reasonably prudent person would have investigated further. Indeed, Florida law is well settled that the failure to investigate, without more, does not constitute actual malice. Instead, there must be obvious reasons to doubt the veracity of the informant or the accuracy of his reports. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Torts > Intentional Torts ▾ > Defamation ▾ > Procedural Matters ▾
View more legal topics

**HN9**⬇ **Defamation, Procedural Matters**
Defamation by implication arises, not from what is stated, but from what is implied when a defendant: (1) juxtaposes a series of facts so as to imply a defamatory connection between them; or (2) creates a defamatory implication by omitting facts, such that he may be held responsible for the defamatory implication. While defamation law shields publishers from liability for minor factual inaccuracies, it also works in reverse, to impose liability upon the defendant who has the details right but the gist wrong. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Torts > Intentional Torts ▾ > Defamation ▾ > Elements ▾
View more legal topics

**HN10**⬇ **Defamation, Elements**
The tort of defamation by implication requires that the implied fact be defamatory. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > Appeals ▾ > Standards of Review ▾ > Abuse of Discretion ▾
View more legal topics

**HN11**⬇ **Standards of Review, Abuse of Discretion**
Ordinarily, a decision to allow leave to amend is within the sound discretion of the trial court, and will not be overturned unless abuse is demonstrated. When making this determination all doubts should be resolved in favor of allowing amendment. Generally, refusal to allow amendment of a pleading constitutes an abuse of discretion unless it clearly appears that allowing the amendment would prejudice the opposing party; the privilege to amend has been abused; or the amendment would be futile. However, as an action progresses, the privilege of amendment progressively decreases to the point that the trial judge does not abuse his or her discretion in dismissing with prejudice. The Court of Appeal of Florida, Third District has observed that with amendments beyond the third attempt, dismissal with prejudice is generally not an abuse of discretion. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*  1

**Counsel:** Andrew M. Kassier, P.A., and Andrew M. Kassier ▼, for appellant.

Mitrani, Rynor, Adamsky & Toland, P.A. ▼, and Karen Kammer ▼, for appellees.

**Judges:** Before FERNANDEZ ▼, LOGUE ▼, and GORDO ▼, JJ.

**Opinion by:** LOGUE ▼

## Opinion

[*1233]  LOGUE ▼, J.

Eric Readon appeals the trial court's dismissal of his third amended complaint with prejudice against defendants WPLG, Inc. (successor in interest to WPLG, LLC), BH Media Group, Inc., Jeff Weinsier, Steve Owen, and Bill Pohovey (collectively, "WPLG"). Readon's complaint alleges defamation and defamation by implication against WPLG for reporting on certain business dealings between Readon and members of the public. Because Readon failed to allege any false statement that would affect the gist of the reports, actual malice in WPLG's reporting, or a defamatory implication, we affirm the trial court's order of dismissal.

### *Factual Background*

The facts we must accept as true are contained within Readon's third amended complaint, the operative complaint for purposes of this appeal. Readon's allegations stem from three news reports broadcast by WPLG in 2017 and their corresponding internet articles.

Readon **[**2]**  is a pastor and public figure. Because he is not paid for his ministerial service, Readon makes a living through business dealings including property management and real estate swaps. Several of Readon's previous business contacts, including some family members and friends, sued Readon in relation to these business activities.

According to the complaint, WPLG first learned of these lawsuits from an informant with a working relationship with WPLG and its employees. The informant advised WPLG of several lawsuits filed against Readon and WPLG subsequently confirmed their existence through a public records search. Before broadcasting its initial report, WPLG contacted Readon to discuss the allegations.

WPLG aired its initial story about Readon's previous business with Thomas Harper, Latasha Blue, Darrick Andrews, and Shanequa Veal. The story outlined that Harper had given Readon money as a deposit for a lease on a property owned by Readon, but Harper was not able to move into the property because it was occupied by a prior tenant. WPLG further reported allegations by Blue that he had placed a deposit for a vehicle that was never delivered, and by Andrews who stated that Readon had borrowed **[**3]**  money to obtain the services of a music performer for a church event that never happened. WPLG correctly reported that the lawsuits from Veal and Harper had settled, however WPLG failed to state that no suit had been filed by Blue or Andrews at that time. Blue and Andrews both gave statements that were included as part of the report.

After the initial broadcast, WPLG was approached by several other members of the community with reports of negative experiences with Readon. WPLG aired a second story about Readon, detailing the allegations of Edward Fuller. Specifically, Fuller alleged that Readon had acquired title to Fuller's home through his non-profit organization with a promise to help Fuller restore the home and return it to him.

The second broadcast further detailed an exchange between Readon and Berenton Whisenant who served as guardian ad litem for a minor child in a family court proceeding. In an email exchange, Readon implored Whisenant to pay particular care and attached a picture of a dead young  [*1234]  man. The news story incorrectly reported that Readon had sent a picture of a dead body to a federal prosecutor. While Whisenant would eventually become a federal prosecutor, he was **[**4]**  not yet a prosecutor when the picture was sent.

Several months later, WPLG broadcast a third story with allegations from Lorenzo Johnson and AAGG Investment, LLC. Johnson claimed that Readon had stolen a personal check from him and forged his signature on the check. During the broadcast, AAGG stated that Readon had not paid rent on a property that it had leased to him.

During each of the stories, Readon was referred to as a pastor and community leader. Many of the allegations in the news stories were voiced over images of Readon preaching in church or attending community events.

As noted above, Readon's third amended complaint alleged defamation and defamation by implication. WPLG moved to dismiss the complaint for failure to state a cause of action. The trial court held a hearing on the motion before dismissing the complaint with prejudice.

*Analysis*

**HN1** We review a trial court's order granting a motion to dismiss de novo. *Cornfeld v. Plaza of the Americas Club, Inc.*, 273 So. 3d 1096, 1098 (Fla. 3d DCA 2019).

**a. Defamation**

**HN2** To state a claim for defamation of a public figure, **1** Readon was required to allege that WPLG's reports contained statements that were (1) false; (2) defamatory; (3) damaging; and (4) that the publisher acted with actual malice. *Don King Prods., Inc. v. Walt Disney Co.*, 40 So. 3d 40, 43 (Fla. 4th DCA 2010).

Most of the statements Readon **[**\*\*5**]** complains of cannot be defamation because they are true. **HN4** In a defamation action against a media defendant, the Constitution requires that the plaintiff allege a false statement. *Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 706 (Fla. 3d DCA 1999) (citing *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775-76, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986)). The complaint alleges that WPLG reported on allegations made by third parties about their business dealings with Readon. However, the complaint admits that those allegations were made and in many cases the lawsuits were pending or had been settled.

The only substantively false statement which Readon alleges, that he sent a picture of a dead body to a prosecutor, is not actionable in a defamation lawsuit. **HN5** Florida recognizes the substantial truth doctrine in defamation cases. *Smith*, 731 So. 2d at 706. "Under the substantial truth doctrine, a statement does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true." *Id.* (quoting *Masson v. New Yorker Mag.*, 501 U.S. 496, 517, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991)). As long as a report is substantially correct, "[i]t is not necessary that it be **[**\*1235**]** exact in every immaterial detail or that it conform to the precision demanded in technical or scientific reporting." *Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502-03 (Fla. 3d DCA 1993) (quoting *Restatement (Second) of Torts § 611, cmt. f* (1977)). Further, Florida law recognizes a difference between statements presented as fact and statements presented as an opinion or rhetorical hyperbole. *See Byrd v. Hustler Mag., Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983). The **[**\*\*6**]** key distinction is whether the incorrectly reported material would "have had a different effect on the mind of the viewer" by affecting "the gist of the story." *Woodard*, 616 So. 2d at 503.

The only "false" statement attributed to WPLG contained in the complaint did not affect the gist of the story by creating a different impression in the mind of the viewer. In reporting that Readon had sent a picture of a dead body to a federal prosecutor, WPLG failed to include information that the recipient was not a federal prosecutor at the time but was in his capacity as guardian ad litem. While this oversight made the statement untrue, it did not change the gist of the story that Readon had emailed a picture of a dead body to an attorney serving as a child's guardian. The third amended complaint therefore contains no actionable false statement and the claim for defamation was properly dismissed.

Readon also failed to allege that WPLG acted with actual malice. **HN6** The First Amendment safeguards publishers from defamation suits brought by public figures unless the publisher acts with actual malice. *Mia. Herald Publ'g Co. v. Ane*, 423 So. 2d 376, 382 (Fla. 3d DCA 1982) (citing *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 162-65, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967) (Warren, C.J., plurality concurrence)). Actual malice is defined as "knowledge that the statement was false or reckless disregard of **[**\*\*7**]** whether it was false or not." *Don King Prods.*, 40 So. 3d at 43 (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)). This standard requires "more than mere negligence." *Id.* Instead, reckless conduct, as defined by the United States Supreme Court in *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968), includes:

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

Readon was therefore required to plead facts sufficient to give rise to a reasonable inference of actual malice. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 701-02 (11th Cir. 2016).

Readon failed to plead facts sufficient to show that WPLG published with sufficient doubts as to the truth of its publication. **HN7** "Actual malice requires more than a departure from reasonable journalistic standards . . . [t]hus, a failure to investigate, standing on its own, does not indicate the presence of actual malice." *Id.* at 703 (citations omitted). Instead, "there must be some showing that the defendant purposefully avoided further investigation with the intent to avoid the truth." *Id.* (citations omitted).

Care **[**\*\*8**]** must be taken not to construe cases which have found a failure to investigate too broadly because the First Amendment "demands that the law of libel carve out an area of 'breathing space' so that protected speech is not discouraged." **[**\*1236**]** *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989) (citations

423

omitted). The analysis in this regard must always be informed by the safeguards provided by the First Amendment "fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957).

Readon argues that WPLG failed to properly investigate and include all relevant facts in its reporting. In *Michel*, the Eleventh Circuit recognized a limited set of circumstances in which actual malice might arise from a failure to investigate. The *Michel* Court stated that the plaintiff failed to show actual malice because the publication was not "fabricated by the defendants, wholly imaginary, based on an unverified anonymous phone call, inherently improbable, or obviously worthy of doubt." *Id.* at 705 (citing *St. Amant*, 390 U.S. at 732).

This limited set of circumstances conforms to the requirements of the First Amendment. **HN8** As stated in *St. Amant*, it is not enough that a reasonably prudent person "would have investigated further." 390 U.S. at 731. Indeed, Florida law is well settled that the **[**9]** failure to investigate, without more, does not constitute actual malice. *Palm Beach Newspapers, Inc. v. Early*, 334 So. 2d 50, 52-53 (Fla. 4th DCA 1976). Instead, there must be "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732.

The third amended complaint asserts that WPLG was contacted by a known informant who apprised the station of the allegations against Readon. Readon admits that WPLG verified the existence of the lawsuits naming him as a defendant by checking public court records. These facts conclusively show that the reports were not fabricated by WPLG, wholly imaginary, based on an unverified anonymous source, inherently improbable, or obviously worthy of doubt. *Michel*, 816 F.3d at 705. Further, Readon admits that he was contacted by WPLG to discuss the allegations. WPLG, therefore, had "no obvious reasons . . . to doubt the challenged statements, so its failure to conduct a more searching investigation does not show actual malice." *Don King Prods.*, 40 So. 3d at 46.

Readon has not shown that WPLG's investigation was deliberately skewed to avoid uncovering what he calls "the whole truth." For instance, Readon points out that several of the cases had been settled and others involved family members. However, WPLG was not required to balance its reporting with potentially **[**10]** mitigating factors so long as the reporting did not "purposely [make] false statements about [Readon] in order to bolster the theme of the program or to inflict harm on [Readon]." *Id.* at 45. WPLG had no reason to believe that the statements made by Readon's accusers were not true, indeed, WPLG confirmed through both interviews and public records that those allegations existed. Further, the existence of similar allegations from various members of the community stemming from business dealings with Readon served to substantiate each of the allegations. Therefore, the third amended complaint fails to show that WPLG acted with actual malice.

Because the complaint failed to allege a relevant false statement or that WPLG acted with actual malice, Readon failed to state a claim for defamation.


### b. Defamation by Implication

The third amended complaint also failed to state a claim for defamation [*1237] by implication. **HN9** As the Florida Supreme Court noted:

> Defamation by implication arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, such that he may **[**11]** be held responsible for the defamatory implication.

*Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008) (quoting *Stevens v. Iowa Newspapers, Inc.*, 728 N.W. 2d 823, 827 (Iowa 2007)). "[W]hile defamation law shields publishers from liability for minor factual inaccuracies, it also works in reverse, to impose liability upon the defendant who has the details right but the 'gist' wrong." *Id.* at 1107-08.

WPLG did not impermissibly juxtapose a series of true facts so as to create a defamatory implication. Readon alleges that WPLG improperly juxtaposed his business dealings as a private person with his role as a pastor, thereby implying that the acts were committed in his role as pastor. In doing so, Readon has mistaken the purpose of the cause of action for defamation by implication. **HN10** The tort requires that the implied fact be defamatory. But WPLG's negative statements about Readon were not the implication that his business dealings were done as a pastor, rather they were that he was engaging in a continuing pattern of deceitful business practices.

Readon's argument would result in a substantial chilling effect on the freedom of the press. A news agency such as WPLG will often name the profession of the subject of their investigative reporting. When this person is a public figure, it is often this information which makes **[**12]** the reporting relevant to the public. This is not contingent, as Readon argues, on there being a connection between the profession and the alleged negative acts. Were we to accept Readon's position it would become nearly impossible for the media to report on various acts by public figures which have consistently shown to be relevant to the public such as a professional football player caught on camera engaging in domestic violence; a prominent businessman organizing an intricate sex trafficking ring; or a television and movie star promulgating racist, sexist, or homophobic tweets. None of these acts are related to the professions of the persons engaged in them, yet the reporting of both the acts and professions is relevant to

A classic example of defamation by implication was before the Second District in _Heekin v. CBS Broad., Inc._, 789 So. 2d 355, 358 (Fla. 2d DCA 2001). **2⬇** In _Heekin_, the plaintiff alleged that a broadcast falsely portrayed him as a spouse abuser by juxtaposing an interview with his former spouse along with stories and pictures of women who had been abused and killed by their partners. 789 So. 2d at 357. Even though the reporting did not literally claim that the plaintiff **[**13]** was a spouse abuser, by overplaying his former wife's story with stories of spouse abuse, the reporting created the defamatory implication that the plaintiff had abused his spouse. Conversely, Readon has alleged no such defamatory implication. The negative statements about Readon, that he was engaged in potentially underhanded business dealings, were not implied but rather stated explicitly. The reporting of Readon's profession did not  [*1238]  make these stories about Readon any more or less negative, but rather gave the public a context for why the stories were relevant.

Since the third amended complaint failed to allege any defamatory implication, Readon failed to state a cause of action for defamation by implication.

### c. Dismissal with Prejudice

Readon claims that the trial court improperly dismissed his complaint with prejudice rather than allow him to submit a fourth amended complaint to correct any errors in the pleadings. WPLG counters that because the original complaint suffered the same infirmities, no cause of action was ever pleaded and therefore, the statute of limitations has run, **3⬇** and nevertheless further amendment would be futile.

_HN11_⬆ Ordinarily, a decision **[**14]** to allow leave to amend is within the sound discretion of the trial court, and "will not be overturned unless abuse is demonstrated." _Holy Temple Church of God in Christ, Inc. v. Maxwell_, 578 So. 2d 877, 878 (Fla. 1st DCA 1991). When making this determination "all doubts should be resolved in favor of allowing amendment." _Adams v. Knabb Turpentine Co._, 435 So. 2d 944, 946 (Fla. 1st DCA 1983). Generally, refusal to allow amendment of a pleading constitutes an abuse of discretion unless it clearly appears that allowing the amendment would prejudice the opposing party; the privilege to amend has been abused; or the amendment would be futile. _See New River Yachting Ctr., Inc. v. Bacchiocchi_, 407 So. 2d 607, 609 (Fla. 4th DCA 1981).

However, "as an action progresses, the privilege of amendment progressively decreases to the point that the trial judge does not abuse his [or her] discretion in dismissing with prejudice." _Kohn v. City of Miami Beach_, 611 So. 2d 538, 539 (Fla. 3d DCA 1992). This Court has "observed that with amendments beyond the third attempt, dismissal with prejudice is generally not an abuse of discretion." _Id._ (citing _Alvarez v. DeAguirre_, 395 So. 2d 213, 217 (Fla. 3d DCA 1981)). Readon's third amended complaint fails to state a claim against WPLG by not pleading any set of facts giving rise to a cause of action for either defamation or defamation by implication. Since further amendment would go beyond the third attempt, it was not an abuse of discretion for the trial court to dismiss with prejudice.

Affirmed.

---

**Footnotes**

---

**1**⬆ _HN3_⬆ Normally, to determine if a plaintiff in a defamation lawsuit is a public figure, Florida courts employ a two-step process: "First, the court must determine whether there is a 'public controversy.'" _Mile Marker, Inc. v. Petersen Publ'g, L.L.C._, 811 So. 2d 841, 845 (Fla. 4th DCA 2002) (quoting _Gertz v. Robert Welch, Inc._, 418 U.S. 323, 351, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)). Second, "the court must . . . determine whether the plaintiff played a sufficiently central role in the instant controversy to be considered a public figure for purposes of that controversy." _Id. at 846_. Readon, however, asserts in his complaint that he is a public figure. Therefore, we accept Readon's statement as true and decline to engage in a public figure analysis.

**2**⬆ While _Heekin_ involved the since-disapproved tort for false light invasion of privacy, the Florida Supreme Court has noted that nearly all such claims could have been brought as defamation by implication. _Jews for Jesus_, 997 So. 2d at 1113.

**3**⬆ WPLG's statement that the statute of limitations has run is of no consequence. _Florida Rule of Civil Procedure 1.190(c)_ states: "When the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth _or attempted to be set forth_ in the original pleading, the amendment shall relate back to the date of the original pleading." (emphasis added). Any amendment by Readon would be based on the news reports previously at issue in this litigation. Any amendment would therefore relate back.

425



About

Privacy Policy

Cookie Policy

Terms & Conditions



Copyright © 2023 LexisNexis.

⬛⬛⬛  ● Lexis  🔍    Saadi v. Maroun, 2008 U.S. Dist. LEXIS 116658 (M.D. Fla. Sep. 9, 200  🔍    Client: -None- ⌄   Folders   History   Help

Search: Everything

---

**Document:**      Saadi v. Maroun, 2008 U.S. Dist. LEXIS 116658     | Actions ⌄

📁⌄   🖨   ✉   ⬇   ⬡   ⛶   | Go to ⌄ |   Page   | Page # |   ⌃ ⌄   Search Document 🔍

⚠ **Saadi v. Maroun, 2008 U.S. Dist. LEXIS 116658**

**Copy Citation**

United States District Court for the Middle District of Florida, Tampa Division

September 9, 2008, Decided; September 9, 2008, Filed

Case No. 8:07-cv-1976-T-24-MAP

**Reporter**

**2008 U.S. Dist. LEXIS 116658** * | 2008 WL 4194824

EDWARD T. SAADI, Plaintiff, -vs- PIERRE A. MAROUN ET AL., Defendants.

**Subsequent History:** Motion denied by Saadi v. Maroun, 2009 U.S. Dist. LEXIS 154205 (M.D. Fla., Apr. 27, 2009)

Summary judgment granted, in part, summary judgment denied, in part by Saadi v. Maroun, 2009 U.S. Dist. LEXIS 42574 (M.D. Fla., May 20, 2009)

Motion granted by, in part, Motion denied by, in part, Motion denied by, Motion denied by, As moot Saadi v. Maroun, 2019 U.S. Dist. LEXIS 244748, 2019 WL 13180398 (M.D. Fla., Mar. 21, 2019)

Motion granted by, in part, Motion denied by, in part, Motion denied by, As moot Saadi v. Maroun, 2019 U.S. Dist. LEXIS 244749, 2019 WL 13180399 (M.D. Fla., Apr. 3, 2019)

Magistrate's recommendation at Saadi v. Maroun, 2019 U.S. Dist. LEXIS 165531, 2019 WL 4718905 (M.D. Fla., Sept. 10, 2019)

Magistrate's recommendation at Saadi v. Maroun, 2020 U.S. Dist. LEXIS 28306, 2020 WL 1894351 (M.D. Fla., Jan. 3, 2020)

Motion denied by Saadi v. Pierre A Maroun & Maroun's Int'l, LLC, 2020 U.S. Dist. LEXIS 263622 (M.D. Fla., Sept. 29, 2020)

Motion granted by, in part, Motion denied by, in part Saadi v. Pierre A Maroun & Maroun's Int'l, LLC, 2020 U.S. Dist. LEXIS 263535 (M.D. Fla., Nov. 6, 2020)

Motion granted by, in part, Motion denied by, in part Saadi v. Maroun, 2020 U.S. Dist. LEXIS 263537 (M.D. Fla., Nov. 6, 2020)

Motion granted by, in part, Motion denied by, in part Saadi v. Pierre A Maroun & Maroun's Int'l, LLC, 2020 U.S. Dist. LEXIS 263534 (M.D. Fla., Nov. 10, 2020)

Motion denied by Saadi v. Pierre A. Maroun & Maroun's Int'l, 2020 U.S. Dist. LEXIS 253830 (M.D. Fla., Nov. 24, 2020)

Motion denied by Saadi v. Maroun, 2021 U.S. Dist. LEXIS 133422 (M.D. Fla., Jan. 6, 2021)

Reserved by, Motion granted by, in part, Motion denied by, in part, Motion denied by, As moot, Motion denied by, Motion granted by Saadi v. Pierre A. Maroun & Maroun's Int'l, LLC, 2021 U.S. Dist. LEXIS 258750 (M.D. Fla., Jan. 21, 2021)

Sanctions disallowed by, Without prejudice Saadi v. Pierre A Maroun & Maroun's Int'l, LLC, 2021 U.S. Dist. LEXIS 258751 (M.D. Fla., Jan. 25, 2021)

Motion granted by, in part, Motion denied by, in part, Without prejudice Saadi v. Pierre A Maroun & Maroun's Int'l, LLC, 2021 U.S. Dist. LEXIS 258619 (M.D. Fla., Mar. 18, 2021)

Motion denied by Saadi v. Pierre A Maroun & Maroun's Int'l, LLC, 2021 U.S. Dist. LEXIS 258623 (M.D. Fla., Mar. 22, 2021)

Motion granted by Saadi v. Pierre A Maroun & Maroun's Int'l, LLC, 2021 U.S. Dist. LEXIS 258625 (M.D. Fla., Mar. 22, 2021)

Motion denied by Saadi v. Pierre A Maroun & Maroun's Int'l, LLC, 2021 U.S. Dist. LEXIS 258621 (M.D. Fla., Mar. 22, 2021)

Sanctions disallowed by, Without prejudice Saadi v. Maroun, 2021 U.S. Dist. LEXIS 258624 (M.D. Fla., Apr. 9, 2021)

Motion denied by, Sanctions disallowed by, Motion granted by, in part, Motion denied by, in part Saadi v. Pierre A Maroun & Maroun's Int'l, LLC, 2021 U.S. Dist. LEXIS 258620 (M.D. Fla., Apr. 9, 2021)

Motion granted by, in part, Motion denied by, in part Saadi v. Maroun, 2021 U.S. Dist. LEXIS 258761 (M.D. Fla., Nov. 15, 2021)

Summary judgment granted by, in part, Summary judgment denied, in part, Summary judgment denied by Saadi v. Maroun, 2022 U.S. Dist. LEXIS 97815 (M.D. Fla., Mar. 2, 2022)

Motion granted by, in part, Motion denied by, in part, Costs and fees proceeding by Saadi v. Maroun, 2022 U.S. Dist. LEXIS 66782, 2022 WL 1738076 (M.D. Fla., Mar. 15, 2022)

Motion denied by Saadi v. Maroun, 2022 U.S. Dist. LEXIS 66970, 2022 WL 1738002 (M.D. Fla., Mar. 15, 2022)

Summary judgment granted by Saadi v. Maroun, 2022 U.S. Dist. LEXIS 66971 (M.D. Fla., Mar. 15, 2022)

Motion granted by, in part, Motion denied by, in part, Judgment entered by Saadi v. Maroun, 2022 U.S. Dist. LEXIS 100570 (M.D. Fla., Mar. 25, 2022)

## Core Terms

intentional infliction of emotional distress, postings, allegations, sites, motion to dismiss, defamatory, threats, libel, defamation, outrageous,

427

comments

**Counsel:** **[\*1]** For Edward T. Saadi, an individual, Plaintiff: Edward T. Saadi, LEAD ATTORNEY, Law Office of Edward T. Saadi ⏷, Boardman, OH; William J. Brown, LEAD ATTORNEY, Law Office of William J. Brown ⏷, Miami, FL.

For Gaspar Ficarrotta ⏷, Mediator: Gasper James Ficarrotta ⏷, LEAD ATTORNEY, Barr, Murman & Tonelli, PA ⏷, Tampa, FL.

For La Punta de Hyde Park, LLC, Movant: Matthew Scott Przybycin ⏷, LEAD ATTORNEY, Dennis Hernandez & Associates, PA ⏷, Tampa, FL.

For Lebanon Relief, Inc., Movant: William J. Brown, LEAD ATTORNEY, Law Office of William J. Brown ⏷, Miami, FL.

**Judges:** SUSAN C. BUCKLEW ⏷, United States District Judge.

**Opinion by:** SUSAN C. BUCKLEW ⏷

## Opinion

### ORDER

This cause comes before the Court on Motions to Dismiss the Complaint for failure to state a claim, filed by Defendants Pierre A. Maroun and Hala Fakhre Maroun (Doc. No. 28) and Defendant Maroun's International, LLC (Doc. No. 40.). Plaintiff has filed Responses in opposition. (Doc. Nos. 44, 50.)

### INTRODUCTION

Plaintiff, Edward T. Saadi, filed suit against Defendants for posting negative statements about him on Internet blogs [1 ⏷] and forums, [2 ⏷] and for otherwise harassing him. In his three-count Second Amended Complaint, Plaintiff asserts claims for (1) libel, (2) intentional infliction of **[\*2]** emotional distress, and (3) injunctive relief. Defendants move to dismiss the Complaint in its entirety. (Doc. Nos. 28, 40.) Defendants argue that: (1) the published statements were opinions and therefore are not actionable, [3 ⏷] (2) Plaintiff cannot establish Defendants' authorship of the negative statements, (3) Defendants' conduct was not so extreme or outrageous as to constitute intentional infliction of emotional distress, and (4) the allegations of intentional infliction of emotional distress are too broad to be answered. (Id.) In the alternative to Defendants' Motion to dismiss Plaintiff's intentional infliction of emotional distress claim, Defendants Pierre A. Maroun and Hala Fakhre Maroun move for a more definite statement of the allegations on which the intentional infliction of emotional distress claim is based. (Doc. No. 28, p. 1.)

### STANDARD OF REVIEW

In deciding a motion to dismiss, the district court is required to view the complaint in the light most favorable to the plaintiff. See Murphy v. Federal Deposit Ins. Corp., 208 F.3d 959, 962 (11th Cir. 2000) (citing Kirby v. Siegelman, 195 F.3d 1285, 1289 (11th Cir. 1999)). The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. Instead, Rule 8(a)(2) requires a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007) (citation omitted). As such, a plaintiff is required to allege "more than labels and conclusions, and a formulaic recitation of the **[\*4]** elements of a cause of action will not do." Id. at 1965 (citation omitted). While the Court must assume that all of the allegations in the complaint are true, dismissal is appropriate if the allegations do not "raise [the plaintiff's] right to relief above the speculative level." Id. (citation omitted). The standard on a 12(b)(6) motion is not whether the plaintiff will ultimately prevail in his or her theories, but whether the allegations are sufficient to allow the plaintiff to conduct discovery in an attempt to prove the allegations. See Jackam v. Hospital Corp. of Am. Mideast, Ltd., 800 F.2d 1577, 1579 (11th Cir. 1986).

### BACKGROUND

Plaintiff is a lawyer practicing in Ohio. (2d. Am. Compl., p. 5.) He is of Lebanese descent and draws over half of his clientele from the Lebanese-American community. (Pl.'s decl., p. 2.) Approximately two years ago, Defendants Pierre A. Maroun and Hala Fakhre Maroun began posting comments about Plaintiff on the Internet, using the screenname "Losers," as well as other possible aliases. (2d. Am. Compl., p. 1.) Although Plaintiff does not directly allege that postings were made by Defendant Maroun's International, LLC, Plaintiff claims that Defendant Maroun's **[\*5]** International, LLC is an alter ego of Defendant Pierre A. Maroun, established for the purpose of evading liability in the present action. (Id., p. 4.)

Defendants' postings appear on a blog, located at http://biggestloosers.blogspot.com, which declares "OUR STORIES ARE TRUE" (Pl.'s Ex. B), and on two forums entitled "Lebanese Forces Official Forum"--located at www.lebforces.org (Pl.'s Ex. C)--and "President Bachir Gemayel Official Forum"--located at www.bachirgemayel.org (Pl.'s Ex. D). The latter two sites, in part, encourage discussion of the political events in Lebanon. (Doc. No. 40, p. 8.) Defendants' postings about Plaintiff include statements that Plaintiff:

(1) is a "stalker," is "mentally unstable," and "claims to have a law degree but never worked or tried a case" (Pl.'s Ex. A);

(2) received a car from Former Prime Minster of Lebanon Michael Aoun, paid for with money stolen by Prime Minister Aoun from the Lebanese people, facts which Defendants claim were confirmed "after some thorough investigations" (Pl.'s Exs. B, D, E);

(3) has a girlfriend who recently turned 18, "so it's legal now" (Pl.'s Ex. C); and

(4) is a "criminal," a "traitor," a failure at his career, and connected to **[\*6]** Hezbollah (Pl.'s Ex. G).

428

In addition to these postings, Defendant Pierre A. Maroun has threatened Plaintiff and his 73 year old father both verbally and in writing. (Id., Am. Compl., pp. 10-11.) As a result of Defendants' behavior, Plaintiff alleges that his reputation and business have suffered, and he has experienced emotional distress. (Id.)

**DISCUSSION**

1. Nature of the Speech

In a suit for defamation, a private plaintiff must allege (1) publication of false statements about the plaintiff that "expose [] [him] to distrust, hatred, contempt, ridicule or obloquy or which cause [him] to be avoided, or which [have] a tendency to injure [him] in his office, occupation, business or employment," Cooper v. Miami Herald, 159 Fla. 296, 31 So. 2d 382, 384 (Fla. 1947); (2) done without reasonable care as to the truth or falsity of those statements; and (3) that result in damage to that person. Hay v. Independent Newspapers, Inc., 450 So. 2d 293, 294-95 (Fla 2d DCA 1984). Libel is "the publication of defamatory matter by written or printed words." Rapp v. Jews for Jesus, Inc., 944 So. 2d 460, 465 (Fla. 4th DCA 2006) (quoting Restatement (Second) of Torts § 568 (1) (1965)).

A. *Expressions of Opinion*

Although expressions **[*7]** of opinion cannot constitute defamation, statements that mix fact and opinion do not enjoy the same absolute protection. Johnson v. Clark, 484 F.Supp. 2d 1242, 1247 (M.D. Fla. 2007). A statement purports to be fact if, rather than commenting on information available to the reader, it implies the existence of undisclosed defamatory facts as its basis. Id. If a statement mixes opinion and fact, it is defamatory if its reasonable interpretation, in context, is defamatory. Rapp, 944 So. 2d at 466-67. The Court decides, as a question of law, whether a statement is one of opinion, fact, or both, and whether the statement is "susceptible [to] defamatory interpretation." Johnson, 484 F. Supp. 2d at 1247.

Here, Defendants claim that the Internet postings cited by Plaintiff are not actionable because they are merely expressions of opinion. (Doc. No. 28, pp. 8-9; Doc. No. 40, pp. 7-8.) However, statements that Plaintiff is a mentally unstable stalker, a criminal, and that he has received gifts paid for with money stolen from the Lebanese government, as well as statements that suggest that Plaintiff falsely purports to have a law degree and has committed statutory rape, imply factual knowledge. **[*8]** They are not merely subjective characterizations of publically-available information. Defendants, at times, even combined the statements with claims that the information was the result of "thorough investigation," and posted them on sites that proclaim "OUR STORIES ARE TRUE." (Pl.'s Ex. B.) Certainly the postings and context in which they were made suggest that the information is based on facts showing that Plaintiff is involved in criminal, immoral, and unprofessional behavior. Thus, the statements assert facts that can reasonably be construed as defamatory.

B. *Political Speech*

Defendants further claim immunity for their speech, because it is posted on sites designed to foment discussion of political issues. (Doc. No. 28, pp. 9-10; Doc. No. 40, pp. 8-9.) Political speech and debate about public questions are protected fiercely in the American ethos. Gibson v. Maloney, 231 So. 2d 823, 825-26 (Fla. 1970). Such comments are protected when made in jest. Abraham v. Baldwin, 52 Fla. 151, 156, 42 So. 591 (1906). However, political sites are not asylums for gratuitous libel. To allow people to post libel freely on any site that coins itself "political" would be to allow landscapes of political discourse **[*9]** to shelter, or rather, incubate, libel. Political surroundings do not, by themselves, transform otherwise-libelous speech into political commentary, nor do they shield such speech from legal action.

The statements levied against Plaintiff were made primarily about his personal and professional life and were, for the most part, entirely unrelated to matters of public concern. Further, Plaintiff alleges that these comments were made maliciously, and therefore would not fall within "fair comment" protection, even if they were made about matters of public concern. Thus, posting the comments on politically-related sites does not immunize the postings from suit.

C. *Location of Postings*

Finally, Defendants suggest that because the postings were not made on sites targeting citizens of Ohio or persons seeking legal counsel, the postings are not actionable. (Doc. No. 28, pp. 10-11; Doc. No. 40, pp. 9-10.) Defendants' argument is inapposite. The test for libel is not whether statements are published in a location meant solely to do professional damage to Plaintiff, but whether the statements cause harm. The postings here are on sites that target the Lebanese-American community, of which Plaintiff **[*10]** is a member, and from which Plaintiff draws more than half of his clientele from that community. (Pl.'s decl., p. 2.) Further, Plaintiff claims that he has suffered damage to his reputation, loss of business, and emotional distress as a result of the postings. (2d Am. Compl., p. 9-10.) The location of Defendants' postings does not, therefore, belie Plaintiff's defamation claim.

2. Attribution to Defendants

In order to state a claim against a particular defendant, the pleadings must allege that the defendant committed a wrongful act or omission. To state a cause of action against a corporation being sued wrongly in order to limit the liability of its constituent, "it is sufficient [that the Complaint] allege the latter to be the alter ego or agent of the parent." Vantage View v. Bali E. Dev. Corp., 421 So. 2d 728, 733 (Fla. 4th DCA 1982).

Plaintiff alleges numerous and specific defamatory postings by Pierre A. Maroun and Hala Fakhre Maroun under the alias "Losers." (2d Am. Compl.) This is sufficient to attribute wrongful action to these defendants. Plaintiff further alleges that Maroun's International, LLC is merely a fraudulently-created alter ego or mere instrumentality of Defendant Pierre A. **[*11]** Maroun, being used to evade liability in the present lawsuit. (Id., p. 4.) Accordingly, Plaintiff claims that Maroun's International, LLC should be held responsible for Defendant Pierre A. Maroun's criminal actions. (Id.) This claim is sufficient to meet the requirements for stating a cause of action against the corporation. Thus, Plaintiff has sufficiently stated a cause of action against these three Defendants.

429

3. Extreme and Outrageous Behavior

To establish a claim for intentional infliction of emotional distress, Plaintiff must allege "conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Rapp, 944 So. 2d at 466 (quotation omitted). There are only "a very limited set of cases in which courts [have] recognized conduct as sufficiently egregious to support a claim of [intentional infliction of emotional distress]." Crenshaw ex. rel. United States v. DeGayner, 622 F. Supp. 2d 1258, 2008 U.S. Dist. LEXIS 50932, at *67-68 (M.D. Fla., June 13, 2008). Threats are nearly never enough to state a claim of intentional infliction of emotional distress unless the threats are explicit  **[*12]** and extreme. See Crenshaw ex. rel. United States, 622 F. Supp. 2d 1258, 2008 U.S. Dist. LEXIS 50932, at *70 ("some level of physical contact or severely threatening behavior is typically required to state a claim for intentional infliction of emotional distress"); Koutsouradis v. Delta Airlines, Inc., 427 F.3d 1339, 1344-45 (11th Cir. 2005) ("mere insults and indignities do not support a claim for the tort of [intentional infliction of emotional distress]"); Nims v. Harrison, 768 So. 2d 1198, 1201 (Fla. 1st DCA 2000) (finding that Plaintiff stated a claim for intentional infliction of emotional distress based on threats to kill her and rape her children). Whether behavior meets the severe standard required to establish a claim for intentional infliction of emotional distress is question of law. Rapp, 944 So. 2d at 466.

Here, Plaintiff alleges that over the course of two years, Defendants posted statements that Plaintiff acted immorally, illegally, and unprofessionally. Although such behavior might be distasteful and offensive, these "insults and indignities" do not meet the extreme standard of approbation required for an intentional infliction of emotional distress claim. See Koutsouradis, 427 F.3d at 1344-45. **[*13]** Because these are the only facts alleged against Defendant Hala Fakhre Maroun as the basis for Plaintiff's intentional infliction of emotional distress claim against him, Defendants' Motion to Dismiss Plaintiff's claim for intentional infliction of emotional distress against Hala Fakhre Maroun is GRANTED.


4. Specificity of the Allegations

Claims for intentional infliction of emotional distress must allege the ultimate facts that the Court can use to determine whether the claim can be sustained. See Liberty Mutual Ins. Co. V. Steadman, 968 So. 2d 592, 595 (Fla. 3d DCA 2007) (finding that, while the plaintiff's complaint alleged all of the elements of a claim for intentional infliction of emotional distress, the pleaded facts were insufficient to meet the standard required to show sufficiently extreme and outrageous conduct); Baker v. Florida Nat'l. Bank, 559 So.2d 284, 287 (Fla. 4th DCA 1990) ("It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.") (quotation omitted). Courts only recognize threats as sufficient to establish a claim of intentional infliction of emotional  **[*14]** distress when they are explicit and egregious, as in Nims, in which the plaintiff was threatened with murder and the rape of her family.

In addition to the alleged defamation and "character assassination" discussed *supra*, Plaintiff accuses Pierre A. Maroun of "bullying, intimidation, and menacing" as well as making "written and verbal threats of physical violence against [Plaintiff] and his 75-year-old father." (Doc. No. 50, p. 18.) Defendants request clarification of these allegations. (Doc. No. 28, p. 15.) Because of the high standard required to state a claim for intentional infliction of emotional distress, the vague reference to verbal threats is insufficient to allow Plaintiff's intentional infliction of emotional distress claim to go forward. Therefore, the Court will dismiss Plaintiff's claim of intentional infliction of emotional distress without prejudice and give him leave to file an amended complaint to provide greater specificity as to the threats upon which the intentional infliction of emotional distress claim is based.


**CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** that Defendants' Motions to Dismiss are **GRANTED IN PART AND DENIED IN PART**.

(1) With respect to Plaintiff's  **[*15]** claim for defamation (Count I) against Defendants Pierre A. Maroun, Hala Fakhre Maroun, and Maroun International, LLC, Defendants' Motions are **DENIED**.

(2) With respect to Plaintiff's claim for intentional infliction of emotional distress (Count II) against Hala Fakhre Maroun, Defendants' Motion (Doc. No. 28) is **GRANTED**. The claim of intentional infliction of emotional distress against Hala Fakhre Maroun is **DISMISSED** for failure to state a claim.

(3) With respect to the Motions to dismiss or to provide a more definitive statement of Plaintiff's intentional infliction of emotional distress claim against Pierre A. Maroun and Maroun's International, LLC, (Count II) (Doc. Nos. 28 & 40), Defendants' Motions are **GRANTED**. The Court dismisses the claim without prejudice and grants Plaintiff leave to amend his Complaint in order to specify the nature of the threats allegedly made by Defendant Pierre A. Maroun and his alter ego, Maroun's International, LLC, on which Plaintiff's claim of intentional infliction of emotional distress is based. Plaintiff is directed to file a third amended complaint that complies with this order by September 22, 2008.

(4) Because Defendants base their Motions to dismiss  **[*16]** Plaintiff's claim for injunctive relief (Count III) on the ground that Plaintiff's libel claim fails, these Motions are also **DENIED**.

**DONE AND ORDERED** at Tampa, Florida, this 9th day of September, 2008.

/s/ Susan C. Bucklew

SUSAN C. BUCKLEW

United States District Judge

---

**Footnotes**

1  Blogs are on-line diary postings, allowing the authors--or, "bloggers"--to post their comments for viewing by other Internet users.

430

**2** Forums are on-line discussion sites that allow viewers to read and respond to each other's postings.

**3** Defendants also claim that one of the postings cited by Plaintiff is not actionable, because the posting is a public **[*3]** court record prepared by Plaintiff. The Court does not review this defense, as Plaintiff denies basing his libel claim on the publication of the court document. Rather, he "included the republication of the [First Amended Complaint] in Exhibit 'G' merely to demonstrate . . . the remaining [allegedly-defamatory] content" in the Exhibit. (Doc. No. 50, p. 13, n. 4.)

 LexisNexis®

About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

⚠️ **Smith v. Cuban Am. Nat'l Found., 731 So. 2d 702**

Copy Citation

Court of Appeal of Florida, Third District

February 3, 1999, Opinion Filed

CASE NO. 96-2702

**Reporter**

**731 So. 2d 702** * | 1999 Fla. App. LEXIS 851 ** | 27 Media L. Rep. 2499 | 24 Fla. L. Weekly D 329

WAYNE SMITH, Appellant, vs. CUBAN AMERICAN NATIONAL FOUNDATION, Appellee.

**Subsequent History:** [**1] Rehearing Denied June 9, 1999. Released for Publication June 9, 1999.

**Prior History:** An Appeal from the Circuit Court for Dade County, W. Thomas Spencer ▾, Judge. LOWER TRIBUNAL NO. 93-21852.

**Disposition:** Reversed final judgment entered below and remanded with instructions to enter a judgment in favor of Smith.

## Core Terms

documentary, defamatory, standard jury instruction, falsity, public figure, interview, clips, trial judge, broadcast

### Case Summary

**Procedural Posture**
Appellee foundation filed suit for defamation against appellant in the Circuit Court for Dade County (Florida). The jury returned a verdict awarding nominal and punitive damages to appellee. Appellant moved for judgment notwithstanding the verdict and for a new trial, and both motions were denied. Appellant sought review in the instant court.

**Overview**
Appellee foundation filed defamation suit against appellant, a university professor, based on a statement that appellant made during the course of an interview given for a television documentary. Appellee was awarded nominal and punitive damages in a jury trial. On appeal, the instant court (court) concluded that the trial court erred in refusing to show the entire documentary to the jury, thus providing no context for the substance of appellant's statement, and also erred in refusing to give a jury instruction on substantial truth. Under the substantial truth doctrine, a statement does not have to be perfectly accurate if the "gist" of the statement is true. The trial court was incorrect in finding that "substantial truth" should not be presented to the jury. Falsity only existed if the publication was substantially and materially false, not just if it was technically false. The court held that appellant's statement was not susceptible to a defamatory effect. Thus, the court reversed the final judgment entered below and remanded with instructions to enter judgment in favor of appellant.

**Outcome**
The instant court reversed the judgment entered by the lower court, and remanded with instructions to enter judgment in favor of appellant, on the grounds that the speech at issue was not susceptible to a defamatory effect; and the lower court erred in refusing to give an instruction on substantial truth.

▼ LexisNexis® Headnotes

Civil Procedure > ... > Jury Trials ▾ > Jury Instructions ▾ > General Overview ▾
Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > General Overview ▾
Torts > Intentional Torts ▾ > Defamation ▾ > Procedural Matters ▾
View more legal topics

**HN1** **Jury Trials, Jury Instructions**

The court has a "prominent function" in determining whether a statement is defamatory, and if a statement is not capable of a defamatory meaning, it should not be submitted to a jury. Thus, a reviewing court may reverse a jury verdict and instruct the lower court to enter a judgment in favor of defendant where the statement is not capable of a defamatory effect, i.e., not a false statement which naturally and proximately results in injury to another. If the statement is capable of more than one meaning, however, the trier of fact should determine whether the language used was actually understood in its defamatory sense. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (9)*

Constitutional Law > ... > Freedom of Speech ⌄ > 📄 Defamation ⌄ > General Overview ⌄
Torts > Intentional Torts ⌄ > Defamation ⌄ > General Overview ⌄

**HN2** **Freedom of Speech, Defamation**

Under the substantial truth doctrine, a statement does not have to be perfectly accurate if the "gist" or the "sting" of the statement is true. A statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (22)*   ➕ 1

Constitutional Law > ... > Freedom of Speech ⌄ > 📄 Defamation ⌄ > 📄 Public Figures ⌄
Torts > ... > Defamation ⌄ > Defenses ⌄ > Truth ⌄
View more legal topics

**HN3** **Defamation, Public Figures**

The Florida standard jury instructions on defamation do not explicitly include an instruction on substantial truth. It is constitutionally required that public figure plaintiff prove falsity, and the standard jury instructions reflect such requirement. The jury instructions do, however, include the language of substantial truth in the instruction for the case of private plaintiff/non-media defendant. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Constitutional Law > ... > Freedom of Speech ⌄ > 📄 Defamation ⌄ > General Overview ⌄
Torts > Intentional Torts ⌄ > Defamation ⌄ > General Overview ⌄

**HN4** **Freedom of Speech, Defamation**

According to the United States Supreme Court and Florida case law, falsity only exists if the publication is substantially and materially false, not just if it is technically false. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (15)*   ➕ 2

---

**Counsel:** Alfredo G. Duran ⌄; Jorden Burt Berenson & Johnson and Richard J. Ovelmen ⌄, for appellant.

G. Luis Dominguez ⌄; George J. Fowler, III and Ian M. Rodriguez ⌄ and Rice Fowler, for appellee.

**Judges:** Before NESBITT ⌄, LEVY ⌄ and SORONDO ⌄, JJ.

## Opinion

 **[*703]** PER CURIAM.

Wayne Smith appeals the lower court's final judgment and the denial of his motion for judgment notwithstanding the verdict and motion for a new trial. For the reasons which follow, we reverse the final judgment and remand with directions to enter judgment for Smith.

The Cuban American National Foundation ("CANF") filed this suit for defamation against Smith, a professor at Johns Hopkins University, based on a statement Smith made during the course of an interview given for a PBS documentary entitled "Campaign for Cuba." The documentary dealt with the anti-Castro movement in the Cuban-American exile community and described  **[*704]**  the activities [**2] of the CANF, the Cuban American Foundation ("CAF"), and the Free Cuba PAC ("PAC"). The documentary looked at the political influence of these groups, and their role in shaping United States policy toward Cuba.

During the first quarter of the program, the narrator describes the CANF, the CAF, and the PAC as three groups controlled by the same person, then identifies members of Congress which have benefitted from PAC money. The narrator states that the PAC has been the single largest contributor to the campaign of the late United States Congressman Dante Fascell, then explains that "Representative Fascell was also instrumental in the creation of the Congressionally funded National Endowment for Democracy, or NED . . . [which has] awarded about nine hundred thousand dollars in grants to the Cuban American National Foundation." Immediately following that statement, the documentary shows a twenty second statement from Mr. Smith which is the subject of this lawsuit:

It's interesting that the National Endowment for Democracy has contributed to the Cuban American National Foundation, and it, in turn, through its -- its -- its own organization, through its PAC, has contributed to the campaign [**3] funds of many Congressmen, including some who have been involved with the National Endowment for Democracy, from whence they got the money in the first place, including Dante Fascell.

CANF received a copy of this documentary prior to broadcast, and sent a letter to Professor Smith, threatening a lawsuit. CANF claimed the

statement implied that it was involved in criminality or corruption, and in particular, that the statement asserted that CANF used money granted to it by the NED to contribute to the campaigns of those United States Congressmen who provided the NED grants to CANF. Smith claims he was relying upon an article by Professor John S. Nichols entitled "The Power of the Anti-Fidel Lobby," which was published in The Nation magazine. Smith contacted Nichols prior to broadcast, and Nichols assured Smith that his statement was correct. The documentary was broadcast, and CANF filed suit against Smith alone.

At the jury trial of this case, the judge excluded from evidence all portions of the documentary other than the one statement by Smith which CANF alleged to be false and defamatory, and four other clips from the documentary which showed other portions of the interview with [**4] Smith. The clips were interspersed throughout the documentary, and amounted to a total of two minutes of air time.

Upon instructing the jury, the trial judge refused to allow an instruction on the defense of "substantial truth." He stated that the Florida Standard Jury Instructions intentionally left the defense out where the plaintiff is a public figure (as it is in this case), because the burden is on the plaintiff to prove falsity. The jury returned a verdict of no compensatory damages, $ 10,000 in nominal damages, and $ 30,000 in punitive

---

| Document: | Smith v. Cuban Am. Nat'l Found., 731 So. 2d 702 | Actions∨ |

---

allowed to see make it clear that CANF was not committing any crime, and, second, even if the statement is technically false, it is substantially true because there would not be a different effect in the mind of the average viewer who watched the documentary without the allegedly false statement, as opposed to with the statement.

*HN1* The court has a "prominent function" in determining whether a statement [**5] is defamatory, and if a statement is not capable of a defamatory meaning, it should not be submitted to a jury. See *Byrd v. Hustler Magazine, 433 So. 2d 593, 595 (Fla. 4th DCA 1983);* Owner's Adjustment Bureau, **[*705]** Inc. v. Ott, 402 So. 2d 466, 468 (Fla. 3d DCA 1981); Wolfson v. Kirk, 273 So. 2d 774, 778 (Fla. 4th DCA 1973); see also Valentine v. C.B.S., Inc., 698 F.2d 430, 432 (11th Cir. 1983); Nelson v. Associated Press, Inc., 667 F. Supp. 1468, 1477 (S.D. Fla. 1987). Thus, a reviewing court may reverse a jury verdict and instruct the lower court to enter a judgment in favor of the defendant where the statement is not capable of a defamatory effect, i.e., not a "false statement which naturally and proximately results in injury to another." *Byrd, 433 So. 2d at 595.* If the statement is capable of more than one meaning, however, the trier of fact should determine whether the language used was actually understood in its defamatory sense. *Wolfson, 273 So. 2d at 778.*

We conclude that the trial court erred in refusing to show the entire documentary to the jury, thus providing no context for the substance of Smith's statement, and also erred in refusing to give a [**6] jury instruction on substantial truth.

### Context

The trial judge in this case ruled that everything other than Mr. Smith's statements were irrelevant. Specifically, the judge stated:

I reviewed the tape. I don't see any relevance to most of it and the issues in this case. They go on about all kinds of subjects involved in Cuba that have got nothing to do with this, but I would have no objection, you know, for the argument Mr. Smith is interviewed maybe four or five different places . . . and I have no objection to the jury seeing the other interviews of Mr. Smith if you want to.

The trial court abused its discretion in allowing only the interviews of Mr. Smith to be seen by the jury. "[A] publication must be considered in its totality." *Byrd, 433 So. 2d at 595;* see also, Colodny v. Iverson, Yoakum, Papiano & Hatch, 936 F. Supp. 917, 923 (M.D. Fla. 1996); Jones v. American Broadcasting Cos., 694 F. Supp. 1542, 1551 (M.D. Fla. 1988), judgment vacated on other grounds, 498 U.S. 892 (1990). To determine whether a statement is defamatory, it must be considered in the context of the publication. See Raymer v. Doubleday & Co., 615 F.2d 241, 244 [**7] (5th Cir. 1980); Rush-Hampton Indus., Inc. v. Home Ventilating Inst., 419 F. Supp. 19, 21 (M.D. Fla. 1976); Early v. Palm Beach Newspapers, Inc., 354 So. 2d 351, 352 (Fla. 1977); Ford v. Rowland, 562 So. 2d 731, 735 (Fla. 5th DCA 1990); Hay v. Indep. Newspapers, Inc., 450 So. 2d 293, 295 (Fla. 2d DCA 1984); O'Neal v. Tribune Co., 176 So. 2d 535, 548 (Fla. 2d DCA 1965); MacGregor v. Miami Herald Publ'g Co., 119 So. 2d 85, 88 (Fla. 2d DCA 1960).

This is not the case only, as CANF argues, where the entire publication is alleged to be defamatory, but even where only a portion of the publication is alleged to be defamatory. For example, in *Byrd,* Hustler magazine published a photograph of the plaintiff. That photograph had been taken from an advertisement, for which the plaintiff posed, for Viceroy cigarettes. 433 So. 2d at 594. Hustler magazine had airbrushed out the index finger of the plaintiff who was doing a "V for Victory" sign, thus making it appear as if he were making an obscene gesture to the camera. Id. The caption underneath the picture as published in Hustler made it plain that the photograph had been changed in order to parody the ad. Id. [**8] The false statement, according to the plaintiff, was that he would pose for this photograph as it appeared in Hustler. Id. at 595. The court held, however, that the words and picture must be considered together. Id. It stated: "'The court must consider all the words used, not merely a particular phrase or sentence.'" Id. (quoting Information Control Corp. v. Genesis One Computer Corp., 611 F.2d 781, 784 (9th Cir. 1980)).

The documentary in this case explains that the three organizations are separate and distinct, although they are controlled by the same individual. Furthermore, the context of the broadcast cannot be irrelevant, **[*706]** because the average viewer would have been watching the entire broadcast, not merely a twenty second clip, or even two minutes of clips interspersed throughout the program. There is no way to determine the "gist" or "sting" of the publication in the mind of the average viewer without examining the statement in context.

### Substantial Truth

The trial judge in this case denied Smith's request for a jury instruction on the issue of "substantial truth," finding that the Florida Supreme Court intentionally excluded it from the standard [**9] jury instructions on defamation, and that the reason must have been because the public figure plaintiff has the burden of proving falsity. This rationale fails, however, when looking at the case law on substantial truth, which is based on First Amendment principles, as well as the Florida Supreme Court's own language in adopting the standard jury instructions.

*HN2* under the substantial truth doctrine, a statement does not have to be perfectly accurate if the "gist" or the "sting" of the statement is true. See Masson v. New Yorker Magazine, 501 U.S. 496, 517, 115 L. Ed. 2d 447, 111 S. Ct. 2419 (1991); Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir. 1993); Nelson v. Associated Press, Inc., 667 F. Supp. 1468, 1477 (S.D. Fla. 1987); Woodard v. Sunbeam Television Corp., 616 So. 2d 501, 503 (Fla. 3d DCA 1993); McCormick v. Miami Herald Publ'g Co., 139 So. 2d 197, 200 (Fla. 2d DCA 1962). A "statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" Id.; Woodard, 616 So. 2d at 503; Early, 354 So. 2d at 352; Bishop v. Wometco Enters., Inc., 235 So. 2d 759 [**10] ." (Fla. 3d DCA 1970); Hill v. Lakeland Ledger Publ'g Corp., 231 So. 2d 254, 256 (Fla. 2d DCA 1970); Hammond v. Times Publ'g Co., 162 So. 2d 681, 682 (Fla. 2d DCA 1964); McCormick, 139 So. 2d at 200.

*HN3* The Florida standard jury instructions on defamation do not explicitly include an instruction on substantial truth. See In re Standard Jury Instructions (Civil Cases 89-1), 575 So. 2d 194 (Fla. 1991). It is constitutionally required that a public figure plaintiff prove falsity, Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 775-76, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986), and the standard jury instructions reflect such requirement. The jury instructions do, however, include the language of substantial truth in the instruction for the case of a private plaintiff/non-media defendant. The argument thus proposed by the CANF, and apparently adopted by the trial court, was that substantial truth must not be included as a requirement in a public figure case, and this must be so because the burden is on the plaintiff to prove falsity. There are two reasons why this argument fails.

 [**11]  First, the jury instructions themselves note that the Supreme Court's "approval for publication is not an adjudication on the merits of the form, substance, or correctness of the instructions nor an approval of the notes and comments of the committee." 575 So. 2d at 195; see also, Aetna Life Ins. Co v. Fruchter, 283 So. 2d 36, 37 (Fla. 1973)("This Court's standard jury instructions[,] . . . while to be generally followed where applicable, are not intended to change the substantive law applicable to the case."); Lynch v. McGovern, 270 So. 2d 770, 771 (Fla. 4th DCA 1972)("the Standard Jury Instructions may be used by trial judges in civil cases where they are applicable. If they are erroneous or inadequate the trial judge may amend them or give some other instruction which adequately  **[*707]**  instructs the jury in the circumstances of the case."). Thus, the Supreme Court did not abrogate existing law on substantial truth by publication of the standard jury instructions.

Second, and most importantly, subsequent to the publication of the jury instructions was the U.S. Supreme Court decision in Masson v. New Yorker Magazine, 501 U.S. 496, 115 L. Ed. 2d 447, 111 S. Ct. 2419 (1991), [**12]  which specifically addresses substantial truth, and brings it into the ambit of constitutional law. 501 U.S. at 517.

The Supreme Court in Masson dealt with the question of whether altered quotations attributed to plaintiff Masson were defamatory. Id. at 499. In answering this limited question, the Court looked to a "broader principle." Id. at 516. The question of falsity, the Court held, "overlooks minor inaccuracies and concentrates upon substantial truth." Id. It adopted the "different effects" test, and recognized that the definition of actual malice "relies upon this historical understanding" that a statement is not false unless it "'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" Id. at 517 (quoting R. Sack, Libel, Slander & Related Problems 138 (1980)). It held that a "deliberate alteration" does not equate with falsity "unless the alteration results in a material change in the meaning conveyed by the statement." Id.

Significantly, Masson was a public figure plaintiff. Id. The Court noted that "in this case, of course, the burden is upon the petitioner to prove falsity. The essence of that  [**13]  inquiry, however, remains the same whether burden rests upon plaintiff or defendant." Id. (citation omitted).

Masson was decided in June 1991, six months after the standard jury instructions were published. Therefore, even assuming that the Supreme Court of Florida had intended to alter the substantive law of defamation by doing away with the substantial truth doctrine, the U.S. Supreme Court's holding in Masson would make any such action unconstitutional as a violation of the First Amendment. This is so whether the plaintiff is a public figure or private individual.

 [**14]  We therefore conclude that the trial court was incorrect in finding that "substantial truth" should not be presented to the jury. *HN4* According to the U.S. Supreme Court and Florida case law, falsity only exists if the publication is substantially and materially false, not just if it is technically false. Whether this is encompassed as a "defense" or as part of the plaintiff's burden of proving falsity, it should have been explicitly explained to the jury.

**Legal Sufficiency**

We have thoroughly reviewed this record and have considered it in conjunction with our "context" and "substantial truth" analyses. We conclude that the statement in question "is not susceptible to a defamatory effect." Byrd, 433 So. 2d at 595. The documentary clearly explains that the CANF, CAF and PAC are three separate entities. In the course of the documentary, these three entities appear related by leadership and philosophy. In interview clips prior to the Smith statement, members of congress refer to the three groups interchangeably. The documentary notes that these members of congress have received money from the PAC and from CANF members.

The portion of the documentary immediately preceding  [**15]  the subject statement states that "[CANF's] PAC" contributed a great deal of money to Dante Fascell, and  **[*708]**  Dante Fascell created the NED, which awarded $ 900,000 in grants to CANF. This essentially implies the same thing that Smith states in the clip which CANF is now suing on. Therefore, we conclude that there would not be a different effect in the mind of the viewer watching the documentary with the Smith statement than there would be without the Smith statement. In either case there would be three separate entities, one of which receives money from NED, the other of which contributes money to congressional candidates, both of which support the same policies, and both of which are run by the same leadership. The failure of the documentary to point out that the CANF passes the grants on to another organization does not make this statement substantially untrue. The NED annual reports show CANF as the recipient of NED grant money. What it then does with the money is irrelevant to what CANF is alleging is a false statement of criminal activity: As long as the PAC is understood as a separate entity, there is no longer an implication of criminal acts.

Accordingly, we reverse the final  [**16]  judgment entered below and remand with instructions to enter a judgment in favor of Smith.

---

**Footnotes**

 We note that these particular jury instructions were criticized as being an incorrect statement of the law, both by dissenting Justice Barkett ▾, 575 So. 2d at 202, and in the Florida Bar Journal, shortly after publication, Thomas R. Julin, Florida's not so Standard Defamation Jury Instructions, 65 Fla. B.J. 15 (June 1991)(criticizing the instructions as being inaccurate on five different points of defamation law).

**2** ⬆ We disagree with the argument that public figures under the First Amendment should shoulder a *lesser* burden than private plaintiffs on this issue, as CANF is essentially arguing. "The burden upon public [figures] is greater because the public's valid interest in their conduct and behavior requires the news media to publish more about them, thus giving more chances for honest error." Times Publ'g Co. v. Huffstetler, 409 So. 2d 112, 114 (Fla. 5th DCA 1982). Turning this burden around flies in the face of First Amendment law.

About

Cookie Policy

RELX ™

Privacy Policy

Terms & Conditions

Copyright © 2023 LexisNexis.

Southard v. Forbes, Inc., 588 F.2d 140, 143 (5th Cir. 197

Search: Everything

Client: -None- ⌄    Folders    History    Help    More

Document:    Southard v. Forbes, Inc., 588 F.2d 140    Actions ⌄

Go to ⌄ | Page | Page # |    Search Document 🔍

Ⓐ **Southard v. Forbes, Inc., 588 F.2d 140**

Copy Citation

United States Court of Appeals for the Fifth Circuit

January 17, 1979

No. 77-3076

**Reporter**
588 F.2d 140 * | 1979 U.S. App. LEXIS 17529 ** | 4 Media L. Rep. 2019

James H. SOUTHARD and Classic Car Investments, Inc., Plaintiffs-Appellants, v. FORBES, INC., Defendant-Appellee.

**Subsequent History:** [**1] Rehearing and Rehearing En Banc Denied February 16, 1979.

**Prior History:** Appeal from the United States District Court for the Northern District of Georgia.

## Core Terms

defamatory, summary judgment, libel, defamation, stocks, soup, defamatory meaning, district court, securities law, unregistered, innuendo, antique

### Case Summary

**Procedural Posture**
Plaintiff classic car dealer appealed the decision of the United States District Court for the Northern District of Georgia, which entered summary judgment in favor of defendant magazine in a defamation action filed by plaintiff regarding a magazine article.

**Overview**
Plaintiff classic car dealer filed suit against defendant magazine for defamation because of an article published about plaintiff's dealership. The Securities and Exchange Commission (SEC) began an informal inquiry of plaintiff the day after the article. The district court entered summary judgment in favor of defendant. The court affirmed the judgment of the district court. The court held that the district court correctly found that nothing on the face of the article explicitly accused plaintiff of violating federal securities law. Thus, the court could not accept that the article was defamatory of plaintiff as a matter of law. The court held that the article, in its ordinary and natural meaning reasonably could have been understood as suggesting at worst that plaintiff and other dealers were puffing the value of investment in classic cars to an extent beyond that permitted in the marketing of securities; that this puffing was exploitative; and that some SEC-like regulation perhaps should intervene against such puffery. The court held that this caveat undoubtedly was unfavorable publicity for plaintiff, but unfavorable commercial publicity as such is not defamation.

**Outcome**
The court affirmed the decision of the district court, which entered summary judgment in favor of defendant magazine in a defamation action filed by plaintiff classic car dealer. The court held that because there was nothing on the face of the article that explicitly accused plaintiff of violating securities laws, that the article was not defamatory as a matter of law.

▼ LexisNexis® Headnotes

Torts > Intentional Torts ⌄ > Defamation ⌄ > Libel ⌄

**HN1** ⚖ **Defamation, Libel**

See Ga. Code Ann. § 105-701.  *More like this Headnote*

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ▾ > Defamation ▾ > Libel ▾

**HN2**⬇ **Defamation, Libel**
See Ga. Code Ann. § 105-703. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ▾ > Defamation ▾ > Libel ▾

**HN3**⬇ **Defamation, Libel**
See Ga. Code Ann. § 105-702. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > Intentional Torts ▾ > Defamation ▾ > 📙 Defamation Per Se ▾
View more legal topics

**HN4**⬇ **Defamation, Defamation Per Se**
It is for the court, upon appropriate motion, initially to determine whether the publication at issue is defamatory as a matter of law. If as a matter of law the publication is not defamatory, the case must be dismissed. If the publication is defamatory per se, the jury is instructed accordingly. If the publication has no necessarily defamatory meaning, but can be understood in more than one way, one of which is defamatory, then it is for the jury to decide if, on the basis of some innuendo resulting from the circumstances surrounding the publication, the publication in fact had that defamatory meaning. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

Civil Procedure > ... > Summary Judgment ▾ > Entitlement as Matter of Law ▾ > Appropriateness ▾
View more legal topics

**HN5**⬇ **Entitlement as Matter of Law, Appropriateness**
Where there is a record that is fully developed through affidavits and depositions and it demonstrates that, construing all of the facts and inferences to be drawn therefrom in favor of the party against whom the judgment is entered, he would not be entitled to have a jury verdict stand, the court should hold that the grant of summary judgment is proper. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

**Counsel:** Joseph R. Manning ▾, Glenn A. Delk ▾, Atlanta, Ga., for plaintiffs-appellants.

Kirk M. McAlpin, Atlanta, Ga., Tennyson Schad ▾, New York City, C. David Vaughan, Atlanta, Ga., for defendant-appellee.

**Judges:** Before BROWN ▾, Chief Judge, TUTTLE ▾ and THORNBERRY ▾, Circuit Judges.

**Opinion by:** TUTTLE ▾

## Opinion

**[\*141]**  James H. Southard, a dealer in antique automobiles and chairman of the board and principal stockholder of plaintiff Classic Car Investments, Inc. ("Classic"), brought this libel suit on the basis of an article about the plaintiffs' line of business in Forbes magazine, published by the defendant Forbes, Inc. ("Forbes"). The district court granted the defendant's motion for summary judgment, ruling that the article was not defamatory of the plaintiffs and was protected by the privilege of fair comment. We affirm.

In its July 15, 1974, issue Forbes published an article entitled "Degradation of a Hobby." The article was written by Alvin A. Butkus, a regular Forbes writer with ten **[\*142]**  years experience, as part of a series [\*\*2]  which the magazine publishes dealing with the investment aspects of "collectibles," items such as artwork that generally have interested collectors rather than investors.

The article discussed the growing field of investment in "classic," or antique, cars. It was clearly critical of speculators and promoters in this field, whom it called "the quick buck boys." The subheading of the article stated: "Want to be the first on your block to get burned in the latest speculative craze? Then get yourself an 'old' car." The gist of the article was to question the certainty of enormous appreciation in the value of old cars claimed by some of the promoters of the investment, and to warn would-be investors of some of the pitfalls of such investments.

The article included a chart, headed "Hottest Cars Around," illustrating some of the most dramatic instances of appreciation in value of old cars and including projections of future prices. A fine print footnote to the chart attributed as the source of the information it contained "Old Car Value Guides and Classic Car Investments." In fact, Classic did not furnish all of the future price estimates and the chart did not include the quality rating [\*\*3]  criteria used in the antique car industry to rate prices.

The final paragraph of the article discussed Southard:

> How far can the craze go? Who can say? The Dutch tulip bulb mania in the 17th century was the prototype of such irrational booms. Some professionals are already licking their chops over prospects for the next round of higher prices. Jim Southard, a former Atlanta stockbroker turned auto collector-dealer, is readying investment programs in classic cars for profit-sharing and

438

pension plans. His strategy is to sell such programs to groups of doctors, lawyers and corporations. They will get the appreciating value of the car and he will get a management fee and possibly even storage fees. "Investing in cars is just like buying stocks, except you don't have the downside risk," argues Southard. "You buy the highest quality, where demand is greatest and supply is small. The value of those cars never goes down, so you're guaranteed to make money." If he made claims like that for stocks, Southard would be in the soup. But there is no Securities & Exchange Commission for classic cars.

The quotations attributed to Southard in this paragraph were not verbatim quotes but [**4]  a "distillation" of comments he made to reporter Butkus. Butkus' transcript and notes showed that Southard used similar, but less emphatic, language. 1. ⬇

The day after this article appeared, the Securities and Exchange Commission, prompted by the article, began an informal inquiry to determine whether Southard and Classic were selling unregistered securities in violation of federal securities law. The inquiry led to no formal SEC action. 2. ⬇

 [**5]  Southard and Classic filed suit for defamation against Forbes in the United States District Court for the Northern District of Georgia. They alleged that the article was libelous because it charged antique car dealers in general with unethical business practices, and Southard and Classic in particular with violations of federal securities law or unethical business practices. Following substantial discovery, the district court granted the defendant's motion for summary judgment. The court ruled that as a matter of Georgia law nothing in the article was defamatory of either plaintiff, and that [*143] the misquotations of Southard were privileged under the doctrine of fair comment.

Both parties agree that Georgia law governs this case. Georgia law defines libel as a publication "tending to injure the reputation of any individual and expose him to public hatred, contempt, or ridicule . . . ." Ga.Code Ann. §§ 105-701, 703. 3. ⬇ [**6]  Although part of the definition of slander, a charge "made against another in reference to his trade, office, or profession" which is "calculated to injure him therein" also gives rise to a libel action. Ga.Code Ann. § 105-702. 4. ⬇

A publication which on its face is necessarily within these statutory definitions is considered libelous per se. Holmes v. Clisby, 118 Ga. 820, 822, 45 S.E. 684 (1903) (predecessor statute). HN4⬆ It is for the court, upon appropriate motion, initially to determine whether the publication at issue is defamatory as a matter of law. If as a matter of law the publication is not defamatory, the case must be dismissed. Garland v. State, 211 Ga. 44, 46, 84 S.E.2d 9 (1954). If the publication is defamatory per se, the jury is instructed accordingly. Weatherholt v. Howard, 143 Ga. 41, 42, 84 S.E. 119 (1915). If the publication has no necessarily defamatory meaning, but can be understood in more than one way, one of which is defamatory, then it is for the jury to decide if, on the basis of some innuendo resulting from [**7]  the circumstances surrounding the publication, the publication in fact had that defamatory meaning. Holmes v. Clisby, supra, 118 Ga. at 822-23, 45 S.E. at 685-86; Sheley v. Southeastern Newspapers, Inc., 87 Ga.App. 167, 171, 73 S.E.2d 211 (1952) and cases cited therein.

These distinctions between libel per se and libel by innuendo do not affect the court's initial task of determining whether the publication is capable of defamatory meaning. Accordingly, the essential question before us in reviewing the grant of summary judgment in this case is whether the publication in Forbes is reasonably capable of some meaning defamatory of James Southard or Classic Car Investments, Inc. In considering this question, we must construe the publication "as a whole . . . in (its) plain, natural, and ordinary meaning, . . . as other people would understand (it), according to the sense in which (it) appear(s) to have been published and the idea (it was) meant to convey." Garland v. State, supra, 211 Ga. at 46, 84 S.E.2d at 11.

The appellants urge that the Forbes article defamed them because it charged them with illegal activities, namely violation of federal [**8]  securities laws. The crux of their argument is that the statements in the article that Southard was "readying investment programs in classic cars for profit-sharing and pension plans" in which investors "will get the appreciating value of the car and (Southard) will get a management fee and possibly even storage fees" charged him with the sale of "investment contracts." Since the willful sale of an unregistered security is unlawful, 5. ⬇ and "security" includes an "investment contract," 6. ⬇ the appellants argue, the effect of this charge was to impute to Southard the unlawful sale of a security. They contend that this usage is reinforced by final sentences of the article: "If he made claims like that for  [*144] stocks, Southard would be in the soup. But there is no S.E.C. for classic cars."

The district court correctly found that nothing on the face [**9]  of the article explicitly accuses Southard of violating federal securities law. Nor do the activities explicitly attributed to Southard on their face make out the elements of a securities law violation. Thus, we cannot accept that the article was defamatory of Southard and Classic Car Investments as a matter of law.

The appellants contend that even if the article is not defamatory on its face, the article as a whole nevertheless can be understood as implying violation of securities law or at least unethical business conduct. They argue that, to a reading audience as sophisticated in business affairs as Forbes ", "investment program" plus "management fees" equals investment contracts. In the context of the misquoted guarantees of a large return on classic car investments, the omission of the rating system in the price chart, the article's derogatory attitude towards the claims of classic car dealers in general, and the article's comment that Southard's statements would put him "in the soup" if he were selling stocks, this equation would lead the reader to conclude that he was selling unregistered securities. As evidence of this implication, the appellants point to the S.E.C. inquiry [**10]  that followed the publication of the article. They also introduced the affidavit of Thomas Sherrard, a professor of corporate and securities law, who stated that he interpreted the article as implying that Southard was selling unregistered securities. Accordingly, the appellants maintain that the Forbes article was capable of defamatory interpretation, and the district court erred in granting summary judgment because the appellant should have had the opportunity to have a jury determine if in fact the defamatory interpretation should be placed upon the article.

The meaning which the appellants urge as a basis for denying summary judgment goes beyond that which the ordinary reader of Forbes would place on the article. It requires too attenuated a series of inferences: the reader would have to conclude first that the sale of antique autos as part of an investment program in which the seller would receive management fees was a sale within the legal definition of a security; then that this security was unregistered; and finally that the violation of securities law was willful. We are not satisfied that the inferences drawn by legal experts in securities law show that an audience as undoubtedly [**11]  sophisticated in securities transactions as Forbes " reasonably would draw the same conclusion, much less that the "person of ordinary capability" 7. ⬇ would do so.

While the statement that Southard would be "in the soup" is clearly capable of defamatory meaning, that statement was conditioned on Southard's selling stocks and thus coming within SEC purview. The article then said: "There is no SEC for classic cars." As the appellants conceded at oral argument, the latter language explicitly takes Southard out of "the soup," negating the implication that Southard's activities or statements were unlawful. The appellants thus seek by the innuendo they claim to impart to the Forbes article a meaning which the article itself denies. But, words which are not defamatory "cannot have their natural meaning enlarged by innuendo." Central of Ga. Rwy. Co. v. Sheftall,

118 Ga. 865, 867, 45 S.E. 687, 689 (1903). [**12]  The purpose of innuendo is to explain ambiguities in the charge made in the statement; and cannot introduce any new matter." Garland v. State, 211 Ga. 44, 46, 84 S.E.2d 9, 11 (1954).

We find that the Forbes article, in its ordinary and natural meaning reasonably can be understood as suggesting at worst that Southard and other classic car dealers were puffing the value of investment in classic cars to an extent beyond that permitted in the marketing of securities; that this puffing was exploitative; and that some SEC-like regulation perhaps should  [*145]  intervene against such puffery. The fundamental message was caveat emptor to potential customers of Southard and others in his business.

This caveat undoubtedly was unfavorable publicity for Southard, but unfavorable commercial publicity as such is not defamation. "(I)t lacks the element of personal disgrace necessary for defamation." W. Prosser, Handbook of the Law of Torts, § 111 at 740 (4th ed. 1971). It does not amount to a publication which tends to expose Southard and Classic "to public hatred, contempt, or ridicule . . .," as required by Ga.Code Ann. §§ 105-701, 703. Nor does it charge Southard with activities [**13]  incompatible with the proper exercise of Southard's business. The publication was therefore not "calculated to injure him" in his trade, as required by Ga.Code Ann. § 105-702. **8.⬆** We hold as a matter of law that this publication was not capable of a meaning defamatory of Southard or of Classic Car Investments, Inc. **9.⬆**

 [**14]  In so deciding, we have the benefit of a record fully developed through affidavits and depositions presented on the defendant's motion for summary judgment. **HN5⬆** Where there is such a record and it "demonstrates that, construing all of the facts and inferences to be drawn therefrom in favor of the party against whom the judgment is entered, he would not be entitled to have a jury verdict stand, we have not hesitated to hold that the grant of summary judgment is proper." Time, Inc. v. McLaney, 406 F.2d 565, 572 (5th Cir.), Cert. denied 395 U.S. 922, 89 S. Ct. 1776, 23 L. Ed. 2d 239 (1969). We bear in mind that a careful look at whether an eventual jury verdict could stand is especially appropriate in libel actions, because the very pendency of a lawsuit may exert the chilling effect which New York Times Co. v. Sullivan **10.⬆** and its progeny seek to guard against. Bon Air Hotel, Inc. v. Time, Inc., 426 F.2d 858, 865 (5th Cir. 1970); Time, Inc. v. McLaney, supra, 406 F.2d at 566; Thompson v. Evening Star Newspaper Co., 129 U.S.App.D.C. 299, 394 F.2d 774, 776, Cert. denied 393 U.S. 884, 89 S. Ct. 194, 21 L. Ed. 2d 160 (1968). [**15]

Our approval of the use of summary judgment in libel cases has come where judgment has been granted on the  [*146]  issue of "actual malice" as defined in New York Times Co. v. Sullivan, **11.⬆** an issue which lends itself to summary judgment because actual malice must be shown with "convincing clarity," New York Times Co. v. Sullivan, supra, 376 U.S. at 285-86, 84 S. Ct. 710. Summary judgment is equally appropriate on the issue whether there is defamation. The protective rationale for summary judgment in libel cases remains the same no matter what the issue on which judgment is granted. Moreover, where no "substantial danger to reputation is apparent" **12.⬆** the press should be more carefully guarded against exposure to liability for defamation than where clearly defamatory content warns it of liability. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 348, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974). Too broad a definition [**16]  of defamation may curtail "uninhibited, robust and wide-open" **13.⬆** discussion as much as may too low a standard of proof.

For these reasons, we hold that the district court did not err in granting Forbes, Inc."s motion for summary judgment.

The judgment is AFFIRMED.

---

**Concur by:** BROWN ⬇

## Concur

JOHN R. BROWN ⬇, Chief Judge, concurring:

I concur in the result and all of the opinion save that I disavow the implication in the concluding portion that the Times-Sullivan First Amendment protection justifies or compels summary judgment for the media where, on the usual accepted principles, it might otherwise fail.

---

**Dissent by:** THORNBERRY ⬇

## Dissent

THORNBERRY ⬇, Circuit Judge, dissenting:

It is with great reluctance that I dissent from an opinion of a majority [**17]  as esteemed as the one in this case. I am compelled, however, to register my dissent because I believe there is a jury question presented whether the Forbes article is capable of a defamatory meaning. To support my position, I need not demonstrate that the article is defamatory: I need only show that the article is capable of two meanings, one defamatory and the other not defamatory.

Southard has presented this court with a plethora of theories why this article is defamatory. Most of his arguments can be dismissed out of hand and the court properly does so. He presents two, however, that are at least colorable. His first theory suggests that the article falsely accuses him of securities law violations in that Southard sold investment contracts without the proper registration. I agree with Judge Tuttle that this theory is strained and simply requires inferences that are too sophisticated for the average Forbes reader.

Southard's second argument, however, I believe, presents a jury question. Essentially, this theory is based upon the concluding sentences in the article: "If he made claims like that for stocks, Southard would be in the soup. But there is no Securities & Exchange Commission [**18]  for classic cars."

The majority states that this statement is "clearly capable of defamatory meaning." At 144. But the majority states that since the second sentence explicitly takes Southard "out of the soup" any implications that Southard was guilty of illegal conduct is negated. I disagree. The second sentence does not negate the inference that Southard is guilty of illegal conduct. It negates the inference that the SEC can do something about it. In effect, the article can be read as accusing Southard of improper business practices, albeit practices outside the jurisdiction of the SEC.

440

I would not be surprised to find that the public associates the work of the SEC with stock fraud. **1.±** Given this inference, I think **[*147]** Southard should be allowed to argue to a jury that the Forbes article accuses him of fraud or improper business practice with relation to classic cars, but that the traditional guardian against fraudulent business activities is without power to do anything about it because Southard's fraud is outside the jurisdiction of the SEC.

 **[**19]**  Because I think the article has two reasonable readings the non-defamatory one posited by Judge Tuttle and the defamatory one suggested by myself I think a jury question is presented and summary judgment is inappropriate. **2.±** I reach this conclusion notwithstanding my agreement with the standard by which we consider the grant of summary judgment in libel cases as stated by Judge Tuttle.

Since I have made these comments under the protective luxury of a dissent, I need not speculate about Southard's status as a plaintiff nor his ability to prove Forbes guilty of actual malice, if Southard is a public figure.

---

**Footnotes**

**1.⊤** The transcript showed that he said: "And this knowledge, again, knowledge, the same thing I was taught for years in the stock market. . . . Basically the same thing, only in this type of thing you don't have the downside that you've got in the market." Butkus' notes read: "Buy quality price bonded (sic) to go up so make money. Can't be made again. . . . Buy quality bound to make money."

**2.⊤** The precise reasons for which the SEC initiated and then terminated its inquiry are not clear, since the SEC did not disclose information in this respect pursuant to the Freedom of Information Act's exemption for intra-agency memoranda, 5 U.S.C. § 552(b)(5).

**3.⊤** *HN1*⊤ Ga.Code Ann. § 105-701 provides:

A libel is a false and malicious defamation of another, expressed in print, or writing, or pictures, or signs, tending to injure the reputation of an individual, and exposing him to public hatred, contempt, or ridicule. The publication of the libelous matter is essential to recovery.

*HN2*⊤ Ga.Code Ann. § 105-703 provides:

Any false and malicious defamation of another in any newspaper, magazine, or periodical, tending to injure the reputation of any individual and expose him to public hatred, contempt, or ridicule, shall constitute a newspaper libel, the publication of such libelous matter being essential to recovery.

**4.⊤** *HN3*⊤ Ga.Code Ann. § 105-702 provides in pertinent part:

Slander, or oral defamation, consists, . . . third, in charges made against another in reference to his trade, office, or profession, calculated to injure him therein; . . . damage is inferred.

**5.⊤** 15 U.S.C. § 77e(c).

**6.⊤** S. E. C. v. W. J. Howey Co., 328 U.S. 293, 298-299, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946).

**7.⊤** Southeastern Newspapers, Inc. v. Walker, 76 Ga.App. 57, 60, 44 S.E.2d 697 (1947), Quoting Little v. Barlow, 26 Ga. 423, 425, 71 Am.Dec. 219, 220 (1858).

**8.⊤** Cf. Hood v. Dun & Bradstreet, Inc., 335 F. Supp. 170, 177 (N.D.Ga.1971) (allegations of doubtful creditworthiness not per se incompatible with proper exercise of contractor's business and to that extent not defamatory), Rev'd on other grounds, 486 F.2d 25 (5th Cir. 1973), Cert. denied, 415 U.S. 985, 94 S. Ct. 1580, 39 L. Ed. 2d 882 (1974).

**9.⊤** The district court considered the article's references to each of the plaintiffs separately. With respect to Classic Car Investments, the court considered only the effect of the attribution to Classic as the source for the chart showing various instances of appreciation in the value of classic cars because there was no mention of Classic in the text of the article. The court concluded that even if this attribution or the concomitant omission of the point rating system for antique cars was a misrepresentation, the misrepresentation did not rise to the level of defamation within the meaning of Ga.Code Ann. § 105-701. The district court also ruled that it is "well-settled" that Classic would not be defamed vicariously by references to Southard, one of its officers, or to the industry of which the company is a part.

Although Classic Car Investments, Inc. appeals from the district court's ruling, the appellant's brief does not challenge these rulings concerning Classic. In any case, we need not address ourselves to these rulings because if the Forbes article was not defamatory of Southard, a fortiori it was not defamatory of Classic.

The district court also issued a secondary ruling that the misquotations of Southard's comments concerning the reliability of investment in antique cars were protected by the privilege of "fair comment" because they fairly represented what Southard said. In addition to this

question of privilege, the parties have argued the question whether Southard was a public figure within the meaning of Gertz v. Robert Welch, Inc., 418 U.S. 323, 351, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974) and whether, accordingly, summary judgment was appropriate because there is insufficient evidence that Forbes " statements concerning Southard were made with the knowing falsehood or reckless disregard of the truth required by New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). Because we find at the threshold that there was no defamation, we need not consider whether either of these privileges against liability apply in this case.

**10.** ⬆ 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964).

**11.** ⬆ See, e. g., Bon Air Hotel, supra, 426 F.2d at 864.

**12.** ⬆ Curtis Publishing Co. v. Butts, 388 U.S. 130, 155, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967).

**13.** ⬆ New York Times Co. v. Sullivan, supra, 376 U.S. at 270, 84 S. Ct. 720.

**1.** ⬆ In Orr v. Argus-Press, 586 F.2d 1108 (6 Cir. 1978), the Sixth Circuit was faced with a defamation case in which the plaintiff had been charged with various securities law violations. A newspaper article had described these charges as "fraud." The Sixth Circuit held that the "word "fraud' . . . is both accurate and appropriate to describe a violation of Michigan's securities laws."

**2.** ⬆ For a similar uncomplimentary article in the financial press, See Reliance Insurance Co. v. Barron's, 442 F. Supp. 1341, 1345 (S.D.N.Y.1977).



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

Client: -None- ⌄    Folders    His

## Document:    Southern Air Transp. v. Post-Newsweek Stations, 568 So. 2d 927    | Actions ⌄

Go to ⌄    Page [Page #]    Search Document 🔍

## ◆ Southern Air Transp. v. Post-Newsweek Stations, 568 So. 2d 927

**Copy Citation**

Court of Appeal of Florida, Third District

May 8, 1990, Filed

Case No. 89-59

**Reporter**

**568 So. 2d 927** * | 1990 Fla. App. LEXIS 3175 ** | 15 Fla. L. Weekly D 1290

SOUTHERN AIR TRANSPORT, INC., Appellant, v. POST-NEWSWEEK STATIONS, FLORIDA, INC., d/b/a WPLG TELEVISION, and SUSAN CANDIOTTI, MARCIA IZAGUIRRE, JOHN TERENZIO, G. WILLIAM RYAN, and L. STANLEY PAIGE, Appellees

**Notice:** Released for Publication November 13, 1990.

**Subsequent History:** Review Denied March 15, 1991, Reported at 1991 Fla. LEXIS 440.

**Prior History:** [**1] An Appeal from the Circuit Court of Dade County, Robert P. Kaye ⌄, Judge.

## Core Terms

drug trafficking, informer, accusation, arms, air, shipments, covert, alleged libel, credibility, public controversy, summary judgment, actual malice, matter of law, public figure, libel action, trial court, photographs, television, broadcast, corrupt, tended, staff

---

### Case Summary

**Procedural Posture**

Plaintiff corporation appealed a decision from the Circuit Court of Dade County (Florida) granting summary judgment to defendants newspaper, television station, and individuals, in plaintiff's libel and defamation action, on grounds that plaintiff was not a limited public figure and a fact issue existed as to whether defendants published defamatory statements with actual malice.

**Overview**

Plaintiff corporation sued defendants newspaper, television station, and individuals for libel and defamation after they published negative reports about plaintiff's involvement in the Iran-Contra scandal. Plaintiffs appealed after the lower court granted defendants summary judgment. The court found that the lower court's determination as to plaintiff's status as a limited public figure was supported in the record. The Iran-Contra scandal was a matter of public controversy, and plaintiff was indisputably a major operative in the Contra supply network. Plaintiff interjected itself into the controversy by hiring a public relations firm to influence the outcome of the controversy. The court found, however, that genuine fact issues existed as to whether defendants' published statements about plaintiff were made with actual malice. There was evidence showing that defendants implicated plaintiff based on an informant's statements without regard to her lack of credibility. That portion of the judgment finding plaintiff was a limited public figure was affirmed, but reversed and remanded in all other respects.

**Outcome**

Summary judgment in favor of defendants newspaper, television station, and individuals in plaintiff corporation's libel and defamation suit was affirmed as to the finding that plaintiff was a limited public figure because plaintiff interjected itself into a matter of public controversy. Fact issues existed as to whether defendants published defamatory statements with actual malice, and that portion of the judgment was reversed and remanded.

---

▼ LexisNexis® Headnotes

443

Torts  >  ...  >  Defamation ▾  >  Public Figures ▾  >  Actual Malice ▾

**View more legal topics**

*HN1* ⬇ **Public Figures, Actual Malice**

A limited public figure cannot recover in a libel action unless it satisfies the "actual malice" standard.  🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

**Counsel:** Beckman & Kirstein ▾ and Robert M. Beckman ▾ (Washington, D.C.) and Dwight Sullivan, for appellant.

Steel Hector & Davis and Donald M. Middlebrooks ▾ and Thomas R. Julin ▾ and Norman Davis, for appellees.

**Judges:** Schwartz ▾, C.J., and Hubbart ▾ and Jorgenson ▾, JJ.

## Opinion

**[*927]** PER CURIAM.

This is an appeal by the plaintiff Southern Air Transport, Inc. from an adverse final summary judgment entered below in a libel action. After thoroughly reviewing the record in this case, we affirm in part and reverse in part based on the following briefly stated legal analysis.

First, we conclude that the trial court was correct in finding, as a matter of law, that the plaintiff was *HN1* ⬆ a limited public figure and, consequently, could not recover in the instant libel action unless it satisfied the *New York Times Co. v. Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)*, "actual malice" standard. *Gertz v. Robert Welch, Inc., 418 U.S. 323, 345, 94 S. Ct. 2997, 3009, 41 L. Ed. 2d 789, 808 (1974)*. We reach this result because the record below demonstrates, without material dispute, that (1) there was an ongoing public controversy at the **[**2]** time of the alleged libel **[*928]** concerning the corruption and illegality involved in the so-called Iran-Contra scandal wherein arms and supply shipments were covertly diverted to the Nicaraguan Contras in 1985-86 in alleged violation of a congressional ban on such arms, (2) the plaintiff was a major operative in the entire Nicaraguan Contra supply network and, as such, reasonably invited public attention as to its role therein, (3) when its covert role became publicly known and the media sought it out, the plaintiff hired a public relations firm and attempted to influence the outcome of the aforesaid public controversy by claiming that it was involved in normal, routine commercial activity, rather than serving as a covert arm of the CIA, and (4) the alleged libel was germane to the plaintiff's role in the alleged illegal, corrupt, and covert shipment of arms to the Nicaraguan Contras. *See, e.g., Waldbaum v. Fairchild Publications, Inc., 201 U.S. App. D.C. 301, 627 F.2d 1287, 1297-98* (D.C. Cir.), *cert. denied, 449 U.S. 898, 101 S. Ct. 266, 66 L. Ed. 2d 128 (1980); McDowell v. Paiewonsky, 769 F.2d 942 (3d Cir. 1985); Dombey v. Phoenix Newspapers, Inc., 150 Ariz. 476,   , 724 P.2d 562,   **3]** 570-71 (1986).*

Second, we conclude, contrary to the trial court's finding, that the plaintiff produced sufficient evidence below upon which a reasonable trier of fact could find by clear and convincing evidence that the defendants [Post-Newsweek Stations, et al.] uttered a defamatory falsehood against the plaintiff -- namely, that the plaintiff was involved in drug trafficking in Latin America -- with "actual malice," i.e., with knowledge that such accusation was false or with reckless disregard of whether it was false or not. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56, 106 S. Ct. 2505, 2574, 91 L. Ed. 2d 202, 216 (1986); New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S. Ct. 710, 726, 11 L. Ed. 2d 686, 706 (1964); Lampkin-Asam v. Miami Daily News, 408 So.2d 666, 668* (Fla. 3d DCA), *rev. denied, 417 So.2d 329 (Fla. 1981), cert. denied, 459 U.S. 806, 103 S. Ct. 29, 74 L. Ed. 2d 44 (1982).* We reach this result because there is evidence in this record tending to show that: (1) the defendants aired an investigative television news show in which a silhouetted, unidentified informer was shown accusing the plaintiff of drug trafficking while engaged in its covert **[**4]** arm shipments to the Nicaraguan Contras, stating that the plaintiff allegedly received illegal drugs in exchange for arms at an airport in Colombia; (2) the credibility of this informer was greatly suspect because (a) the informer had an extensive drug trafficking background and a motive to lie in order to obtain immunity therefor, (b) the informer's drug trafficking accusation against the plaintiff was completely uncorroborated by any other evidence, (c) the informer claimed to have photographs of the plaintiff's guns-for-drugs exchange, was paid $ 350 by the defendant WPLG staff for same, but was never able to produce such photographs, (d) when the defendant WPLG's staff interviewed the informer she was described as a "woman out of control," crying one minute and laughing the next, (e) the informer was given lie detector tests on her story by the FBI with inconclusive results, although the defendants' report of this result on the air falsely infers just the opposite, and (f) the Justice Department has declined to prosecute anyone based on the informer's testimony because it could never obtain any corroboration of such testimony, the informer was difficult to work with, and the information **[**5]** was not valuable; (3) the defendants did not give the plaintiff a fair opportunity to reply to this drug trafficking accusation because (a) they never informed the plaintiff they intended to air the aforesaid drug trafficking accusation, (b) the plaintiff did not itself learn of this intention until it was so announced on television at a prior news show the day before the alleged libel was aired, (c) the defendant refused the plaintiff's subsequent written request that the broadcast of the drug trafficking accusations be delayed for ten days so that it could demonstrate that the accusations were false, and (d) the defendant misrepresented on the air that the plaintiff had declined any comment on such charges; (5) the investigative news show strongly supported the credibility of the informer and did not reveal any of the information which **[*929]** tended to undermine this credibility; and (6) the defendants admit that they have no evidence that the plaintiff's executive officials were involved in drug trafficking, although the alleged libelous broadcast implies the opposite. We have not overlooked other evidence and inferences therefrom in this record which tend to negate any *New York Times* **[**6]** "malice" on the part of the defendants, but conclude that, in balance, this record presents a jury question on the issue. *See, e.g., Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989); Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967); Goldwater v. Ginzburg, 414 F.2d 324, 337 (2d Cir. 1969), cert. denied, 396 U.S. 1049, 90 S. Ct. 701, 24 L. Ed. 2d 695 (1970); Holter v. WLCY T.V., Inc., 366 So.2d 445 (Fla. 2d DCA 1978), cert. denied, 373 So.2d 462 (Fla. 1979).*

The final summary judgment under review is affirmed insofar as it finds that the plaintiff is, as matter of law, a limited public figure, but is reversed in all other respects, and the cause is remanded to the trial court for further proceedings.

Affirmed in part; reversed in part.

444



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

445

Lexis

White v. Fraternal Order of Police, 909 F.2d 512, 52

Search: Everything

Client: -None- ⌄   Folders   History   Help   More

Document:          White v. Fraternal Order of Police, 909 F.2d 512          | Actions ⌄

⚠️ **White v. Fraternal Order of Police, 909 F.2d 512**

Copy Citation

United States Court of Appeals for the District of Columbia Circuit

February 23, 1990, Argued ; July 13, 1990, Decided

No. 89-7079

**Reporter**

909 F.2d 512 * | 1990 U.S. App. LEXIS 11736 ** | 285 U.S. App. D.C. 273 | 17 Media L. Rep. 2137

Robert C. White, Appellant v. Fraternal Order of Police, et al., Appellees

**Prior History:** [**1] Appeal from the United States District Court for the District of Columbia; Civil Action No. 88-0679.

## Core Terms

letters, defamation, defamatory meaning, defamatory, false light, media, omissions, allegations, broadcast, summary judgment, assertions, police officer, articles, Clinic, convey, urine sample, promotion, contends, tests, district court, irregularities, proceedings, discovery, reporting, bribery, drugs, news report, confirmed, malice, qualified privilege

---

### Case Summary

**Procedural Posture**
Plaintiff police captain brought a defamation action against defendants, police organization, newspaper, and broadcaster, alleging that they invaded his privacy and defamed him by implying falsely that he was a drug user in various publications. The police captain appealed from the judgment of the United States District Court for the District of Columbia that granted summary judgment in favor of all defendants.

**Overview**
The police captain contended that the police organization's publication of letters that accused him of having used illegal drugs and of securing his promotion through bribery invaded his privacy due to publication of "private" facts and placed him in a "false light." He contended that the reports published by the newspaper and broadcaster on the controversy similarly defamed him. The court reversed the district court's grant of summary judgment in favor of the police organization on the police captain's false light claim and affirmed the judgment as to the other claims and defendants. The court found that the police organization's letters contained material capable of defamatory meaning and that the qualified privilege was applicable; thus, a jury had to determine whether the impressions were actually conveyed, whether they were false, and whether the letters were motivated by actual malice. The court concluded that the captain's claims of injury from publication of "private facts" failed because the publications involved a legitimate matter of public concern, the fitness for office of a public official, and possible improprieties in police drug testing.

**Outcome**
The court affirmed in part and denied in part the district court's summary judgment for the police organization, newspaper, and broadcaster and permitted the police captained to pursue his false light claim against the police organization.

---

▼ LexisNexis® Headnotes

---

Civil Procedure > ... > Summary Judgment ⌄ > Opposing Materials ⌄ > General Overview ⌄

View more legal topics

**HN1** Summary Judgment, Opposing Materials

Under Fed. R. Civ. P. 56(c), summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The rules impose a two-pronged standard: summary judgment must be awarded where there is no genuine issue of material fact and such judgment is required as a matter of law. When considering motions for summary judgment, courts must view the facts and the inferences to be drawn from the underlying facts in the light most favorable to the opposing party. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (11)*

---

Civil Procedure > Pretrial Matters ▾ > Continuances ▾
View more legal topics

**HN2** Pretrial Matters, Continuances

Fed. R. Civ. P. 56(f), which states that a court "may refuse" applications for summary judgment when the party opposing the motion cannot for reasons stated present by affidavit the facts essential to justify his or her opposition. In such circumstances, the court may refuse summary judgement or may, among other things, order a continuance permitting discovery. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Civil Procedure > Pretrial Matters ▾ > Continuances ▾
View more legal topics

**HN3** Pretrial Matters, Continuances

The decision whether to stay discovery is committed to the sound discretion of the district court judge. Fed. R. Civ. P. 26(c). An appellate court reverses a district court's decision to stay discovery only if it finds that the district court abused its discretion. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (17)*  1

---

Torts > ... > Invasion of Privacy ▾ > False Light ▾ > Elements ▾
View more legal topics

**HN4** False Light, Elements

In the District of Columbia, to recover on the publication of private facts theory, a plaintiff must show that the defendant published private facts in which the public has no legitimate concern and which publication would cause suffering, shame, or humiliation to a person of ordinary sensibilities. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*  1

---

Torts > ... > Invasion of Privacy ▾ > Public Disclosure of Private Facts ▾ > General Overview ▾

**HN5** Invasion of Privacy, Public Disclosure of Private Facts

The public's interest extends to anything that might touch on an official's fitness for office. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Governments > Local Governments ▾ > Ordinances & Regulations ▾

**HN6** Local Governments, Ordinances & Regulations

D.C. Code § 1-616.2, subject to certain exceptions, restricts District of Columbia government employees from disclosing an individual's medical reports. Employees may, however, disclose information concerning illegal or unethical conduct which threatens or which is likely to threaten public health or safety. The provision does not apply to persons other than district employees. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Torts > ... > Invasion of Privacy ▾ > False Light ▾ > Defenses ▾
View more legal topics

**HN7** False Light, Defenses

The false light invasion of privacy action differs from an action for defamation because a defamation tort redresses damage to reputation while a false light privacy tort redresses mental distress from having been exposed to public view. Truth or assertion of opinion are defenses in both causes of action. In addition, the same privileges applicable to libel claims may be invoked to defend false light claims. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (17)*  2

---

Civil Procedure > Preliminary Considerations ▾ > Federal & State Interrelationships ▾ > Erie Doctrine ▾
Torts > Intentional Torts ▾ > Defamation ▾ > General Overview ▾
View more legal topics

**HN8** Federal & State Interrelationships, Erie Doctrine

In an action for defamation, the courts are charged with the responsibility of determining whether a challenged statement is capable of conveying a defamatory meaning. If, at the summary judgment stage, the court determines that the publication is capable of bearing a defamatory meaning, a jury must determine whether such meaning was attributed in fact. Under District of Columbia defamation law, which governs in a diversity case, a court's power to find that a statement is not defamatory as a matter of law is limited. It is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous. A publication may convey a defamatory meaning if it tends to lower the plaintiff in the estimation of a substantial, respectable group, though they are a minority of the total community or plaintiff's associates. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (39)*  4

Torts > Intentional Torts ▾ > Defamation ▾ > General Overview ▾

**HN9** Intentional Torts, Defamation

A defamation by implication stems not from what is literally stated, but from what is implied. District of Columbia law clearly contemplates the possibility that a defamatory inference may be derived from a factually accurate news report. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (13)*  1

Torts > ... > Defamation ▾ > Elements ▾ > General Overview ▾
View more legal topics

**HN10** Defamation, Elements

In entertaining claims of defamation by implication, courts must be vigilant not to allow an implied defamatory meaning to be manufactured from words not reasonably capable of sustaining such meaning. The usual test applied to determine the meaning of a defamatory utterance is whether it was reasonably understood by the recipient of the communication to have been intended in the defamatory sense. When one uses language, one is held to the construction placed on it by those who hear or read, if that construction is a reasonable one. Under this standard, in order to prevail on a defamation claim, the language used must, as a matter of law, be reasonably capable of a defamatory interpretation and a jury must find that the language was actually understood by the recipient in that sense. It is no defense that the defendant did not actually intend to convey the defamatory meaning, so long as the defamatory interpretation is a reasonable one. The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (56)*  2

Evidence > Inferences & Presumptions ▾ > Inferences ▾
Torts > Intentional Torts ▾ > Defamation ▾ > Libel ▾
View more legal topics

**HN11** Inferences & Presumptions, Inferences

If a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, the libel is not established. But if the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference, the communication will be deemed capable of bearing that meaning. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (44)*  6

Torts > Intentional Torts ▾ > Defamation ▾ > General Overview ▾

**HN12** Intentional Torts, Defamation

A court must first examine what defamatory inferences might reasonably be drawn from a materially true communication, and then evaluate whether the author or broadcaster has done something beyond the mere reporting of true facts to suggest that the author or broadcaster intends or endorses the inference. The tortious element is provided by the affirmative conduct of the author or broadcaster, although it is immaterial for purposes of finding defamatory meaning whether the author or broadcaster actually intends or endorses the defamatory inference. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (52)*  6

Torts > ... > Invasion of Privacy ▾ > False Light ▾ > Elements ▾
View more legal topics

**HN13** False Light, Elements

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his or her privacy, if the false light in which the other was placed would be highly offensive to a reasonable person, and the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*  1

Constitutional Law > Bill of Rights ▾ > Fundamental Freedoms ▾ > General Overview ▾
Torts > ... > Defenses ▾ > Privileges ▾ > Constitutional Privileges ▾

**HN14**⬇ **Bill of Rights, Fundamental Freedoms**

A statement of opinion having no provably false factual connotation is entitled to full constitutional protection but that the First Amendment does not carve out an absolute privilege for assertions of opinion. Assertions of opinion on a matter of public concern only receive full constitutional protection if they do not contain a provably false factual connotation. Even with a per se opinion, the question is whether the person has made an assertion that can reasonably be understood as implying provable facts. The test is intended to protect the use of loose, figurative or hyperbolic language that would preclude an impression that the author was seriously maintaining a provable fact. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (14)*    1

Torts > ... > Defamation ▾ > Defenses ▾ > Fair Comment & Opinion ▾
View more legal topics

**HN15**⬇ **Defenses, Fair Comment & Opinion**

If the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or otherwise creates a defamatory implication he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (8)*

Constitutional Law > ... > Freedom of Speech ▾ > 📄 Defamation ▾ > General Overview ▾
Criminal Law & Procedure > Defenses ▾ > General Overview ▾
Torts > Intentional Torts ▾ > Defamation ▾ > General Overview ▾
View more legal topics

**HN16**⬇ **Freedom of Speech, Defamation**

A defamation by implication is not treated any differently than a direct defamation once the publication has been found capable of a defamatory meaning. A defendant may escape liability if the defamatory meaning is established as true or as constitutionally protected expression. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*

Constitutional Law > ... > Fundamental Freedoms ▾ > Freedom of Speech ▾ > Advocacy of Illegal Action ▾
Torts > Intentional Torts ▾ > Defamation ▾ > General Overview ▾

**HN17**⬇ **Freedom of Speech, Advocacy of Illegal Action**

The assertions that someone used illegal drugs and that he engaged in illegal activity such as bribery, whether express or implied, are articulations of objectively verifiable events. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

Torts > ... > Defenses ▾ > Privileges ▾ > Absolute Privileges ▾
View more legal topics

**HN18**⬇ **Privileges, Absolute Privileges**

Under District of Columbia law, communications to superiors concerning alleged misconduct of a police officer are entitled to qualified privilege, while statements published incidental to judicial or quasi-judicial proceedings are absolutely privileged. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Administrative Law > Agency Adjudication ▾ > 📄 Alternative Dispute Resolution ▾
Torts > ... > Defenses ▾ > Privileges ▾ > Absolute Privileges ▾

**HN19**⬇ **Agency Adjudication, Alternative Dispute Resolution**

The absolute privilege for statements published incidental to judicial or quasi-judicial proceedings has been extended to encompass quasi-judicial proceedings conducted by administrative bodies and private arbitration proceedings. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Torts > ... > Defamation ▾ > Public Figures ▾ > Actual Malice ▾
View more legal topics

**HN20**⬇ **Public Figures, Actual Malice**

A plaintiff may defeat a defendant's claim of qualified privilege if he can prove that the defamatory statements were made with actual malice, that is, with knowledge that they were false or with reckless disregard for whether they were false. Where plaintiff is a public figure, malice is also an element of the defamation tort, and, by definition, is part of the false light tort. 🔍 More like this Headnote

449

*Shepardize® - Narrow by this Headnote (5)*

Torts > **Intentional Torts** ▾ > **Defamation** ▾ > **General Overview** ▾

**HN21**⬇ **Intentional Torts, Defamation**

Newspaper reporters should not be required to report the results of investigative journalism with a precision establishing an exhaustive, literal picture of what transpired. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Torts > **Intentional Torts** ▾ > **Defamation** ▾ > **General Overview** ▾

**HN22**⬇ **Intentional Torts, Defamation**

With television, a court must also take into account the impact of the visual effects as well as the text because the television medium offers the publisher the opportunity, through visual presentation, to emphasize certain segments in ways that cannot be ascertained from a mere reading of the transcript. Because a court must examine the entire context of a publication, the court should also consider dramatic intonations by the announcer in determining whether the broadcast conveys a defamatory meaning. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (11)*   

Constitutional Law > ... > **Freedom of Speech** ▾ > 📄**Defamation** ▾ > **General Overview** ▾
Torts > ... > **Defenses** ▾ > **Privileges** ▾ > **Constitutional Privileges** ▾
View more legal topics

**HN23**⬇ **Freedom of Speech, Defamation**

The fair and accurate reporting privilege is a recognized exception to the common law rule that the republisher of a defamation is deemed to have adopted the underlying defamatory statements as its own. The privilege extends broadly to the report of any official proceeding, or any action taken by any officer or agency of government. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (7)*   

Torts > ... > **Defenses** ▾ > **Privileges** ▾ > **General Overview** ▾

**HN24**⬇ **Defenses, Privileges**

The common law privilege of fair and accurate reporting is applicable to reports of proceedings before any court, or agency of the court, reports of any other proceedings, judicial in character, which take place before administrative, executive or legislative bodies which are by law authorized to perform public duties, as well as reports of any official proceeding or action taken by any officer or agency of government. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (9)*   

Torts > ... > **Defenses** ▾ > **Privileges** ▾ > **General Overview** ▾

**HN25**⬇ **Defenses, Privileges**

The common law privilege of fair and accurate reporting is only available to the media when their news reports are presented in such a manner that the average reader would be likely to understand the communication to be a report on, or summary of, an official document or proceeding. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (7)*   

Constitutional Law > ... > **Case or Controversy** ▾ > **Constitutional Questions** ▾ > **General Overview** ▾

**HN26**⬇ **Case or Controversy, Constitutional Questions**

American courts are not to pass upon a constitutional question if there is also present some other ground upon which the case may be disposed of. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

**Counsel:** Peter E. Derry ▾, with whom John J. Pyne ▾ was on the brief, for Appellant.

Cameron Cohick ▾, with whom Dennis A. Davidson was on the brief, for Appellee, Fraternal Order of Police.

Kevin T. Baine ▾, with whom David C. Kiernan and Betsy K. Wagner were on the brief, for Appellees, The Washington Post and National Broadcasting Company, Inc.

**Judges:** Wald ▾, Chief Judge, Mikva ▾, and Edwards ▾, Circuit Judges.

**Opinion by:** MIKVA ▾

Opinion

**[*514]** MIKVA ▾, Circuit Judge.

Robert C. White appeals a grant of summary judgment in favor of the defendants. 707 F. Supp. 579. White, a Captain in the Washington, D.C. Metropolitan Police Department ("MPD") sued the appellees, the Fraternal Order of Police ("FOP"), The Washington Post Company ("the Post"), and National Broadcasting Company, Inc. ("NBC") for invasion of privacy and defamation. Each appellee published statements about a controversy generated when White underwent a routine drug test required for his promotion from Lieutenant to Captain. Among other items, the appellees published the true facts that White's first urine sample **[**2]** initially tested positive for marijuana and that a second urine sample, which was taken and transported under irregular circumstances, tested negative.

Because we find that the publications at issue involved a legitimate matter of public concern -- the fitness for office of a public official and possible improprieties in police drug testing -- we hold that White's claims of injury from publication of "private facts" must fail.

We also uphold the district court's determination that no defamation or "false light" claims could succeed against the media defendants -- the Post and NBC -- because their publications were not capable of bearing a defamatory meaning or placing White in a false light. Alternatively, we hold that the Post was protected by a privilege to publish fair and accurate reports on governmental proceedings. NBC, however, does not enjoy the benefit of this alternative holding because it broadcasted a report reflecting the gist of the charges investigated in the governmental proceeding without ever attributing any of the stated facts to the proceeding. We decline to decide whether media defendants enjoy a First Amendment privilege of neutral reportage because it is **[**3]** not essential to reach this issue in order to resolve the claims against the Post and NBC. We affirm the grant of summary judgment to the media defendants on all counts.

We reverse, however, the award of summary judgment for the FOP on the defamation and "false light" invasion of privacy claims. The FOP sent letters to the U.S. Attorney and the Mayor of the District of Columbia, reporting apparent procedural irregularities in the MPD drug testing program that warranted an investigation; the MPD subsequently conducted such an investigation. The letters, however, contained material capable of defamatory meaning, namely, that White was a candidate for a high position in the MPD who had used an illegal drug and had engaged in bribery to ensure his promotion. Therefore, a jury is responsible for determining whether the letters actually conveyed a defamatory meaning and whether White can establish the other elements of defamation and "false light" invasion of privacy. We hold that the FOP enjoys only a qualified privilege, *inter alia*, to report the alleged misconduct of a police officer to his superiors, *Mosrie v. Trussell*, 467 A.2d 475 (D.C. 1983), and that the jury **[**4]** must determine whether the FOP overreached this privilege because malice fueled its actions.

I. Background

In April 1985, then-Lieutenant White was nominated for promotion to Captain in the MPD and required to pass a physical exam, including a urine test for drugs. White submitted a urine sample to the Police and **[*515]** Fire Department Clinic. There, the sample was subjected to an Enzyme Multiple Immunoassay Test ("EMIT test"), which showed a positive result for marijuana. The standard operating procedure when an EMIT test showed a positive result was to forward the urine sample to the CompuChem laboratory in North Carolina for confirmation of the initial result. Instead, White was notified of the positive result and brought back to the Clinic to submit a second sample.

The next day, White's original and second urine samples were hand-carried by a member of the MPD to the CompuChem lab in North Carolina. Such hand-delivery by a member of the MPD was also a departure from normal procedures as was the testing of the second sample by CompuChem without first subjecting it to an EMIT test at the Clinic. The CompuChem lab found both samples to be drug-free. White was promoted **[**5]** to Captain, and later became head of the Department's narcotics squad.

In 1987, some two years after White's EMIT test, two employees of the Police and Fire Department Clinic, Mrs. Marguerite Anastasi and Officer Vernon Richardson, contacted the FOP, informing it of the results of White's tests and the irregularities in the conduct of the tests. As a result, the FOP's attorney reported the allegations to the U.S. Attorney, Joseph DiGenova ▾, by letter dated July 15, 1987. The Chairman of the FOP sent a second letter, dated July 28, 1987, reporting the allegations to Mayor Marion Barry. The two letters, which were virtually identical, concluded with attestations of truth signed by Anastasi and Richardson.

After describing the irregular procedures employed for White's drug tests, the letters stated that Lieutenant Noyes, the Administrative Lieutenant at the Clinic, said to Richardson: "I am giving you a direct order not to tell anyone about what went on." The letters also reported that Lieutenant Noyes accompanied White to the men's room when he gave his second urine sample, that the urine samples were removed from the clinic and returned later the same day by an officer who normally **[**6]** would not handle urine samples, and that the top lock on the laboratory door was then left unsecured overnight before the samples were sent to CompuChem.

The letters stated that the EMIT test on the first urine sample indicated a high level of cannabinoids that "should easily have been confirmed" by the CompuChem lab, and that it was "highly unusual" for such a result not to be confirmed. The letters concluded:

> Officer Richardson and Mrs. Anastasi are convinced that there is a systematic effort to subvert the integrity of the drug testing procedures at the Police and Fire Clinic and to manipulate the procedures so that desired results can be obtained.

After citing the "known involvement of [high ranking police] officials in the May 1985 incident involving Captain White," the letters continued:

> It appears that drug testing procedures have been subverted to protect one and possibly more MPD officials from the results of positive urinalysis tests. . . . If the system has been corrupted, the ramifications are wide-spread. If records have been falsified, false statements made, or testing procedures subverted for gain (such as promotion), it is likely that **[**7]** criminal as well as ethical violations have been committed. [Footnote]

The footnote following this passage stated:

> Possible statutory violations include 18 U.S.C. Section 201 (bribery); D.C. Code Sections 22-712 (bribery); 22-723 (tampering with physical evidence); and 1-619.1 (standards of conduct).

In response to the FOP letter, Mayor Barry referred the matter to the Chief of Police, Maurice Turner, who in turn created the "Cox Committee,"

headed by Assistant Police Chief Ronal Cox, to investigate the matter. After extensive investigation, the Committee issued a report to Chief Turner in December 1987. The Cox Committee found that the police officials had deviated from standard operating procedures and noted "that it was readily foreseeable that **[*516]** taking the second sample would generate the very suspicion that it has that favoritism, in the form of special attention or something worse, was being shown to a police official." The Committee concluded, however, that there had been no tampering with the specimens. As a result of these findings, the Police Chief reprimanded several high level officials not including White.

 [**8]  On August 25, 1987 and on eight occasions thereafter, the Post published articles concerning the FOP's allegations and the Cox Committee's investigation of those allegations. None of the Post articles mentioned Captain White by name and his picture was never shown. The August 25 article, however, identified White's rank and assignment, noting that after the drug tests "the Lieutenant received his Captain's bars and became commander of the department's narcotics branch and later served on the department's Adverse Action Panel, which decides whether to fire police officers who have tested positive for drugs."

On September 28, 1987, NBC's WRC-TV (Channel 4) broadcasted a report which mentioned White by name and displayed his photograph. Pat Collins delivered the report on location in front of the Police and Fire Clinic. Using dramatic intonation, Collins presented an account of the questionable handling of White's drug tests. Collins' facts were essentially the same as those presented in the FOP letters, but he did not attribute the facts to the letters or the Cox Committee investigation. Upon completion of the report, the broadcast cut to anchorman Jim Vance in the studio who offered [**9]  a terse conclusion: "A three-man task force assigned to investigate the matter is expected to issue a report soon."

White filed suit against each appellee, alleging that the publications invaded his privacy and defamed him by implying falsely, *inter alia*, that he was a drug user. Appellees moved to dismiss the complaint for failure to state a claim upon which relief could be granted and sought a stay of discovery. The court ordered a stay of discovery over White's objection and decided that the motions should be considered as motions for summary judgment.

On February 16, 1989, the district court granted summary judgment on all counts for the defendants. The court held that the invasion of privacy claims could not be sustained because the public had a legitimate interest "in knowing whether normal drug testing procedures were subverted to protect a high-ranking police official who was subsequently assigned to be the head of the Police Department's narcotics squad." The court rejected the defamation claims by reasoning, first, that the published statements were true and incapable of bearing any false and defamatory meaning; and second, that the statements were privileged.

 [**10]  II. Discussion

A. *Standards for Summary Judgment and Stay of Discovery*

**HN1** Under Federal Rule of Civil Procedure 56(c), summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Thus, the Rules impose a two-pronged standard: summary judgment must be awarded where (1) there is no genuine issue of material fact and (2) such judgment is required as a matter of law. When considering motions for summary judgment, courts must view the facts and the inferences to be drawn from the underlying facts in the light most favorable to the opposing party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962) (per curiam).

White charges that the district court committed reversible error when it ordered a stay of discovery. He relies on **HN2** Federal Rule of Civil Procedure 56(f), which states that a court "may refuse" applications for summary judgment when the party opposing the motion "cannot [**11]  for reasons stated **[*517]** present by affidavit the facts essential to justify" his or her opposition. In such circumstances, the court may refuse summary judgement or may, *inter alia*, order a continuance permitting discovery. Fed. R. Civ. P. 56(f). White asserts that summary judgment should not have been ordered because he was placed in an "impossible position" in opposing the summary judgment motions "since all of the facts surrounding the several defamatory publications are in the sole possession of the defendants." Perhaps because the contents of the FOP letters, the Post articles, and the NBC broadcast were available to White, the only issue which he specifically contends warrants discovery is actual malice. But even as to malice, White asserts "that there is already enough evidence to create a factual question" on this issue.

The district court ordered the stay pursuant to the FOP's motion for a protective order. Clearly, **HN3** the decision whether to stay discovery is committed to the sound discretion of the district court judge. *See* Fed. R. Civ. P. 26(c) ("the court . . . may make any order which justice requires"); Fed. R. Civ. P. 56(f) ("the court . . . may order [**12]  a continuance to permit . . . discovery . . . or may make such order as is just"). Therefore, we would reverse the district court's decision to stay discovery only if we found that the court had abused its discretion. White's submissions fall far short of this threshold. Because we find that the record is adequate to determine whether the standards for the grant of summary judgment are met in this case, we conclude that the district court did not err by staying discovery prior to issuing the summary judgment rulings.

We turn then to apply the standards for summary judgment to White's case.

B. *Invasion of Privacy*

White contends that there was sufficient evidence for the court to present his invasion of privacy claims to the jury. He offers two theories for recovery: publication of private facts, and false light publicity. **HN4** In the District of Columbia, to recover on the first theory, a plaintiff must show that the defendant (1) published private facts (2) in which the public has no legitimate concern and (3) which publication would cause suffering, shame, or humiliation to a person of ordinary sensibilities. *Dresbach v. Doubleday & Co., Inc.,* 518 F. Supp. 1285, 1287 (D.D.C. 1981). [**13] 

452

White concedes that publications relating to irregularities in the drug testing procedures are matters of public concern, but argues that the letters and news reports exceeded this permissible area by detailing the private facts of his situation. Appellees reply that drug use or the administering of tests to detect drug use among police officers can never be regarded as mere "private" facts. Even if the matter did reveal private facts, appellees contend that the possibility that a high-ranking police officer used drugs -- or was involved in a coverup of this matter -- was squarely a matter of public concern. We agree.

White concedes that under the relevant case law he is a public official. *HN5* The public's interest "extends to 'anything which might touch on an official's fitness for office.'" *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344-45, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974) (citation omitted). We think it axiomatic that personal drug use is relevant to fitness for public office, especially for officials charged with enforcing the law. The Supreme Court has suggested that law enforcement officers who use drugs may display impaired perception and judgment, indifference [**14] to the mission of drug enforcement, and even vulnerability to corruption or complicity with the drug trade. *See National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S. Ct. 1384, 1393, 103 L. Ed. 2d 685 (1989). Moreover, with public officials, "the legitimate interest of the public . . . may include information as to matters that would otherwise be private." *Restatement (Second) of Torts* § 652D, comment e (1977). The specter of officials who swear to uphold and enforce the law as they break and compromise the law is one that has plagued our democracy.

White also claims a statutory right to privacy based upon D.C. Code **[*518]** § 1-616.2. *HN6* That provision, subject to certain exceptions, restricts District of Columbia government employees from disclosing an individual's medical reports. Employees may, however, disclose "information concerning illegal or unethical conduct which threatens or which is likely to threaten public health or safety." *Id.* In any event, this provision does not apply to persons other than District employees. It does not restrict the press or the FOP and it does not purport to set standards governing when private medical [**15] information becomes a matter of public concern.

For the reasons stated, we conclude that all appellees were entitled as a matter of law to summary judgment on the claim for invasion of privacy due to publication of "private" facts.

White also contends that the Post and NBC reports placed him in a "false light." *HN7* The false light invasion of privacy action differs from an action for defamation because a defamation tort redresses damage to reputation while a false light privacy tort redresses mental distress from having been exposed to public view. Yet, truth or assertion of opinion are defenses in both causes of action. *Rinsley v. Brandt*, 700 F.2d 1304, 1307 (10th Cir. 1983). In addition, the same privileges applicable to libel claims may be invoked to defend false light claims. *See Restatement (Second) of Torts* § 611, comment b (1977); *id.* § 652G. For these reasons, we will address the false light claims in tandem with the defamation claims.

C. *Standards for Defamation by Implication*

*HN8* In an action for defamation, the courts are charged with the responsibility of determining whether a challenged statement is "capable of conveying a defamatory meaning. [**16] " *Southern Air Transport, Inc. v. American Broadcasting Companies, Inc.*, 278 U.S. App. D.C. 222, 877 F.2d 1010, 1013-14 (D.C. Cir. 1989). If, at the summary judgment stage, the court determines that the publication is capable of bearing a defamatory meaning, a jury must determine whether such meaning was attributed in fact. *Id.* Under District of Columbia defamation law, which governs this diversity case, a court's power to find that a statement is not defamatory as a matter of law is limited:

> It is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous.

*Levy v. American Mutual Ins. Co.*, 196 A.2d 475, 476 (D.C. 1964). Generally, a publication may convey a defamatory meaning if it "tends to lower [the] plaintiff in the estimation of a substantial, respectable group, though they are a minority of the total community or plaintiff's associates." *Afro-American Publishing Co. v. Jaffe*, 125 U.S. App. D.C. 70, 366 F.2d 649, 654 n. 10 (D.C. Cir. 1966) [**17] (citations omitted).

This case draws us into an area fraught with subtle complexities: the law of defamation by implication. *HN9* A defamation by implication stems not from what is literally stated, but from what is implied. *See Tavoulareas v. Piro*, 260 U.S. App. D.C. 39, 817 F.2d 762, 780 (D.C. Cir. 1987) (en banc), *cert. denied*, 484 U.S. 870, 98 L. Ed. 2d 151, 108 S. Ct. 200 (1987) (use of the term "set up" in a familial context implied that one family member provided an opportunity to another family member on the basis of kinship, not merit); *see generally* R. Smolla, *Law of Defamation*, § 4.05 (1990). Adding to the complexity of this case is the fact that the reports at issue contain materially true accounts of what transpired. This court has recognized, however, that "District of Columbia law . . . clearly contemplates the possibility that a defamatory inference may be derived from a factually accurate news report." *Southern Air Transport*, 877 F.2d at 1014; *see also McBride v. Merrell Dow and Pharmaceuticals, Inc.*, 230 U.S. App. D.C. 403, 717 F.2d 1460, 1465 (D.C. Cir. 1983) (true statement that an expert [**18] witness received $ 5,000 a day might support an implied defamatory meaning that the plaintiff's testimony was "for sale").

White concedes that much of the information published in the FOP letters and **[*519]** provided in the news reports was true. The core theory underlying his defamation claims is that even concededly accurate information is capable of bearing a defamatory meaning. He asserts that the FOP letters were defamatory by implication and that the respective news reports effected defamation by the omission of certain crucial facts. Before evaluating these claims, we set out our understanding of the law of defamation by implication as applied to materially accurate news reports.

*HN10* In entertaining claims of defamation by implication, courts must be vigilant not to allow an implied defamatory meaning to be manufactured from words not reasonably capable of sustaining such meaning. The difficulty lies in applying a standard that has both subjective and objective components:

> The usual test applied to determine the meaning of a defamatory utterance is whether it was reasonably understood by the recipient of the communication *to have been intended* in the defamatory [**19] sense. . . . When one uses language, one is held to the construction placed on it by those who hear or read, *if that construction is a reasonable one.*

F. Harper, et al., *The Law of Torts* § 5.4 (1986) (emphasis added). Under this standard, in order to prevail on a defamation claim, the language used must, as a matter of law, be reasonably capable of a defamatory interpretation and a jury must find that the language was actually understood by the recipient in that sense. It is no defense that the defendant did not actually intend to convey the defamatory meaning, so long

as the defamatory interpretation is a reasonable one. At bottom, "the meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express." *Restatement (Second) of Torts* § 563 (1977); *see also id.* comment c.

Application of this general standard becomes even more difficult where the reported facts are materially true and the alleged defamation is not stated explicitly. If the speaker or author has not uttered the alleged defamation explicitly, how is the court to discern whether it would be reasonable to understand the **[**20]** alleged defamatory meaning to have been intended? We believe it is possible to extract a standard from the cases addressing the defamatory character, *vel non*, of materially true reports.

In *McBride*, we held that the true statement that Dr. McBride received $ 5,000 a day for his expert testimony might support the implied defamatory meaning that "the plaintiff's case was so weak they had to pay that much to get any expert to testify, and hence that Dr. McBride's testimony was for sale." 717 F.2d at 1465. That implied defamatory meaning arose not out of mere reporting of the $ 5,000 payment, but from the *juxtaposition* of that figure with the fees which the defendant normally paid such experts. The *McBride* court noted this direct comparison. *Id.* The publication read:

"These expert witnesses included William McBride . . . who was paid $ 5,000 a day to testify in Orlando. In contrast, Richardson-Merrell pays witnesses $ 250 to $ 500 a day, and the most it has ever paid is $ 1,000 a day."

*Id.* at 1462.

In *Southern Air Transport*, we considered whether a factually accurate report -- that Southern Air used planes owned by a South **[**21]** African cargo company to transport arms to a Contra base in Central America -- was reasonably capable of conveying the defamatory implication that Southern Air was in partnership with the South African government. 877 F.2d at 1014-15. In particular, the court considered whether the juxtaposition of visual graphics and commentary could imply the defamatory meaning. The court noted that the phrase "South Africa Connection" was emblazoned not on the portion of the film showing the Southern Air plane, but over a different segment designed to emphasize alleged clandestine dealings between the CIA and the South African government in support of the Contras. While only a little imagination a viewer might infer that Southern Air was part of the "South Africa Connection," the court held that nothing in **[*520]** the defendant's specific treatment of Southern Air suggested that it was reasonable to impute such a meaning to the broadcasts. *Id.* at 1015-16.

One of our sister circuits offers a more cogent example of the limits of defamation by implication regarding materially true reports. In *Janklow v. Newsweek, Inc.*, the Eighth Circuit held that a report of the true **[**22]** fact of a 14-year-old's rape allegation was not capable of bearing the defamatory meaning that Janklow was actually guilty of the alleged rape, even though the report omitted the facts that (1) Janklow had passed a lie detector test; (2) the alleged victim had been declared "untestable" because of her emotional display during her polygraph exam; (3) a medical exam showed no signs of rape; and (4) numerous federal authorities had called the rape allegations unfounded. 759 F.2d 644, 648-49 (8th Cir. 1985), *rehard on other grounds*, 788 F.2d 1300 (8th Cir.) (en banc), *cert. denied*, 479 U.S. 883, 107 S. Ct. 272, 93 L. Ed. 2d 249 (1986).

These three cases -- *McBride, Southern Air*, and *Janklow* -- suggest that **HN11** if a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, the libel is not established. But if the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference, the communication will be **[**23]** deemed capable of bearing that meaning.

In *McBride*, the author's juxtaposition of two classes of expert fees supplied the affirmative evidence rendering it reasonable to impute a defamatory meaning to the publication. If in *Southern Air Transport*, for example, the "South Africa Connection" graphic had been superimposed over the footage of Southern Air's plane, this most likely would have constituted affirmative evidence to justify imputing the defamatory meaning that Southern Air was in partnership with South Africa. In sum, **HN12** the court must first examine what defamatory inferences might reasonably be drawn from a materially true communication, and then evaluate whether the author or broadcaster has done something beyond the mere reporting of true facts to suggest that the author or broadcaster intends or endorses the inference. We emphasize that the tortious element is provided by the affirmative conduct of the author or broadcaster, although it is immaterial for purposes of finding defamatory meaning whether the author or broadcaster *actually* intends or endorses the defamatory inference.

White argues that a defamation may also be accomplished by an omission of material **[**24]** facts. In other words, he asserts that the court should consider extrinsic evidence beyond what is stated in the actual communication in evaluating potential defamatory meaning. We disagree, however, with White's interpretation of the only authority he offers in support this proposition. In *Memphis Publishing Co. v. Nichols*, the Supreme Court of Tennessee found a defamatory meaning *not by looking at what was omitted* but from the "clear implication" of the text standing alone. 569 S.W.2d 412, 419 (Tenn. 1978) ("the clear implication of the article is that Mrs. Nichols and Mr. Newton had an adulterous relationship and were discovered by Mrs. Newton, thus precipitating the shooting incident.") The court later referred to material omissions in examining whether the defendant should be allowed the affirmative defense of truth because everything that was published was true in the literal sense. Defamatory meaning and falsity are distinct elements of the tort of defamation and are considered separately. In *Memphis Publishing*, the omissions were not used to establish defamatory meaning, but they demonstrated the falsity of the defamatory meaning which the report was **[**25]** found capable of bearing. *Id.* at 420.

*Memphis Publishing* suggests that the omission of material facts might in some circumstances supply the missing ingredient that would place a literally true communication in the field of implied defamation. However, because we need not **[*521]** decide whether omissions are relevant to establishing defamatory meaning in order to dispose of this case, we leave the delineation of that issue for another day. We turn to apply the standards for defamation by implication to the facts of this case. Because the arguments and privileges applicable to the media defendants differ from those applicable to the FOP, we address the FOP separately.

D. *The FOP*

1. The FOP -- Defamation and "False Light"

White's allegations of defamation regarding the FOP letters compress essentially to two claims: (1) that the letters accuse him of having used illegal drugs, and (2) that the letters accuse him of securing his promotion through bribery. (White also alleges that the letters accuse him, as a member of the MPD's Adverse Action panel, of hypocritically sitting in judgment of other police officers whose urine tested positive for **[**26]** drugs. Because the latter claim was not raised or discussed below, we decline to address it here.)

To support his claim that the FOP letters falsely imply that he used illegal drugs, White relies primarily on two statements contained in the letters. First, the letters accurately state that his EMIT test was positive. Second, they state that White's EMIT result "should easily have been confirmed" by CompuChem because of the high level of cannabinoids shown by the EMIT test. White contends that the letters also should have noted that the EMIT test (allegedly) had an accuracy rate of only five percent during the six-month period preceding his own drug-screening test. To support his claim that the letters accuse him of bribery, White relies on the closing reference in the letters to possible criminal violations that may have been committed.

The district court held that the letters were not actionable, *inter alia*, because none of the statements mentioned above were capable of a defamatory meaning. We disagree. Applying the test outlined above for defamation by implication, we conclude that the FOP letters go beyond merely reporting materially true facts. Those facts -- that White's [**27] EMIT test was positive, that it reflected a high level of cannabinoids, that both samples were not handled according to official procedures, that both samples tested negative at CompuChem, and that White later received his promotion -- might lead a reader to infer that White used an illegal drug and that he was involved in the subversion of official procedures for his own personal gain. The reporting of these facts, standing alone, is not sufficient to render the letters actionable. The letters supply additional evidence, however, to make it reasonable for a reader to impute defamatory meaning to the letters. In addition to reporting the irregular circumstances surrounding White's drug tests, the letters note that the high level of cannabinoids registered by the EMIT test "should easily have been confirmed" when the sample was tested by the CompuChem lab. This assertion renders colorable the inference that White used marijuana, and is at least as suggestive as was the juxtaposition of the disparate witness fees in *McBride*.

The FOP letters also do more than merely present the facts supporting an inference that White played an improper role in the irregularities surrounding his [**28] drug tests. By raising the specter of criminal violations, including bribery, the FOP provided a clear signal from which a reader could conclude, rightly or wrongly, that the defamatory inference was intended or endorsed. The letters invoked the word "bribery" in a context that could only be understood to apply to White; it referred to the subversion of testing procedures "for gain (such as a promotion)" immediately before citing the bribery statutes. In the entire letter, the only person discussed who received a promotion and for whom testing procedures were subverted was White.

We reject White's suggestion that the FOP was *obliged* to state in the letters that the EMIT test had only a 5% accuracy rate, because nothing in the record conclusively supports this assertion. White relies on an Internal Affairs Division ("IAD") report, **[*522]** written two years before the FOP letters were sent, which found that in the six months prior to White's EMIT test, only one of 18 EMIT results that were positive for marijuana was confirmed upon retesting by CompuChem. While the IAD report calls into question the accuracy of the equipment used to conduct the EMIT tests, it does not conclude [**29] that the EMIT test was only 5% accurate. The IAD study outlines concerns about diversions from standard procedures and underscores the uncertainty surrounding the extent of irregularity in the testing program at the time White's test was taken. Without reaching the question of whether omissions can give rise to a cause of action for defamation, we hold that none of the appellants in this case can be charged with knowledge of the accuracy rate of the EMIT test because that rate was uncertain.

White also claims that the FOP letters invaded his privacy by exposing him to false light publicity. The Restatement (Second) of Torts § 652E (1977) defines this tort as follows:

> **HN13** One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his [or her] privacy, if

> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and

> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

White alleges only that "the FOP letters [**30] portrayed [him] in a false light by stating that non-confirmation of [his] first test was highly unusual when FOP knew, at the time the letters were written, that 95% of positive test results at the Clinic in the six months immediately preceding plaintiff's test were erroneous." Although we have ruled that the FOP cannot be charged with knowledge of the accuracy rate of the EMIT tests, we cannot conclude, as a matter of law, that the FOP's assertions as to the confirmability of his first test did not place him in a false light. Again, those assertions render it reasonable for a reader to infer that White used an illegal drug. We have no doubt that it would be highly offensive to a reasonable person to be placed in this light. As with the defamation count, a jury must be allowed to determine whether this impression is false.

Because the letters, viewed in their entirety, are thus capable of bearing implied defamatory meanings and of placing White in a false light, we proceed to discuss whether any of the statements in the FOP letters are privileged or protected as expressions of opinion.

## 2. The FOP - Opinion

The Supreme Court recently revisited the issue of First Amendment [**31] protection for expressions of opinion. It established that **HN14** a statement of opinion having no provably false factual connotation is entitled to full constitutional protection but that the First Amendment does not carve out an absolute privilege for assertions of opinion. *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990). Specifically, the Court rejected the practice, developed by lower courts, of applying a strict dichotomy between assertions of fact and assertions of opinion in determining the scope of First Amendment protection. *See, e.g., Ollman v. Evans,* 242 U.S. App. D.C. 301, 750 F.2d 970 (D.C. Cir. 1984) (en banc), *cert. denied,* 471 U.S. 1127, 86 L. Ed. 2d 278, 105 S. Ct. 2662 (1985). Assertions of opinion on a matter of public concern only receive full constitutional protection if they do not contain a provably false factual connotation. *Milkovich,* 497 U.S. at 21. In other words, even with a *per se* opinion, the question is whether the person has made an assertion that can reasonably be understood as implying provable facts. The test is intended to protect the use [**32] of "loose, figurative or hyperbolic language" which would preclude an impression that the author was seriously maintaining a provable fact. *Id.*

The defamatory meanings that we have found the letters capable of bearing are that White used illegal drugs and that he was involved in illegal conduct -- bribery -- to **[*523]** secure his promotion. Nowhere do the letters directly express assertions to this effect; rather the defamatory meanings are derived by implication. What the district court and the FOP apparently fail to understand is that it is the defamatory *implication* - not the underlying assertions giving rise to the implication - which must be examined to discern whether the statements are entitled to full constitutional protection. Prosser makes this clear in discussing defamation by implication:

> **HN15** If the defendant juxtaposes [a] series of facts so as to imply a defamatory connection between them, or [otherwise]

creates a defamatory implication . . . he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct.

Prosser, The Law of Torts § 116, 5th Ed. (Supp. 1988).  [**33]  *See also* Okun v. Superior Court of Los Angeles County, 29 Cal. 3d 442, 629 P.2d 1369, 175 Cal. Rptr. 157 (1981) (finding in an action for libel by innuendo that the "implications deprecatory to plaintiff" were "mere opinion"); *Cianci v. New Times Publishing Co.*, 639 F.2d 54 (2d Cir. 1980) (evaluating whether "fair implications" which were defamatory would be protected as opinion). Although these authorities are premised on the old assumption that assertions of opinion are absolutely protected, they correctly focused on the aggregate defamatory implication, rather than each underlying assertion. *See also Milkovich*, 110 S. Ct. at __ (finding that nine sentences and a caption combined to "*imply* an assertion that Milkovich perjured himself" and the implication was sufficiently susceptible of being proved true or false to preclude First Amendment protection) (emphasis added). This approach is necessary because defenses are raised to negate that which renders the language actionable -- the defamatory meaning. **HN16** A defamation by implication, therefore, is not treated any differently than a direct defamation once the publication has been found  [**34]  capable of a defamatory meaning. A defendant may escape liability if the defamatory meaning is established as true or as constitutionally protected expression.

We turn, then, to evaluate whether the defamatory implications which arise from the FOP letters constitute protected expression. Patently, they do not. **HN17** The assertions that someone used illegal drugs and that he engaged in illegal activity such as bribery -- whether express or implied -- are "'articulation[s] of . . . objectively verifiable event[s].'" *Milkovich*, 497 U.S. at 21 (citation omitted). The context in which these implications arose, moreover, bolsters this common understanding. The FOP wrote the letters with the express purpose of prompting an investigation to validate or verify its allegations. Under these circumstances, we conclude that the defamatory implications are not entitled to constitutional protection under the First Amendment.

### 3. The FOP - Privilege

White concedes that the FOP letters were subject to qualified privilege. **HN18** Under District of Columbia law, communications to superiors concerning alleged misconduct of a police officer are entitled to *qualified* privilege, Mosrie v. Trussell, 467 A.2d 475 (D.C. 1983), [**35]  while statements published incidental to judicial or quasi-judicial proceedings are *absolutely* privileged. *Mazanderan v. McGranery*, 490 A.2d 180 (D.C. 1984). The district court suggested that the FOP was entitled to absolute privilege under *Mazanderan* but expressed reluctance to extend the absolute privilege "beyond the reach of decided case law." Because it found that the qualified privilege could not be defeated by a showing of malice, the district court rested its decision on the protection afforded by *Mosrie* and the common law qualified privilege of a libel defendant to act in his own interest. We hold that the FOP is only entitled to a qualified privilege.

The FOP asserts that the absolute privilege applied in *Mazanderan* is controlling because the letters were sent to the U.S. Attorney and the Mayor and they precipitated the Cox Committee's investigation, which the FOP claims was a quasi-judicial proceeding. In *Mazanderan*, a libel defendant wrote directly to the Public Vehicles **[*524]** Division of the D.C. Department of Mass Transportation alleging abusive behavior by a taxi driver and requesting revocation of the driver's license. Because [**36]  the letter constituted a formal complaint, resulting in a hearing by the Hacker's License Appeal Board, the court held that the communications in the letter were absolutely privileged. 490 A.2d at 181-82. White contends that the link between the FOP letters and the appointment of the Cox Committee is too tenuous for the letters to have been "published incidental to [quasi-]judicial proceedings" and that, in any event, the Cox Committee does not qualify as a "quasi-judicial" body.

*Mazanderan* provides little assistance in spelling out the limits of the "quasi-judicial" rubric. It notes only that **HN19** the privilege has been extended to encompass quasi-judicial proceedings conducted by administrative bodies and private arbitration proceedings. *Id.* In both of the cases which the *Mazanderan* court cites, however, the decision-making body at issue appears to have had all of the trappings of an adjudicatory tribunal. *See* Sturdivant v. Seaboard Service System, Ltd., 459 A.2d 1058 (D.C. 1983) (arbiter held a prehearing conference with witnesses, conducted a formal hearing, and issued an "opinion" denying the grievance); *Bleecker v. Drury*, 149 F.2d 770 (2d Cir. 1945) [**37]  (New York Industrial Board issued opinions on workmen's compensation claims). *Bleecker*, which applied the privilege to an administrative body, is particularly instructive in describing "judicial" qualities:

> The Board conducts hearings in which the admissibility of evidence is ruled upon by the . . . officer presiding. It limits the rights of persons to appear before it and in substance observes a procedure akin to that of the courts of record of New York. It makes full and conclusive determinations of both questions of fact and law, and an appeal may be taken from its determination to an appellate court.

149 F.2d at 771.

The Cox Committee was a three-person, ad-hoc committee assembled by the Chief of Police solely to investigate the allegations contained in the FOP letter. The committee conducted an extensive investigation which involved interviewing 33 MPD employees, who were not placed under oath, and reviewing numerous documents. The report issued by the committee contains exhaustive "findings" as to each allegation of impropriety, but concludes that no illegal activity took place. It recommends specific improvements in testing procedures [**38]  and concludes that the Police Chief should take "appropriate action" regarding persons the report identifies as having been responsible for irregularities. Initially, the Committee's full report was kept confidential, with only a summary being released for public consumption.

We conclude that the Cox Committee investigation was not sufficiently judicial in nature to warrant application of the absolute privilege afforded in *Mazanderan*. The Committee did not engage in traditional adjudicatory processes such as the holding of formal hearings and did not possess the power to issue a ruling that could be enforced or appealed. The only other case cited by the *Mazanderan* court on this issue suggests that policy considerations militate against absolute privilege in this case.

> Such special immunity is not lightly conferred . . . as it protects deliberate lies told with intent to destroy reputation. Where dealing with preliminary statements other than witness briefings, settlement discussions and the like, there is a need for particularly close attention to the factual circumstances, recognizing that unlike statements made in court, these communications are not cabined by [**39]  a litigant's recognition that contempt of a court may follow if they are outrageously unnecessary and intemperate, even though more or less relevant.

_Brown v. Collins_, 131 U.S. App. D.C. 68, 402 F.2d 209, 213 (D.C. Cir. 1968).

**HN20** White may defeat the FOP's claim of qualified privilege if he can prove that the defamatory statements were made with actual malice, i.e., with knowledge that they were false or with reckless disregard **[*525]** for whether they were false. _New York Times Co. v. Sullivan_, 376 U.S. 254, 280, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964). Because White concededly is a public figure, malice is also an element of the defamation tort, _id._, and, by definition, is part of the false light tort. Contrary to the district court's reasoning, malice cannot be deemed a legal impossibility at this stage because, on the record before us, we cannot establish the truth (or falsity) of the defamatory implications. Because we have found the FOP letters capable of defamatory meaning and false light publicity, a jury must determine whether these impressions were actually conveyed, whether they were false, and whether the letters were [**40] motivated by actual malice.

E. _The Media Defendants - Defamation and "False Light"_

In essence, the only defamatory implication which White alleges vis-a-vis the media reports is that he is accused of using illegal drugs. He contends that the news reports falsely implied illegal drug use primarily because they omitted facts that would have precluded that defamatory implication.

1. The Post

The Post articles state that the initial test of White's urine sample tested positive for marijuana; that the police officials departed from standard procedure in taking a second sample; that other irregularities occurred such as the "hand-carr[ying] by a police officer on a plane to a lab in North Carolina;" that the second sample was reported free of drugs by the lab in North Carolina; and that White subsequently received his promotion and later served on "the department's Adverse Action Panel, which decides whether to fire police officers who have tested positive for drugs." All of these facts reflect the findings of the Cox Committee. White concedes that the facts reported were generally accurate, but he attacks the omission of the facts that the first sample was also sent to [**41] CompuChem and was not confirmed as drug-tainted, and that the "lab in North Carolina" was under contract to perform confirmatory testing for all samples which tested positive at the MPD Clinic. These omissions, White contends, gave the initial EMIT result an aura of absolute reliability thereby creating a defamatory meaning. The seventh Post article did report that both the first and second samples were tested by CompuChem and that both were negative, but White contends that this could not cure the implications occasioned by the earlier omissions.

We find White's arguments unpersuasive. First, as we noted above, his reliance on _Memphis Publishing Co. v. Nichols_, 569 S.W.2d 412 (Tenn. 1978), to establish a defamation by omission is misplaced. There, omissions were relevant only to establish falsity, not defamatory meaning. More importantly, we find that any omissions by the Post were immaterial because the same impressions would have been created if the omitted material had been included. If all of the articles had mentioned that CompuChem did not confirm the EMIT results on the first sample, a reader who concluded that the second sample had been tampered with would [**42] no doubt draw the same conclusion as to the first sample because the report of mishandling would apply to both samples. Moreover, even if this court were to fully define a tort for defamation by omission, leaving out the unreported material did not create a substantially inaccurate portrait of the facts at hand, as was the effect in _Memphis Publishing_. **HN21** Newspaper reporters should not be required to report the results of investigative journalism with a precision establishing an exhaustive, literal picture of what transpired. _See Liberty Lobby, Inc. v. Dow Jones & Co._, 267 U.S. App. D.C. 337, 838 F.2d 1287, 1296 (D.C. Cir.), _cert. denied_, 488 U.S. 825, 109 S. Ct. 75, 102 L. Ed. 2d 51 (1988) (only "the sting of the charge" reported by the newspaper need be "substantially true").

Finally, White asserts that because the third Post article made reference to the two-year-old IAD report, the Post knew and should have reported, beginning with the third article, that the initial EMIT test was only 5% reliable. Again, we reject this **[*526]** argument for the reasons outlined in discussing its application to the FOP letters.

Having rejected White's [**43] claim that the Post is responsible for any omissions, we also find the articles incapable of bearing a defamatory meaning based on the text of the articles themselves. The Post merely reported true facts from which a reader might infer that White used drugs. But we find no evidence in the text of the articles to suggest that it would be reasonable for a reader to conclude that the Post intended the defamatory inference. Beyond unpleasant but true facts, the articles are devoid of any suggestive juxtapositions, turns of phrase, or incendiary headlines. _See, e.g., Cianci v. New Times Publishing Co._, 639 F.2d 54, 60 (2d Cir. 1980) (article with the headline "Buddy We Hardly Knew Ya" allowed readers to conclude that Mayor Cianci was accused of being a rapist and obstructor rather than the man of character he claimed he was).

This analysis applies equally to the false light claim against the Post. We have established that the picture created by the articles was substantially true. Therefore both the defamation and false light claims against the Post should be dismissed.

2. NBC

White's arguments with respect to NBC are essentially the same as those he raises against [**44] the Post, although he accords NBC limited praise for mentioning that the CompuChem lab regularly performed confirmatory testing for the Police Clinic. He contends that defamatory meaning arose from the use of his name and photograph, the dramatic announcement of White's appointment as head of the narcotics squad, and the omission of the nonconfirmation of the EMIT test on his first urine sample. He also contends that reporter Collins' statement, "White comes up clean," was intended to, and did, convey to the viewer that his first sample was "dirty."

The court admittedly is very troubled by the WRC-TV broadcast. We recognize that television news reporting is a different, more powerful genre than newsprint. **HN22** With television, "we must also take into account the impact of the visual effects as well as the text because 'the television medium offers the publisher the opportunity, through visual presentation, to emphasize certain segments in ways that cannot be ascertained from a mere reading of the transcript.'" _Southern Air Transport_, 877 F.2d at 1015 (citations omitted). Because a court must examine the entire context of a publication, _Tavoulareas_, 817 F.2d at 779, [**45] the court should also consider dramatic intonations by the announcer in determining whether the broadcast conveys a defamatory meaning. Television touches more senses than does the print media, and the standards for finding defamation cannot be woodenly applied without taking into account the kind of medium by which the message was delivered.

All of the facts reported in the WRC-TV broadcast were materially true. For reasons outlined in the analysis for the Post, any omissions by NBC

are immaterial. The display of White's picture at the beginning of the broadcast was not in any way suggestive; it merely attached a face to the name that would be used throughout the clip. We are left, then, with Pat Collins' dramatic announcement of White's subsequent elevation to head of the narcotics division and Collins' use of the words, "White comes up clean." We do not find that word choice to be sufficiently suggestive to enable a viewer to infer that Pat Collins intended or endorsed a defamatory inference that White used drugs. The effect of these words is no more suggestive than the Post's statement that "the second sample . . . was reported free of drugs." Finally, we conclude that Pat Collins' [**46] dramatic intonation, standing alone or in combination with other factors, was not sufficiently distinctive to convey a clear implication to the viewers. We therefore conclude that the broadcast is not capable of conveying a defamatory meaning. As with the Post, we reject the false light claim against NBC because the picture created, though unpleasant, was substantially accurate. The Cox Committee itself acknowledged that the bare facts of this controversy **[*527]** would create suspicion of illicit wrongdoing in the eyes of the public.

F. *The Media Defendants - Privilege*

Our analysis thus far makes it clear that the defamation and false light actions cannot be sustained against the media defendants. The media defendants argued in the alternative that their communications were privileged. Normally the issue of privilege antecedes the question whether a communication is capable of defamatory meaning. We departed from this framework, however, because our privilege analysis does not apply equally to both media defendants. We hold in the alternative that White's action cannot proceed against the Post because the Post, unlike NBC, is protected by a common law privilege.

[**47] The Post and NBC both contend that their communications are protected by two theories of privilege: the common law privilege to publish fair and accurate reports of governmental proceedings and the First Amendment privilege of neutral reportage. *HN23* The fair and accurate reporting privilege is a recognized exception to the common law rule that the republisher of a defamation is deemed to have adopted the underlying defamatory statements as its own. *Dameron v. Washington Magazine, Inc.*, 250 U.S. App. D.C. 346, 779 F.2d 736, 739 (D.C. Cir. 1985), *cert. denied*, 476 U.S. 1141, 90 L. Ed. 2d 693, 106 S. Ct. 2247 (1986). The privilege extends broadly to the report "of any official proceeding, or any action taken by any officer or agency of government." *Restatement (Second) of Torts* § 611, comment d (1977).

White contends that the common law privilege is not available to either media defendant because the reports were not "fair and accurate" and because they did not concern a governmental proceeding. We have already established that the reports were substantially accurate. For reasons already noted, we have no doubt that the Post's reports were fair [**48] summaries of the contents of the FOP letters. *See generally Dameron*, 779 F.2d at 739 (reports unfair and inaccurate where "garbled or fragmentary to the point where a false imputation is made about the plaintiff which would not be present had a full and accurate report been made") (citations omitted).

We also have no doubt that the Post's reports concerned a governmental or official proceeding. In *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 88 (D.C. 1980), *cert. denied*, 451 U.S. 989, 68 L. Ed. 2d 848, 101 S. Ct. 2327 (1981), the D.C. Court of Appeals outlined the breadth of the privilege:

*HN24* The privilege has been held applicable to reports of proceedings before any court, or agency of the court, . . . reports of any other proceedings, judicial in character, which take place before administrative, executive or legislative bodies which are by law authorized to perform public duties, . . . *as well as reports of any official proceeding or action taken by any officer or agency of government.*

424 A.2d at 88 (emphasis added). White argues that the news reports concerned not the Cox Committee [**49] proceedings but the allegations in the FOP letters. But, as the district court found, "it would be untenable to make a distinction between a report about an official proceeding and that which, for all purposes, is the subject matter of the proceeding." Furthermore, it is of no moment whether the Committee's investigation was barred to the public. *See, e.g., Medico v. Time, Inc.*, 643 F.2d 134 (3d Cir.), *cert. denied*, 454 U.S. 836, 70 L. Ed. 2d 116, 102 S. Ct. 139 (1981) (applying the privilege, as described in the Second Restatement, to nonpublic FBI reports). Finally, beyond being fair and accurate, the Post articles clearly meet the second prong of the test for the privilege: proper attribution. The premise of the privilege is the interest of the public in obtaining information about what occurs in official proceedings and public meetings. Therefore, *HN25* the privilege is only available to the media when their news reports are presented in such a manner that the average reader would be likely to understand the communication to be a report on -- or summary of -- an official document or proceeding. *Dameron*, 779 F.2d at 739.

**[*528]** [**50] The initial Post article, for example, began by stating that "[a] special police panel is investigating whether police officials . . . tampered with drug testing procedures" at the Police and Fire Clinic. The first and all subsequent articles summarized the gist of the allegations set out in the FOP letters which the "special panel" was investigating, and consistently attributed the reported facts to those documents. Thus, the Post has met all of the requirements for invoking the fair report privilege.

By contrast, the NBC broadcast falls squarely within our ruling in *Dameron*, where a news report presented a story as a matter of historical fact without any indication that the statements were intended as a summary of an official document. 779 F.2d at 740. Not once did Pat Collins mention the Cox Committee investigation or the FOP letters, presenting instead historical facts as if they were the results of his own questioning of "police sources." Jim Vance's one-sentence reference to a "three-man task force assigned to investigate the matter" seems at most an afterthought which could scarcely be understood to attribute Collins' facts to the FOP letters.

Thus, the [**51] common law privilege of fair reportage on governmental proceedings is only available to the Post in this case. The media defendants argue that the fair reportage privilege is absolute. As the district court noted, this area is unsettled. This court has referred to the privilege as "absolute" in a passing reference that was not essential to our holding. *Liberty Lobby*, 838 F.2d at 1302 (D.C. Cir. 1988). In contrast, the D.C. Court of Appeals referred to it as "qualified" in *Phillips*, 424 A.2d at 87, and a previous decision of the D.C. court squarely held the privilege was qualified. *See Johnson v. Johnson Publishing Co.*, 271 A.2d 696, 698 (D.C. 1970). We are inclined to follow the rulings of the D.C. Court of Appeals in interpreting its own common law. Because White cannot defeat a qualified privilege, however, it is not necessary to resolve this issue. We have established that the Post's reports were substantially true, and therefore White cannot make any showing of malice by the Post. Thus, the Post's communications, therefore, are privileged.

The media defendants also claim a right under the First Amendment to report accurately [**52] allegations of wrongdoing in a matter of public interest, even where the allegations are made outside of an official proceeding. The premise of this privilege, they claim, is that accusations of malfeasance by public officials are newsworthy, and the public will only learn of such charges if the press is immune from liability for

dispassionate and disinterested reporting of such allegations. While the Second Circuit has recognized a constitutional privilege of "neutral reportage," *see Edwards v. National Audubon Society, Inc., 556 F.2d 113, 120* (2d Cir.), *cert. denied,* 434 U.S. 1002, 98 S. Ct. 647, 54 L. Ed. 2d 498 (1977), this circuit has not. Because we need not reach this question in order to resolve this case, we decline to do so. "It is an elementary canon that **HN26**  American courts are not to 'pass upon a constitutional question . . . if there is also present some other ground upon which the case may be disposed of.'" *Syracuse Peace Council v. FCC, 276 U.S. App. D.C. 38, 867 F.2d 654, 657 (D.C. Cir. 1989),* cert. *denied,* 493 U.S. 1019, 110 S. Ct. 717, 107 L. Ed. 2d 737 (1990) (citing *Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 345-48, 80 L. Ed. 688, 56 S. Ct. 466 (1936) [**53]* (Brandeis, J., concurring). We note that even if the neutral reportage privilege were recognized by this court, NBC would not likely be able to invoke such privilege because its report does not attribute the facts to allegations made by the FOP.

III. Conclusion

The intersection of so many strands of the law of defamation in this case demonstrates once again the delicate balance between the public's right to know and the individual's right to maintain his or her community standing. Because the media plays an instrumental role in disseminating information to the public, the balance necessarily favors the media as against communications by other parties; the judiciary, however, retains a responsibility to measure the media's performance against complaints **[*529]** of defamation. The advent and ubiquity of the electronic media have made that balancing task even harder, but in this case Captain White's right to his reputation -- and his right to be free from invasion by false light publicity -- can only be pursued against the FOP.

*It is so ordered.*

About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

⚠️ **Wolfson v. Kirk, 273 So. 2d 774**

Copy Citation

Court of Appeal of Florida, Fourth District

February 28, 1973

No. 71-962

**Reporter**

273 So. 2d 774 * | 1973 Fla. App. LEXIS 7313 **

Louis E. WOLFSON, Appellant, v. Claude R. KIRK, Appellee

## Core Terms

defamation, defamatory, words, slander, malice, cause of action, slander per se, allegations, convey

---

### Case Summary

**Procedural Posture**
Appellant sought review of the decision of the Circuit Court for Palm Beach County (Florida), which granted appellee's motion to dismiss appellant's amended complaint for slander per se on the ground that it failed to state a cause of action.

**Overview**
Appellee was the governor of Florida. Appellant filed suit for slander per se against appellee for remarks made by appellee during his reelection campaign. Appellant contended that appellee's remarks were intended to defame appellant for appellee's political benefit. The trial court granted appellee's motion to dismiss on the ground that appellant's complaint failed to state a cause of action for slander per se. The court determined that while the trial court was justified in dismissing the complaint for failure to state a cause of action if it concluded that the communication could not possibly have a defamatory or harmful effect, if a communication was ambiguous and reasonably susceptible of a meaning which was defamatory, it should be left to a jury to decide whether or not the communication was understood in a defamatory sense. The court found, in reversing the trial court, that the allegations in the complaint were sufficient as a matter of pleading to indicate that appellant was intended to be the subject of appellee's remarks and was understood to be such by the listeners.

**Outcome**
The court reversed the trial court's order that dismissed appellant's action for slander per se against appellee and remanded for further proceedings. The court determined that the allegations in the complaint were sufficient to indicate that appellant was intended to be the subject of appellee's remarks, and that it was understood to be such by the listeners.

---

▼ LexisNexis® Headnotes

Torts > Intentional Torts ▾ > Defamation ▾ > General Overview ▾
View more legal topics

**HN1** ⬇️ **Intentional Torts, Defamation**
Defamation (libel and slander) may generally be defined as the unprivileged publication of false statements which naturally and proximately result in injury to another. Malice is an essential element of the tort. Without malice, either express or implied by law, no tort could result from the publication of a defamatory statement concerning another, however untrue it might be. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (26)*  3

Torts > [Intentional Torts ▾] > [Defamation ▾] > [Procedural Matters ▾]
View more legal topics

**HN2** ⬇ **Defamation, Procedural Matters**
There is a distinction between defamation "per se" and defamation "per quod". The reason underlying the distinction is that some statements are so obviously defamatory, that is damaging to reputation, that the mere publication of them gives rise to an absolute presumption both of malice and damage. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (25)*

Torts > [Intentional Torts ▾] > [Defamation ▾] > 📄 [Defamation Per Se ▾]
View more legal topics

**HN3** ⬇ **Defamation, Defamation Per Se**
Oral communications can be actionable per se where the publication was false and not privileged and was such that, its natural and proximate consequences necessarily caused injury to the plaintiff in his social, official and business relations of life. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (4)*  2

Torts > [Intentional Torts ▾] > [Defamation ▾] > 📄 [Defamation Per Se ▾]
View more legal topics

**HN4** ⬇ **Defamation, Defamation Per Se**
An oral communication is actionable per se, that is, without a showing of special damage, if it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics or a condition incompatible with the proper exercise of his lawful business, trade, profession or office, or (d) the other being a woman, acts of unchastity. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (16)*  3

Torts > [Intentional Torts ▾] > [Defamation ▾] > 📄 [Defamation Per Se ▾]
View more legal topics

**HN5** ⬇ **Defamation, Defamation Per Se**
The significance of the classification of a communication as actionable per se lies in the fact that its victim need not plead or prove malice (except where a privilege is involved) or special damage because malice and the occurrence of damage are both presumed from the nature of the defamation. Such a presumption is not an ordinary presumption of fact, but is a presumption of law and is not, therefore, dispelled by the production of evidence. Communications which are not actionable per se may be actionable upon adequate averments of actual damage and express malice. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (6)*  2

Torts > [Intentional Torts ▾] > [Defamation ▾] > [Slander ▾]

**HN6** ⬇ **Defamation, Slander**
The so-called "common mind" rule simply means that the words should be given a reasonable construction in view of the thought intended to be conveyed and that which would be a reasonable construction of the language by those who heard same. In construing the language used in a slander, the court is not limited to the words themselves, but may consider extrinsic facts and circumstances to the extent that they might reasonably given meaning to the language used. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (7)*

Civil Procedure > ... > [Defenses, Demurrers & Objections ▾] > [Motions to Dismiss ▾] > [Failure to State Claim ▾]
Torts > [Intentional Torts ▾] > [Defamation ▾] > [Procedural Matters ▾]
View more legal topics

**HN7** ⬇ **Motions to Dismiss, Failure to State Claim**
Because the facts giving rise to the tort of defamation may be isolated with clarity, the court naturally has a prominent function in evaluating the pleading and proof to determine whether or not a cause is proper for submission to the jury. Where the court finds that a communication could not possibly have a defamatory or harmful effect, the court is justified in either dismissing the complaint for failure to state a cause of action or in granting a directed verdict at the proof stage. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (9)*  1

Torts > [Intentional Torts ▾] > [Defamation ▾] > 📄 [Defamation Per Se ▾]
View more legal topics

**HN8** ⬇ **Defamation, Defamation Per Se**

Where a communication is ambiguous and is reasonably susceptible of a meaning which is defamatory, it is for the trier of fact to decide whether or not the communication was understood in the defamatory sense. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (4)*

**Counsel:** [**1] William H. Maness ▾, Jacksonville, for Appellant.

Joseph D. Farish, Jr. ▾ of Farish & Farish ▾, West Palm Beach, and Ray C. Osborne ▾, Boca Raton, for Appellee.

**Judges:** Reed ▾, Chief Judge. Walden ▾ and Owen ▾, JJ., concur.

**Opinion by:** REED ▾

## Opinion

 **[*776]** This is an appeal from a final judgment consequent on an order of the Circuit Court for Palm Beach County, Florida, which granted defendant's motion to dismiss plaintiff's amended complaint on the ground that the same failed to state a cause of action. The issue before us is whether or not the amended complaint states a cause of action for slander per se.

The amended complaint was filed in the Circuit Court on 8 July 1971. It establishes the facts for purposes of passing on the motion to dismiss. The complaint states in its introductory clause that the plaintiff, Louis E. Wolfson, is referred to in the body of the complaint as "Wolfson". The complaint then avers that Wolfson is a financier, businessman and business consultant, and that Hayden Stone, Inc., is a stock brokerage house which for its customers buys and sells securities on the New York and other stock exchanges. It is then averred that the defendant while Governor of the State [**2] of Florida, on October 11, 1970, eleven days before an election in which the defendant was running for reelection, spoke in Niceville, Florida, before an audience which included political reporters and a television crew. In the course of this speech, the defendant allegedly stated that he knew the plaintiff and said, "When I was running Hayden Stone, we invited him (Wolfson) out of the office." The complaint further alleges that the statement was not true and, ". . . imputes to Wolfson conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office . . .". The complaint further alleged that the statement was intended to defame the plaintiff and was deliberately contrived for defendant's political benefit.

The motion to dismiss asserts that the complaint (a) fails to state a cause of action for slander per se or per quod; (b) omits allegations as to plaintiff's business, occupation and/or reputation at the time the alleged cause of action occurred, and (c) fails to state facts sufficient to identify the plaintiff as the subject of the alleged defamation. We hold that the complaint states a cause of action and that [**3] the motion to dismiss should have been denied.

*HN1*⬆ Defamation (libel and slander) may generally be defined as the unprivileged publication of false statements which naturally and proximately result in injury to another. Cooper v. Miami Herald Pub. Co., 1947, 159 Fla. 296, 299-300, 31 So.2d 382, 384; Delacruz v. Peninsula State Bank, Fla.App.1969, 221 So.2d 772, 775. Malice is an essential element of the tort. In Layne v. Tribune Co., 1933, 108 Fla. 177, 146 So. 234, 238, the court said, ". . . Without malice, either express or implied by law, no tort could result from the publication of a defamatory statement concerning another, however untrue it might be."

*HN2*⬆ The law at an early time recognized a distinction between defamations "per se" and defamations "per quod". The reason underlying the distinction is that some statements are so obviously defamatory, that is damaging to reputation, that the mere publication of them gives rise to an absolute presumption both of malice and damage. See Layne v. Tribune Co., supra.

 **[*777]** Apparently some of the early authorities dealing with the law of defamation, developed the notion that *slander* would be actionable per se only where the [**4] words imputed a crime whereas written defamation, i.e., libel, would be actionable per se where the words covered a greater spectrum of defamatory meanings. See Commander v. Pedersen, 1934, 116 Fla. 148, 154, 156 So. 337, 339. Obviously the reason for limiting slander per se in this fashion, if ever sound, has lost its rational basis in view of the facilities available today for the widespread dissemination of oral communication. Hence it was recognized in Sharp v. Bussey, 1939, 137 Fla. 96, 187 So. 779, that *HN3*⬆ oral communications could be actionable per se where the publication was false and not privileged and was such that, "its natural and proximate consequences *necessarily* caused injury to the plaintiff in his social, official and business relations of life." That general principle was given more specificity in the case of Campbell v. Jacksonville Kennel Club, Fla.1953, 66 So.2d 495, 497, where the Florida Supreme Court in a slander case stated:

"It is established in most jurisdictions that *HN4*⬆ an oral communication is actionable per se - that is, without a showing of special damage - if it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently [**5] existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics or a condition incompatible with the proper exercise of *his lawful business*, trade, profession or office, or (d) the other being a woman, acts of unchastity."

In the later case of Teare v. Local Union No. 295, Fla.1957, 98 So.2d 79, 82, the court in another slander case noted that the categories of slander per se adopted in Campbell v. Jacksonville Kennel Club, supra, constituted an expansion in the law of slander.

*HN5*⬆ The significance of the classification of a communication as actionable per se lies in the fact that its victim need not plead or prove malice (except where a privilege is involved) or special damage because malice and the occurrence of damage are both presumed from the nature of the defamation, Sharp v. Bussey, supra; Johnson v. Finance Acceptance Co. of Georgia, 1935, 118 Fla. 397, 159 So. 364. Such a presumption is not an ordinary presumption of fact, but is a presumption of law and is not, therefore, dispelled by the production of evidence. Communications which are not actionable per se may be actionable upon adequate averments of actual damage and express [**6] malice. See Layne v. Tribune Co., supra, wherein the court noted that words which are not so obviously harmful that they may be presumed by courts to be damaging and uttered with malice, must be shown by pleading and proof to have been damaging and communicated with malice.

In Adams v. News-Journal Corporation, Fla.1955, 84 So.2d 549, 551, the court noted that the task of testing the effect of the language used is

not an easy one because there is no fixed rule that guides to a conclusion. The court reiterated the rule which has been stated in any number of cases:

". . . The language used will be given neither a mild nor harsh construction but the words will be construed 'in that sense in which they may be understood and in which they appear to have been used and according to the ideas which they were adopted to convey to those who hear them, or to whom they are addressed' . . .".

Together with the foregoing, the cases also apply the so-called common mind rule which holds that the words used will be construed as the "common mind" would naturally have understood them. See Diplomat Electric, Inc. v. Westinghouse Electric Supply Co., 5th Cir. 1967, 378 F.2d 377,  [**7]  Adams v. News-Journal Corporation, Fla.1955, 84 So.2d 549, Walsh v. Miami Herald Publishing Co., Fla.1955, 80 So.2d 669, Richard v. Gray, Fla.1953, 62 So.2d 597,  [*778]  McCormick v. Miami Herald Publishing Co., Fla.App.1962, 139 So.2d 197, 200. **HN6** The so-called "common mind" rule simply means that the words should be given a reasonable construction in view of the thought intended to be conveyed and that which would be a reasonable construction of the language by those who heard same.

In construing the language used in a slander, the court is not limited to the words themselves, but may consider extrinsic facts and circumstances to the extent that they might reasonably given meaning to the language used. In Campbell v. Jacksonville Kennel Club, 66 So.2d 495, 498 the court said:

"If, then, the effect of the decision of this court in Commander v. Pedersen, 116 Fla. 148, 156 So. 337, is as contended by appellee - that is, that 'words that are not on their face defamatory per se cannot be aided by innuendos and extrinsic facts and circumstances, so as to make them defamatory or slanderous per se' - then we hereby recede from that portion of our opinion in Commander v. Pedersen,  [**8]  supra; and we hold that even though the full impact of an alleged defamatory communication must be shown by allegations of inducement, colloquium and innuendo, it is nonetheless actionable per se, without the necessity of showing special damage, if the defamation falls within any of the classifications above noted."

To this extent, the construction of a slanderous statement is somewhat different from the construction of a libel. The Florida cases have held that written defamation must be construed as per se or per quod without reference to anything except the words used. See Budd v. J. Y. Gooch Co., 1946, 157 Fla. 716, 27 So.2d 72, for an example. Except for differences wrought by statute and in form, the foregoing is the only meaningful difference remaining between libel and slander after the Florida cases departed from the view that slander per se was limited to words imputing criminal conduct.

**HN7** Because the facts giving rise to the tort of defamation may be isolated with clarity, the court naturally has a prominent function in evaluating the pleading and proof to determine whether or not a cause is proper for submission to the jury. Where the court finds that a communication  [**9]  could not possibly have a defamatory or harmful effect, the court is justified in either dismissing the complaint for failure to state a cause of action or in granting a directed verdict at the proof stage. See Diplomat Electric, Inc. v. Westinghouse Electric Supply Co., supra, Ross v. Gore, Fla.1950, 48 So.2d 412, Cooper v. Miami Herald Publishing Co., 1947, 159 Fla. 296, 31 So.2d 382. In Diplomat Electric, Inc. v. Westinghouse Electric Supply Co., supra, the opinion indicated that if the court finds the language reasonably capable of two or more meanings one of which is defaming, the trier of fact should determine whether the language used was actually understood in its defamatory sense.

In the instant case, the defendant contends that the words attributed to him are not reasonably susceptible of the defamatory meaning contended for by the plaintiff. Undoubtedly this was the basis on which the trial judge dismissed the complaint, and it is with some diffidence that we take a variant position. We conclude, however, that from the language of the comment, it does not seem unreasonable to infer that persons hearing the same and possessed of a common mind might have taken it to mean  [**10]  that the plaintiff was a person with whom commercial relations were undesirable. Hence the comment could under the one of the categories of slander per se recognized in Campbell v. Jacksonville Kennel Club and Teare v. Local Union No. 295, supra. Of course the communication might also have been intended to convey and perhaps did convey only innocuous meanings. **HN8** Where, however, a communication is ambiguous  [*779]  and is reasonably susceptible of a meaning which is defamatory, it is for the trier of fact to decide whether or not the communication was understood in the defamatory sense. Diplomat Electric, Inc. v. Westinghouse Electric Supply Co., 5 Cir. 1967, 378 F.2d 377.

The defendant also contends that the comment does not sufficiently identify the plaintiff as its subject. This contention overlooks the allegations in paragraph 7 of the complaint to the effect that the plaintiff was expressly referred to in the context of the alleged remark and the allegations in paragraph 10 of the complaint to the effect that the remark did convey  [**11]  to the listeners a defamatory meaning with respect to the plaintiff. The defamed person need not be named in the defamatory words if the communication as a whole contains sufficient facts or references from which the injured person may be determined by the persons receiving the communication. O'Neal v. Tribune Company, Fla.App.1965, 176 So.2d 535, 548; Harwood v. Bush, Fla.1969, 223 So.2d 359. We conclude that the allegations in the complaint are sufficient as a matter of pleading to indicate that the plaintiff was intended to be the subject of the defendant's remarks and was understood to be such by the listeners.

No contention is made in the brief of either party that this court is or the lower court was faced with questions involving the existence or application of any theory of privilege. We concur in the implicit view of the parties that we need not at this point be concerned with questions of privilege. Privilege is a matter of affirmative defense or avoidance and should be raised by the answer where it does not clearly appear from the averments of the complaint. See Richard v. Gray, supra, and O'Neal v. Tribune Company, supra.

The judgment is reversed and the cause  [**12]  is remanded for further proceedings.

Reversed and remanded.

WALDEN ▾ and OWEN ▾, JJ., concur.



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

Yang Zhang v. Ga. Telesis, LLC., , 2018 U.S. Dist. LEXIS 24926

Client: -None-   Folders   History   Help   More

Search: Everything

Document:   Yang Zhang v. Georgia Telesis, LLC, 2018 U.S. Dist. LEXIS 249262   | Actions

FULL   KWIC™

Go to   Page   Page #   All terms   63   Search Document   | 1 of 1   Results list

Ⓐ **Yang Zhang v. Georgia Telesis, LLC**, 2018 U.S. Dist. LEXIS 249262

**Copy Citation**

United States District Court for the Southern District of Florida

May 21, 2018, Decided; May 21, 2018, Entered on Docket

Case No.: 0:17-cv-61984-UU

Reporter

**2018 U.S. Dist. LEXIS 249262 \*** | 2018 WL 11476109

**YANG ZHANG**, Plaintiff, **v. GA TELESIS, LLC**, et al., Defendants.

## Core Terms

counterclaim, employment agreement, fraud claim, regulations, matter of law, misrepresentation, fraudulent, allegations, amend, business relationship, managing director, defamation, forged, motion to dismiss, retaliation, inducement, insertion, salary

**Counsel:** **[\*1]** For **Yang Zhang**, Plaintiff, Counter Defendant: Andrew Melzer, David Tracey, LEAD ATTORNEYS, PRO HAC VICE, Sanford Heisler Sharp, LLP ▾, New York, NY USA; Kevin Sharp, Qiaojing Zheng ▾, LEAD ATTORNEYS, PRO HAC VICE, Sanford Heisler Sharp, LLP ▾; Leigh Anne St. Charles, PRO HAC VICE, Sanford Heisler Sharp, LLP ▾, Nashville, TN USA; Brian Joseph Stack ▾, Stack Fernandez & Harris, P.A. ▾, Miami, FL USA.

For **GA Telesis, LLC**, ABDOL MOABERY, Defendants, Counter Claimants: Christopher Patrick Hammon ▾, LEAD ATTORNEY, Ogletree Deakins Nash Smoak & Stewart PC, Miami, FL USA; Dale Warren Schley, II ▾, LEAD ATTORNEY, Laing and Weicholz, P.L. ▾, Boca Raton, FL USA; Gregory Robert Hawran ▾, Ogletree, Deakins, Nash, Smoak & Stewart, P.C. ▾, Miami, FL USA.

**Judges:** URSULA UNGARO ▾, UNITED STATES DISTRICT JUDGE.

**Opinion by:** URSULA UNGARO ▾

## Opinion

### ORDER ON MOTION TO DISMISS

THIS CAUSE came before the Court on Plaintiff's Motion to Dismiss Defendants' Counterclaims and Motion for Leave to Amend the Complaint (D.E. 61).

THE COURT has considered the Motion and the pertinent portions of the record and is otherwise fully advised in the premises.

For the reasons set forth below, the Motion is granted as to Counts I-III, and denied as to Counts IV and **V**. Plaintiff shall **[\*2]** file an Answer no later than May 28, 2018.

### PROCEDURAL HISTORY

Plaintiff filed her operative second amended complaint on February 23, 2018. D.E. 47. In it, Plaintiff brought several claims under the Fair Labor Standards Act ("FLSA") for failure to pay minimum wage, failure to pay overtime, and unlawful retaliation. *Id.* ¶¶ 70, 77, 84. She brought similar claims under Florida law. *Id.* ¶¶ 91, 98. She also included claims arising out of an alleged breach of her employment agreement including breach of contract, unfair, competition, breach of the covenant of good faith and fair dealing, unjust enrichment, and fraudulent inducement. *Id.* ¶¶ 104, 110, 117, 122. The Court denied Defendants' Motion to Dismiss the FLSA and Florida wage-law claims and ordered Defendants to file an Answer. D.E. 59.

465

Defendants filed their answer and counterclaim on April 6, 2018. D.E. 48. In the counterclaim, Defendants bring five causes of action against Plaintiff: (1) fraudulent inducement, (2) fraud in the factum, (3) fraud, (4) defamation, and (5) tortious interference.

### FACTUAL ALLEGATIONS

The facts recited here come from the counterclaim. D.E. 60.

Defendants allege that Plaintiff engaged in a complex fraudulent scheme to extort money from Defendants **[*3]** in connection with her work for GAIC—a joint venture formed by Defendant **GA Telesis** and non-party Air China. D.E. 60 ¶ 172.

GAIC was formed in 2012, and is based in Beijing China. *Id.* ¶ 177. **GA Telesis** and Air China each own 50% of GAIC. *Id.* ¶ 178. Air China is a wholly-owned subsidiary of Air China Group, which is a state-owned enterprise of the government of China. *Id.* ¶ 180. Accordingly, the Communist Party of China effectively governs the operations and management of Air China. *Id.* ¶ 181.

### I. The Employment Agreement

Plaintiff was a long-time, high ranking executive at Air China and a member of the Communist Party. *Id.* ¶¶ 182-83. She was also one of two Air China appointed board members of GAIC at its formation in 2012. *Id.* ¶ 185. On multiple occasions during that year, Plaintiff informed Defendant Abdol Moabery (**GA Telesis**'s CEO) that she was approaching mandatory retirement age and would be forced by Party regulations to retire in the summer of 2014. *Id.* ¶ 186.

Although she would retire with a pension, Plaintiff informed Moabery that she wished to supplement that income by working for GAIC as its Managing Director. *Id.* ¶¶ 187-89. Moabery and Plaintiff began discussing this potential **[*4]** employment. *Id.* ¶ 189. In the course of those discussions, Plaintiff fraudulently informed Moabery that Party regulations prohibited her from collecting her pension while simultaneously drawing a salary from a China state-owned or state-controlled entity such as GAIC. *Id.* ¶ 192. In truth, the Party regulations prohibit a Party member who worked in a leadership position from working in a line of business covered by the previous position. *Id.* ¶ 194. Plaintiff proposed the following plan to Moabery, which she said would allow her to collect a salary and her pension: Plaintiff would work as managing director of GAIC, but her salary would be paid by **GA Telesis**. *Id.* ¶ 198. GAIC would then reimburse **GA Telesis** for her salary. *Id.*

**Zhang** represented that this scheme would comply with Party regulations, but in truth, she knew it was unlawful. *Id.* ¶¶ 200-01. Moabery said that he would agree to the arrangement only if GAIC approved and would agree to reimburse **GA Telesis** for Plaintiff's salary. *Id.* ¶ 203. **Zhang** assured Moabery that the Air China selected board members of GAIC would approve. *Id.* ¶ 204. Defendants relied on **Zhang**'s representations that the arrangement was lawful and that GAIC's board **[*5]** would approve it when they entered into Plaintiff's employment agreement. *Id.* ¶ 205.

Around May 22, 2014, Moabery sent Plaintiff a draft of the employment agreement. *Id.* ¶ 210. The initial draft did not include the words "if applicable" in the paragraph entitled "Subject to Board Approval." *Id.* ¶ 211. 1 Between May 22, 2014, and August 28, 2014, both Moabery and Plaintiff made changes to the agreement, and used track changes to identify changes included in each draft. *Id.* ¶ 212. On or about August 27, 2018, Moabery sent Plaintiff a final version of the agreement. *Id.* ¶ 213. Plaintiff returned it to Moabery with her signature, however, she inserted the phrase "if applicable" into the board-approval paragraph. *Id.* ¶ 214. She did not use track changes or otherwise highlight the alteration. *Id.* ¶ 215. Had Moabery known that the draft Plaintiff signed was not the final draft he sent, he would not have signed it. *Id.* ¶ 219.

After the agreement was signed, Moabery sought the approval of GAIC's board of directors to hire **Zhang** as Managing Director of GAIC. *Id.* ¶ 221. The board never approved her hiring despite Moabery's repeated attempts. *Id.* ¶ 222. Plaintiff attended at all these board **[*6]** meetings and was aware of the board's non-approval. *Id.* ¶ 223. The board's refusal to approve Plaintiff's employment stemmed from fact that the employment agreement appeared to violate the Communist Party regulations discussed above. *Id.* ¶ 225.

Notwithstanding the lack of approval, Plaintiff held herself out as GAIC's Managing Director. *Id.* ¶ 226. Moabery repeatedly told her that she could not work as the Managing Director, but Plaintiff refused to step down and assured Moabery that the Air China board members would grant approval. *Id.* ¶ 227.

### II. Forged Papers Using Moabery's Signature

Plaintiff was the chairperson of the GAIC board of directors beginning on March 6, 2013. *Id.* ¶ 236. On October 19, 2016, GAIC's board agreed to nominate Moabery to become the new chairperson. *Id.* ¶ 240. In order for the appointment to be effective, GAIC was required to file a duly-executed resolution with the Chinese government. *Id.* ¶ 240. GAIC prepared the resolution, but did not file it within the time required by the government, and so Moabery never became the chairperson. *Id.* ¶ 241.

Nevertheless, when Plaintiff filed this lawsuit, she alleged that Moabery was the chairman because, in her own words, "as **[*7]** Chairman of the Board of Directors of GAIC [Moabery] could have easily provided the necessary authorization [for Plaintiff to become Managing Director]." D.E. 1 ¶ 38. Three weeks after she filed her complaint, Plaintiff directed GAIC employees to forge a signature stamp of Moabery's and another **GA Telesis**-nominated board members' signatures. *Id.* ¶ 249. She then used the stamp to sign two board resolutions naming Moabery as chairperson. *Id.* These resolutions were prepared without Moabery's knowledge or consent. *Id.* ¶ 252. GAIC's board never voted on these resolutions, although the resolutions falsely stated that it had. *Id.* ¶ 253. Defendants incurred expenses in attempting to obtain the stamp. *Id.* ¶ 248.

### III. Defamation of Defendants

Plaintiff told an Air China official with influence over GAIC that Defendants were attempting to cheat Air China and that keeping her in control of GAIC was necessary to prevent this. *Id.* ¶ 259. The statement was false, Plaintiff knew that they were false, and they were instrumental in influencing the Air China official to not remove **Zhang** from authority at GAIC. *Id.* ¶ 262.

466

**LEGAL STANDARD**

Federal Rule of Civil Procedure 8(a)(2) provides that a plaintiff's pleading "must contain . . . a short **[*8]**  and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has stated that a plaintiff must submit "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

In considering a motion to dismiss for failure to state a claim, the "plausibility standard is met only where the facts alleged enable 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Simpson v. Sanderson Farms, Inc.,* 744 F.3d 702, 708 (11th Cir. 2014) (quoting *Iqbal,* 556 U.S. at 678)). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557)). Although "[a] plaintiff need not plead 'detailed factual allegations[,] . . . a formulaic recitation of the elements of a cause of action will not do,'" and the plaintiff must offer in support of its claim "sufficient factual matter, accepted as true, to 'raise a right to relief above the speculative level.'" *Simpson,* 744 F.3d at 708 (quoting *Twombly,* 550 U.S. at 555)).

**ANALYSIS**

**I. Fraud Claims [*9]  (Counts I-III)**

Defendants bring three fraud claims against Plaintiff: fraudulent inducement, fraud in the factum, and fraud. All three claims are based, at least in part, on Plaintiff's insertion of the phrase "if applicable" into the employment agreement. D.E. 60 ¶ 264. The first and third claims are also based on her allegedly false representations that Plaintiff's employment as Managing Director was lawful under Communist Party regulations. *Id.* ¶¶ 270, 280. And lastly, the third is also based on Plaintiff's alleged forgery of the board resolutions naming Moabery as chairperson of GAIC.

**A. To the extent the fraud claims are based on the alleged insertion of the phrase "if applicable" into the employment agreement, they fail as a matter of law**

Plaintiff argues that the fraud claims fail as a matter of law to the extent they are based on the alleged insertion of the phrase "if applicable" into the board-approval requirement of the employment agreement. It is well-established in Florida that a party to a written contract cannot challenge the contract on the ground that he signed it without reading it, unless he alleges that he was prevented from reading it, or induced to not read it. **[*10]** *All Fla. Sur. Co. v. Coker,* 88 So. 2d 508, 510 (Fla. 1956) (citations omitted); *Johnson v. Green,* 54 So. 2d 44, 46 (Fla. 1951); *see also Pepple v. Rogers,* 140 So. 205, 208 (Fla. 1932) ("The courts will not ordinarily protect those who, with full opportunity to do so, will not protect themselves."); *Hall v. Burger King Corp.,* 912 F. Supp. 1509, 1524 (S.D. Fla. 1995) ("As a matter of law '[n]o party to a written contract . . . can defend against its enforcement on the sole ground that he signed it without reading it.'") (quoting *Allied Van Lines, Inc. v. Bratton,* 351 So.2d 344, 348 (Fla.1977)). Defendants do not allege that they could not have read the final draft of the employment agreement. Thus to the extent Defendants' fraud claims are based on Plaintiff's alleged insertion of the phrase "if applicable" into the employment agreement, they fail as a matter of law.

Defendants attempt to overcome this obstacle by relying on a district court case from Pennsylvania: *Axalta Coating Sys., LLC v. Midwest II. Inc.,* 217 F. Supp. 3d 813 (E.D. Pa. 2016). There, the court denied a motion to dismiss a fraud claim where the defendant failed to read the final draft, which the plaintiff had changed. There, the change was "radically different" from the previously agreed terms, and the plaintiff knew that if the defendant saw the change, the agreement was "no go." *Id. at 823.* As such, the court reasoned that the defendant could reasonably have assumed that the plaintiff would have mentioned the omission before asking the defendant to sign the agreement. *Id.*

The Court does not find **[*11]** *Axalta* persuasive for the simple reason that it applied Pennsylvania law, which is not as strict as Florida law in this regard. *Compare id. at 821-22* (explaining that a party may challenge the enforceability of an agreement it has not read if it can show "excusable ignorance" of its contents), *with All Fla. Sur. Co. v. Coker,* 88 So. 2d 508, 510 (Fla. 1956) (quoted above).

**B. To the extent the fraud claims are based on Plaintiff's alleged misrepresentations about Chinese law and Communist Party Regulations, they fail as a matter of law**

The parties agree that a fraudulent misrepresentation is not actionable if it is a misrepresentation of the law. *See* D.E. 61, p. 12 *and* D.E. 63, p. 10; *see also Chino Elec., Inc. v. U.S. Fid. & Guar. Co.,* 578 So.2d 320, 323 (Fla. Dist. Ct. App. 1991) ("It is, of course, well settled in Florida that in order to be actionable a fraudulent misrepresentation must be of a material fact, rather than a mere opinion or a misrepresentation of law."). Thus Plaintiff argues that her alleged misrepresentations about Chinese law and Communist Party regulations are not actionable. Defendants reply that Plaintiff did not make a misrepresentation only of law, but of law and fact because the terms of her departure from Air China were unknown to Defendants. This argument is not meritorious. Defendants do not allege that Plaintiff **[*12]** made any representations about the terms of her departure from Air China. Rather, they allege that Plaintiff misrepresented Chinese law so as to make Defendants think her proposed employment plan was lawful. D.E. 60 ¶ 192.

Defendants also argue that even if Plaintiff's misrepresentation was one of pure law, Communist Party regulations are not "law" because they are a "byzantine" system not readily available to or understandable by members of the public. D.E. 63, p. 11-12. This argument is belied by allegations in the counterclaim setting out, in clear detail, the Communist Party regulations. D.E. 60 ¶¶ 193-94. Accordingly, to the extent Defendants fraud claims are based on Plaintiff's alleged misrepresentations about Chinese law and Party regulations, they fail as a matter of law.

467

C. To the extent the fraud claims are based on Plaintiff's alleged forgery of the board resolutions, they fail as a matter of law

The Eleventh Circuit Court of Appeals holds that, as a matter of Florida law, a party has "no right to rely on any representation presented . . . to a third party." *Mergens v. Dreyfoos, 166 F.3d 1114, 1118 (11th Cir. 1999)*. Here, the alleged forged board resolutions were not statements made to Defendants. Additionally, they were not made **[*13]** with the intent to deceive Defendants. Defendants allege that they knew the resolutions were fraudulent. D.E. 60 ¶¶ 240-42. And finally, Defendants do not allege that they relied upon the alleged forgeries in any way. *See id. at 1117* (reciting the elements of fraud including that "the statement was made for the purpose of inducing the Plaintiff to rely on it") (quotations and citations omitted). For these reasons the fraud claims fail as a matter of law.


## II. Defamation (Count IV)

To state a claim for defamation a, plaintiff must allege that: "(1) the defendant published a false statement; (2) about the plaintiff; (3) to a third party; and (4) the plaintiff suffered damages as a result of the publication." *Five for Entertainment S.A. v. Rodriguez, 877 F. Supp. 2d 1321, 1328 (S.D. Fla. 2012)* (quoting *Fortson v. Colangelo, 434 F. Supp. 2d 1369, 1378 (S.D. Fla. 2006)*. Plaintiff alleges that Defendants' defamation allegations are too vague to state a claim. Defendants allege that Plaintiff told an Air China official "with influence over GAIC" that Defendants were attempting to cheat Air China. D.E. 60 ¶ 259. They further allege that this harmed their reputations and business relationship with GAIC and Air China, and that they have incurred costs to rehabilitate their reputations. *Id.* ¶ 263. Although these allegations are not as detailed as the Court **[*14]** might like, they are just sufficient to state a claim. Taking as true that the Air China official had influence over GAIC, it is plausible that Plaintiff's allegedly false statement that Defendants were cheating Air China could harm their reputations and business relationship. Accordingly, Defendants have stated a defamation claim.


## III. Tortious Interference (Count V)

To state a claim for tortious interference, a plaintiff must allege: "(1) the existence of a business relationship; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So.2d 812, 814 (Fla. 1994)* (quotations and citations omitted).

Defendants allege that Plaintiff tortuously interfered with their business relationship with GAIC and Air China by including the phrase "if applicable" in the employment agreement, forging the GAIC board resolutions, and defaming them to the Air China official. D.E. 60 ¶¶ 296-98. They allege that this has impeded their ability to protect, grow, and profit from their business interests. *Id.* ¶ 299. Plaintiff argues that these allegations are insufficient to satisfy **[*15]** the third and fourth elements.

To the extent this claim is predicated on the alleged alteration of the employment agreement and the forged board resolutions, Plaintiffs are correct. Defendants argue that board approval was applicable to Plaintiff's employment, so it is not plausible that inclusion of the phrase "if applicable" in the employment agreement either interfered with or harmed Defendants' business relationships with GAIC or Air China. As to the board resolutions, even assuming they were forged, Defendants did not oppose their substance. Indeed, Defendants had previously attempted to have Moabery appointed chairman. D.E. 60 ¶ 240. It is not plausible that his fraudulent appointment as chairperson interfered with or harmed Defendants' business relationships.

The allegedly defamatory statement, however, is sufficient. Defendants allege that Plaintiff falsely told Air China that Defendants were cheating it and that this damaged their reputations and the value of their business relationship. In short, they allege that they lost goodwill. Although goodwill is intangible, and the allegation therefore somewhat vague, loss of goodwill is a recoverable damage. *See, e.g., Gilbert & Caddy, P.A. v. JP Morgan Chase Bank, N.A., 193 F. Supp. 3d 1294, 1309 (S.D. Fla. 2016)* (collecting **[*16]** cases). Accordingly, Defendants have stated a claim for tortious interference based on the allegedly false statement made to the Air China official.


## IV. Plaintiff's Motion to Amend Complaint

Plaintiff seeks leave to amend her complaint to allege that Defendants' counterclaims constitute unlawful retaliation under FLSA. Leave to amend is governed by Federal Rule of Civil Procedure 15, which provides that amendment should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). Some courts have permitted leave to amend to file retaliation claims where a defendant filed "baseless" counterclaims, lacking any reasonable basis in fact. *See, e.g., Flores v. Mamma Lombardis of Holbrook, Inc., 942 F. Supp. 2d 274, 278 (E.D.N.Y. 2013)*. Other courts have refused, holding that counterclaims cannot be the basis of a retaliation claim. *See, e.g., Hernandez v. Crawford Bldg. Material Co., 321 F.3d 528, 533 (5th Cir. 2003)* ("[A]n employer's filing of a counterclaim cannot support a retaliation claim in the Fifth Circuit."); *Beltran v. Brentwood N. Healthcare Ctr., LLC, 426 F. Supp. 2d 827, 834 (N.D. Ill. 2006)* ("[U]nlike initiating litigation against an employee, filing a counterclaim will not chill plaintiffs from exercising and enforcing their statutory rights because by the time the employer files its counterclaim, plaintiffs have already made their charges and initiated a lawsuit.").

The Court finds the reasoning of cases like *Beltran* persuasive, but regardless, need not decide the issue because **[*17]** Defendants' counterclaim is not baseless. Counts IV and V state claims. And even though the fraud claims must be dismissed as a matter of law, the facts alleged in support of them suggest underhanded (albeit not unlawful) behavior. The Court cannot conclude, therefore, that the counterclaim lacks any basis in fact. As such the Court finds that justice does require amendment. *See Fed. R. Civ. P. 15(a)(2)*.

Defendants also argue that leave to amend should be denied because Plaintiff failed to comply with Local Rule 7.1(a)(3). Rule 7.1(a)(3) requires counsel for the movant to confer or make reasonable efforts to confer with opposing counsel before filing a motion. Plaintiff did not do that here, and denial of the motion to amend is also appropriate on that basis. *Gonzalez v. Batmasian*, No. 9:16-CV-81696, 2017 WL 698604, at *1 (S.D. Fla. Feb. 17, 2017) ("The Court may deny a motion for failure to comply with the local rules, including failure to make good faith efforts to confer."); *see also Reese v. Herbert, 527 F.3d 1253, 1267 n. 22 (11th Cir. 2008)* ("We 'give[ ] great deference to a district court's interpretation of its local rules' and review a district court's application of local rules for an abuse of discretion.") (quoting *Quick v. Peoples Bank of Cullman County*, 993 F.2d 793, 798 (11th Cir.1993)).

468

**CONCLUSION**

For the reasons discussed above, it is hereby

ORDERED AND ADJUDGED that the Motion **[*18]**  (D.E. 61) is GRANTED IN PART AND DENIED IN PART. Counts I, II, and III are DISMISSED WITH PREJUDICE. It is further

ORDERED AND ADJUDGED that Plaintiff's Motion to Amend is DENIED. It is further

ORDERED AND ADJUDGED that Plaintiff SHALL file an Answer to the Counterclaim no later than **Monday, May 28, 2018**. It is further

ORDERED AND ADJUDGED that the Initial Planning and Scheduling Conference is CANCELLED.

DONE AND ORDERED in Chambers at Miami, Florida, this 21st day of May, 2018.

/s/ Ursula Ungaro ▾

URSULA UNGARO ▾

UNITED STATES DISTRICT JUDGE

---

**Footnotes**

1⇑  For a detailed discussion of this clause, see the Court's Order denying Defendant's motion to dismiss. D.E. 46. The inclusion of clause "if applicable" was the central to the Court's denial of that motion. *See id.*

2⇑  Defendants' conclusory allegations to the contrary are just that: conclusory. They are also contradicted by the factual allegations.



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.



Lexis | Zervos v. Trump, Case No. 150522/2017 (Sup. Ct. N' | Search: Everything | Client: -None- | Folders | History | Help | More

Document: Zervos v Trump, 59 Misc. 3d 790 | Actions

Go to | Page | Page # | Search Document | 1 of 8 | Results list

# Zervos v Trump, 59 Misc. 3d 790

Copy Citation

Supreme Court of New York, New York County

March 20, 2018, Decided

150522/17

**Reporter**

**59 Misc. 3d 790 *** | 74 N.Y.S.3d 442 ** | 2018 N.Y. Misc. LEXIS 900 *** | 2018 NY Slip Op 28082 **** | 2018 WL 1404883

[****1] Summer Zervos, Plaintiff, v Donald J. Trump, Defendant.

**Subsequent History:** Stay denied by Zervos v. Trump, 2018 N.Y. App. Div. LEXIS 8989 (N.Y. App. Div. 1st Dep't, May 17, 2018)
Leave to appeal dismissed by, Appeal dismissed by, Stay denied by, As moot Zervos v. Trump, 31 N.Y.3d 1113, 2018 N.Y. LEXIS 1473, 80 N.Y.S.3d 215, 105 N.E.3d 354 (June 14, 2018)

**Prior History:** Zervos v. Trump, 2018 N.Y. Misc. LEXIS 3091 (N.Y. Sup. Ct., Mar. 20, 2018)

## Core Terms

state court, affirmation, campaign, happened, defamation, unofficial, kissing, federal court, allegations, sexual, phony, fame

## Case Summary

**Overview**

[1]-The court declined to stay a defamation action against defendant, the President of the United States, arising from his statements that plaintiff was lying when she came forward during the presidential campaign with an allegation of past sexual misconduct. The Supremacy Clause does not prevent a president being called to account in state court for wrongful conduct bearing no relationship to federal executive responsibility; [2]-The complaint stated a cause of action for defamation because the statements calling plaintiff a liar conveyed that she was contemptible, could be proved true or false, and were not made less actionable by the fact that they were made during campaign speeches.

**Outcome**

Motion denied.

## LexisNexis® Headnotes

Constitutional Law > The Presidency > Immunities

***HN1*** **The Presidency, Immunities**

The President of the United States has no immunity and is subject to the laws for purely private acts. The United States Supreme Court made clear that immunities are grounded in the nature of the function performed, not the identity of the actor who performed it. The litigation of questions that relate entirely to the unofficial conduct of the individual who happens to be the President poses no perceptible risk of misallocation of either judicial power or executive power. More like this Headnote

*Shepardize® - Narrow by this Headnote (3)* 

Constitutional Law > Separation of Powers ▾

**HN2** ⬇ **Constitutional Law, Separation of Powers**

In holding that the doctrine of separation of powers did not mandate a stay of all private actions against the President, the United States Supreme Court has flatly rejected that interactions between the Judicial Branch and the Executive, even quite burdensome interactions, necessarily rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Constitutional Law > Supremacy Clause ▾ > Federal Preemption ▾

**HN3** ⬇ **Supremacy Clause, Federal Preemption**

Nothing in the Supremacy Clause of the United States Constitution even suggests that the President cannot be called to account before a state court for wrongful conduct that bears no relationship to any federal executive responsibility. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Constitutional Law > Supremacy Clause ▾ > Federal Preemption ▾

**HN4** ⬇ **Supremacy Clause, Federal Preemption**

Resolution of an action unrelated to the President's official conduct is the responsibility of a state court and is not impermissible direct control over the President. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

Torts > Intentional Torts ▾ > Defamation ▾ > Elements ▾

**HN5** ⬇ **Defamation, Elements**

A false statement tending to expose a person to public contempt, hatred, ridicule, aversion, or disgrace constitutes defamation. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

▼ Headnotes/Summary

---

**Headnotes**

**Constitutional Law — Supremacy Clause — State Defamation Action against Current President of United States**

1. Defendant, the current President of the United States, was not entitled to have plaintiff's defamation action against him, based on statements made during his presidential campaign, dismissed or stayed during the term of his presidency. The President of the United States has no immunity and is subject to the laws for purely private acts, since immunities are grounded in the nature of the function performed, not the identity of the actor who performed it. When unofficial conduct is at issue, there is no risk that a state will improperly encroach on powers given to the federal government by interfering with the manner in which the President performs federal functions. There is no possibility that a state court will compel the President to take any official action or that it will compel the President to refrain from taking any official action. State courts can manage lawsuits against the President based on private unofficial conduct just as well as federal courts and can be just as mindful of the unique position in the constitutional scheme that the office occupies.

**Pleading — Sufficiency of Pleading — Libel and Slander — Defamation Action against President of United States — Comments Made during Presidential Campaign**

2. Plaintiff's defamation pleading against defendant President of the United States, alleging that defendant, during campaign speeches and on social media, called her a liar and suggested that she was seeking fame or hired by his opponent when she publicly stated that defendant forcibly kissed and touched her inappropriately on several occasions, met the minimum standards to proceed. A false statement tending to expose a person to public contempt, hatred, ridicule, aversion or disgrace constitutes defamation. Statements calling an individual who claims to have been a victim of sexual abuse a liar and suggesting that they were motivated by other interests are susceptible to a defamatory connotation where the defendant appears well placed to have information about the charges and the context of the statements suggested that he spoke with authority, and that his statements were based on facts. Here, defendant, the only person other than plaintiff who knows what happened between the two of them, repeatedly accused plaintiff of dishonesty not just in his opinion but as a matter of fact. He averred that plaintiff told "phony stories" and issued statements that were "totally false" and "fiction," and he insisted that the events "never happened" and that the allegations were "100% false [and] made up." Defendant used specific, easily understood language to communicate that plaintiff lied to further her interests and his statements could be proved true or false. Moreover, the statements, which were not made through op-ed pieces or letters to the editor, but were delivered in speeches, debates and through Twitter, a preferred means of communication often used by defendant, could not be characterized simply as opinion.

471

**Counsel:** *Kasowitz Benson Torres LLP* ▾ (*Mark E. Kasowitz* ▾, *Christina A. Montenegro* ▾ and *Paul J. Burgo* ▾ of counsel) for defendant.

*Cuti Hecker Wang LLP* ▾ (*Mariann Meier Wang* ▾, *John Cuti* ▾, *Eric Hecker* ▾, *Daniel Mullkoff* ▾ and *Heather Gregorio* ▾) of counsel) and *Allred, Maroko & Goldberg* ▾ (*Gloria Allred* ▾, *Nathan Goldberg* ▾ and *Marcus Spiegel* ▾) of counsel) for plaintiff.

**Judges:** HON. Jennifer G. Schecter ▾, J.

**Opinion by:** Jennifer G. Schecter ▾

## Opinion

[**443]  [*791] Jennifer G. Schecter ▾, J.

In *Clinton v Jones* (520 US 681, 117 S Ct 1636, 137 L Ed 2d 945 [1997]), the United States Supreme Court held that a sitting president is not immune from being sued in federal court for unofficial acts. It left open the question of whether concerns of federalism and comity compel a different conclusion for suits brought in state court. Because they do not, defendant's [**444] motion to dismiss this case or hold it in abeyance is denied.

Background

On this motion to dismiss the complaint, the court must accept the facts alleged by plaintiff to be true (*Davis v Boeheim*, 24 NY3d 262, 268, 998 NYS2d 131, 22 NE3d 999 [2014]).

In 2005, plaintiff Summer Zervos, a California resident, was a contestant on *The Apprentice*, a reality show starring and produced by defendant Donald J. Trump (affirmation in support, exhibit 19 [complaint] ¶ 19). After defendant "fired" her [*792] on the program, plaintiff continued to seek him out for advice and to pursue job opportunities (*id.* ¶ 21).

In 2007, plaintiff met with defendant at his New York office. He allegedly kissed her twice on the lips, making her "uncomfortable, nervous and embarrassed" (*id.* ¶ 26). The next time she saw defendant was after he called her and asked her to meet him at the Beverly Hills Hotel for dinner at a restaurant (*id.* ¶ 27). When plaintiff arrived, she was escorted to defendant's bungalow and waited for him in the living room area (*id.* ¶ 28). After 15 minutes, [****2] defendant emerged from his bedroom, kissed Ms. Zervos "open mouthed" and pulled her toward him (*id.* ¶ 29). He asked her to sit next to him, "grabbed her shoulder, again kissing her very aggressively, and placed his hand on her breast" (*id.* ¶ 29). After plaintiff pulled back and walked away, defendant took her hand and led her into the bedroom (*id.* ¶ 30). When plaintiff walked out, he turned her around and suggested that they "lay down and watch some telly telly" (*id.*). He embraced her and plaintiff pushed him away, telling him to "get real" (*id.* ¶ 30). He then repeated plaintiff's words back to her lasciviously and "began to press his genitals against her, trying to kiss her again" (*id.* ¶ 30).

After plaintiff told defendant that she had come to see him for dinner, defendant "paced around the room and seemed angry" (*id.* ¶ 31). The two had dinner, which abruptly ended when defendant stated that he needed to go to bed and told plaintiff to meet him the next day at his golf course (*id.* ¶ 34). Plaintiff immediately went to discuss what had happened with her father and to get his advice (*id.* ¶ 35). She decided to go ahead with the meeting (*id.*).

The following day, plaintiff had limited interaction with defendant who introduced her to the general manager of the golf course (*id.* ¶ 36). Later that week, the manager offered plaintiff a job at half the salary that she had been seeking (*id.* ¶ 38). Plaintiff called defendant and told him that she "was upset, because it felt like she was being penalized for not sleeping with him" (*id.* ¶ 39).

In 2009 and 2010, plaintiff continued seeking employment within the Trump Organization to no avail (*id.* ¶ 40). She believed that defendant's "sexually inappropriate misconduct . . . at the Beverly Hills Hotel was either a test or an isolated incident" (*id.* ¶ 42). In 2016, plaintiff emailed defendant "that their past encounter had been hurtful and embarrassing" (*id.* ¶ 43). She never received a response (*id.*).

[*793] In July 2016, defendant was selected as the presidential nominee for the Republican party (*id.* ¶ 44).

On October 7, 2016, footage from the television show *Access Hollywood* was made public that depicted defendant telling the program's host: " 'I just start kissing [women] . . . Just kiss. . . . I don't even wait. And when you're a star, they let you do it. You can do anything. . . . Grab them by the pussy. You can do anything' " (*id.* ¶¶ 1, 4). During a presidential debate two [**445] days later, defendant denied engaging in the behavior that he had discussed on tape and characterized his words as "locker-room talk" (*id.* ¶ 48).

Plaintiff subsequently "chose to come forward and to speak publicly . . . . She felt that telling the world of her specific experiences . . . was ethically the right thing to do, so that the public could evaluate Mr. Trump fully as a candidate for president" (*id.* ¶ 50). On the afternoon of October 14, 2016, plaintiff along with her counsel held a press conference at which she "publicly described her interactions with Mr. Trump in detail, including his unwanted sexual misconduct" (*id.* ¶ 53).

That very day, defendant responded in a statement that was widely reported and appeared on his campaign website: " '\`To be clear, I never met her at a hotel or greeted her inappropriately a decade ago. That is not who I am as a person and it is not how I've conducted my life' " (*id.* ¶ 55). Later on, at a North Carolina campaign rally, defendant stated,

    "these allegations are 100% false . . . They are made up, they never happened . . . It's not hard to find a small handful of people willing to make false smears for personal fame, who knows maybe for financial reasons, [****3] political purposes, or for the simple reason they want to stop our movement. They want to stop our campaign. Very simple. These claims defy reason, truth, logic, common sense. They're made without supporting witnesses. No witnesses. Hey you know, 28 years ago, 10 years ago, 14 years ago, 12 years ago. Not me. Believe me. Not me. Not me" (*id.* ¶ 59; affirmation in support, exhibit 3 at 2-3).

472

At a rally in New Hampshire on October 15, 2016, defendant reported that plaintiff's cousin "wrote a letter that what she said is a lie" (affirmation in support, exhibit 8 at 2). He stated that many of the allegations against him had already been "proven so false," referred to another story in the media about **[\*794]** him and insisted: "we can't let them get away with this . . . . Total lies. . . . [You've] been seeing total lies" (*id.*). He said "you have phony people coming up with phony allegations, with no witnesses whatsoever" (*id.* at 3).

He tweeted about "100% fabricated and made up charges" and that nothing "ever happened with any of these women. Totally made up nonsense to steal the election" (complaint ¶¶ 60, 63). He lamented over Twitter about losing large numbers of women voters "based on made-up events that never happened" (*id.* ¶ 66).

On October 17, 2016, defendant tweeted: "Can't believe these totally phony stories, 100% made up by women (many already proven false) and pushed big time by press, have impact!" (Affirmation in support, exhibit 12.) He also re-tweeted a statement by someone else about plaintiff, which included a picture of her and set forth "this is all yet another hoax," adding his own comment: "Terrible" (complaint ¶ 69; affirmation in support, exhibit 13). At 4:31 that afternoon, defendant tweeted: "New polls are good because the media has deceived the public by putting women front and center with made-up stories and lies, and got caught" (affirmation in support, exhibit 14).

At the next presidential debate, on October 19, 2016, defendant answered a question about reports by nine women of nonconsensual kissing or groping (complaint ¶ 73; affirmation in support, exhibit 17 at 19/37). He stated:

"those stories are all totally false. . . . I didn't know any of these women. I didn't see these women. These women, the woman on the plane, the woman on the—I think they want either fame or [the Clinton] campaign did it. . . . I believe . . . [Hillary Clinton] got these people to step forward. If it wasn't, they get their ten minutes of fame, but they were all totally—it was all fiction. It was lies and it was [\*\*446] fiction" (complaint ¶ 73; affirmation in support, exhibit 17 at 20/37).

Finally, on October 22, 2016, at a Pennsylvania rally, defendant declared: "Every woman lied when they came forward to hurt my campaign, total fabrication. The events never happened. Never. All of these liars will be sued after the election is over" (complaint ¶ 74).

On January 17, 2017, plaintiff commenced this action, alleging that defendant made defamatory statements about her "knowing they were false and/or with reckless disregard for [\*795] their truth or falsity" (*id.* ¶ 78). She asserts that as a direct result of the false statements and being "branded a liar who came forward only for fame or at the manipulation of the Clinton campaign," she suffered emotionally and financially (*id.* ¶¶ 80-82). She pleads that defendant's statements contained numerous false representations about her, "including that [her] description of being subjected to unwanted sexual touching by defendant was a lie, phony, a hoax and 'made up,' and that [she] was motivated by fame and/or directed by Clinton or the Democrats" (*id.* ¶ 85). She contends that she "suffered at least $2,914" in financial losses because her restaurant lost business (*id.* ¶ 81).

Three days after this action was filed, defendant became the 45th President of the United States. He now moves for dismissal or for a continuance of this case until he leaves office. Because there is no authority for delaying adjudication and because plaintiff has stated a cause of action, defendant's motion is denied.

Analysis

No one is above the law. It is settled that **HN1** the President of the United States has no immunity and is "subject to the laws" for purely private acts (*Clinton*, 520 US at 696). In *Clinton v Jones*, the United States Supreme Court made clear that "immunities are grounded in 'the nature of the function performed, not the identity of the actor who performed it' " (*id. at 695* [citation omitted]). There, the Court required then-President William Jefferson Clinton to defend against a civil rights action that included a state-law defamation claim in federal court. The Court concluded that the President was subject to suit because regardless of the outcome there was no "possibility that the decision [would] curtail the scope of the official powers of the Executive Branch" (*id. at 701*). It explained that the "litigation of questions that relate entirely to the unofficial conduct of the individual who happens to be the President poses no perceptible risk of misallocation of either judicial power or executive power" (*id.*). **HN2** In holding that the doctrine of separation of powers did not mandate a stay of all private actions against the President, the Court flatly rejected that "interactions between the Judicial Branch and the Executive, even quite burdensome interactions, necessarily rise to the level of constitutionally forbidden impairment of the Executive's ability [\*796] to perform its constitutionally mandated functions" (*id. at 702*).

The rule is no different for suits commenced in state court related to the President's unofficial conduct. **HN3** Nothing in the Supremacy Clause of the United States Constitution even suggests that the President cannot be called to account before a state court for wrongful conduct that bears no relationship to any federal executive responsibility. Significantly, when unofficial conduct is at issue, there is no risk that a state will improperly encroach on powers given to the federal government by interfering with the manner in which the President performs official functions. There is no possibility that a state [\*\*447] court will compel the President to take any official action or that it will compel the President to refrain from taking any official action.

To be sure, in pointing out that proceedings in state court may warrant a different analysis from those in federal court, each and every one of the concerns that the United States Supreme Court raised implicates unlawful state intrusion into federal government operations (*id. at 691 n 13*, citing *Hancock v Train*, 426 US 167, 96 S Ct 2006, 48 L Ed 2d 555 [1976] [federal agencies' operations could not be conditioned on obtaining state permits]; *Mayo v United States*, 319 US 441, 445, 447, 63 S Ct 1137, 87 L Ed 1504 [1943] [a state cannot lay fees or exact money on a United States instrumentality as "the federal function must be left free"]; *see also Matter of Schmoll, Inc. v Federal Reserve Bank of N.Y.*, 286 NY 503, 509, 37 NE2d 225 [1941] [a state court may not "control the manner in which a federal agency performs or attempts to perform its functions and duties . . . . Assumption of such power would hamper orderly government and ignore the division of the fields of government of state and nation [\*\*\*\*4] created by the Constitution]", *cert denied* 315 US 818, 62 S Ct 905, 86 L Ed 1215 [1942]). ⬚1⬛ Those concerns are nonexistent when only unofficial conduct is in question.

Nor is there any legitimate fear of local prejudice in state court when the actions under review bear no relationship to [\*797] federal duties (*Clinton*, 520 US at 691, citing 28 USC § 1442 [a] [1] [authorizing removal from state to federal court of actions against officials "for or relating to any act under color of such office"]; *Mesa v California*, 489 US 121, 139, 109 S Ct 959, 103 L Ed 2d 99 [1989] [explaining that in cases where "true state hostility may have existed, it was specifically directed against federal officers' efforts to carry out their federally mandated

duties "]; see also *Watson v Philip Morris Cos., Inc.*, 551 US 142, 150, 127 S Ct 2301, 168 L Ed 2d 42 [2007] [purpose of removal statutes to "protect the Federal Government from the interference with its 'operations' "]).

There is no reason, moreover, that state courts like their federal counterparts will be "either unable to accommodate the President's needs or unfaithful to the tradition . . . of giving 'the utmost deference to Presidential responsibilities' " (*Clinton*, 520 US at 709). State courts can manage lawsuits against the President based on private unofficial conduct just as well as [***12] federal courts and can be just as mindful of the " 'unique position in the constitutional scheme' that th[e] office occupies" (*id.* at 698).

Additionally, and for the very same reasons articulated in *Clinton v Jones*, a stay for the duration of the Trump presidency must be denied. A lengthy and categorical stay is not justified based on the possibility that, at a moment's notice, the President may have to attend to a governmental or international crisis. If and when he does, of course, important federal responsibilities will take precedence.

[1] In the end, there is absolutely no authority for dismissing or staying a civil [**448] action related purely to unofficial conduct because defendant is the President of the United States. *HN4* Resolution of an action unrelated to the President's official conduct is the responsibility of a state court and is not impermissible "direct control . . . over the President" (*Clinton*, 520 US at 691 n 13). Congress, moreover, has enacted legislation deferring civil litigation under circumstances it felt appropriate (*see* 11 USC § 362 [bankruptcy stay]; 50 USC § 3901 *et seq.* [staying proceedings against servicemembers during military service]). Even after *Clinton v Jones*, decided more than 20 years ago, Congress has not suspended proceedings against [***13] the President of the United States and there are no compelling reasons for delaying plaintiff's day in court here.

[2] [*798] Dismissal of the complaint for failure to state a cause of action is also denied as the "pleading meets [the] minimal standard necessary" to proceed (*see* *Davis*, 24 NY3d at 268). 2⬇ Plaintiff's complaint is based on assertions made by defendant, that if proved false, form the predicate for a maintainable defamation action (*Gross v New York Times Co.*, 82 NY2d 146, 154, 623 NE2d 1163, 603 NYS2d 813 [1993]).

*HN5* A false statement tending "to expose a person to public contempt, hatred, ridicule, aversion or disgrace constitutes defamation" (*Davis*, 24 NY3d at 268). In *Davis v Boeheim*, the Court of Appeals determined that a defamation action could be maintained against a defendant who called individuals claiming to have been victims of sexual abuse liars and stated that he believed that they were motivated by money to go public (*Davis*, 24 NY3d 262, 998 NYS2d 131, 22 NE3d 999 [reinstating defamation action against someone who *may* have known undisclosed facts about alleged sexual abuse]). The Court concluded that the statements were susceptible to a defamatory connotation because they communicated that defendant had information unknown to others that justified his statements that the individuals were neither credible nor victims of abuse (*id.* at 272). Defendant [***14] in *Davis* "appeared well placed to have information about the charges" and the context of the statements suggested that he "spoke with authority, and that his statements were based on facts" (*id.* at 273).

The statements here weigh even more heavily against dismissal of the complaint. Defendant—the only person other than plaintiff who knows what happened between the two of them—repeatedly accused plaintiff of dishonesty not just in his opinion but as a matter of fact. He not only averred that plaintiff told "phony stories" and issued statements that were [*799] "totally false" and "fiction," he insisted that the events "never happened" and that the allegations [**449] were [****5] "100% false [and] made up." 3⬇ A reader or listener, cognizant that defendant knows exactly what transpired, could reasonably believe what defendant's statements convey: that plaintiff is contemptible because she "fabricated" events for personal gain (*see* *Divet v Reinisch*, 169 AD2d 416, 564 NYS2d 142 [1st Dept 1991] [libelous character of statement "derives from the fact that it charges (individuals) in writing with being liars and is thus actionable on its face"]).

Defendant used "specific, easily understood language to communicate" that plaintiff lied to further her interests (*Davis*, 24 NY3d at 271). His statements [***15] can be proved true or false, as they pertain to whether plaintiff made up allegations to pursue her own agenda (*id.*). Most importantly, in their context, defendant's repeated statements—which were not made through op-ed pieces or letters to the editor but rather were delivered in speeches, debates and through Twitter, a preferred means of communication often used by defendant—cannot be characterized simply as opinion, heated rhetoric or hyperbole. 4⬇ That defendant's statements about plaintiff's veracity were made while he was campaigning to become President of the United States, does not make them any less actionable (*see* *Silsdorf v Levine*, 59 NY2d 8, 16, 449 NE2d 716, 462 NYS2d 822 [1983] [explaining that "concern over undue limitations upon expression in the course of political campaigns" by allowing a defamation action to proceed was "misplaced"], *cert denied* 464 US 831, 104 S Ct 109, 78 L Ed 2d 111 [1983]). 5⬇

Because there is a reasonable view of the claim upon which plaintiff would be entitled to recover for defamation, the complaint sufficiently states a cause of action (*Davis*, 24 NY3d at [*800] 274). [****6]

Accordingly, it is ordered that defendant's motion is denied.

[***16]

---

**Footnotes**

1⬆      The cases defendant relies on are no different (*see* *Tennessee v Davis*, 100 US 257, 267, 25 L Ed 648 [1879] [statute authorizing removal of actions against federal officers engaged in official duties is "no invasion of State domain"]; *Tarble's Case*, 80 US 397, 20 L Ed 597 [1871] [state judge could not intrude with operations of federal government by discharging a prisoner held under the authority of the United States]; *McClung v Silliman*, 19 US 598, 605, 5 L Ed 340 [1821] [state court cannot issue writ of mandamus compelling federal officer to take governmental action]).

2⬆      New York law applies. Defendant has not established that there is a conflict between substantive New York and California defamation law (*K.T. v Dash*, 37 AD3d 107, 111, 827 NYS2d 112 [1st Dept 2006]). The only difference defendant points out is California's anti-SLAPP provision, which is a procedural statute enacted as part of California's Code of Civil Procedure and has no applicability here (*see* Cal Civ Proc Code § 425.16 [j] [1] [requiring transmission of papers to California's Judicial Council]; *see also* *Liberty Synergistics Inc. v Microflo Ltd.*, 718 F3d 138, 154 [2d Cir 2013] [explaining that "California courts have repeatedly held . . . that California's anti-SLAPP rule is 'procedural' in nature" and applies in California courts regardless of which source of law governs a

plaintiff's substantive claim]; *Kibler v Northern Inyo County Local Hosp. Dist.,* 39 Cal 4th 192, 202, 46 Cal Rptr 3d 41, 47, 138 P3d 193, 198 [2006] [anti-SLAPP statute is a "procedural device"]).

3☞  Accepting the allegations in the complaint as true, the challenged statements were "of and concerning" plaintiff. Some of the statements referred to "every woman" who came forward—"a particular, specifically-defined group of individuals" that a jury could find included plaintiff (*see Three Amigos SJL Rest., Inc. v CBS News Inc.,* 28 NY3d 82, 86-87, 42 NYS3d 64, 65 NE3d 35 [2016]; *see also Gross v Cantor,* 270 NY 93, 96, 200 NE 592 [1936]). The context of other statements—some of which were made days after plaintiff's press conference, related to allegations raised at her press conference or mentioned plaintiff and her family—similarly raise jury questions as to whether they pertained to her.

4☞  *Contrast Jacobus v Trump,* 156 AD3d 452, 453, 64 NYS3d 889 (1st Dept 2017) (holding that the statement that plaintiff, a political strategist, "begged" for a job, was "too vague, subjective and lacking in precise meaning . . . to be actionable [and that its] immediate context . . . would signal to the reasonable reader or listener" that it was an opinion and not fact).

5☞  Plaintiff's complaint, like the one in *Silsdorf*, sufficiently alleges actual malice (*Silsdorf,* 59 NY2d at 17).



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

# Masson v. New Yorker Magazine

Supreme Court of the United States

January 14, 1991, Argued ; June 20, 1991, Decided

No. 89-1799

**Reporter**

501 U.S. 496 *; 111 S. Ct. 2419 **; 115 L. Ed. 2d 447 ***; 1991 U.S. LEXIS 3630 ****; 59 U.S.L.W. 4726; 91 Cal. Daily Op. Service 4683; 91 Daily Journal DAR 7272; 18 Media L. Rep. 2241

JEFFREY M. MASSON, PETITIONER v. NEW YORKER MAGAZINE, INC., ALFRED A. KNOPF, INC. AND JANET MALCOLM

**Prior History:** **[****1]** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

**Disposition:** 895 F.2d 1535, reversed and remanded.

## Syllabus

Petitioner Masson, a psychoanalyst, became disillusioned with Freudian psychology while serving as projects director of the Sigmund Freud Archives, and was fired after advancing his own theories. Thereafter, respondent Malcolm, an author and contributor to respondent New Yorker Magazine, taped several interviews with Masson and wrote a lengthy article on his relationship with the archives. One of Malcolm's narrative devices consists of enclosing lengthy passages attributed to Masson in quotation marks. Masson allegedly expressed alarm about several errors in those passages before the article was published. After its publication, and with knowledge of Masson's allegations that it contained defamatory material, respondent Alfred A. Knopf, Inc., published the work as a book, which portrayed Masson in a most unflattering light. He brought an action for libel under California law in the Federal District Court, concentrating on passages alleged to be defamatory, six of which are before this Court. In each instance, the quoted statement does not appear in the **[****2]** taped interviews. The parties dispute whether there were additional untaped interviews, the notes from which Malcolm allegedly transcribed. The court granted respondents' motion for summary judgment. It concluded that the alleged inaccuracies were substantially true or were rational interpretations of ambiguous conversations, and therefore did not raise a jury question of actual malice, which is required when libel is alleged by a public figure. The Court of Appeals affirmed. The court found, among other things, that one passage -- in which Masson was quoted as saying that archives officials had considered him an "intellectual gigolo" while the tape showed that he said he "was much too junior within the hierarchy of analysis for these important . . . analysts to be caught dead with [him]" -- was not defamatory and would not be actionable under the "incremental harm" doctrine.

*Held:*

1. The evidence presents a jury question whether Malcolm acted with requisite knowledge of falsity or reckless disregard as to the truth or falsity of five of the passages. Pp. 509-525.

(a) As relevant here, the First Amendment limits California's libel law by requiring that a public figure prove by clear **[****3]** and convincing evidence that the defendant published the defamatory statement with actual malice. However, in place of the term actual malice, it is better practice that jury instructions refer to publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity. Pp. 509-511.

(b) A trier of fact in this case could find that the reasonable reader would understand the quotations attributed to Masson to be nearly verbatim reports of his statements. In general, quotation marks indicate a verbatim reproduction, and quotations add authority to a statement and credibility to an author's work. A fabricated quotation may injure reputation by attributing an untrue factual assertion to the speaker, or by indicating a negative personal trait or an attitude the speaker does not hold. While some quotations do not convey that the speaker actually said or wrote the quoted material, such is not the case here. Malcolm's work gives the reader no clue that the quotations are anything but the reproductions of actual conversations, and the work was published in a magazine that enjoyed a reputation for scrupulous factual inquiry. These factors could lead a reader to take the **[****4]** quotations at

501 U.S. 496, *496; 111 S. Ct. 2419, **2419; 115 L. Ed. 2d 447, ***447; 1991 U.S. LEXIS 3630, ****4

face value. Pp. 511-513.

(c) The common law of libel overlooks minor inaccuracies and concentrates upon substantial truth. Thus, a deliberate alteration of a plaintiff's words does not equate with knowledge of falsity for purposes of *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279-280, 11 L. Ed. 2d 686, 84 S. Ct. 710, and *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 341, 342, 41 L. Ed. 2d 789, 94 S. Ct. 2997, unless it results in a material change in the statement's meaning. While the use of quotations to attribute words not in fact spoken is important to that inquiry, the idea that any alteration beyond correction of grammar or syntax by itself proves falsity is rejected. Even if a statement has been recorded, the existence of both a speaker and a reporter, the translation between two media, the addition of punctuation, and the practical necessity to edit and make intelligible a speakers' perhaps rambling comments, make it misleading to suggest that a quotation will be reconstructed with complete accuracy. However, if alterations give a different meaning to a speaker's statements, bearing upon their defamatory character, then the device of quotations might well be critical in finding the words actionable. Pp. 513-518.

(d) Although **[****5]** the Court of Appeals applied a test of substantial truth, it erred in going one step further and concluding that an altered quotation is protected so long as it is a "rational interpretation" of the actual statement. The protection for rational interpretation serves First Amendment principle by allowing an author the interpretive license that is necessary when relying upon ambiguous sources; but where a writer uses a quotation that a reasonable reader would conclude purports to be a verbatim repetition of the speaker's statement, the quotation marks indicate that the author is not interpreting the speaker's ambiguous statement, but is attempting to convey what the speaker said. *Time, Inc.* v. *Pape*, 401 U.S. 279, 28 L. Ed. 2d 45, 91 S. Ct. 633; *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U.S. 485, 80 L. Ed. 2d 502, 104 S. Ct. 1949, distinguished. Pp. 518-520.

(e) In determining whether Masson has shown sufficient falsification to survive summary judgment, it must be assumed, except where otherwise evidenced by the tape recordings' transcripts, that he is correct in denying that he made the statements Malcolm attributed to him, and that Malcolm reported with knowledge or reckless disregard of the differences between what **[****6]** he said and what was quoted. Malcolm's typewritten notes should not be considered, since Masson denied making

the statements, and since the record contains substantial additional evidence to support a jury determination under a clear and convincing evidence standard that Malcolm deliberately or recklessly altered the quotations. While she contests Masson's allegations, only a trial on the merits will resolve the factual dispute. Pp. 520-521.

(f) Five of the six published passages differ materially in meaning from the tape-recorded statements so as to create an issue of fact for a jury as to falsity. Whether the "intellectual gigolo" passage is defamatory is a question of California law, and to the extent that the Court of Appeals based its conclusion on the First Amendment, it was mistaken. Moreover, an "incremental harm" doctrine -- which measures the incremental reputational harm inflicted by the challenged statements beyond the harm imposed by the nonactionable remainder of the publication -- is not compelled as a matter of First Amendment protection for speech, since it does not bear on whether a defendant has published a statement with knowledge of falsity or reckless disregard **[****7]** of whether it was false or not. Pp. 521-525.

2. On remand, the Court of Appeals should consider Masson's argument that the District Court erred in granting summary judgment to the New Yorker Magazine, Inc., and Alfred A. Knopf, Inc., on the basis of their respective relations with Malcolm or the lack of any independent actual malice, since the court failed to reach his argument because of its disposition with respect to Malcolm. P. 525.

**Counsel:** Charles O. Morgan, Jr., argued the cause for petitioner. With him on the briefs was Paul Richard Kleven.

H. Bartow Farr III argued the cause for respondents. With him on the brief were Paul M. Smith, Richard G. Taranto, Charles W. Kenady, and Karl Olson. [*]

--------

[*] Briefs of amici curiae urging reversal were filed for Certain Journalists and Academics by Stewart Abercrombie Baker and Michael P. McDonald; and for the Mountain States Legal Foundation by William Perry Pendley.

Briefs of amici curiae urging affirmance were filed for the Association of American Publishers, Inc., et al. by Robert G. Sugarman, R. Bruce Rich, Slade R. Metcalf, and Laura R. Handman; for Home Box Office, Inc., et al. by P. Cameron DeVore, Daniel M. Waggoner, and Ronald E. Guttman; for the Reporters Committee for Freedom of the Press et al. by Joseph R. Bankoff, James D. Miller, Jane E. Kirtley, J. Laurent Scharff, W. Terry Maguire, Rene P. Milam, and Bruce W.

501 U.S. 496, *496; 111 S. Ct. 2419, **2419; 115 L. Ed. 2d 447, ***447; 1991 U.S. LEXIS 3630, ****7

**Judges:** KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and MARSHALL, BLACKMUN, STEVENS, O'CONNOR, and SOUTER, JJ., joined, and in Parts I, II-A, II-D, and III-A of which WHITE and SCALIA, JJ., joined. WHITE, J., filed an opinion concurring in part and dissenting in part, in which SCALIA, J., joined, post, p. 525.

**Opinion by:** KENNEDY

# Opinion

 **[*499] [***461] [**2424]**      JUSTICE KENNEDY delivered the opinion of the Court.

 [1A] [2A] [3A] [4A] [5A] [6A]In this libel case, a public figure claims he was defamed by an author who, with full knowledge of the inaccuracy, used quotation marks to attribute to him comments he had not made. The First Amendment protects authors and journalists who write about public figures by requiring a plaintiff to prove that the defamatory statements were made with what we have called "actual malice," a term of **[****8]** art denoting deliberate or reckless falsification. We consider in this opinion whether the attributed quotations had the degree of falsity required **[***462]** to prove this state of mind, so that the public figure can defeat a motion for summary judgment and proceed to a trial on the merits of the defamation claim.

I

Petitioner Jeffrey Masson trained at Harvard University as a Sanskrit scholar, and in 1970 became a professor of Sanskrit & Indian Studies at the University of Toronto. He spent eight years in psychoanalytic training, and qualified as **[*500]** an analyst in 1978. Through his professional activities, he came to know Dr. Kurt Eissler, head of the Sigmund Freud Archives, and Dr. Anna Freud, daughter of Sigmund Freud and a major psychoanalyst in her own right. The Sigmund Freud Archives, located at Maresfield Gardens outside of London, serves as a repository for materials about Freud, including his own writings, letters, and personal library. The materials, and the right of access to them, are of immense value to those who study Freud and his theories, life, and work.

In 1980, Eissler and Anna Freud hired petitioner as projects director of the archives. After assuming his post, petitioner became **[****9]** disillusioned with Freudian psychology. In a 1981 lecture before the Western New England Psychoanalytical Society in New Haven, Connecticut, he advanced his theories of Freud. Soon after, the board of the archives terminated petitioner as projects director.

Respondent Janet Malcolm is an author and a contributor to respondent The New Yorker, a weekly magazine. She contacted petitioner in 1982 regarding the possibility of an article on his relationship with the archives. He agreed, and the two met in person and spoke by telephone in a series of interviews. Based on the interviews and other sources, Malcolm wrote a lengthy article. One of Malcolm's narrative devices consists of enclosing lengthy passages in quotation marks, reporting statements of Masson, Eissler, and her other subjects.

During the editorial process, Nancy Franklin, a member of the fact-checking department at The New Yorker, called petitioner to confirm some of the facts underlying the article. According to petitioner, he expressed alarm at the number of errors in the few passages Franklin discussed with him. Petitioner contends that he asked permission to review those portions of the article which attributed quotations **[****10]** or information to him, but was brushed off with a never-fulfilled **[**2425]** promise **[*501]** to "get back to [him]." App. 67. Franklin disputes petitioner's version of their conversation. *Id.*, at 246-247.

The New Yorker published Malcolm's piece in December 1983, as a two-part series. In 1984, with knowledge of at least petitioner's general allegation that the article contained defamatory material, respondent Alfred A. Knopf, Inc., published the entire work as a book, entitled In the Freud Archives.

Malcolm's work received complimentary reviews. But this gave little joy to Masson, for the book portrays him in a most unflattering light. According to one reviewer:

"Masson the promising psychoanalytic scholar emerges gradually, as a grandiose egotist -- mean-spirited, self-serving, full of braggadocio, impossibly arrogant and, in the end, a self-destructive fool. But it **[***463]** is not Janet Malcolm who calls him such: his own words reveal this psychological profile -- a self-portrait offered to us through the efforts of an observer and listener who is, surely, as wise as any in the psychoanalytic profession." Coles, Freudianism Confronts Its Malcontents,

Sanford; and for The Time Inc. Magazine Co. et al. by Roslyn A. Mazer, Paul R. Taskier, Richard M. Schmidt, Jr., Charles S. Sims, Lee Levine, James E. Grossberg, and Mark Goodman.

478

501 U.S. 496, *501; 111 S. Ct. 2419, **2425; 115 L. Ed. 2d 447, ***463; 1991 U.S. LEXIS 3630, ****10

Boston Globe, May 27, 1984, pp. 58, 60.

Petitioner wrote **[****11]** a letter to the New York Times Book Review calling the book "distorted." In response, Malcolm stated:

> "Many of [the] things Mr. Masson told me (on tape) were discreditable to him, and I felt it best not to include them. Everything I do quote Mr. Masson as saying was said by him, almost word for word. (The 'almost' refers to changes made for the sake of correct syntax.) I would be glad to play the tapes of my conversation with Mr. Masson to the editors of The Book Review whenever they have 40 or 50 short hours to spare." App. 222-223.

Petitioner brought an action for libel under California law in the United States District Court for the Northern District of California. During extensive discovery and repeated **[*502]** amendments to the complaint, petitioner concentrated on various passages alleged to be defamatory, dropping some and adding others. The tape recordings of the interviews demonstrated that petitioner had, in fact, made statements substantially identical to a number of the passages, and those passages are no longer in the case. We discuss only the passages relied on by petitioner in his briefs to this Court.

Each passage before us purports to quote a statement made by petitioner during **[****12]** the interviews. Yet in each instance no identical statement appears in the more than 40 hours of taped interviews. Petitioner complains that Malcolm fabricated all but one passage; with respect to that passage, he claims Malcolm omitted a crucial portion, rendering the remainder misleading.

[1B](a)  "*Intellectual Gigolo.*" Malcolm quoted a description by petitioner of his relationship with Eissler and Anna Freud as follows:

> "'Then I met a rather attractive older graduate student and I had an affair with her. One day, she took me to some art event, and she was sorry afterward. She said, "Well, it is very nice sleeping with you in your room, but you're the kind of person who should never leave the room -- you're just a social embarrassment anywhere else, though you do fine in your own room." And you know, in their way, if not in so many words, Eissler and Anna Freud told me the same thing. They like me well enough "in my own room." They loved to hear from me what creeps and dolts analysts are. I was like an intellectual gigolo -- you get your pleasure from him, but you don't take him out in public. . . .'" In the

Freud Archives 38.

The tape recordings contain the substance of petitioner's **[****13]** reference to his graduate student friend, App. 95, but no suggestion that Eissler or Anna Freud considered him, or that **[**2426]** he considered himself, an "'intellectual gigolo.'" Instead, petitioner said:

> **[*503]**  "They felt, in a sense, I was a private asset but a public liability. . . . They liked me when I was alone in their living room, and I **[***464]** could talk and chat and tell them the truth about things and they would tell me. But that I was, in a sense, much too junior within the hierarchy of analysis, for these important training analysts to be caught dead with me." *Id.,* at 104.

[2B](b)  "*Sex, Women, Fun.*" Malcolm quoted petitioner as describing his plans for Maresfield Gardens, which he had hoped to occupy after Anna Freud's death:

> "'It was a beautiful house, but it was dark and sombre and dead. Nothing ever went on there. I was the only person who ever came. I would have renovated it, opened it up, brought it to life. Maresfield Gardens would have been a center of scholarship, but it would also have been a place of sex, women, fun. It would have been like the change in *The Wizard of Oz,* from black-and-white into color.'" In the Freud Archives 33.

The tape recordings contain a **[****14]** similar statement, but in place of the references to "sex, women, fun" and The Wizard of Oz, petitioner commented:

> "It is an incredible storehouse. I mean, the library, Freud's library alone is priceless in terms of what it contains: all his books with his annotations in them; the Schreber case annotated, that kind of thing. It's fascinating." App. 127.

Petitioner did talk, earlier in the interview, of his meeting with a London analyst:

> "I like him. So, and we got on very well. That was the first time we ever met and you know, it was buddy-buddy, and we were to stay with each other and [laughs] we were going to pass women on to each other, and we were going to have a great time together when I lived in the Freud house. We'd have great parties there and we were [laughs] --
> . . . .
>  **[*504]** ". . . going to really, we were going to live it up." *Id.,* at 129.

479

501 U.S. 496, *504; 111 S. Ct. 2419, **2426; 115 L. Ed. 2d 447, ***464; 1991 U.S. LEXIS 3630, ****14

[3B](c)  "*It Sounded Better.*" Petitioner spoke with Malcolm about the history of his family, including the reasons his grandfather changed the family name from Moussaieff to Masson, and why petitioner adopted the abandoned family name as his middle name. The article contains the passage:

> "'My father is a gem merchant who doesn't  **[****15]** like to stay in any one place too long. His father was a gem merchant, too -- a Bessarabian gem merchant, named Moussaieff, who went to Paris in the twenties and adopted the name Masson. My parents named me Jeffrey Lloyd Masson, but in 1975 I decided to change my middle name to Moussaieff -- it sounded better.'" In the Freud Archives 36.

In the most similar tape-recorded statement, Masson explained at considerable length that his grandfather had changed the family name from Moussaieff to Masson when living in France, "just to hide his Jewishness." Petitioner had changed his last name back to Moussaieff, but his then-wife Terry objected that "nobody could pronounce it and nobody knew how to spell it, and it wasn't the name that she knew me by." Petitioner had changed his name to Moussaieff because he "just liked it." "It was sort of part of analysis: a return to the roots, and  **[***465]**  your family tradition and so on." In the end, he had agreed with Terry that "it wasn't her name after all," and used Moussaieff as a middle instead of a last name. App. 87-89.

 [4B](d)  "*I Don't Know Why I Put It In.*" The article recounts part of a conversation between Malcolm and petitioner about the paper  **[****16]**  petitioner presented at his 1981 New Haven lecture:

> "[I] asked him what had happened between the time of the lecture and the present to change him from a Freudian  **[*505]**  psychoanalyst with somewhat outre views into the bitter and belligerent anti-Freudian he had become.
>
>  **[**2427]**  "Masson sidestepped my question. 'You're right, there was nothing disrespectful of analysis in that paper,' he said. 'That remark about the sterility of psychoanalysis was something I tacked on at the last minute, and it was totally gratuitous. I don't know why I put it in.'" In the Freud Archives 53.

The tape recordings instead contain the following discussion of the New Haven lecture:

> Masson: "So they really couldn't judge the material. And, in fact, until the last sentence I think they were

quite fascinated. I think the last sentence was an in, [sic] possibly, gratuitously offensive way to end a paper to a group of analysts. Uh, --"

Malcolm: "What were the circumstances under which you put it [in]? . . ."

Masson: "That it was, was true.

. . . .

". . . I really believe it. I didn't believe anybody would agree with me.

. . . .

". . . But I felt I should say something because the paper's still well within the  **[****17]**  analytic tradition in a sense. . . .

. . . .

". . . It's really not a deep criticism of Freud. It contains all the material that would allow one to criticize Freud but I didn't really do it. And then I thought, I really must say one thing that I really believe, that's not going to appeal to anybody and that was the very last sentence. Because I really do believe psychoanalysis is entirely sterile . . . ." App. 176.

[5B](e)  "*Greatest Analyst Who Ever Lived.*" The article contains the following self-explanatory passage:

>  **[*506]**  "A few days after my return to New York, Masson, in a state of elation, telephoned me to say that Farrar, Straus & Giroux has taken *The Assault on Truth* [Masson's book]. 'Wait till it reaches the best-seller list, and watch how the analysts will crawl,' he crowed. 'They move whichever way the wind blows. They will want me back, they will say that Masson is a great scholar, a major analyst -- after Freud, he's the greatest analyst who ever lived. Suddenly they'll be calling, begging, cajoling: "Please take back what you've said about our profession; our patients are quitting." They'll try a short smear campaign, then they'll try to buy me, and ultimately they'll  **[****18]**  have to shut up. Judgment will be passed by history. There is no possible refutation of this book. It's going to  **[***466]**  cause a revolution in psycho-analysis. Analysis stands or falls with me now.'" In the Freud Archives 162.

This material does not appear in the tape recordings. Petitioner did make the following statements on related topics in one of the taped interviews with Malcolm:

> ". . . I assure you when that book comes out, which I honestly believe is an honest book, there is nothing, you know, mean-minded about it. It's the honest fruit of research and intellectual toil. And

501 U.S. 496, *506; 111 S. Ct. 2419, **2427; 115 L. Ed. 2d 447, ***466; 1991 U.S. LEXIS 3630, ****18

there is not an analyst in the country who will say a single word in favor of it." App. 136.

"Talk to enough analysts and get them right down to these concrete issues and you watch how different it is from my position. It's utterly the opposite and that's finally what I realized, that I hold a position that no other analyst holds, including, alas, Freud. At first I thought: Okay, it's me and Freud against the rest of the analytic world, or me and Freud and Anna Freud and Kurt Eissler and Vic Calef and Brian Bird and Sam **[\*507]** Lipton against the rest of the world. Not so, it's me. it's me alone." *Id.*, at 139.

**[\*\*\*\*19]** The tape of this interview also contains the following exchange between petitioner and Malcolm:

Masson: ". . . analysis stands or falls with me now." Malcolm: "Well that's a very grandiose thing to say."

**[\*\*2428]** Masson: "Yeah, but it's got nothing to do with me. It's got to do with the things I discovered." *Id.*, at 137.

[6B](f) *"He Had The Wrong Man."* In discussing the archives' board meeting at which petitioner's employment was terminated, Malcolm quotes petitioner as giving the following explanation of Eissler's attempt to extract a promise of confidentiality:

"'[Eissler] was always putting moral pressure on me. "Do you want to poison Anna Freud's last days? Have you no heart? You're going to kill the poor old woman." I said to him, "What have I done? *You're* doing it. *You're* firing me. What am I supposed to do -- be grateful to you?" "You could be silent about it. You could swallow it. I know it is painful for you. But you could just live with it in silence." "Why should I do that?" "Because it is the honorable thing to do." Well, he had the wrong man.'" In the Freud Archives 67.

From the tape recordings, on the other hand, it appears that Malcolm deleted part of petitioner's **[\*\*\*\*20]** explanation (italicized below), and petitioner argues that the "wrong man" sentence relates to something quite different from Eissler's entreaty that silence was "the honorable thing." In the tape recording, petitioner states:

"But it was wrong of Eissler to do that, you know. He was constantly putting various kinds of moral pressure on me and, 'Do you want to poison Anna Freud's last days? Have you no heart?' He called me: 'Have you no heart? You're going to kill the

poor old woman. **[\*508]** Have you no heart? Think of what she's done for you and you are now willing to do this to her.' I said, 'What have I, what have I done? *You* did it. You fired me. **[\*\*\*467]** What am I supposed to do: thank you? be grateful to you?' He said, 'Well you could never talk about it. You could be silent about it. You could swallow it. I know it's painful for you but just live with it in silence.' 'Fuck you,' I said, 'Why should I do that? Why? You know, why should one do that?' 'Because it's the honorable thing to do *and you will save face. And who knows? If you never speak about it and you quietly and humbly accept our judgment, who knows that in a few years if we don't bring you back?'* Well, he had the wrong man. **[\*\*\*\*21]** " App. 215-216.

Malcolm submitted to the District Court that not all of her discussions with petitioner were recorded on tape, in particular conversations that occurred while the two of them walked together or traveled by car, while petitioner stayed at Malcolm's home in New York, or while her tape recorder was inoperable. She claimed to have taken notes of these unrecorded sessions, which she later typed, then discarding the handwritten originals. Petitioner denied that any discussion relating to the substance of the article occurred during his stay at Malcolm's home in New York, that Malcolm took notes during any of their conversations, or that Malcolm gave any indication that her tape recorder was broken.

Respondents moved for summary judgment. The parties agreed that petitioner was a public figure and so could escape summary judgment only if the evidence in the record would permit a reasonable finder of fact, by clear and convincing evidence, to conclude that respondents published a defamatory statement with actual malice as defined by our cases. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255-256, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The District Court analyzed each of the passages **[\*\*\*\*22]** and held that the alleged inaccuracies did not raise a jury question. The court found that the allegedly fabricated quotations were either substantially true, or were "'one of a number of possible **[\*509]** rational interpretations' of a conversation or event that 'bristled with ambiguities,'" and thus were entitled to constitutional protection. 686 F. Supp. 1396, 1399 (ND Cal. 1987) (quoting *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984)). The court also ruled **[\*\*2429]** that the "he had the wrong man" passage involved an exercise of editorial judgment upon which the courts could not

481

intrude. 686 F. Supp. at 1403-1404.

The Court of Appeals affirmed, with one judge dissenting. 895 F.2d 1535 (CA9 1989). The court assumed for much of its opinion that Malcolm had deliberately altered each quotation not found on the tape recordings, but nevertheless held that petitioner failed to raise a jury question of actual malice, in large part for the reasons stated by the District Court. In its examination of the "intellectual gigolo" passage, the court agreed with the District Court that petitioner could not demonstrate **[****23]** actual malice because Malcolm had not altered the substantive content of petitioner's self-description, but went on to note that it did not consider the "intellectual gigolo" passage defamatory, as the quotation merely reported Kurt Eissler's and Anna Freud's opinions about petitioner. In any event, concluded the court, the statement would not be **[***468]** actionable under the "'incremental harm branch' of the 'libel-proof' doctrine," *id.*, at 1541 (quoting *Herbert* v. *Lando*, 781 F.2d 298, 310-311 (CA2 1986)).

The dissent argued that any intentional or reckless alteration would prove actual malice, so long as a passage within quotation marks purports to be a verbatim rendition of what was said, contains material inaccuracies, and is defamatory. 895 F.2d at 1562-1570. We granted certiorari, 498 U.S. 808 (1990), and now reverse.

II

A

 **[7]**Under California law, "libel is a false and unprivileged publication by writing . . . which exposes any person to hatred, **[*510]** contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Cal. Civ. Code Ann. § 45 (West 1982). False **[****24]** attribution of statements to a person may constitute libel, if the falsity exposes that person to an injury comprehended by the statute. See *Selleck* v. *Globe International, Inc.*, 166 Cal. App. 3d 1123, 1132, 212 Cal. Rptr. 838, 844 (1985); *Cameron* v. *Wernick*, 251 Cal. App. 2d 890, 60 Cal. Rptr. 102 (1967); *Kerby* v. *Hal Roach Studios, Inc.*, 53 Cal. App. 2d 207, 213, 127 P.2d 577, 581 (1942); cf. *Baker* v. *Los Angeles Herald Examiner*, 42 Cal. 3d 254, 260-261, 721 P.2d 87, 90-91, 228 Cal. Rptr. 206 (1986). It matters not under California law that petitioner alleges only part of the work at issue to be false. "The test of libel is not quantitative; a single sentence may be the basis for an action in libel even though buried in a much

longer text," though the California courts recognize that "while a drop of poison may be lethal, weaker poisons are sometimes diluted to the point of impotency." *Washburn* v. *Wright*, 261 Cal. App. 2d 789, 795, 68 Cal. Rptr. 224, 228 (1968).

 **[8]**The First Amendment limits California's libel law in various **[****25]** respects. When, as here, the plaintiff is a public figure, he cannot recover unless he proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice, *i. e.*, with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279-280, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964). Mere negligence does not suffice. Rather, the plaintiff must demonstrate that the author "in fact entertained serious doubts as to the truth of his publication," *St. Amant* v. *Thompson*, 390 U.S. 727, 731, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968), or acted with a "high degree of awareness of . . . probable falsity," *Garrison* v. *Louisiana*, 379 U.S. 64, 74, 13 L. Ed. 2d 125, 85 S. Ct. 209 (1964).

 **[9]**Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will. See *Greenbelt Cooperative* **[*511]** *Publishing Assn., Inc.* v. *Bresler*, 398 U.S. 6, 26 **[**2430]** L. Ed. 2d 6, 90 S. Ct. 1537 (1970).We have used the term actual malice as a shorthand to describe the First Amendment protections for speech injurious to reputation, and we continue to do so here. But **[****26]** the term can confuse as well as enlighten. In this respect, the phrase may be an unfortunate one. See *Harte-Hanks Communications, Inc.* v. *Connaughton*, 491 U.S. 657, 666, n. 7, 105 L. Ed. 2d 562, 109 S. Ct. 2678 **[***469]** (1989). In place of the term actual malice, it is better practice that jury instructions refer to publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity. This definitional principle must be remembered in the case before us.

B

In general, quotation marks around a passage indicate to the reader that the passage reproduces the speaker's words verbatim. They inform the reader that he or she is reading the statement of the speaker, not a paraphrase or other indirect interpretation by an author. By providing this information, quotations add authority to the statement and credibility to the author's work. Quotations allow the reader to form his or her own

conclusions and to assess the conclusions of the author, instead of relying entirely upon the author's characterization of her subject.

[10]A fabricated quotation may injure reputation in at least two senses, either giving rise to a conceivable claim of defamation. First, the quotation might injure because **[****27]** it attributes an untrue factual assertion to the speaker. An example would be a fabricated quotation of a public official admitting he had been convicted of a serious crime when in fact he had not.

Second, regardless of the truth or falsity of the factual matters asserted within the quoted statement, the attribution may result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold. John Lennon once was quoted as saying of **[*512]** the Beatles, "We're more popular than Jesus Christ now." Time, Aug. 12, 1966, p. 38. Supposing the quotation had been a fabrication, it appears California law could permit recovery for defamation because, even without regard to the truth of the underlying assertion, false attribution of the statement could have injured his reputation. Here, in like manner, one need not determine whether petitioner is or is not the greatest analyst who ever lived in order to determine that it might have injured his reputation to be reported as having so proclaimed.

A self-condemnatory quotation may carry more force than criticism by another. It is against self-interest **[****28]** to admit one's own criminal liability, arrogance, or lack of integrity, and so all the more easy to credit when it happens. This principle underlies the elemental rule of evidence which permits the introduction of statements against interest, despite their hearsay character, because we assume "that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true." Advisory Committee's Notes on Fed. Rule Evid. 804(b)(3), 28 U. S. C. App., p. 789 (citing *Hileman* v. *Northwest Engineering Co.*, 346 F.2d 668 (CA6 1965)).

Of course, quotations do not always convey that the speaker actually said or wrote the quoted material. "Punctuation marks, like words, have many uses. Writers often use quotation marks, yet no reasonable reader would assume that such punctuation automatically implies the truth of the quoted material. **[***470]** " *Baker* v. *Los Angeles Examiner*, 42 Cal. 3d at 263, 721 P.2d at 92. In *Baker*, a television reviewer

printed a hypothetical conversation between a station vice president and writer/producer, and the court found that no reasonable reader would conclude the plaintiff in fact had **[****29]** made the statement attributed to him. *Id.*, at 267, 721 P.2d at 95. Writers often use quotations as in *Baker*, and a reader will not reasonably understand the quotations to indicate reproduction of a conversation **[**2431]** that took place. In other **[*513]** instances, an acknowledgment that the work is so-called docudrama or historical fiction, or that it recreates conversations from memory, not from recordings, might indicate that the quotations should not be interpreted as the actual statements of the speaker to whom they are attributed.

[11]The work at issue here, however, as with much journalistic writing, provides the reader no clue that the quotations are being used as a rhetorical device or to paraphrase the speaker's actual statements. To the contrary, the work purports to be nonfiction, the result of numerous interviews. At least a trier of fact could so conclude. The work contains lengthy quotations attributed to petitioner, and neither Malcolm nor her publishers indicate to the reader that the quotations are anything but the reproduction of actual conversations. Further, the work was published in The New Yorker, a magazine which at the relevant time seemed **[****30]** to enjoy a reputation for scrupulous factual accuracy. These factors would, or at least could, lead a reader to take the quotations at face value. A defendant may be able to argue to the jury that quotations should be viewed by the reader as nonliteral or reconstructions, but we conclude that a trier of fact in this case could find that the reasonable reader would understand the quotations to be nearly verbatim reports of statements made by the subject.

C

The constitutional question we must consider here is whether, in the framework of a summary judgment motion, the evidence suffices to show that respondents acted with the requisite knowledge of falsity or reckless disregard as to truth or falsity. This inquiry in turn requires us to consider the concept of falsity; for we cannot discuss the standards for knowledge or reckless disregard without some understanding of the acts required for liability. We must consider whether the requisite falsity inheres in the attribution of words to the petitioner which he did not speak.

**[*514]**   [12]In some sense, any alteration of a verbatim quotation is false. But writers and reporters by necessity

alter what people say, at the very least to eliminate grammatical **[****31]** and syntactical infelicities. If every alteration constituted the falsity required to prove actual malice, the practice of journalism, which the First Amendment standard is designed to protect, would require a radical change, one inconsistent with our precedents and First Amendment principles. Petitioner concedes that this absolute definition of falsity in the quotation context is too stringent, and acknowledges that "minor changes to correct for grammar or syntax" do not amount to falsity for purposes of proving actual malice. Brief for Petitioner 18, 36-37. We agree, and must determine what, in **[***471]** addition to this technical falsity, proves falsity for purposes of the actual malice inquiry.

Petitioner argues that, excepting correction of grammar or syntax, publication of a quotation with knowledge that it does not contain the words the public figure used demonstrates actual malice. The author will have published the quotation with knowledge of falsity, and no more need be shown. Petitioner suggests that by invoking more forgiving standards the Court of Appeals would permit and encourage the publication of falsehoods. Petitioner believes that the intentional manufacture of quotations does **[****32]** not "represent the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies," *Bose Corp.*, 466 U.S. at 513, and that protection of deliberate falsehoods would hinder the First Amendment values of robust and well-informed public debate by reducing the reliability of information available to the public.

We reject the idea that any alteration beyond correction of grammar or syntax by itself proves falsity in the sense relevant to determining actual malice under the First **[**2432]** Amendment. An interviewer who writes from notes often will engage in the task of attempting a reconstruction of the speaker's statement. That author would, we may assume, **[*515]** act with knowledge that at times she has attributed to her subject words other than those actually used. Under petitioner's proposed standard, an author in this situation would lack First Amendment protection if she reported as quotations the substance of a subject's derogatory statements about himself.

Even if a journalist has tape-recorded the spoken statement of a public figure, the full and exact statement will be reported in only rare circumstances. The existence of both **[****33]** a speaker and a reporter; the translation between two media, speech and the printed word; the addition of punctuation; and the practical necessity to edit and make intelligible a speaker's perhaps rambling comments, all make it misleading to suggest that a quotation will be reconstructed with complete accuracy. The use or absence of punctuation may distort a speaker's meaning, for example, where that meaning turns upon a speaker's emphasis of a particular word. In other cases, if a speaker makes an obvious misstatement, for example by unconscious substitution of one name for another, a journalist might alter the speaker's words but preserve his intended meaning. And conversely, an exact quotation out of context can distort meaning, although the speaker did use each reported word.

In all events, technical distinctions between correcting grammar and syntax and some greater level of alteration do not appear workable, for we can think of no method by which courts or juries would draw the line between cleaning up and other changes, except by reference to the meaning a statement conveys to a reasonable reader. To attempt narrow distinctions of this type would be an unnecessary departure **[****34]** from First Amendment principles of general applicability, and, just as important, a departure from the underlying purposes of the tort of libel as understood since the latter half of the 16th century. From then until now, the tort action for defamation has existed to redress injury to the **[***472]** plaintiff's reputation by a statement that is defamatory and false. See **[*516]** *Milkovich* v. *Lorain Journal Co.*, 497 U.S. 1, 11, 111 L. Ed. 2d 1, 110 S. Ct. 2695 (1990). As we have recognized, "the legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood." *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 341, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974). If an author alters a speaker's words but effects no material change in meaning, including any meaning conveyed by the manner or fact of expression, the speaker suffers no injury to reputation that is compensable as a defamation.

These essential principles of defamation law accommodate the special case of inaccurate quotations without the necessity for a discrete body of jurisprudence directed to this subject alone. Last Term, in *Milkovich* v. *Lorain Journal Co.*, we refused "to create a wholesale **[*****35]** defamation exemption for anything that might be labeled 'opinion.'" 497 U.S. at 18 (citation omitted). We recognized that "expressions of 'opinion' may often imply an assertion of objective fact." *Ibid.* We allowed the defamation action to go forward in that case, holding that a reasonable trier of fact could

501 U.S. 496, *516; 111 S. Ct. 2419, **2432; 115 L. Ed. 2d 447, ***472; 1991 U.S. LEXIS 3630, ****35

find that the so-called expressions of opinion could be interpreted as including false assertions as to factual matters. So too in the case before us, we reject any special test of falsity for quotations, including one which would draw the line at correction of grammar or syntax. We conclude, rather, that the exceptions suggested by petitioner for grammatical or syntactical corrections serve to illuminate a broader principle.

[13] [14]The common law of libel takes but one approach to the question of falsity, regardless of the form of the communication. See Restatement (Second) of Torts § 563, Comment *c* (1977); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on **[**2433]** Law of Torts 776 (5th ed. 1984). It overlooks minor inaccuracies and concentrates upon substantial truth. As in other jurisdictions, California law permits the defense of substantial **[****36]** truth and would absolve a defendant even if she cannot "justify every word of the alleged defamatory matter; it is sufficient if the substance of the **[*517]** charge be proved true, irrespective of slight inaccuracy in the details." 5 B. Witkin, Summary of California Law § 495 (9th ed. 1988) (citing cases). In this case, of course, the burden is upon petitioner to prove falsity. See *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U.S. 767, 775, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986). The essence of that inquiry, however, remains the same whether the burden rests upon plaintiff or defendant. Minor inaccuracies do not amount to falsity so long as "the substance, the gist, the sting, of the libelous charge be justified." *Heuer* v. *Kee*, 15 Cal. App. 2d 710, 714, 59 P.2d 1063, 1064 (1936); see also *Alioto* v. *Cowles Communications, Inc.*, 623 F.2d 616, 619 (CA9 1980); *Maheu* v. *Hughes Tool Co.*, 569 F.2d 459, 465-466 (CA9 1978). Put another way, the statement is not considered false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." R. Sack, Libel, Slander, **[****37]** and Related Problems 138 (1980); see, *e. g., Wehling* v. *Columbia Broadcasting System*, 721 F.2d 506, 509 (CA5 1983); see generally R. Smolla, Law of Defamation § 5.08 (1991). Our definition **[***473]** of actual malice relies upon this historical understanding.

[15]We conclude that a deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity for purposes of *New York Times Co.* v. *Sullivan*, 376 U.S. at 279-280, and *Gertz* v. *Robert Welch, Inc., supra*, at 342, unless the alteration results in a material change in the meaning conveyed by the statement. The use of quotations to attribute words

not in fact spoken bears in a most important way on that inquiry, but it is not dispositive in every case.

Deliberate or reckless falsification that comprises actual malice turns upon words and punctuation only because words and punctuation express meaning. Meaning is the life of language. And, for the reasons we have given, quotations may be a devastating instrument for conveying false meaning. In the case under consideration, readers of In the Freud Archives may have found Malcolm's portrait **[****38]** of petitioner especially **[*518]** damning because so much of it appeared to be a self-portrait, told by petitioner in his own words. And if the alterations of petitioner's words gave a different meaning to the statements, bearing upon their defamatory character, then the device of quotations might well be critical in finding the words actionable.

D

[16]The Court of Appeals applied a test of substantial truth which, in exposition if not in application, comports with much of the above discussion. The Court of Appeals, however, went one step beyond protection of quotations that convey the meaning of a speaker's statement with substantial accuracy and concluded that an altered quotation is protected so long as it is a "rational interpretation" of an actual statement, drawing this standard from our decisions in *Time, Inc.* v. *Pape*, 401 U.S. 279, 28 L. Ed. 2d 45, 91 S. Ct. 633 (1971), and *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U.S. 485, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984). Application of our protection for rational interpretation in this context finds no support in general principles of defamation law or in our First Amendment jurisprudence. Neither *Time, Inc.* v. *Pape* nor *Bose Corp.* **[****39]** involved the fabrication of quotations, or any analogous claim, and because many of the quotations at issue might reasonably be construed to state or imply factual assertions that are both false and defamatory, we cannot accept the reasoning of the Court of Appeals on this point.

**[**2434]** In *Time, Inc.* v. *Pape*, we reversed a libel judgment which arose out of a magazine article summarizing a report by the United States Commission on Civil Rights discussing police civil rights abuses. The article quoted the Commission's summary of the facts surrounding an incident of police brutality, but failed to include the Commission's qualification that these were allegations taken from a civil complaint. The Court noted that "the attitude of the Commission toward the factual

485

501 U.S. 496, *518; 111 S. Ct. 2419, **2434; 115 L. Ed. 2d 447, ***473; 1991 U.S. LEXIS 3630, ****39

verity of the episodes recounted was anything but straightforward," and distinguished between a "direct account [*519] of events that speak for themselves," 401 U.S. at 285, 286, and an article descriptive of what the Commission had [***474] reported. *Time, Inc.* v. *Pape* took into account the difficult choices that confront an author who departs from direct quotation and offers his own interpretation of an ambiguous [****40] source. A fair reading of our opinion is that the defendant did not publish a falsification sufficient to sustain a finding of actual malice.

In *Bose Corp.*, a Consumer Reports reviewer had attempted to describe in words the experience of listening to music through a pair of loudspeakers, and we concluded that the result was not an assessment of events that speak for themselves, but "'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' and descriptive challenges for the writer." 466 U.S. at 512 (quoting *Time, Inc.* v. *Pape, supra*, at 290). We refused to permit recovery for choice of language which, though perhaps reflecting a misconception, represented "the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies." 466 U.S. at 513.

The protection for rational interpretation serves First Amendment principles by allowing an author the interpretive license that is necessary when relying upon ambiguous sources. Where, however, a writer uses a quotation, and where a reasonable reader would conclude that the quotation purports to be a verbatim [****41] repetition of a statement by the speaker, the quotation marks indicate that the author is not involved in an interpretation of the speaker's ambiguous statement, but attempting to convey what the speaker said. This orthodox use of a quotation is the quintessential "direct account of events that speak for themselves." *Time, Inc.* v. *Pape, supra*, at 285. More accurately, the quotation allows the subject to speak for himself.

The significance of the quotations at issue, absent any qualification, is to inform us that we are reading the statement [*520] of petitioner, not Malcolm's rational interpretation of what petitioner has said or thought. Were we to assess quotations under a rational interpretation standard, we would give journalists the freedom to place statements in their subjects' mouths without fear of liability. By eliminating any method of distinguishing between the statements of the subject and the interpretation of the author, we would diminish to a great degree the trustworthiness of the printed word

and eliminate the real meaning of quotations. Not only public figures but the press doubtless would suffer under such a rule. Newsworthy figures might become [****42] more wary of journalists, knowing that any comment could be transmuted and attributed to the subject, so long as some bounds of rational interpretation were not exceeded. We would ill serve the values of the First Amendment if we were to grant near absolute, constitutional protection for such a practice. We doubt the suggestion that as a general rule readers will assume that direct quotations are but a rational interpretation of the speaker's words, and we decline to adopt any such presumption in determining the permissible interpretations of the quotations in question here.

III

A

[17]We apply these principles to [***475] the case before us. On summary judgment, we must [**2435] draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. at 255. So we must assume, except where otherwise evidenced by the transcripts of the tape recordings, that petitioner is correct in denying that he made the statements attributed to him by Malcolm, and that Malcolm reported with knowledge or reckless disregard of the differences between what petitioner said [****43] and what was quoted.

[*521]   [18]Respondents argue that, in determining whether petitioner has shown sufficient falsification to survive summary judgment, we should consider not only the tape-recorded statements but also Malcolm's typewritten notes. We must decline that suggestion. To begin with, petitioner affirms in an affidavit that he did not make the complained of statements. The record contains substantial additional evidence, moreover, evidence which, in a light most favorable to petitioner, would support a jury determination under a clear and convincing standard that Malcolm deliberately or recklessly altered the quotations.

First, many of the challenged passages resemble quotations that appear on the tapes, except for the addition or alteration of certain phrases, giving rise to a reasonable inference that the statements have been altered. Second, Malcolm had the tapes in her possession and was not working under a tight deadline. Unlike a case involving hot news, Malcolm cannot

complain that she lacked the practical ability to compare the tapes with her work in progress. Third, Malcolm represented to the editor in chief of The New Yorker that all the quotations were from the tape recordings. **[****44]** Fourth, Malcolm's explanations of the time and place of unrecorded conversations during which petitioner allegedly made some of the quoted statements have not been consistent in all respects. Fifth, petitioner suggests that the progression from typewritten notes, to manuscript, then to galleys provides further evidence of intentional alteration. Malcolm contests petitioner's allegations, and only a trial on the merits will resolve the factual dispute. But at this stage, the evidence creates a jury question whether Malcolm published the statements with knowledge or reckless disregard of the alterations.

B

We must determine whether the published passages differ materially in meaning from the tape-recorded statements so as to create an issue of fact for a jury as to falsity.

**[*522]**   [1C](a)   *"Intellectual Gigolo."* We agree with the dissenting opinion in the Court of Appeals that "fairly read, intellectual gigolo suggests someone who forsakes intellectual integrity in exchange for pecuniary or other gain." 895 F.2d at 1551. A reasonable jury could find a material difference between the meaning of this passage and petitioner's tape-recorded statement that he was considered "much **[****45]** too junior within the hierarchy of analysis, for these important training analysts to be caught dead with [him]."

[19]The Court of Appeals majority found it difficult to perceive how the " **[***476]** intellectual gigolo" quotation was defamatory, a determination supported not by any citation to California law, but only by the argument that the passage appears to be a report of Eissler's and Anna Freud's opinions of petitioner.   *Id.*, at 1541.We agree with the Court of Appeals that the most natural interpretation of this quotation is not an admission that petitioner considers himself an intellectual gigolo but a statement that Eissler and Anna Freud considered him so. It does not follow, though, that the statement is harmless. Petitioner is entitled to argue that the passage should be analyzed as if Malcolm had reported falsely that *Eissler* had given this assessment (with the added level of complexity that the quotation purports to

represent petitioner's understanding of Eissler's view). An admission that two well-respected senior colleagues **[**2436]** considered one an "intellectual gigolo" could be as, or more, damaging than a similar self-appraisal. In all events, whether the "intellectual **[****46]** gigolo" quotation is defamatory is a question of California law. To the extent that the Court of Appeals based its conclusion in the First Amendment, it was mistaken.

[20][21]The Court of Appeals relied upon the "incremental harm" doctrine as an alternative basis for its decision. As the court explained it: "This doctrine measures the incremental reputational harm inflicted by the challenged statements beyond the harm imposed by the nonactionable remainder of the publication."  *Ibid.;* see generally Note, 98 Harv. L. **[*523]** Rev. 1909 (1985); R. Smolla, Law of Defamation § 9.10[4]d (1991). The court ruled, as a matter of law, that "given the . . . many provocative, bombastic statements indisputably made by Masson and quoted by Malcolm, the additional harm caused by the 'intellectual gigolo' quote was nominal or nonexistent, rendering the defamation claim as to this quote nonactionable." 895 F.2d at 1541.

This reasoning requires a court to conclude that, in fact, a plaintiff made the other quoted statements, cf.  *Liberty Lobby, Inc.* v. *Anderson*, 241 U.S. App. D.C. 246, 251, 746 F.2d 1563, 1568 (1984), vacated and remanded on **[****47]** other grounds, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), and then to undertake a factual inquiry into the reputational damage caused by the remainder of the publication. As noted by the dissent in the Court of Appeals, the most "provocative, bombastic statements" quoted by Malcolm are those complained of by petitioner, and so this would not seem an appropriate application of the incremental harm doctrine.  895 F.2d at 1566.

Furthermore, the Court of Appeals provided no indication whether it considered the incremental harm doctrine to be grounded in California law or the First Amendment. Here, we reject any suggestion that the incremental harm doctrine is compelled as a matter of First Amendment protection for speech. The question of incremental harm does not bear upon whether a defendant has published a statement with knowledge of falsity or reckless disregard of whether it was false or not. As a question of state law, on the other hand, we are given no indication that California accepts this doctrine, though it remains free to do so. Of course, state tort law doctrines of injury, causation, and damages calculation might allow a defendant to press

501 U.S. 496, *523; 111 S. Ct. 2419, **2436; 115 L. Ed. 2d 447, ***476; 1991 U.S. LEXIS 3630, ****47

the argument [***477] that the [****48] statements did not result in any incremental harm to a plaintiff's reputation.

[2C](b) *"Sex, Women, Fun."* This passage presents a closer question. The "sex, women, fun" quotation offers a very different picture of petitioner's plans for Maresfield Gardens [*524] than his remark that "Freud's library alone is priceless." See *supra*, at 503. Petitioner's other tape-recorded remarks did indicate that he and another analyst planned to have great parties at the Freud house and, in a context that may not even refer to Freud house activities, to "pass women on to each other." We cannot conclude as a matter of law that these remarks bear the same substantial meaning as the quoted passage's suggestion that petitioner would make the Freud house a place of "sex, women, fun."

[3C](c) *"It Sounded Better."* We agree with the District Court and the Court of Appeals that any difference between petitioner's tape-recorded statement that he "just liked" the name Moussaieff, and the quotation that "it sounded better" is, in context, immaterial. Although Malcolm did not include all of petitioner's lengthy explanation of his name change, she did convey the gist of that explanation: Petitioner took his abandoned [****49] family name as his middle name. We agree with the Court of Appeals that the words attributed to petitioner did not materially alter the meaning of his statement.

[**2437] [4C](d) *"I Don't Know Why I Put It In."* Malcolm quotes petitioner as saying that he "tacked on at the last minute" a "totally gratuitous" remark about the "sterility of psychoanalysis" in an academic paper, and that he did so for no particular reason. In the tape recordings, petitioner does admit that the remark was "possibly [a] gratuitously offensive way to end a paper to a group of analysts," but when asked why he included the remark, he answered "[because] it was true . . . I really believe it." Malcolm's version contains material differences from petitioner's statement, and it is conceivable that the alteration results in a statement that could injure a scholar's reputation.

[5C](e) *"Greatest Analyst Who Ever Lived."* While petitioner did, on numerous occasions, predict that his theories would do irreparable damage to the practice of psychoanalysis, and did suggest that no other analyst shared his views, no tape-recorded statement appears to contain the substance or the [*525] arrogant and unprofessional tone apparent in this [****50] quotation.

A material difference exists between the quotation and the tape-recorded statements, and a jury could find that the difference exposed petitioner to contempt, ridicule, or obloquy.

[6C](f) *"He Had The Wrong Man."* The quoted version makes it appear as if petitioner rejected a plea to remain in stoic silence and do "the honorable thing." The tape-recorded version indicates that petitioner rejected a plea supported by far more varied motives: Eissler told petitioner that not only would silence be "the honorable thing," but petitioner would "save face," and might be rewarded for that silence with eventual reinstatement. Petitioner described himself as willing to undergo a scandal in order to shine the light of publicity upon the actions of the Freud Archives, while Malcolm would have petitioner describe himself [***478] as a person who was "the wrong man" to do "the honorable thing." This difference is material, a jury might find it defamatory, and, for the reasons we have given, there is evidence to support a finding of deliberate or reckless falsification.

C

[22]Because of the Court of Appeals' disposition with respect to Malcolm, it did not have occasion to address petitioner's argument [****51] that the District Court erred in granting summary judgment to The New Yorker Magazine, Inc., and Alfred A. Knopf, Inc., on the basis of their respective relations with Malcolm or the lack of any independent actual malice. These questions are best addressed in the first instance on remand.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**Concur by:** WHITE (In Part)

**Dissent by:** WHITE (In Part)

# Dissent

JUSTICE **WHITE**, with whom JUSTICE SCALIA joins, concurring in part and dissenting in part.

I join Parts I, II-A, II-D, and III-A, but cannot wholly agree with the remainder of the opinion. My principal disagreement [*526] is with the holding, *ante*, at 517, that "a deliberate alteration of the words uttered by a

501 U.S. 496, *526; 111 S. Ct. 2419, **2437; 115 L. Ed. 2d 447, ***478; 1991 U.S. LEXIS 3630, ****51

plaintiff does not equate with knowledge of falsity . . . unless the alteration results in a material change in the meaning conveyed by the statement."

Under *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964), "malice" means deliberate falsehood or reckless disregard for whether the fact asserted is true or false. *Id.*, at 279-280. As the Court recognizes, the use of quotation marks **[****52]** in reporting what a person said asserts that the person spoke the words as quoted. As this case comes to us, it is to be judged on the basis that in the instances identified by the Court, the reporter, Malcolm, wrote that Masson said certain things that she knew Masson did not say. By any definition of the term, this was " **[**2438]** knowing falsehood": Malcolm asserts that Masson said these very words, knowing that he did not. The issue, as the Court recognizes, is whether Masson spoke the words attributed to him, not whether the fact, if any, asserted by the attributed words is true or false. In my view, we need to go no further than to conclude that the defendants in this case were not entitled to summary judgment on the issue of malice with respect to any of the six erroneous quotations.

That there was at least an issue for the jury to decide on the question of deliberate or reckless falsehood does not mean that plaintiffs were necessarily entitled to go to trial. If, as a matter of law, reasonable jurors could not conclude that attributing to Masson certain words that he did not say amounted to libel under California law, *i. e.*, "exposed [Masson] to hatred, contempt, ridicule, or obloquy, **[****53]** or which caused him to be shunned or avoided, or which had a tendency to injure him in his occupation," Cal. Civ. Code Ann. § 45 (West 1982), a motion for summary judgment on **[***479]** this ground would be justified. [*] I would suppose, for example, **[*527]** that if Malcolm wrote that Masson said that he wore contact lenses, when he said nothing about his eyes or his vision, the trial judge would grant summary judgment for the defendants and dismiss the case. The same would be true if Masson had said "I was spoiled as a child by my Mother," whereas, Malcolm reports that he said "I was spoiled as a child by my parents." But if reasonable jurors could conclude that the deliberate misquotation was libelous, the case should go to the jury.

_____

[*] In dealing with the "intellectual gigolo" passage, the Court of Appeals ruled that there was no malice but in the alternative went on to say that as a matter of law the erroneous attribution was not actionable defamation. 895 F.2d 1535, 1540-1541 (CA9 1989).

This seems to me to be the straightforward, **[****54]** traditional approach to deal with this case. Instead, the Court states that deliberate misquotation does not amount to *New York Times* malice unless it results in a material change in the meaning conveyed by the statement. This ignores the fact that, under *New York Times*, reporting a known falsehood -- here the knowingly false attribution -- is sufficient proof of malice. The falsehood, apparently, must be substantial; the reporter may lie a little, but not too much.

This standard is not only a less manageable one than the traditional approach, but it also assigns to the courts issues that are for the jury to decide. For a court to ask whether a misquotation substantially alters the meaning of spoken words in a defamatory manner is a far different inquiry from whether reasonable jurors could find that the misquotation was different enough to be libelous. In the one case, the court is measuring the difference from its own point of view; in the other it is asking how the jury would or could view the erroneous attribution.

The Court attempts to justify its holding in several ways, none of which is persuasive. First, it observes that an interviewer who takes notes of any interview **[****55]** will attempt to reconstruct what the speaker said and will often knowingly attribute to the subject words that were not used by the speaker. *Ante*, at 514-515. But this is nothing more than an assertion that authors may misrepresent because they cannot remember what the speaker actually said. This **[*528]** should be no dilemma for such authors, for they could report their story without purporting to quote when they are not sure, thereby leaving the reader to trust or doubt the author rather than believing that the subject actually said what he is claimed to have said. Moreover, this basis for the Court's rule has no application where there is a tape of the interview and the author is in no way at a loss to know what the speaker actually said. Second, the Court speculates that even with the benefit of a recording, the author will find it necessary at times to reconstruct, *ante*, at 515, but again, in those cases why should the author be free to put his or her reconstruction in quotation marks, rather than report without them? Third, the Court **[**2439]** suggests that misquotations that do not materially alter the meaning inflict no injury to reputation that is compensable as defamation. *Ante*, at 517. This **[****56]** may be true, but this is a question of defamation or **[***480]** not, and has nothing to do with whether the author deliberately put within quotation marks and attributed to the speaker words that the author knew the speaker did not utter.

489

501 U.S. 496, *528; 111 S. Ct. 2419, **2439; 115 L. Ed. 2d 447, ***480; 1991 U.S. LEXIS 3630, ****56

As I see it, the defendants' motion for summary judgment based on lack of malice should not have been granted on any of the six quotations considered by the Court in Part III-B of its opinion. I therefore dissent from the result reached with respect to the *"It Sounded Better"* quotation dealt with in paragraph (c) of Part III-B, but agree with the Court's judgment on the other five misquotations.

## References

16 Am Jur 2d, Constitutional Law 506; 50 Am Jur 2d, Libel and Slander 173-175, 297, 301

16A Am Jur Pl & Pr Forms (Rev), Libel and Slander, Forms 31, 204, 394

14 Am Jur Proof of Facts 2d 49, Defamation With Actual Malice

17 Am Jur Trials 223, Libel Actions by Public Officials; 19 Am Jur Trials 499, Defamation

USCS, Constitution, Amendment 1

L Ed Digest, Constitutional Law 948; Summary Judgment and Judgment on Pleadings 5

L Ed Index, Freedom of Speech and Press; Libel and **[****57]** Slander; New York Times Rule

Index to Annotations, Freedom of Speech and Press; Libel and Slander; Newspapers and Periodicals; New York Times Rule; Writers and Editors

Annotation References:

Progeny of New York Times v Sullivan in the Supreme Court. 61 L Ed 2d 975.

Constitutional aspects of libel and slander-- Supreme Court cases. 28 L Ed 2d 885.

Libel and slander: Who is "public figure" in the light of Gertz v Robert Welch, Inc. (1974) 418 US 323, 41 L Ed 2d 789, 94 S Ct 2997. 75 ALR3d 616.

Libel and slander: what constitutes actual malice, within federal constitutional rule requiring public officials and public figures to show actual malice.  20 ALR3d 988.

Constitutional aspects of libel or slander of public officials.  95 ALR2d 1450.

Necessity and sufficiency of plaintiff's allegations as to falsity in defamation action.  85 ALR2d 460.

Sufficiency of plaintiff's allegations in defamation action as to defendant's malice.  76 ALR2d 696.

**End of Document**

490

# St. Amant v. Thompson

Supreme Court of the United States

April 4, 1968, Argued ; April 29, 1968, Decided

No. 517

**Reporter**

390 U.S. 727 *; 88 S. Ct. 1323 **; 20 L. Ed. 2d 262 ***; 1968 U.S. LEXIS 3004 ****; 1 Media L. Rep. 1586

ST. AMANT v. THOMPSON

**Prior History: [****1]** CERTIORARI TO THE SUPREME COURT OF LOUISIANA.

**Disposition:** 250 La. 405, 196 So. 2d 255, reversed and remanded.

## Syllabus

Petitioner made a televised political speech in the course of which he read questions which he had put to a union member, Albin, and Albin's answers; the answers falsely charged respondent, a public official, with criminal conduct. Respondent sued petitioner for defamation and was awarded damages by the trial judge. The trial judge, having considered *New York Times Co.* v. *Sullivan*, 376 U.S. 254 (1964), decided after the trial, denied a motion for a new trial. An intermediate appellate court reversed the trial court's judgment, having found that petitioner had not acted with actual malice within the meaning of the *New York Times* rule, *i. e.*, with knowledge that petitioner's statements were false or with reckless disregard of whether they were false or not. The State Supreme Court reversed, finding that there had been sufficient evidence that petitioner had acted in "reckless disregard" in that petitioner had no personal knowledge of respondent's activities; relied solely on Albin's affidavit though there was no evidence **[****2]** as to Albin's veracity; failed to verify the information with others who might know the facts; did not consider whether the statements were defamatory; and mistakenly believed that he had no responsibility for the broadcast because he was merely quoting Albin. *Held*: In order that it can be found that a defendant, within the meaning of *New York Times*, acted in "reckless disregard" of whether a defamatory statement which he made about a public official is false or not, there must be sufficient evidence to permit the conclusion that the defendant had serious doubts as to the truth of his

publication. Pp. 730-733.

(a) In a defamation action by a public official reckless conduct is not measured by whether a reasonably prudent man would have published the statement or would have investigated before publishing. P. 731.

(b) The people's stake in the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would adequately implement First Amendment policies. Pp. 731-732.

(c) A defendant's testimony that he acted in good faith is not conclusive as to that issue, since the fact finder in the light of all the surrounding circumstances **[****3]** must determine whether the publication was indeed made in good faith. P. 732.

(d) The evidence in this case is not sufficient to permit the conclusion that petitioner acted in reckless disregard of whether the statements about respondent were false or not. Pp. 732-733.

**Counsel:** Russell J. Schonekas argued the cause and filed a brief for petitioner.

Robert L. Kleinpeter argued the cause and filed a brief for respondent.

**Judges:** Warren, Black, Douglas, Harlan, Brennan, Stewart, White, Fortas, Marshall

**Opinion by:** WHITE

## Opinion

**[*728] [***265] [**1324]** MR. JUSTICE WHITE delivered the opinion of the Court.

[1]The question presented by this case is whether the Louisiana Supreme Court, in sustaining a judgment for damages in a public official's defamation action, correctly interpreted and applied the rule of *New York Times Co.* v. *Sullivan*, 376 U.S. 254 (1964), that the

390 U.S. 727, *728; 88 S. Ct. 1323, **1324; 20 L. Ed. 2d 262, ***265; 1968 U.S. LEXIS 3004, ****3

plaintiff in such an action must prove that the defamatory publication "was made with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S., at 279-280.

On June 27, 1962, petitioner St. Amant, a candidate for public office, made a televised **[****4]** speech in Baton Rouge, Louisiana. In the course of this speech, St. Amant read a series of questions which he had put to J. D. Albin, a member of a Teamsters Union local, and Albin's answers to those questions. The exchange concerned the allegedly nefarious activities of E. G. Partin, the president of the local, and the alleged relationship between Partin and St. Amant's political opponent. One of Albin's answers concerned his efforts to prevent Partin from secreting union records; in this answer Albin referred to Herman A. Thompson, an East Baton Rouge Parish deputy sheriff and respondent here:

"Now, we knew that this safe was gonna be moved that night, but imagine our predicament, knowing **[*729]** of Ed's connections with the Sheriff's **[***266]** office through Herman Thompson, who made recent visits to the Hall to see Ed. We also knew of money that had passed hands between Ed and Herman Thompson . . . from Ed to Herman. We also knew of his connections with State Trooper Lieutenant Joe Green. We knew we couldn't get any help from there and we didn't know how far that he was involved in the Sheriff's office or the State Police office through that, and it was out of the **[****5]** jurisdiction of the City Police." [1]

Thompson promptly brought suit for defamation, claiming that the publication had "impute[d] . . . gross misconduct" and "infer[red] conduct of the most nefarious nature." The case was tried prior to the decision in *New York Times Co.* v. *Sullivan, supra.* The trial judge ruled in Thompson's favor and awarded $ 5,000 in damages. Thereafter, in the course of entertaining and denying a motion for a new trial, the Court considered the ruling in *New York Times*, finding that rule no barrier to the judgment already entered. The Louisiana Court of Appeal reversed because the record failed to show that St. Amant had acted with

actual malice, **[****6]** as required by *New York Times.* 184 So. 2d 314 (1966). The Supreme Court of Louisiana reversed the intermediate appellate **[**1325]** court. 250 La. 405, 196 So. 2d 255 (1967). In its view, there was sufficient evidence that St. Amant recklessly disregarded whether the statements about Thompson were true or false. We granted a writ of certiorari. 389 U.S. 1033 (1968).

**[*730]** **[***HRLEd2A]** [2A]For purposes of this case we accept the determinations of the Louisiana courts that the material published by St. Amant charged Thompson with criminal conduct, that the charge was false, and that Thompson was a public official [2] and so had the burden of proving that the false statements about Thompson were made with actual malice as defined in *New York Times Co.* v. *Sullivan* and later cases. We cannot, however, agree with either the Supreme Court of Louisiana or the trial court that Thompson sustained this burden.

[2B]

**[****7]** Purporting to apply the *New York Times* malice standard, the Louisiana Supreme Court ruled that St. Amant had broadcast false information about Thompson recklessly, though not knowingly. Several reasons were given for this conclusion. St. Amant had no personal knowledge of Thompson's activities; he relied solely on Albin's affidavit although the record was silent as to Albin's reputation for veracity; he failed to verify the information with those in the union office who might have known the facts; he gave no consideration to whether or not the statements defamed Thompson and went ahead heedless of the consequences; and he mistakenly believed he had no responsibility for the broadcast because he was merely quoting Albin's words.

**[***267]** [3A] [4]These considerations fall short of proving St. Amant's reckless disregard for the accuracy of his statements about Thompson. "Reckless disregard," it is true, cannot be fully encompassed in

---

[1] St. Amant had preceded this question and answer with other answers by Albin asserting that Partin, on learning that a union member had written to the Secretary of Labor charging that Partin had been stealing union funds, had become "pretty riled up" and had decided to "get rid of the safe" containing the union records.

[2] The Louisiana Supreme Court concluded, after considering state law, that a deputy sheriff has "substantial responsibility for or control over the conduct of governmental affairs," the test established by *Rosenblatt* v. *Baer*, 383 U.S. 75, 85 (1966), "at least where law enforcement and police functions are concerned." 250 La., at 422, 196 So. 2d, at 261.

390 U.S. 727, *730; 88 S. Ct. 1323, **1325; 20 L. Ed. 2d 262, ***267; 1968 U.S. LEXIS 3004, ****7

one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards **[\*731]** for judging concrete cases, whether the standard is provided by the Constitution, statutes, **[\*\*\*\*8]** or case law. Our cases, however, have furnished meaningful guidance for the further definition of a reckless publication. In *New York Times, supra*, the plaintiff did not satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was circulating false information. In *Garrison* v. *Louisiana*, 379 U.S. 64 (1964), also decided before the decision of the Louisiana Supreme Court in this case, the opinion emphasized the necessity for a showing that a false publication was made with a "high degree of awareness of . . . probable falsity." 379 U.S., at 74. MR. JUSTICE HARLAN's opinion in *Curtis Publishing Co.* v. *Butts*, 388 U.S. 130, 153 (1967), stated that evidence of either deliberate falsification or reckless publication "despite the publisher's awareness of probable falsity" was essential to recovery by public officials in defamation actions. These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the **[\*\*\*\*9]** defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

**[\*\*1326]** **[5] [6]** It may be said that such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity. Concededly the reckless disregard standard may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher. But *New York Times* and succeeding cases have emphasized that the stake of the **[\*732]** people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies. Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about **[\*\*\*\*10]** public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones. We adhere to this view and to the

line which our cases have drawn between false communications which are protected and those which are not.

**[7]** The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove **[\*\*\*268]** persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. [3]

**[\*\*\*\*11]** **[3B] [8] [9]** By no proper test of reckless disregard was St. Amant's broadcast a reckless publication about a public officer. Nothing referred to by the Louisiana courts indicates an awareness by St. Amant of the probable falsity of Albin's **[\*733]** statement about Thompson. Failure to investigate does not in itself establish bad faith. *New York Times Co.* v. *Sullivan, supra*, at 287-288. St. Amant's mistake about his probable legal liability does not evidence a doubtful mind on his part. That he failed to realize the import of what he broadcast -- and was thus "heedless" of the consequences for Thompson -- is similarly colorless. Closer to the mark are considerations of Albin's reliability. However, the most the state court could say was that there was no evidence in the record of Albin's reputation for veracity, and this fact merely underlines the failure of Thompson's evidence to demonstrate a low community assessment of Albin's trustworthiness or unsatisfactory experience with him by St. Amant.

**[3C]**

Other facts in this record support our view. St. Amant made his broadcast in June 1962. He had known Albin since October 1961, when he first met with members of the **[\*\*\*\*12]** dissident Teamsters faction. St. Amant testified that he had verified other aspects of Albin's information and that he had affidavits from others.

---

[3] See, *e. g., Curtis Publishing Co.* v. *Butts*, 388 U.S. 130, 169-170 (WARREN, C. J., concurring in the result), and 172 (BRENNAN, J., dissenting) (1967).

390 U.S. 727, *733; 88 S. Ct. 1323, **1326; 20 L. Ed. 2d 262, ***268; 1968 U.S. LEXIS 3004, ****12

Moreover Albin swore to his answers, first in writing and later in the presence of newsmen.  According to Albin, he was prepared to substantiate his charges.  St. Amant knew that Albin was engaged in an internal struggle in the union; Albin seemed to St. Amant **[**1327]** to be placing himself in personal danger by publicly airing the details of the dispute.

[10]Because the state court misunderstood and misapplied the actual malice standard which must be observed in a public official's defamation action, the judgment is reversed and the case remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS concur in the judgment of the Court for the reasons set out in **[*734]** their concurring opinions in *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 293 (1964), and *Garrison* v. *Louisiana*, 379 U.S. 64, 79, 80 (1964).

**Dissent by:** FORTAS

# Dissent

MR. JUSTICE FORTAS, dissenting.

I do not believe that petitioner satisfied the minimal standards **[****13]** of care specified by *New York Times Co.* v. *Sullivan*, 376 U.S. 254 **[***269]** (1964). The affidavit that petitioner broadcast contained a seriously libelous statement directed against respondent.  Respondent was a public official. He was not petitioner's adversary in the political contest. Petitioner's casual, careless, callous use of the libel cannot be rationalized as resulting from the heat of a campaign.  Under *New York Times*, this libel was broadcast by petitioner with "actual malice" -- with reckless disregard of whether it was false or not.  The principle of *Curtis Publishing Co.* v. *Butts*, 388 U.S. 130 (1967), in my opinion, should lead us to affirmance here.

The First Amendment is not so fragile that it requires us to immunize this kind of reckless, destructive invasion of the life, even of public officials, heedless of their interests and sensitivities.  The First Amendment is not a shelter for the character assassinator, whether his action is heedless and reckless or deliberate.  The First Amendment does not require that we license shotgun attacks on public officials in virtually unlimited open season.  The occupation **[****14]** of public officeholder does not forfeit one's membership in the human race.

The public official should be subject to severe scrutiny and to free and open criticism.  But if he is needlessly, heedlessly, falsely accused of crime, he should have a remedy in law.  *New York Times* does not preclude this minimal standard of civilized living.

Petitioner had a duty here to check the reliability of the libelous statement about respondent.  If he had made a good-faith check, I would agree that he should be protected **[*735]** even if the statement were false, because the interest of public officials in their reputation must endure this degree of assault.  But since he made no check, I agree with the Supreme Court of Louisiana that *New York Times* does not prohibit recovery.

I would affirm.

# References

Am Jur, Libel and Slander (1st ed 79-83, 169)

12 Am Jur Proof of Facts 523, Retraction of Defamatory Statements

US L Ed Digest, Constitutional Law 927.5; Evidence 175, 918

ALR Digests, Constitutional Law 794; Libel and Slander 65, 127

L Ed Index to Anno, Constitutional Law; Libel and Slander

ALR Quick Index, Libel and Slander

**[****15]**         Annotation References:

The Supreme Court and the right of free speech and press.  93 L Ed 1151, 2 L Ed 2d 1706, 11 L Ed 2d 1116, 16 L Ed 2d 1053.

Libel and slander: who is a public official or otherwise within the federal constitutional rule requiring public officials to show actual malice?  19 ALR3d 1348.

Constitutional aspects of libel or slander of public officials .  95 ALR2d 1450.

Doctrine of privilege or fair comment as applicable to misstatements of fact in publication relating to public officer or candidate for office.  110 ALR 412, 150 ALR 358.

Libel and slander: what constitutes actual malice within federal constitutional rule requiring public officials and public figures to show actual malice.  20 ALR3d 988.

390 U.S. 727, *735; 88 S. Ct. 1323, **1327; 20 L. Ed. 2d 262, ***269; 1968 U.S. LEXIS 3004, ****15

**End of Document**

# CASES PERTAINING TO ANTI-SLAPP STATUTES

Abbas v. Foreign Policy Group, 783 F.3d 1328, 1337 (D.C. Cir. 201

Search: Everything

Client: -None- | Folders | History | Help

⚠️ **Abbas v. Foreign Policy Group, LLC, 783 F.3d 1328**

Copy Citation

United States Court of Appeals for the District of Columbia Circuit

October 20, 2014, Argued; April 24, 2015, Decided

No. 13-7171k

**Reporter**

783 F.3d 1328 * | 414 U.S. App. D.C. 465 ** | 2015 U.S. App. LEXIS 6782 *** | 43 Media L. Rep. 1841 | 91 Fed. R. Serv. 3d (Callaghan) 544

YASSER ABBAS, APPELLANT v. FOREIGN POLICY GROUP, LLC AND JONATHAN SCHANZER, APPELLEES

**Prior History:** [***1] Appeal from the United States District Court for the District of Columbia. (No. 1:12-cv-01565).

Abbas v. Foreign Policy Group, LLC, 975 F. Supp. 2d 1, 2013 U.S. Dist. LEXIS 139177 (D.D.C., 2013)

## Core Terms

questions, defamation, Anti-SLAPP Act, special motion, federal rule, Anti-SLAPP, federal court, cases, district court, likelihood of success, motion to dismiss, summary judgment, defamation claim, pre-trial, plurality opinion, diversity jurisdiction, circumstances, courts, merits

---

## Case Summary

**Overview**

HOLDINGS: [1]-As Fed. R. Civ. P. 12 and 56 answered the same question as the D.C. Anti-Strategic Lawsuits Against Public Participation Act (Anti-SLAPP), and Rules 12 and 56 were valid under the Rules Enabling Act, 28 U.S.C.S. § 2072, a federal court exercising diversity jurisdiction was required to apply Rules 12 and 56 instead of the Anti-SLAPP Act's special motion to dismiss provision, D.C. Code § 16-5502(a); [2]-However, dismissal of a foreign political leader's son's defamation action against a website publisher and the article's author was proper because under Fed. R. Civ. P. 12(b)(6), the allegations did not suffice to make out a defamation claim where they were merely questions, which were not factual representations.

**Outcome**

Judgment affirmed.

---

▼ **LexisNexis® Headnotes**

---

Civil Procedure > ... > Defenses, Demurrers & Objections ▼ > Motions to Dismiss ▼ > Failure to State Claim ▼
Evidence > Burdens of Proof ▼ > Allocation ▼
Constitutional Law > ... > Fundamental Freedoms ▼ > Freedom of Speech ▼ > Strategic Lawsuits Against Public Participation ▼

*HN1* ⬇️ **Motions to Dismiss, Failure to State Claim**

The D.C. Anti-Strategic Lawsuits Against Public Participation Act of 2010 requires courts, upon motion by the defendant, to dismiss defamation lawsuits that target political or public advocacy, unless the plaintiff can show a likelihood of success on the merits. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*

Civil Procedure > ... > Defenses, Demurrers & Objections ▼ > Motions to Dismiss ▼ > Failure to State Claim ▼
Constitutional Law > ... > Fundamental Freedoms ▼ > Freedom of Speech ▼ > Strategic Lawsuits Against Public Participation ▼
Torts > Intentional Torts ▼ > Defamation ▼ > Procedural Matters ▼

*HN2* ⬇️ **Motions to Dismiss, Failure to State Claim**

Many States have enacted Anti-Strategic Lawsuits Against Public Participation Act statutes to give more breathing space for free speech about contentious public issues. Those statutes try to decrease the "chilling effect" of certain kinds of libel litigation and other speech-

restrictive litigation. The statutes generally accomplish that objective by making it easier to dismiss defamation suits at an early stage of the litigation. <u>More like this Headnote</u>

*Shepardize® - Narrow by this Headnote (3)*

Civil Procedure > ... > <u>Defenses, Demurrers & Objections</u> ▾ > <u>Motions to Dismiss</u> ▾ > <u>Failure to State Claim</u> ▾
Constitutional Law > ... > <u>Fundamental Freedoms</u> ▾ > <u>Freedom of Speech</u> ▾ > <u>Strategic Lawsuits Against Public Participation</u> ▾
Torts > <u>Intentional Torts</u> ▾ > <u>Defamation</u> ▾ > <u>Procedural Matters</u> ▾

**HN3** ⬇ **Motions to Dismiss, Failure to State Claim**

Like the various States' Anti-Strategic Lawsuits Against Public Participation Act (anti-SLAPP) laws, the D.C. Anti-SLAPP Act makes it easier for defendants sued for defamation and related torts to obtain quick dismissal of harassing lawsuits. <u>More like this Headnote</u>

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > ... > <u>Defenses, Demurrers & Objections</u> ▾ > <u>Motions to Dismiss</u> ▾ > <u>Failure to State Claim</u> ▾
Torts > <u>Intentional Torts</u> ▾ > <u>Defamation</u> ▾ > <u>Procedural Matters</u> ▾
Evidence > <u>Burdens of Proof</u> ▾ > <u>Burden Shifting</u> ▾
Constitutional Law > ... > <u>Fundamental Freedoms</u> ▾ > <u>Freedom of Speech</u> ▾ > <u>Strategic Lawsuits Against Public Participation</u> ▾

**HN4** ⬇ **Motions to Dismiss, Failure to State Claim**

Under the D.C. Anti-Strategic Lawsuits Against Public Participation Act, a defendant may file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest. <u>D.C. Code § 16-5502(a)</u>. To obtain dismissal, the defendant first must make a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest. <u>§ 16-5502(b)</u>. If the plaintiff makes that prima facie showing, then the plaintiff must demonstrate that the claim is likely to succeed on the merits. If the plaintiff makes that showing, the defendant's special motion to dismiss must be denied. Otherwise, the special motion to dismiss must be granted. While a special motion to dismiss is pending, discovery is stayed except for limited purposes. <u>§ 16-5502(c)</u>. A defendant who prevails on a special motion to dismiss may recover the costs of litigation, including reasonable attorney's fees. <u>D.C. Code § 16-5504(a)</u>. <u>More like this Headnote</u>

*Shepardize® - Narrow by this Headnote (7)*  1

Civil Procedure > ... > <u>Defenses, Demurrers & Objections</u> ▾ > <u>Motions to Dismiss</u> ▾ > <u>Failure to State Claim</u> ▾
Constitutional Law > ... > <u>Fundamental Freedoms</u> ▾ > <u>Freedom of Speech</u> ▾ > <u>Strategic Lawsuits Against Public Participation</u> ▾
Governments > <u>Courts</u> ▾ > <u>Rule Application & Interpretation</u> ▾
<u>View more legal topics</u>

**HN5** ⬇ **Motions to Dismiss, Failure to State Claim**

A federal court exercising diversity jurisdiction may not apply the D.C. Anti-Strategic Lawsuits Against Public Participation Act (Anti-SLAPP) special motion to dismiss provision. <u>Fed. R. Civ. P. 12</u> and <u>56</u> establish the standards for granting pre-trial judgment to defendants in cases in federal court. A federal court must apply those Federal Rules instead of the D.C. Anti-SLAPP Act's special motion to dismiss provision. <u>More like this Headnote</u>

*Shepardize® - Narrow by this Headnote (61)*  2  8

Civil Procedure > <u>Preliminary Considerations</u> ▾ > <u>Federal & State Interrelationships</u> ▾ > <u>General Overview</u> ▾
Governments > <u>Courts</u> ▾ > <u>Rule Application & Interpretation</u> ▾
<u>View more legal topics</u>

**HN6** ⬇ **Preliminary Considerations, Federal & State Interrelationships**

A federal court exercising diversity jurisdiction should not apply a state law or rule if: (1) a Federal Rule of Civil Procedure "answers the same question" as the state law or rule; and (2) the Federal Rule does not violate the Rules Enabling Act. <u>More like this Headnote</u>

*Shepardize® - Narrow by this Headnote (53)*  1  5

Civil Procedure > ... > <u>Defenses, Demurrers & Objections</u> ▾ > <u>Motions to Dismiss</u> ▾ > <u>Failure to State Claim</u> ▾
Constitutional Law > ... > <u>Fundamental Freedoms</u> ▾ > <u>Freedom of Speech</u> ▾ > <u>Strategic Lawsuits Against Public Participation</u> ▾
Evidence > <u>Burdens of Proof</u> ▾ > <u>Allocation</u> ▾
<u>View more legal topics</u>

**HN7** ⬇ **Motions to Dismiss, Failure to State Claim**

For the category of cases that it covers, the D.C. Anti-Strategic Lawsuits Against Public Participation Act (Anti-SLAPP) establishes the circumstances under which a court must dismiss a plaintiff's claim before trial - namely, when the court concludes that the plaintiff does not have a likelihood of success on the merits. But <u>Fed. R. Civ. P. 12</u> and <u>56</u> "answer the same question" about the circumstances under which a court must dismiss a case before trial. And those Federal Rules answer that question differently: They do not require a plaintiff to show a likelihood of success on the merits. That difference matters. Under the Federal Rules, a plaintiff is generally entitled to trial if he or she meets those <u>Rules 12</u> and <u>56</u> standards to overcome a motion to dismiss or for summary judgment. But the D.C. Anti-SLAPP Act nullifies that entitlement in certain cases. Under the D.C. Anti-SLAPP Act, the plaintiff is not able to get to trial just by meeting those <u>Rules 12</u> and <u>56</u> standards. The D.C. Anti-SLAPP Act, in other words, conflicts with the Federal Rules by setting up an additional hurdle a plaintiff must jump over to get to trial. <u>More like this Headnote</u>

*Shepardize® - Narrow by this Headnote (40)*  9

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim
Evidence > Burdens of Proof > Allocation

View more legal topics

**HN8** Motions to Dismiss, Failure to State Claim

Under Fed. R. Civ. P. 12(b)(6), a plaintiff can overcome a motion to dismiss by simply alleging facts sufficient to state a claim that is plausible on its face. A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable. If the complaint survives a motion to dismiss, a defendant may still move before trial for summary judgment under Fed. R. Civ. P. 56. But Rule 56 permits summary judgment only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Rule 56(a), Rules 12 and 56 help form "an integrated program" for determining whether to grant pre-trial judgment in cases in federal court. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (13)*    1    3

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim
Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation
Evidence > Burdens of Proof > Allocation
Governments > Courts > Rule Application & Interpretation

**HN9** Motions to Dismiss, Failure to State Claim

In short, unlike the D.C. Anti-Strategic Lawsuits Against Public Participation Act (Anti-SLAPP), the Federal Rules do not require a plaintiff to show a likelihood of success on the merits in order to avoid pre-trial dismissal. Under Shady Grove, therefore, federal courts may not apply the D.C. Anti-SLAPP Act's special motion to dismiss provision. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (36)*    2    6

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss
Evidence > Burdens of Proof > Allocation
Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation

View more legal topics

**HN10** Defenses, Demurrers & Objections, Motions to Dismiss

The D.C. Court of Appeals has never interpreted the D.C. Anti-Strategic Lawsuits Against Public Participation Act (Anti-SLAPP) likelihood of success standard to simply mirror the standards imposed by Fed. R. Civ. P. 12 and 56. Put simply, the D.C. Anti-SLAPP Act's likelihood of success standard is different from and more difficult for plaintiffs to meet than the standards imposed by Rules 12 and 56. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (7)*

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss
Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Strategic Lawsuits Against Public Participation
Evidence > Burdens of Proof > Allocation

View more legal topics

**HN11** Defenses, Demurrers & Objections, Motions to Dismiss

Qualified immunity heightens the substantive showing a plaintiff must make in order to hold a defendant liable. To over-simplify, qualified immunity allows defendants to avoid liability even when they may have violated the law so long as they acted reasonably. Qualified immunity (on its own) does not tell a court what showing is necessary at the motion to dismiss or summary judgment stages in order to dismiss a case before trial. Rather, Fed. R. Civ. P. 12 and 56 do that. The D.C. Anti-Strategic Lawsuits Against Public Participation Act establishes a new "procedural mechanism" for dismissing certain cases before trial. And it differs from those Federal Rules. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*    1

Civil Procedure > Judgments > Summary Judgment > General Overview
Governments > Courts > Rule Application & Interpretation

View more legal topics

**HN12** Judgments, Summary Judgment

Congress, unlike the States or the District of Columbia, has ultimate authority over the Federal Rules of Civil Procedure; it can create exceptions to an individual rule as it sees fit - either by directly amending the rule or by enacting a separate statute overriding it in certain instances. Congress's decision to enact a heightened pleading standard for a small subset of federal question cases does not change the fact that Fed. R. Civ. P. 12 and 56 otherwise "apply generally." 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > Judgments > Summary Judgment > General Overview
Governments > Courts > Rule Application & Interpretation

View more legal topics

**HN13** Judgments, Summary Judgment

The Rules Enabling Act empowers the Supreme Court to prescribe general rules of practice and procedure and rules of evidence for cases

in the lower federal courts. 28 U.S.C.S. § 2072(a). A Federal Rule of Civil Procedure violates the Rules Enabling Act if it abridges, enlarges, or modifies any substantive right. § 2072(b). So far, the Supreme Court has rejected every challenge to the Federal Rules that it has considered under the Rules Enabling Act. Fed. R. Civ. P. 12 and 56 are valid under the Rules Enabling Act. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (29)*   🔶 1

---

Civil Procedure > Judgments ⌄ > Summary Judgment ⌄ > General Overview ⌄
Governments > Courts ⌄ > Judicial Precedent ⌄
View more legal topics

**HN14⬇ Judgments, Summary Judgment**
Unless the Supreme Court overrules or narrows its decision in Sibbach, that case remains good law and is binding on lower courts. Under Sibbach, any federal rule that "really regulates procedure" is valid under the Rules Enabling Act. As the Supreme Court indicated in Shady Grove, pleading standards and rules governing motions for summary judgment are procedural. It follows that the Fed. R. Civ. P. 12 and 56 are valid under the Rules Enabling Act. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (23)*

---

Civil Procedure > Judgments ⌄ > Summary Judgment ⌄ > General Overview ⌄
Constitutional Law > ... > Fundamental Freedoms ⌄ > Freedom of Speech ⌄ > Strategic Lawsuits Against Public Participation ⌄
View more legal topics

**HN15⬇ Judgments, Summary Judgment**
Fed. R. Civ. P. 12 and 56 answer the same question as the D.C. Anti-Strategic Lawsuits Against Public Participation Act, and those Federal Rules are valid under the Rules Enabling Act. A federal court exercising diversity jurisdiction therefore must apply Rules 12 and 56 instead of the Act's special motion to dismiss provision. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (56)*    2   🔶 6

---

Civil Procedure > ... > Defenses, Demurrers & Objections ⌄ > Motions to Dismiss ⌄ > Failure to State Claim ⌄
Constitutional Law > ... > Fundamental Freedoms ⌄ > Freedom of Speech ⌄ > Strategic Lawsuits Against Public Participation ⌄
View more legal topics

**HN16⬇ Motions to Dismiss, Failure to State Claim**
After granting or denying a special motion to dismiss under the D.C. Anti-Strategic Lawsuits Against Public Participation Act, a court may grant attorney's fees and costs to the prevailing party. D.C. Code § 16-5504. The Act does not purport to make attorney's fees available to parties who obtain dismissal by other means, such as under Fed. R. Civ. P. 12(b)(6). 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*

---

Civil Procedure > Appeals ⌄ > Standards of Review ⌄ > General Overview ⌄

**HN17⬇ Appeals, Standards of Review**
An appellate court may affirm a district court judgment on "any ground the record supports" and that the "opposing party had a fair opportunity to address." 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > ... > Defenses, Demurrers & Objections ⌄ > Motions to Dismiss ⌄ > Failure to State Claim ⌄
View more legal topics

**HN18⬇ Motions to Dismiss, Failure to State Claim**
Dismissal under Fed. R. Civ. P. 12(b)(6) is proper when a plaintiff has failed to plead enough facts to state a claim to relief that is plausible on its face and to nudge his claims across the line from conceivable to plausible. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (4)*

---

Torts > ... > Defamation ⌄ > Elements ⌄ > General Overview ⌄
View more legal topics

**HN19⬇ Defamation, Elements**
To establish liability for defamation under D.C. law, a plaintiff must show, among other things, that the defendants made a false and defamatory statement about him. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Civil Procedure > ... > Federal & State Interrelationships ⌄ > Choice of Law ⌄ > Significant Relationships ⌄
Torts > Intentional Torts ⌄ > Defamation ⌄ > Procedural Matters ⌄
View more legal topics

**HN20⬇ Choice of Law, Significant Relationships**
To determine which jurisdiction's laws govern a plaintiff's defamation claim, a federal court applies the choice-of-law rules of the jurisdiction in which it sits. D.C.'s choice-of-law rules require that the court apply the tort law of the jurisdiction that has the most significant relationship to the dispute. That inquiry requires that the court consider where the injury occurred, where the conduct causing

the injury occurred, the domicile, residence, nationality, place of incorporation and place of business of the parties, and the place where the relationship is centered. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

Torts > ... > Defamation ⌄ > Elements ⌄ > General Overview ⌄

**HN21** ⬇ **Defamation, Elements**

Although the D.C. courts have not confronted the issue of whether questions can be defamatory, it is generally settled as a matter of defamation law in other jurisdictions that a question, however embarrassing or unpleasant to its subject, is not accusation. Questions indicate a defendant's lack of definitive knowledge about the issue. To be sure, as case law bears out, questions that contain embedded factual assertions may sometimes form the basis for a successful defamation claim. For that reason, posing questions has rarely given rise to successful defamation claims in other jurisdictions. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (8)*  1

Torts > ... > Defamation ⌄ > Elements ⌄ > General Overview ⌄

**HN22** ⬇ **Defamation, Elements**

Whether a question can give rise to a successful defamation claim is significant. Reporters routinely and necessarily ask questions in order to obtain information, and the mere asking of a question may cast a shadow on the reputation of a person about whom the question is asked. But a genuine effort to obtain information cannot be defamatory. A contrary rule would render legitimate reporting impossible. Questions can be posed to explore, to inquire, to prompt further inquiry, to frame discussion, to initiate analysis, and the like. But questions are questions. A question is a question. A federal court exercising diversity jurisdiction and applying the general tenets of D.C. defamation law follows the widely adopted defamation principle that questions are questions. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (48)*  1  5

Torts > ... > Defamation ⌄ > Elements ⌄ > General Overview ⌄
View more legal topics

**HN23** ⬇ **Defamation, Elements**

A question's wording or tone or context sometimes may be read as implying the writer's answer to that question. But to make out a defamation by implication claim even in cases involving affirmative statements, D.C. law requires an "especially rigorous showing." 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*

Civil Procedure > Dismissal ⌄ > Involuntary Dismissals ⌄ > General Overview ⌄

**HN24** ⬇ **Dismissal, Involuntary Dismissals**

Dismissal with prejudice is warranted when the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

---

**Counsel:** Louis G. Adolfsen ⌄ argued the cause for appellant. With him on the briefs was S. Dwight Stephens ⌄.

Kevin T. Baine ⌄ argued the cause for appellees. With him on the brief were Adam R. Tarosky ⌄, James M. McDonald, Nathan E. Siegel ⌄, Seth D. Berlin ⌄, and Shaina J. Ward ⌄.

Irvin B. Nathan ⌄, Attorney General, Office of the Attorney General for the District of Columbia, Ariel B. Levinson-Waldman, Senior Counsel to the Attorney General, Todd S. Kim ⌄, Solicitor General, Loren L. AliKhan ⌄, Deputy Solicitor General, and Rebecca P. Kohn ⌄, Assistant Attorney General, were on the brief for the District of Columbia as amicus curiae in support of the District of Columbia Anti-SLAPP Act's applicability in federal diversity cases.

Laura R. Handman, Alison Schary, Thomas R. Burke, Richard A. Bernstein, Kevin M. Goldberg, Karen Kaiser, Jonathan Bloom, Randy L. Shapiro, Jonathan D. Hart, Mark H. Jackson, Jason P. Conti, Jacob P. Goldstein, Oscar Grut, David Giles, Susan E. Seager, Barbara W. Wall, Jonathan Donnellan, Kristina Findikyan, Karole Morgan-Prager, Juan Cornejo, Sandra S. Baron, Kathleen A. Hirce, Charles D. Tobin, **[***2]** Mickey H. Osterreicher, Greg Lewis, Denise Leary, Ashley Messenger, Susan Weiner, David E. McCraw, Mark H. Jackson, Kurt Wimmer, Richard J. Tofel, Bruce D. Brown, Gregg P. Leslie, Gail Gove, Bruce W. Sanford, Laurie A. Babinski, Karen H. Flax, Julie Xanders, Ed Lazarus, John B. Kennedy, and James A. McLauglin were on the brief for amici curiae Media Organizations in support of appellees.

**Judges:** Before: KAVANAUGH ⌄ and SRINIVASAN ⌄, Circuit Judges, and EDWARDS ⌄, Senior Circuit Judge. Opinion for the Court filed by Circuit Judge KAVANAUGH ⌄.

**Opinion by:** KAVANAUGH ⌄

## Opinion

**[**468] [*1331]** KAVANAUGH ⌄, *Circuit Judge*: Yasser Abbas is the son of current Palestinian leader Mahmoud Abbas. In 2012, the Foreign Policy Group published an article on its website about Yasser Abbas and his brother Tarek. At the outset, the article asked two questions: "Are

the sons of the Palestinian president growing rich off their father's system?" and "Have they enriched themselves at the expense of regular Palestinians — and even U.S. taxpayers?"

In response to the questions posed in the article, Yasser Abbas filed suit in the U.S. District Court for the District of Columbia against the Foreign Policy Group and the article's author, Jonathan Schanzer. Abbas alleged [***3] defamation under D.C. law. But **HN1** the D.C. Anti-Strategic Lawsuits Against Public Participation Act of 2010 (known as the Anti-SLAPP Act) requires courts, upon motion by the defendant, to dismiss defamation lawsuits that target political or public advocacy, unless the plaintiff can show a likelihood of success on the merits. Applying the D.C. Anti-SLAPP Act, the District Court dismissed Abbas's defamation complaint.

 **[*1332]**  **[**469]**  Abbas now appeals. He contends that a federal court exercising diversity jurisdiction may not apply the D.C. Anti-SLAPP Act's special motion to dismiss provision. In Abbas's view, the D.C. provision makes it easier for defendants to obtain dismissal of a case before trial than the more plaintiff-friendly standards in Rules 12 and 56 of the Federal Rules of Civil Procedure. Citing the Supreme Court's decision in *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393, 130 S. Ct. 1431, 176 L. Ed. 2d 311 (2010), Abbas says we must follow the Federal Rules, not the D.C. Anti-SLAPP Act, in this federal court proceeding. We agree with Abbas on that point. But we affirm the District Court's judgment on an alternative ground: Under Federal Rule 12(b)(6), Abbas's allegations do not suffice to make out a defamation claim under D.C. law.


I

A

**HN2** Many States have enacted anti-SLAPP statutes to give more breathing space for free speech about contentious [***4] public issues. Those statutes "try to decrease the 'chilling effect' of certain kinds of libel litigation and other speech-restrictive litigation." Eugene Volokh, *The First Amendment and Related Statutes* 118 (5th ed. 2014). The statutes generally accomplish that objective by making it easier to dismiss defamation suits at an early stage of the litigation.

**HN3** Like the various States' anti-SLAPP laws, the D.C. Anti-SLAPP Act makes it easier for defendants sued for defamation and related torts to obtain quick dismissal of harassing lawsuits. The D.C. Council passed the Act in 2010 in response to what the Council described as an upsurge in "lawsuits filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view." Council of the District of Columbia, Committee on Public Safety and the Judiciary, Report on Bill 18-893, at 1 (Nov. 18, 2010).

**HN4** Under the Act as relevant here, a defendant may file a special motion to dismiss "any claim arising from an act in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5502(a). To obtain dismissal, the defendant first must make a "prima facie showing that the claim at issue arises from an act in furtherance [***5] of the right of advocacy on issues of public interest." *Id.* § 16-5502(b). If the defendant makes that prima facie showing, then the plaintiff must demonstrate that "the claim is likely to succeed on the merits." *Id.* If the plaintiff makes that showing, the defendant's special motion to dismiss must be denied. Otherwise, the special motion to dismiss must be granted. *See id.* (As we will see, that likelihood of success requirement is important to this case.) While a special motion to dismiss is pending, discovery is stayed except for limited purposes. *Id.* § 16-5502(c). A defendant who prevails on a special motion to dismiss may recover the costs of litigation, including reasonable attorney's fees. *Id.* § 16-5504(a).


B

Yasser Abbas is the son of Palestinian leader Mahmoud Abbas and is a businessman with substantial commercial interests in the Middle East. Yasser Abbas and his brother Tarek were featured in "The Brothers Abbas," an article by Jonathan Schanzer published by Foreign Policy Group on its website.

Schanzer's article addresses the Abbas brothers' wealth and its possible sources. The article's subtitle poses a question: "Are the sons of the Palestinian president  **[*1333]**  **[**470]**  growing rich off their father's system?" The first paragraph [***6] asks a similar question: "Have they enriched themselves at the expense of regular Palestinians — and even U.S. taxpayers?"

The article recounts allegations of corruption that a former economic advisor to Yasir Arafat made against Mahmoud Abbas. It then describes the "conspicuous wealth" of Yasser and Tarek Abbas. Noting that the brothers' success "has become a source of quiet controversy in Palestinian society," the article describes their credentials and business ventures in some detail. In discussing Yasser Abbas, the article acknowledges that the "president's son is certainly entitled to do business in the Palestinian territories. But the question is whether his lineage is his most important credential — a concern bolstered by the fact that he has occasionally served in an official capacity for the Palestinian Authority." Finally, the article notes that "the Abbas brothers have largely dropped out of sight," but that Palestinians continue to whisper about the source of the brothers' success.

In response to the article, Yasser Abbas filed a D.C.-law defamation suit in the U.S. District Court for the District of Columbia against the Foreign Policy Group and Schanzer. Abbas's defamation [***7] claims rest on the two questions posed at the outset of the article. *See* Compl. ¶¶ 46-94.

The Foreign Policy Group and Schanzer moved to dismiss the complaint under the special motion to dismiss provision of the D.C. Anti-SLAPP Act. They also moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). The District Court granted the defendants' special motion to dismiss under the D.C. Anti-SLAPP Act, dismissed Abbas's complaint with prejudice, and denied the defendants' Rule 12(b)(6) motion as moot. *Abbas v. Foreign Policy Group, LLC*, 975 F. Supp. 2d 1, 20 (D.D.C. 2013). Abbas promptly appealed.


II

The first issue before the Court is whether **HN5** a federal court exercising diversity jurisdiction may apply the D.C. Anti-SLAPP Act's special motion to dismiss provision. The answer is no. Federal Rules of Civil Procedure 12 and 56 establish the standards for granting pre-trial judgment to defendants in cases in federal court. A federal court must apply those Federal Rules instead of the D.C. Anti-SLAPP Act's special motion to dismiss provision.

A

*HN6* A federal court exercising diversity jurisdiction should not apply a state law or rule if (1) a Federal Rule of Civil Procedure "answer[s] the same question" as the state law or rule and (2) the Federal Rule does not violate the Rules Enabling Act. *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393, 398-99, 130 S. Ct. 1431, 176 L. Ed. 2d 311 (2010) (majority opinion) (citing *Hanna v. Plumer*, 380 U.S. 460, 463-64, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965)). **1 ⬇**

*HN7* For the category of cases that it covers, the D.C. Anti-SLAPP Act establishes the circumstances under which a court must dismiss a plaintiff's claim before trial — namely, when the court concludes that the plaintiff does not have a likelihood of success on the merits. But Federal Rules of Civil Procedure 12 and 56 "answer the same question" about the circumstances **[\*1334]  [\*\*471]** under which a court must dismiss a case before trial. And those Federal Rules answer that question differently: They do not require a plaintiff to show a likelihood of success on the merits. **2 ⬇**

That difference matters. Under the Federal Rules, a plaintiff is generally entitled to trial if he or she meets the Rules 12 and 56 standards to overcome a motion to dismiss or for summary judgment. But the D.C. Anti-SLAPP Act nullifies that entitlement in certain cases. Under the D.C. Anti-SLAPP Act, the plaintiff is *not* able to get to trial just by meeting those Rules 12 and 56 standards. The D.C. Anti-SLAPP Act, **[\*\*\*9]**  in other words, conflicts with the Federal Rules by setting up an additional hurdle a plaintiff must jump over to get to trial.

In particular, *HN8* under Federal Rule 12(b)(6), a plaintiff can overcome a motion to dismiss by simply alleging facts sufficient to state a claim that is plausible on its face. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). A well-pleaded complaint "may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable." *Id. at 556.* If the complaint survives a motion to dismiss, a defendant may still move before trial for summary judgment under Rule 56. But Rule 56 permits summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rules 12 and 56 help form "an integrated program" for determining whether to grant pre-trial judgment in cases in federal court. *Makaeff v. Trump University, LLC*, 715 F.3d 254, 274 (9th Cir. 2013) (Kozinski, J., concurring); *see also Makaeff v. Trump University, LLC*, 736 F.3d 1180, 1188 (9th Cir. 2013) (Watford, J., dissenting from denial of rehearing en banc) (Rules 12 and 56 "establish the exclusive criteria for testing the legal and factual sufficiency of a claim in federal court.").

*HN9* In short, unlike the D.C. Anti-SLAPP Act, the Federal Rules do not require a plaintiff to show a likelihood of success on the merits in order to avoid **[\*\*\*10]**  pre-trial dismissal. Under *Shady Grove*, therefore, we may not apply the D.C. Anti-SLAPP Act's special motion to dismiss provision.

To avoid that conclusion, the defendants in this case advance four basic arguments.

*First*, the defendants try to portray the D.C. Anti-SLAPP Act's special motion to dismiss provision as functionally identical to Federal Rule 56's summary judgment test. They creatively argue that the D.C. Anti-SLAPP Act's likelihood of success standard is just another way of describing the federal test for summary judgment. As they see it, the D.C. Anti-SLAPP Act therefore does not conflict with the Federal Rules' comprehensive scheme for testing the sufficiency of a complaint. And they further say that state rules that answer the same question *in the same way* as the Federal Rules are not preempted under *Shady Grove*. Therefore, in their view, the D.C. Anti-SLAPP Act, taken as a whole, does not alter the standard for pre-trial dismissal or summary judgment, but simply layers a right to attorney's fees in this category of cases on top of the existing federal procedural scheme. *See* D.C. Code § 16-5504 (D.C. Anti-SLAPP Act attorney's fees provision).

The main problem with the defendants' theory is that **[\*\*\*11]**  it requires the Court to re-write **[\*1335]** that **[\*\*472]** the special motion to dismiss provision. Had the D.C. Council simply wanted to permit courts to award attorney's fees to prevailing defendants in these kinds of defamation cases, it easily could have done so. But the D.C. Council instead enacted a new provision that answers the same question about the circumstances under which a court must grant pre-trial judgment to defendants. Moreover, *HN10* the D.C. Court of Appeals has never interpreted the D.C. Anti-SLAPP Act's likelihood of success standard to simply mirror the standards imposed by Federal Rules 12 and 56. Put simply, the D.C. Anti-SLAPP Act's likelihood of success standard is different from and more difficult for plaintiffs to meet than the standards imposed by Federal Rules 12 and 56. **3 ⬇**

*Second*, the defendants **[\*\*\*12]**  suggest that the special motion to dismiss provision embodies a substantive D.C. right not found in the Federal Rules — a form of qualified immunity shielding participants in public debate from tort liability.

*HN11* Qualified immunity heightens the substantive showing a plaintiff must make in order to hold a defendant liable. To over-simplify for present purposes, qualified immunity allows defendants to avoid liability even when they may have violated the law so long as they acted reasonably. Qualified immunity (on its own) does not tell a court what showing is necessary at the motion to dismiss or summary judgment stages in order to dismiss a case before trial. Rather, Federal Rules 12 and 56 do that. The D.C. Anti-SLAPP Act, to use the words of the D.C. Court of Appeals, establishes a new "procedural mechanism" for dismissing certain cases before trial. *Doe No. 1 v. Burke*, 91 A.3d 1031, 1036 (D.C. 2014). And it differs from those Federal Rules.

*Third*, the defendants briefly point to the Private Securities Litigation Reform Act of 1995, which modified the pleading standards applicable in certain categories of securities cases. Pub. L. No. 104-67, 109 Stat. 737 (1995). They cite that Act as evidence that Federal Rules 12 and 56 do not foreclose the application of other pleading standards. But *HN12* Congress, **[\*\*\*13]**  unlike the States or the District of Columbia, "has ultimate authority over the Federal Rules of Civil Procedure; it can create exceptions to an individual rule as it sees fit — either by directly amending the rule or by enacting a separate statute overriding it in certain instances." *Shady Grove*, 559 U.S. at 400 (majority opinion). Congress's decision to enact a heightened pleading standard for a small subset of federal question cases does not change the fact that Rules 12 and 56 otherwise "apply generally." *Id.*

*Fourth*, the defendants cite some other courts that have applied State anti-SLAPP acts' pretrial dismissal provisions notwithstanding Federal Rules 12 and 56. *See, e.g.*, *Godin v. Schencks*, 629 F.3d 79, 81, 92 (1st Cir. 2010); *Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164, 168-69 (5th Cir. 2009); *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973 (9th Cir. 1999); *see generally* Charles Alan Wright et al., 19 *Federal Practice & Procedure* § 4509 (2d ed. 2014). That is true, but we agree with Judge Kozinski and Judge Watford **[\*1336]  [\*\*473]**  that those decisions are ultimately not persuasive. *See Makaeff, 736 F.3d at 1188* (Watford, J., dissenting from denial of rehearing en banc) ("California's anti-SLAPP statute impermissibly supplements the Federal Rules' criteria for pre-trial dismissal of an action."); *Makaeff, 715 F.3d at 275* (Kozinski, J., concurring) ("Federal courts have no business applying exotic state procedural rules which, of

503

In short, Federal Rules 12 and 56 answer the same question as the Anti-SLAPP Act's special motion to dismiss provision. Under *Shady Grove*, Rules 12 and 56 therefore govern in diversity cases in federal court, unless Rules 12 and 56 violate the Rules Enabling Act. **4** We turn now to that question.

B

**HN13** The Rules Enabling Act empowers the Supreme Court to "prescribe general rules of practice and procedure and rules of evidence" for cases in the lower federal courts. 28 U.S.C. § 2072(a). A Federal Rule of Civil Procedure violates the Rules Enabling Act if it abridges, enlarges, or modifies any substantive right. *See id.* § 2072(b). So far, the Supreme Court has rejected every challenge to the Federal Rules that it has considered under the Rules Enabling Act. *See Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co., 559 U.S. 393, 407, 130 S. Ct. 1431, 176 L. Ed. 2d 311 (2010)* (plurality opinion of *Scalia*, J.). We need not take a long time here to explain that Federal Rules 12 and 56 are valid under the Rules Enabling Act.

In *Shady Grove*, the Supreme Court considered whether the Rule at issue there, Rule 23 of the Federal Rules of Civil Procedure, violated the Rules Enabling Act. The Court issued no majority [***15] opinion on the test used to analyze whether a Rule violates the Rules Enabling Act. Justice *Scalia* wrote an opinion for four Justices, and Justice Stevens wrote an opinion for only himself. The other four Justices did not directly

Ct. 422, 85 L. Ed. 479 (1941). *See Shady Grove, 559 U.S. at 407-10* (plurality opinion). In *Sibbach*, the Supreme Court held that the test for whether a Federal Rule violates the Rules Enabling Act is whether that Rule "really regulates procedure" — that is, really regulates "the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." *Sibbach, 312 U.S. at 14; see Hanna v. Plumer, 380 U.S. 460, 464, 470-71, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965)* (applying *Sibbach* test). By contrast to Justice *Scalia*'s plurality opinion for four Justices, Justice Stevens's opinion in *Shady Grove* would have distinguished and limited *Sibbach*. *See Shady Grove, 559 U.S. at 427-28* (Stevens, J., concurring in part and concurring in the judgment); *cf. id. at 412* (plurality opinion) ("In reality, the concurrence seeks not to apply *Sibbach* but to overrule it (or, what is the same, to rewrite it).").

So four Justices adopted one formulation. One Justice adopted [***16] a different formulation. **[\*1337] [\*\*474]** And four Justices did not address the question. What should we do in the face of such an unresolved 4-1 disagreement? Neither the 4-Justice view nor the 1-Justice view on its own is binding in these unusual circumstances. Moreover, neither opinion can be considered the *Marks* middle ground or narrowest opinion, as the four Justices in dissent simply did not address the issue. *See generally Marks v. United States, 430 U.S. 188, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977); cf. United States v. Duvall, 740 F.3d 604, 609-11, 408 U.S. App. D.C. 73 (D.C. Cir. 2013)* (*Kavanaugh*, J., concurring). In addition, on the precise question before us — whether the governing standard is still the *Sibbach* standard of "really regulates procedure" or instead something else — no common conclusion was articulated by the 4-Justice opinion and the 1-Justice opinion. Therefore, the answer for us, in these particular circumstances, is to follow the Supreme Court's pre-existing precedent in *Sibbach*. **HN14** Unless and until the Supreme Court overrules or narrows its decision in *Sibbach*, that case remains good law and is binding on lower courts.

The *Sibbach* test is very simple to apply here. Under *Sibbach*, any federal rule that "really regulates procedure" is valid under the Rules Enabling Act. *Sibbach, 312 U.S. at 14; see also Shady Grove, 559 U.S. at 410* (plurality opinion) (quoting that statement from *Sibbach* [***17] ); *Hanna, 380 U.S. at 464* (same). As the Supreme Court indicated in *Shady Grove* (in a portion of the opinion that spoke for a majority), pleading standards and rules governing motions for summary judgment are procedural. *See Shady Grove, 559 U.S. at 404* (majority opinion) (pleading standards and rules governing summary judgment are rules "addressed to procedure"). It follows that Rules 12 and 56 are valid under the Rules Enabling Act.

In sum, **HN15** Federal Rules 12 and 56 answer the same question as the D.C. Anti-SLAPP Act, and those Federal Rules are valid under the Rules Enabling Act. A federal court exercising diversity jurisdiction therefore must apply Federal Rules 12 and 56 instead of the D.C. Anti-SLAPP Act's special motion to dismiss provision. **5**

III

That conclusion does not end this appeal. **HN17** The Court may affirm a district [***18] court judgment on "any ground the record supports" and that the "opposing party had a fair opportunity to address." *Jones v. Bernanke, 557 F.3d 670, 676, 384 U.S. App. D.C. 443 (D.C. Cir. 2009)* (internal quotation marks omitted); *see Washington-Baltimore Newspaper Guild, Local 35 v. Washington Post, 959 F.2d 288, 292 n.3, 294 U.S. App. D.C. 342 (D.C. Cir. 1992)*.

During the District Court proceedings, in addition to their motion to dismiss under the D.C. Anti-SLAPP Act, the defendants also filed a motion to dismiss Abbas's complaint under Federal Rule 12(b)(6). In their Rule 12(b)(6) motion, the defendants argued that the complaint failed to state a claim under D.C. defamation law. The parties fully briefed that motion, but the District Court denied it as moot after granting the defendants' Anti-SLAPP Act special motion to dismiss. *Abbas* **[\*1338] [\*\*475]** v. Foreign Policy Group, LLC, 975 F. Supp. 2d 1, 20 (D.D.C. 2013). As appellees in this court, the defendants have renewed their Rule 12(b)(6) arguments, and both parties have briefed the issue. We agree with the defendants that Rule 12(b)(6) requires dismissal of Abbas's complaint.

**HN18** Dismissal under Rule 12(b)(6) is proper when a plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face" and to nudge his claims "across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*.

**HN19** To establish liability for defamation under D.C. law, Abbas must show, among other things, that the defendants made a false and defamatory statement about him. *See Doe No. 1 v. Burke, 91 A.3d 1031, 1044 (D.C. 2014)*. **6**

In this case, however, Abbas's defamation claim focuses not on statements made in the article but rather on two questions posed in the article: "Are the sons of the Palestinian president growing rich off their father's system?" and "Have they enriched themselves at the expense of regular Palestinians — and even U.S. [***20] taxpayers?"

504

Those questions are not factual representations. The article does not say, for example, that the "sons of the Palestinian president are growing rich off their father's system" and "have enriched themselves at the expense of regular Palestinians and U.S. taxpayers."

*HN21* Although the D.C. courts have not confronted the issue of whether questions can be defamatory, it is generally settled as a matter of defamation law in other jurisdictions that a question, "however embarrassing or unpleasant to its subject, is not accusation." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993). Questions indicate a defendant's "lack of definitive knowledge about the issue." *Partington v. Bugliosi*, 56 F.3d 1147, 1157 (9th Cir. 1995). **7**

For that reason, posing questions has rarely given rise to successful defamation claims in other jurisdictions. *See*, *[***21]* *e.g.*, *id.*; *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191, 195-96 (8th Cir. 1994); *Chapin*, 993 F.2d at 1094; *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 729-31 (1st Cir. **[*1339]** **[**476]** 1992); 1 Robert D. Sack, *Sack on Defamation* § 2:4.8 (4th ed. 2010). As Judge Sack's treatise cogently explains, albeit in a slightly different context, *HN22* whether a question can give rise to a successful defamation claim "is significant. Reporters routinely and necessarily ask questions in order to obtain information, and the mere asking of a question may cast a shadow on the reputation of a person about whom the question is asked. But a genuine effort to obtain information cannot be defamatory. A contrary rule would render legitimate reporting impossible." 1 *Sack on Defamation* § 2:4.8. Questions can be posed to explore, to inquire, to prompt further inquiry, to frame discussion, to initiate analysis, and the like. But questions are questions.

As a federal court exercising diversity jurisdiction and applying the general tenets of D.C. defamation law, we here follow the widely adopted defamation principle that questions are questions. After all, just imagine the severe infringement on free speech that would ensue in the alternative universe envisioned by Abbas. Is the Mayor a thief? Is the quarterback a cheater? Did the Governor accept bribes? Did the CEO pay her taxes? Did the baseball star *[***22]* take steroids? Questions like that appear all the time in news reports and on blogs, in tweets and on cable shows. And all such questions could be actionable under Abbas's novel defamation theory. But D.C. law has not previously extended defamation liability to those kinds of questions.

Of course, some commentators and journalists use questions — such as the classic "Is the President a crook?" — as tools to raise doubts (sometimes unfairly) about a person's activities or character while simultaneously avoiding defamation liability. After all, *HN23* a question's wording or tone or context sometimes may be read as *implying* the writer's answer to that question. But to make out a defamation by implication claim even in cases involving affirmative statements, D.C. law requires an "especially rigorous showing." *Guilford Transportation Industries, Inc. v. Wilner*, 760 A.2d 580, 596 (D.C. 2000) (quoting *Chapin*, 993 F.2d at 1092-93). And Abbas has not cited any D.C. case allowing a defamation by implication claim based on mere questions. The reason for the absence of such D.C. case law seems evident. There is no good or predictable way to neatly divide (i) the questions that are routinely posed in America's robust public forums from (ii) the kinds of questions that would be actionable as defamation by implication *[***23]* under Abbas's theory. Abbas's theory would thus necessarily ensnare a substantial amount of speech that is essential to the marketplace of ideas and would dramatically chill the freedom of speech in the District of Columbia. We will not usher D.C. law down such a new and uncertain road.

In short, the questions posed in the article at issue in this case do not suffice for Abbas to make out a defamation claim under D.C. law. The defendants are therefore entitled to dismissal of Abbas's defamation claim under *Rule 12(b)(6)*. **8**

IV

Applying the Anti-SLAPP Act, the District Court dismissed Abbas's complaint with prejudice. Although we have **[*1340]** *[**477]* relied on alternative grounds to affirm the dismissal, we likewise conclude that dismissal should be with prejudice. *HN24* Dismissal with prejudice is warranted when "the allegation of other facts *[***24]* consistent with the challenged pleading could not possibly cure the deficiency." *Belizan v. Hershon*, 434 F.3d 579, 583, 369 U.S. App. D.C. 160 (D.C. Cir. 2006) (internal quotation marks omitted); *cf. Rollins v. Wackenhut Services, Inc.*, 703 F.3d 122, 132-33, 403 U.S. App. D.C. 215 (D.C. Cir. 2012) (Kavanaugh ▾, J., concurring) (dismissal under *Rule 12(b)(6)* is ordinarily dismissal with prejudice, unless district court in its discretion states otherwise). Abbas's complaint relies exclusively on two questions in one article. We have held that those questions, as a matter of law, do not qualify as false and defamatory statements under D.C. law. Therefore, dismissal with prejudice is appropriate.

* * *

The District Court dismissed Abbas's complaint with prejudice. We affirm the judgment of the District Court.

*So ordered.*

---

**Footnotes**

**1** In *Shady Grove*, Parts I and II-A of Justice *[***8]* Scalia ▾'s opinion commanded a majority of the Court. Those sections govern our analysis of whether a federal rule answers the same question as a state law.

**2** Although D.C. is not a state, *Shady Grove*'s two-part framework applies to federal court cases involving a local D.C. law. *See Burke v. Air Serv International, Inc.*, 685 F.3d 1102, 1107-08, 401 U.S. App. D.C. 478 (D.C. Cir. 2012).

**3** An interesting issue could arise if a State anti-SLAPP act did in fact exactly mirror Federal Rules 12 and 56. Would it still be preempted under *Shady Grove*? As defendants' argument suggests, the answer to that question could matter for attorney's fees and the like. But we need not address that hypothetical here because, as we have explained, the D.C Anti-SLAPP Act's dismissal standard does not exactly mirror Federal Rules 12 and 56.

**4** Of course, the Federal Rule of Civil Procedure in question would not govern if the Rule was unconstitutional in some respect. There is no suggestion of unconstitutionality in this case.

**5** *HN16* After granting or denying a special motion to dismiss under the Anti-SLAPP Act, a court may grant attorney's fees and costs to the prevailing party. *See* D.C. Code § 16-5504. The Act does not purport to make attorney's fees available to parties who obtain dismissal by other means, such as under Federal Rule 12(b)(6). Therefore, although we conclude that the case should be dismissed under Rule 12(b)(6), attorney's fees under the Anti-SLAPP Act are not available to the defendants in this case.

**6** *HN20* To determine which jurisdiction's [***19] laws govern Abbas's defamation claim, we apply the choice-of-law rules of the jurisdiction in which we sit. *Wu v. Stomber*, 750 F.3d 944, 949, 409 U.S. App. D.C. 448 (D.C. Cir. 2014). D.C.'s choice-of-law rules "require that we apply the tort law of the jurisdiction that has the most significant relationship to the dispute." *Id.* (internal quotation marks omitted). That inquiry "requires that we consider where the injury occurred, where the conduct causing the injury occurred, the domicile, residence, nationality, place of incorporation and place of business of the parties, and the place where the relationship is centered." *Id.* (internal quotation marks omitted). In his complaint, Abbas alleges that the conduct that caused his injury took place in the District of Columbia. The defendants agree that D.C. law should govern. The parties relied on D.C. defamation law in briefing this appeal. We conclude that D.C. defamation law governs this dispute.

**7** To be sure, as Judge Sack notes and as case law bears out, questions that contain embedded factual assertions may sometimes form the basis for a successful defamation claim. *See* 1 Robert D. Sack, *Sack on Defamation* § 2:4.8 (4th ed. 2010) (quoting *Chapin*, 993 F.2d at 1094). For example, a question such as "Given that Jones repeatedly abused children, why is he still employed by the school district?" contains a factual assertion that Jones abused children. But that is not what we have here.

**8** The defendants offer other bases for dismissal under Rule 12(b)(6). They allege that Abbas is a public figure and that he failed to demonstrate actual malice in his complaint. They also claim that the District of Columbia's fair comment privilege protects the defendants from liability. Having already decided in the defendants' favor on other grounds, we need not reach those alternative arguments.



About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX ™

Copyright © 2023 LexisNexis.

Document:                          Carbone v. CNN, Inc., 910 F.3d 1345                          | Actions ⌄

Go to ⌄   Page  *Page #*

---

⚠️ **Carbone v. CNN, Inc., 910 F.3d 1345**

Copy Citation

United States Court of Appeals for the Eleventh Circuit

December 13, 2018, Decided

No. 17-10812

**Reporter**

910 F.3d 1345 * | 2018 U.S. App. LEXIS 35095 ** | 2019 Media L. Rep. 11 | 102 Fed. R. Serv. 3d (Callaghan) 468 | 27 Fla. L. Weekly Fed. C 1575

DAVIDE M. CARBONE, Plaintiff-Appellee, versus CABLE NEWS NETWORK, INC., Defendant-Appellant.

**Prior History:** [**1] Appeal from the United States District Court for the Northern District of Georgia. D.C. Docket No. 1:16-cv-01720-ODE.
Carbone v. CNN, Inc., 2017 U.S. Dist. LEXIS 216286 (N.D. Ga., Feb. 14, 2017)

## Core Terms

anti-SLAPP, federal rule, federal court, discovery, motion-to-strike, motion to dismiss, pretrial dismissal, summary judgment, entitlement, conflicts, merits, state statute, probability, claim for relief, surgeries, pendent jurisdiction, complaint states, motion to strike, nonmoving party, district court, mortality rate, no conflict, decisions, failure to state a claim, sufficient evidence, denial of a motion, provisions, pediatric, pleadings, satisfies

---

## Case Summary

### Overview

HOLDINGS: [1]-The district court did not err in denying defendant news network's motion to strike plaintiff's defamation complaint under the Georgia anti-SLAPP (Strategic Lawsuits Against Public Participation) statute, O.C.G.A. § 9-11-11.1; because Fed. R. Civ. P. 8, 12, and 56 were valid under the Rules Enabling Act and the U.S. Constitution's Necessary and Proper Clause and governed the same basic question as § 9-11-11.1, its motion-to-strike procedure did not apply in federal courts sitting in diversity jurisdiction; [2]-The appellate court lacked pendent jurisdiction to review the district court's denial of defendant's motion to dismiss under Rule 12(b)(6) because that issue was not inextricably intertwined with or necessary to ensure meaningful review of the appealable issue: whether § 9-11-11.1's motion-to strike procedure applied in federal court, a pure question of law.

### Outcome

The appellate court affirmed the denial of the motion to strike and dismissed the appeal of the denial of the motion to dismiss.

---

## ▼ LexisNexis® Headnotes

Civil Procedure  >  ...  >  Responses ⌄  >  Defenses, Demurrers & Objections ⌄  >  Motions to Strike ⌄
Constitutional Law  >  ...  >  Fundamental Freedoms ⌄  >  Freedom of Speech ⌄  >  Strategic Lawsuits Against Public Participation ⌄

**HN1** ⬇ **Defenses, Demurrers & Objections, Motions to Strike**

The Georgia anti-SLAPP (Strategic Lawsuits Against Public Participation) statute, O.C.G.A. § 9-11-11.1, applies to claims brought against a person or entity arising from any act which could reasonably be construed as an act in furtherance of the person's or entity's right of

507

petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern. § 9-11-11.1(b)(1). If this condition is satisfied, § 9-11-11.1(b)(1) provides a special procedural mechanism for the defendant to move to strike the claim. That provision requires the claim to be struck unless the court determines that the nonmoving party has established that there is a probability that the nonmoving party will prevail on the claim. § 9-11-11.1(b)(1). 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (4)*

---

Civil Procedure > Discovery & Disclosure ⌄ > Discovery ⌄
Constitutional Law > ... > Fundamental Freedoms ⌄ > Freedom of Speech ⌄ > Strategic Lawsuits Against Public Participation ⌄
View more legal topics

**HN2** ⬇  **Discovery & Disclosure, Discovery**

Under the Georgia anti-SLAPP (Strategic Lawsuits Against Public Participation) statute, O.C.G.A. § 9-11-11.1, discovery is halted during the pendency of a motion to strike, § 9-11-11.1(d), with two exceptions. First, if there exists a claim that the nonmoving party is a public figure plaintiff, then the nonmoving party shall be entitled to discovery on the sole issue of actual malice whenever actual malice is relevant to the court's determination. § 9-11-11.1(b)(2). Second, the court, on noticed motion and for good cause shown, may order that specified discovery or other hearings or motions be conducted. § 9-11-11.1(d). 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Civil Procedure > Appeals ⌄ > Appellate Jurisdiction ⌄
View more legal topics

**HN3** ⬇  **Appeals, Appellate Jurisdiction**

An appellate court reviews de novo federal-versus-state choice-of-law questions and questions concerning its jurisdiction. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Civil Procedure > Preliminary Considerations ⌄ > Federal & State Interrelationships ⌄ > Choice of Law ⌄
Governments > Courts ⌄ > Rule Application & Interpretation ⌄
View more legal topics

**HN4** ⬇  **Federal & State Interrelationships, Choice of Law**

A federal court exercising diversity jurisdiction will not apply a state statute if a Federal Rule of Civil Procedure answers the question in dispute. If a federal rule is sufficiently broad to control the issue before the court, it governs unless it exceeds statutory authorization under the Rules Enabling Act or Congress's rule-making power under the Constitution. If no federal rule answers the question in dispute, the federal court undertakes an "unguided Erie" inquiry to decide whether to apply the state statute or federal common law. That choice-of-law inquiry requires the court to apply Erie and its progeny to determine whether failure to apply the state law would lead to different outcomes in state and federal court and result in inequitable administration of the laws or forum shopping. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (14)*    2

---

Civil Procedure > ... > Defenses, Demurrers & Objections ⌄ > Motions to Dismiss ⌄ > Failure to State Claim ⌄
View more legal topics

**HN5** ⬇  **Motions to Dismiss, Failure to State Claim**

Fed. R. Civ. P. 8 and 12 define the criteria for assessing the sufficiency of a pleading before discovery. Rule 8(a)(2) provides that a complaint that states a claim for relief must contain a short and plain statement of the claim showing that the pleader is entitled to relief. If a complaint's statement of a claim does not satisfy this requirement, it is subject to dismissal under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. A claim satisfies the requirement of Rule 8(a)--and avoids dismissal under Rule 12(b)(6)--if the complaint alleges facts sufficient to establish that the claim is plausible on its face. And under Rule 12(c), a party may move for judgment on the pleadings after the pleadings are closed--but early enough not to delay trial. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (13)*

---

Civil Procedure > ... > Defenses, Demurrers & Objections ⌄ > Motions to Dismiss ⌄ > Failure to State Claim ⌄
View more legal topics

**HN6** ⬇  **Motions to Dismiss, Failure to State Claim**

A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss under Fed. R. Civ. P. 12(b)(6). 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (3)*

---

Civil Procedure > Summary Judgment ⌄ > Entitlement as Matter of Law ⌄ > Genuine Disputes ⌄
View more legal topics

**HN7** ⬇  **Entitlement as Matter of Law, Genuine Disputes**

Fed. R. Civ. P. 56 governs whether a party's claim is supported by sufficient evidence to avoid pretrial dismissal. Under Rule 56, a party is

ordinarily entitled to test the proof for a claim only after the conclusion of discovery. Rule 56(b)(2). Rule 56's requirement that a nonmoving party set forth facts proving a dispute of material fact is qualified by Rule 56's provision that summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition. A complaint that satisfies Fed. R. Civ. P. 8 and 12 will warrant a trial unless, after discovery, the party moving for summary judgment shows that there is no genuine dispute as to any material fact and is entitled to judgment as a matter of law. Rule 56(a). More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Civil Procedure > Preliminary Considerations ⌄ > Federal & State Interrelationships ⌄ > Choice of Law ⌄
Governments > Legislation ⌄ > Interpretation ⌄
View more legal topics

**HN8**⬇ **Federal & State Interrelationships, Choice of Law**
The existence of a conflict between the Federal Rules of Civil Procedure and a state statute does not invariably depend on whether the state law abrogates a procedural right conferred by the Federal Rules, but instead turns on whether the Federal Rules and the state statute answer the same question. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Civil Procedure > Preliminary Considerations ⌄ > Federal & State Interrelationships ⌄ > Choice of Law ⌄
Governments > Courts ⌄ > Rule Application & Interpretation ⌄

**HN9**⬇ **Federal & State Interrelationships, Choice of Law**
The U.S. Supreme Court has explicitly rejected the notion that the Federal Rules of Civil Procedure are to be narrowly construed in order to avoid a direct collision with state law. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (1)*

---

Governments > Legislation ⌄ > Interpretation ⌄

**HN10**⬇ **Legislation, Interpretation**
Under the interpretive canon, expressio unius est exclusio alterius, expressing one item of an associated group or series excludes another left unmentioned. The expression of one thing implies the exclusion of others. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

---

Constitutional Law > Congressional Duties & Powers ⌄ > Necessary & Proper Clause ⌄
Governments > Courts ⌄ > Authority to Adjudicate ⌄
Evidence > Inferences & Presumptions ⌄ > 📙 Presumptions ⌄ > Particular Presumptions ⌄
View more legal topics

**HN11**⬇ **Congressional Duties & Powers, Necessary & Proper Clause**
The Rules Enabling Act empowers the U.S. Supreme Court to prescribe general rules of practice and procedure and rules of evidence for the federal courts, 28 U.S.C.S. § 2072(a), but this power is subject to the limitation that such rules shall not abridge, enlarge or modify any substantive right, § 2072(b). A federal rule does not exceed the scope of the power delegated the Act if it really regulates procedure, meaning that the rule governs the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them. A federal rule falls within Congress's power under the constitutional provision for a federal court system (augmented by the U.S. Constitution's Necessary & Proper Clause) if it is rationally capable of classification as procedural. The Federal Rules of Civil Procedure have presumptive validity under both the constitutional and statutory constraints. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (4)*

---

Civil Procedure > Preliminary Considerations ⌄ > Federal & State Interrelationships ⌄ > Choice of Law ⌄
Constitutional Law > ... ⌄ > Fundamental Freedoms ⌄ > Freedom of Speech ⌄ > Strategic Lawsuits Against Public Participation ⌄
View more legal topics

**HN12**⬇ **Federal & State Interrelationships, Choice of Law**
Fed. R. Civ. P. 8, 12, and 56 comply with the Rules Enabling Act and the U.S. Constitution. Rules 8, 12, and 56 are valid under the Act because they define the procedures for determining whether a claim is alleged in a sufficient manner in a complaint and whether there is a genuine dispute of material fact sufficient to warrant a trial. Rules 8, 12, and 56 affect only the process of enforcing litigants' rights and not the rights themselves, and thus really regulate procedure. And if a rule really regulates procedure, it must be rationally capable of classification as procedural, so Rules 8, 12, and 56 also fall within the scope of the congressional power over the federal courts. Because Rules 8, 12, and 56 are valid under the Act and the Constitution and govern the same basic question as the Georgia anti-SLAPP (Strategic Lawsuits Against Public Participation) statute, O.C.G.A. § 9-11-11.1, the motion-to-strike procedure created by § 9-11-11.1 cannot apply in federal court. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (7)*    1

---

Civil Procedure > Appeals ⌄ > Appellate Jurisdiction ⌄
View more legal topics

*HN1*⬙  Appeals, Appellate Jurisdiction

An appellate court may exercise pendent jurisdiction over an issue only if that issue is inextricably intertwined with or necessary to ensure meaningful review of the appealable issue. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (2)*

---

**Counsel:** For DAVIDE M. CARBONE, Plaintiff - Appellee: Stacey Godfrey Evans ⬙, Wargo & French, LLP ⬙, ATLANTA, GA; L. Lin Wood ⬙, Jonathan David Grunberg ⬙, George Taylor Wilson, L. Lin Wood, PC ⬙, ATLANTA, GA.

For CABLE NEWS NETWORK, INC., Defendant - Appellant: Charles David Tobin ⬙, Ballard Spahr, LLP, WASHINGTON, DC.

For ABC, INC., Amicus Curiae: Peter Canfield ⬙, Jones Day ⬙, ATLANTA, GA.

For SERVICE: David E. Hudson ⬙, Hull Barrett, PC ⬙, AUGUSTA, GA.

**Judges:** Before TJOFLAT ⬙ and WILLIAM PRYOR ⬙, Circuit Judges, and MURPHY, ⬙⬙ District Judge.

**Opinion by:** WILLIAM PRYOR ⬙

## Opinion

[*1347]  WILLIAM PRYOR ⬙, Circuit Judge:

This interlocutory appeal requires us to decide whether the motion-to-strike procedure of the Georgia anti-SLAPP (Strategic Lawsuits Against Public Participation) statute, O.C.G.A. § 9-11-11.1, applies in federal court. Davide Carbone filed a complaint against Cable News Network for publishing a series of allegedly defamatory news reports about him and the medical center he administered. CNN moved to strike the complaint under the Georgia anti-SLAPP statute or, in the alternative, to dismiss the complaint for failure to state a claim for relief under [**2] Federal Rule of Civil Procedure 12(b)(6). The district court denied that motion. It ruled that the special-dismissal provision of the anti-SLAPP statute does not apply in federal court because it conflicts with Rule 12(b)(6) and that Carbone's complaint states a claim for relief. CNN challenges both rulings. We agree with the district court that the special-dismissal provision of the Georgia anti-SLAPP statute does not apply in federal court, but we lack pendent appellate jurisdiction to review whether Carbone's complaint states a claim for relief. We affirm in part and dismiss in part.

## I. BACKGROUND

Carbone alleges that while he served as chief executive officer of St. Mary's Medical Center in West Palm Beach, Florida, CNN published "a series of false and defamatory news reports, articles, and social media posts" asserting that the mortality rate for pediatric open-heart surgery at St. Mary's was 12.5 percent—more than three [*1348] times the national average of 3.3 percent. Carbone alleges that CNN intentionally misrepresented the national average mortality rate for open-heart pediatric surgeries by using a figure based on the *total* number of pediatric heart surgeries. As he puts it in his complaint, "[i]nstead of reporting the St. Mary's program's [**3] mortality rate based on all pediatric heart surgeries it performed (both open and closed heart surgeries) and comparing that number to the national average of the same computation," CNN reported "the St. Mary's program's mortality rate for the most inherently risky surgeries (open heart) and then compared it to the national rate for all surgeries (including the less risky closed heart surgeries)." The total "risk-adjusted mortality rate for St. Mary's Pediatric Cardiac program was 5.3%, and that figure had a 95% confidence interval that encompassed" the "national average 3.4% mortality rate," which meant that there was "no statistically significant difference between the St. Mary's program's mortality rate and the national average." Carbone alleges that, as a result of this reporting, St. Mary's discontinued its pediatric cardiology program and he was forced to resign as chief executive officer.

CNN moved to strike Carbone's complaint under the Georgia anti-SLAPP statute, O.C.G.A. § 9-11-11.1, or, in the alternative, to dismiss it under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *HN1*📌 The anti-SLAPP statute applies to claims brought against "a person or entity arising from any act . . . which could reasonably be construed [**4] as an act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern." O.C.G.A. § 9-11-11.1(b)(1). If this condition is satisfied, the statute provides a special procedural mechanism for the defendant to move to strike the claim. That provision requires the claim to be struck "unless the court determines that the nonmoving party has established that there is a probability that the nonmoving party will prevail on the claim." *Id.*

*HN2*📌 Discovery is halted during the pendency of a motion to strike, *id.* § 9-11-11.1(d), with two exceptions. First, "if there exists a claim that the nonmoving party is a public figure plaintiff, then the nonmoving party shall be entitled to discovery on the sole issue of actual malice whenever actual malice is relevant to the court's determination." *Id.* § 9-11-11.1(b)(2). Second, "[t]he court, on noticed motion and for good cause shown, may order that specified discovery or other hearings or motions be conducted." *Id.* § 9-11-11.1(d). And "a prevailing moving party on a motion to strike shall be granted the recovery of attorney's fees and expenses of litigation related to the [**5] action in an amount to be determined by the court based on the facts and circumstances of the case." *Id.* § 9-11-11.1(b.1).

The district court denied CNN's motion. It ruled that the special dismissal procedure created by Georgia's anti-SLAPP statute does not apply in federal court and that Carbone's complaint states a claim for relief under Rule 12(b)(6). The district court determined that Rule 12(b)(6) "directly conflicts with Georgia's anti-SLAPP statute" because the latter creates a "Rule 12(b)(6) 'plus' standard for cases with a First Amendment nexus." The district court reasoned that this conflict arises because "Rule 12(b)(6) requires 'plausibility' on the face of the complaint" but "Section 9-11-11.1(b)(1) requires a probability of prevailing." The district court ruled that Carbone's complaint contained plausible factual allegations that, if true, would prove liability for defamation.

**[\*1349]  II. STANDARD OF REVIEW**

*HN3* We review de novo federal-versus-state choice-of-law questions, *Adventure Outdoors, Inc. v. Bloomberg*, 552 F.3d 1290, 1294 (11th Cir. 2008), and questions concerning our jurisdiction, *Weatherly v. Ala. State Univ.*, 728 F.3d 1263, 1269 (11th Cir. 2013).

## III. DISCUSSION

We divide our discussion in two parts. First, we consider whether the motion-to-strike procedure created by the Georgia anti-SLAPP statute applies in a federal court sitting in diversity jurisdiction. Second, we address whether we have pendent appellate jurisdiction [\*\*6] to review the denial of the motion to dismiss under Rule 12(b)(6).

*A. The Motion-to-Strike Provision of Georgia's Anti-SLAPP Statute Conflicts with Rules 8, 12, and 56.*

CNN argues that we have already held that motion-to-strike provisions of state anti-SLAPP statutes apply in federal court in two decisions, *Royalty Network, Inc. v. Harris*, 756 F.3d 1351 (11th Cir. 2014), and *Tobinick v. Novella*, 848 F.3d 935 (11th Cir. 2017), but CNN is mistaken. In *Harris*, we held that a separate provision of an earlier version of Georgia's anti-SLAPP statute, which required a complaint asserting a claim covered by the statute to be "accompanied by a verification making specific representations," conflicted with Federal Rule 11(a) and did not apply in federal court. 756 F.3d at 1359. We addressed the motion-to-strike procedure only to clarify that our holding did not conflict with the decisions of our sister circuits holding that such procedures apply in federal court. *Id.* at 1361-62. And in *Novella*, we affirmed the dismissal of certain state-law claims based on California's anti-SLAPP statute. But we did so because the plaintiff-appellants in that appeal "waived their challenge to the district court's application of California's anti-SLAPP statute based on the *Erie* doctrine," not because we concluded that the statute applies in federal court. *Novella*, 848 F.3d at 944. To be sure, we stated that [\*\*7] "[t]he district court acted reasonably in applying California's anti-SLAPP statute," *id.*, but that observation was not part of our holding. *See* Bryan A. Garner et al., *The Law of Judicial Precedent* § 4, at 44 (2016) ("[D]igressions speculating on how similar hypothetical cases might be resolved" are dicta and do not "bind future courts.").

The framework for resolving this question is familiar. *HN4* A federal court exercising diversity jurisdiction will not apply a state statute if a Federal Rule of Civil Procedure "answers the question in dispute." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398, 130 S. Ct. 1431, 176 L. Ed. 2d 311 (2010) (majority opinion). If a Federal Rule is "sufficiently broad to control the issue before the Court," *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749-50, 100 S. Ct. 1978, 64 L. Ed. 2d 659 (1980), "it governs . . . unless it exceeds statutory authorization" under the Rules Enabling Act or "Congress's rulemaking power" under the Constitution, *Shady Grove*, 559 U.S. at 398. If no Federal Rule answers the question in dispute, we undertake an "unguided *Erie*" inquiry to decide whether to apply the state statute or federal common law. *Hanna v. Plumer*, 380 U.S. 460, 471, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965). That choice-of-law inquiry requires us to "apply *Erie* and its progeny to determine 'whether failure to apply the state law would lead to different outcomes in state and federal court and result in inequitable administration of the laws or [\*\*8]  forum shopping.'" **[\*1350]** *Harris*, 756 F.3d at 1358 (citation omitted).

Under that framework, we cannot apply the dismissal provision of the Georgia anti-SLAPP statute. The question in dispute is whether Carbone's complaint states a claim for relief supported by sufficient evidence to avoid pretrial dismissal. Taken together, Rules 8, 12, and 56 provide an answer.

*HN5* Rules 8 and 12 define the criteria for assessing the sufficiency of a pleading before discovery. Rule 8(a)(2) provides that a complaint "that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." If a complaint's statement of a claim does not satisfy this requirement, it is subject to dismissal under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." A claim satisfies the requirement of Rule 8(a)—and avoids dismissal under Rule 12(b)(6)—if the complaint alleges facts sufficient to establish that the claim is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). And under Rule 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." *HN6* A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss under Rule 12(b)(6). *See Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998).

*HN7* Rule 56 governs whether a party's claim is supported [\*\*9]  by sufficient evidence to avoid pretrial dismissal. Under this Rule, a party is ordinarily entitled to test the proof for a claim only after the conclusion of discovery. *See* Fed. R. Civ. P. 56(d)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (explaining that Rule 56's requirement that a nonmoving party set forth facts proving a dispute of material fact "is qualified" by Rule 56's "provision that summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition"). A complaint that satisfies Rules 8 and 12 will warrant a trial unless, after discovery, the party moving for summary judgment "shows that there is no genuine dispute as to any material fact" and is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The motion-to-strike provision of the Georgia anti-SLAPP statute "answer[s] the same question" as Rules 8, 12, and 56, but it does so in a way that conflicts with those Rules. *Shady Grove*, 559 U.S. at 401. For the class of claims that it governs, the anti-SLAPP statute defines the conditions under which a court must dismiss a claim before trial for insufficient pleading or proof.

The standard for pleading imposed by the anti-SLAPP statute differs from Rules 8 and 12 by requiring the plaintiff to establish "a *probability*" that he "will prevail on [\*\*10]  the claim" asserted in the complaint. O.C.G.A. § 9-11-11.1(b)(1) (emphasis added). In contrast, the plausibility standard under Rules 8(a) and 12(b)(6) plainly "does not impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556. Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Id.; see also Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ("The plausibility standard is not akin to a probability requirement . . . ." (citation and internal quotation marks omitted)).

The motion-to-strike procedure also conflicts with Rule 56. The Georgia statute "contemplates a substantive, evidentiary determination of the plaintiff's probability **[\*1351]** of prevailing on his claims." *Rosser v. Clyatt*, 821 S.E.2d 140, 348 Ga. App. 40, 2018 Ga. App. LEXIS 633 at \*6-7, No. A18A0843 (Ga. Ct. App. Nov. 2, 2018). But to avoid summary judgment under Rule 56, a nonmovant need only "designate specific

511

facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotation marks omitted). In determining whether the nonmoving party has satisfied this burden, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The Georgia statute requires the plaintiff to establish that he will likely prevail if the case proceeds to trial. That evidentiary burden **[**11]** is far more demanding than one requiring him only to identify material factual disputes that a jury could reasonably resolve in his favor, and it requires the court to consider whether the factual underpinnings of the plaintiff's claim are likely true. And although Rule 56 does not generally permit a defendant to test a plaintiff's claim for evidentiary sufficiency before discovery, the Georgia anti-SLAPP statute provides that "[a]ll discovery . . . shall be stayed upon the filing" of a "motion to strike . . . until a final decision on the motion," unless the plaintiff satisfies the good cause standard. O.C.G.A. § 9-11-11.1(d). The Georgia statute deprives the plaintiff of the "period for discovery[, unless the plaintiff shows good cause,] before defendant can test plaintiff's case for [evidentiary] sufficiency" conferred by the Federal Rules. *Makaeff v. Trump Univ. (Makaeff I)*, 715 F.3d 254, 274 (9th Cir. 2013) (Kozinski ▾, C.J., concurring).

The Georgia anti-SLAPP statute also compromises the joint operation of Rules 8, 12, and 56. Taken together, these Rules provide a comprehensive framework governing pretrial dismissal and judgment. Under Rule 12(d), a motion to dismiss for failure to state a claim under Rule 12(b)(6) or a motion for judgment on the pleadings "must be treated as one for summary judgment under Rule 56 **[**12]**" if "matters outside the pleadings are presented to and not excluded by the court . . . ." In other words, the Rules contemplate that a claim will be assessed on the pleadings alone or under the summary judgment standard; there is no room for any other device for determining whether a valid claim supported by sufficient evidence to avoid pretrial dismissal.

In short, Rules 8, 12, and 56 express "with unmistakable clarity" that proof of probability of success on the merits "is not required in federal courts" to avoid pretrial dismissal, and that the evidentiary sufficiency of a claim should not be tested before discovery. *Hanna*, 380 U.S. at 470. But the relevant provisions of the Georgia anti-SLAPP statute explicitly require proof of a probability of success on the merits without the benefit of discovery. The result is a "direct collision" between the Federal Rules and the motion-to-strike provision of the Georgia statute. *Id.* at 472.

CNN and its *amici* contend that Rules 12 and 56 establish only minimum requirements that claimants must satisfy at the pleading and pretrial stages that the Georgia anti-SLAPP statute may supplement without contradiction. They assert that neither Rule creates an affirmative entitlement to proceed to discovery **[**13]** or trial because they do not contain the kind of "rights-conferring language" that was critical to the Supreme Court's reasoning in *Shady Grove*. And they argue that the Supreme Court's decision in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949), prohibits us from holding that there is a conflict **[*1352]** between the Federal Rules and a state statute when the Federal Rules create a necessary-but-insufficient set of requirements. As they see it, the Federal Rules at issue merely "provide various theories upon which a suit may be disposed of before trial," but they "do not provide that a plaintiff is entitled to maintain his suit if their requirements are met." *Makaeff v. Trump Univ. (Makaeff II)*, 736 F.3d 1180, 1182 (9th Cir. 2013) (Wardlaw, J., concurring in the denial of rehearing en banc).

Even if the relevant Federal Rules did not create an affirmative entitlement to proceed to discovery or trial, it would not follow that there is no conflict between the Federal Rules and the anti-SLAPP statute. **HN8**⚓ The existence of a conflict does not invariably depend on whether the state law abrogates a procedural right conferred by the Federal Rules, but instead turns on whether the Federal Rules and the state statute "answer the same question." *Shady Grove*, 559 U.S. at 401. Rules 8, 12, and 56 govern whether Carbone's claim states a valid claim supported by sufficient **[**14]** evidence to avoid pretrial dismissal. Those Rules are "'sufficiently broad' . . . to 'control the issue' before the court, thereby leaving no room for the operation" of the motion-to-strike procedure. *Burlington N. R. Co. v. Woods*, 480 U.S. 1, 4-5, 107 S. Ct. 967, 94 L. Ed. 2d 1 (1987) (citations omitted).

CNN responds that the anti-SLAPP statute does not attempt to answer the question whether the plaintiff has alleged a claim that is plausible on its face, but instead answers whether the plaintiff's claim satisfies a probability requirement. But this argument conflates the question a rule or statute is designed to answer with the standard it requires the court to apply in answering that question. Rules 8, 12, and 56 answer the question of sufficiency by requiring the plaintiff to allege a claim that is plausible on its face and to present evidence sufficient to create a triable issue of fact. The Georgia anti-SLAPP statute answers the same question by requiring the plaintiff to allege and prove a probability of success on the merits. CNN's response relies on an artificially narrow construction of the Federal Rules as controlling only on whether their standards have been satisfied. But **HN9**⚓ the Supreme Court has explicitly rejected the notion that "the Federal Rules of Civil Procedure **[**15]** are to be narrowly construed in order to avoid a 'direct collision' with state law." *Walker*, 446 U.S. at 750 n.9.

Rules 8, 12, and 56 create an affirmative entitlement to avoid pretrial dismissal that would be nullified by the Georgia anti-SLAPP statute if it were applied in a federal court. Rule 8 provides that a complaint "that states a claim for relief must contain" three components: (1) "a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support"; (2) "a short and plain statement of the claim showing that the pleader is entitled to relief"; and (3) "a demand for the relief sought." By negative implication, the enumeration of this series of requirements excludes other requirements that must be satisfied for a complaint to state a claim for relief. *See Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80, 122 S. Ct. 2045, 153 L. Ed. 2d 82 (2002) (**HN10**⚓ Under the "interpretive canon, *expressio unius est exclusio alterius*, 'expressing one item of [an] associated group or series excludes another left unmentioned.'" (citation omitted)); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 10, 107 (2012) ("The expression of one thing implies the exclusion of others."). A complaint that satisfies these **[**16]** requirements **[*1353]** will withstand pretrial dismissal under Rule 12(b)(6), which ordinarily entitles the plaintiff to proceed to discovery. *See* Fed. R. Civ. P. 26(b)(1), 56(d)(2); *Anderson*, 477 U.S. at 250 n.5.

To be sure, Congress has formulated additional requirements governing the sufficiency of a complaint as exceptions to the general rule. For example, Rule 9(b) requires fraud plaintiffs to "state with particularity the circumstances constituting fraud." And the Private Securities Litigation Reform Act requires certain securities-law plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

CNN's *amici* contend that "[i]f Rules 12 and 56 affirmatively authorized any plaintiff who meets their requirements to proceed to trial, they would contradict these provisions," but this argument reflects a failure to grasp the teachings of *Shady Grove*. There, the Supreme Court explained that "[t]he fact that Congress has created specific exceptions to Rule 23 hardly proves that the Rule does not apply generally. In fact, it proves the opposite." *Shady Grove*, 559 U.S. at 400 (majority opinion). "If Rule 23 did not authorize class actions across the board, the

statutory exceptions would be unnecessary. *Id.* In the same way, if Rule 8 did not authorize a plaintiff [**9*] to maintain suit and proceed to discovery, Congress would not have needed to add novel requirements for certain categories of claims. The decision whether to dismiss a complaint on alternative grounds would be effectively discretionary.

The "minimum requirements" interpretation of Rule 56 fails for similar reasons. The Rule states that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Rule, in conjunction with other Rules governing pretrial dismissal, qualifies the background entitlement to a trial affirmed by Federal Rules 38 and 39. *See* Fed. R. Civ. P. 38(a) ("The right of trial by jury as declared by the Seventh Amendment to the Constitution—or as provided by a federal statute—is preserved to the parties inviolate."); Fed. R. Civ. P. 39(b) ("Issues on which a jury trial is not properly demanded are to be tried by the court."). It follows that if a plaintiff satisfies the requirements of Rule 56 and avoids summary judgment, he is entitled to a trial on the merits unless the court is required to grant the motion for summary judgment or dismiss the action on some other ground supported by the Federal Rules or some provision of federal law. *See* Abbas v. Foreign Policy Grp., LLC, 783 F.3d 1328, 1334, 414 U.S. App. D.C. 465 (D.C. Cir. 2015) (Kavanaugh, [**18] J.) ("Under the Federal Rules, a plaintiff is generally entitled to trial if he or she meets the Rules 12 and 56 standards to overcome a motion to dismiss or for summary judgment.").

The anti-SLAPP statute abrogates the entitlements conferred by these Rules. Under Rules 8 and 12(b)(6), a plaintiff is ordinarily entitled to maintain his suit and proceed to discovery if his complaint states a claim for relief that is plausible on its face. The anti-SLAPP statute abrogates that entitlement in cases that fall within its ambit by requiring the plaintiff to establish that success is not merely plausible but probable. And under Rule 56, a plaintiff has a right to proceed to trial if he proves the existence of a genuine dispute of material fact. The anti-SLAPP statute would nullify that entitlement by requiring the plaintiff to prove that it is likely, and not merely possible, that a reasonable jury would find in his favor and to do so while **[*1354]** relying exclusively on evidence he was able to obtain without discovery.

These considerations also establish that *Cohen* does not control the outcome of this appeal. In *Cohen*, the Supreme Court held that there was no conflict between a New Jersey statute that required certain plaintiffs [**19] to post a bond as a security for costs as a prerequisite to bringing a shareholder derivative action and former Federal Rule 23 (now Rule 23.1). 337 U.S. at 557. The Federal Rule requires that the complaint in a derivative suit "be verified by oath and to show that the plaintiff was a stockholder at the time of the transaction of which he complains or that his share thereafter devolved upon him by operation of law." *Id.* at 556. These requirements did not conflict with the state statute because they "neither create[ed] nor exempt[ed] from liabilities, but require[d] complete disclosure to the court and notice to the parties in interest." *Id.* The New Jersey statute neither abrogated rights conferred by the Federal Rules nor addressed the questions of disclosure and notice. Instead, it was designed only to protect against "strike suits" that were "brought not to redress real wrongs, but to realize upon their nuisance value." *Id.* at 548. Rules 8, 12, and 56, by contrast, constitute an exhaustive set of requirements governing pretrial dismissal and entitlements to discovery and a trial on the merits. And unlike the state statute at issue in *Cohen*, the Federal Rules and the Georgia anti-SLAPP statute address the same question: whether a complaint states [**20] a valid claim supported by sufficient evidence to warrant a trial on the merits.

CNN and its *amici* also contend that there is no conflict between Rules 12 and 56 and the motion-to-strike provision because each pursues a "separate purpose[]" and operates in a separate "sphere of coverage." Walker, 446 U.S. at 752 & n.13. As they see it, "[t]he object of Rules 12 and 56 is to winnow claims and defenses over the course of litigation," while the object of the anti-SLAPP law is to protect the rights to petition and freedom of speech. They also argue that the existence of Georgia rules of procedure with the same content as Rules 12 and 56 proves that the anti-SLAPP statute can coexist with those rules. *See* O.C.G.A. § 9-11-12(b)(6); *id.* § 9-11-56.

The problem with the argument about the purposes of the relevant Federal Rules and the anti-SLAPP statute is that the means by which the Georgia law pursues its special purpose is by *winnowing claims and defenses in the course of litigation*, just like Rules 12 and 56. That the aim of the statute is to protect First Amendment rights is irrelevant, because the anti-SLAPP statute advances that end by imposing a requirement on a plaintiff's entitlement to maintain a suit over and above the requirements contemplated by the Federal Rules that control the same question. [**21] *Cf.* Shady Grove, 559 U.S. at 403 ("Even if its aim is to restrict the remedy a plaintiff can obtain, [the state statute] achieves that end by limiting a plaintiff's power to maintain a class action.") (majority opinion). Indeed, if anything, the Georgia statute's "mode of operation" is sufficiently similar to that of the relevant Federal Rules "to indicate that the Rule[s] occup[y] the statute's field of operation so as to preclude its application in federal diversity actions." Burlington, 480 U.S. at 7.

Nor does the existence of Georgia state-law analogues of Rules 12 and 56 prove that the federal counterparts of those Rules and the anti-SLAPP statute occupy separate spheres. *See* O.C.G.A. § 9-11-12(b)(6); *id.* § 9-11-56. The existence of equivalent provisions of Georgia law **[*1355]** proves that rules with the same content as Federal Rules 12 and 56 can coexist with the anti-SLAPP statute in a single system of law. But the test of whether a conflict between the Federal Rules and a state statute exists is not whether it is logically possible for a court to comply with the requirements of both, but whether the Federal Rules in question are "sufficiently broad to control the issue before the Court." Walker, 446 U.S. at 749-50.

*Burlington* is instructive. There, the Supreme Court held that an Alabama statute that imposed a mandatory [**22] affirmance penalty on unsuccessful appeals conflicted with Rule 38 of the Federal Rules of Appellate Procedure, *see* 480 U.S. at 4, which provides that a court "may award just damages and single or double costs to the appellee" if it determines that an appeal is "frivolous." Fed. R. App. P. 38. The Court rejected the argument that there was no conflict with Rule 38 "because Alabama has a similar Appellate Rule which may be applied in state court alongside the affirmance penalty statute." Burlington, 480 U.S. at 7. Although it was possible to apply both the statute and Rule 38, the Alabama statute conflicted with the "case-by-case approach" adopted by the Federal Rules by "preclud[ing] any exercise of discretion within its scope of operation." *Id.* at 8. The motion-to-strike procedure's "mode of operation" likewise "unmistakably conflicts" with that of the Federal Rules by mandating a test of sufficiency that the Rules reject. *Id.* at 7.

CNN also argues that the function of the motion-to-strike procedure is to "define the scope" of "state-created right[s]," Shady Grove, 559 U.S. at 423 (Stevens, J., concurring), and not to answer the question whether a complaint is sufficient to withstand pretrial dismissal, but this argument is a nonstarter. The anti-SLAPP statute "creates no substantive rights; it merely provides a procedural mechanism for vindicating [**23] existing rights." Makaeff I, 715 F.3d at 273 (Kozinski ▼, C.J., concurring). The Georgia statute does not purport to alter a defendant's rights to petition and freedom of speech under the Federal and Georgia Constitutions. Nor could it. The only change effectuated by the Georgia statute is to make it easier for a defendant to avoid liability for conduct associated with the exercise of those rights by providing a special *procedural* device—a "motion to strike"—that applies a heightened burden to the claims that fall within its ambit. And by its plain terms,

the motion-to-strike provision of the statute applies to causes of action created by Georgia law and claims that derive from the law of other states or the federal government alike. *See* O.C.G.A [§ 9-11-11.1(b)(1)](#) (restricting availability of the motion to strike only to "claim[s] for relief . . . arising from any act of such person or entity which could reasonably be construed as an act in furtherance of the person's or entity's right of petition or free speech").

CNN relies on several decisions of our sister circuits holding that similar motion-to-strike provisions of state anti-SLAPP statutes apply in federal court. *See [Godin v. Schencks](#),* 629 F.3d 79 (1st Cir. 2010); *[United States ex rel. Newsham v. Lockheed Missiles & Space Co.,](#)* 190 F.3d 963 (9th Cir. 1999); *see also [Block v. Tanenhaus](#),* 815 F.3d 218, 221 (5th Cir. 2016) (assuming without deciding that an anti-SLAPP **[**24]** statute applies in federal court); *[Cuba v. Pylant](#),* 814 F.3d 701, 706& n.6 (5th Cir. 2016) (same); *[Liberty Synergistics Inc. v. Microflo Ltd.](#),* 718 F.3d 138 (2d Cir. 2013) (same). *But see [Abbas](#),* 783 F.3d at 1333-37 (holding that the District of Columbia's anti-SLAPP statute does not apply in federal court). Some of these decisions **[*1356]** assume that state anti-SLAPP statutes apply in federal court with virtually no analysis. Of the precedential decisions of our sister circuits to address this issue, only *Godin* and *Newsham* attempt to explain that there is no conflict between the Federal Rules and state anti-SLAPP statutes akin to Georgia's statute.

We are not persuaded by the reasoning of these decisions. In *Godin*, the First Circuit concluded that there was no conflict between the Federal Rules and Maine's anti-SLAPP statute because [Rule 12(b)(6)](#) "provide[s] a mechanism to test the sufficiency of the complaint," and [Rule 56](#) enables "parties to secure judgment before trial on the basis that there are no disputed material issues of fact," while that statute considers whether the plaintiff can "meet the special rules Maine has created to protect . . . petitioning activity against lawsuits." [629 F.3d at 89.](#) This reasoning mirrors CNN's argument that the question in dispute is whether the standards of the applicable Federal Rules are satisfied and not whether a complaint states **[**25]** a valid claim supported by sufficient evidence to avoid pretrial dismissal. We reject it for the same reasons. And in *Newsham*, the Ninth Circuit held that there was no conflict between California's anti-SLAPP statute and the Federal Rules based on the Supreme Court's decision in *Cohen* and the premise that the anti-SLAPP statute "is crafted to serve an interest not directly addressed by the Federal Rules: the protection of 'the constitutional rights of freedom of speech and petition for redress of grievances.'" [190 F.3d at 973](#) (quoting Cal. Civ. P. Code § 425.16(a)). As we have explained, the former argument relies on a misreading of *[Cohen](#)*, and the latter argument fails to appreciate that a special purpose distinct from that of the relevant Federal Rules is insufficient to eliminate a conflict between the Federal Rules and a state statute.

We find then-Judge Kavanaugh's reasoning in his opinion for the District of Columbia Circuit in *Abbas* far more convincing. As he explained, "[f]or the category of cases that it covers," an anti-SLAPP statute with a probability requirement "establishes the circumstances under which a court must dismiss a plaintiff's claim before trial—namely, when the court concludes that the **[**26]** plaintiff does not have a likelihood of success on the merits." *[Abbas](#),* 783 F.3d at 1333. "But [Federal Rules of Civil Procedure 12](#) and [56](#) 'answer the same question' about the circumstances under which a court must dismiss a case before trial." *[Id.](#)* at 1333-34. And those Rules "answer that question differently: They do not require a plaintiff to show a likelihood of success on the merits." *[Id.](#)* at 1334.

Because the dismissal provision of the Georgia anti-SLAPP statute conflicts with the Federal Rules, it "cannot apply in diversity suits" unless [Rules 8,](#) [12,](#) and [56](#) are "ultra vires" because they fall beyond the scope of the power delegated in the [Rules Enabling Act](#) or congressional powers over the operation of the federal courts. *[Shady Grove](#),* 559 U.S. at 399. **HN11 ⚓** The [Rules Enabling Act](#) empowers the Supreme Court to "prescribe general rules of practice and procedure and rules of evidence" for the federal courts, [28 U.S.C. § 2072(a)](#), but this power is subject to the limitation that such rules "shall not abridge, enlarge or modify any substantive right," *id.* [§ 2072(b).](#) As the Supreme Court has explained, a federal rule does not exceed the scope of the power delegated the Act if it "really regulates procedure," meaning that the rule governs "the judicial process for enforcing rights and duties recognized by substantive law and for justly administering **[**27]** remedy and redress for disregard or infraction **[*1357]** of them." *[Sibbach v. Wilson & Co.](#),* 312 U.S. 1, 14, 61 S. Ct. 422, 85 L. Ed. 479 (1941); *see also [Hanna](#),* 380 U.S. at 470-71; *[Burlington](#),* 480 U.S. at 8. A federal rule falls within Congress's power under "the constitutional provision for a federal court system (augmented by the [Necessary and Proper Clause](#))" if it is "rationally capable of classification" as procedural. *[Hanna](#),* 380 U.S. at 472. The Federal Rules have "presumptive validity under both the constitutional and statutory constraints." *[Burlington](#),* 480 U.S. at 6.

We have little difficulty concluding that **HN12 ⚓** [Rules 8,](#) [12,](#) and [56](#) comply with the [Rules Enabling Act](#) and the Constitution. Those Rules are valid under the [Rules Enabling Act](#) because they define the procedures for determining whether a claim is alleged in a sufficient manner in a complaint and whether there is a genuine dispute of material fact sufficient to warrant a trial. These Rules "affect[] only the process of enforcing litigants' rights and not the rights themselves," *[Burlington](#),* 480 U.S. at 8, and thus "really regulate procedure." *[Sibbach](#),* 312 U.S. at 14; *see also [Shady Grove](#),* 559 U.S. at 404 (majority opinion) (concluding that pleading standards and rules governing summary judgment are "addressed to procedure"). And if a rule "really regulates procedure," it must be "rationally capable of classification" as procedural, so the Rules also fall within the scope of the congressional power over the federal **[**28]** courts. Because [Rules 8,](#) [12,](#) and [56](#) are valid under the [Rules Enabling Act](#) and the Constitution and govern the same basic question as the Georgia anti-SLAPP statute, the motion-to-strike procedure created by that statute cannot apply in federal court.

*B. We Lack Jurisdiction to Review the Denial of the Motion to Dismiss for Failure to State a Claim.*

CNN also asks us to review the denial of its motion to dismiss under [Rule 12(b)(6),](#) but we lack jurisdiction to review this ruling in an interlocutory appeal. We have interlocutory jurisdiction to consider whether the special dismissal procedure created by Georgia's anti-SLAPP statute applies in federal court under the collateral-order doctrine. *[Harris](#),* 756 F.3d at 1355-57. **HN13 ⚓** We may exercise pendent jurisdiction over the denial of CNN's motion to dismiss only if that issue "is 'inextricably intertwined' with or 'necessary to ensure meaningful review' of the appealable issue." *[Black v. Wiginton](#),* 811 F.3d 1259, 1270 (11th Cir. 2016) (quoting *[Summit Med. Assocs., P.C. v. Pryor](#),* 180 F.3d 1326, 1335 (11th Cir. 1999)). The issue whether the district court's ruling on CNN's motion to dismiss was correct does not fall under either category.

Whether the anti-SLAPP statute's motion-to-strike applies in federal court is a pure question of law that we may resolve without touching on the legal or factual merits of Carbone's complaint. **[**29]** "Because we may resolve" this issue "without reaching the merits" of CNN's motion to dismiss, "the latter issue does not come under either of these categories and thus does not fall within our pendent appellate jurisdiction." *[Summit Med. Assocs.](#),* 180 F.3d at 1335 (quoting *[Moniz v. City of Fort Lauderdale](#),* 145 F.3d 1278, 1281 n.3 (11th Cir. 1998)); *see also [Hilton v. Hallmark Cards](#),* 599 F.3d 894, 900-02 (9th Cir. 2010) (holding that pendent jurisdiction is unavailable over a motion to dismiss under Federal [Rule 12(b)(6)](#) in an appeal from a denial of a motion to strike under an anti-SLAPP statute).

We reject the argument of CNN that the denials of its motion to strike and of its **[\*1358]** motion to dismiss are inextricably intertwined with one another because they "implicate[] the same facts and the same law." *Smith v. LePage*, 834 F.3d 1285, 1292 (11th Cir. 2016) (citation omitted). CNN appears to read *Smith* to endorse the proposition that pendent jurisdiction is available when orders deal with the same facts and law to any degree. But that decision used the phrase "implicate[] the same facts and the same law" only as shorthand to describe a ruling that is "inextricably intertwined" with or over which the exercise of jurisdiction is "necessary to ensure meaningful review" of "an appealable decision." *Id.* Because the order denying CNN's motion to dismiss does not fit within either category, *Smith* provides no basis for exercising pendent **[\*\*30]** jurisdiction.

In any event, resolving the issue whether an anti-SLAPP statute applies in federal court does not require us to engage with any of the factual allegations of Carbone's complaint, and the law governing each issue is plainly distinct. To resolve the appealable issue, we ask whether the Federal Rules "answer the same question" as the relevant provisions of the anti-SLAPP statute and whether the relevant Federal Rules are valid under the *Rules Enabling Act* and the Constitution. *Shady Grove*, 559 U.S. at 401. To review the denial of CNN's motion under *Rule 12(b)(6)*, by contrast, we would consider whether Carbone's complaint alleges facts sufficient to state a claim that is "plausible on its face." *Twombly*, 550 U.S. at 570. So it cannot be said that both issues concern the same facts or are governed by the same law.

CNN cites two decisions in which we held that we had pendent jurisdiction over a motion to dismiss, *S & Davis Int'l, Inc. v. Republic of Yemen*, 218 F.3d 1292 (11th Cir. 2000), and *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331 (11th Cir. 2007), but both are inapposite. Neither decision concerned a motion to dismiss for failure to state a claim under *Rule 12(b)(6)*, let alone endorsed the generic proposition that pendent jurisdiction is available over an order denying a motion to dismiss as a matter of course. In *S & Davis International*, we held that an order denying foreign sovereign **[\*\*31]** immunity "based on the 'commercial activity exception' to sovereign immunity which has a 'direct effects' component" was "inextricably intertwined with the 'minimum contacts' component of the personal jurisdiction issue" raised by the defendant's motion to dismiss under *Rule 12(b)(1)*. *218 F.3d at 1297-98*. Resolution of the issue over which we had interlocutory jurisdiction would have "entailed a finding of minimum contacts" and resolved whether the defendant's motion to dismiss for lack of personal jurisdiction should have been granted. *Id. at 1298* (citation omitted). Nothing comparable is true of the issues presented in this appeal. And in *McMahon*, we held that orders denying immunity from claims arising incident to military service under *Feres v. United States*, 340 U.S. 135, 71 S. Ct. 153, 95 L. Ed. 152 (1950), and denying a motion to dismiss on political-question grounds were "inextricably intertwined," which licensed pendent jurisdiction over the latter order. *502 F.3d at 1357*. Because of the nature of the defenses asserted and the facts of the appeal, review of both orders turned on whether there was a "need to avoid judicial interference with sensitive military judgments." *Id.* So in *McMahon*, as in *S & Davis International*, the pendent issue overlapped with the "order over which we [had] jurisdiction." *McMahon, 502 F.3d at 1357*.

There **[\*\*32]** is no sense in which our review of the denial of CNN's motion to strike overlaps with the issues we would need to consider to review the denial of CNN's motion to dismiss under *Rule 12(b)(6)*. **[\*1359]** "[W]e cannot consider" the ruling on the motion to dismiss "without exceeding the scope of our interlocutory jurisdiction." *Black, 811 F.3d at 1270* (emphasis omitted). So we express no view about the denial of the motion to dismiss.

## IV. CONCLUSION

We **AFFIRM** the denial of the motion to strike and **DISMISS** the appeal of the denial of the motion to dismiss.

---

**Footnotes**

 Honorable Stephen J. Murphy III ⌄, United States District Judge for the Eastern District of Michigan, sitting by designation.



About   Cookie Policy   RELX™

Privacy Policy   Terms & Conditions   Copyright © 2023 LexisNexis.

515

Document:                 Heffernan v. Bilzerian, 2022 Cal. App. Unpub. LEXIS 6451 | Actions ⌄

# ● Heffernan v. Bilzerian, 2022 Cal. App. Unpub. LEXIS 6451

**Copy Citation**

Court of Appeal of California, Second Appellate District, Division Five

October 25, 2022, Opinion Filed

B311531

**Reporter**

**2022 Cal. App. Unpub. LEXIS 6451 *** | 2022 WL 14295469

CURTIS HEFFERNAN, Plaintiff and Respondent, v. DAN BILZERIAN, et al., Defendants and Appellants.

**Notice:** NOT TO BE PUBLISHED IN OFFICIAL REPORTS. CALIFORNIA RULES OF COURT, RULE 8.1115(a), PROHIBITS COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY RULE 8.1115(b). THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF RULE 8.1115.

**Subsequent History:** Time for Granting or Denying Review Extended Heffernan v. Bilzerian, 2023 Cal. LEXIS 209 (Cal., Jan. 18, 2023)
Review denied by Heffernan v. Bilzerian, 2023 Cal. LEXIS 562 (Cal., Feb. 1, 2023)

**Prior History:  [*1]** APPEAL from an order of the Superior Court of Los Angeles County, No. 20STCV25549, Gregory Alarcon ⌄ , Judge.

**Disposition:** Affirmed.

## Core Terms

public interest, termination, anti-SLAPP, public forum, incompetence, no evidence, drugs, publicly traded, press release, defamation, implicate, promoted, media, large number of people, open to the public, protected activity, cause of action, declaration, reasons, fired

**Counsel:** Ryan Ellis Law and Ryan A. Ellis ⌄ for Defendant and Appellant Dan Bilzerian.

Flangas Law Group and Kimberly P. Stein for Defendant and Appellant Ignite International Ltd.

Workplace Justice Advocates, Tamara S. Freeze ⌄ and Brenda Armenta ⌄ ; Lim Law Group ⌄ and Preston H. Lim ⌄ for Plaintiff and Respondent Curtis Heffernan.

**Judges:** RUBIN ⌄ , P. J.; MOOR ⌄ , J., KIM ⌄ , J. concurred.

**Opinion by:** RUBIN ⌄ , P. J.

## Opinion

In the course of a dispute between a corporation and one of its former officers, the corporation's CEO told a media outlet that the former officer had been terminated for incompetence. The former officer sued the corporation, its parent corporation and its CEO for defamation. The corporation and CEO brought a motion to strike under Code of Civil Procedure section 425.16, the anti-SLAPP law. The trial court denied the motion on the basis that the CEO's statement about the former officer's termination did not concern an issue of public interest. We affirm.

*FACTUAL AND PROCEDURAL BACKGROUND*

**1.** *Underlying Facts and Allegations of the Complaint*

According to his declaration, the CEO (defendant Dan Bilzerian) is "an actor, Internet personality, and professional **[*2]** poker player, with a social media following of approximately 50 million people." He is also the CEO of defendant Ignite International, Ltd. (Ignite). **1** ⌄ According to

Bilzerian, "Ignite is a publicly traded company currently listed on the Canadian Securities Exchange . . . and in the United States on the OTCX . . . ." **2↧** It is a "consumer products" company. According to the operative complaint, Ignite sells cannabidiol, cannabis, and beverage products.

It is undisputed that plaintiff Curtis Heffernan was, for a time, employed as an officer of Ignite, and promoted to acting president. He was terminated from Ignite on June 8, 2020. The reasons for his termination, however, are disputed.

According to Heffernan, his employment was terminated when he refused to approve a number of questionable charges - including hundreds of thousands of dollars of Bilzerian's personal expenses - as corporate expenses. **3↧** According to Bilzerian, Heffernan was terminated because of negligence and incompetence. Bilzerian took the position that it was Heffernan who had authorized hundreds of thousands in wasteful expenses.

Heffernan alleged that, during "a company meeting," on June 7, 2020, the day before he was fired, **[\*3]** Bilzerian falsely accused him of "taking drugs" and "acting strange."

One month later, on July 7, 2020, Heffernan filed suit against Ignite and Bilzerian, alleging three causes of action. Two related to his termination (whistleblower retaliation and wrongful termination in violation of public policy). The third was for defamation based on Bilzerian's alleged statement that Heffernan was taking drugs.

After Heffernan filed the lawsuit, his attorneys issued press releases. **4↧** Bilzerian was contacted by media outlet TMZ regarding the complaint. Bilzerian told TMZ, in an interview, that Heffernan "was fired for incompetence and negligence and Ignite will be bringing suit against him. His claim is not only frivolous; it is ridiculous."

Heffernan responded by filing a first amended complaint, adding Bilzerian's statement to TMZ as a second basis for his defamation cause of action.


### 2. *Defendants' Anti-SLAPP Motion*

Bilzerian had been named solely in the defamation cause of action. On September 4, 2020, he filed an anti-SLAPP motion, seeking to strike that cause of action.

"An anti-SLAPP motion presents a means by which a defendant, sued for conduct in furtherance of the constitutional right of petition **[\*4]** or free speech, can place the burden on a plaintiff to establish that there is a probability of prevailing on the claim or face early dismissal of the action. ([Code Civ. Proc., § 425.16, subd. (b)(1).](#).) If the defendant first establishes a prima facie showing that a claim is based on so-called 'protected activity,' the burden switches to the plaintiff to establish the lawsuit has at least minimal merit. [Citation.]" (*[Ratcliff v. The Roman Catholic Archbishop of Los Angeles](#)* [(2022) 79 Cal.App.5th 982, 997, 294 Cal. Rptr. 3d 875](#).)

The anti-SLAPP statute itemizes four types of protected activity: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." ([Code Civ. Proc., § 425.16, subd. (e)](#).)

Bilzerian argued in his motion **[\*5]** that the defamation cause of action was based on statements that fell within the protection of [subdivision (e)(3)](#) of the statute - as statements made "in a place open to the public or a public forum in connection with an issue of public interest." He argued that his statements about Heffernan fell within this category because they constituted "criticism of a professional's on-the-job performance" which is a matter of public interest. He elaborated that "potential or current investors in Ignite, a public company, have an interest in being informed of an officer's on-the-job performance, making this a matter of public interest. Further, as Ignite offers consumers products, the issue of the President of the company's performance is also an issue of public concern."

Bilzerian argued that a number of courts have held that "internet postings regarding corporate activity" fell within this category of protected speech. (E.g. *[Ampex Corp. v. Cargle](#)* [(2005) 128 Cal.App.4th 1569, 1576, 27 Cal. Rptr. 3d 863](#) (*[Ampex](#)*).) He acknowledged that "in determining whether particular communications constitute protected activity under these prongs of the anti-SLAPP statute, courts consider three factors: (1) whether the criticized company is publicly traded; (2) the number of investors; and, (3) whether the **[\*6]** company has promoted itself by means of numerous press releases." However, Bilzerian offered no evidence or argument on the latter two factors, content to rely only on the fact that Ignite was a public company.

On September 15, 2020, Ignite filed a joinder in Bilzerian's motion. (See *[Barak v. The Quisenberry Law Firm](#)* [(2006) 135 Cal.App.4th 654, 661, 37 Cal. Rptr. 3d 688](#) [joinder in an anti-SLAPP motion is permissible].) Ignite represented that it was joining Bilzerian's motion because Ignite's potential liability for defamation was based on its alleged vicarious liability for Bilzerian's statements.

Heffernan filed an opposition to the anti-SLAPP motion, arguing that the allegedly defamatory statements did not implicate an issue of public interest as his job performance was not of concern to a substantial number of people. **5↧** Heffernan's opposition was supported by no evidence; he relied only on the allegations of his complaint.

After the motion was fully briefed, the court issued its tentative ruling denying it. The court accepted the unopposed argument that Bilzerian's statement to TMZ was in a public forum for purposes of the anti-SLAPP analysis. Turning to whether the statements were made in connection with an issue of public interest, the court concluded that Bilzerian **[\*7]** and Ignite failed in their burden to show a substantial number of people may have been affected by the subject matter of the statement - the reasons for Heffernan's termination from Ignite. The court particularly considered the three-part test for statements regarding the performance of corporations, and noted that, while defendants had established the first part (that Ignite was publicly traded), they had failed to introduce any evidence on the remaining two parts (the number of investors and whether Ignite had promoted itself by press releases).

The matter was heard on February 24, 2021, where Bilzerian argued against the tentative ruling. He claimed that Heffernan had made his termination a public issue by going public with this lawsuit, thereby injecting himself into the public conversation. He asserted that he had simply responded to Heffernan's public allegations.

The court adopted its tentative and denied the motion. Bilzerian and Ignite filed timely notices of appeal.

517

*DISCUSSION*

**1. *Standard of Review***

"A court evaluates an anti-SLAPP motion in two steps. 'Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected **[*8]** activity in which the defendant has engaged. [Citations.] If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least "minimal merit."' [Citation.] If the plaintiff fails to meet that burden, the court will strike the claim." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884, 249 Cal. Rptr. 3d 569, 444 P.3d 706 (*Wilson*).)

We are concerned here solely with the first prong. "The defendant's first-step burden is to identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute." (*Wilson, supra, 7 Cal.5th at p. 884.*) Whether the claims arise from protected activity is a matter we consider de novo, evaluating both the content and context of the alleged activity. (*Id. at pp. 884-885.*)

Here, defendants argued to the trial court that the allegedly defamatory statements were protected by subdivision (e)(3) of the anti-SLAPP law. For the first time on appeal, they argue that all four subparts of subdivision (e) apply. 6 The California Supreme Court has held that a defendant may not change its claims' theory of anti-SLAPP protection for the first time on appeal. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 321, fn. 10, 46 Cal. Rptr. 3d 606, 139 P.3d 2 [defendant had moved under subdivisions (e)(1) and (e)(4), could not pursue (e)(2) on appeal].) We therefore limit our analysis to subdivision (e)(3).

**2. *Subdivision (e)(3) Does Not Protect Bilzerian's Statements***

Subdivision (e)(3) categorizes as protected speech "any written or oral **[*9]** statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." Here, we are concerned with two statements: Bilzerian's alleged statement in a "company meeting" that Heffernan was using drugs and his subsequent statement to TMZ that Heffernan was terminated for incompetence and negligence.

In his declaration, Bilzerian admitted making the latter statement to TMZ. As to the former statement, Bilzerian neither admitted nor denied saying that Heffernan used drugs; he did, however, deny doing so at a "company meeting." He stated that there was no claims meeting on June 7, 2020 (the day before Heffernan's termination). Instead, he declared that he saw "other employees of Ignite, the Chief Operating Officer and the new incoming President meeting and walked by and said hello." Bilzerian claimed that he "did ask about [Heffernan] and how he was doing, as I stated he had been acting strange in the past couple of weeks." He added that the decision to terminate Heffernan was made by the board of directors "through a series of separate communications, not an official meeting . . . ." Bilzerian added, "Even if a meeting would have occurred **[*10]** as Plaintiff claims, I would have been justified in my opinion that his behavior might have been due to Plaintiff's being under the influence of a controlled substance."

A. *Only Bilzerian's Statement to TMZ Was Made in a Public Forum; the Statement Regarding Drugs was Not*

Initially, we must address whether the statements were made in a place open to the public or public forum. It is undisputed that Bilzerian's statement in an interview with media outlet TMZ was made in a public forum.

The same cannot be said of Bilzerian's alleged statement that Heffernan was using drugs, which Heffernan alleged was made in a "company meeting." In their opening briefs, Bilzerian and Ignite assert with no citation to authority, that "[a] company meeting of a public company is a public forum." Even if we were to credit that there was a "company meeting," there is no evidence as to the type of meeting - shareholder, employee, board, annual, official, unplanned, public or private - where Bilzerian allegedly stated Heffernan was using drugs. Bilzerian, critically, denied that there was a "company meeting" at all, declaring that when he spoke to others at Ignite about Heffernan, he simply added the comments **[*11]** when saying "hello" to other Ignite employees he saw meeting each other. He further specifically denied that the decision to terminate Heffernan was made at a meeting of any kind. Given that Bilzerian's declaration is the only *evidence* on the point as Heffernan submitted no evidence, we conclude for present purposes that the statement, if made, was made in the course of a private conversation, and was therefore not made in a place open to the public or public forum. Bilzerian and Ignite have not met their burden to establish that it is protected by subdivision (e)(3).

B. *The TMZ Statement Was Not Made In Connection With an Issue of Public Interest*

We now turn to whether Bilzerian and Ignite have established that the second statement, to TMZ, was made "in connection with an issue of public interest." 7 The statement was that Heffernan was terminated for incompetence and negligence. Defendants argue that the issue of public interest implicated by this statement is the "on-the-job performance of senior executives in a public company."

The California Supreme Court has agreed with the appellate "consensus view that '"a **[*12]** matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest,"' and that '"[a] person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people."' [Citation.]" (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 621, 243 Cal. Rptr. 3d 1, 433 P.3d 899 (*Rand Resources*).)

Shortly after *Rand Resources*, the California Supreme Court issued its opinion in *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 246 Cal. Rptr. 3d 591, 439 P.3d 1156. In *FilmOn*, the court concluded that the context of speech is relevant in determining whether it was made in furtherance of the right of speech in connection with a public issue. (*Id. at pp. 140.*) Further, the court held that the analysis requires two parts: first, identifying the issue of public interest implicated by the speech; and second, asking about the functional relationship between the speech and the public conversation about the matter of public interest. (*Id. at pp. 149-150.*) Context is relevant to both of these determinations. 8 (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1252, 297 Cal. Rptr. 3d 592, 515 P.3d 623.)

There are three "nonexclusive and sometimes overlapping" categories of statements in the public interest. "The first is when the statement or

conduct concerns a person or entity in the public eye; the second, when it involves 'conduct that could directly affect a large number of people beyond the direct participants'; and the third, **[\*13]** when it involves 'a topic of widespread, public interest.'" (*Rand Resources, supra,* 6 Cal.5th at p. 621.) In considering whether Bilzerian's statement to TMZ satisfies any of these definitions, we first consider it as a statement about Heffernan only, then as a statement about Ignite's operations and investability.

As a statement about Heffernan personally, Bilzerian's representation that he was fired for incompetence and negligence meets none of the three categories. First, it does not concern a person in the public eye. While Bilzerian submitted evidence that he, personally, had achieved a level of internet celebrity, there was no evidence that Heffernan had. Bilzerian argued that Heffernan had injected himself into the public debate by issuing press releases about this lawsuit itself. But Bilzerian's evidence on this point was minimal, consisting only of the statement in his declaration that Heffernan's "attorneys issued press releases and spoke to several press agencies. . . ." With no evidence that Heffernan himself had joined the conversation, we cannot conclude he was in the public eye. Second, the statement did not concern conduct that could directly affect a large number of people beyond the direct participants. The **[\*14]** reasons for Heffernan's termination could have little effect on anyone other than Heffernan. Third, the statement did not concern a topic of widespread public interest. The *Wilson* case is illustrative. There, news network CNN fired the plaintiff and told others, including prospective employers, that he was terminated for plagiarism. (*Wilson, supra,* 7 Cal.5th at p. 899.) When the plaintiff sued, CNN brought an anti-SLAPP motion, arguing that the plaintiff's "professional competence and the reasons for his termination" were issues of public interest. (*Id.* at p. 901.) The California Supreme Court disagreed, holding that while "some individuals may be so prominent, or in such a prominent position, that any discussion of them concerns a matter of public interest," that is the exception to the rule. Generally, "absent unusual circumstances, a garden-variety employment dispute concerning a nonpublic figure will implicate no public issue." (*Ibid.*) If the termination of a CNN employee for plagiarism is not a matter of public interest, the termination of plaintiff for incompetence surely is not.

The real battle in this case is whether the result is different if Bilzerian's statement regarding the reasons for Heffernan's dismissal can be construed **[\*15]** as a statement regarding Ignite. Preliminarily, we question whether defendants have established that Bilzerian's TMZ statement was, in fact, related to Ignite. Bilzerian did not provide the full context of the statement; the entire interview with TMZ is not part of the record. He stated only that TMZ contacted him "regarding the complaint" and he stated that Heffernan "was fired for incompetence and negligence and Ignite will be bringing suit against him. His claim is not only frivolous; it is ridiculous." There is nothing indicating that, in context, Bilzerian represented that Heffernan's purported incompetence related to Ignite's financial status, value as an investment, or products.

Assuming, without deciding, that defendants have established a prima facie case that Bilzerian's TMZ statement about Heffernan was really a statement about the performance of Ignite's management, they must next establish that Ignite's management is an issue of public interest. Defendants argue, correctly, that reports of corporate mismanagement involving publicly traded companies have been held to be statements of public interest. But while some cases have simply accepted, with little analysis, that such **[\*16]** statements implicate matters of public interest when the company is publicly traded (see *Muddy Waters, LLC v. Superior Court* (2021) 62 Cal.App.5th 905, 918, 277 Cal. Rptr. 3d 204; *GetFugu, Inc. v. Patton Boggs LLP* (2013) 220 Cal.App.4th 141, 151, 162 Cal. Rptr. 3d 831), other courts have taken a more nuanced approach. Those courts have asked not only if the corporation is publicly traded, but also the number of investors and whether the company has promoted itself in the press, in order to determine whether statements regarding corporate mismanagement truly implicate the public interest. (*Ampex, supra,* 128 Cal.App.4th at p. 1576; *Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 693-694, 142 Cal. Rptr. 3d 40; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1008, 113 Cal. Rptr. 2d 625; see also *Global Telemedia Int'l., Inc. v. Doe 1* (C.D. Cal. 2001) 132 F.Supp.2d 1261, 1265.)

We believe the latter cases are the better reasoned, in that they better reflect the three overlapping categories of statements in the "public interest." We are ultimately concerned with whether the corporate entity is in the public eye, statements concerning it could directly affect a large number of people, or its management is a topic of widespread public interest. The mere fact that a corporation is publicly traded does not by itself meet any of these categories. But if the company has a large number of shareholders, statements regarding its mismanagement could have a direct financial effect on a large number of people. If the company regularly promotes itself through press releases, it can be assumed to have generated widespread public interest about **[\*17]** its management.

Here, Bilzerian recognized this three-part test in his moving papers, but submitted no evidence regarding the number of shareholders or whether Ignite had promoted itself in the press. When Ignite joined his motion, it made no effort to fill this void in proof. The evidence that Ignite's management is an issue of public interest consists only of evidence that Ignite is publicly traded "on the Canadian Securities Exchange . . . and in the United States on the QTCQX"; and that Bilzerian, personally, has a large social media following. Without further evidence that Ignite has a large number of shareholders and/or that Ignite, rather than Bilzerian, is a topic of interest on social media, defendants have not made a prima facie case that the management of Ignite is an issue of public interest. **9⤓**

## DISPOSITION

The order denying the anti-SLAPP motion is affirmed. Bilzerian and Ignite shall pay Heffernan's costs on appeal. **10⤓**

RUBIN ▾, P. J.

WE CONCUR:

MOOR ▾, J.

KIM, J.

---

### Footnotes

**1⤴**    Ignite is a wholly owned subsidiary of Ignite International Brands, Ltd., which is also named as a defendant. In the operative complaint, plaintiff uses "Ignite" to refer to both the subsidiary and the parent corporation. Defendants largely do the same, both in the trial court and on appeal. However, only Bilzerian and the subsidiary pursued an anti-SLAPP motion. This was no oversight: the parent was, at the time, pursuing a motion to quash service. Similarly, only Bilzerian and the subsidiary filed notices of appeal from the denial of the anti-SLAPP motion; the parent did not. When we called this to the parties' attention, Bilzerian and the Ignite entities took the position that the parent corporation should be considered an appellant, even though it never filed an anti-SLAPP motion and never filed

a notice of appeal. We disagree; the parent corporation is not before us. We therefore partially strike litigation briefs filed by both Ignite entities, to the extent they were filed on behalf of the parent. We use "Ignite" to refer only to the subsidiary, the sole corporate appellant. We recognize, however, that the parties used "Ignite" to refer to both entities and there is some ambiguity in the record as to which entity was intended by any particular reference.

**2** The record does not reveal the meaning of QTCQX. It may be a typographical error for OTCQX, an over the counter exchange.

**3** Heffernan filed no declaration in opposition to the anti-SLAPP motion. Our discussion of his position refers to the allegations in his operative complaint.

**4** There is no indication in the record as to the content of these press releases. Bilzerian's declaration states only, "After Plaintiff filed his lawsuit and his attorneys issued press releases and spoke to several press agencies, . . ."

**5** Heffernan opposed only Bilzerian's anti-SLAPP motion; he filed no opposition to Ignite's joinder. On appeal, Ignite takes the position that since its joinder was unopposed, the trial court should have granted its "motion." But Ignite never filed an anti-SLAPP motion, it only joined Bilzerian's. Heffernan's nonopposition to Ignite's joinder simply means that Heffernan did not dispute Ignite's right to join Bilzerian's motion and tie its right to anti-SLAPP relief to Bilzerian's fate.

**6** At oral argument, counsel for Ignite, but not counsel for Bilzerian, took the position that defendants had based their motion on all four subparts of subdivision (e). We disagree. Bilzerian's motion had argued only that, "The Lawsuit Arises Out of Defendant's Statements Made in a Public Forum in Connection With an Issue of Public Interest, and Thus is Subject to California's Anti-SLAPP Statute." This is the language of subdivision (e)(3). He did not argue any other subparts applied. Ignite's joinder did not purport to expand the scope of the motion to other subparts of subdivision (e).

**7** Subdivision (e)(3) of the anti-SLAPP statute protects "any written or oral statement or writing made in a place open to the public or a public forum *in connection with an issue of public interest*" while subdivision (e)(4) protects "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech *in connection with* a public issue or *an issue of public interest*." (Emphasis added.) As the language we have emphasized is identical in both subdivisions, we rely on caselaw interpreting the language in subdivision (e)(4) as well as subdivision (e)(3).

**8** In their briefing, defendants rely on *Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1042, 72 Cal. Rptr. 3d 210, for its tautological statement that an issue of public interest is any issue "in which the public takes an interest." As later authority has noted, *Nygard* predates *FilmOn* by more than a decade, and its simplified statement of what it means to be an issue of public interest is no longer viable. (*Musero v. Creative Artists Agency, LLC* (2021) 72 Cal.App.5th 802, 822, fn. 8, 287 Cal. Rptr. 3d 625.)

**9** In his reply brief on appeal, Bilzerian states, "This lawsuit prompted hundreds of public posts on YouTube, numerous media reports including Forbes, and prompted at least one regulatory investigation." These purported facts are not supported by anything in the record, and we disregard them.

**10** Heffernan requests an award of attorney's fees on appeal. A prevailing defendant on an anti-SLAPP motion is entitled to his attorney's fees. A prevailing plaintiff is entitled to his attorney's fees only "[i]f the court finds that the [anti-SLAPP motion] is frivolous or is solely intended to cause unnecessary delay." (Code Civ. Proc., § 425.16, subd. (c)(1).) We believe the matter is best raised in the trial court in the first instance.

 LexisNexis®

About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

# Van Dyke v. Retzlaff, 781 Fed. Appx. 368

**Copy Citation**

United States Court of Appeals for the Fifth Circuit

October 22, 2019, Filed

No. 18-40710 Summary Calendar

**Reporter**

781 Fed. Appx. 368 * | 2019 U.S. App. LEXIS 31689 ** | 2019 WL 5405955

JASON LEE VAN DYKE, Plaintiff - Appellee v. THOMAS CHRISTOPHER RETZLAFF, also known as Dean Anderson, doing business as BV Files, ViaView Files, L.L.C., and ViaView Files, Defendant - Appellant

**Notice:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Subsequent History:** US Supreme Court certiorari denied by, Motion granted by Retzlaff v. Van Dyke, 2020 U.S. LEXIS 4989 (U.S., Oct. 13, 2020)

**Prior History:**  [**1] Appeal from the United States District Court for the Eastern District of Texas. USDC No. 4:18-CV-247.
Van Dyke v. Retzlaff, 2018 U.S. Dist. LEXIS 218669 (E.D. Tex., July 24, 2018)

**Disposition:** AFFIRMED.

## Core Terms

district court, federal court, anti-SLAPP, interlocutory appeal, briefing, collateral order doctrine, diversity jurisdiction, motion to dismiss, deny a motion, per curiam, parties, lapses, cases

**Counsel:** Jason Lee Van Dyke, Plaintiff - Appellee, Pro se, Crossroads, TX.

For Thomas Christopher Retzlaff, also known as: Dean Anderson, doing business as: BV Files, doing business as: ViaView Files, L.L.C., doing business as: ViaView Files, Defendant - Appellant: Jeffrey Lee Dorrell ▼, Hanszen Laporte, L.L.P. ▼, Houston, TX.

For Reporters Committee for Freedom of The Press, Amicus Curiae, Amicus Curiaes: Thomas S. Leatherbury ▼, Esq., Vinson & Elkins, L.L.P. ▼, Dallas, TX; Bruce D. Brown, Reporters Committee for Freedom of the Press, Washington, DC; Margaret Dunlay Terwey ▼, Francis Ming Yang ▼, Vinson & Elkins, L.L.P. ▼, San Francisco, CA.

**Judges:** Before WIENER ▼, HAYNES ▼, and COSTA ▼, Circuit Judges.

## Opinion

**[*368]** PER CURIAM: ✦⬇

Plaintiff Jason Lee Van Dyke sued Defendant Thomas Retzlaff, alleging various causes of action based upon allegedly false and harassing statements Retzlaff made about Van Dyke in state court; Retzlaff removed the case to federal court on diversity jurisdiction grounds. The district court opinion ably explains the facts of the case but, suffice it to say, Retzlaff moved to dismiss the claims based upon the  [**2]  Texas Citizens Participation Act (TCPA) ①⬇ which is an "anti-SLAPP" ②⬇ statute. The district court denied the motion to dismiss, concluding that the relevant portions of the TCPA did not apply in federal court. Retzlaff filed an interlocutory appeal to our court.

We first examine whether we have jurisdiction of this interlocutory appeal. The parties agree that the collateral order doctrine applies to this appeal. Based upon precedent, we agree that we have jurisdiction to address whether the Texas anti-SLAPP statute applies here. *Diamond Consortium, Inc. v. Hammervold, 733 F. App'x 151, 154 (5th Cir. 2018)* (per curiam); *NCDR, L.L.C. v. Mauze & Bagby, P.L.L.C., 745 F.3d 742,*

521

747-48 (5th Cir. 2014). That jurisdiction is limited; we cannot address the underlying merits of the case outside the anti-SLAPP question. *See Mauze & Bagby, 745 F.3d at 747* ("[T]he collateral order doctrine can confer *limited* appellate jurisdiction." (emphasis added)).

The next question, then, is whether the district court correctly denied the motion to dismiss based upon the TCPA. At the time that the district court ruled, the application of the Texas anti-SLAPP statute in a federal court exercising diversity jurisdiction was an open question in our circuit. However, by the time the appeal was ripe for decision, we had decided the issue. *See Klocke v. Watson, 936 F.3d 240, 242 (5th Cir. 2019)*. We determined that "the TCPA **[*369]** does not apply to diversity **[**3]** cases in federal court." *Id.*

After allowing the parties to submit supplemental briefing on this point, we conclude that *Klocke* is dispositive. In his supplemental brief, Retzlaff tries to distinguish the two cases by pointing out lapses in the defendant's briefing in *Klocke* that are different from Retzlaff's robust briefing. But the core of *Klocke* does not rest on such lapses, so we are bound by the rule of orderliness to follow its holding. *See Jacobs v. Nat'l Drug Intelligence Ctr., 548 F.3d 375, 378 (5th Cir. 2008)*. Retzlaff's other procedural arguments are beyond the scope of this interlocutory appeal. We express no opinion on the ultimate merits of the case; nor do we opine on the validity of a motion to dismiss or for summary judgment based on arguments other than the TCPA.

AFFIRMED; the case is REMANDED for further proceedings in the district court.

---

**Footnotes**

\* Pursuant to 5ᴛʜ Cɪʀ. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5ᴛʜ Cɪʀ. R. 47.5.4.

1 Tᴇx. Cɪv. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ Aɴɴ. § 27.001.

2 "SLAPP" is short for Strategic Litigation Against Public Participation.



About
Privacy Policy

Cookie Policy
Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

# CASES PERTAINING TO CHOICE OF LAW

Celotex Corp. v. Meehan, 523 So. 2d 141, 144 (Fla. 198

Search: Everything

**Client: -None-** ⌄   Folders   History   Help   More

⚠ **Celotex Corp. v. Meehan, 523 So. 2d 141**

Copy Citation

Supreme Court of Florida

March 17, 1988

Nos. 66,937, 66,938, 66,939

**Reporter**

523 So. 2d 141 * | 1988 Fla. LEXIS 378 ** | CCH Prod. Liab. Rep. P11,718 | 13 Fla. L. Weekly 204

Celotex Corp., Petitioner, v. Carmella Meehan, etc., Respondent; Celotex Corp., et al., Petitioners, v. Jean Nance, etc., Respondent; Celotex Corp., Petitioner, v. Louis Key Colon, et ux., Respondents

**Prior History:** [**1] Case No. 66,937 Application for Review of the Decision of the District Court of Appeal, Certified Great Public Importance, Third District, Case No. 82-122. Case No. 66,938 Application for Review of the Decision of the District Court of Appeal, Certified Great Public Importance, Third District, Case No. 81-382. Case No. 66,939 Application for Review of the Decision of the District Court of Appeal, Direct Conflict of Decisions, Third District, Case No. 84-507.

## Core Terms

cause of action, exposure, significant relationship, disease, statute of limitations, asbestos, discovery, borrowing statute, cases, asbestosis, district court, resident, cancer, exposed to asbestos, trial court, parties, district court of appeal, mesothelioma, manifested, diagnosis, asbestos-related, diagnosed, one-year, occupational disease, limitations period, summary judgment, cause injury, wrongful act, limitations, domicile

## Case Summary

**Procedural Posture**

The Third District Court of Appeals (Florida) certified for review three cases that raised questions as to the application of Florida's borrowing statute, Fla. Sta. ch. 95.10 (1979), to asbestos claims.

**Overview**

The court certified for review three cases that raised questions as to the application of Florida's borrowing statute, Fla. Sta. ch. 95.10 (1979), to asbestosis claims that arose from asbestos exposure in other states. The court noted that whether the borrowing statute would be applied depended on whether the claim had "significant relationships" with Florida. If there were no such significant relationships, the other state's limitations period would apply. The court further noted that under Florida law, a cause of action did not accrue for limitation purposes until the injured party discovered or had a duty to discover the act constituting an invasion of his legal rights; but that this was not the law in many other states. Applying these principles, the court found that in one case, the claim had a significant relationship to Florida, and so Florida's limitation period would apply; in another case, there was no such significant relationship, and the action was time-barred under the rules of the state in which the asbestos exposure had occurred. The court remanded the third case, finding that it could not determine whether the claim had a significant relationship with Florida.

**Outcome**

The court held that Florida's borrowing statute did not apply to extend the statute of limitations for a claim of asbestosis that arose from asbestos exposure in another state unless the claim had significant relationships with Florida. Applying these principles, it quashed all three of the lower court decisions for reasons particular to each case.

▼ **LexisNexis® Headnotes**

Governments > Legislation ⌄ > Statute of Limitations ⌄ > General Overview ⌄

**HN1** **Legislation, Statute of Limitations**

See Fla. Stat. ch. 95.10. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (0)*

Civil Procedure > ... > Federal & State Interrelationships ▾ > Choice of Law ▾ > Significant Relationships ▾
Governments > Legislation ▾ > Statute of Limitations ▾ > General Overview ▾
View more legal topics

**HN2**  Choice of Law, Significant Relationships

The application of Florida's borrowing statute, Fla. Stat. ch. 95.10 is dependent on whether there are significant relationships that establish that the cause of action arose in another state. The criteria for determining whether significant relationships exist include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. 🔍
More like this Headnote

*Shepardize® - Narrow by this Headnote (9)* ➕ 4

Environmental Law > Hazardous Wastes & Toxic Substances ▾ > Asbestos ▾ > Statute of Limitations ▾
Governments > Legislation ▾ > Statute of Limitations ▾ > General Overview ▾

**HN3**  Asbestos, Statute of Limitations

Under Florida's discovery standard, the cause of action does not accrue, for limitations purposes, until the injured party discovers or has a duty to discover the act constituting an invasion of his legal rights. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote (4)* ➕ 1

**Counsel:** Case No. 66,937 Thomas C. MacDonald, Jr. ▾, Charles P. Schropp ▾ and Raymond T. Elligett, Jr. ▾ of Shackleford, Farrior, Stallings and Evans, Tampa, Florida, James W. Kynes, Tampa, Florida, for Petitioner.

Jane N. Saginaw ▾ of Baron & Budd ▾, Dallas, Texas, Louis S. Robles ▾, Miami, Florida, for Respondent.

Case No. 66,938 Thomas C. MacDonald, Jr. ▾, Charles P. Schropp ▾ and Raymond T. Elligett, Jr. ▾ of Shackleford, Farrior, Stallings & Evans, Tampa, Florida, James W. Kynes, Tampa, Florida, James E. Tribble ▾ and Diane H. Tutt ▾ of Blackwell, Walker, Fascell & Hoehl ▾, Miami, Florida, Susan J. Cole ▾ of Blaire & Cole ▾, Coral Gables, Florida, Erik J. Blomqvist, Jr. of Wicker, Smith, Blomqvist, Tutan, O'Hara, McCoy, Graham & Lane ▾, Miami, Florida, Tracey [**2] I. Arpen, Jr. of Marks, Gray, Conroy & Gibbs ▾, Jacksonville, Florida, C. Bryant Boydstun, Jr. of Lyle & Skipper ▾, St. Petersburg, Florida, Tracy Howard of the Law Office of Harold C. Knecht ▾, Coral Gables, Florida, Brian S. Keif ▾ of the Law Office of Karl L. Santone, Miami, Florida, Steven R. Berger ▾, Miami, Florida, Carlos E. Casuso ▾ of Casuso & Trompeter, South Miami, Florida, Gilbert Haddad ▾ of Haddad, Josephs & Jack ▾, Coral Gables, Florida, John Liebman ▾, Orlando, Florida, Thomas J. Schulte ▾ of Lee, Schulte, Murphy & Coe, Miami, Florida, for Petitioners.

Freidin & Hirsch, P.A., Miami, Florida, Sharon L. Wolfe ▾ of Cooper, Wolfe & Bolotin, P.A. ▾, Miami, Florida, for Respondent.

Donald M. Middlebrooks ▾, Thomas R. Julin ▾ and Norman Davis of Steel, Hector and Davis ▾, Miami, Florida, Amicus Curiae, for National Gypsum Company.

Case No. 66,939 Thomas C. MacDonald, Jr. ▾, Charles P. Schropp ▾ Raymond T. Elligett, Jr. ▾ of Schackford, Farrior, Stallings & Evans, Tampa, Florida, James W. Kynes, Tampa, Florida, for Petitioner.

Jane N. Saginaw ▾ of Baron & Budd ▾, Dallas, Texas, Louis S. Robles ▾, Miami, Florida, Michael Y. Rowland ▾ of Rowland & Rowland ▾, Knoxville, Tennessee, for Respondents.

**Judges:** Overton ▾, J., McDonald ▾ [**3] C.J., and Ehrlich ▾ and Shaw ▾, JJ., concur. Barkett ▾, J., concurs in part and dissents in part with an opinion.

**Opinion by:** OVERTON ▾

# Opinion

  [*143]  This is a petition to review *Meehan v. Celotex Corp., 466 So. 2d 1100 (Fla. 3d DCA 1985)*, consolidated with petitions to review *Nance v. Johns-Manville Sales Corp., 466 So. 2d 1113 (Fla. 3d DCA 1985)*, and *Colon v. Celotex Corp., 465 So. 2d 1332 (Fla. 3d DCA 1985)*. These cases involve the application of section 95.10, Florida Statutes (1979), Florida's borrowing statute, to asbestos claims. In *Meehan* and *Nance*, the Third District Court of Appeal refused to apply Florida's borrowing statute. The court held that causes of action which arose in New York and Virginia, because of exposure to asbestos in those states, could be brought in Florida because the injury was discovered in Florida and, therefore, was governed by this state's statute of limitations. In *Colon*, the Third District applied the borrowing statute as construed in *Meehan*, and held that an action in which the plaintiff was exposed to asbestos in Florida was governed by Tennessee's one-year statute of limitations because [**4] the injury was discovered, by medical diagnosis, in Tennessee.

In *Meehan* and *Nance*, the Third District Court of Appeal certified the following question as one of great public importance:

> May an action which could not be maintained by reason of limitations in the state in which the allegedly wrongful conduct occurred because that state does not recognize postponement of accrual until discovery, nonetheless be maintained in Florida because Florida postpones accrual until discovery?

466 So. 2d at 1107. We have jurisdiction over all three cases. *See* art. V, § 3(b)(4) and (3). Fla. Const. We answer the question in the negative.

*HN1* The Florida borrowing statute, section 95.10, Florida Statutes (1979), reads as follows:

> When the cause of action arose in another state or territory of the United States, or in a foreign country, and its laws forbid the maintenance of the action because of lapse of time, no action shall be maintained in this state.

The purpose of the statute is to discourage "forum shopping" and the filing of lawsuits in Florida that have already been barred in the jurisdiction where the cause of action arose.

After the district court of appeal's [**5] decisions, and while this cause was pending, we considered the application of our borrowing statute in

---

Document:                    Celotex Corp. v. Meehan, 523 So. 2d 141                    Actions⌄

---

for the purpose of applying Florida's limitation of actions "borrowing" statute, Fla. Stat. Ann. § 95.10 (West 1982), is the determination . . . to be made solely with reference to the state in which the "last act necessary to establish liability" occurred, or with reference to the "significant relationships" that the respective states have to the cause of action?

*Id.* at 1113 (citations omitted). We stated that we were answering that question "as if it related to any action arising in tort." *Id.* In applying our borrowing statute in **[*144]** that decision, we approved for use in this type of case the newly revised version of the American Law Institute Restatement (Second) of Conflict of Laws § 142 (1971), which reads:

> An action will be maintained if it is not barred by the statute of limitations of the forum unless the action would be barred in some other state which, with respect to the issue of limitations, has a more significant [**6] relationship to the parties and the occurrence.

*Bates*, 509 So. 2d at 1114 (citing 54 U.S.L.W. 2597 (May 27, 1986)). We also approved the commentary which stated that statutes of limitations should be decided like any other choice-of-law issue and recognized the trend away from labeling statutes of limitations as "procedural." We concluded:

> Just as in the case of other issues of substantive law, the significant relationships test should be used to decide conflicts of law questions concerning the statute of limitations. Our ruling does not do violence to Florida's borrowing statute. We simply hold that the significant relationships test should be employed to decide in which state the cause of action "arose." The borrowing statute will only come into play if it is determined that the cause of action arose in another state.

509 So. 2d at 1114-15.

In view of our *Bates* *HN2* decision, the application of section 95.10 is now clearly dependent on whether there are significant relationships which establish that the cause of action arose in another state. The criteria for determining whether significant relationships exist are set forth [**7] in the Restatement (Second) of Conflict of Laws § 145(2) (1971), which provides, in part:

> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil [sic], residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.

*See Bishop v. Florida Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980).

We will address the application of section 95.10 to the *Meehan, Nance,* and *Colon* cases separately, because each has distinguishing aspects relating to the certified question, as well as differences in the application of the significant relationships test. The *Meehan* case produced the primary opinion and the principles adopted in that case were utilized in deciding both *Nance* and *Colon. Meehan* has been further complicated by legislation adopted in New York while *Meehan* was pending in this Court.

*Meehan*

During World War II, from 1942 to 1944, Charles [**8] Meehan worked as a pipefitter at the Brooklyn Navy Yard, where he was exposed to asbestos products. Meehan and his wife, Carmella, did not move to Florida until 1969. Eight years later, Meehan was diagnosed as having asbestosis and mesothelioma, diseases caused by the inhalation of asbestos fibers. As a result of these afflictions, Meehan died in 1978. Carmella Meehan, as personal representative of the estate of her late husband, filed this suit in 1979. The trial court entered final summary judgment for Celotex in 1981 on grounds that Meehan's claim was barred by the New York statute of limitations as borrowed under section 95.10, Florida Statutes (1979). A revised panel decision reversed the summary judgment. On rehearing en banc, the revised panel decision stood as the final decision of the court by virtue of an en banc four-four tie on the merits, with Chief Judge Schwartz and Judge Hubbart writing dissenting opinions.

The panel decision determined that under Florida law a borrowing statute is purely procedural and the determination of whether a cause of

action has arisen is made in accordance with the law of this state." _Meehan_, 466 So. 2d 1104 (citing _Colhoun v. Greyhound Lines, Inc._, 265 So. 2d 18 (Fla. **[\*145]** 1972); [\*\*9] _Farris & Co. v. William Schluderberg, T.J. Kurdle Co._, 141 Fla. 462, 193 So. 429 (1940); _Pledger v. Burpin & Sims, Inc._, 432 So. 2d 1323 (Fla. 4th DCA 1983), _review denied_, 446 So. 2d 99 (Fla. 1984)). In construing section 95.10, the district court reasoned that a cause of action in tort arises in the jurisdiction where the last act necessary to establish liability occurred, and since the accrual of a cause of action must coincide with the aggrieved party's discovery of the injury, a cause of action in tort arises only when the plaintiff knew or should have known of the existence of the cause of action. _Meehan_, 466 So. 2d at 1102. The district court concluded that the trial court erred in finding as a matter of law that Meehan's cause of action arose in New York, where he was exposed to asbestos, rather than in Florida, where he discovered the injury. Furthermore, the district court held that Meehan could bring the cause of action in Florida unless he "knew or should have known through the exercise of due diligence," that his cause of action existed more than four years prior to filing the [\*\*10] action in this state. _Id._ at 1103. In so holding, the district court overruled its decision in _Marano v. Celotex_, 433 So. 2d 592 (Fla. 3d DCA), _review denied_, 438 So. 2d 833 (Fla. 1983).

Chief Judge Schwartz dissented, stating: "The court's decision has resuscitated an action which has been barred for over thirty years in New York, where the defendants' allegedly wrongful acts took place." 466 So. 2d at 1105-06. He reasoned that "to vindicate the very basis of section 95.10 -- we must look to the law of the place where the wrongful act occurred and, under that law, the limitations period was simultaneously initiated." _Id._ at 1106. Judge Schwartz argued that this interpretation carried out the purpose of a borrowing statute "which is to give a cause of action no greater life in the forum jurisdiction than it would have in the state whose substantive law is to be applied." _Id._ n.2 (quoting J. Pearson's revised majority opinion, 466 So.2d 1106).

**HN3** Under Florida's discovery standard, the cause of action does not accrue, for limitations purposes, until the injured party discovers [\*\*11] or has a "duty to discover the act constituting an invasion of his legal rights." _Creviston v. General Motors Corp._, 225 So. 2d 331, 334 (Fla. 1969). Consequently, the medical diagnosis which revealed that the party was suffering from asbestos-related diseases would be the event that triggered Florida's statute of limitations unless it was shown that the party should have been aware of a cause of action before that time. In Florida, the statute does not begin to run until such a discovery occurs. As will be explained, that was not the law in the state of New York at the time this action was initiated, nor is it the law in the state of Virginia, each of which has a different method for determining when a statute of limitations begins to run.

Under New York law in effect at the time this claim was filed and the trial court and district court ruled on the matter, Meehan's cause of action arose and accrued in 1944, the final year of Meehan's employment in the Brooklyn shipyards. Further, the New York statute of limitations expired in 1947, and consequently Meehan's suit in New York had been barred for thirty-nine years. Unlike Florida, New York had expressly rejected [\*\*12] the discovery standard. _Steinhardt v. Johns-Manville Corp._, 54 N.Y.2d 1008, 430 N.E.2d 1297, 446 N.Y.S.2d 244, _amendment granted_, 55 N.Y.2d 802, 432 N.E.2d 139, 447 N.Y.S.2d 437 (1981), _appeal dismissed, cert. denied, sub nom. Rosenberg v. Johns-Manville Sales Corp._, 456 U.S. 967, 72 L. Ed. 2d 840, 102 S. Ct. 2226 (1982). Under New York law when the district court ruled, a cause of action arose and accrued regardless of Meehan's knowledge or discovery of the injury in the state of New York in 1944. _Schmidt v. Merchants Despatch Transportation Co._, 270 N.Y. 287, 200 N.E. 824 (1936).

Given the state of the law, we must reject the holding of the majority opinion of the district court of appeal. Its reasoning effectively allows a former New York resident to resurrect a cause of action in Florida barred in New York for over thirty-nine years (_Meehan_), but denies a Florida resident **[\*146]** the opportunity to bring his cause of action in Florida, where the wrongful act occurred, because the injury was discovered in Tennessee (_Colon_). In view of _Bates_, it is the significant [\*\*13] relationship with the states involved that is the critical factor in determining the application of section 95.10. Where the injury is discovered is only one factor to be considered, not the determining factor.

The legislative purpose of section 95.10 is not to allow a longer statute of limitations in Florida than is provided in the jurisdiction where the cause of action arose. To determine the applicability of the statute, we must apply the significant relationship criteria to Meehan. In our opinion, the criteria clearly show that New York has the significant relationship with Meehan. Meehan was a resident of New York at the time of his exposure; the employer was domiciled in New York; the entire asbestos exposure was at one place of employment in New York; and Meehan continued to reside in New York for twenty-five years after his exposure to asbestos. These circumstances establish that the place where the conduct causing the injury occurred, Meehan's domicile, and the domicile of Meehan's employer at the time of the conduct causing the injury were all in the state of New York. The only significant contact with Florida is that the injury manifested itself and was discovered in this [\*\*14] state. _See_ Restatement (Second) of Conflict of Laws § 145(2) (1971). We find these circumstances establish a significant relationship with New York and, consequently, under the law of New York at the time of the district court of appeal decision, section 95.10 barred the action in Florida.

That should dispose of this matter. However, while this appeal was pending in this Court, the New York Legislature enacted a statute allowing a one-year period for claimants previously barred to bring actions for the recovery of damages for latent effects of exposure to deleterious substances, including asbestos. The new New York law, effective July 30, 1986, provided, in part:

Every action for personal injury . . . caused by the latent effects of exposure to . . . asbestos . . . which is barred as of the effective date of this act or which was dismissed prior to the effective date of this act solely because the applicable period of limitations has or had expired is hereby revived and _an action thereon may be commenced provided such action is commenced within one year from the effective date of this act._

1986 N.Y. Laws, ch. 682, § 4 (emphasis added). Meehan has not advised this Court [\*\*15] whether an action was filed by him in New York during the one-year savings period, which has now expired.

In supplemental briefs which we permitted, Meehan now contends that this change of law in New York "revives" any cause of action which may have expired in New York, and therefore makes our borrowing statute inapplicable. He also contends that a recent New York decision, _Picirelli v. Johns-Manville Sales Corp._, 128 A.D.2d 762, 513 N.Y.S.2d 469 (1987), holding that a cause of action pending in a New York court would not need to be refiled in New York in order to satisfy the requirements of the statutory one-year window provision also applies in this circumstance. Clearly, this action was barred at the time the claim was filed and decided by the lower courts of this state; however, we find the action has now been revived by the newly enacted New York statute and New York case law. We agree with Meehan that we must follow the law in effect at the time of our decision and allow the revival of this cause of action in Florida based on the New York statutory window period. As the law now stands, this cause of action is no longer barred in [\*\*16] New York. It may proceed, but, since the significant relationships are with the state of New York, New York law must be applied, and, if the New York statute is declared unconstitutional or _Picirelli_ is overruled during the pendency of this case, New York law will control and bar the action. ✦⬇

**[\*147]** _Nance_

Nance was exposed to asbestos while working in the Norfolk shipyards in Virginia between 1940 and 1945. In May, 1976, while living in Florida, a doctor diagnosed Mr. Nance as having asbestosis and mesothelioma. As a result of that diagnosis, Nance filed a personal injury action in April, 1980. Following Nance's death later that year, the personal representative of his estate was substituted as a party plaintiff and filed an amended complaint for wrongful death. The trial court entered summary judgment for the defendants based on the Virginia statute [**17] of limitations as applied by virtue of section 95.10. The appeal was heard en banc with the rehearing in *Meehan v. Celotex Corp.*, 466 So. 2d 1100 (Fla. 3d DCA 1985). Relying on the revised *Meehan* panel opinion, the district court reversed the summary judgment and remanded the cause for reconsideration under its *Meehan* decision because the record did not establish whether the last act occurred in Florida or Virginia.

The Virginia statute of limitations provides a two-year limitation period for bringing a cause of action. Virginia does not follow a "discovery standard." Virginia's two-year limitation period begins to run from the "time plaintiff was hurt," which is different from the law of either New York or Florida. In Virginia, the time the plaintiff was hurt "is to be established from available competent evidence, produced by a plaintiff or a defendant, that pinpoints the precise date of injury with a reasonable degree of medical certainty." *See Locke v. Johns-Manville Corp.*, 221 Va. 951, 959, 275 S.E.2d 900, 905 (1981). In Virginia, the statute of limitations began to run when the cancer first occurred as established by [**18] medical testimony, rather than when the cancer was diagnosed. The limited record in *Nance* appears to establish that the significant relationships were with the State of Virginia, with the exception of the diagnosis of asbestosis. If the only relationship with Florida is the diagnosis, then section 95.10 bars Nance's cause of action in this state. Because of the limited record, we do not reach that conclusion and remand for a proper application of the significant-relationships test.

Nance also contends that, regardless of the status of the personal injury claim, the wrongful death action was an independent cause of action brought within two years of Mr. Nance's death. The district court correctly rejected this argument, and we agree that a wrongful death action is derivative of the injured person's right, while living, to recover for personal injury. *Variety Children's Hospital v. Perkins*, 445 So. 2d 1010 (Fla. 1983).

*Colon*

The majority opinion of the Third District Court of Appeal would permit Meehan and Nance, who were exposed to asbestos in other states, to bring their causes of action in Florida under Florida's statute of limitations. On the other hand, [**19] the Third District's decision would not allow Louis Colon, a Florida resident who was exposed to asbestos in Florida, to bring his cause of action in Florida, and would require him to comply with Tennessee's one-year statute of limitations.

Colon worked in Florida for twenty-three years as an installer and dismantler of asbestos products manufactured by Celotex. On June 25, 1979, Mr. Colon visited a doctor in Tennessee who diagnosed his bronchial problems as asbestosis. As a result, Colon filed this suit on June 26, 1980, in Florida. The trial court entered a summary judgment in favor of Celotex based on Tennessee's one-year statute of limitations. The Third District Court of Appeal held that "in light of *Meehan*, Florida is required to borrow the Tennessee limiting statute because the cause of action was discovered while plaintiff was in Tennessee." *Colon*, 465 So. 2d at 1333. The district court remanded, however, for further evidence concerning the date that would **[*148]** begin the Tennessee statute of limitations period.

As the district court noted, this case presents the "other side of the coin" to the issue presented in *Meehan* and *Nance*. Here, [**20] a Florida resident, who was exposed to asbestos in Florida, may be barred from recovery because of Tennessee's statute of limitations. We hold that Florida's borrowing statute does not apply. Mr. Colon was employed in Florida, was exposed to asbestos in Florida, and has been a Florida resident from the time of that exposure to the present day. Florida, under these circumstances, clearly has significant relationships to this action. The fact that Colon traveled to Tennessee, where a doctor diagnosed his disease, does not change the fact that his injury arose in Florida. The district court of appeal held that an injury's diagnosis and discovery in another state binds the injured party to the foreign state's statute of limitations. We find that is not the intent and purpose of section 95.10. If we accepted the district court's analysis of section 95.10, a potential plaintiff suffering from a latent disease would always be required to comply with the statute of limitations period in the state where he or she received medical diagnosis of the injury. In other words, the foreign state's limitation period would be applied without regard to the significant relationships test. We further find [**21] the phrase "when the cause of action arose in another state" in section 95.10 precludes the application of the statute in these circumstances because the significant relationships with Florida have been clearly established. *See Bates*. Colon's suit was filed in 1980 and comes well within Florida's four-year statute of limitations. Consequently, the suit must be allowed to proceed.

For the reasons expressed, we quash the district court's opinion in *Meehan* with directions to remand to the trial court for further proceedings in accordance with this opinion; we quash the district court's opinion in *Nance* except as to the wrongful death issue, which we approve, and remand with directions for further proceedings to apply the significant relationships test in accordance with the principles expressed in this opinion; and we quash the district court's opinion in *Colon* with directions to remand to the trial court for further proceedings in accordance with the views expressed in this opinion.

It is so ordered.

McDONALD ⏷, C.J., and EHRLICH ⏷ and SHAW ⏷, JJ., Concur.

BARKETT ⏷, J., Concurs in part and dissents in part with an opinion. [**22]


**Concur by:** BARKETT ⏷ (In Part)

**Dissent by:** BARKETT ⏷ (In Part)

## Dissent

BARKETT ⏷, J., concurring in part, dissenting in part.

The essential holding in *Bates*, which I agree should be applied here, is: *the state "where the cause of action arose" is deemed to be the state that has the most significant relationship to the parties and to the action.* Consequently, the only issue to be resolved is what state has the most significant relationship to the cause of action and the parties in each of the three cases. 1⬆

In my view, the following is the correct resolution of the case. The significant relationship test must be applied in its totality. In the *Meehan* case, there clearly are two states, Florida and New York, with significant contacts to the parties and the action. The relationship of each of these states to the action should be examined and analyzed *fully*. First, we must distinguish between the place of injury and the place of exposure. Second, we should at least note [**23] that other parts of the test are or are not applicable. Third, because we do not have enough information to determine all aspects of the test, I believe it should be remanded. To exemplify these points, I note that:

(1) The majority's application of the Restatement test focuses almost exclusively on the place of exposure, apparently finding insignificant the place where the injury **[*149]** occurred or manifested. This approach, particularly in the context of a limitations issue, ignores established Florida law. This Court has long recognized the distinction between exposure and legal "injury" in occupational disease cases; that critical distinction is, in fact, the theoretical underpinning of our own discovery rule. As this Court stated thirty years ago in *Seaboard Air Line Railroad Company v. Ford*:

> Generally, in actions for personal injuries resulting from the wrongful act or negligence of another, the cause of action accrues and the statute begins to run from the time when the injury was first inflicted, and not from the time when the full extent of the damages sustained has been ascertained. The rule of Urie and similar cases dealing with limitations of actions for occupational [**24] diseases was developed as an exception to the general rule because of the fact that such diseases may exist unrecognized for a long time and under a judicial determination that the legislature could not have "intended such consequences to attach to blameless ignorance." *Urie v. Thompson*, supra, 337 U.S. 163. The United States Supreme Court said in the Urie case that "'the afflicted employee can be held to be "injured" only when the accumulated effects of the deleterious substance manifest themselves, * * *'" In *City of Miami v. Brooks*, supra, 70 So.2d 306 (Fla. 1954), we adopted the theory of the Urie case and applied it in a nonoccupational disease case where there was no visible traumatic injury at the time of the negligent act nor other circumstance by which plaintiff could have "been put on notice of his right to a cause of action * * *" at that time. And *it must be held, under those decisions, that until an occupational disease has manifested itself, there has been no "injury" to start the running of the statute.*

92 So.2d 160, 164 (Fla. 1956) (emphasis added, citations omitted).

By focusing on the time and place of exposure, the majority [**25] completely ignores the unique features of occupational diseases, such as the asbestos-related diseases, which develop after long incubation periods. In most personal injury cases, the fact of injury is easily discernible. However, in cases, involving latent injury, where the effects of exposure to the disease-causing product do not become evident for twenty to twenty-five years after initial contact, the time and place of injury necessarily is obscure. In such cases, courts must decide whether an "injury" occurred at the time of exposure or at some later time related to the disease's inception or progress. Furthermore, with asbestos-related diseases in particular, courts have recognized that not everyone who inhales asbestos fibers develops an asbestos-related disease. The asbestos may lay dormant **[*150]** for years before *any* disease process begins, and the future time when it *may* develop is unpredictable. *See Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1214 (6th Cir. 1980), *clarified*, 657 F.2d 814 (6th Cir.), *cert. denied*, 454 U.S. 1109, 102 S. Ct. 686, 70 L. Ed. 2d 650 (1981); *Eagle-Picher Industries, Inc. v. Cox*, 481 So.2d 517, 522 (Fla. 3d DCA 1985), [**26] *review denied*, 492 So.2d 1331 (Fla. 1986); *Pierce v. Johns-Manville Sales Corp.*, 296 Md. 656, 660 n.4, 464 A.2d 1020, 1023 n.4 (1983); *Locke v. Johns-Manville Corp.*, 221 Va. 951, 958, 275 S.E.2d 900, 905 (1981).

 [**27] In determining when an injury from asbestos exposure should be deemed to occur, courts have employed three different rules: the discovery rule, the exposure rule, and the medical evidence rule. The discovery rule is the prevailing standard in all but a few jurisdictions. The exposure rule, i.e., that legal injury occurs upon exposure, is clearly a minority view, with New York one of the few states that continues to adhere to it. *See* Note, *Preserving Causes of Action in Latent Disease Cases: The Locke v. Johns-Manville Corp. Date-of-the-Injury Accrual Rule*, 68 Va. L. Rev. 615, 629 & n.97 (1982); Special Project, *An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation*, 36 Vand. L. Rev. 573, 641-49 (1983).

Under the medical evidence rule, the injury is deemed to occur upon the onset of the disease sometime between exposure and discovery. *Locke*. In fashioning that rule, the *Locke* court found that the injury, mesothelioma in that case, did not occur upon exposure: "Simply put, legally and medically there was no injury upon inhalation of defendants' asbestos fibers." 221 Va. at 958, 275 S.E.2d at 905. [**28] The court based its conclusion on uncontradicted medical testimony that many persons exposed to asbestos particles never develop mesothelioma and that the cancerous tumor does not begin upon exposure but some time later:

> There was no injury at the time of the wrongful act. A disease like this cancer must first exist before it is capable of causing injury. To hold otherwise would result in the inequity of barring the mesothelioma plaintiff's cause of action before he sustains injury.

*Id.* at 959, 275 S.E.2d at 906.

The same considerations have compelled numerous courts to hold that claims for asbestosis and cancer arising from the same exposure to asbestos are separate and distinct so that they need not be joined in a single action. *Jackson v. Johns-Manville Sales Corp.*, 727 F.2d 506, 520 (5th Cir. 1984) (a plaintiff stricken with asbestosis but not cancer cannot recover based on assertion that his condition later may cause cancer), *cert. denied*, 478 U.S. 1022, 106 S. Ct. 3339, 92 L. Ed. 2d 743 (1986); *Wilson v. Johns-Manville Sales Corp.*, 221 U.S. App. D.C. 337, 684 F.2d 111, 115-17 (D.C. Cir. 1982) (manifestation [**29] of any asbestos-related disease does not trigger running of statute of limitations on all later-manifested diseases engendered by the same asbestos exposure); *Pearson v. Johns-Manville Sales Corp.*, 525 F. Supp. 671 (D.D.C. 1981); *Eagle-Picher*, 481 So.2d at 522 (only 15% of those persons who contract asbestosis later develop mesothelioma); *Pierce*, 296 Md. at 660 n.4, 464 A.2d at 1023 n.4 (1983) (expert testimony that individual who has been diagnosed with asbestosis will not inevitably contract either mesothelioma or lung cancer); *Lavelle v. Owens-Corning Fiberglas Corp.*, 30 Ohio Misc. 2d 11, 507 N.E.2d 476 (1987) (a plaintiff can never prove causation of a disease which has not yet manifested itself).

All of these decisions are premised on the fact that cancer is a separate disease from asbestosis and that evidence cannot be adduced that asbestosis inevitably will lead to cancer. Indeed, as pointed out earlier, all exposure will not lead inevitably to asbestosis. *See* G. Peters & B. Peters, *Sourcebook on Asbestos Diseases, Medical, Legal & Engineering Aspects*, Vol. I, **[*151]** B18-20 (1980). At early [**30] stages, a plaintiff could at most speculate that he or she might be injured and obviously could not establish proof of the "reasonably certain" damages necessary to establish a compensable injury. *Wilson*, 684 F.2d at 119-20.

The foregoing analysis suggests that in cases involving asbestos-related diseases, the place of exposure may not be the state with the most significant relationship to the claim. Consequently, I believe that under the Restatement test, a court must evaluate all aspects of the "injury"--exposure, discoverability, and manifestation--to determine overall what state has the most significant relationship to the claim.

(2) The majority opinion does not take into account the factors for determining the most significant relationship listed in the Restatement (Second), § 146(6). As this Court noted in *Bishop v. Florida Specialty Paint Co.*, 389 So.2d 999 (Fla. 1980), under the Restatement test, the contacts listed in § 145(2) should be evaluated with an eye to the following factors, important choice-of-law considerations in *all* areas of the law:

> (a) the needs of the interstate and international systems,
>
> (b) the [**31] relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

*Id.* at 1001 n.1 (quoting Restatement (Second) of Conflict of Laws § 6 (1971)).

Several of these criteria are applicable here. For example, Florida clearly has an interest in protecting its residents from the hazards of occupational disease and allowing resident victims a right of action in such cases, based not upon the time of exposure but upon the victim's reasonable discovery of the disease. In light of New York's recent legislation, New York has the identical interest and policy. In fact, the recent legislation indicates that New York now favors the plaintiff's right to sue in such actions over the defendant's right not to be subjected to such suits even when the incubation period of the disease is great. Thus, there is no countervailing policy [**32] consideration to the forum's state's interest in allowing this action to proceed.

(3) In *Meehan*, the plaintiff had been a Florida resident for eight years before the disease manifested. All of the witnesses and testimony on damages will be in Florida. Thus, on the damages issues, the relationship between the parties clearly is centered in Florida.

(4) The third factor under the Restatement, "domicile, residence, nationality, place of incorporation and place of business of the parties," should be examined both at the time of the plaintiff's exposure *and* at the time of the litigation since both may be important in evaluating which state has the most significant relationship to the action and the parties. Although I have been unable to discern from the briefs exactly where Celotex's principal place of business was at the time of exposure while it is at the present time, Celotex clearly is a Florida resident at present. At the time of Meehan's exposure, Celotex apparently had no connection with the disease-causing asbestos at all. The asbestos was manufactured by Philip Carey, an Ohio corporation whose successor Celotex subsequently purchased. In terms of this factor, it is [**33] difficult to see what interest New York has in the action at all.

(5) Following from point four above, we do not know for purposes of the strict liability claim where the conduct causing the injury occurred, i.e., we do not know where the product was manufactured. It does appear, however, that the asbestos was being manufactured and marketed by an Ohio corporation, not a New York or Florida corporation.

In view of the fact that the district and trial courts applied the obsolete *lex loci* rule to construe our borrowing statute, and **[*152]** because I do not believe the facts were developed sufficiently for a thorough application of the significant relationship test in either *Meehan* or *Nance*, I would remand both of these cases to the trial court.

---

**Footnotes**

[*] We note that the law of Florida would only allow an expansion of a statute of limitations period when the change is made *before* the cause of action is barred by the prior statutory limitation period. *Corbett v. General Engineering & Machinery Co.*, 160 Fla. 879, 37 So. 2d 161 (1948).

---

[1] The certified question, as phrased, is no longer apropos since the "state in which the allegedly wrongful conduct occurred" may or may not be the state with the most significant relationship to the cause.

---

[2] The primary asbestos-related diseases are asbestosis, mesothelioma, and lung cancer. Although all result from exposure to asbestos, their etiology is very different. When asbestos particles enter the lungs, fibrous lung tissue surrounds the particles. When the encapsulation process diminishes pulmonary function and makes breathing difficult, the disease of asbestosis is said to be present. There is usually a latent period of 10 to 25 years between initial exposure and apparent effect. How many years of breathing asbestos it takes for asbestosis to occur varies from person to person. Some workers exposed for 40 years or more will not become diseased at all whereas others exposed for shorter periods of time at lower concentrations will contract asbestosis. If the asbestosis is not seriously advanced, an individual may continue to lead a relatively normal life. Although the disease is progressive once it begins and is incurable, it is not cancerous. Mesothelioma, on the other hand, is a rare form of cancer, invariably fatal, which occurs in the

mesothelial cells which line the chest wall and surround the organs of the chest cavity. The latency period may be from 20 to 40 years or more. The development of asbestos-related lung cancer is similar to that of mesothelioma. Although the correlation between asbestos and lung cancer is not established, it appears that inhalation of asbestos increases the risk of lung cancer in persons who smoke. The disease generally occurs 15 to 35 years after exposure and is incurable. *See Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1214 & n.1 (6th Cir. 1980), *clarified*, 657 F.2d 814 (6th Cir.), *cert. denied*, 454 U.S. 1109, 102 S. Ct. 686, 70 L. Ed. 2d 650 (1981); *Pierce v. Johns-Manville Sales Corp.*, 296 Md. 656, 464 A.2d 1020, 1022 n.1 (Md. 1983); Special Project, *An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation*, 36 Vand. L. Rev. 573, 579 (1983); G. Peters & B. Peters, Sourcebook on Asbestos Diseases, Medical, Legal & Engineering Aspects, Vol. I, B18-20 (1980).

 LexisNexis®

About

Privacy Policy

Cookie Policy

Terms & Conditions

RELX™

Copyright © 2023 LexisNexis.

# Transcript of *Corsi v. Newsmax*, 21-10480 (11th. Cir. 2022)

UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

CASE NO.:  21-10480


JEROME CORSI,

      Appellant,

v.

NEWSMAX MEDIA, INC., et al.,

      Appellees.

_____/



TRANSCRIPTION OF AUDIO RECORDING

OF ORAL ARGUMENT


(Pages 1 to 41)


DATE:       Thursday, May 19, 2022

LOCATION:  12th Floor Courtroom
           James Lawrence King Federal Justice
           99 Northeast Fourth Street
           Miami, Florida  33132




Reported By:  Gail Hmielewski
              Court Stenographer

```
 1   APPEARANCES:

 2

 3   Appeared for the Appellant:

 4   MELISSA L. ISAAK, ESQUIRE
     ISAAK LAW FIRM
 5   P.O. Box 4894
     Montgomery, Alabama   36103
 6   334-262-8200  Phone
     334-819-4072  Fax
 7   isaaklaw@gmail.com

 8

 9   Appeared for Appellees:

10   MARK A. LERNER, ESQUIRE
     DUANE MORRIS, LLP
11   230 Park Avenue, Suite 1130
     New York, New York  10169
12   212-404-8714  Phone
     212-818-9606  Fax
13   malerner@duanemorris.com

14       - and -

15   JULIAN ANTONY JACKSON-FANNIN, ESQUIRE
     DUANE MORRIS, LLP
16   201 South Biscayne Boulevard, Suite 3400
     Miami, Florida  33131
17   305-960-2253  Phone
     305-402-0544  Fax
18   jjfannin@duanemorris.com

19

20

21

22

23

24

25
```

1                     INDEX OF PROCEEDINGS

2

3                                                    PAGE

4

   PROCEEDINGS                                         4
5
   CERTIFICATE OF REPORTER                            41
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              MR. LERNER:  Okay.

 2              THE COURT:  -- and if you want to address

 3       whether the complaint plausibly alleges actual

 4       malice, you certainly can.  I don't think it does.

 5              The thing I'm most interested, at least - I

 6       can only speak for myself - is the attorney's fees

 7       issue, and I have serious doubts about whether the

 8       anti-SLAPP statute applies in federal court.  And

 9       it seems to me that if it doesn't, then a suit

10       filed in violation of it can't give rise to an

11       attorney's fee award.

12              MR. LERNER:  I'm certainly happy to address

13       the actual malice issue, although we agree,

14       obviously, with Your Honor and with some of the

15       skepticism addressed by the panel.  So if there

16       aren't questions on the actual malice, I am happy

17       to move on to the questions that seem to be of more

18       interest in terms of the application of anti-SLAPP

19       in this case.

20              THE COURT:  Let me ask you, before you get

21       into the legal merits of the anti-SLAPP, do you

22       really want attorney's fees in this case?  Do you

23       want this case to continue with additional

24       litigation?  I mean, is that, I mean --

25              MR. LERNER:  Well, certainly, as I said
```