IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| PATRICK NATHANIEL REED,<br><br>        Plaintiff,<br>v.<br><br>SHANE RYAN, *et al*<br><br><br>        Defendants. | **Case No: 3:22-cv-01181-TJC-PDB** |
| PATRICK NATHANIEL REED,<br><br>        Plaintiff<br>    v.<br><br>BRANDEL EUGENE CHAMBLEE, et al<br><br>        Defendants. | **Case Number: 3-22-CV-01059-TJC-PDB** |

**<u>PLAINTIFF PATRICK NATHANIEL REED'S POST HEARING BRIEF</u>**

Dated: September 1, 2023

Respectfully submitted,

By: <u>*/s/ Larry Klayman*</u>
Larry Klayman, Esq.
Florida Bar No.: 246220
Klayman Law Group P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Tel: 561-558-5536
leklayman@gmail.com

*Counsel for Patrick Nathaniel Reed*

1

On July 31, 2023, this honorable Court held an omnibus hearing on the Defendants' motions to dismiss. Attending the hearing were Plaintiff Patrick Reed ("Mr. Reed") and his wife and Chief Executive Officer of Team Reed Enterprises, Justine Reed, the undersigned counsel for the Reeds, Larry Klayman, Esq., and counsel for the Defendants. As Mr. Klayman stressed in closing, even golf media are not above the law and must be held accountable when they set out to destroy public figures, such as Mr. Reed. In this regard, Mr. Reed has been made a targeted lightning rod to defame, with countless publications of knowingly false statements and intentional and reckless omissions of material fact to mislead the public. The Defendants are ridden with "*The Badges of Actual Malice*." As a result, Mr. Reed's reputation and his livelihood has suffered insurmountable amounts of damages in his young career, and he is only 33 years old. As just a few examples, he has already lost multi-million dollar sponsorships and cannot employ some of the golf's top coaches. This defamation has also caused severe mental and emotional harm that extends well beyond Mr. Reed, to his wife, Justine, their children, and his family. In effect, Mr. Reed has falsely been portrayed as an evil person and the devil, and he is unable to play rounds of golf without constant hecklers who hurl loud hateful insults to harm his game to make him lose. To make matters worse, he and the family have even been physically threatened, as occurred at a LIV event in Doral, Florida, when there was a bomb threat and play had to be halted. This honorable Court has the ability to give Mr. Reed his good name back, and according to Florida law Mr. Reed is respectfully entitled to a jury trial. In short, the First Amendment does not shield the Defendants from their malicious defamatory agenda to destroy Mr. Reed, his family and associates for clicks, to hit viewership targets, for personal notoriety and corporate gain.

At the conclusion of the hearing, Mr. Klayman asked for leave to file a post hearing brief to aid the Court, as several of the cases cited by the Defendants' counsel were mischaracterized and simply not applicable to the facts and law of the above styled related cases. The Court then ordered that the parties could file a five-page brief following the hearing and later set a September 1, 2023 deadline.

For ease of reference, a copy of the hearing transcript (hereafter "Tr.") is attached as <u>Exhibit 1</u> and a review of it will again put in relief the important issues of fact and law before the Court. Specifically, Mr. Klayman emphasized, upon relevant questioning from the Court, that when alleged defamation involves false statements, mixed questions of opinion and fact, statements which can be interpreted in different ways, or whether publication is "of and concerning" the person defamed, the determination of whether this constitutes defamation, defamation per se or defamation by implication must be given to the jury to decide. And, in determining whether defamation is present, the totality of the publication must be considered as well by the trier of fact. Plaintiffs' case citations are contained in the prior pleadings and set forth in part in the hearing transcript. Tr. 22, 24 -26.[1]

Importantly, another crucial issue discussed at oral argument involves actual malice, and Mr. Klayman also stressed that here not only direct evidence is relevant, but so too is circumstantial. In this regard, as the Court noted a seminal law review article by Manual Socias titled *Showing Constitutional Malice in Media Defamation*, which also for ease of reference is also attached to this brief as <u>Exhibit 2</u> , is a guidepost for this Court considering crucial circumstantial evidence of malice, otherwise known as "badges of malice." Tr. 12-16, 94, 100. During the oral argument, Mr. Klayman, by way of example, made reference to just a few of the many badges of malice which in particular apply to two of the primary Defendants and alleged offenders Brandel Chamblee and Shane Ryan. Because of time limitations some other major defamers such as Defendants Doug Ferguson and AP were not discussed, but their defamation and badges of malice are outlined in Mr. Reed's pleadings in opposition to the motions to dismiss. Id.

Mr. Reed is also submitting on a USB flash drive by Federal Express, with copies to all counsel, which contains two videos shown at the hearing plus two others that are set forth as defamatory in the Amended Complaint, exhibiting the malicious defamation by Brandel Chamblee, Damon Hack and Shane Bacon. These are just a few examples of the defamation which severely harmed Mr. Reed and his family, but also exhibit this actual malice. In addition to Mr. Reed being branded as a taker of blood money, a terrorist

---

[1] See also <u>Harwood v. Bush</u>, 223 So. 2d 359 (Fla. 4th DCA 1969); <u>Perry v. Cosgrove,</u> 464 So. 2d at 666; <u>Abrams v. General Ins. Agency, Co Inc</u>., 460 So. 2d 572 (Fla. 3d DCA 1984); David A. Karp (Carlton Fields), "Survey of Florida Libel Law," August 23, 2022.

sympathizer, someone who would harass 9/11 families and **who actually and not metaphorically**, **as in the inapplicable and mischaracterized cases cited by Defendants, does business with equivalent of Hitler, Mao and Putin** -- meaning the Saudi Public Investment Fund -- all rolled into one, Mr. Reed was factually defamed over and over as **a habitual cheater**, the worst thing that any professional golfer or sports figure can be called. To be called a cheater is not opinion or even mixed opinion, but fact, and regarding Mr. Reed it is categorically false. **In his entire stellar career as one of the top professional golfers in the world, there is no evidence that supports that he has ever been found to have cheated, period. Tr. 27.**

That being said, below is a list of cases mischaracterized at oral argument by Defendants' counsel, which simply are not germane and on point:

Horsley v. Rivera, 292 F.3d 695 (11th Cir. 2002) is cited at Tr. 36 for the proposition that "rhetorical hyperbole" is not actionable as defamation because it is constitutionally protected. *Horsley* is distinguishable because (1) in that case, the Court expressly recognized that everyone, including the Plaintiff, realized and admitted that the statements calling Plaintiff an "accomplice to murder" were meant in a figurative rather than a literal sense, *id*. at 702, and (2) "[t]he fact that the parties were engaged in an emotional debate on a highly sensitive topic [abortion] weighs in favor of the conclusion that a reasonable viewer would infer that Rivera's statement was more an expression of outrage than an accusation of fact." *Id*. To the contrary here, there were no "highly sensitive topics" such as abortion at issue, and no one would have thought that the Defendants were speaking "figuratively" given the Defendants' unabated pattern and practice of spreading the false, malicious, and defamatory lie that Mr. Reed was directly involved with the Saudi regime and not just a professional golfer trying to apply his trade.

Fortson v. Colangelo, 434 F. Supp. 2d 1369 (S.D. Fla. 2006) is cited at Tr. 36 for the proposition that sports commentary is particularly likely to contain opinion because "they have traditionally been a haven for cajoling, invective, and hyperbole." *Fortson* is clearly distinguishable because the alleged defamatory statements by Peter Vecsey were published on a column titled "Hoop du Jour" which was "dedicated to [his] thoughts, opinions, and reactions regarding the league" and "is meant to enlighten and entertain readers." *Id*. at 1374. Crucially, the Court noted that Vescey's column was known to be "**deliberately hyperbolic to convey his strongly held opinions**." *Id*. at 1375. (emphasis added). This is clearly not the case here, as none of the Defendants are widely known for their use of deliberate hyperbole like Vescey in the *Fortson* case. Furthermore, what the Defendants have done here is not "sports commentary." Sports commentary is "who is better, Kobe or LeBron?" Sports commentary is not baselessly calling someone a murderer, a cohort of Hilter or a cheater.. Just because the Mr. Reed is a professional athlete does not mean that everything said about him, however heinous and false, is "sports commentary." (Emphasis added)

Milkovich v. Lorain Journal Co., 497 U.S. 1, 110 S. Ct. 2695 (1990) is cited at Tr. 68 for the proposition that the Supreme Court has recognized that figurative language and expression and hyperbole are not defamatory. The ultimate holding of *Milkovich* was, however, that there **was not** an "additional separate constitutional privilege for "opinion" is required to ensure the freedom of expression guaranteed by the First Amendment." *Id*. at 2707. And the *Milkovich* court actually ruled in favor of the original Plaintiff, finding the statements at issue to be actionable defamatory non-opinion, so this was dicta inapplicable to the facts of the Reed cases.

3

<u>Bongino v. Daily Beast Co., LLC</u>, 477 F. Supp. 3d 1310 (S.D. Fla. 2020) is cited at Tr. 90 for the proposition that Florida's Anti-SLAPP statute can apply in federal court. This is refuted by counsel for Defendants' own admission that "there has not been a published opinion by the Eleventh Circuit on that subject." Tr. at 90. *Bongino* is a rogue decision from the U.S. District Court for the Southern District of Florida, which holds no precedential effect over this Court. Ironically, the *Bongino* Court correctly notes that "a federal court will not apply a state statute that "answers the same question" as a Federal Rule of Civil Procedure." *Id*. at 1322. However, the *Bongino* Court then erroneously finds that Florida's Anti-SLAPP statute is only a "garden variety fee shifting provision…..that does not 'answer the same question' as the Federal Rules." *Id*. at 1323. This was erroneous.

Much more relevant to this Court is *Sterling v. Doe*, 2022 U.S. Dist. LEXIS 105673 (M.D. Fla. Feb. 2, 2022), where this Court found that the Magistrate Judge did not need to follow *Bongino* because "as the *Bongino* court itself explains, the fee-shifting provision of anti-SLAPP laws is obviously different than the pretrial dismissal anti-SLAPP provisions which conflict with and 'answer the same question' as the Federal Rules." *Id*. at 12-13. Furthermore, as pointed out by the *Sterling* Court, found that in prior cases where federal courts had applied Florida's Anti-SLAPP statute, the plaintiff had "had forfeited their right to challenge the anti-SLAPP law's applications under an Erie theory at the district court level." *Id*. at 12. This is clearly not the case here, as Mr. Klayman is challenging such applicability right now. Of even more relevance to the Court is the transcript of the oral argument in *Corsi v. Newsmax Media Inc et al*, 21-10480 (11th Cir.), <u>Exhibit 1</u>, where the panel including the Chief Judge of the U.S. Court of Appeals for the Eleventh Circuit, the Honorable William H. Pryor Jr. ("Judge Pryor") expressed "serious doubt" as to whether Florida's Anti-SLAPP statute could apply in federal court due its requiring a "heightened pleading standard," and also observed that Fed. R. Civ. P. 11 definitively answered the "same question" as Florida's Anti-SLAPP statute, rendering it inapplicable in federal court:

> "There's a conflict in what the - the Florida courts even say this - in how the statute works, right?...On the one hand, at least one DCA has said it does create a heightened pleading standard, right?... The other says it doesn't…..: If it does, it seems to me, then it conflicts with the federal rules and it doesn't apply…..And if it doesn't create a heightened pleading standard, then it seems to me it's procedural and it also doesn't apply…..<u>But either way, it seems to me the statute just doesn't apply in federal court</u>. Tr. at 14 (emphasis added)."

> "The thing I'm most interested, at least – I can only speak for myself - is the attorney's fees issue, and I have serious doubts about whether the anti-SLAPP statute applies in federal court. And it seems to me that if it doesn't, then a suit filed in violation of it can't give rise to an attorney's fee award. Tr. at 18."

> "Even so, I mean, obviously, it's just, talking off the top of my head, it seems to me like a court that finds that there is a meritless suit that's been filed and it's been filed solely because the person is trying to get back at someone and inflict costs on someone for exercising their First Amendment rights in a way that they didn't like, that that would be an improper purpose. I mean, I can't imagine - it's hard for me to imagine that a court would find that that was a proper purpose [and thus sanctionable under Rule 11]." Tr. at 29 – 30."

<u>Fawcett Publ'ns, Inc. v. Morris</u>, 377 P.2d 42 (1962) is cited at Tr. 41 by the Defendants as being "contrary" to Florida law. This is not true. *Fawcett* was a landmark case at the time by the Oklahoma Supreme Court, but the fact is that it has stood the test of time. In 2984, the Oklahoma Supreme Court revisited the issue in *McCullough v. Cities Serv. Co.*, , 676 P.2d 833 (1984) and this time expressly considered the "group libel" doctrine set forth in Restat 2d of Torts, § 564A and found that it did not preclude "group libel" of a class of more than 25 people. The Oklahoma Supreme Court's views align with the observation of the Court at the July 31, 2023 hearing, where it correctly noted that a hard numerical cap was "awful arbitrary." Tr. at 42. The *McCullough* Court found: "The failure in every reported case which has come to our attention to

4

announce the precise numerical dividing line between groups which are 'too large' and groups which are 'small' enough to permit a plaintiff to recover, demonstrates the weakness of slavish reliance upon the general rule which relies upon numbers alone." *Id.* at 836. "Size alone is too narrow a focus to determine the issue of individual application in group defamation." *Id.* at 837. And lastly, in any event, Defendant Chamblee himself makes this admission during his broadcast on Sky Sports, Am. Comp. ¶ 70, where he states that when he looks over the list of the 48 players who participated in the LIV Gold Invitational Series, "there are (only) fourteen names that you might…recognize." This severely reduces the size of the "group" pursuant to the group libel doctrine.

*Davis v. Costa-Gavras*, 654 F. Supp. 653, 656 (S.D.N.Y. 1987) is cited at Tr. 53 for the proposition that a subsequent publisher's knowledge that a plaintiff failed to take legal action earlier negates an inference of actual malice. *Davis* is inapplicable to this case because it involved defamation against filmmakers adapting a prior published book. *Id.* at 655. Here, there is no adaption by a third party, only a continuing, regurgitated defamation from the same original source, Defendant Ryan. Furthermore, in *Davis*, the filmmakers independently did an incredible amount of independent research. "The filmmakers met with Hauser (the author of the book), went over his investigation and sources, supplied him with drafts of the script under preparation and were satisfied that there was no reason to doubt his work." *Id.* at 656. They also extensively interviewed third parties to which made clear that the contents of the book were accurate. *Id.* Only under these facts did the *Davis* Court find that "Certainly the filmmakers obtained no knowledge contradicting the veracity or accuracy of Hauser's book and the stories of the Hormans as told to them and reflected in the book. There is no suggestion to the contrary from any provable sources." This is clearly not the case here, as there is no evidence that Ryan did any research, and indeed, there is publicly available evidence refuting his claims of "cheating" in the form of public affidavits and statements from Mr. Reed's college coaches. Am. Comp. ¶ 73. **Lastly, *Davis* was decided on summary judgment. *Id*. at 655.**

*Loeb v. New Times Commc'ns Corp.*, 497 F. Supp. 85 (S.D.N.Y. 1980) and *Secord v. Cockburn*, 747 F. Supp. 779 (1990) are cited at Tr. 55 for the proposition that there is no duty to go to the subject of a story before publication. These cases are distinguishable because here there is publicly available evidence refuting Defendants' false claims of "cheating" in the form of public affidavits and statements from Mr. Reed's college coaches. Am. Comp. ¶ 73. Thus, the Defendants were aware that their published statements were false. In stark contrast, for instance, the Court in *Loeb* found that "there is no evidence that these sources, even if biased, would necessarily provide false information." *Id.* at 93. Furthermore, in *Loeb*, the Plaintiff was personally interviewed by the Defendants, *id*, and Defendants' depositions indicate that in preparation of the article, they conducted numerous interviews of a variety of sources. They also reviewed many articles and other documentary material. *Id.* at 94. **None of this occurred here, and it is also crucial to note that both *Loeb* and *Secord* were decided on summary judgment, after discovery which has not occurred in these Reed cases.**

*Jones v. Buzzfeed, Inc.*, 591 F. Supp. 3d 1127 (N.D. Ala. 2022 Tr.) and *Abbas v. Foreign Policy Grp., LLC*, 414 U.S. App. D.C. 465 (2015) are cited at Tr. 58 for the proposition that republishing a defamatory statement from another is not actionable. These cases were proffered by counsel for Defendants in response to the Court's inquiry "…if you assume that arguendo and that can be defamatory, is it completely inoculated if you say, 'I'm not saying you cheated. I'm just saying other people said you cheated'? Is it -- does that just make it fine?" Neither of these cases are applicable. Both *Jones* and *Buzzfeed* only involved publishing the mere fact that certain allegations were made against the Plaintiffs without lending credence to those allegations. This is clearly not the case here, as the Defendants have made affirmative, defamatory statements beyond merely reporting that certain allegations had been levied against Mr. Reed. In short, one cannot bootstrap others prior defamatory statements and get off scot free.

**No amount of mischaracterized case law can insulate Defendants from being held to legally account for their very damaging malicious defamation.**

| | |
|---|---|
| Dated: September 1, 2023 | Respectfully submitted,<br>By: /s/ *Larry Klayman*<br>Larry Klayman, Esq.<br>Florida Bar No.: 246220<br>Klayman Law Group P.A.<br>7050 W. Palmetto Park Rd<br>Boca Raton, FL, 33433<br>Tel: 561-558-5536<br>leklayman@gmail.com<br><br>*Counsel for Patrick Nathaniel Reed* |

## CERTIFICATE OF SERVICE

I, Larry Klayman, hereby certify that on this day, September 1, 2023, I electronically filed the foregoing with the Clerk of Court using the Court's ECF procedures. I also certify that the foregoing document is being served this day on all counsel of record through the Court's eservice procedures.

/s/ *Larry Klayman*