IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

PATRICK NATHANIEL REED,

      Plaintiff,

v.                           Case No. 3:22-cv-1059-TJC-PDB

BRANDEL EUGENE CHAMBLEE,
TGC, LLC, DAMON HACK,
BENJAMIN SHANE BACON,
EAMON LYNCH, GANNETT CO.,
INC., GANNETT SATELLITE
INFORMATION NETWORK, LLC,
CONDE NAST INTERNATIONAL,
INC., and ZACH HELFAND,

      Defendants.
_____

PATRICK NATHANIEL REED,

      Plaintiff,              Case No. 3:22-cv-1181-TJC-PDB

v.

SHANE RYAN, HACHETTE BOOK
GROUP, INC., DOUG FERGUSON,
THE ASSOCIATED PRESS, FOX
SPORTS, INC., NYP HOLDINGS,
INC., GAVIN NEWSHAM,
BLOOMBERG L.P., and ERIK
LARSON,

      Defendants.
_____


MOTION HEARING
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE
July 31, 2023
Jacksonville, Florida
Courtroom 10D
2:03 p.m.


(Proceedings recorded by mechanical stenography; transcript
produced by computer.)

A P P E A R A N C E S

PLAINTIFF'S COUNSEL:

      **LARRY ELLIOT KLAYMAN, ESQ.**
      Larry Klayman, Attorney at Law
      7050 West Palmetto Park Road
      Boca Raton, FL  33433

DEFENSE COUNSEL:

      **RACHEL E. FUGATE, ESQ.**
      Shullman Fugate, PLLC
      100 South Ashley Drive, Suite 600
      Tampa, FL  33602

      **MINCH MINCHIN, ESQ.**
      Shullman Fugate, PLLC
      50 Laura Street
      Jacksonville, FL 32202

      **JEREMY CHASE, ESQ.**
      Davis Wright Tremaine, LLP
      1251 Avenue of the Americas
      New York, NY 10020

      **CAROL J. LOCICERO, ESQ.**
      **LINDA NORBUT, ESQ.**
      Thomas & LoCicero, PL
      601 South Boulevard
      Tampa, FL  33606-2629

      **GREGORY W. HERBERT, ESQ.**
      Greenberg Traurig, LLP
      450 South Orange Avenue, Suite 650
      Orlando, FL  32801

      **JAY WARD BROWN, ESQ.**
      Ballard Spahr, LLP
      1909 K Street, NW, 12th Floor
      Washington, D.C.  20006-1157

COURT REPORTER:

      Shannon M. Bishop, RDR, CRR, CRC
      221 North Hogan Street #150
      Jacksonville, FL  32202
      Telephone:  (904)549-1307
      dsmabishop@yahoo.com

```
 1                    P R O C E E D I N G S
 2    July 31, 2023                              2:03 p.m.
 3                         - - -
 4             COURT SECURITY OFFICER:  All rise.  The United States
 5    District Court in and for the Middle District of Florida is now
 6    in session, the Honorable Timothy J. Corrigan presiding.
 7             Please be seated.
 8             THE COURT:  Good afternoon.  This is the case of
 9    Patrick Reed versus Chamblee, et al.  The case is 3:22-cv-1059.
10             The second case, which is consolidated for purposes
11    of argument, is Reed versus Ryan, et al.  That case is
12    3:22-cv-1181.
13             Mr. Klayman is here representing Mr. Reed.  Mr. Reed
14    is present, along with his wife Mrs. Reed.
15             And we have a number of defense counsel present.  So
16    I think I'm going to let -- let the lead counsel for each party
17    introduce themselves and -- and who's with them.
18             I'll start with you, Ms. Fugate, please.
19             MS. FUGATE:  Rachel Fugate and Minch Minchin on
20    behalf of the Golf Channel defendants.
21             THE COURT:  And, Mr. Chase?
22             MR. CHASE:  Yes.  Good afternoon.
23             Jerry Chase from Davis Wright Tremaine on behalf of
24    Hachette Book Group, Inc., NYP Holdings, Inc., and Shane Ryan.
25             THE COURT:  Okay.  And, Ms. LoCicero -- am I saying
```

1   it right?

2            MS. LOCICERO:  LoCicero.

3            THE COURT:  LoCicero.  Sorry.

4            MS. LOCICERO:  I'm here with Linda Norbut on behalf

5   of -- in *Reed I*, Gannett and the *Golfweek* defendants.  And then

6   in *Reed II* for The Associated Press and Mr. Ferguson.

7            THE COURT:  Okay.

8            MS. LOCICERO:  Thank you.

9            THE COURT:  Thank you.

10            Mr. Herbert.

11            MR. HERBERT:  I'm Gregory Herbert with Greenberg

12   Traurig, here on behalf of defendant Bloomberg L.P. and Erik

13   Larson.

14            THE COURT:  Thank you.

15            And, Mr. Brown.

16            MR. BROWN:  Good afternoon, Your Honor.

17            Jay Brown from Ballard Spahr on behalf of the

18   publisher of the New York magazine denominated in the complaint

19   as Conde Nast International, Incorporated.

20            THE COURT:  All right.  Well, welcome to all.

21            We had attempted to schedule this hearing earlier,

22   but Mr. Reed wanted to be here in person, and so we were able

23   to arrange that.  So I'm glad y'all were able to be here.

24            So I -- as I was preparing for this hearing last

25   week, I decided to try to give a little structure to the

1    hearing, because we do have -- I think there's actually seven

2    motions to dismiss in both cases, argued by four different law

3    firms.  And so it's kind of a lot of material and a lot of

4    issues that have been raised.  Some of them obviously overlap.

5           So I decided that what I wanted to do was to let

6    Mr. Klayman, as the advocate of the complaints, go first and --

7    and let him speak, and, also, I do have some questions for him.

8           And then I also -- then I set out the order that I

9    would hear from the defendants.  And so we'll adhere to that

10   order today.

11          The form of the hearing after that will -- we'll just

12   see -- be a little bit influx.  Let me kind of gauge that as we

13   go along.

14          Obviously we're not going to be able to talk about

15   every single issue in the case.  We're not going to be able to

16   talk about every single statement in the case.

17          We -- when I say "we," I mean Ms. Milliron -- my law

18   clerk has given me a list of the statements that are -- we

19   think these are all the statements that are alleged to be

20   defamatory as drawn from the complaint.  The complaint is quite

21   lengthy.  But we think we have pulled out the statements that

22   are alleged to be defamatory.  And there's 55 of them in both

23   cases.

24          And so, obviously, we're not going to have a chance

25   to talk about each one of these, but -- but we'll probably use

1  some as examples and -- and there's -- some of them do probably

2  fit into certain buckets, at least for questioning purposes.

3  So -- so that's how we'll proceed.

4          And so I think that's the run-up.  I -- of course, we

5  reviewed all the briefs and -- and we -- we have the -- both

6  complaints.  We have the various attachments and declarations.

7  And so we'll go ahead and proceed.  And I'm going to ask each

8  counsel to -- who's speaking to come to the podium.

9          Mr. Klayman, you may proceed, sir.

10         MR. KLAYMAN:  Yes.  Thank you, Your Honor.  It's a

11 pleasure to be in front of you, Your Honor.  May it please the

12 Court?

13         THE COURT:  Yes, sir.

14         MR. KLAYMAN:  And I want to thank you for scheduling

15 this matter so Mr. Reed and his wife, Justine, could be here.

16 That's Mr. Reed right there, obviously.  And that's Justine

17 Reed.  She's actually the COO of Team Reed.  So she plays a

18 material role in his participation as a professional golf

19 player.

20         It's a very important case, Your Honor.  These people

21 have been harmed over time.  And it got worse with the creation

22 of LIV.

23         It started with a book primarily by Shane Ryan,

24 *Slaying the Tiger*.  We're going to get to that.  Your Honor

25 wanted to start with the *Chamblee* case first, so I'll dwell

1    mostly on that at this time.  But I want to get something up

2    front.

3            Mr. Reed is a very -- I'd say successful.  There's no

4    question about it.  He's one of the top golfers in the world.

5    Just a few years ago he was ranked sixth in the world rankings.

6            He's a Masters champion, nine-time PGA Tour winner,

7    multiple times in the Ryder Cup, where he earned the title

8    Captain America for his successful exploits.

9            He beat his friend Rory McIlroy.  And that's no small

10   feat.  These people are equal caliber.  And to be called a

11   cheater is the worst thing that you can be called if you're a

12   professional golfer.

13           And that's true in other places, too, whether it's a

14   golfer or whether it's a tennis player, or even whether you're

15   a lawyer.

16           I think Your Honor can appreciate that.  And it's

17   important to recognize that he has never been found to have

18   cheated.  I want to repeat that.  He has never been found to

19   have cheated.

20           And when these issues were raised, what was available

21   to the reporters were sworn affidavits from his coaches at the

22   University of Georgia and Augusta State and elsewhere which

23   said that they weren't aware of any cheating, they weren't

24   aware that he had taken any property or money.

25           But many of the reporters who are defendants here

1   today didn't care about that, because it's a question of

2   profit.  It's a question of cliques.  It's a question of

3   creating something sensational, scandalous.  And we know that

4   in the political sphere.  It's now seeped into the golf media

5   as well.

6          And why did it seep in in such a major way that

7   caused Mr. Reed to retain me to bring cases?  It's because,

8   with the creation of LIV in 2022, the PGA Tour -- which, by the

9   way, is now a friend of LIV.  I'm sure Your Honor has seen the

10  press reports about the proposed merger, et cetera.

11         But at that time the PGA Tour viewed LIV as an

12  existential threat.  That's as -- Commissioner Jay Monahan

13  saying that, tied to the PGA Tour's Golf Channel, which is the

14  partner of the PGA Tour.

15         That chyron that comes on the screen -- I don't know

16  if you're a golfer or not and watch the Golf Channel, but they

17  advertise that:  We're the partner of the PGA Tour -- home of

18  the PGA Tour.

19         And, consequently, with these huge contracts of Golf

20  Channel that go to the PGA Tour and its sister tour, the DP

21  World Tour, which is the European tour, this was a threat.

22         So they devised a strategy to totally trash the LIV

23  players.  And it's the most -- one of the most prominent -- he

24  was the third LIV player to go from the PGA Tour to LIV.  He

25  became the lightning rod.  Patrick became the easy lightning

1  rod.

2        And even when you don't see his name used, you'll see

3  pictures of him.  And, of course, you know from reading the

4  briefs, Your Honor, that it's "of and concerning."  And we've

5  cited several cases on that.  You don't even have to name the

6  party to be defamatory towards a particular person.

7        Johnny Depp proved that in his case in Virginia.

8  Amber Heard never used his name in the publication, but

9  everybody knew who was being talked about.  And that's the case

10  here.

11        Brandel Chamblee, who is one of the biggest offenders

12  of defamation with regard to Patrick and others, like Phil

13  Mickelson, another one who was the brunt of his defamation --

14  even Tiger Woods years ago was called a cheater.  And Tiger

15  threatened to sue him.

16        This -- even Brandel Chamblee admitted that he's in a

17  group of maybe 12 to 14 players that people recognize on LIV.

18  He was a brand named player.

19        Some of the other players on LIV are up-and-coming.

20  They're young guys.  They're really good.  But people don't

21  know who they are yet.  Some of them are, you know, in the

22  twilight of their career, but still doing very, very well.  But

23  Patrick was up there.  And he became the lightning rod.  He

24  became the target.

25        Now, this is what's important here in terms of this

1  case.  Not only was there an attempt to destroy LIV, the

2  existential threat, through calling the players accepters of

3  blood money, murderers, terrorist sympathizers, you name it --

4  no-holds-barred.  Anything went.  It smeared them.

5      It scared sponsors away.  Coaches would not come and

6  coach Patrick, like Claude Harmon, the famous coach, and others

7  over the years, with the false allegations of cheating and also

8  with this.  It harmed the family.

9      We submitted a supplement.  Your Honor hasn't ruled

10  on this yet, but the supplement contains an article which --

11  written by the London *Times* that was written during the BMW

12  tournament in London last year.

13      I was there.  Okay?  And the interview shows that

14  it's not just Patrick that's been harmed.  It's Justine Reed.

15  They go out on the golf course, he's called all kinds of names.

16  You'll see them in the complaint.  Cheater.  You know, why

17  don't you dig a ditch?  Mrs. Reed is called a b-i-t-c-h.

18      It got so bad -- particularly when 9/11 Families were

19  enlisted -- not all of them.  Most of them didn't.  But there

20  was a group called Clout -- and this is pled in the amended

21  complaint -- that was brought in to enlist -- for money, pay to

22  play -- they were paid, some of these 9/11 Families, to

23  protest.  And it got to the point where there was even a bomb

24  threat at Doral, at Trump National last year.

25      I was there.  We were on the 16th hole.  There was a

1  bomb threat, whipping up violence against Patrick and the other

2  players.

3          This is very serious, more than serious.  Yes, it's

4  existential.  He has to have two security guards when he plays

5  on LIV and elsewhere.

6          So lo and behold, the PGA Tour decides, along with

7  the DP World Tour, that they want to merge with LIV.  No

8  problem anymore.  Everything is hunky-dory.  We're all friends

9  again.

10          Obviously it's to the advantage of the PGA Tour to

11  merge with LIV, and for LIV to merge with the PGA Tour.  Even

12  the head of the Saudi Investment Fund, the Public Investment

13  Fund, which was always referred to as the Saudi Public

14  Investment Fund -- now it's only referred to as the Public

15  Investment Fund, PIF.

16          All of this now, for the most part, except for some

17  outliers, has ceased.  It shows you the dishonesty.  It shows

18  you that this was a tactical ploy.  And it severely harmed my

19  client, his wife, and his family, even his daughter.

20          THE COURT:  When you're talking about what you're

21  talking about now, it -- it seems to me you're talking about --

22  and I'm not accepting it or commenting on it, other -- other

23  than to say it seems to me you're talking more about the PGA

24  Tour than you are about these media defendants.

25          MR. KLAYMAN:  No.

1        THE COURT:  And so how does that -- I mean, because a

2   defamation action, which is what you've brought, is a very

3   specific cause of action and it has very specific requirements.

4        And so it's not -- I mean, as I understand it, this

5   Court isn't being asked to talk about the PGA versus the LIV

6   tour.  It's really whether these particular defendants defamed

7   Mr. Reed in a very particular way, isn't it?

8        MR. KLAYMAN:  It is, Your Honor.  But the reason I

9   say that is because of the issue of actual and constitutional

10  malice.  What is the motive?  What is the intent?

11       In the complaint we cite the passage from an

12  interview of Shane Ryan where he says, I'm very beholden to the

13  PGA Tour.  They help me whenever I [verbatim] can.

14       These players, as we pled in the amended complaint,

15  get special privil- -- these reporters, they get free tickets.

16  They get access to the players.  They get all kinds of things.

17  And, consequently, they are, in effect, in the hip pocket of

18  the PGA Tour.

19       Now, LIV -- LIV nor Mr. Reed ever considered the PGA

20  Tour to be an enemy.  I don't want to give you that impression.

21  I'm just giving you a motive for why these reporters jumped on

22  the bandwagon and did this to destroy him and to try to destroy

23  the others.  They are beholden to the PGA Tour for stories, for

24  access, for free tickets, for help when they need it.

25       And, of course, in the case of the Golf Channel, they

1  have major, multimillion dollar contracts with the PGA Tour

2  and the DP World Tour.  And one of the things that was done

3  throughout was to try to scare away other broadcast networks,

4  because they would lose that commercial exclusivity to

5  broadcast.  So that's how it works together.

6          And I'm going to get to the law here on actual malice

7  and constitutional malice, because it's very important to

8  understand, as Your Honor, I'm sure, does.

9          We submitted a compendium in the *Florida Bar Journal,*

10 excellent article, badges of malice, *Showing Constitutional*

11 *Malice in Media Defamation*, 92 *Florida Bar Journal*, written by

12 Manuel Socias.

13         And you can infer actual malice not just from direct

14 evidence -- we have it here -- but from circumstantial

15 evidence, such as a failure to retract.

16         Many of these supervisors, we wrote them the Florida

17 Statute 770 letter that said this is wrong.  They wouldn't

18 retract.

19         Failure to conduct a thorough investigation, they

20 would not go out and talk to the coaches that signed affidavits

21 that he did not cheat in Georgia, or the rules officials who

22 said he committed no infraction at the Farmers Open or at --

23 and I might add, he was only penalized.

24         And golfers are penalized several times in the course

25 of their career.  It's only happened to him twice in about

1    1,000 tournaments -- pro tournaments.

2         He was never found to be disqualified.  He was never

3    found to have cheated, yet this mantle was cast upon him, and

4    it destroyed him and it destroyed his family.  And in this

5    article you can see that even his daughter, Windsor Wells, is

6    bullied at school from kids who, you know, hear their parents

7    talking about it.

8         And I myself have been on the course and heard it.  I

9    hear it routinely.

10        So the Reeds are not just a client.  They're friends.

11   I know they're good people.  They're honest people.  They're

12   hardworking people.  And they deserve to be able to carry out

13   their profession without being defamed and harmed.

14        But let me continue with the badges of malice

15   quickly.  They are to allow comment.  Shane Ryan interviewed

16   him, but never asked him about the allegations of cheating or

17   stealing, never asked him about it.

18        The first thing he finds about it is when he reads

19   the book *Slaying the Tiger*.  And then it's republished in the

20   new book *The Cup They Couldn't Lose*.

21        And who is the first chapter in the book?  Mr. Ryan

22   has an obsession -- an extreme obsession of hatred towards

23   Mr. Reed.

24        And this is the first chapter, just the title, Your

25   Honor, *December 2019, Melbourne, Australia - Fires down*

1    *under ... the great escape ... the end of the legend of Patrick*

2    *Reed.*   And he republishes all of the false information that he

3    did in *Slaying the Tiger*, plus more.

4              But Your Honor asked a good question, because that

5    type of information of evidence is important to determine the

6    actual malice and what was the motive.

7              Failure to report exculpatory facts.

8              Animosity towards the individual, I just read you an

9    example of that.

10             Reporter's knowledge of facts conflicting with the

11   reports.

12             Emphasizing unimportant events to support the

13   defamatory statement.

14             A preconceived determination to defame.

15             Repetitive media text, that's true with Chamblee,

16   with Damon Hack, with Shane Bacon, and also with others that we

17   have set forth.

18             A failure to supervise -- well, the supervisors of

19   these publications.

20             Reporter's lack of credibility.

21             Since there has been this merger, Chamblee has taken

22   it on the chin.  People are saying, you know, this was a sham.

23   We submitted that in our supplemental information.

24             Even the players on the PGA Tour are saying, "We were

25   used.  We were abused."

1          Rory McIlroy says, "I was made the sacrificial lamb.

2    They held me out to dry on this stuff, because they told me

3    that they would never ever work with the Saudies."

4          Well, we know that the Saudis, Your Honor, happened

5    to finance the LPGA, the women.  But, of course, they won't

6    attack the women because that's not socially acceptable.  And

7    it's good they don't, but they'll go after somebody like

8    Patrick Reed.

9          And prior to and subsequent defamatory statements, no

10   action taken versus the plaintiff making threats in

11   conjunction.

12          I can go on and on.

13          But let me get into, quickly here, Your Honor, the

14   law.  I know you know the law, so I don't want to in any way be

15   patronizing, but I think it's important.  And I'd like to

16   attach this to a transcript of this hearing once it's made,

17   because I think it's helpful.

18          Of course, we know that defamation is making a false

19   statement or with reckless disregard for the truth with actual

20   malice.

21          Now, what's important here is we're in a 12(b)(6)

22   stage, so, therefore, the allegations of the complaint must be

23   accepted as true.

24          The famous case *Bell Atlantic versus Twombly*, 550

25   U.S. 554, a Supreme Court case, and its predecessor *Scheuer*

1  *versus Rhodes*, S-c-h-e-u-e-r, 416 U.S. 232, stand for the

2  proposition that Rule 12(b)(6) does not countenance dismissals

3  based on a judge's disbelief of the complaint's factual

4  allegations.  A well-pled complaint may proceed even if it

5  appears that recovery is very remote and unlikely, and a number

6  of other cases.

7          Now, a very important case that we've cited a few

8  times, Your Honor, is the *Dershowitz versus CNN* in Miami --

9  there's your colleague Judge Singhal down there -- where -- in

10 a mixed issue of opinion and fact, where CNN published that

11 Dershowitz said that a president can do whatever he wants, they

12 left out the fact that he also said within the bounds of the

13 law.  I'm just paraphrasing.  That's a mixed opinion, in fact.

14         Judge Singhal allowed the case to proceed to

15 discovery, and presumably it will go to a jury as well.

16         THE COURT:  Are you familiar, sir -- I --

17 Judge Singhal just had another case involving CNN.  And he

18 dismissed the complaint that was brought by Former President

19 Trump.  And he dismissed the complaint.  And he does an

20 analysis of defamation law.

21         So what's the -- if you've seen that, then you may be

22 able to comment on it.  I just had an opportunity to read it

23 this morning.

24         MR. KLAYMAN:  Yeah.

25         THE COURT:  So how do you -- what's the difference

1    between the case you're relying on and that case?

2          MR. KLAYMAN:   The difference is -- is that -- what

3    President Trump alleged was extremely weak.   And, you know,

4    I -- nothing negative against President Trump.   I voted for him

5    twice.   Okay?   So I'm not trying to take a shot at him.   But

6    the fact is it was weak, a big lie.   That's what it was about,

7    a big lie.

8          And there's been a lot of information out there -- I

9    don't agree with it -- that what he said was untrue, in terms

10   of the election being -- had severe irregularities.   Okay?   So

11   there's a difference there.   And I would not equate President

12   Trump with anyone in this case, or for that matter the

13   *Dershowitz* case.

14         But, yes, I saw the case this morning.   And it's not

15   at all factually the same.   And, of course, President Trump has

16   been made radioactive.   And so that's just as a practical

17   matter.   It's very difficult for him to sustain anything like

18   that.

19         Defamation generally -- I just read it to you.   But

20   defamation by implication -- the defendants misstated what

21   defamation by implication is in their briefs.

22         They say that the facts have to be true.   Okay?

23   Well, that's true in certain instances, when you omit facts

24   that juxtaposed would show a defamatory meaning.

25         The definition of defamation by implication, which

1   arises many times in this case, is -- arises from what is

2   stated, but also what is implied when a defendant juxtaposes a

3   series of facts so as to imply a defamatory connection between

4   them, or creates a defamatory implication by omitting facts,

5   such that may be held responsible for the defamatory

6   implication.

7           A good example would be the golf coaches that said

8   that he didn't cheat.  A good example would be where one of the

9   defendants says that a tape showed up which confirmed that a

10  certain rule infraction that occurred -- they don't identify

11  who that is, who the source is.  They just throw it out there.

12  It's a fact that was omitted.

13          That's an example of how you can rise to defamation

14  through defamation by implication.  And then, of course,

15  there's defamation per se, which is when you defame someone in

16  their trade and profession.  And that clearly happened here.

17          When there's mixed fact and opinion, Your Honor, the

18  matter must go to the jury.  It's not for a judge to make the

19  decision on that.  And that arises in the *Dershowitz* case, the

20  *Hay versus Independent Newspapers* case which I cited, and --

21  we're going to provide this little summary to you, if Your

22  Honor says that's okay -- *Barnes versus Horan*.

23          And the publication must be taken as a whole, Your

24  Honor.  It's not just the part that was put in bold in our

25  amended complaints.  But the whole of the article is something

1    that must be taken into account.  And that's the case of *Smith*

2    *versus Cuban American*, 731 So.2d 702, and *Byrd versus Hustler*

3    *Magazine*, 433 So.2d --

4           THE COURT:  I want to ask you a question about the

5    "of and concerning" aspect of it.  And I want to just use an

6    example here.

7           At paragraph -- paragraph 65 through 69 of the

8    amended complaint in *Reed I*, you cite and reference an article

9    published by the Golf Channel written by Mr. Chamblee entitled

10   *Mickelson's statements inaccurate and ironic:  Obnoxious greed?*

11   *Et tu, Phil?*

12          And it's an article about Mr. Mickelson and his

13   relationship with the PGA Tour.  Mr. Reed, to my understanding,

14   is not cited in that article at all.  The article actually was

15   published in February of 2022.  And Mr. Reed didn't join LIV

16   until June of '22.

17          So I guess my question is:  How can an article like

18   that, that doesn't reference your client and talks about LIV,

19   but it was before he joined LIV -- how can that give rise to a

20   defamatory -- to a defamation claim by Mr. Reed?

21          MR. KLAYMAN:  Well, as far as the timing is

22   concerned, it was repeated over and over again, so it was the

23   predecessor of that.

24          But the general statements about taking blood money

25   and working for dictators and people that kill people with bone

1  saws are just being general -- applies to all the LIV players.

2  And, of course, Mr. Reed is the most prominent -- he was the

3  third-most prominent player to be brought on to LIV.

4          So I understand your question, Your Honor, but that's

5  the reason --

6          THE COURT:  So is it your position -- is it your

7  position that anytime anybody is writing anything or

8  broadcasting anything about criticism of the LIV tour and the

9  source of its funding, or anything about the controversies,

10 that they are de facto defaming Mr. Reed because he -- he was

11 such a prominent early member of the LIV tour?

12         MR. KLAYMAN:  Not -- not every time, Your Honor.  I

13 agree with you.  Not every time.

14         But we know that when things go up on the internet

15 they stay there forever.  So it's not like it just happened

16 then.  I mean, it pops up now if you put in "blood money," if

17 you put in "terrorist sympathizers," if you put in "murderers."

18         And so consequently, yes, it's still out there, and

19 it does affect Mr. Reed.

20         Now, it's not the strongest of the various

21 defamations.  And I'm going to show you that right now.  But it

22 is defamatory.

23         I'm going to ask my -- and I just want to finish with

24 the legal aspects.  The summary of it is that "of and

25 concerning" -- it doesn't even have to be an individual person.

1    Defendants raise the issue of group libel, group defamation.

2              We cited cases *Harwood v. Bush*, *Fawcett Publications*

3    *versus Morris*, *Ball versus Taylor*.   In *Fawcett*, 377 P.2d 42,

4    the entire Oklahoma football team was found to have been

5    defamed.  And in *Ball versus Taylor*, there were 58 plaintiffs.

6              Now -- but in this case, Mr. Chamblee has stated on

7    the record, and it's in our pleadings, that it's only about 12

8    players that people recognize on tour because -- on the LIV

9    tour because of the fact that it's a new tour and there are a

10   lot of up-and-coming players there.  So Patrick is always

11   associated with that.

12             Last, but hardly least, Your Honor -- and I know Your

13   Honor appreciates this -- the reason our Founding Fathers

14   created juries was -- and this is no reflection on you, by the

15   way -- was because the -- the king's judges were

16   rubber-stamping his edicts.  And they wanted people to make

17   decisions, not judges.

18             And when you have a mixed question of fact and

19   opinion, or an ambiguity, or an outright defamatory statement,

20   the matters have to be presented to a jury.  And that's all

21   we're asking.

22             Now, let me show you some of the defamatory

23   statements, because it will show you the severity of this.

24   Mr. Anderson, my executive assistant and paralegal, is going to

25   put up a -- one of the broadcasts by Horace Langley, who calls

1    himself Froggy, of all things.  And he's right out of Ponte

2    Vedra, right out of Florida, with Mr. Chamblee.

3           And if you'll do a split screen.

4      (Video played.)

5           MR. KLAYMAN:  Okay.  So the point here, Your Honor,

6    is that Patrick plays for LIV.  He plays for the golf tour.  He

7    doesn't play for the prince of Saudi Arabia.  In fact, the

8    prince of Saudi Arabia is not the operative person that runs

9    LIV.  It's an individual named Yasir, who has now been invited

10    to attend even the British Open.  He was there last week in the

11    British Open with Martin Slumbers, the head of the Royal &

12    Ancient.

13           These people have been welcomed in.  Okay?  They are

14    not murderers.  They don't kill people with bone saws.  And, of

15    course, the Public Investment Fund invests down the road in

16    Walt Disney.  They own a big piece of Disney.  They own a piece

17    of Boeing.  They own a large piece of Apple.  They owned Fox

18    News for a while, 17 percent.  They own 30 percent of the

19    shares in this country.  They actually provide oil.

20           I mean, to the extent that there's money coming to

21    finance PIF, it comes from oil sales, not from killing people

22    with bone saws.  And that's the point that we're making here.

23    And that is very, very harmful to --

24           THE COURT:  So how does that -- a statement that's

25    defamatory of Mr. Reed as a person, as opposed to the LIV

1    tour -- or what do you -- how does that become a defamatory

2    statement of Mr. Reed?

3              MR. KLAYMAN:  Because he is associated with that.

4    They associate his name.

5              THE COURT:  So, under your theory, would any member

6    of LIV -- any -- any golfer who plays for LIV have -- based on

7    that statement, have the same cause of action as Mr. Reed?

8              MR. KLAYMAN:  They could.  But Mr. Reed is one of the

9    three or four most prominent players on LIV, so people

10   associate it with him.

11             And down the line, Your Honor -- we've got

12   Bloomberg's counsel here.  Bloomberg published a story that LIV

13   was -- their lawyers were getting information about 9/11

14   Families, said it was sinister, which means it's evil and

15   dishonest, and whatever.

16             And he wasn't even a member of that case, but they

17   used his picture prominently.  They used his picture because

18   he's the one who's primarily associated with it.  And because

19   he's been made a lightning rod, a whipping boy, it's easy to

20   insert him into that.  And that occurs on a number of

21   occasions.  And in that regard, one of the tweets -- and we're

22   going to get to that tweet next -- was when --

23             THE COURT:  And just for your planning purposes,

24   we've -- believe it or not, we've gone almost 40 minutes, but

25   we'll -- I'm going to probably give you another -- about 5 to

1   10 minutes.

2           MR. KLAYMAN:  Okay.

3           THE COURT:  And then I'm going to need to give --

4   give it to your -- to your opponents for a little while.

5           MR. KLAYMAN:  Okay.  Let me just be -- quickly with

6   Mr. Chamblee --

7           THE COURT:  Yes, sir.

8           MR. KLAYMAN:  -- is that when LIV -- their lawyers

9   lost a -- a temporary restraining order hearing in California,

10  it was the players who brought that case at the time.

11          Chamblee tweeted, "Golf won today.  Murderers lost."

12          He was talking about the players.

13          THE COURT:  Was he?

14          MR. KLAYMAN:  Yes.

15          THE COURT:  Wouldn't -- wouldn't just as rational his

16  explanation be he was talking about the owners of LIV?

17          MR. KLAYMAN:  When you -- Your Honor, when there's an

18  ambiguity, as I said, with the cases, then that's for the jury

19  to decide what was meant.  And they look at circumstantial

20  evidence.

21          But that particular case, it was the players who

22  lost, not LIV.  LIV wasn't a member of that -- of that case at

23  the time.  They came in later.  It was just the players.  They

24  were seeking a temporary injunction so they could play in the

25  FedEx Cup, because they had been excluded and suspended.

1       But let me -- since I've got limited time, you'll see

2   many of the same things occur with regard to not just

3   Chamblee -- and they're all set forth in the complaint -- but

4   also Damon Hack and Shane Bacon, who, despite the fact that a

5   PGA Tour official -- I'd like to play this clip for you,

6   publication 5 -- despite the fact that a rules official ruled

7   that Patrick had done nothing wrong at a tournament, in terms

8   of being able to get -- to place his ball, okay, at the Farmers

9   tournament, that they went off and defamed him anyway.  They

10  didn't care.  And this is the go-to guy to try to do a number

11  on.  And this is defamation by implication.  It's defamation.

12  It's defamation per se.

13      Let's play this clip, Mr. Anderson.

14  (Video played.)

15      THE COURT:  How much longer is this going to run?

16      MR. KLAYMAN:  I think you got the point.

17      So this is textbook defamation by implication, is

18  that here they're pulling stuff out of the hat.  This is why --

19  even though he did nothing wrong and the rules officials said,

20  this is why my client is a sleazeball.  This is why he violated

21  the rules of golf.  This is why he's unacceptable to be

22  considered to be a legitimate No. 1 player on the tour or

23  anyplace else.

24      And that's what they do.  And that's what Chamblee

25  does.  And that's what the others have done.

1          THE COURT:  Let me ask you just a broader question

2    before I -- and I am going to need to give your opponents some

3    equal time here.  And there's a number of them.

4          MR. KLAYMAN:  Sure.

5          THE COURT:  And this is just something that -- and it

6    really is about the law of defamation, really about actual

7    malice.  It's really about being a public figure.

8          But if I were to say to you that unkind and

9    derogatory things have been said in the past in the press

10   about -- I'll just pick a few -- John Daly, Phil Mickelson,

11   Tiger Woods, when he was having all his problems, and they were

12   unflattering and they were derogatory, and they were sometimes

13   mean-spirited -- if I were to say to you that -- even if they

14   were all of those things, that the law of defamation,

15   especially with its First Amendment overlay, protects that type

16   of speech, because if it -- if you start to micromanage what

17   the press can say about public figures, you're in a place that

18   we don't want to be?

19          So what's the difference between those situations and

20   this situation?

21          MR. KLAYMAN:  It's one thing to say I don't like that

22   person or I think he's a bad person.  Okay?  It's another thing

23   to say he's a habitual cheater.  That's the worst thing that

24   you can say to a golfer.

25          That puts a tarred feather on him.  It makes him

1    radioactive.  He can't get sponsors.  We set that forth in the

2    complaint.  He can't hire top-notch coaches.  It harms his

3    family with regard to the threats that are issued against him

4    and the taunts.

5            Cheater is factual, Your Honor.  Cheater, it's based

6    on facts.  And to the extent that the facts aren't even stated,

7    that's where the defamation by implication comes.  You just saw

8    it right there.  They were omitted as to what others have done.

9            Rory McIlroy has done the same thing that Patrick did

10   there.  So have others, okay, throughout the course of their

11   career.  In over -- in nearly 1,000 tournaments, Patrick has

12   only had two penalties.  That's extremely rare.

13           Lydia Ko in an LPJ [verbatim] event just a week

14   ago -- or two weeks ago, got seven penalties in one round.  So

15   when you call someone a habitual cheater, you are destroying

16   them.

17           And Tiger Woods even recognized that.  His agent,

18   Mark Steinberg, threatened to sue Brandel Chamblee when he was

19   called that.  And I might add, Brandel has a history of being

20   mean, but that's -- it's a part of the badge of courage.

21           But at the time that that happened to Tiger, he was

22   down-and-out.  He was injured.  And he wasn't playing terribly

23   well.  And yet he was called a cheater.  You can't call a

24   golfer a cheater.

25           You cannot find a sponsor -- a major sponsor that

1  will come to you.  And you can't find coaches that will coach

2  you.  And Patrick has become radioactive.  That's the

3  difference here.

4         Now, let me just say briefly, because I know you want

5  to move on, with regard to Chamblee --

6         THE COURT:  Yeah.  We really do need to.  I'll give

7  you a couple of minutes and then I'm going to have to turn to

8  your opponent.

9         MR. KLAYMAN:  Yeah.  Will I get a right of reply at

10 the end?

11        THE COURT:  Probably so.

12        MR. KLAYMAN:  Okay.  Thank you.

13        Shane Ryan -- we laid out very carefully in his two

14 books, making allegations of cheating, yet never ever bothering

15 to contact his coaches to say that he didn't cheat, that he

16 didn't steal stuff, quoting people like Kevin Kisner, who

17 wasn't even at Georgia when Patrick was there, saying, "I

18 wouldn't even" -- excuse the French -- "piss on Patrick."

19        I mean, how would he know?  Because he wasn't even at

20 Georgia.  This is what the teammates feel.

21        THE COURT:  Well, I am going to have to ask you:

22 What is -- what's the law with respect to defamation?  If

23 you're reporting on somebody that -- something that somebody

24 said or accused somebody else of, you're not necessarily saying

25 it happened, but you're saying that somebody accused another

1  person of it happening.

2          I understand the potential implication's there, but

3  if you're accurate reporting -- accurately reporting that

4  somebody accused somebody of something, is that defamatory,

5  regardless of whether the underlying fact is true?

6          MR. KLAYMAN:  When it -- this is what I was telling

7  you earlier with the cases.  You have to take the totality of

8  the article or the work in question.  You have to put that in

9  question.

10          Because it goes with the false statements -- the

11 clearly false statements that he's a cheater.  And it amplifies

12 that.  And he had a duty to contact Patrick.  He had a duty to

13 talk to Kisner.  He didn't do that.  He had a duty to do a due

14 diligence, Your Honor.

15          As a lawyer and as a judge, Your Honor would not

16 write something if you weren't reasonably sure that it was

17 accurate.  You just don't pull things out of the air and lay it

18 on.  But it's the totality of the article.  So --

19          THE COURT:  All right, sir.  I'm going to have to --

20          MR. KLAYMAN:  Thank you, Your Honor.

21          THE COURT:  I'm going to have to move on here.

22          Thank you.

23          MR. KLAYMAN:  Okay.  You're welcome.

24          THE COURT:  Ms. Fugate, are you prepared?

25          MS. FUGATE:  Yes, Your Honor.  Thank you, Your Honor.

1      And I know you're familiar with the facts, so I'll

2  try just to jump into the legal argument and address any

3  concerns that you have.

4      In the *Chamblee* case there's ten publications at

5  issue, eight of which are subject to the Golf Channel's motion

6  to dismiss.

7      Publications 1 through 3 and 6 through 8 concern

8  statements about the LIV tour.  And I'll refer to it as the LIV

9  publications.

10      And publications 4 and 5 concern the incident at the

11  Farmers Insurance Open tournament in 2021, where Mr. Reed

12  claimed embedded ball relief.

13      As the Eleventh Circuit has stressed, this court has

14  a very important gatekeeping function in dismissing untenable

15  defamation claims because of the chilling effect that such

16  actions pose to First Amendment rights.

17      And pretrial disposition is especially appropriate

18  here, because the amended complaint suffers from a number of

19  fatal and constitutional flaws.

20      Common defenses to all of the publications are that

21  the statements are protected and non-actionable opinion in

22  rhetorical hyperbole and were not made with actual malice.

23      There are also, in addition to those common defenses,

24  specific defenses to each publication.  With respect to the LIV

25  publications, those publications are not "of and concerning"

1    Reed.

2          With respect to the Farmers Open statements, those

3    are barred by the applicable statute of limitations, which we

4    concur -- which we argue is Texas under Florida's borrowing

5    statute.

6          THE COURT:  Yeah.  Let me ask you about that just a

7    minute.  I don't want to spend a lot of time on it, but -- so,

8    first of all, I don't think -- maybe one of your other

9    opponents has a footnote about the statute of limitations, but

10   the others seem -- seem to be happy to -- to be under Florida

11   law.  And so that's giving me some pause.

12         I know that -- I know that Mr. Klayman, on behalf of

13   Mr. Reed, filed a suit out in Texas, where -- and I don't

14   remember the exact words, but where they said many of the

15   events occurred in Texas and so forth, so I -- I understand

16   that.  But that suit was dismissed pretty quickly and brought

17   over here.

18         And when I look at the -- you know, when I look at

19   the factors you look at for choice of law, I have to say that

20   nothing really stands out particularly.  I mean, you -- you're

21   talking about a -- a national and international personage.

22   You're talking about an international game.  You're talking

23   about publications that go all over the place.  You're talking

24   about the headquarters of some people are in Connecticut.  And

25   Mr. Reed apparently has homes in both Texas and Florida.  So

1   I'm having a little trouble figuring out how we get to Texas.

2           MS. FUGATE:  Certainly.  And, Your Honor, many of the

3   factors are a bit of a push because of -- because the

4   defamation occurred nationally and none of the defendants are

5   in Florida.

6           What we think is dispositive is that Texas suit that

7   was voluntarily dismissed quickly -- it did cover the Farmers

8   Open statement.  It talked about Chamblee's statements, and

9   said they were false and defamatory.

10          And there was an allegation in there that a

11  substantial part of those events occurred in the Southern

12  District of Texas.

13          When you add that to the facts that -- while Mr. Reed

14  may have a residence in Texas and Florida, he's a citizen of

15  Texas.

16          So the primary injury would conceivably be there.

17  And the *Jaisinghani* case -- and I'm probably butchering that --

18  out of the Southern District that we cite, very similar.

19          Most of the -- most of the factors there were a push.

20  The plaintiff there had residences in both California and

21  Florida.  But as the Court stated, you can have many

22  residences, but only one domicile.  And that was California.

23  The court found that he was a citizen of California.  And that

24  was, under the analysis, the dispositive factor.

25          So when you take into consideration that he is a

1  citizen of Texas, you can only have one citizenship, and that

2  is Texas.  The allegations from the Texas complaint that did

3  involve the Farmers Open statements, where he said a

4  substantial amount of the events took place in the Southern

5  District of Texas -- if you combine those two, we think those

6  are dispositive.

7           THE COURT:  All right.  I'm going to -- I've spent as

8  much time on that as I want to.

9           MS. FUGATE:  Okay.  Understood.

10          THE COURT:  Let's go ahead with the -- with the --

11 with the defamation discussion.

12          MS. FUGATE:  Certainly.

13          First, Your Honor, the -- the statements here are

14 protected opinion.  The First Amendment protects nonliteral

15 assertions and hyperbolic comments that cannot reasonably be

16 interpreted as stating actual facts.

17          So, for example, calling somebody a fringe scientist,

18 a mad professor, those are not capable of defamatory meaning

19 because they're not falsifiable.

20          THE COURT:  What about calling somebody a cheater?

21          MS. FUGATE:  Your Honor, we actually didn't call him

22 a cheater.  Under the Farmers Open, they -- both of the

23 publications make very clear that he did not violate the rules.

24 They both make that abundantly clear.  He did not violate any

25 rule.  But the commentators were uncomfortable with his conduct

1    around the ball.  So they --

2            THE COURT:  Did -- I recall one of them saying

3    Mr. Reed has a history of doing things like this, or something

4    like that.  Would that be enough of an implication that --

5    that -- to rise to the level of defamation?

6            MS. FUGATE:  Your Honor, I don't believe so.  They

7    said he had a history -- what they were talking about there was

8    questionable behavior.  They showed video of the 2019

9    tournament where he was assessed the two-stroke penalty.

10           They mentioned the questionable behavior of being

11   kicked off the University of Georgia -- the Georgia team.

12   Those allegations were -- have been widely reported, and is

13   known to the golf community.

14           So I think that the history -- what they were talking

15   about was questionable behavior around the ball.  And that is

16   specifically what they were referring to.  And they made very

17   clear that he did not commit a rules violation in both of the

18   publications.

19           THE COURT:  One -- one of the -- in paragraphs -- I'm

20   looking here at 92, 94, 95, and 97.  There's -- Mr. Chamblee

21   tweets that -- the tweets are about LIV golfers, which

22   presumably would include Mr. Reed, working directly for bin

23   Salman in Saudi Arabia, which I don't think is true.

24           And why isn't that actionable?  I mean, they -- I

25   assume their contracts are with LIV and they don't work

1    directly for that individual or that country.

2          Why isn't that -- and there -- there could be

3    negative connotations to working directly for Saudi Arabia or

4    working directly for bin Salman.

5          Why wouldn't that be good enough?

6          MS. FUGATE:  Your Honor, I think you have to look

7    at -- looking at the context of it, it was clear, and I think

8    known, that LIV -- that LIV was funded directly by the Saudi

9    government.  And that certainly brought widespread

10   condemnation.  And these are tweets from Mr. Chamblee that the

11   gist -- I don't think the defamatory --

12         THE COURT:  By the way, is Mr. Chamblee -- it's

13   really not here nor there, but what -- since they announced

14   this framework agreement, what's the commentary been since

15   then?

16         MS. FUGATE:  Your Honor, I actually haven't seen

17   anything since then about -- since the new -- since the new

18   agreement.  But Mr. Chamblee certainly had an opinion about it.

19   And he let that opinion be known on Twitter, which is -- you

20   have to consider the context of Twitter, too, and the medium.

21         In *Horsley versus Rivera* and the *Fortson* case out of

22   the Southern District, when you're considering rhetorical

23   hyperbole -- which the context of these statements, I think,

24   certainly qualify -- you have to look at the medium.  Here, a

25   Twitter -- a podcast, you expect, kind of, the hyperbolic

1   statements.

2          And the gist of what is alleged to be defamatory

3   isn't directly or indirectly.  It's the murderous tyrannical

4   regime.

5          Certainly I think --

6          THE COURT:  Well, you know, it used to be -- I don't

7   know when we got to this point.  It used to be that people

8   wouldn't compare anybody to Hitler, or people wouldn't compare

9   anything to the Holocaust, or people wouldn't -- you know, a

10  lot of things that were just so beyond the pale that people

11  didn't do them, because you don't -- you didn't do it.  And now

12  I guess you're saying anything goes?  Even if it's hyperbolic

13  in the extreme, anything goes?

14         MS. FUGATE:  If it's clear that it is a hyperbolic

15  statement.  Even the *Dershowitz* case that the plaintiff relies

16  on, comparing -- the comparisons to Stalin were protected as

17  rhetorical hyperbole.

18         So you do have to look at the context.  And if it's

19  clear from the context -- in the *Horsley versus Rivera* case, it

20  was calling an anti-abortion activist an accomplice to murder.

21         THE COURT:  Is there any -- is there any rational

22  world in which Mr. Reed signing up to play for the LIV Golf

23  tour -- is there any rational world in which that can be

24  equated to being on the same side of Hitler or -- I just --

25  it's -- is there -- is there a hyperbole that is just so beyond

1    any rational thinking that it becomes defamatory per se?

2           MS. FUGATE:  Oddly, Your Honor, the more outlandish a

3    statement is, the less likely it is to be believed as a fact.

4    So under rhetorical hyperbole, that's -- it's kind of the rub

5    of hyperbole.  And there may be a situation --

6           THE COURT:  So -- and Mr. Chamblee is not -- for lack

7    of a better term, he's not a fringe podcaster somewhere, or

8    some person that is supposedly in the business to just generate

9    controversy.

10          He's a -- he's a journalist for the Golf Channel,

11   which is supposed to be, for lack of a better term, a

12   mainstream golf channel that reports on golfing news.  And

13   so -- but he gets to, in his spare time, go out and tweet

14   whatever he wants to tweet, no matter how outlandish it is?

15          MS. FUGATE:  Your Honor, he certainly has his

16   opinions.  And he expresses those.  He's -- he is a reporter,

17   but he's also a commentator.  And, interestingly, the *Fortson*

18   case said that sports --

19          THE COURT:  And when he's -- when he's doing that

20   tweeting and podcasting -- and this is a question I actually

21   don't know the answer to -- is he representing the Golf Channel

22   when he's doing that?  Or is that just him?

23          MS. FUGATE:  Your Honor, I think it certainly can

24   depend on the context.  There may be situations where he is

25   not.

1          THE COURT:  Well, what about --

2          MS. FUGATE:  And certainly in this case it's not an

3     issue.  The Golf Channel is -- is defending him and is not --

4     is not saying that he -- he was not.

5          So there may be a circumstance where he -- he could

6     be, but I don't think we have to decide that issue here today.

7          THE COURT:  Well, we certainly have -- I mean,

8     obviously, you're right, that freedom of the press and the

9     First Amendment -- and, unfortunately, the nature of our public

10    discourse these days, people can say lots of things.  And so I

11    guess we're -- I -- I understand I need to be careful between

12    trying to assess what might be responsible journalism and what

13    might be irresponsible or statements that go farther than they

14    need to go in order to generate interest from actionable

15    defamation.

16         So I understand I've got -- that's a difference.

17    But -- but it is -- you know, when I see some -- some of these

18    statements, they're pretty jarring.

19         MS. FUGATE:  Your Honor, they are.  And they are

20    certainly Mr. Chamblee's opinion.

21         Now, when we get into the "of and concerning," these

22    also weren't directed specifically at Mr. Reed, which, again, I

23    don't think they --

24         THE COURT:  Well, what about -- and I -- you -- I

25    think that's a good point.  And I asked Mr. Klayman about it.

1    I think it's hard to tell in many of these situations how

2    Mr. Reed is even involved in them, unless -- I think

3    Mr. Klayman says any time you say "LIV," you're also saying

4    "Patrick Reed," because he's certainly one of the more

5    prominent golfers who joined the tour.  Probably, if you were

6    in a conversation, I'm guessing -- I don't know.

7              I saw -- I saw some -- I don't know how many golfers

8    there are on the LIV tour.  And it may have changed.  But I saw

9    Mr. Chamblee referenced 48 golfers at some point.  I don't know

10   when that was.  I also saw a list of -- of probably the most

11   famous LIV golfers.  And Mr. Reed is certainly right in there.

12             So what about this idea that when you're -- when

13   you're criticizing the golfers of the LIV tour, or you're

14   criticizing LIV golfers in general, that -- that is

15   attributable to Mr. Reed because he's among the more prominent

16   members of that tour?

17             MS. FUGATE:  I think it's just not consistent with

18   Florida law.  The "of and concerning" is a constitutional

19   requirement.  It's a constitutional element that a statement

20   has to be specifically directed at a plaintiff.  And it's --

21   certainly nothing in these publications specifically directs it

22   at Mr. Reed, as opposed to somebody else.

23             And, actually, several of these statements are

24   directed at other golfers.  So it would be hard to look at this

25   and say, "Yes, that one is about Mr. Reed."

1          None of them are.  None of the LIV statements are

2    specifically directed at Mr. Reed.

3          So the Oklahoma case is contrary to Florida law.

4    Oklahoma at that time -- I don't know what the current state of

5    their law is -- didn't have a group libel doctrine.  Florida,

6    on the Oklahoma case, rejected it.

7          The *Harwood* case wasn't about a group of people.  It

8    was a specific individual, a story about "Harwood the Rat."

9    And John Harwood was the plaintiff.  So there was a connection

10   and it could be understood to be about the plaintiff.

11         There isn't any connection between the LIV

12   publication for the Golf Channel and Mr. Reed, other than the

13   fact that he was a member, just as every other member.  And

14   even in his opposition, he says it could apply to Mr. Reed or

15   any other member of LIV.

16         That's the very definition of group libel.  Under

17   Florida -- it's commented about 25, is where that group is.

18   LIV is certainly -- it's not pled that it's under 25.  So that

19   doesn't --

20         THE COURT:  Is that, like, a hard-and-fast rule?  Or

21   that just came -- I read, I think --

22         MS. FUGATE:  The *Adams* case.  And it's not -- they

23   adopt the restatement and -- which had adopted the 25.  So

24   that's where we get the 25 number, but it did adopt the

25   restatement.

1           THE COURT:  It seems awful -- it seems awful
2     arbitrary.
3           MS. FUGATE:  Yeah.  It can be, Your Honor.
4           THE COURT:  Yeah.
5           MS. FUGATE:  Or if there's something else in the
6     publication that gives rise to the fact that it's talking about
7     a specific member, as opposed to any other member.
8           THE COURT:  What about -- I'm looking here at my
9     screen -- because it's part of the pleadings.  I'm looking here
10    about -- an article about LIV.  I mean, it's about LIV.  It
11    doesn't really mention Mr. Reed.
12          But they tell me that it's a -- a silhouetted picture
13    of Mr. Reed that -- that leads the article.  I'm not 100
14    percent sure I would have known that just by looking at it,
15    but -- but what about that, that you're -- it's almost like a
16    wink and a nod here, that, "Well, it's not really about
17    Mr. Reed, but, oh, by the way, here's his picture"?
18          What about that?
19          MS. FUGATE:  And I believe that was not one of the
20    Golf Channel's publications, but another one.
21          THE COURT:  Okay.  So I'm going to have to ask
22    somebody else about that.  Okay.
23          MS. FUGATE:  But, you know -- but I think it's
24    silhouetted.  And you can barely make him out.  It's a stretch.
25          THE COURT:  All right.  I'll ask somebody else.

1    Okay.

2                MS. FUGATE:  So certainly we don't think any of those

3    LIV statements are "of and concerning" Mr. Reed.  And --

4                THE COURT:  Let me ask you this.  If -- is Mr. Reed,

5    for constitutional purposes, a public figure, a limited public

6    figure?  Does it make any difference?  Tell me about that.

7                MS. FUGATE:  I don't think it makes a difference.  I

8    do think he is a public figure.  I don't think that's

9    contested.  It certainly isn't disputed in the opposition.  But

10   it doesn't make a difference.

11               THE COURT:  Well, I agree with you.  He'd almost

12   certainly have to be one or the other.

13               MS. FUGATE:  And even if you were limited, all of the

14   statements at issue are related to his conduct as a

15   professional golfer.  So I don't think it matters one way or

16   the other.

17               But, Your Honor, out of the *Fortson* case, just to

18   wrap up very quickly on opinion, the court there noted that --

19   especially in sports commentaries, in particular, are likely to

20   contain opinions, because they have traditionally been a haven

21   for cajoling, invective, and hyperbole.

22               When you look at the LIV statements, the fact that

23   they are not about Reed in particular, and in the medium that

24   they were made on Twitter and podcasts, which invite

25   commentary, and in the sports -- and are involving sports

1    commentators who you expect that as well, I think most viewers

2    and readers would understand those statements as hyperbolic.

3            THE COURT:  This is -- so let me just read one of

4    your client's statements.

5            This is "one of the saddest days in the history of

6    golf.  Watching these players come together for money and show

7    to the world ... they are showing us they are the greediest,

8    most self-serving, self-interesting, willfully blind players in

9    the world of golf today."

10           Is that -- is that not -- in your -- obviously your

11   view must be it's not defamatory, because we -- but is it not

12   defamatory because it's not "of and concerning" Mr. Reed?  Or

13   is it not defamatory because it's a statement of opinion?

14           MS. FUGATE:  Both.

15           It is not about Mr. Reed, so it couldn't defame him.

16   But it also is a statement of opinion.  It may be an

17   over-the-top opinion.  It may be boldly stated with very

18   hyperbolic statements, but it is still protected opinion.

19           THE COURT:  "I either messaged or talked to 15 to 20

20   current and past tour players, some of them Hall of Fame

21   members, over the past 24 hours and not a single player is in

22   defence of what Patrick Reed did."

23           And what was that in reference to?  That was in

24   reference to --

25           MS. FUGATE:  That was in reference to the Farmers

1   Open statements, Your Honor.

2          THE COURT:  And when -- when was this in point of

3   time?  When was this statement made in point of time?

4          MS. FUGATE:  That was made right -- the day of or the

5   day after.  It -- that was publication 4 or 5.  It's

6   occurring -- it's occurring at the same time as the Farmers

7   Open statement.

8          THE COURT:  Mr. Reed "violated that [unwritten] code

9   in so many ways that even the rules officials themselves were

10  sort of stammering as to how to address it."

11         MS. FUGATE:  That was certainly Mr. Chamblee's

12  opinion.  And in that same article it was noted that Mr. Reed

13  did not violate any rule, that he was cleared of any

14  wrongdoing.  And Mr. Chamblee noted that as well, that he was

15  legally allowed to do what he had -- what he did.

16         THE COURT:  "Ask yourself this: if everybody in the

17  field were to conduct themselves around a golf ball in this

18  manner, would it be good for the game of golf?  It would not

19  be.  It would call into question every single movement or drop

20  that every single player would be making.  It would cause an

21  uproar on the PGA Tour."

22         You say he wasn't being called a cheater, but it kind

23  of sounds like it.

24         MS. FUGATE:  They were definitely questioning his

25  conduct around the ball.  They were not comfortable with it.

1   But both of the publications made clear that he was absolved of

2   wrongdoing.  But people can disagree with that.

3           THE COURT:  Well, I guess a question would be:  Is

4   calling someone a cheater -- is that an opinion?  Or is that --

5   that's actionable?  Or is it a fact that -- I mean, is it an

6   opinion that's not actionable or a fact that is actionable?

7           MS. FUGATE:  I think it depends on the context.  And

8   here what they're making clear -- he did not technically cheat.

9   He was absolved of wrongdoing.  They never called him a

10  cheater.  They said they were uncomfortable with his behavior.

11  They said ethically it didn't appear good.  They didn't like

12  his behavior around the ball.

13          They showed video of that.  They explained why they

14  had that opinion.  And they're entitled to that opinion.

15  People can disagree about what happened with -- with the bounce

16  and what Mr. Reed did.  And they were not comfortable with his

17  behavior.

18          But both of the publications contained that

19  information, that he was cleared, that he didn't do anything

20  legally wrong.

21          But it's okay to disagree with that assessment.  And

22  that's what the commentators did here.  They disagreed with

23  that.  But they explained the basis for that, and included --

24          THE COURT:  And one of the reasons that we have the

25  defamation laws we do, and one of the reasons that actual

1    malice is the standard -- if you get -- if you actually get

2    past defamation, actual malice is the standard -- is so that

3    those who are invoking the First Amendment don't -- so people

4    like Mr. Chamblee and others don't have to be afraid to pull

5    their punches because they might get sued for defamation.

6            MS. FUGATE:  Absolutely, Your Honor.  And all of

7    these defenses -- we haven't even touched upon actual malice

8    yet, you know, which is a very daunting and overwhelming

9    standard.  And I don't think there's any evidence of that here.

10           To plead actual malice, Mr. Reed has to allege facts

11   that are sufficient to give rise to a reasonable inference that

12   the statements at issue were made with knowledge of their

13   falsity or with a reckless disregard as to their truth or

14   falsity.

15           This is not an objective test.  It focuses -- it

16   focused on the subjective state of mind of each defendant and

17   whether they actually entertained serious doubts as to the

18   veracity of the published account, or was highly aware that

19   the --

20           THE COURT:  I'm looking at a statement here that --

21   and I -- I can get the -- I can get -- from my notes, but -- I

22   can get the complaint.  But at paragraph 110, did your -- did

23   Mr. Chamblee say that Mr. Reed had been bought?

24           MS. FUGATE:  Not that Mr. Reed, Your Honor -- I think

25   that was a LIV -- that was -- he was talking about LIV in

1   general.  It was a statement about his opinion about LIV

2   players being bought to play for the Saudi regime.

3          THE COURT:  So it didn't -- you're saying it didn't

4   name Mr. Reed by --

5          MS. FUGATE:  It did not.

6          THE COURT:  Okay.  I can look that up.

7          MS. FUGATE:  It did not.

8          THE COURT:  All right.  I know you probably have lots

9   more you want to say, but I'll give you a couple more minutes

10  here, because I do need to keep moving.

11         So go ahead.  I'm going to -- I'll be quiet and

12  listen to you.  And you can talk -- tell me something that you

13  want to make sure you get in before you have to sit down.

14         MS. FUGATE:  Very quickly, just the allegations of

15  actual malice here is a lot about the PGA Tour.  I don't think

16  that the -- that because the Golf Channel is associated with

17  the PGA Tour that that somehow establishes that these

18  statements at issue were made with actual malice.

19         There's also a lot of talk about ill will/animosity

20  towards Mr. Reed.  The case law is clear that that does not

21  establish actual malice, even taking it at face value.

22         THE COURT:  So what would be the -- and, you know,

23  Mr. Klayman cited that article that had, like, badges of actual

24  malice and so forth.

25         And I know it's -- it's a relatively rare case that

1 can get past the actual malice standard.  You know, I -- I

2 don't know any details, other than what I read about the -- the

3 case against Fox News, that they settled for a bunch of money.

4 But, obviously, it got to a certain point that -- but

5 it's -- it's a relatively -- as I understand this area of the

6 law, it's a relatively rare case that can overcome the actual

7 malice standard, either at a motion to dismiss or a motion for

8 summary judgment stage.

9 So -- but just -- just so I can understand it,

10 what -- in your view, from the -- from a lawyer who represents

11 media figures, what are -- what would be the -- what would be a

12 couple of things -- or how would you prove actual malice?

13 What's missing from this case that you would need?  That's what

14 I'm asking.

15 MS. FUGATE:  Sure.  And it is, Your Honor -- it is

16 extremely rare, especially in the Eleventh Circuit, which

17 favors motions to dismiss on this issue.

18 It would require allegations of facts of an

19 intentional omission of something regarding the statement at

20 issue.

21 The *Dershowitz* case was -- actually, summary judgment

22 was granted, because there was no evidence of actual malice in

23 that case, but it survived the motion to dismiss because

24 Mr. Dershowitz alleged --

25 THE COURT:  So you're saying -- I did not follow that

1    up.  You're saying that even though Judge Singhal denied the

2    motion to dismiss in part, he ended up granting summary

3    judgment?

4            MS. FUGATE:  Yes, Your Honor.  In that case the

5    allegation was CNN had truncated a clip of Mr. Dershowitz which

6    altered the very meaning of that clip and made it out of

7    context, and of course they knew, because they had the extra

8    part of the clip.  That's why that survived summary judgment.

9            Other allegations, if you completely fabricate

10   something, have obvious reasons to doubt the veracity of

11   something.  But just the buzz words.  And, Your Honor, the

12   *Klayman versus City Pages* case is very instructive on this

13   point.

14           You have to focus on the statements at issue.  Simply

15   asserting "maliciously" throughout the complaint, alleging

16   common law, kind of ill will/animosity is not enough.  You have

17   to focus on the statements at issue.  And you have to have

18   facts that give rise to a reasonable inference that the

19   defendants doubted their statements.  And there are simply none

20   of those facts alleged here, Your Honor.  And that is fatal to

21   the entire case.

22           THE COURT:  Thank you so much.  I appreciate the

23   time.

24           I'm going to take just a five-minute comfort break

25   for everybody.  And so it's 3:20.  We'll be back at 3:25.

```
 1                COURT SECURITY OFFICER:  All rise, please.
 2          (Recess from 3:20 p.m. to 3:26 p.m.; all parties present.)
 3                COURT SECURITY OFFICER:  All rise.  This Honorable
 4     Court is now back in session.
 5                Please be seated.
 6                THE COURT:  All right.  Who's up next?
 7                MR. CHASE:  Good afternoon, Your Honor.  It's Jeremy
 8     Chase for Hatchette Book Group, NYP Holdings, and Mr. Ryan.
 9                Before I dive into the specific statements that are
10     applicable to my client, I kind of want to pick up where
11     Ms. Fugate left off, with actual malice.
12                So she was saying before the complaints -- well,
13     frankly, in both actions -- fail to plead actual -- or to raise
14     an inference of actual malice in either case.
15                She was talking about actual malice, buzz words.  In
16     the complaint in the *Reed* case, the second complaint, there's
17     really only three types of evidence of actual malice that are
18     pled.  One is the buzz words, which, again, courts routinely
19     disregard.
20                The second is animus or ill will, which, again,
21     there's sort of subheadings underneath that that Mr. Reed
22     pleads.  One is prior negative coverage.
23                As it pertains to my clients, the only negative
24     coverage that he actually alleges is a book from 2015.  That's
25     it.  So we're not talking about a pattern of negative coverage
```

1   over the years.  It's really one book.

2         The other subcategory of animus, really, is this cozy

3   relationship that he alleges between the PGA Tour --

4         THE COURT:  Why -- why -- there must be a good reason

5   for this, because you would have done it otherwise, but -- but

6   I'm looking at -- some of the quotes that are alleged to be

7   defamatory come from this 2015 book, right?

8         MR. CHASE:  Yes, Your Honor.  So the 2015 -- well,

9   let me back up for one second.

10        So the 2015 book was the basis for some of the

11  subsequent reporting from the '22 -- for the '22 book.  And

12  for -- as it pertains to the *New York Post* article, most of the

13  statements are discussing what was reported in the '22 book.

14  And there are a couple of references to the 2015 book as well.

15        THE COURT:  Does the 2022 book just republish or

16  recapitulate what was in 2015?

17        MR. CHASE:  As it pertains to his college career,

18  that's correct.

19        THE COURT:  Okay.  Because I was wondering -- because

20  you would think that any defamation based upon a book written

21  in 2015, the statute of limitations would have run a long time

22  ago.

23        MR. CHASE:  Well, that's correct, Your Honor.  And

24  that's also one of the reasons why the plaintiff will be unable

25  to show actual malice here, aside from what's pled in the

1    complaint.

2           There's tons -- there's a lot of case law, Your

3    Honor, on the point that a failure to -- a subsequent

4    publisher's knowledge that a plaintiff failed to take legal

5    action earlier negates an inference of actual malice.  That's

6    the *Costa-Gavras* case in the Southern District of New York.

7    And there are others along those lines.

8           But as it pertains to what's actually in the

9    complaint, Your Honor, the -- the plaintiff alleges this cozy

10   relationship and this conspiracy between LIV Golf, and -- I

11   mean, between the PGA Tour and various media entities -- aside

12   from the fact that it's a very shaky theory to begin with, as

13   it pertains to my clients, Mr. Ryan's book was published in May

14   of 2022.

15          Mr. Reed announced that he was joining the LIV tour

16   in June of 2022.  So to the extent that this conspiracy to take

17   down the LIV tour existed, which we contend it did not, it --

18   just simply based on the facts that are in front of Your Honor,

19   it clearly didn't apply as a basis for asserting actual malice

20   against my clients here.

21          So, frankly, these allegations of ill will, honestly,

22   wouldn't even be enough to raise an inference of ill will, let

23   alone constitutional actual malice.

24          The other category of information -- or allegations

25   that he alleges is a failure to investigate, that the

1  defendants chose not to speak with his college coaches,

2  teammates, and PGA Tour officials about the incidents described

3  in the book.

4          As Ms. Fugate said earlier, this is -- actual malice

5  is a subjective standard.  It is not an objective standard that

6  measures whether or not someone engaged in responsible

7  reporting.

8          That said, Mr. -- Mr. Ryan absolutely did engage in

9  responsible reporting.  The -- Mr. Reed alleges in his

10  complaint, at paragraph 39, that Mr. Ryan was given

11  unprecedented access, behind-the-scenes access to PGA Tour

12  players, families, and agents.

13          The 2015 book, which is before Your Honor, makes

14  clear that Ryan spoke with his coaches -- with Reed's coaches

15  and teammates.  He quotes them liberally.

16          And the book and article that are the subjects of

17  this lawsuit prominently include Mr. Reed's denials and

18  explanations of each of these events.

19          Now, they don't necessarily agree with them, but they

20  absolutely include them.

21          Your Honor, a good point of comparison here -- well,

22  actually, before I get there, Mr. Klayman raised two other

23  points in oral argument that weren't -- that aren't actually

24  alleged in the complaint.

25          But one was a failure to retract is somehow evidence

1    of actual malice.  In *Klayman v. City Pages*, where plaintiff's

2    counsel was the plaintiff, the court rejected this, citing *New*

3    *York Times v. Sullivan*, saying that post-publication conduct

4    was -- did not show actual malice.

5           He also raised the failure to go to the subject of a

6    story before publication.  Again, there's case law -- *Loeb v.*

7    *New Times*, which is a Southern District of New York case from

8    1980, and *Secord v. Cockburn,* a D.C. -- a District of D.C.

9    case from 1990 -- both of those say that that is -- there is no

10   duty to go to the source -- to the subject of a story before

11   publishing.

12          Does it lessen the likelihood of there being a

13   finding of actual malice?  Perhaps.  But there's no duty to do

14   so.

15          So all of this put together, Your Honor, simply does

16   not establish a reasonable inference of actual malice if these

17   allegations were to be deemed true.

18          I want to compare this -- draw Your Honor's attention

19   to the *Michel v. NYP Holding*'s case from the Eleventh Circuit

20   in 2018.

21          There, the rapper Prakazrel Michel alleged the same

22   three types of evidence of actual malice that the plaintiff

23   does here.

24          Again, actual malice, buzz word, a failure to

25   investigate, a campaign against him that led to -- you know,

1    that created an inference of ill will or common law malice.

2         And in that case Michel also alleged that the

3    defendant received an e-mail the day before publication from a

4    source that indicated that what they were about to publish the

5    next day was false.  And the Eleventh Circuit still held that

6    that was insufficient to plead actual malice on a 12(b)(6)

7    motion.

8         The plaintiff just doesn't have anything that

9    approaches that.  And, again, the Court should dismiss on

10   actual malice grounds against everyone.

11        Now --

12        THE COURT:  So does -- does the -- you know, these

13   were the questions I was asking Ms. Fugate, but -- so this

14   whole issue of cheating -- whether he was accused of cheating

15   and that was reported is -- what's the -- what's your position

16   on -- on -- on those issues; that is, with respect to -- first

17   of all, the statements that are being attributed to your

18   clients; and, secondly, is it -- is your client accusing

19   Mr. Reed of cheating?  Or are they just reporting that other

20   people said that he did so?  What -- talk to me about that a

21   little bit.

22        MR. CHASE:  Yes, Your Honor.  So to answer your last

23   question, we -- my clients' reports were about what allegations

24   of cheating had been made against Mr. Reed.  Nowhere in the

25   book, in the article, or even in the 2015 book, did anyone

1  affirmatively say that he cheated.  That is not in any of these

2  publications.  However, what they did do was report on

3  allegations that his teammates made in college.

4          Now, Mr. Klayman has pointed to these statements from

5  his college coaches as somehow evidence that my clients were

6  aware that he didn't cheat.  Reading the actual statements

7  themselves, Your Honor, it makes quite clear that they did not

8  say, ever, that Mr. Reed did not cheat.  They said they were

9  unaware that he was cheating.  Those are two very different

10 things.

11         And, frankly, Mr. -- Mr. Ryan saw those statements

12 after Mr. Reed put them out.  And he tweeted shortly after that

13 that he stood by his story.

14         Now, it simply does not --

15         THE COURT:  Well, can you -- is it -- if you assume

16 arguendo it's -- it would be potentially defamatory to say

17 somebody had cheated when they didn't -- so if you assume that

18 you -- if you said some -- to somebody, or that you made that

19 assertion in a publication or -- if you assume that arguendo

20 and that can be defamatory, is it completely inoculated if you

21 say, "I'm not saying you cheated.  I'm just saying other people

22 said you cheated"?

23         Is it -- does that just make it fine?

24         MR. CHASE:  Again, it depends on the context, Your

25 Honor.  But I do want to draw your attention to one case that I

1    think addresses what you're -- what you're getting at, which is

2    the *Jones v. Buzzfeed* case.  That case is out of the Northern

3    District of Alabama, just -- decided just last year.

4           There there was a statement that -- a rape accusation

5    was made.  And the court held -- dismissed that case on the

6    ground that it was true and not actual -- again, this is on

7    summary judgment.

8           However, that was just an accusation of rape; rape,

9    which is far more serious than cheating at golf.  And the court

10   still dismissed that on the ground it was true that the

11   accusation was made.

12          So there are other instances like that.  *Abbas v.*

13   *Foreign Policy Group*, this is out of the District of D.C. in

14   2013.

15          THE COURT:  Well, so you're saying -- again, I

16   understand the underlying premise.  I don't know if you agree

17   with it or not.  But if somebody -- let me ask you this.

18          If somebody is, for lack of a better term, falsely

19   accused of cheating in a game, is that -- could that be a

20   defamatory statement?

21          MR. CHASE:  It depends on the -- on the basis -- on

22   the underlying basis.  Here, there is no question -- so, for

23   instance, Your Honor, the 2019 statements at the Hero World

24   championship, those statements pertained to Mr. Reed grounding

25   his club in a waste area and sweeping away the sand from behind

1   it.  It was caught on video.

2          He was assessed a two-stroke penalty for that

3   conduct.  He committed a violation.

4          Does that necessarily mean that he had the intent to

5   cheat?  It's unclear.  That's a matter of opinion.  So the

6   accusation of cheating is infused with opinion.

7          So -- so in the situation that you raised, where

8   someone just accuses an athlete of cheating at the sport, in a

9   vacuum, without proper explanation of what the actual issue

10  was, yeah, I suppose it could be defamatory.

11         But in this case, even with the college -- the

12  situations at the college, we've explained exactly what the

13  issues were.  One was alleged to -- he was alleged to have

14  shaved strokes off of his score.

15         Well, his college coach at Augusta State attested to

16  the fact, in a sworn statement, that Mr. Reed did, in fact,

17  admit to sending him a scorecard with one stroke off.  And

18  Mr. Gregory then also said in the sworn statement that he

19  suspended Mr. Reed for two matches as a result.

20         Now, does that mean that Mr. Reed was cheating?

21  Mr. Gregory says no.  Other people might believe that someone

22  who submits a scorecard with one stroke taken off and is

23  ultimately suspended by his coach for two matches did cheat.

24  It's a matter of opinion.

25         THE COURT:  So your client, in one of the

1    allegations -- in paragraph 74 -- I won't read the whole thing,

2    but, "The end result was that Reed's teammates, who had

3    previously been silent, came out of the woodwork to crucify him

4    further, confirming old details and adding new ones."

5          Is it -- does the publication -- or does the author

6    have to identify those teammates?  Is it sufficient -- and

7    maybe they did.  You can tell me if they did.

8          But is it sufficient to say -- again, I'm just -- I'm

9    kind of focused on this.  Is it -- can you get out of liability

10   for defamation by saying, "I'm not saying you're a cheater," or

11   in another context, "I'm not saying you're a thief, but other

12   people are saying it"?  Is that -- does that -- and, "I may or

13   may not tell you who those people are"?

14         And is that -- how do you analyze that under

15   defamation law?

16         MR. CHASE:  Well, so you're kind of getting to the

17   question of what is a public controversy?  You know, there are

18   going to be instances where individuals do something and it

19   becomes a big -- a massive public controversy.

20         People can't be restricted from commenting on that

21   public controversy simply because they didn't identify -- you

22   know, people have opinions, I guess is the point.

23         And as it pertains to the specific statement that

24   you're referring to, this -- the statement about people coming

25   out of -- his teammates coming out of the woodwork, Mr. Ryan

1   doesn't need to specific- -- in a book, specifically say in

2   this article these people came out of the woodwork.

3          The article was on *Deadspin*.  And he, in fact, in the

4   very next line of the story, says the *Deadspin* article with the

5   title.  And it -- it includes a full discussion of all of these

6   teammates coming out of the woodwork.

7          So, you know, it's not required, but he did it.  He

8   did the work and he pointed readers in that -- in the direction

9   of where the information was.

10          So it's just -- you know, look, Mr. Reed -- I'm sure

11   no one wants to be branded a cheater, but that's also not what

12   my clients did.  My clients were reporting on the facts that

13   there are a lot of people, including his teammates, other pros,

14   who do not view him in a very favorable light.  And he is a

15   public figure and they can report on that.

16          Now, Your Honor, I do -- before moving along, I do --

17   I do want to address a couple of other points, one of which is

18   the wire service defense, Your Honor.

19          For the *New York Post*, that article is one level

20   further removed from the book, as each statement that Mr. Reed

21   is challenging in the *New York Post* article is drawn directly

22   from either the 2022 book or the 2015 book.

23          Now, a publisher can rely on the research and

24   reporting of an earlier publisher absent a showing of a reason

25   to question the accuracy of the prior report or the bona fides

1    of the report.

2           Now, here Mr. Reed fails to allege any reason why the

3    *Post* -- now, his complaint is very much in 20- -- you know, the

4    end of 2022, after all these publications are written.

5           But he fails to allege any reason why the *Post* should

6    have questioned the accuracy of Mr. Ryan's books.  Mr. Ryan was

7    published by two massive reputable publishers, Penguin Random

8    House and Hachette Book Group, respectively.

9           And he also knew he -- sorry.  The *Post* knew that

10   Ryan was given unprecedented access to the PGA Tour and players

11   in both books because it says so in the book.  And if you read

12   the book, you see that he has spoken with dozens and dozens and

13   dozens of sources.  So there simply -- for the additional

14   reason, the *New York Post* should be dismissed on that ground as

15   well.

16          Now, there's another issue that Your Honor should be

17   aware of that -- that kind of goes to all of -- all of the

18   defendants here, which is plaintiff's failure to plead special

19   damages.

20          Now, initially, Florida law does not recognize a

21   claim for defamation per se against media defendants.  That's

22   the *Edelstein v. WFTV* case from the Florida Supreme Court.

23          So, therefore, the plaintiff's separate defamation

24   per se claim should be dismissed.  But as a result of that, he

25   is required to plead -- specifically plead special damages, as

 1  well as how those special damages were caused by -- by the

 2  defamation.

 3          Now, the exact same special damages are alleged in

 4  both complaints, the *Chamblee* case, paragraphs 15 to 18, and in

 5  the *Ryan* case, 20 to 23.

 6          Both of those are lost endorsement deals.  And

 7  coaches didn't want to work with him, because, he's claimed --

 8  because, he alleges, of his signing with LIV Golf in June 2022

 9  and defendants' supposed conspiracy to defame him.

10          That's what's alleged.  Those are the only special

11  damages that are alleged in the complaint.

12          Nowhere does he allege that any of those supposed

13  damages were caused by any particular publication.  There's no

14  attempt to isolate, nor could he, what, if any, publication

15  caused these supposed damages.  And, therefore, he fails to

16  plead special damages directly attributable to any particular

17  publication, which is an element of his cause of action.

18          I --

19          THE COURT:  Let me ask you one other thing before

20  I --

21          MR. CHASE:  Yeah.

22          THE COURT:  -- because we're going to run out of time

23  here.

24          MR. CHASE:  Of course.

25          THE COURT:  In a footnote -- and this gets back to my

1   question to Ms. Fugate about the statute of limitations.

2         MR. CHASE:  Sure.

3         THE COURT:  In the -- in a footnote you said that New

4   York law should apply, but you -- you also cite Florida law in

5   your analysis.

6         Is that a statute of limitations issue?  Is it just a

7   New York law issue?  What -- what's the -- what's your --

8         MR. CHASE:  Sorry.

9         THE COURT:  I'm not sure what your position is.

10        MR. CHASE:  My position, really, Your Honor, is that

11  it doesn't matter.  New York law and Florida law are quite

12  similar.

13        The special damages point that I just spoke about,

14  Your Honor, is specific to Florida law.  So to the extent you

15  decide that Florida law applies, then that's another basis for

16  dismissal.  If you decide that New York law applies, then,

17  obviously, that's a separate question.

18        The point of that footnote was just to say that it

19  was unclear, given the citizenship of the parties and where

20  these events took place, that -- we just wanted to make it

21  clear for Your Honor.

22        THE COURT:  Well, are you taking the -- okay.  I

23  understand that.  But you also -- because you represent AP and

24  Ferguson, too, right?

25        MR. CHASE:  No, I do not.  That's Ms. LoCicero.

1              THE COURT:  All right.  Sorry.

2              MR. CHASE:  There's a lot of parties here.

3              THE COURT:  You can't tell the players without a

4    scorecard.  All right.  Because I -- because there's a

5    limitations issue there.

6              MR. CHASE:  Yes, that's correct.

7              THE COURT:  I think I'm going to have to leave it

8    there, sir.

9              MR. CHASE:  Fair enough.

10             THE COURT:  Thank you.

11             MR. CHASE:  Thank you.

12             THE COURT:  Good afternoon.

13             MS. LOCICERO:  Good afternoon, Your Honor.  I want to

14   make it clear -- Carol LoCicero -- I'm representing two -- I'm

15   handling two motions; one of them is in *Reed I* and one is in

16   *Reed II*.

17             So if we start with the *Reed I* motion, which involves

18   Gannett and the *Golfweek* articles, just chronologically that

19   might make sense.

20             THE COURT:  All right.

21             MS. LOCICERO:  I want to make it clear what the two

22   articles at issue for Gannett and *Golfweek* are, because, you

23   know, we're not talking about a book and massive amounts of

24   discussion about Mr. Reed.  We're talking about two articles.

25             The first one is an opinion piece by Mr. Lynch that

1    is entitled *PGA Tour's war with LIV Golf enters 'Return of the*

2    *Jedi' phase*.

3           And the second article at issue is another opinion

4    piece by Mr. Lynch, *LIV Golf's problems aren't limited to Greg*

5    *Norman's incompetence.  Replacing him won't solve them.*

6           So with respect to the *Golfweek* articles, it's

7    particularly important to focus on the "of and concerning"

8    issue.

9           The first column is about the commentary, lots of

10   Star Wars references, talk about the evil empire, referring to

11   the kingdom of Saudi Arabia, talking about sportswashing, which

12   is a coin term for, you know, making things look at the sports

13   and not at the atrocities that the kingdom may be committing,

14   and then cutting and running is what players did, taking LIV

15   money, instead of staying with PGA Tour.

16          So there's no reference to Mr. Reed in the articles.

17   There's no description that would lead you to even think of

18   Mr. Reed in the articles.  And -- and the --

19          THE COURT:  So is it -- so are you saying that -- are

20   you saying it should go out on "of and concerning"?

21          MS. LOCICERO:  I'm saying that you've got a buffet,

22   Your Honor.  You can pick, kind of, whatever dish you want.

23   One of them could be "of and concerning," because there's not

24   any reference to Mr. Reed.

25          There's nothing that particularly describes Mr. Reed

1    in the articles that I'm here on.  And there's nothing -- and

2    the group libel concept, it just -- it virtually makes no sense

3    in the -- to try to apply that -- that theory, that if you're

4    talking about LIV Golf you're talking about every player or

5    anybody in the organization who touches LIV Golf.

6              So "of and concerning" would be one way to dismiss

7    the case, as a matter of law.  Lack of actual malice -- and I

8    think one case that I want to point out on actual malice is

9    *Turner versus Wells* out of the Eleventh Circuit in 2018.

10             It's a very recent -- comparatively recent case about

11   actual malice.  And it's -- it's instructive because it went

12   out on a motion to dismiss as a matter of law.

13             And it involved a 144-page report about a coach for

14   the Miami Dolphins, and lots of allegations that were going

15   around in the locker room about bullying of a lineman and how

16   the coach handled it and he was ultimately fired.

17             The Eleventh Circuit had no problem getting rid of

18   the lawsuit that the coach brought about that report on a

19   motion to dismiss with prejudice.

20             And a lot of the issues are instructive here because

21   the report was a report that talked about, you know, kind of

22   everything that was going on in the locker room.  And then

23   there were -- based on those facts in the investigation, there

24   were conclusions that the law firm reached.  There was no

25   actual malice there.  Opinion was a defense in that case.

1        There wasn't an "of and concerning" issue in *Turner*.

2   But actual malice based on the *Turner* decision and the other

3   decisions that have been discussed today is another way for you

4   to get rid of the lawsuit against the *Golfweek* columns.

5        Another way is rhetorical hyperbole.  The language

6   particularly that's used in the *Return of the Jedi* phase/story

7   is very figurative.

8        And the United States Supreme Court in *Milkovich* has

9   recognized that figurative language and expression and

10  hyperbole is not the subject -- the stuff of a defamation

11  action.

12       So I guess what I'm saying is that you can -- you can

13  dismiss on multiple or independent grounds all of the

14  defamation claims in *Reed I* against the *Golfweek* defendants.

15       THE COURT:  Was there -- in the *Turner* case, was

16  there a -- and I don't recall, have you -- I know a number of

17  you pled entitlement under the anti-SLAPP statute.

18       Were you one of them?

19       MS. LOCICERO:  I'm one of them.

20       THE COURT:  Okay.  And did *Turner* involve the

21  anti-SLAPP statute, or not?

22       MS. LOCICERO:  *Turner* did not involve the anti-SLAPP

23  statute.  What I want to make sure the Court is aware is that

24  Florida's anti-SLAPP statute is a little different from

25  other -- it's a lot different from other states' anti-SLAPP

1   statutes.

2           And I was involved when -- an advocacy when the

3   statute was being amended to encompass news reporting.  And

4   what our statute does in Florida is it creates a substantive

5   right to fees if the statute is violated, if a lawsuit is

6   brought without merit involving news reporting.

7           And our contention here is that that's exactly what

8   happened.  And because it's a substantive right and not a

9   statute with a bunch of procedural staying discovery, and you

10  can't do this and you can't do that, and the Court has to, you

11  know, handle things in a certain order, in a certain way,

12  federal courts have applied Florida's anti-SLAPP statute

13  where -- where the Georgia anti-SLAPP statute in *Carbone*, which

14  had more procedural requirements, the Eleventh Circuit said

15  didn't apply.

16          THE COURT:  Well, because I -- because Mr. Klayman, I

17  guess, cited a quote from Chief Judge Pryor at an oral

18  argument, that cast some doubt on it.  I don't know what

19  happened in that case because I didn't get a chance to look at

20  it.

21          But is it -- is there a case -- you're saying it's

22  been held by -- by district courts to apply.  Why -- so why

23  wouldn't it have been in the *Turner* case, would be question

24  one.

25          And, number two, is there any Eleventh Circuit actual

1    decision on the Florida statute?  Or is it all trial court?

2            MS. LOCICERO:  It's all trial court.  There's no

3    Eleventh Circuit decision about the Florida statute applying.

4    And *Corsi* happened to be handled by one of my law partners.

5            It settled after -- it settled before the Eleventh

6    Circuit ruled.  So there was no ruling in *Corsi* about the

7    anti-SLAPP statute.

8            But what we cite in the papers is that there have

9    been -- I think at least four or five decisions that we cite.

10   And there -- there are more out there applying the Florida's

11   anti-SLAPP statute in federal court.

12           THE COURT:  And is it as simple as -- because I've

13   never been asked to apply it before.  Is it as simple as -- in

14   Florida, if you sue a media publication or a media person for

15   something they wrote or published and a motion dismiss is

16   granted or a motion for summary judgment is granted, that the

17   court is required to award attorney's fees in favor of the

18   defendants that the plaintiff has to pay?

19           Is it just that simple?  Or is there -- since you

20   helped write it, what -- is it -- is there any discretion in

21   the court?  Is there any caveat to that?  Or is it just that

22   simple?

23           MS. LOCICERO:  Okay.  I'm not claiming credit for

24   helping write it.  It's not clear enough for me to claim credit

25   for helping write it.

1       The -- what I can say is that, in practice, it often

2  works the way that you're describing.  If there's a motion to

3  dismiss or a motion for summary judgment granted, often an

4  anti-SLAPP award is made, because -- especially when you're

5  talking about a motion to dismiss, like we are here.

6       You know, you're talking about significant matters of

7  law that have been extensively briefed and that the -- that the

8  plaintiff should understand the defects in their case.

9       I'll also point out that it's a prevailing party fee

10  statute.  So it's not a -- a -- sort of a --

11       THE COURT:  So if Mr. -- in this case, if the Court

12  either grants the motion to dismiss with respect to some or all

13  of the parties, or grants a motion for summary judgment,

14  whichever parties won that -- whichever defendants won that,

15  they could seek an award of attorney's fees from Mr. Reed?

16       MS. LOCICERO:  Whichever plaintiff wins --

17       THE COURT:  Whichever party wins you mean.

18       MS. LOCICERO:  I'm sorry.

19       Whichever party wins could seek an award of fees.

20       THE COURT:  And I was going to put it the other way

21  around.  So you're saying if -- if I grant the motion to

22  dismiss as to your client or some other client, or a motion for

23  summary judgment, you could turn around and ask Mr. Reed to pay

24  for your attorney's fees, but vice versa would be true as well;

25  if he wins the case, then he could ask -- he could ask you to

1   pay his fees?

2        MS. LOCICERO:  If he wins -- if he wins on grounds

3   that basically showed that our grounds were wrong.

4        THE COURT:  Okay.

5        MS. LOCICERO:  But I point that out, Your Honor,

6   because that's part of the reason that -- that --it's a

7   fee-shifting statute.  And it has been applied in federal court

8   as a substantive right.

9        With respect to the second motion, if you want to

10  move to that one --

11       THE COURT:  Yes.  Yes, please.

12       MS. LOCICERO:  -- the -- all the things that everyone

13  else has already said about actual malice -- and, you know, a

14  failure to retract is not evidence of actual malice.  Ill will

15  isn't an actual -- isn't evidence of actual malice, which is,

16  you know, a constitutional standard -- applies in *Reed* -- in

17  our motion to dismiss on behalf of AP and Mr. Ferguson, as well

18  as in our motion to dismiss for Gannett.  I won't belabor them

19  again, because the arguments are not different.

20       But I will add for the Court that *Turner versus Wells*

21  made it clear that conclusory allegations that just cite the

22  standard do not satisfy the pleading requirements for actual

23  malice.

24       Mr. Ferguson's article is also an opinion piece about

25  sort of the issues that Mr. Reed is facing, in many ways

1  because of the fallout from what has happened in various

2  tournaments.

3          It reports on -- on the public perception, the fact

4  that at matches -- sorry, at tournaments the spectators yell

5  things like "cheater" at Mr. Reed, and that -- that there is --

6  that there's a reputation that has -- has been built for -- you

7  know, that the public perceived him as a cheater.

8          And so the AP article talks in great depth about the

9  incidents that you've already heard about, the one in the

10  Bahamas, as well as the one at Torrey Pines in California, with

11  the Farmers Insurance Open, and the fact that he -- that

12  Mr. Reed was not found to have committed any rule violation in

13  California at the Farmers tournament, and that with respect to

14  the Bahamas he got a two-stroke penalty.

15          But -- but, again, the column is replete with

16  opinion, lacks -- there's an actual malice -- a lack of actual

17  malice.

18          And we've also raised the borrowing statute in that

19  second motion to say that either the one-year Texas or New York

20  statute of limitations applies and is another ground on which

21  the Court can dismiss.

22          THE COURT:  Okay.

23          MS. LOCICERO:  Thank you, Your Honor.

24          THE COURT:  Thank you.

25          MR. HERBERT:  Good afternoon, Your Honor.

1              Gregory Herbert for Bloomberg and Mr. Larson.

2              THE COURT:  All right.

3              MR. HERBERT:  So I wanted to take a step back first

4    and remind the Court about what the claims against my clients

5    are based on.

6              Unlike some of the other clients that are more

7    involved, their lengthy publications, this -- claims against

8    Bloomberg and Mr. Larson are based on one short article.  And

9    the only statements alleged to be defamatory are the headline

10   and one statement within the article.

11             Stepping back a bit further, really, I think as Your

12   Honor alluded to earlier --

13             THE COURT:  You're the silhouette, right?

14             MR. HERBERT:  I'm the silhouette.  I've been called

15   worse.

16             THE COURT:  So I'm looking at it here.  And there's a

17   picture of a golfer taking a swing and there's a sunset and so

18   forth.  And I guess that's Mr. Reed?

19             MR. HERBERT:  No, Your Honor.  Just so, for the

20   record -- this is not part of the record.  That is a photo that

21   was replaced after Mr. Reed made his claim.  The original photo

22   is in the docket at 50-1.  That's a photo of Mr. Reed looking

23   down with the LIV Golf logo on his hat and the LIV logo name

24   on --

25             THE COURT:  Can I see that?  Then I'm looking at the

1    wrong thing here.

2           MR. HERBERT:  I do have some hand markings on here.

3           THE COURT:  That's all right.  I won't hold it

4    against you.  Yeah.

5           MR. HERBERT:  It is at docket 50-1.

6           THE COURT:  Okay.  So that's more like -- yeah.  All

7    right.  So he is identifiable.

8           MR. HERBERT:  Arguably, it doesn't necessarily matter

9    to the claim.  It does nothing to negate our defenses.

10          THE COURT:  Okay.  All right.  I get you now.  All

11   right.

12          MR. HERBERT:  And the big-picture point is that -- as

13   Your Honor alluded to, this is -- the "of and concerning"

14   defense applies here as well, because the headline and the

15   single statement in the article are not, by any means, about

16   Mr. Reed.

17          You can see the headline is, quote, *Saudi-Backed LIV*

18   *Golf Is using PGA Suit to Get Data on 9/11 Families, Court*

19   *Told*.

20          Now, there's really no dispute that that's a true

21   statement.  This article is about this litigation between LIV

22   Golf and the PGA Tour; notably, litigation that is going on in

23   California and in Washington, D.C.

24          And in the course of that litigation, as often

25   happens in litigation, one of the parties -- actually, a

1  non-party in the case -- accused LIV, one of the parties to

2  that other litigation, of essentially abusing the discovery

3  process to get personal information on the families of the

4  victims of the 9/11 tragedy.

5          So that would -- that statement in the headline is

6  obviously covered by the fair report privilege under the First

7  Amendment.

8          Journalists are clearly entitled to report on the

9  allegations in other federal court proceedings.  And that is

10 regardless of whether the underlying allegation itself is true

11 or false.  The press is entitled to make a fair report of other

12 ongoing litigation, which the headline is.

13         But more importantly here, if you look at the

14 sub-headlines as well, the sub-headlines go to the actual

15 malice question, because the sub-headlines, which appear right

16 below the headline -- and I don't know if you -- have you gone

17 to docket 50-1?  Okay.  I guess the sub-headlines are the same,

18 regardless of the picture.

19         The first sub-headline is *PGA's PR firm says Saudis*

20 *seek documents on unrelated clients*.

21         That obviously is naming and referencing Saudis, some

22 of the backers of LIV Golf.  As far as we know, Mr. Reed is not

23 a Saudi.  That certainly isn't of any concern to him.

24         The second sub-headline is essentially bringing the

25 counterargument -- or counterpoint, *LIV argues PGA used PR firm*

1   *to coordinate 9/11 group protests.*

2           So as with all the other defendants, plaintiff comes

3   nowhere near establishing or pleading, plausibly, actual

4   malice.  And different elements of the article -- as the *Michel*

5   case says, the fact that it's a point -- counterpoint that

6   opposing points of view are mentioned, and, in fact, the

7   article itself -- if anybody was criticized in this article in

8   any way, it really was either the lawyers or the principals of

9   LIV Golf and their litigation tactics.

10          THE COURT:  Well, why wouldn't that -- so let me make

11  sure I'm right.  Because we obviously -- we were looking at the

12  link, but the link -- I guess you replaced the picture now; is

13  that right?

14          MR. HERBERT:  It's not in the record, Your Honor.

15  And I don't want to refer to things that aren't in the record,

16  unlike some of the things that we saw up on the screen today.

17          THE COURT:  Well, it's okay if I ask.

18          So now the picture that used to be linked to -- I

19  mean, the picture that used to be there isn't there anymore,

20  and there's a silhouette person.

21          The original picture, the one that was sued on,

22  though, you can identify Mr. Reed, if you know who he is.

23  And -- and isn't -- is that enough to link him to the article

24  so that if -- so that if there are defamatory statements in

25  that article, that it could be -- it could be attributed to

1    him, so it could be thought to be "of and concerning" him, or

2    not?

3             MR. HERBERT:  The Eleventh Circuit says absolutely

4    not.  Two cases that we cited, the *Rubin* case and the *Parekh*

5    case, are very, very similar.

6             And let me also just back up and add that there is no

7    underlying defamatory statement.  This really all boils down

8    to -- the claims against my client boil down to a defamation by

9    implication argument, which is, you know, part and parcel of

10   the "of and concerning" argument, because the plaintiff's

11   argument is that it's clearly implied that these negative

12   things that you're saying about LIV, and really about LIV's

13   lawyers, or the people who directed the lawyers to engage in

14   this -- discovery tactics, that's really about him, because of

15   his photo.

16            But in order to have a libel by implication, you have

17   to have a defamatory statement.  And there's no defamatory

18   statement here.  There's simply a fair report of what occurred

19   in the litigation.  And then there's simply a mild expression

20   of opinion that if those allegations in that federal court

21   litigation are true, you could deem that to have taken a,

22   quote/unquote, sinister turn.

23            But to get back to your question, which is simply

24   using the photo of a plaintiff in an article that may or may

25   not have defamatory statements in it, is that enough for a

1    defamation or defamation by implication claim?

2         In both *Rubin* and *Parekh*, both Eleventh Circuit

3    cases -- both cases rejected or dismissed libel by implication

4    claims that were based on the use of a plaintiff's photo and a

5    story that really wasn't about the plaintiff, just like this

6    story is not about Mr. Reed.  And no amount of twisting and

7    contorting can make it seem that way.

8         Both of those cases, *Rubin* and *Parekh*, involved not

9    only the use of the plaintiff's photo, but those also -- in

10   those articles, in those cases, they named the plaintiff -- or

11   they quoted the plaintiff.  They -- and they used the photo of

12   the plaintiff as an illustration for -- in one case, to put a

13   name with the quote.  But you still have to look at the

14   statements themselves and are they defamatory.

15        In the *Rubin* case, it was a case about -- and some of

16   my colleagues here, I think, worked on both of those cases.

17   The *Rubin* case was a case about the gold refinery industry.

18   And it made certain allegations about industry generally, and

19   made some unflattering allegations about how business is

20   conducted in that industry.

21        Mr. Rubin talked to the press and let his picture be

22   taken.  His picture was used in the article.  And he said,

23   "You're really talking about me.  You're accusing me of

24   engaging in these unsavory practices."

25        The Eleventh -- the court in the Eleventh Circuit

1  affirmed it and said, "No, that is not a reasonable nor

2  plausible implication to make.  We're making statements about

3  the industry generally.  You gave a quote.  We used your photo.

4  You cannot reasonably and plausibly imply that the article is

5  all about you."

6              In the *Parekh* case it was an article about Parekh's

7  girlfriend and a GoFundMe scam.  And it happened to include a

8  picture of him with her, together.  And the court said

9  that --

10             THE COURT:  All right.  I take your point on that.  I

11  do want to -- and you can probably, I hope, see why I

12  structured the arguments the way I have, because I'm trying to

13  go from the people that have been -- the most to the people who

14  have been alleged the least.  And you're -- you're close to the

15  bottom here.  But I do want to ask you a question about

16  Mr. Larson.

17             You've made a personal jurisdiction argument

18  concerning him.  And could you elaborate on that briefly for

19  me, please.

20             MR. HERBERT:  Certainly, Your Honor.  Just two key

21  points.  One is that, under the Florida long-arm statute, the

22  allegations against Mr. Larson are shotgun allegations.

23  They're not at all related to him personally.  They're not even

24  related to the publication that he authored at all.

25             It says something about all defendants and all their

1    publications were published in Florida and those acts were

2    directed at Florida.

3         So on -- on the pleading standard basis alone, it's

4    not plausible and should be dismissed on those grounds.

5    There's plenty of cases that have thrown out conclusory shotgun

6    type of allegations on -- under the long-arm statute.

7         But, more importantly, under the due process

8    argument, there's no allegation -- no plausible allegation that

9    Mr. Larson, who was an individual who lives in Brooklyn,

10   directed or focused this story toward Florida.

11        The only connection with Florida, in connection

12   with -- this is a story about golf.  As Your Honor mentioned,

13   it's an international dispute, an international controversy, an

14   internationally watched game.

15        It was directed to the entire world, or at least all

16   50 states, for purposes of U.S. personal jurisdiction.  The

17   only connection to Florida is Mr. Reed.  And Mr. Reed is not

18   even a Florida citizen.  He's a Texas citizen, according to the

19   pleadings he's filed in another case.

20        So the plaintiff cannot be the only connection to the

21   forum with -- the defendants' only connection, but it has to

22   allege that the defendants purposely directed their conduct

23   towards the state of Florida.

24        The fact that the PGA Tour may or may not have a

25   principal place of business here is irrelevant.  The PGA Tour

1    is not the plaintiff.  And the PGA Tour is not alleging any

2    harm here.  So there was no purposeful direction or availment

3    of the -- attempt to harm anything in the state of Florida.

4              THE COURT:  All right, sir.  I'm going to -- if you

5    want it, I'm going to give you just a couple of minutes to say

6    anything else that's on your mind that you haven't gotten to

7    say, and then we'll leave it at that.

8              MR. HERBERT:  Well, as I -- I was about to finish up

9    on the *Rubin* and the *Parekh* cases.  In those cases the

10   allegations were stronger.  Mr. Reed's claim here is much

11   weaker.  He is not mentioned in the article.  He's not named in

12   the article.

13             I counted it up and there are actually 15 different

14   individuals -- or entities that are specifically named and

15   referenced in the article, including Phil Mickelson; including

16   another golfer Cameron Smith.  Any of them would still have a

17   meritless claim, but would have a better claim than Mr. Reed.

18             Donald Trump, Scott Walker, Ted Cruz are mentioned in

19   the article.  And, in fact, going through the actual malice

20   element, Keith Frost, the lawyer for LIV, who apparently was

21   the one who executed the sinister plan of the discovery

22   abuses -- he's mentioned in the article.  He's not filing a

23   lawsuit.  He wouldn't have a claim.

24             But Mr. Larson reached out to him for comment.  And

25   as the *Michel* case says, under actual malice, the fact that

1   you're showing the conflicting point of views, the fact that

2   the reporter reached out to the source of some of the

3   information -- those were all factors that weigh against the

4   finding of actual malice.

5          THE COURT:  Thank you, sir.  Appreciate your time.

6          Mr. Brown.

7          MR. BROWN:  Thank you, Your Honor.

8          Jay Brown for *The New Yorker* magazine.  And I say it

9   that way because of the first basis for the motion to dismiss

10  on behalf of the publisher of that magazine, which, simply put,

11  that the plaintiff has sued the wrong entity; indeed, they

12  named Conde Nast International, Incorporated, which became

13  defunct prior to the filing of the lawsuit.

14         And we provided in the motion to dismiss

15  authenticated copies of records from the state agencies

16  responsible for maintaining the corporate records showing that

17  that entity no longer exists.

18         Mr. Reed's only response to that argument is that he

19  requires discovery.  It's one sentence in a footnote.  But he

20  gives no reason why the Court cannot properly take judicial

21  notice of those state government official records to establish

22  that the named defendant does not exist.

23         Given that, there has been no service on the entity

24  that actually publishes *The New Yorker*, and, therefore, for

25  that reason alone the case should be dismissed as it relates to

1    *The New Yorker* article.

2            And I would note in passing in that regard, Your

3    Honor, that although I do not represent Zach Helfand, the

4    author of *The New Yorker* article who was named as a defendant,

5    notwithstanding the numerous extensions of time to serve

6    Mr. Helfand granted by the Court to Mr. Reed, he has not been

7    served, and the Court should not extend the time or authorize

8    alternative means of service, at least insofar as the Court

9    agrees that any one of the other grounds for dismissing the

10   claims against *The New Yorker* article has merit, because there

11   would be no purpose served in extending the time or method for

12   serving Mr. Helfand if the Court otherwise is prepared to agree

13   that *The New Yorker* article is inactionable.

14           But if for some reason the Court disagreed with us

15   about whether the wrong entity was named and, therefore,

16   service on the magazine was improper in this case, then for the

17   several reasons already discussed, which I will just enumerate

18   briefly, plus a couple of reasons unique to *The New Yorker*

19   article, that that claim against *The New Yorker* article should

20   nevertheless be dismissed on the merits.

21           And in that regard, Your Honor, I beseech -- and I

22   use that word on purpose.

23           I beseech the Court to actually read the paragraph of

24   *The New Yorker* article that is at issue, because plaintiff

25   repeatedly mischaracterizes it in the filings in this case.

1          The article which -- in the format printed in the

2     court -- at 62-2 in the docket, comprises 27 pages.  As

3     reflected in the headline and the first several pages, it asks

4     the question whether LIV will save professional golf or destroy

5     it.

6          And the article recounts the numerous controversies

7     surrounding the creator of LIV, those other people affiliated

8     with LIV, and its impact on professional golf.  And it is not

9     literally until you get halfway through the printout of the

10    article that we come to the paragraph that Mr. Reed has sued

11    upon.

12         It is recounting one particular LIV Golf tournament.

13    And because it is so important to consider this in context, I'm

14    going to read the few sentences at issue, Your Honor.

15         Describing the scene at that tournament, the author,

16    Mr. Helfand, writes, "The crowds were sparse.  Some holes had a

17    dozen spectators; tickets were reselling for a dollar.  One

18    perk was that you could get right up next to the golfers.  It

19    has been pointed out that LIV seems to appeal to a certain type

20    of golfing personality, 'a rogue's gallery of assholes,' as the

21    golf writer Elizabeth Nelson put it to me.  There was

22    Mickelson, and Bryson DeChambeau, who was so polarizing on the

23    Tour that his colleague Brooks Koepka once promised free beer

24    to fans who heckled him.  Also:  Koepka himself, who complained

25    about LIV at this summer's U.S. Open, and then defected,

1   joining DeChambeau, the day after the tournament.  (When asked

2   what had changed, he replied, 'Just my opinion, man.')  The

3   golfer Patrick Reed, who has never been popular -- his fellow

4   Georgia alum Kevin Kisner once told *Golf Digest*, of Reed's

5   college teammates, 'I don't know that they'd piss on him if he

6   was on fire,' joined, too.  He subsequently sued several

7   reporters for defamation (One commentator mused, 'LIV needs a

8   public investment fund to sportwash its association with

9   Patrick Reed.')  An agent told me, "The Tour is milquetoast

10  white guys.  I think LIV is going for the W.W.E. model. (The

11  W.W.E. is big in Saudi Arabia. 'There's a lot of pent-up male

12  energy.' a frequent visitor of the kingdom explained."

13          That is the paragraph at issue.  And as I know Your

14  Honor is aware, the sentence that is the sole basis for the

15  defamation claim against *The New Yorker* is the quotation from

16  the commentator who mused that LIV needs a public investment

17  fund to sportwash its association with Patrick Reed, end quote.

18          That is not as plaintiff alleges from an anonymous

19  source, rather -- although the commentator is not named in the

20  print version of the article, in the online version of the

21  article there was and is a hyperlink under that reference that

22  takes one directly to the tweet in which that commentator,

23  who's identified in their Twitter account, made that comment.

24          And this was part of the article's theme of

25  describing the multiple controversies that revolved around many

1   people associated with LIV in different capacities.

2         And that is all extremely important to bear in mind,

3   Your Honor, with respect to the first substitute defense on the

4   merits, which is that -- as presented in context in *The New*

5   *Yorker*, that quoted sentence from another commentator is

6   clearly nonactionable opinion in the form of hyperbole; indeed,

7   here a piece of sarcastic humorous commentary by the tweeter,

8   which was quoted here in an article that repeatedly quotes from

9   and describes the controversies swirling around the people

10  involved in LIV.

11        And we particularly cite the *Horsley* decision from

12  the Eleventh Circuit on that point.  And what plaintiff

13  attempts to do, but cannot under the law, is use other

14  defendants' publications -- and some publications not even at

15  issue as allegedly defamatory -- to attempt to give meaning to

16  that simple sentence in our publication.

17        That sentence in *The New Yorker's* publication has to

18  be analyzed for whether it is a statement of provable fact or

19  nonactionable opinion or a hyperbole on its own merits.

20        And then, secondly, of course, Your Honor -- and I

21  won't dwell on this, because it's been discussed so much -- the

22  plaintiff has not and cannot plead that someone responsible for

23  the publication of this article by *The New Yorker* did so either

24  believing that hyperbolic statement to be false or strongly

25  suspecting that it was false, but nevertheless to go ahead --

1    went ahead and had *The New Yorker* publish it.

2           There literally is not a single allegation in the

3    complaint about anyone at *The New Yorker* having knowledge that

4    that suggestion -- that humorous suggestion that LIV would need

5    a fund in order to sportwash itself of Mr. Reed had any reason

6    to think there was some factual falsity about that; indeed,

7    there's no attempt in the pleadings to connect any of the

8    generic allegations of malice to anyone at *The New Yorker* at

9    all.

10          And I made the point about the hyperlink to the

11   commentator because -- although plaintiff argues that reliance

12   on an anonymous source can be evidence of actual malice, in

13   fact, there was no anonymous source here.  There was a public

14   Twitter commentator who was identified in the online version of

15   the article.

16          And for that reason, and for all of the reasons of

17   law discussed by my colleagues with reference to their clients,

18   plaintiff has not and cannot plead actual malice against *The*

19   *New Yorker* in this case.

20          Your Honor, we raise several alternative arguments

21   for why the defamation claim should be dismissed, which I am

22   happy to stand on the papers on, unless the Court has questions

23   about them.

24          One is the failure to plead a proximate cause of

25   damages, which has been already discussed by other members

1    of -- my colleague.  There's just no attempt to even allege

2    that someone refused to do business with the plaintiff because

3    of *The New Yorker* article.

4           Secondly, we note that the claim for defamation by

5    implication in Count 30 fails for reasons of law already

6    discussed by my colleague.  So I'm happy to stand on the papers

7    on that.

8           Same with respect to Count 31, the pleading of

9    defamation per se.  Happy to stand on the papers with respect

10   to that, unless you have questions.

11          I do want to just briefly say that with respect to

12   Count 32 for tortious interference, all of the defendants have

13   raised the single publication rule -- or at least most -- I

14   believe most of the defendants have raised the single

15   publication rule, which is that you cannot state multiple

16   causes of action based on an allegedly defamatory statement.

17          As the Court said in the *Bongino* case, which has

18   already been discussed with Your Honor today, if the defamation

19   claim fails, then other claims premised on the same statement

20   must fail as a matter of law.  This is to prevent end runs

21   around the First Amendment protections for defamation claims.

22          And that's a well-established principle; not just

23   under Florida law, but as it happens also under Texas and New

24   York law.  So whatever law applies, the tortious interference

25   claim must fail as a matter of law.

1      And then, Your Honor -- again, I won't dwell on it,

2  because it's been discussed so much already.  But if the Court

3  agrees that for any of those foregoing reasons the claim

4  against *The New Yorker* magazine dismissed, then we'd ask that

5  the Court permit the publisher of *The New Yorker* to submit

6  proof of its reasonable attorney's fees and costs in defending

7  under the anti-SLAPP action.

8      The courts do apply the fee provision of the Florida

9  statute in federal court cases sitting in diversity.  And

10  although, to our knowledge, there has not been a published

11  opinion by the Eleventh Circuit on that subject, in the *Bongino*

12  case, which we've already discussed, that court -- district

13  court noted that the Eleventh Circuit recently affirmed an

14  order awarding fees and costs under this statute in a case in

15  kin in both posture and substance to this one.  And that

16  district court cited the *Parekh versus CBS* case, 820 Fed.Appx'

17  827, Eleventh Circuit, 2020.

18      And, finally, Your Honor, as noted with respect to

19  Mr. Helfand -- because he has not been served, there is no

20  point -- he is not before the Court.

21      But given all these meritorious defenses, I would

22  just reiterate, again, that there is no point in extending the

23  time for him to be served or permitting alternative means of

24  service, because that would be fruitless.

25      And unless the Court has questions, I'll stop there.

1           THE COURT:  No, sir.  I'm going to -- thank you very
2   much.

3           MR. BROWN:  Thank you, Your Honor.

4           THE COURT:  Mr. Klayman, you asked for rebuttal.

5           MR. KLAYMAN:  Yes, sir.

6           THE COURT:  And we're -- let me just be clear.
7   Obviously, normally, it's -- the motion to dismiss would be
8   argued first by the defendants, you would go, and then they
9   might get rebuttal.

10          But I thought that -- given the number of defense
11  counsel and the number of parties, I thought this made more
12  sense.  So I'm happy to give you a little bit of time.  We
13  can't take too much time, but I will -- I'll hear from you,
14  sir.

15          MR. KLAYMAN:  I understand, Your Honor.  Thank you.
16  I appreciate that.

17          Let me also point out just quickly -- and I'll get
18  back to it -- Mr. Helfand has evaded service of process.  We've
19  actually had stakeouts to have him served.  So to
20  disingenuously claim that somehow we didn't do our job in
21  serving him just simply doesn't fly here.

22          But let's get back to the major issues here.

23          THE COURT:  Well, the only thing I would say about
24  that is, we got a lawsuit.  The train's leaving the station
25  here.  And -- and as far as I know -- and I -- we've got both

 1   Mr. Newsham and Mr. Helfand.  Mr. Newsham, as I understand it,
 2   lives in the UK.
 3          Is that correct?
 4          MR. KLAYMAN:  Yes.  He also evaded service.
 5          THE COURT:  And so -- well, that's fine.  But you
 6   can't just rely on that.  There has to be some --
 7          MR. KLAYMAN:  I know that, but I just wanted to
 8   correct a misimpression that somehow we didn't try.
 9          THE COURT:  I understand.  I understand.
10          MR. KLAYMAN:  We did at great expense.  Okay?
11          THE COURT:  All right.
12          MR. KLAYMAN:  And it shows bad faith.
13          THE COURT:  Go ahead.
14          MR. KLAYMAN:  And it's one of the badges of malice.
15   You're not willing to answer to your alleged defamation.  It's
16   part of the badge of malice.
17          But let's talk about "of and concerning," is that --
18   notable in the *Dershowitz* case is that Judge Singhal allowed
19   the case to go to discovery.
20          And as we pointed out, Your Honor, in a 12(b)(6)
21   motion to dismiss, Your Honor has to accept the allegations
22   pled as true.
23          We can come forward in discovery with a number of
24   people and have them come to the statements under oath that
25   when they saw these articles they associated it with Mr. Reed.

1     So that's the reason for discovery.

2           But then, again, it's also clear from some of the

3     arguments that were made even by the defendants -- is that

4     Bloomberg -- and I don't mean any disrespect -- tried a

5     bait-and-switch.

6           They told you that this was a silhouette.  It was not

7     a silhouette.  It was a full-color picture of Mr. Reed, which,

8     as Your Honor saw, was completely identifiable.  But, in any

9     event, that's the reason the case needs to go to discovery.

10          Now, when there are two possible meanings, Your

11    Honor, to a defamation, or when there's an ambiguity or some

12    mixed statement of law and fact, it must go to the jury.  And

13    we provided a number of cases in that regard.

14          With regard to defamation by implication, a good

15    example of that is when Mr. Chamblee stated that he had 20

16    persons that verified his conclusion that Patrick had done

17    something unethical and implied that he was cheating at the

18    Farmers Insurance Open unidentified.  And that's one of the

19    badges of malice.

20          This was defamation by implication at a minimum.  And

21    that's another issue to obtain discovery on, to ask questions

22    of Chamblee.

23          "Yes.  Did you make that up?  Or, in fact, did you

24    have 20 that actually said it?"

25          I doubt that he, frankly, talked to 20 people.

1          And that's also true with regard to the last issue
2     with regard to Mr. Helfand.  We've alleged that that tweet was
3     manufactured to be able to put that in there.
4          And there's a showing of animus in this *New Yorker*
5     magazine story.  For instance, Mr. Helfand says that before he
6     talked with the head, Majed Soruour, of LIV, who was running it
7     at the time, he had to wash his hands.  I mean, it reeks with
8     malice.
9          *The New Yorker*, you know, despises LIV.  It is a
10    leftist publication.  And it has that mind set.  And that's one
11    of the badges of malice.
12         Now, this is, Your Honor, that extreme case.  And
13    Your Honor pointed it out.  You can't just go around saying
14    anything you want.  You can't call someone the equivalent of
15    Hitler, Mao, Putin, you name it.
16         And that must be considered in context with the other
17    allegations of defamation.  That's why the law says you look at
18    the totality of what's being said.  You can't lace that in
19    there and say that you didn't intend to defame the person.
20         And, again, the badges of malice, the animus, the
21    desire to harm someone, the repeated defamation over and over
22    and over again, to the point you destroyed Mr. Reed, his wife,
23    his daughter, and his young son, and others in his family,
24    including his caddie.
25         Now, let me read you something here which is quite

1    remarkable.  We're getting into Shane Ryan's book.  And let me

2    say that since he took allegations of cheating -- he would have

3    been home free if he didn't write another book and some of the

4    allegations, but he wrote another book, and he put them in

5    there again.  He published them again.  So he can't hide behind

6    the statute of limitations.  This book was published in 2022.

7    And he has to stand on what he wrote at that time.

8            But let me give you just one example here --

9    actually, two.  He writes at page 11, "It figured that the

10   first time anyone on Reed's team had been honest and open with

11   the media, it would be a caddie admitting he'd shoved a fan."

12           That defames Mrs. Reed.  That defames everybody on

13   the team, his coach.  It defames even me, because I'm on his

14   team, you know, as a lawyer.  It defames people in his family.

15           That is a -- a statement of fact.  He's saying that

16   no one on Reed's team has ever said anything that was true.

17   That's actionable.

18           Now, turning back to another portion of that book,

19   where they're talking about what went on at the Hero World

20   Classic, on page 7, Shane Ryan writes that what happened --

21   even though there was just simply an alleged rules infraction

22   that gave rise to a penalty, not a disqualification, no

23   cheating, he writes, "This is blatantly illegal, and nothing

24   about it was ambiguous."

25           Well, we plead in the complaint it was ambiguous.

1  This was not a sand trap, Your Honor.  This was a waste

2  management -- a waste area.  You're allowed to ground your club

3  in a waste area.  And all pros know that.  So Mr. Reed

4  inadvertently took the club back and moved a little sand.  It

5  was not cheating.  If it had been cheating he would have been

6  disqualified at the time.

7       And we will submit, Your Honor, when we get to trial

8  here, evidence from an expert, that we've alluded to in a prior

9  pleading, that that video was doctored.  We have actually

10  submitted something to that effect.  It's on the court record.

11       So there's -- that's dealing with that.  But this is

12  that extreme case, Your Honor.  Again, you can't be throwing

13  around statements that people are accepting blood money, that

14  they are, you know, in effect, murderers, that they're

15  cavorting with terrorists, and, you know, last, but not least,

16  you know, are associated with these tyrants throughout world

17  history.

18       Your Honor was absolutely correct.  You don't throw

19  the word "Hitler" around willy-nilly.  And that's the problem

20  with the world today, Your Honor.  There has to be consequence

21  to what the media does.

22       It has gotten out of control.  We see it in the

23  political sphere.  We're seeing it with professional golf.  We

24  see it everywhere.

25       Your Honor is in a unique position -- I wish I was in

1    your position, frankly, because I would enforce the law and say

2    that nothing -- it's not that anything goes.  There are limits.

3    And, therefore, many of these things need to be decided by a

4    jury of Mr. Reed's peers.

5            Now, let's talk about SLAPP, because this was

6    misrepresented.  SLAPP does not apply in a federal court

7    diversity action.  There is no federal court that I know of

8    that ever held that SLAPP applies; that the reason it doesn't

9    apply is because the Federal Rule of Civil Procedure 12 and 56

10   set forth the pleading requirements.

11           SLAPP raises the threshold.  SLAPP will apply in a

12   state court.  But as Justice Pryor said -- Judge Pryor, a very

13   distinguished jurist -- I'm sure Your Honor knows him.  He

14   said, "I don't think it applies in federal court."

15           And that was the reason that case settled, Your

16   Honor, because *Newsmax* thought if it couldn't get a pound of

17   flesh, it might as well settle it at the time, with my client

18   Jerome Corsi.

19           Now, with regard to Bloomberg and Larson, two --

20   number one, Mr. Reed is wearing a LIV hat.  Now, he's the only

21   one on LIV that actually wears a LIV hat.  That's one of his

22   few sponsors, because he's been robbed of all these other

23   sponsors.  That gets to the issue of special damages.  We did

24   plead special damages.  That was not accurate.

25           We pled that he lost sponsors, millions of dollars,

1   that he lost the ability to hire coaches, that he lost his

2   reputation, that he lost, you know, virtually everything in

3   terms of common decency.

4           But to say that he was involved in that -- he wasn't

5   a plaintiff in that case.  And Larson had to go into the file

6   to be able to determine the case file in California, what was

7   going on.  It would show that he wasn't even a plaintiff there.

8           So couple that with the fact that he's wearing a LIV

9   hat, that counsel gave you a picture which didn't apply --

10  thank God you asked for the real picture, because that's not

11  the real picture.  It does clearly show Mr. Reed.  And it is

12  "of and concerning."

13          THE COURT:  Yeah, in fairness, I -- counsel didn't

14  give me the wrong picture.  I was looking at the wrong picture.

15          MR. KLAYMAN:  Oh, okay.

16          THE COURT:  And that's because -- you look at the

17  link now, that's the picture on there.

18          MR. KLAYMAN:  Right.

19          THE COURT:  But apparently it's been changed.  But

20  counsel -- I don't think it's right to say that counsel gave me

21  the wrong picture.

22          MR. KLAYMAN:  All right.  Well, I would apologize if

23  that's the case.  That's what I thought occurred.

24          In any event, the fact that they took it down shows

25  you they know that there was a problem with that.  And to say

1  sinister -- you look at Webster's, that means evil, dishonest,

2  vile, heinous -- you name it.  It was sinister.

3        It was sinister to gather information about 9/11

4  Families.  That's what was being said.  Mr. Reed had nothing to

5  do with that.  He would not do that.  He just wants to play

6  golf for the LIV Golf tour or, if there is a merger, whatever

7  comes out of that merger.  That's what he wants to do.  He

8  wants to be left alone.

9        Now, I would say, Your Honor, in conclusion here that

10  the law is clear here -- is that the law is clear that when

11  there are defamatory statements that can be taken two different

12  ways -- Your Honor cited in the example, "Are we talking about

13  LIV players as murderers or LIV, or it's the Saudis?"

14        But that has to be given to the jury.  And the

15  totality of circumstances here would show that they were

16  talking about LIV players, because they were the only ones

17  involved in that court case.  LIV was not part of that court

18  case at that point in time.

19        And these reporters know that because they went into

20  the file.  Chamblee knows that.  This is his job.  This is what

21  he does.

22        And I ask Your Honor -- and I know that you're an

23  honest man and that you've done a hell of a lot of research

24  here -- and I'm not trying to be patronizing with you, but most

25  judges that I'm in front of don't do the background research

1   that you've done here.  And I appreciate that.  And so do the

2   Reeds.

3        But this is a matter that needs to be taken a careful

4   look at, because they destroyed a man and his family.  Even his

5   daughter can't go to school without being bullied.  His wife

6   can't go out on a golf course and follow him around without

7   being called a b-i-t-c-h or some other name.

8        I myself have gone to tournaments -- I could be a

9   witness other than the fact that I may have a conflict of

10  interest if I testify -- and I hear what goes on.  I went on --

11  in the British Open last week.

12       It doesn't leave him.  And Your Honor is the only

13  one -- if you allow it to go to the jury, to go to discovery --

14  we'll show that they do associate it with him, it's "of and

15  concerning."  Your Honor is the only one that can help him

16  clear his name, much like other public figures who have had

17  their name cleared.

18       So I thank you very much.  He's no different than

19  anybody else.  Public figures deserve to be treated with

20  respect as well.  They don't deserve to be treated as punching

21  bags -- convenient punching bags because it's easy.

22       These reporters, you know, they don't want to do real

23  research.  They don't always do what their job is supposed to

24  do.  And that's why the badges of malice are so important to

25  take a look at it.

1    And, in addition, they were given an opportunity,

2    these defendants, to correct what they did.  They chose not to.

3    And the publication is responsible as well.

4         So I thank you for your time.

5         THE COURT:  All right, sir.  Thank you.

6      (Judge confers with law clerk.)

7         THE COURT:  All right.  The motions are submitted.

8    The -- and I'll just make a couple of comments just generally

9    and then the matter will be submitted.

10        The first -- Mr. Klayman, we talked about the

11   unserved defendants.  We have not -- there's one other

12   defendant who at least there's a certificate of service or a --

13   yeah, a certificate of service that's been filed with respect

14   to Fox Sports, but no other pleadings regarding that.

15        It seems odd to me.  I don't really know if Fox

16   Sports -- I don't know that the corporate setup -- if they're a

17   part of the Fox family or if they're -- I saw that it was

18   served on an entity -- a different entity that purported to be

19   the agent of it.

20        But, anyway, it seems odd to me that they would just

21   not respond.  I don't know if you have any more information

22   about that or what your intentions are with respect to Fox

23   Sports.

24        MR. KLAYMAN:  Well, I would say, Your Honor, that

25   they need to be held in default and to come forward in front of

1     this Court.

2          THE COURT:  I wanted to -- Kelly, where was that

3     service?  Do you have it?  I just wanted to look at it a

4     minute.

5          I might have it.

6          LAW CLERK:  You might have it.

7          THE COURT:  I think -- was the registered agent -- or

8     was the company you served Prentice?  Is that correct?

9          MR. KLAYMAN:  I don't have the documentation in front

10    of me, sir.

11         THE COURT:  Yeah.  Let me see if we can find it.

12         Why don't you just pull it up, Kelly, while we're

13    talking about the rest of it, and I'll come back to that.

14         That's my fault.  Ms. Milliron always has me well

15    organized, but I manage to disorganize myself.

16         So -- so I just want to -- and, obviously, there's

17    no -- the lawyers are here representing their clients.  None of

18    their clients are actually present, or client representatives.

19    But the Reeds are here, so I'll just have to speak to you.  I

20    can't speak to clients who aren't here, but the lawyers will --

21    will convey this back.

22         So -- you can go ahead and have a seat, Mr. Klayman.

23    Thanks.

24         What's going to happen now, Mr. and Mrs. Reed, is

25    that -- I've now gotten all this briefing, pages and pages of

1  it.

2         We've now spent two hours and 45 minutes talking

3  about it, which is a long time in the life of a court.

4  Hearings don't usually last that long, but there was a lot to

5  talk about.

6         And so now it's my job to go back and to consider

7  everything and to write an opinion that I think is the legally

8  correct result.

9         And I'm not -- I don't have any prediction for you

10  what that will be.  You have heard that the law in this area

11  is -- does make it difficult for persons to sue the media.

12  It's just hard to do.  And there's -- there's legal standards

13  for that.

14         And primarily -- and I won't -- you've heard a lot of

15  the legal discussion, but primarily it's to protect the First

16  Amendment rights of -- of the media to report.  And -- and

17  so -- so it's a difficult case when it's brought.  And so you

18  just need to be aware of that.

19         But what I will be doing is I will probably,

20  literally -- we've identified 55 actual statements that

21  Mr. Klayman has alleged on your behalf to be defamatory.

22         And I'll -- I'll be analyzing the law, but then I'll

23  actually be applying that to each of those 55 statements to see

24  where -- where the law tells me I should come out on those.

25         So that will take a little bit of work.  And it will

1   take a little bit of time.  And -- but I will -- all I can tell

2   you -- and all I would tell the -- the media clients, if they

3   were here, is that I'll do the best I can.

4          I have to uphold the law.  And I'll do the best I can

5   to do that.  And then I'll issue a published decision as soon

6   as I possibly can.

7          And so do y'all understand what I'm saying to you?

8          MR. REED:  Yes.

9          MRS. REED:  Yes.  Thank you.

10          THE COURT:  All right.  Sure.

11          And, of course -- however any of this turns out, of

12   course, I wish you well.

13          MR. KLAYMAN:  Your Honor, may I ask one thing?

14          THE COURT:  Yes, sir.

15          MR. KLAYMAN:  I think all the parties will probably

16   order a transcript.

17          THE COURT:  Yes, sir.

18          MR. KLAYMAN:  And if we see something in there that

19   we think could help you, can we file a post-hearing brief, a

20   short one?

21          In other words, I think some of the cases that were

22   cited don't apply.  Okay?  And I think that's important.

23          THE COURT:  Yeah.  I'm trying to just think

24   practically how that would work and what I would want if I --

25   because, of course, if I allow you to do that, I'd have to

1   allow everybody else to do it.  And I tell you what -- I'll

2   tell you what I'll do.

3            MR. KLAYMAN:  Okay.

4            THE COURT:  This will be -- but -- it may not be

5   everything you wanted, but it will be -- so are you actually

6   going to order the transcript, because --

7            MR. KLAYMAN:  Yes.

8            THE COURT:  Okay.  So let me confer with Ms. Bishop a

9   minute here.

10       (Judge confers with court reporter.)

11           THE COURT:  So I'm told by Ms. Bishop if a transcript

12  is ordered -- and if you ordered it, then they can get copies.

13  And there's standard rates that apply.

14           I'm told that if it's ordered in the usual course

15  that -- that it's a 30-day process.  And so what I'll do is

16  this.  I don't necessarily -- we may -- we may start to work on

17  the opinions anyway.  But what I'll do is this.

18           So -- and this is just to try to get everybody the --

19  a fair shot at everything.  I don't think it's necessary, but

20  I'm -- so tomorrow is August 1st.

21           So -- so Ms. Bishop would have until the end of

22  August to file briefs -- I mean, to file the transcript.  So

23  I'll -- I'll give any party who wishes to an opportunity to

24  file a post-hearing supplement or post-hearing brief of no more

25  than five pages.  That's all you get, five pages, to get right

1    to the point and tell me what you want to tell me.

2          And I'll -- and that would be simultaneous.  I'm not

3    going to have it back-and-forth.

4          So any party, no later than September 29th, is

5    authorized to file a five-page, post-hearing brief, and -- but

6    it is not required.  If any party chooses not to do it and

7    doesn't feel it's necessary, that's fine, too.  Okay?

8          MR. KLAYMAN:  Thank you, Your Honor.

9          THE COURT:  All right.

10         MR. KLAYMAN:  Have a nice evening.

11         THE COURT:  Yes, sir.

12         All right.  Anything else?

13         The Fox -- yeah.  I recall -- so it says that it was

14   served by serving the Prentice-Hall Corporation System, Inc.,

15   which is the -- it says it's the registered agent for Fox

16   Sports, Inc., by serving them in Wilmington, Delaware.

17         Is that -- is it your representation, Mr. Klayman,

18   that that's the registered agent for the defendant?

19         MR. KLAYMAN:  That's my understanding.  We have a

20   professional process server who tracked it down.

21         THE COURT:  Okay.  Well, all I'm saying to you -- I'm

22   not telling you how to proceed, other than we -- we generally,

23   you know, can't just have a party served but not some

24   resolution made.

25         And so I -- I'm -- if you decide to drop them, that's

1  fine.  If you decide to move forward with whatever legal

2  process is required, that's fine as well.  I'll give you 30

3  days to -- to make that decision.  All right?

4          MR. KLAYMAN:  Thank you, Your Honor.

5          THE COURT:  Is there anything else from -- I think I

6  might have just put you in the middle of the rain here.  Sorry

7  about that.

8          Is there anything else from any other counsel, any

9  matter?

10     (No response.)

11          THE COURT:  Okay.  So I will -- I will -- we'll wait

12  for the transcript.  You'll have your opportunity.  We may

13  start to work on it anyway.  We'll try to get an opinion out as

14  soon as we can.

15          But I guess I do feel like -- in the absence of a

16  better way to do it, I do feel like I'm going to have to

17  address each of these statements.

18          I may be able to group them in some way, but -- and

19  there may -- they may fall into certain categories, just

20  depending on what my rulings are, but -- so it will take us a

21  little while.  And I'll do the best I can to get out an opinion

22  just as soon as I can.

23          And I appreciate everybody's attendance here today.

24  I hope -- I hope the rain will stop soon so you can get out of

25  here.

1          All right.  We are in recess.

2          COURT SECURITY OFFICER:  All rise, please.

3     (The proceedings concluded at 4:51 p.m.)

4                              - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## **CERTIFICATE**

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )


        I hereby certify that the foregoing transcript is a true

and correct computer-aided transcription of my stenotype notes

taken at the time and place indicated herein.


        DATED this 7th day of August, 2023.



                    s/Shannon M. Bishop
                    Shannon M. Bishop, RDR, CRR, CRC

## #

**#150** [1] - 2:23

## '

**'22** [4] - 20:16, 52:11, 52:13
**'Just** [1] - 86:2
**'LIV** [1] - 86:7
**'Return** [1] - 66:1

## 1

**1** [2] - 26:22, 31:7
**1,000** [2] - 14:1, 28:11
**10** [1] - 25:1
**100** [2] - 2:7, 42:13
**10020** [1] - 2:13
**10D** [1] - 1:22
**11** [1] - 95:9
**110** [1] - 47:22
**12** [3] - 9:17, 22:7, 97:9
**12(b)(6** [4] - 16:21, 17:2, 56:6, 92:20
**1251** [1] - 2:12
**12th** [1] - 2:20
**14** [1] - 9:17
**144-page** [1] - 67:13
**15** [3] - 44:19, 63:4, 82:13
**16th** [1] - 10:25
**17** [1] - 23:18
**18** [1] - 63:4
**1909** [1] - 2:20
**1980** [1] - 55:8
**1990** [1] - 55:9
**1st** [1] - 105:20

## 2

**20** [6] - 44:19, 62:3, 63:5, 93:15, 93:24, 93:25
**20006-1157** [1] - 2:21
**2013** [1] - 58:14
**2015** [10] - 51:24, 52:7, 52:8, 52:10, 52:14, 52:16, 52:21, 54:13, 56:25, 61:22
**2018** [2] - 55:20, 67:9
**2019** [3] - 14:25, 35:8, 58:23
**2020** [1] - 90:17
**2021** [1] - 31:11
**2022** [9] - 8:8, 20:15, 52:15, 53:14, 53:16, 61:22, 62:4, 63:8, 95:6

## 2023
**2023** [3] - 1:21, 3:2, 109:10
**221** [1] - 2:23
**23** [1] - 63:5
**232** [1] - 17:1
**24** [1] - 44:21
**25** [4] - 41:17, 41:18, 41:23, 41:24
**27** [1] - 85:2
**29th** [1] - 106:4
**2:03** [2] - 1:23, 3:2

## 3

**3** [1] - 31:7
**30** [3] - 23:18, 89:5, 107:2
**30-day** [1] - 105:15
**31** [3] - 1:21, 3:2, 89:8
**32** [1] - 89:12
**32202** [2] - 2:10, 2:24
**32801** [1] - 2:18
**33433** [1] - 2:4
**33602** [1] - 2:8
**33606-2629** [1] - 2:16
**377** [1] - 22:3
**39** [1] - 54:10
**3:20** [2] - 50:25, 51:2
**3:22-cv-1059** [1] - 3:9
**3:22-cv-1059-TJC-PDB** [1] - 1:5
**3:22-cv-1181** [1] - 3:12
**3:22-cv-1181-TJC-PDB** [1] - 1:12
**3:25** [1] - 50:25
**3:26** [1] - 51:2

## 4

**4** [2] - 31:10, 45:5
**40** [1] - 24:24
**416** [1] - 17:1
**42** [1] - 22:3
**433** [1] - 20:3
**45** [1] - 103:2
**450** [1] - 2:18
**48** [1] - 40:9
**4:51** [1] - 108:3

## 5

**5** [4] - 24:25, 26:6, 31:10, 45:5
**50** [2] - 2:10, 81:16
**50-1** [3] - 74:22, 75:5, 76:17
**55** [3] - 5:22, 103:20, 103:23
**550** [1] - 16:24
**554** [1] - 16:25

## 56
**56** [1] - 97:9
**58** [1] - 22:5

## 6

**6** [1] - 31:7
**600** [1] - 2:7
**601** [1] - 2:15
**62-2** [1] - 85:2
**65** [1] - 20:7
**650** [1] - 2:18
**69** [1] - 20:7

## 7

**7** [1] - 95:20
**702** [1] - 20:2
**7050** [1] - 2:14
**731** [1] - 20:2
**74** [1] - 60:1
**770** [1] - 13:17
**7th** [1] - 109:10

## 8

**8** [1] - 31:7
**820** [1] - 90:16
**827** [1] - 90:17

## 9

**9/11** [7] - 10:18, 10:22, 24:13, 75:18, 76:4, 77:1, 99:3
**904)549-1307** [1] - 2:24
**92** [2] - 13:11, 35:20
**94** [1] - 35:20
**95** [1] - 35:20
**97** [1] - 35:20

## A

**Abbas** [1] - 58:12
**ability** [1] - 98:1
**able** [10] - 4:22, 4:23, 5:14, 5:15, 14:12, 17:22, 26:8, 94:3, 98:6, 107:18
**abortion** [1] - 37:20
**absence** [1] - 107:15
**absent** [1] - 61:24
**absolutely** [5] - 47:6, 54:8, 54:20, 78:3, 96:18
**absolved** [2] - 46:1, 46:9
**abundantly** [1] - 34:24
**abused** [1] - 15:25
**abuses** [1] - 82:22

**abusing** [1] - 76:2
**accept** [1] - 92:21
**acceptable** [1] - 16:6
**accepted** [1] - 16:23
**accepters** [1] - 10:2
**accepting** [2] - 11:22, 96:13
**access** [5] - 12:16, 12:24, 54:11, 62:10
**accomplice** [1] - 37:20
**according** [1] - 81:18
**account** [3] - 20:1, 47:18, 86:23
**accuracy** [2] - 61:25, 62:6
**accurate** [3] - 30:3, 30:17, 97:24
**accurately** [1] - 30:3
**accusation** [4] - 58:4, 58:8, 58:11, 59:6
**accused** [6] - 29:24, 29:25, 30:4, 56:14, 58:19, 76:1
**accuses** [1] - 59:8
**accusing** [2] - 56:18, 79:23
**action** [10] - 12:2, 12:3, 16:10, 24:7, 53:5, 63:17, 68:11, 89:16, 90:7, 97:7
**actionable** [1] - 31:21, 35:24, 39:14, 46:5, 46:6, 95:17
**actions** [2] - 31:16, 51:13
**activist** [1] - 37:20
**acts** [1] - 81:1
**actual** [62] - 12:9, 13:6, 13:13, 15:6, 16:19, 27:6, 31:22, 34:16, 46:25, 47:2, 47:7, 47:10, 48:15, 48:18, 48:21, 48:23, 49:1, 49:6, 49:12, 49:22, 51:11, 51:13, 51:14, 51:15, 51:17, 52:25, 53:5, 53:19, 53:23, 54:4, 55:1, 55:4, 55:13, 55:16, 55:22, 55:24, 56:6, 56:10, 57:6, 58:6, 59:9, 67:7, 67:8, 67:11, 67:25, 68:2, 69:25, 72:13, 72:14, 72:15, 72:22, 73:16, 76:14, 77:3, 82:19, 82:25, 83:4, 88:12, 88:18, 103:20
**Adams** [1] - 41:22

**add** [5] - 13:23, 28:19, 33:13, 72:20, 78:6
**adding** [1] - 60:4
**addition** [2] - 31:23, 101:1
**additional** [1] - 62:13
**address** [4] - 31:2, 45:10, 61:17, 107:17
**addresses** [1] - 58:1
**adhere** [1] - 5:9
**admit** [1] - 59:17
**admitted** [1] - 9:16
**admitting** [1] - 95:11
**adopt** [2] - 41:23, 41:24
**adopted** [1] - 41:23
**advantage** [1] - 11:10
**advertise** [1] - 8:17
**advocacy** [1] - 69:2
**advocate** [1] - 5:6
**affect** [1] - 41:19
**affidavits** [2] - 7:21, 13:20
**affiliated** [1] - 85:7
**affirmatively** [1] - 57:1
**affirmed** [2] - 80:1, 90:13
**afraid** [1] - 47:4
**afternoon** [7] - 3:8, 3:22, 4:16, 51:7, 65:12, 65:13, 73:25
**agencies** [1] - 83:15
**agent** [6] - 28:17, 86:9, 101:19, 102:7, 106:15, 106:18
**agents** [1] - 54:12
**ago** [5] - 7:5, 9:14, 28:14, 52:22
**agree** [6] - 18:9, 21:13, 43:11, 54:19, 58:16, 84:12
**agreement** [2] - 36:14, 36:18
**agrees** [2] - 84:9, 90:3
**ahead** [7] - 6:7, 34:10, 48:11, 87:25, 88:1, 92:13, 102:22
**aided** [1] - 109:7
**air** [1] - 30:17
**al** [2] - 3:9, 3:11
**Alabama** [1] - 58:3
**allegation** [6] - 33:10, 50:5, 76:10, 81:8, 88:2
**allegations** [31] - 10:7, 14:16, 16:22, 17:4, 29:14, 34:2, 35:12, 48:14, 49:18, 50:9, 53:21, 53:24, 55:17, 56:23, 57:3, 60:1,

67:14, 72:21, 76:9, 78:20, 79:18, 79:19, 80:22, 81:6, 82:10, 88:8, 92:21, 94:17, 95:2, 95:4
**allege** [4] - 47:10, 62:2, 62:5, 63:12, 81:22, 89:1
**alleged** [21] - 5:19, 5:22, 18:3, 37:2, 49:24, 50:20, 52:6, 54:24, 55:21, 56:2, 59:13, 63:3, 63:10, 63:11, 74:9, 80:14, 92:15, 94:2, 95:21, 103:21
**allegedly** [2] - 87:15, 89:16
**alleges** [7] - 51:24, 52:3, 53:9, 53:25, 54:9, 63:8, 86:18
**alleging** [2] - 50:15, 82:1
**allow** [4] - 14:15, 100:13, 104:25, 105:1
**allowed** [4] - 17:14, 45:15, 92:18, 96:2
**alluded** [3] - 74:12, 75:13, 96:8
**almost** [3] - 24:24, 42:15, 43:11
**alone** [4] - 53:23, 81:3, 83:25, 99:8
**altered** [1] - 50:6
**alternative** [3] - 84:8, 88:20, 90:23
**alum** [1] - 86:4
**Amber** [1] - 9:8
**ambiguity** [3] - 22:19, 25:18, 93:11
**ambiguous** [2] - 95:24, 95:25
**amended** [6] - 10:20, 12:14, 19:25, 20:8, 31:18, 69:3
**Amendment** [8] - 27:15, 31:16, 34:14, 39:9, 47:3, 76:7, 89:21, 103:16
**America** [1] - 7:8
**American** [1] - 20:2
**Americas** [1] - 2:12
**amount** [2] - 34:4, 79:6
**amounts** [1] - 65:23
**amplifies** [1] - 30:11
**analysis** [3] - 17:20, 33:24, 64:5
**analyze** [1] - 60:14

**analyzed** [1] - 87:18
**analyzing** [1] - 103:22
**Ancient** [1] - 23:12
**Anderson** [2] - 22:24, 26:13
**animosity** [1] - 15:8
**animus** [4] - 51:20, 52:2, 94:4, 94:20
**announced** [2] - 36:13, 53:15
**anonymous** [3] - 86:18, 88:12, 88:13
**answer** [3] - 38:21, 56:22, 92:15
**anti** [12] - 37:20, 68:17, 68:21, 68:22, 68:24, 68:25, 69:12, 69:13, 70:7, 70:11, 71:4, 90:7
**anti-abortion** [1] - 37:20
**anti-SLAPP** [11] - 68:17, 68:21, 68:22, 68:24, 68:25, 69:12, 69:13, 70:7, 70:11, 71:4, 90:7
**anyplace** [1] - 26:23
**anytime** [1] - 21:7
**anyway** [4] - 26:9, 101:20, 105:17, 107:13
**AP** [3] - 64:23, 72:17, 73:8
**apologize** [1] - 98:22
**appeal** [1] - 85:19
**appear** [2] - 46:11, 76:15
**Apple** [1] - 23:17
**applicable** [2] - 32:3, 51:10
**applied** [2] - 69:12, 72:7
**applies** [9] - 21:1, 64:15, 64:16, 72:16, 73:20, 75:14, 89:24, 97:8, 97:14
**apply** [14] - 41:14, 53:19, 64:4, 67:3, 69:15, 69:22, 70:13, 90:8, 97:6, 97:9, 97:11, 98:9, 104:22, 105:13
**applying** [3] - 70:3, 70:10, 103:23
**appreciate** [6] - 7:16, 52:22, 83:5, 91:16, 100:1, 107:23
**appreciates** [1] - 22:13
**approaches** [1] - 56:9

**appropriate** [1] - 31:17
**Arabia** [6] - 23:7, 23:8, 35:23, 36:3, 66:11, 86:11
**arbitrary** [1] - 42:2
**area** [5] - 49:5, 58:25, 96:2, 96:3, 103:10
**arguably** [1] - 75:8
**argue** [1] - 32:4
**argued** [2] - 5:2, 91:8
**arguendo** [2] - 57:16, 57:19
**argues** [2] - 76:25, 88:11
**argument** [10] - 3:11, 31:2, 54:23, 69:18, 78:9, 78:10, 78:11, 80:17, 81:8, 83:18
**arguments** [4] - 72:19, 80:12, 88:20, 93:3
**arises** [3] - 19:1, 19:19
**arm** [2] - 80:21, 81:6
**arrange** [1] - 4:23
**article** [60] - 10:10, 13:10, 14:5, 19:25, 20:8, 20:12, 20:14, 20:17, 30:8, 30:18, 42:10, 42:13, 45:12, 48:23, 52:12, 54:16, 56:25, 61:2, 61:3, 61:4, 61:19, 61:21, 66:3, 72:24, 73:8, 74:8, 74:10, 75:15, 75:21, 77:4, 77:7, 77:23, 77:25, 78:24, 79:22, 80:4, 80:6, 82:11, 82:12, 82:15, 82:19, 82:22, 84:1, 84:4, 84:10, 84:13, 84:19, 84:24, 85:1, 85:6, 85:10, 86:20, 86:21, 87:8, 87:23, 88:15, 89:3
**article's** [1] - 86:24
**articles** [9] - 65:18, 65:22, 65:24, 66:6, 66:16, 66:18, 67:1, 79:10, 92:25
**Ashley** [1] - 2:7
**aside** [2] - 52:25, 53:11
**aspect** [1] - 20:5
**aspects** [1] - 21:24
**asserting** [2] - 50:15, 53:19
**assertion** [1] - 57:19
**assertions** [1] - 34:15
**assess** [1] - 39:12
**assessed** [2] - 35:9,

59:2
**assessment** [1] - 46:21
**assholes** [1] - 85:20
**assistant** [1] - 22:24
**associate** [3] - 24:4, 24:10, 100:14
**ASSOCIATED** [1] - 1:15
**Associated** [1] - 4:6
**associated** [7] - 22:11, 24:3, 24:18, 48:16, 87:1, 92:25, 96:16
**association** [2] - 86:8, 86:17
**assume** [4] - 35:25, 57:15, 57:17, 57:19
**athlete** [1] - 59:8
**Atlantic** [1] - 16:24
**atrocities** [1] - 16:16
**attach** [1] - 16:16
**attachments** [1] - 6:6
**attack** [1] - 16:6
**attempt** [6] - 10:1, 63:14, 82:3, 87:15, 88:7, 89:1
**attempted** [1] - 4:21
**attempts** [1] - 87:13
**attend** [1] - 23:10
**attendance** [1] - 107:23
**attention** [2] - 55:18, 57:25
**attested** [1] - 59:15
**Attorney** [1] - 2:3
**attorney's** [4] - 70:17, 71:15, 71:24, 90:6
**attributable** [2] - 40:15, 63:16
**attributed** [2] - 56:17, 77:25
**August** [3] - 105:20, 105:22, 109:10
**Augusta** [2] - 7:22, 59:15
**Australia** [1] - 14:25
**authenticated** [1] - 83:15
**author** [3] - 60:5, 84:4, 85:15
**authored** [1] - 80:24
**authorize** [1] - 84:7
**authorized** [1] - 106:5
**available** [1] - 7:20
**availment** [1] - 82:2
**Avenue** [2] - 2:12, 2:18
**award** [4] - 70:17, 71:4, 71:15, 71:19

**awarding** [1] - 90:14
**aware** [8] - 7:23, 7:24, 47:18, 57:6, 62:17, 68:23, 86:14, 103:18
**awful** [2] - 42:1

**B**

**b-i-t-c-h** [1] - 10:17
**back-and-forth** [1] - 106:3
**Backed** [1] - 75:17
**backers** [1] - 76:22
**background** [1] - 99:25
**BACON** [1] - 1:7
**Bacon** [2] - 15:16, 26:4
**bad** [3] - 10:18, 27:22, 92:12
**badge** [2] - 28:20, 92:16
**badges** [8] - 13:10, 14:14, 48:23, 92:14, 93:19, 94:11, 94:20, 100:24
**bags** [2] - 100:21
**Bahamas** [2] - 73:10, 73:14
**bait** [1] - 93:5
**bait-and-switch** [1] - 93:5
**ball** [7] - 26:8, 31:12, 35:1, 35:15, 45:17, 45:25, 46:12
**Ball** [2] - 22:3, 22:5
**Ballard** [2] - 2:20, 4:17
**bandwagon** [1] - 12:22
**Bar** [2] - 13:9, 13:11
**barely** [1] - 42:24
**Barnes** [1] - 19:22
**barred** [2] - 10:4, 32:3
**based** [11] - 17:3, 24:6, 28:5, 52:20, 53:18, 67:23, 68:2, 74:5, 74:8, 79:4, 89:16
**basis** [9] - 46:23, 52:10, 53:19, 58:21, 58:22, 64:15, 81:3, 83:9, 86:14
**bear** [1] - 87:2
**beat** [1] - 7:9
**became** [5] - 8:25, 9:23, 9:24, 83:12
**become** [2] - 24:1, 29:2
**becomes** [2] - 38:1, 60:19

**beer** [1] - 85:23
**BEFORE** [1] - 1:20
**begin** [1] - 53:12
**behalf** [9] - 3:20, 3:23, 4:4, 4:12, 4:17, 32:12, 72:17, 83:10, 103:21
**behavior** [6] - 35:8, 35:10, 35:15, 46:10, 46:12, 46:17
**behind** [3] - 54:11, 58:25, 95:5
**behind-the-scenes** [1] - 54:11
**behold** [1] - 11:6
**beholden** [2] - 12:12, 12:23
**belabor** [1] - 72:18
**Bell** [1] - 16:24
**below** [1] - 76:16
**BENJAMIN** [1] - 1:7
**beseech** [2] - 84:21, 84:23
**best** [3] - 104:3, 104:4, 107:21
**better** [5] - 38:7, 38:11, 58:18, 82:17, 107:16
**between** [9] - 18:1, 19:3, 27:19, 39:11, 41:11, 52:3, 53:10, 53:11, 75:21
**beyond** [2] - 37:10, 37:25
**big** [6] - 18:6, 18:7, 23:16, 60:19, 75:12, 86:11
**big-picture** [1] - 75:12
**biggest** [1] - 9:11
**bin** [2] - 35:22, 36:4
**Bishop** [6] - 2:23, 105:8, 105:11, 105:21, 109:13, 109:13
**bit** [7] - 5:12, 33:3, 56:21, 74:11, 91:12, 103:25, 104:1
**BITCH** [1] - 100:7
**blatantly** [1] - 95:23
**blind** [1] - 44:8
**blood** [4] - 10:3, 20:24, 21:16, 96:13
**BLOOMBERG** [1] - 1:16
**Bloomberg** [6] - 4:12, 24:12, 74:1, 74:8, 93:4, 97:19
**Bloomberg's** [1] - 24:12
**BMW** [1] - 10:11

**Boca** [1] - 2:4
**Boeing** [1] - 23:17
**boil** [1] - 78:8
**boils** [1] - 78:7
**bold** [1] - 19:24
**boldly** [1] - 44:17
**bomb** [2] - 10:23, 11:1
**bona** [1] - 61:25
**bone** [3] - 20:25, 23:14, 23:22
**Bongino** [2] - 89:17, 90:11
**book** [31] - 6:23, 14:19, 14:20, 14:21, 51:24, 52:1, 52:7, 52:10, 52:11, 52:13, 52:14, 52:15, 52:20, 53:13, 54:3, 54:13, 54:16, 56:25, 61:1, 61:20, 61:22, 62:11, 62:12, 65:23, 95:1, 95:3, 95:4, 95:6, 95:18
**Book** [3] - 3:24, 51:8, 62:8
**BOOK** [1] - 1:14
**books** [3] - 29:14, 62:6, 62:11
**borrowing** [2] - 32:4, 73:18
**bothering** [1] - 29:14
**bottom** [1] - 80:15
**bought** [2] - 47:23, 48:2
**Boulevard** [1] - 2:15
**bounce** [1] - 46:15
**bounds** [1] - 17:12
**boy** [1] - 24:19
**brand** [1] - 9:18
**branded** [1] - 61:11
**Brandel** [4] - 9:11, 9:16, 28:18, 28:19
**BRANDEL** [1] - 1:6
**break** [1] - 50:24
**brief** [3] - 104:19, 105:24, 106:5
**briefed** [1] - 71:7
**briefing** [1] - 102:25
**briefly** [4] - 29:4, 80:18, 84:18, 89:11
**briefs** [4] - 6:5, 9:4, 18:21, 105:22
**bring** [1] - 8:7
**bringing** [1] - 76:24
**British** [3] - 23:10, 23:11, 100:11
**broadcast** [2] - 13:3, 13:5
**broadcasting** [1] - 21:8

**broadcasts** [1] - 22:25
**broader** [1] - 27:1
**Brooklyn** [1] - 81:9
**Brooks** [1] - 85:23
**brought** [10] - 10:21, 12:2, 17:18, 21:3, 25:10, 32:16, 36:9, 67:18, 69:6, 103:17
**BROWN** [4] - 2:19, 4:16, 83:7, 91:3
**Brown** [4] - 4:15, 4:17, 83:6, 83:8
**brunt** [1] - 9:13
**Bryson** [1] - 85:22
**buckets** [1] - 6:2
**buffet** [1] - 66:21
**built** [1] - 73:6
**bullied** [2] - 14:6, 100:5
**bullying** [1] - 67:15
**bunch** [2] - 49:3, 69:9
**Bush** [1] - 22:2
**business** [4] - 38:8, 79:19, 81:25, 89:2
**butchering** [1] - 33:17
**buzz** [4] - 50:11, 51:15, 51:18, 55:24
**Buzzfeed** [1] - 58:2
**Byrd** [1] - 20:2

**C**

**caddie** [2] - 94:24, 95:11
**cajoling** [1] - 43:21
**caliber** [1] - 7:10
**California** [8] - 25:9, 33:20, 33:22, 33:23, 73:10, 73:13, 75:23, 98:6
**Cameron** [1] - 82:16
**campaign** [1] - 55:25
**cannot** [9] - 28:25, 34:15, 80:4, 81:20, 83:20, 87:13, 87:22, 88:18, 89:15
**capable** [1] - 34:18
**capacities** [1] - 87:1
**Captain** [1] - 7:8
**Carbone** [1] - 69:13
**care** [2] - 1:8, 26:10
**career** [4] - 9:22, 13:25, 28:11, 52:17
**careful** [2] - 39:11, 100:3
**carefully** [1] - 29:13
**Carol** [1] - 65:14
**CAROL** [1] - 2:14
**carry** [1] - 14:12
**case** [113] - 3:8, 3:9,

3:10, 3:11, 5:15, 5:16, 6:20, 6:25, 9:7, 9:9, 10:1, 12:25, 16:24, 16:25, 17:7, 17:14, 17:17, 18:1, 18:12, 18:13, 18:14, 19:1, 19:19, 19:20, 20:1, 22:6, 24:16, 25:10, 25:21, 25:22, 31:4, 33:17, 36:21, 37:15, 37:19, 38:18, 39:2, 41:3, 41:6, 41:7, 41:22, 43:17, 48:20, 48:25, 49:3, 49:6, 49:13, 49:21, 49:23, 50:4, 50:12, 50:21, 51:14, 51:16, 53:2, 53:6, 55:6, 55:7, 55:9, 55:19, 56:2, 57:25, 58:2, 58:5, 59:11, 62:22, 63:4, 63:5, 67:7, 67:8, 67:10, 67:25, 68:15, 69:19, 69:21, 69:23, 71:8, 71:11, 71:25, 76:1, 77:5, 78:4, 78:5, 79:12, 79:15, 79:17, 80:6, 81:19, 82:25, 83:25, 84:16, 84:25, 88:19, 89:17, 90:12, 90:14, 90:16, 92:18, 92:19, 93:9, 94:12, 96:12, 97:15, 98:5, 98:6, 98:23, 99:17, 99:18, 103:17
**Case** [2] - 1:5, 1:12
**cases** [20] - 5:2, 5:23, 8:7, 9:5, 17:6, 22:2, 25:18, 30:7, 78:4, 79:3, 79:8, 79:10, 79:16, 81:5, 82:9, 90:9, 93:13, 104:21
**cast** [2] - 14:3, 69:18
**categories** [1] - 107:19
**category** [1] - 53:24
**caught** [1] - 59:1
**caused** [4] - 8:7, 63:1, 63:13, 63:15
**causes** [1] - 89:16
**caveat** [1] - 70:21
**cavorting** [1] - 96:15
**CBS** [1] - 90:16
**ceased** [1] - 11:17
**certain** [9] - 6:2, 18:23, 19:10, 49:4, 69:11, 79:18, 85:19, 107:19
**certainly** [1] - 33:2,

34:12, 36:9, 36:18, 36:24, 37:5, 38:15, 38:23, 39:2, 39:7, 39:20, 40:4, 40:11, 40:21, 41:18, 43:2, 43:9, 43:12, 45:11, 76:23, 80:20
**certificate** [2] - 101:12, 101:13
**CERTIFICATE** [1] - 109:1
**certify** [1] - 109:6
**cetera** [1] - 8:10
**challenging** [1] - 61:21
**CHAMBLEE** [1] - 1:6
**Chamblee** [29] - 3:9, 6:25, 9:11, 9:16, 15:15, 15:21, 20:9, 22:6, 23:2, 25:6, 25:11, 26:3, 26:24, 28:18, 29:5, 31:4, 35:20, 36:10, 36:12, 36:18, 38:6, 40:9, 45:14, 47:4, 47:23, 63:4, 93:15, 93:22, 99:20
**Chamblee's** [3] - 33:8, 39:20, 45:11
**champion** [1] - 7:6
**championship** [1] - 58:24
**chance** [2] - 5:24, 69:19
**changed** [3] - 40:8, 86:2, 98:19
**Channel** [11] - 3:20, 8:13, 8:16, 8:20, 12:25, 20:9, 38:10, 38:21, 39:3, 41:12, 48:16
**channel** [1] - 38:12
**Channel's** [2] - 31:5, 42:20
**chapter** [2] - 14:21, 14:24
**CHASE** [20] - 2:11, 3:22, 51:7, 52:8, 52:17, 52:23, 56:22, 57:24, 58:21, 60:16, 63:21, 63:24, 64:2, 64:8, 64:10, 64:25, 65:2, 65:6, 65:9, 65:11
**Chase** [3] - 3:21, 3:23, 51:8
**cheat** [8] - 13:21, 19:8, 29:15, 46:8, 57:6, 57:8, 59:5, 59:23
**cheated** [7] - 7:18,

7:19, 14:3, 57:1, 57:17, 57:21, 57:22
**cheater** [19] - 7:11, 9:14, 10:16, 27:23, 28:5, 28:15, 28:23, 28:24, 30:11, 34:20, 34:22, 45:22, 46:4, 46:10, 60:10, 61:11, 73:5, 73:7
**cheating** [19] - 7:23, 10:7, 14:16, 29:14, 56:14, 56:19, 56:24, 57:9, 58:9, 58:19, 59:6, 59:8, 59:20, 93:17, 95:2, 95:23, 96:5
**Chief** [1] - 69:17
**chilling** [1] - 31:15
**chin** [1] - 15:22
**choice** [1] - 32:19
**chooses** [1] - 106:6
**chose** [2] - 54:1, 101:2
**chronologically** [1] - 65:18
**chyron** [1] - 8:15
**Circuit** [17] - 31:13, 49:16, 55:19, 56:5, 67:9, 67:17, 69:14, 69:25, 70:3, 70:6, 78:3, 79:2, 79:25, 87:12, 90:11, 90:13, 90:17
**circumstance** [1] - 39:5
**circumstances** [1] - 99:15
**circumstantial** [2] - 13:14, 25:19
**cite** [8] - 12:11, 20:8, 33:18, 64:4, 70:8, 70:9, 72:21, 87:11
**cited** [11] - 9:5, 17:7, 19:20, 20:14, 22:2, 48:23, 69:17, 78:4, 90:16, 99:12, 104:22
**citing** [1] - 55:2
**citizen** [5] - 33:14, 33:23, 34:1, 81:18
**citizenship** [2] - 34:1, 64:19
**city** [1] - 55:1
**City** [1] - 50:12
**Civil** [1] - 97:9
**claim** [19] - 20:20, 62:21, 62:24, 70:24, 74:21, 75:9, 79:1, 82:10, 82:17, 82:23, 84:19, 86:15, 88:21, 89:4, 89:19, 89:25, 90:3, 91:20

**claimed** [2] - 31:12, 63:7
**claiming** [1] - 70:23
**claims** [9] - 31:15, 68:14, 74:4, 74:7, 78:8, 79:4, 84:10, 89:19, 89:21
**Classic** [1] - 95:20
**Claude** [1] - 10:6
**clear** [21] - 34:23, 34:24, 35:17, 36:7, 37:14, 37:19, 46:1, 46:8, 48:20, 54:14, 57:7, 64:21, 65:14, 65:21, 70:24, 72:21, 91:6, 93:2, 99:10, 100:16
**cleared** [3] - 45:13, 46:19, 100:17
**clearly** [7] - 19:16, 30:11, 53:19, 76:8, 78:11, 87:6, 98:11
**clerk** [2] - 5:18, 101:6
**CLERK** [1] - 102:6
**client** [12] - 11:19, 14:10, 20:18, 26:20, 51:10, 56:18, 59:25, 71:22, 78:8, 97:17, 102:18
**client's** [1] - 44:4
**clients** [15] - 51:23, 53:13, 53:20, 56:18, 57:5, 61:12, 74:4, 74:6, 76:20, 88:17, 102:17, 102:18, 102:20, 104:2
**clients'** [1] - 56:23
**clip** [5] - 26:5, 26:13, 50:5, 50:6, 50:8
**cliques** [1] - 8:2
**close** [1] - 80:14
**Clout** [1] - 10:20
**club** [3] - 58:25, 96:2, 96:4
**CNN** [4] - 17:8, 17:10, 17:17, 50:5
**CO** [1] - 1:7
**coach** [9] - 10:6, 29:1, 59:15, 59:23, 67:13, 67:16, 67:18, 95:13
**coaches** [13] - 7:21, 10:5, 13:20, 19:7, 28:2, 29:1, 29:15, 54:1, 54:14, 57:5, 63:7, 98:1
**Cockburn** [1] - 55:8
**code** [1] - 45:8
**coin** [1] - 66:12
**colleague** [4] - 17:9, 85:23, 89:1, 89:6

**colleagues** [2] - 79:16, 88:17
**college** [8] - 52:17, 54:1, 57:3, 57:5, 59:11, 59:12, 59:15, 86:5
**color** [1] - 93:7
**column** [2] - 66:9, 73:15
**columns** [1] - 68:4
**combine** [1] - 34:5
**comfort** [1] - 50:24
**comfortable** [2] - 45:25, 46:16
**coming** [6] - 9:19, 22:10, 23:20, 60:24, 60:25, 61:6
**comment** [4] - 14:15, 17:22, 82:24, 86:23
**commentaries** [1] - 43:19
**commentary** [4] - 36:14, 43:25, 66:9, 87:7
**commentator** [8] - 38:17, 86:7, 86:16, 86:19, 86:22, 87:5, 88:11, 88:14
**commentators** [3] - 34:25, 44:1, 46:22
**commented** [1] - 41:17
**commenting** [2] - 11:22, 60:20
**comments** [2] - 34:15, 101:8
**commercial** [1] - 13:4
**Commissioner** [1] - 8:12
**commit** [1] - 35:17
**committed** [3] - 13:22, 59:3, 73:12
**committing** [1] - 66:13
**common** [5] - 31:20, 31:23, 50:16, 56:1, 98:3
**community** [1] - 35:13
**company** [1] - 102:8
**comparatively** [1] - 67:10
**compare** [3] - 37:8, 55:18
**comparing** [1] - 37:16
**comparison** [1] - 54:21
**comparisons** [1] - 37:16
**compendium** [1] - 13:9
**complained** [1] -

85:24
**complaint** [28] - 4:18, 5:20, 10:16, 10:21, 12:11, 12:14, 16:22, 17:4, 17:18, 17:19, 20:8, 26:3, 28:2, 31:18, 34:2, 47:22, 50:15, 51:16, 53:1, 53:9, 54:10, 54:24, 62:3, 63:11, 88:3, 95:25
**complaint's** [1] - 17:3
**complaints** [5] - 5:6, 6:6, 19:25, 51:12, 63:4
**completely** [3] - 50:9, 57:20, 93:8
**comprises** [1] - 85:2
**computer** [1] - 1:25, 109:7
**computer-aided** [1] - 109:7
**conceivably** [1] - 33:16
**concept** [1] - 67:2
**concern** [3] - 31:7, 31:10, 76:23
**concerned** [1] - 20:22
**concerning** [20] - 9:4, 20:5, 21:25, 31:25, 39:21, 40:18, 43:3, 44:12, 66:7, 66:20, 66:23, 67:6, 68:1, 75:13, 78:1, 78:10, 80:18, 92:17, 98:12, 100:15
**concerns** [1] - 31:3
**concluded** [1] - 108:3
**conclusion** [2] - 93:16, 99:9
**conclusions** [1] - 67:24
**conclusory** [2] - 72:21, 81:5
**concur** [1] - 32:4
**Conde** [2] - 4:19, 83:12
**CONDE** [1] - 1:9
**condemnation** [1] - 36:10
**conduct** [8] - 13:19, 34:25, 43:14, 45:17, 45:25, 55:3, 59:3, 81:22
**conducted** [1] - 79:20
**confer** [1] - 105:8
**confers** [2] - 101:6, 105:10
**confirmed** [1] - 19:9
**confirming** [1] - 60:4

**conflict** [1] - 100:9
**conflicting** [2] - 15:10, 83:1
**conjunction** [1] - 16:11
**connect** [1] - 88:7
**Connecticut** [1] - 32:24
**connection** [8] - 19:3, 41:9, 41:11, 81:11, 81:17, 81:20, 81:21
**connotations** [1] - 36:3
**consequence** [1] - 96:20
**consequently** [3] - 8:19, 12:17, 21:18
**consider** [3] - 36:20, 85:13, 103:6
**consideration** [1] - 33:25
**considered** [3] - 12:19, 26:22, 94:16
**considering** [1] - 36:22
**consistent** [1] - 40:17
**consolidated** [1] - 3:10
**conspiracy** [3] - 53:10, 53:16, 63:9
**constitutional** [8] - 12:9, 13:7, 31:19, 40:18, 40:19, 43:5, 53:23, 72:16
**Constitutional** [1] - 13:10
**contact** [2] - 29:15, 30:12
**contain** [1] - 43:20
**contained** [1] - 46:18
**contains** [1] - 10:10
**contend** [1] - 53:17
**contention** [1] - 69:7
**contested** [1] - 43:9
**context** [13] - 36:7, 36:20, 36:23, 37:18, 37:19, 38:24, 46:7, 50:7, 57:24, 60:11, 85:13, 87:4, 94:16
**continue** [1] - 14:14
**contorting** [1] - 79:7
**contracts** [3] - 8:19, 13:1, 35:25
**contrary** [1] - 41:3
**control** [1] - 96:22
**controversies** [4] - 21:9, 85:6, 86:25, 87:9
**controversy** [5] - 38:9, 60:17, 60:19, 60:21,

81:13
**convenient** [1] - 100:21
**conversation** [1] - 40:6
**convey** [1] - 102:21
**COO** [1] - 6:17
**coordinate** [1] - 77:1
**copies** [2] - 83:15, 105:12
**corporate** [2] - 83:16, 101:16
**Corporation** [1] - 106:14
**correct** [10] - 52:18, 52:23, 65:6, 92:3, 92:8, 96:18, 101:2, 102:8, 103:8, 109:7
**Corrigan** [1] - 3:6
**CORRIGAN** [1] - 1:20
**Corsi** [3] - 70:4, 70:6, 97:18
**Costa** [1] - 53:6
**Costa-Gavras** [1] - 53:6
**costs** [2] - 90:6, 90:14
**counsel** [11] - 3:15, 3:16, 6:8, 24:12, 55:2, 91:11, 98:9, 98:13, 98:20, 107:8
**COUNSEL** [2] - 2:2, 2:5
**Count** [3] - 89:5, 89:8, 89:12
**counted** [1] - 82:13
**countenance** [1] - 17:2
**counterargument** [1] - 76:25
**counterpoint** [2] - 76:25, 77:5
**country** [2] - 23:19, 36:1
**couple** [9] - 29:7, 48:9, 49:12, 52:14, 61:17, 82:5, 84:18, 98:8, 101:8
**courage** [1] - 28:20
**course** [22] - 6:4, 9:3, 10:15, 12:25, 13:24, 14:8, 16:5, 16:18, 18:15, 19:14, 21:2, 23:15, 28:10, 50:7, 63:24, 75:24, 87:20, 100:6, 104:11, 104:12, 104:25, 105:14
**court** [30] - 31:13, 33:23, 43:18, 55:2, 58:5, 58:9, 70:1,

70:2, 70:11, 70:17, 70:21, 72:7, 76:9, 78:20, 79:25, 80:8, 85:2, 90:9, 90:12, 90:13, 90:16, 96:10, 97:6, 97:7, 97:12, 97:14, 99:17, 103:3, 105:10
**COURT** [146] - 1:1, 2:22, 3:4, 3:8, 3:21, 3:25, 4:3, 4:7, 4:9, 4:14, 4:20, 6:13, 11:20, 12:1, 17:16, 17:25, 20:4, 21:6, 23:24, 24:5, 24:23, 25:3, 25:7, 25:13, 25:15, 26:15, 27:1, 27:5, 29:6, 29:11, 29:21, 30:19, 30:21, 30:24, 32:6, 34:7, 34:10, 34:20, 35:2, 35:19, 36:12, 37:6, 37:21, 38:6, 38:19, 39:1, 39:7, 39:24, 41:20, 42:1, 42:4, 42:8, 42:21, 42:25, 43:4, 43:11, 44:3, 44:19, 45:2, 45:8, 45:16, 46:3, 46:24, 47:20, 48:3, 48:6, 48:8, 48:22, 49:25, 50:22, 51:1, 51:3, 51:6, 52:4, 52:15, 52:19, 56:12, 57:15, 58:15, 59:25, 63:19, 63:22, 63:25, 64:3, 64:9, 64:22, 65:1, 65:3, 65:7, 65:10, 65:12, 65:20, 66:19, 68:15, 68:20, 69:16, 70:12, 71:11, 71:17, 71:20, 72:4, 72:11, 73:22, 73:24, 74:2, 74:13, 74:16, 74:25, 75:3, 75:6, 75:10, 77:10, 77:17, 80:10, 82:4, 83:5, 91:1, 91:4, 91:6, 91:23, 92:5, 92:9, 92:11, 92:13, 98:13, 98:16, 98:19, 101:5, 101:7, 102:2, 102:7, 102:11, 104:10, 104:14, 104:17, 104:23, 105:4, 105:8, 105:11, 106:9, 106:11, 106:21, 107:5, 107:11, 108:2, 109:2
**Court** [30] - 3:5, 6:12, 12:5, 16:25, 33:21,

51:4, 56:9, 62:22, 68:8, 68:23, 69:10, 71:11, 72:20, 73:21, 74:4, 75:18, 83:20, 84:6, 84:7, 84:8, 84:12, 84:14, 84:23, 88:22, 89:17, 90:2, 90:5, 90:20, 90:25, 102:1
**Courtroom** [1] - 1:22
**courts** [4] - 51:18, 69:12, 69:22, 90:8
**cover** [1] - 33:7
**coverage** [3] - 51:22, 51:24, 51:25
**covered** [1] - 76:6
**cozy** [2] - 52:2, 53:9
**CRC** [2] - 2:23, 109:13
**created** [2] - 22:14, 56:1
**creates** [2] - 19:4, 69:4
**creating** [1] - 8:3
**creation** [2] - 6:21, 8:8
**creator** [1] - 85:7
**credibility** [1] - 15:20
**credit** [2] - 70:23, 70:24
**criticism** [1] - 21:8
**criticized** [1] - 77:7
**criticizing** [2] - 40:13, 40:14
**crowds** [1] - 85:16
**CRR** [2] - 2:23, 109:13
**crucify** [1] - 60:3
**Cruz** [1] - 82:18
**Cuban** [1] - 20:2
**Cup** [3] - 7:7, 14:20, 25:25
**current** [2] - 41:4, 44:20
**cutting** [1] - 66:14

**D**

**D.C** [5] - 2:21, 55:8, 58:13, 75:23
**Daly** [1] - 27:10
**damages** [12] - 62:19, 62:25, 63:1, 63:3, 63:11, 63:13, 63:15, 63:16, 64:13, 88:25, 97:23, 97:24
**Damon** [2] - 15:16, 26:4
**DAMON** [1] - 1:6
**Data** [1] - 75:18
**DATED** [1] - 109:10
**daughter** [4] - 11:19, 14:5, 94:23, 100:5
**daunting** [1] - 47:8

**Davis** [2] - 2:12, 3:23
**days** [3] - 39:10, 44:5, 107:3
**de** [1] - 21:10
**Deadspin** [2] - 61:3, 61:4
**dealing** [1] - 96:11
**deals** [1] - 63:6
**December** [1] - 14:25
**decency** [1] - 98:3
**DeChambeau** [2] - 85:22, 86:1
**decide** [6] - 25:19, 39:6, 64:15, 64:16, 106:25, 107:1
**decided** [4] - 4:25, 5:5, 58:3, 97:3
**decides** [1] - 11:6
**decision** [7] - 19:19, 68:2, 70:1, 70:3, 87:11, 104:5, 107:3
**decisions** [3] - 22:17, 68:3, 70:9
**declarations** [1] - 6:6
**deem** [1] - 78:21
**deemed** [1] - 55:17
**Defamation** [1] - 13:11
**defamation** [54] - 9:12, 9:13, 12:2, 16:18, 17:20, 18:19, 18:20, 18:21, 18:25, 19:13, 19:14, 19:15, 20:20, 22:1, 26:11, 26:12, 26:17, 27:6, 27:14, 28:7, 29:22, 31:15, 33:4, 34:11, 35:5, 39:15, 46:25, 47:2, 47:5, 52:20, 60:10, 60:15, 62:21, 62:23, 63:2, 68:10, 68:14, 78:8, 79:1, 86:7, 86:15, 88:21, 89:4, 89:9, 89:18, 89:21, 92:15, 93:11, 93:14, 93:20, 94:17, 94:21
**defamations** [1] - 21:21
**defamatory** [40] - 5:20, 5:22, 9:6, 15:13, 16:9, 18:24, 19:3, 19:4, 19:5, 20:20, 21:22, 22:19, 22:22, 23:25, 24:1, 30:4, 33:9, 34:18, 36:11, 37:2, 38:1, 44:11, 44:12, 44:13, 52:7, 57:16, 57:20, 58:20, 59:10, 74:9,

77:24, 78:7, 78:17, 78:25, 79:14, 87:15, 89:16, 99:11, 103:21
**defame** [5] - 15:14, 19:15, 44:15, 63:9, 94:19
**defamed** [4] - 12:6, 14:13, 22:5, 26:9
**defames** [4] - 95:12, 95:13, 95:14
**defaming** [1] - 21:10
**default** [1] - 101:25
**defected** [1] - 85:25
**defects** [1] - 71:8
**defence** [1] - 44:22
**defendant** [8] - 4:12, 19:2, 47:16, 56:3, 83:22, 84:4, 101:12, 106:18
**Defendants** [2] - 1:10, 1:18
**defendants** [26] - 3:20, 4:5, 5:9, 7:25, 11:24, 12:6, 18:20, 19:9, 22:1, 33:4, 50:19, 54:1, 62:18, 62:21, 68:14, 70:18, 71:14, 77:2, 80:25, 81:22, 89:12, 89:14, 91:8, 93:3, 101:2, 101:11
**defendants'** [2] - 63:9, 81:21, 87:14
**defending** [2] - 39:3, 90:6
**DEFENSE** [1] - 2:5
**defense** [6] - 3:15, 61:18, 67:25, 75:14, 87:3, 91:10
**defenses** [6] - 31:20, 31:23, 31:24, 47:7, 75:9, 90:21
**definitely** [1] - 45:24
**definition** [2] - 18:25, 41:16
**defunct** [1] - 83:13
**Delaware** [1] - 106:16
**denials** [1] - 54:17
**denied** [1] - 50:1
**denominated** [1] - 4:18
**Depp** [1] - 9:7
**depth** [1] - 73:8
**derogatory** [2] - 27:9, 27:12
**Dershowitz** [9] - 17:8, 17:11, 18:13, 19:19, 37:15, 49:21, 49:24, 50:5, 92:18
**described** [1] - 54:2

**describes** [2] - 66:25, 87:9

**describing** [3] - 71:2, 85:15, 86:25

**description** [1] - 66:17

**deserve** [3] - 14:12, 100:19, 100:20

**desire** [1] - 94:21

**despises** [1] - 94:9

**despite** [2] - 26:4, 26:6

**destroy** [4] - 10:1, 12:22, 85:4

**destroyed** [4] - 14:4, 94:22, 100:4

**destroying** [1] - 28:15

**details** [2] - 49:2, 60:4

**determination** [1] - 15:14

**determine** [2] - 15:5, 98:6

**devised** [1] - 8:22

**dictators** [1] - 20:25

**difference** [9] - 17:25, 18:2, 18:11, 27:19, 29:3, 39:16, 43:6, 43:7, 43:10

**different** [11] - 5:2, 57:9, 68:24, 68:25, 72:19, 77:4, 82:13, 87:1, 99:11, 100:18, 101:18

**difficult** [3] - 18:17, 103:11, 103:17

**dig** [1] - 10:17

**Digest** [1] - 86:4

**diligence** [1] - 30:14

**direct** [1] - 13:13

**directed** [9] - 39:22, 40:20, 40:24, 41:2, 78:13, 81:2, 81:10, 81:15, 81:22

**direction** [2] - 61:8, 82:2

**directly** [9] - 35:22, 36:1, 36:3, 36:4, 36:8, 37:3, 61:21, 63:16, 86:22

**directs** [1] - 40:21

**disagree** [3] - 46:2, 46:15, 46:21

**disagreed** [2] - 46:22, 84:14

**disbelief** [1] - 17:3

**discourse** [1] - 39:10

**discovery** [12] - 17:15, 69:9, 76:2, 78:14, 82:21, 83:19, 92:19, 92:23, 93:1, 93:9, 93:21, 100:13

**discretion** [1] - 70:20

**discussed** [9] - 68:3, 84:17, 87:21, 88:17, 88:25, 89:6, 89:18, 90:2, 90:12

**discussing** [1] - 52:13

**discussion** [4] - 34:11, 61:5, 65:24, 103:15

**dish** [1] - 66:22

**dishonest** [2] - 24:15, 99:1

**dishonesty** [1] - 11:17

**disingenuously** [1] - 91:20

**dismiss** [23] - 5:2, 31:6, 49:7, 49:17, 49:23, 50:2, 56:9, 67:6, 67:12, 67:19, 68:13, 70:15, 71:3, 71:5, 71:12, 71:22, 72:17, 72:18, 73:21, 83:9, 83:14, 91:7, 92:21

**dismissal** [1] - 64:16

**dismissals** [1] - 17:2

**dismissed** [14] - 17:18, 17:19, 32:16, 33:7, 58:5, 58:10, 62:14, 62:24, 79:3, 81:4, 83:25, 84:20, 88:21, 90:4

**dismissing** [2] - 31:14, 84:9

**Disney** [2] - 23:16

**disorganize** [1] - 102:15

**disposition** [1] - 31:17

**dispositive** [3] - 33:6, 33:24, 34:6

**dispute** [2] - 75:20, 81:13

**disputed** [1] - 43:9

**disqualification** [1] - 95:22

**disqualified** [2] - 14:2, 96:6

**disregard** [3] - 16:19, 47:13, 51:19

**disrespect** [1] - 93:4

**distinguished** [1] - 97:13

**district** [3] - 69:22, 90:12, 90:16

**DISTRICT** [5] - 1:1, 1:1, 1:21, 109:2, 109:3

**District** [11] - 3:5, 33:12, 33:18, 34:5, 36:22, 53:6, 55:7,

55:8, 58:3, 58:13

**ditch** [1] - 10:17

**dive** [1] - 51:9

**diversity** [2] - 90:9, 97:7

**DIVISION** [1] - 1:2

**docket** [4] - 74:22, 75:5, 76:17, 85:2

**doctored** [1] - 96:9

**doctrine** [1] - 41:5

**documentation** [1] - 102:9

**documents** [1] - 76:20

**dollar** [2] - 13:1, 85:17

**dollars** [1] - 97:25

**Dolphins** [1] - 67:14

**domicile** [1] - 33:22

**Donald** [2] - 82:18

**done** [9] - 13:2, 26:7, 26:25, 28:8, 28:9, 52:5, 93:16, 99:23, 100:1

**Doral** [1] - 10:24

**dory** [1] - 11:8

**doubt** [3] - 50:10, 69:18, 93:25

**doubted** [1] - 50:19

**doubts** [1] - 47:17

**DOUG** [1] - 1:14

**down** [12] - 14:25, 17:9, 23:15, 24:11, 28:22, 48:13, 53:17, 74:23, 78:7, 78:8, 98:24, 106:20

**down-and-out** [1] - 28:22

**dozen** [1] - 85:17

**dozens** [2] - 62:12, 62:13

**DP** [3] - 8:20, 11:7, 13:2

**draw** [2] - 55:18, 57:25

**drawn** [2] - 5:20, 61:21

**Drive** [1] - 2:7

**drop** [2] - 45:19, 106:25

**dry** [1] - 16:2

**dsmabishop@yahoo .com** [1] - 2:25

**due** [2] - 30:13, 81:7

**during** [1] - 10:11

**duty** [5] - 30:12, 30:13, 55:10, 55:13

**dwell** [3] - 6:25, 87:21, 90:1

## E

**e-mail** [1] - 56:3

**EAMON** [1] - 1:7

**early** [1] - 21:11

**earned** [1] - 7:7

**easy** [3] - 8:25, 24:19, 100:21

**Edelstein** [1] - 62:22

**edicts** [1] - 22:16

**effect** [4] - 12:17, 31:15, 96:10, 96:14

**eight** [1] - 31:5

**either** [8] - 44:19, 49:7, 51:14, 61:22, 71:12, 73:19, 77:8, 87:23

**elaborate** [1] - 80:18

**election** [1] - 18:10

**element** [3] - 40:19, 63:17, 82:20

**elements** [1] - 77:4

**Eleventh** [18] - 31:13, 49:16, 55:19, 56:5, 67:9, 67:17, 69:14, 69:25, 70:3, 70:5, 78:3, 79:2, 79:25, 87:12, 90:11, 90:13, 90:17

**Elizabeth** [1] - 85:21

**ELLIOT** [1] - 2:3

**elsewhere** [2] - 7:22, 11:5

**embedded** [1] - 31:12

**emphasizing** [1] - 15:12

**empire** [1] - 66:10

**encompass** [1] - 69:3

**end** [7] - 15:1, 29:10, 60:2, 62:4, 86:17, 89:20, 105:21

**ended** [1] - 50:2

**endorsement** [1] - 63:6

**enemy** [1] - 12:20

**energy** [1] - 86:12

**enforce** [1] - 97:1

**engage** [2] - 54:8, 78:13

**engaged** [1] - 54:6

**engaging** [1] - 79:24

**enlist** [1] - 10:21

**enlisted** [1] - 10:19

**enters** [1] - 66:1

**entertained** [1] - 47:17

**entire** [3] - 22:4, 50:21, 81:15

**entities** [2] - 53:11, 82:14

**entitled** [5] - 20:9, 46:14, 66:1, 76:8, 76:11

**entitlement** [1] - 68:17

**entity** [6] - 83:11, 83:17, 83:23, 84:15, 101:18

**enumerate** [1] - 84:17

**equal** [2] - 7:10, 27:3

**equate** [1] - 18:11

**equated** [1] - 37:24

**equivalent** [1] - 94:14

**Erik** [1] - 4:12

**ERIK** [1] - 1:16

**escape** [1] - 15:1

**especially** [5] - 27:15, 31:17, 43:19, 49:16, 71:4

**ESQ** [8] - 2:3, 2:6, 2:9, 2:11, 2:14, 2:14, 2:17, 2:19

**essentially** [2] - 76:2, 76:24

**establish** [3] - 48:21, 55:16, 83:21

**established** [1] - 89:22

**establishes** [1] - 48:17

**establishing** [1] - 77:3

**Et** [1] - 20:11

**et** [3] - 3:9, 3:11, 8:10

**ethically** [1] - 46:11

**EUGENE** [1] - 1:6

**European** [1] - 8:21

**evaded** [2] - 91:18, 92:4

**evening** [1] - 106:10

**event** [3] - 28:13, 93:9, 98:24

**events** [6] - 15:12, 32:15, 33:11, 34:4, 54:18, 64:20

**everywhere** [1] - 96:24

**evidence** [14] - 13:14, 13:15, 15:5, 25:20, 47:9, 49:22, 51:17, 54:25, 55:22, 57:5, 72:14, 72:15, 88:12, 96:8

**evil** [3] - 24:14, 66:10, 99:1

**exact** [2] - 32:14, 63:3

**exactly** [2] - 59:12, 69:7

**example** [9] - 15:9, 19:7, 19:8, 19:13, 20:6, 34:17, 93:15, 95:8, 99:12

**examples** [1] - 6:1

**excellent** [1] - 13:10

**except** [1] - 11:16

**excluded** [1] - 25:25

**exclusivity** [1] - 13:4
**exculpatory** [1] - 15:7
**excuse** [1] - 29:18
**executed** [1] - 82:21
**executive** [1] - 22:24
**exist** [1] - 83:22
**existed** [1] - 53:17
**existential** [3] - 8:12, 10:2, 11:4
**exists** [1] - 83:17
**expect** [2] - 36:25, 44:1
**expense** [1] - 92:10
**expert** [1] - 96:8
**explained** [4] - 46:13, 46:23, 59:12, 86:12
**explanation** [2] - 25:16, 59:9
**explanations** [1] - 54:18
**exploits** [1] - 7:8
**expresses** [1] - 38:16
**expression** [2] - 68:9, 78:19
**extend** [1] - 84:7
**extending** [2] - 84:11, 90:22
**extensions** [1] - 84:5
**extensively** [1] - 71:7
**extent** [4] - 23:20, 28:6, 53:16, 64:14
**extra** [1] - 50:7
**extreme** [4] - 14:22, 37:13, 94:12, 96:12
**extremely** [4] - 18:3, 28:12, 49:16, 87:2

**F**

**fabricate** [1] - 50:9
**face** [1] - 48:21
**facing** [1] - 72:25
**fact** [38] - 17:10, 17:12, 17:13, 18:6, 19:12, 19:17, 22:9, 22:18, 23:7, 26:4, 26:6, 30:5, 38:3, 41:13, 42:6, 43:22, 46:5, 46:6, 53:12, 59:16, 61:3, 73:3, 73:11, 77:5, 77:6, 81:24, 82:19, 82:25, 83:1, 87:18, 88:13, 93:12, 93:23, 95:15, 98:8, 98:24, 100:9
**facto** [1] - 21:10
**factor** [1] - 33:24
**factors** [4] - 32:19, 33:3, 33:19, 83:3
**facts** [18] - 15:7,

15:10, 18:22, 18:23, 19:3, 19:4, 28:6, 31:1, 33:13, 34:16, 47:10, 49:18, 50:18, 50:20, 53:18, 61:12, 67:23
**factual** [3] - 17:3, 28:5, 88:6
**factually** [1] - 18:15
**fail** [3] - 51:13, 89:20, 89:25
**failed** [1] - 53:4
**fails** [5] - 62:2, 62:5, 63:15, 89:5, 89:19
**failure** [12] - 13:15, 13:19, 15:7, 15:18, 53:3, 53:25, 54:25, 55:5, 55:24, 62:18, 72:14, 88:24
**fair** [5] - 65:9, 76:6, 76:11, 78:18, 105:19
**fairness** [1] - 98:13
**faith** [1] - 92:12
**fall** [1] - 107:19
**fallout** [1] - 73:1
**false** [10] - 10:7, 15:2, 16:18, 30:10, 30:11, 33:9, 56:5, 76:11, 87:24, 87:25
**falsely** [1] - 58:18
**falsifiable** [1] - 34:19
**falsity** [3] - 47:13, 47:14, 88:6
**Fame** [1] - 44:20
**familiar** [2] - 17:16, 31:1
**families** [2] - 54:12, 76:3
**Families** [5] - 10:18, 10:22, 24:14, 75:18, 99:4
**family** [8] - 10:8, 11:19, 14:4, 28:3, 94:23, 95:14, 100:4, 101:17
**famous** [3] - 10:6, 16:24, 40:11
**fan** [1] - 95:11
**fans** [1] - 85:24
**far** [4] - 20:21, 58:9, 76:22, 91:25
**Farmers** [12] - 13:22, 26:8, 31:11, 32:2, 33:7, 34:3, 34:22, 44:25, 45:6, 73:11, 73:13, 93:18
**fast** [1] - 41:20
**fatal** [2] - 31:19, 50:20
**Fathers** [1] - 22:13
**fault** [1] - 102:14

**favor** [1] - 70:17
**favorable** [1] - 61:14
**favors** [1] - 49:17
**Fawcett** [2] - 22:2, 22:3
**feat** [1] - 7:10
**feather** [1] - 27:25
**February** [1] - 20:15
**Fed.Appx'** [1] - 90:16
**Federal** [1] - 97:9
**federal** [9] - 69:12, 70:11, 72:7, 76:9, 78:20, 90:9, 97:6, 97:7, 97:14
**FedEx** [1] - 25:25
**fee** [3] - 71:9, 72:7, 90:8
**fee-shifting** [1] - 72:7
**fees** [8] - 69:5, 70:17, 71:15, 71:19, 71:24, 72:1, 90:6, 90:14
**fellow** [1] - 86:3
**Ferguson** [3] - 4:6, 64:24, 72:17
**FERGUSON** [1] - 1:14
**Ferguson's** [1] - 72:24
**few** [5] - 7:5, 17:7, 27:10, 85:14, 97:22
**fides** [1] - 61:25
**field** [1] - 45:17
**figurative** [2] - 68:7, 68:9
**figure** [5] - 27:7, 43:5, 43:6, 43:8, 61:15
**figured** [1] - 95:9
**figures** [4] - 27:17, 49:11, 100:16, 100:19
**figuring** [1] - 33:1
**file** [8] - 98:5, 98:6, 99:20, 104:19, 105:22, 105:24, 106:5
**filed** [3] - 32:13, 81:19, 101:13
**filing** [2] - 82:22, 83:13
**filings** [1] - 84:25
**finally** [1] - 90:18
**finance** [2] - 16:5, 23:21
**fine** [5] - 57:23, 92:5, 106:7, 107:1, 107:2
**finish** [2] - 21:23, 82:8
**fire** [1] - 86:6
**fired** [1] - 67:16
**Fires** [1] - 14:25
**firm** [3] - 67:24, 76:19, 76:25
**firms** [1] - 5:3

**First** [8] - 27:15, 31:16, 34:14, 39:9, 47:3, 76:6, 89:21, 103:15
**first** [18] - 5:6, 6:25, 14:18, 14:21, 14:24, 32:8, 34:13, 56:16, 65:25, 66:9, 74:3, 76:19, 83:9, 85:3, 87:3, 91:8, 95:10, 101:10
**fit** [1] - 6:2
**five** [5] - 50:24, 70:9, 105:25, 106:5
**five-minute** [1] - 50:24
**five-page** [1] - 106:5
**FL** [6] - 2:4, 2:8, 2:10, 2:16, 2:18, 2:24
**flaws** [1] - 31:19
**flesh** [1] - 97:17
**Floor** [1] - 2:20
**FLORIDA** [2] - 1:1, 109:3
**Florida** [36] - 1:22, 3:5, 13:9, 13:11, 13:16, 23:2, 32:10, 32:25, 33:5, 33:14, 33:21, 40:18, 41:3, 41:5, 41:17, 62:20, 62:22, 64:4, 64:11, 64:14, 64:15, 69:4, 70:1, 70:3, 70:14, 80:21, 81:1, 81:2, 81:10, 81:11, 81:17, 81:18, 81:23, 82:3, 89:23, 90:8
**Florida's** [4] - 32:4, 68:24, 69:12, 70:10
**fly** [1] - 91:21
**focus** [2] - 50:14, 50:17, 66:7
**focused** [3] - 47:16, 60:9, 81:10
**focuses** [1] - 47:15
**follow** [2] - 49:25, 100:6
**football** [1] - 22:4
**footnote** [5] - 32:9, 63:25, 64:3, 64:18, 83:19
**foregoing** [2] - 90:3, 109:6
**Foreign** [1] - 58:13
**forever** [1] - 21:15
**form** [2] - 5:11, 87:6
**format** [1] - 85:1
**Former** [1] - 17:18
**forth** [8] - 15:17, 26:3, 28:1, 32:15, 48:24, 74:18, 97:10, 106:3

**Fortson** [3] - 36:21, 38:17, 43:17
**forum** [1] - 81:21
**forward** [3] - 92:23, 101:25, 107:1
**Founding** [1] - 22:13
**four** [3] - 5:2, 24:9, 70:9
**FOX** [1] - 1:15
**Fox** [8] - 23:17, 49:3, 101:14, 101:15, 101:17, 101:22, 106:13, 106:15
**framework** [1] - 36:14
**frankly** [5] - 51:13, 53:21, 57:11, 93:25, 97:1
**free** [4] - 12:15, 12:24, 85:23, 95:3
**freedom** [1] - 39:8
**French** [1] - 29:18
**frequent** [1] - 86:12
**friend** [2] - 7:9, 8:9
**friends** [2] - 11:8, 14:10
**fringe** [2] - 34:17, 38:7
**Froggy** [1] - 23:1
**front** [6] - 6:11, 7:2, 53:18, 99:25, 101:25, 102:9
**Frost** [1] - 82:20
**fruitless** [1] - 90:24
**FUGATE** [38] - 2:6, 3:19, 30:25, 33:2, 34:9, 34:12, 34:21, 35:6, 36:6, 36:16, 37:14, 38:2, 38:15, 38:23, 39:2, 39:19, 40:17, 41:22, 42:3, 42:5, 42:19, 42:23, 43:2, 43:7, 43:13, 44:14, 44:25, 45:4, 45:11, 45:24, 46:7, 47:6, 47:24, 48:5, 48:7, 48:14, 49:15, 50:4
**Fugate** [9] - 2:7, 2:9, 3:18, 3:19, 30:24, 51:11, 54:4, 56:13, 64:1
**full** [2] - 61:5, 93:7
**full-color** [1] - 93:7
**function** [1] - 31:14
**Fund** [5] - 11:12, 11:13, 11:14, 11:15, 23:15
**fund** [3] - 86:8, 86:17, 88:5
**funded** [1] - 36:8
**funding** [1] - 21:9

## G

**gallery** [1] - 85:20
**game** [4] - 32:22, 45:18, 58:19, 81:14
**GANNETT** [2] - 1:7, 1:8
**Gannett** [4] - 4:5, 65:18, 65:22, 72:18
**gatekeeping** [1] - 31:14
**gather** [1] - 99:3
**gauge** [1] - 5:12
**GAVIN** [1] - 1:16
**Gavras** [1] - 53:6
**general** [4] - 20:24, 21:1, 40:14, 48:1
**generally** [5] - 18:19, 79:18, 80:3, 101:8, 106:22
**generate** [2] - 38:8, 39:14
**generic** [1] - 88:8
**Georgia** [8] - 7:22, 13:21, 29:17, 29:20, 35:11, 69:13, 86:4
**girlfriend** [1] - 80:7
**gist** [2] - 36:11, 37:2
**given** [9] - 5:18, 54:10, 62:10, 64:19, 83:23, 90:21, 91:10, 99:14, 101:1
**glad** [1] - 4:23
**go-to** [1] - 26:10
**God** [1] - 98:10
**GoFundMe** [1] - 80:7
**gold** [1] - 79:17
**Golf** [28] - 3:20, 8:13, 8:16, 8:19, 12:25, 20:9, 25:11, 31:5, 37:22, 38:10, 38:21, 39:3, 41:12, 42:20, 48:16, 53:10, 63:8, 66:1, 67:4, 67:5, 74:23, 75:18, 75:22, 76:22, 77:9, 85:12, 86:4, 99:6
**golf** [20] - 6:18, 8:4, 10:15, 19:7, 23:6, 26:21, 35:13, 38:12, 44:6, 44:9, 45:17, 45:18, 58:9, 81:12, 85:4, 85:8, 85:21, 96:23, 99:6, 100:6
**Golf's** [1] - 66:4
**golfer** [10] - 7:12, 7:14, 8:16, 24:6, 27:24, 28:24, 43:15, 74:17, 82:16, 86:3
**golfers** [11] - 7:4,

13:24, 35:21, 40:5, 40:7, 40:9, 40:11, 40:13, 40:14, 40:24, 85:18
**golfing** [2] - 38:12, 85:20
**Golfweek** [6] - 4:5, 65:18, 65:22, 66:6, 68:4, 68:14
**government** [2] - 36:9, 83:21
**grant** [1] - 71:21
**granted** [5] - 49:22, 70:16, 71:3, 84:6
**granting** [1] - 50:2
**grants** [2] - 71:12, 71:13
**great** [3] - 15:1, 73:8, 92:10
**greed** [1] - 20:10
**greediest** [1] - 44:7
**Greenberg** [2] - 2:17, 4:11
**Greg** [1] - 66:4
**Gregory** [4] - 4:11, 59:18, 59:21, 74:1
**GREGORY** [2] - 2:17
**ground** [5] - 58:6, 58:10, 62:14, 73:20, 96:2
**grounding** [1] - 58:24
**grounds** [6] - 56:10, 68:13, 72:2, 72:3, 81:4, 84:9
**group** [11] - 9:17, 10:20, 22:1, 41:5, 41:7, 41:16, 41:17, 67:2, 77:1, 107:18
**Group** [4] - 3:24, 51:8, 58:13, 62:8
**GROUP** [1] - 1:14
**guards** [1] - 11:4
**guess** [8] - 20:17, 37:12, 39:11, 46:3, 60:22, 68:12, 69:17, 74:18, 76:17, 77:12, 107:15
**guessing** [1] - 40:6
**guy** [1] - 26:10
**guys** [2] - 9:20, 86:10

## H

**habitual** [2] - 27:23, 28:15
**Hachette** [2] - 3:24, 62:8
**HACHETTE** [1] - 1:14
**Hack** [2] - 15:16, 26:4
**HACK** [1] - 1:6

**halfway** [1] - 85:9
**Hall** [2] - 44:20, 106:14
**hand** [1] - 75:2
**handle** [1] - 69:11
**handled** [2] - 67:16, 70:4
**handling** [1] - 65:15
**hands** [1] - 94:7
**happy** [5] - 32:10, 88:22, 89:6, 89:9, 91:12
**hard** [4] - 40:1, 40:24, 41:20, 103:12
**hard-and-fast** [1] - 41:20
**hardly** [1] - 22:12
**hardworking** [1] - 14:12
**harm** [3] - 82:2, 82:3, 94:21
**harmed** [5] - 6:21, 10:8, 10:14, 11:18, 14:13
**harmful** [1] - 23:23
**Harmon** [1] - 10:6
**harms** [1] - 28:2
**Harwood** [4] - 22:2, 41:7, 41:8, 41:9
**hat** [5] - 26:18, 74:23, 97:20, 97:21, 98:9
**Hatchette** [1] - 51:8
**hatred** [1] - 44:22
**haven** [1] - 43:20
**Hay** [1] - 19:20
**head** [3] - 11:12, 23:11, 94:6
**headline** [9] - 74:9, 75:14, 75:17, 76:5, 76:12, 76:16, 76:19, 76:24, 85:3
**headlines** [4] - 76:14, 76:15, 76:17
**headquarters** [1] - 32:24
**hear** [5] - 5:9, 14:6, 14:9, 91:13, 100:10
**heard** [4] - 14:8, 73:9, 103:10, 103:14
**Heard** [1] - 9:8
**hearing** [10] - 4:21, 4:24, 5:1, 5:11, 16:16, 25:9, 104:19, 105:24, 106:5
**HEARING** [1] - 1:20
**hearings** [1] - 103:4
**heckled** [1] - 85:24
**heinous** [1] - 99:2
**held** [7] - 16:2, 19:5, 56:5, 58:5, 69:22,

97:8, 101:25
**Helfand** [9] - 84:3, 84:6, 84:12, 85:16, 90:19, 91:18, 92:1, 94:2, 94:5
**HELFAND** [1] - 1:9
**hell** [1] - 99:23
**help** [4] - 12:13, 12:24, 100:15, 104:19
**helped** [1] - 70:20
**helpful** [1] - 16:17
**helping** [2] - 70:24, 70:25
**HERBERT** [14] - 2:17, 4:11, 73:25, 74:3, 74:14, 74:19, 75:2, 75:5, 75:8, 75:12, 77:14, 78:3, 80:20, 82:8
**Herbert** [3] - 4:10, 4:11, 74:1
**hereby** [1] - 109:6
**herein** [1] - 109:8
**Hero** [2] - 58:23, 95:19
**hide** [1] - 95:5
**highly** [1] - 47:18
**himself** [2] - 23:1, 85:24
**hip** [1] - 12:17
**hire** [2] - 28:2, 98:1
**history** [6] - 28:19, 35:3, 35:7, 35:14, 44:5, 96:17
**Hitler** [2] - 37:8, 37:24, 94:15, 96:19
**Hogan** [1] - 2:23
**hold** [1] - 75:3
**Holding's** [1] - 55:19
**HOLDINGS** [1] - 1:15
**Holdings** [2] - 3:24, 51:8
**holds** [1] - 10:4
**hole** [1] - 10:25
**holes** [1] - 85:16
**Holocaust** [1] - 37:9
**home** [2] - 8:17, 95:3
**homes** [1] - 32:25
**honest** [3] - 14:11, 95:10, 99:23
**honestly** [1] - 53:21
**Honor** [117] - 4:16, 6:10, 6:11, 6:20, 6:24, 7:16, 8:9, 9:4, 10:9, 12:8, 13:8, 14:25, 15:4, 16:4, 16:13, 17:8, 19:17, 19:22, 19:24, 21:4, 21:12, 22:12, 22:13, 23:5, 24:11, 25:17, 28:5, 30:14, 30:15,

30:20, 30:25, 33:2, 34:13, 34:21, 35:6, 36:6, 36:16, 38:2, 38:15, 38:23, 39:19, 42:3, 43:17, 45:1, 47:6, 47:24, 49:15, 50:4, 50:11, 50:20, 51:7, 52:8, 52:23, 53:3, 53:9, 53:18, 54:13, 54:21, 55:15, 56:22, 57:7, 57:25, 58:23, 61:16, 61:18, 62:16, 64:10, 64:14, 64:21, 65:13, 66:22, 72:5, 73:23, 73:25, 74:12, 74:19, 75:13, 77:14, 80:20, 81:12, 83:7, 84:3, 84:21, 85:14, 86:14, 87:3, 87:20, 88:20, 89:18, 90:1, 90:18, 91:3, 91:15, 92:20, 92:21, 93:8, 93:11, 94:12, 94:13, 96:1, 96:7, 96:12, 96:18, 96:20, 96:25, 97:13, 97:16, 99:9, 99:12, 99:22, 100:12, 100:15, 101:24, 104:13, 106:8, 107:4
**Honor's** [1] - 55:18
**HONORABLE** [1] - 1:20
**Honorable** [2] - 3:6, 51:3
**hope** [3] - 80:11, 107:24
**Horace** [1] - 22:25
**Horan** [1] - 19:22
**Horsley** [3] - 36:21, 37:19, 87:11
**hours** [2] - 44:21, 103:2
**House** [1] - 62:8
**huge** [1] - 8:19
**humorous** [2] - 87:7, 88:4
**hunky** [1] - 11:8
**hunky-dory** [1] - 11:8
**Hustler** [1] - 20:2
**hyperbole** [11] - 31:22, 36:23, 37:17, 37:25, 38:4, 38:5, 43:21, 68:5, 68:10, 87:6, 87:19
**hyperbolic** [7] - 34:15, 36:25, 37:12, 37:14, 44:2, 44:18, 87:24
**hyperlink** [2] - 86:21, 88:10

**I**

**idea** [1] - 40:12
**identifiable** [2] - 75:7, 93:8
**identified** [3] - 86:23, 88:14, 103:20
**identify** [4] - 19:10, 60:6, 60:21, 77:22
**II** [2] - 4:6, 65:16
**ill** [7] - 48:19, 50:16, 51:20, 53:21, 53:22, 56:1, 72:14
**illegal** [1] - 95:23
**illustration** [1] - 79:12
**impact** [1] - 85:8
**implication** [18] - 18:20, 18:21, 18:25, 19:4, 19:6, 19:14, 26:11, 26:17, 28:7, 35:4, 78:9, 78:16, 79:1, 79:3, 80:2, 89:5, 93:14, 93:20
**implication's** [1] - 30:2
**implied** [3] - 19:2, 78:11, 93:17
**imply** [2] - 19:3, 80:4
**important** [14] - 6:20, 7:17, 9:25, 13:7, 15:5, 16:15, 16:21, 17:7, 31:14, 66:7, 85:13, 87:2, 100:24, 104:22
**importantly** [2] - 76:13, 81:7
**impression** [1] - 12:20
**improper** [1] - 84:16
**IN** [1] - 1:1
**inaccurate** [1] - 20:10
**inactionable** [1] - 84:13
**inadvertently** [1] - 96:4
**INC** [5] - 1:8, 1:9, 1:14, 1:15, 1:16
**Inc** [4] - 3:24, 106:14, 106:16
**incident** [1] - 31:10
**incidents** [2] - 54:2, 73:9
**include** [4] - 35:22, 54:17, 54:20, 80:7
**included** [1] - 46:23
**includes** [1] - 61:5
**including** [4] - 61:13, 82:15, 94:24
**incompetence** [1] - 66:5
**Incorporated** [2] -

4:19, 83:12
**indeed** [3] - 83:11, 87:6, 88:6
**independent** [1] - 68:13
**Independent** [1] - 19:20
**indicated** [2] - 56:4, 109:8
**indirectly** [1] - 37:3
**individual** [6] - 15:8, 21:25, 23:9, 36:1, 41:8, 81:9
**individuals** [2] - 60:18, 82:14
**industry** [4] - 79:17, 79:18, 79:20, 80:3
**infer** [1] - 13:13
**inference** [7] - 47:11, 50:18, 51:14, 53:5, 53:22, 55:16, 56:1
**influx** [1] - 5:12
**INFORMATION** [1] - 1:8
**information** [12] - 15:2, 15:5, 15:23, 18:8, 24:13, 46:19, 53:24, 61:9, 76:3, 83:3, 99:3, 101:21
**infraction** [3] - 13:22, 19:10, 95:21
**infused** [1] - 59:6
**injunction** [1] - 25:24
**injured** [1] - 28:22
**injury** [1] - 33:16
**inoculated** [1] - 57:20
**insert** [1] - 24:20
**insofar** [1] - 84:8
**instance** [2] - 58:23, 94:5
**instances** [3] - 18:23, 58:12, 60:18
**instead** [1] - 66:15
**instructive** [3] - 50:12, 67:11, 67:20
**insufficient** [1] - 56:6
**Insurance** [3] - 31:11, 73:11, 93:18
**intend** [1] - 94:19
**intent** [2] - 12:10, 59:4
**intentional** [1] - 49:19
**intentions** [1] - 101:22
**interest** [2] - 39:14, 100:10
**interesting** [1] - 44:8
**interestingly** [1] - 38:17
**interference** [2] - 89:12, 89:24
**International** [2] -

4:19, 83:12
**INTERNATIONAL** [1] - 1:9
**international** [4] - 32:21, 32:22, 81:13
**internationally** [1] - 81:14
**internet** [1] - 21:14
**interpreted** [1] - 34:16
**interview** [2] - 10:13, 12:12
**interviewed** [1] - 14:15
**introduce** [1] - 3:17
**invective** [1] - 43:21
**investigate** [2] - 53:25, 55:25
**investigation** [2] - 13:19, 67:23
**investment** [2] - 86:8, 86:16
**Investment** [5] - 11:12, 11:14, 11:15, 23:15
**invests** [1] - 23:15
**invite** [1] - 43:24
**invited** [1] - 23:9
**invoking** [1] - 47:3
**involve** [3] - 34:3, 68:20, 68:22
**involved** [8] - 40:2, 67:13, 69:2, 74:7, 79:8, 87:10, 98:4, 99:17
**involves** [1] - 65:17
**involving** [3] - 17:17, 43:25, 69:6
**ironic** [1] - 20:10
**irregularities** [1] - 18:10
**irrelevant** [1] - 81:25
**irresponsible** [1] - 39:13
**isolate** [1] - 63:14
**issue** [32] - 5:15, 12:9, 17:10, 22:1, 31:5, 39:3, 39:6, 43:14, 47:12, 48:18, 49:17, 49:20, 50:14, 50:17, 56:14, 59:9, 62:16, 64:6, 64:7, 65:5, 65:22, 66:3, 66:8, 68:1, 84:24, 85:14, 86:13, 87:15, 93:21, 94:1, 97:23, 104:5
**issued** [1] - 28:3
**issues** [7] - 5:4, 7:20, 56:16, 59:13, 67:20, 72:25, 91:22
**itself** [3] - 76:10, 77:7,

88:5

**J**

**Jacksonville** [3] - 1:22, 2:10, 2:24
**JACKSONVILLE** [1] - 1:2
**Jaisinghani** [1] - 33:17
**jarring** [1] - 39:18
**Jay** [3] - 4:17, 8:12, 83:8
**JAY** [1] - 2:19
**Jedi** [1] - 68:6
**Jedi'** [1] - 66:2
**Jeremy** [1] - 51:7
**JEREMY** [1] - 2:11
**Jerome** [1] - 97:18
**Jerry** [1] - 3:23
**job** [4] - 91:20, 99:20, 100:23, 103:6
**John** [2] - 27:10, 41:9
**Johnny** [1] - 9:7
**join** [1] - 20:15
**joined** [3] - 20:19, 40:5, 86:6
**joining** [2] - 53:15, 86:1
**Jones** [1] - 58:2
**Journal** [2] - 13:9, 13:11
**journalism** [1] - 39:12
**journalist** [1] - 38:10
**journalists** [1] - 76:8
**JUDGE** [1] - 1:21
**Judge** [8] - 17:9, 17:17, 50:1, 69:17, 92:18, 97:12, 101:6, 105:10
**judge** [3] - 17:14, 19:18, 30:15
**judge's** [1] - 17:3
**judges** [3] - 22:15, 22:17, 99:25
**judgment** [9] - 49:8, 49:21, 50:3, 50:8, 58:7, 70:16, 71:3, 71:13, 71:23
**judicial** [1] - 83:20
**July** [2] - 1:21, 3:2
**jump** [1] - 31:2
**jumped** [1] - 12:21
**June** [2] - 20:16, 53:16, 63:8
**juries** [1] - 22:14
**jurisdiction** [2] - 80:17, 81:16
**jurist** [1] - 97:13
**jury** [8] - 17:15, 19:18,

22:20, 25:18, 93:12, 97:4, 99:14, 100:13
**Justice** [1] - 97:12
**Justine** [3] - 6:15, 6:16, 10:14
**juxtaposed** [1] - 18:24
**juxtaposes** [1] - 19:2

**K**

**keep** [1] - 48:10
**Keith** [1] - 82:20
**Kelly** [2] - 102:2, 102:12
**Kevin** [2] - 29:16, 86:4
**key** [1] - 80:20
**kicked** [1] - 35:11
**kids** [1] - 14:6
**kill** [2] - 20:25, 23:14
**killing** [1] - 23:21
**kin** [1] - 90:15
**kind** [12] - 5:3, 5:12, 36:25, 38:4, 45:22, 50:16, 51:10, 60:9, 60:16, 62:17, 66:22, 67:21
**kinds** [2] - 10:15, 12:16
**king's** [1] - 22:15
**kingdom** [3] - 66:11, 66:13, 86:12
**Kisner** [3] - 29:16, 30:13, 86:4
**KLAYMAN** [46] - 2:3, 6:10, 6:14, 11:25, 12:8, 17:24, 18:2, 20:21, 21:12, 23:5, 24:3, 24:8, 25:2, 25:5, 25:8, 25:14, 25:17, 26:16, 27:4, 27:21, 29:9, 29:12, 30:6, 30:20, 30:23, 91:5, 91:15, 92:4, 92:7, 92:10, 92:12, 92:14, 98:15, 98:18, 98:22, 101:24, 102:9, 104:13, 104:15, 104:18, 105:3, 105:7, 106:8, 106:10, 106:19, 107:4
**Klayman** [18] - 2:3, 3:13, 5:6, 6:9, 32:12, 39:25, 40:3, 48:23, 50:12, 54:22, 55:1, 57:4, 69:16, 91:4, 101:10, 102:22, 103:21, 106:7
**knowledge** [5] - 15:10, 47:12, 53:4,

88:3, 90:10
**known** [4] - 35:13, 36:8, 36:19, 42:14
**knows** [2] - 97:13, 99:20
**Ko** [1] - 28:13
**Koepka** [2] - 85:23, 85:24

## L

**L.P** [2] - 1:16, 4:12
**lace** [1] - 94:18
**lack** [6] - 15:20, 38:6, 38:11, 58:18, 67:7, 73:16
**lacks** [1] - 73:16
**laid** [1] - 29:13
**lamb** [1] - 16:1
**Langley** [1] - 22:25
**language** [2] - 68:5, 68:9
**large** [1] - 23:17
**LARRY** [1] - 2:3
**Larry** [1] - 2:3
**Larson** [9] - 4:13, 74:1, 74:8, 80:16, 80:22, 81:9, 82:24, 97:19, 98:5
**LARSON** [1] - 1:17
**last** [11] - 4:24, 10:12, 10:24, 22:12, 23:10, 56:22, 58:3, 94:1, 96:15, 100:11, 103:4
**Laura** [1] - 2:10
**law** [54] - 5:2, 5:17, 13:6, 16:14, 17:13, 17:20, 27:6, 27:14, 29:22, 32:11, 32:19, 40:18, 41:3, 41:5, 48:20, 49:6, 50:16, 53:2, 55:6, 56:1, 60:15, 62:20, 64:4, 64:7, 64:11, 64:14, 64:15, 64:16, 67:7, 67:12, 67:24, 70:4, 71:7, 87:13, 88:17, 89:5, 89:20, 89:23, 89:24, 89:25, 93:12, 94:17, 97:1, 99:10, 101:6, 103:10, 103:22, 103:24, 104:4
**Law** [1] - 2:3
**LAW** [1] - 102:6
**laws** [1] - 46:25
**lawsuit** [7] - 54:17, 67:18, 68:4, 69:5, 82:23, 83:13, 91:24
**lawyer** [5] - 7:15,

30:15, 49:10, 82:20, 95:14
**lawyers** [7] - 24:13, 25:8, 77:8, 78:13, 102:17, 102:20
**lay** [1] - 30:17
**lead** [2] - 3:16, 66:17
**leads** [1] - 42:13
**least** [9] - 6:2, 22:12, 70:9, 80:14, 81:15, 84:8, 89:13, 96:15, 101:12
**leave** [3] - 65:7, 82:7, 100:12
**leaving** [1] - 91:24
**led** [1] - 55:25
**left** [3] - 17:12, 51:11, 99:8
**leftist** [1] - 94:10
**legal** [6] - 21:24, 31:2, 53:4, 103:12, 103:15, 107:1
**legally** [3] - 45:15, 46:20, 103:7
**legend** [1] - 15:1
**legitimate** [1] - 26:22
**lengthy** [2] - 5:21, 74:7
**less** [1] - 38:3
**lessen** [1] - 55:12
**letter** [1] - 13:17
**level** [2] - 35:5, 61:19
**liability** [1] - 60:9
**libel** [4] - 22:1, 41:5, 41:16, 67:2, 78:16, 79:3
**liberally** [1] - 54:15
**lie** [2] - 18:6, 18:7
**life** [1] - 103:3
**light** [1] - 61:14
**lightning** [4] - 8:25, 9:23, 24:19
**likelihood** [1] - 55:12
**likely** [2] - 38:3, 43:19
**limitations** [8] - 32:3, 32:9, 52:21, 64:1, 64:6, 65:5, 73:20, 95:6
**limited** [4] - 26:1, 43:5, 43:13, 66:4
**limits** [1] - 97:2
**Linda** [1] - 4:4
**LINDA** [1] - 2:14
**line** [2] - 24:11, 61:4
**lineman** [1] - 67:15
**lines** [1] - 53:7
**link** [4] - 77:12, 77:23, 98:17
**linked** [1] - 77:18
**list** [2] - 5:18, 40:10

**listen** [1] - 48:12
**literally** [3] - 85:9, 88:2, 103:20
**litigation** [9] - 75:21, 75:22, 75:24, 75:25, 76:2, 76:12, 77:9, 78:19, 78:21
**LIV** [101] - 6:22, 8:8, 8:9, 8:11, 8:22, 8:24, 9:17, 9:19, 10:1, 11:5, 11:7, 11:11, 12:5, 12:19, 20:15, 20:18, 20:19, 21:11, 21:3, 21:8, 21:11, 22:8, 23:6, 23:9, 23:25, 24:6, 24:9, 24:12, 25:8, 25:16, 25:22, 31:8, 31:24, 35:21, 35:25, 36:8, 37:22, 40:3, 40:8, 40:11, 40:13, 40:14, 41:1, 41:11, 41:15, 41:18, 42:10, 43:3, 43:22, 47:25, 48:1, 53:10, 53:15, 53:17, 63:8, 66:1, 66:4, 66:14, 67:4, 67:5, 74:23, 75:17, 75:21, 76:1, 76:22, 76:25, 77:9, 78:12, 82:20, 85:4, 85:7, 85:8, 85:12, 85:19, 85:25, 86:10, 86:16, 87:1, 87:10, 88:4, 94:6, 94:9, 97:20, 97:21, 98:8, 99:6, 99:13, 99:16, 99:17
**LIV's** [1] - 78:12
**lives** [2] - 81:9, 92:2
**LLC** [2] - 1:6, 1:8
**LLP** [3] - 2:12, 2:17, 2:20
**lo** [1] - 11:6
**LOCICERO** [17] - 2:14, 4:2, 4:4, 4:8, 65:13, 65:21, 66:21, 68:19, 68:22, 70:2, 70:23, 71:16, 71:18, 72:2, 72:5, 72:12, 73:23
**LoCicero** [6] - 2:15, 3:25, 4:2, 4:3, 64:25, 65:14
**locker** [2] - 67:15, 67:22
**Loeb** [1] - 55:6
**logo** [2] - 74:23
**London** [2] - 10:11, 10:12
**long-arm** [2] - 80:21,

81:6
**look** [21] - 25:19, 32:18, 32:19, 36:6, 36:24, 37:18, 40:24, 43:22, 48:6, 61:10, 66:12, 69:19, 76:13, 79:13, 94:17, 98:16, 99:1, 100:4, 100:25, 102:3
**looking** [12] - 35:20, 36:7, 42:8, 42:9, 42:14, 47:20, 52:6, 74:16, 74:22, 74:25, 77:11, 98:14
**Lose** [1] - 14:20
**lose** [1] - 13:4
**lost** [6] - 25:9, 25:11, 25:22, 63:6, 97:25, 98:1, 98:2
**LPGA** [1] - 16:5
**LPJ** [1] - 28:13
**Lydia** [1] - 28:13
**LYNCH** [1] - 1:7
**lynch** [2] - 65:25, 66:4

## M

**mad** [1] - 34:18
**Magazine** [1] - 20:3
**magazine** [6] - 4:18, 83:8, 83:10, 84:16, 90:4, 94:5
**mail** [1] - 86:11
**mainstream** [1] - 38:12
**maintaining** [1] - 83:16
**Majed** [1] - 94:6
**major** [4] - 8:6, 13:1, 28:25, 91:22
**male** [1] - 86:11
**malice** [66] - 12:10, 13:6, 13:7, 13:10, 13:13, 14:14, 15:6, 16:20, 27:7, 31:22, 47:1, 47:2, 47:7, 47:10, 48:15, 48:18, 48:21, 48:24, 49:1, 49:7, 49:12, 49:22, 51:11, 51:14, 51:15, 51:17, 52:25, 53:5, 53:19, 53:23, 54:4, 55:1, 55:4, 55:13, 55:16, 55:22, 55:24, 56:1, 56:6, 56:10, 67:7, 67:8, 67:11, 67:25, 68:2, 72:13, 72:14, 72:15, 72:23, 73:16, 73:17, 76:15, 77:4, 82:19, 82:25,

81:6
**Malice** [1] - 13:11
**maliciously** [1] - 50:15
**man** [3] - 86:2, 99:23, 100:4
**manage** [1] - 102:15
**management** [1] - 96:2
**manner** [1] - 45:18
**mantle** [1] - 14:3
**Manuel** [1] - 13:12
**manufactured** [1] - 94:3
**Mao** [1] - 94:15
**Mark** [1] - 28:18
**markings** [1] - 75:2
**Martin** [1] - 23:11
**massive** [3] - 60:19, 62:7, 65:23
**Masters** [1] - 7:6
**matches** [3] - 59:19, 59:23, 73:4
**material** [2] - 5:3, 6:18
**matter** [16] - 6:15, 18:12, 18:17, 19:18, 38:14, 59:5, 59:24, 64:11, 67:7, 67:12, 75:8, 89:20, 89:25, 100:3, 101:9, 107:9
**matters** [3] - 22:20, 43:15, 71:6
**McIlroy** [5] - 7:9, 16:1, 28:9
**mean** [21] - 5:17, 12:1, 12:4, 21:16, 23:20, 27:13, 28:20, 29:19, 32:20, 35:24, 39:7, 42:10, 46:5, 53:11, 59:4, 59:20, 71:17, 77:19, 93:4, 94:7, 105:22
**mean-spirited** [1] - 27:13
**meaning** [4] - 18:24, 34:18, 50:6, 87:15
**meanings** [1] - 93:10
**means** [5] - 24:14, 75:15, 84:8, 90:23, 99:1
**meant** [1] - 25:19
**measures** [1] - 54:6
**mechanical** [1] - 1:24
**Media** [1] - 13:11
**media** [13] - 8:4, 11:24, 15:15, 49:11, 53:11, 62:21, 70:14, 95:11, 96:21,

103:11, 103:16, 104:2
**medium** [1] - 36:20, 36:24, 43:23
**Melbourne** [1] - 14:25
**member** [9] - 21:11, 24:5, 24:16, 25:22, 41:13, 41:15, 42:7
**members** [3] - 40:16, 44:21, 88:25
**mention** [1] - 42:11
**mentioned** [6] - 35:10, 77:6, 81:12, 82:11, 82:18, 82:22
**merge** [3] - 11:7, 11:11
**merger** [4] - 8:10, 15:21, 99:6, 99:7
**meritless** [1] - 82:17
**meritorious** [1] - 90:21
**merits** [3] - 84:20, 87:4, 87:19
**messaged** [1] - 44:19
**method** [1] - 84:11
**Miami** [2] - 17:8, 67:14
**Michel** [5] - 55:19, 55:21, 56:2, 77:4, 82:25
**Mickelson** [5] - 9:13, 20:12, 27:10, 82:15, 85:22
**Mickelson's** [1] - 20:10
**micromanage** [1] - 27:16
**middle** [1] - 107:6
**Middle** [1] - 3:5
**MIDDLE** [2] - 1:1, 109:3
**might** [12] - 13:23, 28:19, 39:12, 39:13, 47:5, 59:21, 65:19, 91:9, 97:17, 102:5, 102:6, 107:6
**mild** [1] - 78:19
**Milkovich** [1] - 68:8
**millions** [1] - 97:25
**Milliron** [2] - 5:17, 102:14
**milquetoast** [1] - 86:9
**Minch** [1] - 3:19
**MINCH** [1] - 2:9
**Minchin** [1] - 3:19
**MINCHIN** [1] - 2:9
**mind** [4] - 47:16, 82:6, 87:2, 94:10
**minimum** [1] - 93:20
**minute** [2] - 32:7,

50:24, 102:4, 105:9
**minutes** [6] - 24:24, 25:1, 29:7, 48:9, 82:5, 103:2
**mischaracterizes** [1] - 84:25
**misimpression** [1] - 92:8
**misrepresented** [1] - 97:6
**missing** [1] - 49:13
**misstated** [1] - 18:20
**mixed** [5] - 17:10, 17:13, 19:17, 22:18, 93:12
**model** [1] - 86:10
**Monahan** [1] - 8:12
**money** [10] - 7:24, 10:3, 10:21, 20:24, 21:16, 23:20, 44:6, 49:3, 66:15, 96:13
**morning** [2] - 17:23, 18:14
**Morris** [1] - 22:3
**most** [17] - 8:23, 10:19, 11:16, 21:2, 21:3, 24:9, 33:19, 40:10, 44:1, 44:8, 52:12, 80:13, 89:13, 89:14, 99:24
**mostly** [1] - 7:1
**MOTION** [1] - 1:20
**motion** [26] - 31:5, 49:7, 49:23, 50:2, 56:7, 65:17, 67:12, 67:19, 70:15, 70:16, 71:2, 71:3, 71:5, 71:12, 71:13, 71:21, 71:22, 72:9, 72:17, 72:18, 73:19, 83:9, 83:14, 91:7, 92:21
**motions** [4] - 5:2, 49:17, 65:15, 101:7
**motive** [3] - 12:10, 12:21, 15:6
**move** [4] - 29:5, 30:21, 72:10, 107:1
**moved** [1] - 96:4
**movement** [1] - 45:19
**moving** [2] - 48:10, 61:16
**MR** [81] - 3:22, 4:11, 4:16, 6:10, 6:14, 11:25, 12:8, 17:24, 18:2, 20:21, 21:12, 23:5, 24:3, 24:8, 25:2, 25:5, 25:8, 25:14, 25:17, 26:16, 27:4, 27:21, 29:9, 29:12, 30:6, 30:20,

30:23, 51:7, 52:8, 52:17, 52:23, 56:22, 57:24, 58:21, 60:16, 63:21, 63:24, 64:2, 64:8, 64:10, 64:25, 65:2, 65:6, 65:9, 65:11, 73:25, 74:3, 74:14, 74:19, 75:2, 75:5, 75:8, 75:12, 77:14, 78:3, 80:20, 82:8, 83:7, 91:3, 91:5, 91:15, 92:4, 92:7, 92:10, 92:12, 92:14, 98:15, 98:18, 98:22, 101:24, 102:9, 104:8, 104:13, 104:15, 104:18, 105:3, 105:7, 106:8, 106:10, 106:19, 107:4
**MRS** [1] - 104:9
**MS** [53] - 3:19, 4:2, 4:4, 4:8, 30:25, 33:2, 34:9, 34:12, 34:21, 35:6, 36:6, 36:16, 37:14, 38:2, 38:15, 38:23, 39:2, 39:19, 40:17, 41:22, 42:3, 42:5, 42:19, 42:23, 43:2, 43:7, 43:13, 44:14, 44:25, 45:4, 45:11, 45:24, 46:7, 47:6, 47:24, 48:5, 48:7, 48:14, 49:15, 50:4, 65:13, 65:21, 66:21, 68:19, 68:22, 70:2, 70:23, 71:16, 71:18, 72:2, 72:5, 72:12, 73:23
**multimillion** [1] - 13:1
**multiple** [4] - 7:7, 68:13, 86:25, 89:15
**murder** [1] - 37:20
**murderers** [6] - 10:3, 21:17, 23:14, 25:11, 96:14, 99:13
**murderous** [1] - 37:3
**mused** [2] - 86:7, 86:16
**must** [10] - 16:22, 19:18, 19:23, 20:11, 44:11, 52:4, 89:20, 89:25, 93:12, 94:16

**N**

**name** [13] - 9:2, 9:5, 9:8, 10:3, 24:4, 48:4, 74:23, 79:13, 94:15,

99:2, 100:7, 100:16, 100:17
**named** [10] - 9:18, 23:9, 79:10, 82:11, 82:14, 83:12, 83:22, 84:4, 84:15, 86:19
**names** [1] - 10:15
**naming** [1] - 76:21
**NAST** [1] - 1:9
**Nast** [2] - 4:19, 83:12
**NATHANIEL** [2] - 1:3, 1:11
**National** [1] - 10:24
**national** [1] - 32:21
**nationally** [1] - 33:4
**nature** [1] - 39:9
**near** [1] - 77:3
**nearly** [1] - 28:11
**necessarily** [5] - 29:24, 54:19, 59:4, 75:8, 105:16
**necessary** [2] - 105:19, 106:7
**need** [13] - 12:24, 25:3, 27:2, 29:6, 39:11, 39:14, 48:10, 49:13, 61:1, 88:4, 97:3, 101:25, 103:18
**needs** [4] - 86:7, 86:16, 93:9, 100:3
**negate** [1] - 75:9
**negates** [1] - 53:5
**negative** [6] - 18:4, 36:3, 51:22, 51:23, 51:25, 78:11
**Nelson** [1] - 85:21
**NETWORK** [1] - 1:8
**networks** [1] - 13:3
**never** [12] - 7:17, 7:18, 9:8, 14:2, 14:16, 14:17, 16:3, 29:14, 46:9, 70:13, 86:3
**nevertheless** [2] - 84:20, 87:25
**new** [5] - 14:20, 22:9, 36:17, 60:4
**New** [38] - 2:13, 4:18, 52:12, 53:6, 55:2, 55:7, 61:19, 61:21, 62:14, 64:3, 64:7, 64:11, 64:16, 73:19, 83:8, 83:24, 84:1, 84:4, 84:10, 84:13, 84:18, 84:19, 84:24, 86:15, 87:4, 87:17, 87:23, 88:1, 88:3, 88:8, 88:19, 89:3, 89:23, 90:4, 90:5, 94:4, 94:9
**news** [3] - 38:12, 69:3,

69:6
**News** [2] - 23:18, 49:3
**Newsham** [2] - 92:1
**NEWSHAM** [1] - 1:16
**Newsmax** [1] - 97:16
**Newspapers** [1] - 19:20
**next** [5] - 24:22, 51:6, 56:5, 61:4, 85:18
**nice** [1] - 106:10
**nilly** [1] - 96:19
**nine** [1] - 7:6
**nine-time** [1] - 7:6
**no-holds-barred** [1] - 10:4
**non** [2] - 31:21, 76:1
**non-actionable** [1] - 31:21
**non-party** [1] - 76:1
**nonactionable** [2] - 87:6, 87:19
**none** [5] - 33:4, 41:1, 50:19, 102:17
**nonliteral** [1] - 34:14
**Norbut** [1] - 4:4
**NORBUT** [1] - 2:14
**normally** [1] - 91:7
**Norman's** [1] - 66:5
**North** [1] - 2:23
**Northern** [1] - 58:2
**notable** [1] - 92:18
**notably** [1] - 75:22
**notch** [1] - 28:2
**note** [2] - 84:2, 89:4
**noted** [5] - 43:18, 45:12, 45:14, 90:13, 90:18
**notes** [2] - 47:21, 109:7
**nothing** [11] - 18:4, 26:7, 26:19, 32:20, 40:21, 66:25, 67:1, 75:9, 95:23, 97:2, 99:4
**notice** [1] - 83:21
**notwithstanding** [1] - 84:5
**nowhere** [3] - 56:24, 63:12, 77:3
**number** [14] - 3:15, 17:5, 24:20, 26:10, 27:3, 31:18, 41:24, 68:16, 69:25, 91:10, 91:11, 92:23, 93:13, 97:20
**numerous** [2] - 84:5, 85:6
**NW** [1] - 2:20
**NY** [1] - 2:13
**NYP** [4] - 1:15, 3:24,

12

51:8, 55:19

## O

**oath** [1] - 92:24
**objective** [2] - 47:15, 54:5
**obnoxious** [1] - 20:10
**obsession** [2] - 14:22
**obtain** [1] - 93:21
**obvious** [1] - 50:10
**obviously** [14] - 5:4, 5:14, 5:24, 6:16, 11:10, 39:8, 44:10, 49:4, 64:17, 76:6, 76:21, 77:11, 91:7, 102:16
**occasions** [1] - 24:21
**occur** [1] - 26:2
**occurred** [6] - 19:10, 32:15, 33:4, 33:11, 78:18, 98:23
**occurring** [2] - 45:6
**occurs** [1] - 24:20
**odd** [2] - 101:15, 101:20
**oddly** [1] - 38:2
**OF** [2] - 1:1, 109:3
**offenders** [1] - 9:11
**OFFICER** [4] - 3:4, 51:1, 51:3, 108:2
**official** [3] - 26:5, 26:6, 83:21
**officials** [4] - 13:21, 26:19, 45:9, 54:2
**often** [3] - 71:1, 71:3, 75:24
**oil** [2] - 23:19, 23:21
**Oklahoma** [4] - 22:4, 41:3, 41:4, 41:6
**old** [1] - 60:4
**omission** [1] - 49:19
**omit** [1] - 18:23
**omitted** [2] - 19:12, 28:8
**omitting** [1] - 19:4
**once** [3] - 16:16, 85:23, 86:4
**one** [86] - 5:25, 7:4, 8:23, 9:11, 9:13, 13:2, 19:8, 22:25, 24:8, 24:18, 24:21, 27:21, 28:14, 32:8, 33:22, 34:1, 35:2, 35:19, 40:4, 40:25, 42:19, 42:20, 43:12, 43:15, 44:3, 44:5, 46:24, 46:25, 51:18, 51:22, 52:1, 52:9, 52:24, 54:25, 57:25,

59:13, 59:17, 59:22, 59:25, 61:11, 61:17, 61:19, 63:19, 65:15, 65:25, 66:23, 67:6, 67:8, 68:18, 68:19, 69:24, 70:4, 72:10, 73:9, 73:10, 73:19, 74:8, 74:10, 75:25, 76:1, 77:21, 79:12, 80:21, 82:21, 83:19, 84:9, 85:12, 85:17, 86:22, 88:24, 90:15, 92:14, 93:18, 94:10, 95:8, 95:16, 97:20, 97:21, 100:13, 100:15, 101:11, 104:13, 104:20
**One** [1] - 86:7
**one-year** [1] - 73:19
**ones** [2] - 60:4, 99:16
**ongoing** [1] - 76:12
**online** [2] - 86:20, 88:14
**Open** [14] - 13:22, 23:10, 23:11, 31:11, 32:2, 33:8, 34:3, 34:22, 45:1, 45:7, 73:11, 85:25, 93:18, 100:11
**open** [1] - 95:10
**operative** [2] - 33:8
**opinion** [36] - 17:10, 17:13, 19:17, 22:19, 31:21, 34:14, 36:18, 36:19, 39:20, 43:18, 44:13, 44:16, 44:17, 44:18, 45:12, 46:4, 46:6, 46:14, 48:1, 59:5, 59:6, 59:24, 65:25, 66:3, 67:25, 72:24, 73:16, 78:20, 86:2, 87:6, 87:19, 90:11, 103:7, 107:13, 107:21
**opinions** [4] - 38:16, 43:20, 60:22, 105:17
**opponent** [1] - 29:8
**opponents** [3] - 25:4, 27:2, 32:9
**opportunity** [4] - 17:22, 101:1, 105:23, 107:12
**opposed** [3] - 23:25, 40:22, 42:7
**opposing** [1] - 77:6
**opposition** [2] - 41:14, 43:9
**oral** [2] - 54:23, 69:17
**Orange** [1] - 2:18
**order** [10] - 5:8, 5:10,

25:9, 39:14, 69:11, 78:16, 88:5, 90:14, 104:16, 105:6
**ordered** [3] - 105:12, 105:14
**organization** [1] - 67:5
**organized** [1] - 102:15
**original** [2] - 74:21, 77:21
**Orlando** [1] - 2:18
**otherwise** [2] - 52:5, 84:12
**outlandish** [2] - 38:2, 38:14
**outliers** [1] - 11:17
**outright** [1] - 22:19
**over-the-top** [1] - 44:17
**overcome** [1] - 49:6
**overlap** [1] - 5:4
**overlay** [1] - 27:15
**overwhelming** [1] - 47:8
**own** [5] - 23:16, 23:17, 23:18, 87:19
**owned** [1] - 23:17
**owners** [1] - 25:16

## P

**P.2d** [1] - 22:3
**p.m** [5] - 1:23, 3:2, 51:2, 108:3
**page** [3] - 95:9, 95:20, 106:5
**pages** [6] - 85:2, 85:3, 102:25, 105:25
**Pages** [2] - 50:12, 55:1
**paid** [1] - 10:22
**pale** [1] - 37:10
**Palmetto** [1] - 2:4
**papers** [4] - 70:8, 88:22, 89:6, 89:9
**paragraph** [8] - 20:7, 47:22, 54:10, 60:1, 84:23, 85:10, 86:13
**paragraphs** [2] - 35:19, 63:4
**paralegal** [1] - 22:24
**paraphrasing** [1] - 17:13
**parcel** [1] - 78:9
**Parekh** [6] - 78:4, 79:2, 79:8, 80:6, 82:9, 90:16
**Parekh's** [1] - 80:6
**parents** [1] - 14:6
**Park** [1] - 2:4
**part** [14] - 11:16,

19:24, 28:20, 33:11, 42:9, 50:2, 50:8, 72:6, 74:20, 78:9, 86:24, 92:16, 99:17, 101:17
**participation** [1] - 6:18
**particular** [9] - 9:6, 12:6, 12:7, 25:21, 43:19, 43:23, 63:13, 63:16, 85:12
**particularly** [6] - 10:18, 32:20, 66:7, 66:25, 68:6, 87:11
**parties** [9] - 51:2, 64:19, 65:2, 71:13, 71:14, 75:25, 76:1, 91:11, 104:15
**partner** [2] - 8:14, 8:17
**partners** [1] - 70:4
**party** [5] - 3:16, 9:6, 71:9, 71:17, 71:19, 76:1, 105:23, 106:4, 106:6, 106:23
**passage** [1] - 12:11
**passing** [1] - 84:2
**past** [5] - 27:9, 44:20, 44:21, 47:2, 49:1
**PATRICK** [2] - 1:3, 1:11
**Patrick** [24] - 3:9, 8:25, 9:12, 9:23, 10:6, 10:14, 11:1, 15:1, 16:8, 22:10, 23:6, 26:7, 28:9, 28:11, 29:2, 29:17, 29:18, 30:12, 40:4, 44:22, 86:3, 86:9, 86:17, 93:16
**patronizing** [2] - 16:15, 99:24
**pattern** [1] - 51:25
**pause** [1] - 32:11
**pay** [4] - 10:21, 70:18, 71:23, 72:1
**peers** [1] - 97:4
**penalized** [2] - 13:23, 13:24
**penalties** [2] - 28:12, 28:14
**penalty** [4] - 35:9, 59:2, 73:14, 95:22
**Penguin** [1] - 62:7
**pent** [1] - 86:11
**pent-up** [1] - 86:11
**people** [47] - 6:20, 7:10, 9:17, 9:20, 14:11, 14:12, 15:22, 20:25, 22:8, 22:16, 23:13, 23:14, 23:21,

24:9, 29:16, 32:24, 37:7, 37:8, 37:9, 37:10, 39:10, 41:7, 46:2, 46:15, 47:3, 56:20, 57:21, 59:21, 60:12, 60:13, 60:20, 60:22, 60:24, 61:2, 61:13, 78:13, 80:13, 85:7, 87:1, 87:9, 92:24, 93:25, 95:14, 96:13
**per** [6] - 19:15, 26:12, 38:1, 62:21, 62:24, 89:9
**perceived** [1] - 73:7
**percent** [3] - 23:18, 42:14
**perception** [1] - 73:3
**perhaps** [1] - 55:13
**perk** [1] - 85:18
**permit** [1] - 90:5
**permitting** [1] - 90:23
**person** [12] - 4:22, 9:6, 21:25, 23:8, 23:25, 27:22, 30:1, 38:8, 70:14, 77:20, 94:19
**personage** [1] - 32:21
**personal** [2] - 76:3, 80:17, 81:16
**personality** [1] - 85:20
**personally** [1] - 80:23
**persons** [2] - 93:16, 103:11
**pertained** [1] - 58:24
**pertains** [6] - 51:23, 52:12, 52:17, 53:8, 53:13, 60:23
**PGA** [38] - 7:6, 8:8, 8:11, 8:13, 8:14, 8:17, 8:18, 8:20, 8:24, 11:6, 11:10, 11:11, 11:23, 12:5, 12:13, 12:18, 12:19, 12:23, 13:1, 15:24, 20:13, 26:5, 45:21, 48:15, 48:17, 52:3, 53:11, 54:2, 54:11, 62:10, 66:1, 66:5, 75:18, 75:22, 76:25, 81:24, 81:25, 82:1
**PGA's** [1] - 76:19
**phase** [1] - 66:2
**phase/story** [1] - 68:6
**Phil** [4] - 9:12, 20:11, 27:10, 82:15
**photo** [9] - 74:20, 74:21, 74:22, 78:15, 78:24, 79:4, 79:9, 79:11, 80:3
**pick** [3] - 27:10, 51:10,

66:22
**picture** [22] - 24:17, 42:12, 42:17, 74:17, 75:12, 76:18, 77:12, 77:18, 77:19, 77:21, 79:21, 79:22, 80:8, 93:7, 98:9, 98:10, 98:11, 98:14, 98:17, 98:21
**pictures** [1] - 9:3
**piece** [7] - 23:16, 23:17, 65:25, 66:4, 72:24, 87:7
**PIF** [2] - 11:15, 23:21
**Pines** [1] - 73:10
**piss** [2] - 29:18, 86:5
**PL** [1] - 2:15
**place** [7] - 26:8, 27:17, 32:23, 34:4, 64:20, 81:25, 109:8
**places** [1] - 7:13
**plaintiff** [33] - 16:10, 33:20, 37:15, 40:20, 41:9, 41:10, 52:24, 53:4, 53:9, 55:2, 55:22, 56:8, 70:18, 71:8, 71:16, 77:2, 78:24, 79:5, 79:10, 79:11, 79:12, 81:20, 82:1, 83:11, 84:24, 86:18, 87:12, 87:22, 88:11, 88:18, 89:2, 98:5, 98:7
**Plaintiff** [2] - 1:4, 1:12
**plaintiff's** [6] - 55:1, 62:18, 62:23, 78:10, 79:4, 79:9
**PLAINTIFF'S** [1] - 2:2
**plaintiffs** [1] - 22:5
**plan** [1] - 82:21
**planning** [1] - 24:23
**plausible** [3] - 80:2, 81:4, 81:8
**plausibly** [2] - 77:3, 80:4
**play** [8] - 10:22, 23:7, 25:24, 26:5, 26:13, 37:22, 48:2, 99:5
**played** [2] - 23:4, 26:14
**player** [9] - 6:19, 7:14, 8:24, 9:18, 21:3, 26:22, 44:21, 45:20, 67:4
**players** [26] - 8:23, 9:17, 9:19, 10:2, 11:2, 12:14, 12:16, 15:24, 21:1, 22:8, 22:10, 24:9, 25:10, 25:12, 25:21, 25:23,

44:6, 44:8, 44:20, 48:2, 54:12, 62:10, 65:3, 66:14, 99:13, 99:16
**playing** [1] - 28:22
**plays** [5] - 6:17, 11:4, 23:6, 24:6
**plead** [12] - 47:10, 51:13, 56:6, 62:18, 62:25, 63:16, 87:22, 88:18, 88:24, 95:25, 97:24
**pleading** [6] - 72:22, 77:3, 81:3, 89:8, 96:9, 97:10
**pleadings** [5] - 22:7, 42:9, 81:19, 88:7, 101:14
**pleads** [1] - 51:22
**pleasure** [1] - 6:11
**pled** [9] - 10:20, 12:14, 17:4, 41:18, 51:18, 52:25, 68:17, 92:22, 97:25
**plenty** [1] - 81:5
**PLLC** [2] - 2:7, 2:9
**ploy** [1] - 11:18
**plus** [2] - 15:3, 84:18
**pocket** [1] - 12:17
**podcast** [1] - 36:25
**podcaster** [1] - 38:7
**podcasting** [1] - 38:20
**podcasts** [1] - 43:24
**podium** [1] - 6:8
**point** [31] - 10:23, 23:5, 23:22, 26:16, 37:7, 39:25, 40:9, 45:2, 45:3, 49:4, 50:13, 53:3, 54:21, 60:22, 64:13, 64:18, 67:8, 71:9, 72:5, 75:12, 77:5, 80:10, 83:1, 87:12, 88:10, 90:20, 90:22, 91:17, 94:22, 99:18, 106:1
**pointed** [1] - 57:4, 61:8, 85:19, 92:20, 94:13
**points** [4] - 54:23, 61:17, 77:6, 80:21
**polarizing** [1] - 85:22
**Policy** [1] - 58:13
**political** [2] - 8:4, 96:23
**Ponte** [1] - 23:1
**pops** [1] - 21:16
**popular** [1] - 86:3
**portion** [1] - 95:18
**pose** [1] - 31:16
**position** [7] - 21:6,

21:7, 56:15, 64:9, 64:10, 96:25, 97:1
**possible** [1] - 93:10
**possibly** [1] - 104:6
**post** [5] - 55:3, 104:19, 105:24, 106:5
**Post** [7] - 52:12, 61:19, 61:21, 62:3, 62:5, 62:9, 62:14
**post-hearing** [4] - 104:19, 105:24, 106:5
**post-publication** [1] - 55:3
**posture** [1] - 90:15
**potential** [1] - 30:2
**potentially** [1] - 57:16
**pound** [1] - 97:16
**PR** [2] - 76:19, 76:25
**practical** [1] - 18:16
**practically** [1] - 104:24
**practice** [1] - 71:1
**practices** [1] - 79:24
**Prakazrel** [1] - 55:21
**preconceived** [1] - 15:14
**predecessor** [2] - 16:25, 20:23
**prediction** [1] - 103:9
**prejudice** [1] - 67:19
**premise** [1] - 58:16
**premised** [1] - 89:19
**Prentice** [2] - 102:8, 106:14
**Prentice-Hall** [1] - 106:14
**prepared** [2] - 30:24, 84:12
**preparing** [1] - 4:24
**present** [4] - 3:14, 3:15, 51:2, 102:18
**presented** [2] - 22:20, 87:4
**president** [1] - 17:11
**President** [5] - 17:18, 18:3, 18:4, 18:11, 18:15
**presiding** [1] - 3:6
**press** [6] - 8:10, 27:9, 27:17, 39:8, 76:11, 79:21
**Press** [1] - 4:6
**PRESS** [1] - 1:15
**presumably** [2] - 17:15, 35:22
**pretrial** [1] - 31:17
**pretty** [2] - 32:16, 39:18

**prevailing** [1] - 71:9
**prevent** [1] - 89:20
**previously** [1] - 60:3
**primarily** [4] - 6:23, 24:18, 103:14, 103:15
**primary** [1] - 33:16
**prince** [2] - 23:7, 23:8
**principal** [1] - 81:25
**principals** [1] - 77:8
**principle** [1] - 89:22
**print** [1] - 86:20
**printed** [1] - 85:1
**printout** [1] - 85:9
**privil** [1] - 12:15
**privilege** [1] - 76:6
**pro** [1] - 14:1
**problem** [4] - 11:8, 67:17, 96:19, 98:25
**problems** [2] - 27:11, 66:4
**procedural** [2] - 69:9, 69:14
**Procedure** [1] - 97:9
**proceed** [6] - 6:3, 6:7, 6:9, 17:4, 17:14, 106:22
**Proceedings** [1] - 1:24
**proceedings** [2] - 76:9, 108:3
**process** [6] - 76:3, 81:7, 91:18, 105:15, 106:20, 107:2
**produced** [1] - 1:25
**profession** [2] - 14:13, 19:16
**professional** [7] - 6:18, 7:12, 43:15, 85:4, 85:8, 96:23, 106:20
**professor** [1] - 34:18
**profit** [1] - 8:2
**prominent** [7] - 8:23, 21:2, 21:3, 21:11, 24:9, 40:5, 40:15
**prominently** [2] - 24:17, 54:17
**promised** [1] - 85:23
**proof** [1] - 90:6
**proper** [1] - 59:9
**properly** [1] - 83:20
**property** [1] - 7:24
**proposed** [1] - 8:10
**proposition** [1] - 17:2
**pros** [2] - 61:13, 96:3
**protect** [1] - 103:15
**protected** [4] - 31:21, 34:14, 37:16, 44:18

**protections** [1] - 89:21
**protects** [2] - 27:15, 34:14
**protest** [1] - 10:23
**protests** [1] - 77:1
**provable** [1] - 87:18
**prove** [1] - 49:12
**proved** [1] - 9:7
**provide** [2] - 19:21, 23:19
**provided** [2] - 83:14, 93:13
**provision** [1] - 90:8
**proximate** [1] - 88:24
**Pryor** [3] - 69:17, 97:12
**Public** [4] - 11:12, 11:13, 11:14, 23:15
**public** [17] - 27:7, 27:17, 39:9, 43:5, 43:8, 60:17, 60:19, 60:21, 61:15, 73:3, 73:7, 86:8, 86:16, 88:13, 100:16, 100:19
**publication** [24] - 9:8, 19:23, 26:6, 31:24, 41:12, 42:6, 45:5, 55:3, 55:6, 56:3, 57:19, 60:5, 63:13, 63:14, 63:17, 70:14, 80:24, 87:16, 87:17, 87:23, 89:13, 89:15, 94:10, 101:3
**publications** [21] - 15:19, 31:4, 31:7, 31:9, 31:10, 31:20, 31:25, 32:23, 34:23, 35:18, 40:21, 42:20, 46:1, 46:18, 57:2, 62:4, 74:7, 81:1, 87:14
**Publications** [1] - 22:2
**publish** [2] - 56:4, 88:1
**published** [13] - 17:10, 20:9, 20:15, 24:12, 47:18, 53:13, 62:7, 70:15, 81:1, 90:10, 95:5, 95:6, 104:5
**publisher** [5] - 4:18, 61:23, 61:24, 83:10, 90:5
**publisher's** [1] - 53:4
**publishers** [1] - 62:7
**publishes** [1] - 83:24
**publishing** [1] - 55:11
**pull** [3] - 30:17, 47:4,

102:12
**pulled** [1] - 5:21
**pulling** [1] - 26:18
**punches** [1] - 47:5
**punching** [2] - 100:20, 100:21
**purported** [1] - 101:18
**purpose** [2] - 84:11, 84:22
**purposeful** [1] - 82:2
**purposely** [1] - 81:22
**purposes** [5] - 3:10, 6:2, 24:23, 43:5, 81:16
**push** [2] - 33:3, 33:19
**put** [15] - 19:24, 21:16, 21:17, 22:25, 30:8, 55:15, 57:12, 71:20, 79:12, 83:10, 85:21, 94:3, 95:4, 107:6
**Putin** [1] - 94:15
**puts** [1] - 27:25

**Q**

**qualify** [1] - 36:24
**questionable** [3] - 35:8, 35:10, 35:15
**questioned** [1] - 62:6
**questioning** [2] - 6:2, 45:24
**questions** [6] - 5:7, 56:13, 88:22, 89:10, 90:25, 93:21
**quickly** [8] - 14:15, 16:13, 25:5, 32:16, 33:7, 43:18, 48:14, 91:17
**quiet** [1] - 48:11
**quite** [4] - 5:20, 57:7, 64:11, 94:25
**quotation** [1] - 86:15
**quote** [5] - 69:17, 75:17, 79:13, 80:3, 86:17
**quote/unquote** [1] - 78:22
**quoted** [3] - 79:11, 87:5, 87:8
**quotes** [3] - 52:6, 54:15, 87:8
**quoting** [1] - 29:16

**R**

**Rachel** [1] - 3:19
**RACHEL** [1] - 2:6
**radioactive** [3] - 18:16, 28:1, 29:2
**rain** [2] - 107:6,

107:24
**raise** [4] - 22:1, 51:13, 53:22, 88:20
**raised** [8] - 5:4, 7:20, 54:22, 55:5, 59:7, 73:18, 89:13, 89:14
**raises** [1] - 97:11
**Random** [1] - 62:7
**ranked** [1] - 7:5
**rankings** [1] - 7:5
**rape** [3] - 58:4, 58:8
**rapper** [1] - 55:21
**rare** [4] - 28:12, 48:25, 49:6, 49:16
**Rat** [1] - 41:8
**rates** [1] - 105:13
**rather** [1] - 86:19
**rational** [4] - 25:15, 37:21, 37:23, 38:1
**Raton** [1] - 2:4
**RDR** [2] - 2:23, 109:13
**reached** [3] - 67:24, 82:24, 83:2
**read** [11] - 15:8, 17:22, 18:19, 41:21, 44:3, 49:2, 60:1, 62:11, 84:23, 85:14, 94:25
**readers** [2] - 44:2, 61:8
**reading** [2] - 9:3, 57:6
**reads** [1] - 14:18
**real** [3] - 98:10, 98:11, 100:22
**really** [23] - 9:20, 12:6, 27:6, 27:7, 29:6, 32:20, 36:13, 42:11, 42:16, 51:17, 52:1, 52:2, 64:10, 74:11, 75:20, 77:8, 78:7, 78:12, 78:14, 79:5, 79:23, 101:15
**reason** [18] - 12:8, 21:5, 22:13, 52:4, 61:24, 62:2, 62:5, 62:14, 72:6, 83:20, 83:25, 84:14, 88:5, 88:16, 93:1, 93:9, 97:8, 97:15
**reasonable** [5] - 47:11, 50:18, 55:16, 80:1, 90:6
**reasonably** [3] - 30:16, 34:15, 80:4
**reasons** [9] - 46:24, 46:25, 50:10, 52:24, 84:17, 84:18, 88:16, 89:5, 90:3
**rebuttal** [2] - 91:4, 91:9
**recapitulate** [1] -

52:16
**received** [1] - 56:3
**recent** [1] - 67:10
**recently** [1] - 90:13
**recess** [1] - 108:1
**Recess** [1] - 51:2
**reckless** [2] - 16:19, 47:13
**recorded** [1] - 1:24
**recognize** [4] - 7:17, 9:17, 22:8, 62:20
**recognized** [2] - 28:17, 68:9
**record** [6] - 22:7, 74:20, 77:14, 77:15, 96:10
**recorded** [1] - 1:24
**records** [3] - 83:15, 83:16, 83:21
**recounting** [1] - 85:12
**recounts** [1] - 85:6
**recovery** [1] - 17:5
**Reed** [122] - 3:9, 3:11, 3:13, 3:14, 4:5, 4:6, 4:22, 6:15, 6:16, 6:17, 7:3, 8:7, 10:14, 10:17, 12:7, 12:19, 14:23, 15:2, 16:8, 20:8, 20:13, 20:15, 20:20, 21:2, 21:10, 21:19, 23:25, 24:2, 24:7, 24:8, 31:11, 32:1, 32:13, 32:25, 33:13, 35:3, 35:22, 37:22, 39:22, 40:2, 40:4, 40:11, 40:15, 40:22, 40:25, 41:2, 41:12, 41:14, 42:11, 42:13, 42:17, 43:3, 43:4, 43:23, 44:12, 44:15, 44:22, 45:8, 45:12, 46:16, 47:10, 47:23, 47:24, 48:4, 48:20, 51:16, 51:21, 53:15, 54:9, 56:19, 56:24, 57:8, 57:12, 58:24, 59:16, 59:19, 59:20, 61:10, 61:20, 62:2, 65:15, 65:16, 65:17, 65:24, 66:16, 66:18, 66:24, 66:25, 68:14, 71:15, 71:23, 72:16, 72:25, 73:5, 73:12, 74:18, 74:21, 74:22, 75:16, 76:22, 77:22, 79:6, 81:17, 82:17, 84:6, 85:10, 86:3, 86:9, 86:17, 88:5, 92:25, 93:7, 94:22, 95:12, 96:3, 97:20, 98:11, 99:4,

102:24
**REED** [4] - 1:3, 1:11, 104:8, 104:9
**Reed's** [9] - 54:14, 54:17, 60:2, 82:10, 83:18, 86:4, 95:10, 95:16, 97:4
**Reeds** [3] - 14:10, 100:2, 102:19
**reeks** [1] - 94:7
**refer** [2] - 31:8, 77:15
**reference** [9] - 20:8, 20:18, 44:23, 44:24, 44:25, 66:16, 66:24, 86:21, 88:17
**referenced** [2] - 40:9, 82:15
**references** [2] - 52:14, 66:10
**referencing** [1] - 76:21
**referred** [2] - 11:13, 11:14
**referring** [3] - 35:16, 60:24, 66:10
**refinery** [1] - 79:17
**reflected** [1] - 85:3
**reflection** [1] - 22:14
**refused** [1] - 89:2
**regard** [12] - 9:12, 24:21, 26:2, 28:3, 29:5, 84:2, 84:21, 93:13, 93:14, 94:1, 94:2, 97:19
**regarding** [2] - 49:19, 101:14
**regardless** [3] - 30:5, 76:10, 76:18
**regime** [2] - 37:4, 48:2
**registered** [3] - 102:7, 106:15, 106:18
**reiterate** [1] - 90:22
**rejected** [3] - 41:6, 55:2, 79:3
**related** [3] - 43:14, 80:23, 80:24
**relates** [1] - 83:25
**relationship** [3] - 20:13, 52:3, 53:10
**relatively** [3] - 48:25, 49:5, 49:6
**reliance** [1] - 88:11
**relief** [1] - 31:12
**relies** [1] - 37:15
**rely** [2] - 61:23, 92:6
**relying** [1] - 18:1
**remarkable** [1] - 95:1
**remember** [1] - 32:14
**remind** [1] - 74:5
**remote** [1] - 17:5
**removed** [1] - 61:20

**repeat** [1] - 7:18
**repeated** [2] - 20:22, 94:21
**repeatedly** [2] - 84:25, 87:8
**repetitive** [1] - 15:15
**replaced** [2] - 74:21, 77:12
**replacing** [1] - 66:5
**replete** [1] - 73:15
**replied** [1] - 86:2
**reply** [1] - 29:9
**report** [14] - 15:7, 57:2, 61:15, 61:25, 62:1, 67:13, 67:18, 67:21, 76:6, 76:8, 76:11, 78:18, 103:16
**reported** [3] - 35:12, 52:13, 56:15
**reporter** [3] - 38:16, 83:2, 105:10
**REPORTER** [1] - 2:22
**reporter's** [2] - 15:10, 15:20
**reporters** [7] - 7:21, 7:25, 12:15, 12:21, 86:7, 99:19, 100:22
**reporting** [11] - 29:23, 30:3, 52:11, 54:7, 54:9, 56:19, 61:12, 61:24, 69:3, 69:6
**reports** [5] - 8:10, 15:11, 38:12, 56:23, 73:3
**represent** [2] - 64:23, 84:3
**representation** [1] - 106:17
**representatives** [1] - 102:18
**representing** [4] - 3:13, 38:21, 65:14, 102:17
**represents** [1] - 49:10
**republish** [1] - 52:15
**republished** [1] - 14:19
**republishes** [1] - 15:2
**reputable** [1] - 62:7
**reputation** [2] - 73:6, 98:2
**require** [1] - 49:18
**required** [5] - 61:7, 62:25, 70:17, 106:6, 107:2
**requirement** [1] - 40:19
**requirements** [4] - 12:3, 69:14, 72:22, 97:10

**requires** [1] - 83:19
**research** [4] - 61:23, 99:23, 99:25, 100:23
**reselling** [1] - 85:17
**residence** [1] - 33:14
**residences** [2] - 33:20, 33:22
**resolution** [1] - 106:24
**respect** [16] - 29:22, 31:24, 32:2, 56:16, 66:6, 71:12, 72:9, 73:13, 87:3, 89:8, 89:9, 89:11, 90:18, 100:20, 101:13, 101:22
**respectively** [1] - 62:8
**respond** [1] - 101:21
**response** [2] - 83:18, 107:10
**responsible** [7] - 19:5, 39:12, 54:6, 54:9, 83:16, 87:22, 101:3
**rest** [1] - 102:13
**restatement** [2] - 41:23, 41:25
**restraining** [1] - 25:9
**restricted** [1] - 60:20
**result** [4] - 59:19, 60:2, 62:24, 103:8
**retain** [1] - 8:7
**retract** [4] - 13:15, 13:18, 54:25, 72:14
**Return** [1] - 68:6
**reviewed** [1] - 6:5
**revolved** [1] - 86:25
**rhetorical** [5] - 31:22, 36:22, 37:17, 38:4, 68:5
**Rhodes** [1] - 17:1
**rid** [2] - 67:17, 68:4
**rights** [2] - 31:16, 103:16
**rise** [11] - 3:4, 19:13, 20:19, 35:5, 42:6, 47:11, 50:18, 51:1, 51:3, 95:22, 108:2
**Rivera** [2] - 36:21, 37:19
**road** [1] - 23:15
**Road** [1] - 2:4
**robbed** [1] - 97:22
**rod** [4] - 8:25, 9:1, 9:23, 24:19
**rogue's** [1] - 85:20
**role** [1] - 6:18
**room** [2] - 67:15, 67:22
**Rory** [2] - 7:9, 28:9
**rory** [1] - 16:1
**round** [1] - 28:14

**routinely** [2] - 14:9, 51:18
**Royal** [1] - 23:11
**rub** [1] - 38:4
**rubber** [1] - 22:16
**rubber-stamping** [1] - 22:16
**Rubin** [7] - 78:4, 79:2, 79:8, 79:15, 79:17, 79:21, 82:9
**rule** [7] - 19:10, 34:25, 41:20, 45:13, 73:12, 89:13, 89:15
**Rule** [2] - 17:2, 97:9
**ruled** [3] - 10:9, 26:6, 70:6
**rules** [8] - 13:21, 26:6, 26:19, 26:21, 34:23, 35:17, 45:9, 95:21
**ruling** [1] - 70:6
**rulings** [1] - 107:20
**run** [4] - 6:4, 26:15, 52:21, 63:22
**run-up** [1] - 6:4
**running** [2] - 66:14, 94:6
**runs** [2] - 23:8, 89:20
**Ryan** [17] - 3:11, 3:24, 6:23, 12:12, 14:15, 14:21, 29:13, 51:8, 54:8, 54:10, 54:14, 57:11, 60:25, 62:6, 62:10, 63:5, 95:20
**RYAN** [1] - 1:14
**Ryan's** [3] - 53:13, 62:6, 95:1
**Ryder** [1] - 7:7

**S**

**s/Shannon** [1] - 109:13
**sacrificial** [1] - 16:1
**saddest** [1] - 44:5
**sales** [1] - 23:21
**Salman** [2] - 35:23, 36:4
**sand** [3] - 58:25, 96:1, 96:4
**sarcastic** [1] - 87:7
**SATELLITE** [1] - 1:8
**satisfy** [1] - 72:22
**Saudi** [12] - 11:12, 11:13, 23:7, 23:8, 35:23, 36:3, 36:8, 48:2, 66:11, 75:17, 76:23, 86:11
**Saudi-Backed** [1] - 75:17
**Saudies** [1] - 16:3

**Saudis** [4] - 16:4, 76:19, 76:21, 99:13
**save** [1] - 85:4
**saw** [18] - 18:14, 28:7, 40:7, 40:8, 40:10, 57:11, 77:16, 92:25, 93:8, 101:17
**saws** [3] - 21:1, 23:14, 23:22
**scam** [1] - 80:7
**scandalous** [1] - 8:3
**scare** [1] - 13:3
**scared** [1] - 10:5
**scene** [1] - 85:15
**scenes** [1] - 54:11
**schedule** [1] - 4:21
**scheduling** [1] - 6:14
**Scheuer** [1] - 16:25
**SCHEUER** [1] - 17:1
**school** [2] - 14:6, 100:5
**scientist** [1] - 34:17
**score** [1] - 59:14
**scorecard** [3] - 59:17, 59:22, 65:4
**Scott** [1] - 82:18
**screen** [4] - 8:15, 23:3, 42:9, 77:16
**se** [6] - 19:15, 26:12, 38:1, 62:21, 62:24, 89:9
**seat** [1] - 102:22
**seated** [2] - 3:7, 51:5
**second** [8] - 3:10, 51:16, 51:20, 52:9, 66:3, 72:9, 73:19, 76:24
**secondly** [3] - 56:18, 87:20, 89:4
**Secord** [1] - 55:8
**SECURITY** [4] - 3:4, 51:1, 51:3, 108:2
**security** [1] - 11:4
**see** [16] - 5:12, 9:2, 10:16, 14:5, 26:1, 39:17, 62:12, 74:25, 75:17, 80:11, 96:22, 96:24, 102:11, 103:23, 104:18
**seeing** [1] - 96:23
**seek** [3] - 71:15, 71:19, 76:20
**seeking** [1] - 25:24
**seem** [3] - 32:10, 79:7
**seep** [1] - 8:6
**seeped** [1] - 8:4
**self** [2] - 44:8
**self-interesting** [1] - 44:8
**self-serving** [1] - 44:8

**sending** [1] - 59:17
**sensational** [1] - 8:3
**sense** [3] - 65:19, 67:2, 91:12
**sentence** [5] - 83:19, 86:14, 87:5, 87:16, 87:17
**sentences** [1] - 85:14
**separate** [2] - 62:23, 64:17
**September** [1] - 106:4
**series** [1] - 19:3
**serious** [4] - 11:3, 47:17, 58:9
**serve** [1] - 84:5
**served** [9] - 84:7, 84:11, 90:19, 90:23, 91:19, 101:18, 102:8, 106:14, 106:23
**server** [1] - 106:20
**service** [10] - 61:18, 83:23, 84:8, 84:16, 90:24, 91:18, 92:4, 101:12, 101:13, 102:3
**serving** [5] - 44:8, 84:12, 91:21, 106:14, 106:16
**session** [2] - 3:6, 51:4
**set** [6] - 5:8, 15:17, 26:3, 28:1, 94:10, 97:10
**settle** [1] - 97:17
**settled** [4] - 49:3, 70:5, 97:15
**setup** [1] - 101:16
**seven** [2] - 5:1, 28:14
**several** [7] - 9:5, 13:24, 40:23, 84:17, 85:3, 86:6, 88:20
**severe** [1] - 18:10
**severely** [1] - 11:18
**severity** [1] - 22:23
**shaky** [1] - 53:12
**sham** [1] - 15:22
**Shane** [9] - 3:24, 6:23, 12:12, 14:15, 15:16, 26:4, 29:13, 95:1, 95:20
**SHANE** [2] - 1:7, 1:14
**Shannon** [2] - 2:23, 109:13
**shares** [1] - 23:19
**shaved** [1] - 59:14
**shifting** [1] - 72:7
**short** [2] - 74:8, 104:20
**shortly** [1] - 57:12
**shot** [2] - 18:5, 105:19

**shotgun** [2] - 80:22, 81:5
**shoved** [1] - 95:11
**show** [11] - 18:24, 21:21, 22:22, 22:23, 44:6, 52:25, 55:4, 98:7, 98:11, 99:15, 100:14
**showed** [4] - 19:9, 35:8, 46:13, 72:3
**Showing** [1] - 13:10
**showing** [5] - 44:7, 61:24, 83:1, 83:16, 94:4
**shows** [5] - 10:13, 11:17, 92:12, 98:24
**Shullman** [2] - 2:7, 2:9
**side** [1] - 37:24
**signed** [1] - 13:20
**significant** [1] - 71:6
**signing** [2] - 37:22, 63:8
**silent** [1] - 60:3
**silhouette** [5] - 74:13, 74:14, 77:20, 93:6, 93:7
**silhouetted** [2] - 42:12, 42:24
**similar** [3] - 33:18, 64:12, 78:5
**simple** [5] - 70:12, 70:13, 70:19, 70:22, 87:16
**simply** [3] - 50:14, 50:19, 53:18, 55:15, 57:14, 60:21, 62:13, 78:18, 78:19, 78:23, 83:10, 91:21, 95:21
**simultaneous** [1] - 106:2
**Singhal** [5] - 17:9, 17:14, 17:17, 50:1, 92:18
**single** [9] - 5:15, 5:16, 44:21, 45:19, 45:20, 75:15, 88:2, 89:13, 89:14
**sinister** [6] - 24:14, 78:22, 82:21, 99:1, 99:2, 99:3
**sister** [1] - 8:20
**sit** [1] - 48:13
**sitting** [1] - 90:9
**situation** [3] - 27:20, 38:5, 59:7
**situations** [4] - 27:19, 38:24, 40:1, 59:12
**sixth** [1] - 7:5
**SLAPP** [16] - 68:17, 68:21, 68:22, 68:24,

68:25, 69:12, 69:13, 70:7, 70:11, 71:4, 90:7, 97:5, 97:6, 97:8, 97:11
**Slaying** [3] - 6:24, 14:19, 15:3
**sleazeball** [1] - 26:20
**Slumbers** [1] - 23:11
**small** [1] - 7:9
**smeared** [1] - 10:4
**Smith** [2] - 20:1, 82:16
**So.2d** [2] - 20:2, 20:3
**socially** [1] - 16:6
**Socias** [1] - 13:12
**sole** [1] - 86:14
**solve** [1] - 66:5
**someone** [10] - 19:15, 28:15, 46:4, 54:6, 59:8, 59:21, 87:22, 89:2, 94:14, 94:21
**sometimes** [1] - 27:12
**somewhere** [1] - 38:7
**son** [1] - 94:23
**soon** [4] - 104:5, 107:14, 107:22, 107:24
**sorry** [7] - 4:3, 62:9, 64:8, 65:1, 71:18, 73:4, 107:6
**sort** [4] - 45:10, 51:21, 71:10, 72:25
**Soruour** [1] - 94:6
**sounds** [1] - 45:23
**source** [8] - 19:11, 21:9, 55:10, 56:4, 83:2, 86:19, 88:12, 88:13
**sources** [1] - 62:13
**South** [3] - 2:7, 2:15, 2:18
**Southern** [6] - 33:11, 33:18, 34:4, 36:22, 53:6, 55:7
**Spahr** [2] - 2:20, 4:17
**spare** [1] - 38:13
**sparse** [1] - 85:16
**speaking** [1] - 6:8
**special** [10] - 12:15, 62:18, 62:25, 63:1, 63:3, 63:10, 63:16, 64:13, 97:23, 97:24
**specific** [9] - 12:3, 31:24, 41:8, 42:7, 51:9, 60:23, 61:1, 64:14
**specifically** [8] - 35:16, 39:22, 40:20, 40:21, 41:2, 61:1, 62:25, 82:14
**spectators** [2] - 73:4,

85:17
**speech** [1] - 27:16
**spend** [1] - 32:7
**spent** [2] - 34:7, 103:2
**sphere** [2] - 8:4, 96:23
**spirited** [1] - 27:13
**split** [1] - 23:3
**spoken** [1] - 62:12
**sponsor** [2] - 28:25
**sponsors** [5] - 10:5, 28:1, 97:22, 97:23, 97:25
**sport** [1] - 59:8
**sports** [5] - 38:18, 43:19, 43:25, 66:12
**SPORTS** [1] - 1:15
**Sports** [4] - 101:14, 101:16, 101:23, 106:16
**sportswashing** [1] - 66:11
**sportwash** [3] - 86:8, 86:17, 88:5
**stage** [2] - 16:22, 49:8
**stakeouts** [1] - 91:19
**Stalin** [1] - 37:16
**stammering** [1] - 45:10
**stamping** [1] - 22:16
**stand** [5] - 17:1, 88:22, 89:6, 89:9, 95:7
**standard** [11] - 47:1, 47:2, 47:9, 49:1, 49:7, 54:5, 72:16, 72:22, 81:3, 105:13
**standards** [1] - 103:12
**stands** [1] - 32:20
**Star** [1] - 66:10
**start** [6] - 3:18, 6:25, 27:16, 65:17, 105:16, 107:13
**started** [1] - 6:23
**state** [8] - 41:4, 47:16, 81:23, 82:3, 83:15, 83:21, 89:15, 97:12
**State** [2] - 7:22, 59:15
**statement** [38] - 5:16, 15:13, 16:19, 22:19, 23:24, 24:2, 24:7, 33:8, 37:15, 38:3, 40:19, 44:13, 44:16, 45:3, 45:7, 47:20, 48:1, 49:19, 58:4, 58:20, 59:16, 59:18, 60:23, 60:24, 61:20, 74:10, 75:15, 75:21, 76:5, 78:7, 78:17, 78:18, 87:18, 87:24, 89:16, 89:19, 93:12,

95:15
**statements** [52] - 5:18, 5:19, 5:21, 16:9, 20:10, 20:24, 22:23, 30:10, 30:11, 31:8, 31:21, 32:2, 33:8, 34:3, 34:13, 36:23, 37:1, 39:13, 39:18, 40:23, 41:1, 43:3, 43:14, 43:22, 44:2, 44:4, 44:18, 45:1, 47:12, 48:18, 50:14, 50:17, 50:19, 51:9, 52:13, 56:17, 57:4, 57:6, 57:11, 58:23, 58:24, 74:9, 77:24, 78:25, 79:14, 80:2, 92:24, 96:13, 99:11, 103:20, 103:23, 107:17
**States** [2] - 3:4, 68:8
**states** [1] - 81:16
**STATES** [3] - 1:1, 1:21, 109:2
**states'** [1] - 68:25
**stating** [1] - 34:16
**station** [1] - 91:24
**Statute** [1] - 13:17
**statute** [29] - 32:3, 32:5, 32:9, 52:21, 64:1, 64:6, 68:17, 68:21, 68:23, 68:24, 69:3, 69:4, 69:5, 69:9, 69:12, 69:13, 70:1, 70:3, 70:7, 70:11, 71:10, 72:7, 73:18, 73:20, 80:21, 81:6, 90:9, 90:14, 95:6
**statutes** [1] - 69:1
**stay** [1] - 21:15
**staying** [2] - 66:15, 69:9
**steal** [1] - 29:16
**stealing** [1] - 14:17
**Steinberg** [1] - 28:18
**stenography** [1] - 1:24
**stenotype** [1] - 109:7
**step** [1] - 74:3
**stepping** [1] - 74:11
**still** [7] - 9:22, 21:18, 44:18, 56:5, 58:10, 79:13, 82:16
**stood** [1] - 57:13
**stop** [2] - 90:25, 107:24
**stories** [1] - 12:23
**story** [11] - 24:12, 41:8, 55:6, 55:10, 57:13, 61:4, 79:5,

79:6, 81:10, 81:12, 94:5
**strategy** [1] - 8:22
**Street** [3] - 2:10, 2:20, 2:23
**stressed** [1] - 31:13
**stretch** [1] - 42:24
**stroke** [5] - 35:9, 59:2, 59:17, 59:22, 73:14
**strokes** [1] - 59:14
**stronger** [1] - 82:10
**strongest** [1] - 21:20
**strongly** [1] - 87:24
**structure** [1] - 4:25
**structured** [1] - 80:12
**stuff** [4] - 16:2, 26:18, 29:16, 68:10
**sub** [6] - 76:14, 76:15, 76:17, 76:19, 76:24
**sub-headline** [2] - 76:19, 76:24
**sub-headlines** [4] - 76:14, 76:15, 76:17
**subcategory** [1] - 52:2
**subheadings** [1] - 51:21
**subject** [5] - 31:5, 55:5, 55:10, 68:10, 90:11
**subjective** [2] - 47:16, 54:5
**subjects** [1] - 54:16
**submit** [2] - 90:5, 96:7
**submits** [1] - 59:22
**submitted** [6] - 10:9, 13:9, 15:23, 96:10, 101:7, 101:9
**subsequent** [3] - 16:9, 52:11, 53:3
**subsequently** [1] - 86:6
**substance** [1] - 90:15
**substantial** [2] - 33:11, 34:4
**substantive** [3] - 69:4, 69:8, 72:8
**substitute** [1] - 87:3
**successful** [2] - 7:3, 7:8
**sue** [4] - 9:15, 28:18, 70:14, 103:11
**sued** [5] - 47:5, 77:21, 83:11, 85:10, 86:6
**suffers** [1] - 31:18
**sufficient** [3] - 47:11, 60:6, 60:8
**suggestion** [2] - 88:4
**suit** [3] - 32:13, 32:16, 33:6
**Suit** [1] - 75:18

**Suite** [2] - 2:7, 2:18
**Sullivan** [1] - 55:3
**summary** [11] - 19:21, 21:24, 49:8, 49:21, 50:2, 50:8, 58:7, 70:16, 71:3, 71:13, 71:23
**summer's** [1] - 85:25
**sunset** [1] - 74:17
**supervise** [1] - 15:18
**supervisors** [2] - 13:16, 15:18
**supplement** [3] - 10:9, 10:10, 105:24
**supplemental** [1] - 15:23
**support** [1] - 15:12
**suppose** [1] - 59:10
**supposed** [5] - 38:11, 63:9, 63:12, 63:15, 100:23
**supposedly** [1] - 38:8
**Supreme** [3] - 16:25, 62:22, 68:8
**surrounding** [1] - 85:7
**survived** [2] - 49:23, 50:8
**suspecting** [1] - 87:25
**suspended** [3] - 25:25, 59:19, 59:23
**sustain** [1] - 18:17
**sweeping** [1] - 58:25
**swing** [1] - 74:17
**swirling** [1] - 87:9
**switch** [1] - 93:5
**sworn** [3] - 7:21, 59:16, 59:18
**sympathizers** [2] - 10:3, 21:17
**System** [1] - 106:14

## T

**tactical** [1] - 11:18
**tactics** [2] - 77:9, 78:14
**talks** [2] - 20:18, 73:8
**Tampa** [2] - 2:8, 2:16
**tape** [1] - 19:9
**target** [1] - 9:24
**tarred** [1] - 27:25
**taunts** [1] - 28:4
**Taylor** [2] - 22:3, 22:5
**Team** [1] - 6:17
**team** [6] - 22:4, 35:11, 95:10, 95:13, 95:14, 95:16
**teammates** [10] - 29:20, 54:2, 54:15, 57:3, 60:2, 60:6,

60:25, 61:6, 61:13, 86:5
**technically** [1] - 46:8
**Ted** [1] - 82:18
**Telephone** [1] - 2:24
**temporary** [2] - 25:9, 25:24
**ten** [1] - 31:4
**tennis** [1] - 7:14
**term** [4] - 38:7, 38:11, 58:18, 66:12
**terms** [4] - 9:25, 18:9, 26:7, 98:3
**terribly** [1] - 28:22
**terrorist** [2] - 10:3, 21:17
**terrorists** [1] - 96:15
**test** [1] - 47:15
**testify** [1] - 100:10
**Texas** [16] - 32:4, 32:13, 32:15, 32:25, 33:1, 33:6, 33:12, 33:14, 33:15, 34:1, 34:2, 34:5, 73:19, 81:18, 89:23
**text** [1] - 15:15
**textbook** [1] - 26:17
**TGC** [1] - 1:6
**THE** [142] - 1:1, 1:15, 1:20, 3:8, 3:21, 3:25, 4:3, 4:7, 4:9, 4:14, 4:20, 6:13, 11:20, 12:1, 17:16, 17:25, 20:4, 21:6, 23:24, 24:5, 24:23, 25:3, 25:7, 25:13, 25:15, 26:15, 27:1, 27:5, 29:6, 29:11, 29:21, 30:19, 30:21, 30:24, 32:6, 34:7, 34:10, 34:20, 35:2, 35:19, 36:12, 37:6, 37:21, 38:6, 38:19, 39:1, 39:7, 39:24, 41:20, 42:1, 42:4, 42:8, 42:21, 42:25, 43:4, 43:11, 44:3, 44:19, 45:2, 45:8, 45:16, 46:3, 46:24, 47:20, 48:3, 48:6, 48:8, 48:22, 49:25, 50:22, 51:6, 52:4, 52:15, 52:19, 56:12, 57:15, 58:15, 59:25, 63:19, 63:22, 63:25, 64:3, 64:9, 64:22, 65:1, 65:3, 65:7, 65:10, 65:12, 65:20, 66:19, 68:15, 68:20, 69:16, 70:12, 71:11, 71:17,

71:20, 72:4, 72:11, 73:22, 73:24, 74:2, 74:13, 74:16, 74:25, 75:3, 75:6, 75:10, 77:10, 77:17, 80:10, 82:4, 83:5, 91:1, 91:4, 91:6, 91:23, 92:5, 92:9, 92:11, 92:13, 98:13, 98:16, 98:19, 101:5, 101:7, 102:2, 102:7, 102:11, 104:10, 104:14, 104:17, 104:23, 105:4, 105:8, 105:11, 106:9, 106:11, 106:21, 107:5, 107:11
**theme** [1] - 86:24
**themselves** [5] - 3:17, 45:9, 45:17, 57:7, 79:14
**theory** [3] - 24:5, 53:12, 67:3
**therefore** [6] - 16:22, 62:23, 63:15, 83:24, 84:15, 97:3
**thief** [1] - 60:11
**thinking** [1] - 38:1
**third** [2] - 8:24, 21:3
**third-most** [1] - 21:3
**Thomas** [1] - 2:15
**thorough** [1] - 13:19
**threat** [5] - 8:12, 8:21, 10:2, 10:24, 11:1
**threatened** [2] - 9:15, 28:18
**threats** [2] - 16:10, 28:3
**three** [3] - 24:9, 51:17, 55:22
**threshold** [1] - 97:11
**throughout** [4] - 13:3, 28:10, 50:15, 96:16
**throw** [2] - 19:11, 96:18
**throwing** [1] - 96:12
**thrown** [1] - 81:5
**tickets** [3] - 12:15, 12:24, 85:17
**tied** [1] - 8:13
**Tiger** [8] - 6:24, 9:14, 14:19, 15:3, 27:11, 28:17, 28:21
**timing** [1] - 20:21
**TIMOTHY** [1] - 1:20
**Timothy** [1] - 3:6
**title** [3] - 7:7, 14:24, 61:5
**today** [10] - 5:10, 8:1,

25:11, 39:6, 44:9, 68:3, 77:16, 89:18, 96:20, 107:23
**together** [4] - 13:5, 44:6, 55:15, 80:8
**tomorrow** [1] - 105:20
**tons** [1] - 53:2
**took** [5] - 34:4, 64:20, 95:2, 96:4, 98:24
**top** [3] - 7:4, 28:2, 44:17
**top-notch** [1] - 28:2
**Torrey** [1] - 73:10
**tortious** [2] - 89:12, 89:24
**totality** [4] - 30:7, 30:18, 94:18, 99:15
**totally** [1] - 8:22
**touched** [1] - 47:7
**touches** [1] - 67:5
**Tour** [38] - 7:6, 8:8, 8:11, 8:14, 8:17, 8:18, 8:20, 8:21, 8:24, 11:6, 11:7, 11:10, 11:11, 11:24, 12:13, 12:18, 12:20, 12:23, 13:1, 13:2, 15:24, 20:13, 26:5, 45:21, 48:15, 48:17, 52:3, 53:11, 54:2, 54:11, 62:10, 66:15, 75:22, 81:24, 81:25, 82:1, 85:23, 86:9
**tour** [21] - 8:20, 8:21, 12:6, 21:8, 21:11, 22:8, 22:9, 23:6, 24:1, 26:22, 31:8, 37:23, 40:5, 40:8, 40:13, 40:16, 44:20, 53:15, 53:17, 99:6
**Tour's** [2] - 8:13, 66:1
**tournament** [9] - 10:12, 26:7, 26:9, 31:11, 35:9, 73:13, 85:12, 85:15, 86:1
**tournaments** [6] - 14:1, 28:11, 73:2, 73:4, 100:8
**toward** [1] - 81:10
**towards** [5] - 9:6, 14:22, 15:8, 48:20, 81:23
**tracked** [1] - 106:20
**trade** [1] - 19:16
**traditionally** [1] - 43:20
**tragedy** [1] - 76:4
**train's** [1] - 91:24
**transcript** [8] - 1:24, 16:16, 104:16,

105:6, 105:11, 105:22, 107:12, 109:6
**transcription** [1] - 109:7
**trap** [1] - 96:1
**trash** [1] - 8:22
**Traurig** [2] - 2:17, 4:12
**treated** [2] - 100:19, 100:20
**Tremaine** [2] - 2:12, 3:23
**trial** [3] - 70:1, 70:2, 96:7
**tried** [1] - 93:4
**trouble** [1] - 33:1
**true** [18] - 7:13, 15:15, 16:23, 18:22, 18:23, 30:5, 35:23, 55:17, 58:6, 58:10, 71:24, 75:20, 76:10, 78:21, 92:22, 94:1, 95:16, 109:6
**Trump** [7] - 10:24, 17:19, 18:3, 18:4, 18:12, 18:15, 82:18
**truncated** [1] - 50:5
**truth** [2] - 16:19, 47:13
**try** [9] - 4:25, 12:22, 13:3, 26:10, 31:2, 67:3, 92:8, 105:18, 107:13
**trying** [5] - 18:5, 39:12, 80:12, 99:24, 104:23
**tu** [1] - 20:11
**turn** [3] - 29:7, 71:23, 78:22
**Turner** [8] - 67:9, 68:1, 68:2, 68:15, 68:20, 68:22, 69:23, 72:20
**turning** [1] - 95:18
**turns** [1] - 104:11
**tweet** [5] - 24:22, 38:13, 38:14, 86:22, 94:2
**tweeted** [2] - 25:11, 57:12
**tweeter** [1] - 87:7
**tweeting** [1] - 38:20
**tweets** [4] - 24:21, 35:21, 36:10
**twice** [2] - 13:25, 18:5
**twilight** [1] - 9:22
**twisting** [1] - 79:6
**Twitter** [8] - 36:19, 36:20, 36:25, 43:24, 86:23, 88:14
**two** [25] - 11:4, 28:12, 28:14, 29:13, 34:5,

35:9, 54:22, 57:9, 59:2, 59:19, 59:23, 62:7, 65:14, 65:15, 65:21, 65:24, 69:25, 73:14, 78:4, 80:20, 93:10, 95:9, 97:19, 99:11, 103:2
**two-stroke** [3] - 35:9, 59:2, 73:14
**Twombly** [1] - 16:24
**type** [4] - 15:5, 27:15, 81:6, 85:19
**types** [2] - 51:17, 55:22
**tyrannical** [1] - 37:3
**tyrants** [1] - 96:16

## U

**U.S** [4] - 16:25, 17:1, 81:16, 85:25
**UK** [1] - 92:2
**ultimately** [2] - 59:23, 67:16
**unable** [1] - 52:24
**unacceptable** [1] - 26:21
**unaware** [1] - 57:9
**unclear** [2] - 59:5, 64:19
**uncomfortable** [2] - 34:25, 46:10
**under** [23] - 15:1, 24:5, 32:4, 32:10, 33:24, 34:22, 38:4, 41:16, 41:18, 60:14, 68:17, 76:6, 80:21, 81:6, 81:7, 82:25, 86:21, 87:13, 89:23, 90:7, 90:14, 92:24
**underlying** [5] - 30:5, 58:16, 58:22, 76:10, 78:7
**underneath** [1] - 51:21
**understood** [2] - 34:9, 41:10
**unethical** [1] - 93:17
**unflattering** [2] - 27:12, 79:19
**unfortunately** [1] - 39:9
**unidentified** [1] - 93:18
**unimportant** [1] - 15:12
**unique** [2] - 84:18, 96:25
**United** [2] - 3:4, 68:8
**UNITED** [3] - 1:1, 1:21,

109:2
**University** [2] - 7:22, 35:11
**unkind** [1] - 27:8
**unless** [4] - 40:2, 88:22, 89:10, 90:25
**unlike** [2] - 74:6, 77:16
**unlikely** [1] - 17:5
**unprecedented** [2] - 54:11, 62:10
**unrelated** [1] - 76:20
**unsavory** [1] - 79:24
**unserved** [1] - 101:11
**untenable** [1] - 31:14
**untrue** [1] - 18:9
**unwritten** [1] - 45:8
**up** [26] - 6:4, 7:1, 9:19, 9:23, 11:1, 19:9, 21:14, 21:16, 22:10, 22:25, 37:22, 43:18, 48:6, 50:1, 50:2, 51:6, 51:10, 52:9, 77:16, 78:6, 82:8, 82:13, 85:18, 86:11, 93:23, 102:12
**up-and-coming** [2] - 9:19, 22:10
**uphold** [1] - 104:4
**uproar** [1] - 45:21
**usual** [1] - 105:14

**V**

**vacuum** [1] - 59:9
**value** [1] - 48:21
**various** [4] - 6:6, 21:20, 53:11, 73:1
**Vedra** [1] - 23:2
**veracity** [2] - 47:18, 50:10
**verbatim** [2] - 12:14, 28:13
**verified** [1] - 93:16
**versa** [1] - 71:24
**version** [3] - 86:20, 88:14
**versus** [20] - 3:9, 3:11, 12:5, 16:10, 16:24, 17:1, 17:8, 19:20, 19:22, 20:2, 22:3, 22:5, 36:21, 37:19, 50:12, 67:9, 72:20, 90:16
**vice** [1] - 71:24
**victims** [1] - 76:4
**video** [4] - 35:8, 46:13, 59:1, 96:9
**Video** [2] - 23:4, 26:14
**view** [4] - 44:11, 49:10, 61:14, 77:6

**viewed** [1] - 8:11
**viewers** [1] - 44:1
**views** [1] - 83:1
**vile** [1] - 99:2
**violate** [3] - 34:23, 34:24, 45:13
**violated** [3] - 26:20, 45:8, 69:5
**violation** [3] - 35:17, 59:3, 73:12
**violence** [1] - 11:1
**Virginia** [1] - 9:7
**virtually** [2] - 67:2, 98:2
**visitor** [1] - 86:12
**voluntarily** [1] - 33:7
**voted** [1] - 18:4

**W**

**W.W.E** [2] - 86:10, 86:11
**wait** [1] - 107:11
**Walker** [1] - 82:18
**Walt** [1] - 23:16
**wants** [6] - 17:11, 38:14, 61:11, 99:5, 99:7, 99:8
**war** [1] - 66:1
**WARD** [1] - 2:19
**Wars** [1] - 66:10
**wash** [1] - 94:7
**Washington** [2] - 2:21, 75:23
**waste** [4] - 58:25, 96:1, 96:2, 96:3
**watch** [1] - 8:16
**watched** [1] - 81:14
**watching** [1] - 44:6
**ways** [3] - 45:9, 72:25, 99:12
**weak** [2] - 18:3, 18:6
**weaker** [1] - 82:11
**wearing** [2] - 97:20, 98:8
**wears** [1] - 97:21
**Webster's** [1] - 99:1
**week** [4] - 4:25, 23:10, 28:13, 100:11
**weeks** [1] - 28:14
**weigh** [1] - 83:3
**welcome** [2] - 4:20, 30:23
**welcomed** [1] - 23:13
**well-established** [1] - 89:22
**well-pled** [1] - 17:4
**Wells** [3] - 14:5, 67:9, 72:20
**West** [1] - 2:4

**WFTV** [1] - 62:22
**whichever** [5] - 71:14, 71:16, 71:17, 71:19
**whipping** [2] - 11:1, 24:19
**white** [1] - 86:10
**whole** [4] - 19:23, 19:25, 56:14, 60:1
**widely** [1] - 35:12
**widespread** [1] - 36:9
**wife** [5] - 3:14, 6:15, 11:19, 94:22, 100:5
**will/animosity** [2] - 48:19, 50:16
**willfully** [1] - 44:8
**willing** [1] - 92:15
**willy** [1] - 96:19
**willy-nilly** [1] - 96:19
**Wilmington** [1] - 106:16
**Windsor** [1] - 14:5
**wink** [1] - 42:16
**winner** [1] - 7:6
**wins** [6] - 71:16, 71:17, 71:19, 71:25, 72:2
**wire** [1] - 61:18
**wish** [2] - 96:25, 104:12
**wishes** [1] - 105:23
**witness** [1] - 100:9
**women** [2] - 16:5, 16:6
**won** [3] - 25:11, 71:14
**wondering** [1] - 52:19
**Woods** [3] - 9:14, 27:11, 28:17
**woodwork** [4] - 60:3, 60:25, 61:2, 61:6
**word** [3] - 55:24, 84:22, 96:19
**words** [5] - 32:14, 50:11, 51:15, 51:18, 104:21
**works** [2] - 13:5, 71:2
**world** [9] - 7:4, 7:5, 37:22, 37:23, 44:7, 44:9, 81:15, 96:16, 96:20
**World** [5] - 8:21, 11:7, 13:2, 58:23, 95:19
**worse** [2] - 6:21, 74:15
**worst** [2] - 7:11, 27:23
**wrap** [1] - 43:18
**Wright** [2] - 2:12, 3:23
**write** [6] - 30:16, 70:20, 70:24, 70:25, 95:3, 103:7
**writer** [1] - 85:21
**writes** [2] - 85:16, 95:9, 95:20, 95:23

**writing** [1] - 21:7
**written** [6] - 10:11, 13:11, 20:9, 52:20, 62:4
**wrongdoing** [3] - 45:14, 46:2, 46:9
**wrote** [4] - 13:16, 70:15, 95:4, 95:7

**Y**

**y'all** [2] - 4:23, 104:7
**Yasir** [1] - 23:9
**year** [4] - 10:12, 10:24, 58:3, 73:19
**years** [4] - 7:5, 9:14, 10:7, 52:1
**yell** [1] - 73:4
**York** [15] - 2:13, 4:18, 52:12, 53:6, 55:3, 55:7, 61:19, 61:21, 62:14, 64:4, 64:7, 64:11, 64:16, 73:19, 89:24
**Yorker** [21] - 83:8, 83:24, 84:1, 84:4, 84:10, 84:13, 84:18, 84:19, 84:24, 86:15, 87:5, 87:23, 88:1, 88:3, 88:8, 88:19, 89:3, 90:4, 90:5, 94:4, 94:9
**Yorker's** [1] - 87:17
**young** [2] - 9:20, 94:23
**yourself** [1] - 45:16

**Z**

**Zach** [1] - 84:3
**ZACH** [1] - 1:9