## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

PATRICK NATHANIEL REED,

          Plaintiff,

v.

SHANE RYAN, *et al*

       Defendants.

**Case No: 3:22-cv-01181-TJC-PDB**

PATRICK NATHANIEL REED,

          Plaintiff

      v.

BRANDEL EUGENE CHAMBLEE, et al

       Defendants.

**Case Number: 3-22-CV-01059-TJC-PDB**

<u>**ORAL ARGUMENT REQUESTED**</u>

---

### PLAINTIFF PATRICK NATHANIEL REED'S MOTIONS TO RECUSE THE HONORABLE TIMOTHY J. CORRIGAN PURSUANT TO 28 U.S.C. § 455 <u>AND 28 U.S.C. § 144</u>

## I.   INTRODUCTION

Plaintiff Patrick Nathaniel Reed ("Mr. Reed") hereby moves, **with accompanying sworn affidavit pursuant to 28 U.S.C. § 144, which is incorporated herein in whole and must be read and considered in conjunction with these motions,** to recuse the Honorable Timothy J. Corrigan ("Judge

Corrigan") pursuant to 28 U.S.C. § 455 and 28 U.S.C. § 144 as it has become clear as a result of his September 27, 2023 Order incredulously dismissing each and every one of Mr. Reed's claims (the "Dismissal Order") – involving a total of fifty-five (55)  defamatory statements – that Mr. Reed cannot receive a fair, neutral, and unbiased adjudication before this jurist, as shown in detail below.

Mr. Reed, through counsel, is contemporaneously filing a Motion for Reconsideration, to Alter or Amend a Judgment, and for Relief from Judgment or Order pursuant to Fed. R. Civ. P 59 and 60 seeking to vacate the Dismissal Order ("Motion for Reconsideration"). This Dismissal Order is fatally flawed and contrary to the facts and the law. It  intentionally misstates the facts and the law. Judge Corrigan must immediately recuse himself from these cases and vacate at least the Dismissal Order. Otherwise, Mr. Reed's contemporaneously filed Motion for Reconsideration must be assigned to another judge in the U.S. District Court for the Middle District of Florida, as it has become abundantly clear that Judge Corrigan's predetermined, prejudicial mindset will preclude Mr. Reed from receiving a fair, neutral, and unbiased adjudication of his Motion for Reconsideration.

Critically most revealingly,  these cases were wrongfully and without cause terminated the motion to dismiss stage, before any discovery, as discovery was improperly *sua sponte* stayed by Judge Corrigan, *Ryan* ECF No. 41,  when the only question was whether the Amended Complaint pled what needed to be

pled. *Dershowitz v. Cable News Network, Inc.* 541 F. Supp. 3d 1354  (S.D. Fla. 2021). As set forth below, while it is clear that issues such as "of and concerning" were properly pled, by *sua sponte* staying discovery, Judge Corrigan prevented Mr. Reed from putting before him actual discovery evidence that the statements were "of and concerning" and and taken by readers and viewers as  associated with Mr. Reed.

Judge Corrigan's intentions in retrospect have become clear. This jurist obviously did not want evidence to be put on the record which could negate his predetermined desire to abort these cases at inception  no matter what the developed facts would show and prove, much less what had been properly pled.

After Mr. Reed and his counsel amended the Complaints, trying to divine what Judge Corrigan intended, given the lack of real guidance in his *sua sponte* orders, Mr. Reed filed detailed Notices of Compliance (*Reed v. Chamblee, et al* Dkt. No. 29 and *Reed v. Ryan, et al* Dkt. No. 28) setting forth exactly how he had complied with Judge Corrigan's *sua sponte* orders. Exhibit 1 ¶ 8. Not hearing any objection or complaint from either Judge Corrigan or the Defendants to the substance of these Notices of Compliance, Mr. Reed and his counsel had good reason to believe that they had satisfied the judge's instructions, however unclear and vague they were. Indeed, even during the subsequent oral argument concerning Defendants later filed motions to dismiss, which oral argument occurred almost seven (7) months after the Amended Complaints were filed, on

July 31, 2023, no mention was made by Judge Corrigan that Plaintiff had failed to comply with his *sua sponte* orders. Exhibit 1 ¶ 9. Thus, when Judge Corrigan issued his Dismissal Order, his prejudicial, predetermined, and biased mindset become suddenly abundantly clear. It did not matter how Mr. Reed amended his Complaints as Judge Corrigan was going to conjure up a way to dismiss them regardless, and thus he later prevented any discovery to make sure no impediment would stand in his way.

Furthermore, Judge Corrigan openly exhibited his predetermined mindset to throw out the cases regardless of the facts and the law, with intentionally using a harsh, mocking, and condescending tone in his Dismissal Order (*See* Exhibit 1; *Affidavit of Larry Klayman*), which personally attacked not only Mr. Reed, but also his counsel, Mr. Klayman. For instance:

> A few days before the July 31, 2023 hearing on the motions to dismiss, Reed filed an Affidavit with 538 pages of attachments containing cases and a Motion for Leave to Supplement the Oppositions to Motions to Dismiss. (Docs. 82, 83 in 3:22-cv-1059; 75, 76 in 3:22-cv-1181). In the motion, Reed disingenuously said the Court indicated it "would review materials outside of the four corners of the Amended Complaints" and attached 215 pages of documents containing information about Reed's purported "financial, reputational and emotional damage," and "condemnation by even PGA Tour players of the defamatory tactics" of certain Defendants, along with other outside sources. (Docs. 83 in 3:22-cv-1059; 76 in 3:22-cv-1181). These voluminous filings made only days before the hearing were both untimely and improper. The Court never indicated it would consider materials outside of the four corners of the Amended Complaints; rather, the Court said it would receive courtesy copies of electronically filed pleadings and exhibits, as is routinely done. (Docs. 54 in 3:22-cv-1059; 41 in 3:22-cv-1181). **(This also means Reed's counsel's attacks on**

**opposing counsel who filed courtesy copies were unwarranted.)** Accordingly, the Court denies the motion for leave to supplement and strikes the affidavit. To the extent Reed cited case law in his briefing elsewhere, the Court considered those cases. ECF No. 98, fn. 27. (Emphasis added).

This condescending, mocking attack on Mr. Reed and his counsel is just one piece of the compelling evidence of the need for  recusal, as courts have also held that a jurist is subject to recusal when extra-judicial bias toward the client's attorney as well as his client becomes manifest. *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-51 (5th Cir. 1975); *see also Souder v. Owens-Corning Fiberglas Corp.*, 939 F.2d 647, 653 (8th Cir. 1991); *United States v. Ritter*, 540 F.2d 459, 462 (10th Cir. 1976). Florida courts have agreed, finding that a judge must be recused when there were grounds to show bias and prejudice towards an attorney representing a party.

For instance, in *Brewton v. Kelly*, 166 So. 2d 834 (Fla. Dist. Ct. App. 1964), the court held that the judge should be disqualified in an election-misconduct case because the partners of defendant's counsel had brought about a bill of impeachment against the judge, and counsel for the plaintiffs had appeared before the judge at the same impeachment trial. The court, in issuing a writ of prohibition disqualifying the judge, said that prejudice of a judge toward counsel for a party may be of such a degree as to effect a prejudice against the party itself. *See also James v. Theobald*, 557 So. 2d 591 (Fla. Dist. Ct. App. 1990); *State v. Hahn*,

660 N.E.2d 606 (Ind. Ct. App. 1996); *Roberts v. Ace Hardware, Inc.*, 515 F. Supp. 29 (N.D. Ohio 1981).

Then, as the final straw, Judge Corrigan's entire Dismissal Order consists only of what can only be seen as intentionally "cooked" factual and legal reasoning in an attempt to justify his fatally flawed ruling. It is simply an impossibility that all fifty-five (55) defamatory statements would be dismissed with prejudice, particularly before any discovery had taken place. All of this, taken together, strongly evidence extreme extrajudicial bias, prejudice and prejudgment which requires recusal in the interests of justice and fundamental fairness.

## II.   LEGAL STANDARD

An impartial judiciary is a fundamental component of the system of justice in the United States. The right to a "neutral and detached judge" in any proceeding is protected by the U.S. Constitution and is an integral part of maintaining the public's confidence in the judicial system. *Ward v. City of Monroeville*, 409 U.S. 57, 61-62 (1972); *see also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 243 (1980) (The U.S. Constitution guarantees a party an impartial and disinterested tribunal in civil cases). To ensure that this right is protected, Congress has sought to secure the impartiality of judges by requiring them to step aside and recuse themselves, in various circumstances.

Under 28 U.S.C. § 455, a judge " . . . shall disqualify himself [or herself] in any proceeding in which his [or her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a).  In order to preserve the integrity of the judiciary, and to ensure that justice is carried out in each individual case, judges must adhere to high standards of conduct. *York v. United States*, 785 A.2d 651, 655 (D.C. 2001).  "A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned . . ." ABA Code of Judicial Conduct Canon 3(C)(1); *See also Scott v. United States*, 559 A.2d 745, 750 (D.C. 1989) (en banc). Recusal is required when there is even the appearance that the court's impartiality may be called into question, and "could suggest, to an outside observer, such a 'high degree of favoritism or antagonism to defendants' position that 'fair judgment is impossible.'" *Litecky v. United States*, 510 U.S. 540, 555 (1994).

Indeed, the "very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *United States v. Microsoft Corp.*, 253 F.3d 34, 114 (D.C. Cir. 2001). As such, "violations of the Judicial Code of Conduct may give rise to a violation of § 455(a) if doubt is cast on the integrity of the judicial process. *Id.*

Similarly, Under 28 U.S.C. § 144:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him

or in favor of any adverse party, **such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding. 28 U.S.C. § 144.** (Emphasis Added).

This statute is unambiguous – if the requirements are met, another judge must be assigned to take over the matter, period.

> The disqualification statute, 28 U.S.C. §144, is <u>mandatory and automatic</u>, requiring only a timely and sufficient affidavit alleging personal bias or prejudice of the judge. The judge is a silent defendant, unable to make findings on the truth or falsity of the affiant's allegations, and truth must be presumed. *United States v. Hanrahan*, 248 F. Supp. 471, 474 (D.D.C. 1965) (Emphasis added); and the allegations may be based upon information and belief, *Berger v. United States*, 255 U.S. 22, 34, 65 L. Ed. 481, 41 S. Ct. 230 (1920).

*Brotherhood of Locomotive Firemen & Enginemen v. Bangor & Aroostook Railroad Co.*, 380 F.2d 570, 576 (D.C. 1967) (emphasis added).

As evidence of the absolute requirement of impartiality from judicial officers, the U.S. Courts of Appeals for the **<u>Eleventh</u>**, First, Sixth, Tenth, and Fifth Circuits have said that close questions should be decided in favor of recusal. *See United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989); *Republic of Pan. v. American Tobacco Co.*, 217 F.3d 343, 347 (5th Cir. 2000) (citing *In re Chevron*, 121 F.3d 163, 165 (5th Cir. 1997)); *In re United States*, 158 F.3d 26, 30 (1st Cir. 1998); *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995); *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993).

"The test for personal bias or prejudice in [S]ection 144 is identical to that in section 455(b)(1), and the decisions interpreting this language in [S]ection 144

are controlling in the interpretation of section 455(b)(1)." *United States v. Sibla*, 624 F.2d 864, 867 (9th Cir. Cal. 1980). In *Litecky v. United States*, the U.S. Supreme Court held that while "judicial rulings <u>alone</u> never constitute a valid basis for a bias or partiality motion," 510 U.S. at 555 (emphasis added), **if the judge succumbs to extrajudicial influence, he is subject to such a motion. Even more, in the absence of an extrajudicial influence, judicial rulings coupled with the requisite "degree of favoritism or antagonism" can serve as the basis for such a motion even "when no extrajudicial source is involved."** *Id.* (Emphasis Added). Lastly, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings" constitute a basis for such a motion if "they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.*

## III.  LEGAL DISCUSSION

Judge Corrigan's conduct, taken as a whole, throughout these cases, along with his contrived and egregiously wrong Dismissal Order more than evidence a "deep-seated favoritism or antagonism that would make fair judgment impossible." This mandates recusal. This is particularly true given Judge Corrigan's status as Chief Judge of this Court, and the fact that he has a lot of considerable experience in and knowledge of the law, as well as the administration of cases.  He clearly therefore did not make any unintentional mistakes and his actions were not innocent.  All of this goes to show that the

fundamental, egregious errors contained in his Dismissal Order simply could not possibly have occurred by simple error or inadvertence. The only possible explanation is that the Dismissal Order was prepared with a biased, prejudicial mindset to jettison the cases entirely at their conception, aborting the proverbial baby. These intentional "errors" are then compounded by Judge Corrigan's disparate and discriminatory treatment between Mr. Reed and his counsel and Defendants and their counsel in patently and openly favoring the Defendants.

Indeed, it more than appears Judge Corrigan knew that his Dismissal Order was fundamentally wrong in this regard, which is why he for the most part did not give individual analysis to the fifty- five (55) defamatory statements at issue, and instead chose to conveniently and inappropriately, as counsel for the Defendant TGC, LLC., Mr. Minch Minchin, had suggested be done in his client's motion to dismiss, lump statements together in a manner that allowed for him to conveniently "gloss over" clearly defamatory statements. In stark contrast, in another case where the undersigned counsel served as counsel on until trial, *Moore v. Senate Majority PAC et al*, 4:19-cv-01855 (N.D. Al.)(the "*Moore* Case"), the Honorable Corey Maze ("Judge Maze") was also presented with a defamation complaint involving numerous statements. Judge Maze actually took the time to go through and analyze all of the statements at issue, and in the end allowed one single statement to go to trial and be put before the jury, *Moore* ECF No. 62, which resulted in an over $8 million dollar judgment for the Plaintiff. *Moore* ECF

10

No. 207. This just goes to show that even just one defamatory statement can compensate the victim of defamation, and the Court therefore has a duty to parse through each and every statement even if it might be easier to simply "gloss over" statements and lump them into groups.   This egregious error must be corrected, if only to give the appellate court a workable record to rule upon.

### A.   Judge Corrigan's Disparate and Discriminatory Treatment of the Parties

By way of just one example, Judge Corrigan has openly exhibited prejudicial conduct showing an extreme degree of favoritism with regard to counsel for Defendant TGC, LLC, Minch Minchin, Esq ("Mr. Minchin") of Shullman Fugate, PLLC who, not coincidentally, previously worked for Judge Corrigan. Mr. Minchin sent, *ex parte*, without providing a copy to Mr. Reed and his counsel, a USB flash drive and along with documents extraneous to what was pled in the Amended Complaints to the chambers of Judge Corrigan. Exhibit 1 ¶ 14. Mr. Reed and counsel had no way of knowing what was put before Judge Corrigan. When, after Mr. Minchin outrageously refused to provide to Mr. Reed and his counsel this material, Plaintiff moved for an order requiring their production, instead of ordering Mr. Minchin to provide copies of what was sent *ex parte* to Mr. Reed and his counsel, Judge Corrigan instead issued a March 14, 2023 order allowing the *ex parte* materials to stand uncorrected and stating that he would consider the materials sent by Mr. Minchin. Exhibit 1 ¶ 18.

In stark contrast - given that Judge Corrigan had created case precedent that he would consider materials outside the scope of the Amended Complaints - when Mr. Reed also, as Mr. Minchin had done, filed an affidavit authenticating documents outside of the scope of the four corners of the Amended Complaints, Judge Corrigan in his Dismissal Order struck this and would not consider it. Exhibit 1 ¶ 21. Even more, in doing so, Judge Corrigan openly and with rank condenscension mocks and demeans Mr. Reed and Mr. Klayman while protecting Mr. Minchin:

> A few days before the July 31, 2023 hearing on the motions to dismiss, Reed filed an Affidavit with 538 pages of attachments containing cases and a Motion for Leave to Supplement the Oppositions to Motions to Dismiss. (Docs. 82, 83 in 3:22-cv-1059; 75, 76 in 3:22-cv-1181). In the motion, Reed disingenuously said the Court indicated it "would review materials outside of the four corners of the Amended Complaints" and attached 215 pages of documents containing information about Reed's purported "financial, reputational and emotional damage," and "condemnation by even PGA Tour players of the defamatory tactics" of certain Defendants, along with other outside sources. (Docs. 83 in 3:22-cv-1059; 76 in 3:22-cv-1181). These voluminous filings made only days before the hearing were both untimely and improper. The Court never indicated it would consider materials outside of the four corners of the Amended Complaints; rather, the Court said it would receive courtesy copies of electronically filed pleadings and exhibits, as is routinely done. (Docs. 54 in 3:22-cv-1059; 41 in 3:22-cv-1181). **(This also means Reed's counsel's attacks on opposing counsel who filed courtesy copies were unwarranted.)** Accordingly, the Court denies the motion for leave to supplement and strikes the affidavit. To the extent Reed cited case law in his briefing elsewhere, the Court considered those cases. ECF No. 98, fn. 27. (Emphasis Added).

This clearly disparate and discriminatory treatment of Mr. Minchin as opposed to the undersigned counsel evidences a "deep-seated favoritism or antagonism that would make fair judgment impossible." Conduct such as this mandates recusal. It is thus no wonder and coincidence that in the Defendants' recently filed motion for an award of attorneys fees that they have Mr. Minchin, who is not even lead counsel for the Golf Channel Defendants, lead the pack in signing this frivolous and flawed pleading, as they all believe that Mr. Minchin, who worked for Judge Corrigan, has a special "in " with him as a result of favoritism. *See* Defendants' Motion for Anti-SLAPP Fees. ECF No. 92.

**B.   Judge Corrigan's Dismissal Order is Intentionally Wrong and Unsupportable**

Next, Judge Corrigan's seventy-eight (78) page Dismissal Order is rife with conclusory statements adopting clearly erroneous and inapplicable case law proffered by the Defendants, while not even considering the controlling precedent and authority as set forth by Mr. Reed. Given Judge Corrigan's wealth of experience and knowledge and status as Chief Judge of this Court, there is simply no way for these completely egregious errors to have been accidental, and thus it must be presumed that these were done intentionally with a predetermined, prejudicial, and biased mindset.

This sort of prejudicial conduct is illustrated in *In re Hammermaster*, 985 P.2d 924 (1999), where Judge Hammermaster intentionally misstated the law on

numerous occasions, threatening certain defendants that he would impose indefinite jail sentences or life imprisonment until certain fines were paid, despite knowing that he had no legal authority to do so. *Id.* at 928. Under those facts, the Supreme Court of Washington censured Judge Hammermaster and suspended him for six (6) months.

If intentionally misstating and misapplying the law can subject a judge to discipline, then surely it can also form the basis for recusal, a much less severe remedy. *See also Litecky* 510 U.S. at 555 ("…if the judge succumbs to extrajudicial influence, he is subject to such a motion." Even more, in the absence of an extrajudicial influence, judicial rulings coupled with the requisite "degree of favoritism or antagonism" will serve as the basis for such a motion even "when no extrajudicial source is involved." Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings" constitute a basis for such a motion if "they display a deep-seated favoritism or antagonism that would make fair judgment impossible.")

In that regard, further evidencing the extreme nature of  factual and legal errors injected into Judge Corrigan's Dismissal Order, it is  impossible for him to have found, in good faith, that none of the **fifty-five** (55) defamatory statements at issue were non-defamatory and not even subject to discovery and later to be given to the jury to decide, particularly given the patently defamatory nature of

many of these statements. This predetermined, prejudicial, and biased mindset is evidenced by Judge Corrigan as early as the first page of his Dismissal Order dismissing each and every single one of the fifty-five (55) false, malicious, and defamatory statements as he offensively downplays these defamatory statements as simply "negative media coverage" or merely "criticism of LIV generally" that is "over the top." ECF No. 91 at 2, 5. These cavalier and dismissive statements, in particular, evidence Judge Corrigan's predetermined, prejudicial, and biased mindset because the publications set forth in the Amended Complaints are not what "negative media coverage" looks like for a professional golfer, but instead outrageous and malicious defamatory attacks.

Mere negative media coverage or simple criticism would by way of example be something along the lines of: "player X always chokes under pressure," or "player y really struggles on this course." Routine "negative media coverage" or "criticism" does not contemplate falsely and outrageously branding someone a murderer, thief, cheater, and working directly for a genocidal dictator. These are two very different things. Simple "negative media coverage" or critisicm does not result in a complete and total loss of sponsors, *Chamblee* ¶ 17, 18, Mr. Reed being verbally abused with profanities and threats at nearly every single event that he plays in, to the point when Mr. Reed has had to use security guards to protect himself and his family, *Chamblee* ¶ 131, and to endure even a bomb threat halting play at Trump National Golf Course in Doral, Florida. *Chamblee* ¶ 132.

This highly insulting, if not callous diminution of the defamatory publications at issue speaks for itself and proves that there were no legal or factual bases for Judge Corrigan to have reduced the well pled defamatory statements to simple negative media coverage or critism by critics. As just a few examples, the false, malicious, and defamatory statements include, but are not limited to:

A. "Golf won today. **Murderers lost**." *Chamblee* ¶ 89

B. **"So if they're aligning themselves with a tyrannical, murderous leader... look if you if you look at who MBS is... centralizing power, committing all these atrocities, you look at what he's doing to the citizens of his... of his country ask yourself I mean would you have played for Stalin would you have played for Hitler would you have played for Mao would you play for Pol Pot,"** [Froggy] **"would you have played for Putin?"** [Chamblee in agreement] **"would you have played for Putin... which... and this who this guy is. He settles disputes with bonesaws**." *Chamblee* ¶ 58.

C. Mr. Reed is "**over there purely playing for blood money**." *Chamblee* ¶ 63.

D. "...either way, whether the money is against or in addition to guarantees **its still blood money and you're still complicit in sportswashing**." *Chamblee* ¶ 90.

E. "It **figured that the first time anyone on Reed's team had been honest** and open with the media, it would be a caddie admitting he'd shoved a fan." *Ryan* ¶ 84.

F. "When items including a watch, a putter and $400 went missing from the locker room, **teammates suspected it was Reed who had taken them**, especially as he turned up the following day with a large wad of cash." *Ryan* ¶ 93.

G. "[t]he criticism of LIV defectors is not that they are doing it for the money, that is easily understood, what is not so easily understood is why **they would directly work for a regime that has such a reprehensible record on human rights.**" *Chamblee* ¶ 97.

H. On August 28, 2022, Chamblee tweeted "[t]he IOC decides where the Olympics go…and there is a big difference between doing business in a country and **directly for a murderous regime as LIV golfers are**." *Chamblee* ¶ 94.

I. **"I either messaged or talked to 15 to 20 current and past tour players, some of them Hall of Fame members, over the past 24 hours and not a single player is in defense of what Patrick Reed di**d." *Chamblee* ¶ 78.

These statements are pure questions of fact which are incredibly harmful to Mr. Reed's reputation and economic well-being in his trade and profession as a professional golfer, and are therefore not only defamatory generally, but also defamatory *per se*. *Axelrod v. Califano*, 357 So. 2d 1048 (Fla. Dist. Ct. App. 1978). There was simply no way for Judge Corrigan to have had plausible grounds to find that these were statements of non-actionable opinion, evidencing a clear intent and predetermined mindset, bias, and prejudice to simply "deep six" the entire cases. For example, Defendants Newsham, New York Post, and Fox Sports published "[w]hen items including a watch, a putter and $400 went missing from the locker room, **teammates suspected it was Reed who had taken them**, especially as he turned up the following day with a large wad of cash." This is a purely factual question. Either Mr. Reed was accused of theft or he was not. Of course, he was not, and Mr. Reed referenced sworn statements from his college

17

coaches to that effect as well. Furthermore, Defendant Chamblee published, "Golf won today. **Murderers lost**." *Chamblee* ¶ 89. This is another purely factual question, particularly because in the context of which it was made, which the Court must consider. *Smith v. Cuban Am. Nat'l Found.*, 731 So.2d 702, 705 (Fla. 3d DCA 1999). This tweet was made in reference to an order from the U.S. District Court for the Northern District of California in *Mickelson v. PGA Tour, Inc. et al*, 5:22-cv-04486) denying the plaintiffs', who are LIV players, motion for preliminary injunctive relief. ECF No. 63. <u>Crucially</u>, LIV was not a party to this lawsuit, as the plaintiffs were several professional golfers who had signed to LIV. Thus, the only possible plausible interpretation of this tweet is that Defendant Chamblee published that LIV golfers, including especially Mr. Reed, are **murderers**.

Furthermore, Defendants Ryan and Hachette published that, "It **figured that the first time anyone on Reed's team had been honest** and open with the media, it would be a caddie admitting he'd shoved a fan." *Ryan* ¶ 84. This is a purely factual statement accusing Mr. Reed and his team of being habitual liars, which is completely and totally false.

Lastly, it is clear that Defendant Chamblee did not talk to "15 to 20" players, but that he simply made this up to lend credence and great fabricated weight to his malicious defamation of Mr. Reed. However, at a bare minimum, this is a purely factual question that should have gone to a jury.

These statements are clearly defamatory on their face, meaning that Judge Corrigan's Dismissal Order was clearly wrong. However, at a bare minimum, even if Judge Corrigan found that the defamatory nature of the statements were even ambiguous, the Court was presented with clear precedent that this question must go to a jury. *Perry v. Cosgrove*, 464 So. 2d 664 (Fla. Dist. Ct. App.1985). This is particularly true at the motion to dismiss stage, where there has been zero discovery, and the only question is whether the Amended Complaints pled what needed to be pled. *Dershowitz v. Cable News Network, Inc.* 541 F. Supp. 3d 1354 (S.D. Fla. 2021).

Despite being presented all of this controlling precedent, Judge Corrigan exposed his prejudicial, biased, and predetermined mindset in steadfastly finding, ""[w]hether the defendant's statements constitute defamation . . . is a question of law for the court to determine," giving no role to the jury. ECF No. 91 at 25. Further evidence of this prejudicial, biased, and predetermined mindset and Judge Corrigan's clear goal to get rid of these cases at any cost is that nowhere in his voluminous seventy-eight (78) page decision is the word "jury" even mentioned! He arrogates all authority to himself as if he were appointed by King George III to rubber stamp the king's edits to dismiss the legitimate complaints of the colonies.

Another egregious example Judge Corrigan's predetermined, prejudicial, and biased mindset to intentionally throw the entire cases out, is the question

whether the defamatory statements that did not specifically mention Mr. Reed, but could be found to be "of and concerning" and associated with him. In this regard, notwithstanding Judge Corrigan preventing any discovery on this crucial issue, he also seriously erred by intentionally overlooking cases and black letter defamation law that pertains to "of and concerning," which involve a group of victims. This is particularly true with regard to the defamatory publication by Defendants Larson and Bloomberg, *Ryan* ¶¶ 113 – 119, where they prominently featured a large recognizable picture of Mr. Reed in their article titled "*Saudi-Backed LIV Golf is Using PGA Suit to Get Data on 9/11 Families Court Told*." Despite this, Judge Corrigan incredibly ruled that "[a]s a matter of law, no reasonable person would understand the article as implicating Reed." ECF No. 91 at 38. This is egregiously obviously and intentionally wrong, and beyond bizarre. The only reasonable readers who would <u>not</u> understand the article as being "of and concerning" and associated with Mr. Reed are those who are blind and therefore cannot see the picture of Mr. Reed, particularly since Mr. Reed being a part of LIV is widely known, yet the exact parties to the LIV Golf v. PGA lawsuit is not. Therefore, by prominently featuring the photo of Mr. Reed for no reason other than to create the false impression that he was involved in investigating September 11, 2001 families, and publishing, "It's (meaning the issue of 9/11 family victims) has taken a more sinister turn," *Ryan* ¶ 118, Defendants Larson and Bloomberg capitalize on the fact that the public for the most part does not

20

know that Mr. Reed was not a party to the LIV Golf v. PGA lawsuit to maliciously implicate and tie him to the defamation. This is exacerbated by the fact that Mr. Reed was among the few most prominent players to join LIV and was one of the earliest golfers who made the switch. As such, his likeness and photo have been used profusely in the media since LIV came into being. Thus, in the public's eye, he was certainly among the top "faces" of LIV. Mr. Reed has also been the primary target of the golf media when discussing LIV, *Chamblee* ¶ 40, and in conjunction with the golf media frequently using pictures of Mr. Reed, including Defendants Bloomberg and Larson, means that most reasonable viewers would have believed that the Larson/Bloomberg Article was "of and concerning" and associated with Mr. Reed. In any event, this is a factual question for the jury that simply could not have been disposed of by Judge Corrigan at the motion to dismiss stage, particulary before any discovery has taken place.

Next, in his Dismissal Order, Judge Corrigan falsely writes, "[i]n his Amended Complaints, Reed does not distinguish what statements constitute each type of defamation; instead, he incorporates every alleged statement by a Defendant into each Count against that Defendant." ECF No. 98, fn. 9. A review of the Amended Complaints shows, however, that this is not true. Each type of defamation – defamation generally, defamation *per se* and defamation by implication – is separated into an individual count against each individual defendant. This is notwithstanding, of course, the fact that Mr. Reed filed

detailed Notices of Compliance (*Reed v. Chamblee, et al* Dkt. No. 29 and *Reed v. Ryan, et al* Dkt. No. 28) setting forth exactly how he had complied with Judge Corrigan's *sua sponte* orders, to which no objections were raised.

This is particularly true with regard to defamation by implication, which holds out the victim to ""hatred, distrust, ridicule, contempt or disgrace," *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1114 (Fla. 2008), as a result of statements which are "premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." *Id*. at 1107. This clearly, at a bare minimum, indisputably exists in these cases.

As just a few examples, statements that clearly meet this threshold include, but are not limited to:

A. Mr. Reed is "**over there purely playing for blood money**. *Chamblee* ¶ 63.

B. "[n]ow he has continued his subterfuge by saying the PGA Tour could end any threat, **presumably from the Saudi blood money funding a proposed Super Golf League**, by just handing back the media rights to the players." *Chamblee* ¶ 65.

C. "…either way, whether the money is against or in addition to guarantees **its still blood money and you're still complicit in sportswashing**." *Chamblee* ¶ 90

D. "[b]y defectors I mean those who have turned their backs on the meritocracy of professional golf**. I mean those who have sold their independence to a murderous dictator and those who have sued their fellow professionals so they can benefit from the tours they are trying to ruin**." *Chamblee* ¶ 92.

E. The violation was so egregious that Rickie Fowler, glancing at the replay on television, quickly raised his eyebrows and said: "Whoa! What was THAT!" *Ryan* ¶ 107.

F. **There is no greater punishment in golf than being stuck with a reputation for cheating**." *Ryan* ¶ 107

For instance, as just one example, statement E is an objectively verifiable fact, and Mr. Reed should have been afforded discovery in this regard. Furthermore, these statements are, at a minimum, defamatory by implication because it is true that Mr. Reed and LIV Golf are financed by the Saudi Public Investment Fund ("PIF"), but that in no way equates to taking "blood money," being associated with terrorists, or engaging in sportswashing, as the Defendants falsely and maliciously publish. Defendants are simply taking advantage of the general public's unfamiliarity with the PIF—which as set forth in the Amended Complaints has invested in many of the most prominent businesses in America such as Disney, Uber, Boeing, Facebook, Citigroup, Bank of America, Capcom, Nexon, Electronic Arts, Take-Two Interactive, Activision Blizzard, and Berkshire Hathaway, *Chamblee* ¶ 30, and which also owns Newcastle United F.C. of the English Premier League, *Chamblee* ¶ 31—in order to push their defamatory agendas. Defendants omit from their defamatory statements any reference to the fact that Mr. Reed and LIV are simply financed by the PIF, creating the false implication to the public that they are employed by an alleged murderous regime and dictator who is the equivalent to Hitler, Stalin, Putin and Mao all

rolled into one, directly. This is textbook defamation by implication, and it was an egregious, manifest error for Judge Corrigan to have ignored this.

All of this is also notwithstanding the clearly and patently defamatory nature of the titles of the articles at issue, which make false, malicious, defamatory, and highly damaging statements "of and concerning" and associated with Mr. Reed. These include, but are not limited to: "*Don't know they'd p\*\*\* [piss] on him if he was on fire': The scandalous truth of golf's biggest villain,*" *Ryan* ¶ 87; "*The scandalous truth about Patrick Reed, the bad boy of golf," id.*; "*Reed's reputation from Bahamas the ultimate penalty," Ryan* ¶ 105.

Almost certainly realizing that he had no plausible basis to find each and every statement at issue as non-defamatory, Judge Corrigan made sure to also attempt to "cover his tracks" and slam every door to a jury consideration by falsely stating in a conclusory fashion that Mr. Reed had failed to allege actual malice. This was clearly because Judge Corrigan must have known that many of the statements in the Amended Complaints were patently defamatory and others that were ambiguous, which questions needed to go to a jury. *Perry v. Cosgrove*, 464 So. 2d 664 (Fla. Dist. Ct. App.1985). However, the Amended Complaints clearly have both pled actual malice with extreme specificity, including but not limited to numerous "badges" of actual malice set forth in  the article by Manual Socias titled *Showing Constitutional Malice in Media Defamation* which were conspicuously not even mentioned by Judge Corrigan once in his seventy-eight

(78) page Dismissal Order. The badges which clearly are present here include, but are not limited to:

    A. failure to report exculpatory facts, *Ryan* ¶ 73;
    B. omitting pertinent information to create a false impression, *Ryan* ¶ 75, *Chamblee* ¶ 82;
    C. repetitive media attacks on the plaintiff. *Chamblee* ¶¶ 57-82, 89-98, *Ryan* ¶¶ 37, 67 – 86, ;
    D. a reporter's ill will toward the plaintiff, *Ryan* ¶ 46;
    E.  prior and subsequent defamatory statements; and
    F. refusal to publish a retraction upon learning of errors in a story. *Ryan* ¶ 122, *Chamblee* ¶ 133.

In addition to the numerous "badges" of actual malice which were present, which are clearly relevant to showing actual malice, *Herbert v. Lando*, 441 U.S. 153 (1979), the Amended Complaints also set forth in extreme detail exactly how the Defendants either knew that the statements they were making were false, or at a minimum acted with a reckless disregard for the truth. *Dershowitz v. Cable News Network, Inc.* 541 F. Supp. 3d 1354, 1367 (S.D. Fla. 2021). For instance, with regard to the fabricated statement that Mr. Reed had been accused of stealing from his college teammates, Mr. Reed had pled that he possessed sworn statements from his college coaches conclusively refuting any such accusations. Am. Comp. ¶ 94, ECF No. 34-5. Similarly, with regard to fabricated statements that Mr. Reed had intentionally cheated in his college and professional career, Mr. Reed also pled that he possessed sworn statements from his college coaches that they were unaware of any cheating accusations against him, Am. Comp. ¶

75, and also set forth that Mr. Reed has never once been found to have intentionally cheated by the PGA Tour or any other tour or entity, period.

Judge Corrigan's plan all along was obvious to take the entire cases out of the hands of the trier of fact - where it indisputably belonged – arrogating to himself unbridled and unchecked authority so he could dismiss all fifty-five (55) defamatory statements. As a result, he intentionally glossed over or ignored numerous clearly defamatory statements "of and concerning" and associated with Mr. Reed. Tellingly, and again, there is not a single mention of a "jury" in Judge Corrigan's seventy-eight (78) page Dismissal Order, despite Mr. Reed having presented a number of controlling cases that highlighted exactly how and why these cases needed to be presented to jury.

These cases include, but are not limited to: *Perry v. Cosgrove*, 464 So. 2d 664 (Fla. Dist. Ct. App.1985) ("A jury issue is present whenever a phrase is "ambiguous and reasonably susceptible of a defamatory meaning."); *Abrams v. Gen. Ins. Co.,* 460 So. 2d 572 (Fla. Dist. Ct. App. 1984) ("A complaint cannot be dismissed if there is any possibility that the common mind could construe the publication as defamatory."); *Barnes v. Horan*, 841 So. 2d 472, 476-77 (Fla. Dist. Ct. App. 1984) and *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. Dist. Ct. App. 1984) (Mixed opinion is actionable defamation). Yet, despite having been presented with all of this controlling precedent, Judge Corrigan openly exhibits his prejudicial, predetermined mindset. This is evident where he states

26

"[w]hether the defendant's statements constitute defamation . . . is a question of law for the court to determine." ECF No. 91 at 25. This can only be explained by a predetermined, prejudicial mindset to get rid of these cases by any means, and to freeze the jury out of any role.

Lastly, while the matter of an award of attorneys fees and costs is subject to further briefing in the next weeks, if Judge Corrigan had been unbiased and impartial, the award of attorneys fees and costs under Florida's Anti-SLAPP statute would have already been rejected, as it has by all appellate federal circuits who have considered it in actions founded on diversity jurisdiction, not some rogue lower court judge. *Abbas v. Foreign Policy Group*, 783 F.3d 1328, 1337 (D.C. Cir. 2015); *Carbone v. CNN, Inc.*, 910 F.3d 1345 (11th Cir. 2018), *Van Dyke v. Retzlaff*, 781 F. App'x 368 (5th Cir. 2019). Furthermore, Judge Corrigan was also presented with *Sterling v. Doe*, 2022 U.S. Dist. LEXIS 105673 (M.D. Fla. Feb. 2, 2022), where this same court found that the Magistrate did not need to follow *Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310 (S.D. Fla. 2020) because "as the *Bongino* court itself explains, the fee-shifting provision of anti-SLAPP laws is obviously different than the pretrial dismissal anti-SLAPP provisions which conflict with and 'answer the same question' as the Federal Rules." *Id.* at 12-13. Furthermore, as was set forth in *Sterling*, in prior cases where federal courts had applied Florida's Anti-SLAPP statute, the plaintiff had "had forfeited their right to challenge the anti-SLAPP law's applications under an Erie theory at the

27

district court level." *Id*. at 12. This is clearly not the case here, as Mr. Reed more than timely challenged the applicability of the statute.

Of even more relevance and of course importance to the Court is the transcript of the oral argument in *Corsi v. Newsmax Media Inc et al*, 21-10480 (11th Cir.), <u>Exhibit 2</u>, where the panel including the Chief Judge of the U.S. Court of Appeals for the Eleventh Circuit, the Honorable William H. Pryor Jr. ("Judge Pryor"), who sits above Judge Corrigan, expressed "serious doubt" as to whether Florida's Anti-SLAPP statute could apply in federal court due its requiring a "heightened pleading standard," and also opined that Fed. R. Civ. P. 11 answered the "same question" as Florida's Anti-SLAPP statute, rendering it inapplicable in federal court:

> There's a conflict in what the - the Florida courts even say this - in how the statute works, right?...On the one hand, at least one DCA has said it does create a heightened pleading standard, right?... The other says it doesn't….: If it does, it seems to me, then it conflicts with the federal rules and it doesn't apply…..And if it doesn't create a heightened pleading standard, then it seems to me it's procedural and it also doesn't apply…..**But either way, it seems to me the statute just doesn't apply in federal court**. <u>Exhibit 1</u> at 14 (emphasis added).

> The thing I'm most interested, at least – I can only speak for myself - is the attorney's fees issue, and I have serious doubts about whether the anti-SLAPP statute applies in federal court. And it seems to me that if it doesn't, then a suit filed in violation of it can't give rise to an attorney's fee award.

> Even so, I mean, obviously, it's just, talking off the top of my head, it seems to me like a court that finds that there is a meritless suit that's been filed and it's been filed solely because the person is trying to

> get back at someone and inflict costs on someone for exercising their
> First Amendment rights in a way that they didn't like, that that
> would be an improper purpose. I mean, I can't imagine - it's hard for
> me to imagine that a court would find that that was a proper
> purpose [and thus sanctionable under Rule 11]." <u>Exhibit 2</u> at 29 – 30.

Despite all of this, Judge Corrigan still declined to summarily reject the

Defendants' claim for fees under Florida's Anti-SLAPP statute. This is clear and

unequivocal evidence of Judge Corrigan simply ignoring the law in order to

achieve his predetermined goal to dismiss these cases entirely and punitively

and unjustly award attorneys fees and costs to the defamers and their counsel,

including Mr. Minch Minchin, who have caused so much severe damage to Mr.

Reed, his family, and team. This is intentional extra-judicial prejudicial conduct,

and is so egregiously wrong that a deep seated favoritism and bias is self-evident

to any reasonable person, and thus recusal is mandatory.

## IV.  CONCLUSION

Accordingly, Judge Corrigan must be recused from these cases and his

Dismissal Order must be vacated.  *Ognenovic v. David J. Giannone, Inc.*, 184 So. 3d

1135 (Fla. Dist. Ct. App. 2015). Alternatively, if Judge Corrigan does not

immediately recuse himself and vacate his Dismissal Order, these cases must be

reassigned to another jurist the U.S. District Court for the Middle District of

Florida to rule upon Mr. Reeds' Motion for Reconsideration pursuant to Federal

Rules of Civil Procedure 59 and 60 in the interest of justice and fundamental

fairness.

This motion with accompanying affidavit must respectfully be ruled upon expeditiously as required by 28 U.S.C. § 144 and § 455.

Dated: October 23, 2023                    Respectfully submitted,

                                           By: */s/ Larry Klayman*_____
                                           Larry Klayman, Esq.
                                           Florida Bar No.: 246220
                                           Klayman Law Group P.A.
                                           7050 W. Palmetto Park Rd
                                           Boca Raton, FL, 33433
                                           Tel: 561-558-5536
                                           leklayman@gmail.com

                                           *Counsel for Patrick Nathaniel Reed*

## CERTIFICATE OF SERVICE

I, Larry Klayman, hereby certify that on this day, October 23, 2023, I electronically filed the foregoing with the Clerk of Court using the Court's ECF procedures. I also certify that the foregoing document is being served this day on all counsel of record through the Court's eservice procedures.

                                           */s/ Larry Klayman*_____

## CERTIFICATE OF COUNSEL

I, Larry Klayman, hereby certify that this motion is being made in good faith.

                                           */s/ Larry Klayman*_____

## MEET AND CONFER CERTIFICATION

Defendants, and their counsel, particularly Mr. Minchin, predictably oppose this motion, as they apparently welcome, approve of and profit by the extrajudicial bias, prejudice and extreme favoritism exhibited by the Honorable Timothy J. Corrigan.

*/s/ Larry Klayman*
Larry Klayman, Esq.

EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

PATRICK NATHANIEL REED,

               Plaintiff,

v.

SHANE RYAN, *et al*

               Defendants.

**Case No: 3:22-cv-01181-TJC-PDB**

PATRICK NATHANIEL REED,

               Plaintiff

v.

BRANDEL EUGENE CHAMBLEE, et al

               Defendants.

**Case Number: 3-22-CV-01059-TJC-PDB**

**ORAL ARGUMENT REQUESTED**

**AFFIDAVIT IN SUPPORT MOTIONS TO RECUSE THE HON. TIMOTHY J.**
**CORRIGAN PURSUANT TO 28 U.S.C. § 144 AND 28 U.S.C. § 455**

I, Larry Klayman, counsel for Plaintiff Patrick Nathaniel Reed, and with his full direction, consent, authority and approval to proffer this Affidavit in Support Recusal of the Hon. Timothy J. Corrigan Pursuant to 28 U.S.C. § 144 and 28 U.S.C. § 455 on his behalf, being over 18 years of age, hereby swear under oath to the best of my personal knowledge and belief as follows:

1

1.      Shortly after these above-styled cases were assigned on September 28, 2022 and November 1, 2022, whether randomly or by election by the Chief Judge Timothy J. Corrigan ("Judge Corrigan") of the U.S. District Court for the Middle District of Florida, to Judge Corrigan, my client, Patrick Nathaniel Reed (hereafter "Mr. Reed"), through his wife and business manager, Justine Reed, who is the CEO of Team Reed, conducted background research concerning Judge Corrigan to get an understanding of his history and related matters. Reviewing the questionnaire which all federal judicial candidates must fill out to apply for a federal appointment, we discerned that Judge Corrigan had been and perhaps still is a member of an exclusive club in Ponte Vedra, Florida, where high level officials of the PGA Tour also are members, likely even the commissioner of the PGA Tour, Jay Monahan and his staff. The name of this club is the Ponte Vedra Inn and Club and is located just minutes from the headquarters of the PGA Tour in Ponte Vedra, Florida, and its signature championship golf course, TPC Sawgrass.

2.      Since as alleged in the complaints filed in both of the above-styled cases the PGA Tour instigated much of the alleged defamation of Mr. Reed and LIV Golf, as a way to harm competition by a new rival golf league which Mr. Reed has joined as one of its top recruits, LIV Golf, this caused Mr. Reed, his wife Justine and I concern as creating the potential for a possible conflict of interest down the road, as well as an inherent extra-judicial bias against Mr. Reed and his

allegations and instead favoritism toward the Defendants who were alleged to do the anticompetitive bidding of Monahan and the PGA Tour.

3.   At my suggestion, I counseled the Reeds to take a wait and see approach and not jump to conclusions at that point in order to get a feel as to how Judge Corrigan would administer to the above styled cases.

4.   However, shortly thereafter on November 18, 2022 and December 13, 2022 Judge Corrigan *sua sponte* dismissed the initial Complaints, before even responsive pleadings to the pleadings by the Defendants in both cases were due to be filed, claiming that they were shotgun pleadings and needed to be shortened to allege only cognizable legal claims, he issued only vague and ambiguous orders that failed to specify why they were shotgun pleadings or why legal claims were not properly alleged or why the Complaints needed to be shortened. Immediately after these *sua sponte* orders issued in these high-profile cases, predictably the captive and coopted PGA Tour golf media wasted no time seizing on this and published a myriad of negative, if not defamatory articles suggesting that Mr. Reed's Complaints were frivolous and thus had been dismissed on the merits and Defendants had won outright.

5.   This pro-PGA Tour golf media caused additional harm to Mr. Reed, his wife, family and colleagues as it painted him in a very negative light as an unhinged crackpot and purveyor of false and dishonest information giving rise

to frivolous defamation Complaints, consistent with and which compounds the defamatory statements alleged in the complaints..

6.     In retrospect, given what Mr. Reed perceives to be the extrajudicial bias and prejudice exhibited by Judge Corrigan, in his latest Dismissal Order of September 27, 2023, (*Reed v. Chamblee, et al* Dkt. No. 91), which disparage, if not mock, him and his counsel at nearly every turn and trivialize the alleged defamation, notwithstanding largely incorrect factual and legal analysis, as also set forth below and in the accompanying motion to recuse, it would appear that these early sua sponte dismissals were calculated by Judge Corrigan to humiliate and mock Mr. Reed and cast a negative light on him and his counsel; in other words to play to the media to disparage Mr. Reed and his counsel.

7.     Courts have also held that a jurist is subject to recusal when extra-judicial bias toward the client's attorney as well as his client becomes manifest. *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-51 (5th Cir. 1975); *see also Souder v. Owens-Corning Fiberglas Corp.*, 939 F.2d 647, 653 (8th Cir. 1991); *United States v. Ritter*, 540 F.2d 459, 462 (10th Cir. 1976). Florida courts have agreed, finding that a judge must be recused when there was grounds to show bias and prejudice towards an attorney representing a party. For instance, in *Brewton v. Kelly*, 166 So. 2d 834 (Fla. Dist. Ct. App. 1964), the court held that the judge should be disqualified in an election-misconduct case because the partners of defendant's counsel had brought about a bill of impeachment against the judge,

and counsel for the plaintiffs had appeared before the judge at the same impeachment trial. The court, in issuing a writ of prohibition disqualifying the judge, said that prejudice of a judge toward counsel for a party may be of such a degree as to effect a prejudice against the party itself. *See also James v. Theobald*, 557 So. 2d 591 (Fla. Dist. Ct. App. 1990); *State v. Hahn*, 660 N.E.2d 606 (Ind. Ct. App. 1996); *Roberts v. Ace Hardware, Inc.*, 515 F. Supp. 29 (N.D. Ohio 1981).

8.      To add insult to injury, this occurred after Mr. Reed and his counsel amended the Complaints, trying to divine what Judge Corrigan intended, given the lack of real guidance in his *sua sponte* orders, Mr. Reed filed detailed Notices of Compliance (*Reed v. Chamblee, et al* Dkt. No. 29 and *Reed v. Ryan, et al* Dkt. No. 28) setting forth exactly how he had complied with Judge Corrigan's *sua sponte* orders.

9.      Not hearing any objection or complaint from either Judge Corrigan or the Defendants to the substance of these Notices of Compliance, Mr. Reed and his counsel had good reason to believe that they had satisfied the judge's instructions, however unclear and vague they were. Indeed, even during the subsequent oral argument on Defendants later filed motions to dismiss, which oral argument occurred almost seven (7) months after the Amended Complaints were filed, on July 31, 2023, no mention was made by Judge Corrigan that Plaintiff had failed to comply with his *sua sponte* orders.

10.     Rather, for the first time, and again a full (7) months later, as set forth in the Dismissal Order of September 27, 2023, Judge Corrigan strangely and surprisingly writes at footnote 9:

> In his Amended Complaints, Reed does not distinguish what statements constitute each type of defamation; instead, he incorporates every alleged statement by a Defendant into each Count against that Defendant. (See e.g., Docs. 28 ¶¶ 134–58 in 3:22-cv-1059; 27 ¶¶ 123–47 in 3:22-cv1181). As a general rule, this manner of pleading contains the same deficiencies identified in the Court's Orders dismissing Reed's original complaints. (See Docs. 27 in 3:22-cv- 1059; 25 in 3:22-cv-1181). Further, the forms of defamation alleged by Reed require proof of different elements so his identical factual allegations for each type of defamation and inclusion of numerous statements in each Count constitutes improper pleading. See e.g., Zimmerman v. Buttigieg, 576 F. Supp. 3d 1082, 1091–92 (M.D. Fla. 2021) (dismissing amended complaint as a shotgun pleading because the plaintiff alleged three types of defamation under Florida law, yet each count contained allegations with respect to both tweets at issue and incorporated all preceding allegations, including an element specific to general defamation in the plaintiff's defamation by implication and per se counts). Though the Court would be well within its right to dismiss both Amended Complaints as shotgun pleadings, because Defendants have met Reed on the sufficiency of his defamation claims and because ordering another repleader would not change the substance of the claims, the Court will engage on the substantive issues.

11.     Notwithstanding that Judge Corrigan's recitation of facts are wrong, coupled with the additional facts attested to below, this unnecessary belittling, apparent animus, and sandbagging of Mr. Reed and his counsel, shows manifest and extreme extra-judicial bias and prejudice against Mr. Reed.

12.     This is particularly so as the U.S. Court of Appeals for the Eleventh Circuit has opined with regard to "shotgun pleadings":

> Though the groupings cannot be too finely drawn, we have identified four rough types or categories of shotgun pleadings. The most common type — by a long shot — is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type, at least as far as our published opinions on the subject reflect, is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against. The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests. *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015).

13.     And, this is also particularly so since Mr. Reed and his counsel did plead cognizable claims with specificity as to each Defendant with regard to fifty-five (55) defamatory publications, which explains the necessary length of the amended complaints, particularly since Mr. Reed and his counsel did take pains to plead direct evidence of actual malice and buttress this with strong circumstantial evidence of actual malice, as set forth in Manual Socias' article titled *Showing Constitutional Malice in Media Defamation* (the "Socias Article"), which has been submitted and provided to this Court on several occasions.  And, to make the incredible gratuitous statement at the end of footnote 9, that

"Though the Court would be well within it right to dismiss both Amended Complaints as shotgun pleadings, because Defendants have met Reed on the sufficiency of his defamation claims and because ordering another repleader would not change the substance of the claims, the Court will engage on the substantive issues," also demonstrates Judge Corrigan's latest extrajudicial bias and prejudice. This statement was couched by Judge Corrigan as if he was doing Defendants a favor by not dismissing again without prejudice, but instead ending the lawsuits now with prejudice.[*]

14.     This last sentence of footnote 9 wreaks of extra-judicial bias and prejudice against Mr. Reed, as this gratuitous  comment, in effect what appears to Mr. Reed and his counsel to be prejudicial cheap shot, was unnecessary and was sprung upon Mr. Reed, again apparently for consumption by the pro PGA Tour captive and coopted  golf media, as what Mr. Reed and his counsel now see as evidence of a contrived and strained "long since" prejudged excuse to rule that all fifty-five (55) defamatory statements were without merit. A total dismissal with prejudice of all fifty-five (55) pled defamatory statements is an impossibility unless Judge Corrigan had prejudged these cases -- especially given that many of them are provably false, provably false mixed opinion and fact, or

---

[*] Notably, Plaintiff had not moved to amend either of his Complaints and he should have been accorded this right, which is to be granted liberally by law, if Judge Corrigan disagreed with the amendments which Mr. Reed made pursuant to his vague and ambiguous sua sponte orders.

simply can be read more than one way as false or true, before the parties even conducted discovery, which discovery had been wrongly stayed also *sua sponte*, *Ryan* ECF No. 41, and then after disposition of any motions for summary judgment and any later trial. While it is clear that issues such as "of and concerning" were properly pled, by sua sponte staying discovery, Judge Corrigan cleverly prevented Mr. Reed from putting before him evidence that the statements were "of and concerning" and associated with Mr. Reed. Judge Corrigan's intentions in retrospect have become clear. Clearly there were a myriad of such alleged defamatory statements which must go to the jury to decide. Yet, Judge Corrigan's Dismissal Order of September 27, 2023, in reciting law most of which is not linked directly to the facts of the cases before him, but are merely conclusory string citations of general principles, totally writes out any role for the trier of fact, the jury. He arrogates all authority to himself as if he were appointed by King George III to rubber stamp the king's edits to dismiss the legitimate complaints of the colonies. In fact, the word "jury" cannot be found at all even once in his seventy-eight (78) page decision, confirming that it clear that he wanted to jettison the entirety of cases himself without giving even any consideration as to whether a jury should reach disputed issues of fact, mixed opinions of fact, and ambiguous statements capable of being read or heard and understood by the listener or reader in more than one way. Nor did Judge Corrigan want to take the chance, in his apparently prejudged mission to dismiss

the entirely of the cases,  of  allowing  a jury to decide whether defamatory statements which did not specifically name Mr. Reed, were understood by the listener or reader to be "of and concerning" and associated with Mr. Reed, as discussed more fully below.

15.     Then in finally responding to the Amended Complaints on or about January 13, 2023 (*Reed v. Ryan, et al* Dkt. No. 35) a counsel who Mrs. Reed and Plaintiff's counsel had learned had previously worked for Judge Corrigan, and who was not lead counsel on the case on behalf of the Defendant clients of his firm Shullman Fugate, PLLC, Mr. Minch Minchin, sent a USB flash drive and along with documents apparently extraneous to what was pled in the Amended Complaints to the chambers of Judge Corrigan. Given prior experience with the lack of candor of this counsel, Mr. Minch Minchin, as set forth in Exhibit 1, counsel for Mr. Reed asked Mr. Minchin to send to him what had been sent to chambers, as Mr. Reed had no way of knowing what was put before Judge Corrigan ex parte. This was important also because it is not accepted practice in the overwhelming majority of federal courts to send courtesy copies directly to chambers without going through the clerk of the court in particular and providing copies to other counsel of record to verify what was sent.

16.     However, Mr. Minchin, who has also strangely signed his clients' motion to dismiss, despite the fact that his senior partner and lead counsel Deanna Shullman of the firm of Shullman Fugate, PLLC having signed all other

pleadings in the case, refused, when requested, to provide copies of what was sent to chambers. As a result, Mr. Klayman reasonably moved Judge Corrigan to order Mr. Minchin to provide the materials and if not to allow Mr. Reed to have Judge Corrigan provide copies to Mr. Reed and his counsel.

17.     Mr. Reed and his counsel were concerned, legitimately, given the lack of candor of Mr. Minchin in past communications that what had been provided to chambers could be prejudicial to Mr. Reed as outside of and not relevant to what had been alleged in the Amended Complaints. This was in the context, as Judge Corrigan was advised on the record, that a relevant video by Mr. Minchin's client, Defendant TGC, LLC., had been doctored. Indeed, the statement of a forensic expert had been provided to Judge Corrigan that the video had been altered to falsely show Mr. Reed allegedly cheating at *The Hero World Challenge* on December 6, 2019. That provided more reason to see what had been provided to Judge Corrigan.

18.     However, instead of ordering Mr. Minchin to provide copies of what was sent *ex parte* to Mr. Reed and his counsel, Judge Corrigan instead issued a March 14, 2023 order allowing the *ex parte* materials to stand uncorrected and stating that he would consider the materials sent by Mr. Minchin.

> Plaintiff's Motion to Return to Defendants' Counsel USB Drive and Documents Submitted by Defendants' Counsel to Court Ex Parte Concerning Defendants' Motion to Dismiss (Doc. 41 in 3:22-cv-1059), Plaintiff's Motion for Leave to File Reply (Doc. 43 in 3:22-cv-1059), Plaintiff's Motion to Strike USB Drives and Other Exhibits and For

Sanctions (Doc. 44 in 3:22-cv-1059), and Plaintiff's Motion for Leave to File Reply (Doc. 48 in 3:22-cv-1059) are **DENIED.** Providing courtesy copies is routine and does not constitute unauthorized ex parte communications.

Defendants' Motion for Leave to Conventionally File Hard Copies of Exhibits (Doc. 32 in 3:22-cv-1181) is **GRANTED**. **The Court will consider the materials sent by counsel. (Emphasis Added.)**

19.     Thus, Judge Corrigan cavalierly and dismissively ignored Mr. Reed's and his counsel's concerns and instead not only accepted what Mr. Minchin had sent but also in effect throwing cold water in Mr. Reed's and his counsel's face, ordered that he would review and consider what Mr. Minchin had provided to him ex parte in deciding Mr. Minchin's motion to dismiss on behalf of his clients. The judge apparently had no problem with Mr. Minchin's behavior, likely because Mr. Minchin had worked for him in the past and must have maintained personal relations thereafter.

20.     Mr. Reed and his counsel also viewed Mr. Minchin's signing of the clients' motion to dismiss as a means to curry favor with and influence Judge Corrigan based on Mr. Minchin previously having worked for him, as advertised on his firm's website as an apparent means to lure clients to represent in the Middle District, where Judge Corrigan is the chief judge. This seemed calculated since as discussed above, the senior partner Ms. Deanna Shullman was lead counsel and has signed all other pleadings, and notably at oral argument on July 31, 2023, Mr. Minchin, perhaps chastened by Mr. Reed's and his counsel's

protestations, if not his secondary role as counsel, later sat inert and silent during this oral argument.

21.     All of this was put aside and shelved  by Mr. Reed and his counsel, until in shock they read footnote 27 of Judge Corrigan's Dismissal Order, which sternly and condescendingly without factual basis attacked Mr. Reed and his counsel and falsely claimed that they were not entitled to the same treatment as he had accorded Mr. Minchin concerning the consideration of the extraneous materials he had provided secretly in chambers. Counsel for Mr. Reed submitted an affidavit as Mr. Minchin had authenticating documents outside the four corners of the Amended Complaint. Yet, Judge Corrigan in his Dismissal Order struck this and would not consider it. Even more, in doing so, Judge Corrigan openly and with rank condenscension mocks Mr. Reed and Mr. Klayman while protecting Mr. Minchin:

> A few days before the July 31, 2023 hearing on the motions to dismiss, Reed filed an Affidavit with 538 pages of attachments containing cases and a Motion for Leave to Supplement the Oppositions to Motions to Dismiss. (Docs. 82, 83 in 3:22-cv-1059; 75, 76 in 3:22-cv-1181). In the motion, Reed disingenuously said the Court indicated it "would review materials outside of the four corners of the Amended Complaints" and attached 215 pages of documents containing information about Reed's purported "financial, reputational and emotional damage," and "condemnation by even PGA Tour players of the defamatory tactics" of certain Defendants, along with other outside sources. (Docs. 83 in 3:22-cv-1059; 76 in 3:22-cv-1181). These voluminous filings made only days before the hearing were both untimely and improper. The Court never indicated it would consider materials outside of the four corners of the Amended Complaints; rather, the Court said it would receive courtesy copies of electronically

13

filed pleadings and exhibits, as is routinely done. (Docs. 54 in 3:22-cv-1059; 41 in 3:22-cv-1181). (**This also means Reed's counsel's attacks on opposing counsel who filed courtesy copies were unwarranted.**) Accordingly, the Court denies the motion for leave to supplement and strikes the affidavit. To the extent Reed cited case law in his briefing elsewhere, the Court considered those cases. (Emphasis added).

22.    This clearly disparate and discriminatory treatment of Mr. Minchin as opposed to the undersigned counsel evidences  a "deep-seated favoritism or antagonism that would make fair judgment impossible." Conduct such as this mandates recusal.   It is thus no wonder and no coincidence that in the Defendants' recently filed motion for an award of attorneys fees that they have Mr. Minchin,   who is not even lead counsel for Defendant TGC, LLC., prominently lead the pack in signing this frivolous and flawed pleading, as they all believe that Mr. Minchin, who worked for Judge Corrigan, has a special "in " with him as a result of demonstrated favoritism by the Court. *See* Defendants' Motion for Anti-SLAPP Fees. ECF No. 92.

23.    This predetermined, prejudicial, and biased mindset is evidenced by Judge Corrigan as early as the first page of his Dismissal Order dismissing each and every single one of the fifty-five (55) false, malicious, and defamatory statements which he offensively downplays as simply "negative media coverage" or merely "criticism of LIV generally" that is "over the top." ECF No. 91 at 2, 5. These cavalier and dismissive statements, in particular, evidence Judge Corrigan's predetermined, prejudicial, and biased mindset because the

publications set forth in the Amended Complaints are not what "negative media coverage" looks like for a professional golfer, but instead outrageous and malicious defamatory attacks. Mere negative media coverage or simple criticism would by way of example be something along the lines of: "player X always chokes under pressure," or "player y really struggles on this course." Routine "negative media coverage" or "criticism" does not contemplate falsely and outrageously  branding someone a murderer, thief, cheater, and working directly for a genocidal dictator. These are two very different things. Simple "negative media coverage" or critisicm  does not result in a complete and total loss of sponsors, *Chamblee* ¶ 17, 18, Mr. Reed being verbally abused with profanities and threats at nearly every single event that he plays in, to the point when Mr. Reed has had to use security guards to protect himself and his family, *Chamblee* ¶ 131, and even endure a bomb threat halting play at Trump National Golf Course in Doral, Florida. *Chamblee* ¶ 132.

24.     It more than appears Judge Corrigan knew that his Dismissal Order was fundamentally wrong in this regard, which is why he for the most part did not give individual analysis to the fifty- five (55) defamatory statements at issue, and instead chose to conveniently lump statements together in a manner that allowed for him as suggested by Mr. Minchin of the Defendant TGC, LLC., to conveniently "gloss over" clearly defamatory statements. In stark contrast, in another case where the undersigned counsel served as counsel on until trial,

*Moore v. Senate Majority PAC et al*, 4:19-cv-01855 (N.D. Al.)(the "*Moore* Case"), the Honorable Corey Maze ("Judge Maze") was also presented with a defamation complaint involving numerous statements. Judge Maze actually took the time to go through all of the statements at issue, and in the end allowed one single statement to go to trial and be put before the jury, *Moore* ECF No. 62, which resulted in an over $8 million dollar judgment for the Plaintiff. *Moore* ECF No. 207. This just goes to show that even just one defamatory statement can compensate the victim of defamation, and the Court therefore has a duty to parse through each and every statement even if it might be easier to simply "gloss over" statements and lump them into groups.  This egregious error must be corrected, if only to give the appellate court a workable record to rule upon.

25.    By way of example, the following  false defamatory statements in particular and by way of simple example cannot and should not even be considered for dismissal before going to a jury, particularly given that Mr. Reed, in excruciating detail had pled actual malice. Indeed, citing not just direct evidence of actual malice, Mr. Reed also set forth compelling numerous badges of actual malice set forth in the Socias Article sufficient to withstand motions to dismiss pursuant to Rule 12 (b)(6) of the Federal Rules of Civil Procedure ("FRCP):

A. "Golf won today. **Murderers lost**." *Chamblee* ¶ 89

B. "**So if they're aligning themselves with a tyrannical, murderous leader... look if you if you look at who MBS is... centralizing power, committing all these atrocities, you look at what he's doing to the citizens of his... of his country ask yourself I mean would you have played for Stalin would you have played for Hitler would you have played for Mao would you play for Pol Pot,**" [Froggy] "**would you have played for Putin?**" [Chamblee in agreement] "**would you have played for Putin... which... and this who this guy is. He settles disputes with bonesaws**." *Chamblee* ¶ 58.

C. "...either way, whether the money is against or in addition to guarantees **its still blood money and you're still complicit in sportswashing**." *Chamblee* ¶ 90.

D. "It **figured that the first time anyone on Reed's team had been honest** and open with the media, it would be a caddie admitting he'd shoved a fan." *Ryan* ¶ 84.

E. "When items including a watch, a putter and $400 went missing from the locker room, **teammates suspected it was Reed who had taken them**, especially as he turned up the following day with a large wad of cash." *Ryan* ¶ 93.

F. On August 28, 2022, Chamblee tweeted "[t]he IOC decides where the Olympics go...and there is a big difference between doing business in a country and **directly for a murderous regime as LIV golfers are**." *Chamblee* ¶ 94.

26.    The following false statements of mixed opinion and fact cannot and should not even be considered for dismissal before going to a jury. *Barnes v. Horan*, 841 So. 2d 472, 476-77 (Fla. Dist. Ct. App. 1984). This is particularly true given that Mr. Reed, in excruciating detail, had pled actual malice. Indeed, citing not just direct evidence of actual malice, Mr. Reed also set forth  compelling

numerous badges of actual malice sufficient to defeat motions to dismiss pursuant to FRCP 12 (b)(6).

A. **"I either messaged or talked to 15 to 20 current and past tour players, some of them Hall of Fame members, over the past 24 hours and not a single player is in defense of what Patrick Reed di**d." *Chamblee* ¶ 78.

B. "To me, this looks bad for Patrick Reed, **a guy that has history of doing these things [cheating]**." *Chamblee* ¶ 86.

C. "I can understand [Mohammed bin Salman Al Saud's] regime wanting to become more than a petro[l] country & corporate interest to serve that part of the world. **I can't understand an individual working for him**." *Chamblee* ¶ 95.

27.     It is clear that Defendant Chamblee did not talk to "15 to 20" players, but that he simply made this up to lend credence and false weight to his malicious defamation of Mr. Reed. However, at a bare minimum, this is a purely factual question that should have gone to a jury.

28.     The following  ambiguous statements capable of being read as false or true, which are alleged to be false, cannot and should not even be considered for dismissal before going to a jury. *Perry v. Cosgrove*, 464 So. 2d 664 (Fla. Dist. Ct. App.1985). This is particularly true given that Mr. Reed, in excruciating detail, had pled actual malice. Indeed, citing not just direct evidence of actual malice, Mr. Reed also set forth compelling numerous badges of actual malice sufficient to withstand motions to dismiss pursuant to FRCP 12 (b)(6).

A. "Saudi-Backed LIV Golf is Using PGA Suit to Get Data on 9/11 Families Court Told." *Ryan* ¶ 113.

B. **I mean those who have sold their independence to a murderous dictator** and those who have sued their fellow professionals so they can benefit from the tours they are trying to ruin." *Chamblee* ¶ 92.

29.    Judge Corrigan's statement that "[i]n his Amended Complaints, Reed does not distinguish what statements constitute each type of defamation; instead, he incorporates every alleged statement by a Defendant into each Count against that Defendant, " ECF No. 98, fn. 9, is patently false.

30.    A review of the Amended Complaints shows, however, that this is not true. Each type of defamation – defamation generally, defamation *per se* and defamation by implication – is separated into an individual count against each individual defendant. This is notwithstanding, of course, the fact that Mr. Reed filed detailed Notices of Compliance (*Reed v. Chamblee, et al* Dkt. No. 29 and *Reed v. Ryan, et al* Dkt. No. 28) setting forth exactly how he had complied with Judge Corrigan's *sua sponte* orders, to which no objections were raised.

31.    This is particularly true with regard to defamation by implication, which holds out the victim to ""hatred, distrust, ridicule, contempt or disgrace," *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1114 (Fla. 2008), as a result of statements which are "premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." *Id*. at 1107. This clearly, at a bare minimum, indisputably exists in

this case. By way of a few examples, statements that clearly meet this threshold include, but are not limited to:

A. Mr. Reed is "**over there purely playing for blood money**. *Chamblee* ¶ 63.

B. "[n]ow he has continued his subterfuge by saying the PGA Tour could end any threat, **presumably from the Saudi blood money funding a proposed Super Golf League**, by just handing back the media rights to the players." *Chamblee* ¶ 65.

C. "…either way, whether the money is against or in addition to guarantees **its still blood money and you're still complicit in sportswashing**." *Chamblee* ¶ 90

D. "[b]y defectors I mean those who have turned their backs on the meritocracy of professional golf**. I mean those who have sold their independence to a murderous dictator and those who have sued their fellow professionals so they can benefit from the tours they are trying to ruin**." *Chamblee* ¶ 92.

E. The violation was so egregious that Rickie Fowler, glancing at the replay on television, quickly raised his eyebrows and said: "Whoa! What was THAT!" *Ryan* ¶ 107.

F. **There is no greater punishment in golf than being stuck with a reputation for cheating**." *Ryan* ¶ 107.

32. Statement E is an objectively verifiable fact, and Mr. Reed should have been afforded discovery in this regard, at a minimum.

33. These statements are, at a minimum, defamatory by implication because it is true that Mr. Reed and LIV Golf are financed by the Saudi Public Investment Fund ("PIF"), but that in no way equates to taking "blood money,"bei ng associated with terrorists, or engaging in sportswashing, as the

Defendants falsely and maliciously publish. Defendants are simply taking advantage of the general public's unfamiliarity with the PIF—which as set forth in the Amended Complaints has invested in many of the most prominent businesses in America such as Disney, Uber, Boeing, Facebook, Citigroup, Bank of America, Capcom, Nexon, Electronic Arts, Take-Two Interactive, Activision Blizzard, and Berkshire Hathaway, *Chamblee* ¶ 30, and which also owns Newcastle United F.C. of the English Premier League, *Chamblee* ¶ 31—in order to push their defamatory agendas. Defendants omit from their defamatory statements any reference to the fact that Mr. Reed and LIV are simply financed by the PIF, creating the false implication to the public that they are employed by an alleged murderous regime and dictator the equivalent of Hitler, Stalin, Putin and Mao all rolled into one, directly. This is textbook defamation by implication, and it was an egregious, manifest error for Judge Corrigan to have ignored this.

34.    All of this is also notwithstanding the clearly and patently defamatory nature of the titles of the articles at issue, which make false, malicious, defamatory, and highly damaging statements "of and concerning" and associated with Mr. Reed. These include, but are not limited to: "*Don't know they'd p\*\*\* [piss] on him if he was on fire': The scandalous truth of golf's biggest villain,*" *Ryan* ¶ 87; "*The scandalous truth about Patrick Reed, the bad boy of golf,*" *id.*; "*Reed's reputation from Bahamas the ultimate penalty,*" *Ryan* ¶ 105.

35.     Almost certainly realizing that he had no plausible basis to find each and every statement at issue as non-defamatory, Judge Corrigan made sure to also "cover his tracks" by alleging in a conclusory fashion that Mr. Reed had failed to allege actual malice. This was clearly and surely because Judge Corrigan knew many of the statements in the Amended Complaints, and the above are just a few examples of this,  were patently defamatory and others that were ambiguous, which questions needed to go to a jury. *Perry v. Cosgrove*, 464 So. 2d 664 (Fla. Dist. Ct. App.1985). Judge Corrigan therefore without basis in fact, since actual malice had been clearly pled with great specificity, beyond the minimum that is required procedurally, falsely conjured up the issue of actual malice as well in order to try to slam every door on Mr. Reed and protect himself from reversal on appeal.

36.     However, the Amended Complaints clearly have both pled actual malice with extreme specificity, including but not limited to numerous "badges" of actual malice set forth in  the article by Manual Socias titled *Showing Constitutional Malice in Media Defamation* which were conspicuously not even mentioned by Judge Corrigan once in his seventy-eight (78) page Dismissal Order. The badges which clearly are present here include, but are not limited to:

A. failure to report exculpatory facts, *Ryan* ¶ 73;
B. omitting pertinent information to create a false impression, *Ryan* ¶ 75, *Chamblee* ¶ 82;
C. repetitive media attacks on the plaintiff. *Chamblee* ¶¶ 57-82, 89-98, *Ryan* ¶¶ 37,  67 – 86,  ;

D. a reporter's ill will toward the plaintiff, *Ryan* ¶ 46;
E.   prior and subsequent defamatory statements; and
F. refusal to publish a retraction upon learning of errors in a story.
   *Ryan* ¶ 122, *Chamblee* ¶ 133.

37.    In addition to the numerous "badges" of actual malice which were present, which are clearly relevant to showing actual malice, *Herbert v. Lando*, 441 U.S. 153 (1979), the Amended Complaints also set forth in extreme detail exactly how the Defendants either knew that the statements they were making were false, or at a minimum acted with a reckless disregard for the truth. *Dershowitz v. Cable News Network, Inc.* 541 F. Supp. 3d 1354, 1367 (S.D. Fla. 2021). For instance, with regard to the fabricated statement that Mr. Reed had been accused of stealing from his college teammates, Mr. Reed had pled that he possessed sworn statements from his college coaches conclusively refuting any such accusations. Am. Comp. ¶ 94, ECF No. 34-5. Similarly, with regard to fabricated statements that Mr. Reed had intentionally cheated in his college and professional career, Mr. Reed also pled that he possessed sworn statements from his college coaches that they were unaware of any cheating accusations against him, Am. Comp. ¶ 75, and also set forth that Mr. Reed has never once been found to have intentionally cheated by the PGA Tour or any other tour or entity, period.

38.    Further as set forth above, Judge Corrigan cannot and should not have taken away from the jury consideration of whether alleged defamatory

statements that did not specifically mention Mr. Reed, but could be found to be "of and concerning" and associated with him. In this regard, notwithstanding Judge Corrigan preventing any discovery on this crucial issue, he also seriously erred by intentionally overlooking cases and black letter defamation law that pertains to "of and concerning," which involve a group of victims.

39.     This is particularly true with regard to the defamatory publication by Defendants Larson and Bloomberg, *Ryan* ¶¶ 113 – 119, where they prominently featured a large recognizable picture of Mr. Reed in their article titled "*Saudi-Backed LIV Golf is Using PGA Suit to Get Data on 9/11 Families Court Told.*" Despite this, Judge Corrigan incredibly ruled that "[a]s a matter of law, no reasonable person would understand the article as implicating Reed." ECF No. 91 at 38. This is egregiously obviously and intentionally wrong, and beyond bizarre. The only reasonable readers who would <u>not</u> understand the article as being "of and concerning" and associated with Mr. Reed are those who are blind and therefore cannot see the picture of Mr. Reed, particularly since Mr. Reed being a part of LIV is widely known, yet the exact parties to the LIV Golf v. PGA lawsuit is not. Therefore, by prominently featuring the photo of Mr. Reed for no reason other than to create the false impression that he was involved in investigating September 11, 2001 families, and publishing, "It's (meaning the issue of 9/11 family victims) has taken a more sinister turn," *Ryan* ¶ 118, Defendants Larson and Bloomberg capitalize on the fact that the public for the

most part does not know that Mr. Reed was not a party to the LIV Golf v. PGA lawsuit to maliciously "rope him in" to the defamation. This is exacerbated by the fact that Mr. Reed was among the few most prominent players to join LIV and was one of the earliest golfers who made the switch. As such, his likeness and photo have been used profusely in the media since LIV came into being. Thus, in the public's eye, he was certainly among the top "faces" of LIV. Mr. Reed has also been the primary target of the golf media when discussing LIV, *Chamblee* ¶ 40, and in conjunction with the golf media frequently using pictures of Mr. Reed, including Defendants Bloomberg and Larson, means that most reasonable viewers would have believed that the Larson/Bloomberg Article was "of and concerning" and associated with Mr. Reed. In any event, this is a factual question for the jury that simply could not have been disposed of by Judge Corrigan at the motion to dismiss stage, particulary before any discovery had taken place.

40.    This is exacerbated by the fact that Mr. Reed was among the few most prominent players to join LIV, and was one of the earliest golfers who made the switch. Thus, in the public's eye, he was certainly among the top "faces" of LIV. Mr. Reed has also been the primary target of the golf media when discussing LIV, *Chamblee* ¶ 40, and in conjunction with the golf media frequently using pictures of Mr. Reed as their LIV player of easy and convenient choice to defame when discussing LIV, including Defendants Bloomberg and Larson,

means that most reasonable viewers would have believed that the Larson/Bloomberg Article was "of and concerning" and associated with Mr. Reed. In any event, this is a factual question for the jury that simply could not have been disposed of at the motion to dismiss stage, particularly before any discovery had taken place that would have confirmed the "of and concerning" association with Mr. Reed.

41.    The test for "of and concerning" is "who a part of the audience may reasonably think is named." Sack on Defamation § 2:9.1 (5th Ed.) "If [a defamatory statement] is intended to be about a person and is so understood by at least one recipient of the communication, the person has been defamed to that audience of at least one." *Id.* It is therefore unsurprising that under these extremely low thresholds, "**[u]nder modern practice in most states, it is enough merely to plead that the defamatory publication was made 'of and concerning' the plaintiff**." *Id.*

42.    Furthermore, Judge Corrigan intentionally and fundamentally erred by finding that the group libel doctrine was not applicable with regard to statements referring to LIV, despite conceding that Defendant Chamblee admitted that there were only fourteen recognizable players, ECF No. 91 at 32, therefore severely reducing the size of the "group" at issue. Judge Corrigan also gives no consideration to the case law set forth by Mr. Reed in *Fawcett Publ'ns v. Morris*, 377 P2d42 (Okla. 1962) finding the "of and concerning" requirement

satisfied with regard to the entire Oklahoma Sooners football team, which was much larger than the LIV roster. *See also Neiman-Marcus v. Lait*, 13 F.R.D. 311 (S.D.N.Y. 1952); *Palmerlee v. Nottage*, 119 Minn. 351 (1912); *Fullerton v. Thompson*, 123 Minn. 136 (1913).

43.     The Defendants' pattern and practice of maliciously defaming Mr. Reed as a murderer, habitual cheater, and thief, among other disgusting things, has caused enormous harm to Mr. Reed, including but not limited to (1) being verbally abused with profanities and threats at nearly every single event that he plays in, to the point when Mr. Reed has had to use security guards to protect himself and his family, *Chamblee* ¶ 131, and (2) an enormous loss of sponsors. *Chamblee* ¶ 17, 18, and even endure (3) a bomb threat halting play at Trump National Golf Course in Doral, Florida. *Chamblee* ¶ 132.

44.     Perhaps nowhere in the Dismissal Order is Judge Corrigan's prejudicial, predetermined mindset more evident than where he arrogantly declares that "[w]hether the defendant's statements constitute defamation . . . is a question of law for the court to determine." ECF No. 91 at 25. As shown above, this is simply not true, as Florida Courts have long held that in many circumstances, including but not limited to where the statements at issue are ambiguous, *Perry v. Cosgrove*, 464 So. 2d 664 (Fla. Dist. Ct. App.1985), the question must go to a jury. This can only be explained by a predetermined, prejudicial mindset to get rid of these cases by any means.

45.     The role of the jury is sacrosanct in American jurisprudence, since our Founding Fathers and Framers, in crafting our Constitution, understood that King George III had used "yes men" judges to persecute the colonies with his edicts. Not trusting the judges of the king, who rubber stamped what this monarch wanted without regard to the facts and the law, they thus expanded the role of the jury and implemented it in our civil justice system, as well as the criminal justice system. Here is what these wise men had to say about the role of the jury:

> I consider trial by jury as the only anchor ever yet imagined by man, by which government can be held to the principles of its constitution. - Thomas Jefferson, 1788.

> Representative government and trial by jury are the heart and lungs of liberty.  Without them we have no other fortification against being ridden like horses, fleeced like sheep, worked like cattle and fed and clothed like swine and hounds. - John Adams, 1774.

> Trial by jury in civil cases is as essential to secure the liberty of the people as any one of the pre-existent rights of nature.  James Madison, 1789.

> The civil jury trial is preferable to any other and ought to be held sacred. - Virginia Declaration of Rights, 1776.

> In civil suits the parties have a right to trial by jury and this method of procedure shall be held sacred.  -  Massachusetts Constitution, 1780.

> In suits at common law, trial by jury in civil cases is essential to secure the liberty of the people as any one of the pre-existent rights of nature.  - James Madison, 1789.

46.     Finally, rather than just dismissing the Defendants' bogus claim for an award of attorneys and costs, which only theoretically is possible given Judge

Corrigan wrongful dismissal of all 55 defamatory statements, he writes at page 74 of his biased Dismissal Order of September 27, 2023, that "Federal courts sitting in diversity and applying Florida law routinely award fees under Florida's anti-Slapp statute." To the contrary one rogue court in the U.S. Southern District Court for the Southern District of Florida, which is not binding precedent in any even as it emanates not from an appeals court but a lower court, does not amount to a routine granting of attorneys fees and costs and the hard fact is that all other federal courts -- *Abbas v. Foreign Policy Group*, 783 F.3d 1328, 1337 (D.C. Cir. 2015); *Carbone v. CNN, Inc.*, 910 F.3d 1345 (11th Cir. 2018), *Van Dyke v. Retzlaff*, 781 F. App'x 368 (5th Cir. 2019) – as well as the chief judge of the U.S. Court of Appeals for the Eleventh Circuit, the Honorable William Pryor, reject this false premise. The supporting view of Chief Judge Pryor, Judge Corrigan's superior on the Eleventh Circuit, is conveniently relegated, diminished and reduced to a shocking mere footnote, in comparison. This is further evidence of a prejudged and biased extra-judicial mindset by Judge Corrigan who is now wrongfully considering punishing Mr. Reed for his having sought to seek justice in his court.

47.     While the matter of an award of attorneys fees and costs is subject to further briefing in the next weeks, if Judge Corrigan had been unbiased and impartial, the award of attorneys fees and costs under Florida's Anti-SLAPP statute would have already been rejected, as it has by all appellate federal circuits

29

who have considered it in actions founded on diversity jurisdiction, not some rogue lower court judge.

48.    Judge Corrigan was also presented with *Sterling v. Doe*, 2022 U.S. Dist. LEXIS 105673 (M.D. Fla. Feb. 2, 2022), where this same court found that the Magistrate did not need to follow *Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310 (S.D. Fla. 2020) because "as the *Bongino* court itself explains, the fee-shifting provision of anti-SLAPP laws is obviously different than the pretrial dismissal anti-SLAPP provisions which conflict with and 'answer the same question' as the Federal Rules." *Id*. at 12-13. Furthermore, as pointed out in *Sterling*, in prior cases where federal courts had applied Florida's Anti-SLAPP statute, the plaintiff had "had forfeited their right to challenge the anti-SLAPP law's applications under an Erie theory at the district court level." *Id*. at 12. This is clearly not the case here, as Mr. Reed more than timely challenged the applicability of the statute.

49.    Of even more relevance and of course importance to the Court is the transcript of the oral argument in *Corsi v. Newsmax Media Inc et al*, 21-10480 (11th Cir.), <u>Exhibit 2</u>, where the panel including the Chief Judge of the U.S. Court of Appeals for the Eleventh Circuit, the Honorable William H. Pryor Jr. ("Judge Pryor"), who sits above Judge Corrigan, expressed "serious doubt" as to whether Florida's Anti-SLAPP statute could apply in federal court due its requiring a "heightened pleading standard," and also opined that Fed. R. Civ. P. 11

answered the "same question" as Florida's Anti-SLAPP statute, rendering it inapplicable in federal court:

> There's a conflict in what the - the Florida courts even say this - in how the statute works, right?...On the one hand, at least one DCA has said it does create a heightened pleading standard, right?... The other says it doesn't….: If it does, it seems to me, then it conflicts with the federal rules and it doesn't apply…..And if it doesn't create a heightened pleading standard, then it seems to me it's procedural and it also doesn't apply…..**But either way, it seems to me the statute just doesn't apply in federal court**. (emphasis added).

> The thing I'm most interested, at least – I can only speak for myself - is the attorney's fees issue, and I have serious doubts about whether the anti-SLAPP statute applies in federal court. And it seems to me that if it doesn't, then a suit filed in violation of it can't give rise to an attorney's fee award.

> Even so, I mean, obviously, it's just, talking off the top of my head, it seems to me like a court that finds that there is a meritless suit that's been filed and it's been filed solely because the person is trying to get back at someone and inflict costs on someone for exercising their First Amendment rights in a way that they didn't like, that that would be an improper purpose. I mean, I can't imagine - it's hard for me to imagine that a court would find that that was a proper purpose [and thus sanctionable under Rule 11]." Exhibit 2 at 29 – 30.

50.    In sum, Judge Corrigan did not make any unintentional mistakes and his actions were not innocent. He is an extremely experienced jurist and the Chief Judge of this Court. He clearly has an enormous amount of experience in and knowledge of the law. All of this goes to show that the fundamental, egregious errors contained in his Dismissal Order simply could not possibly have occurred by simple mistake or inadvertence. A jurist at Judge Corrigan's level and experience does not make these types of egregious errors, and therefore

the only remaining explanation is that the Dismissal Order was prepared with an extrajudicial biased, prejudicial mindset to get rid of the case entirely.

51. A judge may not intentionally misstate and misapply the lawThis sort of prejudicial conduct is illustrated in *In re Hammermaster*, 985 P.2d 924 (1999), where Judge Hammermaster intentionally misstated the law on numerous occasions, threatening certain defendants that he would impose indefinite jail sentences or life imprisonment until certain fines were paid, despite knowing that he had no legal authority to do so. *Id.* at 928. Under those facts, the Supreme Court of Washington censured Judge Hammermaster and suspended him for six (6) months. If intentionally misstating and misapplying the law can subject a judge to discipline, then surely it can also form the basis for recusal, a much less severe remedy. *See also Litecky* 510 U.S. at 555 ("…if the judge succumbs to extrajudicial influence, he is subject to such a motion." Even more, in the absence of an extrajudicial influence, judicial rulings coupled with the requisite "degree of favoritism or antagonism" will serve as the basis for such a motion even "when no extrajudicial source is involved." Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings" constitute a basis for such a motion if "they display a deep-seated favoritism or antagonism that would make fair judgment impossible.")

52.     Mr. Reed, through counsel, is contemporaneously filing Motions for Reconsideration, to Alter or Amend a Judgment, and for Relief from Judgment or Order pursuant to Fed. R. Civ. P 59 and 60 seeking to vacate the Dismissal Order ("Motion for Reconsideration") as being intentionally wrong, contrary to the law, and misstating the facts. Judge Corrigan must now vacate the Dismissal Order and allow these cases to proceed. *Ognenovic v. David J. Giannone, Inc.*, 184 So. 3d 1135 (Fla. Dist. Ct. App. 2015).

53.     Otherwise, Mr. Reed's Motions for must be reassigned to another jurist the U.S. District Court for the Middle District of Florida to rule upon Mr. Reeds' Motion for Reconsideration pursuant to Federal Rules of Civil Procedure 59 and 60 in the interest of justice and fundamental fairness.

Sworn to this 23nd day of October 2023 under penalty of perjury.


*/s/ Larry Klayman*
Larry Klayman, Esq.
For and on behalf of Plaintiff Patrick Nathaniel Reed

## CERTIFICATE OF SERVICE

I, Larry Klayman, hereby certify that on this day, October 23, 2023, I electronically filed the foregoing with the Clerk of Court using the Court's ECF procedures. I also certify that the foregoing document is being served this day on all counsel of record through the Court's eservice procedures.

*/s/ Larry Klayman*_____

# EXHIBIT 2

UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

CASE NO.:  21-10480


JEROME CORSI,

     Appellant,

v.

NEWSMAX MEDIA, INC., et al.,

     Appellees.

_____/



TRANSCRIPTION OF AUDIO RECORDING

OF ORAL ARGUMENT


(Pages 1 to 41)

DATE:       Thursday, May 19, 2022

LOCATION:   12th Floor Courtroom
              James Lawrence King Federal Justice
              99 Northeast Fourth Street
              Miami, Florida  33132




Reported By:  Gail Hmielewski
             Court Stenographer

```
 1    APPEARANCES:

 2

 3    Appeared for the Appellant:

 4    MELISSA L. ISAAK, ESQUIRE
      ISAAK LAW FIRM
 5    P.O. Box 4894
      Montgomery, Alabama  36103
 6    334-262-8200  Phone
      334-819-4072  Fax
 7    isaaklaw@gmail.com

 8

 9    Appeared for Appellees:

10    MARK A. LERNER, ESQUIRE
      DUANE MORRIS, LLP
11    230 Park Avenue, Suite 1130
      New York, New York  10169
12    212-404-8714  Phone
      212-818-9606  Fax
13    malerner@duanemorris.com

14         - and -

15    JULIAN ANTONY JACKSON-FANNIN, ESQUIRE
      DUANE MORRIS, LLP
16    201 South Biscayne Boulevard, Suite 3400
      Miami, Florida  33131
17    305-960-2253  Phone
      305-402-0544  Fax
18    jjfannin@duanemorris.com

19

20

21

22

23

24

25
```

1                    INDEX OF PROCEEDINGS

2

3                                          PAGE

4
   PROCEEDINGS                             4

5
   CERTIFICATE OF REPORTER                 41
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      PROCEEDINGS
 2            THE COURT:  Oh, Corsi vs. Newsmax Media.  Oh,
 3       boy.
 4            Good morning, Ms. Isaak.
 5            MS. ISAAK:  Good morning, Judge.
 6            THE COURT:  You can begin.
 7            MS. ISAAK:  May it please the Court.  My name
 8       is Melissa Isaak and I represent Jerome Corsi in
 9       this matter.
10            And we're arguing two main points here today,
11       Your Honors, is that the case was properly
12       dismissed via a 12(b)(6) motion by the District
13       Court; and also the fee provision, the fee
14       distribution, rather, ruling by the District Court
15       was improper because the Florida's anti-SLAPP
16       statute does not apply in federal court; and also,
17       which we don't - we say it does not, but, if it
18       did, the statute was not complied with by the lower
19       court.
20            THE COURT:  It seems to me the actual malice
21       requirement is a tough one for you here.
22            MS. ISAAK:  He is a public figure and I think
23       the actual malice standard is a hurdle for any
24       public figure in a defamation action, however --
25            THE COURT:  Yeah, and I just - it just doesn't
```

5

```
 1        seem to me that you've alleged enough to plausibly

 2        allege actual malice.

 3             I mean, you know, the fact that the Newsmax

 4        defendants and Fairbanks knew Corsi doesn't know -

 5        doesn't mean they know his character for

 6        truthfulness was beyond reproach or anything like

 7        that.  The fact that Newsmax has sold Corsi's books

 8        doesn't imply that they entertained serious doubts

 9        about the allegation that he plagiarized a

10        reporting.

11             You know, just - I look at these allegations,

12        I'm looking for where the actual malice is alleged

13        and I'm not seeing it.

14             MS. ISAAK:  I understand, sir.  The

15        defendants, they called Mr. Corsi's allegations a

16        conspiracy theory, but Mr. Corsi would offer that

17        those who know Roger Stone would know that that is

18        not a conspiracy theory.

19             We allege the complaint was properly pled

20        under Rule 8, and also there was an affidavit

21        submitted by Mr. Corsi where he specifies that

22        these people know him, the defendants know him and

23        they know that the allegations made were untrue;

24        and not only are they untrue, they're provably

25        false.
```

```
 1              Mr. Corsi is not a liar.  Mr. Corsi --
 2         THE COURT:  Just the fact that they know him
 3    means that they know that what he says was untrue?
 4         MS. ISAAK:  The fact that they intimately know
 5    Mr. Corsi, that they have worked with Mr. Corsi.  I
 6    understand that Newsmax sold his books, however,
 7    Mr. Corsi did allege and he pled that these are,
 8    these things are provably false.
 9              And what they called him - a liar, a
10    plagiarist, having committed fraud - these are all
11    things that can destroy and discredit him in his
12    trade and profession, which would be defamation
13    per se.
14         THE COURT:  Yeah, but I thought --  I mean,
15    maybe I'm wrong about this, I thought that this was
16    on a program where it was a sort of point
17    counterpoint and so there was an opportunity to
18    respond to these allegations real time provided by
19    the station.
20         MS. ISAAK:  Well, Your Honors, Mr. Klayman,
21    Mr. Corsi's attorney, was invited on Newsmax
22    America Talks Live.  Well, he was more lured into
23    the program.  Now, counsel for defendants say that
24    this was a debate.  Mr. Klayman did not know that
25    he was entering into a debate.  In fact, the issues
```

1    that Mr. Klayman thought were to be discussed were

2    the public issues related to the Mueller

3    investigation and the results involving Roger

4    Stone's alleged crimes of perjury, witness

5    tampering, and obstruction of justice.  Mr. Klayman

6    was not even made aware that Ms. Fairbanks was

7    going to be on the show until directly before the

8    show went live.

9         So I understand the way it was presented, that

10   this was a debate where they had an opportunity to

11   respond, but Mr. Klayman was not given notice that

12   this was going to be the issue of the show.

13        THE COURT:  Yeah, I mean, I understand.  I

14   mean, that means sounds like a legitimate gripe

15   against Newsmax if you just want to like write them

16   a letter or something.  I guess my point is it just

17   seems - it seems hard to tag Newsmax with the

18   statements of, I guess it's --

19        MALE VOICE:  Fairbanks.

20        THE COURT:  -- Fairbanks, given that Newsmax's

21   role was to host these people and give them an

22   opportunity to respond.

23        MS. ISAAK:  Yes, sir, and Mr. Corsi, again, we

24   do believe that he's properly pled under Rule 8,

25   and also, if they were allowed to proceed to

```
 1          discovery, Mr. Corsi believes that he would have

 2          been able to prove the allegations that he did make

 3          in his complaint.

 4              Again, this is not --  Mr. Corsi is intimately

 5          familiar with Roger Stone, and the fact that

 6          Mr. Stone worked in concert with others, as joint

 7          tortfeasors to defame Dr. Corsi, was something that

 8          he believes that he could prove had the case

 9          advanced to the discovery phase.

10              THE COURT:  I'll tell you, the thing that I

11          was more interested in here was attorney's fee

12          issue, because I have doubts about whether the

13          anti-SLAPP statute applies.

14              MS. ISAAK:  Yes, sir.  We contend the

15          anti-SLAPP statute does not apply, well, for two

16          reasons.  First, in this case, as it applied the

17          Florida statute, which of course is just a garden

18          variety fee-shifting statute, however, the Florida

19          statute states with specificity that for fees to be

20          assessed, a hearing must be scheduled.  It says

21          shall - it doesn't say may, it says shall.

22              THE COURT:  Well, there has to be a violation

23          of the statute, the Florida statute, and here's the

24          concern I have.  If the statute doesn't apply in

25          federal court, then --
```

```
 1              MS. ISAAK:  We don't think the statute
 2       applies.
 3              THE COURT:  -- then there can't be an
 4       attorney's fee based on it, can there?
 5              MS. ISAAK:  No.  No, sir, you're absolutely
 6       correct.
 7              THE COURT:  Based on its violation.
 8              MS. ISAAK:  Yes, sir, it's a violation.  I
 9       think that --
10              THE COURT:  No, I'm saying there can't be an
11       attorney's fee award based on its violation if it
12       doesn't apply in federal court.
13              MS. ISAAK:  That's correct.  That's correct,
14       yes.
15              THE COURT:  And so in order to figure out
16       whether it applies, I mean, we would compare the
17       language of Rule 11, right --
18              MS. ISAAK:  Correct.
19              THE COURT:  -- with the language, the fee
20       language in the anti-SLAPP statute, which basically
21       says that fees would be awarded, reasonable fees
22       would be awarded if, "A", the suit is without merit
23       and, "B", it's primarily filed because someone
24       exercised the First Amendment right, right?
25              MS. ISAAK:  Yes, that's correct.  That's
```

```
 1      correct.
 2          THE COURT:  Well, if we're looking under - so
 3      if we're looking under Rule 11, then, so the
 4      question is whether that captures everything that's
 5      in there, and I guess the question then is, under
 6      Rule 11, it would have to be without merit and/or
 7      filed for an improper reason, right.
 8          MS. ISAAK:  Yes, ma'am.  Yes, ma'am.
 9          THE COURT:  Okay.  So the question then to me,
10      anyway, is, if it's primarily filed because
11      somebody has exercised a First Amendment right,
12      does that mean it's filed for an improper reason?
13          MS. ISAAK:  Yes, ma'am, it would, and that
14      would directly fall under Rule 11.  The anti-SLAPP
15      statutes covers means to dispose of cases, whether
16      it be through a 12(b)(6), through summary judgment.
17      It also covers how to recoup attorney's fees --
18      I'm sorry.  The rules allow, under Rule 11, where
19      you could recoup attorney's fees, so they're
20      saying, they're calling it "meriless" - meritless,
21      rather --
22          THE COURT:  They really aren't the same thing,
23      though, are they?  So Rule 11, in saying that
24      there's an improper purpose, is not the same thing
25      as filing a meritless lawsuit about someone's free
```

1    speech exercise.

2        MS. ISAAK:  But the Florida anti-SLAPP statute

3    says that the suit was filed for the purpose of

4    silencing free speech or infringing on a First

5    Amendment right, so therefore it would be an

6    improper purpose under Rule 11.

7        THE COURT:  Well, I don't know, I just --  I

8    guess the problem with the Rule 11 argument, in my

9    mind, is that we've said over and over and over

10   again, and it's just common sense with the law,

11   that if states want to have fee-shifting statutes,

12   then they can have fee-shifting statutes for the

13   causes of action that state law creates and those

14   fee-shifting statutes would apply in federal court.

15   So why isn't the way to see this as just a

16   fee-shifting statute that, if you file a meritless

17   defamation lawsuit, then you have to pay the other

18   side's fees?

19       MS. ISAAK:  Because it's more of a procedural

20   rule.  So the Florida fee-shifting statute gives a

21   procedure to recoup on attorney's fees.  The

22   Florida federal - I'm sorry, the federal rules

23   already have that.  Rule 11 already allows for

24   that.

25       THE COURT:  Okay.  So, I mean, we've said in

```
 1        like seven different cases that statutes for the

 2        recovery of attorney's fees apply in federal court

 3        as just a general matter, so, I mean, what would

 4        make this conflict with Rule 11 specifically if

 5        just a normal state fee-shifting statute doesn't

 6        conflict?

 7            MS. ISAAK:  Well, I think if we look at most

 8        of the states' anti-SLAPP statutes, they deal with

 9        shifting burdens, they deal with heightened

10        pleading requirements.  Florida's being just a

11        garden variety anti-SLAPP statute really is just a

12        mirror image of the Rule 11.

13            THE COURT:  Isn't the answer that this

14        attorney's fee provision is tied to a pleading

15        standard as opposed to, well, if you win a claim

16        for - under the deceptive trade practices act,

17        you're entitled to attorney's fees, the prevailing

18        party's entitled to attorney's fees?

19            MS. ISAAK:  Yes, we would offer that Rule 11

20        always applies to pleading standards.  I think if a

21        pleading is considered --

22            THE COURT:  I'm not even sure you understand

23        my --

24            THE COURT:  Let me ask a question to follow

25        up --
```

 1            MS. ISAAK:  Okay.

 2            THE COURT:  -- on Judge Pryor's question.  So

 3       he said, you know, isn't - doesn't this statute

 4       impose a pleading standard, and he's talking about

 5       the part of the statute that says, you know,

 6       merits, right?

 7            The question is, does that part of the statute

 8       impose a pleading standard or is it just if you

 9       lose, then you pay the fees?  Is there a pleading

10       standard associated with that phrase?

11            MS. ISAAK:  The heightened standard I think

12       that's imposed in the Florida Statute goes along

13       with the --  There's an evidentiary burden that has

14       to be set.

15            THE COURT:  Okay.  When you say the heightened

16       standard, where are you getting the idea that the

17       Florida Anti-SLAPP Statute imposes a heightened

18       standard?

19            MS. ISAAK:  Because the Florida Anti-SLAPP

20       Statute says that, prior to any fees being

21       assessed, or prior to a case being dismissed under

22       the Florida Anti-SLAPP Statute, that it must be set

23       for a hearing.  If it has to be set for a hearing,

24       the parties are required to produce - to submit

25       evidence on their respective positions.  Now --

14

```
1              THE COURT:  There's a conflict in what the -
2       the Florida courts even say this - in how the
3       statute works, right?
4              MS. ISAAK:  Yes.
5              THE COURT:  On the one hand, at least one DCA
6       has said it does create a heightened pleading
7       standard, right?
8              MS. ISAAK:  Correct.
9              THE COURT:  The other says it doesn't.
10             MS. ISAAK:  That's correct.
11             THE COURT:  If it does, it seems to me, then
12      it conflicts with the federal rules and it doesn't
13      apply.
14             MS. ISAAK:  Yes, sir.
15             THE COURT:  And if it doesn't create a
16      heightened pleading standard, then it seems to me
17      it's procedural and it also doesn't apply.
18             MS. ISAAK:  Well, yes, sir --
19             THE COURT:  But either way, it seems to me the
20      statute just doesn't apply in federal court.
21             MS. ISAAK:  Yes, sir, that's what we
22      submitted, it does not apply.  Between, we have
23      Rule 8 --
24             THE COURT:  May I ask a follow-up question on
25      that?  I'm not sure I understand that.  So if it
```

1          is - if it doesn't impose a heightened pleading

2          standard, why isn't it just a fee-shifting statute?

3               MS. ISAAK:  Well, there is case law that says

4          it's just a fee-shifting standard.  It says that.

5               THE COURT:  Okay.  Well, if it's just a

6          fee-shifting statute as part of the tort of

7          defamation in Florida law, why isn't that something

8          that applies in federal court?

9               MS. ISAAK:  Because we're dealing I think

10         specifically with anti-SLAPP as it pertains to this

11         issue, so I --

12              THE COURT:  Okay.

13              THE COURT:  Well, I mean, here's the thing.

14         This is the text of the statute - the court shall

15         award the prevailing party reasonable attorney's

16         fees and costs incurred in connection with a claim

17         that an action was filed in violation of this

18         section --

19              MS. ISAAK:  Yes, sir.

20              THE COURT:  -- right?

21              MS. ISAAK:  Yes, sir.

22              THE COURT:  And the section says - sets out,

23         basically, a procedural requirement, right --

24              MS. ISAAK:  Yes, sir.

25              THE COURT:  -- and says you can't file it if

```
1        the suit's without merit and if it was filed

2        because someone exercised their free speech rights.

3             MS. ISAAK:  That's correct, so the court would

4        have to make a finding that that's specifically why

5        that was --

6             THE COURT:  Filed.

7             MS. ISAAK:  -- filed, right, which conflicts

8        with Rule 8.  The Rule 8 pleading requirements

9        don't have that level of a standard.  And also, for

10       the Rule 11, Rule 11 covers all of these things

11       already.

12            THE COURT:  Okay, I think we understand your

13       argument.

14            THE COURT:  Can you just address the issue of

15       certification?  I know we sent you some questions

16       to address, one is whether we should certify this

17       question to the Florida Supreme Court.  We've

18       already talked about the split in the intermediate

19       appellate courts.  I just want to get your position

20       on that.

21            MS. ISAAK:  It's a quick no.  I don't think

22       that it needs to be certified to the Florida

23       Supreme Court, because the federal rules are clear

24       that there are other avenues for recovery and there

25       are other avenues for dismissal of cases.
```

17

```
 1           So I think, based upon the federal case law,
 2      and based upon the procedure that's in place for
 3      the federal court, I don't think this is
 4      necessarily an issue for the state court to decide.
 5      This -- Go ahead.
 6           THE COURT:  Okay.  Mr. Lerner.
 7           MR. LERNER:  Thank you, Your Honors.  May it
 8      please the Court, my name is Mark Lerner and I'm
 9      here with my colleague, Julian Jackson-Fannin, and
10      we represent the appellees, Newsmax Media, Inc.,
11      Christopher Ruddy, John Bachman, and John Cardillo.
12           This case is a public figure's groundless
13      attempt to punish a media outlet for engaging in
14      classic First Amendment protected activity because
15      he didn't like what a guest, and only the guest,
16      said about him on a live television broadcast.
17           As it did in Michel v. NYP Holdings, and
18      numerous other cases, this Court should recognize
19      the powerful interest in ensuring that speech is
20      not burdened by the defense of groundless
21      litigation and affirm the decision of the District
22      Court in its entirety.
23           The facts here, which I think you're familiar
24      and discussed a little bit before --
25           THE COURT:  We know the facts --
```

```
 1            MR. LERNER:  Okay.

 2            THE COURT:  -- and if you want to address

 3       whether the complaint plausibly alleges actual

 4       malice, you certainly can.  I don't think it does.

 5            The thing I'm most interested, at least - I

 6       can only speak for myself - is the attorney's fees

 7       issue, and I have serious doubts about whether the

 8       anti-SLAPP statute applies in federal court.  And

 9       it seems to me that if it doesn't, then a suit

10       filed in violation of it can't give rise to an

11       attorney's fee award.

12            MR. LERNER:  I'm certainly happy to address

13       the actual malice issue, although we agree,

14       obviously, with Your Honor and with some of the

15       skepticism addressed by the panel.  So if there

16       aren't questions on the actual malice, I am happy

17       to move on to the questions that seem to be of more

18       interest in terms of the application of anti-SLAPP

19       in this case.

20            THE COURT:  Let me ask you, before you get

21       into the legal merits of the anti-SLAPP, do you

22       really want attorney's fees in this case?  Do you

23       want this case to continue with additional

24       litigation?  I mean, is that, I mean --

25            MR. LERNER:  Well, certainly, as I said
```

```
 1      before, Newsmax is hoping and the individual

 2      defendants who didn't utter any of the allegedly

 3      defamatory statements don't want to be burdened by

 4      ongoing litigation.  On the other hand, they do

 5      believe it makes sense to take advantage and send

 6      the message that this kind of lawsuit chills the

 7      speech that they should be protected from.

 8          THE COURT:  Okay.

 9          MR. LERNER:  So, yeah, I mean, it makes sense

10      here that there is this fee-shifting that the

11      Florida legislature has determined is important in

12      this kind of case and that they --

13          THE COURT:  So the question, I guess --  The

14      reason I ask that sort of practical question is

15      that one of our options here would be to certify

16      this question to the Florida Supreme Court, which

17      would, if we were to do that, would continue the

18      litigation, right?  I mean, you would just - it

19      would just be another court, come back to us, we'd

20      rule again, go back to the District Court, all to

21      collect some kind of attorney's fees ward against

22      Mr. Corsi.  Do you want to do that?

23          MR. LERNER:  Well, there is a principal at

24      stake here and we agree, frankly, what little we do

25      agree with with Ms. Isaak in terms of her position
```

```
 1     that this doesn't need to be --

 2          THE COURT:  That it doesn't need to be

 3     certified.

 4          MR. LERNER:  Right, it doesn't need to be

 5     certified, exactly.  So there should be no

 6     continuation of litigation on that front, because

 7     all that was applied here, frankly, was

 8     Rule 12(b)(6).

 9          THE COURT:  We appreciate your confidence in

10     the 11th Circuit.  Thank you.

11          MR. LERNER:  Well, whether it's my confidence

12     in the 11th Circuit or a query as to whether or not

13     there really is a material issue of law that needs

14     to be addressed in order for the 11th Circuit to

15     rule on this issue, in this particular

16     circumstance, the case doesn't turn on the answer

17     to a material state law question because Florida

18     law doesn't directly impose, nor did the defendants

19     seek, a higher pleading standard here.

20          The court only ever cited application of

21     Rule 12(b)(6) and the federal pleading standards

22     under Iqbal and Twombly.  There was no burden

23     shifting undertaken, there was no heightened

24     standard applied, nor is, actually, one called for

25     in the language of the statute.
```

21

1          The language of the statute simply prohibits a

2     lawsuit brought without merit and it provides for a

3     person or entity may move the court for an order

4     dismissing the action or granting final judgment in

5     favor of that person.  The person or entity may

6     file a motion for summary judgment together with

7     supplemental affidavit.

8          I mean, this just repeats that, okay, the

9     procedure that's available to you under the federal

10    rules is available to you here.  You can file a

11    motion to dismiss, you can file a motion for

12    summary judgment.  It doesn't stay discovery like

13    some of the other cases do, anti-SLAPP laws do, it

14    doesn't impose --

15          THE COURT:  But then you would agree that

16    there's a split in authority among the DCAs about

17    what it does and what it doesn't do, wouldn't you?

18          MR. LERNER:  It's not a hundred percent clear

19    to me, honestly, Your Honor, in terms of what it

20    does or doesn't do as far as a heightened pleading

21    standard under the federal rules, right?

22          There's a question in terms of burden shifting

23    and how you determine whether or not the case at

24    issue falls under anti-SLAPP because there is a

25    statement of the case being related to an

1        abridgement of First Amendment rights.  And in

2        Gundel, there was a question of going outside the

3        pleadings in order to determine whether or not

4        there was a First Amendment issue.

5            As far as the determination of whether the

6        case has merit, I don't think that there's really

7        any indication that Lam and Gundel are clearly in

8        opposition.  That question ultimately wasn't

9        answered and again here certainly there was no

10       heightened pleading standard applied.  It was a

11       simple 12(b)(6) plausibility standard that was

12       applied.

13           And as Your Honor pointed out, Judge Pryor

14       said, it doesn't rise to that level.  There's just

15       no plausibility on the notion that a claim of

16       actual --

17           THE COURT:  I agree, I agree that if,

18       obviously, if there's no actual malice under the

19       regular pleading standards, that's it, but for

20       purposes of our decision on the attorney's fees

21       issue, I mean, there is a split in authority as to

22       whether there's a heightened pleading standard, is

23       there not?

24           MR. LERNER:  Again, I think the question of

25       the heightened pleading standard goes to the burden

1          as far as establishing that the case falls under

2          anti-SLAPP.  That's the most you could say as far

3          as where Gundel and Lam might be in opposition.

4          So, but, again, it's clear on its face here there

5          wasn't any dispute in this case.  There was no

6          heightened pleading standard, there was no --

7               THE COURT:  But if it doesn't fall under

8          anti-SLAPP you wouldn't be entitled to your fees

9          even in --  I mean, right?

10              MR. LERNER:  Yes, if it didn't fall under

11         anti-SLAPP, but, again, this is clear on its face

12         that the allegations of the complaint stated that

13         the basis for the defamation claim was a broadcast

14         from a media outlet that hosted a live public

15         forum.

16              There was nowhere else you had to look, there

17         was no heightened pleading, there was no

18         burden-shifting to say, well, plaintiffs met this

19         burden initially, now let's go to, sorry,

20         defendants met this burden initially, now let's go

21         to plaintiff to determine if they can establish

22         that in fact it doesn't fall under anti-SLAPP,

23         because I think the dispute in-between Gundel and

24         Lam in terms of is there that shifting, does the

25         plaintiff have to come forward now with evidence to

1          show that it doesn't fall under anti-SLAPP.

2              None of that is an issue here.  It is clear on

3          the face of the pleadings that this falls under

4          anti-SLAPP because it relates to the exercise of

5          First Amendment activity.  And because it falls

6          under anti-SLAPP, it is, as Judge Brasher said, a

7          garden variety, and then, frankly, Ms. Isaak said,

8          a garden variety fee-shifting.

9              And the court's ruling I think in Showen v.

10         Presti (phonetic) really should be controlling.

11         There the 11th Circuit held that Rule 11 addresses

12         punitive sanctions, not fee-shifting, and it

13         answers a different question from what Georgia

14         statute was there.  And the Georgia statute at

15         issue provided for compensatory damages for

16         frivolous suits, including attorney's fees, which

17         is much closer to Rule 11, right.  There's a

18         frivolousness question built into the Georgia law

19         and this court still applied that Georgia law,

20         saying that a state's law attorney's fee provision

21         are unequivocally substantive and then there's no

22         question that they should apply.

23             And this has been supported by the Supreme

24         Court numerous times as well, it says that Rule 11

25         sanctions are not fee-shifting provisions.

1       Sanctions under Rule 11 aren't tied to the outcome

2       of litigation.  The relevant inquiry is whether a

3       particular filing was well-founded, so the rule

4       only calls for an appropriate sanction and

5       attorney's fees aren't even mandated.

6           In Business Guides, the Supreme Court said

7       that the main objective of Rule 11 is not to reward

8       parties who are victimized by litigation, it's to

9       deter baseless filings and curb abuses and it

10      imposes an objective standard on those who sign

11      papers.  Rule 11 authorizes sanctions to prevent

12      repeated abuses, which may or may not be monetary

13      sanctions.

14          Florida, in contrast, enacted a policy to

15      prevent anti-SLAPP suits that would, among other

16      things, chill free speech, whether or not they're

17      frivolous.  Meritless doesn't necessarily equal

18      frivolous.  Under Florida 768.295 --

19          THE COURT:  But there's something, right,

20      there's something --  So I guess what you're

21      saying, because I asked your friend on the other

22      side this question, is you have to have without

23      merit and primarily because the party exercised its

24      First Amendment rights, right?

25          MR. LERNER:  Yes.

1          THE COURT:  And so your friend on the other

2     side says the part that says primarily - it was

3     filed primarily because the party exercised its

4     First Amendment rights is necessarily the

5     equivalent of saying that it was filed for an

6     improper purpose.  And so your position I guess has

7     to be it's not, is that right?

8          MR. LERNER:  That's right.  I mean, you know,

9     there may be some incidental overlap, as the courts

10    have talked about, that where a rule is procedural

11    if it affects a substantive right and here, you

12    know, it's that substantive right that the Florida

13    courts have said you can be free from a suit of

14    defamation that impinges free speech rights and

15    that should result in fee-shifting if it's without

16    merit.

17         THE COURT:  I guess, you know, a lot of, I

18    think even your Rule 11 argument goes to the

19    definition of the phrase without merit, right?  I

20    mean, you read without merit to say you lose the

21    lawsuit, that's a lawsuit without merit.  It seems

22    like maybe you could also read it to be something a

23    little bit different to impose some kind of

24    heightened standard.

25         I guess, how do we answer --  It seems like we

1 have to answer that question before we get to the

2 Rule 11 issue, right?  We have to decide what the

3 standard is before we can decide whether this

4 conflicts with Rule 11?

5  MR. LERNER:  Well, again, I mean, you know, in

6 order to determine whether the fee-shifting

7 applies, right, as Your Honors have pointed out,

8 you do have to determine whether anti-SLAPP

9 applies, and for it to apply it has to be an action

10 that was primarily filed because a person or entity

11 exercised the constitutional right of free speech,

12 but that doesn't implicate a heightened pleading

13 standard under the federal rules or Iqbal/Twombly.

14  THE COURT:  Your argument is that it also

15 isn't about whether it's an improper purpose, it's

16 just really an inquiry into was this a lawsuit

17 about someone speaking?

18  MR. LERNER:  Correct, right, that the focus of

19 Rule 11 in terms of curbing abuses in the court and

20 protecting the integrity of the court and making

21 sure that pleadings that are filed are signed

22 knowing that there are, you know, a factual and

23 legal basis that aren't frivolous is protecting the

24 integrity of the system, whereas the Florida

25 Statute, as Your Honor pointed out, is simply a

1           question of is this what this case is about.

2                THE COURT:  But it's got to be more than just

3           the fact that the case involves First Amendment

4           issues, right?  Because it says it was filed

5           primarily because of that.  I mean, so there has to

6           be - it has to mean something more, otherwise it

7           would just say and the case involved the exercise

8           of First Amendment rights, right?

9                MR. LERNER:  Well, primarily, I mean, there's

10          a standard of, you know, is the primary basis for

11          this the exercise of First Amendment rights.

12               THE COURT:  When I read that, I wondered

13          whether that meant you might have joinder of a lot

14          of claims.

15               MR. LERNER:  Exactly, and it's --

16               THE COURT:  And you might have some weird like

17          consumer fraud or, you know, allegation or

18          something like that, but the thrust of the suit was

19          about someone just as a "but for" kind of matter

20          was about them exercising speech rights.

21               MR. LERNER:  That's exactly right.

22               THE COURT:  I mean, that could certainly be

23          the case.  You know, that's certainly one

24          reasonable way of looking at it, but could it also

25          reasonably be the case that it means something

1   else; that, you know, that it was filed sort of in

2   retaliation, which is what your friend on the other

3   side says, which is kind of different, right?

4   Because then, then, if that's the meaning of it,

5   then it's assuming an improper purpose, right?

6      MR. LERNER:  I mean, again, it depends on your

7   notion of what an improper purpose is, which gets

8   you to the question of Rule 11.

9      THE COURT:  I mean, you can't --  I think it

10  would be an improper purpose to file a suit without

11  merit because you're trying to get back at someone

12  for saying things you don't like.  Why would that

13  not be an improper purpose?

14     MR. LERNER:  It may be an improper purpose

15  but, again, not necessarily under the rubric of

16  Rule 11, which I think is aimed at a different kind

17  of relief.  And, again, Rule 11 is kind of - the

18  sanctions that it provides for are prospective

19  sanctions.  They're not retrospective

20  compensatory --

21     THE COURT:  Even so, I mean, obviously, it's

22  just, talking off the top of my head, it seems to

23  me like a court that finds that there is a

24  meritless suit that's been filed and it's been

25  filed solely because the person is trying to get

30

```
 1          back at someone and inflict costs on someone for

 2          exercising their First Amendment rights in a way

 3          that they didn't like, that that would be an

 4          improper purpose.  I mean, I can't imagine - it's

 5          hard for me to imagine that a court would find that

 6          that was a proper purpose.  Do you disagree?

 7              MR. LERNER:  Yeah, I understand your position,

 8          Your Honor, that it may be an improper purpose, but

 9          that doesn't necessarily mean that the fee-shifting

10          under anti-SLAPP, and if this is a garden variety

11          fee-shifting, as Judge Brasher is suggesting, that

12          this court regularly recognizes, then it still

13          applies in federal court.  I mean, it is a garden

14          variety fee-shifting, because, unlike Rule 11,

15          again, which is prospective --

16              THE COURT:  I'm sorry, but that's kind of a

17          different issue, right?  I mean, you're, I mean,

18          maybe you're saying it's not a different issue,

19          you're saying it doesn't even matter.  Let's assume

20          it was for an improper purpose, it still doesn't

21          cross over completely with Rule 11, because in

22          Rule 11 we're trying to deter this kind of bad

23          conduct, whereas with this anti-SLAPP statute,

24          although I think that's also trying to deter this

25          kind of bad conduct, we're trying to compensate
```

1      someone for having to have to deal with this,

2      although I think under Rule 11 you'd find that,

3      even though it's to deter the conduct, that

4      oftentimes the punishments that will be imposed

5      would be imposed in such a way that you're

6      essentially making whole the party that had the

7      improper purpose inflicted upon them.

8           MR. LERNER:  I seem out of time, but I'm happy

9      to --

10          THE COURT:  You may continue to speak, and

11     I've got a question for you.

12          MR. LERNER:  I hear everything and acknowledge

13     all of that, but I think that there's still

14     daylight there; that, yes, it may be for an

15     improper purpose, and it's possible that Rule 11

16     award in certain circumstances may have the effect

17     incidentally of compensating somebody, but that

18     still doesn't mean that it's, you know, the central

19     question is the same and the compensation for

20     having been burdened with this kind of suit, even,

21     you know, a suit for an improper purpose, is a

22     different question.  The compensation question

23     is --

24          THE COURT:  Let me ask you this.

25          MR. LERNER:  -- different than a deterrence

```
 1        question.

 2             THE COURT:  Let me ask you, is there anything

 3        in the text of this statute that requires a court

 4        to determine the purpose or motive behind why a

 5        lawsuit was filed?

 6             MR. LERNER:  Well, only if Your Honors read --

 7             THE COURT:  Well, let's just read the words

 8        and --  I mean, is there anything in the words that

 9        says that a court has to determine the purpose

10        behind a lawsuit to apply the anti-SLAPP?

11             MR. LERNER:  The word purpose is not in there,

12        right.  The question is whether it was filed

13        against another person or entity without merit and

14        primarily because such person has exercised the

15        constitutional right of free speech.

16             THE COURT:  Yeah, and it's really whether that

17        is - that primarily "because of" language is just

18        "but for" kind of stuff, right, or whether it's

19        imposing some kind of retaliatory standard, right?

20        And it's just --  The question I was going to ask

21        you about that is are you aware of any Florida case

22        law that addresses that question?

23             MR. LERNER:  I am not, Your Honor.

24             THE COURT:  Okay.  Is that another reason why

25        we ought to certify it?
```

```
 1                    MR. LERNER:  I don't think so, Your Honor.

 2              I appreciate your time this morning,

 3         Your Honors.

 4              THE COURT:  How much money are you trying to

 5         get in attorney's fees?

 6                    MR. LERNER:  Well, that's the subject of a

 7         separate appeal, actually, already.

 8              THE COURT:  Okay.

 9                    MR. LERNER:  I mean, right now there is a

10         judgment for $50,000.

11              THE COURT:  Fifty thousand dollars?

12                    MR. LERNER:  I mean, approximately.  It's a

13         little bit less than that.

14              THE COURT:  Are you sure you want to go to the

15         Florida Supreme Court, come back here, maybe go

16         back to the District Court, do all that just to try

17         to get $50,000?

18                    MR. LERNER:  Well, again, no, we don't want to

19         go to the Supreme Court to do all that because

20         we're hoping Your Honors will affirm the decision

21         in its entirety as we've requested today.

22              THE COURT:  All right.

23                    MR. LERNER:  We thank you for your time.

24              THE COURT:  Ms. Isaak, you've got five

25         minutes.
```

34

```
 1           MS. ISAAK:  Yes, sir.  In the Carbone case, I
 2      think the court properly referenced the Abbas case,
 3      and in the Carbone case the court said that Federal
 4      Rules of Civil Procedure 12 and 56 answer the same
 5      question about the circumstance under which a court
 6      must dismiss a case before trial.
 7           The Abbas case talks about an order granting a
 8      special motion to dismiss under the anti-SLAPP act.
 9      The court may grant attorney's fees and costs to
10      the prevailing party.  The act does not purport to
11      make attorney's fees available to parties who
12      obtained dismissal by other means, such as Federal
13      Rule 12(b)(6), such as what we have in this case.
14      Therefore we conclude that the case should be
15      dismissed under 12(b)(6), attorney's fees under the
16      anti-SLAPP statute are not available to the
17      defendants in this case.  It's our position that
18      anti-SLAPP does not apply, period - does not apply.
19           And as far as the argument, Your Honors, that
20      the statute says that it was filed primarily
21      because of someone exercising the First Amendment
22      rights, this case was filed because Jerome Corsi
23      was in fact injured by statements that he could
24      prove to be false.  This case was not filed, nor
25      was there a finding that this case was filed,
```

35

```
 1        primarily for the purpose of infringing on

 2        someone's First Amendment rights.

 3             THE COURT:  Now, don't say purpose; it's

 4        because of, right?

 5             MS. ISAAK:  Because of, yes.

 6             THE COURT:  Because of someone's exercise of

 7        First Amendment rights --

 8             MS. ISAAK:  Yes.

 9             THE COURT:  -- right?

10             MS. ISAAK:  Yes.

11             THE COURT:  I mean, you filed it because of

12        the exercise of First Amendment rights, right?

13             MS. ISAAK:  Filed it because he was damaged by

14        a provable - provably false, because the

15        statements --

16             THE COURT:  Well, you filed it because of

17        speech, someone's speech on a news show on TV.

18             THE COURT:  I mean, defamation is speech.

19             MS. ISAAK:  Defamation is speech, but

20        defamatory statements are not protected speech and

21        that is why this was filed.  There was nothing --

22             THE COURT:  If you find that the claim of

23        defamation is without merit, then you're left with

24        it being speech and it is protected, right?

25             MS. ISAAK:  Well, I understand that, sir, but
```

36

```
1        if this - we believe if this case was allowed to go

2        to the discovery phase, perhaps we would have had a

3        different result.

4              THE COURT:  I understand that.

5              MS. ISAAK:  But I don't think that there can

6        be --

7              THE COURT:  Let's assume for just the sake of

8        the argument you're going to lose on whether there

9        was a plausible allegation of actual malice.

10              MS. ISAAK:  Okay.

11              THE COURT:  Okay?

12              MS. ISAAK:  Okay.

13              THE COURT:  Then where are we?

14              MS. ISAAK:  Well, if we lose that there was a

15        plausible allegation of actual malice, then I guess

16        we're stuck with the 12(b)(6) dismissal.  However,

17        the attorney's fees provision in the District Court

18        was awarded pursuant to the Florida anti-SLAPP

19        statute, does not apply in this case, it does not

20        apply in federal court, and that is our position

21        there.

22              I think the federal courts have been clear,

23        even though there's been a split in the circuit,

24        there's - that it does not, it does not apply in

25        federal court.  And we go to the case, the Georgia
```

```
 1        case, the Carbone case, Georgia's anti-SLAPP
 2        statute --
 3             THE COURT:  I mean, none of these cases, not
 4        Carbone, none of them have to do with an award of
 5        attorney's fees.
 6             MS. ISAAK:  I understand that, but it has to
 7        do with the applicability of the anti-SLAPP --
 8             THE COURT:  We apply state laws that provide
 9        for an award of attorney's fees for claims that
10        arise under state law --
11             MS. ISAAK:  Yes, sir.
12             THE COURT:  -- or fail under state law all the
13        time, right?
14             MS. ISAAK:  Yes, sir.
15             THE COURT:  So why wasn't the District Court
16        to award --  Why was the District Court wrong to
17        award the fees here?
18             MS. ISAAK:  Because they awarded the fees
19        pursuant to the anti-SLAPP statute, the Florida
20        anti-SLAPP statute, and that's why this is wrong.
21             Not only --  Of course, we contend that the
22        anti-SLAPP statute has no place in federal court,
23        it should not be applied in federal court, but,
24        even if it was, they did not follow their own
25        statute, which says it required a hearing.  So
```

1        there is a higher evidentiary burden for the

2        Florida SLAPP statute that is not - that does not

3        apply in federal court.

4            THE COURT:  And where do you get the idea --

5        I mean, where in the text of the statute does the

6        idea that there's a higher evidentiary burden come

7        from?

8            MS. ISAAK:  Because upon the filing of a

9        dismissal under the Florida anti-SLAPP statute, and

10       before the assessment of attorney's fees, a hearing

11       must be scheduled.  It says "shall".  That is not

12       something that is optional, so --

13           THE COURT:  Yeah, but, I mean, but wouldn't

14       you have to have a hearing to assess the attorney's

15       fees?  I mean, couldn't you apply 12(b)(6) for a

16       motion for summary judgment, Rule 56, whatever, to

17       the issue of merit?

18           Of course you have to have a hearing to assess

19       attorney's fees.  I mean, you can't, you know, just

20       magic come out of the air, you have to determine

21       what the attorney's fees are, that kind of stuff.

22       Why does that impose --  The idea of having a

23       hearing, why does that say that there's a

24       heightened evidentiary standard on the issue of

25       whether there's merit or not?

```
1              MS. ISAAK:  I guess because the statute --
2        The statute, there has to be a showing that there
3        is a violation of the anti-SLAPP statute, that this
4        was filed primarily for - because someone exercised
5        free speech.
6              And I understand what you're saying, Judge, I
7        do.  I think there's a difference here that there
8        has to be a showing of that, but also --
9              THE COURT:  It seems to me it's just
10       uncontested that this is a speech case.
11             MS. ISAAK:  Well, I would say it's --
12             THE COURT:  I mean, the suit's about
13       someone --
14             MS. ISAAK:  A defamation?
15             THE COURT:  -- speaking, right?  It's a
16       defamation suit, that's all it's about, and if it's
17       without merit, if the claim of defamation is
18       without merit, it was filed primarily because
19       someone exercised their right to speak.
20             MS. ISAAK:  I understand what you're saying,
21       Judge, and Dr. Corsi was in fact damaged by
22       provably false statements and it's his position
23       that they are defamatory and at the very least he
24       should have been allowed to go to the discovery
25       phase and I don't even think there was an
```

1       opportunity to amend pleadings.

2           THE COURT:  Okay.  I think we understand your

3       case, MS. ISAAK.  And you've gone over, but you've

4       been answering questions from us, so we're going to

5       move to our last case.

6           MS. ISAAK:  Okay.

7           THE COURT:  Thank you.

8           (The audio concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3

4    STATE OF FLORIDA

5    COUNTY OF MIAMI-DADE

6

7         I, Gail Hmielewski, Court Stenographer, do hereby

8    certify that the foregoing transcript, Pages 1 to and

9    including 40, is a true and correct transcript of an

10   audio recording that was provided to me of court

11   proceedings.

12

13        The audio recording was provided to me by Larry E.

14   Klayman, Esquire, and transcribed to the best of my

15   ability.

16

17        Dated this 2nd day of June, 2022.

18

19

20

21   _____

22   Gail Hmielewski, Court Stenographer

23

24

25

**A**

Abbas 34:2,7
ability 41:15
able 8:2
abridgement 22:1
absolutely 9:5
abuses 25:9,12 27:19
acknowledge 31:12
act 12:16 34:8 34:10
action 4:24 11:13 15:17 21:4 27:9
activity 17:14 24:5
actual 4:20,23 5:2,12 18:3,13 18:16 22:16,18 36:9,15
additional 18:23
address 16:14 16:16 18:2,12
addressed 18:15 20:14
addresses 24:11 32:22
advanced 8:9
advantage 19:5
affidavit 5:20 21:7
affirm 17:21 33:20
agree 18:13 19:24,25 21:15 22:17,17
ahead 17:5
aimed 29:16
air 38:20
al 1:7
Alabama 2:5
allegation 5:9 28:17 36:9,15
allegations 5:11

5:15,23 6:18 8:2 23:12
allege 5:2,19 6:7
alleged 5:1,12 7:4
allegedly 19:2
alleges 18:3
allow 10:18
allowed 7:25 36:1 39:24
allows 11:23
amend 40:1
Amendment 9:24 10:11 11:5 17:14 22:1,4 24:5 25:24 26:4 28:3,8,11 30:2 34:21 35:2,7 35:12
America 6:22
and/or 10:6
answer 12:13 20:16 26:25 27:1 34:4
answered 22:9
answering 40:4
answers 24:13
anti-SLAPP 4:15 8:13,15 9:20 10:14 11:2 12:8,11 13:17,19,22 15:10 18:8,18 18:21 21:13,24 23:2,8,11,22 24:1,4,6 25:15 27:8 30:10,23 32:10 34:8,16 34:18 36:18 37:1,7,19,20 37:22 38:9 39:3
ANTONY 2:15
anyway 10:10
appeal 33:7
APPEALS 1:1

APPEARAN... 2:1
Appeared 2:3,9
Appellant 1:5 2:3
appellate 16:19
appellees 1:8 2:9 17:10
applicability 37:7
application 18:18 20:20
applied 8:16 20:7,24 22:10 22:12 24:19 37:23
applies 8:13 9:2 9:16 12:20 15:8 18:8 27:7 27:9 30:13
apply 4:16 8:15 8:24 9:12 11:14 12:2 14:13,17,20,22 24:22 27:9 32:10 34:18,18 36:19,20,24 37:8 38:3,15
appreciate 20:9 33:2
appropriate 25:4
approximately 33:12
arguing 4:10
argument 1:13 11:8 16:13 26:18 27:14 34:19 36:8
asked 25:21
assess 38:14,18
assessed 8:20 13:21
assessment 38:10
associated 13:10
assume 30:19

36:7
assuming 29:5
attempt 17:13
attorney 6:21
attorney's 8:11 9:4,11 10:17 10:19 11:21 12:2,14,17,18 15:15 18:6,11 18:22 19:21 22:20 24:16,20 25:5 33:5 34:9 34:11,15 36:17 37:5,9 38:10 38:14,19,21
audio 1:12 40:8 41:10,13
authority 21:16 22:21
authorizes 25:11
available 21:9 21:10 34:11,16
Avenue 2:11
avenues 16:24 16:25
award 9:11 15:15 18:11 31:16 37:4,9 37:16,17
awarded 9:21,22 36:18 37:18
aware 7:6 32:21

**B**

B 9:23
Bachman 17:11
back 19:19,20 29:11 30:1 33:15,16
bad 30:22,25
based 9:4,7,11 17:1,2
baseless 25:9
basically 9:20 15:23
basis 23:13 27:23 28:10

believe 7:24 19:5 36:1
believes 8:1,8
best 41:14
beyond 5:6
Biscayne 2:16
bit 17:24 26:23 33:13
books 5:7 6:6
Boulevard 2:16
Box 2:5
boy 4:3
Brasher 24:6 30:11
broadcast 17:16 23:13
brought 21:2
built 24:18
burden 13:13 20:22 21:22 22:25 23:19,20 38:1,6
burden-shifting 23:18
burdened 17:20 19:3 31:20
burdens 12:9
Business 25:6

**C**

C 41:1,1
called 5:15 6:9 20:24
calling 10:20
calls 25:4
captures 10:4
Carbone 34:1,3 37:1,4
Cardillo 17:11
case 1:2 4:11 8:8 8:16 13:21 15:3 17:1,11 18:19,22,23 19:12 20:16 21:23,25 22:6 23:1,5 28:1,3,7 28:23,25 32:21

34:1,2,3,6,7,13
34:14,17,22,24
34:25 36:1,19
36:25 37:1,1
39:10 40:3,5
**cases** 10:15 12:1
  16:25 17:18
  21:13 37:3
**causes** 11:13
**central** 31:18
**certain** 31:16
**certainly** 18:4
  18:12,25 22:9
  28:22,23
**CERTIFICATE**
  3:5
**certification**
  16:15
**certified** 16:22
  20:3,5
**certify** 16:16
  19:15 32:25
  41:8
**character** 5:5
**chill** 25:16
**chills** 19:6
**Christopher**
  17:11
**circuit** 1:1 20:10
  20:12,14 24:11
  36:23
**circumstance**
  20:16 34:5
**circumstances**
  31:16
**cited** 20:20
**Civil** 34:4
**claim** 12:15
  15:16 22:15
  23:13 35:22
  39:17
**claims** 28:14
  37:9
**classic** 17:14
**clear** 16:23
  21:18 23:4,11
  24:2 36:22

**clearly** 22:7
**closer** 24:17
**colleague** 17:9
**collect** 19:21
**come** 19:19
  23:25 33:15
  38:6,20
**committed** 6:10
**common** 11:10
**compare** 9:16
**compensate**
  30:25
**compensating**
  31:17
**compensation**
  31:19,22
**compensatory**
  24:15 29:20
**complaint** 5:19
  8:3 18:3 23:12
**completely**
  30:21
**complied** 4:18
**concern** 8:24
**concert** 8:6
**conclude** 34:14
**concluded** 40:8
**conduct** 30:23
  30:25 31:3
**confidence** 20:9
  20:11
**conflict** 12:4,6
  14:1
**conflicts** 14:12
  16:7 27:4
**connection**
  15:16
**considered**
  12:21
**conspiracy** 5:16
  5:18
**constitutional**
  27:11 32:15
**consumer** 28:17
**contend** 8:14
  37:21
**continuation**

20:6
**continue** 18:23
  19:17 31:10
**contrast** 25:14
**controlling**
  24:10
**correct** 9:6,13
  9:13,18,25
  10:1 14:8,10
  16:3 27:18
  41:9
**Corsi** 1:4 4:2,8
  5:4,16,21 6:1,1
  6:5,5,7 7:23
  8:1,4,7 19:22
  34:22 39:21
**Corsi's** 5:7,15
  6:21
**costs** 15:16 30:1
  34:9
**counsel** 6:23
**counterpoint**
  6:17
**COUNTY** 41:5
**course** 8:17
  37:21 38:18
**court** 1:1,24 4:2
  4:6,7,13,14,16
  4:19,20,25 6:2
  6:14 7:13,20
  8:10,22,25 9:3
  9:7,10,12,15
  9:19 10:2,9,22
  11:7,14,25
  12:2,13,22,24
  13:2,15 14:1,5
  14:9,11,15,19
  14:20,24 15:5
  15:8,12,13,14
  15:20,22,25
  16:3,6,12,14
  16:17,23 17:3
  17:4,6,8,18,22
  17:25 18:2,8
  18:20 19:8,13
  19:16,19,20
  20:2,9,20 21:3

21:15 22:17
  23:7 24:19,24
  25:6,19 26:1
  26:17 27:14,19
  27:20 28:2,12
  28:16,22 29:9
  29:21,23 30:5
  30:12,13,16
  31:10,24 32:2
  32:3,7,9,16,24
  33:4,8,11,14
  33:15,16,19,22
  33:24 34:2,3,5
  34:9 35:3,6,9
  35:11,16,18,22
  36:4,7,11,13
  36:17,20,25
  37:3,8,12,15
  37:15,16,22,23
  38:3,4,13 39:9
  39:12,15 40:2
  40:7 41:7,10
  41:22
**court's** 24:9
**Courtroom** 1:17
**courts** 14:2
  16:19 26:9,13
  36:22
**covers** 10:15,17
  16:10
**create** 14:6,15
**creates** 11:13
**crimes** 7:4
**cross** 30:21
**curb** 25:9
**curbing** 27:19

**D**

**damaged** 35:13
  39:21
**damages** 24:15
**DATE** 1:16
**Dated** 41:17
**day** 41:17
**daylight** 31:14
**DCA** 14:5
**DCAs** 21:16

**deal** 12:8,9 31:1
**dealing** 15:9
**debate** 6:24,25
  7:10
**deceptive** 12:16
**decide** 17:4 27:2
  27:3
**decision** 17:21
  22:20 33:20
**defamation** 4:24
  6:12 11:17
  15:7 23:13
  26:14 35:18,19
  35:23 39:14,16
  39:17
**defamatory** 19:3
  35:20 39:23
**defame** 8:7
**defendants** 5:4
  5:15,22 6:23
  19:2 20:18
  23:20 34:17
**defense** 17:20
**definition** 26:19
**depends** 29:6
**destroy** 6:11
**deter** 25:9 30:22
  30:24 31:3
**determination**
  22:5
**determine** 21:23
  22:3 23:21
  27:6,8 32:4,9
  38:20
**determined**
  19:11
**deterrence**
  31:25
**difference** 39:7
**different** 12:1
  24:13 26:23
  29:3,16 30:17
  30:18 31:22,25
  36:3
**directly** 7:7
  10:14 20:18
**disagree** 30:6

discovery 8:1,9
21:12 36:2
39:24
discredit 6:11
discussed 7:1
17:24
dismiss 21:11
34:6,8
dismissal 16:25
34:12 36:16
38:9
dismissed 4:12
13:21 34:15
dismissing 21:4
dispose 10:15
dispute 23:5,23
distribution
4:14
District 4:12,14
17:21 19:20
33:16 36:17
37:15,16
dollars 33:11
doubts 5:8 8:12
18:7
Dr 8:7 39:21
DUANE 2:10,15

E

E 41:1,1,13
effect 31:16
either 14:19
ELEVENTH
1:1
enacted 25:14
engaging 17:13
ensuring 17:19
entering 6:25
entertained 5:8
entirety 17:22
33:21
entitled 12:17
12:18 23:8
entity 21:3,5
27:10 32:13
equal 25:17
equivalent 26:5

Esquire 2:4,10
2:15 41:14
essentially 31:6
establish 23:21
establishing
23:1
et 1:7
evidence 13:25
23:25
evidentiary
13:13 38:1,6
38:24
exactly 20:5
28:15,21
exercise 11:1
24:4 28:7,11
35:6,12
exercised 9:24
10:11 16:2
25:23 26:3
27:11 32:14
39:4,19
exercising 28:20
30:2 34:21

F

F 41:1
face 23:4,11
24:3
fact 5:3,7 6:2,4
6:25 8:5 23:22
28:3 34:23
39:21
facts 17:23,25
factual 27:22
fail 37:12
Fairbanks 5:4
7:6,19,20
fall 10:14 23:7
23:10,22 24:1
falls 21:24 23:1
24:3,5
false 5:25 6:8
34:24 35:14
39:22
familiar 8:5
17:23

far 21:20 22:5
23:1,2 34:19
favor 21:5
Fax 2:6,12,17
federal 1:18
4:16 8:25 9:12
11:14,22,22
12:2 14:12,20
15:8 16:23
17:1,3 18:8
20:21 21:9,21
27:13 30:13
34:3,12 36:20
36:22,25 37:22
37:23 38:3
fee 4:13,13 8:11
9:4,11,19
12:14 18:11
24:20
fee-shifting 8:18
11:11,12,14,16
11:20 12:5
15:2,4,6 19:10
24:8,12,25
26:15 27:6
30:9,11,14
fees 8:19 9:21,21
10:17,19 11:18
11:21 12:2,17
12:18 13:9,20
15:16 18:6,22
19:21 22:20
23:8 24:16
25:5 33:5 34:9
34:11,15 36:17
37:5,9,17,18
38:10,15,19,21
Fifty 33:11
figure 4:22,24
9:15
figure's 17:12
file 11:16 15:25
21:6,10,11
29:10
filed 9:23 10:7
10:10,12 11:3
15:17 16:1,6,7

18:10 26:3,5
27:10,21 28:4
29:1,24,25
32:5,12 34:20
34:22,24,25
35:11,13,16,21
39:4,18
filing 10:25 25:3
38:8
filings 25:9
final 21:4
find 30:5 31:2
35:22
finding 16:4
34:25
finds 29:23
FIRM 2:4
First 8:16 9:24
10:11 11:4
17:14 22:1,4
24:5 25:24
26:4 28:3,8,11
30:2 34:21
35:2,7,12
five 33:24
Floor 1:17
Florida 1:19
2:16 8:17,18
8:23 11:2,20
11:22 13:12,17
13:19,22 14:2
15:7 16:17,22
19:11,16 20:17
25:14,18 26:12
27:24 32:21
33:15 36:18
37:19 38:2,9
41:4
Florida's 4:15
12:10
focus 27:18
follow 12:24
37:24
follow-up 14:24
foregoing 41:8
forum 23:15
forward 23:25

Fourth 1:18
frankly 19:24
20:7 24:7
fraud 6:10 28:17
free 10:25 11:4
16:2 25:16
26:13,14 27:11
32:15 39:5
friend 25:21
26:1 29:2
frivolous 24:16
25:17,18 27:23
frivolousness
24:18
front 20:6

G

Gail 1:24 41:7
41:22
garden 8:17
12:11 24:7,8
30:10,13
general 12:3
Georgia 24:13
24:14,18,19
36:25
Georgia's 37:1
getting 13:16
give 7:21 18:10
given 7:11,20
gives 11:20
go 17:5 19:20
23:19,20 33:14
33:15,19 36:1
36:25 39:24
goes 13:12 22:25
26:18
going 7:7,12
22:2 32:20
36:8 40:4
Good 4:4,5
grant 34:9
granting 21:4
34:7
gripe 7:14
groundless
17:12,20

**guess** 7:16,18 10:5 11:8 19:13 25:20 26:6,17,25 36:15 39:1
**guest** 17:15,15
**Guides** 25:6
**Gundel** 22:2,7 23:3,23

**H**
**hand** 14:5 19:4
**happy** 18:12,16 31:8
**hard** 7:17 30:5
**head** 29:22
**hear** 31:12
**hearing** 8:20 13:23,23 37:25 38:10,14,18,23
**heightened** 12:9 13:11,15,17 14:6,16 15:1 20:23 21:20 22:10,22,25 23:6,17 26:24 27:12 38:24
**held** 24:11
**higher** 20:19 38:1,6
**Hmielewski** 1:24 41:7,22
**Holdings** 17:17
**honestly** 21:19
**Honor** 18:14 21:19 22:13 27:25 30:8 32:23 33:1
**Honors** 4:11 6:20 17:7 27:7 32:6 33:3,20 34:19
**hoping** 19:1 33:20
**host** 7:21
**hosted** 23:14
**hundred** 21:18

**hurdle** 4:23

**I**
**idea** 13:16 38:4 38:6,22
**image** 12:12
**imagine** 30:4,5
**impinges** 26:14
**implicate** 27:12
**imply** 5:8
**important** 19:11
**impose** 13:4,8 15:1 20:18 21:14 26:23 38:22
**imposed** 13:12 31:4,5
**imposes** 13:17 25:10
**imposing** 32:19
**improper** 4:15 10:7,12,24 11:6 26:6 27:15 29:5,7 29:10,13,14 30:4,8,20 31:7 31:15,21
**in-between** 23:23
**incidental** 26:9
**incidentally** 31:17
**including** 24:16 41:9
**incurred** 15:16
**INDEX** 3:1
**indication** 22:7
**individual** 19:1
**inflict** 30:1
**inflicted** 31:7
**infringing** 11:4 35:1
**initially** 23:19 23:20
**injured** 34:23
**inquiry** 25:2 27:16

**integrity** 27:20 27:24
**interest** 17:19 18:18
**interested** 8:11 18:5
**intermediate** 16:18
**intimately** 6:4 8:4
**investigation** 7:3
**invited** 6:21
**involved** 28:7
**involves** 28:3
**involving** 7:3
**Iqbal** 20:22
**Iqbal/Twombly** 27:13
**Isaak** 2:4,4 4:4,5 4:7,8,22 5:14 6:4,20 7:23 8:14 9:1,5,8,13 9:18,25 10:8 10:13 11:2,19 12:7,19 13:1 13:11,19 14:4 14:8,10,14,18 14:21 15:3,9 15:19,21,24 16:3,7,21 19:25 24:7 33:24 34:1 35:5,8,10,13 35:19,25 36:5 36:10,12,14 37:6,11,14,18 38:8 39:1,11 39:14,20 40:3 40:6
**isaaklaw@gm...** 2:7
**issue** 7:12 8:12 15:11 16:14 17:4 18:7,13 20:13,15 21:24 22:4,21 24:2 24:15 27:2

30:17,18 38:17 38:24
**issues** 6:25 7:2 28:4

**J**
**Jackson-Fannin** 2:15 17:9
**James** 1:18
**Jerome** 1:4 4:8 34:22
**jjfannin@dua...** 2:18
**John** 17:11,11
**joinder** 28:13
**joint** 8:6
**Judge** 4:5 13:2 22:13 24:6 30:11 39:6,21
**judgment** 10:16 21:4,6,12 33:10 38:16
**Julian** 2:15 17:9
**June** 41:17
**justice** 1:18 7:5

**K**
**kind** 19:6,12,21 26:23 28:19 29:3,16,17 30:16,22,25 31:20 32:18,19 38:21
**King** 1:18
**Klayman** 6:20 6:24 7:1,5,11 41:14
**knew** 5:4
**know** 5:3,4,5,11 5:17,17,22,22 5:23 6:2,3,4,24 11:7 13:3,5 16:15 17:25 26:8,12,17 27:5,22 28:10 28:17,23 29:1 31:18,21 38:19

**knowing** 27:22

**L**
**L** 2:4
**Lam** 22:7 23:3 23:24
**language** 9:17 9:19,20 20:25 21:1 32:17
**Larry** 41:13
**law** 2:4 11:10,13 15:3,7 17:1 20:13,17,18 24:18,19,20 32:22 37:10,12
**Lawrence** 1:18
**laws** 21:13 37:8
**lawsuit** 10:25 11:17 19:6 21:2 26:21,21 27:16 32:5,10
**left** 35:23
**legal** 18:21 27:23
**legislature** 19:11
**legitimate** 7:14
**Lerner** 2:10 17:6,7,8 18:1 18:12,25 19:9 19:23 20:4,11 21:18 22:24 23:10 25:25 26:8 27:5,18 28:9,15,21 29:6,14 30:7 31:8,12,25 32:6,11,23 33:1,6,9,12,18 33:23
**let's** 23:19,20 30:19 32:7 36:7
**letter** 7:16
**level** 16:9 22:14
**liar** 6:1,9
**litigation** 17:21 18:24 19:4,18

20:6 25:2,8
**little** 17:24 19:24
  26:23 33:13
**live** 6:22 7:8
  17:16 23:14
**LLP** 2:10,15
**LOCATION**
  1:17
**look** 5:11 12:7
  23:16
**looking** 5:12
  10:2,3 28:24
**lose** 13:9 26:20
  36:8,14
**lot** 26:17 28:13
**lower** 4:18
**lured** 6:22

**M**

**ma'am** 10:8,8,13
**magic** 38:20
**main** 4:10 25:7
**making** 27:20
  31:6
**MALE** 7:19
**malerner@du...**
  2:13
**malice** 4:20,23
  5:2,12 18:4,13
  18:16 22:18
  36:9,15
**mandated** 25:5
**Mark** 2:10 17:8
**material** 20:13
  20:17
**matter** 4:9 12:3
  28:19 30:19
**mean** 5:3,5 6:14
  7:13,14 9:16
  10:12 11:25
  12:3 15:13
  18:24,24 19:9
  19:18 21:8
  22:21 23:9
  26:8,20 27:5
  28:5,6,9,22
  29:6,9,21 30:4

30:9,13,17,17
31:18 32:8
33:9,12 35:11
35:18 37:3
38:5,13,15,19
39:12
**meaning** 29:4
**means** 6:3 7:14
  10:15 28:25
  34:12
**meant** 28:13
**media** 1:7 4:2
  17:10,13 23:14
**Melissa** 2:4 4:8
**meriless** 10:20
**merit** 9:22 10:6
  16:1 21:2 22:6
  25:23 26:16,19
  26:20,21 29:11
  32:13 35:23
  38:17,25 39:17
  39:18
**meritless** 10:20
  10:25 11:16
  25:17 29:24
**merits** 13:6
  18:21
**message** 19:6
**met** 23:18,20
**Miami** 1:19 2:16
**MIAMI-DADE**
  41:5
**Michel** 17:17
**mind** 11:9
**minutes** 33:25
**mirror** 12:12
**monetary** 25:12
**money** 33:4
**Montgomery**
  2:5
**morning** 4:4,5
  33:2
**MORRIS** 2:10
  2:15
**motion** 4:12
  21:6,11,11
  34:8 38:16

**motive** 32:4
**move** 18:17 21:3
  40:5
**Mueller** 7:2

**N**

**name** 4:7 17:8
**necessarily** 17:4
  25:17 26:4
  29:15 30:9
**need** 20:1,2,4
**needs** 16:22
  20:13
**New** 2:11,11
**news** 35:17
**Newsmax** 1:7
  4:2 5:3,7 6:6
  6:21 7:15,17
  17:10 19:1
**Newsmax's** 7:20
**normal** 12:5
**Northeast** 1:18
**notice** 7:11
**notion** 22:15
  29:7
**numerous** 17:18
  24:24
**NYP** 17:17

**O**

**objective** 25:7
  25:10
**obstruction** 7:5
**obtained** 34:12
**obviously** 18:14
  22:18 29:21
**offer** 5:16 12:19
**oftentimes** 31:4
**Oh** 4:2,2
**okay** 10:9 11:25
  13:1,15 15:5
  15:12 16:12
  17:6 18:1 19:8
  21:8 32:24
  33:8 36:10,11
  36:12 40:2,6
**ongoing** 19:4

**opportunity**
  6:17 7:10,22
  40:1
**opposed** 12:15
**opposition** 22:8
  23:3
**optional** 38:12
**options** 19:15
**ORAL** 1:13
**order** 9:15 20:14
  21:3 22:3 27:6
  34:7
**ought** 32:25
**outcome** 25:1
**outlet** 17:13
  23:14
**outside** 22:2
**overlap** 26:9

**P**

**P.O** 2:5
**PAGE** 3:3
**Pages** 1:15 41:8
**panel** 18:15
**papers** 25:11
**Park** 2:11
**part** 13:5,7 15:6
  26:2
**particular** 20:15
  25:3
**parties** 13:24
  25:8 34:11
**party** 15:15
  25:23 26:3
  31:6 34:10
**party's** 12:18
**pay** 11:17 13:9
**people** 5:22 7:21
**percent** 21:18
**period** 34:18
**perjury** 7:4
**person** 21:3,5,5
  27:10 29:25
  32:13,14
**pertains** 15:10
**phase** 8:9 36:2
  39:25

**Phone** 2:6,12,17
**phonetic** 24:10
**phrase** 13:10
  26:19
**place** 17:2 37:22
**plagiarist** 6:10
**plagiarized** 5:9
**plaintiff** 23:21
  23:25
**plaintiffs** 23:18
**plausibility**
  22:11,15
**plausible** 36:9
  36:15
**plausibly** 5:1
  18:3
**pleading** 12:10
  12:14,20,21
  13:4,8,9 14:6
  14:16 15:1
  16:8 20:19,21
  21:20 22:10,19
  22:22,25 23:6
  23:17 27:12
**pleadings** 22:3
  24:3 27:21
  40:1
**please** 4:7 17:8
**pled** 5:19 6:7
  7:24
**point** 6:16 7:16
**pointed** 22:13
  27:7,25
**points** 4:10
**policy** 25:14
**position** 16:19
  19:25 26:6
  30:7 34:17
  36:20 39:22
**positions** 13:25
**possible** 31:15
**powerful** 17:19
**practical** 19:14
**practices** 12:16
**presented** 7:9
**Presti** 24:10
**prevailing** 12:17

15:15 34:10
**prevent** 25:11
25:15
**primarily** 9:23
10:10 25:23
26:2,3 27:10
28:5,9 32:14
32:17 34:20
35:1 39:4,18
**primary** 28:10
**principal** 19:23
**prior** 13:20,21
**problem** 11:8
**procedural**
11:19 14:17
15:23 26:10
**procedure** 11:21
17:2 21:9 34:4
**proceed** 7:25
**proceedings** 3:1
3:4 4:1 41:11
**produce** 13:24
**profession** 6:12
**program** 6:16
6:23
**prohibits** 21:1
**proper** 30:6
**properly** 4:11
5:19 7:24 34:2
**prospective**
29:18 30:15
**protected** 17:14
19:7 35:20,24
**protecting** 27:20
27:23
**provable** 35:14
**provably** 5:24
6:8 35:14
39:22
**prove** 8:2,8
34:24
**provide** 37:8
**provided** 6:18
24:15 41:10,13
**provides** 21:2
29:18
**provision** 4:13

12:14 24:20
36:17
**provisions** 24:25
**Pryor** 22:13
**Pryor's** 13:2
**public** 4:22,24
7:2 17:12
23:14
**punish** 17:13
**punishments**
31:4
**punitive** 24:12
**purport** 34:10
**purpose** 10:24
11:3,6 26:6
27:15 29:5,7
29:10,13,14
30:4,6,8,20
31:7,15,21
32:4,9,11 35:1
35:3
**purposes** 22:20
**pursuant** 36:18
37:19

**Q**
**query** 20:12
**question** 10:4,5
10:9 12:24
13:2,7 14:24
16:17 19:13,14
19:16 20:17
21:22 22:2,8
22:24 24:13,18
24:22 25:22
27:1 28:1 29:8
31:11,19,22,22
32:1,12,20,22
34:5
**questions** 16:15
18:16,17 40:4
**quick** 16:21

**R**
**R** 41:1
**read** 26:20,22
28:12 32:6,7

**real** 6:18
**really** 10:22
12:11 18:22
20:13 22:6
24:10 27:16
32:16
**reason** 10:7,12
19:14 32:24
**reasonable** 9:21
15:15 28:24
**reasonably**
28:25
**reasons** 8:16
**recognize** 17:18
**recognizes** 30:12
**recording** 1:12
41:10,13
**recoup** 10:17,19
11:21
**recovery** 12:2
16:24
**referenced** 34:2
**regular** 22:19
**regularly** 30:12
**related** 7:2
21:25
**relates** 24:4
**relevant** 25:2
**relief** 29:17
**repeated** 25:12
**repeats** 21:8
**Reported** 1:24
**REPORTER**
3:5
**reporting** 5:10
**represent** 4:8
17:10
**reproach** 5:6
**requested** 33:21
**required** 13:24
37:25
**requirement**
4:21 15:23
**requirements**
12:10 16:8
**requires** 32:3
**respective** 13:25

**respond** 6:18
7:11,22
**result** 26:15 36:3
**results** 7:3
**retaliation** 29:2
**retaliatory**
32:19
**retrospective**
29:19
**reward** 25:7
**right** 9:17,24,24
10:7,11 11:5
13:6 14:3,7
15:20,23 16:7
19:18 20:4
21:21 23:9
24:17 25:19,24
26:7,8,11,12
26:19 27:2,7
27:11,18 28:4
28:8,21 29:3,5
30:17 32:12,15
32:18,19 33:9
33:22 35:4,9
35:12,24 37:13
39:15,19
**rights** 16:2 22:1
25:24 26:4,14
28:8,11,20
30:2 34:22
35:2,7,12
**rise** 18:10 22:14
**Roger** 5:17 7:3
8:5
**role** 7:21
**rubric** 29:15
**Ruddy** 17:11
**rule** 5:20 7:24
9:17 10:3,6,14
10:18,23 11:6
11:8,20,23
12:4,12,19
14:23 16:8,8
16:10,10 19:20
20:8,15,21
24:11,17,24
25:1,3,7,11

26:10,18 27:2
27:4,19 29:8
29:16,17 30:14
30:21,22 31:2
31:15 34:13
38:16
**rules** 10:18
11:22 14:12
16:23 21:10,21
27:13 34:4
**ruling** 4:14 24:9

**S**
**sake** 36:7
**sanction** 25:4
**sanctions** 24:12
24:25 25:1,11
25:13 29:18,19
**saying** 9:10
10:20,23 24:20
25:21 26:5
29:12 30:18,19
39:6,20
**says** 6:3 8:20,21
9:21 11:3 13:5
13:20 14:9
15:3,4,22,25
24:24 26:2,2
28:4 29:3 32:9
34:20 37:25
38:11
**scheduled** 8:20
38:11
**se** 6:13
**section** 15:18,22
**see** 11:15
**seeing** 5:13
**seek** 20:19
**send** 19:5
**sense** 11:10 19:5
19:9
**sent** 16:15
**separate** 33:7
**serious** 5:8 18:7
**set** 13:14,22,23
**sets** 15:22
**seven** 12:1

shifting 12:9
  20:23 21:22
  23:24
show 7:7,8,12
  24:1 35:17
Showen 24:9
showing 39:2,8
side 25:22 26:2
  29:3
side's 11:18
sign 25:10
signed 27:21
silencing 11:4
simple 22:11
simply 21:1
  27:25
sir 5:14 7:23
  8:14 9:5,8
  14:14,18,21
  15:19,21,24
  34:1 35:25
  37:11,14
skepticism 18:15
SLAPP 38:2
sold 5:7 6:6
solely 29:25
somebody 10:11
  31:17
someone's 10:25
  35:2,6,17
sorry 10:18
  11:22 23:19
  30:16
sort 6:16 19:14
  29:1
sounds 7:14
South 2:16
speak 18:6 31:10
  39:19
speaking 27:17
  39:15
special 34:8
specifically 12:4
  15:10 16:4
specificity 8:19
specifies 5:21
speech 11:1,4

16:2 17:19
  19:7 25:16
  26:14 27:11
  28:20 32:15
  35:17,17,18,19
  35:20,24 39:5
  39:10
split 16:18 21:16
  22:21 36:23
stake 19:24
standard 4:23
  12:15 13:4,8
  13:10,11,16,18
  14:7,16 15:2,4
  16:9 20:19,24
  21:21 22:10,11
  22:22,25 23:6
  25:10 26:24
  27:3,13 28:10
  32:19 38:24
standards 12:20
  20:21 22:19
state 11:13 12:5
  17:4 20:17
  37:8,10,12
  41:4
state's 24:20
stated 23:12
statement 21:25
statements 7:18
  19:3 34:23
  35:15,20 39:22
states 1:1 8:19
  11:11
states' 12:8
station 6:19
statute 4:16,18
  8:13,15,17,18
  8:19,23,23,24
  9:1,20 11:2,16
  11:20 12:5,11
  13:3,5,7,12,17
  13:20,22 14:3
  14:20 15:2,6
  15:14 18:8
  20:25 21:1
  24:14,14 27:25

30:23 32:3
  34:16,20 36:19
  37:2,19,20,22
  37:25 38:2,5,9
  39:1,2,3
statutes 10:15
  11:11,12,14
  12:1,8
stay 21:12
Stenographer
  1:24 41:7,22
Stone 5:17 8:5,6
Stone's 7:4
Street 1:18
stuck 36:16
stuff 32:18 38:21
subject 33:6
submit 13:24
submitted 5:21
  14:22
substantive
  24:21 26:11,12
suggesting 30:11
suit 9:22 11:3
  18:9 26:13
  28:18 29:10,24
  31:20,21 39:16
suit's 16:1 39:12
Suite 2:11,16
suits 24:16
  25:15
summary 10:16
  21:6,12 38:16
supplemental
  21:7
supported 24:23
Supreme 16:17
  16:23 19:16
  24:23 25:6
  33:15,19
sure 12:22 14:25
  27:21 33:14
system 27:24

T

T 41:1,1
tag 7:17

take 19:5
talked 16:18
  26:10
talking 13:4
  29:22
talks 6:22 34:7
tampering 7:5
television 17:16
tell 8:10
terms 18:18
  19:25 21:19,22
  23:24 27:19
text 15:14 32:3
  38:5
thank 17:7
  20:10 33:23
  40:7
theory 5:16,18
thing 8:10 10:22
  10:24 15:13
  18:5
things 6:8,11
  16:10 25:16
  29:12
think 4:22 9:1,9
  12:7,20 13:11
  15:9 16:12,21
  17:1,3,23 18:4
  22:6,24 23:23
  24:9 26:18
  29:9,16 30:24
  31:2,13 33:1
  34:2 36:5,22
  39:7,25 40:2
thought 6:14,15
  7:1
thousand 33:11
thrust 28:18
Thursday 1:16
tied 12:14 25:1
time 6:18 31:8
  33:2,23 37:13
times 24:24
today 4:10 33:21
top 29:22
tort 15:6
tortfeasors 8:7

tough 4:21
trade 6:12 12:16
transcribed
  41:14
transcript 41:8
  41:9
TRANSCRIP...
  1:12
trial 34:6
true 41:9
truthfulness 5:6
try 33:16
trying 29:11,25
  30:22,24,25
  33:4
turn 20:16
TV 35:17
two 4:10 8:15
Twombly 20:22

U

ultimately 22:8
uncontested
  39:10
understand 5:14
  6:6 7:9,13
  12:22 14:25
  16:12 30:7
  35:25 36:4
  37:6 39:6,20
  40:2
undertaken
  20:23
unequivocally
  24:21
UNITED 1:1
untrue 5:23,24
  6:3
utter 19:2

V

v 1:6 17:17 24:9
variety 8:18
  12:11 24:7,8
  30:10,14
victimized 25:8
violation 8:22

9:7,8,11 15:17
18:10 39:3
**VOICE** 7:19
**vs** 4:2

**W**
**want** 7:15 11:11
16:19 18:2,22
18:23 19:3,22
33:14,18
**ward** 19:21
**wasn't** 22:8 23:5
37:15
**way** 7:9 11:15
14:19 28:24
30:2 31:5
**we're** 4:10 10:2
10:3 15:9
30:22,25 33:20
36:16 40:4
**we've** 11:9,25
16:17 33:21
**weird** 28:16
**well-founded**
25:3
**went** 7:8
**win** 12:15
**witness** 7:4
**wondered** 28:12
**word** 32:11
**words** 32:7,8
**worked** 6:5 8:6
**works** 14:3
**wouldn't** 21:17
23:8 38:13
**write** 7:15
**wrong** 6:15
37:16,20

**X**

**Y**
**yeah** 4:25 6:14
7:13 19:9 30:7
32:16 38:13
**York** 2:11,11

**Z**

**0**

**1**
**1** 1:15 41:8
**10169** 2:11
**11** 9:17 10:3,6
10:14,18,23
11:6,8,23 12:4
12:12,19 16:10
16:10 24:11,17
24:24 25:1,7
25:11 26:18
27:2,4,19 29:8
29:16,17 30:14
30:21,22 31:2
31:15
**1130** 2:11
**11th** 20:10,12,14
24:11
**12** 34:4
**12(b)(6)** 4:12
10:16 20:8,21
22:11 34:13,15
36:16 38:15
**12th** 1:17
**19** 1:16

**2**
**201** 2:16
**2022** 1:16 41:17
**21-10480** 1:2
**212-404-8714**
2:12
**212-818-9606**
2:12
**230** 2:11
**2nd** 41:17

**3**
**305-402-0544**
2:17
**305-960-2253**
2:17
**33131** 2:16
**33132** 1:19

**334-262-8200**
2:6
**334-819-4072**
2:6
**3400** 2:16
**36103** 2:5

**4**
**4** 3:4
**40** 41:9
**41** 1:15 3:5
**4894** 2:5

**5**
**50,000** 33:10,17
**56** 34:4 38:16

**6**

**7**
**768.295** 25:18

**8**
**8** 5:20 7:24
14:23 16:8,8

**9**
**99** 1:18